### TO STRENGTHEN THE AIR RESERVES

Again on February 5, 1934, I introduced H.R. 7657, for the better organizing and training of the Air Reserves. This element of our national defense consists of young men who have obtained training as pilots and have received commissions as Reserve officers in the Air Corps of the United States Army, and are ready at any instant to be called into the service of the Nation. My purpose is to insure more thorough and satisfactory tactical training for these Reserve officers of the Air Corps. They are men of the highest patriotism, who are willing to give of their time and strength and talents in order to keep themselves ready for a national emergency. It is very little to ask of the Nation to give them some training each year in formation flying so that they may the better be prepared to fight, if fight they must.

### JUNIOR AIR CORPS RESERVES

Then again on January 29, 1934, I introduced H.R. 7413, to organize the junior Air Corps Reserve as a civilian component of the United States Army. I believe this is a most constructive piece of legislation. It encourages all persons between the ages of 18 and 21 to learn to become pilots so that they, too, may be a reservoir from which Reserves may be finally withdrawn, and also from which the Air Corps itself may be finally supplied with flying material, both officers and enlisted men. Flying is not only the work but actually is the sport of young men. All the boys of the Nation are filled with an ardent love for flying. If this enthusiasm can be capitalized for the defense of the Nation it will be a great asset. Under my plan, perhaps 10,000 young men may annually be graduated into the junior Air Corps Reserves with practically no expense to the Nation. These young persons love the sport of flying so much and will be so inspired by the thought that they may be of service to the country, and will receive some suitable recognition of such service, that they will give of their money and of their time in order to prepare themselves for this kind of service. I am receiving many responses from all parts of the country to this suggestion, and I believe it is bound to be one of the most far-reaching and useful defense measures ever suggested to the Congress. It appeals to the love of daring and the spirit of adventure in all youth, and turns these youthful traits into the service of the Nation without cost or charge. It contains vast possibilities for good.

### REVISION OF FEDERAL FOOD AND DRUGS ACT

Mrs. JENCKES of Indiana. Mr. Speaker, I ask unanimous consent to extend my own remarks in the RECORD.

The SPEAKER. Without objection, it is so ordered.

There was no objection.

Mrs. JENCKES of Indiana. Mr. Speaker, I introduced a bill in the House today designed to thoroughly revise the Federal Food and Drugs Act and strengthen materially its protection to consumers.

The bill introduced extends the Food and Drugs Act to include cosmetics, therapeutic devices, and substances other than food to remedy a structural or functional defect of the body, prohibiting their adulteration, misbranding, and false advertisement. It also extends the act to prohibit the false advertisement of food and drugs. Administrative powers and enforcement provisions of the act are strengthened by the addition of an injunction proceeding, enlargement of the administrative authority of publicity, and increased penalties.

An important provision of my bill calls for the establishment of an administrative board of review of five members, appointed by the President, acting independently of the Department of Agriculture, to which any adverse decision rendered by the Secretary of Agriculture under the act may be appealed. The decision of the board of review would be binding upon the Secretary of Agriculture.

I contend that because of the vast scope of the affected advertising and the difficulties of administering an act regulating it, such a board of review is a necessary safeguard which will in no way lessen the protection given the consuming public under the act.

Publishers and other disseminators of advertising are relieved of responsibility for the dissemination of false advertising for others, as are dealers handling adulterated or misbranded articles purchased by them in good faith.

Collection and examination of representative samples of food, drugs, and cosmetics is provided for, and delivery of a part of each sample to the person affected, for check analysis, is required. An administrative hearing is provided for before a criminal prosecution, and the Secretary of Agriculture is empowered to settle violations on the basis of a warning, or notice or agreement to cease and desist if he believes such a settlement satisfies the act.

As revised by my bill the Food and Drugs Act is extended, as follows:

First. To include cosmetics: Cosmetics are brought under the act and their adulteration, misbranding, and false advertisement are prohibited. A cosmetic is declared adulterated if it contains any poisonous or deleterious substance which renders it injurious to health, when it is used as directed or customary. A cosmetic is declared misbranded if its label is false in any particular, or if its label, while not false, is actually and injuriously misleading to the purchasing public in any particular.

