2981

1    Indian Self-Determination and Education Assistance

2    Act (25 U.S.C. 5304).

3         (2) RECLAMATION STATE.—The term "Rec-

4    lamation State" means a State or territory described

5    in the first section of the Act of June 17, 1902 (32

6    Stat. 388, chapter 1093; 43 U.S.C. 391).

7         (3) SECRETARY.—The term "Secretary" means

8    the Secretary of the Interior.

# TITLE XII—HORSERACING
# INTEGRITY AND SAFETY

**SEC. 1201. SHORT TITLE.**

12    This title may be cited as the "Horseracing Integrity

13    and Safety Act of 2020".

**SEC. 1202. DEFINITIONS.**

15    In this Act the following definitions apply:

16         (1) AUTHORITY.—The term "Authority" means

17    the Horseracing Integrity and Safety Authority des-

18    ignated by section 1203(a).

19         (2) BREEDER.—The term "breeder" means a

20    person who is in the business of breeding covered

21    horses.

22         (3) COMMISSION.—The term "Commission"

23    means the Federal Trade Commission.

24         (4) COVERED HORSE.—The term "covered

25    horse" means any Thoroughbred horse, or any other

2982

1    horse made subject to this Act by election of the ap-
2    plicable State racing commission or the breed gov-
3    erning organization for such horse under section
4    1205(k), during the period—

5        (A) beginning on the date of the horse's
6        first timed and reported workout at a racetrack
7        that participates in covered horseraces or at a
8        training facility; and

9        (B) ending on the date on which the Au-
10       thority receives written notice that the horse
11       has been retired.

12    (5) COVERED HORSERACE.—The term "covered
13    horserace" means any horserace involving covered
14    horses that has a substantial relation to interstate
15    commerce, including any Thoroughbred horserace
16    that is the subject of interstate off-track or advance
17    deposit wagers.

18    (6) COVERED PERSONS.—The term "covered
19    persons" means all trainers, owners, breeders, jock-
20    eys, racetracks, veterinarians, persons (legal and
21    natural) licensed by a State racing commission and
22    the agents, assigns, and employees of such persons
23    and other horse support personnel who are engaged
24    in the care, training, or racing of covered horses.

2983

(7) EQUINE CONSTITUENCIES.—The term "equine constituencies" means, collectively, owners, breeders, trainers, racetracks, veterinarians, State racing commissions, and jockeys who are engaged in the care, training, or racing of covered horses.

(8) EQUINE INDUSTRY REPRESENTATIVE.—The term "equine industry representative" means an organization regularly and significantly engaged in the equine industry, including organizations that represent the interests of, and whose membership consists of, owners, breeders, trainers, racetracks, veterinarians, State racing commissions, and jockeys.

(9) HORSERACING ANTI-DOPING AND MEDICATION CONTROL PROGRAM.—The term "horseracing anti-doping and medication control program" means the anti-doping and medication program established under section 1206(a).

(10) IMMEDIATE FAMILY MEMBER.—The term "immediate family member" shall include a spouse, domestic partner, mother, father, aunt, uncle, sibling, or child.

(11) INTERSTATE OFF-TRACK WAGER.—The term "interstate off-track wager" has the meaning given such term in section 3 of the Interstate Horseracing Act of 1978 (15 U.S.C. 3002).

2984

1          (12) JOCKEY.—The term "jockey" means a

2      rider or driver of a covered horse in covered

3      horseraces.

4          (13) OWNER.—The term "owner" means a per-

5      son who holds an ownership interest in one or more

6      covered horses.

7          (14) PROGRAM EFFECTIVE DATE.—The term

8      "program effective date" means July 1, 2022.

9          (15) RACETRACK.—The term "racetrack"

10     means an organization licensed by a State racing

11     commission to conduct covered horseraces.

12         (16) RACETRACK SAFETY PROGRAM.—The term

13     "racetrack safety program" means the program es-

14     tablished under section 1207(a).

15         (17) STAKES RACE.—The term "stakes race"

16     means any race so designated by the racetrack at

17     which such race is run, including, without limitation,

18     the races comprising the Breeders' Cup World

19     Championships and the races designated as graded

20     stakes by the American Graded Stakes Committee of

21     the Thoroughbred Owners and Breeders Association.

22         (18) STATE RACING COMMISSION.—The term

23     "State racing commission" means an entity des-

24     ignated by State law or regulation that has jurisdic-

2985

1 tion over the conduct of horseracing within the ap-

2 plicable State.

3 (19) TRAINER.—The term "trainer" means an

4 individual engaged in the training of covered horses.

5 (20) TRAINING FACILITY.—The term "training

6 facility" means a location that is not a racetrack li-

7 censed by a State racing commission that operates

8 primarily to house covered horses and conduct offi-

9 cial timed workouts.

10 (21) VETERINARIAN.—The term "veterinarian"

11 means a licensed veterinarian who provides veteri-

12 nary services to covered horses.

13 (22) WORKOUT.—The term "workout" means a

14 timed running of a horse over a predetermined dis-

15 tance not associated with a race or its first quali-

16 fying race, if such race is made subject to this Act

17 by election under section 1205(k) of the horse's

18 breed governing organization or the applicable State

19 racing commission.

20 **SEC. 1203. RECOGNITION OF THE HORSERACING INTEG-**

21 **RITY AND SAFETY AUTHORITY.**

22 (a) IN GENERAL.—The private, independent, self-

23 regulatory, nonprofit corporation, to be known as the

24 "Horseracing Integrity and Safety Authority", is recog-

25 nized for purposes of developing and implementing a

2986

1  horseracing anti-doping and medication control program

2  and a racetrack safety program for covered horses, cov-

3  ered persons, and covered horseraces.

4      (b) BOARD OF DIRECTORS.—

5          (1) MEMBERSHIP.—The Authority shall be gov-

6      erned by a board of directors (in this section re-

7      ferred to as the ''Board'') comprised of nine mem-

8      bers as follows:

9              (A) INDEPENDENT MEMBERS.—Five mem-

10         bers of the Board shall be independent mem-

11         bers selected from outside the equine industry.

12             (B) INDUSTRY MEMBERS.—

13                 (i) IN GENERAL.—Four members of

14             the Board shall be industry members se-

15             lected from among the various equine con-

16             stituencies.

17                 (ii) REPRESENTATION OF EQUINE

18             CONSTITUENCIES.—The industry members

19             shall be representative of the various

20             equine constituencies, and shall include not

21             more than one industry member from any

22             one equine constituency.

23         (2) CHAIR.—The chair of the Board shall be an

24     independent member described in paragraph (1)(A).

2987

(3) BYLAWS.—The Board of the Authority shall be governed by bylaws for the operation of the Authority with respect to—

(A) the administrative structure and employees of the Authority;

(B) the establishment of standing committees;

(C) the procedures for filling vacancies on the Board and the standing committees;

(D) term limits for members and termination of membership; and

(E) any other matter the Board considers necessary.

(c) STANDING COMMITTEES.—

(1) ANTI-DOPING AND MEDICATION CONTROL STANDING COMMITTEE.—

(A) IN GENERAL.—The Authority shall establish an anti-doping and medication control standing committee, which shall provide advice and guidance to the Board on the development and maintenance of the horseracing anti-doping and medication control program.

(B) MEMBERSHIP.—The anti-doping and medication control standing committee shall be comprised of seven members as follows:

2988

1    (i) INDEPENDENT MEMBERS.—A ma-
2    jority of the members shall be independent
3    members selected from outside the equine
4    industry.

5    (ii) INDUSTRY MEMBERS.—A minority
6    of the members shall be industry members
7    selected to represent the various equine
8    constituencies, and shall include not more
9    than one industry member from any one
10    equine constituency.

11    (iii) QUALIFICATION.—A majority of
12    individuals selected to serve on the anti-
13    doping and medication control standing
14    committee shall have significant, recent ex-
15    perience in anti-doping and medication
16    control rules.

17    (C) CHAIR.—The chair of the anti-doping
18    and medication control standing committee
19    shall be an independent member of the Board
20    described in subsection (b)(1)(A).

21    (2) RACETRACK SAFETY STANDING COM-
22    MITTEE.—

23    (A) IN GENERAL.—The Authority shall es-
24    tablish a racetrack safety standing committee,
25    which shall provide advice and guidance to the

2989

1     Board on the development and maintenance of

2     the racetrack safety program.

