UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA,                            Indictment No.: 20 CR 160 (MKV)


     v.


JORGE NAVARRO, et al.,
(SETH FISHMAN),

                    Defendant.

------------------------------------------------------------X



**MEMORANDUM OF LAW IN SUPPORT OF SETH FISHMAN'S
MOTION TO SUPPRESS**



SERCARZ & RIOPELLE, LLP
950 Third Avenue, 32nd Floor
New York, New York 10022
Telephone: 1-212-586-4900
*Attorneys for Seth Fishman*

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

THE LEGAL STANDARD ..................................................................................... 5

   Electronic Surveillance ..................................................................................... 5

   The Target Crimes: Scheme To Defraud ......................................................... 6

ARGUMENT .......................................................................................................... 9

I.     There Was No Probable Cause To Believe That Seth Fishman Was Involved In A Scheme To Defraud; That Communications Regarding Such A Scheme Would Be Obtained Through The Interception Of Calls On His Cell Phone; Or, That Normal Investigative Procedures Had Been Tried And Failed Or Reasonably Appeared To Be Unlikely To Succeed ........................................................................................ 9

       A. Background to the Investigation ............................................................ 10

       B. The Turpin Affidavit Fails To Establish Probable Cause ...................... 11

       C. The Turpin Affidavit Fails To Demonstrate That Alternative Investigative Techniques Have Been Exhausted ............................................................ 15

II.    The Renewal Applications For Authority To Eavesdrop On The Fishman Phone Clearly Establish That (1) Evidence In Support Of Probable Cause Was Derived From The Earlier Unlawful Wiretaps; And (2) No Additional Support For A Finding Of Probable Cause Is Provided Based Upon Independent Investigative Sources ............................. 16

III.   The June 21, 2019 Application For Authority To Search The Content Of Fishman's DropBox And Email Accounts Is Derived In Significant Part From The Use Of Information Obtained During The Execution Of The Prior Unlawful Eavesdropping Warrants, And Fails To Provide Probable Cause That Evidence Regarding The Target Offenses Will Be Found In These Accounts ................................................................. 20

IV.   The Search Of The Defendant's Belongings, Including His Cell Phones, Upon His Entry Into The United States Was Conducted Pursuant To An Anticipatory Warrant Derived From Evidence Obtained During Earlier Unlawful Interceptions, And Was Based Upon A Warrant Lacking In Probable Cause .................................................... 22

V.    Evidence Seized During A Search Of The Defendant's Home, Ground Floor Business Premises And  Storage Facility Must Be Suppressed On The Basis That Evidence In Support Of These Searches Was Derived, In Large Measure, From Unlawful Wiretapping Activity ........................................................................................ 25

CONCLUSION ..................................................................................................... 26

i

## **TABLE OF AUTHORITIES**

### Cases

*Berger v. New York*, 388 U.S. 41 (1967) ...................................................................... 5

*Fountain v. United States*, 357 F.3d 250 (2d Cir. 2004) ................................................ 7

*Franks v. Delaware*, 438 U.S. 154 (1978) .................................................... 5, 6, 8, 26

*Katz v. United States*, 389 U.S. 347 (1967) ................................................................ 5

*United States v. Biaggi*, 853 F.2d 89, 95 (2d Cir. 1988) ......................................... 3, 5

*United States v. Canfield*, 212 F.3d 713 (2d Cir. 2000) ............................................. 8

*United States v. Dinome*, 86 F.3d 277 (2d Cir. 1996) ................................................ 7

*United States v. Fury*, 554 F.2d 522  (2d Cir. 1977) ................................................ 5

*United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed2d 341 (1974) ........................ 6

*United States v. Lilla*, 534 F.Supp. 1247 (N.D. New York 1982) ................................. 5

*United States v. Marion*, 535 F.2d 697 (2d Cir. 1976) .............................................. 4

*United States v. Martin*, 411 F.Supp.2d 370 (S.D.N.Y. 2006) ..................................... 6

*United States v. Monaco*, 194 F.3d 381 (2d Cir. 1999) ............................................. 7

*United States v. Rajaratnam*, 09 CR 1184 (RJH), 2010WL4867402
   (S.D.N.Y. Nov. 24, 2010) ..................................................................... 4, 8

*United States v. Rajaratnam*, 719 F.3d 139  (2d Cir. 2013) ........................................ 8

*United States v. Trapilo*, 130 F.3d 547 (2d Cir. 1997) .............................................. 7

### Statutes

18 U.S.C. §§ 2510-2522 (Title III) ............................................................. 5

18 U.S.C. § 2518(1)(a) ......................................................................... 21

18 U.S.C. § 2518(1)(c) ........................................................................................... 6

18 U.S.C. § 2518(3) ................................................................................................ 3

8 U.S.C. § 2518(10)(a) ......................................................................................... 26

Other Authorities

Title III of the Omnibus Crime Control & Safe Streets Act .......................................... 5

Rules

Fed.R.Crim.P. Rule 12(b)(4)(B) ............................................................................. 27

## INTRODUCTION

Seth Fishman ("Dr. Fishman," "Fishman," "the defendant") is charged in Counts 1 and 2 of the instant Indictment.  Count 1 charges a conspiracy to engage in the adulteration and misbranding of drugs from 2016 to 2020 with five other indicted defendants in violation of 18 U.S.C. § 371.  Count 2 charges the defendant with conspiracy to engage in the adulteration and misbranding of drugs from 2002 through March of 2020, together with three defendants not named in Count 1.

Dr. Fishman moves to suppress evidence (1) derived from electronic eavesdropping on the phones of alleged co-conspirators in instances where the defendant is overheard in conversation with others;  (2) derived from electronic eavesdropping on the Fishman phone; (3) seized during the searches of his home, ground floor business premises and storage unit; (4) seized from his DropBox account and two email accounts; and (5) derived from the searches of cell phones seized incident to his arrest.

