# SERCARZ & RIOPELLE, LLP
950 THIRD AVENUE, 32ND FLOOR
NEW YORK, NEW YORK 10022
(212) 586-4900
FACSIMILE (212) 586-1234
www.sercarzandriopelle.com

ROLAND G. RIOPELLE
MAURICE H. SERCARZ*

*ADMITTED IN NY & NJ

December 13, 2021

**BY ECF & EMAIL**

The Honorable Mary Kay Vyskocil
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re: *United States v. Navarro, et al,* 20 CR 160
         <u>Seth Fishman – Defendant</u>

Your Honor:

  I write in response to the Government's letter of December 6, 2021 in which they request a Bail Review in light of what they describe as "evidence of [Dr. Fishman's] continued violation of the federal misbranding laws and the terms of his pretrial release."

  Dr. Fishman has never made a secret of his intention, following his arrest, to continue exporting his products while redoubling his efforts to comport with the requirements of the export exemption to the adulteration and misbranding statutes. He expressly advised the Government of this fact as part of his application for a deferred prosecution agreement. And, he sought a bail modification before this Court for the purpose of traveling to the United Arab Emirates for the purpose of engaging in these business activities.

  Moreover, while the Government notes, in its application for a bail review, that it was "Employee-1," the defendant's Administrative Assistant, who informed the Government that "Fishman's business was creating 'energy drinks' for foreign distribution" and; that she was "continuing to create a 'Bleeder' paste for foreign distribution." The Government failed to describe those aspects of its relationship with the Assistant that cast doubt upon the voluntariness of her consent. This witness had earlier conducted two extensive proffer sessions with the Government in which she described the full scope of her responsibilities in Dr. Fishman's business, thereby raising the possibility that she, too, could be charged with the criminal activity spelled out in the instant Indictment. The interviews were conducted pursuant to a limited

immunity (proffer) agreement which imposed an unacceptable burden upon her decision to consent to the search of the premises.

And, there is nothing in the evidence seized from Dr. Fishman's premises as a result of the most recent search which demonstrates that he has violated the restrictions of the export exemption to the adulteration and misbranding statutes.

For the reasons that follow, we respectfully submit that the Government cannot meet its burden in demonstrating that the defendant's bail should be revoked.

## **The Applicable Law**

Upon an application by the Government to "review" a defendant's bail, the Court should conduct a hearing in accordance with the provisions of 18 U.S.C. § 3148(b). Following a hearing, the Court should revoke bail and detain a defendant only if it finds (1) probable cause to believe that the defendant has committed any crime while on release, or finds, by clear and convincing evidence, a violation of any other bail conditions; and (2) further finds that no conditions will ensure against flight or danger or that the defendant is unlikely to honor the conditions of his release. *See* 18 U.S.C. § 3148(b). Although the statute does not specify the type of hearing required, the Second Circuit has held that defendants facing bail revocation should be given "an opportunity to testify and to present evidence on their own behalf." *United States v. Davis,* 845 F.2d 412, 415 (2d Cir. 1988).

### **Limitations On The Ability Of The Administrative Assistant To Consent To A Search Of The Defendant's Office**

A warrantless search or seizure without probable cause does not violate the Fourth Amendment if "the authorities have obtained the voluntary consent of a person authorized to grant such consent." *See United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995). The prosecution must demonstrate by a preponderance of the evidence that consent was voluntarily given." *See United States v. Isiofia*, 370 F.3d 226, 230 (2d Cir. 2004); *United States v. Buttner-Janusch*, 649 F.2d 759, 764 (2d Cir. 1981). Voluntariness is determined based on the totality of circumstances, with an eye toward whether the consent was a product of free choice "rather than a mere acquiescence in a show of authority." *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993); *see also United States v. Bye*, 919 F.2d 6, 9 (2d Cir 1990) (reversing district court that "fixed its [consent] analysis almost exclusively on" only one factor).

### **The Export Exemption To The Adulteration And Misbranding Statutes**

The defendant contends that he attempted in "good faith" to conform his conduct to the export exemption to the adulteration and misbranding statute which is the subject of both counts against him in the instant Indictment. The relevant portions of the export exemption in the FDCA § 801, and 21 U.S.C. § 381(e) states, in relevant part, as follows:

(1) A food, drug, device, tobacco product or cosmetic intended for export shall not be deemed to be adulterated or misbranded under this chapter, […] if it –
A. Accords to the specifications of the foreign purchaser

      B. Is not in conflict with the laws of the country to which it is intended for export
      C. Is labeled on the outside of the shipping package that it is intended for export, and
      D. Is not sold or offered for sale in domestic commerce.[1]

For the reasons set forth herein, it is clear (1) that the defendant's Administrative Assistant did not voluntarily consent to the search of the premises; and (2) that in any event, the defendant sought in "good faith" to conform his conduct to the export exemption to the adulteration and misbranding statute.

