M1iWfisC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4            v.                          20 Cr. 160 (MKV)

 5   SETH FISHMAN and
     LISA GIANNELLI,
 6
                  Defendants.
 7                                        Conference
     ------------------------------x
 8                                        New York, N.Y.
                                          January 18, 2022
 9                                        2:15 p.m.

10   Before:

11                    HON. MARY KAY VYSKOCIL,

12                                        District Judge

13                         APPEARANCES

14   DAMIAN WILLIAMS
          United States Attorney for the
15        Southern District of New York
     BY:  ANDREW C. ADAMS
16        SARAH MORTAZAVI
          ANDEN F. CHOW
17        Assistant United States Attorneys

18   SERCARZ & RIOPELLE, LLP
          Attorneys for Defendant Fishman
19   BY:  MAURICE H. SERCARZ
          -and-
20   MARC A. FERNICH

21   FASULO, BRAVERMAN & DiMAGGIO, LLP
          Attorneys for Defendant Giannelli
22   BY:  LOUIS V. FASULO
          -and-
23   BOBBI C. STERNHEIM
     BY: ALEX S. HUOT (appearing remotely)
24
     Also Present:  Karline Jung, Paralegal Specialist
25
```

M1iWfisC

```
1                    (Case called; appearances noted)
2              THE COURT:  Good afternoon to all of you.  We're here
3     for the final pretrial conference in this matter.
4              There are a number of things I thought we should talk
5     about today, the first of which is voir dire, which will begin
6     tomorrow, first thing in the morning.
7              Before we do that, let's just talk about and make sure
8     everyone is comfortable with and doesn't have issues with the
9     setup in the courtroom.
10             MR. FASULO:  Judge, just one issue from me -- two
11    issues from me, actually.
12             THE COURT:  Yes.  I'm sorry, Mr. Fasulo.
13             MR. FASULO:  Two issues from me, your Honor.
14             THE COURT:  It might be better if to stand just so I
15    can see you.
16             MR. FASULO:  Yes, that's one of the issues that I
17    have.
18             THE COURT:  I know.  I know.
19             MR. FASULO:  One of the issues I have from where I am
20    right now is, and I'm OK to kind of move my head a lot, but I
21    can't see the Court often, so that could present a problem if
22    there's an objection or something, so I will try to move back
23    and forth.
24             THE COURT:  Yes, and speak loudly into the
25    microphone --
```

M1iWfisC

```
1              MR. FASULO:  Sure.
2              THE COURT:  -- if you have an objection.
3              MR. FASULO:  That's one issue --
4              THE COURT:  Yes.
5              MR. FASULO:  -- we can address with the Court.
6              The witness, however, though, if I have somebody stand
7     here and if somebody is in the booth, it really does block,
8     because of where this table is situated, it blocks my complete
9     vision of the witness.
10             THE COURT:  What if you sit in the other seat?
11             MR. FASULO:  Let me see.  Maybe that will be --
12             THE COURT:  Sometimes the simplest practical thing --
13             MR. FASULO:  Actually, if I do sit here --
14             THE COURT:  Yes.
15             MR. FASULO:  -- it will be much better.
16             THE COURT:  OK.
17             MR. FASULO:  So I think that will alleviate that issue
18    for me.
19             THE COURT:  OK.  That's an easy solution.
20             MR. FASULO:  Thank you, Judge.  Logistically
21    (inaudible).
22             And then the last thing is, as you know, Mr. Huot is
23    still working on the case, but he's not going to be at trial in
24    the courtroom, and I hope that's OK with the Court.
25             THE COURT:  Sure.
```

M1iWfisC

1          MR. FASULO:  So we're ready.  It's not an issue for us

2     in that regard.

3          However, Mr. McCabe, who comes from my office, he is

4     going to be in court, and I need him, obviously, because there

5     is a lot of last-minute juggling here.

6          THE COURT:  OK.

7          MR. FASULO:  I'm trying to figure out where Ms.

8     Giannelli should be.

9          THE COURT:  Yes, that was the issue I was going to

10    address with both of you.  It seems to me -- I know from time

11    to time when you're in the middle of the trial, you want to be

12    conferring with your witness so shouldn't Ms. Giannelli be in

13    the front row right next to where you are?

14         MR. FASULO:  That would be ideal, Judge, if we could

15    take the yellow --

16         THE COURT:  Oh, you mean that's blocked off?

17         MR. FASULO:  Yes, but if they could sit in this, that

18    would be perfect.

19         THE COURT:  I don't think we're allowed to take it

20    off, given the Covid protocols.

21         MR. FASULO:  Because that gives us distance.  For a

22    lot of different reasons, we feel it's much better there,

23    especially if I'm going to move here.  I don't really believe

24    Ms. Giannelli should be that close to the booth here, and as

25    well, she wouldn't be able to see the witnesses as well.

M1iWfisC

| 1 | THE COURT:  Well, the only other possibility --
| 2 | MR. FASULO:  This is perfect if you can make that
| 3 | happen.
| 4 | THE COURT:  I don't have the flexibility to remove
| 5 | that tape.  That was put there by the court to maintain the
| 6 | protocols.
| 7 | The only other thing I could suggest is she can sit
| 8 | with you at counsel table, but then your colleague can't.
| 9 | MR. FASULO:  Right.  Would it be OK with the Court if
| 10 | she sat in the second row?  That would be OK with us.
| 11 | THE COURT:  Is there tape on it?
| 12 | MR. FASULO:  No.
| 13 | THE COURT:  Yes.
| 14 | MR. FASULO:  The interesting thing is every other row
| 15 | is taped.  I'm just curious why it couldn't be every other row,
| 16 | and just change the --
| 17 | THE COURT:  Every other row, and what?
| 18 | MR. FASULO:  Every other row here is taped.
| 19 | THE COURT:  Yes, that's the social distancing.
| 20 | MR. FASULO:  Right, which is fine, which I understand.
| 21 | But my point is this is fine if she sits here, but there's no
| 22 | tape on this row.
| 23 | THE COURT:  There is or there is not tape?
| 24 | MR. FASULO:  There is not any tape.
| 25 | THE COURT:  Then she can sit there.

M1iWfisC

1          MR. FASULO:  OK.

2          THE COURT:  If there's no tape, she can sit there, and

3    that's what I was going to suggest.

4          MR. FASULO:  That would work perfectly, Judge.

5          THE COURT:  And Dr. Fishman, you may want to have him

6    sit in the same row, six feet apart, closer to your table, in

7    case you want to be conferring, but I leave it up to you.

8          MR. SERCARZ:  Your Honor (inaudible).

9          THE COURT:  Yes.  If there's no tape in the row, he

10   certainly can sit there.

11         MR. FASULO:  OK.  I didn't know how the Court felt

12   about the defendant sitting in that row, but as long as the

13   Court's OK, we're OK with it.  That works with us, and if we

14   have to get up, we can always bring paper to her and bring

15   paper back and forth.  So we're fine.

16         THE COURT:  Is there any issue on this end, from the

17   government's point of view?

18         MS. MORTAZAVI:  I'm sorry, your Honor.  Regarding the

19   defendants' positions?

20         THE COURT:  Yes.

21         MS. MORTAZAVI:  No.

22         THE COURT:  OK.

23         MS. MORTAZAVI:  No issues.

24         THE COURT:  Mr. Sercarz.

25         MR. SERCARZ:  In the event that, during the course of

M1iWfisC

1    the proceedings, I wish to consult with my client

2    unobtrusively, does the Court have any problem if I get up,

3    walk around, and go back and talk?  Because I'm comfortable

4    doing it; I just don't want you to feel I'm disrupting the

5    proceedings.

6            THE COURT:  Well, you really can't just walk around

7    the courtroom, because then you're getting within six feet of

8    the jurors and all of that, so you really can't do it.  You

9    have to tell me you need to confer.

10            MR. SERCARZ:  Then that's what I'll do.

11            THE COURT:  Are there telephones on counsel table?

12            MR. FASULO:  No.

13            THE COURT:  No?

14            MR. FASULO:  Judge, I'm looking.  I can only tell you

15    what I see.

16            THE COURT:  No?

17            MR. FASULO:  I cannot see one.

18            THE COURT:  I'm just surprised, because I spoke to the

19    District Executive yesterday about these issues.

20            Ms. Dempsey, can you make a note.

21            Because what I was told -- Mr. Sercarz, go back to

22    your seat.

23            What I was told was that's how you could confer with

24    your client, that she would be at the table with you, distanced

25    from you, but you could talk to her if you had concerns about

M1iWfisC

1    the distance.  So I don't know why they're not there.

2              MR. FASULO:  Maybe they'll be here tomorrow, Judge,

3    but they're not here.

4              THE COURT:  We'll try to look into it once we conclude

5    today, but Ms. Giannelli can certainly move up to that front

6    row, where you're telling me there's no tape, right parallel to

7    your table.

8              MR. FASULO:  Yes.

9              THE COURT:  And Dr. Fishman is welcome to come up and

10   do the same.  You're welcome to do so, sir.

11             MR. FASULO:  No.  We're fine, Judge, with this setup.

12   We're fine with Ms. Giannelli sitting in the second row.  We're

13   fine with me sitting over here.  So we are ready --

14             THE COURT:  OK.

15             MR. FASULO:  -- in terms of the defense and logistics.

16             THE COURT:  All right.  So that's it in terms of the

17   logistics, except for the phones.  We'll look into that.

18             Ms. Mortazavi.

19             MS. MORTAZAVI:  And your Honor, just to confirm that

20   the Court is comfortable with this arrangement for the

21   government.

22             THE COURT:  Did you move any chairs around, or is that

23   how it was?

24             MS. MORTAZAVI:  Ms. Jung, our paralegal, has added a

25   chair at the end so that she can take direction on which

M1iWfisC

1    exhibits to publish.

2          THE COURT:  I think she's technically too close to my

3    clerk.  Is she not?

4          MS. MORTAZAVI:  And that's why we sought the Court's

5    permission.  We're happy to shuffle things.  I have had a

6    trial, your Honor, where one of the assistants sat against the

7    wall to create some distance, but Ms. Jung does need to be

8    seated at that position.  I understand IT has already

9    configured her computer so that she can connect to the network

10   there.

11         THE COURT:  All right.  I'm fine with it if everybody

12   who is a participant is fine.

13         MR. SERCARZ:  Your Honor, Dr. Fishman has just come

14   forward to advise us that he wishes to be seated at counsel

15   table.

