M1KPFIS1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                     20 Cr. 160 (MKV)

SETH FISHMAN and
LISA GIANNELLI,

           Defendants.

------------------------------x       Trial

                                 New York, N.Y.
                                 January 20, 2022
                                 2:24 p.m.

Before:

                HON. MARY KAY VYSKOCIL,

                                 District Judge
                                 –and a Jury–

                     APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  ANDREW C. ADAMS
     SARAH MORTAZAVI
     ANDEN F. CHOW
     Assistant United States Attorneys

SERCARZ & RIOPELLE, LLP
     Attorneys for Defendant Fishman
BY:  MAURICE H. SERCARZ
     –and–
LAW OFFICE OF MARC FERNICH
BY:  MARC A. FERNICH

FASULO, BRAVERMAN & DiMAGGIO, LLP
     Attorneys for Defendant Giannelli
BY:  LOUIS V. FASULO

ALSO PRESENT:  KARLINE JUNG, Paralegal Specialist
                 SEAN McCABE, Paralegal Specialist

1              (In open court; jury not present)

2              THE COURT:  Please be seated, everyone.  All right.

3    I'm told that our jurors are on their way up.

4              (Pause)

5              MR. ADAMS:  Your Honor, if I could just flag one

6    thing?  In order to make sure that Ms. Adams can't hear me or

7    make faces, we actually had Ms. Adams log off of Teams.  So

8    after the opening statements are done, it will just take a

9    moment to communicate that she needs to log back on, but it

10   shouldn't be long.

11             THE COURT:  All right.  We'll just take a brief pause

12   at that point, but did you work out everything you needed to

13   with technology?  I thought before that we needed to take a

14   ten-minute break for you to deal with technology and all of

15   that.

16             MR. ADAMS:  No, I think we're good to roll right into

17   it.

18             THE COURT:  Okay.  All right.  Perfect.

19             (Jury present)

20             THE COURT:  All right.  You all may be seated.  We're

21   standing for you.

22             Thank you.  You all may be seated.

23             All right.  Ladies and gentlemen, good afternoon and

24   thank you very much for your patience.  We're about ready to

25   begin the trial in this case.  I wanted to say a few words to

M1KPFIS1

1    you about your service and to give you a couple of preliminary

2    instructions before we get going.  Are you able to see me okay?

3             JUROR:  Yes.

4             THE COURT:  Okay, all right.  So I want to just tell

5    you, the Federal Courts here in Manhattan have been in

6    continuous operation for 231 years.  We've operated through

7    several wars, through the pandemic you probably heard about in

8    1918, some come it the Spanish Flu pandemic, through the Great

9    Depression and through the attacks of September 11th on our

10   country.

11            During the present pandemic that we're all facing, the

12   judges of the court and the court staff have continued to

13   operate here at the courthouse.  During the worst of times, we

14   operated remotely from our homes and conducted proceedings on

15   platforms that you're all probably sick of by now, Zoom and

16   Teams, and those sorts of things.

17            After a break between March and August of last year,

18   we resumed jury trials, and since September of 2020, we've

19   conducted scores of jury trials and we've done so safely.  You

20   will be the 105th, I believe, jury that has tried a case in our

21   court during the pandemic.

22            So as I said to you before, jury trials are a part and

23   a bedrock of American democracy, and citizen jurors, each of

24   you, not judges, decide the outcome of criminal and civil

25   proceedings.  This right to trial by jury is enshrined in our

1    Constitution.

2         Notwithstanding Covid, each of you has responded to

3    the call to serve, and it's an important act of your

4    citizenship.  You're sending a message that you want the

5    cherished American institution of trial by jury to continue,

6    even in the most challenging of times.  So as I said before, I

7    hope that each of you, after your service concludes and even

8    many years down the road, will look back proudly on your

9    service during these difficult times and reflect really on what

10   a significant thing it is that you're doing.

11        We, as a court, have gone to great lengths to ensure

12   your safety during the pandemic and your service.  As you know,

13   everybody, you all had to be screened on your way into the

14   courthouse; so you know that everybody entering the courthouse,

15   even the judges, have to comply with certain safety protocols.

16        Just to give you some orientation about what this

17   courtroom looks like and how we're going to conduct things, all

18   of our witnesses -- except the first witness, who I'll tell you

19   about in a moment -- are going to testify from this

20   Plexiglas-enclosed witness stand.  There's a HEPA filter in

21   this witness box to take out all of the air and recirculate it.

22        Lawyers are going to conduct their examination from

23   over here in this Plexiglas enclosure, which also has a HEPA

24   filter.  While they are in either the witness stand or at that

25   lectern in the Plexiglas box, the people speaking can remove

1  their masks because of the HEPA filter.  They'll put them back

2  on before they leave the enclosure.

3       All other participants, including me, will wear a

4  facemask at all times, and we ask you each to please do so too.

5  I know it's not comfortable, but this is the time we're living

6  in.

7       All right.  We're going to provide you each day with

8  lunch, and you're going to eat lunch in that room --

9       Right, Ms. Dempsey?

10       THE DEPUTY CLERK:  Yes.

11       THE COURT:  -- where you were right before Ms. Dempsey

12  accompanied you here.  As you see, there's plenty of room for

13  you to socially distance there.  We're also going to provide a

14  light breakfast, I'll call it, each morning.  Beginning at 8:30

15  it will be available.  We're doing that so that you can be here

16  and be ready to be in your seats and begin with the trial

17  promptly at the time we talk about at the conclusion of the day

18  before.  You're not going to be in a regular jury room when

19  you -- well, you've seen we've retrofitted what used to be

20  courtrooms basically to be a room that will be large enough to

21  spread out and socially distance.

22       I think that our clerk's office and our district

23  executive has thought through every detail.  We'll try to keep

24  everything running as smoothly as possible.  If during the

25  trial there are any concerns, particularly related to Covid or

M1KPFIS1

any other concerns that you have, Ms. Dempsey will be your point of contact. She will give you, if she hasn't already, information so you know how to be in touch with her if there are any questions or any issues that you have.

All right? So momentarily, I'm going to give you -- well, we're going to hear opening statements from counsel. I told you that at the beginning of the trial, but I want to just give you a little bit more information about what to expect and some guiding principles that I need to ask you to keep in mind.

So we're going to begin the trial each day at 9:30. All right? That means I need to ask you to please arrive at a minimum ten or 15 minutes before that, but really, I'd ask you to be in the jury room at around 9:00. And like I said, at the very latest, you need to arrive in time to get through security downstairs, but we've given you the cards to help facilitate that a little bit.

We'll have a light breakfast available for you. Each day we'll take a short break mid-morning, then we'll break for lunch at 12:30 or so for an hour, and as I said, we'll provide lunch for you. We'll take another break in the afternoon, and we'll try to stop with testimony at about 4:30 each day. Obviously, I'm not going to stop a witness mid-sentence, but we'll stop around that time each day, just so you know for planning purposes and you can take care of whatever business you need to take care of then after that time.

1      All right.  So in terms of the conduct of the trial,

2 we're going to start with opening statements of the parties.

3 The government will give its opening statement first, and then

4 you'll hear from each of the defendants.  Opening statements

5 are an opportunity for the lawyers to give you a sense of what

6 they think the evidence will prove at trial.

7      After the opening statements, the government will

8 present its case, put on its evidence.  It will call witnesses,

9 one at a time, and as I said, they'll testify from this

10 Plexiglas witness box.  If at any point you have trouble

11 hearing or seeing, please let us know, and we'll try to see

12 what we can do to accommodate that because you are the people

13 who will assess the credibility of witnesses and decide what

14 you believe and what you don't believe.

15      So the government, when it's putting on its evidence,

16 will question witnesses.  That's called direct examination.

17 Defense counsel has an opportunity to ask questions of each of

18 the government's witnesses.  That's called cross-examination.

19 Then if the government wishes, it has the opportunity to ask

20 further questions, redirect, of its witnesses, and there may be

21 recross by defense counsel before I ultimately excuse each

22 witness.

23      After the government has called its last witness, the

24 defendants will have a chance to call witnesses.  Please

25 remember, though, the defendant has no burden to call any

1    witness or to present any evidence whatsoever.  The burden at

2    this trial is always and exclusively on the government to prove

3    guilt beyond a reasonable doubt.  Having said that, the

4    defendants may call witnesses, if either of them wishes to do

5    so.

6            After the evidentiary record is complete, the lawyers

7    have the opportunity to make closing arguments to you.  That is

8    their opportunity to present arguments about what they believe

9    the evidence has shown and why you ought to rule in their

10   favor.

11           I will then instruct you on the law.  Then you'll

12   retire, you'll deliberate, and you will reach a verdict.  As I

13   mentioned yesterday when we were downstairs in the jury

14   assembly room, in our American system of justice, the judge and

15   the jury have separate roles.  It's my job to instruct you on

16   the law, and as I've just indicated, I will largely do that at

17   the end of the case.  There may be things throughout the course

18   of the trial in which I need to give you instructions on, but

19   by and large you'll get the instructions at the conclusion of

20   the case.

21           Your job, as jurors, is to decide all of the fact

22   issues of this case based on the evidence presented in this

23   courtroom during the trial.  You are the only triers of fact,

24   and your decisions will control the verdict rendered here.

25   Please do not take anything that I say or do during this trial

 1   as any indication of what the verdict should be.

 2              I ask you please pay close attention to all of the

 3   evidence at the trial.  If you need a break at any point in

 4   time, you can signal to me or to Ms. Dempsey.  As I said, we'll

 5   try to take a mid-morning and a mid-afternoon break but,

 6   obviously, if there's anything that causes you to need to

 7   break, let us know that, and we'll try to accommodate you at a

 8   convenient breaking point for the parties who are presenting

 9   their case.

10              Now, evidence comes in three different categories.

11   The first category is testimony from witnesses called by the

12   parties.  And with one exception that I'm going to explain in a

13   few minutes, all of the witnesses are going to testify from

14   this witness stand, as I've said.  Testimony given by a witness

15   under oath is evidence.

16              The second category of evidence consists of documents

17   and exhibits if I formally receive them into evidence during

18   the trial.

19              The third category of evidence is stipulations or

20   agreements between the parties.  If the parties stipulate to

21   certain facts or to what a witness might say, that stipulation

22   is also evidence.

23              Now, there are other things that happen during the

24   course of the trial that are not evidence.  A question asked by

25   a lawyer before a witness answers is not evidence.  Any

M1KPFIS1

1    statements by counsel, including their opening statements and

2    closing remarks, are not evidence.  Anything I exclude during

3    the trial, or if I strike any evidence, or if I tell you not to

4    consider something, that is not evidence that you may consider

5    in your deliberations.

6            And finally, I just remind you again, as we talked

7    about earlier today, anything you see or you hear or you read

8    outside the courtroom is not evidence, and you need to

9    immediately call to the Court's attention if you hear anything

10   about this case or if anyone tries to talk to you about the

11   case outside of what's presented formally in the courtroom.

12   You must base your verdict solely on the evidence that's

13   received in this courtroom.

14           From this point on, until you retire to deliberate on

15   your verdict, it is your duty not to discuss this case and not

16   to remain in the presence of any other people who may be

17   discussing the case.  When you are out in the hallway or coming

18   in or leaving the courthouse, there may be reporters around,

19   there may be parties to the case, there may be other

20   individuals who may not realize you're jurors and may start

21   talking about the case.  You need to get away from them and you

22   need to also tell them, please don't talk about the case in my

23   presence; I'm a juror.  All right?

