M1LTFIS1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          20 Cr. 160 (MKV)

5    SETH FISHMAN and
     LISA GIANNELLI,
6
               Defendants.
7                                          Trial
     ------------------------------x
8                                          New York, N.Y.
                                           January 21, 2022
9                                          9:30 a.m.

10   Before:

11                   HON. MARY KAY VYSKOCIL,

12                                         District Judge
                                           –and a Jury–
13
                            APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  ANDREW C. ADAMS
          SARAH MORTAZAVI
17        ANDEN F. CHOW
          Assistant United States Attorneys
18
     SERCARZ & RIOPELLE, LLP
19        Attorneys for Defendant Fishman
     BY:  MAURICE H. SERCARZ
20        –and–
     LAW OFFICE OF MARC FERNICH
21   BY:  MARC A. FERNICH

22   FASULO, BRAVERMAN & DiMAGGIO, LLP
          Attorneys for Defendant Giannelli
23   BY:  LOUIS V. FASULO

24
     ALSO PRESENT:  KARLINE JUNG, Paralegal Specialist
25                  SEAN McCABE, Paralegal Specialist

1          (In open court; jury not present)

2          THE COURT:  Good morning, everyone.

3          Let me have appearances for the record.  For the

4     government?

5          MS. MORTAZAVI:  Good morning, your Honor, Sarah

6     Mortazavi, Andrew Adams, Anden Chow and Karline Jung from our

7     office.

8          THE COURT:  Good morning, everyone.

9          For the defendant, Mr. Seth Fishman.

10         MR. SERCARZ:  For defendant Fishman, Maurice Sercarz

11    and Marc Fernich.  The defendant is present in court.

12         THE COURT:  Good morning, gentlemen.

13         MR. FASULO:  Good morning, your Honor, Louis Fasulo

14    along with Sean McCabe, Ms. Giannelli is in the audience and

15    our intern, Mattie Stewart, is here as well.

16         THE COURT:  Thank you.  I hope everyone had a good

17    evening.  I came out before we bring the jury out because when

18    we broke yesterday Mr. Fasulo had proposed that we put on the

19    record the stipulation regarding the current witness who is

20    testifying remotely and what you all agreed in terms of what

21    she would have access to and what the rules would be.

22         So who is prepared to address that?

23         MR. ADAMS:  Your Honor, I can speak to that and speak

24    to both the discussions and agreements that we have had with

25    defense counsel as well as the instructions that have been

1    given to Ms. Adams for several days now.

2              So Ms. Adams has been provided with a copy of her

3    government exhibits, it's the same binder that the Court has,

4    it's the same binder that defense counsel has, and that is what

5    she is holding in front of her, and she has been referring to

6    that through her testimony.

7              I have also provided to her counsel a copy of her full

8    set of 3500 material so that, if needed for refreshment on

9    direct or cross, she can be referred to those documents.  But I

10   have instructed her counsel that she should not share the 3500

11   material with Ms. Adams before being instructed to do so and

12   she has not been instructed to do so.

13             Then with respect to where she is physically, she is

14   testifying from her residence in Florida.  Her counsel is in

15   the residence to be on hand if needed and to deliver the 3500

16   material.  Her counsel, though, is outside of the room where

17   she's testifying.  Ms. Adams has been instructed that she can't

18   be communicating with anyone during the course of her

19   testimony, including her counsel.

20             THE COURT:  And she doesn't have any devices or cell

21   phones, laptops, iPads in front of her?

22             MR. ADAMS:  She's been working through a computer, but

23   she's been instructed not to communicate with anybody at any

24   point, and the only exhibits she's referring to are the

25   government exhibits that are put in front of her for the

M1LTFIS1

1    purposes of her testimony.

2                THE COURT:  All right.  Is that consistent with the

3    defendants' understanding?

4                MR. FASULO:  Yes, Judge.  My only concern for the

5    Court to consider is I thought it was important that Ms. Adams

6    actually confirm that.

7                THE COURT:  You're absolutely right.  I was going to

8    say when we first have her log on, we have to have her confirm

9    that.

10                MR. ADAMS:  Sure.  For efficiency sake, I'm happy to

11    call her.

12                THE COURT:  That's fine.  Let me confirm with

13    Mr. Sercarz that's consistent with your understanding of what

14    was agreed to.

15                MR. SERCARZ:  It is, your Honor.

16                THE COURT:  Thank you.  So let's get Ms. Adams on the

17    line, ask for her to confirm.

18                (Pause)

19                THE COURT:  Was that a voice mail or did you actually

20    reach her?

21                MR. ADAMS:  That was her.

22                THE COURT:  Good morning, Ms. Adams, are you able to

23    hear me?

24                THE WITNESS:  Yes, I am.  Good morning.

25                THE COURT:  Good morning.  As a reminder, you remain

M1LTFIS1

1    under oath, Ms. Adams.

2              THE WITNESS:  Yes.

3              THE COURT:  I'm going to ask Mr. Adams to put on the

4    record the agreement between the parties about the rules that

5    are going to govern your testifying remotely, and we would like

6    you to please confirm that that is your understanding and that

7    you are complying with these rules, please.

8              THE WITNESS:  Okay.

9              MR. ADAMS:  So Ms. Adams, you have been provided with

10   a copy of a binder containing government exhibits, is that

11   correct?

12             THE WITNESS:  Correct.

13             MR. ADAMS:  And those include the exhibits that we

14   admitted yesterday on the record as well as a copy of what's

15   been marked as Government Exhibit 402HH and Government

16   Exhibit 11000 which has not yet been offered, is that correct?

17             THE WITNESS:  Let me just double-check.

18             I have the one binder.  Is the 402 in the secondary

19   binder?

20             MR. ADAMS:  402 should be in the binder in front of

21   you in numerical order.

22             THE WITNESS:  There it is, sorry.

23             MR. ADAMS:  And at the very back, the only additional

24   exhibit what we haven't talked about yet is Exhibit 11000.  Do

25   you see that one?

M1LTFIS1

1              THE WITNESS:  Yes.

2              MR. ADAMS:  Okay.  Your counsel has been provided with

3    a copy of your what's called 3500 material or prior statements,

4    is that correct?

5              THE WITNESS:  Yes.

6              MR. ADAMS:  But that has not been provided to you,

7    correct?

8              THE WITNESS:  No.

9              THE COURT:  No, it's not correct, or no, it has been

10   provided to you?

11             THE WITNESS:  It has not been provided to me.

12             THE COURT:  Thank you.

13             MR. ADAMS:  Thank you, your Honor.

14             Ms. Adams, are you testifying again today from your

15   residence?

16             THE WITNESS:  I am.

17             MR. ADAMS:  Is your counsel going to be present in

18   your residence today?

19             THE WITNESS:  I don't believe so.

20             MR. ADAMS:  Yesterday was your counsel present at your

21   residence?

22             THE WITNESS:  Yes.

23             MR. ADAMS:  Was he in a different room than the one

24   you were testifying in?

25             THE WITNESS:  Yes.

M1LTFIS1

1              MR. ADAMS:  Have you been instructed and have you

2     followed the instruction to not communicate with anyone during

3     the course of your testimony other than with me in court?

4              THE WITNESS:  Yes.

5              MR. ADAMS:  Anything further that your Honor would

6     like to confirm?

7              THE COURT:  Not from the Court.

8              MR. FASULO:  Not from defendant, your Honor.

9              THE COURT:  Mr. Sercarz?

10             MR. SERCARZ:  No, your Honor, thank you.

11             THE COURT:  Thank you very much, Ms. Adams.  We'll be

12    back with you shortly after the jury returns.  Okay?

13             THE WITNESS:  Okay.

14             MR. ADAMS:  Ms. Adams, you can log off again and I

15    will again give you a call and tell you when to log back on.

16             THE WITNESS:  Okay.

17             THE COURT:  Thank you very much.  Is there anything

18    else for the record before we bring the jury out?

19             Anything from you, Mr. Adams?

20             MR. ADAMS:  Yes, your Honor.  I would request the

21    Court instruct people sitting in the gallery to not encroach on

22    the jury during the course of the trial, and in particular, to

23    not peer over the back edge of the jury box in a way that might

24    give access to what the jurors might be writing in their notes.

25    That was something that was reported to be happening yesterday

1    and it should not happen.

2            THE COURT:  I couldn't agree more.  For those of you

3    who are sitting behind the bar there, first, you need to be

4    socially distanced.  I was trying to observe yesterday and

5    wasn't 100 percent sure that the people in the very back were

6    distanced, but I can't always tell from here what row you're

7    in.  So you need to be six feet apart from one another and

8    nobody should go behind where that juror box is.  You shouldn't

9    be there, never mind peering over.

10           This is the only side available for people who are not

11   in the well of the courtroom.  If this section is full, people

12   need to go to the overflow courtroom.

13           Thank you.  Anything from you?

14           MR. FERNICH:  Your Honor, one quick thing, and I

15   apologize for not broaching with the government earlier, it

16   just slipped my mind.  Can the witness physically see the

17   defendants from where she is?

18           We understand Covid and the remote restrictions and

19   don't have any problem with them, we stipulated to them, but to

20   effectuate the defendants' right to confrontation, it would be

21   ideal if we could maximize the degree to which both the witness

22   and the defendants can see one another, because that's truly

23   the confrontation right.  And to the degree that we could

24   accommodate the remote situation and Covid consistent with

25   that, that would be ideal.  So maybe if somebody could inquire

1    to the extent to which she can actually see them.

2              THE COURT:  First of all, I think you have the screen

3    in front of you and you can see, I believe, what we the

4    witnesses see.

5              MR. FERNICH:  There was no problem.  He could see her

6    from where he was yesterday on the big screen and he could see

7    from here.  The issue from my perspective is more as to whether

8    she can see, and the case law the old song:  Look me in the eye

9    and say that, look me in the eye and say that.  So my issue is

10   whether she, the witness, can see them.

11             MR. ADAMS:  Your Honor, the witness can see what's on

12   the screen.  She can see Mr. Fishman, she can see

13   Ms. Giannelli, they're both on the screen.  She can see me when

14   I'm examining.  And she'll take the instruction later when I

15   signal her to turn her mic on and off, she can do that, we

16   tested yesterday, she can see that, and there was no objection

17   yesterday as to this.

18             THE COURT:  We can confirm that with her.  The size of

19   the screen is what it is, I appreciate that, but I don't really

20   see what the issue is.

21             MR. FERNICH:  The issue, Judge, is the aerial view.

22             THE COURT:  What would you like me to do about that,

23   sir?

24             MR. FERNICH:  I would like to be able for her to see.

25   And I understand there's another issue that's been sealed, so

M1LTFIS1

1    I'm speaking with respect to Dr. Fishman primarily now, I would

2    like to, if we can arrange it, for her to be able to see his

3    face.

4                THE COURT:  Mr. Adams?

5                MR. ADAMS:  The protocol that we have had in place

6    since before this jury was even selected has not come up once.

7    It's been completely apparent what the aerial view looks like

8    the entire time we have been testing this and talking about it.

9    The witness can see Dr. Fishman.  I am looking at the screen, I

10    can see Dr. Fishman, I can see Ms. Giannelli, the Court can see

11    both of them.  And it's a little late in the day to try to

12    rearrange the tech in an effort to get beyond what is already

13    an agreed-upon protocol.

14                THE COURT:  I have to say, Mr. Fernich, I agree with

15    that.  And the Court last week, when we had the pretrial

16    conference, the government requested leave for access to the

17    courtroom, and I believe Mr. Fasulo did.  I don't recall

18    whether your team did, but I said on the record that anyone who

19    wanted access to the courtroom to deal with AV issues or to

20    view how everything was working could be in touch with my

21    courtroom deputy and make arrangements.

22                I know that some parties did, but I also understand

23    some parties did not.  For you now, three days into us all

24    being assembled here in connection with this trial, to raise is

25    the issue is untimely.  There's nothing I can do right now

M1LTFIS1

1    about this issue.

2             MR. FERNICH:  I appreciate your Honor's point.

3    Obviously, tech is a fluid situation.  We just resolved the

4    other day the issue of Dr. Fishman's presence at the table.

5    And we're all trying to work consistent with the Covid

6    protocols.  And to be very clear, we don't have any problem

7    with the issue of remote testimony.  I'm familiar with *Maryland*

8    *v. Craig*, all of that.  I want to work with everybody, get the

9    trial going and deal with it consistent with Covid.

10            To the extent that we can work the tech so that she

11   can see his face, that's really the essence of the

12   confrontation right.  And obviously we didn't insist on literal

13   physical confrontation because I think this arrangement

14   survives under applicable precedent, but to the extent, even by

15   moving Dr. Fishman around, and I get there's a jury here, I

16   would like her, if we can, to be able to see his face.

17            THE COURT:  All right.  Your points are noted.  Is

18   there anything else for the record?

19            MR. SERCARZ:  No, your Honor.

20            MR. FASULO:  Nothing, your Honor.

21            MR. ADAMS:  Nothing, your Honor.

22            THE COURT:  Anything else, Mr. Sercarz?

23            MR. SERCARZ:  No, your Honor, thanks.

24            THE COURT:  Ms. Popper, please let the Ms. Dempsey

25   know that we're ready for the jury.

M1LTFIS1

1          LAW CLERK:  Yes, Judge.

2          MR. ADAMS:  Your Honor, would you like me to call

3     Ms. Adams and get her on the stand, so to speak?

4          THE COURT:  You can have her on the screen but with

5     her microphone turned off.

6          MR. ADAMS:  Your Honor, there's one audio exhibit I

7     expect to play during the examination.  We tested the speaker

8     here earlier, and I don't expect this is going to happen before

9     the morning break, but we can test it again with the Court

10    present to make sure that you can hear it at the bench, but it

11    sounded audible.

12         THE COURT:  It should be fine.

13         MR. ADAMS:  And at the break we have sets of jury

14    binders with the draft transcripts that are prepared.  The

15    defense --

16         THE COURT:  Of the recording, you mean?

17         MR. ADAMS:  Transcripts of all the recordings.  But

18    what we ask is to distribute those and have the jurors be

19    instructed that they only open the transcript that they're

20    directed to open.

21         THE COURT:  Have you shared that binder of transcripts

22    with the defendants?

23         MR. ADAMS:  The exhibits that the binders are derived,

24    but again, we won't do this before the break.

25         THE COURT:  But before you hand them to the jury you

M1LTFIS1

1        clearly have to give them to the defendants and hear whether

2        they have any issues.

3                    MR. ADAMS:  Absolutely.

4                    THE COURT:  Our jurors are going to enter shortly.

5                    Sir, by the back door, you cannot keep getting up and

6        walking past the jurors.  You can stand there or leave, but

7        decide right now, because the jury is about to enter.

8                    All right.  Ms. Dempsey, we're ready.

9                    (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Good morning, ladies and gentlemen.  Thank

3     you for being here.  I hope everyone had a good evening.

4              All right, Mr. Adams.

5              MR. ADAMS:  Thank you, your Honor.

6              THE COURT:  Ms. Adams is with us.

7              Ms. Adams, you are still under oath.  You understand

8     that?

9              THE WITNESS:  Yes, I do.

10             THE COURT:  Thank you.

11     COURTNEY DIANE ADAMS,    (Continued)

12         having been previously sworn, testified as follows:

13     DIRECT EXAMINATION

14     BY MR. ADAMS:

15     Q.  Good morning, Ms. Adams.

16     A.  Good morning.

17     Q.  When we were together yesterday we were talking about the

18     beginning of your time at Equestology and we were talking about

19     the time period around 2012, 2013.  Let me turn you back to

20     that period for a moment.  And before I do that, let me ask you

21     to turn in the exhibit binder in front of you to what has been

22     marked for identification as 402H.

23     A.  Okay.

24     Q.  Do you recognize that document?

25     A.  Yes.

M1LTFIS1                    Adams - Direct

1    Q.  What is it?

2    A.  It's a series of texts between Seth and I.

3    Q.  Do those texts relate to your work at Equestology?

4    A.  Yes, they do.

5            MR. ADAMS:  Your Honor, I would briefly like to read

6    from what's already in evidence as Government Exhibit 9008,

7    which is the stipulation related to electronic devices, and

8    specifically to refer to one more device in the chart that I

9    mentioned yesterday.  Again, columns A and B reflect the

10   locations and dates where each respective device was seized,

11   and column C refers to the government exhibits extracted from

12   that device.

13           For present purposes, I point to the second line of

14   the stipulation:  An Apple iPhone 7 Plus in column B seized

15   from Seth Fishman's person on April 1st, 2019, and the exhibits

16   related thereto are 402B through 402H.

17           On the basis of the stipulation and Ms. Adams'

18   testimony, I offer 402B through 402H.

19           MR. SERCARZ:  No objection.

20           THE COURT:  Mr. Fasulo?

21           MR. FASULO:  No objection, Judge.

22           THE COURT:  It will be admitted.

23           (Government's Exhibits 402B though 402H received in

24   evidence)

25           MR. ADAMS:  Thank you, your Honor.


SOUTHERN DISTRICT REPORTERS, P.C.

1    BY MR. ADAMS:

2    Q.  Ms. Adams if we could now look at 402H.

3              MR. ADAMS:  And Ms. Jung, if you could please, for the

4    jury, put up 402H, and if we could blow up the first two lines.

5    Q.  In particular, Ms. Adams, focusing on the first two lines

6    here, can you tell me the date that appears on those messages?

7    A.  January 1st, 2013.

8    Q.  And what is the discussion in these two lines relating to?

9    A.  Labels for the products.

10   Q.  Which products are those?

11   A.  The products that Seth was making.

12   Q.  What was being conveyed to you about the labels at that

13   time?

14   A.  That a person named Ryan messed something up or that he

15   was -- he was angry with him because he did not understand the

16   conversation they had about designing the labels.

17   Q.  With respect to the second message in this text reading:

18   Ask him about cleaning up logos and if he has any memory of the

19   Equestology logo and manipulating the E.

20             What did you understand Fishman to be referring to

21   here?

22   A.  On the Equestology logo, the E is larger, and that is kind

23   of like the one letter that stands out in the logo.  And he

24   wanted him to make it cleaner so it was more pronounced, it

25   wasn't lost in the logo, it was bold so the customer would see

M1LTFIS1                          Adams - Direct

1   that first so it would look nice.

2   Q.  In general, what was Fishman's role in designing logos for

3   Equestology?

4   A.  He would give me or anyone else designing them all the

5   information to go on the logo, and then from there I would take

6   it and edit it so it looked clean, orderly, professional

7   looking.

8   Q.  The logo itself, was that on a label or on some other part

9   of the product?

10  A.  It was on the label.

11  Q.  And you referred to the information that went with that.

12  What kind of information was included on Equestology labels?

13           MR. FASULO:  Objection.

14           THE COURT:  Grounds?

15           MR. FASULO:  Generalization, Judge, all labels.

16           THE COURT:  Lay a better foundation, please,

17  Mr. Adams.

18           MR. ADAMS:  Certainly.

19  Q.  Ms. Adams, did you participate in designing one label or

20  multiple labels?

21  A.  Multiple labels.

22  Q.  Did you design those labels at Fishman's direction or on

23  your own initiative?

24  A.  Fishman's direction.

25  Q.  Did you include information relating to the contents of the

M1LTFIS1                        Adams - Direct

1  products on all of the labels or only on some of the labels?

2  A.  Kind of hard to answer.  So they would always have

3  ingredients, but sometimes it wouldn't list exactly what was in

4  it, it would say proprietary blend.

5  Q.  Did you ever ask Fishman what was in the proprietary blend

6  for any Equestology products?

7  A.  A few times, yes.

8  Q.  What was his response?

9  A.  That was protected information and he was allowed to put

10  that on a label because it was his formula.  He didn't have to

11  disclose every single thing in it.

12  Q.  Were there some products that had no label whatsoever?

13  A.  Yes.

14  Q.  And what kinds of products were those?

15  A.  I'm not really sure what they were.

16  Q.  Did you ever ask Fishman what those products were?

17  A.  Yes.

18  Q.  And what was his response to that?

19  A.  That I didn't need to know the details.

20  Q.  Those products, the unlabeled products, were those shipped

21  outside of Equestology with no label on it?

22  A.  Yes.

23  Q.  And who directed you to ship unlabeled products?

24  A.  Seth would, or I would get an order from Lisa, but then

25  Seth would confirm that the items that Lisa Ranger had asked

1    for were indeed the unlabeled products.

2            MR. ADAMS:  Ms. Jung, if we could scroll down a bit to

3    the next green block of text here.

4    Q.  Ms. Adams, focusing on the first two lines from Fishman to

5    you, what did you understand him to be conveying to you here?

6    A.  That he was angry I was not working more, and that, in the

7    second message, he is referring to Lisa Ranger making a certain

8    amount of money and that if I put more time and initiative, I

9    could do the same thing.

10   Q.  What kind of work did you understand Fishman to be

11   incentivizing you to perform?

12   A.  Sales.

13   Q.  And sales of what kinds of products?

14   A.  Sales of all of the products that he made.

15   Q.  In 2013, were you engaged in sales of Equestology products?

16   A.  Not by myself, no.

17   Q.  With other people?

18   A.  No, what I mean is I didn't have clients of my own.  So I

19   would talk to clients of Seth's, sometimes they would send me

20   their orders directly, but I was not their salesperson.

21           MR. ADAMS:  If we could scroll down to -- still on the

22   first page, but to the next gray text.

23   Q.  Ms. Adams, do you see what's marked as line 4325?

24   A.  Yes.

25   Q.  And if you could look at that and then the text on the next

M1LTFIS1                          Adams – Direct

1     page and let us know what this conversation is about, please.

2     A.  Okay.  It is me asking Seth about what we want.

3              THE COURT:  Hold on.  Can you scroll up?  You want her

4     to see the bottom of the one page and the top of the next page?

5              MR. ADAMS:  Correct.  I would like her to do I think

6     what she's doing, then we'll walk through the conversation.

7              THE COURT:  All right.  The jurors and I cannot see

8     the second part.

9              MR. ADAMS:  We'll be scrolling through.

10             THE COURT:  All right.

11    Q.  Ms. Adams, if you could start with the top line, 4325.

12    A.  That is referring to how much he wants me to put on a

13    customs form for shipping product, how much he wants the

14    product to be labeled as.

15    Q.  What did you mean when you wrote bleeder?

16    A.  That's the name of one of the products.

17    Q.  From your time at Equestology, are you familiar with the

18    purpose of bleeder?

19    A.  No.

20    Q.  Did you ever ask Seth what the purpose of bleeder was?

21    A.  Yes.

22    Q.  And what was his response?

23    A.  To be honest, I don't remember.  There was a lot of

24    descriptions of things that I didn't really understand what

25    exactly they did.

M1LTFIS1                          Adams - Direct

1   Q.  And you mentioned yesterday your educational background.

2   What was your field of study?

3   A.  Ecology and conservation biology.

4   Q.  Have you ever studied veterinarian medicine?

5   A.  No.

6   Q.  Have you ever studied pharmacology?

7   A.  No.

8   Q.  When you refer to customs forms, to where was Equestology

9   shipping products?

10  A.  For the most part, to the UAE.

11  Q.  The United Arab Emirates?

12  A.  Yes.

13  Q.  Were there any other countries outside the United States to

14  which Equestology shipped its products?

15  A.  Yes.

16  Q.  What countries were those?

17  A.  Singapore, I know there's -- Saudi Arabia, and there may

18  have been one or two others randomly but I can't remember what

19  they were.

20  Q.  On this line when you refer to having 970 ready to ship,

21  that's 970 what?

22  A.  Vials.

23  Q.  Vials of what?

24  A.  Of bleeder.

25          MR. ADAMS:  And Ms. Jung, if you go to the next page,

1    please.

2    Q.  And focusing here on the top three lines, Ms. Adams, what

3    did you understand Fishman's response to you to mean?

4    A.  He says like 75 cents each, which means I would put each

5    vial at a value of 75 cents.

6    Q.  Were vials of the bleeder product sold for 75 cents?

7    A.  No.

8    Q.  Were they sold for more than 75 cents?

9    A.  Yes.

10   Q.  What was your understanding of why 75 cents was to be used

11   on this customs form?

12   A.  To keep the total commercial value under a certain limit.

13   Q.  And what was your understanding of what the purpose of that

14   false information to be?

15   A.  I would assume to have duties and taxes --

16           MR. FASULO:  Objection.

17           THE COURT:  Sustained.  Ms. Adams, you can't assume.

18   If you know, you can testify to what you know.

19           THE WITNESS:  I don't know for sure.

20           MR. ADAMS:  Thank you.

21           Ms. Jung, if you could go now to the final page of

22   this exhibit.

23   Q.  Ms. Adams, if you could do the same, this is a green block

24   of text.  Could you look at this block of communications and

25   tell us what the conversation is about?

M1LTFIS1                        Adams – Direct

1    A.  One moment, let me just review it real quick.

2            Okay.

3    Q.  What is that exhibit about, or what is that conversation

4    about?

5    A.  It is about us all being somewhere together, and that I was

6    going to meet with Dr. Vernon and Seth would be there as well,

7    but I had invited a friend that they did not know and that he

8    was not comfortable talking about anything in front of this

9    person.

10   Q.  So let me walk through some of that and clarify exactly who

11   you're talking about.

12           Who was meeting together around this time?

13   A.  Seth Fishman, Geoff Vernon, myself, and my friend referred

14   to as Jeff.

15   Q.  Your friend Jeff, does he spell his name with a J or G?

16   A.  J.

17   Q.  Who is Geoff Vernon?

18   A.  Geoff Vernon is a vet.

19   Q.  Did Geoff Vernon have any relationship with Equestology?

20   A.  He bought products from us.

21   Q.  And Geoff Vernon, does he spell his name with a G or J?

22   A.  A G.

23   Q.  And as you review this conversation, what, if anything, was

24   Fishman conveying to you in this conversation?

25   A.  That no business was going to be discussed as long as my

M1LTFIS1                        Adams - Direct

1    friend Jeff was sitting there.

2    Q.  And your friend Jeff is not Geoff Vernon, the vet, is that

3    correct?

4    A.  Correct.

5    Q.  What was your understanding of the business that would be

6    discussed but for the presence of your friend?

7                MR. FASULO:  Objection.

8                THE COURT:  Sustained.

9    Q.  Ms. Adams, did you know what the business was that would be

10   discussed but for the presence of your friend?

11               MR. SERCARZ:  Objection.

12               THE COURT:  She can answer yes or no.  Did she know?

13   We'll take it one question at a time.

14   A.  Yes.

15   Q.  And what was that business?

16               THE COURT:  Sustained.

17   Q.  Did Seth Fishman tell you what the business that would have

18   been discussed but for the presence of your friend Jeff was?

19   A.  Is this a yes or no question?  It's a little more -- not as

20   black and white.

21   Q.  Did Seth tell you --

22               MR. FASULO:  Objection and move to strike.

23               THE COURT:  What are you striking?

24               MR. FASULO:  The answer.

25               THE COURT:  She didn't answer.  That's denied.  She

1  asked a question.

2          Go ahead, Mr. Adams.

3  Q.  Did Seth Fishman explain to you the business that would be

4  discussed but for the presence of your friend?

5  A.  Yes.

6  Q.  And what did he explain to you?

7          MR. SERCARZ:  Objection.

8          THE COURT:  Grounds?

9          MR. SERCARZ:  Not in furtherance.

10          THE COURT:  Overruled.

11          You can answer.

12  A.  They were to be discussing future products, development of

13  products, use of products we already had, basically ongoing

14  business and future business.

15  Q.  If we could scroll down to the second to last line here.

16  A.  Okay.

17  Q.  On the second to last line where Fishman writes:  No, you

18  were talking to a U.S. Olympic vet and theoretically have an

19  NDA.  What is your understanding of what he meant by an NDA?

20  A.  Non-disclosure agreement.

21  Q.  Did you in fact have a non-disclosure agreement with

22  Fishman?

23  A.  No.

24  Q.  Were you ever asked to enter into a non-disclosure

25  agreement?

M1LTFIS1                        Adams - Direct

1    A.  Yes.

2    Q.  Who asked you to do that?

3    A.  Seth did.

4    Q.  And did he explain the purpose for having you sign an NDA?

5    A.  Yes.

6    Q.  What did he tell you?

7    A.  That it would protect him and I against me having to answer

8    questions to anyone else about his business.

9    Q.  Did he discuss who might be asking questions about his

10   business?

11   A.  Yes.

12   Q.  And who were among the people that Fishman told you he was

13   concerned would ask questions about his business?

14   A.  There was quite a few people, the FDA, any regulatory

15   person, basically any authority that has to do with horses.

16   Q.  Ms. Adams, a question about the organization at

17   Equestology.  With respect to the labels that you were

18   assisting in designing, would you store electronic copies of

19   those labels?

20   A.  Yes.

21   Q.  And where would you store electronic copies of those

22   labels?

23   A.  In our Dropbox account.

24   Q.  What is a Dropbox account?

25   A.  It is a cloud-based system where you can store all kinds of

M1LTFIS1                         Adams - Direct

1    files and pictures.

2    Q.  Who, if you know, set up the Dropbox account for

3    Equestology?

4    A.  I did.

5    Q.  Who asked you to do that?

6    A.  Seth Fishman.

7    Q.  And apart from labels, did you maintain any other kind of

8    documents or records on the Equestology Dropbox account?