Second. To include therapeutic devices: Such devices are brought under the act by including them within the term "drug", and their adulteration, misbranding, and false advertisement are prohibited. A device is declared adulterated if it is injurious to health, when it is used as directed by the seller. A device is declared misbranded if it is offered for sale in pursuance of any representation regarding its use, value, or effect, which is false in any particular, or which, while not false, is actually and injuriously misleading to the purchasing public in any particular.

Third. To include all substances, other than food, intended for use to remedially affect the structure or any function of the body: Such substances—for example, obesity remedies—are brought under the act by including them within the term "drug", and their adulteration, misbranding, and false advertisement are prohibited. Any such substance is declared adulterated if it is injurious to health, when used as directed. It is declared misbranded if its label is false in any particular, or if its label, while not false, is actually and injuriously misleading to the purchasing public in any particular.

Fourth. To include the false advertisement of food, drugs, and cosmetics: Such advertisement is brought under the act and prohibited. An advertisement is declared false if it is false in any particular; or if, while not false, it is actually and injuriously misleading to the purchasing public in any particular. But it is provided that no representation upon the label or in an advertisement, regarding the value or effect of a drug, shall be deemed false if it is supported by substantial medical opinion or by demonstrable scientific facts. Likewise it is provided that no representation upon the label or in an advertisement, regarding the value or effect of a food or cosmetic, shall be deemed false if it is supported by substantial scientific opinion or by demonstrable scientific facts.

Fifth. To broaden the definition of food: This definition is broadened to include ingredients of food and their adulteration is specially defined. An ingredient is declared adulterated if its use in food renders such food injurious to health or unfit for consumption.

Sixth. To broaden the definition of the adulteration of food: This definition is broadened to outlaw any food dangerous to public health; also a food whose container bears or is composed of any poisonous or deleterious substance which by contamination renders such food injurious to health; also a food prepared, packed, or held under insanitary conditions, whereby it has become contaminated with filth and is unfit for consumption; also a food containing any admixture to deceptively increase its bulk or weight.

Seventh. To broaden the definition of the misbranding of food: This definition is broadened to outlaw deceptively made, formed, or filled containers; also to require the name and address of a manufacturer or seller on the label; also to prohibit the sale of any food falling below the minimum

standard of identity, quality, and/or fill prescribed by the Secretary of Agriculture, unless its label plainly indicates that fact. The Secretary is empowered to establish one minimum standard of identity, quality, and/or fill for each generic class of food, which is reasonable in character and necessary for the purposes of the act, but proprietary foods are excluded from this power if they comply with the other provisions of this act; and in prescribing such standard the Secretary is required to follow good commercial practice if and to the extent he can do so consistently with the public interest. The standard is subject to approval by an expert committee on food advisory to the Secretary. The committee is appointed by the President and consists of nine members proportionately representative of the Department of Agriculture, the food-manufacturing industry, and the public at large.

Eighth. To broaden the definition of the adulteration of drugs: This definition is broadened to outlaw any drug if it is injurious to health when it is used as a medicine or remedy as directed; also to expressly include drugs recognized in the Homeopathic Pharmacopœia of the United States; also to empower the Secretary of Agriculture to prescribe reasonable tests or methods of assay for official drugs, if they are not officially prescribed, after public hearing and subject to approval by an expert committee advisory to the Secretary, consisting of five members appointed by the President; also to outlaw any injurious or deceptive admixture or substitution.

Ninth. To broaden the definition of the misbranding of drugs: This definition is broadened to outlaw deceptively made, formed, or filled containers; also to require the name and address of the manufacturer or seller on the label; also to require an adequate statement of directions and any necessary warning on the label, with certain exceptions; also to require the label declaration of certain narcotic or hypnotic or dangerous ingredients; also to require a precautionary statement on the label of drugs subject to injurious deterioration.

Tenth. To increase the penalties: That penalties are ranged up to a fine of not less than $1,000 nor more than $10,000 or imprisonment for not less than 1 year nor more than 3 years, or both, in the case of a gross and willful violation highly dangerous to the public health.

Eleventh. To permit an injunction proceeding: The district courts of the United States are vested with jurisdiction to restrain by temporary injunction a violation of the act in issue before any such court in a proceeding under the act if probable cause is shown that the public interest requires such injunction, and to restrain by permanent injunction a violation of the act with respect of which a final court judgment in favor of the United States has been entered in a proceeding under the act.