3         (B) MEMBERSHIP.—The racetrack safety

4     standing committee shall be comprised of seven

5     members as follows:

6             (i) INDEPENDENT MEMBERS.—A ma-

7         jority of the members shall be independent

8         members selected from outside the equine

9         industry.

10            (ii) INDUSTRY MEMBERS.—A minority

11         of the members shall be industry members

12         selected to represent the various equine

13         constituencies.

14         (C) CHAIR.—The chair of the racetrack

15     safety standing committee shall be an industry

16     member of the Board described in subsection

17     (b)(1)(B).

18     (d) NOMINATING COMMITTEE.—

19     (1) MEMBERSHIP.—

20         (A) IN GENERAL.—The nominating com-

21     mittee of the Authority shall be comprised of

22     seven independent members selected from busi-

23     ness, sports, and academia.

24         (B) INITIAL MEMBERSHIP.—The initial

25     nominating committee members shall be set

2990

1  forth in the governing corporate documents of

2  the Authority.

3      (C) VACANCIES.—After the initial com-

4  mittee members are appointed in accordance

5  with subparagraph (B), vacancies shall be filled

6  by the Board pursuant to rules established by

7  the Authority.

8  (2) CHAIR.—The chair of the nominating com-

9  mittee shall be selected by the nominating committee

10  from among the members of the nominating com-

11  mittee.

12  (3) SELECTION OF MEMBERS OF THE BOARD

13  AND STANDING COMMITTEES.—

14      (A) INITIAL MEMBERS.—The nominating

15  committee shall select the initial members of

16  the Board and the standing committees de-

17  scribed in subsection (c).

18      (B) SUBSEQUENT MEMBERS.— The nomi-

19  nating committee shall recommend individuals

20  to fill any vacancy on the Board or on such

21  standing committees.

22  (e) CONFLICTS OF INTEREST.—To avoid conflicts of

23  interest, the following individuals may not be selected as

24  a member of the Board or as an independent member of

25  a nominating or standing committee under this section:

2991

1        (1) An individual who has a financial interest

2    in, or provides goods or services to, covered horses.

3        (2) An official or officer—

4            (A) of an equine industry representative;

5        or

6            (B) who serves in a governance or policy-

7        making capacity for an equine industry rep-

8        resentative.

9        (3) An employee of, or an individual who has a

10    business or commercial relationship with, an indi-

11    vidual described in paragraph (1) or (2).

12        (4) An immediate family member of an indi-

13    vidual described in paragraph (1) or (2).

14    (f) FUNDING.—

15        (1) INITIAL FUNDING.—

16            (A) IN GENERAL.—Initial funding to es-

17        tablish the Authority and underwrite its oper-

18        ations before the program effective date shall be

19        provided by loans obtained by the Authority.

20            (B) BORROWING.—The Authority may bor-

21        row funds toward the funding of its operations.

22            (C) ANNUAL CALCULATION OF AMOUNTS

23        REQUIRED.—

24            (i) IN GENERAL.—Not later than the

25        date that is 90 days before the program ef-

2992

1          fective date, and not later than November
2          1 each year thereafter, the Authority shall
3          determine and provide to each State racing
4          commission the estimated amount required
5          from the State—

6                    (I) to fund the State's propor-
7               tionate share of the horseracing anti-
8               doping and medication control pro-
9               gram and the racetrack safety pro-
10              gram for the next calendar year; and

11                   (II) to liquidate the State's pro-
12              portionate share of any loan or fund-
13              ing shortfall in the current calendar
14              year and any previous calendar year.

15          (ii) BASIS OF CALCULATION.—The
16          amounts calculated under clause (i) shall—

17                   (I) be based on—

18                        (aa) the annual budget of
19                   the Authority for the following
20                   calendar year, as approved by the
21                   Board; and

22                        (bb) the projected amount of
23                   covered racing starts for the year
24                   in each State; and

2993

1          (II) take into account other

2          sources of Authority revenue.

3          (iii) Requirements regarding

4          budgets of authority.—

5          (I) Initial budget.—The initial

6          budget of the Authority shall require

7          the approval of ⅔ of the Board.

8          (II) Subsequent budgets.—

9          Any subsequent budget that exceeds

10         the budget of the preceding calendar

11         year by more than 5 percent shall re-

12         quire the approval of ⅔ of the Board.

13         (iv) Rate increases.—

14         (I) In general.—A proposed in-

15         crease in the amount required under

16         this subparagraph shall be reported to

17         the Commission.

18         (II) Notice and comment.—

19         The Commission shall publish in the

20         Federal Register such a proposed in-

21         crease and provide an opportunity for

22         public comment.

23     (2) Assessment and collection of fees by

24 states.—

2994

1        (A) NOTICE OF ELECTION.—Any State
2    racing commission that elects to remit fees pur-
3    suant to this subsection shall notify the Author-
4    ity of such election not later than 60 days be-
5    fore the program effective date.

6        (B) REQUIREMENT TO REMIT FEES.—
7    After a State racing commission makes a notifi-
8    cation under subparagraph (A), the election
9    shall remain in effect and the State racing com-
10   mission shall be required to remit fees pursuant
11   to this subsection according to a schedule estab-
12   lished in rule developed by the Authority and
13   approved by the Commission.

14       (C) WITHDRAWAL OF ELECTION.—A State
15   racing commission may cease remitting fees
16   under this subsection not earlier than one year
17   after notifying the Authority of the intent of
18   the State racing commission to do so.

19       (D) DETERMINATION OF METHODS.—Each
20   State racing commission shall determine, sub-
21   ject to the applicable laws, regulations, and con-
22   tracts of the State, the method by which the
23   requisite amount of fees, such as foal registra-
24   tion fees, sales contributions, starter fees, and

U:\2021OMNI\14OMNI\DivO-FF.xml                                          SEN. APPRO.

2995

1    track fees, and other fees on covered persons,
2    shall be allocated, assessed, and collected.
3        (3) ASSESSMENT AND COLLECTION OF FEES BY
4    THE AUTHORITY.—
5            (A) CALCULATION.—If a State racing com-
6        mission does not elect to remit fees pursuant to
7        paragraph (2) or withdraws its election under
8        such paragraph, the Authority shall, not less
9        frequently than monthly, calculate the applica-
10       ble fee per racing start multiplied by the num-
11       ber of racing starts in the State during the pre-
12       ceding month.
13           (B) ALLOCATION.—The Authority shall al-
14       locate equitably the amount calculated under
15       subparagraph (A) collected among covered per-
16       sons involved with covered horseraces pursuant
17       to such rules as the Authority may promulgate.
18           (C) ASSESSMENT AND COLLECTION.—
19               (i) IN GENERAL.—The Authority shall
20           assess a fee equal to the allocation made
21           under subparagraph (B) and shall collect
22           such fee according to such rules as the Au-
23           thority may promulgate.
24               (ii) REMITTANCE OF FEES.—Covered
25           persons described in subparagraph (B)

2996

1        shall be required to remit such fees to the
2        Authority.
3            (D) LIMITATION.—A State racing commis-
4        sion that does not elect to remit fees pursuant
5        to paragraph (2) or that withdraws its election
6        under such paragraph shall not impose or col-
7        lect from any person a fee or tax relating to
8        anti-doping and medication control or racetrack
9        safety matters for covered horseraces.
10        (4) FEES AND FINES.—Fees and fines imposed
11    by the Authority shall be allocated toward funding
12    of the Authority and its activities.
13        (5) RULE OF CONSTRUCTION.—Nothing in this
14    Act shall be construed to require—
15            (A) the appropriation of any amount to the
16        Authority; or
17            (B) the Federal Government to guarantee
18        the debts of the Authority.
19    (g) QUORUM.—For all items where Board approval
20 is required, the Authority shall have present a majority
21 of independent members.
22 **SEC. 1204. FEDERAL TRADE COMMISSION OVERSIGHT.**
23    (a) IN GENERAL.—The Authority shall submit to the
24 Commission, in accordance with such rules as the Com-
25 mission may prescribe under section 553 of title 5, United

2997

1　States Code, any proposed rule, or proposed modification

2　to a rule, of the Authority relating to—

3　　　　(1) the bylaws of the Authority;

4　　　　(2) a list of permitted and prohibited medica-

5　tions, substances, and methods, including allowable

6　limits of permitted medications, substances, and

7　methods;

8　　　　(3) laboratory standards for accreditation and

9　protocols;

10　　　　(4) standards for racing surface quality mainte-

11　nance;

12　　　　(5) racetrack safety standards and protocols;

13　　　　(6) a program for injury and fatality data anal-

14　ysis;

15　　　　(7) a program of research and education on

16　safety, performance, and anti-doping and medication

17　control;

18　　　　(8) a description of safety, performance, and

19　anti-doping and medication control rule violations

20　applicable to covered horses and covered persons;

21　　　　(9) a schedule of civil sanctions for violations;

22　　　　(10) a process or procedures for disciplinary

23　hearings; and

24　　　　(11) a formula or methodology for determining

25　assessments described in section 1203(f).