Dr. Fishman, a veterinarian, created, distributed and administered substances to animals, including racehorses, in the United States and abroad.

On October 23, 2018, the Honorable Colleen McMahon, U.S. District Judge, authorized the interception of wire and electronic communications occurring over a cellphone used by Nick Surick, a trainer of racehorses.  On January 7, 2019, the Honorable Richard M. Berman, U.S. District Judge authorized the interception of wire and electronic communications occurring over a cell phone subscribed to in the name of Jorge Navarro and used by Navarro, a trainer of racehorses.  The defendant was overhead in conversation with Navarro during the period of wiretapping on the Navarro cell phone.

On February 14, 2019, the Honorable Edgardo Ramos, U.S. District Court, authorized electronic interception of conversations over cellphones identified with Seth Fishman and Christopher Oakes.  The Government sought and obtained renewal of the wiretapping authorizations over the Fishman phone on March 19, 2019, by order of the Honorable Sidney Stein, U.S. District Court Judge, and on April 17, 2019, by order of the Honorable Kimba M. Wood, U.S. District Court Judge.

On March 29, 2019, the Government sought and obtained an anticipatory warrant to seize cell phones and electronic devices from Fishman, who had departed the United States in or about February 26, 2019, upon his return from the United Arab Emirates to the United States. Authority to engage in this seizure was renewed on several occasions.

Meanwhile, on or about June 17 through June 21, 2019 the Government sought and obtained authority to search the defendant's DropBox account, and two email accounts.

On October 22, 2019, the defendant's cell phone was seized incident to his arrest upon his return to the United States.

On October 25, 2019, the Government obtained a warrant in the Southern District of Florida to search the defendant's home, office, and a storage facility.

The applications for wiretapping authority each made reference to the regime of regulations to limit the administration of performance enhancing substances to racehorses in New Jersey, New York and Florida.  The regulations limited both the nature of the substances that can be administered to horses, and the proximity to a given race when substances can be provided to the horse.  Violations of these regulations may result in charges relating to the adulteration or misbranding of performance enhancing substances.

2

While the various wiretap applications and applications for authority to search for and seize items of evidence referenced the adulteration and misbranding of drugs in connection with the alleged "doping" of racehorses, these charges do not qualify as "target offenses" in accordance with the wiretapping statutes.  Instead, in each application for electronic surveillance, the Government alleged a "scheme to defraud" horse owners, racetracks, and the betting public. The Government's applications each alleged that there was probable cause to believe that the Fishman cell phone would be used as part of a "scheme to defraud" in violation of the mail fraud statute, 18 U.S.C. § 1341; the wire fraud statute, 18 U.S.C. § 1343; a conspiracy to violate these statutes, 18 U.S.C. § 1349; and, money laundering crimes in violation of 18 U.S.C. §§ 1956 and 1957.

For reasons set forth herein, we contend that the Government failed to establish probable cause to believe (1) that an individual was committing one of the target offenses enumerate above; (2) that communications relevant to that offense would be intercepted by the wiretap; and (3) that the facilities to be surveilled were being used in furtherance of that criminal conduct. *See* 18 U.S.C. § 2518(3); *United States v. Biaggi*, 853 F.2d 89, 95 (2d Cir. 1988).

Specifically, we contend that an examination of the evidence cited in support of the Government's wiretapping authority ignores the distinction between "horse doping," on the one hand; and, Dr. Fishman's efforts to create products which seek to improve a horse's athletic performance through the use of natural, unregulated substances, on the other.

We further contend that evidence in support of the applications for authority to wiretap the Fishman phone, to search the defendant's DropBox account and email accounts, to seize and search his cell phone upon his re-entry into the United States, and to search his home and storage

facility were all based upon evidence derived from the exploitation of the initial unlawful eavesdropping.

We also contend that the Government failed to engage in normal investigative procedures prior to resorting to the initial, and subsequent, wiretap applications, in violation of 18 U.S.C. § 2518(1)(c).

Finally, under the terms of 18 U.S.C. § 2517 (5), the Government can only use wiretap evidence of crimes "other than those specified" in the authorization order or in § 2516 by obtaining judicial approval 'as soon as practicable.'  In order to obtain approval, the Government must show that 'the original order was lawfully obtained, that it was sought in good faith and not as a subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order.'"  *United States v. Rajaratnam*, 09 CR 1184 (RJH), 2010WL4867402, at *3 (S.D.N.Y. Nov. 24, 2010)(quoting *United States v. Marion*, 535 F.2d 697, 700 (2d Cir. 1976).  Under the circumstances set forth herein, we submit that, given that the defendant was never charged with any of those "target crimes" which were the object of the eavesdropping authority there is reason to believe that the earlier warrant applications were a subterfuge for eavesdropping concentrated on the crimes of "misbranding" and "adulteration." Should the Court find that this was the case, all evidence derived from the eavesdropping should, for this reason as well be suppressed.[1]

---

[1] The Court should be aware that the defendant was interviewed by agents of law enforcement in 2010 in connection with the prosecution in the Eastern District of New York of David H. Brooks; and that the defendant submitted to a series of proffer sessions following his arrest in this case.  These interviews were conducted pursuant to limited immunity agreements.  The Government has yet to indicate whether it intends to use the contents of any of these interviews as evidence in the forthcoming trial of Seth Fishman.  Accordingly, we reserve the right to make any additional motions that are appropriate in light of additional discovery and further developments in the litigation.

 The Court should also note that following the defendant's return to the United States in October 2019, his home, office, and a storage facility were the subject of searches by agents of law enforcement.  The Government has yet to

In the alternative, the defendant seeks a hearing in accordance with *Franks v. Delaware*, 438 U.S. 154, 164-72 (1978).