**The Underlying Facts**

On October 30, 2019, Dr. Fishman was arrested as he disembarked from a flight to New York from the United Arab Emirates ("UAE"). He was charged in a Complaint containing a single count alleging a violation of the misdemeanor version of the adulteration and misbranding statutes. (A copy of the Complaint is annexed hereto as **Exhibit A**). Soon thereafter, the United States began to experience the dislocations and shutdowns that resulted from our efforts to respond to the coronavirus pandemic. As a result, Dr. Fishman was faced with the uncertain prospects, not only of an arrest, but the destruction of his business while he awaited a distant trial on the charges contained in his Indictment.

On the date of his arrest, agents of law enforcement searched his home and offices and seized large portion of his inventory of products prepared for distribution to the owners of animals, both in the United States and abroad. The bulk of the packages prepared for shipping were destined for Dr. Fishman's clients in the United Arab Emirates. Nonetheless, Dr. Fishman vowed to continue his business while redoubling his efforts to conform his practices to the requirements of the law.

On November 12, 2019, this Court issued an Order and Appearance Bond setting forth the condition of Dr. Fishman's release. Dr. Fishman was released on a bond of $100,000, secured by his home in Highland Beach, Florida. Travel conditions restricted Dr. Fishman to the Southern and Eastern Districts of New York and South Florida, and transit points in between. Notably, the order granting bail contained no limitations on Dr. Fishman's right to continue in business, provided that he did not commit any state or federal crimes.

---

[1] 21 U.S.C. § 381(e)(1)(D) does not clearly indicate whether the export exemption prohibits the domestic sale of any product with the same formulation as the product at issue; only those items that are part of the same shipment as the product which is destined for export; or something in between. I have been informed by Ted Sullivan, the attorney retained to advise the defendant regarding the parameters of the export exemption that (D) refers both to the formulation and the label of the product. In other words, Mr. Sullivan advised the defendant that he cannot take items that are prepared according to the specifications of the foreign purchaser and labeled "For Export Only," and sell these items domestically. Nor can he take a shipment that was previously labeled for domestic distribution and sell it abroad.

For the past two years, Dr. Fishman has maintained a record of compliance with the terms and conditions of his bail. This is the first application by the Government for any modification in the terms and conditions of his release.

On or about February 3, 2020, prior to the unsealing of Dr. Fishman's Indictment, his attorney, Andrew Feldman, submitted a Memorandum in support of the defendant's application for a declination of prosecution or a non-criminal alternative to prosecution (A copy of the Memorandum is annexed hereto as **Exhibit B**). The application noted Dr. Fishman's exemplary record as a veterinarian and his work in developing new products to improve the health and welfare of the animals he treated in his practice.

The application made it abundantly clear that Dr. Fishman intended to continue in the practice of veterinary medicine and to continue to dispense his veterinary products overseas. To quote from the application:

> There is no threat or harm currently posed by Dr. Fishman to U.S. animals, U.S. taxpayers or the U.S. Government. This is because Dr. Fishman intends to export all animal drugs and/or devices overseas. As set forth below, the exportation of new animal drugs is not a criminal offense in the United States under the FDCA. *See* Ex. 7, 21 U.S.C. § 381.

The application described the parameters of the export exemption pursuant to which Dr. Fishman intended to maintain his practice of distributing veterinary products.

The memorandum noted, in support of his "good faith" effort to conform his business practices to law, that Dr. Fishman had retained the services of the law firm Quarles & Brady, and an expert FDA Attorney specializing in FDA-veterinary issues, Ted Sullivan. Mr. Sullivan previously worked for the FDA and had "a robust FDA-veterinarian regulator practice." The memorandum included his curriculum vitae as an exhibit.

While the Government determined not to grant the defendant's application for a deferred prosecution, it took no immediate steps to ensure that Dr. Fishman's ongoing practice did not violate the terms and conditions of his bail.

On March 3, 2020, an Indictment was unsealed charging Dr. Fishman with two counts of conspiracy to violate the adulteration and misbranding statutes. (A copy of the Indictment is annexed hereto as **Exhibit C**).