16         THE COURT:  Well, he can't be.  One of you has to

17   vacate your seat to give him a seat.  That's all we can do.

18         MR. SERCARZ:  We'll work with it as is, your Honor.

19         THE COURT:  Either one of you has to move from there

20   or he has to move.

21         MR. SERCARZ:  Mr. Fernich is invaluable to me, your

22   Honor.

23         THE COURT:  Well, you have to talk to your client

24   then.

25         MR. FERNICH:  One moment, your Honor?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M1iWfisC

1          THE COURT:  Yes.

2          MR. FERNICH:  I apologize.

3          THE COURT:  Somebody is hitting the microphone.

4          MR. FERNICH:  Your Honor, my understanding from

5   cocounsel, I'm not personally privy to this, is that the

6   executives or the people in charge of the logistics here in the

7   court, cocounsel's enhanced my understanding that we're

8   permitted to have three at the table.  I don't know if I'm

9   misinformed about that.

10          THE COURT:  I think you are, since the chairs are

11   where the chairs are.

12          MR. FERNICH:  OK.  If your Honor could, I don't mean

13   to --

14          THE COURT:  Yes, we'll check on it.  We'll check on

15   it, but I don't think that's going to be the case.

16          MR. FERNICH:  It certainly wouldn't be the first time.

17          THE COURT:  OK.  Anything else on logistics?

18          All right.  You all understand that the rules are --

19   I'm going to try to get this moved a little bit so that I have

20   a better sight line -- when you are questioning a witness or

21   giving your opening statement, you go to this lectern, in the

22   box, which has the HEPA filter, and you can remove your mask

23   while you are speaking from inside that box.  Before you leave,

24   put it back on so that you don't pass by Mr. Fasulo or his

25   colleague or Mr. Sercarz too closely.

M1iWfisC

1          The witness, when they take the witness stand, also

2     can remove his or her mask, because again, we have this HEPA

3     filter setup that will get the air out of here and, I guess,

4     spew it all over me.  I thought it was supposed to go

5     somewhere, but anyway, the witness does not have to be masked.

6          Throughout the trial, all of the jurors need to wear

7     their masks, as does everyone else in the courtroom.  People

8     need to maintain social distancing in the gallery area.  We've

9     alerted the District Executive's office that there has been

10    some interest in this trial, and there may be media coverage,

11    so there will be an overflow courtroom where things will be

12    streamed in through Teams.  I think the overflow courtroom, if

13    I'm not mistaken, is my own courtroom downstairs.  So if some

14    of you have colleagues, family, they're welcome to be here if

15    they get here early enough to get a seat, and if not, there is

16    the overflow courtroom where people can be.  OK?

17         Let's talk about and finalize everything with respect

18    to jury selection.

19         I have a couple of questions that I want to just

20    confirm with people, and in the meantime, Ms. Dempsey and my

21    clerk, Ms. Popper, who will be with me throughout the trial --

22    you all should get to know both of them if you don't know them.

23         This is Ms. Popper, my law clerk.  And I think you all

24    know Ms. Dempsey, and I intend to introduce them to the jurors

25    as well before we get going tomorrow.

M1iWfisC

1          We have taken what was tab 7 in the binder that was

2     submitted to me last week plus I received from -- I think the

3     letter came from Mr. Fasulo with some additional questions that

4     the defendants wanted me to add.

5          Yes, a January 14 letter with ten additional

6     questions.  I am going to ask all ten of those questions that

7     have been requested by the defendants.  We've pulled them into

8     the document that you gave us.

9          Are all parties now in agreement that that set of

10    proposed voir dire questions are acceptable?

11         MR. SERCARZ:  Yes, your Honor, on behalf of

12    Dr. Fishman.

13         MR. FASULO:  On behalf of Ms. Giannelli, yes, your

14    Honor.

15         THE COURT:  Thank you.

16         MS. MORTAZAVI:  Your Honor, as you know, we had

17    objected to two of the questions, but we understand the Court's

18    ruling on that and have no further arguments.

19         THE COURT:  All right.

20         So what we've done, we've pulled them all together.

21    We have a document that we're going to give you.  I've made

22    some edits.  They're relatively minor.  Frankly, I think for

23    the most part they're nonsubstantive, but I will hand out to

24    you now the document.  This is the composite of the tab 7 and

25    Mr. Fasulo's letter.  I am planning that we will hand these out

M1iWfisC

1    to the venire.

2             We will have 82, I think I was told, prospective

3    jurors.  That's all that will fit in the jury assembly room and

4    upstairs.  Hopefully we won't have any issues, and we'll be

5    able to get a pool of jurors from which we can pick our jury.

6    We need a total of 36 people after I screen people with you

7    for, first, hardship and, second, for cause against whom then

8    you'll all exercise your peremptory challenges.

9             I'm going to go through this with you in a minute to

10   just point out some of the changes that we've made.  I wanted

11   to just confirm that -- it's not in this document, but I want

12   to confirm that the case summary that was contained in the

13   letter I received over the weekend from the government has been

14   signed off on by all parties.

15            Ms. Mortazavi, obviously, the government is in accord.

16   Correct?

17            MS. MORTAZAVI:  Certainly that's the government's

18   proposal after having conferred with defense counsel, your

19   Honor, and I'm just reviewing the summary of the case on pages

20   8 and 9 of the documents that you circulated.  I see that

21   they're -- I just want to confirm with the Court that the

22   proposal the government put forward was adopted.  I see some

23   language that I recall defense counsel having objected to here.

24            THE COURT:  Hold on one second.

25            All right.  I thought we pulled in what was in the

M1iWfisC

1    letter from you over the weekend, Ms. Mortazavi.

2              MS. MORTAZAVI:  And I do recognize some of the

3    changes, your Honor, so as to this version, the government has

4    no objection.  And I'll leave it to defense counsel if they

5    want to comment further on it, but no issues from the

6    government's perspective.

7              THE COURT:  All right.  Give me one moment.

8              Ms. Mortazavi's letter represented to me that

9    defendants had seen it and signed off on it, I thought, or were

10   silent, and silent is deemed by me to be consent.

11             MS. MORTAZAVI:  That's correct, your Honor, and so I

12   will stop speaking and let the defense counsel speak.

13             THE COURT:  All right.  Fair enough.

14             I will tell you that I did make a couple of modest

15   edits to what was in Ms. Mortazavi's letter consistent with

16   what I had said on the record last week.  So let me, for

17   example, find what was submitted, where Ms. Mortazavi was

18   proposing to say Fishman is charged with agreeing with others

19   to distribute adulterated and misbranded performance-enhancing

20   drugs, also referred to as PEDs.

21             I mean I told you that I thought things were a little

22   redundant in that respect, and I've taken the liberty of taking

23   out those labels, but otherwise --

24             Mr. Fasulo.

25             MR. FASULO:  Judge, we worked with the government on

M1iWfisC

1    this, and we agree with the language that currently exists on

2    page 8 and 9 of your proposal, of your voir dire document.

3              THE COURT:  OK.

4              MR. FASULO:  So we are in agreement.

5              THE COURT:  All right.  Thank you.

6              Mr. Sercarz.

7              MR. SERCARZ:  Can I have one moment?

8              THE COURT:  Sure.

9              Just so everyone is clear, it is not my contemplation

10   that what I give to the prospective jurors is going to contain

11   this text.  I'm going to read this.

12             MR. SERCARZ:  Yes.

13             THE COURT:  OK.

14             MR. FERNICH:  Your Honor, (inaudible) just so that

15   we're clear that on pages 8 and 9 on the thicker submission,

16   the description of the charges, that this is intended to be a

17   thumbnail sketch of what the indictment alleges, we don't --

18   this is not intended to be a formal instruction as to what the

19   elements of the charges are, which is going to come at the end

20   of the case and which we've already had some written

21   submissions about and which we'll have more to say about later,

22   ahead of the Rule 30 conference; with that caveat, we believe

23   that this accurately summarizes the content of the indictment,

24   although we have some disagreement about the elements of the

25   offense, particularly, the last clause on each of the two

M1iWfisC

paragraphs, spread across pages 8 and 9, but I don't think it's

necessary to go through that now.

THE COURT:  No, no, no.  Be specific what you're

talking about, and if you're objecting, I want to know what the

objection is.

MR. SERCARZ:  Your Honor --

MR. FASULO:  Judge, I apologize, but because the

direction of the speech is towards the Court, it's really

helpful if we can have the mikes used.

THE COURT:  Yes.  You should just remain seated.  All

right?  Remain seated and pull the microphones to your mouths,

especially for today.

MR. SERCARZ:  It is our contention, your Honor, and

you will hear this repeated throughout, that the relevant --

THE COURT:  You don't have to speak louder now that

you're using the mike.  OK?

MR. SERCARZ:  I'll get the hang of it.

-- that the relevant intent is the intent to defraud

or mislead as to the adulteration and misbranding and not the

intent to enhance the performance of thoroughbred racehorses,

as suggested by this recitation in the questionnaire.  And it's

going to come up periodically.  I wanted the Court to be aware

of the distinction that we make.

THE COURT:  All right.  I understand what you're

saying now.  Thank you.

M1iWfisC

1          I need to go back and look at the indictment itself,

2     because this does purport to be a summary of the indictment,

3     not acquiescing in it in any way.  So if this is what the

4     indictment says, then it's going to stay.  If the indictment

5     reads otherwise, it will get changed.

6          MR. SERCARZ:  Thank you, your Honor.

7          THE COURT:  Ms. Mortazavi, do you want to say anything

8     at this point?

9          MS. MORTAZAVI:  No, your Honor.

10          THE COURT:  All right.  But I'd like you to please go

11     back and look at that.

12          MS. MORTAZAVI:  Certainly.

13          THE COURT:  All right.

14          OK.  I had not, frankly, intended to give you all this

15     document, but I guess it's just as well so that you have the

16     summary of the case.  This is my master script, which I'm going

17     to collect back from you before we leave.

18          The voir dire questions that you have in front of you

19     is what I intend to have the jury administrators hand to the

20     jurors once we get going, and the way things are going to

21     work -- I don't know if you've all seen the jury assembly room.

22     If you haven't, you might want to stop down there just to get a

23     sense of it.  Everything is different in the age of Covid, and

24     it's not an ideal arrangement, to be perfectly candid with you,

25     but the way it is set up is there are 40 or 42 chairs in the

M1iWfisC

jury assembly room, and then there's the overflow room upstairs
with another 41 or 42 seats piped in.  We'll have a big screen
so the people upstairs can see what's going on downstairs.