24           And this rule I'm telling you about, about not

25   discussing the case with others, includes discussions even with

1    members of your own family or any of your friends.  And again,

2    I remind you, please don't read about the case.  If by any

3    chance you happen to come across some kind of an article about

4    the case, you need to call that to my attention before we start

5    with the trial on any given day.

6              If at any time during the trial anyone attempts to

7    talk to you or communicate with you about the case, either in

8    or out of the courthouse, as I said, please immediately report

9    that attempt to me through my courtroom deputy, Ms. Dempsey.

10   You can tell her in the morning or at a break that you need to

11   call something to my attention.

12             So in this regard, let me just explain to you that the

13   attorneys and the parties to the case are not supposed to speak

14   with jurors either, even just to offer a friendly "hello" or a

15   greeting.  So if you happen to see any of the lawyers or any of

16   the parties outside the courtroom, in the hallway, they will

17   and they should ignore you.  Please don't take offense to that.

18   They're only acting properly by doing that.

19             Just as you must not have any in-person communications

20   about this case, you must not communicate with anyone about

21   this case by cell phone, through e-mail, through Blackberry,

22   iPhones, text messaging, Twitter, any kind of blog sites, any

23   internet chat rooms, or by way of any other kind of social

24   networking and I'm including in that Facebook, Instagram,

25   LinkedIn, YouTube.  We talked about all of those earlier today.

M1KPFIS1

1      Similarly, please don't use any of these tools to post

2 information about the case.  Don't do any research or make any

3 investigation on your own about any matter relating to the case

4 or any case of this type.  This means, for example, you

5 shouldn't consult any newspapers, any online sources, reference

6 works, dictionaries, go search internet websites, blogs or use

7 any other electronic tools to try to obtain information about

8 this case, about this type of case, about the parties to the

9 case, about anything relating to the case or anyone else

10 involved in the case.

11      You must decide this case, as I asked you throughout

12 our conversations the last two days, based only on the evidence

13 in this courtroom and my instructions on the law.  It would be

14 improper for you to supplement that information on your own.

15      All right?  With that, we are ready to begin with

16 opening statements.  Is the government ready to proceed?

17      MR. CHOW:  Yes, your Honor.

18      JUROR:  Your Honor, may I ask for a minute of your

19 time?

20      THE COURT:  To take a break you mean?

21      JUROR:  No, it's regarding a schedule issue.

22      THE COURT:  All right.  Let me let Ms. Dempsey talk to

23 you.  All right?

24      JUROR:  Thank you.

25      (Pause)

M1KPFIS1

1          THE COURT:  All right.  I think we should talk at

2     sidebar.

3          JUROR:  All right.

4          THE COURT:  And can I have one lawyer for each party?

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1KPFIS1

1          (At the side bar; juror not present)

2          THE COURT:  All right.  Folks, Mr. Sercarz, this juror

3   has now raised that he has a vacation that he's planned and

4   paid for starting next week.  Why he didn't disclose this to us

5   during our examinations, I have no idea, and my inclination is

6   to tell him I'm terribly sorry but I asked if there was any

7   hardship to you when you spoke to me yesterday and he's not

8   excused.

9          MR. FASULO:  Judge, I would agree.  This is

10  Mr. Fasulo.  I would agree with that.  We only have four

11  alternates --

12         THE COURT:  I know, I know.

13         MR. FASULO:  -- and if we start with one short --

14         THE COURT:  Correct.

15         MR. FASULO:  -- it's not going to be a great place to

16  be; so I'm not willing to excuse him, Judge.

17         MR. ADAMS:  Agreed.

18         MR. SERCARZ:  Agreed.

19         THE COURT:  You can remain if you want when he comes.

20         MR. FASULO:  I'd rather sit, Judge, if that is okay.

21         THE COURT:  If you'd rather sit, that's fine.  Sure,

22  sure.

23         (Attorneys not present, juror present)

24         THE COURT:  All right, sir.

25         JUROR:  Hi.  The Court has asked for three weeks, and

1  I'm very glad to give it.  I need 24 hours.  I'm on a plane

2  today at 6:30 with my family for a trip we've had scheduled for

3  a very long time.

4  　　　　THE COURT:  What does that mean, you need 24 hours?

5  　　　　JUROR:  It means I'm only there for the weekend, and I

6  will be back, ready to serve on Monday morning.  I cannot

7  appear tomorrow.

8  　　　　THE COURT:  So it's just tomorrow?

9  　　　　JUROR:  It is just tomorrow, yes, your Honor.

10  　　　　THE COURT:  All right.  Let me talk to the lawyers

11  again.

12  　　　　JUROR:  Okay.

13  　　　　THE COURT:  Counsel, could you please come back up?

14  　　　　(Juror not present; attorneys present)

15  　　　　THE COURT:  All right.  So apparently his issue is

16  that he was going to fly out tomorrow, and it's only for the

17  weekend; so he's asking us to give him tomorrow off, which

18  would mean we would be dark tomorrow.  I am loathed to do it,

19  but I also don't want to lose a juror.

20  　　　　MR. FASULO:  I would prefer to do that, Judge.  My

21  recommendation, rather than lose a juror at this early stage.

22  　　　　THE COURT:  I don't think we can afford the alternate.

23  There's only four.

24  　　　　MR. ADAMS:  I don't think we can afford to lose him.

25  I also think it's massively disruptive to allow this guy to

M1KPFIS1

1    derail this, and I don't think we should set this aside.  I

2    have witnesses scheduled in town, they also have done things to

3    be here on time.

4            THE COURT:  All right.  You know, the more I think

5    about it, he can join his family later in the day.  Okay.

6            MR. FASULO:  It's up to the Court.  Only, I'm fine

7    with whatever the decision is.

8            (Attorneys not present, juror present)

9            THE COURT:  All right.  Sir, here's the situation

10   you've put us in.  I asked yesterday, when I spoke with you, if

11   there was any hardship, and you did not raise this issue.  We

12   now have a whole schedule of witnesses lined up, and I cannot

13   adjourn tomorrow and have a dark day.  So you're going to have

14   to change your flight plans and meet your family late.  I'm

15   very sorry, but there's nothing I can do about it.  If you had

16   raised it with me in a timely fashion, I might have been able

17   to accommodate you.  That's where we're at.

18           JUROR:  I did, before leaving yesterday.

19           THE COURT:  Before you left, but we were finished with

20   your questioning at that point, sir.  You were under oath.

21           JUROR:  Your Honor, I did not believe that a flight

22   was a hardship, and so I didn't want to offer it to the Court

23   for a reason I could not serve.  It was simply because I had a

24   weekend away with family after spending two years avoiding

25   family.

THE COURT:  I understand that, sir, but if that was your belief, that was your belief.  I'm sorry, but this is where we're at.  You're going to have to join your family late.  All right?  That's my ruling.  I'm sorry.

JUROR:  Well --

THE COURT:  Back to your seat, please.

(Continued on next page)

1          (In open court)

2          THE COURT:  All right.  At this stage, Ms. Dempsey is

3     going to administer the oath to each of you to fulfill your

4     duties as jurors in this case.

5          Ms. Dempsey?

6          (A jury of 12 and 4 alternates was impaneled and sworn)

7          THE DEPUTY CLERK:  Thank you.  Please be seated.

8          THE COURT:  All right.  We'll be begin with opening

9     statements.  Mr. Chow for the government.

10         MR. CHOW:  Good afternoon, ladies and gentlemen.

11         THE COURT:  Mr. Chow, you're allowed to take your mask

12    off there.  Thank you.

13         MR. CHOW:  For almost 20 years Seth Fishman and Lisa

14    Giannelli, the defendants, ran a black market drug company.

15    The defendants created, promoted and distributed literally

16    hundreds of unregulated and dangerous drugs for the purpose of

17    secretly doping racehorses.  But their specialty, the secret to

18    their longevity, was that Fishman and Giannelli sold products

19    that they believed could not be caught on anti-doping tests.

20         Why?  So that their customers, the racehorse trainers

21    that they were helping to win races by cheating, could commit

22    fraud; so those customers could keep winning races using the

23    defendants' illegal substances, and so that Fishman and

24    Giannelli could profit from that fraud by selling more and more

25    illegal drugs to be pumped and injected into more and more

1   racehorses around the world.

2           Along the way, over nearly two decades, Fishman and

3   Giannelli did their best to avoid getting caught, and they were

4   remarkably successful in those efforts, until today.  Because

5   the defendants sold illegal drugs and lied and covered up their

6   activities, they committed a federal crime.  That is why we are

7   here today.

8           In this opening statement, I'm going to do two things.

9   First, I'm going to talk about what the evidence at this trial

10  is going to show; and second, in a moment, I will talk to you

11  about how we expect to prove this case.

12          So what will the evidence at this trial show?  The

13  world of professional horseracing is highly competitive and,

14  for the winners, highly lucrative.  Winners of a race can

15  collect prizes that stretch into the millions of dollars, and

16  so there's a huge temptation for horse trainers to use illicit

17  substances to enhance the horse's performances, to dope the

18  horses.

19          To guard against this sort of cheating, there are

20  rules intended to keep the sport fair.  Those rules include

21  restrictions on what drugs can or cannot be given to a horse

22  prior to racing.  And to enforce those rules, racehorses are

23  frequently tested before or after races to make sure no illicit

24  substances are in their system.

25          Fishman and Giannelli sold drugs for horse trainers to

1    get around those rules, to secretly dope their racehorses.

2    They operated through a company called Equestology, "Equest" as

3    in equestrian; that is, horses.  It was an illegal drug company

4    designed to assist in fraud.

5          Fishman was the owner of Equestology, and the one in

6    charge of designing untestable doping products.  He was a

7    veterinarian on paper, but he decided he would rather sell

8    drugs than treat animals.

9          Giannelli, previously known by her maiden name Lisa

10   Ranger, was his main salesperson.  Giannelli promoted, sold and

11   delivered the drugs that Fishman created, and they did well.

12   The two sold Fishman's drugs across the country and even around

13   the world.  They had hundreds of clients and sold millions of

14   dollars' worth of drugs.  Giannelli, as the main salesperson,

15   was paid hundreds of thousands of dollars a year.

16         What were some of those drugs?  There were dozens.

17   There were drugs that boosted a horse's red blood cell count.

18   These are known as blood builders, which Fishman called the

19   Holy Grail of sports doping.  They were branded with names like

20   BB2 and BB3 -- "BB" standing for blood builder -- drugs that

21   increased a horse's testosterone to unnatural levels, with

22   names like Equine Growth Hormone, or EGH; drugs that prevented

23   a horse from feeling pain so that they would race through

24   injuries and overexertion.

25         These, and other drugs that Fishman and Giannelli

1    peddled, were designed to dope racehorses.  They push a horse

2    to perform beyond its natural capabilities, and you will learn

3    that there are strict rules regarding their use on horses that

4    run in races.

5              So in order to make their drugs marketable to

6    customers looking to cheat their way into wins, Fishman

7    designed his drugs with a special extra feature, untestability.