9    A.  Yes.

10   Q.  Did the Dropbox account contain solely records related to

11   Equestology business?

12   A.  No.

13   Q.  What other kinds of documents were found on the Dropbox

14   account?

15   A.  I had personal pictures and other items on there that were

16   mine.

17   Q.  And who had access to the Equestology Dropbox account?

18   A.  Seth and I.

19   Q.  Did anyone else have access to the Equestology account, so

20   far as you know?

21   A.  Mary Fox did at one point later down the road.

22          MR. ADAMS:  Your Honor, I would like to briefly read

23   into the record a portion of what's been marked for

24   identification as Government Exhibit 9010.  It's a stipulation.

25          THE COURT:  All right.  Do I have a copy of that?

1          MR. ADAMS:  I'm handing one up right now, your Honor.

2          THE COURT:  Thank you.

3          Give us one minute, Mr. Adams.

4          MR. ADAMS:  Certainly.  And with the Court's

5     permission, I will jump over the same preliminary paragraph

6     regarding the parties that agree.  It's the same as the

7     original stipulation.  That's all right?

8          THE COURT:  Why don't you do it one more time.

9          MR. ADAMS:  It is hereby stipulated and agreed by and

10    among the United States of America by Damian Williams, United

11    States Attorney for the Southern District of New York, Andrew

12    C. Adams, Anden Chow and Sarah Mortazavi, Assistant United

13    States Attorneys, of counsel, and Seth Fishman, the defendant,

14    by his attorney, Maurice Sercarz, Esq., and Lisa Giannelli, the

15    defendant, by her attorney, Louis Fasulo, Esq., that:

16          1.  If called to testify at trial, a representative of

17    Dropbox, Inc., referred to as Dropbox, would testify as

18    follows:  Government Exhibits 2001 through 2056, listed under

19    column A in the chart appended to this stipulation, are true

20    and correct copies of certain records and associated data for

21    the Dropbox account associated with the user name

22    seth@equestology.com, referred to here as the Equestology

23    Dropbox account, maintained by Dropbox.

24          It's further stipulated and agreed by and between the

25    parties that this stipulation, which is Government

M1LTFIS1                        Adams – Direct

1    Exhibit 9010, may be received in evidence at trial.  And it's
2    signed by the parties.
3            It contains an appendix including the three columns
4    relating to the exhibits referred to previously in the range of
5    2001 through 2056.
6            The government, on the basis of the stipulation and
7    Ms. Adam's testimony, offers first Government Exhibit 9010 into
8    evidence, the stipulation itself.
9            THE COURT:  It will be received.
10           (Government's Exhibit 9010 received in evidence)
11           MR. ADAMS:  And the exhibits referred to on the
12   appendix to 9010, which are in the range referred to in the
13   stipulation.
14           THE COURT:  Do you want to state the range for the
15   record, please?
16           MR. ADAMS:  2001, which includes the subparts referred
17   to in the appendix, through 2056.
18           THE COURT:  They will be received.
19           (Government's Exhibits 2001 through 2056, including
20   subparts, received in evidence)
21           MR. ADAMS:  That's 2056, including the subparts
22   referred to in the exhibit.
23           THE COURT:  They're admitted.
24           MR. ADAMS:  Thank you, your Honor.
25           Ms. Jung, if you wouldn't mind pulling up what's in

1    evidence from yesterday as Government Exhibit 1908, please.

2    BY MR. ADAMS:

3    Q.  And Ms. Adams, when you have that, can you tell us what

4    this email chain is referring to?

5    A.  Okay.  It's an email from Lisa Ranger to me asking me to

6    send product to a person called Richard Banca.

7    Q.  Below that, the second email on the chain, what was your

8    response?

9    A.  Okay.  What did you need sent?  I will send it on Monday.

10   Q.  What was your understanding, first, of who Doc was?

11   A.  Doc is Seth Fishman.

12   Q.  And do you know a person named Richard Banca?

13   A.  No.

14   Q.  Was Richard Banca ever a client of yours?

15              MR. FASULO:  Objection.  She doesn't know.

16              THE COURT:  She will say that then.

17              MR. FASULO:  She did.

18              MR. ADAMS:  My question is Richard --

19              THE COURT:  Don't back and forth.  The objection is

20   overruled.

21   A.  No.

22   Q.  Where Ranger says you can send them to me or them directly,

23   what did you understand her to be directing you to do?

24   A.  I can either send the order directly to Richard or to her.

25   Q.  And from this email, did you know what "stuff" referred to?

M1LTFIS1                        Adams - Direct

1   A.   Product that we made.  It didn't specify.

2   Q.   Before you would send products to a client of Ranger, how

3   would you verify which products to send?

4   A.   If she would -- if there was a list with names on them then

5   I would know exactly what to send.  Otherwise, I would have to

6   confirm with Seth if it was just generalized.

7   Q.   Did Equestology employ sales representatives?

8   A.   On the books?

9   Q.   At all.

10  A.   Lisa was our sales rep, as far as I know.

11  Q.   Could I ask you now to turn to the next exhibit in

12  evidence, it's 1909.

13  A.   Okay.

14  Q.   Do you recognize this document?

15  A.   Yes.

16  Q.   What is this document?

17  A.   This is a document that Lisa had with her of all the

18  products that she sold.

19  Q.   At the top, inventory travel sheet, where it reads

20  inventory travel sheet --

21          MR. ADAMS:  Ms. Jung, if you put up 1909.

22          MR. FASULO:  Judge, I have an objection to the last

23  question and answer, foundation.

24          THE COURT:  Can you give me one moment?

25          I don't think the question was even finished.  You

1    started to ask a question and then he turned to his colleague

2    and asked her to put the document up.

3            Let's hear the question and then I will entertain an

4    objection if there is one.

5            MR. ADAMS:  Thank you, your Honor.

6            Ms. Jung, this is in evidence, can you publish it for

7    the jury, please?

8    BY MR. ADAMS:

9    Q.  Ms. Adams, did you travel for purposes of selling

10   Equestology products?

11   A.  No.

12   Q.  Does this document contain a full inventory of all

13   Equestology products?

14   A.  No.

15   Q.  Did you maintain a base of clients in Delaware at any

16   point?

17   A.  No, I did not.

18   Q.  Who, among the people at Equestology, maintained Delaware

19   clients?

20   A.  Lisa Ranger.

21           MR. ADAMS:  And Ms. Jung, if we could focus in on two

22   different portions, if it's possible to zoom in, first on the

23   left hand column, midway down, the line reading EGH.

24   Q.  Ms. Adams, do you see that line?

25   A.  Yes.

1   Q.  Are you familiar with the acronym EGH?

2   A.  Yes.

3   Q.  What did EGH stand for?

4   A.  Equine growth hormone.

5   Q.  And just below EGH, where it reads endurance, from your

6   time at Equestology, do you have an understanding of what

7   endurance is?

8   A.  No.

9   Q.  Did you ever ask Seth Fishman what endurance is?

10          MR. FASULO:  Objection.

11          THE COURT:  She can say whether she asked him that or

12  not.

13  A.  Not to my knowledge, no.

14  Q.  If we could go to the right-hand column at the top, and on

15  the line reading hormone therapy pack.  Did you ever discuss

16  with Fishman the purpose of the hormone therapy pack?

17  A.  No.

18  Q.  And going down a bit to the line reading -- it's in the

19  middle of the screen now -- oxytocin.  Did Equestology sell

20  oxytocin?

21  A.  Yes.

22          MR. ADAMS:  If we could please pull up now what's in

23  evidence as Government Exhibit 1910.

24  Q.  Ms. Adams, what is this conversation about?

25  A.  It is about labels for certain products and making them

1   easier to read, changing a few things on them.

2   Q.  What was the product that you were discussing?

3   A.  Pain shot.

4   Q.  And from your time at Equestology, do you have an

5   understanding of what pain shot is?

6   A.  Not exactly, no.

7   Q.  Did you ever discuss pain shot with Seth Fishman?

8   A.  Possibly.

9   Q.  Do you have a clear recollection of whether you did or not?

10  A.  I know I asked him about almost everything, but the answers

11  I do not remember.

12  Q.  Could you tell us the date of the top email here?

13  A.  November 22nd, 2015.

14  Q.  By November of 2015 had your role changed at Equestology?

15  A.  Yes.

16  Q.  Where were you living at this time?

17  A.  I might have been back in Idaho at this time.

18  Q.  Did there come a time when you left Florida while you were

19  still working for Equestology?

20  A.  Yes.

21  Q.  And at that time, when you left Florida, what role did you

22  play in the company?

23  A.  I was doing sales.

24  Q.  One of the participants on the email, Mary Fox, who is Mary

25  Fox?

M1LTFIS1                          Adams - Direct

1  A.  Mary Fox was the new office manager.  She took over my old

2  position.

3  Q.  Did you ever discuss -- well, withdrawn.

4          Let's go to the bottom of this exhibit, the last --

5  it's the last email in the chain.

6          MR. SERCARZ:  Could I have the exhibit number again?

7          MR. ADAMS:  1910.

8  A.  Okay.

9  Q.  What was the -- what were you being asked or provided in

10  this email?

11  A.  The directions for the label for pain shot LC.

12  Q.  And who drafted those directions?

13  A.  Seth, I believe.  Yeah, Seth.

14  Q.  Did you have any discussions with Fishman regarding what

15  information should not appear on Equestology labels?

16  A.  Yes.

17  Q.  Can you describe those conversations?

18          MR. SERCARZ:  Objection.

19          THE COURT:  Sustained.

20          MR. SERCARZ:  Unclear whether --

21          THE COURT:  I said sustained.

22          MR. SERCARZ:  Thank you.

23  Q.  You had conversations with Fishman about what should not

24  appear on Equestology labels.  What did Fishman tell you about

25  what should not appear on Equestology labels?

M1LTFIS1                         Adams - Direct

1          THE COURT:  Same objection, it's sustained.

2    A.  Certain labels of products --

3          THE COURT:  Ms. Adams, when I sustain an objection you

4    should not answer.

5          THE WITNESS:  Sorry.

6          THE COURT:  Mr. Adams, you need to break it down.

7          MR. ADAMS:  Certainly.

8    Q.  Ms. Adams, were you ever told by Fishman not to include any

9    information about the ingredients of Equestology products?

10   A.  Yes.

11   Q.  Can you describe what Fishman told you when he gave you

12   that direction?

13         MR. SERCARZ:  Objection.

14   A.  Certain products --

15         THE COURT:  Hold on.

16         Mr. Sercarz, it would be better if you stayed seated

17   and say "objection" into the microphone.

18         MR. SERCARZ:  Yes, your Honor.

19         THE COURT:  That way I can hear you and the witness

20   can hear you.

21         MR. SERCARZ:  I apologize.

22         THE COURT:  Go ahead with your objection.  What's the

23   basis?

24         MR. SERCARZ:  It's unclear whether we're referring to

25   this particular exhibit or to conversations in general.

1              THE COURT:  He didn't ask the question with regard to

2      the exhibit, as I understand it.  Is that correct, Mr. Adams?

3              MR. ADAMS:  That's correct.  This is a question about

4      directions given generally by the defendant.

5              THE COURT:  Go ahead, Ms. Adams, if you're able to

6      answer generally.

7      A.  Yes, in general on certain products he would tell me to not

8      list the ingredients.

9      Q.  Did he tell you why he wanted you not to the list

10     ingredients?

11     A.  There was a few reasons.  One was that they did not need to

12     by listed.  And two, in the case of proprietary blend, which we

13     did not always put on the label, that he was entitled to keep

14     his formulas secret, so to say, and that you didn't -- legally

15     he didn't have to put them there.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1    BY MR. ADAMS:

2    Q.  If we could turn to what's in evidence as government

3    Exhibit 1912.  Ms. Adams, what's the e-mail about?

4    A.  Asking me to pay a bill for certain chemicals that were

5    ordered.

6    Q.  And who gave you that direction?

7    A.  Seth.

8    Q.  And how were you directed to pay bills for chemicals being

9    ordered?

10   A.  With his credit card.

11   Q.  And the second e-mail in the chain, reading

12   RobertH@LGMpharma.com, what is LGM Pharma?

13   A.  One of the suppliers for the chemicals for API.

14   Q.  Do you personally know where LGM Pharma is based?

15   A.  I do not.

16   Q.  If we could look down at Exhibit 1913 in evidence.

17   Ms. Adams, do you recognize this document?

18   A.  Yes, I do.

19   Q.  What is this?

20   A.  It is a list of products that I sent to a Josh Marks.

21   Q.  And the list that appears below, what is that list?

22   A.  You want me to read it?

23   Q.  In general, what were you listing?

24   A.  The specific products and quantities that I had shipped to

25   this customer.

M1LPFIS2                          Adams – Direct

1    Q.  Do you know Josh Marks?

2    A.  No.

3    Q.  Was Josh Marks ever a client of yours?

4              MR. FASULO:  Objection.

5              THE COURT:  Overruled.

6    A.  I don't remember.

7    Q.  Have you ever met Josh Marks or a person named Josh Marks?

8    A.  No, no.

9    Q.  5X green cap, what is green cap?

10   A.  That is --

11             MR. FASULO:  Objection, your Honor.

12   A.  -- a product that --

13             THE COURT:  Hold on, Ms. Adams.

14             MR. FASULO:  Objection.  I think he clarified it.  I

15   withdraw it.

16   Q.  What is 5X green cap?  What is green cap?

17   A.  Green cap is an unknown product that is stored and has a

18   green cap.

19   Q.  And when you say it's an unknown product, do you know

20   what's in that product?

21   A.  No.

22   Q.  Did you ever discuss the contents of that product with

23   Fishman?

24   A.  I may have asked him about it, but I do not remember what

25   he said.

M1LPFIS2                        Adams - Direct

1  Q.  How was green cap labeled on the bottle?

2  A.  It was not labeled.

3  Q.  Was it not labeled when it was shipped out of Equestology?

4  A.  No.

5  Q.  Below that, where it reads "4X IT plus," what is IT plus?

6  A.  One of the other products that we made.

7  Q.  And from your time at Equestology, do you understand what

8  IT plus' purpose is?

9  A.  No.  I don't know what it does.

10 Q.  In your time at Equestology, did you ever receive any

11 customer complaints about IT plus?

12 A.  About that one in particular, I don't remember.

13 Q.  Did you receive any customer complaints about Equestology

14 products generally?

15 A.  Yes.

16      MR. FASULO:  Objection, relevance.  Judge, if you

17 don't mind if I can sit and make my objections?

18      THE COURT:  That would be better, please.  That's an

19 instruction to all counsel that when you're objecting, just

20 because of the layout of the courtroom.

21      The jury should understand the lawyers are standing,

22 which is the normal protocol, out of respect, but because of

23 the setup that we have here, it's really better if they just

24 stay seated because I can hear them in the microphone and the

25 court reporter can hear them in the microphone.  So they're not

M1LPFIS2                              Adams - Direct

 1    being disrespectful to you or to me, but I'm instructing that

 2    the lawyers stay seated when they object and say them into the

 3    microphones.

 4              Go ahead.  Thank you.  Mr. Adams, go ahead.

 5    BY MR. ADAMS:

 6    Q.  At your time at Equestology, did you receive any customer

 7    complaints about products in general?

 8              MR. FASULO:  Objection.

 9              THE COURT:  Ground?

10              MR. FASULO:  Relevance.

11              THE COURT:  Overruled.

12    A.  Yes, I did.

13    Q.  What were the nature of those complaints?

14              MR. SERCARZ:  Objection, hearsay.

15              MR. ADAMS:  Not offered for the truth, your Honor.

16              THE COURT:  The objection is overruled.

17              MR. SERCARZ:  Objection, foundation.

18              THE COURT:  That's sustained.

19    BY MR. ADAMS:

20    Q.  Ms. Adams, did you learn of the nature of the complaints

21    during your time at Equestology?

22    A.  Yes.

23    Q.  And what did you learn as the nature --

24              MR. SERCARZ:  Objection, same objection.

25              THE COURT:  Sustained.  You need to break it down,

1    Mr. Adams.

2    BY MR. ADAMS:

3    Q.  Ms. Adams, did you receive customer complaints about the

4    stability of products at Equestology?

5            MR. SERCARZ:  Objection.  May I approach Mr. Adams?

6    It may --

7            THE COURT:  Approach Mr. Adams?

8            MR. SERCARZ:  Yes.

9            THE COURT:  No.

10           MR. SERCARZ:  Very well.

11           THE COURT:  Hold on.  You may answer.  The objection

12   is overruled.

13   A.  Yes, I did.

14   Q.  Can you describe what you learned about the stability of

15   Equestology products?

16           MR. SERCARZ:  Objection, foundation.

17           THE COURT:  Overruled.

18   A.  Certain products would -- if the customer had ordered them

19   multiple times, they know what they should look like, and

20   occasionally they would receive something that did not look the

21   same as it did before.  For example, it would be one color one

22   time and slightly off another, or what we call the matrix.  If

23   it's freeze dried or dried, inside the vial sometimes it would

24   look like it was exploded or splattered all over the inside of

25   the vial and the customer would question, you know, if there's

M1LPFIS2                          Adams - Direct

1    something wrong with it.

2    Q.  Are you familiar with a company called 21st Century?

3    A.  Yes.

4    Q.  What is 21st Century?

5    A.  That was one of the labs where we had the majority of our

6    products made.

7    Q.  Who at 21st Century did you interact with, if anybody?

8    A.  Jordan Fishman, Pam Crowley, Michael Sheeha, I think is the

9    last name.  There may have been one other tech.

10   Q.  And in your time at Equestology, did you receive any

11   complaints regarding stability of products provided by 21st

12   Century in particular?

13   A.  Could you -- sorry, could you repeat that?

14           THE COURT:  Hold on.  Hold on.

15           MR. SERCARZ:  Objection, foundation.

16           THE COURT:  Overruled.  It's a yes or no question.

17   He's laying the foundation.

18   A.  Could you repeat that?

19   Q.  Yes.  Did you receive any complaints regarding products

20   provided by 21st Century in particular?

21   A.  Yes.

22   Q.  And can you describe the nature of those complaints?

23   A.  They were the complaints that I had just referred to, the

24   inside of the products did not look the same from one batch to

25   the other, something was -- you know, one had crystals, was

M1LPFIS2                        Adams - Direct

1    crystalizing in it, different colors, that kind of thing.

2    Q.  Did you ever discuss with Fishman whether Fishman had any

3    financial interest in 21st Century?

4    A.  No.

5    Q.  What, if any, equipment did Equestology provide to 21st

6    Century?

7    A.  He had paid for a few of the equipment pieces to be used

8    because we needed them for our stuff.

9    Q.  By "our stuff" what do you mean?

10   A.  All the products that we were making.

11   Q.  Did you have discussions about the need for providing

12   specialized equipment for Equestology products?

13   A.  Do you -- can you rephrase that?

14   Q.  Yes.  You said there were devices provided to 21st Century

15   for the purpose of manufacturing Equestology products; is that

16   correct?

17   A.  Sorry, it froze for a second.  Seth had purchased certain

18   pieces of equipment to be used to make his products, and the

19   lab was also allowed to use that equipment.

20   Q.  If we could turn to what's in evidence as 401-X, please.

21       Ms. Adams, what's this conversation regarding?

22   A.  It's between Seth and I, and it's clarifying exactly what I

23   need to send.  It's asking about blood builder, and I'm asking

24   if it's a certain product, and he's correcting me and telling

25   me the proper things it is.

M1LPFIS2                          Adams - Direct

1    Q.  Do you know anyone named Brian Malone personally?

2    A.  Personally, no.

3    Q.  Was Brian Malone ever a client of yours?

4    A.  Not that I remember, no.

5    Q.  What were you referring to when you write "NPX"?

6    A.  That is the name that we called one of the products.

7    That's what I knew it as.

8    Q.  And was that, in fact, the blood builder?

9    A.  No.

10   Q.  What was NPX?

11   A.  I don't -- I don't know.  It says it in the text message,

12   but I don't know what that means.

13   Q.  You're referring to the line reading "NPX is

14   analgesic/sedative"?

15   A.  Yes.

16   Q.  Above that line, where Seth writes, "No, it's orange cap

17   3cc amber," what is orange cap?

18   A.  That is one of the unlabeled products that was kept in the

19   fridge or freezer.

20   Q.  When you say "unlabeled," was it shipped with no label?

21   A.  Yes.

22   Q.  How did you recognize which drug to pick out if it had no

23   label on it?

24   A.  We went by cap color.

25   Q.  And what were some of the common cap colors that you would

1  refer to at Equestology?

2  A.  Orange, magenta, amber -- not amber because that is

3  glass -- green, red, blue.

4  Q.  And you mentioned glass a moment ago.  What is your

5  understanding that amber refers to?

6  A.  Amber is the color of the glass vial.

7  Q.  Were there different color glasses referred to at

8  Equestology?

9  A.  Yes.

10  Q.  And how would you refer to different color glasses?

11  A.  Clear or amber.

12  Q.  All right.  If we could turn to what's in evidence as 1900,

13  please?

14  A.  Okay.

15  Q.  Ms. Adams, can you describe the conversation that's going

16  on in this series of e-mails?

17  A.  So it is between Mary Fox and I.  It's about a shipment to

18  the UAE for a customer, and Adel is the gentleman that we go

19  back and forth with, that puts the orders in.

20  Q.  Did you ever speak with a customer named Adel?

21  A.  A few times.

22  Q.  Did you ever meet a customer named Adel?

23  A.  Yes.

24  Q.  And where did you say he was based?

25  A.  He was in Dubai.

M1LPFIS2                        Adams – Direct

1    Q.  All right.  If we could flip back to 401-U in evidence.

2    And --

3    A.  Okay.

4    Q.  Ms. Adams, what were you discussing in 401-U?

5    A.  A list of products that Adel wanted to be sent, put an

6    order in.

7    Q.  Is this the same Adel or a different Adel than the person

8    referred to in Exhibit 1900?

9    A.  This is the same person.

10   Q.  And on the second row, where you write "also found a

11   fridge/freezer at Home Depot," what were you conveying to Seth

12   in this message?

13   A.  That we had been looking for some fridges and freezers for

14   the office to store products in, and so I found one on sale,

15   and I was letting him know.

16   Q.  Yesterday you testified about the physical workspace when

17   you first began working at Equestology.  Did there come a time

18   when Equestology expanded?

19   A.  Yes.

20   Q.  And into what kind of space did Equestology expand?

21   A.  We rented out an office space in another building where we

22   had a lot more room, and it was an actual office.

23   Q.  And did you, in fact, obtain fridges and freezers for that

24   office space?

25   A.  Yes.

1    Q.  Approximately how many?

2    A.  We had one large freezer and then another fridge/freezer.

3    Q.  When you said large freezer, can you approximate how tall?

4    A.  Five-and-a-half, six feet, the full-size freezers that you

5    would have in your house or your garage.

6    Q.  And what would be stored in the Equestology freezers?

7    A.  Any product that required refrigeration or freezing.

8    Q.  Did that include orange cap?

9    A.  I believe so.  It went in either the fridge or the freezer,

10   I can't remember which one.

11   Q.  Were there certain products that required that they be kept

12   under freezing temperatures?

13   A.  Yes.

14   Q.  Do you recall which products were required to be kept

15   frozen?

16   A.  No.

17   Q.  Then let's look at 401-V, please.  I'm sorry, before we

18   leave this, the last line on 401-U, Seth -- there is a list

19   that appears, beginning with "blast off"?

20   A.  Mmm, hmm.

21   Q.  "Blast off 1286," what was your understanding of what was

22   being sent to you in this list?

23   A.  That is the list of products that I needed to ship to Adel.

24   Q.  And the numbers that appear here, blast off 1286, what does

25   the number refer to?

1    A.  The quantity of vials that needed to be sent.

2    Q.  Did Equestology ever send drug samples to clients or

3    potential clients?

4    A.  Occasionally they would send them, yes.

5    Q.  Do the quantities listed here reflect a sample size?

6    A.  No.

7    Q.  What's your understanding of "HP bleeder," what does that

8    mean?

9    A.  It's one of our products.  I'm not sure what it does.

10   Q.  Thank you.  And now to 401-V, please.  If you could

11   describe what your are talking about in this conversation?

12   A.  Between Seth and I, he's angry at me for ordering certain

13   things on the account that's getting him possibly flagged.

14   Q.  And what kind of account was that?

15   A.  The account was Bayer, which is where he would buy certain

16   products that we didn't make or were raw chemicals.

17   Q.  And were you placing orders directly through there?

18   A.  Yes.  I would call the sales rep or have Lisa ask for them

19   to be ordered as well.

20   Q.  And what kind of products were you ordering?

21   A.  By the looks of this message, these are some of the orders

22   for some of the people that were my friends that had horses.

23   So they're most likely like pain medication or heartworm stuff

24   for some of our friends' dogs.  In this instance, I don't know

25   exactly what it's referring to.

1    Q.  Would you order prescription medication from Bayer?

2    A.  Yes.

3    Q.  And whose veterinary license would you use to order the

4    prescription medication?

5    A.  Seth's.

6    Q.  Did Seth Fishman have any sort of relationship with the

7    animals for whom you were ordering medication?

8    A.  No.

9    Q.  And at the very bottom of this chain where you write -- I'm

10   sorry, where you say -- it reads "Oder" -- O-d-e-r -- "for Adel

11   was never supposed to have HP bleeder plus," what did you

12   understand that to mean?

13   A.  That one of the orders I sent to Adel, he's saying that it

14   had HP bleeder plus in it.

15   Q.  Was there a difference between HP bleeder and HP bleeder

16   plus?

17   A.  Yes.

18   Q.  Do you understand what the difference between those two

19   products was?

20   A.  One of them had an added ingredient for which I was unaware

21   of what it did.

22   Q.  All right.  If we could go to Exhibit 1904, please.

23   Ms. Adams, what was happening in this e-mail chain?

24   A.  It is Seth asking someone in Saudi Arabia, and I'm copied

25   on the e-mail, about how to properly address that person on the

1   shipment basically because there's a limit to how many

2   characters you can put for someone's name.

3   Q.  And was this in relation to a shipment of Equestology

4   products?

5   A.  Yes.

6   Q.  Sitting here today, do you recall which products were

7   shipped to this individual?

8   A.  No, without reading this.

9   Q.  Do you recall where this individual was located?

10  A.  Yes.

11  Q.  Where was that?

12  A.  Saudi Arabia.

13  Q.  All right.  And, Ms. Jung, if you could scroll to the third

14  page of this exhibit.  That's good.  Thank you.  And if you

15  could blow up the bottom e-mail there -- sorry, the second, in

16  the black text.

17          MR. ADAMS:  And for the record, your Honor, reading,

18  from Ayman to Seth, Equestology, on March 16th, 2015:  "We want

19  samples of actual experience, and we will be one of the

20  suppliers you, Saudi Arabia, and will open you to a market for

21  horses and jockeys, and we are the largest market for these

22  products in the Middle East and the world level and now you

23  have steroids and painkillers does not detect the hardware

24  analysis of blood and urine, do you have it."

25          Scrolling up from there.  That's good, Ms. Jung.

1          And reading the next e-mail in the chain "Dr. Zanaty,

2     There are many products that are not testable by their

3     composition and also by their half-life.  I am always creating

4     new products always to further insure this.  My latest products

5     have been in modified growth factors.  I have been working with

6     a group that has 25 years' experience in modified growth

7     factors and tissue regeneration."

8     BY MR. ADAMS:

9     Q.  Ms. Adams, have you ever discussed with Seth Fishman

10    modified growth factors?

11    A.  Not -- not that I remember the details.

12    Q.  To your recollection, did Seth Fishman ever describe to you

13    the effect of administering modified growth factors?

14    A.  No.

15    Q.  Okay.  If we could scroll up.  Now on the second page,

16    reading -- that's good, Ms. Jung, thank you -- "Dr. Zanaty,

17    please let me know the exact tendon and type of injury you are

18    looking to treat.  Are you looking to accelerate healing of an

19    acute injury or looking to block the pain for a more chronic

20    injury?  Or maybe both?"

21          Ms. Adams, did you ever have any conversations with

22    Seth Fishman about the concept of blocking pain in horses?

23    A.  In general, yes.

24    Q.  And can you describe what Fishman told you about blocking

25    pain in horses?

1    A.  He explained it very generically to me.  He said it's a

2    painkiller that would get horses to block, you know, pain that

3    they would have on a daily basis, if they had a sore leg or,

4    you know, if we have a headache, we take Ibuprofen.  That kind

5    of thing.

6    Q.  Okay.  If we could get Government Exhibit 1901, please.

7    Ms. Adams, do you recognize this e-mail?

8    A.  Yes.

9    Q.  What's happening in this e-mail chain?

10   A.  I am asking Mary to send out specific products to a

11   customer.

12   Q.  And who is that customer?

13   A.  Brandie Holloway.

14   Q.  And do you know a person named Brandie Holloway?

15   A.  I do not know.

16   Q.  And looking at the bottom e-mail on this chain, last in

17   time, from Courtney to John Pundyk, who is John Pundyk?

18   A.  John was the person on the ground in front of the people

19   getting these orders.

20   Q.  What relationship, if any, does John Pundyk have to

21   Equestology?

22   A.  He's not directly related.  He worked with Geoff Vernon,

23   who then was my client; so he was down the chain of people.