Twelfth. To enlarge the publicity power of the Secretary of Agriculture: The Secretary is empowered to disseminate general and correct information regarding food, drugs, or cosmetics consistent with the provisions of the act and necessary to safeguard the public health and to protect the purchasing public from fraud, provided that such information shall not refer by trade name or otherwise to a particular product unless and until it has been finally adjudged adulterated or misbranded in a court proceeding under the act, except in cases actually involving imminent danger to public health or gross deception of the purchasing public.

As so revised by my bill the act is subject to these exceptions:

First. The act does not apply to any regularly established common carrier in the ordinary conduct of its business in good faith as a common carrier. This exception is not in the present act.

Second. The act does not apply to any food, drug, or cosmetic shipped for export to a foreign country in a form complying with the laws of such country and acceptable to the foreign consignee, provided that if the article is diverted for domestic use, it becomes subject to the act. This exception is in the present act.

Third. No person acting in the capacity of publisher, advertising agency, radio broadcast licensee, or any commercial disseminator of advertisement for another is deemed in violation of the act because of his dissemination for another of a false advertisement by another. But if any such person willfully refuses or neglects to disclose the name and address of the party who caused him to disseminate any advertisement subject to investigation under the act, upon official request, he is guilty of a misdemeanor subject to a fine of not more than $500 for each offense. This exception is not in the present act, because it does not apply to advertisements.

Fourth. No person acting in the capacity of dealer is deemed in violation of the act because of his commerce in an adulterated or misbranded food, drug, or cosmetic secured by him from another, if its adulteration or misbranding occurred prior to the receipt of the article by the dealer and he has no knowledge of such adulteration or misbranding. But if any dealer willfully refuses or neglects to disclose the name and address of the party from whom he secured any article subject to investigation under the act, upon official request, he is guilty of a misdemeanor subject to a similar fine. This exception is not in the present act.

Fifth. No person acting in the capacity of a dealer may be prosecuted under the act with respect of any food, drug, or cosmetic secured by him from another, residing in the United States, if he establishes a dated guaranty signed by and containing the address of such other person, to the effect that the article when and as delivered by such other person is not adulterated or misbranded within the meaning of the act. This exception is in the present act in a broader form.

NATIONAL DEFENSE WEEK

Mrs. ROGERS of Massachusetts. Mr. Speaker, I ask unanimous consent to proceed for one-half minute.

The SPEAKER. Is there objection to the request of the lady from Massachusetts?

There was no objection.

Mrs. ROGERS of Massachusetts. I ask unanimous consent to revise and extend my remarks and to include therein an editorial on Lincoln's Birthday and our national defense which appeared in the Washington Herald on Lincoln's Birthday.

The SPEAKER. Is there objection?

There was no objection.

Mrs. ROGERS of Massachusetts. I wish to direct the attention of the Members of the House to National Defense Week which is now being observed and sponsored by various patriotic societies, in order that the people of the United States may think of the importance of our national defense and its relation to our national economic well-being.

National Defense Week is being sponsored by the following organizations: Daughters of the American Revolution, American War Mothers, Reserve Officers' Association, American Legion, Navy League, Military Order of the World War, Navy Reserve Officers' Association, Coalition of Patriotic Societies, and other patriotic societies.

These organizations have undertaken to render a worthwhile patriotic service to the country in acquainting our citizens with the necessity of adequate national defense. They are disseminating useful information concerning our Army, Navy, and Marine Corps. They are conducting and sponsoring essay contests in our educational institutions on such subjects as The Navy and Our Trade Lanes and The Economic Value of the Soldier.

This last subject, The Economic Value of the Soldier, is very dear to me, because the Army has so ably shown in the past 12 months its economic value. I refer particularly to its service in the conservation of our natural resources and the conservation of the youth of our country in connection with the Civilian Conservation Corps. Further, according to our recent announcements, in connection with the cancelation of the air mail contracts the Army regular pilots and reserve pilots will again serve the country. These are two recent illustrations of how the Army serves in peace time. Those who served in the World War know what it does in war time.