2998

1    (b) PUBLICATION AND COMMENT.—

2        (1) IN GENERAL.—The Commission shall—

3            (A) publish in the Federal Register each

4            proposed rule or modification submitted under

5            subsection (a); and

6            (B) provide an opportunity for public com-

7            ment.

8        (2) APPROVAL REQUIRED.—A proposed rule, or

9    a proposed modification to a rule, of the Authority

10    shall not take effect unless the proposed rule or

11    modification has been approved by the Commission.

12    (c) DECISION ON PROPOSED RULE OR MODIFICA-

13    TION TO A RULE.—

14        (1) IN GENERAL.—Not later than 60 days after

15    the date on which a proposed rule or modification is

16    published in the Federal Register, the Commission

17    shall approve or disapprove the proposed rule or

18    modification.

19        (2) CONDITIONS.—The Commission shall ap-

20    prove a proposed rule or modification if the Commis-

21    sion finds that the proposed rule or modification is

22    consistent with—

23            (A) this Act; and

24            (B) applicable rules approved by the Com-

25            mission.

2999

1        (3) REVISION OF PROPOSED RULE OR MODI-

2    FICATION.—

3            (A) IN GENERAL.—In the case of dis-

4        approval of a proposed rule or modification

5        under this subsection, not later than 30 days

6        after the issuance of the disapproval, the Com-

7        mission shall make recommendations to the Au-

8        thority to modify the proposed rule or modifica-

9        tion.

10            (B) RESUBMISSION.—The Authority may

11        resubmit for approval by the Commission a pro-

12        posed rule or modification that incorporates the

13        modifications    recommended    under    subpara-

14        graph (A).

15    (d) PROPOSED STANDARDS AND PROCEDURES.—

16        (1) IN GENERAL.—The Authority shall submit

17    to the Commission any proposed rule, standard, or

18    procedure developed by the Authority to carry out

19    the horseracing anti-doping and medication control

20    program or the racetrack safety program.

21        (2) NOTICE AND COMMENT.—The Commission

22    shall publish in the Federal Register any such pro-

23    posed rule, standard, or procedure and provide an

24    opportunity for public comment.

3000

1    (e) INTERIM FINAL RULES.—The Commission may
2 adopt an interim final rule, to take effect immediately,
3 under conditions specified in section 553(b)(B) of title 5,
4 United States Code, if the Commission finds that such a
5 rule is necessary to protect—

6        (1) the health and safety of covered horses; or
7        (2) the integrity of covered horseraces and wa-
8     gering on those horseraces.

9 SEC. 1205. JURISDICTION OF THE COMMISSION AND THE
10           HORSERACING INTEGRITY AND SAFETY AU-
11           THORITY.

12    (a) IN GENERAL.—Beginning on the program effec-
13 tive date, the Commission, the Authority, and the anti-
14 doping and medication control enforcement agency, each
15 within the scope of their powers and responsibilities under
16 this Act, as limited by subsection (j), shall—

17        (1) implement and enforce the horseracing anti-
18     doping and medication control program and the
19     racetrack safety program;

20        (2) exercise independent and exclusive national
21     authority over—

22           (A) the safety, welfare, and integrity of
23        covered horses, covered persons, and covered
24        horseraces; and

3001

   (B) all horseracing safety, performance,
and anti-doping and medication control matters
for covered horses, covered persons, and covered
horseraces; and

  (3) have safety, performance, and anti-doping
and medication control authority over covered persons similar to such authority of the State racing
commissions before the program effective date.

 (b) PREEMPTION.—The rules of the Authority promulgated in accordance with this Act shall preempt any provision of State law or regulation with respect to matters within the jurisdiction of the Authority under this Act, as limited by subsection (j). Nothing contained in this Act shall be construed to limit the authority of the Commission under any other provision of law.

 (c) DUTIES.—

  (1) IN GENERAL.—The Authority—

   (A) shall develop uniform procedures and
rules authorizing—

    (i) access to offices, racetrack facilities, other places of business, books,
records, and personal property of covered
persons that are used in the care, treatment, training, and racing of covered
horses;

3002

1          (ii) issuance and enforcement of sub-
2      poenas and subpoenas duces tecum; and
3          (iii) other investigatory powers of the
4      nature and scope exercised by State racing
5      commissions before the program effective
6      date; and
7      (B) with respect to an unfair or deceptive
8  act or practice described in section 1210, may
9  recommend that the Commission commence an
10  enforcement action.
11      (2) APPROVAL OF COMMISSION.—The proce-
12  dures and rules developed under paragraph (1)(A)
13  shall be subject to approval by the Commission in
14  accordance with section 1204.
15      (d) REGISTRATION OF COVERED PERSONS WITH AU-
16  THORITY.—
17      (1) IN GENERAL.—As a condition of partici-
18  pating in covered races and in the care, ownership,
19  treatment, and training of covered horses, a covered
20  person shall register with the Authority in accord-
21  ance with rules promulgated by the Authority and
22  approved by the Commission in accordance with sec-
23  tion 1204.
24      (2) AGREEMENT WITH RESPECT TO AUTHORITY
25  RULES, STANDARDS, AND PROCEDURES.—Registra-

U:\2021OMNI\14OMNI\DivO-FF.xml                                    SEN. APPRO.

3003

1    tion under this subsection shall include an agree-

2    ment by the covered person to be subject to and

3    comply with the rules, standards, and procedures de-

4    veloped and approved under subsection (c).

5        (3) COOPERATION.—A covered person reg-

6    istered under this subsection shall, at all times—

7            (A) cooperate with the Commission, the

8        Authority, the anti-doping and medication con-

9        trol enforcement agency, and any respective

10       designee, during any civil investigation; and

11           (B) respond truthfully and completely to

12       the best of the knowledge of the covered person

13       if questioned by the Commission, the Authority,

14       the anti-doping and medication control enforce-

15       ment agency, or any respective designee.

16       (4) FAILURE TO COMPLY.—Any failure of a

17   covered person to comply with this subsection shall

18   be a violation of section 1208(a)(2)(G).

19   (e) ENFORCEMENT OF PROGRAMS.—

20       (1) ANTI-DOPING AND MEDICATION CONTROL

21   ENFORCEMENT AGENCY.—

22           (A) AGREEMENT WITH USADA.—The Au-

23       thority shall seek to enter into an agreement

24       with the United States Anti-Doping Agency

25       under which the Agency acts as the anti-doping

3004

1     and medication control enforcement agency

2     under this Act for services consistent with the

3     horseracing anti-doping and medication control

4     program.

5     (B) AGREEMENT WITH OTHER ENTITY.—If

6     the Authority and the United States Anti-

7     Doping Agency are unable to enter into the

8     agreement described in subparagraph (A), the

9     Authority shall enter into an agreement with an

10    entity that is nationally recognized as being a

11    medication regulation agency equal in qualifica-

12    tion to the United States Anti-Doping Agency

13    to act as the anti-doping and medication control

14    enforcement agency under this Act for services

15    consistent with the horseracing anti-doping and

16    medication control program.

17    (C) NEGOTIATIONS.—Any negotiations

18    under this paragraph shall be conducted in

19    good faith and designed to achieve efficient, ef-

20    fective best practices for anti-doping and medi-

21    cation control and enforcement on commercially

22    reasonable terms.

23    (D) ELEMENTS OF AGREEMENT.—Any

24    agreement under this paragraph shall include a

25    description of the scope of work, performance

3005

1    metrics, reporting obligations, and budgets of

2    the United States Anti-Doping Agency while

3    acting as the anti-doping and medication con-

4    trol enforcement agency under this Act, as well

5    as a provision for the revision of the agreement

6    to increase in the scope of work as provided for

7    in subsection (k), and any other matter the Au-

8    thority considers appropriate.