## THE LEGAL STANDARD

### Electronic Surveillance

Electronic surveillance is subject to the Fourth Amendment's prohibition against unreasonable searches and seizures.  *See Katz v. United States*, 389 U.S. 347 (1967); *Berger v. New York*, 388 U.S. 41 (1967).  Title III of the Omnibus Crime Control & Safe Streets Act, 18 U.S.C. §§ 2510-2522 (Title III) was enacted to regulate the circumstances in which electronic surveillance maybe employed and to regulate the use of information obtained by such means.

Under 18 U.S.C. § 2518(3), to obtain a wiretap warrant, the Government must show that there was probable cause to believe that (1) an individual had committed one of the target offenses enumerated in 18 U.S.C. § 2516; (2) communications relevant to that offense would be intercepted by the wiretap; and, (3) the facilities to be surveilled were being used in furtherance of that criminal conduct.  *See United States v. Biaggi*, 853 F.2d 89, 95 (2d Cir. 1988).

The test for probable cause in a wiretap warrant is the same as that for a search warrant. *See United States v. Fury*, 554 F.2d 522, 530 (2d Cir. 1977).  Conclusory statements in an application for eavesdropping authority, without more, are "all together inadequate to support" the issuance of the warrant.  *See United States v. Lilla*, 534 F.Supp. 1247 (N.D. New York 1982). Where allegations exist of falsehood or reckless disregard of the truth in a warrant application,

---

provide notice of the items of evidence it intends to offer into evidence that are products of these searches. Accordingly, we reserve the right to move to suppress items of evidence the Government may seek to offer on the basis, *inter alia*, that the seizure was a fruit of the unlawful wire activity, as well as for other reasons.

the warrant is not unlawful if, setting aside the questioned material, there is sufficient information to support a finding of probable cause.  *See Franks v. Delaware*, 438 U.S. 154, 171-2, 98 S.Ct. 2674, 2684-5, 57 L.Ed.2d 667 (1978).

In addition to the requisite demonstration of probable cause, wiretap applications must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried, or to be too dangerous."  *See* 18 U.S.C. § 2518(1)(c).  The necessity requirement ensures that wiretaps are "not to be routinely employed as the initial step in a criminal investigation."  *United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed2d 341 (1974).

**The Target Crimes: Scheme To Defraud**

While each of the warrant applications discussed herein makes reference to the regulatory scheme governing the conduct of horseracing in New Jersey, New York and Florida; and, the violation of these regulations may give rise to the crime of misbranding or adulterating substances, the only "targeted offenses" alleged in the various warrant applications that fall within the ambit of the eavesdropping statute are mail fraud, in violation of 18 U.S.C. 1341; wire fraud, in violation of 18 U.S.C. § 1343; conspiracy to commit these offenses in violation of 18 U.S.C. § 1349 and money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

In *United States v. Martin*, 411 F.Supp.2d 370 (S.D.N.Y. 2006), the defendant moved to dismiss an Indictment charging conspiracy to commit wire fraud and mail fraud arising from an alleged scheme to "dope" racehorses.  The Indictment alleged that the defendant Martin "devised and effectuated a scheme to fix a horserace by giving a racehorse a performance-enhancing

substance and then profit from their actions by placing bets on that racehorse to win a horse race."

The Court denied the defendant's motion to dismiss the Indictment prior to trial. However, it held that the Indictment must allege that the defendant "agreed with another to commit the offense" of wire fraud, and "that he knowingly engaged in the conspiracy with the specific intent to commit [wire fraud], and that an overt act in furtherance of the conspiracy was committed." Citing *United States v. Monaco*, 194 F.3d 381, 386 (2d Cir. 1999). The Court found that the essential elements of a mail or wire fraud violation are (1) a scheme to defraud; (2) money or property as the object of the scheme; and (3) use of the mails [or wires] to further the scheme. *See Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004) (alterations in original) (quoting *United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 1996)).[2] Finally, the Court rejected the defendant's argument that the alleged conspiracy was not a "scheme to defraud" within the meaning of the wire fraud statute because the scheme did not involve any misrepresentations or fraudulent omissions. Instead, the Court found that a misrepresentation or omission is not a necessary element of a "scheme to defraud" under the wire fraud statute but, is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society. Citing *United States v. Trapilo*, 130 F.3d 547, 550 n.3 (2d Cir. 1997).

Assuming, *arguendo,* that *Martin* accurately describes the contours of a "scheme to defraud," the Court must, therefore, find that there is probable cause to believe that the targeted cell phone is being used in a scheme to generate money or property through the "doping" of

---

[2]  While the Indictment did not charge that the defendant Martin placed bets, it did allege that he aided and abetted the betting activity of his co-defendant, Appelbaum.

racehorses that are to be the subject of betting, or the receipt of purse money, by members of the conspiracy.

For the reasons that follow, we respectfully submit that there was no evidence to indicate that Fishman had a financial or a betting interest in the outcome of particular horseraces and that he, or another individual, used his phone in order further that interest. As a result, there was no evidence to support the inference that Fishman's phone would be used in furtherance of the "scheme to defraud." Furthermore, we submit that the Government failed to demonstrate that alternative investigative techniques had been exhausted.

In addition, the Court should suppress all evidence derived from the electronic eavesdropping on the basis that the original order was unlawfully obtained in that it was sought as a subterfuge for a search for electronic evidence of the "non target" offenses of "adulteration" and "misbranding." *United States v. Rajaratnam*, 09 CR 1184 (RJH), 2010WL4867402, at *3 (S.D.N.Y. Nov. 24, 2010) (quoting *United States v. Marion*, 535 F.2d 697, 700 (2d Cir. 1976).