At an early appearance before this Court, prior counsel brought a motion to modify the conditions of his release in order to permit him to travel to the United Arab Emirates. The motion contained the following language, demonstrating, yet again, Dr. Fishman's intention to continue in the export business while confining his distribution of products to accord with the export exemption:

> The purpose of his travel is straight forward. Dr. Fishman at present has no clients (veterinarians or trainers) or patients (camels or horses) in the United States and must travel to survive. Dr. Fishman occupies the role as Chief

Research Officer with Presidential Camels, Sector of Scientific Centers & Presidential Camels. In that role, Dr. Fishman has worked on research and involving zoonotic diseases and African sleeping Sickness and breeding. Prior to the Indictment, Dr. Fishman's veterinary practice focused primarily on servicing clients in United Arab Emirates (UAE). Following the Indictment, Dr. Fishman's primary source of income has been the exportation of certain veterinary products to the UAE.

A copy of the defendant's motion is annexed hereto as **Exhibit D**.

The Government opposed the defendant's application primarily on the basis that he presented a flight risk as a result of his ties to the United Arab Emirates. While the Government suggested that such travel also might enhance the likelihood of continued criminal activity, in support of this assertion, the Government pointed only to "prior filings by the defendant and his foreign business partners." The Government made no mention of particular activity which it deemed violative of the export exemption, or the adulteration and misbranding statutes. While the application for a bail modification was denied, the Government, was, again, placed on notice of the defendant's business ties to the UAE.

Thereafter, on July 28, 2020, and again on August 3, 2020, the Government interviewed the defendant's Administrative Assistant. The interviews were conducted pursuant to the standard proffer agreement then in use in the Southern District of New York. (Annexed hereto, collectively, as **Exhibit E** are the FD-302s reflecting her two interviews with agents of the Federal Bureau of Investigation. A copy of her proffer agreement is annexed hereto as **Exhibit F**).

During the interviews, the Government learned that Dr. Fishman hired her to work as his Administrative Assistant in 2015. Her work involved keeping an inventory of products for the defendant's distribution business, Equestology, and the coordination of product shipments to customers. She confirmed that Equestology shipped products both in the United States and abroad. She related to the agents that in response to the search of the defendant's home and offices in October 2019, Dr. Fishman limited his business to exporting his products:

> Fishman never explained his legal troubles in full to [ ], but after October 2019, Fishman directed [ ] to work more on shipping energy drinks to the United Arab Emirates for Equestology.

It is worthy of note, that during these two proffer sessions agents were present in Dr. Fishman's office. The agent who prepared the report of the July 28th interview even included information regarding his observations of containers, plastic bins and shipping boxes found on the premises. Yet, it does not appear that the agents sought the consent of the Assistant to seize evidence; nor, did they seek a warrant to search the office.

**The Warrantless Search Of Dr. Fishman's Premises Was Not**
**Based Upon The Voluntary Consent Of His Administrative Assistant**

In or about November 1, 2021, the Government released 3500 material pertaining to those witnesses, the Government intended to call to testify against him at trial.  The materials included FBI reports reflecting the prior interviews with the Administrative Assistant and clearly demonstrating that she would be a witness against him at trial.  Counsel notified Dr. Fishman of the contents of the 3500 material.  Nonetheless, Dr. Fishman maintained the Administrative Assistant in his employ.

On or about November 30, 2021, agents of the FBI determined to conduct a search of the location where the Administrative Assistant was working on behalf of Dr. Fishman.  Among the agents involved in the planning and execution of the search of this location was SA Timothy Bergen, one of the same agents who participated in the earlier interviews of the Administrative Assistant.

The search took place on December 3, 2021.  The agents who conducted the search generated FBI reports documenting their search.  (A copy of these reports is annexed hereto as **Exhibit G**).

The agents noted that upon arriving at the premises, the Administrative Assistant had to unlock the door to let the agents into the premises.  The fact that the door was locked indicates that the premises did not function as an office, open to the public; but rather, as a location devoted to the manufacture and shipment of Dr. Fishman's products.

The report reflects that upon entering the premises, the agents and Administrative Assistant held a conference call with AUSA Sarah Mortazavi and Assistant's attorney to discuss the parameters of the search.  No comparable effort was made to contact counsel for the defendant.

While the Government's motion glosses over this, there is reason to question the voluntariness of the Assistant's consent to the search.  At the time that her consent to the search was sought and obtained, she had participated in two extensive proffers in which she revealed her involvement, over a seven year period, in the manufacture and distribution of Dr. Fishman's products.  While her proffer agreement granted a limited form of immunity for her statements, it did not preclude the Government from obtaining investigative leads.  Nor did it foreclose the possibility that the Administrative Assistant would be prosecuted for conspiracy or the aiding and abetting of a violation of the adulteration and misbranding statutes.  And, the proffer agreement contains the following paragraphs:

> (4) The client understands and agrees that in the event the client seeks to qualify for a reduction in sentence under Title 18 U.S.C. § 3553(f), the United States Sentencing Guidelines, § 2D1.1(b)(18) or 5C1.2, or Fed.R.Crim.P. Rule 35(b), the Office may offer or use at any stage of the criminal proceeding any statement made by client during the meeting, and all evidence obtained directly or indirectly therefrom […]

6

> (5) To the extent that the Government is entitled under this agreement to offer in evidence any statements by client or leads obtained therefrom, client shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule that such statements or any leads therefrom should be suppressed.