There are two microphones in the front of the jury
assembly room.  If it were only a one-defendant case, we could
have jurors come up two at a time to a center table with
counsel on either side, but because there are two defendants
here, you're going to need those tables -- obviously one for
the government and one for each of the defendants and their
counsel.

Ms. Fasulo will be all the way on the right, and she
should be closest to the window for reasons we talked about
last week.

MR. FASULO:  Yes, Judge.

THE COURT:  And that way she's distanced from
everybody else.

MR. SERCARZ:  You meant to say Ms. Giannelli, your
Honor.  You said Ms. Fasulo.

THE COURT:  I'm sorry.  I meant Ms. Giannelli, yes.
Mr. Fasulo is fine.

Then what we're going to have to do is we can't put
jurors in the box the way you would typically do, because
there's just not room with the social distancing.  So we'll
give everyone these questions.  I will tell them that it is
important that everybody pay attention and that they follow

M1iWfisC

along with me, because I am not going to repeat the questions.

I'm going to call up the first two jurors and go through these

questions one by one with them.  Then the next two will come

up, and I will ask them, are there any of the questions that I

asked to which your answers would be yes, and they can tell me.

And as needed, we'll go over them and do sidebars.

There's kind of a screened-off area where counsel and

I can confer and deal with sidebars and talk about whether

people need to be excused for cause or -- obviously, hardship

I'll deal with.  If we need to confer, we'll confer.  All

right?

And then we'll go through these questions.  We need to

get 36 prospective jurors, because we've talked about having

four alternates instead of two.  That means that the strikes

are, as I think set forth somewhere on here, but in any event,

you know the way it works, six for the government, ten for the

defendants.

What I need to understand from the defendants ahead of

time is are you jointly exercising your ten, or are you doing

five and five?  Have you talked to each other?

MR. FERNICH:  Give us two minutes for that?

THE COURT:  Yes.  Go ahead.

MS. MORTAZAVI:  Your Honor, you had mentioned this at

our last conference.  Is it the case that we will have

additional peremptory challenges.

M1iWfisC

1         THE COURT:  Yes.

2         MS. MORTAZAVI:  Very good.

3         THE COURT:  You mean for the alternates.

4         MS. MORTAZAVI:  Yes.

5         THE COURT:  Yes.

6         MS. MORTAZAVI:  OK.

7         THE COURT:  I'm going to get to that in a minute.

8         MS. MORTAZAVI:  Thank you, your Honor.

9         MR. FASULO:  Judge, we've conferred, obviously.  We're

10   going to do joint, that will be joint ten challenges.

11        THE COURT:  All right.  Terrific.  Thank you.

12        And then with regard to the four alternates, you get

13   your, you know, standard number plus, because we're doing four,

14   I think you get two additional per side under the rules.

15   Right?  No issues?

16        MR. FASULO:  That's my understanding, Judge.

17        THE COURT:  OK.  So that's how we will be proceeding.

18        Let me just quickly walk you through.  Really, I think

19   you want to just look at the boiled down sheet, although it

20   doesn't have page numbers, and I guess we should fix that for

21   tomorrow.

22        MR. FASULO:  Judge, if I may, just for clarity?

23        THE COURT:  Yes.

24        MR. FASULO:  Because I just want to keep on

25   (inaudible).  Can the Court tell me how many jurors we're going

M1iWfisC

1    to speak to at one given time before we begin to exercise, or

2    are we going to do the whole upstairs, downstairs panel and

3    then make our challenges?

4              THE COURT:  Who keeps hitting the mike?

5              MR. FASULO:  Me, of course, Judge.

6              THE COURT:  Please try and be careful.

7              MR. FASULO:  I'll try and be careful.  I promise.

8              THE COURT:  OK.

9              MR. FASULO:  I just want to know how the Court goes

10   about the jury selection.  I have not had an opportunity to try

11   cases in this courtroom.

12             THE COURT:  Well, we need to get 36 that haven't been

13   excused for hardship or cause.  Once we have that --

14             MR. FASULO:  Work with the 36.

15             THE COURT:  -- we'll work with the 36.

16             MR. FASULO:  Perfect.

17             THE COURT:  If people get excused beyond the initial

18   41 that are downstairs because of hardship or cause, then we'll

19   have to bring people down and they'll come up and we'll do the

20   questioning.  But once we have a group of 36 people that have

21   been cleared for hardship or for cause, then we're good to go.

22             MR. FASULO:  Right.  And then my question then really

23   was once we have that 36, if, during the questioning, the

24   Court, whatever happens --

25             THE COURT:  Then we have to bring people down.

M1iWfisC

1    MR. FASULO:  -- we'll bring people down, and then

2    we'll continue with that 36.

3    THE COURT:  Correct.

4    MR. FASULO:  And then we'll make our challenges.

5    THE COURT:  Correct.

6    MR. FASULO:  That was what I wanted to understand,

7    that we're bringing people into the mix, even if they may be OK

8    initially, but at some point --

9    THE COURT:  Yes.  If somebody goes for hardship or

10   cause, before your peremptories --

11   MR. FASULO:  Whatever.

12   THE COURT:  -- they get substituted --

13   (Indiscernible overlap)

14   MR. FASULO:  That's perfect for me.

15   THE COURT:  OK.

16   A couple of things to finalize about the questionnaire

17   before we turn to finalizing voir dire.  I need a list from

18   somebody of the names and the locations that the jurors are

19   likely to hear about.

20   Who is preparing that?

21   MS. MORTAZAVI:  The government will provide a copy

22   this evening, your Honor.

23   THE COURT:  All right.  Have you shared that with

24   defendants?

25   MS. MORTAZAVI:  No, but we will, and then we will

M1iWfisC

1    circulate it to the Court.

2            THE COURT:  All right.  But it can't be too late, Ms.

3    Mortazavi, because I've got to pull it into the document and

4    get the document copied for the prospective jurors for tomorrow

5    morning.

6            MS. MORTAZAVI:  Understood.

7            THE COURT:  OK.

8            MR. FASULO:  So we're assuming that anywhere where

9    it's gray, we're assuming anywhere it's gray, it's going to be

10   (inaudible) same color.

11           THE COURT:  Yes.  That's just a reminder for me to

12   talk to you about --

13           MR. FASULO:  I figured that.  I just wanted to bring

14   it to the Court's attention.

15           THE COURT:  Yes.

16           All right.  Let me walk you through quickly -- there

17   are questions that said something like "do you have an opinion"

18   that I just tinkered with the wording to say "do you believe."

19   I'll go through one by one, but I guess, as I said to you,

20   really nothing that I've done has been terribly substantive.  I

21   don't intend to have the follow-up questions asking is there

22   anything about your, let's just say, have you ever attended a

23   horse race; is there anything about that that would prevent you

24   from participating fairly and impartially?  I'm not going to

25   print that every time on this questionnaire, as you'll see, but

M1iWfisC

 1    obviously, I know to ask the follow-up.

 2              Let me just go through.

 3              Question 52, Ms. Mortazavi, the people you would like

 4    to have introduced, obviously, you, Mr. Adams, Mr. Chow and --

 5    I'm sorry.  Spell your paralegal's name.

 6              MS. MORTAZAVI:  Yes, your Honor.  Karline Jung.

 7    K-A-R-L-I-N-E, last name J-U-N-G.

 8              And we would also ask that the names of the case

 9    agents be read, which I'm happy to read into the record now or

10    email to you.

11              THE COURT:  We have Ms. Jung on No. 53.  Do we have

12    the agents' names correct?

13              MS. MORTAZAVI:  They are correct, your Honor.

14              THE COURT:  All right.  Thank you.

15              All right.  Paragraphs 54 and 56 and 57, if the

16    defendants and their counsel would please look at those and

17    tell me if you're fine with those.

18              MR. FASULO:  Yeah.  Judge, on 57 I would ask that you

19    add Sean McCabe, who will be sitting at counsel table, from the

20    firm of Fasulo, Braverman & DiMaggio.

21              THE COURT:  OK.  And I'm sorry.  Is he a lawyer or

22    paralegal?

23              MR. FASULO:  He's almost a lawyer.  He's a legal

24    specialist.  He's awaiting admission.

25              THE COURT:  OK.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M1iWfisC

| | |
|---|---|
| 1 | MR. FASULO:  We call him a legal specialist. |
| 2 | THE COURT:  But I'm a stickler.  I'm not going to |
| 3 | introduce him as counsel. |
| 4 | MR. FASULO:  No, no, no, no. |
| 5 | (Indiscernible overlap) |
| 6 | THE COURT:  OK. |
| 7 | Mr. Sercarz, paragraph 56. |
| 8 | MR. SERCARZ:  There's no one else who's going to be |
| 9 | sharing space with us, your Honor.  That will do it. |
| 10 | THE COURT:  OK.  Thank you. |
| 11 | MR. FASULO:  Oh, I'm sorry, Judge.  One other thing. |
| 12 | THE COURT:  Yes. |
| 13 | MR. FASULO:  I don't know why this gets picked up, but |
| 14 | Alex Huot is not of the law firm of Jay Goldberg, P.C.  He's |
| 15 | with the law firm of Bobbi Sternheim. |
| 16 | THE COURT:  Oh. |
| 17 | MR. FASULO:  Since he's not going to be in the |
| 18 | courtroom, I don't know that it's necessary. |
| 19 | THE COURT:  No, but I think since he's going to be |
| 20 | working with your team -- |
| 21 | MR. FASULO:  Yeah.  He's with Bobbi Sternheim. |
| 22 | THE COURT:  OK. |
| 23 | All right.  So we'll make those edits. |
| 24 | MR. FASULO:  Thank you.  Nothing else from the |
| 25 | defense. |

M1iWfisC

1          THE COURT:  And you are fine with Ms. Giannelli was

2     formerly known as or also known as Lisa Ranger.

3          MR. FASULO:  Ranger.

4          So, yes, Ms. Giannelli, as named in the indictment, or

5     formally known as Lisa Ranger --

6          THE COURT:  Ranger.

7          MR. FASULO:  Since the case started, she's no longer

8     Lisa Giannelli.  She is currently Lisa V-O-S-H-E-L-L, so that

9     may be relevant.