8    Fishman and Giannelli marketed these drugs to customers as

9    substances that cheaters could use to win without getting

10   caught by state drug and racing authorities.

11             But this is a federal case, and that is because the

12   drugs sold were both illegal under federal law and designed for

13   fraud.  You can't just go out and sell a slew of chemicals to

14   nonprofessionals to inject and to pump into animals claiming to

15   boost their blood count, testosterone or performance ability.

16   There are federal laws and regulations that govern how a person

17   must manufacture and sell drugs, laws designed to ensure

18   safety, laws that these two defendants actively evaded in order

19   to line their own pockets.

20             You will hear about multiple ways in which these

21   defendants' drugs were illegal under federal drug laws.  For

22   example, drugs for sale must be approved by the Food and Drug

23   Administration, also referred to as the FDA.  The drugs Fishman

24   created, and that both defendants sold, were never approved by

25   the FDA.

1            Drugs for sale must be manufactured in a registered

2      facility approved by the FDA.  Fishman and Equestology were

3      neither registered nor approved.  Drugs for sale must have

4      proper labeling.  The labels that were slapped onto the drugs

5      Fishman created left out required information and contained

6      misleading instructions for use.

7            And certain drugs for sale require a valid veterinary

8      prescription, especially drugs that are supposed to be injected

9      into a horse's vein.  But Giannelli and Fishman sold them

10     anyway, without a prescription, to anyone willing to pay and

11     willing to keep quiet about where those drugs were coming from.

12           You will learn that if a drug violates any one of

13     these rules, it is known as a misbranded or adulterated drug.

14     And at that time, the defendants' business of creating,

15     promoting, shipping and profiting from these drugs was entirely

16     illegal.

17           And so, to keep their illegal business alive, the

18     defendants needed to avoid being caught.  To do that, they

19     developed this system of lies to mislead both state and federal

20     authorities.  What we're some of those lies?  As one means of

21     covering up the illegal practices of Equestology, you will

22     learn that Seth Fishman held a veterinary license but that he

23     did not actually practice as a veterinarian.

24           He didn't examine horses.  He didn't keep track of

25     patient files.  He didn't diagnose medical conditions.  He

1    didn't actually write prescriptions.  Instead of using his

2    veterinary license and medical skills to treat animals, Fishman

3    and Giannelli used that license as a cover for their crimes.

4         Fishman used his veterinary license to hide that, for

5    decades, he created and manufactured hundreds of different

6    drugs for racehorses, including performance enhancing drugs, or

7    PEDs, that made racehorses run faster, run longer, run through

8    pain and recover more quickly so that they could run more

9    frequently.

10        Giannelli took advantage of Fishman's license too.  In

11   addition to selling the doping drug that Fishman himself

12   created, Giannelli used Fishman's license to order other

13   performance enhancing prescription drugs in bulk so that she

14   could sell them to Equestology clients across the country.

15        Defendants lied to guard their profits in other ways.

16   Their labels were designed to deflect scrutiny.  Some drugs

17   were labeled with misleading information, words like R and D,

18   meaning research and development, or "use under supervision of

19   a licensed veterinarian," even though Fishman and Giannelli

20   knew full well that their clients were using Fishman's false

21   status as their veterinarian as a means of covering up their

22   crime.

23        The defendants were picky about who they invited to

24   become clients.  Remember, this wasn't some legal, normal

25   business with an interest in publicity and a good reputation.

1   The defendants only wanted horse trainers that wouldn't snitch,

2   trainers that weren't careless or flashy with their use of the

3   drugs.  They weren't looking for customers.  They were looking

4   for co-conspirators.

5           And, of course, the defendants lied about what they

6   were doing.  In 2011, when the State of Delaware began looking

7   into them, Fishman lied and stated that he physically examined

8   all of the animals he was treating, and Giannelli lied and

9   stated that she did not sell drugs for Fishman, she just

10  delivered supplies for Fishman.  But the defendants were not

11  running a veterinary office, they were running a doping

12  factory, a factory that was producing and selling illegal drugs

13  targeted to people in the racehorse industry who were looking

14  to cheat.

15          You will also learn that Fishman's notoriety led him

16  to assist one especially prominent racehorse trainer to dope

17  his horses.  Jorge Navarro one of the most successful

18  thoroughbred trainers in the United States, ran a doping

19  program that relied on Fishman and other corrupt drug

20  salespeople.  Fishman sold Navarro his drugs, including blood

21  builders, growth factors and painkillers.  Navarro used those

22  drugs and others on his horses.  And after Navarro won a big

23  race overseas, he thanked Fishman, saying that Fishman was a

24  big part of his win.

25          Finally, you will learn that the allure of money was

1   so great that Fishman refused to stop his illegal drug sales

2   even after he was arrested in this case.  You will learn in

3   October 2019 his warehouse, storage unit and home were all

4   searched.  Hundreds of drugs were seized.  He was criminally

5   charged.  But you will also learn that he was undeterred.  Even

6   while on bail afterwards, he continued to manufacture and sell

7   precisely the same illegal drugs, in precisely the same illegal

8   manner.

9           So that is what the evidence will show.  Now, let's

10  talk about how we will prove this to you, the types of evidence

11  we expect you will see and hear.

12          THE COURT:  Mr. Chow, could I interrupt you for one

13  second.

14          Could I ask our jurors to all please pay attention.

15  I'm sorry.

16          MR. CHOW:  No problem.

17          You're going to see the drugs.  We will bring some of

18  the drugs into the courtroom, and you will be able to see the

19  boxes and bins full of drugs and shoddy labels that were found

20  in Equestology's office.  You're going to see boxes of the same

21  drugs that were found in Giannelli's house, drugs with false

22  prescription information pasted right on the bottles.

23          You're going to see the same drugs again that were

24  seized from the barns of various customers, horse trainers like

25  Jorge Navarro, who would buy drugs from Giannelli or from

1    Fishman.  You're going to read documents written by the

2    defendants, where they explain exactly what their drugs were

3    intended to do.  You will see an inventory list of the drugs

4    they offered for sale, hundreds of different drugs.

5            You will read e-mails and text messages showing that,

6    far from being a delivery person, Giannelli was working to

7    promote Fishman's products to horse trainers up and down the

8    East Coast.  You will see that she was repeatedly making sales

9    of prescription drugs and customized PEDs to clients that had

10   no relationship with Fishman, who never spoke to Fishman, but

11   for whom Giannelli obtained prescription drugs using Fishman's

12   license.

13           You will hear from an expert witness who will explain

14   to you what effect these drugs can have to boost a racehorse's

15   performance.  You will hear another expert witness explain to

16   you the process for legal sales of all drugs, prescription and

17   nonprescription drugs, processes that include registration with

18   the FDA, and transparency and inspection, approval for drug

19   content and drug labeling, clinical trials and the use of valid

20   veterinary prescriptions.

21           And you will hear from witnesses, insiders, who will

22   explain how the defendants' operation worked.  You will hear

23   from a former employee of Equestology, who will describe

24   Fishman and Giannelli's roles in the company.  The employee was

25   not the scientist or the creators of the drugs.  That was

1    Fishman's role.

2              She, instead, worked on labeling and packaging the

3    drugs that were mailed out to the defendant's customers and

4    mailed out to Giannelli in bulk, to sell to even more

5    customers.  She will walk you through how orders came in and

6    were fulfilled.  She will describe how Fishman was constantly

7    jet setting around the world but never actually going out to

8    examine horses that Giannelli was selling drugs for.

9              The employee will explain that the entire point of the

10   drugs Equestology sold was for them to be untestable, meaning

11   that they would not be detected if a racehorse was drug tested

12   to see if it had been given any performance enhancing drugs.

13             You will also hear from customers of Fishman and

14   Giannelli, who will describe for you how they purchased

15   performance enhancing drugs for their horses from the

16   defendants with no prescription for no valid medical purpose.

17   They will tell you about the secrecy of Giannelli's sales

18   tactics and the potency of Fishman's specialized injectable

19   cocktail.

20             Make no mistake, these customers were cheaters.  They

21   wanted their horses to win without getting caught for using

22   performance enhancing drugs.  Some of them have pled guilty to

23   committing federal crimes as a result.  When they testify, you

24   should scrutinize their testimony and ask how it fits with all

25   the other evidence in the case.

1        Evidence like the drugs found at the Equestology

2   warehouse and in the defendant's homes, evidence like the

3   e-mails of Giannelli and the e-mails of Fishman explaining in

4   detail the purpose and untestability of their drugs.  Evidence

5   like years of text messages between the defendants reflecting

6   their fraudulent scheme, and evidence like the words of the

7   defendants themselves.  Their words on wiretap recordings when

8   they thought nobody was listening.  Their words discussing

9   their paranoia over being caught or snitched on by outsiders.

10       You will hear Fishman explain in detail his fixation

11  with testability and, indeed, you will hear about Fishman's

12  confession to law enforcement that he was engaged in an illegal

13  drug business focused on the doping of racehorses.

14       So that's what this case is about, corruption and

15  greed in the horseracing industry.  I'm about to sit down, but

16  before I do, I'd like to ask you to do three things during this

17  trial:  First, please pay close attention to the testimony and

18  exhibits; second, please listen carefully to and follow the

19  Court's instructions on the law; and third, please use your

20  common sense to evaluate the evidence, the same common sense

21  you use in your everyday lives.

22       If you do these three things, you will reach the only

23  verdict that is consistent with the evidence in this case, that

24  the defendants, Seth Fishman and Lisa Giannelli, are guilty.

25           THE COURT:  Thank you, Mr. Chow.

1          All right.  We'll hear now from the lawyers for the

2     defendants, Mr. Sercarz, on behalf of Dr. Fishman.

3          MR. SERCARZ:  May it please the Court, members of the

4     prosecution, Mr. Fasulo, Ms. Giannelli, Mr. Fishman, and ladies

5     and gentlemen of the jury.

6          When Seth Fishman graduated from veterinary medical

7     school, he had to take an oath just, as you had to take an oath

8     in order to assume the role as jurors in this case.  And the

9     oath he took, in words or substance, said the following, and I

10    quote: "Being admitted to the profession of veterinary

11    medicine, I solemnly swear to use my scientific knowledge and

12    skills for the benefit of society, to the protection of animal

13    health and welfare, the prevention and relief of animal

14    suffering, the conservation of animal resources, the promotion

15    of public health and the advancement of medical knowledge."

16         This is the oath that Seth Fishman took.  This is the

17    calling that he assumed.  This is the role he promised to

18    portray when he went into the business of veterinary medicine,

19    and as his career evolved, he graduated from the type of

20    veterinary medicine that would involve examining your dog or

21    your cat when it was ill and came to the veterinarian's office,

22    and chose instead to involve himself with the mixture,

23    manufacture and dispensing of animal medicine on a larger

24    scale.

25         It will be for the government to prove beyond a

1    reasonable doubt, and at the end of this case, we're going to

2    audit that proof.  But it's for them to prove, not simply to

3    say on an opening statement, that his intent and purpose in

4    doing so was something other than limiting animal suffering,

5    something other than promoting animal welfare, something other

6    than conserving animal resources and, in a broad sense, that's

7    what this case is going to be about, ladies and gentlemen of

8    the jury.