24   Q.  Did John Pundyk ever act as a sales representative for

25   Equestology?

```
 1   A.  Yes.  He wasn't officially a sales rep, but he was under
 2   me, so to speak.  I was the sales rep, and he was my person
 3   that was out and about.
 4   Q.  So can you describe the chain of shipments that would occur
 5   between you and John Pundyk and recipients of Equestology
 6   drugs?
 7           MR. FASULO:  Objection as to form.
 8   A.  Yes, well --
 9           THE COURT:  Sustained.  Can you rephrase, Mr. Adams.
10           MR. ADAMS:  Yes, your Honor.
11   Q.  Would you ship drugs at John Pundyk's direction?
12   A.  Yes.
13   Q.  To whom?
14   A.  To his clients.
15   Q.  When you did that, who would place the order for the
16   shipment?
17   A.  Can you be more specific?
18   Q.  In instances when John Pundyk had clients that would
19   receive orders from Equestology, how would you learn of the
20   request to send a shipment?
21   A.  John would always e-mail me the order, and then I would --
22   if I was okay with the order, if it's something that I knew we
23   had, I would forward it to Mary, and Mary would ship it to the
24   customer.
25   Q.  Okay.  Thank you.  If we could go to 401-FF, please?
```

1          THE COURT:  Mr. Adams, if you're finished with this

2     document, this might be a convenient point for a break.  Does

3     that work for you?

4          MR. ADAMS:  It does, your Honor.  Thank you.

5          THE COURT:  All right.  Ladies and gentlemen, why

6     don't we take our mid-morning break now.  You can leave your

7     notepads on your seat.  I just remind you, please, don't talk

8     about the evidence you've been hearing at any point until you

9     get to your deliberations.  Have a good stretch break, and

10    we'll see you back here in 15 minutes.  All right?  Thank you.

11          (Jury not present)

12          THE COURT:  All right.  Please be seated, everyone.

13          MR. ADAMS:  Your Honor, can I have Ms. Adams log off

14    for the moment?

15          THE COURT:  I was just going to say, Ms. Adams, you

16    remain under oath.  You can log off.  If you would log back on

17    in about ten minutes.

18          THE WITNESS:  Okay.

19          THE COURT:  Mr. Adams, you can let her know when to

20    log on.  Mr. Adams will let you know.

21          THE WITNESS:  Okay.

22          THE COURT:  You remain under oath.

23          THE WITNESS:  Yes.

24          THE COURT:  Thank you.

25          (Witness temporarily excused)

1          Is there anything we need to discuss?

2          MR. SERCARZ:  Yes, your Honor.  Thank you.  Your

3   Honor, there were a series of objections I made to questions in

4   which the witness was asked about complaints that she received

5   regarding the stability of products or whether the products

6   changed from one shipment to another, and I want to flesh out

7   the basis for my objection.

8          I objected on the basis of hearsay because, to the

9   extent that the government intends to use this evidence to try

10  and demonstrate that my client's products were unsafe, that

11  testimony would be used for the truth of the matter asserted,

12  and I respectfully submit it would be objectionable on that

13  ground.

14         To the extent that it was meant to demonstrate

15  something regarding my client's state of mind, there was no

16  foundation demonstrating that these complaints were conveyed to

17  Dr. Fishman, and it was for that reason that you heard me use

18  the word "foundation" in response to a lot of those

19  questions -- in my objection.

20         THE COURT:  So your -- sorry, go ahead.

21         MR. SERCARZ:  And the third thing would be there was

22  no testimony indicating that, in response to those complaints,

23  anything was done that could appropriately be labeled to be in

24  the furtherance of the conspiracy, no subsequent conversations

25  about remedying, concealing or anything of the like.

1          It is very difficult, from one question, to try and

2     frame one-word objections.  I respect the need to do it, but I

3     wanted the Court to know the basis for my objections.  And

4     under the circumstances and given the state of the record, I

5     ask that those questions and answers be stricken because they

6     do not meet the requirements of the rules of evidence.  Thank

7     you for letting me be heard.

8          THE COURT:  Your motion to strike is denied.  What

9     you're basically making is an argument in response to what you

10    anticipate Mr. Adams might try to use this evidence for when he

11    argues to the jury, but there's nothing objectionable about the

12    questions and the answers as they came in.

13         Your objection, as I said, they really go to the use

14    that the government might try to make of the answers.  Right

15    now, the record is that Ms. Adams received complaints.  That's

16    it.  She received complaints.  That's not hearsay.

17         MR. SERCARZ:  Barring something further, your Honor, I

18    submit that that testimony, as it sits in the record, has no

19    relevance.

20         THE COURT:  At this stage, that objection is

21    overruled.  Anything further?

22         MR. ADAMS:  Your Honor, if now is a convenient time,

23    I'd like to try the audio.  I'd like to make sure you can hear

24    it at the bench.

25         THE COURT:  Sure.

1          MR. FASULO:  Your Honor, is it okay for us to take a

2     break?

3          THE COURT:  Yes.  Anybody who wishes to be, can be

4     excused.

5          (Recess)

6          (Jury not present)

7          THE COURT:  You can be seated, everyone.  I understand

8     the jurors are on their way back up.

9          MR. ADAMS:  Your Honor, I'll have Ms. Adams rejoin us,

10    if that's okay.

11         THE COURT:  Sure.  Thank you.

12         MR. ADAMS:  Ms. Adams, can you hear?

13         THE WITNESS:  Yes, I can.

14         THE COURT:  Our jurors are on their way up; so we

15    should be with you shortly, Ms. Adams.

16         THE WITNESS:  Okay.

17         (Pause)

18         MR. ADAMS:  Your Honor, just for planning purposes,

19    you're thinking of going through 12:30 or 1:00?

20         THE COURT:  12:30 is what time they're bringing lunch

21    for the jury.  If you have a few more minutes, again, whatever

22    is convenient, but right around then.

23         MR. ADAMS:  Okay.  Thank you.

24         (Jury present)

25         THE COURT:  All right.  Thank you.  Please be seated,

1    everyone.  Welcome back to our jurors.

2            Mr. Adams.

3            MR. ADAMS:  Thank you, your Honor.

4    BY MR. ADAMS:

5    Q.  Ms. Adams, we were discussing complaints about Equestology

6    products from customers previously.  Did you discuss those

7    complaints with Seth Fishman?

8    A.  Yes.

9    Q.  What did you tell Fishman about the complaints that you

10   were aware of?  One moment.

11   A.  -- and let him know --

12   Q.  I'm sorry.  We froze on this end.  Can you repeat the

13   answer to that last question?

14   A.  I would tell Seth what the customer had told me in regards

15   to exactly what was wrong.

16   Q.  And what was Seth's reaction to hearing those complaints?

17   A.  He was worried about that, and then we would check back

18   with the lab to figure out what the problem was.

19   Q.  Okay.  Did there come a time when those complaints stopped

20   coming in to Equestology?

21   A.  I don't -- I wouldn't say stopped.  They were very few and

22   far between.  It happened very sporadically.

23   Q.  Okay.  When that happened, to your knowledge, was any

24   direction given to 21st Century about changing its

25   manufacturing process?

1   A.   Yes.

2   Q.   And what were the directions given to 21st Century?

3   A.   I don't know exactly what direction -- what Seth said

4   specifically, but they were instructed to figure out what the

5   problem was and fix it.

6   Q.   Let me ask you to look at Government Exhibit 1905 in

7   evidence.  What were you conveying in this e-mail?

8   A.   That an order that was being sent to Geoff Vernon needed to

9   get to the address in that e-mail as soon as possible by a

10  certain date so it could make it onto a horse trailer that was

11  going across the border to Canada.

12  Q.   You write -- you refer to "Geoff."  Is this the Geoff

13  Vernon you referred to earlier?

14  A.   Yes.

15  Q.   And why was a shipment being sent to a trailer before going

16  to Canada?

17  A.   As far as I understood it, Geoff was with those horses or

18  associated with them and that it needed to -- it had to

19  physically be with him to cross the border.

20  Q.   And which border -- I'm sorry.  And did you have an

21  understanding of why Geoff Vernon needed to be physically with

22  those drugs to cross the border?

23  A.   Because he is a vet, and they can't -- they need to be in

24  his possession or with some prescription or something.  I'm not

25  really sure.

M1LPFIS2                          Adams - Direct

1   Q.   Okay.  And now looking at 401-II in evidence --

2   A.   What was that number?

3   Q.   It's 401-II.

4   A.   Okay.

5   Q.   Can you describe what you were asking when you wrote "Geoff

6   wants to know if our EGH is testable"?

7   A.   Geoff was requesting if the equine drug hormone was

8   testable to any governing body, like the Horseracing Commission

9   or anyone -- any other test that was done on the horses.

10  Q.   Did you have conversations with Seth Fishman about the

11  testability of Equestology products?

12  A.   Yes.

13  Q.   From your conversations with Fishman, did you have an

14  understanding as to whether testability was an important

15  feature of Equestology products?

16  A.   Yes.

17  Q.   What was your understanding on the basis of your

18  conversations with Fishman?

19  A.   That that was our biggest selling point, that we

20  specialized in making products that were not testable.

21  Q.   Did he discuss with you the potential risk if an

22  Equestology product were to become testable by a governing

23  body?

24  A.   Yes.

25  Q.   And what did he tell you about that risk?

M1LPFIS2                        Adams – Direct

1  A.  The risk was if someone was to get their hands on one of

2  our products, you know, that they could make a test for it, and

3  then that product would no longer be useful to us.  We would

4  have to make something else.

5  Q.  And why would you have to make something else if an

6  Equestology product became testable?

7  A.  Because that was the whole point of that product, was to be

8  not testable.

9  Q.  And reading here from 401-II, the sent message from Seth to

10  you, for the record:  "Listen, Geoff needs to talk to me.

11  Things are not black and white, and itself, no.  But too much

12  can raise testosterone.  Also, he should be using the modified

13  MGF more than EGH."

14         Ms. Adams, do you have an understanding of what

15  modified MGF is?

16  A.  No, I'm not familiar with what that acronym is.

17  Q.  Do you recall what you did with the information that

18  Fishman provided to you in this text message?

19  A.  I most likely relayed it to Geoff Vernon and asked him to

20  speak to Geoff directly.

21         MR. FASULO:  Objection, I move to strike.

22         THE COURT:  Sustained, sustained.

23         Ms. Adams, I'm going to remind you, if you remember

24  something and have a clear recollection or knowledge, you can

25  testify to it, but you can't speculate, and don't tell us what

1   you most likely did, only what you know you did.

2              THE WITNESS:  Okay.

3              THE COURT:  All right?  That testimony is stricken.

4              MR. ADAMS:  Okay, your Honor.  I'll move on.

5              Can we go to Government Exhibit 1902 in evidence,

6   please.

7   BY MR. ADAMS:

8   Q.  Ms. Adams, what's happening in this e-mail chain?

9   A.  This is an e-mail chain between Seth and Adel in the UAE,

10  with Mary and I copied on it, about ordering more product and

11  the timeline that it's on.

12  Q.  From your review of this e-mail, can you identify the

13  product that was to be shipped?

14  A.  Yes, a thousand vials of equine growth hormone.

15  Q.  Is that EGH?

16  A.  Yes.

17  Q.  Is a thousand vials a sample size of EGH?

18  A.  No.

19  Q.  And below that, where it reads:  "Please, if you can ship

20  to DEH at the earliest possible on IP services," do you have an

21  understanding of what "DEH" stands for?

22  A.  Yes, Dubai Equine Hospital.

23  Q.  If we could go 401-BB, as in boy, boy.  What did you

24  understand this message to convey to?

25  A.  That Adel had decided to go with 500 vials of EGH, and he

1  wants everything to be sent as one package.

2  Q.  Is this the same Adel that we've discussed previously?

3  A.  Yes, it is.

4  Q.  If we could look at 401-CC, please, the next one?

5  A.  Okay.

6  Q.  Can you describe what's happening in this conversation?

7  A.  Between Seth and I, he's asking me -- or I'm saying that I

8  cannot find the 200 vials of PSDS and wondering if maybe Lisa

9  can send some back to us, and he is upset that I didn't take

10 care of this a few weeks prior to this.

11 Q.  And who is the Lisa that you're referring to?

12 A.  Lisa Ranger.

13 Q.  And what have you sent to Lisa?

14 A.  The product, PSDS.

15 Q.  What was PSDS?

16 A.  A pain shot double strength.

17 Q.  And what's your understanding of the purpose of pain shot

18 double strength?

19 A.  A double strength product that blocks pain.

20 Q.  And what was your understanding of what the "big drama"

21 would be as a result of not having set aside the vials that had

22 been sent to Lisa?

23 A.  That whoever we were sending it to is going to be very

24 upset that we don't have what Seth told him that we had.

25 Q.  Let's go now to, please, what's in evidence as 1903.  What

1   were you conveying in 1903?

2   A.  Make sure I'm on the right one, sorry, 03.  I'm conveying

3   to Mary at the office to send products to Lisa that she had

4   requested.

5   Q.  And when you say "she had requested," who had requested the

6   products?

7   A.  Lisa Ranger had asked me.

8   Q.  In your role at Equestology, would you decide on your own

9   initiative what products Lisa should receive?

10  A.  No.

11  Q.  How did you learn what products to send to Lisa?

12  A.  Lisa would either request them, or Seth would tell me to

13  send them to her.

14  Q.  And looking on this e-mail, on the line reading "HP bleeder

15  plus," is that the same product we discussed a moment ago with

16  respect to shipments to Adel?

17  A.  I don't re -- no, we were talking about EGH before.

18  Q.  Do you recall my question earlier about the difference

19  between HB bleeder and HB bleeder plus?

20  A.  Oh, yes, a few shipments ago with the photos in the

21  exhibit, yes.  That was HB bleeder plus.

22  Q.  On this line, where it says "send version with horse head

23  logo, not SPC," what's your understanding of what -- what did

24  you intend to convey in writing that?

25  A.  So some of the products are -- have different brands that

M1LPFIS2                    Adams - Direct

1    are on them, depending on where they're being sold.  So some of

2    HB bleeder plus has the Equestology logo on it, some of them

3    would have SPC logos, some of them would have other -- we have

4    multiple other logos or brands.  So I'm specifying exactly

5    which one needs to be sent.

6    Q.  Okay.  And was there a reason that one brand would be used

7    for certain vials, as opposed to a different brand?

8                MR. SERCARZ:  Objection, foundation.

9                THE COURT:  Can you lay a foundation, please,

10   Mr. Adams?  Sustained.

11   Q.  Ms. Adams, are you aware of any reason that one brand would

12   be used to label a vial as opposed to a different brand?

13   A.  Yes.

14   Q.  Did you become aware of that reason from your work at

15   Equestology?

16   A.  Yes.

17   Q.  Did you discuss the reasons for differentiation with Seth

18   Fishman?

19   A.  Yes.

20   Q.  Did you discuss the reasons for that differentiation with

21   Lisa Ranger?

22   A.  Yes.

23   Q.  Okay.  What was the reason for the differentiation?

24   A.  Certain regions or areas or clients would request their own

25   brand; so -- do you want me to give you an example?

1    Q.  Certainly.

2    A.  Adel, in the UAE, he requested that he have his own logo

3    and that logo not be used on any other products.  So all of his

4    things would have specific logos, and that would not be then

5    sold to Lisa Ranger or Geoff Vernon.  It was only his.

6    Q.  Okay.  What does SPC stand for?

7    A.  Specialized performance compound.

8    Q.  Thank you.  Let's look at 401-Z also.

9            Ms. Adams, what is this text chain about?

10   A.  It's between Seth and I about the product called GNRH and

11   what the quantity is and the price for a customer named

12   Lisette.

13   Q.  What is GNRH?

14   A.  I do not know.

15   Q.  Okay.  Did you ever talk to Seth Fishman about GNRH?

16   A.  Yes, briefly.

17   Q.  And what do you recall him telling you about GNRH?

18   A.  I don't recall the details.

19   Q.  Okay.  And who is Lisette?

20   A.  Lisette is one of his customers in south Florida.

21   Q.  To your knowledge, did Lisette have clients to whom she was

22   reselling Equestology products?

23   A.  Yes.

24   Q.  Where were those clients based?

25   A.  South America.

M1LPFIS2                          Adams - Direct

1   Q.  And do you know in this chain, where it reads "MOQ of 25"

2   and later, "minimum order quantity," what was a minimum order

3   quantity?

4   A.  Seth was saying that Lisette had to order a minimum

5   quantity of 25 if she wanted to get that product.

6   Q.  Who decided what minimum order quantities would be ordered

7   by Equestology?

8   A.  Seth did.

9   Q.  And can we go to 401-EE, please.

10  A.  Okay.

11  Q.  Can you tell us what's happening in this text chain?

12  A.  Between Seth and I, I'm letting him know that Lisette

13  wanted 50 of the EGH, but I already had it packed to ship to

14  Adel, and he's taking to take the 50 vials from Adel's shipment

15  and that he will deal with Adel in telling him that we don't

16  have those 50 anymore.

17  Q.  Okay.  Where Seth writes to you "got to tell Adel the label

18  was off and I credit him," was there, in fact, an issue with

19  the label for the shipment intended for Adel?

20  A.  No.

21  Q.  What was your understanding of why that -- why Seth would

22  tell you that?

23  A.  It was just a reason to say something was wrong with the

24  label, and so we don't have as many as we thought we did.  An

25  excuse.

M1LPFIS2                              Adams - Direct

1  Q.  Okay.  And the EGH that was packed for Adel, was that the

2  same product and the same vials that were also intended to go

3  to Lisette?

4  A.  Yes.

5  Q.  And can you remind -- can you say again where Lisette was

6  based?

7  A.  South America -- she was out of Miami, but her products

8  were being forwarded or shipped to South America.

9  Q.  Where were they being shipped initially from?

10 A.  Miami.  Sorry, one second.  Is that too loud?

11 Q.  It sounds a bit like you're at a drag race, but I think

12 we're okay now.

13 A.  Okay.

14 Q.  Ms. Adams, did you have conversations with Seth Fishman

15 about the use of Equestology products by horse trainers?

16 A.  Can you be more --

17 Q.  Did Seth Fishman ever talk to you --

18         MR. ADAMS:  Your Honor, I believe she froze.

19         THE COURT:  I think probably so.  Can you hear us,

20 Ms. Adams?

21         THE WITNESS:  Yes.  Could you repeat the question?

22 BY MR. ADAMS:

23 Q.  I'll rephrase the question.  Ms. Adams, did Seth Fishman

24 talk to you about particular horse trainers to whom Equestology

25 products were being sold?

M1LPFIS2                          Adams - Direct

1   A.  No, he did not.

2   Q.  Did he talk to you about the use of Equestology products by

3   racehorse trainers?

4   A.  Yes, in very general terms.

5   Q.  And understanding that they're in general terms, what do

6   you recall Seth Fishman telling you about the use of

7   Equestology products by racehorse trainers?

8   A.  He would describe to me what they were -- why they were

9   using them, what they did in general; very basic descriptions

10  of where they were going, how they were being used and why.

11  Q.  And when you say why they were being used, what did he

12  describe to you about why they were being used?

13  A.  They were being used because they were -- had requested

14  untestable products.

15  Q.  Untestable products for what purpose?

16  A.  To enhance performance.

17  Q.  Did there come a time that you moved out of south Florida

18  while you were still working for Equestology?

19  A.  Yes.

20  Q.  Where did you go?

21  A.  Idaho.

22  Q.  Did your role at Equestology change in any way when you

23  moved to Idaho?

24  A.  Yes, it did.

25  Q.  And how did it change?

M1LPFIS2                          Adams - Direct

1    A.  I no longer was the office manager.  I was doing more

2    sales.  I did, however, help still designing some labels and

3    general help in the office, if Mary needed it.

4    Q.  Okay.  And in connection with changing your role to sales,

5    did there come a time that you set up a payment processing

6    account?

7    A.  Yes.

8    Q.  And why did you set up the payment processing account?

9    A.  Because I had to take payment for the sales.

10   Q.  And was that payment, the money for those sales, did that

11   all go to you?

12   A.  Yes, I would collect all the money.

13   Q.  Okay.  Would you get to keep all that money as your own

14   revenue?

15   A.  No.

16   Q.  What would you do with a portion of that money?

17   A.  I would keep commissions off of it, and the rest I would

18   pay to Seth at the end of each month.

19                   (Continued on next page)

20

21

22

23

24

25

1    BY MR. ADAMS:

2    Q.  What was your commission?

3    A.  I believe it was eight to ten percent.  It varied between

4    products, so in that range.

5    Q.  And during the course of time that you worked at

6    Equestology, approximately how much did you make per year?

7    A.  Around 50,000.

8    Q.  When you began sales, did you have conversations with Seth

9    about the number of your clients and the number of your sales?

10   A.  Yes.

11   Q.  And what did Seth tell you, if anything, about those

12   numbers?

13   A.  That they could be significantly greater if I was to follow

14   Lisa Ranger's footsteps.

15   Q.  And what was your reaction to that?

16   A.  I didn't really -- I wasn't really interested in sales.  I

17   don't like pushing things on people and I don't like being out

18   and about in front of them.  So I was kind of hesitant.  It

19   was -- I told him it was easy for me to take care of Geoff

20   Vernon and under him John and all the people they knew, but I

21   was not interested in going and finding new clients.

22   Q.  Did there come a time that you returned to Florida from

23   Idaho?

24   A.  Yes.

25   Q.  And let me direct you to the year 2016.  Were you -- had

1  you returned to Florida by 2016?

2  A.  Yes, at the mid to end of 2016.

3  Q.  And did you continue making sales for Equestology when you

4  returned?

5  A.  Yes.

6  Q.  Did your role change again when you returned to Florida?

7  A.  Kind of.  I would come physically into the office every

8  once in a while to assist Mary, but for the most part it was

9  still just sales.

10 Q.  Did Equestology engage in any advertising that you're aware

11 of?

12 A.  Not that I'm aware of, no.

13 Q.  Did Equestology maintain a website, so far as you're aware?

14 A.  We had created one, but I was not aware if it launched to

15 the public.

16 Q.  Did you participate in any way in planning the website?

17 A.  Yes.

18 Q.  Can you describe your role in planning the website?

19 A.  I was helping design the website, not on the back end, but

20 helping the web designer -- what we wanted displayed, the

21 content we wanted on it, the look that we were trying to

22 achieve, just basic artistic direction.

23 Q.  Did you discuss the content and the appearance of the

24 website with Fishman?

25 A.  Yes.

M1LTFIS3                          Adams - Direct

1    Q.  Was the website intended to be publicly accessible?

2    A.  No.

3    Q.  Can you describe to whom the website was intended to be

4    accessible?

5    A.  Specific people would be given a user name and password to

6    log in and only those people would then be able to access what

7    the website had.  There would be a general landing page for the

8    public but they would not be able to get to anything.

9    Q.  Would you need any particular information to get past the

10   landing page?

11   A.  Yes.

12   Q.  What?

13   A.  Yes, you would have to have a password.

14   Q.  Did there ever come a point where passwords were provided

15   to anybody for the website?

16   A.  Not that I was aware.

17   Q.  Did there come a time when you stopped working for

18   Equestology?

19   A.  Yes.

20   Q.  Approximately when did you stop?

21   A.  Early 2017, I believe.  I can't remember exactly.

22   Q.  Why did you stop working at Equestology?

23   A.  I was just over it, to be honest, I didn't want to do it

24   any more and -- yeah.

25   Q.  What, if anything, did Fishman ask you about talking to

1    others about your work at Equestology when you left?

2    A.  He asked me to not discuss the business that we conducted

3    with anyone.

4    Q.  What was your response?

5    A.  I said okay.

6    Q.  Did there come a time that you were approached by agents of

7    the Food & Drug Administration?

8    A.  Yes.

9    Q.  Was that before or after you had stopped working at

10   Equestology?

11   A.  After.

12   Q.  Where did that approach happen?

13   A.  At Nani's Doughnut Shop.

14   Q.  Why were you there?

15   A.  I was working there.

16   Q.  What, if anything, were you asked by the FDA at that time?

17              MR. SERCARZ:  Objection.

18              MR. FASULO:  Objection.

19              THE COURT:  Grounds?

20              MR. SERCARZ:  Without an offer of proof, your Honor,

21   it's hard to say, but hearsay for starters.

22              THE COURT:  Overruled.  You can't make an objection

23   and say it's hard to say why.

24              MR. FASULO:  Hearsay, your Honor.

25              THE COURT:  Mr. Adams?

1          MR. ADAMS:  It's a question about a question, not for

2     the truth.

3          THE COURT:  Overruled.

4          You can answer, Ms. Adams.

5     A.  I do not remember exactly what they asked me.

6     Q.  Did you tell Seth Fishman about that incident?

7     A.  Not that I recall, no.

8     Q.  And did the FDA come back and ask you anything further

9     after they approached you?

10    A.  No, they did not.

11    Q.  Did there later come a time that you reached out to law

12    enforcement about your time at Equestology?

13    A.  Yes.

14    Q.  Why did you do that?

15    A.  I was made aware from a friend about all the arrests, and I

16    read the article that was published about it and realized that

17    they didn't have the whole story, and that I felt obligated to

18    give them more details.

19    Q.  Ms. Adams --

20         MR. ADAMS:  And this is just for Ms. Adams, not for

21    the jury.  Your Honor has a copy of the next exhibit,

22    Government Exhibit 11000.

23         THE COURT:  I assume you gave this to the defendants

24    as well.

25         MR. ADAMS:  It's in the same binder, your Honor, yes.

1          THE COURT:  Thank you.  What number?

2          MR. ADAMS:  11000.

3          THE COURT:  Is this in evidence, Mr. Adams?

4          MR. ADAMS:  It's not, your Honor.

5          THE COURT:  Take it down, please.

6          MR. ADAMS:  It's not published.

7          THE COURT:  Okay.

8          MR. ADAMS:  Thank you, your Honor.

9    BY MR. ADAMS:

10   Q.  Ms. Adams, do you have a copy of Government Exhibit 11000

11   in front of you?

12   A.  Yes.

13   Q.  Do you recognize that document?

14   A.  Yes, I do.

15   Q.  What is it?

16   A.  It is my non-prosecution agreement.

17   Q.  Under the terms of this agreement, what are you required to

18   do?

19   A.  Tell the truth about any questions asked.

20   Q.  Are you required to testify here today?

21   A.  Yes.

22   Q.  If you live up to your obligations under that agreement,

23   has the government promised you anything in return?

24   A.  No.  Well, non-prosecution.

25   Q.  And non-prosecution from what?

1   A.  For anything that I did while working for Seth.

2   Q.  If you lie on the stand today, do you get that protection?

3   A.  No, I do not.

4   Q.  Can you please look at what's in evidence as Government

5   Exhibit 401AA.

6   A.  Okay.

7           MR. ADAMS:  This is in evidence.

8   Q.  Ms. Adams, can you describe what this conversation was

9   about?

10  A.  This was about me doing an interview for my replacement in

11  the beginning when I was thinking about leaving.

12  Q.  And scrolling to the bottom of this conversation, where you

13  write, "Seems to be.  He was very calm, didn't seem like the

14  kind to go talking about details to anyone," what were you

15  conveying to Seth in that?

16  A.  That he was not going to go out with friends or anyone that

17  was not related to the business and talk about what he did,

18  what we did in Equestology.

19  Q.  From your conversations with Fishman, was that kind of

20  discretion an important requirement for having your job?

21  A.  Yes.

22          MR. ADAMS:  Your Honor, I would like to read now

23  what's marked for identification as Government Exhibit 9009.

24          THE COURT:  Are you offering this?

25          MR. ADAMS:  I will in just a moment, I'm handing you a

1      copy if you need it.

2                  THE COURT:  Okay.  This is a stipulation between the

3      parties.

4                  MR. ADAMS:  Yes, your Honor.

5                  THE COURT:  Thank you.

6                  MR. ADAMS:  And it reads:  It's hereby stipulated and

7      agreed by --

8                  Actually, your Honor, I will skip the preliminary, if

9      it's all right.

10                 THE COURT:  Yes, that's fine.

11                 MR. ADAMS:  Thank you, your Honor.

12                 THE COURT:  Just so it's clear to the jury, this is an

13     agreement that was entered into by the parties.  It's on

14     consent and it is evidence.

15                 MR. ADAMS:  It is agreed that the exhibits listed

16     under column B and in the chart below are true and accurate

17     transcriptions of the audio recordings listed under column A,

18     which accurately reflect the content recorded in those audio

19     recordings listed under column A.  And column A first refers to

20     Government Exhibit 910, and B refers to 910T, 911, 911T, 912

21     and 912T respectively.

22                 And it's further stipulated and agreed by and between

23     the parties that this stipulation, which is Government

24     Exhibit 9009, may be received into evidence at trial.

25                 Your Honor, with that, and on the basis of the prior

M1LTFIS3                         Adams - Direct

1   stipulation and the electronic stipulation, 9008, the

2   government offers Exhibit 9009 as well as 910 through 912 and

3   910T through 912T.

4              THE COURT:  I assume, based on the stipulation,

5   there's no objection, they will be received in evidence.

6              MR. ADAMS:  Thank you, your Honor.

7              (Government's Exhibits 9009, 910 through 912, and 910T

8   through 912T received in evidence)

9              THE COURT:  Could we, Ms. Jung, briefly put up 401AA,

10  please.