9    (E) DUTIES AND POWERS OF ENFORCE-

10    MENT AGENCY.—The anti-doping and medica-

11    tion control enforcement agency under an

12    agreement under this paragraph shall—

13    (i) serve as the independent anti-

14    doping and medication control enforcement

15    organization for covered horses, covered

16    persons, and covered horseraces, imple-

17    menting the anti-doping and medication

18    control program on behalf of the Author-

19    ity;

20    (ii) ensure that covered horses and

21    covered persons are deterred from using or

22    administering medications, substances, and

23    methods in violation of the rules estab-

24    lished in accordance with this Act;

3006

1          (iii) implement anti-doping education,
2     research, testing, compliance and adjudica-
3     tion programs designed to prevent covered
4     persons and covered horses from using or
5     administering medications, substances, and
6     methods in violation of the rules estab-
7     lished in accordance with this Act;
8          (iv) exercise the powers specified in
9     section 1206(c)(4) in accordance with that
10    section; and
11         (v) implement and undertake any
12    other responsibilities specified in the agree-
13    ment.
14    (F) TERM AND EXTENSION.—
15         (i) TERM OF INITIAL AGREEMENT.—
16    The initial agreement entered into by the
17    Authority under this paragraph shall be in
18    effect for the 5-year period beginning on
19    the program effective date.
20         (ii) EXTENSION.—At the end of the 5-
21    year period described in clause (i), the Au-
22    thority may—
23              (I) extend the term of the initial
24         agreement under this paragraph for
25         such additional term as is provided by

3007

1          the rules of the Authority and con-
2          sistent with this Act; or

3              (II) enter into an agreement
4          meeting the requirements of this para-
5          graph with an entity described by sub-
6          paragraph (B) for such term as is
7          provided by such rules and consistent
8          with this Act.

9     (2) AGREEMENTS FOR ENFORCEMENT BY
10   STATE RACING COMMISSIONS.—

11          (A) STATE RACING COMMISSIONS.—

12              (i) RACETRACK SAFETY PROGRAM.—
13          The Authority may enter into agreements
14          with State racing commissions for services
15          consistent with the enforcement of the
16          racetrack safety program.

17              (ii) ANTI-DOPING AND MEDICATION
18          CONTROL PROGRAM.—The anti-doping and
19          medication control enforcement agency
20          may enter into agreements with State rac-
21          ing commissions for services consistent
22          with the enforcement of the anti-doping
23          and medication control program.

24          (B) ELEMENTS OF AGREEMENTS.—Any
25   agreement under this paragraph shall include a

3008

1       description of the scope of work, performance

2       metrics, reporting obligations, budgets, and any

3       other matter the Authority considers appro-

4       priate.

5       (3) ENFORCEMENT OF STANDARDS.—The Au-

6    thority may coordinate with State racing commis-

7    sions and other State regulatory agencies to monitor

8    and enforce racetrack compliance with the standards

9    developed under paragraphs (1) and (2) of section

10    1207(c).

11    (f) PROCEDURES WITH RESPECT TO RULES OF AU-

12  THORITY.—

13       (1) ANTI-DOPING AND MEDICATION CON-

14       TROL.—

15           (A) IN GENERAL.—Recommendations for

16           rules regarding anti-doping and medication con-

17           trol shall be developed in accordance with sec-

18           tion 1206.

19           (B) CONSULTATION.—The anti-doping and

20           medication control enforcement agency shall

21           consult with the anti-doping and medication

22           control standing committee and the Board of

23           the Authority on all anti-doping and medication

24           control rules of the Authority.

3009

1  (2) RACETRACK SAFETY.—Recommendations

2 for rules regarding racetrack safety shall be devel-

3 oped by the racetrack safety standing committee of

4 the Authority.

5 (g) ISSUANCE OF GUIDANCE.—

6  (1) The Authority may issue guidance that—

7   (A) sets forth—

8    (i) an interpretation of an existing

9    rule, standard, or procedure of the Author-

10    ity; or

11    (ii) a policy or practice with respect to

12    the administration or enforcement of such

13    an existing rule, standard, or procedure;

14    and

15   (B) relates solely to—

16    (i) the administration of the Author-

17    ity; or

18    (ii) any other matter, as specified by

19    the Commission, by rule, consistent with

20    the public interest and the purposes of this

21    subsection.

22  (2) SUBMITTAL TO COMMISSION.—The Author-

23 ity shall submit to the Commission any guidance

24 issued under paragraph (1).

U:\2021OMNI\14OMNI\DivO-FF.xml                                SEN. APPRO.

3010

1      (3) IMMEDIATE EFFECT.—Guidance issued

2    under paragraph (1) shall take effect on the date on

3    which the guidance is submitted to the Commission

4    under paragraph (2).

5  (h) SUBPOENA AND INVESTIGATORY AUTHORITY.—

6 The Authority shall have subpoena and investigatory au-

7 thority with respect to civil violations committed under its

8 jurisdiction.

9  (i) CIVIL PENALTIES.—The Authority shall develop

10 a list of civil penalties with respect to the enforcement of

11 rules for covered persons and covered horseraces under its

12 jurisdiction.

13  (j) CIVIL ACTIONS.—

14      (1) IN GENERAL.—In addition to civil sanctions

15    imposed under section 1208, the Authority may

16    commence a civil action against a covered person or

17    racetrack that has engaged, is engaged, or is about

18    to engage, in acts or practices constituting a viola-

19    tion of this Act or any rule established under this

20    Act in the proper district court of the United States,

21    the United States District Court for the District of

22    Columbia, or the United States courts of any terri-

23    tory or other place subject to the jurisdiction of the

24    United States, to enjoin such acts or practices, to

25    enforce any civil sanctions imposed under that sec-

U:\2021OMNI\14OMNI\DivO-FF.xml                                        SEN. APPRO.

3011

1    tion, and for all other relief to which the Authority

2    may be entitled.

3        (2) INJUNCTIONS AND RESTRAINING ORDERS.—

4    With respect to a civil action commenced under

5    paragraph (1), upon a proper showing, a permanent

6    or temporary injunction or restraining order shall be

7    granted without bond.

8    (k) LIMITATIONS ON AUTHORITY.—

9        (1) PROSPECTIVE APPLICATION.—The jurisdic-

10    tion and authority of the Authority and the Commis-

11    sion with respect to the horseracing anti-doping and

12    medication control program and the racetrack safety

13    program shall be prospective only.

14        (2) PREVIOUS MATTERS.—

15            (A) IN GENERAL.—The Authority and the

16        Commission may not investigate, prosecute, ad-

17        judicate, or penalize conduct in violation of the

18        horseracing anti-doping and medication control

19        program and the racetrack safety program that

20        occurs before the program effective date.

21            (B) STATE RACING COMMISSION.—With re-

22        spect to conduct described in subparagraph (A),

23        the applicable State racing commission shall re-

24        tain authority until the final resolution of the

25        matter.

3012

(3) OTHER LAWS UNAFFECTED.—This Act shall not be construed to modify, impair or restrict the operation of the general laws or regulations, as may be amended from time to time, of the United States, the States and their political subdivisions relating to criminal conduct, cruelty to animals, matters unrelated to antidoping, medication control and racetrack and racing safety of covered horses and covered races, and the use of medication in human participants in covered races.

(l) ELECTION FOR OTHER BREED COVERAGE UNDER ACT.—

(1) IN GENERAL.—A State racing commission or a breed governing organization for a breed of horses other than Thoroughbred horses may elect to have such breed be covered by this Act by the filing of a designated election form and subsequent approval by the Authority. A State racing commission may elect to have a breed covered by this Act for the applicable State only.

(2) ELECTION CONDITIONAL ON FUNDING MECHANISM.—A commission or organization may not make an election under paragraph (1) unless the commission or organization has in place a mechanism to provide sufficient funds to cover the costs of

3013

1    the administration of this Act with respect to the
2    horses that will be covered by this Act as a result
3    of the election.

4        (3) APPORTIONMENT.—The Authority shall ap-
5    portion costs described in paragraph (2) in connec-
6    tion with an election under paragraph (1) fairly
7    among all impacted segments of the horseracing in-
8    dustry, subject to approval by the Commission in ac-
9    cordance with section 1204. Such apportionment
10   may not provide for the allocation of costs or funds
11   among breeds of horses.

12   **SEC. 1206. HORSERACING ANTI-DOPING AND MEDICATION**
13   **CONTROL PROGRAM.**

14   (a) PROGRAM REQUIRED.—

15       (1) IN GENERAL.—Not later than the program
16   effective date, and after notice and an opportunity
17   for public comment in accordance with section 1204,
18   the Authority shall establish a horseracing anti-
19   doping and medication control program applicable to
20   all covered horses, covered persons, and covered
21   horseraces in accordance with the registration of
22   covered persons under section 1205(d).