In the alternative, the defendant requests a hearing in accordance with *Franks v. Delaware*, 438 U.S. 154, 164-72 (1978). To obtain a *Franks* hearing, a defendant must make a "substantial preliminary showing" that (1) the warrant affidavit included misrepresentations or omissions that were made with a knowing or reckless disregard for the truth; and (2) those misrepresentations or omissions were material, meaning "necessary to the [issuing] Judge's probable cause [or necessity] finding." *United States v. Rajaratnam*, 719 F.3d 139, 146-147 (2d Cir. 2013)(alterations in original)(quoting *United States v. Canfield*, 212 F.3d 713, 717-18 (2d Cir. 2000)).

<u>**ARGUMENT**</u>

I.      **There Was No Probable Cause To Believe That Seth Fishman Was Involved In A Scheme To Defraud; That Communications Regarding Such A Scheme Would Be Obtained Through The Interception Of Calls On His Cell Phone; Or, That Normal Investigative Procedures Had Been Tried And Failed Or Reasonably Appeared To Be Unlikely To Succeed**

On or about February 13, 2019, the Government obtained authorization to intercept wire and electronic communications occurring over the cellular telephone initially identified as 561-270-9286 ("Fishman Cell Phone"), as well as a second target cell phone subscribed in the name of Susan M. Oakes (the "Oakes Phone").  In support of the application for wiretapping authority, the Government relied, *inter alia*, upon the Affidavit of Agent Bruce Turpin of the FBI.

Agent Turpin alleged that the target offenses which were the subject of this application included mail fraud, in violation of 18 U.S.C. § 1341; wire fraud, in violation of 18 U.S.C. § 1343; conspiracy to commit those offenses, in violation of 18 U.S.C. § 1349; and, money laundering in violation of 18 U.S.C. §§ 1956 and 1957, "each relating to a scheme to obtain, distribute, and administer various chemical substances in order to defraud racetracks, competitors, and the betting public by placing and racing horses in races after secretly administering such substances to the racing horse […]" (Ex. A, Turpin Aff. at p. 6).

The Turpin Affidavit made reference to prior authorization for electronic eavesdropping on the Surick cell phone on October 23, 2018, November 21, 2018, December 20, 2018, and January 18, 2019.  Yet, there was no indication that this eavesdropping yielded any evidence demonstrating probable cause in connection with the application relating to the Fishman cell phone.  The application also made reference to an authorization to engage in electronic eavesdropping over the Navarro cell phone.  Authorization for the Navarro cell phone was

obtained on January 7, 2019, and renewed on February 6, 2019.  Yet, apart from a single instance

referenced below, there was no indication that two months of electronic eavesdropping over the

Navarro cell phone provided any evidence to indicate that the requirements for eavesdropping

over the Fishman phone could be met.

## A.  Background to the Investigation

Under the section entitled "Background to the Investigation," Agent Turpin referred to

information provided by a confidential source ("CS-4") described as a licensed veterinarian

based in Kentucky.  According to CS-4, in or about 2018 he was contacted by another individual

("Co-Conpsirator-1," "CC-1") who offered him an opportunity to purchase a performance

enhancing drug that he alleged was created and sold by Fishman.  (Ex. A, Turpin Aff. at p.18).

The affidavit further alleged that CS-4 did, in fact, purchase the offered drugs and reported this

activity to another confidential source ("CS-1") and provided five vials of that drug to CS-1.

However, CS-4 did not indicate that he purchased these substances based upon a representation

that they would be used to enhance the performance of a racehorse, or that Fishman understood

they would be administered in a way that violated the rules of any racetrack or organization.[3]  No

details were provided in the affidavit concerning the conversation that led to the purchase of the

substance.  Moreover, the Turpin Affidavit offers no indication that the vials of the substance

were recovered by agents of law enforcement; were subsequently tested; or, found to contain a

banned substance.  (Ex. A, Turpin Aff. at 16-19).

---

[3]  The Government provided no evidence to suggest that the compounds created by Fishman were unlawfully administered to horses.  While the relevant rules may provide that the substances cannot be administered on, or close to race days, none of the intercepted conversations cited by Agent Turpin include a statement that Dr. Fishman knew, or was told, that the compounds he distributed would be administered in violation of the applicable regulations.

### B.  The Turpin Affidavit Fails To Establish Probable Cause

The Turpin Affidavit contains reference to conversations intercepted over the Navarro cell phone, with targeted individuals other than Fishman, in which the effect of various products appears to have been discussed.  However, there are no comparable conversations cited in the Turpin Affidavit which make reference to conversations with Fishman; let alone, to the use of the Fishman phone to advance the scheme to defraud which provided the basis for this wiretap application.

As set forth in the Introduction, while Fishman is overheard discussing the chemistry of improving a horse's blood flow and respiration, and is overheard prescribing substances to reduce pain sustained by horses, the Government ignores the distinction between the use of substances administered in violation of State regulations, on the one hand; and Fishman's legitimate efforts to create products which will improve a racehorse's health through the use of natural substances administered in accordance with regulations, on the other.

For example, Agent Turpin lists a conversation on January 25, 2019, at approximately 11:27 a.m. EST, in which Navarro, using the Navarro cell phone, placed an outgoing call to Chris Oakes on the Oakes phone.  The following conversation is alleged to have occurred, in substance and in part:

> NAVARRO:   Chris, I have horse that I really like on Sunday but this mother fucker he like in the middle of the race ties up, clamps up, do you have anything for that?
>
> OAKES:      Well I always […]
>
> NAVARRO:   I know this crazy fuck Seth. He sent me something with amino acid right last year and I fucking gave it to this horse. This mother fucker galloped. Galloped.  Yes.

11

| OAKES: | Amino acid. |
|---|---|
| NAVARRO: | Yeah, some amino acid. Injectable. Small bottle. |
| OAKES: | And he's not around I don't think now. |
| NAVARRO: | No that crazy fuck. He's probably in Dubai somewhere. |
| OAKES: | Yeah, I think he's in Dubai right now. Uh, let me check. I'm just trying to check in my head what exactly you are talking about because you wanna do the same thing if it worked before. |

(Ex A, Turpin Aff. pp. 37-38).