(Ex. F).

In other words, at the time her consent to the search was obtained (1) she was at risk of prosecution for the very offenses with which Dr. Fishman was charged; and, (2) subject to a proffer agreement that allowed ample opportunity to use her statements against her both at trial and at sentencing. Thus, the Administrative Assistant had little choice but to succumb to the demand by agents that they be permitted to search the premises.

**Dr. Fishman Sought, In Good Faith, To Conform His**
**Business To The Requirements Of The Export Exemption**

It should be noted that, during the period preceding Dr. Fishman's arrest, he made numerous trips to the United Arab Emirates for the purpose of discussing with those who purchased his products the precise specifications of these products; the number of doses contained in each bottle shipped; the number of bottles in each box; and the labels to be appended to each bottle. Once Dr. Fishman was precluded, by the terms of his bail, from traveling to the Emirates in support of his business relations, he was relegated to shipping products in accordance with the terms of his prior orders.

**Evidence Obtained During The Recent Search Fail To Demonstrate**
**That Dr. Fishman Violated The Export Exemption**

Among the photographs taken during the search and provided by the Government to defense counsel are several that indicate Dr. Fishman's compliance with the export exemption.

The Government has provided a photograph of the recipe for a homeopathic Bleeder paste. Among the photos, are pictures of large bottles of the ingredients listed in this recipe.[2] Moreover, the series of photographs includes a photo of labels marked "For Export Only."

It should also be noted that while the Government has furnished defense counsel with FD-302s describing the conduct of the agents in conducting the search, there are no FD-302s or agent notes reflecting conversations with the Administrative Assistant in which she stated either

---

[2] One of the Government's photographs contains the image of a bottle of the drug, Totrazaril. It is our understanding that this was an empty bottle which was inadvertently left in a refrigerator when it was returned by agents to the defendant following the earlier search of his business premises. We believe that this is the bottle referenced in the FBI report in which the following appears:

> When agents examined a clear glass bottle with a red cap, which contained a white powder that was found in an otherwise empty fridge, [the Assistant] said "that is from what you guys brought back to us."

7

that the defendant had expanded his export business beyond the description that she had previously provided; or that he was now involved in the domestic distribution of his products.

**The Timing Of The Government's Application Suggests That It Is Made**
**For Strategic Purposes Rather Than As The Result Of A Material Change**
**In The Defendant's Risk Of Flight Or Propensity To Engage In Criminal Activity**

At a remote conference on May 14, 2021, the Court noted its displeasure at motions filed belatedly, and for obvious strategic purposes.

In denying a motion to recuse the Court from further presiding over this case, based upon an inaccurate description of Your Honor's involvement in horse breeding, the Court noted that the motion was filed 18 months into the case and after this Court had been called upon to review hundreds of pages worth of defense motion in support of their motions to dismiss the Indictment.

The Court dismissed the motion as a "frivolous, and obvious tactical gambit […]" (Minutes of Remote conference at p. 12). Most respectfully, we would ask the Court to apply the same scrutiny to the Government's motives in bringing the current application for a bail review almost on the eve of trial:

The Government first began proffering its witness on July 28, 2020. Another extensive interview took place on August 3, 2020. During these interviews, the witness indicated that following his arrest, the defendant was focusing his business on the shipment of energy drinks to the United Arab Emirates. These interviews took place 15 months before the Government sought access to the defendant's premises.

The Government acknowledges that it began to prepare for a search of the defendant's premises in November of 2021. Yet, the Government fails to disclose any material, new, information obtained from this witness, or from any other source, indicating that the defendant had expanded his foreign shipments beyond the Bleeder paste and energy drinks identified by the witness; or that the defendant was now distributing his products domestically.

Assuming, *arguendo*, that this witness was capable of voluntarily consenting to a search of the defendant's premises, there is no good reason why the Government could not have sought her consent and conducted the search at any time subsequent to the July 28 and August 3, 2020 interviews.

Yet, the Government now seeks to have the defendant detained 4 weeks before his trial is scheduled to begin, when his ongoing contact with defense counsel will be most necessary in order to prepare his defense for trial.



## Conclusion

Under these circumstances, and in view of his otherwise exemplary record of compliance, the Government's application to modify the defendant's bail should be denied.

Most respectfully,

/s/Maurice H. Sercarz

Encls.