10          THE COURT:  Voshell.  OK.  I think we need to fix that

11     as well.

12          MR. FASULO:  For purposes of the trial, we're going to

13     address her -- I think all the documents are in Lisa

14     Giannelli's name.

15          THE COURT:  Yes, but I think there are some documents

16     or some mention somewhere of Ranger.

17          MR. FASULO:  Yes.  No.  Ranger or Giannelli, but we're

18     not planning on using both her names for the purpose of these

19     questions.

20          THE COURT:  OK.

21          MR. FASULO:  -- more complex than it already is.

22          THE COURT:  OK.

23          Turning over to question 66, you'll see this series of

24     questions I've made some edits.  I don't like the idea of

25     instructing the venire in the context of jury selection, so I'm

M1iWfisC

 1    taking out some of this language that was proposed:  "I

 2    instruct you that using a cooperating witness is perfectly

 3    legal."  That was proposed by the government.  Same thing with

 4    question No. 68.  That's why we've given you the more

 5    comprehensive document and made it clear what I've stricken.

 6    And it really starts with 66.  So I'll give you a few moments

 7    to look at that just so you see, but that is what I'm doing.

 8    I'm not really asking for edits.

 9               MR. FASULO:  Judge, from Ms. Giannelli's point of

10    view, I've read over the 67, I think, questions --

11               THE COURT:  Yes.

12               MR. FASULO:  -- 68 questions.  There are no objections

13    to the voir dire as proposed by the Court.

14               THE COURT:  Thank you.

15               MR. FERNICH:  No objections by Dr. Fishman.

16               THE COURT:  All right.

17               Do you need time, Ms. Mortazavi?

18               MS. MORTAZAVI:  No.  No objections from the

19    government, your Honor.

20               THE COURT:  All right.  So then if you would all

21    please hand me back this master document that shows you the

22    edits I've made.  If you want, you can keep the shorter

23    document, although obviously we need to make minor tinkering to

24    reflect the fixing of the names and pull in the witnesses, the

25    locations and the list of names.

M1iWfisC

1          MR. SERCARZ:  Your Honor, there is a question that we

2     had, defense counsel had, which we do not really answer, and it

3     deals with the question of juror vaccination.  I, frankly,

4     don't recall that we resolved this at the initial pretrial

5     conference, but the questions are is the Court going to inquire

6     into the vaccination status of the prospective jurors, and is

7     it going to do so in front of all the parties or *ex parte*?

8          THE COURT:  I was not intending to inquire.  That's

9     what you thought?  Is that what you said?

10          MR. SERCARZ:  Yes, that was what I thought you said,

11     but I didn't see it in the transcript.

12          Thank you.

13          THE COURT:  Is there any comment by anyone with

14     respect to that?

15          I know some judges do ask, but, frankly, I think

16     people have privacy rights that I believe should be respected

17     unless I hear otherwise.

18          MR. FASULO:  Judge, I have no objection to that.

19     However, I'm just curious, taking this one step further.  What

20     happens if a juror who is selected has that question in terms

21     of the other jurors that are sitting amongst them?

22          THE COURT:  Well, they're all socially distanced at

23     all times.  If you see the jury box has been -- you do

24     understand that that section there is --

25          MR. FASULO:  That'll be the response of the Court,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M1iWfisC

1    that we socially distance.

2            THE COURT:  Yes.

3            MR. FASULO:  -- not requiring --

4            (Indiscernible overlap)

5            THE COURT:  Correct.  And when they take their

6    breaks -- I mean I spent the afternoon after our last

7    conference reviewing all the space.  The jurors are taken by

8    court staff to two separate rooms, where they are not even

9    allowed to -- I mean, there are marks on the table where they

10   have to sit, and they are all completely socially distanced.

11   Some of them are in their own little cubby room, separated from

12   each other.  So they will not be -- and the same is true when

13   they're deliberating.  They will not be closer than six feet to

14   each other, and they have to wear their masks, unfortunately.

15           MR. FASULO:  That's fine.  So that would be the

16   Court's response, and I'm fine --

17           THE COURT:  Yes.

18           (Indiscernible overlap)

19           MR. FASULO:  I just wanted to play out in my head that

20   situation if a juror had an issue.

21           THE COURT:  Yes.

22           MR. FASULO:  Very well.

23           THE COURT:  That's how we'll be taking it.

24           Now, the final thing I just want to talk to you

25   about -- has everyone given back that master document?

M1iWfisC

1          OK.  The final thing I just want to make people

2     understand, because different judges do things different ways,

3     we're going to use the struck jury method, and it is the

4     Court's plan to give you each a sheet that will have the

5     numbers of the jurors on it.  We'll break once we have the 36.

6     We'll have a separate room for the defendants and a separate

7     room for the government in the back here, and you can

8     physically strike on that sheet the appropriate number of

9     people from the jury pool first.  Then, separately, you'll do

10    the strikes with respect to the alternates, and the first 12

11    who are not stricken will be our jury and the first four who

12    are not stricken from the alternate group will be the

13    alternates.

14          Any questions?

15          MR. SERCARZ:  Yes, your Honor.  When in the process do

16    you include challenges for cause?

17          THE COURT:  Early on, before we get to the settling on

18    the 36.

19          MR. SERCARZ:  OK.  I thought you were going to -- oh,

20    all right.  I see.

21          Thank you, your Honor.

22          THE COURT:  As we go through the questioning, if

23    there's need for a sidebar, you know, then I'll hear from each

24    of you, from each side.  If you think someone should be

25    stricken for cause, you'll say that to me and then I'll hear

M1iWfisC

1    from the government, and then I'll rule.  OK?

2              MR. FASULO:  Ms. Giannelli has no objection.

3              Judge, you mentioned sidebar.  I guess you'll get to

4    this.  I understand the sidebar downstairs.  I've been familiar

5    with that room.

6              THE COURT:  Yes.

7              MR. FASULO:  I'm questioning now the sidebar in this

8    courtroom, how we go about that.

9              THE COURT:  Right over here.  I have to say, given the

10   very limited space and the fact that you're going to end up

11   being too close, really, to my clerk --

12             MR. FASULO:  I see.

13             THE COURT:  We will do it right over here.  I'll come

14   over this way, but you really are going to have to have just

15   one lawyer for each party.  It's not going to work for the

16   whole team to come up with the client.

17             MR. FASULO:  That's fine, Judge.  I just wanted to --

18             THE COURT:  Yes.

19             MR. FASULO:  -- looking at this space.

20             THE COURT:  Sure.  No.  That's fair.  I mean none of

21   this is ideal.  You're right, Mr. Fasulo.

22             Mr. Adams, did you have something?

23             MR. ADAMS:  Your Honor, only to say that we're going

24   to try at every break to forecast as many issues as might arise

25   as possible to minimize sidebars.

M1iWfisC

1          THE COURT:  Yes.  Well, I thought -- yes, I'm going to

2     talk to you in a few minutes about rules for the conduct of the

3     trial, and that will be one of them.  But you anticipate, to

4     the extent you can, every time we have a break you can talk

5     about issues so that we can excuse the jurors and we can do it

6     without having to come up to sidebar.  But we'll talk about all

7     of that in a moment.

8          Any other questions or comments on selecting the jury?

9          MR. FASULO:  None from defendant Giannelli.

10          THE COURT:  Mr. Sercarz.

11          MR. SERCARZ:  No, your Honor.  Thank you.

12          THE COURT:  Ms. Mortazavi.

13          MS. MORTAZAVI:  None from the government.

14          THE COURT:  All right.

15          Let me just be clear.  Are you taking the lead, Ms.

16     Mortazavi?  Should I be calling on you first?

17          MS. MORTAZAVI:  Depending on the issue, your Honor.

18          THE COURT:  Tomorrow, for example, jury selection.

19          MS. MORTAZAVI:  And I think that also could be a

20     matter up for discussion, but we will --

21          THE COURT:  All right.  You'll let me know.  OK.

22          MR. ADAMS:  We will take a lead person.

23          THE COURT:  All right.  Look, I don't want to be

24     disrespectful to either of you, but what I'm saying is it

25     appears Mr. Fasulo is the lead for Ms. Giannelli.

M1iWfisC

| | |
|---|---|
| 1 | Mr. Sercarz, am I correct that you're taking the lead? |
| 2 | MR. SERCARZ:  You're correct. |
| 3 | THE COURT:  OK.  For Dr. Fishman.  OK. |
| 4 | All right.  Let me just talk to you about a couple of |
| 5 | other things, then.  I have a request from Dr. Fishman's |
| 6 | lawyers to bring electronic devices into the courthouse.  If |
| 7 | anybody else has one, it behooves you to get it in quickly |
| 8 | because I can't control how quickly the District Executive's |
| 9 | office acts on these things. |
| 10 | MR. FASULO:  We have ours in as well, Judge. |
| 11 | THE COURT:  OK. |
| 12 | MR. FASULO:  We filed yesterday -- |
| 13 | THE COURT:  Ms. Mortazavi. |
| 14 | MR. FASULO:  We filed yesterday with the wrong number, |
| 15 | and we refiled it today. |
| 16 | THE COURT:  OK. |
| 17 | (Indiscernible overlap) |
| 18 | MS. MORTAZAVI:  And your Honor, I spoke with Ms. |
| 19 | Dempsey this morning -- |
| 20 | THE COURT:  OK. |
| 21 | MS. MORTAZAVI:  -- and she's indicated that we did not |
| 22 | need an order, but we're happy to submit one if the Court |
| 23 | requires it. |
| 24 | THE COURT:  Whatever the rules are that she told you. |
| 25 | She knows these things better than I do. |

M1iWfisC

1        MS. MORTAZAVI:  Very good, your Honor.

2        THE COURT:  OK.

3        All right.  I'm told by the jury administrator that

4    you are supposed to -- I just want to put this out there -- at

5    the close of the evidence provide to the Court a thumb drive

6    with a copy of all of the evidence that has been introduced.

7    All right?  So that both sides understand that?

8        MS. MORTAZAVI:  Yes, your Honor.

9        THE COURT:  Mr. Fasulo, any questions?  Do you

10   understand?

11       MR. FASULO:  I understand, Judge.  We'll give a thumb

12   drive of all the exhibits that have been entered into

13   evidence --

14       THE COURT:  Right.

15       Mr. Sercarz, OK/

16       MR. SERCARZ:  Understood.  Understood.

17       THE COURT:  All right.

18       When is the government going to be getting me your

19   exhibits, your exhibit list, your 3500 materials?  Or are you

20   intending to give me binders?