9        If brevity of the soul of wit, then this opening at

10   the same time is going to have a lot of soul because I'm not

11   going to be on my feet for very long.  At the end of this case,

12   I'm going to talk to you about what the evidence proves, but in

13   the interim and right now, I'm going to seek for your benefit

14   to focus you on the one true issue of dispute, the one issue of

15   dispute between defense counsel and the defendant Fishman and

16   the government in this case, and that is my purpose in making

17   these remarks to you now.

18              (Continued on next page)

19

20

21

22

23

24

25

1    MR. SERCARZ:  In the world where Dr. Fishman chose to

2   employ his craft, you're going to find there is great beauty.

3   There is great beauty in the sport of horseracing, but there is

4   also ugliness in the sport of horseracing.  And here the

5   government and I agree that there are all too many horse owners

6   and all to many trainers who are willing to sacrifice the

7   health and welfare of their animals in order to achieve a

8   temporary and unlawful advantage in a horserace.

9    But before you jump to the conclusion of thinking that

10   anything about this case is going to be easy, I would make this

11   observation, ladies and gentlemen of the jury, that for every

12   person who comes to a veterinarian with a legitimate need for

13   animal medicine, there may be somebody who requests that

14   medicine for the sake of using it for nefarious purposes.  And

15   the government just asked you to use your common sense.  Your

16   common sense will tell you that you can't always tell who the

17   people are that are wearing the white hats and the black hats.

18   And this is the complex world in which Seth Fishman chose to

19   employ his craft of helping to manufacture and dispense animal

20   medicine.

21    Again, my one goal in speaking to you now is to focus

22   you on the issues that will really be in contention in this

23   case.  And I want you to know that with respect to these new

24   animal drugs that the government has described to you, on the

25   issue of whether Dr. Fishman, a small independent creator and

1   distributor of animal products, met all of the many and varied

2   requirements and regulations of the Food, Drug & Cosmetic Act,

3   as implemented by the FDA.  I respectfully submit that he did

4   not.  I will tell you up front that he did not.

5           But ladies and gentlemen of the jury, in order to

6   establish a violation of this statute, the one you are going to

7   be weighing in this case, the government must prove beyond a

8   reasonable doubt an additional element.  It's not going to be

9   enough to prove that the products failed to meet the many and

10  varied mind-numbing regulations of the Food, Drug & Cosmetics

11  Act, they're going to have to prove that my client, Seth

12  Fishman, intentionally manufactured and distributed adulterated

13  and misbranded products and injected them into the stream of

14  interstate commerce with the intent to defraud or mislead.

15          Again, they are going to have to prove beyond a

16  reasonable doubt that, when examining the state of mind of my

17  client, he was not seeking to promote animal welfare, conserve

18  animal resources, and look out for the safety and welfare of

19  the animals for whom he was prescribing.  They would have to

20  prove that was not his state of mind and that his state of mind

21  was to defraud and mislead.  That's in quotes, to defraud or

22  mislead.

23          And in that regard, ladies and gentlemen of the jury,

24  and to show you how difficult this is going to be, I would ask

25  this simple question on my opening statement:  Defraud or

1    mislead whom?  The government has already portrayed

2    Mr. Fishman's customers as his co-conspirators.  The evidence

3    will show that the individuals who purchased substances,

4    products from Mr. Fishman knew exactly what they were getting.

5            To make life more complicated, you are going to learn

6    from the experts that the government calls as witnesses that

7    the concept of performance-enhancing drugs was by no means easy

8    to put your arms around.  Indeed, you're going to learn from

9    the government's own experts that the meaning of what is a

10   banned performance-enhancing substance evolved over time, that

11   substances that were medically recognized as useful and

12   beneficial for some purposes were later banned because it was

13   found that they provided a temporary boost to a horse during a

14   race.

15           You'll also learn that the various jurisdictions, the

16   local racing jurisdictions that regulate what a horse is

17   allowed to ingest before a horserace have a literal crazy quilt

18   of regulations varying from one jurisdiction to another

19   involving different substances, different percentages in the

20   drug counts of those substances, and it is within that nebulous

21   crazy quilt of regulations that one defines the concept of a

22   performance-enhancing drug.

23           The government has hurled a series of brickbats at my

24   client during the course of this opening statement, and I want

25   to focus on one.  They talk about this concept of testability

1    and whether or not a substance is testable, and they say that

2    for Mr. Fishman this was an obsession, to use their words, and

3    this is proof of guilt, this obsession he had with testability.

4         And I am going to ask you at the end of this case to

5    consider the possibility that talking about whether testability

6    is a possibility was meant to signal to the people who are

7    buying these products that they could safely use them to evade

8    racing regulations or whether Dr. Fishman, knowing he was

9    operating in the horseracing business, was attempting to help

10   people avoid an inadvertent disqualification in a horserace.

11   And I tell you again, it is for them to prove beyond a

12   reasonable doubt that my client is guilty, had the guilty frame

13   of mind, had the guilty intent charged in the indictment, the

14   incident to defraud or mislead.

15        Again, on the subject of defraud and mislead, again I

16   will ask you to consider as you're listening to this testimony:

17   Defraud and mislead whom?  The customers who are allegedly his

18   co-conspirators?  The FDA?

19        With regard to these labels that the government

20   describes on their opening statement, I will make this

21   observation:  After examining the evidence, it will be clear to

22   you that Mr. Fishman, Dr. Fishman, did not create these labels

23   for the purpose of making them a facsimile of those labels that

24   pass muster with the FDA.  He didn't deliberately defraud the

25   FDA by making his labels look like FDA labels while the content

1   was not FDA content.  Look carefully at those labels and you

2   will find that that's not the allegation that they're making at

3   all.

4           So if he didn't defraud his customers, and his labels

5   weren't made to defraud the FDA, can they prove the guilt of

6   the defendant beyond a reasonable doubt?

7           And in attempting to prove that he defrauded

8   regulators or racing authorities, I ask you again to consider

9   the likelihood that not everyone who purchased product from

10  Dr. Fishman told him in advance that they intended to use

11  otherwise appropriate medical products to achieve an unlawful

12  advantage in a horserace.

13          The one issue that I'm asking you to consider, ladies

14  and gentlemen of the jury, is the issue of his state of mind,

15  the issue of his intent.  And at the end of this case, we'll

16  come once again to meet together in this room, in this place

17  with me behind this booth to audit the government's proof.  But

18  in the meantime, everything I have said to you is for the

19  purpose of trying to get to you do the following when you come

20  to court every day:  Presume him innocent, according with the

21  rules and the instructions that you will receive from this

22  Court, keep an open mind as you listen to the evidence, and

23  focus, laser focus, on Dr. Fishman's state of mind.  And again,

24  at the end of this case, we will determine whether the

25  government has proven the guilt of my client as to each and

1    every element of the crimes charged beyond a reasonable doubt.

2           Thank you very much for your attention.

3           THE COURT:  Thank you, Mr. Sercarz.

4           Mr. Fasulo, are you ready on behalf of Mr. Giannelli?

5           MR. FASULO:  I am, your Honor, if I may.

6           THE COURT:  You may.

7           MR. FASULO:  We sit here today after hearing the

8    government's opening statement thinking that Lisa Giannelli is

9    a lone wolf in a herd of sheep.  This case will prove that Lisa

10   was a sheep herded by the sheep master.

11          You will learn who Lisa Giannelli is.  You will learn

12   that she is a high school graduate, that she has an abundance

13   of experience in the horse industry, that her life was

14   dedicated to the wellbeing of horses.  You will learn that for

15   18 years she worked under the guise of who she believed was a

16   good vet, Dr. Fishman.  You will learn that she lived a simple

17   life.  You will not learn that Lisa Giannelli was flying all

18   over the world.  You will not learn that Lisa Giannelli made

19   hundreds and hundreds of thousands of dollars every year.  You

20   will learn that Lisa got up early in the morning, she went to

21   work, she had responsibilities, and she fulfilled those

22   responsibilities.  She doesn't hide from that, and you will

23   hear that.

24          You will hear what she intended to do, what she

25   understood she was doing, and what she understood her goal was

1    for working for Dr. Fishman.

2            You will learn what products she was involved in.  You

3    will learn where those products came from.  You will learn that

4    Lisa Giannelli had no, no ability to create those products.

5    She had no ability to label those products.  She took no

6    responsibility as to the products as they were presented to

7    her, other than they were presented by a veterinarian who was

8    licensed in the states in which she was dealing.

9            You will learn that she had an understanding of the

10   horse industry, that she had worked under vets as a grooms

11   person, as a trainer of horses before she came to work for

12   Dr. Fishman.

13           You will learn that she knew the racing industry.  She

14   knew the guys who were untrustworthy, the ones who wouldn't pay

15   their bills, the ones that were not above board.  And she

16   believed, and you will hear that she believed she was dealing

17   with people that she can trust to pay the bills.  Because at

18   the end of the day, you will learn that Seth Fishman,

19   Dr. Fishman, had Lisa on a pay plan, and the pay plan was that

20   she was be paid based on collections, not sales.  And you will

21   learn prior to Lisa getting involved in this practice,

22   Dr. Fishman's collection rate was very poor, and you will learn

23   that Lisa created a system which was successful in having

24   Dr. Fishman paid for the products that he made, that he

25   produced, that he indicated were okay to deliver and to be

1    involved in the transportation and sale of those products.  And

2    you will hear that.  You will hear it in this courtroom.  You

3    will hear it from the witness stand.  It will be part of the

4    evidence.

5            You will also learn a little bit about the horseracing

6    industry.  You will learn that everyone had different roles and

7    responsibilities.  It is an industry that was based on

8    everybody playing their role.  There are owners, there are

9    track owners, there are people involved in the waging and the

10   gambling part of the track.  There are grooms people, people

11   that take care of the horses daily.  There are trainers that

12   have a regimen that will develop horses so that they can best

13   perform.

14           Now some of you may like the idea of watching a

15   horserace and have no ill feelings about the idea of horses

16   running and optimizing their ability to win races, others of

17   you will find it offensive in some way.  We're not here to

18   defend or to vilify the industry.  The idea is it is

19   horseracing.  Owners buy horses so they can win races.

20   Trainers are engaged in the development of those horses so that

21   they can optimize their performances.  Regimens are

22   established, training regimens, regimens of running, of

23   practicing, regimens of different feeding, different training

24   regimens by each trainer.  Each trainer has their own way of

25   going about training horses.  There are regulations that guide

1   the trainers and the trainers push the limits to the point

2   where they can optimize the performance of the horses for

3   owners who have a financial stake at the end of the day.

4           And you will also learn that at the end of the day,

5   Ms. Giannelli, who is seated in the second row, had no stake in

6   that.  She had no stake in who won or who lost races.  Others

7   did, others that you will hear from the witness stand.

8           So you will learn all about the roles and

9   responsibilities, and you will learn a lot about horses.  You

10  will learn about horses, the effectiveness of their ability to

11  run based on their breeding, based on their training, based on

12  the regimen that they're put on, based on different supplements

13  that they're given legally.  And it's up to the trainers, it's

14  up to the trainers to administer what's available to them.

15  It's up to the trainers to administer that.  And you will learn

16  that from the witness stand.

17          This case is a serious case.  It's serious to my

18  client.  It's serious to the government.  It's serious to

19  Dr. Fishman.  What you're going to be asked to do in this case

20  is there are two trials in the courtroom.  There is the trial

21  against Dr. Fishman, and the government needs to prove every

22  element of a crime against Dr. Fishman before or if you're able

23  to reach a verdict of guilty as to his guilt.