11             Could we go to the last two lines, please.

12  BY MR. ADAMS:

13  Q.  Ms. Adams, could you please read the last thing you wrote

14  to Seth Fishman?

15  A.  I told him the job requires discretion and possible NDA.

16  Q.  And what was the possible NDA you were referring to?

17  A.  That he may need to sign a non-disclosure agreement.

18             MR. ADAMS:  Thank you, your Honor.

19             At this point the government intends to publish 910 to

20  the jury.  Could we please put up 910T for the jury to follow

21  along?

22             THE COURT:  And just so I'm clear, 910 is the audio

23  recording?

24             MR. ADAMS:  That's correct.

25             THE COURT:  Thank you.  So ladies and gentlemen, you

1  need to listen carefully, but the document will be put up so

2  you can follow along.

3          MR. ADAMS:  For the record, 910T includes a list of

4  participants and a date.  The date from the file name is

5  April 3rd, 2014, the participants are listed as Seth Fishman

6  and Adel Sebaay.

7          (Audio recording played)

8          MR. ADAMS:  Thank you, Ms. Adams.

9          Thank you, your Honor, no further questions.

10          THE COURT:  Thank you.

11          Who is going first for the defense?

12          MR. SERCARZ:  I am, your Honor.

13          THE COURT:  Mr. Sercarz.

14  CROSS-EXAMINATION

15  BY MR. SERCARZ:

16  Q.  Good morning, Ms. Adams.

17  A.  Good morning.

18  Q.  I represent Seth Fishman, Dr. Fishman.

19          Ms. Adams, you would never knowingly work for someone

20  who is engaged in ongoing criminal conduct, would you?

21  A.  No.

22  Q.  You began working for Dr. Fishman in 2012, is that correct?

23  A.  Yes.

24  Q.  And you worked with him for at least five years until 2017,

25  am I correct?

M1LTFIS3                          Adams - Cross

```
 1   A.  Yes.
 2   Q.  And during that period of time, you developed an intimate
 3   knowledge of his business, am I correct?
 4   A.  Yes.
 5   Q.  You began as a personal assistant for Dr. Fishman, am I
 6   correct?
 7   A.  Yes.
 8   Q.  And gradually you became more and more involved in the
 9   business of Equestology, am I correct?
10   A.  Yes.
11   Q.  You organized his documents, am I correct?
12   A.  Yes, among other things.
13   Q.  Among other things, you created the Dropbox account to
14   store documents in the cloud, am I correct?
15   A.  Correct.
16   Q.  These documents included receipts, correct?
17   A.  Correct.
18         MR. SERCARZ:  I didn't hear that last one, I don't
19   know if anybody else --
20         THE COURT:  We seem to have an audio problem.
21         Could you repeat your answer verbally?
22   A.  Yes, I did.
23   Q.  It included orders for products, am I correct?
24   A.  Can you be more specific?
25   Q.  Well, I'll leave that one to the side.
```

SOUTHERN DISTRICT REPORTERS, P.C.

1                    Important emails, am I correct?

2    A.  Yes.

3    Q.  Emails involving customers and the people at Equestology,

4    am I correct?

5    A.  Occasionally, yes.

6    Q.  Documents including text messages, am I correct?

7    A.  No.

8    Q.  Eventually you became involved in labeling product, am I

9    correct?

10   A.  Yes.

11   Q.  And during the course of your work that you performed for

12   Dr. Fishman, you became aware of conversations he had with

13   customers, am I correct?

14   A.  Yes.

15   Q.  You yourself participated in conversations with

16   Ms. Giannelli, who was involved in the distribution of his

17   products, am I correct?

18   A.  Yes, I did.

19   Q.  You became involved in conversations with Jordan Fishman

20   and others who worked for him at 21st Century, am I correct?

21   A.  Yes.

22   Q.  And just by way of reminder, 21st Century was involved in

23   the manufacture or compounding of ingredients used in the

24   products that were distributed by Equestology, am I correct?

25   A.  Correct.

M1LTFIS3                          Adams - Cross

1    Q.  You were involved in conversations with customers of

2    Equestology, am I correct?

3    A.  Yes, a few customers.

4    Q.  You were engaged in all of this business activity for at

5    least five years, am I correct?

6    A.  It's a little more -- not as black and white.  Over the

7    five years all of those things happened, but not all of them

8    every year.

9    Q.  Understood.  Indeed, there came a time, I think you told

10   us, when you actually moved to Idaho and were moving on the

11   other side of the country from Equestology, am I correct?

12   A.  Yes.

13   Q.  How long a period was that?

14   A.  Just under one year.

15   Q.  And during that year, you didn't make plans to work

16   anywhere else, did you?

17   A.  No.

18   Q.  You didn't leave the employment of Mr. Fishman to seek

19   other work -- Dr. Fishman, to seek other work, am I correct?

20   A.  Correct.

21   Q.  You didn't refuse to perform any of the tasks that

22   Dr. Fishman asked you to perform, am I correct?

23   A.  No.

24   Q.  "No" means I'm not correct or "no" means you didn't refuse?

25   A.  "No" means you're not correct.

1    Q.  We'll get to those in a moment.

2              During that period, you referred to him as Doc, am I

3    correct?

4    A.  No, I did not refer to him as that.

5    Q.  Others did, is that right?

6    A.  Yes.

7    Q.  And you understood that to be Dr. Seth Fishman,

8    veterinarian, am I correct?

9    A.  Correct.

10   Q.  And they referred to him by that name in the course of his

11   practice, am I correct?

12   A.  Yes.

13   Q.  Now by the time you left in 2017, to use your words on

14   direct examination, you were over it.  Are those your words

15   just moments ago?

16   A.  Yes.

17   Q.  Would it be fair to say that you were not getting along

18   very well with Dr. Fishman by the time you left?

19   A.  Yes.

20   Q.  Indeed, at the time that you were leaving his employment,

21   he accused you of making personal purchases for personal items

22   with the firm's business cards, am I correct?

23   A.  Correct.

24   Q.  And he accused you of taking items that belonged to

25   Equestology when you were in the process of leaving, am I

M1LTFIS3                              Adams - Cross

1   correct?

2   A.  Yes, he did.

3   Q.  And you were upset by that accusation, am I correct?

4   A.  To an extent, because they were false, yes.

5   Q.  And given the nature of these false accusations, you had

6   every reason to be upset, fair enough?

7   A.  Yes.

8   Q.  But it was not until these false accusations were made that

9   you left the employ of Dr. Fishman, isn't that correct?

10  A.  I don't remember exactly when that happened and when I

11  officially moved on.

12  Q.  You learned some things about Dr. Fishman during the course

13  of working for him that, in your view, made him unpleasant to

14  work with, fair enough?

15  A.  Yes.

16  Q.  Fair to say that he got angry with you on occasion?

17  A.  On occasion, yes.

18  Q.  He was given to have a temper, am I correct?

19  A.  Yes.

20  Q.  He also was arrogant, isn't that correct?

21  A.  Occasionally, yes.

22  Q.  Particularly when it came to his supposed knowledge of

23  veterinarian medicine, am I correct?

24  A.  That would be one of the instances, yes.

25  Q.  And when it came to veterinarian medicine, he used to

1  criticize some of the other people that he dealt with, am I

2  correct?

3  A.  Not that I remember, no.

4  Q.  Didn't he make comments about other veterinarians --

5              MR. ADAMS:  Objection.

6              THE COURT:  Grounds?

7              MR. ADAMS:  Calls for hearsay.

8              THE COURT:  I'm sorry?

9              MR. ADAMS:  Calls for hearsay.

10             THE COURT:  Overruled.

11  Q.  Did he make comments to you about other veterinarians that

12  he dealt with?

13  A.  Not that I remember, not vets.

14  Q.  Owners and trainers?

15  A.  No.

16  Q.  Who was it then that he was making disparaging comments

17  about?

18  A.  In particular about Adel and the UAE, he would frequently

19  be upset with him.  There's a language barrier, so it's

20  understandable.

21  Q.  Didn't Dr. Fishman suggest that he knew better than anyone

22  else about seeing to the safety and health of the racehorses

23  for whom he was prescribing product?

24             MR. ADAMS:  Objection.

25             THE COURT:  Hearsay ground?

M1LTFIS3                         Adams - Cross

1              MR. ADAMS:  Yes.

2              THE COURT:  Overruled.  I assume you're not offering

3    it for the truth.

4              MR. SERCARZ:  Correct, your Honor, for state of mind.

5              THE COURT:  Overruled.

6              THE WITNESS:  Can you repeat that?

7              MR. SERCARZ:  May I have it read by the reporter?

8              THE COURT:  Please.

9              (Record read)

10   A.  I don't recall that direct statement.

11   Q.  Wasn't he arrogant when it came to his supposed knowledge

12   of the safety and welfare of the racehorses and what would be

13   good for them?

14   A.  No.

15   Q.  I want to go on to another subject momentarily.  You talked

16   to us a little bit about becoming involved in the investigation

17   of Dr. Fishman.  You mentioned that you -- after you left you

18   heard about the arrest of other individuals in a horse doping

19   investigation, is that correct?

20   A.  Correct.

21   Q.  Before that happened, you mentioned you were contacted by

22   the Food & Drug Administration, is that correct?

23   A.  Yes.

24   Q.  When that happened, did you contact legal counsel?

25   A.  I asked my attorney if I should do or say anything, yes.

M1LTFIS3                          Adams - Cross

1    Q.  And as a result of your conversations with your attorney,

2    did you enter into a series of what are known as proffer

3    agreements?

4    A.  Not directly after that, no.

5    Q.  Did there come a time when you entered into proffer

6    agreements governing your conversations with the government?

7    A.  I'm not sure exactly what that means.  The FDA approached

8    me in the beginning and I never spoke to them again.

9            Are you referring to the most recent interactions?

10           THE COURT:  Just answer the question, Ms. Adams.  If

11   you're not able to answer it, say you're not able to.  You

12   don't get to ask questions.

13   A.  I'm not able to answer that.

14   Q.  Let me try to break it down.  When was it that the FDA

15   contacted you?

16   A.  I don't recall the exact date.

17   Q.  Can you give us your best approximation?

18   A.  Sometime in 2018.

19   Q.  And on that occasion, did you subject yourself to an

20   interview?

21   A.  I was forced to sit down, yes, with the FDA.

22   Q.  Forced by whom?

23   A.  The FDA.

24   Q.  How did they force you to sit down with them?

25   A.  They came in, showed their badges, and said they needed to

M1LTFIS3                          Adams - Cross

1    speak with me, and I didn't know if I could say no.

2    Q.  And as a result of your interview under those

3    circumstances, were any reports created?

4                MR. ADAMS:  Objection.

5    A.  Not that I'm aware of.

6                MR. SERCARZ:  I didn't hear the objection.

7                THE COURT:  I didn't hear.  Mr. Adams, do you have an

8    objection?

9                MR. ADAMS:  On the basis of the answer that arrived, I

10   do not.

11               THE COURT:  Okay.  Ms. Adams, let me suggest that you

12   give a second before you answer so that if there are objections

13   I can deal with them.  All right?  Thank you.

14               THE WITNESS:  Okay.

15   BY MR. SERCARZ:

16   Q.  To the best of your recollection, was that your last

17   contact with law enforcement until 2021?

18   A.  Yes.

19   Q.  In the interim, did you seek the advice of counsel?

20   A.  Can you be more specific?

21   Q.  Did you go to an attorney?  Did you contact Ms. Tuchman?

22   A.  Yes.

23   Q.  And was that because you were afraid that --

24               MR. ADAMS:  Objection.

25               THE COURT:  He didn't ask a question yet.  Let him

M1LTFIS3                          Adams - Cross

1  finish the question and then I will hear.

2  Q.  Leaving out the issue of why you contacted your lawyer,

3  after that interview with the FDA were you afraid that you

4  might be charged with crimes in connection with your work for

5  Equestology?

6  A.  Yes, the thought occurred to me.

7  Q.  In connection with that thought, did you -- either you,

8  yourself, or through your attorney -- approach members of law

9  enforcement about speaking to them?

10  A.  Yes, in 2021.

11  Q.  And did those conversations result in some sort of a

12  limited immunity or proffer agreement?

13  A.  I'm not sure that's what the agreement I have is.

14  Q.  Do you have nearby in your possession documents labeled

15  Government Exhibits 3501-0003 and Government Exhibit 3501-0002?

16  A.  No.

17          MR. SERCARZ:  May I approach the government, your

18  Honor?

19          THE COURT:  Yes.  If we need to get into the details

20  about the logistics that we agreed to, maybe we ought to take

21  the lunch break now.

22          MR. SERCARZ:  That's fine, your Honor.

23          THE COURT:  So we could work out some of these

24  details.

25          MR. SERCARZ:  That's fine.

SOUTHERN DISTRICT REPORTERS, P.C.

1              MR. CHOW:  Your Honor, I think the instruction is very
2    easy, but we're also happy to break at this point.  She just
3    needs to reach into the second binder she was instructed not to
4    open.
5              THE COURT:  All right.  Mr. Adams, why don't you
6    explain.  Do you mind if he does this?
7              Why don't you talk briefly.  I think Mr. Chow just
8    told you.
9              Ladies and gentlemen of the jury, they are talking
10   about some of the logistics that the lawyers agreed to ahead of
11   time in order to facilitate Ms. Adams testifying remotely.
12             MR. SERCARZ:  Your Honor, perhaps this is a way to be
13   helpful:  May I ask the witness before we break for lunch that
14   she reach into the second binder, the one that she apparently
15   does not have in the room with her now, and I will be asking
16   her questions about that after the luncheon recess?  Would that
17   help?
18             THE COURT:  Are you comfortable with her looking at
19   that binder or would you direct her to looking at certain
20   documents?
21             MR. SERCARZ:  I'm comfortable with her looking at that
22   binder, your Honor.
23             THE COURT:  Is that acceptable to the government?
24             MR. ADAMS:  Absolutely.
25             THE COURT:  Mr. Fasulo, any objection?

1          MR. FASULO:  Yes.  Upon request by counsel as to what

2     documents she needs to look at, I'm comfortable with her

3     looking at those documents.  I don't think it's appropriate to

4     have full access to the binder and give testimony without us

5     knowing exactly what she's doing.

6          THE COURT:  Why don't you direct her where you want to

7     go.

8          MR. SERCARZ:  Yes, your Honor.  Please take a look for

9     now at Government Exhibit 3501-0002 and 0003 between now and

10    when we reconvene.

11         THE COURT:  Did you understand that?

12         THE WITNESS:  Can you repeat that?

13         MR. SERCARZ:  3501-0002 and 0003.

14         THE WITNESS:  Okay.

15         THE COURT:  Thank you, Ms. Adams.

16         We're going to break for lunch now.  Ms. Adams, you

17    remain under oath and you may not speak with anyone about the

18    substance of your testimony between now and when you resume.

19    Do you understand that?

20         THE WITNESS:  I understand, your Honor.

21         THE COURT:  All right.  And ladies and gentlemen of

22    the jury, you can leave your notebooks here if you wish to do

23    so.  We'll take a break for lunch until 1:30.  Please be ready

24    five minutes or so before then so that Ms. Dempsey and her

25    colleagues can escort you back up here.  Please remember, do

M1LTFIS3                          Adams - Cross

1    not talk about the case even among yourselves during the break.

2            All right.  Thank you very much and have a good lunch

3    and a good break.

4            (Jury not present)

5            THE COURT:  I just need -- maybe Mr. Chow can show me

6    where the 3500 materials are located in what you provided to me

7    so that I can follow along.

8            And is there anything else that we need to talk about?

9            MR. SERCARZ:  Not from us.

10           THE COURT:  Have a good lunch, everyone, and I will

11   see everyone here slightly before 1:30.

12           (Luncheon recess taken)

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1            A F T E R N O O N   S E S S I O N

2                         1:30 P.M.

3            (In open court; jury not present)

4            THE COURT:  Please be seated, everyone.  All right.

5    Good afternoon.  I'm told the jury is here.  They'll be up

6    momentarily.

7            (Jury present)

8            Be seated, please.  Good afternoon.  Thank you very

9    much for being ready to start on time.  Mr. Sercarz?

10           MR. SERCARZ:  Thank you, your Honor.

11           THE COURT:  Just one moment.  Do we have Ms. Adams

12   with us?

13           THE WITNESS:  Yes.

14           THE COURT:  All right.  Good afternoon, Ms. Adams.  As

15   a reminder, you remain under oath.

16           And, Mr. Sercarz, whenever you're ready.

17           MR. SERCARZ:  Thank you.

18   BY MR. SERCARZ:

19   Q.  Good afternoon, Ms. Adams.

20   A.  Good afternoon.

21   Q.  Shortly before we broke, you mentioned that sometime in

22   2020 you were approached by people from the FDA; do you recall

23   that testimony?

24   A.  Yes.

25   Q.  And you had a conversation with them; am I correct?

1    A.  Yes.

2    Q.  And I believe you said, as a result of that conversation,

3    you were somewhat concerned; do you recall that?

4    A.  Yes.

5    Q.  There came a time thereafter that you learned that there

6    had been arrests in an investigation related to this case; am I

7    correct?

8    A.  Correct.

9    Q.  And I believe you said that you contacted agents of law

10   enforcement because they were not getting a correct account or

11   a full account; was that correct?

12   A.  Yes.

13   Q.  How did you know what account agents of law enforcement

14   had?

15   A.  By reading the article that I read, it didn't seem like

16   they had the full picture.

17   Q.  This was an article in the newspaper, is that what you're

18   saying?

19   A.  I'm not sure if it was a newspaper.  I was sent a link; so

20   it was an online link.  I don't remember if it was associated

21   with a newspaper.

22   Q.  By whom were you sent this link?

23   A.  One of my -- one of my friends that's in the horse

24   industry.

25   Q.  And as a result of having read this link, you were

1   concerned that they -- the agents of law enforcement may have

2   information about you that was incorrect; is that right?

3   A.   No.

4   Q.   What was the nature of your concern?

5   A.   That they didn't have the full story of what Equestology

6   was involved in.

7   Q.   Well, up until then, you had not voluntarily gone in to see

8   law enforcement; am I correct?

9   A.   Correct.

10  Q.   But at that point, you were concerned that they might not

11  have the full story regarding Equestology; am I correct?

12  A.   Yes.

13  Q.   Fair to say that at the time you first went in to speak to

14  agents of law enforcement, your motive was to implicate

15  Equestology; isn't that correct?

16  A.   No.

17  Q.   You were concerned that they were missing certain salient

18  facts; am I correct?

19  A.   Yes.

20  Q.   Were you concerned that those facts might reflect well upon

21  you, these facts that they were missing?

22  A.   Yes, it crossed my mind that it may effect me as well.

23  Q.   In any event, you went in to see agents of law enforcement;

24  am I right?

25  A.   I didn't physically go to see anyone.  I was gave contact

1    information for them.

2    Q.  As a result of that information, was there an interview or

3    either telephonic that was arranged?

4    A.  Yes, there was.

5    Q.  And was that conducted pursuant to what's called a proffer

6    agreement?

7    A.  Yes.

8    Q.  All right.  I'd like to call your attention to two

9    documents.  Do you have in front of you Government's

10   Exhibit 3501-0003 and then 0002?

11   A.  Yes, I do.

12   Q.  All right.  Now, are these agreements that governed the

13   circumstances under which these interviews were conducted?

14   A.  I'm not really sure how to interpret this document in its

15   extent.

16   Q.  Well, take a look at them.  They're called a proffer of

17   limited immunity agreement; is that correct?

18   A.  It says proffer agreement, yes, at the top.

19   Q.  All right.

20   A.  I'm not --

21           THE COURT:  You've answered.

22   Q.  Am I right -- the documents are not in evidence, but I'm

23   inquiring into your state of mind.  Were those documents that

24   you had a chance to read and review before you conducted these

25   telephonic interviews with agents of law enforcement?

M1LPFIS4                     Adams - Cross

1    A.  Yes.

2    Q.  And did you understand, as a result of having reviewed

3    these documents with your attorney, that under certain

4    circumstances, nothing you said during those interviews could

5    be used as evidence against you in any future prosecution?

6    A.  I'm not sure I understand the question.  Can you rephrase

7    it?

8    Q.  Sure.  Was it your understanding of the import of those

9    documents that it would protect you from having statements you

10   made used against you in any way?

11   A.  No.

12   Q.  What was your understanding of those documents and why they

13   were created?

14   A.  My understanding was that I would tell the government what

15   I knew, and after they knew -- sorry, after they reviewed

16   everything I had told them, they would then decide whether an

17   agreement would be made.  It says right in here that it is not

18   a -- I'm not being protected at this point any.

19   Q.  Doesn't it indicate that as long as you tell the truth

20   during that interview, that nothing that you say can be used

21   against you?

22   A.  I'm not sure.  I'd have to read every sentence to find

23   that.  It says it's not a cooperation agreement.

24   Q.  I understand.  If I could lay my hands on it for a minute.

25            THE COURT:  Mr. Sercarz, if you're going to come from

M1LPFIS4                    Adams - Cross

1    behind that enclosure, you need to put your mask on.

2              MR. SERCARZ:  I'm sorry, your Honor.

3    BY MR. SERCARZ:

4    Q.  Take a look at Government's Exhibit 3501-0003 and, for

5    example, paragraph 2?

6    A.  Okay.

7    Q.  And I'll wait a second while you read it.

8              (Pause)

9    A.  Okay.

10   Q.  Okay?  Am I correct that the document speaks to whether or

11   not in any subsequent prosecution, statements that you make

12   during that telephonic interview can be used against you?

13   A.  To be honest, I'm not sure exactly what --

14   Q.  Take a look at Government's Exhibit 3501-0003.  Is that

15   your --

16   A.  I --

17   Q.  -- signature?

18             THE COURT:  That's the same document, right, sir?

19   A.  Yes.

20             MR. SERCARZ:  I'm sorry, your Honor?

21             THE COURT:  The same document you just --

22             MR. SERCARZ:  Yes.

23             THE COURT:  -- directed her to?  Okay.

24   BY MR. SERCARZ:

25   Q.  Is that your signature at the bottom of page 2?

SOUTHERN DISTRICT REPORTERS, P.C.

M1LPFIS4                          Adams - Cross

 1  A.  Yes, it is.

 2          MR. SERCARZ:  I offer it in evidence.

 3          MR. ADAMS:  No objection.

 4          THE COURT:  All right.  It will be received.

 5  BY MR. SERCARZ:

 6  Q.  Now, this document covers the interview that you had by

 7  phone on February 16th of 2021; does it not?

 8          MR. ADAMS:  Your Honor, I'm sorry.

 9          THE COURT:  Hold on.

10  A.  Yes.

11          MR. ADAMS:  Could we get an exhibit number for this?

12  I think --

13          MR. SERCARZ:  We offer it as Defense Exhibit 1.

14          MR. ADAMS:  Yes.  Thank you, your Honor.

15          THE COURT:  All right.  It will be received as

16  Defendant Exhibit 1.  It's right now marked with Bates

17  3501-0003.

18          MR. SERCARZ:  Thank you, your Honor.

19          (Defendant's Exhibit 1 received in evidence)

20  BY MR. SERCARZ:

21  Q.  Paragraph 2 of the agreement --

22          MR. SERCARZ:  In fact, can we have it put up, your

23  Honor?  I think the government has it under 3501-0003.

24          THE COURT:  Mr. Adams, is your team able to help

25  Mr. Sercarz?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

1          MR. ADAMS:  I believe so, your Honor.

2          THE COURT:  Thank you.

3    BY MR. SERCARZ:

4    Q.  Take a look at paragraph 2, Ms. Adams.

5    A.  All right.

6    Q.  Am I correct -- am I correct that it speaks to events that

7    may occur in the event you are prosecuted?

8    A.  Possibly.  To be honest, I'm not sure how to interpret all

9    the details of --

10   Q.  Let me read it to you, if I may, given that it's in

11   evidence --

12   A.  Okay.

13   Q.  -- and we'll talk about what it meant to you.

14         THE COURT:  Okay.  Excuse me.  Both, Mr. Sercarz and

15   Ms. Adams, please let each other finish.  You're stepping on

16   each other's answers and questions.

17         MR. SERCARZ:  I'll try and be careful, your Honor.

18   Thank you.

19   Q.  I'm going to read it to you, and then ask you a question,

20   okay?

21         Paragraph 2:  "In any prosecution brought against

22   client by this office, except as provided below, the government

23   will not offer in evidence on its case in chief, or in

24   connection with any sentencing proceeding for the purpose of

25   determining an appropriate sentence, any statements made by

M1LPFIS4                          Adams - Cross

1   client at the meeting, except (a) in a prosecution for false

2   statements, obstruction of justice or perjury, with respect to

3   any acts committed or statements made during or after the

4   meeting or testimony given after the meeting; or (b) if at any

5   time following the meeting, client becomes a fugitive from

6   justice."  Do you see that paragraph?

7   A.  Yes.

8   Q.  All right.  Now, do you understand that the word "client"

9   refers to you?

10  A.  Yes.

11  Q.  And do you understand that the word "office" refers to the

12  office of the United States Attorney?

13  A.  Yes.

14  Q.  And would it be fair to say, then, that it was your

15  understanding that this paragraph spoke about a potential

16  prosecution against you, the client, by the office, meaning the

17  United States Attorney's Office for the Southern District of

18  New York?

19  A.  Yes.

20  Q.  And that this paragraph deals with the circumstances under

21  which the government would be free to use your statements

22  against you and the circumstances under which they would be

23  limited against using these statements against you?

24  A.  I'm not sure I follow that, but....

25  Q.  Have you completed your answer?

M1LPFIS4                          Adams - Cross

1  A.  Yeah.

2  Q.  What is your understanding of this paragraph?

3  A.  That as long as I do not break the (a), (b) parts of it,

4  that they're not going to prosecute me for what I say.

5  Q.  All right.  And would it be fair to say that, subsequently,

6  you entered into another one of these agreements to govern a

7  telephonic conversation that you had on June 17th of 2021?  And

8  I call your attention to Government's Exhibit 3501-0002.

9  A.  Yes.

10  Q.  And for the sake of saving time, would it be fair to say

11  that that second agreement appears to be identical in all

12  respects to the one that I've introduced as an exhibit?

13          THE COURT:  Mr. Sercarz, I don't know that your

14  question saves time.  Do you want to make that representation?

15          MR. SERCARZ:  I would, your Honor.

16          THE COURT:  Is that acceptable?

17          MR. ADAMS:  Apart from the date, yes, your Honor.

18          THE COURT:  All right.  Thank you.

19          There's no question, Ms. Adams.

20          MR. SERCARZ:  Very well.

21  BY MR. SERCARZ:

22  Q.  Then you signed a similar agreement in connection with the

23  second telephone conversation that you had with the government

24  on June 17th of 2021; am I correct?

25  A.  Yes.

M1LPFIS4                          Adams - Cross

1    Q.  And would it be fair to say that at the time that you were

2    talking to the agents, it was your hope that you would not be

3    prosecuted for crimes relating to your employment at

4    Equestology?

5    A.  Yes.

6    Q.  And that you were thinking about that concern that you had

7    in answering the questions that were posed by the agents at the

8    meeting?

9    A.  Yes, I was thinking about that.

10   Q.  Now, after you had engaged in those two telephonic

11   conversations, you subsequently received a non-prosecution

12   agreement; am I correct?

13   A.  Correct.

14   Q.  Do you have that agreement in front of you?

15   A.  Yes, I do.

16   Q.  I believe that the version you have is Government's

17   Exhibit 9 -- is it 9001?

18            MR. ADAMS:  11,000.

19            MR. SERCARZ:  11,000.

20            THE COURT:  That's in the first binder?

21            MR. ADAMS:  It's in the Government exhibit binder.

22            THE COURT:  Thank you.

23   BY MR. SERCARZ:

24   Q.  I'd ask you to take a look back in the government's exhibit

25   binder at Government's Exhibit 11,000.

1    A.  Okay.

2    Q.  And this is the cooperation agreement that you received; am

3    I correct?

4            MR. ADAMS:  Objection, mischaracterizes.

5            THE COURT:  Sustained.

6            MR. SERCARZ:  I'm sorry, your Honor.  I didn't hear

7    your ruling.

8            THE COURT:  Sustained.

9    A.  Yes, it is the offer that I received.

10           THE COURT:  No, if there's an objection, Ms. Adams,

11   that I sustained, you don't answer.

12           THE WITNESS:  Oh, I'm sorry.

13           THE COURT:  All right?

14   BY MR. SERCARZ:

15   Q.  Is this the agreement that governs your relationship with

16   the prosecution and the Court as of today?

17   A.  Yes.

18   Q.  Now, with regard to this agreement, and I believe you

19   testified about this on direct, it requires you to do certain

20   things; am I correct?

21   A.  Correct.

22   Q.  Now, if you'll take a look at the third paragraph in the

23   agreement, it requires you, among other things --

24           MR. SERCARZ:  By the way, may we have this agreement

25   posted, your Honor, since it's in evidence?

1           MR. ADAMS:  Sorry, your Honor, it's not in evidence,

2      but I have no objection to it being admitted.

3           THE COURT:  All right.  It will be -- are you offering

4      it?

5           MR. SERCARZ:  I offer it in evidence.  Thank you.  I'm

6      sorry.