23       (2) CONSIDERATION OF OTHER BREEDS.—In
24   developing the horseracing anti-doping and medica-
25   tion control program with respect to a breed of horse

3014

1    that is made subject to this Act by election of a

2    State racing commission or the breed governing or-

3    ganization for such horse under section 1205(k), the

4    Authority shall consider the unique characteristics of

5    such breed.

6    (b) CONSIDERATIONS IN DEVELOPMENT OF PRO-

7    GRAM.—In developing the horseracing anti-doping and

8    medication control program, the Authority shall take into

9    consideration the following:

10        (1) Covered horses should compete only when

11        they are free from the influence of medications,

12        other foreign substances, and methods that affect

13        their performance.

14        (2) Covered horses that are injured or unsound

15        should not train or participate in covered races, and

16        the use of medications, other foreign substances, and

17        treatment methods that mask or deaden pain in

18        order to allow injured or unsound horses to train or

19        race should be prohibited.

20        (3) Rules, standards, procedures, and protocols

21        regulating medication and treatment methods for

22        covered horses and covered races should be uniform

23        and uniformly administered nationally.

24        (4) To the extent consistent with this Act, con-

25        sideration should be given to international anti-

3015

1　doping and medication control standards of the
2　International Federation of Horseracing Authorities
3　and the Principles of Veterinary Medical Ethics of
4　the American Veterinary Medical Association.

5　　(5) The administration of medications and
6　treatment methods to covered horses should be
7　based upon an examination and diagnosis that iden-
8　tifies an issue requiring treatment for which the
9　medication or method represents an appropriate
10　component of treatment.

11　　(6) The amount of therapeutic medication that
12　a covered horse receives should be the minimum nec-
13　essary to address the diagnosed health concerns
14　identified during the examination and diagnostic
15　process.

16　　(7) The welfare of covered horses, the integrity
17　of the sport, and the confidence of the betting public
18　require full disclosure to regulatory authorities re-
19　garding the administration of medications and treat-
20　ments to covered horses.

21　(c) ACTIVITIES.—The following activities shall be car-
22　ried out under the horseracing anti-doping and medication
23　control program:

24　　(1) STANDARDS FOR ANTI-DOPING AND MEDI-
25　CATION CONTROL.—Not later than 120 days before

3016

1   the program effective date, the Authority shall issue,

2   by rule—

3        (A) uniform standards for—

4             (i) the administration of medication to

5        covered horses by covered persons; and

6             (ii) laboratory testing accreditation

7        and protocols; and

8        (B) a list of permitted and prohibited

9        medications, substances, and methods, including

10       allowable limits of permitted medications, sub-

11       stances, and methods.

12       (2) REVIEW PROCESS FOR ADMINISTRATION OF

13   MEDICATION.—The development of a review process

14   for the administration of any medication to a cov-

15   ered horse during the 48-hour period preceding the

16   next racing start of the covered horse.

17       (3) AGREEMENT REQUIREMENTS.—The devel-

18   opment of requirements with respect to agreements

19   under section 1205(e).

20       (4) ANTI-DOPING AND MEDICATION CONTROL

21   ENFORCEMENT AGENCY.—

22       (A) CONTROL RULES, PROTOCOLS, ETC.—

23       Except as provided in paragraph (5), the anti-

24       doping and medication control program enforce-

25       ment agency under section 1205(e) shall, in

3017

1    consultation with the anti-doping and medica-
2    tion control standing committee of the Author-
3    ity and consistent with international best prac-
4    tices, develop and recommend anti-doping and
5    medication control rules, protocols, policies, and
6    guidelines for approval by the Authority.

7        (B) RESULTS MANAGEMENT.—The anti-
8    doping and medication control enforcement
9    agency shall conduct and oversee anti-doping
10   and medication control results management, in-
11   cluding independent investigations, charging
12   and adjudication of potential medication control
13   rule violations, and the enforcement of any civil
14   sanctions for such violations. Any final decision
15   or civil sanction of the anti-doping and medica-
16   tion control enforcement agency under this sub-
17   paragraph shall be the final decision or civil
18   sanction of the Authority, subject to review in
19   accordance with section 1209.

20       (C) TESTING.—The anti-doping enforce-
21   ment agency shall perform and manage test dis-
22   tribution planning (including intelligence-based
23   testing), the sample collection process, and in-
24   competition and out-of-competition testing (in-
25   cluding no-advance-notice testing).

3018

1          (D) TESTING LABORATORIES.—The anti-
2     doping and medication control enforcement
3     agency shall accredit testing laboratories based
4     upon the standards established under this Act,
5     and shall monitor, test, and audit accredited
6     laboratories to ensure continuing compliance
7     with accreditation standards.

8     (5) ANTI-DOPING AND MEDICATION CONTROL
9     STANDING COMMITTEE.—The anti-doping and medi-
10    cation control standing committee shall, in consulta-
11    tion with the anti-doping and medication control en-
12    forcement agency, develop lists of permitted and pro-
13    hibited medications, methods, and substances for
14    recommendation to, and approval by, the Authority.
15    Any such list may prohibit the administration of any
16    substance or method to a horse at any time after
17    such horse becomes a covered horse if the Authority
18    determines such substance or method has a long-
19    term degrading effect on the soundness of a horse.

20    (d) PROHIBITION.—Except as provided in sub-
21    sections (e) and (f), the horseracing anti-doping and medi-
22    cation control program shall prohibit the administration
23    of any prohibited or otherwise permitted substance to a
24    covered horse within 48 hours of its next racing start, ef-
25    fective as of the program effective date.

3019

1    (e) ADVISORY COMMITTEE STUDY AND REPORT.—

2        (1) IN GENERAL.—Not later than the program

3    effective date, the Authority shall convene an advi-

4    sory committee comprised of horseracing anti-doping

5    and medication control industry experts, including a

6    member designated by the anti-doping and medica-

7    tion control enforcement agency, to conduct a study

8    on the use of furosemide on horses during the 48-

9    hour period before the start of a race, including the

10   effect of furosemide on equine health and the integ-

11   rity of competition and any other matter the Author-

12   ity considers appropriate.

13       (2) REPORT.—Not later than three years after

14   the program effective date, the Authority shall direct

15   the advisory committee convened under paragraph

16   (1) to submit to the Authority a written report on

17   the study conducted under that paragraph that in-

18   cludes recommended changes, if any, to the prohibi-

19   tion in subsection (d).

20       (3) MODIFICATION OF PROHIBITION.—

21           (A) IN GENERAL.—After receipt of the re-

22       port required by paragraph (2), the Authority

23       may, by unanimous vote of the Board of the

24       Authority, modify the prohibition in subsection

25       (d) and, notwithstanding subsection (f), any

3020

1    such modification shall apply to all States be-
2    ginning on the date that is three years after the
3    program effective date.

4         (B) CONDITION.—In order for a unani-
5    mous vote described in subparagraph (A) to ef-
6    fect a modification of the prohibition in sub-
7    section (d), the vote must include unanimous
8    adoption of each of the following findings:

9              (i) That the modification is war-
10        ranted.

11             (ii) That the modification is in the
12        best interests of horse racing.

13             (iii) That furosemide has no perform-
14        ance enhancing effect on individual horses.

15             (iv) That public confidence in the in-
16        tegrity and safety of racing would not be
17        adversely affected by the modification.

18    (f) EXEMPTION.—

19         (1) IN GENERAL.—Except as provided in para-
20    graph (2), only during the three-year period begin-
21    ning on the program effective date, a State racing
22    commission may submit to the Authority, at such
23    time and in such manner as the Authority may re-
24    quire, a request for an exemption from the prohibi-

U:\2021OMNI\14OMNI\DivO-FF.xml                                        SEN. APPRO.

3021

1    tion in subsection (d) with respect to the use of
2    furosemide on covered horses during such period.

3        (2) EXCEPTIONS.—An exemption under para-
4    graph (1) may not be requested for—

5            (A) two-year-old covered horses; or

6            (B) covered horses competing in stakes
7        races.

8        (3) CONTENTS OF REQUEST.—A request under
9    paragraph (1) shall specify the applicable State rac-
10   ing commission's requested limitations on the use of
11   furosemide that would apply to the State under the
12   horseracing anti-doping and medication control pro-
13   gram during such period. Such limitations shall be
14   no less restrictive on the use and administration of
15   furosemide than the restrictions set forth in State's
16   laws and regulations in effect as of September 1,
17   2020.