Several aspects of this limited portion of a conversation are important to note:  First, the substance referenced in the conversation appears to be an amino acid, an organic substance that is not alleged to be a performance enhancing drug or a banned substance.  Second, it is clear from the content of the conversation that Navarro is describing an instance in which a horse "clamped up" during a race and Fishman subsequently prescribed an amino acid to keep this from occurring in the future. Third, there is no indication in this conversation that Fishman prescribed the substance for use by one of Navarro's horses during or in preparation for a race.

Agent Turpin references other conversations between Navarro and Oakes regarding products that "he;" or "the doctor," made. (*Id.* at 40, 42).  However, there is no indication that this individual refers to Fishman.

There is nothing in any of the intercepted conversations to indicate that Fishman was ever involved in discussions regarding the "doping" of horses to enhance their performance on the day of a race.

On or about January 27, 2019 at approximately 11:47 a.m. EST, Navarro received an incoming call from Seth Fishman using the Fishman phone. The following conversation occurred, in substance and in part:

> NAVARRO:   Cuz you remember that amino acid injectable shit you sent me
>
> FISHMAN:   Which one there is […]
>
> NAVARRO:   That was a long time ago there were small bottles. Bottles. I asked Chris if he had some and he thought […] I'm running a horse today, he clamps up really bad and used it on him and it worked pretty good. So Seth, I'm at the track right now. I need you to send me an email with what I owe you. You never sent me an invoice […]
>
> FISHMAN:   But what was what you got from Chris? What you wanted? I have hundreds of products.
>
> NAVARRO:   Listen Seth, I'm at the track right now. There is people in front of me, I don't want to talk about medication in front of people, ok.

(Ex. A, Turpin Aff. at 43-44).

Agent Turpin provides the following interpretation of the January 27, 2019 call:

> I believe that on the January 27 call, Navarro and Fishman are discussing a particular performance enhancing substance that Fishman supplied to Navarro in order to improve the performance of Navarro's racehorses.

(*Id*. at pp.44-45).

Yet, in the two calls between Fishman and Navarro cited by Agent Turpin in his affidavit, Fishman discusses the use of an amino acid to treat a horse that has <u>previously demonstrated a propensity to "tie-up"</u> during races – a far cry from an instance where a performance enhancing drug is prescribed for a horse to ingest on race day in order to avoid such problems during the race.

13

In a section entitled "Basis and Scope of Declarations," Agent Turpin offers the following disclaimer:

> Except where otherwise noted or the context otherwise makes clear, (i) the information set forth in this Affidavit may include information provided to me by other law enforcement agents who have assisted in the investigation; (ii) wherever in this Affidavit I assert that a statement was made by another law enforcement (any of whom may have had either direct of hearsay knowledge of that statement) to whom I or other law enforcement officers have spoken or whose reports I have read and reviewed; (iii) such statements are reported in substance and in part; (iv) where I refer to the contents of previously recorded conversations (e.g., consensual recordings or prior wiretap interceptions), my quotations and descriptions are based on preliminary draft transcripts and/or translations of those conversations […]

(Ex. A, Turpin Aff. at pp. 15-16).

In other words, Agent Turpin does not claim to have listened to those portions of the conversation referenced in his affidavit. Yet, his description of the conversation between Navarro and Fishman mischaracterizes the nature of the conversation in a way that makes it appear more incriminating toward Fishman. This is one of several such instances which together warrant a *Franks* hearing.

Under these circumstances, the Affidavit is clearly defective in establishing the requisite elements of probable cause. It simply fails to demonstrate that the Fishman phone was being used in the furtherance of the targeted crimes.

In the alternative, we submit that the combination of instances where conversations excerpted in the warrant application were mischaracterized, and the omission of any acknowledgement relating to the lack of evidence linking Fishman with either betting activity or an agreement to share in purse money, together warrant a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 164-72 (1978).

14

**C.  The Turpin Affidavit Fails To Demonstrate That Alternative Investigative Techniques Have Been Exhausted**

In that section of his Affidavit entitled "Insufficiency of alternative investigative techniques" (Ex. A, Turpin Aff. at p. 49), Agent Turpin explains that introducing an undercover officer or confidential informant to Fishman would be unlikely to produce evidence implicating him in the schemes alleged in this eavesdropping warrant application.  Yet, he offers no explanation as to why the Government could not attempt to arrange a controlled buy of products distributed by Fishman for the care of horses, either in person or over the phone. Intercepted conversations reveal that Fishman is prepared to discuss the nature of his business with individuals who are comparative strangers to him.  (*See* Conversation between Fishman and FNU LNU-39 on March 21, 2019 at p. 17, *infra*).  Moreover, in August of 2019, the Government used a confidential source to purchase products from an alleged distributor of Fishman's Lisa Gianelli.  (*See* Affidavit in support of a search of the defendant's home at pp. 6-7).

Moreover, while Agent Turpin acknowledged that a financial investigation was ongoing in the effort to "identify the means and methods of the target subject's payment for prohibited substances," (Ex, A, at 54), there is no indication as to whether information regarding the accounts of Fishman, or, his firm, Equestology, had been subpoenaed, or what those subpoenas had unearthed.

Perhaps the most glaring omission is the failure to indicate whether the horses raced by any of the trainers to whom Fishman was allegedly providing his products were tested in the aftermath of a race and found to have ingested a banned substance arguably supplied by Fishman.  The Government cannot seriously argue that participating in such tests would have compromised their investigation when such tests are administered as a normal part of the

15

regulatory regime.  Nor can the Government plausibly suggest that it would have been difficult

to obtain the cooperation of racing authorities in choosing those horses to test.  The utter failure

of this Affidavit, and those that followed, relating to the Fishman phone, to reference the results

of any tests is proof positive that the Government cannot link Fishman's activities – or his phone

– to the alleged "scheme to defraud" which is at the heart of the application for eavesdropping

authority.  This material omission, when coupled with the mischaracterizations of those of

Fishman's conversations excerpted in the affidavit, together warrant the remedy of a *Franks*

hearing.