21       MS. MORTAZAVI:  Yes, your Honor.  We're preparing

22   hard-copy binders, and they're ready to be delivered to the

23   Court tomorrow.

24       THE COURT:  And you intend to hand them to the Court

25   witness by witness?

M1iWfisC

1          MS. MORTAZAVI:  We were going to provide the Court

2     with a full set of the 3500 materials and the exhibits.

3          THE COURT:  That's what I expected, yes.

4          And I'll get them when?

5          MS. MORTAZAVI:  Tomorrow, your Honor.  Our paralegals

6     are diligently working to put those together.

7          THE COURT:  OK.

8          Does the government have an estimate of how long you

9     anticipate your opening to be?  Have the parties discussed

10    this?

11         MS. MORTAZAVI:  We have not discussed it with defense

12    counsel.  The government anticipates 20 minutes.

13         THE COURT:  I'm sorry?

14         MS. MORTAZAVI:  20 minutes, your Honor.

15         THE COURT:  OK.

16         And defendants.

17         MR. SERCARZ:  15, your Honor, for Dr. Fishman.

18         MR. FASULO:  Five minutes, five to ten minutes, Judge,

19    for Ms. Giannelli.

20         THE COURT:  OK.  All right.  If we have a jury in

21    place, it's the Court's expectation that we're doing opening

22    statements tomorrow.  OK?

23         All right.

24         MR. FASULO:  No objection.

25         On that note, Judge, can I ask one other question?

M1iWfisC

```
1              THE COURT:  Of course.
2              MR. FASULO:  If we have a jury in place and we do do
3    opening statements tomorrow, are we also going to go into
4    witness testimony tomorrow?
5              THE COURT:  Depending on the timing, yes.
6              MR. FASULO:  OK.  Just so we can get --
7              THE COURT:  Are you going to have a witness ready?
8              MR. FASULO:  -- from the government and we know which
9    witnesses they're putting on so we are not surprised at the
10   last minute.
11             Thank you.
12             MS. MORTAZAVI:  Yes, your Honor.  We have a witness
13   available tomorrow afternoon, should we proceed.
14             THE COURT:  OK.  And you'll provide notice to the
15   defendants.
16             MS. MORTAZAVI:  We've already discussed the order of
17   our witnesses, depending on whether we commence witness
18   testimony Wednesday or Thursday.
19             THE COURT:  OK.
20             All right.  And how are the parties planning to handle
21   the stipulations that you've been mentioning to me?
22             MS. MORTAZAVI:  With respect to reading them into
23   evidence, we will plan to do that throughout the proceeding.
24             THE COURT:  Just as it goes in the flow of your case
25   presentation.
```

M1iWfisC

1          MS. MORTAZAVI:  Yes.

2          THE COURT:  OK.

3          All right.  Ms. Mortazavi, do you have a general sense

4     of how long you anticipate the government's case will take?

5          MS. MORTAZAVI:  I assume, your Honor, if we begin

6     Wednesday -- it's difficult to predict the cross-examination,

7     particularly with two defendants and two sets of defense

8     counsel, but we anticipate perhaps ten full trial days.

9          THE COURT:  OK.  And you'll update us as you're going

10    along how you're doing, because I do intend to say to the

11    jurors that we think this case will last roughly 15 trial days,

12    three weeks, and that we should be finished by whatever that

13    date is, but obviously I can't guarantee it.  But we will try

14    to keep them updated throughout the course of the trial on how

15    we're doing in terms of our anticipated schedule.

16          I think I talked to you all last week about the fact

17    that we will conduct trial every day from 9:30 -- I may have

18    said five, but after talking with the jury administrators,

19    they're recommending 4:30-ish.  We'll see.  But that's the

20    ballpark, full days 9:30 to 4:30, 5:00 every day.

21          We'll do lunch every day from 12:30 to 1:30.  It has

22    to be at that time.  I mean, obviously, if you're in the middle

23    of a sentence, I'm not going to say we're breaking now for

24    lunch, but the court staff needs to know.  I think you know we

25    bring lunch in for the jurors during Covid to try to cut down

1    on people being outside and mixing.  So I need to give them

2    some sense of what we're aiming for.  So we're talking roughly

3    12:30 to 1:30 for lunch, and then a midmorning and a

4    midafternoon break.  If there are things we need to talk about

5    when we break, if you would please try to give me a heads-up so

6    that, as somebody mentioned, we can cut down on the need for

7    sidebars.

8           We'll start with the jury at 9:30 every day.  I will

9    be available then at 9:00 each day for any discussions that we

10   need to have.  Obviously if something comes up that's more

11   significant -- I hope it doesn't -- but if that happens, we can

12   adjust and meet slightly earlier than that.  I would need you

13   to let me know each day if there are significant enough things

14   that you anticipate you need to start before 9:00.  Otherwise

15   we'll do 9:00 each day.  I'll meet with you all and we'll deal

16   with anything that might arise.  If there's nothing, you can

17   all go get another cup of coffee and I'll see you back at 9:30

18   when the jury resumes.

19          All right.  There are not any holidays that I'm aware

20   of that are during the period that we're going to be on trial,

21   so there's nothing that we need to deal with with that.

22          In terms of trial procedures, just a reminder, when

23   you're questioning the witness, you need to stay in that box,

24   especially during the era of Covid.  You cannot be walking

25   around here next to counsel table, in front of the jury.  I

M1iWfisC

know lawyers like to sometimes be dramatic and all, but you have to stay in that Plexiglas enclosure there.

I would ask that you please stand when the jury enters and leaves the courtroom. I know some judges during Covid have said don't do that, but I think the jury's entitled to that much respect from all of us. So I'd ask you to please do that.

Also, I will not tolerate speaking objections. If you have objections, just say objection and I will rule. If I need to hear from you, I'll let you know. OK?

I believe that is it in terms of logistics.

The final thing I have is to talk to you about the letters that I got from everybody over the weekend with respect to the *in limine* motions.

There is nothing in the letters I received that changes my view with regard to the death of the horse in Delaware. That's off limits. It's acceptable to talk about, as you know, I think I ruled last week about the fact that there was an investigation. There was a complaint. You've told me you have a stipulation for how you're going to handle what the outcome of that was, so that is my ruling.

With regard to the experts, I would like to better understand the statement in the letter that I got. This is ECF-687, although, I think --

Mr. Sercarz, is this letter from you?

MR. SERCARZ: Yes.

M1iWfisC

1        THE COURT:  Yes.

2        -- where you say on January 10, the government

3    provided defense counsel with a substantial additional trove of

4    3500 material.  Would you define a trove, additional trove,

5    substantial additional trove.

6        MR. SERCARZ:  Your Honor, I'm making an estimate here,

7    but there are now 35 witnesses for whom 3500 material has been

8    provided.  Of those I would estimate that we have received

9    additional 3500 material for approximately a quarter of the

10   witnesses, and the number of additional exhibits that we have

11   received ranges from one or two up to 10 or 15 exhibits.

12       I will hasten to add that in those cases where there

13   are multiple exhibits, very often they involve a series of

14   photographs.  With regard in particular to Dr. Cole, for

15   example --

16       THE COURT:  Yes, that's what we're talking about.

17       MR. SERCARZ:  All right.  Well, the trove that I

18   described refers to the general proposition --

19       THE COURT:  All right.

20       MR. SERCARZ:  -- the number of exhibits of 3500

21   material.

22       With regard to Dr. Cole -- and again, this is an

23   estimate, and the government will correct me -- I would say

24   that we received somewhere in the neighborhood of seven to ten

25   additional items of 3500 material, sometimes including more

M1iWfisC

1    than one of these -- I can't call them articles, but these

2    statements of which I provided you the most relevant one,

3    relating to subject matters that it appears she may be called

4    upon to testify about.

5              THE COURT:  All right.  Here's the Court's ruling.  My

6    view with regard to the government's three experts is the same

7    as it was last week.  I am not going to preclude them, but the

8    government is on notice that experts cannot invade my province

9    in terms of telling jurors what they think the law is or what

10   they think the statutes that govern here mean, and if they do

11   they're going to be reprimanded in front of the jury.  But it's

12   fair ground for these people to opine.

13             Now, the question that remains then is the witness

14   that the defense wishes to call in response to Dr. Cole.  And I

15   told you last week that I, frankly, don't understand, and I'd

16   like to hear more about why disclosures were not timely made

17   with respect to -- it's Dr. Fenger, I believe.

18             MR. SERCARZ:  Yes, your Honor.

19             MR. FASULO:  Judge, (inaudible) Mr. Fishman's case,

20   because the defense, Ms. Giannelli, does not plan on calling

21   any experts.

22             THE COURT:  Yes.  That's correct.

23             MR. FASULO:  Thank you.

24             THE COURT:  Thank you, Mr. Fasulo.

25             MR. SERCARZ:  Two things, if I may, your Honor?

M1iWfisC

1          THE COURT:  Yes.

2          MR. SERCARZ:  My particular concern about Dr. Cole, as

3     articulated in the letter, did not go so much as to the danger

4     that Dr. Cole would invade the province of the jury; I was

5     making another point in my letter.  In my letter, I tried to

6     make the point that the statutes themselves define the term

7     "safe" --

8          THE COURT:  Yes.

9          MR. SERCARZ:  -- with regard to a drug.  And the

10    doctor's article -- may I call it an article -- seemed to

11    suggest an intent on the part of the government to take her

12    through the Equestology product list and have her opine

13    regarding the safety and efficacy of each of those products.

14    And to go even further and to further particularize my concern,

15    there are instances in which she says that they will not

16    qualify as safe because they run afoul of FDA guidance, which

17    is not that objectionable to me, but there are other instances

18    in which she opines as to her view that the products are

19    dangerous to racehorses separate and apart from whatever FDA

20    guidance says about how they need to be manufactured and how

21    they need to be labeled.

22          There are instances in which the chemical content of

23    products are described, and the doctor offers an opinion that a

24    product with this type of chemical content would cause harm or

25    may tend to cause harm to a racehorse.  And to me, the argument

M1iWfisC

1  I tried to make is that that is independently objectionable not

2  only because it usurps the province of the Court but because it

3  is prejudicial.  All the government needs to prove in this case

4  is that there was adulteration and misbranding of the products,

5  not that the products pose an immediate threat to the health

6  and safety of racehorses.