24          And then, there's also the trial against Lisa

25  Giannelli.  For example, the judge read you the indictment or

1    talked about the indictment in her opening remarks yesterday.

2    And you heard that Dr. Fishman is charged in Count One and

3    Count Two of the indictment and Ms. Giannelli is charged only

4    in Count Two of the indictment.  When I say "only," I don't

5    mean to minimize it, but it's to point out that there are two

6    separate trials going on here, there's the trial against Seth

7    Fishman and the trial against Lisa Giannelli.

8          You may see counsel, both government and defense

9    counsel, all speaking together, me speaking with Mr. Sercarz.

10   Be clear, there are two separate defenses in this case, there

11   are two separate lawyers in this case, and there are going to

12   be verdicts in this case regarding Dr. Fishman and a verdict

13   regarding Lisa Giannelli.  So I ask you to remember that as you

14   sit here and think about the evidence that's relevant to

15   Ms. Giannelli and the evidence that's relevant to Dr. Fishman.

16   And there's overlap.  There's overlap.

17         What we don't hide from in this case is the fact that

18   Lisa Giannelli worked for Dr. Fishman.  What we will hear from

19   the witness stand is Lisa Giannelli, what the government found

20   in her home, what was on the list were products given to her by

21   Seth Fishman, the veterinarian, and you will hear that she

22   believed those products to be okay to transport to others.

23         You will also hear that Ms. Giannelli had nothing to

24   do with the compounding or making of those products, nor did

25   she understand or would she understand the actual ingredients,

1    the full ingredients any of those products.

2             You will also hear what her understanding of the FDA

3    was and what her understanding of the effects of the products

4    that she was giving on horses were in her mind.  And you will

5    hear all that.

6             And this is where the government and I agree:  I ask

7    you, I urge you to pay close attention to the evidence in this

8    case.  There many be a thousand exhibits or so that you will

9    look at or hear in this case.  There will be over 20 to 30

10   witnesses in this case that you're going to hear from.  Pay

11   attention to all of it.  Pay attention to all the details, to

12   the words, and then pay attention to the words that you are

13   going to hear from the defendant in this case, Ms. Giannelli.

14            I also ask you to use your common sense, as the

15   government did, because it's your common sense as working

16   people of what would be expected of somebody as they go to work

17   every day and whether the testimony of somebody telling you

18   what they did, why they did it, rings true or doesn't ring

19   true.  Pay attention to that.  Listen to the law, because the

20   law is what will guide you.  We embrace it.

21            So the government and us agree, common sense, listen

22   to the law, and pay close attention to the evidence in this

23   case.  If you do that, at the end of this case, I will return

24   to you and I will point to you, within the evidence that's

25   produced in this courtroom through the witness stand, through

1    the various documents and through the testimony of all of the

2    witnesses, including the defendant, Ms. Giannelli, that you

3    will be able to come to a just verdict, and that verdict will

4    be that the government, the government has not proved this case

5    beyond a reasonable doubt against Ms. Giannelli.

6            I thank you for your attention, I thank you for your

7    service, and I urge you to take this case seriously.  It may

8    not be serious to you.  Trust me, it is serious to all of us in

9    this courtroom and it is serious to Ms. Giannelli.

10           Thank you very much.

11           THE COURT:  All right.  Thank you, Mr. Fasulo.

12           At this point, we're ready to turn to and begin the

13   presentation of evidence.  I think that we need a very short

14   break so that we can take care of a couple of technology issues

15   that we need to deal with.

16           I ask you to please don't even leave the courtroom,

17   you can stand in your place.  We'll take a two to three minute

18   break, stretch a little bit.  I know some of you are getting

19   tired, but it is important that you each pay attention, please,

20   to the evidence that is being presented.

21           All right.  So we're going to recess briefly, and

22   Ms. Dempsey, you will let me know when we're ready to resume.

23           (Recess taken)

24           THE COURT:  We're not quite ready to begin, but could

25   I see the lawyers at the sidebar while we're waiting?

M1KTFIS2

1          (At sidebar)

2          THE COURT:  So really all I want to know from the

3     government is about how long do you expect this witness is

4     going to go.

5          MR. ADAMS:  Ms. Adams will certainly go into tomorrow.

6          THE COURT:  So I promised jurors we would end around

7     4:30 each day, so whoever is taking the lead -- who is that, by

8     the way?

9          If you just keep an eye on the clock and let me know

10    when it's a convenient breaking point so we could break at 4:30

11    as we promised.  If you thought you could finish, we would keep

12    going, but otherwise let's keep to what we promised jurors.

13         MR. ADAMS:  Yes, and I will ask Ms. Mortazavi and

14    Mr. Chow to flag five minutes before.

15         THE COURT:  Sure.

16         MR. FASULO:  Judge, in your opening instructions you

17    were clear that the jury should not speak with anyone else

18    about the case.  The one thing I think would be helpful from

19    the defense is if you remind them they also can't speak among

20    themselves about the case until the time that the jury

21    deliberates.  I think they understand that, but I prefer that.

22         THE COURT:  Okay.  And I am going to, each day before

23    I dismiss them, remind them.  I will first, before you go, give

24    them a charge about note taking.  I was surprised to see people

25    taking notes during openings.  I thought they would wait for

1  the evidence.  So I will give it now, then the charge about the

2  remote witness, and you call your first witness.

3  　　　　　MR. FASULO:  On that note, I'm assuming at the end of

4  case you will tell them that they have to rely on the

5  transcript.

6  　　　　　THE COURT:  I will tell them it now and at the end, so

7  when we have the final charging conference you will probably

8  want to add a charge to that effect.

9  　　　　　MR. FASULO:  That's what I was thinking.

10  　　　　　MR. ADAMS:  If I could add one more point for your

11  preference on this, I expect that I will get to at least one of

12  the stipulations today, or at least the first one.  I was

13  planning to read the preamble language, it is agreed to between

14  the parties, and then I have been admonished for doing that and

15  not doing it.

16  　　　　　THE COURT:  I'm fine with you doing it.

17  　　　　　MR. FASULO:  I have no objection.

18  　　　　　MR. SERCARZ:  That's fine.

19  　　　　　MR. FASULO:  I don't think we have to do it every time

20  because it will be if the record, but whatever you please.

21  　　　　　MR. ADAMS:  Thanks.

22  　　　　　THE COURT:  You're ready to go, Ms. Dempsey?

23  　　　　　DEPUTY CLERK:  Yes.

24  　　　　　THE COURT:  I'm going to recess and you can knock me

25  in again.

1          DEPUTY CLERK:  Okay.

2          (Recess taken)

3          THE COURT:  All right.  As I said, ladies and

4    gentlemen, we're about to begin with the presentation of

5    evidence.  I want to give you two brief instructions before the

6    first witness talks to you.  Ms. Dempsey handed out to each of

7    you notebooks in case you wanted to take notes during the

8    course of the trial.  We talked about that, and the parties

9    agreed it's fine if you wish to take notes.

10          If you want to take notes during the trial, as I say,

11   you may do so.  You're not obligated to do that.  If you do

12   take notes, please be sure that taking notes doesn't interfere

13   in any way with your listening to and considering the evidence

14   as it's being presented to you.  If you do take notes, please

15   do not discuss them with anyone during the trial even during

16   your deliberations.  If you take notes, those notes are to be

17   used solely to assist you, the note taker.  Your notes are not

18   to substitute for your recollection of the evidence and they

19   are not, of course, evidence in this case.  The fact that a

20   particular juror has taken notes will entitle that juror's view

21   when you deliberate to no greater weight than the view of any

22   other juror during the course of your deliberations.

23          One other point.  Please do not show your notes to any

24   other juror during the deliberations.  And if during

25   deliberations you have any doubt to what the testimony was, you

M1KTFIS2

will be permitted to request the official transcript.  As you

know, we have court reporter right here who is making an

official record of these proceedings, and you have the right to

ask to see the transcript or to have it read back to you.

I would also ask you, when you leave at the end of

each day, please do not take your notebooks with you, please

leave them, Ms. Dempsey in the jury room.

DEPUTY CLERK:  Yes.

THE COURT:  You can take them downstairs with you, but

leave them in your place in the jury room.

Okay.  Now we're about to call our first witness.  I

told you earlier that the witnesses were all going to testify

from this plexiglass-enclosed witness stand.  We have one

exception.  You're going to hear now from a witness who is

testifying by a video teleconferencing platform.  Her testimony

is being taken in this manner upon consent, by agreement by the

government and both defendants.  I anticipate that this will be

the only witness at trial who is going to testify in this

manner, but I ask you, please, pay the same attention to this

witness's testimony as you would to any other witness

testifying in the courtroom.  You should give no more or no

less consideration to her testimony based on the manner in

which she is testifying.

Is the government ready to proceed?

MR. ADAMS:  We are, your Honor.

M1KTFIS2                    Adams - Direct

1          THE COURT:  Would you call your first witness, please,

2    Mr. Adams.

3          MR. ADAMS:  The government calls Courtney Adams.

4          THE COURT:  Before we proceed, can all of the jurors

5    see the witness on your screens that are in front of you?  You

6    each have an individual screen.

7          JUROR:  Yes.

8          JUROR:  I have a problem.

9          THE COURT:  We have one issue.

10          While we're trying to deal with the technology,

11    Ms. Adams, are you able to see and hear us clearly?

12          THE WITNESS:  Yes, I am.

13          THE COURT:  Thank you.

14          Please administer the oath.

15     COURTNEY DIANE ADAMS,

16          called as a witness by the Government,

17          having been duly sworn, testified as follows:

18    DIRECT EXAMINATION

19    BY MR. ADAMS:

20          MR. ADAMS:  May I proceed, your Honor?

21          THE COURT:  Yes.

22    Q.  Good afternoon, Ms. Adams.

23          Could you please tell us first:  How old are you?

24    A.  34 years old.

25    Q.  And directing you to approximately 2012, did there come a

1   time that you moved to south Florida?

2   A.   Yes.

3   Q.   And where are you testifying from today?

4   A.   South Florida.

5   Q.   When you moved to south Florida, why did you move there

6   originally?

7   A.   I moved back from Australia and I didn't want to go back.

8   I'm here where my grandmother was in search of a job.

9   Q.   At the time that you moved to Australia, what was your

10  education -- when you moved to south Florida, what was your

11  educational background at that time?

12  A.   I had a bachelor's degree in conservation and ecology.

13  Q.   When you arrived in south Florida, did there come a time

14  that you met an individual named Seth Fishman?

15  A.   Yes.

16          MR. ADAMS:  Judge, if I could, for the witness only,

17  display what's been marked for identification as Government

18  Exhibit 1005.

19          JUROR:  Excuse me, we don't see --

20          THE COURT:  You're not seeing it right now.

21          JUROR:  Oh.

22          THE COURT:  Just the witness.

23          1005?  Do I have a copy?

24          MR. ADAMS:  It's in the back of the binder that I

25  handed up earlier, your Honor.

1          THE COURT:  Thank you.  They're not in order.  Thank

2     you.

3          You may proceed.

4          MR. ADAMS:  Thank you, your Honor.  They should be in

5     numerical order.