7           THE COURT:  It will be admitted without objection, and

8      then, Mr. Adams, is your team able to help Mr. Sercarz by

9      pulling this up?

10          MR. ADAMS:  Yes, your Honor.  For simplicity sake, if

11     we can keep this designated as Government Exhibit 11,000?

12          MR. SERCARZ:  No objection.  Thank you.  Thank you,

13     Mr. Adams.

14          THE COURT:  Okay.

15          (Government's Exhibit 11,000 received in evidence)

16          THE COURT:  Is this -- are you all able to see it?

17     Thank you.  Thank you, Mr. Adams.

18          MR. ADAMS:  Sure.

19     BY MR. SERCARZ:

20     Q.  Now, among the things that you are required to do in order

21     to avoid being prosecuted, pursuant to the terms of the

22     agreement, and I call your attention to the third paragraph,

23     subsection (c) says you "shall attend all meetings at which

24     this office requests your presence;" am I correct?

25     A.  Yes.

1    Q.  Subsection (d) says you "will provide, upon request, any

2    document, record or other tangible evidence relating to the

3    matters about which this office or any designated law

4    enforcement agency inquires of you;" is that correct?

5    A.  Yes.

6    Q.  In addition, you "must testify truthfully before any grand

7    jury, at any trial, and any other court proceeding with respect

8    to any matters about which the office may request your

9    testimony;" is that correct?

10   A.  Yes.

11   Q.  Sub (f) indicates that you "shall bring to the office's

12   attention all crimes which you have committed and all

13   administrative, civil or criminal proceedings, investigations

14   or prosecutions in which you have been a subject, target, party

15   or witness;" do you see that?

16   A.  Yes.

17   Q.  And sub (g) says you "shall commit no crimes whatsoever."

18   Do you see that?

19   A.  Yes.

20   Q.  Now, in addition to that, there is a requirement laid out

21   in subdivision (b).  I want you to take a look at that and read

22   it.

23   A.  "Shall cooperate fully with this office" --

24   Q.  I apologize.  I just wanted you to look at it for the

25   moment.

1            THE COURT:  You said "and read it."  You meant read it

2      to herself?

3            MR. SERCARZ:  Yes, sorry.

4      Q.  Read it to yourself.

5      A.  Okay.

6      Q.  Okay?  Now, during the course of your cooperation, you have

7      been interviewed by agents of law enforcement; am I correct?

8      A.  Yes.

9      Q.  They included agents of the FBI; am I correct?

10     A.  Yes.

11     Q.  All right.  Beyond the requirements of those other

12     subsections that you have read to us out loud, what additional

13     type of cooperation is required by subsection (b) of this

14     agreement?

15     A.  Can you rephrase that?

16     Q.  What is it that you're required to do in subsection (b)

17     that you weren't already required to do by all the other

18     paragraphs of this agreement?

19            THE COURT:  Including subparagraph (a), which you

20     didn't read into the record.

21            MR. SERCARZ:  Yes, your Honor.

22     A.  Nothing that I'm aware of.

23     Q.  Do you have any understanding as to why this additional

24     paragraph was included?

25     A.  No.

M1LPFIS4                          Adams - Cross

1    Q.  And am I reading it correctly when it says "shall cooperate

2    fully with this office, the Federal Bureau of Investigation,

3    and any other law enforcement agency designated by this

4    office;" did I read it correctly?

5    A.  Yes.

6    Q.  What did you think might happen to you if you were

7    interviewed by the Federal Bureau of Investigation and they

8    didn't think you were telling the truth?

9    A.  I don't know.

10   Q.  What did you think might happen to you if you were

11   interviewed by the Federal Bureau of Investigation and they

12   thought you had left something out?

13   A.  They would ask me to elaborate.

14   Q.  And that's it?

15   A.  Besides that, I didn't think about it.

16   Q.  What did you think might happen to you if you were

17   questioned by the Federal Bureau of Investigation, and they

18   thought you were withholding information regarding Dr. Fishman?

19   A.  That I could possibly be in trouble.

20   Q.  According to your understanding of this agreement, who is

21   it that decides whether or not you have provided full and

22   comprehensive information?

23   A.  The government.

24   Q.  Did you ever, during the course of any of your interviews,

25   answer questions in such a way that you thought it might help

M1LPFIS4                          Adams - Cross

1    you to avoid prosecution in this agreement -- according to this

2    agreement?

3    A.  No.

4    Q.  Now, you've testified regarding your relationship with

5    Geoffrey Vernon; am I correct?

6    A.  Yes.

7    Q.  And about your dealings with Mr. Vernon; am I correct?

8    A.  Yes.

9             MR. SERCARZ:  May I have a moment, your Honor?

10            THE COURT:  Sure.

11            (Pause)

12   BY MR. SERCARZ:

13   Q.  Do you recall being asked questions regarding Mr. Vernon's

14   business practices?

15   A.  Can you be more specific?

16   Q.  Yes.  Did Mr. Vernon have any specific requests regarding

17   whether or not products shipped to him would be labeled?

18   A.  Yes.

19   Q.  And what was his request in that regard?

20   A.  That all products be labeled properly.

21   Q.  And what did you understand him to mean by "properly"?

22   A.  With a full label.

23   Q.  With a full --

24   A.  With a label.

25   Q.  There was another word you used, and I just didn't hear it.

M1LPFIS4                        Adams - Cross

1    A.  A full label.

2    Q.  And what did -- what did you understand him to mean by "a

3    full label"?

4    A.  Not just a simple sticker that had a number or a letter on

5    it or an abbreviation.

6    Q.  Do you recall being interviewed by agents of law

7    enforcement on February 16th of 2020 and being asked about

8    Mr. Vernon and his requests, and telling them that Mr. Vernon

9    wanted plain, generic labeling, along with directions for how

10   to use the products?

11   A.  I don't remember if I said that on that date.

12   Q.  All right.  Do you have handy Government's Exhibit 3501-04?

13   A.  The binder is not in the room with me.

14           MR. SERCARZ:  Your Honor, may we ask the witness to

15   get the binder?

16           THE COURT:  Yes.  Is your counsel available to bring

17   that exhibit to you?

18           MR. ADAMS:  Your Honor, I think I mentioned earlier

19   that her counsel is not actually physically present today, but

20   I can instruct Ms. Adams to go and get the binder.

21           THE COURT:  I'll instruct her.

22           Ms. Adams, are you able to go -- is the binder in

23   another room where you are?

24           THE WITNESS:  Yes.  It's in a different room in my

25   house.

SOUTHERN DISTRICT REPORTERS, P.C.

M1LPFIS4                        Adams - Cross

1              THE COURT:  Mr. Sercarz, are there any other

2    documents --

3              MR. SERCARZ:  Yes, your Honor.

4              THE COURT:  -- besides this that you want her to

5    retrieve?

6              MR. SERCARZ:  I would ask the Court to instruct the

7    witness, when she goes to retrieve that document, also to

8    retrieve 3501-05 and 3501-08.

9              THE COURT:  Okay.

10             THE WITNESS:  Just those two?

11             THE COURT:  Well, 04.

12             MR. SERCARZ:  04, 05 and 08.

13             THE COURT:  And 08.

14             THE WITNESS:  All right.

15             THE COURT:  All right.  We'll wait for you, Ms. Adams.

16             THE WITNESS:  All right.

17             (Pause)

18             THE COURT:  Excuse me.  Do the jurors need us to close

19    those shades?  No?  Okay.

20             All right.  Ms. Adams, you have the documents that you

21    were asked to retrieve?

22             THE WITNESS:  Yes, I do.

23             THE COURT:  All right, Mr. Sercarz.

24             MR. SERCARZ:  Thank you, your Honor.

25    BY MR. SERCARZ:

M1LPFIS4                        Adams - Cross

1    Q.  First of all, calling your attention to Government

2    Exhibit 3501-004, and I call your attention in particular to

3    page 4, the second paragraph on the page.  Read it to yourself,

4    and I ask you, looking at the second sentence in that

5    paragraph, whether it refreshes your recollection that Geoff

6    had specific requests on product labeling and that all

7    products --

8                THE COURT:  Excuse me.  Is this in evidence?

9                MR. ADAMS:  It is not.

10               MR. SERCARZ:  No.

11               THE COURT:  You read from a document that's not in

12   evidence.  You can direct her attention to it, and you can ask

13   her a question, but you can't read it --

14               MR. SERCARZ:  Yes, your Honor.

15               THE COURT:  -- if it's not in evidence.

16   BY MR. SERCARZ:

17   Q.  I direct your attention to that portion of that document,

18   and I ask you whether it refreshes your recollection that

19   Mr. Vernon wanted a plain, generic-looking label with

20   directions of use on the label?

21   A.  Yes.

22   Q.  Now, by the way, the interview at which you were asked

23   those questions took place on February 16th of 2020; would that

24   be correct?

25   A.  Can you repeat that, please?

M1LPFIS4                          Adams - Cross

1    Q.  Yes.  The interview at which you were asked the question

2    and told the agents that he wanted generic labels with

3    information as to usage on them, took place on February 16th of

4    2020; is that correct?

5    A.  I don't remember.

6    Q.  You don't recall the date?

7    A.  No, I'm not sure if I said that on that date.

8    Q.  All right.  Fair enough.  Just before I leave it, would you

9    please look at page 1, in the upper left-hand corner, and just

10   tell us if that refreshes your recollection as to the date of

11   the interview?

12   A.  Yes.

13   Q.  "Yes," meaning it refreshes your recollection?

14   A.  Yes, if this is a document --

15   Q.  Don't refer to the content of the document.  The only thing

16   I'm permitted to ask you is whether it refreshes your memory as

17   to when the interview took place.

18            THE COURT:  And, Ms. Adams, reading from the document

19   is not refreshing your recollection.  Looking at that, do you

20   now have an independent recollection of what Mr. Sercarz is

21   asking you?

22            THE WITNESS:  I believe so.  Can I ask a question?

23            THE COURT:  No.  Just wait for the next question.

24            MR. SERCARZ:  I'll leave it, your Honor.

25            THE COURT:  Yup.

M1LPFIS4                          Adams - Cross

1    BY MR. SERCARZ:

2    Q.  Do you recall being interviewed by agents of the Federal

3    Bureau of Investigation on November 2nd of 2020?

4    A.  No.

5    Q.  All right.  Let me put it this way.  On a subsequent

6    occasion, do you recall telling agents of the Federal Bureau of

7    Investigation that --

8              MR. ADAMS:  Objection.

9              THE COURT:  Are you reading from the document?  Is

10   that the objection?

11             MR. ADAMS:  That is the objection.

12             THE COURT:  Are you, Mr. Sercarz?

13             MR. SERCARZ:  I'm not about to read from the document.

14   I'm about to ask a general question.

15             THE COURT:  Let's hear the question, and then I'll --

16   BY MR. SERCARZ:

17   Q.  Am I correct that in a subsequent interview with the FBI,

18   you told the agents that Mr. Vernon didn't want labels on the

19   products that were shipped to him?

20   A.  I don't recall.

21   Q.  I'd ask you, if I may, to take a look at Government's

22   Exhibit 3501-0005, in particular, at the top of the second

23   page, the first line.  Read it to yourself, and then I'll ask

24   you a question.

25             (Pause)

M1LPFIS4                          Adams - Cross

1    A.  How far do you want me to read?  Sorry.

2    Q.  I'd ask you to read the sentence beginning at the bottom of

3    page 1 and going over to the top of page 2.

4    A.  Okay.

5            THE COURT:  Have you finished reading?  There's no

6    question yet.

7            THE WITNESS:  Not quite.

8            THE COURT:  Tell us when you're ready.

9            (Pause)

10           THE WITNESS:  Okay.

11   BY MR. SERCARZ:

12   Q.  Okay?  Does that refresh your recollection that on the

13   occasion of at least one other interview, you told the agents

14   that Geoffrey Vernon didn't want labels on the drugs that were

15   shipped to him?

16   A.  I'm not sure how to answer the question.

17   Q.  After reading the document, do you have a memory of what

18   you told the agents on at least one interview, other than the

19   one we spoke about earlier?

20   A.  Yes.

21   Q.  And is your memory, which has now been refreshed, that

22   Dr. Vernon -- withdrawn -- that Mr. Vernon didn't want labels

23   on the drugs that were shipped to him?

24   A.  He would occasionally ask for that.

25   Q.  When you say "occasionally," meaning there were only a few

M1LPFIS4                          Adams - Cross

1    instances in which Mr. Vernon specifically requested unlabeled

2    product; is that correct?

3    A.  Yes.

4    Q.  Do you recall telling the agents of law enforcement on a

5    third occasion that the unlabeled drugs that were purchased by

6    Vernon were stored in a freezer at Dr. Fishman's office?

7    A.  Yes.

8    Q.  Was there a reason why you told the agents on one occasion

9    that he wanted generic labels, and on another occasion, that

10   all of his unlabeled drugs were stored in a freezer?

11   A.  Can you repeat that?  Sorry, it broke up.

12           MR. SERCARZ:  May I have it read?

13           THE COURT:  Are you able to read it?  Thank you.

14           (Record read)

15   A.  Yes.

16   Q.  Why?

17   A.  Between the two interviews, I would -- was going back

18   through all of my --

19           THE COURT:  Hold on.  Could you turn that off?  Thank

20   you.

21           All right.  Go ahead, Ms. Adams.  I'm sorry.

22   A.  Between the two interviews, when I was asked to look for

23   additional documents and e-mails between Geoff Vernon and I, I

24   found a few e-mails where he did request certain products

25   without any labels.

M1LPFIS4                          Adams - Cross

```
 1   Q.  And that was -- it is your testimony now that this is only
 2   something that happened on occasion; is that correct?
 3   A.  Yes.
 4   Q.  But that there was a place set aside in the refrigerator to
 5   store those unlabeled products; am I correct?
 6   A.  There was no specific place, but they were to be stored in
 7   the fridge or freezer.
 8   Q.  Only the unlabeled products; was that correct?
 9   A.  No.
10   Q.  Were the unlabeled products different than the products
11   that were being sent to him with labels on them?
12   A.  I'm not sure I understand the question.  Can you say it
13   again?
14   Q.  May I have it reread?
15            (Record read)
16   A.  I'm not sure how to answer that.
17   Q.  Fair enough.  I'd like to go back with you to the first
18   binder that you were using on your testimony.
19   A.  Okay.
20   Q.  Now, I believe you testified on direct examination that you
21   were unaware of any instance in which Dr. Fishman examined a
22   racehorse.  Was that your testimony?
23   A.  Yes.
24   Q.  Were you aware that Dr. Fishman consulted with other
25   veterinarians in the examination and treatment of racehorses?
```

1    A.  I was not.

2    Q.  I'd like to call your attention to Government's

3    Exhibit 1904, which the government went over with you this

4    morning.

5    A.  Okay.

6    Q.  I'd like you to take a look at page 2 of this exhibit.

7              THE COURT:  Are you intending or asking that it be

8    pulled up?

9              MR. SERCARZ:  I'm sorry, your Honor?  Please, yes.

10             THE COURT:  Mr. Adams --

11             MR. SERCARZ:  Now, I ask that page 2 be pulled up.

12             THE COURT:  -- are you willing to help out?

13             MR. ADAMS:  Absolutely, every time.

14             THE COURT:  Thank you.

15             MR. SERCARZ:  Thank you.  You can stop right there.

16   BY MR. SERCARZ:

17   Q.  Are you able to see on the screen in front of you, the

18   letter from Dr. Fishman to Dr. Zanaty?

19             THE COURT:  I don't think she has the screen.  I think

20   she's looking at --

21   Q.  Can you look at your book?

22             MR. SERCARZ:  Apologies, your Honor.

23   Q.  Can you take a look at your book, at page 2 --

24   A.  Yes.

25   Q.  -- to the message from Seth to Dr. Zanaty toward the bottom

1    of the page?

2    A.  Okay.

3    Q.  Okay?  And the message reads:  "Please let me know the

4    exact tendon and the type of injury you are looking to treat.

5    Are you looking to accelerate healing of an acute injury or

6    looking to block the pain for a more chronic injury?  Or maybe

7    both?"  Do you see that?

8    A.  Yes.

9    Q.  Now, the question I just asked you is whether you were

10   aware of any instance in which Dr. Fishman was consulted in

11   connection with the examination or treatment of an animal, and

12   you've been asked on several occasions to interpret these

13   conversations.  Would you tell me whether or not this

14   conversation doesn't refer to Dr. Fishman being consulted

15   regarding the treatment of an animal?

16            MR. ADAMS:  Objection, speaks for itself.

17            THE COURT:  Sustained.  To the form of the question.

18   Q.  What do you understand this conversation to be about?

19   A.  Seth asking this Dr. Zanaty about exactly what he wants.

20   Q.  And do you have any understanding of the purpose for which

21   Dr. Fishman is asking the question?

22   A.  So he knows what to make him.

23   Q.  And would it be your understanding that Dr. Fishman wanted

24   to learn what to make Dr. Zanaty in order better to treat the

25   tendon injury that's described in the letter?

M1LPFIS4                          Adams - Cross

1    A.  Yes.

2    Q.  Now, you were aware, in the course of your responsibilities

3    as the administrative assistant to Dr. Fishman, that he

4    traveled; am I correct?

5    A.  Yes.

6    Q.  Made numerous trips abroad to the United Arab Emirates; am

7    I correct?

8    A.  Correct.

9    Q.  That he traveled to California; am I correct?

10   A.  California, I do not remember.

11   Q.  Do you recall that he traveled elsewhere within the United

12   States?

13   A.  Yes.

14   Q.  I think you also mentioned Singapore, Dubai and other

15   places; am I correct?

16   A.  Correct.

17   Q.  Did you tell the ladies and gentlemen of the jury that he

18   never consulted with other veterinarians regarding the

19   treatment of animals during any of those visits?

20   A.  Is this a yes or no or --

21           THE COURT:  Is that what you're telling the jurors?

22   A.  I am not -- I was not aware of his travel was for that

23   purpose.

24   Q.  Now, you testified that when you began working for

25   Dr. Fishman, your principal job was to help put his documents

M1LPFIS4                          Adams - Cross

1    in order; is that correct?

2    A.  Yes.

3    Q.  He really had no file system to speak of; am I right?

4    A.  Correct.

5    Q.  And I think you stated that among the documents that were

6    absent from any file system were invoices and receipts for

7    billing; am I correct?

8    A.  Correct.

9    Q.  That he had no system of client lists; am I correct?

10   A.  No -- he didn't have a system that was easy to access and

11   find things, no.

12   Q.  All right.  No system of cataloging prior orders by

13   customers for products; am I right?

14   A.  Correct.

15   Q.  Now, did that mean to you that he had no appointments?

16   A.  No.

17   Q.  Did that mean to you that he had no clients?

18   A.  No.

19   Q.  Did that mean to you that there were no clients who owed

20   him money?

21   A.  No.

22   Q.  You were also unable to get your hands on correspondence

23   between my client and customers; am I correct?

24   A.  I'm not sure how to answer that.

25   Q.  Well, were you able to find and to catalog and store

1  correspondence between Dr. Fishman and his customers?

2  A.  I was not asked to do that, that I remember.

3  Q.  And fair to say you don't know whether he had customers who

4  were corresponding with him regarding the medical care of their

5  animals or not; isn't that correct?

6  A.  I'm not sure how to answer that.  Can you be more specific?

7  Q.  You testified that you didn't see any prescriptions written

8  by Dr. Fishman; am I correct?

9  A.  That's not correct.

10  Q.  Then you did see prescriptions written by Dr. Fishman; am I

11  correct?

12  A.  Yes, I had seen a photo of a prescription.

13  Q.  Was this a photo of a prescription for the treatment of a

14  medical condition in an animal?

15  A.  I don't recall.

16  Q.  Would it be fair to say that among the items that you were

17  unable to find and catalog were prescriptions for the treatment

18  of animals?

19  A.  Possibly, yes.

20  Q.  Does this mean to you that there were no prescriptions or

21  that you were unable to find them and catalog them?

22  A.  I was unable to find them and catalog them.

23  Q.  During the course of the time you spent in Dr. Fishman's

24  home, in your office within his home, did you ever hear him in

25  conversation with other people regarding business matters?

1   A.  Yes.

2   Q.  And did you hear him talking about the condition of animals

3   during those conversations, without telling me exactly what was

4   said?

5   A.  No, I don't remember.

6   Q.  You don't recall any conversations regarding the treatment

7   of animals?

8   A.  No, I don't.

9   Q.  During the time you spent working for Dr. Fishman, did he

10  make use of the phone to conduct business?

11  A.  Yes.

12  Q.  Did he make use of the computer to conduct business?

13  A.  Yes.

14  Q.  Were you aware of all of the conversations that he had on

15  his phone?

16  A.  No.

17  Q.  Were you aware of all of the correspondence back and forth

18  on his computer?

19  A.  No.

20  Q.  Would it be fair to say you're not prepared to tell us

21  whether or not any of it related to the care and treatment of

22  animals?

23  A.  Can you repeat that?  The beginning was cut off.

24  Q.  I'll withdraw it.  I'll withdraw it.

25          During the course of your relationship with

M1LPFIS4                        Adams - Cross

1    Dr. Fishman, were you involved in trying to learn the business

2    of distributing these products to his customers?

3    A.  Yes.

4    Q.  On at least one occasion, did Dr. Fishman bring you with

5    him on a business trip to Dubai?

6    A.  Yes.

7    Q.  Were you present on that occasion at a dinner in which

8    Dr. Andrew Marty and a Dr. Ashan were present?

9    A.  I don't recall if those two were at the dinner.

10   Q.  Do you recall that, among those that were at the dinner,

11   there was discussion of medications for the treatment of

12   animals?

13   A.  I don't remember the conversations from those dinners.

14   Q.  Among the places that you went with Dr. Fishman and others,

15   did you go to breeding stables in Dubai?

16   A.  I did not.

17   Q.  Did you go to veterinary hospitals in Dubai?

18   A.  No.

19   Q.  To your knowledge, did Dr. Fishman visit those locations on

20   those trips?

21   A.  No.

22   Q.  You heard questions asked on the subject of testability,

23   and you said that it was one of the most important things to

24   Dr. Fishman, to make sure that his products were untestable; is

25   that correct?

1    A.  Correct.

2    Q.  All right.  I'd like to call your attention to the exhibit

3    tab, the Government's Exhibit 401, I think it's II.  It's hard

4    for me to read that.  Can we have it brought up on the

5    computer?  Thank you.

6            And I believe you were asked about what you understood

7    this conversation to be about.  Do you recall that?

8    A.  Yes.

9    Q.  Now, in the first paragraph, "Geoff indicates he wants to

10   know whether EGH is testable," correct?

11   A.  Correct.

12   Q.  And by the way, the best of your understanding, Geoff was

13   Geoffrey Vernon; am I correct?

14   A.  Correct.

15   Q.  And incidentally, just by way of reminder, Geoffrey Vernon

16   was involved with the United States equestrian team; am I

17   correct?

18   A.  Correct.

19   Q.  All right.  Mr. Fishman's response -- I'd like to go

20   through it sentence by sentence, if you don't mind.  First

21   sentence is "Listen Geoff needs to talk to me."  Do you see

22   that?

23   A.  Yes.

24   Q.  Fair to say that he is telling you that he can't just send

25   a message through you as to whether or not this product is

M1LPFIS4                        Adams - Cross

1    testable; that he needs to speak to Dr. Fishman directly?

2    A.  Exactly.

3    Q.  All right.  The next sentence says "things are not black

4    and white;" do you see that clause?

5    A.  Yes.

6    Q.  What did you understand that to mean?

7    A.  It's not as simple.

8    Q.  All right.  The next part of that sentence says "and

9    itself, no;" did you understand that to mean that while the EGH

10   may not be testable, the whole subject of testability with

11   regard to this product was not black and white?

12   A.  Yes.

13   Q.  The next sentence says "but too much can raise

14   testosterone;" do you see that?

15   A.  Yes.

16   Q.  And it follows with a sentence that says "Also, he should

17   be using the modified MGF more than EGH;" do you see that?

18   A.  Yes.

19   Q.  Did those two last sentences mean to you that giving the

20   animal EGH may prompt inadvertent positive results to a test

21   for testosterone?

22   A.  Yes, that's how I would interpret that.

23   Q.  And does the last sentence mean that he wants to give Geoff

24   the additional advice of using modified MGF more than EGH?

25   A.  Yes.

M1LPFIS4                          Adams - Cross

1   Q.  Would it be fair to say that this conversation, at least in

2   part, demonstrated that Dr. Fishman wanted to avoid an

3   inadvertent positive test result?

4   A.  Yes.

5   Q.  Now, I'd like to ask you some questions about your work in

6   labeling products.  Can we go the to Government's Exhibit 1910?

7   GX1910 in the binder.  And if we may, can we have it brought up

8   on the screen?

9           Do you have it in front of you?

10  A.  Yes.

11  Q.  Now, first of all, if you could go to the last page of this

12  exhibit?

13  A.  Okay.

14  Q.  Am I correct that Dr. Fishman makes a point of telling the

15  customer for this product to administer it slowly, with

16  emphasis on the word "slowly"?

17  A.  Correct.

18  Q.  Am I also correct that all of the e-mails in this string

19  refer to a pain shot; am I correct?

20  A.  Let me see for one moment.

21          (Pause)

22          Yes, with the exception that another label is

23  partially in with the photos that's not referred to.

24  Q.  Now, I believe you testified this morning in connection

25  with the labels for the pain shot, that Dr. Fishman actually

M1LPFIS4                         Adams - Cross

1   wanted the label to be made bigger; do you recall that?

2   A.  I don't recall me saying it to be bigger.  To be edited.

3   Q.  To be edited how?

4   A.  By the colors in the label.

5   Q.  To be clear, you were involved in labeling over a long

6   period of time during the course of your employment with

7   Dr. Fishman; am I correct?

8   A.  Correct.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. SERCARZ:

2   Q.  During the course of your relationship with Dr. Fishman,

3   did he ever take a label from an FDA approved product and put

4   it in front of you and say here's what I want my label to look

5   like?

6   A.  I don't recall.

7   Q.  Did he ever say to you with regard to an FDA label, make it

8   look like this so that it will pass muster with the FDA?

9   A.  Not that I remember, no.

10  Q.  In fact, he never asked you to include the name of a

11  prescribing physician on a label, isn't that correct?

12  A.  Not that I remember, no.

13  Q.  He never asked you to include all of the active ingredients

14  on a label, am I correct?

15  A.  No.

16  Q.  "No," meaning I'm wrong or "no," meaning I'm correct?

17  A.  "No," meaning you're wrong.

18  Q.  All right.  He asked you to include ingredients on

19  occasion, am I correct?

20  A.  Correct.

21  Q.  But did he ever ask you include all of the active

22  pharmaceutical ingredients or API on a label?

23  A.  I don't recall.

24  Q.  He certainly didn't ask you to make it your practice in

25  every case to include all of the active pharmaceutical

1   ingredients, am I correct?

2   A.  Correct.

3   Q.  He never asked you to indicate on the label that the drugs

4   were FDA approved, did he?

5   A.  No.

6   Q.  And yet, at least in connection with these pain shot

7   medications, the discussion was about changing the color of the

8   medication -- of the label, am I correct?

9   A.  Yes.

10  Q.  About making it bigger or smaller, am I correct?

11  A.  Possibly, they refer -- I'm not sure, I would have to read

12  it.

13  Q.  About changing the size of the horse on the Equestology

14  label?

15  A.  Yes.

16  Q.  Am I correct that very often the content of the label was

17  dictated by the customer rather than by Dr. Fishman?

18  A.  No.

19  Q.  Wouldn't the customers weigh in on what they wanted on a

20  particular label?

21  A.  Not to my knowledge.

22  Q.  Didn't you just tell us within the last half hour that

23  Geoffrey Vernon wanted generic labels with the ingredients on

24  them?

25  A.  I did, but I was not, again, just with the customers.

1   Q.  Did Geoff order product from Dr. Fishman?

2   A.  He did, yes.

3   Q.  Did he have any input into what the label would look like?

4   A.  Yes, he did.

5           THE COURT:  Are you finished, Mr. Sercarz?

6           MR. SERCARZ:  No, your Honor, forgive me.

7   Q.  You spoke on direct examination about ensuring that someone

8   who worked in the position of administrative assistant would be

9   trustworthy.  Do you recall that testimony?

10  A.  Yes, I do.

11  Q.  And you stated that by "trustworthy," you mean that they

12  wouldn't talk about Dr. Fishman's work, is that correct?

13  A.  Correct.

14  Q.  Can you take a look at Government Exhibit 401AA in the

15  binder.

16          MR. SERCARZ:  And I would ask that it be brought up on

17  the screen.

18  A.  Okay.

19  Q.  In describing an individual here, were you talking about

20  someone that you hoped would be able to succeed you as an

21  administrative assistant?

22  A.  Yes.

23  Q.  This was an interview candidate for the job, is that the

24  idea?

25  A.  Yes.

M1LTFIS5                          Adams - Cross

1    Q.  Your description of this individual -- and I'm looking at

2    the first paragraph -- is the guy was pretty cool.  Definitely

3    more of what I pictured as an office manager.

4                Do you see that?

5    A.  Yes.

6    Q.  And continuing:  Very calm and organized.  Correct?

7    A.  Yes.

8    Q.  He is also into working out, so might have a lot in common,

9    and is interested in doing personal assistant stuff for you,

10   too.  Do you see that?