18       (4) GRANT OF EXEMPTION.—Subject to sub-
19   section (e)(3), the Authority shall grant an exemp-
20   tion requested under paragraph (1) for the remain-
21   der of such period and shall allow the use of
22   furosemide on covered horses in the applicable State,
23   in accordance with the requested limitations.

24   (g) BASELINE ANTI-DOPING AND MEDICATION CON-
25   TROL RULES.—

3022

1       (1) IN GENERAL.—Subject to paragraph (3),
2   the baseline anti-doping and medication control rules
3   described in paragraph (2) shall—

4           (A) constitute the initial rules of the horse-
5       racing anti-doping and medication control pro-
6       gram; and

7           (B) except as exempted pursuant to sub-
8       sections (e) and (f), remain in effect at all
9       times after the program effective date.

10      (2) BASELINE ANTI-DOPING MEDICATION CON-
11  TROL RULES DESCRIBED.—

12          (A) IN GENERAL.—The baseline anti-
13      doping and medication control rules described
14      in this paragraph are the following:

15              (i) The lists of permitted and prohib-
16          ited substances (including drugs, medica-
17          tions, and naturally occurring substances
18          and synthetically occurring substances) in
19          effect for the International Federation of
20          Horseracing Authorities, including the
21          International Federation of Horseracing
22          Authorities International Screening Limits
23          for urine, dated May 2019, and the Inter-
24          national Federation of Horseracing Au-

3023

1    thorities International Screening Limits for
2    plasma, dated May 2019.

3        (ii) The World Anti-Doping Agency
4    International Standard for Laboratories
5    (version 10.0), dated November 12, 2019.

6        (iii) The Association of Racing Com-
7    missioners International out-of-competition
8    testing standards, Model Rules of Racing
9    (version 9.2).

10        (iv) The Association of Racing Com-
11    missioners International penalty and mul-
12    tiple medication violation rules, Model
13    Rules of Racing (version 6.2).

14        (B) CONFLICT OF RULES.—In the case of
15    a conflict among the rules described in subpara-
16    graph (A), the most stringent rule shall apply.

17    (3) MODIFICATIONS TO BASELINE RULES.—

18        (A) DEVELOPMENT BY ANTI-DOPING AND
19    MEDICATION CONTROL STANDING COM-
20    MITTEE.—The anti-doping and medication con-
21    trol standing committee, in consultation with
22    the anti-doping and medication control enforce-
23    ment agency, may develop and submit to the
24    Authority for approval by the Authority pro-

3024

1    posed modifications to the baseline anti-doping

2    and medication control rules.

3        (B) AUTHORITY APPROVAL.—If the Au-

4    thority approves a proposed modification under

5    this paragraph, the proposed modification shall

6    be submitted to and considered by the Commis-

7    sion in accordance with section 1204.

8        (C) ANTI-DOPING AND MEDICATION CON-

9    TROL ENFORCEMENT AGENCY VETO AUTHOR-

10   ITY.—The Authority shall not approve any pro-

11   posed modification that renders an anti-doping

12   and medication control rule less stringent than

13   the baseline anti-doping and medication control

14   rules described in paragraph (2) (including by

15   increasing permitted medication thresholds,

16   adding permitted medications, removing prohib-

17   ited medications, or weakening enforcement

18   mechanisms) without the approval of the anti-

19   doping and medication control enforcement

20   agency.

21   **SEC. 1207. RACETRACK SAFETY PROGRAM.**

22       (a) ESTABLISHMENT AND CONSIDERATIONS.—

23           (1) IN GENERAL.—Not later than the program

24       effective date, and after notice and an opportunity

25       for public comment in accordance with section 1204,

3025

1   the Authority shall establish a racetrack safety pro-

2   gram applicable to all covered horses, covered per-

3   sons, and covered horseraces in accordance with the

4   registration of covered persons under section

5   1205(d).

6       (2) CONSIDERATIONS IN DEVELOPMENT OF

7   SAFETY PROGRAM.—In the development of the

8   horseracing safety program for covered horses, cov-

9   ered persons, and covered horseraces, the Authority

10   and the Commission shall take into consideration ex-

11   isting safety standards including the National Thor-

12   oughbred Racing Association Safety and Integrity

13   Alliance Code of Standards, the International Fed-

14   eration of Horseracing Authority's International

15   Agreement on Breeding, Racing, and Wagering, and

16   the British Horseracing Authority's Equine Health

17   and Welfare program.

18   (b) ELEMENTS OF HORSERACING SAFETY PRO-

19   GRAM.—The horseracing safety program shall include the

20   following:

21       (1) A set of training and racing safety stand-

22   ards and protocols taking into account regional dif-

23   ferences and the character of differing racing facili-

24   ties.

3026

1    (2) A uniform set of training and racing safety

2    standards and protocols consistent with the humane

3    treatment of covered horses, which may include lists

4    of permitted and prohibited practices or methods

5    (such as crop use).

6    (3) A racing surface quality maintenance sys-

7    tem that—

8        (A) takes into account regional differences

9        and the character of differing racing facilities;

10       and

11       (B) may include requirements for track

12       surface design and consistency and established

13       standard operating procedures related to track

14       surface, monitoring, and maintenance (such as

15       standardized seasonal assessment, daily track-

16       ing, and measurement).

17   (4) A uniform set of track safety standards and

18   protocols, that may include rules governing oversight

19   and movement of covered horses and human and

20   equine injury reporting and prevention.

21   (5) Programs for injury and fatality data anal-

22   ysis, that may include pre- and post-training and

23   race inspections, use of a veterinarian's list, and

24   concussion protocols.

U:\2021OMNI\14OMNI\DivO-FF.xml                                    SEN. APPRO.

3027

1    (6) The undertaking of investigations at race-
2    track and non-racetrack facilities related to safety
3    violations.

4    (7) Procedures for investigating, charging, and
5    adjudicating violations and for the enforcement of
6    civil sanctions for violations.

7    (8) A schedule of civil sanctions for violations.

8    (9) Disciplinary hearings, which may include
9    binding arbitration, civil sanctions, and research.

10    (10) Management of violation results.

11    (11) Programs relating to safety and perform-
12    ance research and education.

13    (12) An evaluation and accreditation program
14    that ensures that racetracks in the United States
15    meet the standards described in the elements of the
16    Horseracing Safety Program.

17    (c) ACTIVITIES.—The following activities shall be car-
18  ried out under the racetrack safety program:

19    (1) STANDARDS FOR RACETRACK SAFETY.—
20    The development, by the racetrack safety standing
21    committee of the Authority in section 1203(c)(2) of
22    uniform standards for racetrack and horseracing
23    safety.

24    (2) STANDARDS FOR SAFETY AND PERFORM-
25    ANCE ACCREDITATION.—

U:\2021OMNI\14OMNI\DivO-FF.xml                                    SEN. APPRO.

3028

1        (A) IN GENERAL.—Not later than 120

2        days before the program effective date, the Au-

3        thority, in consultation with the racetrack safe-

4        ty standing committee, shall issue, by rule in

5        accordance with section 1204—

6        (i) safety and performance standards

7        of accreditation for racetracks; and

8        (ii) the process by which a racetrack

9        may achieve and maintain accreditation by

10        the Authority.

11        (B) MODIFICATIONS.—

12        (i) IN GENERAL.—The Authority may

13        modify rules establishing the standards

14        issued under subparagraph (A), as the Au-

15        thority considers appropriate.

16        (ii) NOTICE AND COMMENT.—The

17        Commission shall publish in the Federal

18        Register any proposed rule of the Author-

19        ity, and provide an opportunity for public

20        comment with respect to, any modification

21        under clause (i) in accordance with section

22        1204.

23        (C) EXTENSION OF PROVISIONAL OR IN-

24        TERIM ACCREDITATION.—The Authority may,

25        by rule in accordance with section 1204, extend

3029

1          provisional or interim accreditation to a race-
2          track accredited by the National Thoroughbred
3          Racing Association Safety and Integrity Alli-
4          ance on a date before the program effective
5          date.

6          (3) NATIONWIDE SAFETY AND PERFORMANCE
7      DATABASE.—

8          (A) IN GENERAL.—Not later than one year
9          after the program effective date, and after no-
10         tice and an opportunity for public comment in
11         accordance with section 1204, the Authority, in
12         consultation with the Commission, shall develop
13         and maintain a nationwide database of race-
14         horse safety, performance, health, and injury
15         information for the purpose of conducting an
16         epidemiological study.