It is not an exaggeration to say that the application utterly failed to indicate that

alternative investigative techniques had been exhausted.  For this reason, as well, evidence

derived from interceptions pursuant to the warrant must be suppressed.

**II.    The Renewal Applications For Authority To Eavesdrop On The Fishman Phone
         Clearly Establish That (1) Evidence In Support Of Probable Cause Was Derived
         From The Earlier Unlawful Wiretaps; And (2) No Additional Support For A
         Finding Of Probable Cause Is Provided Based Upon Independent Investigative
         Sources**

Interceptions pursuant to the February 14, 2019 Order commenced on February 18, 2019,

and expired on March 19, 2019.  That Order was renewed for an additional 30 days by the

Honorable Sidney H. Stein.  The Government subsequently sought an additional 30 day renewal

before the Honorable Kimba M. Wood.  An Affidavit in support of wiretapping authority was

provided by Agent Berntsson of the FBI.  The affidavit is notable in several respects:

First of all, the affidavit clearly references conversations obtained from interceptions over

the Surick and Navarro cell phones (Ex. B, Berntsson Aff. at p. 30).  Moreover, it makes specific

reference to communications with the Fishman phone cited in support of probable cause to

obtain the initial eavesdropping warrant for the Fishman phone. (*Id.* at pp.41-49). The Berntsson Affidavit contains references to the January 25, 2019 conversation between Navarro and Oakes, as well as the January 27, 2019 conversation between Navarro and Fishman that are lifted verbatim from the Affidavit in support of the original application for eavesdropping authority on the Fishman phone. (*Id.* at pp. 47-49).

Accordingly, the evidence in support of probable cause to allow continued electronic eavesdropping is, clearly, the "fruit of the poisonous tree." In accordance with 18 U.S.C. §2518(10)(a), the defendant is an "aggrieved person" with standing to suppress the contents of any wire or oral communication […] or <u>evidence derived therefrom</u>" based upon a violation of Title III. (Emphasis supplied).

The balance of the Berntsson Affidavit describes conversations intercepted over the Fishman phone. These include conversations in which Fishman describes aspects of his work as a veterinarian – conversations that undermine any contention that he is using his phone to engage in the alleged "scheme to defraud."

Thus, the affidavit references a text message on March 21, 2019, at approximately 2:01 a.m. EST, in which Fishman sends an outgoing message to Jordan Fishman ("Jordan") in which he provides instruction for a product that Jordan is compounding on Fishman's behalf. Seth Fishman writes: "Raise ph to 12 after adding arginine and keto together. Use citric acid to bring back down to a ph of 7." This text message reinforces the notion that Fishman uses organic substances to create his medicine for horses. (Ex. B, Berntsson Aff. at p.74). No narcotics or other drugs are mentioned.

17

The affidavit also references a conversation between Fishman and an individual described as FNU LNU-39 in which Fishman describes the nature of his veterinary work:

FNU LNU-39: Well uh, I heard about your company and your products so I just wanted to get more information.

FISHMAN:  Right, so I'll give you my email or if you want U/I most of the products I make are private and custom and then some guys will sell it into the common market but I mostly make private medicine and production. […]

[…]

FISHMAN:  How many horses are you looking at and what because I design programs for people. So if you're somebody whose [sic] got a bunch of endurance horses and you know what you are doing and that's why I technically only work with trainers that have a certain amount of horses or more cause it would make sense to do it. I design programs for people. I mostly work in regenerative peptides and I work in things that are not commercially available. […]  what I pride myself on is doing is having a working relationship with top trainers and top owners where they say to me, hey have I have tendon problems, I have gastric ulcers, I have these problems and I give them solutions that are not commercially available.  And I'm not talking solutions like liquid solutions, I'm talking solutions like solutions to a problem.

(*Id.* at 75-77)(Emphasis supplied).

Again, it is clear from this conversation that Fishman is in the business of creating organic products as an alternative to the substances customarily banned at major racetracks.

As a final example, on April 2, 2019, at 11:20 a.m. EST, Fishman received an incoming call from Adrienne Hall. During the conversation, Ms. Hall begins by explaining that she is happy with the condition of her horses.  She references a race that has already occurred at which one of her horses performed capably:

HALL:  Yeah, my horses are doing so well, I, I don't know, I'm very happy.

FISHMAN:  Right.

> HALL:      I got beat a head last night by a 1-5 favorite that's all he had to do was drive him, the kind of horse that, like I didn't even think would get a check last night. […]

(Ex. B at p. 83).

Hall and Fishman then discuss a treatment Fishman provided to build up a horse's blood levels:

> HALL:      When you give that blood builder shot, like is it something that like lasts or is it something that is like [U/I] or is it like gradual?
>
> FISHMAN:   Yeah, it's uh you know. You realize that this is stuff that is so obscure in mentioned in research it's like this. We may be the closest people to knowing how it actually performs outside of people who did tests on laboratory rats and stuff, you know?

(*Id.* at p. 84).

Fishman then suggests that Hall keep a record of her efforts to improve the blood content of her horses:

> FISHMAN:   So why don't you, when you think about uh, tell me what day have you been keeping a record of what you have been doing?
>
> HALL:      Yeah.
>
> FISHMAN:   So why don't you put that in a text, and then I can kind of […] because again, if you, originally you said you wanna cut in short sooner than later. Now you are going later than sooner.
>
>            […]
>
> HALL:      What are people doing to get their red blood cells up and what?
>
> FISHMAN:   Well, that's why we used EPO mimetic […]

(*Id.* at 86).