7       THE COURT:  Well, but it does have to be with the

8  intent to defraud or deceive somebody.

9       MR. SERCARZ:  Here, again, your Honor, I would

10  respectfully submit that the question of whether the product is

11  viewed by an expert as independently dangerous to the horse is

12  independent of the issue of --

13       THE COURT:  Yes, I understand.

14       MR. SERCARZ:  -- whether or not, in adulterating or

15  misbranding, the defendant's effort was to conceal the fact

16  that he had adulterated and misbranded the product.

17       THE COURT:  I understand that last point.

18       MR. SERCARZ:  Thank you.

19       THE COURT:  You're correct.

20       But you haven't addressed your expert, which is what I

21  asked you about.  Why did you not timely comply with the agreed

22  deadlines?

23       MR. SERCARZ:  Your Honor, as I indicated, I would seek

24  to offer her only as a rebuttal witness.  If I am successful in

25  extracting on cross-examination from the government's witness

M1iWfisC

1    or witnesses a definition of VCPR, the

2    veterinarian-caregiver-patient relationship, that I feel is

3    consistent with my understanding and that I can live with from

4    a strategic point of view, I would never call her.  But if I

5    find during the course of testimony by government experts that

6    they are offering a view of VCPR that I find is inconsistent

7    with the common knowledge within the profession and which I

8    disagree with, I'm going to be in search of a remedy at that

9    point.  And I couldn't -- couldn't -- have met the requirement

10   of expert witness notice as to that until I had some sense of

11   exactly how it is that the government's expert is going to

12   define that relationship.

13            THE COURT:  OK.  I don't know what the understanding

14   was among the parties about the need to designate expert

15   witnesses and whether excluded from that designation was

16   rebuttal experts, but you certainly seem to have anticipated.

17            So let me hear from the government so I have a better

18   understanding here.

19            MR. ADAMS:  Your Honor, two points.

20            First, with respect to Dr. Cole, just to make one

21   additional point clear, the use of the phrase or the term

22   "product" when describing what Dr. Fishman was selling goes

23   directly to one of the issues that Dr. Cole will be addressing,

24   which is these are drugs, not simply that they are -- that they

25   are drugs.

M1iWfisC

1          THE COURT:  Are you uncomfortable sitting, Mr. Adams.

2     It might work better than standing.

3          MR. ADAMS:  If it's OK with you, your Honor.

4          THE COURT:  Sure.

5          MR. ADAMS:  Thank you.

6          And although Dr. Fishman may be uncomfortable with the

7     testimony comes out insofar as the effect of the products was

8     often deleterious to the horse's health, that just demonstrates

9     that they do have an effect, which goes to the question of

10    whether they were drugs, not merely products.

11         With respect to the rebuttal question, there seems to

12    be some conflation of the notion of whether you need to call

13    the expert versus what that expert would say.  And today,

14    sitting here, we don't have any understanding of what

15    Dr. Fenger would say or what her bases for saying it would be,

16    notwithstanding that it's perfectly understandable that

17    Mr. Sercarz might not know today whether he wants to call her.

18         THE COURT:  But was your protocol and understanding

19    that the parties had to designate to each other rebuttal

20    experts?

21         MS. MORTAZAVI:  Your Honor, we had set a reciprocal

22    expert disclosure -- we had proposed a reciprocal expert

23    disclosure deadline to the Court -- the Court adopted it --

24         THE COURT:  Yes.

25         MS. MORTAZAVI:  -- and ordered it -- of November 18.

M1iWfisC

1          THE COURT:  Right.

2          MS. MORTAZAVI:  We nonetheless had a conversation with

3    defense counsel, where Mr. Sercarz said he may supplement, I

4    think, a two-sentence letter that he gave us on Dr. Fenger with

5    appropriate materials for an expert disclosure, which include

6    3500 materials provided to her, any reports, within a week; and

7    if not, he was unlikely to call her.

8          THE COURT:  And you never got those materials?

9          MS. MORTAZAVI:  We've never received any supplemental

10   materials, your Honor.  He has known as of at least that date

11   that we were going to call an expert to speak to the

12   veterinarian-client-patient relationship.  Certainly before

13   that he knew the contours of the argument that the government

14   would make about establishing an appropriate

15   veterinarian-client-patient relationship.  It came up in

16   numerous letters, certainly something the defense could have

17   anticipated.  They could have easily met that deadline.  They

18   still have not, and I think that's the basis to exclude any

19   rebuttal expert.  It's not merely an opportunity to keep an

20   expert in defense's back pocket to be able to introduce at any

21   point in this trial.  If there are additional examinations that

22   need to be made of that expert, if there's a *Daubert* hearing,

23   it's going to be very disruptive to do it in the middle of

24   trial.

25         THE COURT:  I agree.

M1iWfisC

1          Why did you not give her the materials within a week

2     of your letters?

3          MR. SERCARZ:  If I'm not mistaken, and I may be, so

4     Ms. Mortazavi will correct me, I did provide the government

5     earlier on with Dr. Fenger's curriculum vitae --

6          THE COURT:  That's hardly expert disclosure.

7          MR. SERCARZ:  -- and her qualifications.

8          As to what she, as to the content of what she would

9     say on the subject of VCPR, in my conversations with Dr.

10     Fenger, the concept is broad.  It is nebulous.  It depends on

11     numerous factors, and I did not feel that I was in a

12     position --

13          THE COURT:  You mean it's not capable of scientific

14     testing or couldn't meet the *Daubert* standard?

15          MR. SERCARZ:  The definition of the VCPR is the

16     subject of scientific agreement.  I believe that there's a

17     section in the C.F.R., 21 C.F.R., that defines it, and I'm

18     perfectly comfortable with that.  And it is my expectation that

19     any witness called by the government will acknowledge that that

20     is the guidance --

21          THE COURT:  That's what you're going to do in

22     cross-examination, Mr. Sercarz.  You know, look, I'm sorry,

23     sir, but I said we can deal with that in cross-examination,

24     obviously.

25          MR. SERCARZ:  I agree.

M1iWfisC

| | |
|---|---|
| 1 | THE COURT:  I'm bending over backwards here to deal |
| 2 | with any potential prejudice, but you're not giving me anything |
| 3 | to work with.  You blew by the deadline that you agreed to and |
| 4 | that the Court ordered.  Ms. Mortazavi reached out to you -- |
| 5 | I'm taking representations as given to me -- reached out to |
| 6 | you, and you promised to give her materials within a week and |
| 7 | you didn't do that.  So absent somebody telling me something |
| 8 | different, I am not permitting Dr. Fenger to testify. |
| 9 | MR. SERCARZ:  I understand, your Honor, and I don't -- |
| 10 | for the record, I don't quarrel with Ms. Mortazavi's |
| 11 | representation. |
| 12 | THE COURT:  OK.  So that is the Court's ruling then. |
| 13 | That is all that I have on my agenda for today.  Is |
| 14 | there anything else that anybody wishes to raise? |
| 15 | MR. FASULO:  Judge, I just wanted the Court to be |
| 16 | aware, I respect the Court, and I understand.  I just don't |
| 17 | want the Court to think that I'm moving around. |
| 18 | THE COURT:  It's all right. |
| 19 | MR. FASULO:  I'm trying to, like, see you, and I don't |
| 20 | want to disrespect the Court in any way, so -- |
| 21 | THE COURT:  Not a problem. |
| 22 | MR. FASULO:  It's a real -- I'm not complaining about |
| 23 | it, but it's going to look like I'm a little -- |
| 24 | THE COURT:  I understand.  I intend, after we break, |
| 25 | to try to see what I can do with these screens too. |

M1iWfisC

1          (Indiscernible overlap)

2          MR. FASULO:  -- make sure you understand I'm trying to

3    be respectfully and --

4          THE COURT:  All right.  Thank you.

5          MR. FASULO:  -- be in a position to see you better.

6          MR. SERCARZ:  Your Honor, there's another brief issue

7    that I raised with Mr. Adams yesterday, and I told him we would

8    be bringing it up.

9          THE COURT:  OK.

10         MR. SERCARZ:  Mr. Fernich is going to make the

11   argument, but it deals with the reference to camels in many of

12   the items of 3500 materials, the fact that among the exhibits

13   are items of medicine clearly designated for camels, and it

14   involved the question of whether the government has the right

15   to offer quote/unquote camel exhibits as direct evidence of

16   guilt or whether this is "other act" evidence, which would be

17   the subject of our *Huddleston* analysis.  And Mr. Fernich can

18   further enlighten the Court.

19         THE COURT:  All right.  Before we do that, you said

20   you raised this with Mr. Adams.  Did you hear back, or is there

21   a dispute, is my question?

22         MR. SERCARZ:  Yes, there is a dispute.

23         THE COURT:  OK.

24         MR. SERCARZ:  Otherwise I wouldn't raise it.  I

25   attempted to resolve -- I wanted you to know that I made an

M1iWfisC

1    attempt to resolve it.

2                    THE COURT:  OK.

3                    Mr. Fernich.

4                    MR. FERNICH:  Yes, Judge.

5            Just briefly, before turning to the camel issue, I

6    want to be clear on the Court's ruling with respect to the

7    expert and make sure that I understood what my friend Mr. Adams

8    said appropriately, if my understanding is accurate.

9            I believe that he said that the expert's testimony, as

10   Mr. Sercarz described it, was necessary on the issue of

11   distinguishing products or articles, on the one hand, from

12   drugs, on the other.  The term "drug" has a statutory

13   definition in Section 321 of 21 U.S.C., to mean an article

14   intended for use in the diagnosis, cure, mitigation --

15                   THE COURT:  Mr. Fernich, I'm sorry.  I'm going to

16   interrupt you.  We're not going to have you read back the

17   transcript.  If you have a specific question, ask the question.

18   But if it's a question to Mr. Adams, do you need to occupy the

19   Court's time?

20                   MR. FERNICH:  I do not.

21           To the extent that Mr. Adams is arguing that the

22   expert's testimony is needed to differentiate these things, I

23   don't believe we're going to be disputing the issue that the

24   substances in question are drugs.

25           Further, the definition of new animal drug is a purely

M1iWfisC

objective definition as to whether the substance at issue is
generally recognized as safe and effective in the scientific
community.

        THE COURT:  Right.