6          This is the discrepancy, it is marked 10005.  I

7     apologize.

8          THE COURT:  Yes, thank you.

9     BY MR. ADAMS:

10    Q.  Ms. Adams, have you had a chance to review what is marked

11    for identification as 10005?

12    A.  Yes.

13    Q.  Do you recognize what is depicted in that exhibit?

14    A.  I do.

15    Q.  What is that?

16    A.  It is Seth Fishman.

17         MR. ADAMS:  Your Honor, the government moves to admit

18    10005.

19         MR. SERCARZ:  No objection.

20         MR. FASULO:  No objection.

21         THE COURT:  It's admitted.

22         (Government's Exhibit 10005 received in evidence)

23         MR. ADAMS:  With permission, may we publish that to

24    the jury?

25         THE COURT:  Yes.

M1KTFIS2                    Adams - Direct

1           MR. ADAMS:  Is that exhibit displayed for the jury at

2      this point?

3           THE COURT:  I believe it is.  Is there anyone who

4      can't see it?  Raise your hand.

5           I think we're good, Mr. Adams.

6           MR. ADAMS:  Thank you, your Honor.

7      BY MR. ADAMS:

8      Q.  Ms. Adams, how did you meet Mr. Fishman originally?

9      A.  We were introduced from a mutual friend.

10     Q.  And when he was introduced to you, how was he introduced to

11     you?

12     A.  He was introduced as a friend of the friend that needed

13     help, he needed assistant work, so like personal assistant-type

14     work, and then possibly with his business.

15     Q.  And at that time did you come to learn what sort of

16     business he was running?

17     A.   In the beginning it was pretty vague, it was just horse

18     medicine.  My friend thought I would be interested since I

19     liked animals.

20     Q.  Did you eventually learn what that business was called?

21     A.  Yes.

22     Q.  What was the business called?

23     A.  Equestology.

24     Q.  Did there come a point where you began to work for

25     Equestology?

1    A.   Yes.

2    Q.   And approximately how long after you originally arrived in

3    south Florida did you begin working with Equestology?

4    A.   A few months.

5    Q.   So focusing you still at the time of 2012, had you begun

6    working at Equestology by the end of 2012?

7    A.   Yes.

8    Q.   At that time, when you began working with Equestology, can

9    you describe the physical work space?

10   A.   I had my office in the spare bedroom in Seth's condo.

11   Q.   Was anybody living in that same work space?

12   A.   Do you mean in that office or in the unit?

13   Q.   In the unit, please.

14   A.   Yes, Seth was living in the other bedroom.

15   Q.   At that time when you were working out of the condo, did

16   Fishman maintain any other physical space related to the

17   business?

18   A.   He had a storage unit that was used to store his things in.

19   Q.   And through the course of time that you worked with

20   Equestology, was additional physical space obtained?

21   A.   Yes.

22   Q.   And can you describe what kind of space was obtained?

23   A.   Years later we obtained an office space in another building

24   that was being run by another business, they had extra room

25   with its own entrance, and so Seth rented it out and we turned

1    that into my office.

2    Q.  When you mentioned that part of your job was acting as a

3    personal assistant, can you describe the kinds of tasks that

4    you undertook as part of that role?

5    A.  Yeah, pick up dry cleaning, grocery shopping, general

6    errands, picking him up, taking him to the airport, that kind

7    of thing.

8    Q.  With respect to your role at the business, at the time that

9    you began work, what were your typical day-to-day duties?

10   A.  Tracking emails.  He wanted me to start an inventory system

11   of everything that he had, basically organizing everything to

12   do with Equestology.  And then my main role, besides inventory,

13   was to create labels for all of his products.

14   Q.  Let me still focus on the early days working at

15   Equestology.  At that time, did you come to learn what kind of

16   products Equestology was selling?

17   A.  Yes, I had a general idea in the beginning.

18   Q.  And in the beginning, what was your general idea of what

19   was being sold?

20   A.  Equine pharmaceutical products to enhance performance.

21   Q.  Who was manufacturing those performance-enhancing products

22   at the time that you began?

23   A.  One of his labs, Nemera Pharmacy, I believe.

24   Q.  Could you repeat the name?

25   A.  I believe it was called Nemera Pharmacy.

1    Q.  Do you know where that lab was located?

2    A.  Somewhere in south Florida.

3    Q.  To your knowledge, who was giving directions about the

4    content of the drugs to be manufactured?

5    A.  Seth was.

6            MR. SERCARZ:  Objection, it calls for hearsay.

7            THE COURT:  Not on that ground.  You may answer.

8    A.  Seth Fishman did.

9    Q.  Ms. Adams, you mentioned a moment ago an inventory system.

10   Was there an inventory system for Equestology when you began in

11   2012?

12   A.  Not that I was aware of.

13   Q.  When you began working at Equestology, what were you asked

14   to do with respect to an inventory system?

15   A.  He wanted me to inventory all products that he currently

16   had and then also inventory anything ordered, create an

17   inventory system for the lab as well.  So anything that he

18   would order and send to the lab, whether it be vials or raw

19   product, I was to keep track of everything.

20   Q.  Did you develop an inventory system?

21   A.  Yes.

22   Q.  When you arrived, before you developed the inventory

23   system, what did you learn about how Equestology was keeping

24   track of what drugs it had in stock?

25   A.  I wasn't aware of any kind of inventory system besides

1    maybe an email or an invoice of the product being ordered in

2    the first place.

3    Q.   What system, if any, was there to keep track of which drugs

4    had expired or not?

5    A.   There was none that I was aware of.

6    Q.   Who was the owner of Equestology?

7    A.   Seth.

8    Q.   To your knowledge, did anybody else have an ownership

9    interest in the business?

10   A.   Not that I was aware of, no.

11   Q.   And can you describe what Seth Fishman's role at

12   Equestology was when you began working there?

13   A.   He was the owner, operator, veterinarian.

14   Q.   Let me ask about the last portion.  To your knowledge, did

15   Fishman maintain a veterinarian license during your time at

16   Equestology?

17   A.   Yes.

18   Q.   How often was Fishman treating animals when you worked at

19   the company?

20   A.   Maybe once or twice.

21   Q.   And for how many -- for how long did you work at the

22   company?

23   A.   From 2012 to 2016.

24   Q.   You mentioned a moment ago that you assisted Fishman with

25   travel as well?

1   A.   Yes.

2   Q.   To your knowledge, how often was Fishman traveling for the

3   purpose of treating animals outside of the State of Florida?

4   A.   None that I was aware of.

5               THE COURT:  Hold on.

6               MR. SERCARZ:  Objection to the form of the question,

7   "for the purpose of."

8               THE COURT:  Nothing wrong with the form of the

9   question.

10              MR. SERCARZ:  Foundation.

11              THE COURT:  That's sustained.

12  Q.   Ms. Adams, during your time at Equestology, are you aware

13  of Dr. Fishman traveling at any point for the purpose of

14  treating animals?

15  A.   No.

16  Q.   Does that include with respect to trips that you were aware

17  of -- sorry let me rephrase.

18              Given that, are you aware of any time that Dr. Fishman

19  traveled to the State of New York for the purpose of treating

20  animals?

21  A.   No.

22  Q.   Are you aware of any time that Dr. Fishman traveled to the

23  State of Delaware for the purpose of treating animals?

24  A.   No.

25  Q.   Was it among your duties at Equestology to maintain any

1   patient files?

2   A.  Can you elaborate on what you mean as patient files?

3   Q.  Did you maintain any documents relating to the health of

4   particular horses at Equestology?

5   A.  No, I did not.

6   Q.  When you began working for Equestology, was anybody else

7   working at the company?

8   A.  Yes.

9   Q.  And who was that?

10  A.  Lisa Ranger.

11  Q.  What was Lisa Ranger's role when you began working at

12  Equestology?

13  A.  She was a sales rep, as far as I know.

14  Q.  And now Ms. Adams, I will ask about a series of documents

15  that you have in front of you.

16  A.  Okay.

17  Q.  Have you had an opportunity to review what's been marked

18  for identification as Government Exhibits 1900 through 1905 and

19  1907 through 1913?

20  A.  Yes.

21  Q.  Can you tell me, without describing the substance, can you

22  tell me in general what are those documents?

23  A.  Emails either between Seth and I or Mary and I about orders

24  and other inventory-related items.

25  Q.  And who is Mary?

1    A.  Mary was my replacement when I decided to leave the

2    company.

3    Q.  Are each of these documents related to your work at

4    Equestology?

5    A.  Yes, I am involved in them.

6                MR. ADAMS:  Your Honor, the government moves to admit

7    Exhibits 1900 through 1905 and 1907 through 1913.

8                MR. SERCARZ:  Your Honor, no objection regarding the

9    authenticity.  Under the circumstances, may I reserve the right

10   to object to the content, her testimony regarding any document?

11               THE COURT:  When we get to testimony, of course.

12               Yes, the documents will be admitted with Mr. Sercarz's

13   right to object to the testimony as it is elicited.

14               (Government's Exhibits 1900 through 1905 and 1907

15   through 1913 received in evidence)

16               MR. ADAMS:  Thank you, your Honor.

17               With that understanding, the government would ask to

18   display for the jury Government Exhibit 1907 to begin with.

19               THE COURT:  Yes.

20   BY MR. ADAMS:

21   Q.  Ms. Adams, if you could please turn to Government

22   Exhibit 1907.

23   A.  All right.

24               THE COURT:  Any juror that is not able to see this,

25   can you raise your hand, just so we're sure the technology is

1    all working?

2            Does everyone have a copy coming up?

3            All right.  Thank you.

4            Sorry, Mr. Adams, go ahead.

5            MR. ADAMS:  Thank you, your Honor.

6            I will ask if Ms. Jung to zoom in as we're going

7    through this a bit.  I know it may be a bit small on the screen

8    to begin with, but we'll expand it.

9    BY MR. ADAMS:

10   Q.  Ms. Adams, do you recognize this document?

11   A.  Yes, I do.

12   Q.  First, can you note the date for the record, please, on the

13   email at the top of the document.

14   A.  Monday, May 13, 2013.

15   Q.  In May of 2013, what was your role at Equestology?

16   A.  I was the office manager in charge of everything office

17   related, taking orders, shipping them out, that kind of thing.

18   Q.  Do you recognize the email address and names at the top of

19   the document?

20   A.  Yes.

21   Q.  Who controlled the email address equestology@gmail.com?

22   A.  Lisa Ranger.

23   Q.  Below that, is that your email address?

24   A.  Yes, it is.

25   Q.  Looking at the forwarded message where it begins "I would

1    keep the lower name," can you describe what you understood this

2    message to be about.

3    A.  All right.  One moment.  The message is --

4              MR. FASULO:  Objection, your Honor.  Objection, this

5    isn't a party to this email.

6              THE COURT:  She received a copy of it, did she not,

7    per the upper email?

8              MR. FASULO:  She got a copy but she wasn't a party.

9              THE COURT:  He's asking her understanding when she

10   received it.  Overruled.

11   BY MR. ADAMS:

12   Q.  You can continue, Ms. Adams.

13   A.  It's instructions on the difference in the labeling between

14   the products that are photographed in the email and basically

15   asking me to change parts of it.

16   Q.  And on the forwarded message, whose name appears in the

17   "from" line?