11   A.  Yes.

12   Q.  The words, "you, too," indicate that this was an additional

13   part of what he might be looking for in the way of a job, is

14   that correct?

15   A.  Yes.

16   Q.  What was the primary responsibility for which he was being

17   interviewed?

18   A.  To be office manager of Equestology.

19   Q.  And it was in that context that you wrote the next

20   sentence, which is:  But can he be trusted, and why he looking

21   for this job after last employment?

22                Do you see that?

23   A.  Yes, but Seth sent that, not me.

24   Q.  All right.  And it was in this context that the word

25   "trusted" first appears, am I correct?

1    A.  Yes.

2    Q.  And this is the same thing that Seth is talking about at

3    the bottom of the page when he says he seemed trustworthy, is

4    that correct?

5    A.  Yes.

6    Q.  And by the way, is that you or Mr. Fishman who says he

7    seemed trustworthy?

8    A.  That's Seth saying that.

9    Q.  All right.  Had Seth met him at that point?

10    A.  No.

11    Q.  And yet Seth was willing to offer an opinion based on your

12    description that he seemed trustworthy, isn't that correct?

13    A.  No.

14    Q.  Now you testified about the fact that Seth was very jealous

15    of keeping secret his proprietary blends, am I correct, his

16    custom products, am I right?

17    A.  I don't believe I used the word "jealous."

18    Q.  My word.  And what is the word you would use?

19    A.  He kept all of his proprietary blends close.

20    Q.  Among other things, he didn't want one customer to know

21    what another customer was receiving in the way of a custom

22    product, am I correct?

23    A.  Correct.

24    Q.  And he was afraid that product he sold to one customer

25    might fall into the hands of another customer, correct?

1  A.  Not to my knowledge.

2  Q.  Well, wasn't he concerned that somehow or another people

3  could duplicate the custom products that he was making and he

4  would lose his engine for profit?

5          MR. ADAMS:  Objection.

6          THE COURT:  Foundation?

7          MR. ADAMS:  Speculation, your Honor.

8          THE COURT:  Sustained.

9  Q.  Do you know whether Seth was concerned about making money

10  from his business of selling his custom products?

11          MR. ADAMS:  Objection.  Speculation, calls for

12  hearsay.

13          THE COURT:  Now it just asks whether she knows.  Yes

14  or no.

15  A.  Can you repeat the question, please.

16          MR. SERCARZ:  May I have it reread?

17          (Record read)

18  A.  I'm not sure how to answer that question.

19  Q.  Let me try and ask a different question.  Didn't Seth seem

20  obsessed to you with making money from the sale of his

21  products?

22  A.  No.

23  Q.  Wasn't he concerned, almost to the exclusion of anything

24  else, with making money from the sale of his custom products?

25  A.  No.

1   Q.  That wasn't the biggest thing for him?

2   A.  Are you referring to money?  Sorry, I don't understand.

3   Q.  Did money appear to you to be very important to Seth?

4   A.  Yes, it was important.

5   Q.  And was his vehicle for making money the sale of these

6   custom products?

7   A.  Yes.

8   Q.  Did he let you know that it was important to him that when

9   he customized a product, only the customer who was receiving it

10  would find out what the ingredients were?

11  A.  I'm not sure.

12  Q.  Let me ask you this:  The government ended its direct

13  examination by playing you a portion of a conversation between

14  Adel and Dr. Fishman.  Do you recall that?

15  A.  Yes.  I could not hear all the details of it, but yes.

16  Q.  Could you hear the portion that was played for you?

17  A.  I could not hear all of the audio recording, no.

18  Q.  Did you hear enough to know that it had to do with

19  conversation concerning a non-disclosure agreement?

20  A.  Yes.

21  Q.  And that specifically the non-disclosure agreement is one

22  that, according to Dr. Fishman, is one that he entered into

23  with you, am I correct?

24  A.  You're correct in assuming that, yes.

25  Q.  All right.  But in fact, you told the ladies and gentlemen

M1LTFIS5

1  of the jury during your direct examination that he never had a

2  non-disclosure agreement with you, am I right?

3  A.  Correct.

4  Q.  In other words, whatever was on that conversation referred

5  to a document that never existed, isn't that correct?

6  A.  Yes.

7           MR. SERCARZ:  I have no further questions, thank you.

8           THE COURT:  All right.  Thank you.

9           Why don't we take a break now, ladies and gentlemen.

10  You can leave your notepads here and I would ask you to please

11  be back and be ready to come back and finish up the day and the

12  week when Ms. Dempsey lets you know we're ready.

13           Thank you very much.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

M1LTFIS5

1          (Jury not present)

2          THE COURT:  Is there anything that we need to talk

3     about?

4          MR. FASULO:  Yes, your Honor.

5          THE COURT:  All right.

6          MR. FASULO:  The defense on behalf of Ms. Giannelli is

7     very concerned about the witness's last statement being that

8     she couldn't --

9          THE COURT:  Do you want to -- Ms. Adams, do you want

10    to log off and Mr. Adams will let you know when we're ready to

11    have you log back on?

12         THE WITNESS:  Okay.

13         THE COURT:  Thank you.

14         (Pause)

15         THE COURT:  Go ahead.

16         MR. FASULO:  I'm sorry, the integrity of the process,

17    meaning we have a remote witness, I think it's important that

18    that portion of the tape that was played that the witness now

19    says that she didn't hear, that the witness hears it.  The idea

20    here is that the witness would be in court and able to hear

21    everything going on, and I believe that she, for the integrity

22    of what we're doing and having the witness present, I think we

23    need to make sure the witness hears what she has now indicated

24    she couldn't hear.

25         THE COURT:  Go ahead, Mr. Adams.

M1LTFIS5

1          MR. ADAMS:  Your Honor, the list of exhibits --

2    Ms. Adams wasn't asked any questions about that on direct.

3    Mr. Sercarz has asked her questions about her understanding of

4    its substance.

5          THE COURT:  The topic.

6          MR. ADAMS:  The topic, correct.  And, of course, this

7    witness was not a party to that conversation.  It's not clear

8    to me that Mr. Fasulo has specific questions about the content

9    of the recording itself.  If he did, that may be one thing.

10          THE COURT:  Look, my recommendation is:  Do you have

11    any objection to us trying to -- are we going to be able to get

12    to her a copy of the transcription?

13          MR. ADAMS:  The transcription should be easy, the

14    audio --

15          THE COURT:  No, let's take the transcription.  Can we

16    get that to her?

17          MR. ADAMS:  We can put it on the screen, too.

18          THE COURT:  She can see it?

19          MR. ADAMS:  Certainly.

20          THE COURT:  It was on the screen?

21          MR. ADAMS:  It was on the screen, she was on the

22    screen, it was displayed to the jury and the witness.

23          THE COURT:  But I didn't know if she could see

24    documents when you're calling them up or she only sees the

25    physical copies of what she has.

M1LTFIS5

1          MR. ADAMS:  She should be able to see that document as

2     well.

3          MR. FASULO:  I don't remember her seeing --

4          THE COURT:  I don't think she can either.  Let them

5     figure it out.

6          My suggestion was going to be, just so you know, since

7     Mr. Fasulo has an objection, replay it with her having the

8     transcription in front of her, if he wants her to have the

9     substance of it.

10         MR. ADAMS:  Certainly, your Honor.

11         THE COURT:  Is that acceptable, Mr. Fasulo?

12         MR. FASULO:  Judge, let me be clear, I don't plan on

13    questioning the witness in this area.  However, I think for the

14    integrity of the process, we make sure the witness hears what

15    was going in the courtroom while she was on the witness stand.

16         THE COURT:  I agree.  Let's replay, it Mr. Adams.

17         MR. ADAMS:  Certainly, your Honor.  Mr. Fasulo is not

18    questioning about this and Mr. Sercarz rested his

19    cross-examination.

20         THE COURT:  It's repetitive.

21         MR. ADAMS:  Unnecessary, yes.  But I can replay it

22    notwithstanding.  It's not clear to me that the audio is going

23    to flow through to her as opposed to me providing a copy of

24    that exhibit.

25         THE COURT:  I would like you to do both.

M1LTFIS5

1          MR. ADAMS:  Certainly.

2          THE COURT:  Turn up the volume and put a microphone

3     next to the speaker so, just as she's hearing me speak or

4     hearing anybody else in the courtroom speak, she would hear the

5     recording.  Right?

6          MR. SERCARZ:  May I be heard?

7          THE COURT:  Yeah.

8          MR. SERCARZ:  It's not lost on the Court that this is

9     a very delicate area, sensitive issue of examination.  If

10    Mr. Fasulo is not going to question on this subject, then

11    there's no reason to assume that the integrity of the process

12    was jeopardized in any way, number one.

13          Number two, if any party needs to question the witness

14    regarding this document, is there any reason why it can't be

15    played for her outside the hearing of the jury so that she can

16    be asked whatever questions without the need to expose the jury

17    yet again to the content of this tape?

18          THE COURT:  Do you want to talk to Mr. Fasulo?

19          MR. SERCARZ:  Yes.

20          THE COURT:  Why don't you do that and we'll all go

21    back on the record before the jury returns.

22          MR. SERCARZ:  May I use the restroom?  Perhaps he can

23    meet me out in the hallway.

24          THE COURT:  You can meet wherever you want.  We'll

25    take a short break.

M1LTFIS5

1                MR. SERCARZ:  Thank you, your Honor.

2                (Recess taken)

3                THE COURT:  All right.  Have we worked out a game

4     plan?

5                MR. FASULO:  Yes, Judge.  I will move ahead with my

6     examination at this time.  I withdraw my application.

7                THE COURT:  You withdraw that objection?

8                MR. FASULO:  I have no questions in that area.

9                THE COURT:  You are withdrawing your objection?

10               MR. FASULO:  I am, your Honor.

11               THE COURT:  Go ahead.

12               MR. ADAMS:  Your Honor, I put on the record, in light

13    of the prior conversation, that Ms. Adams plainly heard and

14    responded to every question that has been put to her throughout

15    the proceeding.

16               THE COURT:  I think that's accurate.  She never

17    expressed that she couldn't hear, she simply is said, in

18    response to Mr. Sercarz directing her to recall the recording

19    earlier, she made some comment that she couldn't understand

20    every bit of it.  But the substance of Mr. Sercarz's questions

21    were asking her about whether it was about an ND agreement, and

22    she clearly was able to answer that question.

23               MR. FASULO:  Judge, just for the record, I agree.  I

24    have been in the courtroom the whole time.  Everything

25    indicates to me she heard the questions and she was giving

M1LTFIS5

1  appropriate responses to the questions.  So I don't want the

2  record to be clouded on that issue about that.  I was a little

3  concerned about this, but it was not part of any question she

4  was asked and I'm willing to move ahead.

5         THE COURT:  So when the jury comes back, Mr. Fasulo,

6  you are ready for your cross, or your colleague?

7         MR. FASULO:  I'm pointing to the witness stand.

8         THE COURT:  I thought you were pointing to your

9  colleague.

10         MR. FASULO:  I wish he could.

11         THE COURT:  He's not an attorney?

12         MR. FASULO:  He's almost an attorney.

13         THE COURT:  Okay, I'm sorry.  In any event, do you

14  have any estimate of how long you will be?

15         MR. FASULO:  I hopeful less than a half hour, Judge.

16         THE COURT:  So my hope is that we'll finish up with

17  Ms. Adams today.

18         MR. FASULO:  For sure, depending on the government.

19         MR. ADAMS:  Absolutely, your Honor.

20         THE COURT:  Thank you.  So as soon as the jury is

21  back, we'll be ready to go.

22         Did you have something else?

23         MR. ADAMS:  Not only do we hope to finish up with

24  Ms. Adams today, we hope we can call Angela Jett, who is the

25  next witness.  And if the Court is amenable to going to 5:00

M1LTFIS5

1    today, I think we would probably finish Ms. Jett as well.

2              THE COURT:  I have to gauge the jurors, though,

3    because it is a Friday afternoon and I promised them we would

4    aim for around 4:30.  If I tell them --

5              You might be able to finish the witness, will everyone

6    else?

7              MR. ADAMS:  I can't speak to that.

8              THE COURT:  Right.

9              MR. ADAMS:  I can say -- I'm sorry to interrupt, your

10   Honor.

11             THE COURT:  No, go ahead.

12             MR. ADAMS:  I was going to say Ms. Jett's testimony is

13   relatively limited.  Essentially what I intend to do is elicit

14   a past recollection recorded, have her read a portion of the

15   prior notes, and that's it.

16             THE COURT:  And you disclosed to the defendants that

17   that's the next witness?

18             MR. ADAMS:  Yes.

19             THE COURT:  Okay.  I thought we were going to some

20   issue about displaying physical evidence.

21             MR. ADAMS:  If we had two more hours I would do that.

22             THE COURT:  But that's for next week.

23             MR. ADAMS:  That's for next week.

24             THE COURT:  Thank you.  As soon as the jury is ready,

25   we'll resume then, and if we can press ahead, we will, but

1    we'll see where we're at.

2             MR. ADAMS:  Thank you.

3             (Jury present)

4             THE COURT:  Thank you all very much.

5             We're ready for cross-examination by Ms. Giannelli's

6    lawyer, Mr. Fasulo.

7             MR. ADAMS:  Your Honor, I think I need to actually

8    call Ms. Adams, if I could take one moment.

9             THE COURT:  Yes, sure.

10            (Pause)

11            THE COURT:  Thank you, Mr. Adams.

12            Good afternoon, Ms. Adams.  Can you hear us clearly?

13            THE WITNESS:  Yes, I can, your Honor.

14            THE COURT:  Thank you.

15            Mr. Fasulo.

16            MR. FASULO:  Your Honor, if I may.

17            THE COURT:  Sure.

18   CROSS-EXAMINATION

19   BY MR. FASULO:

20   Q.  Good afternoon, Ms. Adams.

21   A.  Hello.

22   Q.  I have a few questions for you.  I represent Ms. Giannelli,

23   Lisa Ranger, and I have a few questions for you.

24   A.  Okay.

25   Q.  First of all, you worked for Equestology for approximately

1    five years, is that fair to say?

2    A.  Yes.

3    Q.  And you talked about, during both your examination up to

4    this point, that you were started in a more administrative role

5    and went into sales a little bit, then you left the company,

6    correct?

7    A.  Correct.

8    Q.  And when you went into your sales role, and you said that

9    you had a gentleman, John -- I think P-U-R-D-Y-K work under

10   you, is that correct?

11   A.  His name is John Pundyk, yes.

12   Q.  And he was working with you, correct?

13   A.  You could say that, yes.

14   Q.  And he would go out to the barns or to the trainers, et

15   cetera, and work the field, and you didn't like that part of

16   the job, is that what you're saying?

17   A.  Yes.

18   Q.  And when he went out to the field, he would have a list of

19   products that were products of Equestology, correct?

20   A.  No, I didn't provide him with a list.

21   Q.  Did you have a list of the products that Equestology had in

22   stock at the time that you were in the sales end of the

23   business?

24   A.  No, I did not have the list.

25   Q.  But you did keep inventory of all the products that existed

M1LTFIS5                          Adams - Cross

1    in Equestology at that time, correct?

2    A.  Yes.

3    Q.  So you were aware of what the inventory was and what the

4    products were, is that fair to say?

5    A.  Yes.

6    Q.  And I would like to ask you that --

7           MR. FASULO:  I ask the government if we can have

8    Government Exhibit --

9    Q.  I want to go through some of the government exhibits with

10   you.  Government Exhibit 401T in your file, please.

11          If you could let me know when you have that exhibit.

12   A.  Okay.

13   Q.  On direct examination you had a chance to talk about this

14   exhibit.  Do you remember that?

15   A.  Yes.

16   Q.  And in this exhibit it indicates that Lisa, which you

17   identified as Lisa Ranger, had said that she does not have the

18   vet's license, correct?

19   A.  Correct.

20   Q.  And by that, you meant that she didn't have a copy of

21   Dr. Fishman's license, correct?

22   A.  Yes.

23   Q.  And she was asking for a copy of that license, correct?

24   A.  I don't believe that's what she was asking.

25   Q.  So she wasn't asking for a copy of the license?

1    A.  No, this was me writing this message.

2    Q.  Okay.  So she was just indicating to you that she did not

3    have a copy on file in her place in Delaware, correct?

4    A.  Yes.

5    Q.  Now you ordered many products from different vendors, is

6    that fair to say?

7    A.  Yes.

8    Q.  And those vendors included vendors for raw materials as

9    well as vendors with materials that have already been composed,

10   correct?

11   A.  Correct.

12   Q.  And you did that only because you had the authority of

13   Dr. Fishman to do such orders, isn't that correct?

14   A.  Yes.

15   Q.  And it was under his license that allowed you as an

16   administrator to make those orders, is that fair to say?

17   A.  Yes.

18   Q.  And had you not been working for Dr. Fishman, these vendors

19   would not have just sold you these products that were

20   drug-related products that needed a veterinarian, correct?

21   A.  Correct.

22   Q.  And as far as you knew, that's how Lisa would get her

23   products as well, if you know?

24   A.  Some of them, yes.

25   Q.  Some of them would be sent from you in Florida up to

1  Delaware and other products would be sent directly from vendors

2  to Delaware, is that fair to say?

3  A.  Yes.

4  Q.  Additionally, some product would go directly to an

5  individual client or customer, is that fair to say?

6  A.  Yes.

7  Q.  Now during the time that you worked for the doctor both in

8  an administrative capacity and in your sales role, you had a

9  number of interactions with the doctor in terms of text

10  messages and emails on a daily basis, is that fair to say?

11  A.  Yes.

12  Q.  Would it be fair to say that Dr. Fishman was very much

13  involved in the running of his practice?

14  A.  Yes.

15  Q.  He was involved in the time that you got to work, he was

16  involved in when you left, he was involved in whether you

17  should take a vacation day, he was involved in the daily

18  responsibilities that he expected you to do, correct?

19  A.  Yes, outside of maybe the vacation day part.

20  Q.  Well, you did text him about taking a day off and him

21  arguing with you about not taking a day off and that you had

22  just been off for a couple of weeks, and you explained to him

23  that you needed the time off for whatever reason, right?  You

24  had those kinds of text messages back and forth, do you

25  remember that?

1   A.  I don't remember that.

2   Q.  In any event, he was very involved and he was involved in

3   all the parts of the practice, is that fair to say?

4   A.  Yes.

5   Q.  And before you sent anything to Ms. Ranger in Delaware,

6   before you sent anything out, you would check with the doctor,

7   especially on the products that he made himself in Florida, is

8   that fair to say?

9   A.  Yes.

10  Q.  And in Florida, that was the location that not only the

11  products were sent from, that's where the pastes or the

12  products or the compounds were actually manufactured, is that

13  fair to say?

14  A.  The pastes were made there, yes.

15  Q.  And you actually participated in helping to put together

16  the paste, is that fair to say?

17  A.  Yes.

18  Q.  And that happened in Florida and that did not happen in

19  Delaware, is that correct, to your knowledge, during the time

20  that you worked there?

21  A.  Correct.

22  Q.  And in fact, when you talked about labels, it was also that

23  you, under the direction of Dr. Fishman, started to design

24  labels for his products, is that fair to say?

25  A.  Yes.

1    Q.  And it was with the direction of Dr. Fishman that you were

2    able to figure out what had to go on these labels, right?

3    A.  Yes.

4    Q.  You didn't all the sudden decide this should be a label

5    that says X if Dr. Fishman didn't agree with that, correct?

6    A.  Could you rephrase that?

7    Q.  You didn't decide what the ingredients were on an

8    individual product and decide to put those on the labels

9    without talking to Dr. Fishman and ascertaining those were the

10   ingredients in the products, correct?

11   A.  Correct.

12   Q.  That was him, that was not you who made those decisions,

13   correct?

14   A.  Yes.

15   Q.  And you were involved in the artistic and the creative

16   presentation of those products, would that be fair to say?

17   A.  Yes.

18   Q.  And the ultimate person who was involved in labeling the

19   products, putting the ingredients on the labels of those

20   products, was Dr. Fishman?

21   A.  Maybe rephrase that.

22   Q.  Sure.  Let me ask you, who had input into putting the

23   ingredient list on the product?

24   A.  Dr. Fishman.

25   Q.  And other than Dr. Fishman, you did not have input on that,

1    correct?

2    A.  Correct.

3    Q.  Nor did anyone else, to your knowledge?

4    A.  To my knowledge, no.

5    Q.  And in terms of the names of the product, although

6    Dr. Fishman may ask you about those names -- which he did,

7    correct?

8    A.  Yes.

9    Q.  It was up to him to decide how to name those products, not

10   you nor anyone else at Equestology, is that correct?

11   A.  Yes.

12   Q.  And that was your experience in working with Dr. Fishman

13   during your five years, correct?

14   A.  With regards to labeling, yes.

15   Q.  With regard to labeling and with regards to actually making

16   the pastes, correct?

17   A.  Can you rephrase that?

18   Q.  You were directed what to do, what ingredients went into

19   what paste, correct?

20   A.  Correct.

21   Q.  In fact, as was stated earlier, you don't have any advanced

22   degrees in pharmacology or in biology that would have given you

23   an understanding of what those ingredients were, correct?

24   A.  Correct.

25   Q.  And you took the ingredients that Dr. Fishman told you to

M1LTFIS5                        Adams - Cross

1   take and you mixed them in the way that he told you to mix them

2   and you made the compounds, correct?

3   A.   Yes.

4   Q.   And then you put them into jars and you would either label

5   them or not label them, correct, depending on what the product

6   was?

7   A.   They were put into tubes, not jars, but, yeah.

8   Q.   And these were glass tubes?

9   A.   No.

10  Q.   What kind of tubes were they?

11  A.   Plastic -- purchases --

12  Q.   Could repeat that again?  I lost a little bit of that.

13           THE COURT:  Ms. Adams, I think you froze.  Could we

14  ask the court reporter to read back the question?

15           (Record read)

16  A.   The tubes were plastic tubes that were specifically made

17  for paste.

18  Q.   And each tube had a different color cap you were talking

19  about before, is that right?

20  A.   No.

21  Q.   How would that work?  How would they be capped and how

22  would they be identified before they would be stored?

23  A.   In reference to the paste that was made in Florida, those

24  were all put into a certain sized tube that was white with a

25  white cap and then it was labeled as soon as they were all

SOUTHERN DISTRICT REPORTERS, P.C.

M1LTFIS5                          Adams - Cross

1    filled and packaged and then they would be stored.

2    Q.  Now after they were labeled, some of them required storage

3    in refrigeration and some didn't require refrigeration, is that

4    fair to say?

5    A.  Yes.

6    Q.  And you were made aware of which ones had to go where by

7    Dr. Fishman?

8    A.  Yes.

9    Q.  Now let me bring your attention to the next exhibit I would

10   like to talk about, which is 401W.  If you could get into your

11   book and open that up and we can show that on the screen.

12   A.  Okay.

13   Q.  This was a text message or an email?

14   A.  A text.

15   Q.  And it was a text message from you to Dr. Fishman or from

16   Dr. Fishman to you?

17   A.  From me to Dr. Fishman.

18   Q.  And in this text message, it does say that the Doc needs to

19   send one of his blood builders to Paul Minastrelli.  Please

20   remind him.

21        And you said you cut and pasted that message, is that

22   correct?

23   A.  Yes.  The "from Lisa" part I wrote and the rest is copy and

24   paste.

25   Q.  And so from this message, was it your understanding that

M1LTFIS5                          Adams - Cross

1    the doctor already knew that Lisa needed these blood builders?

2    A.  Yes.

3    Q.  And was it your understanding that the doctor already knew

4    that Lisa was going to distribute these blood builders to a

5    Paul Minastrelli?

6    A.  Yes.

7    Q.  I would like to move you now to Government Exhibit

8    Number 401FF.

9            Now you worked at Equestology five years, right?

10   A.  A little bit more than that, yes.

11   Q.  And as you worked there, you were comfortable with your job

12   in terms of understanding what you were to do and you felt like

13   what you were doing was right, is that fair to say?

14   A.  Yes.

15   Q.  Did you ever believe you were breaking the law in the

16   things you were doing in labeling products or selling Fishman

17   products?

18   A.  I did not believe that I was breaking the law.

19   Q.  Did you understand that Dr. -- did you know that

20   Dr. Fishman has a veterinarian's license in more than one

21   state?

22   A.  Yes.

23   Q.  And were you aware what states he actually had his license

24   in?

25   A.  At the time, yes.

1    Q.  And at this time you don't remember?

2    A.  Not all of them, no.

3    Q.  But you were aware that he was licensed in multiple states,

4    is that fair to say?

5    A.  Yes, it is.

6    Q.  Did it also seem to you -- was it your understanding that

7    he had a working knowledge of the products that he was

8    producing?

9    A.  Yes.

10   Q.  And a working knowledge of the goals and the gains of those

11   products?

12   A.  Yes.

13   Q.  And would it be your understanding that he was pretty

14   confident in the products he was developing and their

15   likelihood of success?  Was that your understanding?

16   A.  Yes.

17   Q.  And that was one of the reasons why you remained and worked

18   with him for five years, right?

19   A.  I'm not sure how to answer that.

20   Q.  Well, you were around horses during this time not only with

21   Dr. Fishman and the practice, but you had friends that played

22   polo and you were a pretty much a horse lover, right, you liked

23   horses?

24   A.  Yes.

25   Q.  And you wouldn't be working someplace where you thought

1    there was danger presented to the well-being of horses, were

2    you?

3    A.   Correct.

4    Q.   So you never believed it was -- in your understanding, that

5    anything that you were doing or that Equestology was doing was

6    to the detriment of any horses?

7              MR. ADAMS:   Objection, relevance.

8              THE COURT:   Mr. Fasulo?

9              MR. FASULO:   Judge, it goes to her understanding of

10   what she was doing and what was happening within the practice

11   itself.

12             THE COURT:   She's not a defendant here.

13             MR. FASULO:   No, but I think it's important because

14   the government proffered through her testimony there were other

15   words or other activities in Equestology that would give her a

16   different impression, and I think it's relevant for me to

17   inquire about what her impression of the work that she was

18   doing was.

19             THE COURT:   The objection is sustained.

20             MR. FASULO:   Very well.

21   BY MR. FASULO:

22   Q.   So during the time that you worked with Dr. Fishman, if you

23   could look at this exhibit, did you -- do you remember reading

24   this exhibit earlier?  Could you quickly glance over it?

25             In the first line it says John is with Geoff in

1   Canada.  Was that the John that was working with you?

2   A.  Yes.

3   Q.  And this happened in 2016, correct?

4   A.  Correct.

5   Q.  And it was your understanding that John indicated that

6   there was an order but the order was too big to cross the

7   border.  Is that what your understanding here was?

8   A.  I'm not sure.

9   Q.  What was your understanding of this email?

10  A.  That it was -- well, this text, that it was either too big

11  or it didn't get there in time, I'm not -- besides that, it's a

12  guess.

13  Q.  So it wasn't your understanding that anything was wrong

14  that was happening in terms of the transferring of this item

15  into Canada, is that your understanding?

16  A.  Can you repeat that?  Sorry.

17  Q.  Did you believe there was anything illegal or anything

18  wrong with the way that the shipment was being transferred into

19  Canada based on this email?

20  A.  According to this text, no.

21  Q.  Okay.  I would like to go to Exhibit Number 402H.

22          MR. FASULO:  If we could have that exhibit up and

23  bring us to the green section of that exhibit, I think it is.

24  A.  What was the exhibit number?

25  Q.  402H.

M1LTFIS5                          Adams - Cross

1    A.  Okay.

2    Q.  You see in the number 334 on the left, if you look all the

3    way over you will see the text of that message.

4    A.  Yes.

5    Q.  Now this was a message from Dr. Fishman to you, correct?

6    A.  Yes.

7    Q.  And Lisa Ranger, Lisa Giannelli, was not on this message,

8    correct?

9    A.  No.

10   Q.  And this is where Dr. Fishman says to you that Lisa made

11   over $250,000 last year, correct?

12   A.  Correct.

13   Q.  Now you don't know if that was true or not true, correct?

14   A.  Correct.

15   Q.  Because you didn't have any idea of what Lisa was making or

16   not making, isn't that fair to say?

17   A.  Yes.

18   Q.  And in fact, the Delaware books were kept separate from the

19   Florida books, would that be fair to say?

20   A.  I don't know.

21   Q.  You weren't keeping track of the Delaware income or the

22   Delaware expenses, correct?

23   A.  No.  Sorry, correct, no, I don't know.

24   Q.  During the time you were working, were you keeping track of

25   any of the income or expenses on the Delaware sales from Lisa

1     Ranger?

2     A.  No.

3     Q.  And you were talking about systems that you used.  You did

4     not use the Avimark system, is that correct?

5     A.  I don't believe so, no.

6     Q.  So you weren't familiar with that system, correct?

7     A.  No.

8     Q.  I now move to Government Exhibit 1900, GX1900, and I would

9     like to draw are your attention to the photographs that are

10    listed as attachments on the first page and on the second page.

11           I don't know if we could get those a little bigger.

12    A.  Okay.

13    Q.  The labels put on these products in Government

14    Exhibit 1900, were these labels that you designed for the

15    doctor?