17         (B) COLLECTION OF INFORMATION.—In
18         accordance with the registration of covered per-
19         sons under section 1205(d), the Authority may
20         require covered persons to collect and submit to
21         the database described in subparagraph (A)
22         such information as the Authority may require
23         to further the goal of increased racehorse wel-
24         fare.

3030

**SEC. 1208. RULE VIOLATIONS AND CIVIL SANCTIONS.**

(a) DESCRIPTION OF RULE VIOLATIONS.—

(1) IN GENERAL.—The Authority shall issue, by rule in accordance with section 1204, a description of safety, performance, and anti-doping and medication control rule violations applicable to covered horses and covered persons.

(2) ELEMENTS.—The description of rule violations established under paragraph (1) may include the following:

(A) With respect to a covered horse, strict liability for covered trainers for—

(i) the presence of a prohibited substance or method in a sample or the use of a prohibited substance or method;

(ii) the presence of a permitted substance in a sample in excess of the amount allowed by the horseracing anti-doping and medication control program; and

(iii) the use of a permitted method in violation of the applicable limitations established under the horseracing anti-doping and medication control program.

(B) Attempted use of a prohibited substance or method on a covered horse.

3031

1    (C) Possession of any prohibited substance

2    or method.

3    (D) Attempted possession of any prohib-

4    ited substance or method.

5    (E) Administration or attempted adminis-

6    tration of any prohibited substance or method

7    on a covered horse.

8    (F) Refusal or failure, without compelling

9    justification, to submit a covered horse for sam-

10    ple collection.

11    (G) Failure to cooperate with the Author-

12    ity or an agent of the Authority during any in-

13    vestigation.

14    (H) Failure to respond truthfully, to the

15    best of a covered person's knowledge, to a ques-

16    tion of the Authority or an agent of the Author-

17    ity with respect to any matter under the juris-

18    diction of the Authority.

19    (I) Tampering or attempted tampering

20    with the application of the safety, performance,

21    or anti-doping and medication control rules or

22    process adopted by the Authority, including—

23    (i) the intentional interference, or an

24    attempt to interfere, with an official or

25    agent of the Authority;

3032

(ii) the procurement or the provision
of fraudulent information to the Authority
or agent; and

(iii) the intimidation of, or an attempt
to intimidate, a potential witness.

(J) Trafficking or attempted trafficking in
any prohibited substance or method.

(K) Assisting, encouraging, aiding, abet-
ting, conspiring, covering up, or any other type
of intentional complicity involving a safety, per-
formance, or anti-doping and medication control
rule violation or the violation of a period of sus-
pension or eligibility.

(L) Threatening or seeking to intimidate a
person with the intent of discouraging the per-
son from the good faith reporting to the Au-
thority, an agent of the Authority or the Com-
mission, or the anti-doping and medication con-
trol enforcement agency under section 1205(e),
of information that relates to—

(i) an alleged safety, performance, or
anti-doping and medication control rule
violation; or

3033

1          (ii) alleged noncompliance with a safe-
2          ty, performance, or anti-doping and medi-
3          cation control rule.
4    (b) TESTING LABORATORIES.—
5          (1) ACCREDITATION AND STANDARDS.—Not
6    later than 120 days before the program effective
7    date, the Authority shall, in consultation with the
8    anti-doping and medication control enforcement
9    agency, establish, by rule in accordance with section
10   1204—
11          (A) standards of accreditation for labora-
12          tories involved in testing samples from covered
13          horses;
14          (B) the process for achieving and main-
15          taining accreditation; and
16          (C) the standards and protocols for testing
17          such samples.
18          (2) ADMINISTRATION.—The accreditation of
19   laboratories and the conduct of audits of accredited
20   laboratories to ensure compliance with Authority
21   rules shall be administered by the anti-doping and
22   medication control enforcement agency. The anti-
23   doping and medication control enforcement agency
24   shall have the authority to require specific test sam-

3034

1  ples to be directed to and tested by laboratories hav-

2  ing special expertise in the required tests.

3    (3) EXTENSION OF PROVISIONAL OR INTERIM

4  ACCREDITATION.—The Authority may, by rule in ac-

5  cordance with section 1204, extend provisional or in-

6  terim accreditation to a laboratory accredited by the

7  Racing Medication and Testing Consortium, Inc., on

8  a date before the program effective date.

9    (4) SELECTION OF LABORATORIES.—

10      (A) IN GENERAL.—Except as provided in

11    paragraph (2), a State racing commission may

12    select a laboratory accredited in accordance

13    with the standards established under paragraph

14    (1) to test samples taken in the applicable

15    State.

16      (B) SELECTION BY THE AUTHORITY.—If a

17    State racing commission does not select an ac-

18    credited laboratory under subparagraph (A),

19    the Authority shall select such a laboratory to

20    test samples taken in the State concerned.

21    (c) RESULTS MANAGEMENT AND DISCIPLINARY

22  PROCESS.—

23    (1) IN GENERAL.—Not later than 120 days be-

24  fore the program effective date, the Authority shall

25  establish in accordance with section 1204—

U:\2021OMNI\14OMNI\DivO-FF.xml                                         SEN. APPRO.

3035

1          (A) rules for safety, performance, and anti-
2      doping and medication control results manage-
3      ment; and

4          (B) the disciplinary process for safety, per-
5      formance, and anti-doping and medication con-
6      trol rule violations.

7      (2) ELEMENTS.—The rules and process estab-
8  lished under paragraph (1) shall include the fol-
9  lowing:

10          (A) Provisions for notification of safety,
11      performance, and anti-doping and medication
12      control rule violations.

13          (B) Hearing procedures.

14          (C) Standards for burden of proof.

15          (D) Presumptions.

16          (E) Evidentiary rules.

17          (F) Appeals.

18          (G) Guidelines for confidentiality and pub-
19      lic reporting of decisions.

20      (3) DUE PROCESS.—The rules established
21  under paragraph (1) shall provide for adequate due
22  process, including impartial hearing officers or tribu-
23  nals commensurate with the seriousness of the al-
24  leged safety, performance, or anti-doping and medi-

3036

1  cation control rule violation and the possible civil

2  sanctions for such violation.

3  (d) CIVIL SANCTIONS.—

4      (1) IN GENERAL.—The Authority shall estab-

5  lish uniform rules, in accordance with section 1204,

6  imposing civil sanctions against covered persons or

7  covered horses for safety, performance, and anti-

8  doping and medication control rule violations.

9      (2)  REQUIREMENTS.—The  rules  established

10  under paragraph (1) shall—

11          (A) take into account the unique aspects of

12      horseracing;

13          (B) be designed to ensure fair and trans-

14      parent horseraces; and

15          (C) deter safety, performance, and anti-

16      doping and medication control rule violations.

17      (3) SEVERITY.—The civil sanctions under para-

18  graph (1) may include—

19          (A)  lifetime  bans  from  horseracing,

20      disgorgement of purses, monetary fines and

21      penalties, and changes to the order of finish in

22      covered races; and

23          (B) with respect to anti-doping and medi-

24      cation control rule violators, an opportunity to

25      reduce  the  applicable  civil  sanctions  that  is

3037

1  comparable to the opportunity provided by the
2  Protocol for Olympic Movement Testing of the
3  United States Anti-Doping Agency.

4  (e) MODIFICATIONS.—The Authority may propose a
5  modification to any rule established under this section as
6  the Authority considers appropriate, and the proposed
7  modification shall be submitted to and considered by the
8  Commission in accordance with section 1204.

9  **SEC. 1209. REVIEW OF FINAL DECISIONS OF THE AUTHOR-**
10  **ITY.**

11  (a) NOTICE OF CIVIL SANCTIONS.— If the Authority
12  imposes a final civil sanction for a violation committed by
13  a covered person pursuant to the rules or standards of
14  the Authority, the Authority shall promptly submit to the
15  Commission notice of the civil sanction in such form as
16  the Commission may require.

17  (b) REVIEW BY ADMINISTRATIVE LAW JUDGE.—

18  (1) IN GENERAL.—With respect to a final civil
19  sanction imposed by the Authority, on application by
20  the Commission or a person aggrieved by the civil
21  sanction filed not later than 30 days after the date
22  on which notice under subsection (a) is submitted,
23  the civil sanction shall be subject to de novo review
24  by an administrative law judge.