When taken together, these conversations demonstrate that Fishman is in the business of creating and distributing substances to improve the health and performance of horses, including

19

racehorses, over the long term.  His products are made from organic substances.  In this

exchange, Fishman references an "epo memetic."  He is, therefore, describing a custom made

product intended to mimic the benefits of Epogen, presumably without the chemical content of

the banned substance.  Moreover, Fishman does not appear to be prescribing substances for

particular horses.  Nor is he providing instruction for the use of these substances in order to

enhance performance during a particular race.  There is nothing in the conversations to suggest

that Fishman is seeking to profit from efforts by owners or trainers to make money by gaming

the system of awarding purses to winning horses; or, by enhancing the likelihood that the people

to whom he speaks will profit from betting on particular horses in particular races.

Finally, there are no references in this lengthy Affidavit to evidence derived from sources

independent of the eavesdropping performed on the Fishman phone during the period following

the grant of initial wiretapping authority.  Thus, evidence seized during the period of renewed

wiretapping authority are clearly "the fruit of the poisonous tree."

**III.   The June 21, 2019 Application For Authority To Search The Content Of
Fishman's DropBox And Email Accounts Is Derived In Significant Part From
The Use Of Information Obtained During The Execution Of The Prior Unlawful
Eavesdropping Warrants, And Fails To Provide Probable Cause That Evidence
Regarding The Target Offenses Will Be Found In These Accounts**

On June 21, 2019, the Government sought authority to search the contents of the

defendant's DropBox account pursuant to 18 U.S.C. § 2703 (a), (b)(1)(A) and (c)(1)(A).  The

Government also sought authority to search the content of the defendant's email accounts.  The

defendant was listed as a target subject of the search.

The applications were based upon the Affidavits of Timothy Bergen of the FBI.  (A copy

of the Bergen Affidavit in support of authority to search Dropbox account is annexed as Ex D;

A copy of the Bergen Affidavit in support of authority to search the defendant's email accounts is annexed as Ex. E). Bergen alleged that there was probable cause to believe that the DropBox account and emails accounts contained "evidence, fruits, and instrumentalities" of violations of 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); and 18 U.S.C. § 1349 (conspiracy to commit mail and wire fraud); as well as misbranding of drugs and devices in violation of 21 U.S.C. § 352 ("the subject offenses"). (Ex. D at p.2).

Agent Bergen alleged that the offenses related to a scheme "to obtain, distribute and administer various chemical substances in order to defraud racetracks, competitors, and the betting public by placing and racing horses in races after secretly administering prohibited substances to the racing horse." (*Id.* at p. 2).

The application incorporated by reference the full history of electronic eavesdropping over the Fishman phones. (Bergen Aff. at pp. 8-23). Accordingly, evidence obtained through the use of this authorization must be suppressed because the evidence of probable cause was "the fruit of the poisonous tree," derived in large measure from the exploitation of the earlier violation of Title III. *See* 18 U.S.C. § 2518(1)(a).

The authorization indicates that one of the cellular phones recovered from Fishman pursuant to the aforementioned search, contained a DropBox mobile application. A review of the contents of the DropBox application disclosed filed names of various alleged performance enhancing substances including "VO2-pallet," "vo2.pdf," "omeprazoleinj.pdf," and "ITPP50mL." Also noted were files with the names "HPbleederplus" and "horse spreadsheet." The application sought authority to examine those folders within the defendant's DropBox file. No evidence was proffered to establish (1) the relationship of these substances to the regimen of banned substances in New York, New Jersey and Florida, described in the eavesdropping

21

applications; (2) the defendant's use of any of these substances in preparing and distributing products to his customers; (3) any communication by the defendant suggesting the use of the substances in any illicit way; or (4) the defendant's alleged participation in the target offenses described above.

As a result, there was no viable evidence proffered to demonstrate that, in the words of the application for authority to search the contents of the DropBox account, "there is probable cause to believe that Seth Fishman uses the DropBox account, and that information stored on the provider's servers associated with the subject account will contain evidence, fruits and instrumentalities of the subject offenses." (Ex. D, Bergen Aff. at p.2).  The same is true with regard to the searches of Fishman's two email accounts. (Ex. E).

IV.     **The Search Of The Defendant's Belongings, Including His Cell Phones, Upon His Entry Into The United States Was Conducted Pursuant To An Anticipatory Warrant Derived From Evidence Obtained During Earlier Unlawful Interceptions, And Was Based Upon A Warrant Lacking In Probable Cause**

On or about March 29, 2019, the Government sought and obtained an anticipatory warrant in the Eastern District of New York permitting a search of the defendant's cell phones upon his reentry into the United States.  Notice of the warrant was delayed in order not to advise the defendant of this impending law enforcement action.

The warrant was executed upon the defendant's arrival in the United States from the United Arab Emirates on or about October 22, 2019.

It is notable that, while almost seven months elapsed since the original warrant application was filed; and, while the Government was engaged in wiretapping activity on Fishman's cell phone for several months during this intervening period, the Government never

sought to supplement or amend its original warrant application by providing additional evidence in support of its assertion that there was probable cause for the wiretap.

The application was based on the Affidavit of FBI Agent Bruce Turpin for anticipatory authority to seize the phones.  (A copy of the Turpin Affidavit is annexed as Ex. C).

The Turpin Affidavit incorporates material from the prior applications for eavesdropping authority regarding the target subjects and offenses; the confidential sources and the information they supplied in support of the warrant; the rules and regulations regarding the use of controlled substances in connection with horseracing in New York, New Jersey and Florida, and the content of the earlier Title III intercepts.  (Ex. C, Turpin Aff. at pp. 4-31).

The Affidavit contains no reference to information derived from sources independent of the earlier unlawful eavesdropping.  Accordingly, the evidenced marshalled in support of both the applications to seize, and to search, the phones are "the fruit of the poisonous tree," because the evidence was obtained unlawfully.