        MR. FERNICH:  In our view, that's the testimony that
the expert at issue is qualified to opine upon.  And then,
transcending that objective inquiry, to drill down into the
specifics of these particular drugs at issue and whether they
are, in fact, safe or effective is marginally relevant, and its
prejudicial effect far outweighs any minimal probative value
given the fact that it's an objective inquiry, and all the
expert has to say is no, it's not generally so recognized, in
my scientific view, as safe and effective, and by definition,
these are customized drugs, so they're not going to be
generally recognized as safe and effective.  And I don't
believe there's going to be any dispute on that score either.

        THE COURT:  Mr. Fernich, if there's no dispute,
there's no dispute.  Then there won't be anything for me to
rule on, but I don't really know what the point is of your
speech that you just made.

        MR. FERNICH:  The point is that allowing the expert to
go beyond testifying that these drugs are not generally
recognized as safe and effective in the community to the
specifics of each particular drug and trotting out a parade of
potential horribles about each drug is minimally probative,

M1iWfisC

1    maximally prejudicial and should be excluded.

2              THE COURT:  Ms. Mortazavi or Mr. Adams.

3              MR. ADAMS:  Yes, your Honor.

4              First, I think we already went over this in motions *in*

5    *limine*, and the Court ruled on it.

6              THE COURT:  Yes.

7              MR. ADAMS:  But to reiterate, Dr. Cole, as opposed to

8    Dr. Bowman, is going to be testifying about, is essentially a

9    dictionary sort of witness:  This is the drug that's

10   represented to be in a particular product.  This is what this

11   drug is.  I know that on the basis of my studies, my expertise.

12   This drug has the following effect on the body of a horse.

13             THE COURT:  But why is that relevant?

14             MR. ADAMS:  The definition of a drug includes the

15   notion that the substance has an effect on the body of an

16   animal or a human.

17             THE COURT:  It does.  That's true.

18             MR. ADAMS:  That's that.

19             With respect to, beyond that simple fact, the notion

20   of the intent behind this conspiracy is further developed by

21   the nature of that effect, what happens to the body of the

22   horse.

23             THE COURT:  All right.  But now you're getting back to

24   the question that, I think, Mr. Sercarz raised earlier, which

25   is that the intent element of this charged offense is not an

M1iWfisC

1    intent to injure racehorses.

2            MR. ADAMS:  No.

3            THE COURT:  It's an intent to deceive or mislead.

4            MR. ADAMS:  Correct, your Honor.  Relevant to that is

5    the fact that these drugs are intended to be performance

6    enhancing, and that is the underlying nature of the overall

7    fraud, that we are attempting to --

8            THE COURT:  You didn't plead fraud.  You didn't plead

9    a fraud case here.  You pled drug adulteration and misbranding

10   with an intent to defraud or mislead.

11           MR. ADAMS:  Correct.  That's right.  That intent to

12   defraud or mislead ties back to the notion that we're going to

13   cheat at horse racing, get away with it, in part through the

14   use of untestable performance-enhancing drugs.  The fact that

15   they are, in fact, performance-enhancing drugs speaks to the

16   fact that they did hold exactly the intent that underlies the

17   purpose of the entire (inaudible).

18           Dr. Cole will talk about the effect of the drugs; that

19   will include her talking about the fact that in the body of a

20   horse, for example, a blood-doping drug, just by way of

21   example, will increase the oxygen level and the effect would be

22   greater performance, longer performance, etc.

23           THE COURT:  Could be.

24           MR. ADAMS:  That's right, and that's subject to

25   cross-examination, obviously.  And it's also subject to sort of

M1iWfisC

1    the potency and other factors that she will speak to with

2    respect to --

3              THE COURT:  And the size of the horse and all kinds

4    of --

5              MR. ADAMS:  Precisely, the dosage of the drug, etc.,

6    to the extent, by the way, that any of that was actually on the

7    label, because she's, of course, going off of information that

8    exists in the case at bar.

9              THE COURT:  All right.  Look, I understand both sides'

10   arguments here.  Some of this is really not the type of thing

11   that I can just rule on in a vacuum.  You have my rulings from

12   last week.

13             MR. ADAMS:  Yes.

14             THE COURT:  I gave you leave and I've reconsidered

15   with respect to Dr. Fenger, but my ruling is unchanged, just as

16   my ruling is unchanged with respect to the death of the horse

17   in Delaware.  The rest of it I'm going to have to take question

18   by question and rule on objections during the course of how the

19   evidence is unfolding.

20             MR. ADAMS:  Thank you, your Honor.

21             MR. FERNICH:  I'm just trying to narrow the areas of

22   the dispute for the Court and forecast where I'm going with

23   this.

24             THE COURT:  Why don't you try to narrow the areas of

25   dispute with your adversary.

M1iWfisC

1          MR. FERNICH:  Well, I understand Mr. Adams's point,

2     and I take it.  My point does not go to the

3     performance-enhancing effect of the drugs.  That's pleaded in

4     the indictment as a relevant motive for the commission of the

5     offenses.  I get that.

6          What I'm specifically drilling down into and what

7     Mr. Sercarz's letter, I believe, attempted to get at is the

8     next step, the adverse physical consequences from the horse and

9     potentially adverse physical consequences to the horse, and

10    that's what I'm claiming is maximally prejudicial, minimally

11    probative, given that the definition of unsafe is a purely

12    objective one.

13         THE COURT:  But the definition of a drug is something

14    that has an impact on the body of a human or an animal.  We

15    talked about this in the context of something earlier in this

16    case.  I don't remember when or how it came up, but that's the

17    definition of a drug.  So as I understand it, you're intending

18    on the fact of Dr. Fishman, you asked me to include questions,

19    I overruled the government's objection and I'm going to include

20    questions about whether things are homeopathic or just

21    supplements.

22         They're, therefore, entitled to put on evidence that

23    this is a drug within the meaning of the statute, and a drug is

24    something that has an effect on the physical -- I mean, I'll

25    look at the exact language, but that's what the statute says.

M1iWfisC

1    You can't have it both ways.

2                MR. FERNICH:  I'm not seeking to have it both ways.

3                THE COURT:  Well, you kind of are.

4                MR. FERNICH:  No.  I will confer with Mr. Sercarz and

5    Dr. Fishman to confirm my understanding of the defense in this

6    case.

7                THE COURT:  OK.

8                MR. FERNICH:  But I do not believe that we're going to

9    contest that these substances are drugs, and that, therefore,

10   should factor into the Court's 403 balancing with respect to

11   the further step that the government wants to take.

12               THE COURT:  Right, but Mr. Fernich, I'm going to say

13   what I said before.  I can't do a 403 balancing when you

14   haven't even figured out what your position is.

15               MR. FERNICH:  We will enlighten the Court as to that

16   first thing tomorrow morning.

17               THE COURT:  Right.  But I've told you I am not going

18   to rule on it in advance.

19               MR. FERNICH:  I understand.

20               THE COURT:  OK.  So we're not going to waste time.  If

21   we have time while we're waiting for the venire to be ready,

22   that's one thing.

23               MR. FERNICH:  I certainly don't intend to waste the

24   Court's time.

25               Now, turning to the camel issue, it's my position and

M1iWfisC

the defense's position as follows:  That the camel evidence may
have potential relevance as a piece of 404(b) evidence to the
extent it is offered for a proper 404(b) purpose and can
withstand Rule 403 balancing, but this is plainly extrinsic
rather than intrinsic evidence.  Nowhere in this 46-page
speaking indictment is there any reference to camel drugging.
The indictment is singularly focused on the drugging of
racehorses, and to be clear, this is not an argument simply
about unfair surprise.  I'm not claiming that.  This is a
recipe for a constructive amendment of the indictment, and I
would cite *U.S. v. Wozniak*, which I believe is 126 F.3d
something or other, a 1997 --

            THE COURT:  Why wasn't this in your *in limine* motions?

            MR. FERNICH:  We didn't understand that the government
was going to try to use camel evidence as substantive --
substantive, your Honor -- evidence as opposed to potential
404(b) -- I can see it coming in as 404(b) evidence with an
appropriate limiting instruction.  What I can't see is how this
could possibly constitute intrinsic evidence of the charged
conspiracy.

            THE COURT:  All right.  I hear you.

            OK.  Mr. Adams or Ms. Mortazavi, do one of you want to
be heard?  But I will tell you that this is striking me, again,
as -- I don't really know how I'm supposed to rule on this in a
vacuum because you're admitting that it may be appropriate in

M1iWfisC

1    certain circumstances but in other circumstances it may not,

2    and I have no idea what the government's case is going to look

3    like here.

4              MR. FERNICH:  I'm saying it's inappropriate in all

5    circumstances as direct substantive evidence of the charged

6    conspiracies.

7              THE COURT:  Right.

8              MR. FERNICH:  It may well be appropriate evidence as

9    404(b) proof, to the extent they're saying it's relevant to

10   motive, intent, opportunity.

11             THE COURT:  Right.

12             MR. FERNICH:  -- absence of mistake and the Court

13   makes a 403 finding.  What I'm objecting to is the government's

14   apparent effort to use this as direct substantive proof of the

15   charged conspiracies.  It plainly is not.  It's not embraced

16   within the scope of the four corners of the indictment.  It

17   broadens potential bases for --

18             THE COURT:  You're repeating yourself now,

19   Mr. Fernich.  I agree with you that it may be inappropriate,

20   but the problem with what you're arguing -- well, there's two

21   problems.

22             One is what I just said -- that I need to see how and

23   if the government even intends to use this.  And secondly, when

24   a party introduces evidence, they don't say, Well, I'm

25   introducing this not as direct evidence of the conspiracy but,

M1iWfisC

1    instead, for this other purpose.  You just introduce evidence.

2    You don't say --

3        So let me hear from someone from the government, and I

4    suspect this is one of these items that I'm going to have to

5    deal with as we have a better sense of how the case is

6    unfolding.

7        MR. ADAMS:  Your Honor, I'll speak to it.

8        THE COURT:  Pull the mike over, Mr. Adams.

9        Thank you.

10        MR. ADAMS:  Thank you, your Honor.

11        I'll speak to it, and I agree that it may well be

12    something that the Court needs to rule on as we get to

13    particular pieces of evidence.

14        THE COURT:  OK.

15        MR. ADAMS:  What I'd say, though, for the Court's

16    context, as we do that, is that this is direct proof in at

17    least two different ways.  One is they're the same drugs that

18    we're talking about, so when Dr. Fishman and Equestology make

19    an HP liter of plus and sell, it is created by Equestology.