18   A.  Lisa Ranger.

19   Q.  And who is it sent to?

20   A.  Seth Fishman.

21   Q.  And is that Seth Fishman's email account ending in Hotmail

22   that appears there?

23   A.  Yes.

24   Q.  If you would, please just read the content beginning with,

25   "I would keep the lower."

1    A.  You want me to read it out loud?

2    Q.  Yes, please.

3    A.  I would keep --

4    Q.  And I'm asking Ms. Jung to zoom in slightly to make it a

5    little easier for the jury to read in the box, but you can

6    continue.

7    A.  I would keep the lower name in white with black letters,

8    i.e., Methocarbamol.  At this point, the client needs to know

9    that Equibaxin is Robaxin.  As you have it now with the lower

10   name in blue or any other color, it will fade into the bottle

11   and the client's eyes won't see it.  They need to get used to

12   the new name first then slowly fade it into the background of

13   main label color.

14   Q.  Let me ask you to stop there.  Do you have an understanding

15   of what Equibaxin is?

16            MR. SERCARZ:  Objection, your Honor.

17   A.  I don't know.

18            THE COURT:  It's just a yes or no.  Does she have an

19   understanding?  And she said no.

20   Q.  I'm sorry, Ms. Adams, your answer was no, you do not?

21   A.  Correct, I do not know what that product is for

22   specifically.

23   Q.  Okay.  In looking at this email, can you speak more

24   generally to Lisa Ranger's role in creating labels for

25   Equestology products?

1              MR. FASULO:  Objection to form.

2              THE COURT:  Mr. Adams, can you ask the question

3    without regard to the document?

4              MR. ADAMS:  Certainly.

5    Q.  Ms. Adams, what was Lisa Ranger's role with respect to

6    creating labels for Equestology?

7    A.  She would suggest edits so the customer could better

8    understand what the product was.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  And on this document, where it refers to, at this point,

2    "the client needs to know," what's your understanding of whose

3    clients are being referred to here?

4    A.  Lisa's client.

5    Q.  Did you, in 2013, did you have clients at Equestology?

6    A.  No.

7    Q.  And from your work at Equestology, what's your

8    understanding of the kinds of clients that were

9    buying Equestology products?

10             MR. SERCARZ:  Objection.

11             MR. FASULO:  We join in the objection and lacks a

12   foundation.

13             THE COURT:  Sustained.

14   BY MR. ADAMS:

15   Q.  Let me re-ask the question.

16             In your role at Equestology, did you become familiar

17   with the identity of the Equestology clients?

18   A.  I knew their names, when I would get shipped like order

19   requests, but I was not familiar with the client in more ways

20   than that.

21   Q.  Did you have conversations at any point with Seth Fishman

22   regarding the nature of the business of Equestology clients?

23   A.  Yes.

24   Q.  What did Seth Fishman tell you about the nature of the

25   business of Equestology clients?

1   A.   That we specialized in making performance products.

2   Q.   Performance products for what purpose?

3   A.   For horses that were untestable.

4   Q.   You testified a moment ago that, at this time, you did not

5   have clients.  Were you familiar with who at Equestology did

6   have clients associated with their own business?

7   A.   Yes.

8   Q.   Apart from Ms. Ranger, who else at Equestology had clients?

9   A.   Lisa was the only one working for Equestology that had

10  clients.

11  Q.   At any point did Seth Fishman have his own clients

12  of Equestology?

13  A.   Yes.

14  Q.   In the course of your time at Equestology, did you become

15  familiar with whose clients were associated with Fishman and

16  whose clients were associated with Ranger?

17  A.   For the most part, yes.

18  Q.   And from your time at Equestology, did you become familiar

19  with where Lisa Ranger's clients were typically located?

20            MR. FASULO:  Objection.

21  A.   Yes.

22            THE COURT:  Sustained.  You need to clarify.

23            MR. ADAMS:  Sure.

24            THE COURT:  Or lay a foundation.

25  Q.   From your time at Equestology, did you become familiar with

1    the addresses associated with Equestology clients?

2    A.   Yes.

3    Q.   Did you participate in preparing shipments to Equestology

4    clients?

5    A.   Yes, I did.

6    Q.   Did that include preparing shipments for Lisa Ranger's

7    clients?

8    A.   Yes.

9    Q.   Did you personally assist in shipping products to Lisa

10   Ranger's clients?

11   A.   Yes, I did.

12   Q.   From that part of your business in Equestology, did you

13   become familiar with where Lisa Ranger's clients were located?

14   A.   Yes.

15   Q.   And in general, what part of the world were they located

16   in?

17             MR. FASULO:  Objection.

18   A.   In the northeast --

19             THE COURT:  Overruled.

20   Q.   You may answer it, Ms. Adams.

21   A.   They were in the northeast of the United States.

22             MR. ADAMS:  Your Honor, at this point, I'm going to

23   read a portion of a stipulation.  This is Exhibit 9008.

24             THE COURT:  Is it in this binder?

25             MR. ADAMS:  Thank you, your Honor.  The parties have

1   made one amendment to this, which I will -- it's not reflected

2   in the document you have, but we will provide the change that

3   relates to one of the exhibits mentioned.

4           THE COURT:  When you read the stipulation, you're

5   obviously going to read the amendment?

6           MR. ADAMS:  The corrected version, that's correct.

7           This is the first stipulation that we'll read is

8   marked for identification as Government Exhibit 9008, and it

9   reads as follows:  It is hereby stipulated and agreed by and

10  among the United States of America by Damian Williams, United

11  States Attorney for the Southern District of New York,

12  Andrew C. Adams, Anden Chow and Sarah Mortazavi, Assistant

13  United States Attorneys, of counsel, and Seth Fishman, the

14  defendant, by his attorney, Maurice Sercarz, Esquire, and Lisa

15  Giannelli, the defendant, by her attorney, Louis Fasulo,

16  Esquire that:

17          First, the electronic devices and locations listed in

18  the chart below under columns A and B are true and accurate

19  reflections of the locations and dates where each respective

20  electronic device was seized.

21          If called as a witness at trial, a representative of

22  the Federal Bureau of Investigations would testify that the

23  exhibits listed under column C in the chart below are true and

24  accurate extractions of electronic records from each respective

25  electronic device listed in column A.

1          There follows a chart and, your Honor, for today's

2    purposes, I'm going to read just a few of the lines rather than

3    the entirety of the chart.  The first line, column A, refers to

4    an Apple iPhone X, the location is designated as Seth Fishman's

5    person, on April 1st, 2019.  And the exhibits are noted as

6    Government Exhibits 401-A through 401-G, and 401-I through

7    401-II.

8          On page 3, at the top line, the same chart, refers to

9    an Apple iPad.  The location is noted as Seth Fishman's person,

10   on or about October 27th, 2019, and the Government Exhibits are

11   designated as 900-A through 903, 905 and 980 through 914.

12         Paragraph 3 reads that:  If called as a witness at

13   trial, a representative of the Federal Bureau of Investigation

14   would testify that Government Exhibit 910 was an excerpt from

15   an electronic record extracted from an Apple iPad recovered

16   from Seth Fishman's person that had the following metadata.

17         And for purposes of today's presentation, I will skip

18   this metadata and the metadata that follows, but offer the full

19   exhibit.

20         It is further stipulated and agreed by and between the

21   parties that this stipulation, which is Government

22   Exhibit 9008, may be received in evidence at trial.  And it's

23   signed by the parties and dated January 18th, 2022.

24         THE COURT:  All right.  Based on the stipulation of

25   the parties, it will be received in evidence.

1              MR. ADAMS:  Thank you, your Honor.

2              (Government's Exhibit 9008 received in evidence)

3    BY MR. ADAMS:

4    Q.  Ms. Adams, now, if I could ask you to look again at some of

5    the exhibits in front of you and specifically --

6    A.  Okay.

7    Q.  -- specifically if you could please look at what has been

8    marked for identification as Government Exhibits 401-S --

9    A.  Okay.

10   Q.  -- through 401-FF and 401-II?

11   A.  Okay.

12   Q.  Do you recognize those documents?

13   A.  Yes, I do.

14   Q.  And without referring to substance, can you tell us what

15   are those?

16   A.  They are text messages between Seth and I.

17   Q.  Do those messages relate to your business at Equestology?

18   A.  Yes, they do.

19              MR. ADAMS:  Your Honor, on the basis of the

20   stipulation in 9008 with respect to these Government Exhibits

21   401 series, the government offers 401-S through 401-FF and

22   401-II.

23              THE COURT:  They'll be received.

24              MR. ADAMS:  Thank you, your Honor.

25              (Government's Exhibits 401-S through 401-FF and 401-II

1    received in evidence)

2                MR. ADAMS:  Ms. Jung, if we could please put up what's

3    now in evidence as 401-T, please.

4    BY MR. ADAMS:

5    Q.  And, Ms. Adams, if you could look at 401-D, could you

6    describe more specifically what is this document?

7    A.  It's a text between Seth and I about the message I received

8    from Lisa about a his vet license.

9    Q.  And who is "Lisa"?

10   A.  Lisa is the sales rep.

11   Q.  Is that the same Lisa Ranger you mentioned a moment ago?

12   A.  Yes.

13   Q.  On this document, the number ending in 2600, whose number

14   is that?

15   A.  That is mine.

16   Q.  And the phone number ending in 9286, whose number is that?

17   A.  Seth's.

18   Q.  And who sent this message to him?

19   A.  I sent it to Seth.

20   Q.  Could you note the date for us, please?

21   A.  June 10th, 2015.

22   Q.  By June 2015 had your role at Equestology changed in any

23   way?

24   A.  I may have started trying to like training on how to do

25   sales at that point.  I can't be sure of the exact time line.

1    Q.  Okay.  Did there come a time that you were asked to engage

2    in sales of Equestology products?

3    A.  Yes.

4    Q.  And did you agree to do that?

5    A.  To a certain extent, yes.

6    Q.  Did you, yourself, have clients when you began operating

7    with sales?

8    A.  Yes.

9    Q.  In this document, can you describe what you're relaying to

10   Seth?

11   A.  I'm saying that Lisa told me that she does not have his vet

12   license, she only has a business license, but she's sending me

13   a link that shows all the information on it, basically.

14   Q.  And whose vet license did you understand Lisa to be

15   referring to?

16   A.  To Seth's.

17   Q.  What was the purpose of using Seth's veterinary license?

18            MR. FASULO:  Objection.

19            THE COURT:  Sustained.

20   Q.  In your work at Equestology, were you familiar with the use

21   of Seth Fishman's veterinary license with respect to that

22   business?

23   A.  Yes.

24   Q.  What was the nature of how Seth Fishman's veterinary

25   license was used by Equestology?

1          MR. SERCARZ:  Objection.

2          THE COURT:  Give me a moment.  She can testify to her

3     understanding.

4          MR. ADAMS:  Thank you, your Honor.

5     Q.   Your understanding of the use of Seth Fishman's veterinary

6     license, please?

7     A.   Yes, it was used -- we had many different companies that we

8     would order what we call API, or pharmaceutical products, from

9     that required his vet license to be on file in order to get

10    them.  It was used for that, and then it was also used for him

11    to be able to legally practice veterinary medicine.

12         MR. SERCARZ:  Move to strike that last item.

13         THE COURT:  The whole thing or after "and" are you

14    saying?