16    A.  Yes, they are.

17    Q.  And when you say you designed them, you put on the product

18    name, correct?

19    A.  Yes.

20    Q.  And in these, do you know if these labels had the

21    ingredients on them?

22    A.  I don't recall.

23    Q.  And when you were -- when it was decided to put the

24    ingredients on, were there any conversations that took place

25    between you and Dr. Fishman regarding putting on the

1    ingredients or not putting on the ingredients on these

2    products?

3    A.  Yes, certain products, yes, you talk about.

4    Q.  And was it your understanding that some products he wanted

5    the ingredients on and some he didn't want the ingredients on?

6    A.  Yes.

7    Q.  And sometimes that would be based on his own -- solely on

8    his own opinion and sometimes it was based on what the

9    customers requested, correct?

10   A.  I'm not sure.

11   Q.  Okay.  And in fact, you had no training in whether or not

12   these products needed to have ingredients on them or not on

13   them, correct?

14   A.  Correct.

15   Q.  And you didn't even know whether or not there was a

16   requirement to put the ingredients on these products, correct?

17   A.  Correct.

18   Q.  Now go to Government Exhibit 1901.  If you look at the

19   beginning of this exhibit, it says Wednesday, September 21,

20   2016 at about 1:56 you sent a message to Mary Fox, is that

21   right?

22   A.  Yes.

23   Q.  And you said you needed an order to go out, correct?

24   A.  Yes.

25   Q.  In 2016, you were a part of the sales -- sales helper or

M1LTFIS5                          Adams - Cross

1   sales administrator for Dr. Fishman, correct?

2   A.  Yes.

3   Q.  And you were selling these products in this email, correct?

4   A.  Can you rephrase that?

5   Q.  You said:  Mary, I have an order that needs to go out.

6           When you say you have an order, what did you

7   understand that to be?

8   A.  That I received an order from John to send out.

9   Q.  And when you say John, who was John?

10  A.  John Pundyk.  He was the person on the ground, the actual

11  salesperson in front of the customers.

12  Q.  Working with you, correct?

13  A.  Correct.

14  Q.  And your customers, correct?

15  A.  Technically, yes.

16  Q.  And there's a list of products here, 10XTB7, correct?

17  A.  Yes.

18  Q.  What was that?

19  A.  I'm not sure exactly what it does, Dynacin something.  I

20  can't remember the full name.

21  Q.  And the second one is 3X Zoloquine, 10 packs.  Were you

22  aware of what was in that product or what it was?

23  A.  At the time, yes, now I don't remember.

24              (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

M1LPFIS6                          Adams - Cross

1    Q.  Okay.  42 waters, is that water?

2    A.  Yes.

3    Q.  Okay.  And these are products that the customer wanted, put

4    the order in, and you processed that order, correct?

5    A.  Yes.

6    Q.  And it went to Brandie Holloway, correct?

7    A.  Correct.

8    Q.  And that was in Kansas?

9    A.  Yup.

10   Q.  Is that somebody that you knew?

11   A.  No.

12   Q.  Is it somebody who just decided to order through your

13   company and put these -- and wanted these items, correct?

14   A.  Yes.

15   Q.  And you fulfilled the order?

16   A.  Yes.

17   Q.  Okay.  Let me move on to Government Exhibit No.  GX-1908,

18   if I may.  I'm trying to go through in order.  This is the

19   easiest way.

20   A.  Okay.

21   Q.  I just want to be clear.  This was an e-mail that you

22   received from Lisa Ranger to you, correct, on Saturday,

23   December 21st, 2013?

24   A.  Yes.

25   Q.  And this was early on in your work experience with

M1LPFIS6                          Adams - Cross

1    Dr. Fishman, correct?

2    A.  Yeah, I'd been working for him for a little bit.

3    Q.  How long were you working for him when you received this

4    e-mail?

5    A.  About a little bit over a year.

6    Q.  And --

7    A.  And --

8    Q.  All right.  And when you got this e-mail, Ms. Ranger said

9    to you that the doctor said -- "the doctor said to send you an

10   e-mail, stuff for Richard Banca, you can send to me or them

11   directly."

12         When she said the doctor said to send you an e-mail,

13   in your understanding, was that a common practice that you

14   worked with Lisa Ranger and with Dr. Fishman; that she would

15   indicate that the doctor has already told -- had a discussion

16   with her and told her to e-mail you?

17   A.  Yes.

18   Q.  Okay.  And then you sent it out, correct?

19   A.  Correct.

20   Q.  And when it says "stuff for Richard Banca," how were you

21   able to identify what the stuff for Richard Banca was?

22   A.  So I answered a little too fast in the first one.  It was

23   sent out eventually, after she described or informed me what

24   was needed to be sent.

25   Q.  Okay.  So that was another conversation somewhere, where

M1LPFIS6                          Adams - Cross

1    she described to you what it was that she needed?

2    A.   Yes.

3    Q.   And that was following up on this e-mail, correct?

4    A.   Possibly.  It could have been a text message as well.

5    Q.   Okay.  I want to go to Government Exhibit 1909.

6              Now, you had a chance on direct examination to look at

7    some of the names of the products listed on this page called

8    Inventory Travel Sheet; is that correct?

9    A.   Yes.

10   Q.   And these were products that Dr. Fishman had available

11   through Equestology; is that fair to say?

12   A.   I'm not sure.

13   Q.   Okay.  Do you know when this list was made up?

14   A.   No.

15   Q.   I'm sorry, let me withdraw that question.  Do you know when

16   this list was comprised and composed?

17   A.   No.

18   Q.   Okay.  Was it composed during the time that you worked with

19   the doctor?

20   A.   I'm not sure -- I'm not sure.  I saw it during that time.

21   I can't say to when it was originally created.

22   Q.   And can you say that these are all products that existed at

23   the time that you worked during Equestology, during that

24   five-year period, or not?

25             MR. FASULO:  I think the witness is frozen, Judge.

1          THE COURT:  I thought she was just reading it.

2          Ms. Adams, are you able to hear us?

3          THE WITNESS:  I can hear you now.

4          THE COURT:  Were you reading the document?  Did you

5     answer the question?

6          THE WITNESS:  I believe -- what was the last question?

7          THE COURT:  Can we have it read back?

8          MR. FASULO:  Yes, if you wouldn't mind.  Judge, I'll

9     withdraw the question and ask another question just to move

10    along.

11         THE COURT:  Thank you.  I appreciate it.

12    BY MR. FASULO:

13    Q.  On the list labeled Government Exhibit 1909, the one you're

14    looking at, are you aware whether or not all of these products

15    were products that Dr. Fishman had at the time that you were

16    working at Equestology?

17    A.  They were -- we did not have all those products.

18    Q.  And were you -- and, therefore, you were not involved in

19    the organization of this list, the composing of this list or

20    the setting of the prices of this list?

21    A.  I was not involved in any of that.

22    Q.  And you don't know, actually, where this Inventory Travel

23    Sheet came from, then?

24    A.  Correct.

25    Q.  And you don't know who composed it?

M1LPFIS6                          Adams - Cross

1    A.  Correct.

2    Q.  Okay.  Just a few more questions, Ms. Adams.  A couple more

3    questions and we'll be through.

4              Now, when you met Dr. Fishman and you began your work,

5    you understood that you were working for a veterinarian, a

6    Doctor, correct?

7    A.  Yes.

8    Q.  And the idea of confidentiality between doctors and

9    patients, and doctors and clients, is important and that was

10   explained to you when you went to work with Dr. Fishman; is

11   that fair to say?

12   A.  Yes.

13   Q.  So you understood the importance of that confidentiality,

14   correct?

15   A.  Yes.

16   Q.  Now, you also said that at some point, you were questioned

17   by the FDA; is that correct?

18   A.  Yes.

19   Q.  And do you remember what year that was that you were

20   questioned by the FDA originally?

21   A.  I believe -- I believe it was 2020.

22   Q.  Okay.  And you also stated, I think, that you didn't speak

23   with them at that time, correct?

24   A.  Correct.  I met with them, but did not have a conversation

25   with them about anything.

M1LPFIS6                          Adams - Cross

1    Q.  And after you met with them and didn't have a conversation

2    about anything, did they just tell you, we're part of the FDA,

3    or what was your understanding of the reason why they appeared

4    in front of you at that time?

5    A.  They approached me at work.  They identified themselves,

6    told me what they wanted to ask me about, and I said that I was

7    not comfortable answering their questions without a subpoena or

8    my attorney present, and that was the end of it.

9    Q.  And what was the subject matter that you were advised or

10   that you understood at the time that they wanted to talk to you

11   about?

12   A.  About Seth.

13   Q.  About Dr. Fishman?

14   A.  Yes.

15   Q.  Prior to that time, had you had any question in your mind

16   about talking to the FDA or any government official about any

17   of the activities or actions that you had taken during your

18   time at Equestology?

19   A.  No.

20   Q.  And it's only once you get this newspaper or this news

21   flash about the case, this horse doping case, that that got

22   your interest in speaking with the government; is that right?

23   A.  Correct.

24   Q.  And that was the first time that you believed that it was

25   important for you to speak to the government about activities

1  that you had conducted while you were at Equestology?

2  A.  Correct.

3  Q.  And prior to that, you had never believed that you needed

4  to speak to the government about any of your activities; is

5  that fair to say?

6  A.  Yes.

7  Q.  Because you didn't believe you were doing anything wrong?

8  A.  Correct.

9  Q.  Finally, you said that you -- there came a time that you

10  ordered some raw products; is that right, from API?

11  A.  I frequently ordered API for Seth, yes.

12  Q.  Yes.  And prior to ordering the products, or simultaneously

13  with ordering the products, would you advise Dr. Fishman that

14  you made such orders?

15  A.  Yes.

16  Q.  Would he know the volume of the orders that you were

17  making, the quantity?

18  A.  Yes.

19  Q.  Would he know the costs associated with those orders?

20  A.  I'm not sure.

21  Q.  Well, was it your decision to make the purchases at any

22  price, or were there prices that you had to work within, based

23  on the fact that you were working for Dr. Fishman?

24  A.  It depends on the circumstance of the purchase.

25  Q.  Okay.  Did you have parameters to work within as you made

M1LPFIS6                          Adams - Cross

1    these orders?

2    A.  I'm not sure how to answer the question.  Can you be more

3    direct?

4    Q.  Well, would you just pick up -- what would you base -- let

5    me ask this.  During the time that you worked with Dr. Fishman,

6    what would you base the necessity to place these orders on?

7    How would you make those orders?

8    A.  For most of the raw API, I was instructed by Seth to order

9    that specifically for orders that needed to be made, and then

10   from other companies, if I was ordering, say, for John Pundyk

11   or one of the other customers, some companies sold raw API and

12   pre-composed product.  Those products that were already made

13   and ready to be used, as long as we didn't mark them up, Seth

14   did not know or care what the price was because they were just

15   being resold.

16   Q.  But as to the API and raw products, you made sure that Seth

17   knew what products were being ordered from --

18   A.  Absolutely.

19   Q.  And as to the other products, there came a time where Seth

20   had to pay the bills for the purchase of those products,

21   correct?

22   A.  Yes.

23   Q.  And Dr. Fishman would know what products were purchased or

24   not purchased, correct?

25   A.  Correct.

M1LPFIS6                        Adams - Redirect

1    Q.  And, in fact, you actually -- well, let me withdraw that.

2              And finally, you traveled to Dubai with Dr. Fishman;

3    is that correct?

4    A.  Yes.

5    Q.  And you traveled to Dubai, and how many nights were you in

6    Dubai with Dr. Fishman?

7    A.  Repeat that?

8    Q.  How many -- how long was that trip?

9    A.  A week or two.

10   Q.  Okay.  And Lisa Ranger wasn't a member of the team that

11   went to Dubai; is that correct?

12   A.  Correct.

13   Q.  And, in fact, Lisa Ranger had nothing to do with any of the

14   international sales of Dr. Fishman during the time you worked

15   for Dr. Fishman; isn't that correct?

16   A.  To my knowledge, correct.

17             MR. FASULO:  Okay.  And that's it.  Thank you very

18   much.

19             THE COURT:  All right.  Thank you, Mr. Fasulo.

20             Is there any redirect?

21             MR. ADAMS:  Briefly, your Honor.

22   REDIRECT EXAMINATION

23   BY MR. ADAMS:

24   Q.  Good afternoon, Ms. Adams.  Have you ever worked with a

25   horse trainer?

M1LPFIS6                           Adams - Redirect

1    A.  Have I ever -- sorry, have I ever worked?

2    Q.  Have you ever worked as a racehorse trainer?

3    A.  No.

4    Q.  Did you visit racing stables to sell drugs for Dr. Fishman?

5    A.  No.

6    Q.  You were asked questions about Brandie Holloway a moment

7    ago in connection with an order that you fulfilled.  What was

8    the relationship between Brandie Holloway and John Pundyk?

9    A.  They were a client of his.

10   Q.  What was the relationship between John Pundyk and Geoff

11   Vernon?

12   A.  That John was selling under Geoff.

13   Q.  And what was Geoff Vernon's profession?

14   A.  He was a vet.

15   Q.  Were you ever asked to explain the effect or purpose of a

16   particular drug to Geoff Vernon?

17   A.  Me?  No.

18   Q.  Was it necessary for you to explain to Geoff Vernon or John

19   Pundyk what Thymosin Beta 7 does?

20           MR. FASULO:  Objection.

21           MR. SERCARZ:  I couldn't hear.

22           THE COURT:  You couldn't hear, that's your objection?

23           MR. SERCARZ:  I said I couldn't hear.  Mr. Fasulo

24   objected.

25           THE COURT:  Sustained.  Could you rephrase it.

SOUTHERN DISTRICT REPORTERS, P.C.

M1LPFIS6                         Adams - Redirect

1   BY MR. ADAMS:

2   Q.  Did you ever explain to Geoff Vernon or John Pundyk what

3   Thymosin Beta 7 was?

4   A.  Not to my recollection.

5   Q.  Did either of them ever ask you to do that?

6   A.  I'm not sure.

7   Q.  Ms. Jung, if you could pull up, please, Government

8   Exhibit 910 in evidence, and can we go to the last page,

9   please.  I'm sorry, 1910, and if we could go to the last page.

10          Do you recall Mr. Sercarz asking you questions about

11  this document, Ms. Adams?

12  A.  Yes.

13  Q.  At any point did Seth Fishman discuss with you the risk of

14  laypeople injecting drugs into animal's veins?

15  A.  Can you repeat that?

16  Q.  At any point did Seth Fishman discuss with you the risk of

17  laypeople injecting drugs into animal's veins?

18  A.  I am not familiar with the term "laypeople."

19  Q.  Non-veterinarian's.

20  A.  Yes.

21  Q.  And what did he say the risk of non-veterinarians injecting

22  drugs into animals' veins would be?

23  A.  There's risk of severe side effects, such -- you know,

24  ranging from very mild to death.

25  Q.  We discussed earlier, and Mr. Fasulo a moment ago put up an

M1LPFIS6                          Adams - Redirect

1   e-mail referring to an individual named Richard Banca.  Do you

2   know Richard Banca?

3   A.  No.

4   Q.  Do you know whether Richard Banca is a horse trainer?

5   A.  I do not.

6   Q.  Do you know if Richard Banca is a veterinarian?

7   A.  I do not.

8   Q.  Do you know if Josh Marks is a veterinarian?

9   A.  No.

10  Q.  Do you know if an individual named Ross Cohen is a

11  veterinarian?

12  A.  No.

13  Q.  Do you know if an individual named Jamen Davidovich is a

14  veterinarian?

15          MR. FASULO:  Objection, beyond the scope.

16          THE COURT:  Seems to be.

17  Q.  Ms. Adams, are you aware if Fishman and Giannelli, or

18  Ms. Ranger, had clients who are not veterinarians?

19  A.  Can you repeat that?  Sorry.

20  Q.  Yes.  Do you know one way or the other whether Seth Fishman

21  and Lisa Ranger had clients who were not veterinarians?

22  A.  I can't say for sure, no.

23  Q.  Okay.  If we could go to Government Exhibit 1904, please.

24  If you can go to page 2 of 4.

25  A.  Okay.

1   Q.  Mr. Sercarz asked you some questions here reading, "Please

2   let me know the exact tendon;" do you see that one?

3   A.  Yes.

4   Q.  Okay.  And the phrase "or looking to block the pain for a

5   more chronic injury;" do you see that phrase?

6   A.  Yes.

7   Q.  To your knowledge, is masking pain from a chronic injury in

8   the best interest of an animal's safety and health?

9           MR. SERCARZ:  Objection.

10          THE COURT:  Sustained.  You need to lay a foundation.

11  Q.  Ms. Adams, you were asked your understanding as to whether

12  this e-mail reflected Dr. Fishman's care and interest in animal

13  safety and health.  Do you recall those questions?

14  A.  Yes.

15  Q.  Do you have any understanding as to whether masking pain

16  for an animal and its chronic injury is in the best interests

17  of an animal's safety and health?

18  A.  I can't say.

19  Q.  Is there a difference that you're aware of between masking

20  pain for an injury and treating an injury?

21          MR. SERCARZ:  Objection, foundation.

22          THE COURT:  Sustained.  Sustained.

23  Q.  Ms. Adams, at a horserace, can a trainer make money from a

24  horse that doesn't run?

25          MR. FASULO:  Objection.

M1LPFIS6                        Adams - Recross

1                THE COURT:  Sustained.

2                MR. ADAMS:  No further questions, your Honor.

3                THE COURT:  Anything on recross?

4                MR. SERCARZ:  Very briefly.

5    RECROSS EXAMINATION

6    BY MR. SERCARZ:

7    Q.  In your -- Ms. Adams, in your experience and to your

8    knowledge do veterinary technicians give injections to animals

9    all the time?

10   A.  Yes.

11   Q.  You did say -- and I made the mistake -- that Geoffrey

12   Vernon is a veterinarian; am I correct?

13   A.  Correct.

14   Q.  And when asked about the relationship between Dr. Vernon

15   and Dr. Fishman, could you please explain again what the nature

16   of their relationship was?

17   A.  Geoff was a client of Seth's, but they would also

18   collaborate on specific products that Geoff would want and

19   need.

20               MR. SERCARZ:  Thank you.  Thank you.  Nothing further.

21               THE COURT:  Put your mask on.  Thank you.

22               Anything further, Mr. Fasulo?

23               MR. FASULO:  Nothing, Judge.

24               THE COURT:  All right.

25               MR. ADAMS:  Nothing here, your Honor.

1              THE COURT:  All right.  Ms. Adams, thank you very much

2    for your time.  You are excused.

3              THE WITNESS:  All right.  Thank you, your Honor.

4              (Witness excused)

5              THE COURT:  Ms. Dempsey, do you want to disconnect the

6    screen.

7              Mr. Adams, your next witness.

8              MR. ADAMS:  Yes, your Honor.  The government calls

9    Angela Jett, and while she is brought to the witness stand, the

10   government intends to play one additional exhibit, an audio

11   exhibit that's already in evidence, as she's brought up.  And

12   with permission, I would just bring up to the witness stand one

13   document that I'll have Ms. Jet identify.

14             THE COURT:  That's fine.  In terms of the recording

15   you want to play, is there a transcription?

16             MR. ADAMS:  There is.  It's also in evidence.

17             THE COURT:  All right.  Mr. Adams, is this your

18   witness?  Are you Ms. Jett?

19             THE WITNESS:  Yes.

20             THE COURT:  If you just take the witness stand, and as

21   soon as we're ready, I'll ask Ms. Dempsey to administer the

22   oath.  All right?

23             MR. ADAMS:  Thank you, your Honor.  Since the witness

24   is here, I'll just proceed with Ms. Jett, and I'm going to

25   bring up the document.

M1LPFIS6                    Jett - Direct

1        THE COURT:  You just hold onto it until you're asked
2   to do something with it, and my courtroom deputy Ms. Dempsey
3   will swear you in.
4    ANGELA JETT,
5        called as a witness by the Government,
6        having been duly sworn, testified as follows:
7        THE DEPUTY CLERK:  Please state and spell your name
8   for the record.
9        THE COURT:  Yes, and you can remove your mask while
10  you're in the enclosure.
11       THE DEPUTY CLERK:  State and spell your name.
12       THE WITNESS:  Angela Jett, A-n-g-e-l-a, Jett, J-e-t-t.
13       THE COURT:  All right.  You may be seated.
14       Ms. Dempsey, the microphone on in the witness stand?
15       All right.  Mr. Adams.
16       MR. ADAMS:  Thank you, your Honor.
17  DIRECT EXAMINATION
18  BY MR. ADAMS:
19  Q.  Good afternoon, Ms. Jett.
20  A.  Good afternoon.
21  Q.  Where are you currently employed?
22  A.  I am currently not employed.  I'm retired.
23  Q.  And where were you formerly employed?
24  A.  I was employed by the FBI.
25  Q.  What was your title at the FBI?

M1LPFIS6                              Jett - Direct

1    A.  I was a special agent.

2    Q.  For how long were you a special agent with the FBI?

3    A.  25 years.

4    Q.  And while you were with the FBI, were you assigned to any

5    particular field offices?

6    A.  I was assigned to the New York City office, first; then the

7    Long Island RA for 14, and then the Brooklyn Queens office for

8    five.

9    Q.  Thank you.  And I'm sorry, could you tell us the

10   approximate time that you were working on Long Island?

11   A.  Fourteen years.

12   Q.  From when to when approximately?

13   A.  Probably 1997, '98 until 2010.

14   Q.  And while you were at the Long Island office, did you have

15   any particular subject matter that was the focus of your

16   investigations?

17   A.  Yes.  I did securities fraud.

18   Q.  And without getting into the substance, did there come a

19   time that you were involved in the investigation of an

20   individual named David Brooks?

21   A.  Yes.

22   Q.  And at a high level, what was the nature of the Brooks

23   investigation?

24   A.  It was an accounting fraud, securities fraud.

25   Q.  Was the focus of that investigation in any way related to

M1LPFIS6                         Jett - Direct

1  the misbranding of drugs?

2  A.  No.

3  Q.  Was the focus of that investigation in any way related to

4  corruption within the world of professional horseracing?

5  A.  No.

6  Q.  Approximately when did you begin your investigation of the

7  Brooks' matter?

8  A.  I believe in 2004, possibly.

9  Q.  And roughly how long did that investigation last?

10  A.  Probably like five years, six years.

11  Q.  In the course of that investigation, did there come a time

12  that you spoke with an individual named Seth Fishman?

13  A.  Yes.

14  Q.  And approximately in what year did you first speak to Seth

15  Fishman?

16  A.  I believe the first time was in 2009.

17  Q.  And approximately how many times in the course of that

18  investigation did you speak with Seth Fishman?

19  A.  I would say about six times at most, and at least two of

20  them by phone, those were by phone.

21  Q.  Now, directing you to March 6th of 2010, did you speak with

22  Seth Fishman on that day?

23  A.  Yes.

24  Q.  As you sit here today, do you accurately recall what Seth

25  Fishman told you on March 6th of 2010?

M1LPFIS6                         Jett - Direct

1   A.  No.

2   Q.  Could I ask you now to look at what has been put in front

3   of you?

4          MR. ADAMS:  This is just for the witness and, your

5   Honor, I'll pass you up a copy.

6          THE COURT:  Thank you.

7          MR. ADAMS:  Marked as -- this is 3500 material --

8   3520-02 is the document.

9   BY MR. ADAMS:

10  Q.  And, Ms. Jett, I'm going to ask you to turn to the second

11  page, please?

12  A.  Okay.

13  Q.  And if you could please look at the second page, the third

14  page and the fourth page, and let me know when you've finished.

15  A.  Okay.

16  Q.  Having looked at 3520-02, the second, third and fourth

17  pages, do you now have, without looking at the document, an

18  accurate recollection of what Seth Fishman told you on

19  March 6th, 2010?

20  A.  No.

21  Q.  At the time -- do you recognize the document that you just

22  looked at?

23  A.  Yes.

24  Q.  What is the document, without its substance?

25  A.  These are my handwritten notes of a phone call that I had

SOUTHERN DISTRICT REPORTERS, P.C.

M1LPFIS6                          Jett - Direct

1  with the prosecutor and Seth Fishman.

2  Q.  How do you recognize those notes?

3  A.  Because it's my handwriting.

4  Q.  Okay.  At the time that you made these notes, were you --

5  was this at a time that you were involved in the Brooks

6  investigation?

7  A.  Yes, we were on trial at this time.

8  Q.  And at the time that you made these notes, were you

9  personally hearing information being provided by Seth Fishman?

10  A.  Yes.

11  Q.  At the time that you made these notes, did you take the

12  notes contemporaneously with the conversation?

13  A.  Yes.

14  Q.  When you took these notes, this was part of your job as a

15  special agent; is that correct?

16  A.  Yes.

17  Q.  Was accuracy in note taking important at that point?

18  A.  Yes.

19  Q.  Would you use your notes and notes of this kind in

20  furtherance of your job in 2010?

21  A.  Yes.

22  Q.  And at the time that you took these notes, did these notes

23  accurately reflect the content of your interview with Seth

24  Fishman?

25  A.  Yes.

1          MR. ADAMS:  Your Honor, with that, and pursuant to

2     803.5, I'd ask that the Court allow Ms. Jett to read certain

3     portions of this document into the record.

4          MR. SERCARZ:  No objection.

5          THE COURT:  It will be admitted.

6          MR. ADAMS:  Thank you.  And, your Honor, I'm only

7     having her read this into the record.

8          THE COURT:  You're not offering the document itself?

9          MR. ADAMS:  Correct.  Thank you, your Honor.

10    BY MR. ADAMS:

11    Q.  Ms. Jett, if I could direct you to the first page of these

12    notes, the bottom paragraph?

13    A.  Okay.

14    Q.  Can you please read your notes into -- for the jury,

15    slowly, please?

16    A.  With regard to horses, Seth and Brooks brought a lot of

17    product into the U.S. via FedEx.  Seth had it mailed to Brooks'

18    house, once to Terry Brooks' attention.  Vitamins and

19    supplements for horses.  They were not FDA approved to be

20    shipped to the U.S.

21    Q.  And, Ms. Jett, in the course of your investigation of the

22    Brooks affair, who was Terry Brooks?

23    A.  Terry Brooks was David Brooks' wife.

24    Q.  And you referred to Seth and Brooks brought a lot of

25    product into the U.S., who is "Brooks" in that phrase?

M1LPFIS6                              Jett - Direct

1    A.  David Brooks.

2    Q.  Okay.

3              THE COURT:  Mr. Adams, can you take the mask off so we

4    hear you a little more clearly?

5              MR. ADAMS:  I apologize, your Honor.

6              THE COURT:  That's all right.  I appreciate you trying

7    to be careful with the protocol.

8              MR. ADAMS:  Unfortunately, it becomes second nature to

9    keep the mask on.

10             THE COURT:  Yes.  It's a sad commentary on our times.

11   BY MR. ADAMS:

12   Q.  Ms. Jett, if you could turn the page now to the -- the next

13   page and read from the top, the first paragraph, please?

14   A.  Okay.  Pre-race, giving a horse a product before a race

15   that is not accepted medication.  Seth supplied these products

16   to Brooks, who would give it to his trainer.  Seth has also

17   dealt with Brooks' trainers, like Carl Conti.

18   Q.  Carl Conti?

19   A.  Mmm, hmm.

20   Q.  Thank you.

21   A.  Brooks would instruct his trainers, which is in violation

22   of the Race Commission, to give his horses pre-race shots.

23   Brooks had offered to use his plane to transport the product

24   H. growth hormone, HGH.

25             Doping, legal and illegal, done both ways to increase

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

1    the red blood cell count.  Brooks illegal use of Epogen, he

2    provides this for Brooks.  Brooks has also gotten it from

3    others as well.  Brooks' horses do not test positive because

4    they do not test for the right drugs.  Seth can identify drugs

5    that could be tested or in previous samples taken of Brooks'

6    horses at the track.  Brooks is well aware of everything going

7    on with his pre-race and illegal doping of his own horses.  It

8    is done at his direction.

9    Q.  Thank you.  And if you could turn to the next page, and if

10   you could please read again slowly from the top to the end?

11   A.  Yes.  Seth recalled once Brooks wanted him to give Lloyd

12   Arnold's horse something that would slow him down, so he could

13   win a race.  Seth would not do it.  Brooks said he was not a

14   team player.  J. Brooks would bet on races.  They would bet

15   their horses.  J. Brooks -- I'm sorry, JB would call it in.

16              THE COURT:  I'd like to clarify one thing for the

17   record.

18              MR. ADAMS:  Certainly, your Honor.

19              THE COURT:  I don't believe the witness said

20   "estrogen."  Let her read it off the document.

21   Q.  Certainly.  Ms. Jett, if you could turn back to the second

22   page that you read.

23   A.  Epogen, E-p-o-g-e-n.

24              MR. ADAMS:  Thank you.  And thank you, your Honor.  No

25   further questions for Ms. Jett.

M1LPFIS6                          Jett - Cross

1              THE COURT:  Any cross?

2              MR. SERCARZ:  Yes, your Honor, but may I indulgent for

3     a moment and see the document that Agent Jett has in front of

4     her?  Do you have a hard copy?

5              THE COURT:  Just for the record, this was produced to

6     the defendants, right, Mr. Adams?