25  (2) NATURE OF REVIEW.—

U:\2021OMNI\14OMNI\DivO-FF.xml                                    SEN. APPRO.

3038

1          (A) IN GENERAL.—In matters reviewed

2     under this subsection, the administrative law

3     judge shall determine whether—

4               (i) a person has engaged in such acts

5          or practices, or has omitted such acts or

6          practices, as the Authority has found the

7          person to have engaged in or omitted;

8               (ii) such acts, practices, or omissions

9          are in violation of this Act or the anti-

10         doping and medication control or racetrack

11         safety rules approved by the Commission;

12         or

13              (iii) the final civil sanction of the Au-

14         thority was arbitrary, capricious, an abuse

15         of discretion, or otherwise not in accord-

16         ance with law.

17         (B) CONDUCT OF HEARING.—An adminis-

18    trative law judge shall conduct a hearing under

19    this subsection in such a manner as the Com-

20    mission may specify by rule, which shall con-

21    form to section 556 of title 5, United States

22    Code.

23    (3) DECISION BY ADMINISTRATIVE LAW

24    JUDGE.—

3039

    (A) IN GENERAL.—With respect to a mat-
ter reviewed under this subsection, an adminis-
trative law judge—

    (i) shall render a decision not later
than 60 days after the conclusion of the
hearing;

    (ii) may affirm, reverse, modify, set
aside, or remand for further proceedings,
in whole or in part, the final civil sanction
of the Authority; and

    (iii) may make any finding or conclu-
sion that, in the judgment of the adminis-
trative law judge, is proper and based on
the record.

    (B) FINAL DECISION.—A decision under
this paragraph shall constitute the decision of
the Commission without further proceedings
unless a notice or an application for review is
timely filed under subsection (c).

(c) REVIEW BY COMMISSION.—

  (1) NOTICE OF REVIEW BY COMMISSION.—The
Commission may, on its own motion, review any de-
cision of an administrative law judge issued under
subsection (b)(3) by providing written notice to the
Authority and any interested party not later than 30

3040

1    days after the date on which the administrative law

2    judge issues the decision.

3    (2) APPLICATION FOR REVIEW.—

4    (A) IN GENERAL.—The Authority or a per-

5    son aggrieved by a decision issued under sub-

6    section (b)(3) may petition the Commission for

7    review of such decision by filing an application

8    for review not later than 30 days after the date

9    on which the administrative law judge issues

10    the decision.

11    (B) EFFECT OF DENIAL OF APPLICATION

12    FOR REVIEW.—If an application for review

13    under subparagraph (A) is denied, the decision

14    of the administrative law judge shall constitute

15    the decision of the Commission without further

16    proceedings.

17    (C) DISCRETION OF COMMISSION.—

18    (i) IN GENERAL.—A decision with re-

19    spect to whether to grant an application

20    for review under subparagraph (A) is sub-

21    ject to the discretion of the Commission.

22    (ii) MATTERS TO BE CONSIDERED.—

23    In determining whether to grant such an

24    application for review, the Commission

U:\2021OMNI\14OMNI\DivO-FF.xml

SEN. APPRO.

3041

1          shall consider whether the application
2          makes a reasonable showing that—
3                    (I) a prejudicial error was com-
4               mitted in the conduct of the pro-
5               ceeding; or
6                    (II) the decision involved—
7                         (aa) an erroneous applica-
8                    tion of the anti-doping and medi-
9                    cation control or racetrack safety
10                   rules approved by the Commis-
11                   sion; or
12                        (bb) an exercise of discretion
13                   or a decision of law or policy that
14                   warrants review by the Commis-
15                   sion.
16     (3) NATURE OF REVIEW.—
17          (A) IN GENERAL.—In matters reviewed
18     under this subsection, the Commission may—
19                    (i) affirm, reverse, modify, set aside,
20               or remand for further proceedings, in
21               whole or in part, the decision of the admin-
22               istrative law judge; and
23                    (ii) make any finding or conclusion
24               that, in the judgement of the Commission,
25               is proper and based on the record.

3042

1          (B) DE NOVO REVIEW.—The Commission

2     shall review de novo the factual findings and

3     conclusions of law made by the administrative

4     law judge.

5          (C) CONSIDERATION OF ADDITIONAL EVI-

6     DENCE.—

7               (i) MOTION BY COMMISSION.—The

8          Commission may, on its own motion, allow

9          the consideration of additional evidence.

10              (ii) MOTION BY A PARTY.—

11                   (I) IN GENERAL.—A party may

12              file a motion to consider additional

13              evidence at any time before the

14              issuance of a decision by the Commis-

15              sion, which shall show, with particu-

16              larity, that—

17                        (aa) such additional evidence

18                   is material; and

19                        (bb) there were reasonable

20                   grounds for failure to submit the

21                   evidence previously.

22                   (II) PROCEDURE.—The Commis-

23              sion may—

24                        (aa) accept or hear addi-

25                   tional evidence; or

3043

1          (bb) remand the proceeding
2                to the administrative law judge
3                for the consideration of addi-
4                tional evidence.

5      (d) STAY OF PROCEEDINGS.—Review by an adminis-
6 trative law judge or the Commission under this section
7 shall not operate as a stay of a final civil sanction of the
8 Authority unless the administrative law judge or Commis-
9 sion orders such a stay.

**SEC. 1210. UNFAIR OR DECEPTIVE ACTS OR PRACTICES.**

11     The sale of a covered horse, or of any other horse
12 in anticipation of its future participation in a covered race,
13 shall be considered an unfair or deceptive act or practice
14 in or affecting commerce under section 5(a) of the Federal
15 Trade Commission Act (15 U.S.C. 45(a)) if the seller—
16         (1) knows or has reason to know the horse has
17     been administered—
18             (A) a bisphosphonate prior to the horse's
19         fourth birthday; or
20             (B) any other substance or method the Au-
21         thority determines has a long-term degrading
22         effect on the soundness of the covered horse;
23         and

3044

1    (2) fails to disclose to the buyer the administra-

2    tion of the bisphosphonate or other substance or

3    method described in paragraph (1)(B).

4  **SEC. 1211. STATE DELEGATION; COOPERATION.**

5    (a) STATE DELEGATION.—

6        (1) IN GENERAL.—The Authority may enter

7    into an agreement with a State racing commission to

8    implement, within the jurisdiction of the State rac-

9    ing commission, a component of the racetrack safety

10   program or, with the concurrence of the anti-doping

11   and medication control enforcement agency under

12   section 1205(e), a component of the horseracing

13   anti-doping and medication control program, if the

14   Authority determines that the State racing commis-

15   sion has the ability to implement such component in

16   accordance with the rules, standards, and require-

17   ments established by the Authority.

18       (2) IMPLEMENTATION BY STATE RACING COM-

19   MISSION.—A State racing commission or other ap-

20   propriate regulatory body of a State may not imple-

21   ment such a component in a manner less restrictive

22   than the rule, standard, or requirement established

23   by the Authority.

24   (b) COOPERATION.—To avoid duplication of func-

25 tions, facilities, and personnel, and to attain closer coordi-

3045

1 nation and greater effectiveness and economy in adminis-

2 tration of Federal and State law, where conduct by any

3 person subject to the horseracing medication control pro-

4 gram or the racetrack safety program may involve both

5 a medication control or racetrack safety rule violation and

6 violation of Federal or State law, the Authority and Fed-

7 eral or State law enforcement authorities shall cooperate

8 and share information.

9 **SEC. 1212. DETERMINATION OF BUDGETARY EFFECTS.**

10     The budgetary effects of this Act, for the purpose of

11 complying with the Statutory Pay-As-You-Go Act of 2010,

12 shall be determined by reference to the latest statement

13 titled "Budgetary Effects of PAYGO Legislation" for this

14 Act, submitted for printing in the Congressional Record

15 by the Chairman of the House Budget Committee, pro-

16 vided that such statement has been submitted prior to the

17 vote on passage.

18 # TITLE XIII—COMMUNITY

19 # DEVELOPMENT BLOCK GRANTS

20 **SEC. 1301. COMMUNITY DEVELOPMENT BLOCK GRANTS.**

21     (a) IN GENERAL.—Funds previously made available

22 in chapter 9 of title X of the Disaster Relief Appropria-

23 tions Act, 2013 (Public Law 113–2, division A; 127 Stat.

24 36) under the heading "DEPARTMENT OF HOUSING

25 AND URBAN DEVELOPMENT—Community Planning