The Turpin Affidavit in support of authority to search the contents of the cellphone seized on October 28, 2019, under the title "Communications with the Target Cell Phones in furtherance of the Target Offenses," lists a more expansive set of conversations.  However, the affidavit mischaracterizes certain conversations; and, those that remain, do not fill the gaps necessary to provide a showing of probable cause.

Thus, for example, the Government cites to a conversation on February 19, 2019, at approximately 12:26 p.m. EST.  According to the affidavit, Fishman places an outgoing call to Steven Greenberg in which they discuss the compounding of various substances.  According to the affidavit, among the substances discussed is Tramadol.  Agent Turpin then suggests that

Tramadol is a painkiller "often administered to horses prior to a race in order to prevent them from feeling pain during a race." (*Id.* at 14-15).  However, the Government's synopsis of the conversation reads as follows:

"Got some stuff from India because they <u>can't use Tramadol</u>."
(Ex.G at p.2)(Emphasis supplied).

Moreover, there is nothing in the quoted portions of the transcript to suggest (1) that Fishman was contemplating that the painkiller would be administered to a horse; (2) that the horse would be running in a race; or (3) that the race would take place in the United States.

Transcripts of other conversations intercepted over the Fishman phone relate to the use of "blood builders," "broncho dilators," (*id.* at 14) and a substances prepared by Fishman including BB-3 and VO2max.  (*Id.* at pp. 11-13).  However, there is nothing in the conversations to suggest that these substances are to be administered in violation of the regulatory regime in any State. Indeed, there is nothing to suggest that these substances will be administered in preparation for a race to be held in the United States.

Other interceptions clearly indicate that the defendant's business involves creating custom products with organic ingredients that are designed to mimic the beneficial effects of banned substances.  (e.g. "Epomimetics")(*Id.* at 17).

In sum, while this collection of transcripts references Fishman's products, there is no basis upon which to infer that the products are banned, or are destined for use in a domestic horserace, or that Dr. Fishman intends the products to be administered in violation of any law, rule or regulation.

Most importantly, the Government's affidavit, again, utterly fails to provide a single instance where a test performed as part of the post-race examination of racehorses disclosed a banned substance linked to the defendant.

Under such circumstances, the warrant application is clearly deficient.

**V.     Evidence Seized During A Search Of The Defendant's Home, Ground Floor Business Premises And  Storage Facility Must Be Suppressed On The Basis That Evidence In Support Of These Searches Was Derived, In Large Measure, From Unlawful Wiretapping Activity**

On November 7, 2019, the Government obtained a warrant to search the defendant's home in Boca Raton, Florida, ground floor business premises located in Delray Beach, Florida and a storage unit located at SmartShip Self-Storage in Delray Beach, Florida.

The warrants were obtained based upon the Affidavit of Robert Ekey, a Special Agent with the Food and Drug Administration Office of Criminal Investigations assigned to the Windham resident office in Manchester, New Hampshire. (A copy of the Ekey Affidavit is annexed as Ex. F).

The Affidavit sought authority to search the specified premises and to seize items and information constituting evidence, fruits and instrumentalities of violations of 21 U.S.C. §§ 331, 333, and 352 (misbranding) and 21 U.S.C. § 841 (narcotics distribution)(the "Subject Offenses").

The Affidavit asserted that substances sought during the search of the premises "may be deemed 'misbranded' under the federal Food Drug & Cosmetic Act ("FDCA") due to several deficiencies, including, but not limited to, drugs that are: labeled using a deficient label, including one that is false or misleading; prescription drugs provided for use without a valid medical prescription; not approved for use by the Food and Drug Administration to the FDCA;

25

and manufactured by an establishment that is not registered with the FDA as a drug

establishment. *See* 21 U.S.C. §§ 331, 333, 360(b), 351, 352, 353, 360." (Ex. F at p.5).

However, the Affidavit in support of the search warrant fails to provide the requisite probable

cause to indicate that violations of the misbranding and narcotics distribution statutes had

occurred; or, that the defendant was engaged in this activity.

In considering the lawfulness of the Government's earlier applications for eavesdropping

authority, the Court should note that there is no indication, either in the warrant application or in

the inventory of seized items, suggesting that the defendant was engaged in any of the "target

offenses" enumerated in the earlier applications for eavesdropping authority.

For the reasons set forth above, we respectfully submit that the evidence obtained during

these searches must be suppressed on the basis that the seized evidence was derived from the

exploitation of the earlier unlawful eavesdropping warrants. *See* 18 U.S.C. § 2518(10)(a).

## **<u>CONCLUSION</u>**

For all the reasons set forth herein, the defendant respectfully moves for an Order

suppressing the introduction of evidence pursuant to the wiretap orders and searches described

herein.

In the alternative, the defendant seeks a hearing in accordance with *Franks v. Delaware*,

438 U.S. 154, 164-72 (1978).

We respectfully join in the motions and arguments of the co-defendants Jorge Navarro and

Christopher Oakes to suppress evidence obtained by electronic eavesdropping over those phones

in which Fishman is, within the meaning of the statute, an "aggrieved party."

The defendant further joins in all motions brought by his co-defendants to the extent that they are applicable to him.

Finally, we reserve the right to supplement this motion once the Government specifies, in accordance with Fed.R.Crim.P. Rule 12(b)(4)(B), the evidence seized during Court ordered electronic eavesdropping, searches of the defendant's home,  ground floor business premises and storage facility, and statements made by the defendant during interrogation by agents of law enforcement.

And, for such other and further relief as to this Court may seem just and proper.

Dated:  New York, New York
        July 29, 2021

Respectfully submitted,

SERCARZ AND RIOPELLE, LLP

By: /s/ Maurice H. Sercarz
        950 Third Avenue, 32nd Floor
        New York, New York 10019
        Telephone: (212) 586-4900
        Email: msercarz@sercarzandriopelle.com
        *Attorneys for Seth Fishman*