20    Equestology is designed to create performance-enhancing drugs

21    for horses.  The fact that they are creating the same

22    performance-enhancing drug and then happen to sell it to a

23    client who wants to use it for a camel -- and potentially

24    camels and horses in many cases -- doesn't change the fact that

25    it is direct proof that what Equestology does is make horse

M1iWfisC

1  drugs; it's just that the client happens to wants to use it for

2  different purposes.

3          The other point here is that to the extent that the

4  defendants want to argue, at the end of the day, that the jury

5  ought to be instructed simply on the misdemeanor as opposed to

6  the fraudulent felony --

7          THE COURT:  Yes.  I haven't crossed that bridge.

8          MR. ADAMS:  Right.  To the extent that that becomes

9  relevant, the difference that they're trying to draw is

10  basically one of the particular direction of fraudulent intent

11  and not as to the fact that they're making this brand of drug.

12          THE COURT:  All right.  Look, is this something that

13  you're intending to discuss during opening statements?

14          MR. ADAMS:  No.

15          THE COURT:  OK.  So I am ordering there should be no

16  mention of camel evidence, the language you're putting on it --

17  I don't even know what that means fully -- during opening

18  statement from either side.  If this issue comes up in the

19  context of what you're intending to do, then you'll let me know

20  about that and we'll deal with it at one of these morning

21  conferences before any mention is made in front of the jury,

22  and I'll rule on it.

23          MR. ADAMS:  No problem.

24          THE COURT:  Mr. Fernich, if you --

25          I'm going to direct the government the day before to

M1iWfisC

1    let Mr. Fernich know so they can have notice.

2             Mr. Fernich, then if you want to submit something in

3    writing to amplify your argument a little bit more so that I

4    can rule on it the following morning and we don't delay things,

5    I will entertain that.

6             MR. FERNICH:  Sure, Judge.

7             THE COURT:  All right.

8             MR. FERNICH:  Thank you.

9             THE COURT:  All right.  Thank you.

10            OK.  Anything else?

11            MR. ADAMS:  Your Honor, if there's nothing else of

12   substance, just one thing on procedure --

13            THE COURT:  Yes.

14            MR. ADAMS:  -- for the remote witness that I wanted to

15   flag --

16            THE COURT:  Yes.

17            MR. ADAMS:  -- and put on the record.

18            This is with respect to Ms. Adams, who will be one of

19   the first witnesses.

20            THE COURT:  He's the witness.

21            MR. ADAMS:  She's the witness.

22            She may be -- if we begin witness testimony on

23   Thursday, she will be the first witness, and we are working

24   with Ms. Dempsey and with court technology officers to set up a

25   remote setup for her.

M1iWfisC

1              THE COURT:  OK.

2              MR. ADAMS:  We did a run through this morning that was

3       successful.  The notion will be that she will dial in to a

4       Microsoft Teams --

5              THE COURT:  Right.

6              MR. ADAMS:  -- be visible to the jury.  We will be

7       able to share screens to show particular documents to her.

8              THE COURT:  You all have screens, right, at your

9       tables?  So it will come on those screens.

10             MR. ADAMS:  It will come on those screens.  It will

11      come on the screen to the Court and will appear to be visible

12      to the jury box as well.

13             THE COURT:  Each juror has their own screen.

14             MR. ADAMS:  Yes.

15             And then for the gallery there's also a large screen.

16             THE COURT:  Yes.

17             MR. ADAMS:  All that seemed to be working this

18      morning.

19             What we have done to try and streamline this -- and I

20      flag it for the Court as a sort of point of procedure, and

21      we've spoken with defense counsel about this -- we are sending,

22      we have sent Ms. Adams a copy of the government exhibits that

23      we intend to use with her so that she can, in advance, go

24      through those in bulk.  And what I'm going to propose, to avoid

25      what is a rather bulky version of turning off the screen,

M1iWfisC

1    having her look at it outside the jury's view, turning it back

2    on, dragging it over, to have her review it, I'll lay

3    foundation for the documents sort of as a group of documents,

4    and then move to admit them subject to connection for relevance

5    down the line.  And that way, rather than have to do, showing

6    the witness the document outside the presence of the jury and

7    then change the technology so that we can then display it for

8    the jury, it will be a little more seamless.

9               THE COURT:  Have you talked with defense counsel about

10   this?

11              MR. ADAMS:  I have, and I understand there is no

12   objection to the procedure.

13              THE COURT:  Is that correct, Mr. Sercarz?

14              MR. SERCARZ:  Yes.  There's no objection to the

15   procedure.  We are reserving our right to object if we feel

16   that the use --

17              THE COURT:  Sure.

18              MR. SERCARZ:  -- of any particular document during the

19   testimony is not relevant or is objectionable for other

20   reasons.

21              THE COURT:  Yes, of course.

22              MR. SERCARZ:  All right.

23              THE COURT:  Mr. Fasulo.

24              MR. FASULO:  As to Ms. Giannelli, no objection to the

25   foundation being laid by the government in this way.

M1iWfisC

|   |   |
|---|---|
| 1 | THE COURT:  OK. |
| 2 | MR. ADAMS:  Thank you, your Honor. |
| 3 | THE COURT:  And have you provided those exhibits to |
| 4 | the other side? |
| 5 | MR. ADAMS:  They have been provided.  We're going to |
| 6 | flag exactly which ones we're going to use. |
| 7 | THE COURT:  OK.  And how are you proposing to get any |
| 8 | exhibits the defense might wish to use to -- Ms. Adams, you |
| 9 | said is her name? |
| 10 | MR. ADAMS:  That's correct, your Honor.  That is her |
| 11 | name. |
| 12 | If the defense wishes to use any particular exhibit, |
| 13 | obviously the government exhibits are going to be loaded on to |
| 14 | the government's computer at the outset of the day, so if |
| 15 | there's a particular government exhibit that is already |
| 16 | stamped, they just need to tell us which one to throw up, and |
| 17 | we can do that.  If there's a defense exhibit that they want to |
| 18 | put in, we need an electronic version of it in advance to put |
| 19 | on to the system to put up for her.  But we will be able to -- |
| 20 | it will be a little more cumbersome, but we will be able to |
| 21 | turn off the exhibit for the jury so that Ms. Adams can see it, |
| 22 | review it, authenticate it, if need be, and then we'd display |
| 23 | it for the jury. |
| 24 | THE COURT:  Anything from you, Mr. Sercarz, or |
| 25 | Mr. Fasulo? |

M1iWfisC

1          MR. FASULO:  One other thing, Judge.

2          THE COURT:  On this point.

3          MR. FASULO:  On this point.

4          THE COURT:  Yes.

5          MR. FASULO:  Yes.

6          THE COURT:  OK.

7          MR. FASULO:  In terms of the 3500 material, we had

8    agreed with the government as well that the 3500 material

9    relevant to Courtney Adams's testimony will be sent to her

10   attorney in Florida ahead of time, so if there's an issue on

11   refreshing recollection or some other nonintroduction evidence

12   issue that's related to the testimony, the witness will have it

13   available if, in fact, the technology in the courtroom failed.

14   So we have agreed that her lawyer can get that and the

15   government will give instructions on how they wish her or not

16   wish her to look at that before she testifies.

17         THE COURT:  All right.  That makes sense.

18         MR. FASULO:  -- agreed to that as well.

19         THE COURT:  That is acceptable to you, Mr. Sercarz?

20         MR. SERCARZ:  Yes.

21         THE COURT:  Mr. Adams, yes?

22         MR. ADAMS:  Absolutely, and it will be in the FedEx at

23   4:00.

24         THE COURT:  You'd better get moving.

25         Anything else from anyone?

M1iWfisC

<pre>
 1          All right.  I would like the parties to talk to each

 2   other and agree on -- obviously, I need to tell the jurors that

 3   this witness is going to be testifying remotely, but all other

 4   witnesses we're anticipating are going to be live, and why and

 5   that you've worked out all the logistics, so I'd like you to

 6   confer with each other.

 7          MR. ADAMS:  Sure.

 8          THE COURT:  And give me some proposed language before

 9   she takes the stand.  OK?

10          MR. ADAMS:  OK.

11          MR. FASULO:  Judge, on that note, I think the

12   application by the government and our understanding of the

13   reasons are already in the record.  I don't think that they're

14   going to all be necessary to tell the jury.

15          THE COURT:  No.

16          MR. FASULO:  But I do want there to be in the record

17   as to why the defense decided that this was going to be

18   acceptable to the defense.

19          THE COURT:  Well, I mean, in fairness, they need to

20   know some basic information --

21          MR. FASULO:  Right.

22          THE COURT:  -- so that no adverse inferences are going

23   to be drawn from the fact that, by agreement of all parties --

24          MR. FASULO:  Right.

25          THE COURT:  -- this witness is being permitted to
</pre>

M1iWfisC

1    testify remotely for health-related reasons.  Right?

2             MR. ADAMS:  Correct.

3             MR. FASULO:  Correct.

4             THE COURT:  That may be sufficient, but I want you all

5    to talk and give me the agreed language.

6             MR. ADAMS:  We will, your Honor.

7             THE COURT:  OK?

8             OK.  If there's nothing else, then, I thank our court

9    reporter very much.  We stand adjourned.  I'll see everyone

10   tomorrow morning at 9:30, and hopefully, we'll hear from the

11   jury administration people promptly that they're ready for us.

12            We should all meet here in the morning.  When the jury

13   administrator people call us, then we'll go down together.  We

14   are all going to collect behind the jury assembly room.

15            Does everyone know what I'm talking about?

16            MS. MORTAZAVI:  Yes, your Honor.

17            MR. FASULO:  Yes, your Honor.

18            THE COURT:  Then when we're ready we'll process in

19   together.  Obviously, the government takes the first table over

20   here and then the middle table for Dr. Fishman's counsel, or

21   however you work that out.  There are two seats at the table.

22   And then Ms. Giannelli will be at the far right-hand table.

23   OK?

24            MR. SERCARZ:  Yes, your Honor.

25            THE COURT:  OK.  Thanks, everybody.  Have a good rest

M1iWfisC

1    of the day then.  I'll see everybody in the morning.

2            Thank you.

3            MR. FASULO:  Thank you, your Honor.

4            (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25