15         MR. SERCARZ:  I don't have the text in front of me but

16    I believe it's after the "and."

17         THE COURT:  Overruled, in any event.

18         MR. ADAMS:  Ms. Jung, can we please show for the jury

19    what's now in evidence as Government Exhibit 401-W.

20    BY MR. ADAMS:

21    Q.   And, Ms. Adams, if you could also look at 401-W?

22    A.   Okay.

23    Q.   Do you recognize this document?

24    A.   Yes.

25    Q.   What is this document?

1   A.  This is a text between Seth and I.

2   Q.  And can you describe the content of the document?

3   A.  Yup.  I'm forwarding a message from Lisa asking -- she's

4   asking me, doc needs to send blood builder to one of her

5   clients that she names.

6   Q.  What is your understanding -- what was your understanding

7   of who "doc" was?

8   A.  "Doc" is Seth Fishman.

9   Q.  And what's your understanding of what was meant by blood

10  builders?

11  A.  I'm not -- it's a product we have.  I'm not sure what it

12  is.  I just know that's what it's referred to.

13  Q.  Did you participate in any way in developing the chemical

14  makeup of any of the Equestology products?

15  A.  Not -- can you rephrase the question?

16  Q.  Sure.  Did you assist in any way in designing Equestology

17  products?

18  A.  Only the labels.

19  Q.  Are you familiar with who Paul Minastrelli is?

20  A.  I have heard the name.  I don't know anything more about

21  him.

22  Q.  And this begins with "from Lisa."  How did this message

23  arrive to you in the first instance?

24          MR. FASULO:  Objection to the form question, as to

25  form.

1           THE COURT:  Sustained.

2    Q.  The beginning of this says "from Lisa."  Did you receive a

3    message from Lisa Ranger before sending this message?

4    A.  Yes.

5    Q.  How is that message from Lisa conveyed to you?

6    A.  Exactly as I copy and pasted it, exactly as it shows.

7    Q.  If we could -- well, let me ask.  Your role at Equestology

8    by 2015, had you developed any kind of inventory system?

9    A.  Yes.

10   Q.  Were you maintaining Equestology records electronically or

11   in hard copy by 2015?

12   A.  Electronically, yes.

13   Q.  Did you maintain any prescription records on file

14   at Equestology?

15   A.  Can you be more specific?

16   Q.  Did you maintain any prescription records for Lisa Ranger's

17   clients at Equestology?

18   A.  No.

19   Q.  Were you ever asked -- I'm sorry.  Did you ever ask Lisa

20   Ranger to send a request for written prescription?

21   A.  No.

22   Q.  When, if ever, did Lisa Ranger ask you to schedule an

23   appointment for Dr. Fishman to examine horses belonging to her

24   clients?

25   A.  Never.

1    Q.  If we could now please show both for the jury and for --

2              MR. ADAMS:  I'm sorry, your Honor.  It's 4:30 and if

3    the Court's preference is to break, now would be a fine time.

4              THE COURT:  All right.  This is a convenient breaking

5    point?

6              MR. ADAMS:  It is, your Honor.

7              THE COURT:  All right.  Ladies and gentlemen, we're

8    going to adjourn for the day.  I promised you we would sit

9    until about 4:30 each day; so I thank you very much for your

10   attention.  I remind you, first, please leave your notebooks in

11   the jury assembly room on your way out, or I guess you could

12   leave them -- so leave them in the jury assembly room.  You can

13   pick them up tomorrow morning.

14             Please do not talk to anyone about the case after you

15   leave here today and that includes, please, don't speak among

16   each other either until you retire at the end of the case to

17   deliberate.  You can talk to each other about other things, but

18   not about the case or about anything happening in the courtroom

19   or about what you're hearing in the evidence.  All right?

20             I thank you all very much, and I hope you all have a

21   good evening.  I'll see everybody tomorrow morning.  Please

22   remember to be here on time tomorrow morning.  Thank you all.

23   Have a good evening.

24             (Jury not present)

25             THE COURT:  All right.  Please be seated for just one

1    moment, everyone.

2           Ms. Adams, you can log off.  You are excused but

3    please remember you remain under oath.  You cannot talk about

4    the substance of your testimony after we excuse you and before

5    you take the stand again tomorrow.

6           THE WITNESS:  Okay.

7           THE COURT:  Thank you very much.  Have a good evening.

8           THE WITNESS:  Thank you.  You too.

9           (Witness temporarily excused)

10          THE COURT:  All right.  Is there anything we need to

11   discuss outside the presence of the jury?

12          MR. FASULO:  Yes, your Honor.  May I remain seated so

13   you can hear me?

14          THE COURT:  Yes, that's fine.

15          MR. FASULO:  Thank you, Judge.  I would like for the

16   record to be clear as to the conditions that Ms. Courtney Adams

17   is testifying to.  Both the prosecution and the defense had

18   agreed on certain conditions that would exist at Ms. Adams'

19   place of testimony.

20          It's not on the record at this point, and I think it

21   should be on the record, and it should be confirmed by the

22   witness that those are the conditions that she understood and

23   that she's actually testifying in that way.

24          The reason I didn't bring it up, I didn't want to

25   holdup the Court before we were doing the testimony.  I'm

1    certain -- I'm sure that we've done everything, both the

2    government and ourselves, to make sure that those conditions

3    are met, but I do think we need that on the record that

4    Ms. Adams has understood those conditions and, in fact, she has

5    complied and continues to comply by the conditions.

6           For example, that she's in the room by herself; and

7    her lawyer is not making contact with her during her testimony;

8    that she is not communicating with anybody during the

9    testimony; nor is she using any outside device to communicate

10   with anybody regarding any of the substance of her testimony;

11   and that she is limited in the materials available to her, to

12   the materials that have been submitted to the government in

13   this witness binder book, as well as other materials that may

14   be necessary for her testimony, which are also available to her

15   part of 3500, but which she has not yet been asked to open.

16          And I think those are the conditions that we

17   understood.  If I'm wrong, Mr. Adams can add to them, but I do

18   think we need the witness to secure to the Court that these are

19   being met.

20          THE COURT:  All right.  I assume you don't mean this

21   to be done in the presence of the jury.

22          MR. FASULO:  Absolutely not, Judge.  I think we can do

23   it outside the jury.  I didn't want to interfere with the

24   testimony, but I think we need to get that on the record.

25          THE COURT:  Mr. Adams?

1          MR. ADAMS:  Yes, your Honor.  Thank you.  Mr. Fasulo

2     is right, and the understanding is correct.  Ms. Adams has the

3     same jury binder that now the Court has and defense counsel

4     has.  That was FedEx'd to her I think as we discussed on

5     Thursday.

6          THE COURT:  All right.  I think that what makes sense,

7     based on what Mr. Fasulo is asking, I don't have anywhere a

8     list of the conditions that you all agreed to, but maybe you

9     want to put them in writing and make sure you're both on the

10    same page.  And then why don't we, before we bring the jury up

11    tomorrow morning, ask Ms. Adams to sign on and you can confirm

12    with her, Mr. Adams, you know, read the list and ask her to

13    confirm.

14         MR. ADAMS:  No problem, your Honor.

15         THE COURT:  And we'll ask her to log off, and bring

16    the jurors up and begin testimony for the day.

17         MR. ADAMS:  That's great.  Thank you.

18         MR. FASULO:  Thank you, your Honor.

19         THE COURT:  All right.  Is there anything else, then,

20    that we need to talk about tomorrow morning?

21         MR. FERNICH:  Can I just have two seconds with

22    Mr. Sercarz?

23         THE COURT:  Sure.

24         MR. FASULO:  Nothing from defendant Giannelli.

25         THE COURT:  All right.  Thank you, Mr. Fasulo.

1    Anything from the government?

2                MR. FERNICH:  Nothing further.

3                THE COURT:  Mr. Adams, anything from the government?

4                MR. ADAMS:  Nothing to flag right now, your Honor.  If

5    we think of anything in advance of tomorrow, we will let the

6    Court know.

7                THE COURT:  As I told you at the outset, if you have

8    anything that requires us to meet earlier than normal, you need

9    to let us know that preferably by tonight, if not by 8:00

10   tomorrow morning, in order that people can make the necessary

11   shifts in scheduling.  All right?

12               Mr. Sercarz, anything?

13               MR. SERCARZ:  No, not now.  Thank you.

14               THE COURT:  All right.  Thank you.

15               MS. MORTAZAVI:  Your Honor, one issue, or not an

16   issue.  One item I wanted to raise with the Court.  This just

17   occurred to me, is we've discussed the process for having

18   physical evidence in the courtroom.

19               THE COURT:  Yes.

20               MS. MORTAZAVI:  We've discussed with defense counsel

21   and the defense counsel has consented to the government's

22   proposal that we set up a table in order to have the physical

23   items there.  I think it will be easier for the defense's

24   inspection and for reference.  As long as that is permissible

25   to the Court, that is the process we will follow.

1          THE COURT:  Fine with me.

2          MR. FASULO:  Judge, there's no objection from the

3     defendant as to that.  However, if, in fact --

4          THE COURT:  Hold on.  Could you guys sit in the front

5     so I can see Mr. Fasulo.

6          MR. FASULO:  Sorry.  There's no objection.  We have

7     discussed that with the government.  However, we're

8     understanding that that will only be during the time that that

9     evidence is necessary for the government's presentation and not

10    for the entirety of the case.

11         THE COURT:  Ms. Mortazavi?

12         MS. MORTAZAVI:  That's consistent with our

13    understanding, your Honor.

14         THE COURT:  All right.  Mr. Sercarz, acceptable to

15    you?

16         MR. SERCARZ:  Yes, your Honor, it is.

17         THE COURT:  All right.  So are you asking to set that

18    up before Ms. Adams is finished testifying?

19         MS. MORTAZAVI:  No, your Honor.

20         THE COURT:  We take a break?

21         MS. MORTAZAVI:  Because it will be happening tomorrow

22    and we need to arrange for the table, I wanted to make sure

23    that the Court is aware.  We will plan to do it during a break,

24    hopefully, after Mr. Adams has concluded Ms. Adams'

25    presentation.

1           THE COURT:  All right.  Do you have a sense of how

2    long you will be with Ms. Adams?  Like, will it take us to the

3    morning break?  Is that when you're proposing to do the setup?

4           MR. ADAMS:  I expect she'll go through the morning

5    break.

6           THE COURT:  Fine.  Okay.  That's fine with the Court.

7    Anything else?  All right.  I hope everyone has a nice evening

8    then, and I'll see you tomorrow morning.

9           MR. ADAMS:  Thank you, your Honor.

10           MS. MORTAZAVI:  Thank you, your Honor.

11           (Adjourned to January 21, 2022, at 9:30 a.m.)

12

13                     INDEX OF EXAMINATION

14    Examination of:                          Page

15     COURTNEY DIANE ADAMS

16    Direct By Mr. Adams . . . . . . . . . . . . .55

17

18                     GOVERNMENT EXHIBITS

19    Exhibit No.                           Received

20     10005  . . . . . . . . . . . . . . . . . .57

21     1900 through 1905 and 1907 through 1913  . . .65

22     9008  . . . . . . . . . . . . . . . . . .75

23     401-S through 401-FF and 401-II  . . . . . .75

24

25