7              MR. ADAMS:  Correct, your Honor.

8              THE COURT:  Thank you.

9              MR. SERCARZ:  May I please have a moment, your Honor?

10    I apologize.

11             THE COURT:  Sure.

12             (Pause)

13    CROSS-EXAMINATION

14    BY MR. SERCARZ:

15    Q.  Agent Jett, I believe you told us that you do not have a

16    good memory of the interviews that you conducted with

17    Dr. Fishman; is that correct?

18    A.  That's correct.

19    Q.  And that even after looking at the notes of your

20    interviews, they do not refresh your recollection; is that

21    correct?

22    A.  That's correct.

23    Q.  Now, there came a time when you had conversations with

24    Dr. Fishman; is that correct?

25    A.  Yes.

M1LPFIS6                          Jett - Cross

1    Q.  And do you recall the year in which those conversations

2    took place?

3    A.  Yes.

4    Q.  When was that?

5    A.  We interviewed him during the trial.

6    Q.  And the trial took place, the best of your recollection?

7    A.  2010.

8    Q.  The events about which you were interviewing Dr. Fishman,

9    when did they take place?

10   A.  Probably prior, like five or six years prior.

11   Q.  All right.  In other words, when my client spoke to you, he

12   was speaking to you about events that had occurred five years

13   earlier; am I correct?

14   A.  Yes.

15   Q.  All right.  And am I correct to say that when Dr. Fishman

16   spoke to you, he didn't tell you whether he had a

17   contemporaneous memory of the events that he was describing,

18   did he?

19   A.  No.

20   Q.  Dr. Fishman told you that there came a time when he learned

21   that David Brooks was having his trainer administer performance

22   enhancing substances to the horses; am I correct?

23   A.  If that's what's reflected in my notes that I read, yes.

24   Q.  But your notes do not indicate, do they, whether

25   Dr. Fishman learned about the use of these drugs at the time he

1    gave them to David Brooks or after the fact; am I correct?

2    A.  Can you repeat that?

3    Q.  Yes.

4           MR. SERCARZ:  May I have it reread?

5           (Record read)

6    A.  I think I'm not following your question.  He's

7    describing -- he's articulating to me his relationship with

8    David Brooks, to his recollection.

9    Q.  He's describing his recollection of having provided these

10   substances to Mr. Brooks, correct?

11   A.  Yes.

12   Q.  He is providing his recollection of what Mr. Brooks did

13   with these substances; am I correct?

14   A.  Yes, and what he did with them as well.

15   Q.  But he did not tell you whether the substances that

16   Mr. Brooks provided to his trainer, Mr. Conti, whether Fishman

17   learned about that contemporaneously or after the fact; isn't

18   that correct?

19   A.  Yes, I couldn't tell.

20   Q.  To the best of your recollection, if you have one, was

21   Mr. Fishman speaking to you pursuant to any sort of an immunity

22   agreement?

23   A.  At this time?

24   Q.  Yes.

25   A.  No.

M1LPFIS6                          Jett - Cross

1    Q.  All right.  And indeed, if he had been, the FBI would have

2    some record of it; am I correct?

3    A.  Yes.

4    Q.  As far as you know, he was appearing voluntarily; am I

5    correct?

6    A.  Yes.

7    Q.  As a witness against Mr. Brooks; am I correct?

8    A.  Yes.

9    Q.  He told you, on at least one occasion, that Mr. Brooks

10   asked him to administer drugs to a racehorse and he refused?

11   A.  Yes.

12   Q.  Isn't that correct?

13   A.  Yes.

14   Q.  Final line of questioning.  Do you recognize anyone in this

15   courtroom?

16   A.  No.

17   Q.  When David Brooks went to trial, there was a co-defendant

18   in the case; am I correct?

19   A.  Yes.

20   Q.  Her name was Sandra Hatfield; am I correct?

21   A.  Yes.

22   Q.  She was represented by two lawyers; am I correct?

23   A.  Yes.

24   Q.  One of them was this skinny guy with a large nose; am I

25   correct?

M1LPFIS6                    Jett – Redirect

1    A.  Yes.

2            MR. ADAMS:  Objection, relevance.

3    Q.  It's nice to see you again, Agent.

4    A.  Nice to see you.

5            THE COURT:  Put your mask on, please.

6            MR. SERCARZ:  Yes, your Honor.

7            THE COURT:  Over the big nose.

8            MR. SERCARZ:  Thank you, your Honor.

9            (Laughter)

10           Thank you.

11           THE COURT:  Mr. Fasulo, any questions?

12           MR. FASULO:  No, your Honor.

13           THE COURT:  Any further redirect?

14           MR. ADAMS:  Very briefly.

15   REDIRECT EXAMINATION

16   BY MR. ADAMS:

17   Q.  Agent Jett, or former Special Agent Jett, you were just

18   asked a moment ago whether Mr. Fishman spoke to you without

19   protection from under any sort of immunity agreement; do you

20   recall this question?

21   A.  Yes.

22   Q.  And he talked to you about legal and illegal doping while

23   speaking to you, correct?

24   A.  Yes.

25   Q.  Did he also speak to you about any other illegal activity

M1LPFIS6                        Jett - Redirect

1    that he was involved in without protection, if you recall?

2    A.   Yes.

3    Q.   And what was the other illegal activity that he was

4    involved in?

5              MR. SERCARZ:  Objection, beyond the scope of the

6    cross.

7              THE COURT:  I'd like you up here, sidebar, please.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1LPFIS6                          Jett - Redirect

1          (At the side bar)

2          THE COURT:  I just need to know where you're going

3     with this, and I don't want it on the record for everyone.

4          MR. ADAMS:  Certainly.  Mr. Sercarz, both with

5     Ms. Adams and again just now, had questions about speaking to

6     agents without protection and plainly eliciting a line of

7     questions about state of mind with respect to speaking to this

8     agent without protection, suggesting that, in talking about his

9     doping activities, he must have not believed it was illegal.

10         Mr. Fishman also spoke to this agent about other

11    illegal activity that he was involved, including providing

12    marijuana to Mr. Brooks' children, as well as his involvement

13    in assisting Mr. Brooks with things like money laundering.

14         THE COURT:  I'm not getting the relevance.

15         MR. ADAMS:  Well, to the extent that Mr. Fishman -- if

16    the point is that Mr. Fishman couldn't have believed he was

17    doing something illegal because he told this to the agent

18    without any immunity, then there's no question that he

19    understands that providing pot to minors is an illegal activity

20    and that he also spoke to that.

21         THE COURT:  It says that right in the document I

22    think.

23         MR. ADAMS:  Yes.

24         MR. SERCARZ:  I've advised the Court, your Honor, that

25    I do not intend to pursue any sort of a defense involving

M1LPFIS6                        Jett - Redirect

1    entrapment by estoppel.  I do not intend to argue that based

2    upon this encounter, my client felt he was at liberty to

3    continue the same behavior.

4            THE COURT:  You clearly said in your opening what is

5    his state of mind, and now you're implying that he wouldn't

6    have done this and talked to an agent about it freely if he

7    understood that it was illegal.  So you have tried to create

8    the impression, the negative impression, that by having this

9    agreement, his state of mind was that there was nothing illegal

10   about what happened he was doing.  That's clearly the

11   impression you were trying to leave; so I'm going to allow it.

12           MR. SERCARZ:  Judge --

13           MR. FERNICH:  Judge --

14           MR. SERCARZ:  If I may, the impression that I was

15   trying to leave is that, according to the evidence that has

16   been adduced, there is no evidence that my client confessed to

17   having provided performance enhancing drugs with

18   contemporaneous knowledge that they would be given to the

19   horses.

20           THE COURT:  That wasn't by implication.  You asked

21   that directly.

22           MR. SERCARZ:  Yes.

23           THE COURT:  Right.  But then you asked about, did he

24   go in and talk with the promise of immunity?  The only purpose

25   for that could be you're trying to create inferences with

1   regard to intent.  So the government is entitled to try to

2   rebut that inference that you've tried to create.

3           MR. SERCARZ:  The inference that I sought to create

4   was that the drugs that were administered to the horses were

5   administered to the horses without my client's knowledge.

6           THE COURT:  Well, that's not the inference.  You asked

7   that directly, and then you asked about the proffer agreement.

8   I'm not hearing from two lawyers for one party.

9           MR. FERNICH:  Yes, can I speak to Mr. Sercarz?

10          THE COURT:  Yes, but also, the rule is one lawyer

11  comes up here, not both of you.

12          MR. FERNICH:  Sure.  I wasn't clear on that.  I'll

13  just speak to Mr. Sercarz at the side and then come back.

14          THE COURT:  Go ahead.

15          MR. FASULO:  I'd like to make my application so we can

16  move it along, Judge.

17          THE COURT:  I know.

18          MR. FASULO:  I understand.

19          THE COURT:  All right.  Gentlemen, we've got to move

20  this along.  Mr. Fasulo has a separate application.

21          MR. SERCARZ:  Mr. Fernich makes, for my benefit, the

22  valid point that any witness is subjected to a Giglio review

23  and is required to reveal his prior bad acts, No. 1.

24          And No. 2, this is going to prompt seriatim bouts of

25  redirect about these issues which are, A, collateral, and B, I

1    did not elicit on my cross-examination.

2            THE COURT:  All right.  You made your record.

3            MR. FASULO:  Judge, so I understand the problem here,

4    but as to Ms. Giannelli, I think the prejudice of the fact

5    outweighs its probative value.  Unless there's a curative

6    instruction, none of this testimony is -- because one of the

7    things -- the defense case in this case is, who is Dr. Fishman

8    to Ms. Giannelli?  This additional information comes out as if

9    to put a light on Dr. Fishman in a public way that maybe

10   Ms. Giannelli should have known about, which obviously she

11   didn't --

12           THE COURT:  I'm prepared to give a limiting

13   instruction --

14           MR. FASULO:  I'm fine then.

15           THE COURT:  -- that the questioning that I'm going to

16   permit is admitted with regard to Dr. Fishman only and not

17   Ms. Giannelli.

18           MR. ADAMS:  Yes.

19           MR. FASULO:  I'm fine with that, Judge.

20           THE COURT:  All right.

21           (Continued on next page)

22

23

24

25

1              (In open court)

2              THE COURT:  All right.  Ladies and gentlemen, I'm

3    going to allow Mr. Adams to pursue this line in very limited

4    fashion, but I first want to give you an instruction.

5              This line of questioning and the answers, frankly,

6    because the questions are not evidence -- remember, I told you

7    that -- the answers to this line of questioning are being

8    admitted solely with respect to Dr. Fishman and have no

9    relevance to your determination with respect to Ms. Giannelli.

10             MR. ADAMS:  Thank you, your Honor.

11             THE COURT:  Mr. Adams.

12   BY MR. ADAMS:

13   Q.  Ms. Jett, I was asking whether you have today any present

14   recollection, without review of the document, of any further

15   illegal activity that Seth Fishman admitted to you during your

16   interview on March 6th, 2010?

17   A.  Yes, but I've read it.  I don't have an independent

18   recollection of it.  I recall it when I read it.

19   Q.  Okay.  And you're referring to reading it on the same notes

20   we discussed earlier?

21   A.  Yes.

22   Q.  Okay.  I'd ask that the witness be permitted to begin

23   reading at the top of the same document?

24             THE COURT:  I'm going to ask you to clarify because

25   she said when she read it, she now has a recollection.

1  Q.  I'm sorry.  Ms. Jett, do you currently, without looking at

2  that document, have a recollection of what Seth Fishman told

3  you on that day?

4  A.  No.

5         MR. ADAMS:  Thank you, your Honor.

6  Q.  Ms. Jett, if you could please read from the top line of the

7  first paragraph through the end of the third paragraph?

8  A.  SF has smoked pot with Andrew and Victoria Brooks.  David

9  can't smoke pot, it does not mix well with Ativan.  D. Brooks

10 has asked Seth to get pot for Andrew for school to smoke with

11 his friends.  Seth gave it to him and did not sell it to him.

12 The pot was quality stuff.  When Seth was with them in San

13 Tropez, Andrew and Victoria were partying a lot.  Before the

14 trip, Brooks asked him to get him pot so they could bring it

15 with them for his kids.

16 Q.  Thank you.  Ms. Jett, from your investigation of the Brooks

17 affair, do you recall who Andrew and Victoria Brooks are?

18 A.  They are his children.

19        MR. ADAMS:  No further questions, your Honor.

20        THE COURT:  Wait a second, Mr. Sercarz.  Let Mr. Adams

21 clear the booth so we follow the protocol.  All right?

22        MR. SERCARZ:  Yes, ma'am.

23        THE COURT:  All right.  Whenever you're ready,

24 Mr. Sercarz.  Thank you.

25 RECROSS EXAMINATION

M1LPFIS6                         Jett - Recross

1   BY MR. SERCARZ:

2   Q.  Agent Jett, at the time that you interviewed my client,

3   Dr. Fishman, was it standard procedure that before an

4   individual could be used as a witness on behalf of the

5   government, you conducted what is called a Giglio --

6   G-i-g-l-i-o, for the reporter -- review?

7              MR. ADAMS:  Objection, relevance.

8              THE COURT:  No, I'm going to allow it.

9   A.  Yes.

10  Q.  And would it be fair to say that this review requires the

11  witness to elicit any prior bad acts or misconduct in which he

12  or she engaged?

13  A.  Yes.

14  Q.  And if you recall, was it in response to that Giglio

15  interview that you elicited the information that you've just

16  described?

17  A.  Yes.

18             MR. SERCARZ:  Thank you.  No further questions.

19             THE COURT:  Put your mask on, please, before you leave

20  the booth.

21             MR. SERCARZ:  I'm sorry, your Honor.

22             THE COURT:  All right.  Anything from you, Mr. Fasulo?

23             MR. FASULO:  Nothing, Judge.

24             THE COURT:  No redirect?

25             MR. ADAMS:  No redirect.

M1LPFIS6                        Jett - Recross

1              THE COURT:  All right.  Thank you very much, Special

2       Agent Jett.

3              (Witness excused)

4              Mr. Adams?

5              MR. ADAMS:  Your Honor, one moment, your Honor.

6              THE COURT:  Yes.

7              MS. MORTAZAVI:  Your Honor, we call Mr. Dan Folensbee

8       to the stand.

9              THE COURT:  All right.  Is the witness here?

10             MS. MORTAZAVI:  He is, your Honor.  He's been waiting

11      in a room outside the courtroom, and if the Court would permit

12      me to approach the booth, I'd like to place the binder of

13      exhibits.

14             THE COURT:  Yes.  And can I ask, before the witness

15      comes up, let Ms. Mortazavi put a book up there.  And can I ask

16      your team if someone can please help me find the book?  If

17      that's you, Mr. Chow, it's all right for you to come up here.

18             MS. MORTAZAVI:  And, your Honor, for the record, I'm

19      going to hand up photocopies of the same exhibits in that book.

20             THE COURT:  Okay.  So I don't need a book; you're

21      going to hand me them?

22             MS. MORTAZAVI:  Yes, your Honor.

23             THE COURT:  All right.  Thank you.  You can hand them

24      up to Ms. Dempsey, then.  Thank you.

25             All right.  Ms. Dempsey, would you swear our witness,

M1LPFIS6                          Folensbee - Direct

1    please.

2     DANIEL FOLENSBEE,

3          called as a witness by the Government,

4          having been duly sworn, testified as follows:

5          THE DEPUTY CLERK:  Would you please state and spell

6    your name for the record.

7          THE WITNESS:  Daniel Folensbee.  That's D-a-n-i-e-l,

8    last name, F-o-l-e-n-s-b-e-e.

9          MS. MORTAZAVI:  Thank you.  Mr. Folensbee, could you

10   please take a seat.

11   DIRECT EXAMINATION

12   BY MS. MORTAZAVI:

13   Q.  Mr. Folensbee, you may want to pull the microphone closer

14   to you just to make sure that everybody in the courtroom can

15   hear you.

16         THE COURT:  Right.  And just to orient you, sir, this

17   is our jury here.  Okay?

18         Ms. Mortazavi.

19         MS. MORTAZAVI:  Thank you, your Honor.

20   BY MS. MORTAZAVI:

21   Q.  Mr. Folensbee, can you tell us where you work?

22   A.  I work for the FBI in Redstone Arsenal in Huntsville,

23   Alabama.

24   Q.  And what position do you hold with the FBI?

25   A.  I'm a staff operations specialist and formerly an evidence

1   response team member.

2   Q.  And how long have you held that position with the FBI?

3   A.  Since October of 2016.

4   Q.  Where did you work prior to joining the FBI?

5   A.  Public supermarkets.

6   Q.  Sir, I'd like to direct your attention to October 27th,

7   2019.  Were you asked to perform anything that day in relation

8   to your work at the FBI?

9   A.  Yes.  I was asked to be the photographer for a search

10  location.

11  Q.  What was that location?

12  A.  It was 3500 Northwest 2nd Avenue, Unit 723, Boca Raton,

13  Florida.

14  Q.  And was that premises located within a larger property?

15  A.  Yes, it was.

16  Q.  Can you describe the property surrounding the premises that

17  was searched?

18  A.  Yes.  It was a -- somewhat of a warehouse complex, and the

19  search location was one unit inside of that complex.

20  Q.  And the interior of the premises itself, could you describe

21  what that appeared to be?

22  A.  Yes.  It was a makeshift office, slash, storage facility.

23  Q.  And during the search, were there others present?

24  A.  Only law enforcement personnel.

25  Q.  Approximately how many law enforcement personnel?

M1LPFIS6                              Folensbee – Direct

1   A.  About ten to 20.

2   Q.  Do you recall at approximately what time the search

3   started?

4   A.  Yes, about 12:00 a.m. on the 28th of October 2019.

5   Q.  Okay.  Mr. Folensbee, in front of you is a binder that

6   contains a series of government exhibits that have been marked

7   Government Exhibit 4000 to 4047.  Sir, have you reviewed those

8   exhibits before today?

9   A.  Yes, I have.

10  Q.  Do you recognize them?

11  A.  Yes, I do.

12  Q.  What are they?

13  A.  They are the photos that I took at the search location.

14  Q.  And how do you know that?

15  A.  I was the one that took the photos.

16          MS. MORTAZAVI:  All right.  The government moves to

17  admit Government Exhibits 4000 to 4047?

18          THE COURT:  They will be received.

19          (Government's Exhibits 4000 to 4047 received in

20  evidence)

21          MS. MORTAZAVI:  Thank you, your Honor.

22          And, Ms. Jung, can we please publish Government

23  Exhibit 4000.

24          And let me confirm that the jury is able to see the

25  exhibits?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

1          THE COURT:  None of us can.  Oh, you all can?  No,

2     it's not up on mine yet either.

3          MS. MORTAZAVI:  All right.  I see nodding heads.

4     BY MS. MORTAZAVI:

5     Q.  Mr. Folensbee --

6          THE COURT:  Hold on.  Can the jurors in the back see?

7     All right.  Thank you all.

8          I'm sorry, Ms. Mortazavi.  Go ahead.

9     BY MS. MORTAZAVI:

10    Q.  Mr. Folensbee, can you tell us what is depicted in

11    Government Exhibit 4000?

12    A.  Yes.  This is the entry way to unit 723 of the search

13    location.

14    Q.  Okay.  Ms. Jung, can we pull up Government Exhibit 4030.

15         Could you tell us what's depicted here?

16    A.  Yes, this is one side of the search location.  This was

17    more the office side of it.

18    Q.  Ms. Jung, could you pull up Government Exhibit 4031.

19         Mr. Folensbee, you referred previously to the office

20    side of the premises.  Was this government exhibit the office

21    side of the premises?

22    A.  This was more the storage location, to my knowledge.

23    Q.  Okay.  And, Ms. Jung, could you please pull up Government

24    Exhibit 4032.

25         Mr. Folensbee, what does this depict?

M1LPFIS6                     Folensbee - Direct

1    A.   This is the storage area of the location.

2    Q.   And, sir, you see on those racks what there appear to be

3    some blue translucent containers and some transparent white

4    containers?

5    A.   Yes.

6    Q.   Did you take additional photos of all of those items?

7    A.   Yes, I did.

8    Q.   Ms. Jung, could you please pull up Government Exhibit 4010.

9         Could you tell us what's depicted here Mr. Folensbee?

10   A.   This is one of the evidence items that we collected.  It's

11   a vial of what appear to be narcotics.

12        (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

M1LTFIS7                          Folensbee - Direct

1    BY MS. MORTAZAVI:

2    Q.  Could you please read the label starting with product name

3    and the directions.

4    A.  Yes, it's pain B, the directions are intravenous

5    administration, and it's for strenuous exercise.

6              MS. MORTAZAVI:  All right.  Ms. Jung, please pull up

7    Government Exhibit 4016.

8    Q.  Sir, is this another one of the vials that you photographed

9    during the search that you described?

10   A.  Yes, it is.

11   Q.  Could you please read the name of this particular vial as

12   well as the caption underneath it.

13   A.  Yes, it is Equiscience and it's equine growth hormones.

14             MS. MORTAZAVI:  And Ms. Jung, please pull up

15   Government Exhibit 4018.

16   Q.  Mr. Folensbee, what is depicted in this exhibit?

17   A.  This is Toltrazuril.

18   Q.  Is that the product Toltrazuril?

19   A.  Yes.

20   Q.  Do you see here it lists EXP date?

21   A.  Yes.

22   Q.  Could you read the date?

23   A.  The manufacturer date is May 6, 2013.

24   Q.  And EXP date under that?

25   A.  That is May 5, 2016.

M1LTFIS7                          Folensbee - Direct

1    Q.  When did your search take place?

2    A.  October 28 of 2019.

3    Q.  What's the gross weight that's listed on this particular

4    item that you photographed?

5    A.  28 kilograms.

6            MS. MORTAZAVI:  Ms. Jung, please pull up Government

7    Exhibit 4021.

8    Q.  Mr. Folensbee, do you see here there appears to be a

9    shipping label attached to this particular -- I'm going to call

10   it a tub?

11   A.  Yes.

12   Q.  And underneath "ship to," could you please read the name

13   and address?

14   A.  Seth Fishman at 2565 South Ocean Drive, Highland Beach,

15   Florida.

16   Q.  Is there a company name also associated with that address?

17   A.  Yes, Equestology.

18   Q.  Does it appear above that there's another name and address

19   that's listed?

20   A.  Yes, first name Lisa.

21   Q.  And Mr. Folensbee, if you wait one moment, I believe we'll

22   be able to pull it up.

23           If you could read that name and address again.

24   A.  Lisa Ranger to Equestology, 125 Jennifer Lane.

25   Q.  And the city and state?

M1LTFIS7                      Folensbee - Direct

1    A.  Felton, Delaware.

2    Q.  Thank you.

3            MS. MORTAZAVI:  Ms. Jung, if you could go back to the

4    original exhibit.

5    Q.  And sir, does it appear that there's both a Fed Ex and a

6    UPS ground label attached to this particular exhibit?

7    A.  Yes, there is.

8            MS. MORTAZAVI:  Ms. Jung, please pull up Government

9    Exhibit 4022.

10   Q.  Mr. Folensbee, what is depicted here?

11   A.  These are labels that were used to put on various vials and

12   tubs.

13   Q.  The labels that are pictured here, is that how you found

14   them at the location?

15   A.  Yes.

16           MS. MORTAZAVI:  And Ms. Jung, looking at the third

17   label from the top that's green, could you please zoom in on

18   that particular portion.

19   Q.  And Mr. Folensbee, could you read the product name and the

20   directions.

21   A.  Yes, it is called HP bleeder plus, it's a homeopathic

22   bleeder plus analgesic.  The directions are to administer 10

23   CCs IV or administer five to six hours before exercise.

24   Q.  And underneath that?

25   A.  This product contains no known testable ingredients.

M1LTFIS7

1   Q.  And if you could read the ingredients themselves.

2   A.  It says a proprietary blend of homeopathic and complex

3   amino acid structures.

4          MS. MORTAZAVI:  Ms. Jung, if we could go back to the

5   original exhibit, I'm going to ask you to zoom in on the third

6   label from the bottom that appears to be a white label.

7   Q.  Mr. Folensbee, could you again read the product name and

8   the directions here.

9   A.  Yes, it is a homeopathic analgesic, the directions are to

10  administer 2 CCs intravenously only six hours prior to

11  strenuous exercise.

12  Q.  And sir, is there a company name associated with this

13  product that appears on the label?

14  A.  Yes, SPC or Specialized Performance Compounds.

15  Q.  Do you see the name Equestology on this label?

16  A.  I do not, no.

17         MS. MORTAZAVI:  Your Honor, thank you for the Court's

18  indulgence.  I see that it is 4:30.  This seems like a natural

19  breaking point.

20         THE COURT:  You're not going to be able to finish in

21  short order?

22         MS. MORTAZAVI:  If I could confer with defense

23  counsel, it's possible that we could finish today and relieve

24  the witness before the weekend.

25         THE COURT:  Why don't you all talk and report back to

M1LTFIS7

1    me then I will ask our jurors.

2              (Pause)

3              MS. MORTAZAVI:  Your Honor, this appears to be a

4    natural breaking point, but we will be recalling the witness on

5    Monday.

6              THE COURT:  So sir, you may step down, but please bear

7    in mind that you remain under oath.  You may not speak with any

8    of the lawyers for the government over the weekend about your

9    testimony.

10             THE WITNESS:  Yes, ma'am.

11             THE COURT:  Thank you for being here.

12             All right.  Ladies and gentlemen, we're going to break

13   at this point then.  I promised you I would aim to get you out

14   by about 4:30 every day.  What I talked to the lawyers about is

15   if we could move things along by asking you to stay a few extra

16   minutes we would do that, but it appears they will not be able

17   to wrap things up, there's no reason for me imposing on you, so

18   we'll break for the day.

19             JUROR:  Thank you.

20             THE COURT:  I just remind you, please do not speak to

21   anyone about this case over the weekend or at all until you

22   finally deliberate, and I just remind you that that does

23   include talking with your family and your friends about the

24   case.  Please don't do any research, don't read about the case.

25   If any articles about the case should come to your attention,

M1LTFIS7

1  don't read them, put them aside, but you will have to let me

2  know about that then on Monday morning.  Hopefully that won't

3  happen.  Please do your best to avoid coming into any contact

4  with anything about this case.

5          You can leave your notebooks.  Ms. Dempsey is going to

6  take you back to the jury assembly room to pick up your

7  belongings.  You can leave them there and they will be waiting

8  for you Monday morning.

9          I hope everyone has a nice weekend, and thank you,

10  everybody, for your patience and attention.

11          (Jury not present)

12          THE COURT:  Is there anything that we need to speak

13  about before we adjourn?

14          MR. ADAMS:  Your Honor, I heard you speak to the

15  witness a moment ago that he couldn't speak to the government

16  attorneys.  He's still on direct examination, and we certainly

17  don't talk to a witness once he's on cross-examination.  We

18  take notes on preparation when people are still on direct.  I

19  don't know that we will speak to this witness while he's on

20  direct.

21          THE COURT:  You shouldn't be speaking to a witness

22  once he's under oath.  You shouldn't.

23          Anything else?

24          MR. FASULO:  Nothing for defendant Giannelli, your

25  Honor.

M1LTFIS7

1              MR. SERCARZ:  Nothing for me.

2              THE COURT:  I hope you have a nice weekend.  I know

3    it's been a long week and you have all been patient with the

4    process, which was somewhat tedious, but thank you all.  Have a

5    good weekend, everyone.  I'll see you Monday morning then.

6              Assuming there's nothing we need to talk about, I will

7    see you at 9:15, we'll be ready to start at 9:30.  If there is

8    anything, you need to email it to the chambers' email so I know

9    to meet you earlier and I will let you know what time to meet,

10   but otherwise we will see everyone at 9:15.

11             Have a good weekend everyone.

12             MR. ADAMS:  Thank you, your Honor.

13             (Adjourned to January 24, 2022 at 9:15 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2    Examination of:                          Page

 3     COURTNEY DIANE ADAMS

 4    Direct By Mr. Adams . . . . . . . . . . . . 101

 5    Cross By Mr. Sercarz . . . . . . . . . . . 168

 6    Cross By Mr. Fasulo . . . . . . . . . . . 233

 7    Redirect By Mr. Adams . . . . . . . . . . 259

 8    Recross By Mr. Sercarz . . . . . . . . . . 264

 9     ANGELA JETT

10    Direct By Mr. Adams . . . . . . . . . . . 266

11    Cross By Mr. Sercarz . . . . . . . . . . . 274

12    Redirect By Mr. Adams . . . . . . . . . . 278

13    Recross By Mr. Sercarz . . . . . . . . . . 286

14     DANIEL FOLENSBEE

15    Direct By Ms. Mortazavi . . . . . . . . . 288

16                   GOVERNMENT EXHIBITS

17    Exhibit No.                         Received

18     402B though 402H  . . . . . . . . . . . 102

19     9010   . . . . . . . . . . . . . . . . . 116

20     2001 through 2056, including subparts,  . . 116

21     9009, 910 through 912, and 910T through 912T  167

22     11,000   . . . . . . . . . . . . . . . . 194

23     4000 to 4047 . . . . . . . . . . . . . . 290

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

1                          DEFENDANT EXHIBITS

2     Exhibit No.                                    Received

3       1   . . . . . . . . . . . . . . . . . . . 188

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25