M1PTFIS1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        20 Cr. 160 (MKV)

5    SETH FISHMAN,

6              Defendant.
                                         Trial
7    ------------------------------x
                                         New York, N.Y.
8                                        January 25, 2022
                                         9:40 a.m.
9    Before:

10                   HON. MARY KAY VYSKOCIL,

11                                       District Judge
                                         -and a Jury-
12
                          APPEARANCES
13
     DAMIAN WILLIAMS
14        United States Attorney for the
          Southern District of New York
15   BY:  ANDREW C. ADAMS
          SARAH MORTAZAVI
16        ANDEN F. CHOW
          Assistant United States Attorneys
17
     SERCARZ & RIOPELLE, LLP
18        Attorneys for Defendant Fishman
     BY:  MAURICE H. SERCARZ
19        -and-
     LAW OFFICE OF MARC FERNICH
20   BY:  MARC A. FERNICH

21
     ALSO PRESENT:  KARLINE JUNG, Paralegal Specialist
22

23

24

25
```

1          (Case called, jury not present)

2          DEPUTY CLERK:  Counsel, starting with the government,

3    please state your name for the record.

4          MS. MORTAZAVI:  Good morning, Sarah Mortazavi, Andrew

5    Adams and Anden Chow and for the government.

6          MR. SERCARZ:  For the defendant Seth Fishman, Maurice

7    Sercarz and Marc Fernich.  The defendant is present in court.

8          THE COURT:  Good morning, counsel, and good morning,

9    Dr. Fishman.  Good morning to Mr. McDaniel, our court reporter.

10         Before we go any further, I just want to make clear on

11   the record exactly where we're at.

12         As you all know, yesterday counsel for Mr. Giannelli

13   tested positive for Covid, having been tested pursuant to the

14   new protocols that were put in place.  I announced to everyone,

15   pursuant to Federal Rule of Criminal Procedure 26.3, that it

16   was my intent, based on that test, to declare a mistrial, but

17   gave people the opportunity to be heard.

18         Mr. Fasulo moved for a mistrial with respect to

19   Ms. Giannelli.  The government moved to sever, and then

20   Mr. Fasulo moved for the mistrial with respect to

21   Ms. Giannelli.  I granted the motion for a mistrial with

22   respect to Ms. Giannelli, and obviously that's a granting of

23   the motion to sever then.

24         Dr. Fishman's counsel then argued that they thought

25   that a mistrial was in order then with respect to Dr. Fishman

as well.  I gave both counsel an opportunity to submit written

submissions at the end of the day.  I instead received from the

government a submission over lunchtime.  When we resumed in the

afternoon, Dr. Fishman's counsel argued on the record.  I

invited and gave you ample opportunity to make a written

submission by the end of the day yesterday and to propose a

limiting instruction that would be given to the jury if I did

not declare a mistrial.  I received nothing further in writing

from either party.

So I note that defense counsel, in its oral argument

yesterday, agreed with the government's recitation of all of

the governing legal standards which are laid out in the

government's letter at Docket Entry 702.  Specifically, both

sides now agree that the standard for retroactive misjoinder,

which is what counsel for Dr. Fishman seemed to be arguing in

support of its motion for a mistrial, is compelling prejudice.

And the relevant guidance from the Second Circuit is set forth

in *United States v. Hamilton*, 334 F.3d 170, 181 (2d Cir. 2003),

and *United States v. Jones*, 16 F.3d 487, 493 (2d Cir. 1994).

Dr. Fishman's counsel also acknowledged that the Court has

discretion with respect to these issues, citing *United States

v. Cardascia*, 951 F.2d 474, 482, (2d Cir. 1991).

The Court does not find that Dr. Fishman has suffered

or would suffer any compelling prejudice from the mistrial with

respect to Ms. Giannelli or from the defense strategy that

1    Ms. Giannelli's counsel pursued at the beginning of the trial,

2    her subsequent mistrial, or the combination of the two factors.

3    And I will note for the record that Dr. Fishman's counsel was

4    emphatic that but for the development with respect to

5    Mr. Fasulo and Covid, it had not yet come to a landing on

6    whether it intended to make any kind of a motion, and that

7    yesterday's developments were the precipitating factor in its

8    seeking a mistrial.

9         With respect to Ms. Giannelli's absence for the rest

10   of the trial, as I noted yesterday, it's not infrequent that a

11   defendant might plead guilty in the middle of a trial.  A

12   defendant might decide in the middle of trial to testify

13   against a remaining defendant.  The case law makes clear that

14   even in those circumstances there would not be grounds for a

15   mistrial so long as the trial judge gives appropriate

16   cautionary instructions to the jury.  And I would cite

17   specifically to *United States v. Barret*, 848 F.3d 524, 534 (2d

18   Cir. 2017).

19        It seems to the Court that all of the arguments that

20   Ms. Giannelli's counsel made were completely foreseeable when

21   Dr. Fishman's counsel and Dr. Fishman consented to be tried

22   with her, and her absence from the rest of this trial does not

23   foreclose any line of defense that Dr. Fishman is entitled to

24   pursue.  In fact, in of the Court's view, it might make it

25   easier for him to pursue certain lines of defense.  It is not

M1PTFIS1

1    infrequent that co-defendants seek to place blame on one

2    another, and that circumstance does not require severance.

3    See, *United States v. Villegas*, 899 F.2d, 1324, 1346 (2d Cir.

4    1990).

5              Mr. Fernich, when he was arguing to me, stressed that

6    it had been his intent to cross-examine Ms. Giannelli, which

7    obviously he can no longer do, based on his understanding that

8    Mr. Fasulo made a representation in his opening statement that

9    Ms. Giannelli intended to testify.  Even if that is accurate,

10   there was absolutely no guarantee that Ms. Giannelli would

11   testify and she was never under any obligation to do so.  And

12   in fact, I so instructed the jury in my preliminary

13   instructions.

14             As Mr. Fernich acknowledged, trials are fluid.  I

15   appreciate that he and Mr. Sercarz may have formulated a

16   particular strategy that they were planning to pursue in light

17   of Ms. Giannelli's defense during the first day and a half of

18   trial.  Counsel will need to adapt.  That's what it means to

19   say a trial is a fluid situation.

20             Dr. Fishman has received and will continue to receive

21   a fair trial.  Contrary to what counsel argues, a cautionary

22   instruction is adequate to protect Dr. Fishman's constitutional

23   rights.  So the motion by Dr. Fishman for a mistrial is denied

24   and we will move forward with the trial today.

25             Now I have copies for counsel of the instruction that

M1PTFIS1

1    I intend to give the jury.

2            Ms. Dempsey, if you could hand this out, I would

3    appreciate it.

4            I did receive a proposed instruction from the

5    government yesterday at the lunch break.  As I think I said on

6    the record yesterday, I had some reactions to it and proposed

7    modifications.  I am giving you the proposed instruction I

8    would intend to give, and I will give everyone a few moments to

9    look it over and give me any comments.

10            MR. ADAMS:  Thank you, your Honor.  It looks good to

11    the government.

12            THE COURT:  Thank you.

13            MR. FERNICH:  Obviously, without prejudice to the

14    prior arguments, the limiting instruction is appropriate.

15            THE COURT:  Thank you very much.

16            All right.  Ms. Dempsey, were our jurors all

17    assembled?

18            DEPUTY CLERK:  Not yet.

19            THE COURT:  So we'll stand in recess until roughly

20    10 o'clock.  Ms. Dempsey will let me know when our jurors are

21    all here and we will pick up.

22            Is your witness ready?  You were in the middle of a

23    witness.

24            MS. MORTAZAVI:  Yes, your Honor, we do have our

25    witness ready.  And we have one matter to bring to the Court's

M1PTFIS1

1    attention.

2              THE COURT:  Sure.

3              MS. MORTAZAVI:  We have transcript binders I believe

4    we brought to the Court's attention before.  Defense counsel

5    has reviewed them.  And they're binders containing

6    transcriptions of various wire recordings that we would like to

7    make available to the jurors.  So if it's amenable to the

8    Court, we could either place them in the jurors' seats now or

9    do it after the jurors have assembled.

10             THE COURT:  You mean for them to follow along?

11             MS. MORTAZAVI:  That's right, your Honor.

12             THE COURT:  Okay.  Why don't you put them on their

13   seats while we are in recess so that that way when they arrive,

14   we don't have to hold things up.

15             MS. MORTAZAVI:  Certainly.  Thank you, your Honor.

16             THE COURT:  Okay.  Anything from you, Mr. Fernich or

17   Mr. Sercarz?

18             MR. FERNICH:  Judge, I don't mean to be a pest.

19   Turning back to the limiting instruction for a minute, the

20   instruction anticipated what had been my paramount concern.  A

21   subsidiary concern, I would like to add something in there that

22   the jury is to disregard all arguments and evidence and

23   questioning and answers elicited by Giannelli and her counsel.

24             MS. MORTAZAVI:  Your Honor, we would object to such an

25   instruction.  Obviously the evidence that was elicited against

M1PTFIS1

1    Ms. Giannelli is relevant to Dr. Fishman, as they're

2    co-conspirators.

3         THE COURT:  I'm not going to instruct anything with

4    respect to evidence, and I have already instructed that opening

5    statements are not evidence.  I will, to the extent it's not

6    included in what you all proposed in the joint instructions for

7    the end of the trial, obviously I will include that then.  And

8    if you want me specifically to mention Mr. Fasulo's opening,

9    you can propose that, but right now I'm not going to amend this

10   proposed instruction.

11        MR. FERNICH:  I'm less concerned, actually, about the

12   opening statement.  I understand what is going to -- you have

13   already given an instruction about that, it will be reiterated.

14        I will join issue with Ms. Mortazavi on the

15   admissibility of the prior evidence that an absent order --

16        THE COURT:  I'm sorry, I'm not hearing you fully.

17   Could you sit and talk into the microphone?

18        MR. FERNICH:  Sorry, Judge.  I'm not so concerned

19   about the opening statement, for the reasons your Honor

20   articulated.  Your Honor has given an instruction and will give

21   another instruction in the ordinary course.

22        I will join issue, though, with Ms. Mortazavi on the

23   admissibility of the testimony that an absent defendant has now

24   elicited.  We can't react to that.  Insinuations were left by

25   the defense lawyer.  I don't think that belongs in the record

M1PTFIS1

anymore.  If the government wants to elicit its own proof as to

what Ms. Giannelli did or did not do as a putative

co-conspirator in the case, that's on them, but that party is

no longer involved in this case, and that evidence, in my view,

all that happened under the baton of Mr. Fasulo and

Ms. Giannelli should now be stricken from the record.  We're

involved in a separate trial now and who knows how Mr. Fasulo

would have amended that or supplemented that or footnoted that

going forward, and we shouldn't have to contend with that

evidence moving forward.

THE COURT:  I do hear your argument and I do

understand the concern.  I need input from the parties on this,

to be perfectly honest.

MR. FERNICH:  Okay.  It's a bit of a novel issue.

MS. MORTAZAVI:  Your Honor, let me say this:  The

point of adapting to changed circumstances is not having a

second bite at the apple and pretending what the jury has heard

has not actually occurred.  The point is to adapt moving

forward.  And I don't think that we need to strike any

responses by certain of the witnesses to a line of questions as

if it was somehow inappropriately placed before the jury or

somehow prejudicial to Dr. Fishman.  The point is not to erase

what has happened, the point is to instruct the jury how

they're going to weigh the evidence moving forward.

THE COURT:  So let me say this:  I am telling you, in

M1PTFIS1

1    all candor, I honestly do not know the answer here, which is

2    why I told you I want input from the parties.

3           My gut tells me the following:  If Ms. Giannelli had

4    taken the stand and offered evidence and then we have a

5    mistrial and she disappears, I think that would probably have

6    to be stricken.  But the fact that Mr. Fasulo, on her behalf --

7    as did you or Mr. Sercarz on behalf of your client --

8    cross-examined witnesses, does not strike me as something that

9    would have to be stricken.

10          But I honestly do not know the answer to this, and I'm

11   going to give you a short time to try to give me something to

12   lean on.  Otherwise, as I say, my sense is that that

13   instruction is not appropriate.  The opening, yes, but I have

14   already given that and I will give it again at the end.

15          MR. FERNICH:  I don't know the answer.  I'm being

16   candid with you.  It seems to me, though, it's not limited to

17   our opportunity to -- or lack thereafter -- to cross-examine

18   Giannelli, who may or may not have appeared and testified.  But

19   we have a strategic call to make about whether to cross-examine

20   subsequent witnesses about the assertions made by Adams in

21   response to questioning and evidence elicited by Mr. Fasulo.

22          THE COURT:  Right.  You have to make that decision.

23          It seems to me evidence is evidence.  And suppose she

24   had pled guilty and was out of the case.  In the cases that we

25   looked at last night to try to formulate my ruling, never did

M1PTFIS1

we see a limiting instruction after a defendant disappeared

from a case because of a plea that any of the evidence that had

been adduced up to that point needed to be stricken, and that's

what is guiding my thinking here.

MR. FERNICH:  That's a fair point.  I will take a

look, and I take that point.

THE COURT:  All right.

MS. MORTAZAVI:  Your Honor, if I may add something to

this argument, which is it's not as simple as Mr. Fernich is

making it sound.

THE COURT:  I don't know if he's making it sound

simple, he's being honest that he doesn't know.

MS. MORTAZAVI:  It's not merely the fact of removing

the questions and answers by Mr. Fasulo because counsel for

Dr. Fishman had the opportunity for recross and government had

the opportunity for redirect.

THE COURT:  Yes, I said that.

MS. MORTAZAVI:  Certainly.  I apologize if I missed

it, your Honor.

THE COURT:  I didn't say it in those exact words, I

said there was opportunity for them to conduct whatever

examinations they wanted.

MS. MORTAZAVI:  And I think it's more complex to try

to do the surgical correction that Mr. Fernich is proposing

than to simply leave the evidence as it is.

M1PTFIS1

1              THE COURT:  That is my instinct.

2              MR. FERNICH:  That part is not complex, you just

3     strike out the entire examination.

4              THE COURT:  No, I don't think it's that simple,

5     Mr. Fernich, because that might have impacted what the

6     government might have done or might have impacted what you

7     might have done.  To go back retroactively and try to alter the

8     record, it seems to me, creates more problems in terms of the

9     fairness of the trial.  So that's my instinct.

10             Why don't we take a break.  If you want to find

11    contrary authority to bring to my attention, I will consider

12    it, but otherwise my ruling is I am not going to include

13    anything in the instruction about striking anything from the

14    record.

15             MR. FERNICH:  I will take a look.  And just to be

16    clear, I won't belabor it, we understand each other.  My

17    concern is sort of different from -- we understand we had the

18    opportunity to cross and recross Ms. Adams, but it's certainly

19    not unheard of in a trial to get one prosecution witness to

20    impeach the testimony of another, either implicitly or

21    explicitly, and that's a common weapon in our arsenal.  Now

22    we're in the horns of a dilemma:  Do we do that or not?  And

23    it's tough, and it depends on whether that evidence still

24    exists or not.

25             THE COURT:  The evidence still exists.

M1PTFIS1

1          We'll stand in recess.  Ms. Dempsey will check on the

2     availability of our jurors.  If you find something that you

3     want to call to my attention, I am open to hearing it, but

4     that's my ruling.

5          We'll stand in recess.  Thank you.

6          MS. MORTAZAVI:  Thank you, your Honor.

7          (Recess taken)

8          THE COURT:  I'm told our jurors have all arrived, so

9     we're ready to resume.

10         Anything further from you, Mr. Sercarz or Mr. Fernich?

11         MR. FERNICH:  Yes, your Honor, just briefly.  I

12    understand your Honor's preliminary ruling on the instruction

13    point.  I will add to the record the following:  Because the

14    government has not shown that testimony elicited by Giannelli

15    would have been admissible against Fishman had their trials

16    initially been severed, I'm maintaining my position that the

17    testimony should be stricken and disregarded.  And for the

18    present I will cite for that *U.S. v. Flores*, 362 F.3d 1030,

19    1041 (8th Cir. 2004).

20         THE COURT:  Anything from our circuit?

21         MR. FERNICH:  Eighth Circuit.

22         THE COURT:  I said do you have anything from our

23    circuit?

24         MR. FERNICH:  No, but the Eighth Circuit case cites to

25    two other cases, and they're all interpreting language in

M1PTFIS1

1   *Zafiro*, which says -- we talked about *Zafiro* yesterday.  *Zafiro*

2   says that in the ordinary course testimony by a severed

3   co-defendant would not ordinarily by stricken if it would have

4   been inadmissible -- if it would have been admissible in a

5   separate trial.  That's what I was able to find in the moment.

6          THE COURT:  All right.  First of all, it's not in the

7   moment.  I gave you yesterday evening to submit whatever you

8   wanted to submit and you chose to submit nothing, including

9   nothing on a limiting instruction.  So the record needs to be

10  clear about that point.

11         I will take a quick look at the case, but anything

12  from you, Mr. Adams?

13         MR. ADAMS:  Only that, number one, there's not been a

14  single objection by Mr. Fishman to any question that Mr. Fasulo

15  asked throughout the course of examination.  That's because

16  everything he asked of those witnesses was admissible in this

17  case.  It would have been admissible in a separate case against

18  Fishman.  All statements by Ms. Giannelli that have been

19  elicited so far have been in furtherance of Fishman's

20  conspiracy and would be admissible even in separate trials.

21  But the core fact is if they would have been admissible to

22  Mr. Fishman, he had the opportunity to object at the time and

23  did not.

24         (Continued on next page)

25

M1PPFIS2

1          MR. FERNICH:  I have the testimony calling

2     Dr. Fishman -- eliciting evidence from Courtney Adams to

3     support the notion that -- and I think the word "sheep master"

4     was even used in the examination.  Obviously, we didn't object

5     at the time because the calculation was different, because we

6     were having joint trial, and we'd have the opportunity, as the

7     trial went on, to rebut that.

8          Standing on its own, that certainly, certainly would

9     not have been admissible against Dr. Fishman in a separate

10     trial.  That argument strains credulity.

11          THE COURT:  You have the same opportunity to rebut now

12     that you had before, and as I said earlier, to the extent

13     you're claiming you would have rebutted it by cross-examining

14     Ms. Giannelli, it was not a foregone conclusion that she was

15     going to testify.  She had the right to change her mind at any

16     moment.

17          So the Court holds the same view as I ruled.  I'm not

18     going to add anything to the limiting instruction about

19     questioning by Mr. Fasulo, and I am not going to strike any

20     evidence.

21          MR. FERNICH:  I understand.  I'm not -- I appreciate

22     your Honor's ruling.  For the record, I do want to say one more

23     thing.  Even if Ms. Giannelli had rescinded the -- I've never

24     heard a representation like that by a lawyer in an opening,

25     that you will hear from Ms. Giannelli.

M1PPFIS2

1          Even that, had that been rescinded, though, we would

2     have had the opportunity to seek to call Ms. Giannelli on our

3     own case, and that opportunity is gone by virtue of her certain

4     invocation of the Fifth Amendment at this point, given that

5     we've been severed.  So I'll just add that to the record.  I

6     don't want to belabor it.  I just want to make sure my record

7     is clear.

8          THE COURT:  You would not have had the opportunity to

9     call her.  As a co-defendant, she is entitled not to take the

10    stand and to say nothing, and you would not be free to comment

11    on that.

12         MR. FERNICH:  If she invoked, I agree with you.

13         THE COURT:  All right.  The other thing, I do not find

14    the case that you've cited to me as persuasive on this point.

15    I mean, just for the record -- and then we're going to move on

16    because the jurors are waiting outside -- that case says "a

17    fair trial does not include the right to exclude relevant and

18    competent evidence.

19         A defendant normally would not be entitled to exclude

20    the testimony of a former co-defendant if the District Court

21    did sever their trials, and we see no reason why relevant

22    competent testimony would be prejudicial merely because the

23    witness is also a co-defendant."

24         So you have my ruling.  I'm going to ask my clerk to

25    let Ms. Dempsey know we're ready for the jury to come in, and I

M1PPFIS2

1    will give the limiting instruction that you have, both sides,

2    seen and have no objection to.  Correct, Mr. Adams?

3                 MR. ADAMS:  Correct, your Honor.

4                 THE COURT:  Mr. Fernich?

5                 MR. FERNICH:  Not other than the objection previously

6    launched.

7                 THE COURT:  The objection is that you want me to

8    strike evidence, but the text of what I gave you, you have no

9    objection to, you just want more added?

10                MR. FERNICH:  That is correct.

11                THE COURT:  Okay.  Thank you.

12                MR. ADAMS:  And, your Honor, shall I call Agent

13   Folensbee to the stand, get him up there while --

14                THE COURT:  No, I think you should wait for the jury.

15   I think he should come in when the jury is sitting.

16                MR. ADAMS:  Okay.

17                THE COURT:  And I'm sorry, what was his name again?

18                MR. ADAMS:  Folensbee.

19                THE COURT:  I'm sorry?

20                MS. MORTAZAVI:  His name is Folensbee, your Honor,

21   F-o-l-e-n-s-b-e-e.

22                THE COURT:  All right, thank you.  And Agent or

23   Mister?

24                MS. MORTAZAVI:  Mister.  He was the staff operations

25   specialist.

M1PPFIS2

1          THE COURT:  Thank you.

2          (Pause)

3          (Jury present)

4          All right.  Please be seated, everyone.

5          Good morning, ladies and gentlemen.  Let me first say

6     thank you very, very much for your patience yesterday.  I'm

7     sorry for the disruption and the imposition on you.  I

8     appreciate your patience again this morning.

9          The lawyers and I had some legal issues that we had to

10    sort through and talk about outside of your presence, and that

11    was the reason why we first had you standing by yesterday and

12    then ultimately realized that we weren't going to get to any

13    testimony, and so it was fine for you to leave for the day

14    yesterday.  So I appreciate your patience.

15          From time to time there are legal issues that come up

16    that I do need to talk to the lawyers about outside your

17    presence, but we'll try to keep that to a minimum, do it over

18    lunch break or the morning or afternoon break so we don't

19    impose on all of you, but thank you again.

20          So before we resume the testimony, I have further

21    instructions that I want to give to all of you.  Ms. Giannelli

22    is no longer on trial.  You are not being asked to render a

23    verdict as to her.  Now, you are not to be concerned with

24    Ms. Giannelli, nor should you speculate about the reasons why

25    she is no longer a part of this trial.  The trial against

M1PPFIS2

1    Dr. Fishman will be going forward.

2           This development may not effect or influence your

3    verdict with respect to Dr. Fishman in any way.  You must base

4    your verdict as to Dr. Fishman solely on the basis of the

5    evidence, or lack of evidence, against him.  Ms. Giannelli's

6    absence is not evidence of either defendant's guilt, and you

7    may not draw any negative inference against Dr. Fishman based

8    on the fact that Ms. Giannelli's trial is not proceeding at

9    this time.

10          All right?  So, Mr. Adams, would you please re-call

11   Mr. Folensbee, who was the witness we were hearing from when we

12   broke on Friday, I believe.

13          MR. ADAMS:  Certainly, your Honor.

14          THE COURT:  Oh, and ladies and gentlemen, you also

15   have on your chair a binder that counsel left for you because

16   they will be using some of what's in those binders during the

17   examination this morning because we thought it was just easier

18   and more efficient to have it there for you, but they'll let

19   you know when you need it.

20          Good morning, sir.  Thank you for being here, and I

21   remind you that you remain under oath, sir.  Thank you.

22          Ms. Mortazavi.

23          MS. MORTAZAVI:  Thank you, your Honor.

24    DANIEL FOLENSBEE,

25   DIRECT EXAMINATION (Resumed)

M1PPFIS2                        Folensbee – Direct

```
 1    BY MS. MORTAZAVI:
 2    Q.  Good morning, Mr. Folensbee.
 3    A.  Good morning.
 4    Q.  Just to remind the jury, because you had begun your
 5    testimony on Friday, and we're resuming today.  You are a staff
 6    operations specialist with the FBI; is that right?
 7    A.  Yes.
 8    Q.  And when you last testified Friday afternoon, you discussed
 9    your participation in a search that took place between
10    October 27th and 28th, 2019; is that correct?
11    A.  Yes.
12    Q.  And the address of the search was 3500 Northwest 2nd
13    Avenue, Unit 723, Boca Raton, Florida; is that also right?
14    A.  Yes, that is correct.
15    Q.  And again, to remind the jurors, you were the photographer
16    for that particular search; is that correct?
17    A.  That is correct.
18    Q.  Ms. Jung, could you please pull up Government Exhibits
19    4000, 4031 and 4032, and these are all in evidence.  If you
20    could please publish it for the jury as well.
21            Mr. Folensbee, could you just remind us again about
22    the interior of the premises that was searched with reference
23    to these exhibits?
24    A.  Yes.  The left photo is the entrance to the office area,
25    and the door in the back in the photo leads to the storage
```

1  area, which is on the right two photos.

2  Q.  And on Friday, you previously discussed the photo to the

3  right side of the screen at the bottom, I believe that's

4  Government Exhibit 4032, correct?

5  A.  Yes.

6  Q.  And you testified about the rubber bins that were stacked

7  on the shelves in that unit, correct?

8  A.  Yes.

9  Q.  Do you recall what was inside those rubber bins, generally

10  speaking?

11  A.  Vials of drugs.

12  Q.  Ms. Jung, could you pull up Government Exhibit 4001 and

13  4002.

14          Mr. Folensbee, are these refrigerators that were found

15  within the premises?

16  A.  Yes, they are.

17  Q.  And do you see on the left side of the screen that's

18  Government Exhibit 4001, that there appears to be a white board

19  that's attached to one of the fridges?

20  A.  That's correct.

21  Q.  All right.  And looking to Government Exhibit 4002, could

22  you please read the names that are listed on that white board?

23  A.  We have AC, ACTH, ATM, ATQ Red, BPR, one that I can't read,

24  Cobalt Chloride, another one that can't read, EquiAce, EquiCam,

25  Equitosan, FAB, FAB plus, HCG 11,000, NPPI-34D, P3, Serum,

M1PPFIS2                    Folensbee – Direct

1    SODHSP 125, SODHSP-C, and Wake Me Up.

2    Q.  And, Ms. Jung, could you please pull up Government

3    Exhibit 4003 and 4005.

4            Mr. Folensbee, what are we looking at here?

5    A.  We are looking at one of the refrigerators found at the

6    search location and one of the drawers inside that

7    refrigerator.

8    Q.  And is that in reference -- and you mentioned one of the

9    drawers, is that Government Exhibit 4005?

10   A.  Yes, ma'am.

11   Q.  Do you see that there's a tape with some writing on it on

12   that shelf?

13   A.  Yes.

14   Q.  Could you please read that out loud, to the extent you can

15   understand it?

16   A.  ITP, 20 milliliter amber, DOM 7.19.

17   Q.  And, Ms. Jung, could you please pull up Government

18   Exhibits 4036, 4037 and 4047.

19           And, again, Mr. Folensbee, are we looking at the

20   interior of fridges that were found on the premises?

21   A.  Yes, we are.

22   Q.  Looking at Government Exhibit 4036 for the moment, do you

23   see that there are rubber containers contained within the

24   fridge with tape on them that appears to contain some writing?

25   A.  Yes, I do.

1   Q.  Could you please read out what's written on those pieces of

2   tape?

3           And, Ms. Jung, if we could expand that particular

4   Exhibit 4036 so that it's legible?

5   A.  One says NPX1, a couple letters I can't read, 10

6   milliliters, DOM 6.18.

7           THE COURT:  Excuse me.  Are we able to make that

8   bigger?  Can you make that bigger?

9           MS. MORTAZAVI:  We'll try.  Ms. Jung, could you focus

10  on the top shelf, make that bigger?

11          THE COURT:  Thank you very much.

12  A.  Okay.  So the one on the left, NPX1, old, in quotation

13  marks, 10 milliliter, DOM 6.18.

14  Q.  And on the other container full of bottles?

15  A.  AICAR, Equi-Ace, DOM 8.19.

16  Q.  Thank you.

17          Ms. Jung, could we please focus on Government

18  Exhibit 4037.

19          Looking again at the top shelf, could you please read

20  those labels, Mr. Folensbee, starting with the top left and

21  then moving down and to the right side of the screen?

22  A.  The top left, a couple letters and Equine New 7.16; bottom

23  left Glutathione; bottom right, Equitriopian; top right, ATQB0.

24  Q.  Thank you.

25          Ms. Jung, could you please pull up Government

1    Exhibit 4019 and 4020.

2              Mr. Folensbee, are you able to see the labels that are

3    on this cardboard container?

4    A.  Yes.

5    Q.  And looking to Government Exhibit 4047 –– I'm sorry 4020,

6    my mistake, which is on the right side of your screen, could

7    you please read out the address of what appears to be the

8    sender on this shipping label?

9    A.  6 Teda Building, 87 Wing Lok Street, Sheung Wan, Hong Kong

10   Island, 999077, Hong Kong.

11   Q.  And is there a business name associated with that?

12   A.  Yes, Ancheng Pharma Limited.

13   Q.  Thank you.  And there appears to be a line with product

14   written on it.  Would you please read out the name of the

15   product that appears?

16   A.  Diclazuril.

17   Q.  Okay.  And, sir, do you see a sticker on this container

18   that appears to contain a company name or a branded sticker?

19   A.  Yes, Equi-Science on the top, top right.

20   Q.  All right.  Ms. Jung, could you please pull up Government

21   Exhibit 4022 and 4023.

22              Mr. Folensbee, we reviewed some of these exhibits

23   previously when you testified before.  I just want to ask you,

24   looking at these two exhibits, do you see any of these labels

25   that contain the name Equestology on them?

1    A.  No, ma'am.

2    Q.  Do you see any of these labels that appear to contain the

3    address that was searched, 3500 Northwest Second Avenue?

4    A.  No.

5    Q.  Ms. Jung, could you please pull up Government Exhibit 4024

6    and 4027.

7           Mr. Folensbee, were these also labels that were found

8    at the address that was searched?

9    A.  Yes.

10   Q.  And looking at these rolls of labels, again, could you

11   please tell us if any of these contain the company name

12   Equestology?

13   A.  No.

14   Q.  Do any of these contain the address that was searched?

15   A.  No.

16   Q.  Ms. Jung, could you please pull up Government Exhibit 4028

17   and 4029.

18          Mr. Folensbee, is this one of the -- well, on the

19   right side, one of the bottles that was found, and on the left

20   side, collection of the same type of bottles that was found on

21   the premises of the search?

22   A.  Yes.

23   Q.  Could you, to the extent you can, read out the product name

24   and information on the label that appears on this particular

25   bottle with reference to Government Exhibit 4029?

1    A.  Yes.  GNRH, Gonadorelin diacetate, 20 milliliter,

2    multiple-dose vial.

3    Q.  Thank you, sir.

4            Ms. Jung, could you please pull up Government

5    Exhibit 4034 and 4035, and could you zoom in with respect to

6    4035, Ms. Jung, on the single blue packaging that appears in

7    that picture.

8            And, Mr. Folensbee, could you read the name of this

9    product?

10   A.  Equitosan.

11   Q.  And the information that appears under it, starting with, I

12   believe, it's 20 milliliter?

13   A.  250 milligrams/milliliter, 20 milliliter multi-dose vial,

14   pentosan polysulfate.

15   Q.  Thank you, sir.

16           Ms. Jung, could you please pull up Government

17   Exhibit 4024, 4043 and 4044, and could you focus, please,

18   Ms. Jung, on the top right exhibit.

19           And, Mr. Folensbee, could you read out the name on

20   this label, what appears to be the name of this product?

21   A.  Homeopathic analgesic.

22   Q.  To the extent you can read it, or we can have Ms. Jung

23   expand it, could you please read the directions for this

24   particular product?

25   A.  Administer 2 cc's intravenously only, four to six hours

1    prior to strenuous exercise.

2    Q.  And, Mr. Folensbee, looking at Government Exhibit 4043, is

3    that a single bottle that is the same bottle that appears in

4    Government Exhibit 4044?

5    A.  Yes.

6    Q.  That's the bottle with the pink cap, correct?

7    A.  Yes.

8    Q.  And also looking at Government Exhibit 4044, the tub that

9    is beside it that contains a collection of bottles with pink

10   caps, are those multiple bottles of the same type as the

11   homeopathic analgesic that we were just discussing?

12   A.  Yes, they are.

13          MS. MORTAZAVI:  Your Honor, no further questions.

14          THE COURT:  Thank you.

15          MR. SERCARZ:  Can I have one moment?

16          THE COURT:  Sure.

17          (Pause)

18          MR. SERCARZ:  No questions, your Honor.

19          THE COURT:  All right.  Thank you.

20          All right.  Thank you, sir.  You're excused.

21          (Witness excused)

22          Mr. Adams, your next witness?

23          MR. ADAMS:  Thank you, your Honor.  The government

24   calls Dr. Jean Bowman.

25          MS. MORTAZAVI:  I'm sorry, your Honor.  Before we call

 1   our next witness, we'd like to read into the record a

 2   stipulation.

 3           THE COURT:  All right.  Do I have copies of the

 4   stipulation?

 5           MR. SNIM:  It should be in your binder, but Ms. Jung

 6   can pull up a copy.  It is a government exhibit that's been

 7   marked as Government Exhibit 9011, and we'll also be reading in

 8   9014.

 9           THE COURT:  All right.  If you're able to hand them

10   up, that would be easier because I don't know which of these

11   many binders we're working with and, frankly, if someone can

12   provide the same binder that you gave the jurors to me.

13           MS. MORTAZAVI:  I believe the Court does have a copy

14   of the transcript binder.

15           THE COURT:  Yes, but I can't find it.

16           MS. MORTAZAVI:  We can amend that.

17           THE COURT:  Thank you, Mr. Chow.  I appreciate your

18   help.  Thank you.

19           All right.  Put this on the screen.  I can work with

20   that.  Thank you, Ms. Mortazavi.  I'm sorry.

21           MS. MORTAZAVI:  So reading into the record what's been

22   marked as Government Exhibit 9011, which is the stipulation

23   between the parties, given that it's the first stipulation of

24   the day, I'll go ahead and read the introductory statements

25   that we've read before.

M1PPFIS2                         Folensbee - Direct

1              It is hereby stipulated and agreed, by and among the

2       United States of America, by Damian Williams, United States

3       Attorney for the Southern District of New York, Andrew C.

4       Adams, Anden Chow and Sarah Mortazavi, Assistant United States

5       Attorneys, of counsel, and Seth Fishman, defendant, by his

6       attorney, Maurice Sercarz, Esquire, that:

7              In 2019, agents with the Federal Bureau of

8       Investigation, FBI, conducted judicially authorized wiretap

9       interception of wire and electronic communications over certain

10      cellular phones.

11             The contents of each intercepted wire or electronic

12      communication, the incoming and outgoing phone numbers

13      associated with the communication, and when provided, the

14      geo-location data including the coordinates of particular

15      cellular telephone towers through which particular

16      communications were routed by the relevant cellular services

17      providers, e.g. T-Mobile, were recorded at the time each

18      communication occurred.

19             Each recording and its associated data was then

20      transferred to a computer system under the custody and control

21      of the FBI.  The government exhibits listed in schedules A, B,

22      C and D to the stipulation are true and correct copies of

23      portions of communications that were intercepted pursuant to

24      such judicially authorized wiretaps in the manner described in

25      paragraph 1 above.

M1PPFIS2                          Folensbee – Direct

 1          Schedule A lists calls and text messages intercepted

 2     over a cellular phone identified with the telephone number

 3     561-270-9286, subscribed to in the name of Seth Fishman.  The

 4     9286 phone.

 5          Schedule B lists calls and text messages intercepted

 6     over a cellular phone identified with the telephone number

 7     302-222-2220, subscribed in the name of Lisa Giannelli.  The

 8     2220 phone.

 9          Schedule C lists calls and text messages intercepted

10     over a cellular phone identified with the telephone number

11     954-557-7015, subscribed in the name of Jorge Navarro.  The

12     7015 phone.

13          Schedule D lists calls and text messages intercepted

14     over a cellular phone identified with the telephone number

15     570-991-3010, subscribed in the name of Susan M. Oakes.  The

16     3010 phone.

17          Government Exhibits 203, 204, 205 and 206, which are

18     also listed in Schedule A to the stipulation, are true and

19     correct copies of maps generated based on geo-location data

20     provided by T-Mobile.

21          Government Exhibits 101-T through 199-T are true and

22     accurate transcriptions and voice attributions of portions of

23     intercepted wire communications described in paragraphs 1 and 2

24     above, and are marked corresponding to the number assigned to

25     the relevant recording.

1           For example, Government Exhibit 101-AT is a transcript

2    of the recording contained in Government Exhibit 101-A.

3           Also included as part of each transcript is true and

4    accurate information regarding the time and/or date of the

5    relevant recording and the participating phone numbers.

6           It is further stipulated and agreed, by and between

7    the parties, that the aforementioned government exhibits and

8    the stipulation, which is Government Exhibit 9011, may be

9    received in evidence at trial.

10          Your Honor, the government offers Government Exhibits

11   9011, 101-A through 115-C, 117-A through 143-D, D as in dog,

12   160-A through 173-A, 190-A through 192-A, and 199-A through

13   199-B, as in bravo.

14          THE COURT:  Those are all the exhibits covered by the

15   stipulation, correct?

16          MS. MORTAZAVI:  Correct, your Honor.

17          MR. FERNICH:  No objection from the defense.

18          THE COURT:  All right.  They'll be received in

19   evidence.

20          (Government's Exhibits 9011, 101-A through 115-C,

21   117-A through 143-D, 160-A through 173-A, 190-A through 192-A,

22   and 199-A through 199-B received in evidence)

23          MS. MORTAZAVI:  Your Honor, and I'll read one separate

24   exhibit dealing with one of those calls.  That's Government

25   Exhibit 9014.  It was signed this morning, and I don't believe

1    the Court has a copy, but I'll be reading it into the record.

2              THE COURT:  Slowly, though, okay?

3              MS. MORTAZAVI:  Government Exhibit 192-AT is a true

4    and accurate English-language translation and transcription of

5    the Spanish-language recording contained in Government

6    Exhibit 192-A.  Government Exhibit 192-AT reflects true and

7    accurate information regarding voice attributions, time and/or

8    date, and participating phone numbers for Government

9    Exhibit 192-A.

10             I will do my best to slow down for the court reporter.

11             And, your Honor, with that stipulation, I'd like the

12   jurors to please turn to the binders in front of them to the

13   tab marked 121-AT, and I'd like to have Ms. Jung please pull up

14   that government exhibit, and please play the portion of the

15   recording marked Government Exhibit 121-A.

16             THE COURT:  All right.  Don't play it until I say go

17   ahead because everyone needs a minute.

18             MS. MORTAZAVI:  Certainly, and I'll just state for the

19   record that this is a portion of an intercepted call taking

20   place on March 21st, 2019, between Seth Fishman and an

21   unidentified male, as indicated on Government Exhibit 121-AT.

22             THE COURT:  Has everyone found the exhibit?  Anyone

23   need more time?  Just raise your hand.  Okay.  And if it's

24   easier for you, I do think the exhibit is on your screen.

25             Is right?

1              MS. MORTAZAVI:  That's correct.

2              THE COURT:  Is that easier?  Does anyone need more

3    time?

4              JUROR:  Can we have more?

5              THE COURT:  Can you have more time?  Sure.  I'm not

6    hearing.

7              JUROR:  Can we have the ones that can't find it in the

8    book?

9              THE COURT:  It's on the screen.

10             JUROR:  Oh, okay.

11             THE COURT:  Is your screen --

12             JUROR:  No, I have it.

13             THE COURT:  Thank you.

14             All right.  Ms. Mortazavi?

15             MS. MORTAZAVI:  Ms. Jung, if you could play Government

16   Exhibit 121-A.

17             (Audio played)

18             And, your Honor, I'd like to direct the jurors to the

19   next tab in their binders, what's been marked as Government

20   Exhibit 121-BT, B as in bravo, and have Ms. Jung please pull up

21   Government Exhibit 121-BT and Government Exhibit 121-B but not

22   yet play that portion of a recorded call.

23             And for the jurors' benefit, I'll describe this

24   particular government exhibit is a portion of that same

25   intercepted call that we heard, Government Exhibit 121-A, but

1  occurring later during that call.

2           Ms. Jung, could you please play that recording?

3           (Audio played)

4           And, your Honor, I'll direct the jurors and the Court

5  to what's been marked as Government Exhibit 121-DT, which is

6  also in the transcript binder.  It is another portion of that

7  same intercepted call on March 21st, 2019, and I'll ask

8  Ms. Jung to please ready Government Exhibit 121-D.  And it

9  appears the jurors have located that transcript.

10          THE COURT:  Yes.

11          MS. MORTAZAVI:  Ms. Jung, if you could play Government

12  Exhibit 121-D.

13          (Audio played)

14          Thank you, your Honor.  And I'd like to direct the

15  jurors to one more recording and transcript.  It's what's been

16  marked as Government Exhibit 128-AT in their binders, and I'll

17  have Ms. Jung pull up to the screen Government Exhibit 128-AT

18  and 128-A.

19          And this is as reflected in the stipulation that I

20  read for the record, a portion of the intercepted call on

21  April 25th, 2019, between Seth Fishman and an unidentified

22  male.

23          Ms. Jung, if you could play Government Exhibit 128-A.

24          (Audio played)

25          Thank you, your Honor.

1          The government would now like to call Dr. Jean Bowman
2     to the stand.
3          THE COURT:  Good morning, Dr. Bowman.  Once you're in
4     the enclosure, you can take your mask off and remain standing.
5          Ms. Dempsey?
6      JEAN BOWMAN,
7          called as a witness by the Government,
8          having been duly sworn, testified as follows:
9          THE COURT:  If you can try to speak into the
10    microphone.
11         THE WITNESS:  I do.
12         THE COURT:  Please spell and say your last name.  You
13    can be seated.
14         THE WITNESS:  My last name is Bowman, B-o-w-m-a-n.
15    DIRECT EXAMINATION
16    BY MS. MORTAZAVI:
17    Q.  Good morning, Dr. Bowman.
18    A.  Good morning.
19    Q.  Would you mind pulling the microphone a little bit closer
20    to your mouth, just so that we make sure all the jurors are
21    able to hear you?
22    A.  Is that better?
23    Q.  That's slightly better.  It may have to be uncomfortably.
24    A.  Better?
25         THE COURT:  Yes, it is.  Thank you.

1    Q.  Dr. Bowman, can you tell us where you are employed?

2    A.  Yes.  I'm employed at the FDA Center for Veterinary

3    Medicine.

4    Q.  Is that referred to as FDA CVM?

5    A.  Yes.

6    Q.  What's your current title?

7    A.  I'm a veterinary medical officer.

8    Q.  What sort of work do you do as a veterinary medical officer

9    at the FDA CVM?

10   A.  In my current position, I do primarily work on unapproved

11   animal drugs, and that could involve import, sales of

12   unapproved drugs from brick and mortar retailers and/or online.

13   Q.  Dr. Bowman, does the FDA CVM focus on animal drugs?

14   A.  Yes, we do.

15   Q.  Are both animal drugs and human drugs regulated by the FDA?

16   A.  Yes, they are.

17   Q.  Are those regulations identical?

18   A.  No, they're not.

19   Q.  And --

20   A.  They're largely similar but not identical.

21   Q.  And during your time at the FDA, have you focused solely on

22   animal drug regulations?

23   A.  Yes.

24   Q.  For approximately how long have you worked at the FDA CVM?

25   A.  I've worked there 32-and-a-half years.

1  Q.  And generally speaking, what is the FDA CVM's mission?

2  A.  Our mission is to make sure that there are safe and

3  effective animal drugs available and keeping human food supply

4  safe.

5  Q.  Are you a licensed veterinarian?

6  A.  Yes, I am.

7  Q.  What state are you licensed in?

8  A.  I'm licensed in Maryland.

9  Q.  And what's your educational background?

10  A.  I have a Bachelor of Science in animal science from the

11  University of Maryland, and a DVM from -- it's from Virginia

12  Tech, but it's the Maryland Virginia Regional College of

13  Veterinary Medicine.  That's a mouthful.

14  Q.  It certainly is.  You mentioned the acronym DVM.  What does

15  that stand for?

16  A.  That stands for Doctor of Veterinary Medicine.

17  Q.  Were you employed between college and veterinary school?

18  A.  I was, yes.

19  Q.  Where?

20  A.  I was employed at the University of Maryland Horse Research

21  Center.

22  Q.  What sort of work did you do at the Horse Research Center

23  at the University of Maryland?

24  A.  I did all sorts of work, from general animal care to

25  collecting samples for studies that professors at the

1  University were doing.  We had a breeding herd.  We maintained

2  the foals, mares and teased and bred mares through artificial

3  insemination.

4  Q.  And, Dr. Bowman, I'm just going to ask you, for the benefit

5  of our court reporter and our jurors, to keep your voice up and

6  to the extent you can, speak into the microphone.

7  A.  Thank you.

8  Q.  I know the logistics are a little foreign.

9          And, Dr. Bowman, what year did you begin veterinary

10  school?

11  A.  I began veterinary school in 1985.

12  Q.  And what year did you graduate?

13  A.  1989.

14  Q.  After you graduated from veterinary school, what did you do

15  next?

16  A.  I started practicing with a veterinarian that I knew doing

17  farm call, equine practice primarily, and I also, within a few

18  months, started working at CVM.

19  Q.  I'd like to ask you about the farm call/equine practice.

20  What is the term "farm call"?

21  A.  "Farm call" means it is a mobile practice, where you bring

22  your services to the clients at their homes or the place where

23  their horse is boarded.

24  Q.  And you mentioned equine practice, does that mean that you

25  focused on horses?

M1PPFIS2                          Bowman - Direct

1    A.  Yes, it does.

2    Q.  How long were you employed in that farm call practice?

3    A.  For five years.

4    Q.  You mentioned that, in generalities, the sort of work you

5    did in that practice, can you elaborate as to the tasks that

6    you engaged in?

7    A.  It was all types of routine and emergency veterinary care;

8    so you might be seeing lacerations or other injuries,

9    lamenesses, doing routine healthcare such as administering

10   dewormers or vaccinations, setting up programs for farms so

11   that they have their horses on a regular schedule to keep them

12   healthy, maybe colics, every type of routine emergency that

13   could be seen.

14   Q.  Did you conduct physical examinations of horses?

15   A.  Yes.

16   Q.  Did you prescribes drugs to patients?

17   A.  Yes.

18   Q.  And have you heard the term "medical file"?

19   A.  Yes.

20   Q.  Did you maintain medical files for patients?

21   A.  Yes, we did.

22   Q.  What is a medical file?

23   A.  A medical file is the record of the treatment and diagnosis

24   for each patient.

25   Q.  And what types of records would typically be included in a

1  medical files?

2  A.  That would include dates of visits, the findings of the

3  physical exam, any diagnostic tests that were ordered and their

4  results, and any medications that were prescribed or home

5  healthcare that was recommended.

6  Q.  And you mentioned, Dr. Bowman, that you were employed in

7  that practice for five years; is that correct?

8  A.  That's correct.

9  Q.  All right.  I believe you mentioned that a few months after

10  you were on the farm call practice, you then became employed

11  with the FDA CVM, correct?

12  A.  Correct.

13  Q.  In what year did you join the FDA CVM?

14  A.  I joined in August of 1989.

15  Q.  And when you first joined the agency, what position did you

16  hold?

17  A.  I was veterinary medical officer.

18  Q.  And what responsibilities did you have when you first

19  joined the FDA?

20  A.  When I first joined the FDA, I was in the office of new

21  animal drug evaluation, and my duties involved reviewing the

22  data and helping companies set protocols to test their proposed

23  new animal drugs for safety and effectiveness.

24  Q.  Did you subsequently move to a different position?

25  A.  I did.  In 2008, I -- it's called "crossing the street"

1   because it's literally crossing the street.  I moved into the

2   office of surveillance and compliance, which is primarily

3   dealing with post-marketing of animal drugs.

4   Q.  And when you refer to surveillance and compliance, what is

5   that portion of FDA CVM ensuring compliance with?

6   A.  Their role is to ensure compliance with the rules and

7   regulations in the Federal Food Drug and Cosmetic Act.

8   Q.  Does the federal Food Drug and Cosmetic Act sometimes

9   referred to as the FDCA?

10  A.  Yes, it is.

11  Q.  And is that the office, the office in which you currently

12  work as a veterinary medical officer?

13  A.  Yes, it is.

14  Q.  Have you heard the term enforcement action?

15  A.  Yes.

16  Q.  And what are those?

17  A.  In our universe, enforcement actions can be anything from

18  an advisory letter or a warning letter to a seizure injunction.

19  When a firm refuses to come into compliance, they might be

20  enjoined to stop manufacturing certain drugs or stop other

21  activities.

22  Q.  And what sorts of tools does the FDA have to ensure

23  oversight and compliance by a company?

24  A.  Our tools at the center level are somewhat limited.  We can

25  send letters.  We can have meetings, and we can -- our top

1    action that I've ever heard of is enjoining a firm to stop

2    their activities, but we can also refer cases to the office of

3    criminal investigations part of FDA and, at times, they will

4    take those cases on.

5    Q.  Does the FDA employ FDA agents?

6    A.  Yes, they do.

7    Q.  Do they conduct investigations?

8    A.  Yes.

9    Q.  And in your current position, Dr. Bowman, do you have a

10   particular focus?

11   A.  My particular focus is involving unapproved drugs pretty

12   broadly, but one of my specifics duties is writing GRASE

13   evaluations, which are determinations of unapproved drugs, to

14   determine whether they are generally recognized as safe and

15   effective, and if they, are then they don't require approval

16   under the act.  So that's a type of review that I do quite

17   often to determine whether drugs are truly unapproved drugs

18   that needs further evaluation of what are the risks of those

19   drugs.

20   Q.  And, Dr. Bowman, you mentioned the term GRASE.  Am I to

21   take it that's an acronym for Generally Recognized As Safe and

22   Effective?

23   A.  Yes.

24   Q.  So your GRASE analysis is reviewing the safety and efficacy

25   of drugs; is that fair?

```
 1   A.  Yes.
 2   Q.  And apart from the professional experience you just
 3   described with respect to horses, do you have any experience
 4   with horses beyond your professional farm call practice and
 5   your work at the FDA and CVM?
 6   A.  Yes.  I've been a horse owner and enthusiast since I was a
 7   kid.  I got my first horse when I was 11, and I still have
 8   three horses for just family use, for my children and I to
 9   enjoy as pleasure horses.
10   Q.  Do you race horses?
11   A.  No.
12   Q.  Have you ever raced horses?
13   A.  No.
14   Q.  Dr. Bowman, have you testified on behalf of the FDA CVM
15   before?
16   A.  Yes.
17   Q.  Have you ever been called as an expert witness before?
18   A.  Yes, once before.
19            MS. MORTAZAVI:  Your Honor, at this time, the
20   government offers Dr. Bowman as an expert in FDA and new animal
21   drug approvals and enforcement process and the standards for
22   veterinary practice.
23            MR. SERCARZ:  No objection, subject to the material
24   discussed in the in limine practice, your Honor.
25            THE COURT:  All right.  She will be qualified.
```

1          MS. MORTAZAVI:  Thank you.

2          THE COURT:  Recognized as qualified.

3          MS. MORTAZAVI:  Thank you, your Honor.

4     BY MS. MORTAZAVI:

5     Q.  Dr. Bowman, you mentioned in your prior position as a

6     veterinary medical officer that you reviewed new animal drugs

7     and participated in the new animal drug approval process,

8     correct?

9     A.  Correct.

10    Q.  What is considered an animal drug?

11    A.  An animal -- well, a drug is any substance or article that

12    is intended to treat a disease or the symptoms of a disease, or

13    to the affect the structure or function of the animal, or is

14    found in one of the national pharmacopeias or is a component of

15    one of those other articles, and that applies to both human and

16    animal drugs.

17    Q.  All right.  And, Dr. Bowman, I want to ask you some

18    follow-up questions about what you just said.  You mentioned

19    that a drug would be anything that could be used in the

20    treatment or diagnosis of a disease, correct?

21    A.  Correct.

22    Q.  Could you give an example?

23    A.  In the equine world, flunixin meglumine.

24    Q.  Could you just spell that for the court reporter?

25    A.  F-l-u-n-i-x-i-n, m-e-g-l-u-m-i-n-e.  And that's a

1    nonsteroidal anti-inflammatory drug that's used to treat pain,

2    colic, which is intestinal pain, fevers.

3    Q.  So something that is intended to treat pain would be

4    considered a drug?

5    A.  Yes.

6    Q.  Okay.  And you also mentioned a drug would be anything that

7    would affect the structure or function of the animal; is that

8    correct?

9    A.  Yes.

10   Q.  And could you give an example of that?

11   A.  A drug that's intended to strengthen your fingernails or

12   the horses hoof, that would be considered a drug.

13   Q.  Okay.  And an animal drug, is that a drug that is intended

14   for use by animals?

15   A.  Yes.

16   Q.  All right.  Are there also prescription animal drug and

17   over-the-counter animal drugs?

18   A.  Yes.

19   Q.  Can you give us an example of a prescription animal drugs?

20   A.  The flunixin meglumine that I just mentioned is a

21   prescription animal drug.

22   Q.  All right.  And an example of an over-the-counter animal

23   drug?

24   A.  An over-the-counter animal drug is actually Penicillin.

25   Q.  Are you familiar with the term API?

M1PPFIS2                          Bowman - Direct

1    A.  Yes.

2    Q.  What does that stand for?

3    A.  It stands for active pharmaceutical ingredient.

4    Q.  And what is that?

5    A.  That's the active ingredient in an animal drug, and there

6    could be more than one in an animal drug.

7    Q.  Can you give us some examples of what would be considered

8    an API?

9    A.  We can go back to the same one, flunixin meglumine is the

10   API in the product that there's a paste, an oral paste, and

11   there's also an injection.  So that's the established name for

12   the active ingredient is flunixin meglumine.

13   Q.  Have you heard of Erythropoietin?

14   A.  Yes.

15   Q.  Is that an API?

16   A.  Yes.

17   Q.  And have you heard of the term opioid?

18   A.  Yes.

19   Q.  What is an opioid?

20   A.  Opioids are a class of pharmaceuticals that act on the

21   opioid receptors in the body.

22   Q.  Would those be considered APIs?

23   A.  Yes, they would.

24   Q.  What did the FDA CVM look to in determining whether a

25   substance is, in fact, a drug?

1  A.  As opposed to?

2  Q.  As opposed to any other substance.  In other words, what

3  does the FDA CVM refer to to conclude that something is an

4  animal drug?

5  A.  If it meets the definition of an animal drug as described

6  in the act, then it's an animal drug.

7  Q.  What sorts of materials or records would indicate whether a

8  drug would affect the structure or function of an animal, for

9  example?

10  A.  We look at the intended use for products.  So descriptions

11  of the intended use are usually found on the label in the

12  medication section.  Failing that, we would look at published

13  materials or online information available at the point of sale

14  that would establish the intended use.  That's just what

15  they -- what the company that's marketing it is telling you

16  that it's used for.

17  Q.  So FDA CVM would look at any labeling for a particular

18  drug?

19  A.  We would look at all the labeling we could find.

20  Q.  Okay.  Would the FDA CVM also review promotional material?

21  A.  Yes.

22  Q.  That includes pamphlets, brochures?

23  A.  Yes.

24  Q.  Things like that?

25  A.  Yes.

1    Q.  What about statements by the manufacturer?

2    A.  Yes.  We would look at statements.  We have e-mail

3    exchanges, like e-mails, anything that we can get that helps

4    establish that intended use is necessary.

5    Q.  What about oral representations by the manufacturer?

6    A.  Yes.

7    Q.  And what about the name of the product?

8    A.  Sometimes, yes.

9    Q.  To what extent do the actual chemical contents of the

10   substance matter in determining its intended use?

11   A.  That varies on the product.  If it's a product that has a

12   very limited usefulness, then the fact that that chemical is in

13   there is certainly going to give us evidence towards intended

14   use.

15   Q.  Can the FDA CVM conclude that a product is a drug just by

16   looking at the materials you referenced earlier, the labeling,

17   promotional materials, oral statements?

18   A.  Yes.

19   Q.  Does the FDA have to conduct drug testing before

20   determining that something is a drug?

21   A.  No, not at all.

22   Q.  Dr. Bowman, we discussed APIs, active pharmaceutical

23   ingredients, a moment ago.  If a substance contains no APIs,

24   but the manufacturer claims that it will treat a disease, would

25   that be considered a drug?

1    A.  Yes.

2    Q.  And what is considered a new animal drug?

3    A.  So a drug is a new animal drug if it's not generally

4    recognized as safe and effective for the intended use by

5    experts in the field.

6    Q.  You mentioned, Dr. Bowman, that you participated in the new

7    animal drug approval process at FDA CVM, correct?

8    A.  Correct.

9    Q.  Can you walk us through, at a high level, that process?

10   A.  In that process, companies come into the FDA, they usually

11   have an idea or a concept product.  They come in, they sit down

12   with us.  We set up meetings to help them develop protocols to

13   prove that the drug is safe and effective, and establish the

14   recommended types of studies to prove that it will work for the

15   intended indication.  As that process plays out over time, data

16   is collected, it comes into the FDA, it's reviewed.

17   Q.  And, Dr. Bowman, let me stop you there.  You said that data

18   is collected.  Can you elaborate on what type of data is

19   collected, as far of a new animal drug approval process?

20   A.  So when we develop those protocols, those protocols are

21   from multiple studies.  Some of the studies are intended to

22   establish the safety of the product.  Some firms come in with a

23   dose already pretty firmly established.  In that case, they may

24   only need to prove that the dose is safe, and then they go on

25   to prove that it's also effective for the intended use.  So

1    that takes multiple studies in both safety and effectiveness.

2            They also have to go through a manufacturing section,

3    where they prove that they can manufacture the product and have

4    it be repeatable; that they can always manufacture it to the

5    same standard, and all of the ingredients that go into that

6    product have to come from approved sources.  All of that is

7    done in the pre-approval section of the application.

8    Q.  And, Dr. Bowman, are you familiar with clinical trials?

9    A.  Yes.

10   Q.  Do those play any role in the new animal drug approval

11   process?

12   A.  Yes.  A lot of the efficacy data is conducted or collected

13   in clinical trials.

14   Q.  You mentioned that data is collected and then submitted to

15   the FDA CVM.  Is that data from clinical trials that the

16   manufacturer will have conducted?

17   A.  It will be from both laboratory and clinical trials.

18           THE COURT:  Ms. Mortazavi, if you can try to find a

19   convenient time for a break in the next few minutes, that would

20   be appreciated.

21           MS. MORTAZAVI:  Certainly, your Honor.  I think I have

22   a few more questions on this topic, and then I that will be a

23   natural breaking point.

24           THE COURT:  Great.

25   BY MS. MORTAZAVI:

M1PPFIS2                          Bowman - Direct

1    Q.   Dr. Bowman, you mentioned the term "safe and effective" a
2    few times.  Can you give us a hypothetical example of a drug
3    that would be considered ineffective given its intended use?
4    A.   I think one of the best examples we have, there are
5    companies out there that market water, basically, magical water
6    that's going to treat your cancer.  It's not going to do that,
7    and it's just water, but it's still a drug because the intended
8    use is to treat cancer.
9                   (Continued on next page)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1   BY MS. MORTAZAVI:

2   Q.  And can you give a hypothetical example of a drug that

3   would be considered unsafe, given its intended use?

4   A.  An easy example would be eye medication.  If eye medication

5   isn't sterile and it contains any kind of bacteria or

6   contaminants, it can seriously damage your eye and cause a

7   worse problem than you're treating.

8   Q.  So when the FDA CVM reviews safety and efficacy, it's

9   looking to both factors before it will approve the drug, is

10  that fair to say?

11  A.  Yes.

12  Q.  How important is the intended use of a drug to the FDA

13  CVM'S evaluation of whether it's effective?

14  A.  It's paramount.

15  Q.  Why is that?

16  A.  All those studies that are designed are designed to

17  establish the safety and effectiveness for an intended use.  So

18  that's in the front mind as every study is designed, which

19  parameters to measure, how frequently to measure those

20  parameters, how often the follow-ups need to occur, all of that

21  is protocol development so clinical investigators can conduct

22  the study and collect uniform data from every patient.

23  Q.  So is the intended use of a drug the reference point for

24  determining whether it's actually effective?

25          MR. FERNICH:  Objection.

1              THE COURT:  Grounds?

2              MR. FERNICH:  Statute speaks for itself.

3              THE COURT:  Overruled.

4    Q.  Dr. Bowman, you can answer the question.

5    A.  Can you repeat it?

6    Q.  Sure.  Is the intended use of a drug the reference point

7    for determining whether or not it's effective?

8    A.  Yes.

9              MS. MORTAZAVI:  Your Honor, that's a good place for us

10   to pause.

11             THE COURT:  All right.  We'll take the morning break

12   now.  Since we got started a little bit late, you can try to

13   keep it to 10, 15 minutes at the most.  We might push the lunch

14   break a little bit further back, but I will see you all in

15   about 10, 15 minutes.

16             Have a good break.

17             (Continued on next page)

18

19

20

21

22

23

24

25

M1PTFIS3                          Bowman - Direct

1              (Jury not present)

2              THE COURT:  We'll see everyone back here in about 10,

3     15 minutes.

4              Dr. Bowman, you remain under oath.

5              THE WITNESS:  Thank you.

6              (Recess taken)

7              THE COURT:  I understand the jurors are on their way

8     up.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Jury present)

2              THE COURT:  You remain under oath.

3              Ms. Mortazavi, please.

4              MS. MORTAZAVI:  Thank you, your Honor.

5    BY MS. MORTAZAVI:

6    Q.  Dr. Bowman, before the break we discussed the FDA CVM's

7    participation in the new animal drug approval process, correct?

8    A.  Yes.

9    Q.  Does the FDA CVM review both prescription and

10   over-the-counter new animal drugs?

11   A.  Yes, we do.

12   Q.  What are the differences, if any, in approving a

13   prescription animal drug versus an over-the-counter animal

14   drug?

15   A.  The process of getting the drug approved is the same

16   regardless of whether it is intended for prescription or

17   over-the-counter status.  At times we don't determine the final

18   marketing status for the drug until all the data is collected

19   and reviewed, and a drug that might initially be thought of as

20   likely to be over the counter isn't, the data doesn't show that

21   it's safe that way, so it may be approved as a prescription

22   drug instead.

23   Q.  And you previously testified that as part of the new animal

24   drug approval process the FDA CVM will also review

25   manufacturing conditions, is that right?

1   A.  Yes, absolutely.

2   Q.  Why does an applicant have to make a showing with respect

3   to the FDA CVM with respect to how they manufacture a drug?

4   A.  They have to be able to manufacture the drug to the same

5   standard in every batch, and if they can't do that then that

6   drug is not ready for approval.

7   Q.  Does that ensure consistency?

8   A.  It ensures consistency from batch to batch and safety from

9   batch to batch in terms of impurities and maybe microbial

10  contamination.  All of that has to be evaluated and very strict

11  processes put into place individually for each drug that's

12  approved.

13  Q.  And you testified previously that the suppliers to a drug

14  manufacturer also have to comply with good drug manufacturing

15  processes, is that accurate?

16  A.  That is accurate.

17  Q.  Have you heard the term CGMP?

18  A.  Yes.

19  Q.  What does that refer to?

20  A.  It's the Current Good Manufacturing Practices that the FDA

21  puts out.

22  Q.  Can you explain what those are?

23  A.  Those are the general standards by which all drugs need to

24  be manufactured.  And there's different standards for different

25  types of drugs, so tablets have a different set of standards

1  for their manufacturing than an IV injection.  So there's a

2  series of actual CGMPs depending on the type of drug.

3  Q.  Assuming a manufacturer is not in compliance with those

4  standards, how would that impact the approval process?

5  A.  They can't be approved if they're not in compliance.

6  Q.  What measures does the FDA CVM take to ensure that a

7  manufacturer is in compliance?

8  A.  Well, as I said, there's an entire technical section

9  devoted to manufacturing for every new animal drug application,

10  and in that section they have to detail the entire process from

11  start to finish, they have to identify and name every component

12  manufacturer, and all of those component manufacturers have to

13  be FDA establishment registered and they get inspected before

14  the drug is approved, as well as the manufacturing facility

15  that makes the drug at the end, the finished managed

16  pharmaceutical.  So every active component has to meet FDA

17  standards.

18  Q.  And you mentioned, Dr. Bowman, that the components have to

19  be manufactured consistent to FDA CVM standards, is that right?

20  A.  That is correct.

21  Q.  By "components," do you mean the final ingredients that go

22  into the final drug?

23  A.  I do, and even the containers.

24  Q.  And you also mentioned the suppliers of those components

25  have to be FDA establishment registered.  What does that mean?

1    A.    Under the federal Food, Drug & Cosmetic Act, all

2    manufacturers have to register with FDA, and being part of that

3    registration process enables FDA to know where they are, what

4    is made at their facilities, and allows for routine

5    inspections.  So that's all part -- every component of that

6    drug has to come in under FDA authority.

7    Q.    And as part of the new animal drug approval process, is

8    there any role that the FDA CVM plays in reviewing labeling for

9    a drug?

10   A.    Yes.

11   Q.    Can you describe that?

12   A.    There's another technical section in the application that

13   is devoted entirely to labeling, and that will include any

14   promotional materials that expected to be released along with

15   the product.  It will include the labels themselves, the

16   cartons, the container labels, any package inserts that are

17   required.

18          You will notice -- I'm sure you noticed on your drugs,

19   even over-the-counter drugs, that sometimes there's a kind of

20   extra label where you unstick and unfold and they have all this

21   extra information and then you can stick it back on there.

22   Those are basically the package insert.  So a vial or a bottle

23   that comes inside of a box will have that information often on

24   a separate sheet of paper that's called a package insert, it

25   will be inserted in that box.

1    Q.  Does the FDA CVM review those materials?

2    A.  All of those.  They all have to comply.

3    Q.  And that is a component of the new drug approval process,

4    correct?

5    A.  Yes, it is.

6    Q.  Are there any differences in the standards for labeling for

7    over-the-counter versus prescription drugs?

8    A.  There are some slight differences.  Most of the information

9    is very similar, but on the over-the-counter drugs, first of

10   all, it won't have the prescription legend, which is that

11   statement that says:  Caution, federal law restricts this drug

12   to use by only order of a licensed veterinarian, or physician

13   in the case of a human drug.  That won't be on there.

14        It also has to be able to provide directions for use

15   for the lay person, so the directions for use will read a

16   little differently.  The indications will be easy to

17   understand, they will be something that any owner can read for

18   their horse or dog or whatever they're medicating and know

19   that, okay, my dog has a bald spot and this is to put on bald

20   spots.  So it would be written at a simple level.  It won't

21   give you all the pharmacokinetics of how that drug is absorbed,

22   it won't give you that stuff, it will be on the prescription

23   labeling.

24   Q.  You mentioned for over-the-counter drugs there is

25   information given for the lay person to understand, is that

1    right?

2    A.   Correct.

3    Q.   What do you mean by "lay person?"

4    A.   I mean a non-veterinarian.

5    Q.   Sort of an average person without medical training?

6    A.   Yes.

7    Q.   And the labeling information for a particular drug, would

8    that be included with every bottle of a drug that is

9    manufactured and distributed?

10   A.   Yes.

11   Q.   Can oral instructions replace the labeling information that

12   you just described?

13   A.   No.

14   Q.   So I would like to ask you a hypothetical question

15   Dr. Bowman, based on the answers that you have given.  If a

16   veterinarian were to ship a client a drug with no label but

17   provide instructions for the drug's use over the phone, would

18   that be sufficient to satisfy labeling requirements?

19   A.   No.

20            MR. FERNICH:  Objection.  I could approach.

21            THE COURT:  I will see counsel at the sidebar.

22            (Continued on next page)

23

24

25

M1PTFIS3                         Bowman - Direct

1              (At sidebar)

2              MR. FERNICH:  Just briefly, under Second Circuit

3     authority like Scop, S-C-O-P, and Garcia, hypotheticals that

4     track the facts of the case posed to an expert are unhelpful

5     and impermissible and merely tell the jury what result to

6     reach.  They're improper bolstering.

7              MS. MORTAZAVI:  Your Honor, we're not going to ask the

8     expert for her ultimate conclusion as to the facts the jury

9     will find, my hypothetical was asked to the labeling

10    requirement, which I think she is permitted to opine on.

11             THE COURT:  Let me go back and look at the question.

12             (Pause)

13             THE COURT:  The objection is overruled.

14             (Continued on next page)

1          (In open court)

2          THE COURT:  The objection is overruled.

3          Dr. Bowman, you may answer, the question but could we

4     have the question read back.

5          (Record read)

6     A.  No.

7     Q.  Why is that?

8     A.  The minimum labeling requirements have to be in writing for

9     people to refer back to.  A phone conversation to provide

10    additional context is great, but they still need that written

11    material to refer back to in case they're not administering it

12    at the moment.  If they're speaking to the vet or the person on

13    the phone, they need something that they can look at and say we

14    give this as an injection or give this as oral.

15    Q.  Thank you.  Dr. Bowman, you referenced tracking that the

16    FDA CVM does for manufacturers.  What, if any, records does the

17    FDA CVM maintain for approved animal drugs?

18    A.  For approved animal drugs we have a database that we

19    maintain.  You can access that information publicly at animal

20    drugs at FDA, I think it is, I forget the exact address, but

21    Google that and it will pop right up.

22          THE COURT:  Don't Google that.

23    A.  That allows everyone to see what is approved and what the

24    concentrations of the ingredients are and the information on

25    what it's used for, what it's indicated for, what species, what

M1PTFIS3                         Bowman - Direct

1    doses, what conditions.

2    Q.  In the new animal drug approval process, how important is

3    the identity of the manufacturer?

4    A.  It's extremely important because at any point that the --

5    we call the person who gets the drug approved the drug sponsor.

6    So at any point if the drug sponsor -- maybe they can no longer

7    get an ingredient for their formulation from the original

8    source, they actually have to file a supplemental approval to

9    get a new source approved.  Or if they have to change

10   locations, maybe they have a fire and their building burns

11   down, they can't just hire another company to make their drug,

12   they have to actually get a new location approved, it has to be

13   inspected, we have to make sure that they can actually follow

14   the process that is outlined in their application at that

15   location to manufacture the drug so it will be the same as it

16   was before.

17   Q.  Dr. Bowman, I can't speak to the jurors sitting in the

18   back, I'm having a little bit of difficulty hearing you.  If

19   you could pull microphone even closer.

20   A.  Okay.

21   Q.  I think you may be able to pull it down as well.

22   A.  Yep.

23   Q.  Thank you.

24           So Dr. Bowman --

25           THE COURT:  Let me interrupt at this point.  If at any

M1PTFIS3                          Bowman - Direct

time any of you can't hear, please raise your hand or wave me

down so we'll ask to make the necessary adjustments.  It's very

important that you be able to see and to hear.

        Thank you all.

        MS. MORTAZAVI:  Your Honor, it may be the plexiglass

that's making it harder.

        THE COURT:  Could be.

Q.  Once a drug is approved, could any company manufacture that

approved drug?

A.  No.

Q.  Why not?

A.  That approved drug is the property of the company that

sponsored it and got it approved.

Q.  Can the sponsor that put forward the new animal drug for

approval change the ingredients of that drug without consulting

with the FDA CVM?

A.  No.

Q.  Why not?

A.  Because a change in ingredients could charge the

effectiveness or the safety of the drug.

Q.  And what about the intended use of the drug?

A.  The intended use of the drug, if the company wants to

modify their application to add an intended use, that requires

a supplemental application with additional data to support that

new use.

1    Q.  After a new animal drug is approved, does the FDA CVM's

2    oversight of that company or that drug end?

3    A.  No.  The companies file annual reports that include the

4    amount of the drug that they sold during the year, they include

5    any reports of adverse events that have come in to them, which

6    their contact information is right on the label, so that, for

7    adverse reporting purposes, they're required by law to submit

8    all those adverse events to us.

9    Q.  Dr. Bowman, if I could pause you there, you mentioned

10   adverse events, could you just explain what you mean by that

11   term?

12   A.  So an adverse event is an unanticipated negative

13   consequence that is attributed to the drug.  It may not

14   actually be the fault of the drug, but if it happened at the

15   time that the drug was being administered, a lot of people will

16   assume that the drug caused it.  So all of those should be

17   reported and they will all get investigated by our team that

18   specializes in that.

19   Q.  And the reporting of adverse events, is that part of the

20   annual report that you mentioned?

21   A.  It is, unless there are serious adverse events which have

22   to be reported more frequently.

23   Q.  And does the FDA CVM take action in response to a series of

24   adverse events for a particular drug?

25   A.  Yes.

1    Q.   What sorts of things does the FDA CVM do?

2    A.   The FDA may encourage a firm to do a recall.  Recalls are

3    technically voluntary, but we can encourage firms to do that.

4    In other cases, we may need to modify the labeling.  So if we

5    see a frequently occurring adverse event and we can anticipate

6    changes in the process of selecting the patients or maybe

7    administering the drug that would ameliorate those risks, we

8    will have the label changed to make that safer.

9    Q.   Dr. Bowman, apart from the annual reporting that you just

10   described, are there any other ways in which FDA CVM engages

11   with a drug manufacturer after approval?

12   A.   There are routine inspections of the manufacturing

13   facilities that happen following approval.  Every one to two

14   years generally there's new inspections to ensure that they're

15   continuing to follow the process laid out in their application.

16   Q.   Dr. Bowman, I would like turn to a prior discussion of

17   prescription drugs and over-the-counter drugs.  Can you tell us

18   what is the difference between a prescription drug and an

19   over-the-counter drug?

20   A.   So an over-the-counter drug is one, just like on the human

21   side, that you can walk into -- instead of a pharmacy it will

22   often be a tack store or a feed store, and it will just be

23   sitting there on the shelf and you can just purchase it for

24   use.

25            A prescription drug will either be dispensed by your

1  veterinarian at the time that they examine your pet or your

2  animal and make a diagnosis and recommended treatment or they

3  may give you a written prescription which you can take to

4  another pharmacy to get filled.

5  Q.  And Dr. Bowman, by "dispense," do you mean a veterinarian

6  will actually administer, either by injection or orally, the

7  drug itself?

8  A.  Sometimes it would be administration of the drug, but

9  generally it will be maybe the veterinarian shows you how to

10  give the first dose and then they hand you the bottle and say

11  you're going to continue this medication for the next ten days,

12  do it exactly as I just showed you but do it twice a day for

13  the next ten days, for example.

14  Q.  And you testified that the FDA CVM, as part of the new

15  animal drug approval process, will look to whether something

16  should -- a drug should be prescription or over the counter,

17  correct?

18  A.  Correct.

19  Q.  What sorts of things does the FDA CVM look to to make that

20  determination?

21  A.  Well, I think the primary cutoff is if directions for use

22  can be written for the laymen the way the law is written then

23  the drug should be over the counter.

24       However, we look at -- when you're looking at the drug

25  we're also looking at:  How safe is it?  Is the therapeutic

1    window really narrow?  That's the difference between the

2    effective dose and the toxic dose.  If that window is really

3    narrow, then you don't allow that to be an over-the-counter

4    drug, that should be a prescription drug.  Somebody should

5    calculate that dose who you can rely on to calculate it

6    correctly.

7            Other things that might put it into the prescription

8    category would be the route of administration.  So if a drug

9    requires IV administration, it will be prescription, because

10   most owners don't have the skill necessary to administer an IV

11   injection.

12   Q.  Dr. Bowman, by IV, do you mean intravenous?

13   A.  I do, I'm sorry, intravenous injection.

14   Q.  What does that refer to in layman's terms?

15   A.  It's an injection directly into the vein.  So if it

16   requires injection directly into the vein, that's a skill that

17   veterinarians learn but most owners do not -- are not

18   proficient and could not do that.  A lot of times drugs are

19   administered IV because they're very damaging to the muscle

20   tissue if you get them outside the vein.  So there's usually a

21   reason why those drugs are administered IV.

22   Q.  There's other routes?

23   A.  There's other routes of administration that also require

24   prescription status, such as drugs that are delivered via

25   nasogastric tube where you pass a tube down to the animal's

1  stomach and administer the drug through the tube.  That will

2  require prescription status.

3  Q.  Dr. Bowman, are there oral drugs, so drugs you would take

4  through your mouth, that are still prescription status?

5  A.  Oh, yes, many.  Most antibiotics and any drugs -- like I

6  said, if it requires a diagnosis prior to use, if the pet owner

7  or the horse owner can't make that diagnosis because they don't

8  have the training, the skills, or the diagnostic tests, then

9  that drug is going to be prescription only because veterinarian

10  has to make that diagnosis before determining that drug is

11  appropriate for that patient.

12  Q.  So the method of administration and the therapeutic window

13  that you testified about are two of many factors that go into

14  FDA CVM's determination of deeming something prescription or

15  over the counter, is that fair to say?

16  A.  Yes.

17  Q.  Dr. Bowman, are you familiar with the term IM injection?

18  A.  Yes, that's intramuscular injection.

19  Q.  What does that mean?

20  A.  There's many kinds of injections.  Intramuscular injections

21  are the kind where the needle is directed into a muscle mass

22  before the liquid is injected into the animal.

23       MS. MORTAZAVI:  Ms. Jung, if you could please pull up

24  but not yet play Government Exhibit 139A.  And I would like to

25  direct the jurors to their binders to the tab marked 139AT.

1    And I will also have Ms. Jung pull up that exhibit.

2              THE COURT:  This is in evidence?

3              MS. MORTAZAVI:  That's correct, your Honor, that was

4    subject to the prior stipulation.

5              While the jurors are finding their place in the

6    binder, I will remark this is a portion of an intercepted call

7    dated June 4, 2019, between Seth Fishman and Lisa Giannelli, as

8    indicated on Government Exhibit 139AT.

9              Ms. Jung, if you could please play Government

10   Exhibit 139A.

11             (Audio recording played)

12             MS. MORTAZAVI:  I will ask the jurors to please put

13   away their binders.

14   BY MS. MORTAZAVI:

15   Q.  Dr. Bowman, are you familiar with the concept of

16   nutritional supplements for humans?

17   A.  Yes.

18   Q.  Generally speaking, what are nutritional supplements for

19   human use?

20             THE COURT:  Let's pause for a moment and let everyone

21   get settled.  These binders are bulky.

22             You want to repeat the question, Ms. Mortazavi?

23             MS. MORTAZAVI:  Of course.

24   Q.  Generally speaking, Dr. Bowman, what does the term

25   nutritional supplements for humans refer to?

M1PTFIS3                          Bowman – Direct

1    A.  It's a more recent category of FDA-regulated products that

2    are allowed to make some structure function claims without

3    having to go through the drug approval process.

4    Q.  Is that category of nutritional supplements something that

5    the FDA CVM recognizes for animals?

6    A.  No, the FDA CVM's type animal drugs in general were not

7    included in the act that established that category of drugs for

8    people.  That's called DSHEA.  I couldn't tell you what DSHEA

9    stands for right this minute, but that's an act that was

10   enacted that left animals out.

11   Q.  So is there any category of nutritional supplements that is

12   approved for animal use?

13   A.  In general, products that make structure function claims

14   are either foods for us or they're drugs.

15   Q.  So with respect to FDA CVM's classifications, it's a food

16   or it's a drug, correct?

17   A.  Correct.

18   Q.  Dr. Bowman, I would like to shift and ask you about your

19   experiences in veterinarian practice.  Are you familiar with

20   the term VCPR?

21   A.  Yes.

22   Q.  What does that term refer to?

23   A.  VCPR is the acronym for Veterinarian-Client Patient

24   Relationship, and that is the structure under which animals are

25   properly treated and diagnosed.  So you have a relationship

1    with your veterinarian, you and your veterinarian work together

2    to ensure the health of that animal that's in your care.

3    Q.  Dr. Bowman, in that relationship, who is the client?

4    A.  The client is typically the owner, but in some cases the

5    client may be whoever is designated by the owner to have

6    decision-making authority for that animal.

7    Q.  Who is considered the patient?

8    A.  The patient is the animal.

9    Q.  What sorts of steps would have a veterinarian take in order

10   to establish that relationship?

11   A.  The veterinarian would have to meet with the client and the

12   pet or the horse, whatever animal it is, and examine that

13   animal, establish its current health conditions, whether it has

14   any chronic problems, and what the goals are for the visit.  Is

15   the animal sick at that moment?  Is it just getting caught up

16   on routine?  Is it just having an annual physical?  Like all of

17   us go in for annual physicals, people establish annual

18   physicals for their animals as well.  And that is the first

19   step in establishing that relationship.

20   Q.  And typically speaking, in that relationship, who is

21   qualified to issue prescriptions for a prescription animal

22   drug?

23   A.  The veterinarian.

24   Q.  And before issuing a prescription, what steps does the

25   veterinarian typically take?

1    A.   Typically the veterinarian needs to examine the animal,

2    establish a diagnosis, discuss that with the owner, create a

3    treatment plan and a follow-up plan.  If there's any diagnostic

4    test that needs to be completed in order to make that final

5    diagnosis.  You may make a preliminary diagnosis, but you may

6    need some diagnostic test to confirm it and then decide what

7    drug to administer to treat that problem that you diagnosed.

8    Q.   Those steps that you just described, are those the same

9    whether a patient is a new patient or an existing patient?

10   A.   Generally they're the same for a new problem.  If it's an

11   existing problem in an existing patient, so you're already

12   familiar with the patient and the owner, and the problem is

13   chronic, it may not require a new physical exam every time that

14   you recommend that the client retreat for a chronic problem.

15   Q.   You testified about the steps that a veterinarian would

16   take to reach to a diagnosis.  Why would a veterinarian need to

17   reach a diagnosis before issuing a prescription?

18   A.   You don't know what you're treating until you have a

19   diagnosis, so the diagnosis is important.  You may have a lame

20   horse but you can't just administer a pain reliever without

21   knowing why the horse is lame and what it really needs to heal.

22   So you have to examine that horse, and it there could be a

23   hundred reasons why that horse is lame, and if you don't kind

24   of drill down to the exact one then you're not actually

25   treating the problem.

1    Q.  Dr. Bowman, you referred a few times to a horse being lame

2    or lameness, could you just explain what you mean by that?

3    A.  A horse that limps.  Horses quite often will sustain

4    injuries that will make them limp.  They could be temporary.

5    They could be chronic.  And until you have done that initial

6    examination and narrowed it down and diagnosed the underlying

7    problem that's making that horse limp, then you don't know what

8    you're treating.

9    Q.  Is a horse that's lame a horse that's having difficulty

10   walking?

11   A.  It's going to have an abnormal gait when it walks.  There's

12   all sorts of degrees of lameness.  So it may not be what we

13   call hopping lameness where it won't bear any weight on the

14   leg, it may be just a little gimpy, as we call it.

15   Q.  All right.  Can a veterinarian establish the

16   veterinarian-client patient relationship without ever

17   physically examining an animal?

18   A.  No.

19   Q.  What if a client describes symptoms to a veterinarian over

20   the phone but there's no physical examination?

21   A.  Unless -- as I said, unless it's a chronic problem that's

22   been treated multiple times that's expected to recur, then

23   there's no way to trust that the client's description of the

24   symptoms will lead you to a diagnosis.

25   Q.  What do you mean by that?

1   A.  Go back to the lameness example.  The horse is lame.  Some

2   horses have chronic lamenesses, like conditions called

3   navicular disease.  Those horses are lame a lot.  And you might

4   consult with your veterinarian by telephone and say Frosty is

5   lame again, just like always, and the veterinarian may say

6   okay, let's treat him with a non-steroidal antiinflammatory

7   drug for five days.  If he's not better give me a call, or if

8   he gets any worse, call me and I will come out.  And that's

9   within that established veterinarian-client relationship.

10  However, if Frosty is not usually lame and Frosty comes into

11  the barn lame, then you set up an appointment right away to

12  check Frosty over to figure out what is going on.

13  Q.  Can a veterinarian make a diagnosis based solely from blood

14  tests without any physical examination?

15  A.  No.

16  Q.  Why not?

17  A.  Because all diagnostic tests have to be interpreted in

18  light of the physical examination findings and the history

19  provided by the client.

20  Q.  Dr. Bowman, have you heard the term "companion animal?"

21  A.  Yes.

22  Q.  What does that refer to?

23  A.  In the CVM world, companion animals are horses, dogs and

24  cats.  They're basically not for food.

25  Q.  And approximately when did the FDA begin to categorize

1   horses, dogs and cats as companion animals?

2   A.  To the best of my recollection, it started in the 1990s.

3   Q.  Are cattle considered companion animals?

4   A.  No.

5   Q.  Sheep?

6   A.  No.

7   Q.  Pigs?

8   A.  No.

9   Q.  And why does the FDA distinguish between companion animals

10  and other types of animals?

11  A.  The distinction comes during the approval process, because

12  all the animals that could get used for food, any drug being

13  approved for their use has to go through an extra step to

14  determine the human food safety and establish a withdrawal time

15  so that that drug will be gone from the edible tissues of that

16  animal.  Whether it's milk from a dairy cow, eggs from a

17  chicken or meat, we want to ensure that that food is safe.

18  Q.  Is it typical in a veterinary practice to distribute bulk

19  quantities of drugs?

20  A.  No.

21  Q.  Are veterinarians exempted from FDA's regulations regarding

22  drug manufacturing?

23  A.  No.

24  Q.  What are the differences between a drug manufacturer and a

25  veterinarian?

M1PTFIS3                          Bowman - Direct

A.  The job of the drug manufacturer is to manufacture and
distribute quantities of drugs.  The job of the veterinarian is
to diagnose and treat animals.  And as part of that practice,
veterinarians are allowed to compound for individual patients,
but that requires that they meet the guidance under 21 CFR 530,
which spells out when compounding is appropriate.  In general,
they need to use an FDA-approved drug whenever possible as the
starting material for that, and it has to be done only to
prevent animal suffering or death.
Q.  And do compounded drugs also require prescription before
they can be given out?
A.  If you are compounding a drug within your practice for an
animal that you already have an established VCPR for, you would
dispense the drug to the patient.  You wouldn't write a special
prescription.  If they were going to a compounding pharmacy to
get a special drug made for their pet or their horse, then you
would write a prescription that they then could take to a
pharmacy and have filled.
Q.  You testified before that you have participated in what you
termed GRASE analyses, correct?
A.  Correct.
Q.  And that terms refers to Generally Recognized As Safe and
Effective, is that right?
A.  Correct.
Q.  Can you explain to us what steps you take when you conduct

1    a GRASE review?

2    A.   When we do the GRASE review we review the labeling that's

3    available to establish the intended use for the drugs.

4    Typically these are -- well, exclusively these are done on

5    unapproved animal drugs.  The human side of the FDA also does

6    an analysis like this for their unapproved human drugs.  That

7    analysis, once we have established the intended use, allows us

8    to search the public literature to see if there are adequate

9    and well-controlled studies -- as would be required for

10   approval -- out there that we can look at to see if this drug

11   is safe and effective for that intended use.

12   Q.   Dr. Bowman, do you look to a single publication?

13   A.   No, we use databases that include thousands of

14   publications.

15   Q.   Do you also review whether or not a drug appears in an FDA

16   database?

17   A.   Yes, we always -- if it hasn't already been established,

18   when I do GRASEs I search our internal database to determine

19   whether the drug has ever had an investigational file or is an

20   approved new animal drug.

21   Q.   Do you also determine whether the manufacturer is

22   registered with the FDA?

23   A.   Yes.

24           MS. MORTAZAVI:  Your Honor, I would to like to read

25   into the record Government Exhibit 9002, which is a stipulation

M1PTFIS3                          Bowman - Direct

1    between the parties.  If I could have Ms. Jung please pull that

2    up.

3                THE COURT:  All right.

4                MS. MORTAZAVI:  With the Court's permission I will

5    read from the stipulation.

6                THE COURT:  Yes.

7                MS. MORTAZAVI:  If called to testify at trial,

8    representatives of the Food & Drug Administration, Center for

9    Veterinary Medicine, FDA, would testify that after conducting a

10   diligent search of all relevant records and databases, the FDA

11   has no records indicating that the FDA issued export

12   certificates for any of the following companies, individuals

13   entities or drug products:  Equestology, Equestology, Inc.,

14   Equestology LLC, Seth Fishman, DVM, 21st Century Biochemicals,

15   Inc., Jordan Fishman, Equiformance, Equiscience, Equi-Tech,

16   Specialized Performance Compounds, VO2 Max, BB2, BB3 –– and for

17   the court reporter that's Bravo Bravo –– Serenity, TB-7

18   (Thymosyn Beta), ITPlus, BPB, HP Bleeder, HP Bleeder Plus,

19   Homeopathic Bleeder Paste, EPM Double Kill, Iron Sucrose, GNRH,

20   PSDS (Pain Shot DS), ACTH.

21                After conducting diligent search of all relevant

22   records and databases, the FDA has no records indicating that

23   any of the following companies, entities or individuals were

24   ever registered with the FDA to manufacture drugs in the United

25   States:  Equestology, Inc., Equestology LLC, Seth Fishman, DVM,

1    21st Century biochemicals, Inc., Jordan Fishman, Equiformance,

2    Equi-Science, Equi-Tech, Specialized Performance Compounds.

3              After conducting a diligent search of all relevant

4    records and databases, the FDA has no records indicating that

5    any of the following drug products were listed with the FDA:

6    VO2 Max, BB2, BB3, Serenity, TB-7 (Thymosyn Beta), ITPlus, BPB,

7    HP Bleeder, HP Bleeder Plus, Homeopathic Bleeder Paste, EPM

8    Double Kill, Iron Sucrose, GMRH, PSDS (Pain Shot DS), ACTH.

9              It is further stipulated and agreed by and between the

10   parties that this stipulation, which is Government

11   Exhibit 9002, may be received in evidence at trial.

12             And the government offers Government Exhibit 9002.

13             THE COURT:  It will be admitted.

14             (Government's Exhibit 9002 received in evidence)

15             MS. MORTAZAVI:  Thank you.

16   BY MS. MORTAZAVI:

17   Q.  Dr. Bowman, were you asked to conduct GRASE analyses as

18   part of -- in connection with your testimony in this case?

19   A.  Yes, I was.

20   Q.  Were you also asked to check whether certain of those drugs

21   received any FDA approvals?

22   A.  Yes.

23   Q.  And who asked you to undertake this analysis?

24   A.  You did.

25   Q.  I would like to review some categories of medications with

M1PTFIS3                        Bowman - Direct

1   you and then discuss the analysis that you conducted in this

2   case.

3           MS. MORTAZAVI:  Your Honor, given it's 12:20, I'm

4   going to proceed, but if the Court would like to break now, it

5   would be a natural breaking point.

6           THE COURT:  Let me talk to Ms. Dempsey.

7           (Pause)

8           THE COURT:  I think we should continue because we took

9   the morning break a little bit late, we got started a little

10  late, let's press on to at least 12:45 or so.

11          MS. MORTAZAVI:  Certainly, your Honor.

12          I would like to admit Government Exhibits 700 to 715.

13  These are items that were the subject of Government

14  Exhibit 9008, a stipulation between the parties, and they

15  represent electronic extractions from a computer that was

16  seized at Lisa Giannelli's residence.

17          THE COURT:  And this stipulation stipulates to these

18  exhibits and their admissibility?

19          MS. MORTAZAVI:  That's correct.

20          THE COURT:  They will be admitted.

21          (Government's Exhibits 700 to 715 received in

22  evidence)

23          MS. MORTAZAVI:  Thank you, your Honor.

24          Ms. Jung, please pull up Government Exhibit 711.  And

25  you can publish that to the jurors as it's now in evidence.

1    BY MS. MORTAZAVI:

2    Q.  Dr. Bowman, I would like to review this document with you,

3    which consists of a list of different drugs.

4            Looking at that first category, HP Bleeder Plus,

5    beside the number 1, could you read the description of this

6    drug, starting with the first paragraph?

7    A.  Yes.  A combination of a proven and test-free bleeding

8    (EIPH: Exercise-Induced Pulmonary Hemorrhage) and analgesic.

9    The analgesic constituents have been published as effective and

10   safe in a peer-reviewed study in global journals.  Made of a

11   combination of naturally-occurring amino acids, they are not

12   easily sourced in their proper enantiomorphs.

13   Q.  I would like to ask you some questions about some of the

14   terms appearing here.  Are you familiar with EIPH,

15   Exercise-Induced Pulmonary Hemorrhage?

16   A.  Yes.

17   Q.  Can you explain what that refers to?

18   A.  It refers to a condition in horses where certain horses

19   will bleed into their lungs after extreme exercise.

20   Q.  And the term "analgesic," are you familiar with that term?

21   A.  Yes.

22   Q.  What does that mean?

23   A.  So an analgesic is a pain killer.  In humans, analgesics

24   are things like aspirin and ibuprofen.  There are many in

25   horses, too.

1   Q.  In that second sentence of this description it refers to

2   the analgesic constituents.  What does that mean?

3   A.  I presume that that means that the active ingredients that

4   they're using as an analgesic have been published somewhere as

5   potentially effective.

6   Q.  Could you read the second paragraph under this description

7   of HP Bleeder Plus.

8   A.  Evidence of EIPH can be found in all horses engaged in

9   strenuous exercise.  Racing most notable and although most

10  diagnostic evidence is subclinical, the overall performance is

11  always affected.  Pressure within pulmonary vasculature

12  increases nearly three to fourfold during racing.  Heart rate

13  rises and peripheral vasculature constricts causing more

14  resistance and more work for the heart.

15  Q.  There are references here to vasculature.  Could you

16  explain what that means, if you're familiar with that term?

17  A.  The vasculature is just referring to veins and arteries.

18  Q.  And at the third paragraph, if you could please read the

19  first two sentences.

20  A.  HP Bleeder Plus contains the strongest test-free

21  vasodilators available on the market.  Vasodilation is a

22  benefit to all athletes, as shown in numerous published

23  articles for humans.

24  Q.  Are you familiar with the term "vasodilator?"

25  A.  Yes.

1    Q.  What does that mean?

2    A.  A vasodilator is a substance that will -- there is smooth

3    muscle around your veins and your arteries, and that smooth

4    muscle constricts causing vasoconstriction.  That happens when

5    the horse is exercising to its full extent.  It happens in

6    other situations as well.  And it particularly happens in

7    peripheral -- it starts peripherally, it starts to constrict.

8    So these drugs would be expected to relax that smooth muscle,

9    allow the blood to continue to flow into those areas where

10   oxygen can then be gotten from the blood into the muscle.

11   Q.  So does the vasodilator increase blood flow and the flow of

12   oxygen?

13   A.  To the peripheral tissues in this case is how I understand

14   it.

15   Q.  Could you read the last sentence of that same paragraph,

16   starting with:  HP Bleeder Plus can.

17   A.  HP Bleeder Plus can achieve same results without the side

18   effects of Lasix.

19   Q.  Are you familiar with Lasix?

20   A.  Yes.

21   Q.  What is it?

22   A.  Lasix is a drug that contains furosemide, and it is --

23   yeah, it makes you pee a lot, going brain dead here.  So it

24   reduces the circulating volume of fluid.

25   Q.  And is furosemide an API or FDA approved drug?

1   A.  There is an FDA approved drug.  Lasix is FDA approved.

2   Q.  And so is furosemide the active ingredient in that drug?

3   A.  Yes, it's the established name for the active ingredient.

4   Q.  Are there claims here made in the description about the

5   drug's intended use?

6   A.  Yes.

7   Q.  What are those?

8   A.  It claims to treat EIPH.  It claims to cause vasodilation

9   and to be as effective as the approved drug Lasix.

10  Q.  And looking at this description, is this the type of drug

11  that would require a diagnosis and then a prescription?

12  A.  Yes.

13  Q.  Could you explain?

14  A.  In order to diagnose EIPH, you have to send a scope down

15  into the horse's lungs after exercise to see if there's blood

16  present, and how much.  So all cases of EIPH are not equal.

17  Some horses don't require treatment.  The general philosophy is

18  if it's mild they would not be necessarily treated.  And it is,

19  by some practitioners, considered normal to have a small amount

20  of bleeding after extreme exercise.

21       So without that diagnostic test and the physical

22  examination of the horse and the history of whether the horse's

23  performance is stable or suffering, you kind of have to put all

24  those pieces together to come up with a diagnosis of whether

25  this horse needs to be treated for EIPH or not.

M1PPFIS4                          Bowman - Direct

Q.   Is this product, HP Bleeder Plus an FDA approved drug?

A.   No.

Q.   Were you asked to conduct a GRASE analysis of HP Bleeder
Plus?

A.   Yes.

Q.   And what were your conclusions?

A.   My conclusions are that there is no adequate,
well-controlled studies out there to show that this product is
effective or safe.

          MS. MORTAZAVI:  Your Honor, the government offers
Government Exhibit 1000 to 1003, 1005 to 1011, and 1013 to 1053
into evidence.  These were subject to the same stipulation I
mentioned earlier, Government Exhibit 9008.  They are
electronic extractions from files from a computer recovered
from Seth Fishman's residence.

          THE COURT:  They're received into evidence.

          (Government's Exhibits 1000 to 1003, 1005 to 1011, and
1013 to 1053 received in evidence)

          MS. MORTAZAVI:  Ms. Jung, could you please pull up and
publish to the jury Government Exhibit 1018, and could you
please zoom in on the label.

BY MS. MORTAZAVI:

Q.   Dr. Bowman, do you see here on your screen the label for HP
Bleeder?

A.   I do.

1    Q.   Could you read the company name that appears on the

2    left-hand side of the screen?

3    A.   Specialized Performance Compounds.

4    Q.   Is there a website associated with it?

5    A.   On the label it lists a website address.

6    Q.   And what is that?

7    A.   WWW.SPC-brands.com.

8    Q.   Could you please read the directions and ingredients that

9    appear on this label?

10   A.   The directions:  Administer 5.0 cc IV or IM, six to eight

11   hours before exercise.  This product contains no known testable

12   ingredients.

13        Ingredients:  Proprietary blend of complex amino acid

14   structures.

15   Q.   Does this label contain all the information that the FDA

16   typically requires on a drug label?

17   A.   No.

18   Q.   What, if any, information is missing?

19   A.   There is a lot of missing information.  There's no

20   indications on the label; so there's no information on the use

21   of the product beyond the implied use in the product name.  The

22   ingredient statement is inadequate for any parenteral drug,

23   which is any kind of injectable drug.  All the ingredients need

24   to be listed, with the percentage of each ingredient in the

25   formulation, and you can't claim that it's a proprietary blend.

1    You have to specifically provide the name of every ingredient.

2              There's no prescription legend.  Because this is

3    administered IV, there needs to be a prescription legend, which

4    says:  "Caution:  Federal law restricts this drug to use by or

5    on the order of a licensed veterinarian."

6              There needs to be full information on the manufacturer

7    or the distributor, including contact information with a valid

8    address and telephone number.  And I'm probably forgetting a

9    couple other things that are required to be on there, but I

10   think that's it.

11   Q.  You mentioned contact information, is that website that's

12   listed at the bottom of this label sufficient to satisfy that

13   requirement for the manufacturer?

14   A.  No.  The language is specifically spelled out in 21 CFR 200

15   what it needs to be, and then it needs to say, you know,

16   "distributed by" or "manufactured for" and then it lists the

17   complete company name, address and phone number, and it can

18   also have a website.  It's not that a website isn't something,

19   but it needs to have all of that information.

20   Q.  So a website isn't a replacement for the other information

21   that you described?

22   A.  No.

23              MS. MORTAZAVI:  Ms. Jung, could you please pull up,

24   just for the parties, Government Exhibit 9012.

25              And, your Honor, this is another stipulation between

the parties I'd like to read into the record:

If called to testify at trial, law enforcement agents with the Federal Bureau of Investigation would testify that on March 9th, 2020, law enforcement agents with the Federal Bureau of Investigation conducted a search of the Golden Shoe Training Center, a racehorse training facility, at street address 261 Bullville Road, Montgomery, New York, 12549.  The Bullville property.

Government Exhibits 1400 through 1420, and 9500 through 9505, are physical items, including paper records, seized from the Bullville property at the time of the search, or photographs fairly and accurately depicting the Bullville property, or photographs fairly and accurately depicting items during the search of the Bullville property.

On March 9th, 2020, law enforcement agents with the Federal Bureau of Investigation conducted a search of the Mount Hope Training Center, a racehorse training facility at street address, 335 Guymard Turnpike, Middletown, New York 10940.  The Guymard property.

Government Exhibits 1500 through 1511 and 9600 through 9604 are physical items, including paper records seized from the Guymard property at the time of the search, or photographs fairly and accurately depicting the Guymard property, or photographs fairly and accurately depicting items taken during the search of the Guymard property.

1    On March 9th, 2020, law enforcement agents with the

2    Federal Bureau of Investigation conducted a search of the

3    residence of Jorge Navarro at street address 10477 Southwest

4    49th Place, Cooper City, Florida  33332.  The 49th Place

5    property.

6    Government Exhibits 1200 through 1222, and 9200

7    through 9216, are physical items, including paper records,

8    seized from the 49th Place property at the time of the search,

9    or photographs fairly and accurately depicting the 49th Place

10   property, or photographs fairly and accurately depicting items

11   taken during the search of the 49th Place property.

12   On or about March 14th, 2019, law enforcement agents

13   with the Federal Bureau of Investigation conducted a search of

14   a horse barn used by Christopher Oakes at street address 121

15   Bald Mountain Road, Bear Creek Village, Pennsylvania 18702.

16   The Bald Mountain property.

17   Government Exhibits 1100 through 1128, and 9300

18   through 9311, are physical items, including paper records,

19   seized from the Bald Mountain property at the time of the

20   search, or photographs fairly and accurately depicting the Bald

21   Mountain property, or photographs fairly and accurately

22   depicting items taken during the search of the Bald Mountain

23   property.

24   It's further stipulated and agreed, by and between the

25   parties, that the aforementioned government exhibits and this

1    stipulation, which is Government Exhibit 9012, may be received

2    in evidence at trial.

3          So, your Honor, the government offers into evidence

4    Government Exhibit -- the following Government Exhibits:  9012,

5    1400 through 1420, 9500 through 9505, 1500 through 1511, 9600

6    through 9604, 1200 through 1222, 9200 through 9216, 1100

7    through 1128, and 9300 through 9311.

8          THE COURT:  All of those exhibits are received in

9    evidence.

10          (Government's Exhibits 9012, 1400 through 1420, 9500

11    through 9505, 1500 through 1511, 9600 through 9604, 1200

12    through 1222, 9200 through 9216, 1100 through 1128, and 9300

13    through 9311 received in evidence)

14          MS. MORTAZAVI:  Thank you.

15          Ms. Jung, with that, could you please pull up the

16    following government exhibits for the parties and the jury:

17    1122, 1123 and 1124, which are all items seized, as I indicated

18    in the stipulation, on March 14th, 2019, of a horse barn owned

19    by Christopher Oakes.

20    BY MS. MORTAZAVI:

21    Q.  Dr. Bowen, could you please read out the name that appears

22    in Government Exhibit 1122, to the extent you can read the

23    label?

24    A.  HP Bleeder Plus.

25    Q.  All right.  Do these exhibits all appear to be of the same

1   bottle from different angles?

2   A.  Yes.

3   Q.  If you could then read what appears on the labeling, under

4   directions and ingredients?

5   A.  Directions:  Administer 10 cc's IV or IM five to eight --

6   it's five to six, I misread it -- five to six hours --

7            THE COURT:  Dr. Bowman?

8   A.  -- before exercise.  Ahh, that's better.

9            THE COURT:  Yes.  Thank you.

10  A.  This product contains no known testable ingredients.

11  Q.  And if you could read the ingredients on the label?

12  A.  Ingredients:  Proprietary blend of homeopathic and complex

13  amino acid structures.

14  Q.  Thank you.

15           Ms. Jung, could you please pull up Government

16  Exhibit 1101, which is another item that was seized from the

17  same search of Christopher Oakes' horse barn.

18           Could you read out, Dr. Bowman, the company name that

19  appears on this label, to the extent you can identify one?

20  A.  It has a logo and it says Specialized Performance

21  Compounds.

22  Q.  And is there a website associated with this company?

23  A.  Yes, it's WWW.SPC-brands.com.

24  Q.  Ms. Jung, could you please pull up Government Exhibits

25  1407, 1408, 1409 and 1410, which are all items that were seized

1    during the search of the racehorse training facility called

2    Golden Shoe.

3           And, Dr. Bowman, does this appear to be photos of the

4    same bottle from different angles?

5    A.  Yes.

6    Q.  And again, to the extent you can -- and Ms. Jung may be

7    able to assist us here -- could you please read the product

8    name?

9    A.  The product name is HP Bleeder Plus.

10   Q.  And the ingredients?

11   A.  The ingredients:  Proprietary blend of homeopathic and

12   complex amino acid structures.

13   Q.  Thank you.  And is there a company name that appears on

14   this logo?

15          Ms. Jung, if you could go back to the original set of

16   four exhibits.

17   A.  Specialized Performance Compounds.

18   Q.  Ms. Jung, we can take down this set of exhibits, and if you

19   could please pull up Government Exhibits 1200, 1202 and 1203,

20   which are all exhibits, and they are mentioned in the prior

21   stipulation seized from a search of a premises associated with

22   Jorge Navarro.

23          Dr. Bowman, once again, could you read the product

24   name for this particular bottle?

25   A.  Yes, this is HP Bleeder.  I can't see a plus on this one,

1   homeopathic bleeder.

2   Q.  And the ingredients?

3   A.  Ingredients:  Proprietary blend of complex amino acid

4   structures.

5   Q.  And there appears to be a website at the bottom of the

6   label.  Could you please read that out loud as well?

7   A.  Yes, WWW.SPC-brands.com.

8   Q.  Thank you.

9           Ms. Jung, we can take down this set of exhibits.

10          I'd like to direct the jurors to their binders, to the

11  tab 125-AT, and I'll ask Ms. Jung to please pull up that

12  particular exhibit, as well as Exhibit 125-A.  I think there

13  may be one or two jurors who are still trying to find their

14  place so we'll wait another minute.

15          THE COURT:  Yes, if you would all look up maybe once

16  you're ready, okay?

17          MS. MORTAZAVI:  Ms. Jung, if you could please --

18          THE COURT:  No, no, no.  Give it a minute.

19          MS. MORTAZAVI:  Pardon me.

20          THE COURT:  Anybody who needs more time?  All right.

21          Thank you, Ms. Mortazavi.

22          MS. MORTAZAVI:  Ms. Jung, could you please play

23  Government Exhibit 125-A.

24          (Audio played)

25          And for the record, your Honor, that was a portion of

1   a call intercepted on April 3rd, 2019, between Seth Fishman and

2   Jordan Fishman, as represented on Government Exhibit 125-AT.

3          Ms. Jung, could you please go back to Government

4   Exhibit 711.

5   BY MS. MORTAZAVI:

6   Q.  Dr. Bowman, do you see at the bottom, in red, under or

7   beside the No. 2, "bleeding pills"?

8   A.  Yes.

9   Q.  Ms. Jung, could you please turn to the second page of this

10  exhibit, and if you could enhance the writing that appears at

11  the top of the page.

12         Dr. Bowman, could you please read out a portion of

13  this description starting with the first paragraph?

14  A.  Yes.  "Bleeder pills increase vascular integrity and help

15  reduce inflammation.  They have coagulant properties as well.

16  They have benefits far beyond bleeding.  If you wanted to make

17  an analogy, they would be equivalent to giving a low-dose

18  corticosteroid for prevention of bleeding."

19  Q.  Let me ask you about some of those terms.  Vascular

20  integrity, are you familiar with that?

21  A.  Common sense interpretation is vascular --

22         MR. FERNICH:  Objection.

23         THE COURT:  Sustained.

24  Q.  Are you familiar with the term "vascular"?

25  A.  Yes.

1    Q.   What does that mean?

2    A.   So vascular has to do with the veins and arteries,

3    circulatory system.

4    Q.   And the term "coagulant" that appears in that second

5    sentence, are you familiar with that word?

6    A.   Yes.

7    Q.   What does "coagulant" mean?

8    A.   A coagulant property is a property that would make the

9    blood clot better, faster.

10   Q.   All right.  And if you could read the first sentence of the

11   second paragraph that follows?

12   A.   "HP Bleeder Plus is a strong natural vasodilator and mild

13   natural analgesic."

14   Q.   Are there any claims made here about the drug's intended

15   use?

16   A.   Yes.

17   Q.   What are those?

18   A.   So it claims that this drug will be a vasodilator, which is

19   a classic drug and an analgesic, another class of drugs; so it

20   will perform those functions.

21   Q.   Is that similar to the HP Bleeder Plus product that you

22   testified about earlier?

23   A.   Those are some of the same intended uses.

24   Q.   And these bleeder pills, are these FDA approved?

25   A.   No.

1   Q.  Were you asked to conduct a GRASE analysis on this

2   particular product?

3   A.  Yes.

4   Q.  What did you conclude?

5   A.  I couldn't find any published information that provided any

6   data to support that these pills are safe or effective.

7           MS. MORTAZAVI:  Ms. Jung, could you please pull up for

8   the parties and the jury Government Exhibit 1125, which again

9   is --

10          THE COURT:  Ms. Mortazavi, if you're going to a new

11  exhibit, this might be a good time for a break.

12          MS. MORTAZAVI:  Certainly, your Honor.

13          THE COURT:  Is this convenient for you, or am I

14  breaking you mid-stream?

15          MS. MORTAZAVI:  This is a fine point.  We're happy to

16  pick up here after the lunch break.

17          THE COURT:  All right.  Ladies and gentlemen, we'll

18  take the lunch break now.  If you can please be ready to be

19  back in your seats for us to resume no later than 2:00 p.m.

20  All right?

21          (Jury not present)

22          THE COURT:  All right.  Dr. Bowman, you remain under

23  oath, and you should not discuss your testimony with anyone

24  over the break, please.  All right?

25          Everyone, have a good lunch, and I'll see you back

1    here a little bit before 2:00.

2              MR. FERNICH:  Judge, could I -- it's extrinsic to

3    this.  Could I raise something that's come up separate from

4    this?

5              THE COURT:  Yes, hold on.

6              Dr. Bowman, you can have lunch, and we'll see you back

7    here.  If you can try to be here ten to 2:00, five to 2:00.

8              THE WITNESS:  All right.

9              THE COURT:  All right.  If we could let Dr. Bowman

10   excuse herself and everyone have a seat for a moment.

11              (Witness temporarily excused)

12              THE COURT:  Okay.

13              MR. FERNICH:  Judge, as it happens, I handled the

14   appeal for El Chappo.  In an unfortunate bit of timing, the

15   Second Circuit denied the appeal as we started this morning, in

16   a published opinion, and I've gotten, you know, quite a few

17   press requests for comment, and I've given a, you know,

18   one-sentence comment.

19              Obviously, it's not intended to affect the jury in

20   this case.  I'm not a party to the litigation.  I don't know

21   that any action needs to be taken.  I'm not suggesting that it

22   does.  I'm just alerting you that this happened, and I'm sad

23   that it happened at this time, but, obviously, it's beyond my

24   control.

25              THE COURT:  All right.  I appreciate the advice.

M1PPFIS4                        Bowman - Direct

1    Anything from the government?

2              MR. ADAMS:  Nothing, your Honor.

3              THE COURT:  All right.  Thank you.

4              Have a good lunch, everyone.  See you back here a bit

5    before 2:00.

6              (Luncheon recess)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        AFTERNOON SESSION

                           (2:00 p.m.)

 1          THE COURT:  The jury is on its way up.

 2          I just want to say one thing for the record.  When we

 3   were at the sidebar, Mr. Fernich -- I think it was you -- cited

 4   a case to me, *Garcia*, you also said "Scope."  I don't know if

 5   that was the name of the case or you were talking about the

 6   scope of an examination.  But in any event, if you're going to

 7   be using names like Garcia that appears in thousands of case

 8   names, you need to give me a better orientation going forward,

 9   please.

10          MR. FERNICH:  I understand.  I spelled S-C-O-P out for

11   the reporter, which is 846 F.2d.  And actually I think I

12   misspoke about Garcia, I think it's called -- your Honor's

13   point is taken, I think it's called Cruz, I think it's 981.

14          THE COURT:  Cruz, you're saying?

15          MR. FERNICH:  I think Cruz.

16          THE COURT:  Not much better.

17          MR. FERNICH:  They say the same thing.  Your Honor

18   could grasp my point.

19          THE COURT:  Okay, thank you.  As I say, the jury is on

20   its way up, so we'll be ready to resume.

21          Mr. Adams and Ms. Mortazavi, when we conclude for the

22   day, I will ask you to give us an update of how we're doing in

23   terms of anticipated scheduling.  Okay?

1          MR. ADAMS:  Certainly.  Thank you.

2          THE COURT:  Thank you.

3          (Jury present)

4          THE COURT:  Dr. Bowman, you remain under oath.

5          Ms. Mortazavi, please.

6          MS. MORTAZAVI:  Thank you.

7          Ms. Jung, please pull up for government and the

8    parties Government Exhibit 1125.

9    BY MS. MORTAZAVI:

10   Q.  Dr. Bowman, if you recall before the lunch break we were

11   discussing what was labeled Bleeder Pills on Government

12   Exhibit 711.  I would like to direct your attention to this

13   exhibit.  It's a photograph of an item that was observed during

14   a search on March 14, 2019, of a horse barn associated with

15   Christopher Oakes.

16          Apart from the brown pills that appear in that Ziploc

17   bag, do you see two other items enmeshed in those brown pills?

18   A.  Yes.

19   Q.  Are you able to read the label on those items?

20          THE COURT:  Can we zoom in?

21   A.  Maybe if you zoom in.

22   Q.  If the answer is no, that's perfectly acceptable.

23   A.  I could read some of it, I can't read the label.

24          THE COURT:  Sorry, you need to speak into the mic.

25   A.  I can't read the name.

Q.  All right.  Thank you, Dr. Bowman.

MS. MORTAZAVI:  Ms. Jung, we can take this exhibit down.

Your Honor, I would like to read into the record a stipulation between the parties that was just signed this morning.  It's Government Exhibit 9006.

If called as a witness at trial, a record custodian for the entity Equestology, Inc., Equestology, and for each of the government exhibits identified below would testify that Government Exhibits 300 through 320E and 320FA through 331 are true and correct copies of certain records of Equestology maintained by Equestology and are records of regularly-conducted activities of Equestology that remained at or near the time by or from information transmitted by someone with knowledge of the information contained therein, kept in the course of regularly-conducted activities of Equestology, and made in the regular practice of the activities of Equestology.

It is further stipulated and agreed by and between the parties that the aforementioned government exhibits and this is stipulation, which is Government Exhibit 9006, may be received in evidence at trial.

Your Honor, the government offers Government Exhibit 9006 and the exhibits referenced therein, 300 through 320E and 320FA through 331 into evidence.

THE COURT:  Those are all received as evidence.

1          (Government's Exhibits 9006, 300 through 320E and

2    320FA through 331 received in evidence)

3          MS. MORTAZAVI:  Ms. Jung, please pull up for the

4    parties and the jury Government Exhibit 306.

5          Could you please zoom in on the text at the top,

6    Ms. Jung.

7    BY MS. MORTAZAVI:

8    Q.  Dr. Bowman, does this appear to be an email?

9    A.  Yes, it does.

10   Q.  I would like us to read portions of this exhibit into the

11   record.

12         Looking at the bottom there's an email from Lisa

13   Ranger.  In the from section, could you read the email address

14   associated with Lisa Ranger?

15   A.  Yes, it's equestology@gmail.com.

16   Q.  What was the date at which this email was sent?

17   A.  March 18, 2017.

18   Q.  And who is the recipient on this chain email?

19   A.  Seth Fishman.

20   Q.  Could you read out the email address associated with Seth

21   Fishman, please.

22   A.  Yeah, sethfishman@hotmail.com.

23   Q.  And the subject of this email?

24   A.  Can you please give a short explanation of the bleeding

25   pills, how they differ from Homeopathic Bleeder Plus, why use

1    together or by themselves.

2    Q.  And the subject line of this the email is Bleeder Pills, is

3    that right?

4    A.  Correct.

5    Q.  Now looking at the top email on this exhibit, could you

6    tell us who sent the top email and when it was sent?

7    A.  Dr. Fishman sent this email on March 18, 2017.

8    Q.  And could you read out the recipients, please.

9    A.  Lisa Ranger.

10   Q.  Could you please then read the text in the body of the

11   email?

12   A.  Bleeder pills increase vascular integrity and help reduce

13   inflammation.  They have coagulant properties as well.  They

14   have benefits far beyond bleeding.  If you wanted to make an

15   analogy, they would be equivalent to giving a low dose

16   corticosteroid for the prevention of bleeding.  HP Bleeder Plus

17   is a strong natural vasodilator and mild natural analgesic.

18   Vasodilators are extremely beneficial for many reasons beyond

19   decreasing bleeding in horses.  The natural analgesic is just

20   an added benefit as pain will increase likelihood of bleeding.

21            MS. MORTAZAVI:  Ms. Jung, you can take this exhibit

22   down.

23            Please pull up Government Exhibit 711 and turn to page

24   2.

25   Q.  Dr. Bowman, again this is the document that we were

1   referencing earlier in your testimony this morning.  Looking

2   next to the No. 3 and the product that is listed beside it,

3   could you read out the name of the product?

4   A.  VO2 Max.

5   Q.  And there's a highlighted portion to this text.  Please

6   read that out as well.

7   A.  HP Bleeder plus with additional ingredients.  Usually 10

8   mls usually four to five fors prior to race.

9   Q.  And is fors spelled F-O-R-S?

10  A.  Yes.

11  Q.  Please read the first two sentences that appear in the

12  description below the portion that you just read.

13  A.  All natural Japanese amino acid-based product that has

14  profound vasodilatory properties.  Vasodilation benefits all

15  performance animals because it reduces cardiac exertion during

16  performance.

17  Q.  Dr. Bowman, just for sake of clarity, what does cardiac

18  refer to?

19  A.  Cardiac refers to the work that the heart is doing in this

20  case.

21  Q.  All right.

22  A.  Cardiac exertion.

23  Q.  Could you read the next sentence starting with

24  pharmaceutical vasodilators.

25  A.  Pharmaceutical vasodilators are usually tested in most

1    jurisdictions and disciplines because they are proven to be

2    effective sports enhancing.  Vasodilation significantly reduces

3    EIPH, Exercise-Induced Pulmonary Hemorrhage, and lactic acid

4    accumulation.  The formula is a proven oral prework designed

5    for Olympic athletes.

6    Q.  Dr. Bowman, I will stop you there.  Exercise-Induced

7    Pulmonary Hemorrhage or EIPH, just to remind us all, was that

8    the same condition that was described with respect to

9    Homeopathic Bleeder Plus?

10   A.  Yes.

11   Q.  And at a high level, does that consist of bleeding in a

12   horse's lungs?

13   A.  Yes.

14   Q.  Could you read the last two sentences in this description

15   of the VO2 Max, starting with dose is 10ten to 20.

16   A.  Dose is 10 to 20 mls intravenously for a 1,000 pound or

17   450-kilogram.  Although this product will not interfere with

18   other medications, do not mix with anything else in the same

19   syringe.

20   Q.  Looking at the description, Dr. Bowman, are there any

21   claims made about intended uses for this product?

22   A.  In the previous paragraph it made claims that it was a

23   vasodilator and analgesic and it would reduce cardiac work and

24   reduce lactic acid.  And the directions for use about when to

25   use it imply that the expected use --

1          MR. FERNICH:  Objection.

2          THE COURT:  Sustained.

3   Q.  All right.  Dr. Bowman, looking at the description, is this

4   the type of drug that would require a diagnosis before it's

5   administered?

6   A.  Yes.

7   Q.  Is VO2 Max FDA approved?

8   A.  No.

9   Q.  Were you asked to conduct a GRASE analysis of VO2 Max?

10  A.  Yes.

11  Q.  What were your conclusions?

12  A.  I was unable to locate any adequate well-controlled studies

13  that support the use of this product or any of these uses,

14  vasodilation or to reduce lactic acid accumulation or to reduce

15  cardiac exertion.

16          MS. MORTAZAVI:  Ms. Jung, could you please pull up

17  Government Exhibit 1028.

18          And Ms. Jung, are you able to zoom in on part of the

19  label?

20          THE COURT:  Do you have the ability to rotate it?

21          MS. MORTAZAVI:  We may not, your Honor, we may have to

22  do it manually.

23  Q.  Dr. Bowman, I apologize for that.

24  A.  It's okay.

25  Q.  Could you read out the product name that appears here?

1  A.  VO2 Max.

2  Q.  And the directions and then the ingredients?

3  A.  Directions:  Administer intravenously 10 to 20 CCs one to

4  four hours prior to strenuous exercise.

5  Q.  And the ingredients?

6  A.  Ingredients:  Proprietary blend of amino acids.

7  Q.  Does this label contain all the information the FDA

8  typically requires on an approved drug label?

9  A.  No.

10  Q.  What is missing?

11  A.  There's no indication section to describe when you should

12  use the product.  It lacks the --

13        MR. FERNICH:  Objection.

14        THE COURT:  Grounds?

15        MR. FERNICH:  It's inconsistent with the face of the

16  document.

17        THE COURT:  You can cross-examine.

18        MR. FERNICH:  Thank you, your Honor.

19        THE COURT:  Sorry, Dr. Bowman, go ahead, you can

20  answer.

21  A.  It lacks that federal law restricts this drug to use by a

22  licensed veterinarian, the prescription legend.  It lacks who

23  it's manufactured by or distributed by, that information.  I

24  don't see a batch number or lot number or an expiration date.

25  It lacks an adequate ingredient statement.  It should have all

1    the ingredients listed, including the inactive ingredients

2    specifically, not just "proprietary blend."

3    Q.  Dr. Bowman, you stated there was no expiration date.  I

4    know this label is a little difficult to read.  I want to make

5    sure to clarify.  The words in red text at the bottom --

6    A.  Yes, EXP, I missed it.

7    Q.  But otherwise, looking at the label, do you see any

8    manufacturer information?

9    A.  No.

10   Q.  Do you see a name or address associated with a manufacturer

11   or distributor?

12   A.  No.

13           MS. MORTAZAVI:  Ms. Jung, please pull up Government

14   Exhibits 1114, 1115, 1116 and 1117.  And these are items that

15   were observed during a search of the horse barn associated with

16   Christopher Oakes on March 14, 2019.

17           Could we please, Ms. Jung, zoom in on Government

18   Exhibit 1117.

19   Q.  Dr. Bowman, please read the name of this product.

20   A.  This is VO2 Max.

21   Q.  To the extent you can, I know it's a little difficult, if

22   you could read the text that appears in red underneath the name

23   of the product.

24   A.  Administer intravenously 10 CCs, I think it says four to

25   six hours prior to strenuous exercise.  Proprietary blend of

1   amino acids.

2            MS. MORTAZAVI:  Thank you.  You can take down these

3   exhibits.

4            I would like to direct the jurors to their transcript

5   binders, Government Exhibit 127BT.  I will have Ms. Jung pull

6   up that exhibit and Government Exhibit 127B.

7            This refers to a portion of a call that's intercepted

8   on April 4, 2019, between Seth Fishman and Nick Devita.

9            THE COURT:  So I'm clear on this, when you say 127BT,

10  T is what is in the transcript binder and 127B is the actual

11  recording?

12           MS. MORTAZAVI:  That's correct, your Honor.

13           THE COURT:  Thank you.

14           MS. MORTAZAVI:  I believe all the jurors have the

15  transcript open, so I ask Ms. Jung to please play Government

16  Exhibit 127B.

17           (Audio recording played)

18           MS. MORTAZAVI:  If you could please pull up Government

19  Exhibit 711, and please turn to page 2.

20  Q.  Dr. Bowman, next to No. 4 there appears the name homeogesic

21  and then in parenthesis natural analgesic pain killer.

22           Can you remind us what an analgesic is?

23  A.  An analgesic is a pain reliever.

24  Q.  Could you please read this first paragraph that appears

25  under that caption.

1    A.   Three products in one.  A combination of the three most

2    common preparatory products in global racing combined in one

3    product for the most value and benefit.  MSM and DMG are well

4    documented in racing industry and are both included in the

5    highest bioavailable concentration.  Proprietary analgesic

6    combinations based on a published peer reviewed article are

7    included as the third product.

8    Q.   And could you read the last sentence that appears in this

9    description.  I believe it's in the following paragraph

10   starting with the literature -- sorry, the second to last

11   sentence appearing in the next paragraph starting with the

12   literature regarding.

13   A.   The literature regarding the benefits or both MSM and DMG

14   in the equine athlete is endless.  Now both are available in a

15   combination therapy with the added benefit of a proven

16   analgesic.

17   Q.   Dr. Bowman, when you're conducting your GRASE analysis do

18   you look to each individual component or ingredient in a drug?

19   A.   Not for evidence of the well-controlled studies on that

20   product.

21   Q.   Do you look to the drug as a whole?

22   A.   We look to the drug as a whole, and it needs to actually be

23   the formulation that is in use.  So it can't be someone else's

24   formulation, especially if we don't know all the ingredients,

25   because we can't confirm that it would be identical to this

M1PTFIS5                         Bowman - Direct

1   product.

2   Q.  Is it sufficient if each individual ingredient is generally

3   recognized as safe and effective?

4   A.  No.

5   Q.  Why not?

6   A.  Because, just as I said, it's the finished product that is

7   being tested.  You can have the same ingredients in three

8   different products and they might all have different

9   half-lives, which mean they last in the body for different

10  lengths of time until half of it's gone, it's a common

11  pharmacokinetic measurement, or they might reach different

12  highest C max, which is the highest concentration that you get

13  in the blood, and that is important, it matters to the safety

14  and effectiveness.

15  Q.  So does the interaction of all the ingredients matter when

16  you're reviewing safety and efficacy?

17  A.  Always, yes.

18          MS. MORTAZAVI:  Ms. Jung, please go back to the

19  original exhibit, page 2 of Government Exhibit 711, and turn to

20  the next product, No. 5, PSDS natural analgesic pain killer.

21  Q.  Could you had please read the portion in bold, Dr. Bowman,

22  that appears underneath the name of this drug.

23  A.  This product is based on the original Panacin formulation.

24  It has 2.5 times more D-Phenylalanine than all other compounded

25  and production versions.

1    Q.  Dr. Bowman, are you familiar with Panacin?

2    A.  I wasn't, but I went and did some research.

3    Q.  What did you find?

4    A.  I found --

5             MR. FERNICH:  Objection.

6             THE COURT:  Lay a better foundation, please.

7    Q.  What did you review, Dr. Bowman, when looking into Panacin?

8    A.  I reviewed information found in Daily Med and some of the

9    other medical websites.  There are two formulations of Panacin,

10   there's one for --

11            MR. FERNICH:  Objection.

12            THE COURT:  What's the objection?

13            MR. FERNICH:  My objection is it violates the

14   confrontation clause under *Williams v. Illinois*.

15            THE COURT:  Overruled.

16   A.  So there's a human drug called Panacin that's a tablet, at

17   least I only saw it in a tablet form.  It's sold in Europe.

18   It's not sold in the United States.  It's not approved here.

19   It includes acetaminophen, which is the active ingredient in

20   Tylenol, caffeine and aspirin.  And then there was reference to

21   a veterinary formulation, so I searched further and I found

22   that --

23            MR. FERNICH:  Objection.

24            THE COURT:  Same objection?

25            MR. FERNICH:  It exceeds the bounds of her expert

1    testimony.  She's quoting research she did in this particular

2    case.

3                THE COURT:  Lay a better foundation.

4    Q.  Dr. Bowman, you mentioned that you had come across various

5    versions of Panacin, correct?

6    A.  Correct.

7    Q.  And you testified about a human version, is that right?

8    A.  Yes.

9    Q.  And you mentioned that you looked into Daily Med, I

10   believe, in order to do your research?

11   A.  That's one place I checked, yes.

12   Q.  And is that a database or a publication or something else?

13   A.  It's a database, NIH maintains it, it's publicly available,

14   and all the approved drugs are found.

15   Q.  And the research that you did, was that in connection with

16   your testimony today?

17   A.  Yes.

18   Q.  In the course of your research, did you come to learn about

19   a different version of Panacin that's intended for animal use?

20   A.  Yes.

21   Q.  Could you tell us what you know about Panacin with respect

22   to animal use?

23   A.  It has two amino acids.  It's reported to have two amino

24   acids.

25                MR. FERNICH:  Objection.

1                THE COURT:  Sustained.

2    Q.  Dr. Bowman, I turn back to PSDS on Government Exhibit 711.

3    Could you please read the first sentence underneath the portion

4    that you just read starting with:  It is a mild.

5    A.  It is a mild antiinflammatory compound and is a prominent

6    component in wound healing.  Carnosine is a major muscle

7    buffer.  In muscle tissue, phosphate and carnosine together

8    provide approximately 90 percent of the buffering capacity.

9    Q.  Dr. Bowman, I will pause you there.

10               MS. MORTAZAVI:  Could you please turn to -- and this

11   is directed to Ms. Jung, if you could please turn to the next

12   page in this exhibit, which is page 3.

13   Q.  Dr. Bowman, do you see that the PSDS description continues

14   on the next page?

15   A.  Yes.

16   Q.  Could you please read the sentence starting with:  With

17   increasing acidity?

18   A.  With increasing acidity comes premature muscle fatigue with

19   an associated decrease in performance.

20   Q.  Let me pause you there.  Looking at the last few sentences

21   in bold in this description, could you please read that portion

22   out loud, starting with:  Best used over.

23   A.  Best used over two to three days prior to strenuous

24   exercise.  The typical dose is five mls and the last dose is

25   usually administered four to six hours prior to strenuous

1    exercise.  Given its safety, many trainers opt to give 10 mls

2    for the last dosage.

3    Q.  Dr. Bowman, looking at the entirety of that explanation of

4    PSDS, are there any claims made about the intended use of PSDS?

5    A.  It's making a claim to improve performance throughout its

6    buffering capacity and as an antioxidant, and it reduces muscle

7    fatigue and improves muscle function.

8    Q.  Is PSDS FDA approved?

9    A.  No, it's not.

10   Q.  Were you asked to conduct a GRASE analysis of PSDS?

11   A.  Yes.

12   Q.  What were your conclusions?

13   A.  My conclusions are that it's an unapproved new animal drug.

14   There's no adequate and well-controlled studies regarding its

15   use.

16         MS. MORTAZAVI:  Ms. Jung, please pull up for the

17   parties and the jury Government Exhibit 1027.

18   Q.  Dr. Bowman, could you read the name of this product.

19   A.  Pain Shot LC.

20   Q.  And again, you may have to crane your neck, but could you

21   read out the description -- or apologies, the directions that

22   appear on this label.

23   A.  Directions:  Administer 10 to 15 mls IM or IV slowly 24

24   hours something four to six hours prior to strenuous exercise.

25   Q.  All right.  It says --

1   A.   24 hours and four to six hours prior.

2   Q.   Okay.  And on this particular government exhibit, 1027,

3   which was an extraction from a computer that was found in Seth

4   Fishman's residence, could you please tell us if this label

5   contains all the information the FDA typically requires on an

6   approved drug label?

7   A.   No, it does not.

8   Q.   What, if any, information is missing?

9   A.   There's no indication section.  The prescription legend is

10  it absent.  Although it says keep refrigerated, that is not

11  usually adequate for the storage instructions.

12          MR. FERNICH:  The what?

13  Q.   Dr. Bowman, if you could repeat what you just said.

14  A.   Although it says keep refrigerated, that doesn't usually

15  suffice for the storage instructions which are required on the

16  label for all OTC and prescription drugs.  I may have forgotten

17  to mention that earlier.  There are so many things on the label

18  that need to be there.

19  Q.   Dr. Bowman, again, this could be me because of where I'm

20  located in the courtroom, if you could pull the microphone

21  close to your mouth.  And I think you should feel free to move

22  the microphone if you need to.

23          THE COURT:  She just did.

24          MS. MORTAZAVI:  Thank you, your Honor.

25          Ms. Jung, if we could take down this exhibit and

1    return to Government Exhibit 711.  If you turn to page 3.

2    Q.  Next to No. 7 appearing on this page, Dr. Bowman, GNRH,

3    could you please read the description starting with Gondorelin

4    Acetate?

5    A.  Gondorelin Acetate is similar to Factrel and identical in

6    sequence to Cystorelin.  This product is best used for sulking

7    horses.  Typically one-half to full bottle is used four to six

8    hours prior to strenuous exercise.  Both Factrel and Cystorelin

9    require refrigeration, and if not stored properly they may lose

10   potency.  As a lyophilized presentation, GNRH is less likely to

11   degrade and lose potency if not stored under refrigeration at

12   all times.

13   Q.  That first phrase, Dr. Bowman, which I won't attempt to

14   pronounce again, are you familiar with that term?

15   A.  Gondorelin Acetate?

16   Q.  Yes.

17   A.  Yes, that's the active ingredient in several approved new

18   animal drugs.

19   Q.  When you say the active ingredient, is that the same as an

20   API?

21   A.  Yes.

22   Q.  Looking at Factrel, which is also included in this

23   description, are you familiar with that term?

24   A.  Yes.

25   Q.  What is it?

1    A.   That's an approved new animal drug.

2    Q.   And Cystorelin also appears in that sentence.  Are you

3    familiar with that term?

4    A.   Yes.

5    Q.   What is that?

6    A.   That is also an approved new animal drug.

7    Q.   Can you remind us, Dr. Bowman, can someone else manufacture

8    an approved new animal drug once it's been approved?

9    A.   No, not unless they go through the approval process and get

10   their own approval.

11   Q.   In the second sentence, Dr. Bowman, there's a reference to

12   sulking horses.  Are you familiar with a sulking horse?

13   A.   A sulking horse would be the same as a sour horse.

14   Typically those are horses that are reluctant to leave their

15   stall or leave the barn area.  They don't like to go out and

16   work.

17   Q.   Is this product, GNRH, FDA approved?

18   A.   This product isn't, but there are FDA approved GMRHs.

19   Q.   When you say this product isn't, what do you mean by that?

20   A.   I mean as far as the labels that I saw were not for the FDA

21   approved product, they were for an unapproved new animal drug

22   with the same active ingredient.

23   Q.   Again, when you check for new animal drugs that are

24   approved by the FDA, does it matter who the manufacturer is?

25   A.   Yes.

1   Q.  Were you asked to conduct a GRASE analysis on GNRH?

2   A.  Yes.

3   Q.  What were your conclusions?

4   A.  My conclusions were that there are no adequate well-

5   controlled studies to support the use of this drug and it's an

6   unapproved new animal drug.

7           MS. MORTAZAVI:  Ms. Jung, please pull up Government

8   Exhibit 1023, which is an electronic extraction from a computer

9   found at Seth Fishman's residence.

10  Q.  Dr. Bowman, could you he read the name of the product

11  appearing on this label.

12  A.  GNRH, Gondorelin Diacetate.

13  Q.  And the directions?

14  A.  Directions.  Reconstitute with 20 mls bacteriostatic water.

15  Each ml contains 50 micrograms GNRH.  Use IM or IV for as

16  prescribed by veterinarian.

17  Q.  Just looking at the label, is this the type of drug that

18  would require a diagnosis and a prescription?

19  A.  Yes.

20  Q.  Does this label contain all of the information that the FDA

21  would typically require on a new drug label?

22  A.  No.

23  Q.  What's missing?

24  A.  It misses the indications section, the manufacturer and

25  distributor information and contact information.  It is lacking

1   a full ingredient -- well, it may not be.  Without knowing

2   more, I don't know if it's listing all the ingredients.  It

3   lacks the storage statement for the product before

4   reconstitution.  And did I say the prescription legend is

5   missing?

6   Q.  Is there a manufacturer listed here?

7   A.  No.

8   Q.  Any manufacturer address?

9   A.  No.

10          MS. MORTAZAVI:  Ms. Jung, could you please pull up

11  Government Exhibit 1417, 1418, 1419 and 1420, these are all

12  admitted, and photographs of items that were observed during

13  the search of the Golden Shoe training facility.

14  Q.  Dr. Bowman, can you see these appear to be photographs of a

15  label from different angles of the same drug?

16  A.  Yes.

17  Q.  Can you read the drug name?

18  A.  The drug name is GNRH, Gonadorelin Diacetate.

19  Q.  And to the extent you could read the directions, could you

20  please read those out loud?

21  A.  Directions:  Reconstitute with 20 mls bacteriostatic water.

22  Each ml contains 50 micrograms GMRH.  Use IM or IV as

23  prescribed by veterinarian.

24          MS. MORTAZAVI:  Ms. Jung, please zoom in on Government

25  Exhibit 1420 in the bottom right corner.

1    Q.  Do you see a company name on this label?

2    A.  It says Specialized Performance Compounds.

3    Q.  Was that present in our review of the last exhibit,

4    Government Exhibit 1023?

5    A.  No, it wasn't.

6         MS. MORTAZAVI:  And Ms. Jung, could you please pull up

7    Government Exhibit 1507.  This is a photograph of an item that

8    was observed during the premises search of the Mount Hope

9    training facility.

10        If you could zoom in on the label, Ms. Jung.

11   Q.  Dr. Bowman, again, could you read out the name of this

12   product?

13   A.  This is GMRH, Gonadorelin Diacetate.

14   Q.  And I won't have you read out the directions, but do they

15   appear to be identical to the label that you reviewed

16   previously?

17   A.  Yes.

18        MS. MORTAZAVI:  Ms. Jung, please pull up Government

19   Exhibit 711, and turn to page 3 of that exhibit.

20   Q.  Dr. Bowman, looking at the bottom, looking next to No. 8,

21   do you see the name ITTP Plus?

22   A.  Yes.

23   Q.  What's in parenthesis next to that product name?

24   A.  Increase oxygen release in the blood.

25   Q.  Could you read the description that follows?

M1PTFIS5                          Bowman - Direct

1    A.  ITPP plus other ingredients.  ITPP increases oxygen

2    release.  Compared to what's sold online, its lets than one

3    half the price.  Most people are using one half bottle night

4    before and remainder of bottle four to five hours before event.

5              MS. MORTAZAVI:  And Ms. Jung, if we could please pull

6    up Government Exhibit 1025, and zoom in on one of those labels.

7    Q.  Could you read the product name here, Dr. Bowman.

8    A.  This is IT Plus.

9    Q.  And the directions.

10   A.  Directions:  Reconstitute with 30 mls bacteriostatic water

11   and administer 15 mls 24 hours and four hours before exercise.

12   Q.  Dr. Bowman, were you asked to check FDA's databases to see

13   if IT Plus is FDA approved?

14   A.  Yes.

15   Q.  Is it FDA approved?

16   A.  No, it isn't.

17   Q.  Were you also asked to conduct a GRASE analysis of IT Plus?

18   A.  Yes.

19   Q.  What were your conclusions?

20   A.  My conclusions were that it's an unapproved new animal

21   drug.  There aren't adequate and well-controlled studies to

22   support its use.

23   Q.  Looking at the label, does this label contain all the

24   information that the FDA typically requires?

25   A.  No.

1   Q.  What is missing?

2   A.  There's no indication section.  The prescription legend is

3   missing.  There's no storage information.  It lacks an

4   ingredients section that is complete.  It's inadequate to say

5   proprietary amino acids and sugars, you have to list each one

6   with its concentration in the final formulation.

7   Q.  Is there a manufacturer listed here?

8   A.  No, it's lacking the manufacturer distributor information.

9          MS. MORTAZAVI:  I would like to direct the jurors to

10  pick up their transcript binders once again and have Ms. Jung

11  pull up Government Exhibit 132AT.

12         And I will have Ms. Jung prepare Government Exhibit

13  132A.

14         And while the jurors are locating the transcript, for

15  record, this is a portion of an intercepted call taking place

16  on April 17, 2019 between Seth Fishman and Richard Silverman.

17         It appears all the jurors have found the transcript,

18  so Ms. Jung, if you could please play Government Exhibit 132A.

19         (Audio recording played)

20         MS. MORTAZAVI:  Thank you, Ms. Jung.  Please pull up

21  Government Exhibits 1118, 1119, 1120 and 1121, which are all

22  photographs of items that were observed during the March 14,

23  2019 search of Christopher Oakes' horse barn.

24  Q.  Dr. Bowman, again with respect to the two exhibits to the

25  right, 1120 and 1121, does that appear to be the same bottle

1    but from different angles?

2    A.  Yes.

3            MR. ADAMS:  Ms. Jung, if could you zoom in on 1120 and

4    1121.

5    Q.  Could you read the product name, Dr. Bowman, that appears

6    on this label.

7    A.  This one is ITTP plus.

8    Q.  And if you could read the beginnings of the directions,

9    whatever is legible under Government Exhibit 1120.

10   A.  Directions:  Reconstitute bacteriostatic water and

11   administer IV 24 hours and four hours before -- I can't read

12   that word.

13   Q.  And Dr. Bowman, are you familiar with that term,

14   "reconstitute?"

15   A.  Yes.

16   Q.  What does that mean?

17   A.  There are a lot of medications that come in lyophilized

18   form, so they're powder in a vial.  You take that powder and

19   you reconstitute it with the liquid that's specified, whether

20   that's sterile water or, in this case, bacteriostatic water.

21   Q.  So does reconstitute mean to combine or mix?

22   A.  Combine or mix.  And it turns the powder in a liquid.  You

23   shouldn't still see flakes or crystals in that after you add

24   the liquid.

25   Q.  And what's bacteriostatic water?

1  A.  It's a diluent, something that you mix with drugs.  It has

2  a little bit of alcohol in it, and the remainder, I believe, is

3  just sterile water.  There is an approved -- I don't know if

4  this has been approved, but there is an FDA-approved

5  bacteriostatic water.

6          MS. MORTAZAVI:  Ms. Jung, you can take down these

7  exhibits, and please pull up Government Exhibit 143C and 143C2.

8  And I will ask the jurors to open up their binders to 143CT.

9          While they're doing so, I will say for the record this

10 is a portion of a call intercepted on June 12, 2019, between

11 Seth Fishman, John Pundyk and Geoff Vernon.

12         And Ms. Jung, if you could please play Government

13 Exhibit 143C.

14         (Audio recording played)

15         MS. MORTAZAVI:  Ms. Jung, if you could take down this

16 exhibit and return to Government Exhibit 711.  And turn to page

17 4 of that exhibit.

18 Q.  Dr. Bowman, looking at No. 9 at the top of the page, do you

19 see product named TB-7?

20 A.  Yes.

21 Q.  Can you read what is in parentheticals beside TB-7?

22 A.  Accelerated tissue repair, especially in lungs.

23 Q.  Could you read the first few sentences starting with:  This

24 product has.

25 A.  This product has the same sequencing as the infamous TB500

1    product, except now available at a fraction of the cost.  TB500
2    marketed this well-studied sequence from the many published
3    results in the numerous use patents filed for this sequence.
4    Q.  I will pause you there, Dr. Bowman.  Looking at the first
5    paragraph, can you locate the last sentence -- sorry, the next
6    to last sentence starting with "Like all immunomodulators," and
7    please read beginning with that portion.
8    A.  Like all immunomodulators, they are highly beneficial in
9    small strategic doses and promote overall healing and increased
10   immunity.  Helps in after-race care for bleeders.  Proactively
11   promotes healing.
12   Q.  Dr. Bowman, are there any claims made here about the
13   intended uses of TB-7?
14   A.  Yes.
15   Q.  What are those?
16   A.  Its intended uses, to improve and speed, apparently,
17   healing of the lungs following bleeding after a race.  It
18   increases -- it says it's an immunomodulator.  That means it's
19   going to increase the immunity.  That should be something that
20   helps prevent infections.
21   Q.  Anything else, Dr. Bowman?
22   A.  That's all I see.
23   Q.  Is this product TB-7 FDA approved?
24   A.  No, it's not.
25   Q.  Were you asked to conduct a GRASE analysis of TB-7?

1    A.  Yes.

2    Q.  What were your conclusions?

3    A.  That TB-7 is an unapproved new animal drugs.

4    Q.  Are there any well-controlled studies in the literature

5    regarding TB-7?

6    A.  No.

7            MS. MORTAZAVI:  Ms. Jung, please pull up Government

8    Exhibit 1024.  If you could zoom in on one of these portions of

9    the label.

10           This is an electronic extraction from a computer found

11   in Seth Fishman's residence.

12   Q.  Could you read the product name here, Dr. Bowman?

13   A.  TB-7 Acetylated Thymosin Beta 4 and 10.

14   Q.  Do you see a company named here?

15   A.  Equestology.

16   Q.  Is there any contact information associated with that

17   company?

18   A.  No.

19   Q.  Do you see the phrase in red at the bottom:  For R and D

20   and clinical trial use only, exclamation mark?

21   A.  Yes.

22   Q.  Are you familiar with the term R and D?

23   A.  That typically means research and development.

24   Q.  Can you explain what that is?

25   A.  That's not a terminology that is used on an FDA label, but

1   research and development is the research that is done behind

2   new products, whether new drugs or other things.

3   Q.  And do you see here the reference to clinical trial?

4   A.  Yes.

5   Q.  You testified before about clinical trials and how that

6   data can be used to inform the drug approval process, correct?

7   A.  Correct.

8   Q.  Are there certain drugs that are permitted to be used for

9   clinical trial purposes?

10  A.  Yes.

11  Q.  Does the FDA track those drugs?

12  A.  Yes.

13  Q.  Can you explain?

14  A.  When companies come in and they're interested in pursuing a

15  new animal drug, the first step is setting up an

16  investigational new animal drug file, and in that file is where

17  all the early data is collected.  Every drug that is

18  distributed for use in a clinical trial has a special statement

19  on the label, it's found at 21 CFR 511.  If it's for use in a

20  clinical trial, it says for investigational use only, and for

21  clinical trials in horses, for use in clinical trials only.

22  That might not be the exact language but it's pretty close.  So

23  this statement would have no regulatory meaning.

24  Q.  So in other words, the statement that is recognized for

25  drugs that can be used in a clinical trial, does that statement

1    appear on this label?

2    A.   No.

3    Q.   Looking at the label as a whole, excluding the section in

4    red, is there any information here that is missing that the FDA

5    would typically require?

6    A.   The labels we require for investigational drugs are

7    different, so it doesn't meet that standard.  And it certainly

8    doesn't meet the standard as we described of an approved new

9    animal drug label.  It doesn't have an indication section.  It

10   doesn't have storage information.  It doesn't have the

11   manufactured by and distributed by information with the contact

12   information.  It doesn't include the dose or the directions for

13   administration.  It doesn't have any cautions or precautions or

14   warnings to let you know what might go wrong, what you should

15   be looking for for adverse events or how to select the proper

16   patients for it.

17           MS. MORTAZAVI:  Ms. Jung, please take down this

18   exhibit and pull up Government Exhibits 1111, 1112 and 1113,

19   which are all items that were observed during the March 14,

20   2019 search of the horse barn associated Christopher Oakes.

21           If we could, please, focus on Government Exhibit 1112,

22   Ms. Jung.

23   Q.   Dr. Bowman, can you read the name that appears on this

24   label.

25   A.   This is TB-7, Acetylated Thymosin Beta 4 and Beta 10.

M1PTFIS5                          Bowman - Direct

1    Q.  Looking at this collection of exhibits, do there appear to

2    be on this label any reference to the company or the

3    manufacturer of this particular drug?

4    A.  No, all I see is a faint logo.

5    Q.  And is that logo an image or does it include any writing?

6    A.  I just see an image.

7              (Continued on next page)

1   Q.  And again, what information, if you could give one or two

2   examples, is missing from this label that the FDA would

3   otherwise require?

4   A.  It lacks an indication section.  It lacks a complete -- I'm

5   assuming.  I don't see an ingredient panel; so it doesn't have

6   the proper ingredient statement.  It lacks the prescription

7   legend.  It lacks indications, warnings, precautions.

8   Q.  And Doctor --

9   A.  And storage information.

10  Q.  Dr. Bowman, with reference to the last exhibit we looked

11  at, which was the TB-7 label, Government Exhibit 1024, the

12  language for "R and D and clinical trial use only" appeared in

13  red.  Do you see that phrase on any of these images?

14  A.  No, I don't.

15  Q.  Ms. Jung, could you please take down these exhibits and

16  pull up Government Exhibits 1216, 1217, 1218 and 1219.

17          These are all objects that were seized during the

18  search of Jorge Navarro's residence.

19          Dr. Bowman, could you read the product name out once

20  again?

21  A.  TB-7, Acetylated thymosin B4 and B10.

22  Q.  Is there a manufacturer or distributor listed here?

23  A.  No.

24  Q.  Do you see the phrase "for R and D clinical trial use only"

25  listed here?

1    A.  No.

2    Q.  Ms. Jung, you can take these exhibits down, and if you

3    could please turn back to Government Exhibit 711, page 4.

4         Dr. Bowman, looking at the bottom of the page, next to

5    No. 13, do you see the product name ACTH?

6    A.  Yes.

7    Q.  Could you read what appears after ACTH?

8    A.  "In small doses will act as natural anti-inflammatory.

9    Larger doses, two cc's or more, will act as sedation."

10   Q.  And could you read the next two sentences that follow?

11   A.  "With testing of corticosteroids, there are not many viable

12   options left.  ACTH, adrenocorticotropic hormone, causes the

13   adrenal gland to release cortisol, the body's natural

14   corticosteroid.  Most companies supply this peptide in an

15   aqueous base formulation with questionable stability."

16   Q.  And I'll stop you there.

17        Ms. Jung, could we turn to the next page, that's page

18   5.

19        Dr. Bowman, could you read the description that starts

20   on page 5 starting with the sentence "each vial contains a

21   thousand"?

22   A.  "Each vial contains 1,000 international units and is

23   reconstituted and kept in refrigerator for longest shelf life.

24   The bottle, once reconstituted, should be used within five

25   days."

1    Q.  Looking at this description of ACTH, are there any claims

2    made about its intended use?

3    A.  Yes.

4    Q.  What are some of those?

5    A.  It claims that it will cause the release of natural

6    corticosteroids in the body for an anti-inflammatory effect.

7    Q.  And is this drug, ACTH, FDA approved?

8    A.  This ACTH isn't FDA approved, but there are approved ACTHs.

9    Q.  And what's the difference between this ACTH and the

10   approved versions?

11   A.  This one is a little more concentrated, I believe.  I would

12   have to --

13   Q.  And Dr. Bowman --

14   A.  -- refresh my memory.

15   Q.  I'll rephrase the question, for the sake of clarity.

16          The FDA approved versions of ACTH, are they

17   manufactured by any of the company names that you were provided

18   by the prosecution?

19   A.  No.

20   Q.  And so this version of ACTH, were you checking the approval

21   against the potential manufacturers that you were provided by

22   the prosecution?

23   A.  Yes.

24   Q.  Were you also asked to conduct a GRASE analysis of ACTH?

25   A.  Yes.

M1PPFIS6                        Bowman - Direct

1    Q.  And what were your conclusions?

2    A.  My conclusions were that this version of ACTH is an

3    unapproved new animal drug, and there aren't any adequate or

4    well-controlled studies to support its use.

5    Q.  Ms. Jung, could you please take down this exhibit and pull

6    up Government Exhibit 1022, which again is an electronic record

7    from a computer found at Seth Fishman's residence.

8            Dr. Bowen, could you read the product name?

9    A.  ACTH.

10   Q.  And under the directions, if you could read those as well?

11   A.  "Reconstitute with 5 mls bacteriostatic water.  Administer

12   2.5 to 5 mls IM or IV or as prescribed by veterinarian."

13   Q.  Would this be the type of product that would require a

14   prescription before it's dispensed?

15   A.  Yes.

16   Q.  Why is that?

17   A.  Because you need a diagnosis to use it properly.  The two

18   common uses for ACTH, the approved uses, one is as a diagnostic

19   test to diagnose Cushing's disease in horses; so you use ACTH

20   to stimulate the natural release of corticosteroids.  You do a

21   pre-injection blood sample, post-injection blood sample, have

22   both those blood samples tested to see if the horse can respond

23   to the administration of the ACTH, and that provides your

24   diagnosis of, yes, it's Cushing's; no, it's not.  If it can

25   respond it's not a Cushing's horse.

1          The other use, which is a very old use on the old

2    labels is in animals with a deficiency of ACTH, which in modern

3    veterinary times we realize there really weren't any

4    deficiencies.  It's not something that's deficient.

5    Q.  And looking at this label, Dr. Bowman, does there appear to

6    be a manufacturer name?

7    A.  No.

8    Q.  Does there appear to be any sort of address or telephone

9    number associated with the manufacturer?

10   A.  No.

11   Q.  And what about contact information for a distributor?

12   A.  No.

13   Q.  Are there any ingredients here?

14   A.  No, just the concentration of the one active.

15   Q.  All right.  Ms. Jung, if you could take down this exhibit,

16   and please pull up Government Exhibits 1400, 1401, 1402 and

17   1403, which were all items that were found during a premises

18   search of the Golden Shoe Training Center.

19          Dr. Bowman, could you read the product name that

20   appears on this label?

21   A.  This is ACTH, the thousand international unit vial

22   injection size.

23   Q.  All right.  And again, does this set of exhibits appear to

24   be the same bottle, just from different angles?

25   A.  Yes.

1    Q.   Looking at these various exhibits, is there a manufacturer

2    or distributor name?

3    A.   No.

4    Q.   And, Dr. Bowman, is there any ingredients listed in these

5    labels?

6    A.   Only the concentration of the active ingredient.

7    Q.   Ms. Jung, if you could take these exhibits down, and please

8    pull up Government Exhibits 1508, 1509, 1510 and 1511, which

9    are all items that were observed during the search of the Mount

10   Hope Training Center.

11        And, Dr. Bowman, once again, do these exhibits appear

12   to depict the same bottle, from different angles?

13   A.   Yes.

14   Q.   Could you read the product name?

15   A.   ACTH.

16   Q.   All right.  And looking at these exhibits, do you see a

17   manufacturer or distributor name?

18   A.   No, I don't.

19   Q.   Contact information for a manufacturer or distributor?

20   A.   No.

21   Q.   And if Ms. Jung could zoom in on Government Exhibit 1510

22   and 1511.

23        Dr. Bowman, do you see any ingredients listed?

24   A.   No, only the concentration of the one active ingredient.

25   Q.   Thank you.

1              And, Ms. Jung, you can take down these exhibits.

2     Ms. Jung, if you could please return to Government Exhibit 711.

3     Turn to page 7 of that exhibit.

4              Next to No. 19, Dr. Bowman, do you see the word

5     "Serenity" and in parenthesis "sedation"?

6     A.  Yes.

7     Q.  Could you please read out the three sentences that follow?

8     A.  "It's an antianxiety, for the most part.  Takes away stress

9     without affecting performance.  Typically 5 to 10 cc's, IV,

10    four to six hours before event."

11    Q.  Looking towards the bottom of this description, Dr. Bowman,

12    do you see the sentence starting with "It was also shown"?

13    A.  Yes.

14    Q.  Could you start reading from that sentence up to the end of

15    this description?

16    A.  "It was also shown to increase GABA and stimulates Dopamine

17    in the brain.  More recent studies have shown it can increase

18    serotonin levels as well.  Having the ability to increase three

19    key neurotransmitters, the end result is a destressed mind and

20    muscle relaxation."

21    Q.  Any claims here made about Serenity's intended use?

22    A.  Yes.

23    Q.  Can you describe some of those?

24    A.  They're describing it as an antianxiety medication, without

25    effecting performance; so that's like something that trainers

1  love because the horses get very anxious before competition.

2          MR. FERNICH:  Objection, move to strike.

3          THE COURT:  Sustained, but I'm not striking.

4  A.  Okay.

5  Q.  Dr. Bowman, let me ask you specifically about sedation.  Is

6  the claim to sedate an animal a claim that would affect the

7  structure or function of the animal?

8  A.  Yes.

9  Q.  All right.  And there are references here to a few

10  different chemicals.  Are you familiar with Dopamine?

11  A.  Yes.

12  Q.  What is that?

13  A.  It's a brain neurotransmitter that is responsible for

14  calmness.  It's a calming, happy neurotransmitter.

15  Q.  In looking at this description, would this be the type of

16  drug that requires a prescription?

17  A.  Yes.

18  Q.  And why do you say that?

19  A.  First of all, because it's given IV.  By that route of

20  administration alone, it requires the skill of a veterinarian

21  or a veterinarian to determine that a particular client would

22  have the skill to administer it.  In which case, they could

23  dispense it or give them a prescription for it.

24  Q.  Is Serenity FDA approved?

25  A.  No, it isn't.

1  Q.  Were you asked to conduct a GRASE analysis of Serenity?

2  A.  Yes.

3  Q.  What were your conclusions?

4  A.  My conclusions are there are no adequate, well-controlled

5  studies to support its use, and it's a non-approved new animal

6  drug.

7  Q.  Thank you.

8          And, Ms. Jung, could you please pull up Government

9  Exhibit 319-S, which is a record of Equestology Inc.

10          Dr. Bowman, looking at this label, is there any

11  manufacturer information?

12  A.  No, there isn't.

13  Q.  Any distributor information?

14  A.  No.

15  Q.  Is there any company name that appears on this label?

16  A.  No.

17  Q.  And for the sake of the record, what's the name of this

18  product?

19  A.  This is Serenity.

20  Q.  Could you please read out the ingredients listed for this

21  product?

22  A.  Proprietary sugars and amino acid blend.

23  Q.  What information, if any, is missing from this label that

24  the FDA would typically require?

25  A.  There would be required to be an indication section,

1    telling you when to use it and whether there's any

2    contraindications to use.  There would have to be a complete

3    ingredient statement, where each ingredient was listed along

4    with its concentration.  There needs to be any cautions or

5    precautions about the use of the drug, or information on any

6    adverse events that might occur because of it so people know

7    what to look out for.  It needs to the prescription legend.

8    Q.  Thank you.  Dr. Bowman -- I'm sorry.

9              Ms. Jung, if we could please take down this exhibit.

10             And, Dr. Bowman, I'd like to review one or two e-mails

11   with you.

12             THE COURT:  Before we do that, Ms. Mortazavi, is this

13   a convenient point for a break?

14             MS. MORTAZAVI:  It is, your Honor.

15             THE COURT:  All right.  Ladies and gentlemen, we'll

16   take our afternoon break now.  If we can keep it to 15 minutes

17   maximum, which means you're ready to come back up in about ten

18   minutes.  Okay?  We'll try to get you out on time today.  Okay?

19   Thank you.

20             (Jury not present)

21             THE COURT:  All right.  I'll see everyone back here

22   slightly before 3:20, please.

23             And, Dr. Bowman, you remain under oath.

24             THE WITNESS:  Thank you.

25             (Recess)

1          THE COURT:  Please be seated.  The jurors are on their

2     way.

3          MS. MORTAZAVI:  Your Honor, with respect to timing,

4     there's a chance I'll be able to conclude my direct

5     examination, not by 4:30 but potentially by 5:00.  Given the

6     late start, would the Court like me to proceed past 4:30?

7          THE COURT:  Let's see if the jurors are willing to

8     stick it out.  Okay?

9          MS. MORTAZAVI:  Certainly.

10          THE COURT:  Is that your preference, Mr. Sercarz, that

11     we press on and try to finish the direct?

12          MR. SERCARZ:  Yes, as long as we can get done by 5:00.

13          THE COURT:  Okay.  Let's see where we're at, and

14     Ms. Mortazavi, if you just kind of keep me informed as best you

15     can.

16          MS. MORTAZAVI:  Yes, I will do my best, your Honor.

17          MR. SERCARZ:  It may please the Court to know that in

18     the aftermath of the events of yesterday, the government and

19     defense counsel are speaking about trying to streamline the

20     case, to some degree.

21          THE COURT:  Okay.  That's always a good thing, anyway.

22     I think in terms of the jurors will appreciate it.

23          MR. FERNICH:  I'm sure you will too.

24          THE COURT:  Well, I will, that's true, but the jurors

25     are more important than I am at this point, at least for all of

1    you.

2              Now, tomorrow morning you all have to be tested again,

3    right?

4              MS. MORTAZAVI:  Yes, your Honor.

5              MR. SERCARZ:  That's right, your Honor.

6              THE COURT:  Is that going to be arranged before hours

7    so we can start at our normal time, or are we going to be a

8    little delayed?

9              MR. ADAMS:  Before hours.  The court's website said

10   they'll be available I think as early as 7:00 a.m.

11             THE COURT:  All right.

12             MS. MORTAZAVI:  And, your Honor, the courtroom staff

13   had given us boxes of the test to self-administer, and we're

14   able to text the results either to courthouse staff or to your

15   Honor's chambers, whatever you prefer.

16             THE COURT:  Well, you should do it -- why don't we do

17   this, and I did ask my clerk to say this to you, Mr. Fernich,

18   over the weekend, like when you're communicating with Covid

19   response at SDNY, if you copy my chambers' e-mail, we'll be in

20   the loop.  I think that's what makes the most sense.

21             MS. MORTAZAVI:  We'll plan to do that.  Thank you,

22   your Honor.

23             THE COURT:  Thank you.

24             (Jury present)

25             THE COURT:  Please be seated, everyone.

1              Dr. Bowman, you remain under oath.

2              And, Ms. Mortazavi, please.

3              MS. MORTAZAVI:  Thank you.

4    BY MS. MORTAZAVI:

5    Q.  Dr. Bowman, before the afternoon break, we were discussing

6    a product called Serenity; do you recall that?

7    A.  Yes.

8    Q.  And I was about to review a set of e-mails with you that

9    I'm going to have Ms. Jung pull up now.

10             Ms. Jung, if you could pull up Government Exhibit 308,

11   which is a record of Equestology, and if you could zoom in on

12   the text portion.  Thank you.

13             Dr. Bowman, do you see at the bottom there is a

14   lower-in-chain e-mail dated June 8th, 2017, from Lisa Ranger?

15   A.  Yes.

16   Q.  Can you read the body of that e-mail?

17   A.  "Can you write a short explanation about Serenity and how

18   to use it?"

19   Q.  And at the top e-mail, do you see that there's another

20   June 8th, 2017, e-mail from Seth Fishman to Lisa Ranger?

21   A.  Yes.

22   Q.  Could you read the subject line?

23   A.  Regarding:  Serenity/Equility.

24   Q.  And then the body of that e-mail?

25   A.  "I can make a simple description, if you want.  It's an

1    antianxiety, for the most part.  Takes away stress without

2    affecting performance.  Typically 5 to 10 cc's, IV, four to six

3    hours before the event."

4    Q.  Thank you.

5         Ms. Jung, if you could pull up Government Exhibit 304,

6    which is also a record of Equestology.

7         And looking at the top portion of this e-mail,

8    Dr. Bowman, do you see that this is sent from Lisa Ranger to

9    Seth Fishman?

10   A.  Yes.

11   Q.  Could you read the subject of this e-mail?

12   A.  "Serenity," "Regarding:  Serenity."

13   Q.  And the date it was sent?

14   A.  June 22nd, 2017.

15   Q.  And do you see the lower-in-chain e-mail below that dated

16   June 21st, 2017, from Seth Fishman?

17   A.  Yes.

18   Q.  All right.  I'd like you to read a portion of this,

19   starting with, if you go a few lines down, "L-theanine can

20   cross the blood," if you can read that portion of this e-mail,

21   please?

22   A.  Yes.  "L-theanine can cross the blood-brain barrier and has

23   many published studies demonstrating it can significantly

24   reduce anxiety and stress.  It was also shown to increase GABA

25   and stimulates dopamine in the brain.  More recent studies have

shown it can increase serotonins as well.  Having the ability
to increase three key neurotransmitters.  The end result is a
destressed mind and muscle relaxation."

Q.  I'll pause you there.  You testified earlier that dopamine
is a neurotransmitter; is that right?

A.  Yes.

Q.  And in the prior exhibit there was a reference to cc's.
Can you tell us what cc's are, if you know?

A.  Cc's are the same as milliliters.  It's two big
centimeters.

Q.  Is it just a measure of volume?

A.  Exactly.  And they're equivalent, one cc equals one ml.

Q.  And then below the portion that you read, could you read
out the sentence starting with "Interesting to note"?

A.  "Interesting to note that the IOC and WADA were thinking to
ban the amino acid because of the profound effect it had on
certain events."

Q.  And the line that follows, please?

A.  "I would suggest using this in most horses because there is
really no downside and does seem to work very well in human
athletes."

Q.  Ms. Jung, if you could take down this exhibit.

          And, Dr. Bowman, were you asked to do a GRASE analysis
of a product described as BB3?

A.  Yes.

1   Q.  Were you also asked to check whether BB3 is FDA approved?

2   A.  Yes.

3   Q.  Is it FDA approved?

4   A.  No, it is not.

5   Q.  And what were the results of your GRASE analysis of BB3?

6   A.  A BB3 is an unapproved new animal drug, and there were no

7   well-controlled studies -- adequate and well-controlled studies

8   to support its use.

9   Q.  Ms. Jung, could you please pull up Government Exhibit 1220,

10  which is an item that was seized during a premises search of

11  the residence of Jorge Navarro.

12          And, Dr. Bowman, could you read the label here?

13  A.  BB3.

14  Q.  Any ingredients listed here?

15  A.  No.

16  Q.  Any manufacturer information?

17  A.  No.

18  Q.  Other than the words BB3, for the record, anything

19  appearing on this label?

20  A.  No.

21  Q.  Ms. Jung, if you could please take down this exhibit, and

22  I'm going to direct the jurors back to their transcript

23  binders, to Government Exhibit 113-AT.

24          And I'll ask Ms. Jung to please pull up that exhibit

25  and the recording, Government Exhibit 113-A, which for the

1    record is a portion of an intercepted call dated February 21st,

2    2019, between Seth Fishman and Jeff Gillis.

3           I believe we're waiting on one or two jurors who are

4    still trying to locate the tab.  We'll give them a minute.

5           JUROR:  Tab?

6           THE COURT:  113-A, like, Apple, T, for transcript.

7           (Pause)

8           MS. MORTAZAVI:  All right.  Ms. Jung, if you could

9    please play Government Exhibit 113-A.

10           (Audio played)

11           And, Ms. Jung, if you could please pull up Government

12    Exhibit 113-BT, and I'm going to direct the jurors to the next

13    tab in their binder, which is 113-BT, as well, and I'll have

14    Ms. Jung prepare Government Exhibit 113-BT.

15           Again, this is another portion of this same recorded

16    call that we listened to earlier between Seth Fishman and Jeff

17    Gillis.

18           Ms. Jung, if you could please play Government

19    Exhibit 113-BT.

20           (Audio played)

21           Thank you, Ms. Jung.

22    BY MS. MORTAZAVI:

23    Q.  Dr. Bowman, we earlier talked about erythropoietin being an

24    API; do you recall testifying about that?

25    A.  Yes.

M1PPFIS6                        Bowman - Direct

1   Q.  Do you know of any other terms or names used to referred to
2   erythropoietin?
3   A.  It's generally referred to as EPO as an abbreviation, and I
4   think there are some other terms that are used, Epogen.  Those
5   are the ones I am familiar with.
6   Q.  All right.  So you're familiar with EPO and Epogen as
7   referred to the API erythropoietin?
8   A.  Yes.
9   Q.  I'd like to direct the jurors to Government Exhibit 134-AT,
10  which is also in their binders.
11          And I'll have Ms. Jung pull up Government
12  Exhibit 134-AT and Government Exhibit 134-A.  And for the
13  record, that's a portion of an intercepted call dated May 5th,
14  2019, between Seth Fishman and Richard Silverman.
15          And it looks as though all of the jurors have all
16  their place in the binders; so I'll have Government
17  Exhibit 134-A.
18          THE COURT:  Are you able to zoom in on the screen,
19  make it larger, so that anybody who prefers, can follow along
20  that way?  Thank you.
21          (Audio played)
22          MS. MORTAZAVI:  Ms. Jung, if you could please take
23  down these exhibits.
24          And the jurors can put away their binders for the time
25  being.

M1PPFIS6                          Bowman – Direct

1              And, Ms. Jung, if you could please pull up Government

2     Exhibit 309, and zoom in on the text, please.  Thank you.

3     BY MS. MORTAZAVI:

4     Q.  Dr. Bowman, do you see at the top of this government

5     exhibit an e-mail from Seth Fishman to Lisa Ranger dated

6     January 5th, 2019?

7     A.  Yes.

8     Q.  And below that, do you see a lower-in-chain e-mail from

9     Lisa Ranger to Seth Fishman on January 4th, 2019?

10    A.  Yes.

11    Q.  All right.  Looking at the top e-mail dated January 5th,

12    2019, can you read the three words that are in the body of that

13    e-mail?

14    A.  "Please see below."

15    Q.  And then looking at the lower-in-chain e-mail, can you read

16    the language in bold, starting with "Let's try this."

17    A.  "Let's try this.  Simple terms.  Please input.  For pain,

18    tie up, attitude, inflammation, et cetera.  I know you gave

19    description, but I need a one-word blip to catch their

20    attention.  Without me suggesting or telling them.  That way,

21    they will question, then ask you or me about it."

22    Q.  And looking at that list, Dr. Bowman, that has a list of

23    names in red.  Looking at GNRH, can you read the language in

24    the black text that follows?

25    A.  "Factrel, androgenic hormone."

1    Q.  And was Factrel the product that you testified about

2    previously when we were discussing GNRH?

3    A.  Yes.  Factrel is one of the FDA approved forms of GNRH for

4    animals.

5    Q.  Looking at the next line, ITTP Plus, can you read the black

6    text that follows?

7    A.  "Increased oxygen release in the blood."

8    Q.  And can you read the line after that?

9    A.  "Accelerated tissue repair, especially lung tissue."

10   Q.  Does that language appear beside the product named TB-7?

11   A.  Yes.

12   Q.  Going a few lines down to EGH in red, can you please read

13   the black text that follows?

14   A.  "Increases testosterone."

15   Q.  And again, a few lines down in red, PSDS.  Can you read the

16   black text that follows?

17   A.  "Natural analgesic, painkiller."

18   Q.  And below that in red, BB3.  Can you please read the black

19   text that follows?

20   A.  "Long acting blood builder.  Would only let trusted clients

21   have this."

22   Q.  Thank you.

23        Miss Jung, could you please take down this exhibit,

24   and pull up Government Exhibits 4016 and 4017.  Oh, and,

25   Ms. Jung, if you could please take down that exhibit.

1              MS. MORTAZAVI:  Your Honor, could I please read an

2     additional stipulation into the record, which was signed by the

3     parties?  This is Government Exhibit 9015.

4              THE COURT:  Yes.

5              MS. MORTAZAVI:  If called to testify at trial, law

6     enforcement agents with the Federal Bureau of Investigation or

7     the Food and Drug Administration would testify that on or about

8     October 28th, 2018, law enforcement agents with the Federal

9     Bureau of Investigation conducted a search of the office and

10    warehouse space associated with Equestology, Inc. -- the

11    Equestology warehouse -- at street address 3500 Northwest 2nd

12    Avenue, Unit No. 723, Boca Raton, Florida 33431.

13             Government Exhibits 9020 through 9086 are physical

14    items seized from the Equestology warehouse property at the

15    time of the search.  On or about October 28th, 2019, law

16    enforcement agents with the Federal Bureau of Investigation

17    conducted a search of the residence of Seth Fishman, located at

18    street address 2565 South Ocean Boulevard, No. 412N, as in

19    Nancy, Boca Raton, Florida 33487.  The Fishman residence.

20             Government Exhibits 6000 through 6005 are photographs

21    fairly and accurately depicting the Fishman residence, or

22    photographs fairly and accurately depicting the items taken

23    during the search of the Fishman residence.

24             On or about October 28th, 2019, law enforcement agents

25    with the Federal Bureau of Investigation conducted a search of

1    a storage unit associated with Equestology, Inc. -- the

2    Equestology storage unit -- located at street address 189

3    Linton Boulevard, Unit No. 757, Delray Beach, Florida 33444.

4              Government Exhibits 1300 through 1317 -- that's

5    1317 -- are photographs fairly and accurately depicting the

6    Equestology storage unit, or photographs fairly and accurately

7    depicting items taken during the search of the Equestology

8    storage unit.

9              On March 9th, 2020, law enforcement agents with the

10   Federal Bureau of Investigation conducted a search of the

11   residence of Lisa Giannelli at street address 125 Jennifer

12   Lane, Felton, Delaware, 19943.  The Giannelli residence.

13             Government Exhibits 5000 through 5018, and 9100

14   through 9122 are:  One, physical items, including paper

15   records, seized from the Giannelli residence at the time of the

16   search; or, two, photographs fairly and accurately depicting

17   the Giannelli residence; or, three, photographs fairly and

18   accurately depicting items taken during the search of the

19   Giannelli residence.

20             On March 9th, 2020, law enforcement agents with the

21   Federal Bureau of Investigation conducted a search of a horse

22   barn used by Christopher Oakes at street address 121 Bald

23   Mountain Road, Bear Creek Village, Pennsylvania 18702.  The

24   Bald Mountain property.

25             Government Exhibits 1800 through 1806, and 9400

1    through 9414 -- that's one-four -- are:  One, physical items,

2    including paper records, seized from the Bald Mountain property

3    at the time of the search; or two, photographs fairly and

4    accurately depicting the Bald Mountain property; or three,

5    photographs fairly and accurately depicting items taken during

6    the search of the Bald Mountain property.

7            Your Honor, the government moves for admission of this

8    stipulation, which is Government Exhibit 9015, and the exhibits

9    that are referenced therein, which I can read into the record

10   again.

11           THE COURT:  You don't need to read them into the

12   record again, but did the end of that stipulation stipulate to

13   the admissibility?

14           MS. MORTAZAVI:  Yes, your Honor.  I'll read that

15   portion as well.

16           It is further stipulated and agreed by and between the

17   parties that the aforementioned government exhibits in this

18   stipulation, which is Government Exhibit 9015, may be received

19   in evidence at trial.

20           THE COURT:  Stipulation and all of the referenced

21   exhibits are received and are evidence in this case.

22           (Government's Exhibits 9015, 9020-9086, 6000-6005,

23   1300-1317, 5000-5018, 9100-9122, 1800-1806, 9400-9414 received

24   in evidence)

25           MS. MORTAZAVI:  Thank you, your Honor.

1           And, Ms. Jung, if we could pull up Government Exhibits

2    4016 and 4017.  These are both items that were photographed

3    during the search of the Equestology office space.

4    BY MS. MORTAZAVI:

5    Q.  Dr. Bowman, looking at this label -- and if we could have

6    Ms. Jung please pull up the images; thank you, Ms. Jung -- do

7    you see a company name or a manufacturer name on this label?

8    A.  I see a logo with a company name Equi-Science.

9    Q.  Do you see a product name?

10   A.  Yes, EGH, equine growth hormone.

11   Q.  And what are the directions for use?

12   A.  Directions:  Dose for 500 kilogram horse.  5 mls IM two

13   times per week for eight weeks.

14   Q.  Dr. Bowman, is EGH, as depicted here, FDA approved?

15   A.  No.

16   Q.  Were you asked to conduct a GRASE analysis of EGH?

17   A.  No.

18   Q.  All right.  Does this label contain all of the information

19   the FDA typically requires on an approved drug label?

20   A.  No, it doesn't.

21   Q.  Could you give us two examples of information that's

22   missing?

23   A.  Well, there's no indication section.  There's no contact

24   information on the manufacturer by or distributed by, and

25   there's no complete ingredient list.

1    Q.  Thank you.

2            Ms. Jung, could you please pull up what's been marked

3    as Government Exhibits 1207, 1208, 1209 and 1210.  These are

4    all items that were found during a search of the residence

5    associated with Jorge Navarro.

6            Dr. Bowman, once again, does this appear to be images

7    of the same bottle from different angles?

8    A.  Yes.

9    Q.  Could you read the name that appears to be the product name

10   for this bottle?

11   A.  BPB.

12   Q.  And, Ms. Jung, if you could focus on Government

13   Exhibit 1209 and pull up the bottle image, and if you could do

14   the same with Government Exhibit 1208.

15           Dr. Bowman, looking at this label, again, does there

16   appear to be any manufacturer information?

17   A.  No.

18   Q.  Does there appear to be any contact information for a

19   distributer?

20   A.  No.

21   Q.  Does there appear to be any ingredients listed here?

22   A.  No.

23   Q.  Ms. Jung, if you could take down these images, and please

24   pull up Government Exhibit 1411, Government Exhibit 1412 and

25   Government Exhibit 1413.

1              These are all items that were found during the search

2      of the Golden Shoe Training Center.

3              And, Ms. Jung, if you could pull up the images on the

4      left-hand side of 1411 and 1412.  Thank you.

5              Dr. Bowman, can you again read the product name that

6      appears on this bottle?

7      A.  BPB.

8      Q.  Once again, does there appear to be a manufacturer listed

9      here?

10     A.  No.

11     Q.  What about ingredients?

12     A.  No.

13     Q.  Is this product, BPB, FDA approved?

14     A.  No.

15     Q.  Were you asked to do a GRASE analysis of BPB?

16     A.  I honestly can't recall.

17     Q.  Do you recall, Dr. Bowman, preparing a report in connection

18     with your testimony here today?

19     A.  Yes.  I just don't recall if this drug was part of that

20     report.

21     Q.  All right.  Would that report have listed information about

22     the drugs that you did conduct a GRASE analysis on?

23     A.  Yes.

24     Q.  Would that report refresh your recollection?

25     A.  Yes.

1           MS. MORTAZAVI:  Your Honor, may I please pass up a

2    copy of Dr. Bowman's report?

3           THE COURT:  Yes.

4           MS. MORTAZAVI:  And, your Honor, if I could approach

5    the witness?

6           THE COURT:  Sure.

7           MS. MORTAZAVI:  Thank you.

8           THE COURT:  Thank you.

9           (Pause)

10           THE WITNESS:  Thank you.  So yes, BPB was on the list

11    of drugs I examined.

12           MR. SERCARZ:  Your Honor, can I please find out if it

13    refreshed her recollection?

14           THE COURT:  Dr. Bowman, I'm going to instruct you

15    please don't read the report.

16           THE WITNESS:  Okay.

17           THE COURT:  Let Ms. Mortazavi ask you questions

18    specifically.  She gave it to you for the purpose of refreshing

19    your recollection.

20           THE WITNESS:  Right, exactly.

21           THE COURT:  Having reviewed that report, without

22    reading from it or reading it into the record, does it refresh

23    your recollection about whether you did a GRASE study on this

24    substance?

25           THE WITNESS:  Yes, it does.

1          THE COURT:  Thank you.

2          THE WITNESS:  And I did.

3   BY MS. MORTAZAVI:

4   Q.  All right.  And if you could make sure to put away the

5   report if you haven't already, Dr. Bowman?

6          THE COURT:  Just flip it over.

7   A.  That should work just fine.

8   Q.  Now, having been refreshed on your analysis, do you recall

9   what your conclusions were after conducting your GRASE analysis

10  for BPB?

11  A.  Yes.  BPB is an unapproved new animal drug, and I did not

12  find any well-controlled studies, adequate well-controlled

13  studies to support its use in horses.

14  Q.  Thank you, Dr. Bowman.  Turning back to this label, are you

15  familiar with the terms, which does not appear here, but the

16  term "DOM"?

17  A.  In reference to?

18  Q.  In reference to label information.  And I'll have

19  Ms. Jung --

20  A.  Oh, date of manufacturer, yes.

21  Q.  All right.  And here on this label, I'll correct myself,

22  DOM does appear on this label of BPB.

23          There are the words "EXP."  Are you familiar with

24  that?

25  A.  Yes, that's the expiration date.

M1PPFIS6                          Bowman - Direct

1   Q.  And what's the date of manufacturer and the expiration date

2   listed here?

3   A.  Date of manufacture is November of 2016; expiration date is

4   November of 2019.

5   Q.  Thank you.

6           If you could take down these exhibits, Ms. Jung.

7           I'm going to direct the jurors to once again retrieve

8   their transcription binders, and please turn to tab 120-AT.

9   I'll have Ms. Jung pull up that same exhibit and prepare

10  Government Exhibit 120-A.

11          THE COURT:  Everyone okay?  All right.

12          Ms. Mortazavi.

13          MS. MORTAZAVI:  Ms. Jung, if you could please play

14  Government Exhibit 120-A.

15          (Audio played)

16          Thank you, Ms. Jung.

17          And for the record, that was a call dated March 7,

18  2019, between Seth Fishman and Mary Fox, as indicated on

19  Government Exhibit 120-AT.

20  BY MS. MORTAZAVI:

21  Q.  Dr. Bowman, you spoke about FDA CVM's oversight of

22  manufacturer after a drug has been approved; do you recall that

23  testimony?

24  A.  Yes.

25  Q.  Once a label is approved for a new animal drug, under what

1  circumstances can the manufacturer make changes to the label?

2  A.  The manufacturer can make changes to the label by

3  submitting a supplemental application.  If all it is is making

4  a change to the label, for example, if they want to add more

5  detail to the label, explaining how the drug is used or what it

6  could be good for, that might not require additional data.

7        However, if they wanted to change the ingredients and,

8  therefore, have to change the label, or if they wanted to add

9  an indication, then data would be required.  It would be a

10  supplement with data.

11  Q.  All right.

12        MS. MORTAZAVI:  Your Honor, I'd like to read yet

13  another stipulation into the the record.  It is Government

14  Exhibit 9005.

15        If called as a witness at trial, a record custodian

16  for Microsoft Corporation, Microsoft, and for each of

17  Government Exhibits 3401 through 3410, and 3412 through 3457,

18  would testify that Government Exhibits 3401 through 3410, and

19  3412 through 3457, are true and correct copies of electronic

20  records, including e-mails and their attachments, associated

21  with the e-mail account SethFishman@Hotmail.com, made and

22  maintained by Microsoft.

23        And if the Court is comfortable with this, I'd like to

24  move on to the second paragraph without reading the additional

25  matter.

1          THE COURT:  That's fine.

2          MS. MORTAZAVI:  All right.  In paragraph 2 of this

3     exhibit:  If called as a witness at trial, a record custodian

4     for 1&1 IONOS, I-O-N-O-S, and for each of Government Exhibits

5     3301 through 3314, 3316 through 3326, 3399-A, 3399-B and

6     3399-C, would testify that those government exhibits are true

7     and correct copies of electronic records, including e-mails and

8     their attachments, associated with the e-mail account

9     Seth@Equestology.com made and maintained by 1&1 IONOS.

10         And again, your Honor, I will skip the portions that

11    follow and read paragraph 3.

12         If called as a witness at trial, a record custodian

13    for Google LLC, Google, and for Government Exhibit 1600 would

14    testify that Government Exhibit 1600 is true and correct copy

15    of an electronic record associated with the e-mail account

16    JNavarroStables@Gmail.com, made and maintained by Google.

17         And I'll skip to the final portion of this

18    stipulation, which states:  It is further stipulated and agreed

19    by and between the parties that the aforementioned government

20    exhibits and this stipulation, which is Government

21    Exhibit 9005, may be received in evidence at trial.

22         And the government offers the stipulation, Government

23    Exhibit 9005, and all the exhibits referenced therein into

24    evidence.

25         THE COURT:  All right.  The stipulation itself, 9005,

1    and all of the exhibits, the numbers of which Ms. Mortazavi

2    have read into the record, are admitted in evidence in this

3    case.

4              (Government's Exhibits 9005, 3401-3410, 3412-3457,

5    3301-3314, 3316-3326, 3399-A, B, and C, 1600 received in

6    evidence)

7              MS. MORTAZAVI:  Thank you, your Honor.

8              Ms. Jung, could you please pull up Government

9    Exhibit 3323.

10   BY MS. MORTAZAVI:

11   Q.  And I'd like to review that with you, Dr. Bowman.

12             Thank you, Ms. Jung.

13             Could you read the header information on the e-mail

14   that is depicted in Government Exhibit 3323?

15   A.  It's from John Pundyk to Seth Fishman, Lindsay Whitaker and

16   Geoff Vernon.

17   Q.  And what is the subject of this e-mail?

18   A.  The subject:  Equitosan, ACTH and TB-7 labels, dated Friday

19   April 28th, 2017.

20   Q.  And could you please read the body of the e-mail, starting

21   with "As per our conference call yesterday"?

22   A.  "As per our conference call yesterday, here are

23   alterations/additions I need made to the Equitosan" -- I can't

24   say anything -- "label.  Change 50ml to 20ml, change the

25   verbiage to dose and route of administration as recommended by

1    a licensed veterinarian.  All products must have visual

2    association and familiarity in design and appearance.  Once

3    this has been done, please send Dr. Vernon and myself for final

4    approval."

5    Q.  All right.  And below, a few lines below the portion that

6    you just read is the term "ACTH" and the lines, "As you heard

7    yesterday, Dr. Vernon aquates the color red to danger.  So

8    let's go with the older label with the horse head in gunmetal

9    and the softer colored label (blue)."

10            There appears to be a numbered list under that.  Could

11   you please read that numbered list into the record?

12   A.  "One.  Add the verbiage 'RnD peptide'; also, add 'dose and

13   route of administration as recommended by a licensed

14   veterinarian;' and three, all products must have visual

15   association and familiarity in design and appearance."

16   Q.  And under TB-7, which appears under the portion that you

17   read, can you read the numbered list under TB-7, please?

18   A.  "No. 1, add the verbiage 'RnD peptide;' No. 2, also add

19   'dose and route of administration as recommended by a licensed

20   veterinarian;' and three, all products must have visual

21   association and familiarity in design and appearance."

22   Q.  Are you familiar with the term RnD, Dr. Bowman?

23   A.  In my typical experience it means research and development.

24   Q.  And you testified about research and development, correct?

25   A.  Correct.

1  Q.  And you previously testified that drugs that are intended
2  for research and development are proposed to the FDA as part of
3  the new animal approval process; is that correct?
4  A.  That is correct.
5  Q.  All right.
6          Ms. Jung, if you could please take down this exhibit.
7          Dr. Bowman, in what ways does the FDA regulate
8  promotional materials for a drug?
9  A.  Promotional materials for approved drugs are submitted
10  annually as part of the annual report for review and
11  consistency with the application, to ensure that companies
12  aren't either intentionally or accidentally including new
13  indications or new doses in their promotional materials.
14          As far as unapproved drugs, we use all of that
15  information as evidence of intended use and tend to use that as
16  evidence if we take any regulatory actions.
17  Q.  And, Dr. Bowman, you spoke about changes to labeling and
18  the route through which a manufacturer would have to get label
19  changes approved.  Do there have to be processes followed for
20  changes when promotional material is altered?
21  A.  No, I don't -- there is no pre-approval requirement for all
22  promotional material.  So a company can change their
23  promotional materials and start using them, but then when they
24  submit them with their annual report, if they have changed them
25  in such a way that they're no longer consistent with the

M1PPFIS6                          Bowman - Direct

1    approval, they are likely to receive a letter from us.

2    Q.  What type of letter?

3    A.  It could be an advisory letter or a warning letter.

4    Q.  And why would they receive that letter if their promotional

5    material is no longer consistent with the drug that they are

6    distributing?

7    A.  Because then they are not staying consistent with their

8    approved application.

9    Q.  All right.

10          Ms. Jung, could you please pull up Government

11   Exhibit 319-K, which is a record of Equestology, Inc. that's in

12   evidence.

13          Dr. Bowman, I'd like to review this with you.  If you

14   look at the very top of this exhibit, it appears to be an

15   e-mail from Lisa Ranger to Seth Fishman dated May 4th, 2016.

16   Could you please read the subject line?

17   A.  "Need description and recommendation."

18   Q.  And looking at the bottom of this thread, can you -- at the

19   e-mail that appears to be dated May 4th, 2016, at 2:28 p.m.

20   from Lisa Ranger.  Can you read the body of that e-mail?

21   A.  "On your Heptam product please.  In writing.  So I can

22   print."

23   Q.  And looking one line up, what appears to be the response to

24   that e-mail?

25   A.  "What do you mean."

1    Q.  And is that sent from Seth Fishman on May 4th, 2016?

2    A.  Yes, it is.

3    Q.  And above that, what's the response from Lisa Ranger?

4    A.  "I need a description of the product."

5    Q.  Ms. Jung, if you could take that down, and please pull up

6    Government Exhibit 319-M.

7         And again, Dr. Bowman, this appears to be an e-mail

8    chain.  At the top is an e-mail from Lisa Ranger to Mary Fox

9    and Seth Fishman.  It's dated May 24th, 2016, with the subject

10   Re: NPX.  Looking at the very bottom of this chain, can you

11   please read the date, time and sender for the e-mail, and then

12   the body of the e-mail itself?

13   A.  The bottom of the chain by date or by position?

14   Q.  The bottom of the chain by date.  It's May 23rd, 2016, at

15   3:32 p.m. from Mary Fox.

16   A.  Okay.

17   Q.  If you could read the lines that follow, please?

18   A.  "Seth needs to know how many NPX you want for the year, if

19   possible, so he can plan production for the lab."

20   Q.  And looking at the top e-mail, could you read the body of

21   that message dated May 24th, 2016, starting with "At this

22   point, 50"?

23   A.  "At this point, 50.  It would sell more, but people need to

24   know it exists.  If he could write a short description of each

25   of the new products below in understandable layman's terms, it

1    would help his sales tremendously."

2    Q.  And below there appears to be a list of products.  Do you

3    see the name "EPM Double Kill"?

4    A.  Yes.

5    Q.  Could you read the lines that follow?

6    A.  "It's a great seller but a description could make it get

7    there more and have even greater sales."

8    Q.  And then the line, in all caps, that follows after that,

9    please?

10   A.  'any other new product he has that he wants to send me."

11   Q.  Thank you.

12        Ms. Jung, you can take that exhibit down.  If you

13   could please pull up Government Exhibit 319-U, and if you could

14   zoom in, Ms. Jung, on the portion of the e-mail that's dated

15   Wednesday, January 4th, 2017, at 9:26 a.m.  And, Ms. Jung, to

16   make it easier to read, you can just focus solely on the header

17   information and the few lines that follow, not the entirety of

18   the message.  Thank you very much.

19        Dr. Bowman, do you see that this is an e-mail from

20   Mary Fox to Seth Fishman dated January 4th, 2017?

21   A.  Yes.

22   Q.  Could you read the subject line of this e-mail?

23   A.  "Lisa needs descriptions to sell more of this product for

24   you and any other new items you are considering."

25   Q.  And could you please read the body of the e-mail as it

M1PPFIS6                          Bowman - Direct

1    appears here?

2    A.  "I also need a short explanation, in horseman's terms,

3    about his new products.  If he wants to open the door to them,

4    he needs them to be able to ask and understand the product."

5    Q.  Thank you, Ms. Jung.

6            Could you please turn to Government Exhibit 319-J, and

7    again, this is a record of Equestology, Inc.  And if you could

8    focus, Ms. Jung, on the lower e-mail that's dated Wednesday,

9    January 2nd, 2019, at 1:32 p.m.

10           And for the record, that appears to be an e-mail from

11   Lisa Ranger to Seth Fishman that's dated January 3rd, 2019 --

12   pardon me, January 2nd, 2019.

13           Could you read the subject line of this e-mail,

14   Dr. Bowman?

15   A.  "Item description needed."

16   Q.  And could you read the body of this e-mail?

17   A.  "Can you please send a short description of each item,

18   please."

19   Q.  And what appears below that?

20   A.  "No. 1, B3, this is a blood builder that is used five to

21   six days prior.  Usually it takes two weeks to see results.

22   The dosing is once every two weeks.  I would really stay low

23   key on this one.

24           "No. 2, BPR Blue, strong analgesic.  Like other

25   products, I would start with one-half cc IV and work my way up.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1        "No. 3, ITTP Plus.  ITPP plus other ingredients.  ITPP

2   increases oxygen release.  Compared to what's sold online, it's

3   less than half the price.  Most people are using one-half

4   bottle night before and remainder of bottle four to five hours

5   before event.

6        "4, VO2 Max.  HP Bleeder Plus with additional

7   ingredients.  Usually 10 mls, four to five fors prior to race.

8        "5, P3 Pentosan Platinum Plus.  Equivalent to dose of

9   pentosan and one bottle of Polyglycan."

10  Q.  And, Dr. Bowman, if you could continue reading the

11  sentences that follow?

12  A.  "I have other products and will start organizing them.  I

13  have stuff you can use the day before that is far better than

14  bute and banamine on many levels."

15  Q.  Thank you.

16       And, Ms. Jung, if you could take down this exhibit,

17  and pull up Government Exhibit 319-N, which is yet again a

18  record of Equestology, Inc. and if you could focus on the text,

19  please.

20       Dr. Bowman, do you see at the top of this e-mail that

21  this is a message sent from Lisa Ranger to Seth Fishman on

22  July 2nd, 2019?

23  A.  Yes.

24  Q.  And below that, do you see a lower-in-chain e-mail sent

25  from Seth Fishman dated July 2nd, 2019?

1    A.   Yes.

2    Q.   What's the subject line of this e-mail chain?

3    A.   Panacin.

4    Q.   All right.  And could you read the body of the e-mail

5    following the header information on two July 2nd, 2019?

6    A.   Which one do you want to do first --

7    Q.   Sure.

8    A.   -- 3:15 or 3:48?

9    Q.   At -- oh, pardon me.  Thank you for the correction.  The

10   e-mail at 3:48 p.m.

11   A.   Okay.

12   Q.   I believe they may have been sent around the same time.

13   The line starting "According to a study at Dubai Equine"?

14   A.   "According to a study at Dubai Equine, 10 cc's, 24 hours,

15   and 10 cc four hours before stress was equivalent to one dose

16   of Banamine.  Use IV because IM injections can be painful."

17   Q.   And looking below that, at the e-mail that preceded the

18   e-mail that you just read out, could you please read the body

19   of that e-mail?

20   A.   "Correct way to use, different options on use if there are

21   any, so I can forward to clients."

22   Q.   Thank you.

23        Ms. Jung, you can take down this exhibit, and could

24   you please pull up Government Exhibit 319-O, which is again a

25   record of Equestology, Inc.

1    BY MS. MORTAZAVI:

2    Q.  Dr. Bowman, do you see this is an email from Lisa Ranger to

3    Seth Fishman dated February 23, 2018?

4    A.  Yes.

5    Q.  And there appears to be an attachment to this email.  Could

6    you read the name of the file that's attached?

7    A.  The attachment is inventory - doc summary.PDF.

8    Q.  What the body of that top email?

9    A.  Here you go.

10   Q.  There appears to be a lower chain email dated

11   February 23rd, 2018 sent from Seth Fishman.  Could you please

12   read the text of that lower-in-chain email?

13   A.  When you have a chance, please send me the current prices

14   we are charging for the stuff I make.

15            MS. MORTAZAVI:  Ms. Jung, if we could take down this

16   exhibit and please pull up Government Exhibit 709.  And this is

17   an item that was retrieved from a computer that was found at

18   Lisa Giannelli's residence.

19   Q.  Starting with page 1, Dr. Bowman, looking at the categories

20   that appear in bold, looking at the first category, adrenals

21   thyroid glands, do you recognize on this list any FDA approved

22   drug names?

23   A.  Well, as we discussed, I mean ACTH is an FDA-approved drug,

24   I just don't know if any of these are the ones that are

25   approved.

1    Q.  Are there any names appearing here that appear to be APIs
2    or active pharmaceutical ingredients?
3    A.  Yes.
4    Q.  Can you name one or two examples?
5    A.  Well, ACTH powder is an active pharmaceutical ingredient,
6    and there is also the -- it's hard to tell because you don't
7    know what dosage form they're in, if they're in finished dosage
8    forms or not.  Some of the powders may be for administration.
9    The thyroid powder is an unapproved drug, however it is
10   marketed.  Thyro-L is a marketed the version of that drug.
11   That's the drug listed with the FDA.
12   Q.  Thank you, Dr. Bowman.  We can go back to the original
13   exhibit, 709.
14          Looking at that second category, Dr. Bowman
15   antiinflammatory relax pain, does that category make a
16   representation about the intended uses for the drugs that
17   appear here?
18   A.  Yes.
19   Q.  Can you explain?
20   A.  Well, by categorizing them all as antiinflammatory,
21   relaxation or pain, the drugs in this category are intended for
22   all or one -- at least one of those three uses, so they're
23   either pain relievers, muscle relaxants or they're
24   antiinflammatory by nature.
25   Q.  Dr. Bowman, looking at the bottom of the first column the

1    product that is three up from the very last one, Flunixin, you

2    testified about Flunixin previously, is that right?

3    A.  Yes.

4    Q.  Is that a product that requires a prescription?

5    A.  Yes, it is.

6    Q.  Looking at the product one up from that, which is Banamine,

7    are you familiar with Banamine?

8    A.  Yes.

9    Q.  Does that require a prescription?

10   A.  Yes.

11   Q.  Are there any other items appearing in this categorical

12   list that appear to be drugs that would require a prescription?

13   A.  Yes.

14   Q.  Could you give us one or two examples?

15   A.  Well, there is Acepromazine pills, Bute powder, Bute

16   tablets, Bute Phenylbutazone is probably an injection,

17   Dexamethazone, Flunixamine, gentamicin, which brand name is

18   Gentacin, Isoxoprine.  Those are all prescription drugs.  Most

19   of the drugs in this category are prescription drugs.

20   Q.  Thank you, Dr. Bowman.

21        MS. MORTAZAVI:  And Ms. Jung, you can take down this

22   exhibit.

23        I will ask the jurors to pick up their transcription

24   binders and turn to tab 122CT, and I will ask Ms. Jung to

25   please pull up Government Exhibit 122CT and prepare Government

1    Exhibit 122C.

2              And for the record, this is a portion of a call

3    intercepted on March 31, 2019 between Seth Fishman and an

4    unidentified female.

5              If any jurors still need it, it's tab 122CT.  122CT.

6              Ms. Jung, please play Exhibit 122CT.

7              (Audio recording played)

8              MS. MORTAZAVI:  Ms. Jung, if you could take down those

9    exhibits and the jurors could put away their binders.

10             And while they're doing so, I will have Ms. Jung

11   please pull up Government Exhibit 3404.  That exhibit is in

12   evidence subject to the prior stipulation.  It is an email from

13   the email address sethfishman@hotmail.com.

14             And Ms. Jung, if you could actually go to the last

15   page in this email.

16   Q.  Dr. Bowman, do you see that this is an email from Seth

17   Fishman, sethfishman@hotmail.com, to an individual named

18   Karthik Ragavan (ph)?

19   A.  Yes.

20   Q.  What is the date on this email?

21   A.  May 8, 2017.

22   Q.  Could you please read the body of the email?

23   A.  It's been a long time.  Hope you are doing well.  I have a

24   group of investors that would like to invest in registering

25   Pentosan for veterinarian use in USA.  I have one of company in

1   India that is very interested in the deal.  As we have a long

2   history and you are USA-based, I would offer you the first

3   right of refusal.  Please let me know if you are interested in

4   this deal.

5   Q.  Dr. Bowman, are you familiar with Pentosan?

6   A.  Yes.

7   Q.  What is it?

8   A.  It's a drug that is commonly used in horses to inject

9   joints to treat osteoarthritis, synovitis, also approved in

10  people to treat idiopathic cystitis, I believe.

11  Q.  Is it FDA approved in the United States for animal use?

12  A.  No, not for animal use, only human use.

13          MS. MORTAZAVI:  Ms. Jung, please take down this

14  portion of the exhibit and go back to the original exhibit,

15  3404.  I'm sorry, if you could go two pages over, please.

16  Q.  At the very bottom, Dr. Bowman, do you see the email

17  response from Karthik Ragavan to Seth Fishman?

18  A.  Yes.

19          MS. MORTAZAVI:  May 8, 2017 at 11:04 p.m.

20          Ms. Jung, if we could actually go back to the original

21  page, it's the portion at the very bottom, 11:04 p.m., and if

22  you could turn to the next page, Ms. Jung, where it appears

23  that that message continues.

24  Q.  Could you read the body of that email, please, Dr. Bowman.

25  A.  Yes.  I would like to know more about the deal, what will

1    Sentio's role be, et cetera.

2              MS. MORTAZAVI:  Ms. Jung, please go back to page 2 of

3    this exhibit.

4    Q.  And we're going to work up the chain, Dr. Bowman, and read

5    these portions of this email into the record.  Looking at the

6    May 8, 2017, 10:05 p.m. email from Seth Fishman to Karthik

7    Ragavan, could you please read the body of the email.

8    A.  I will buy API and have you bottle, if interested.

9    Q.  An email response from Mr. Ragavan on Monday, May 8, 2017

10   at 11:07 p.m. to Seth Fishman, could you please read the body

11   of that email appearing in the center of page 2.

12   A.  What about regulatory?  That is a major project.  CMC,

13   clinical trials, et cetera.  You are looking at roughly five

14   years.  It's not just buying API.  As a manufacturer, we will

15   need to submit an entire dossier to CVM.  That alone will cost

16   2 to 3 million.

17   Q.  Dr. Bowman, we previously referred to FDA CVM, is that also

18   referred to as simply CVM?

19   A.  Yes, it is.

20   Q.  Is that a reference to your place of employment?

21   A.  Yes.

22   Q.  And by that, I mean CVM appearing in this email in

23   Government Exhibit 3404.

24   A.  Yes, I believe so.

25   Q.  And looking at the email response above that dated Monday,

1  May 8, 2017, at 10:23 p.m. from Seth Fishman to Mr. Ragavan,

2  could you please read the body of that email.

3  A.  I told the investors in the group that it would cost

4  serious money.  They're well aware of the costs.  An Indian

5  group was interested and willing to share in expenses.  They

6  are looking, I think, more about for human.  I'm not sure if

7  they genuine in their offer and requirements for human maybe

8  exponentially more.  If you have an interest, I will discuss

9  with you.  Indian group selling worldwide and mostly human.  I

10  need to know if you're interested.  I also still wanting to

11  know if you are interested in formulating and bottling, as we

12  discussed, for a medical device to start.

13          MS. MORTAZAVI:  And Ms. Jung, if you could turn to

14  page 1 of this email chain.

15  Q.  Dr. Bowman, do you see here the response to the email you

16  just read out dated May 8, 2017 at 11:28 p.m. from Mr. Ragavan

17  to Seth Fishman?

18  A.  Yes.

19  Q.  Could you read the body of that email.

20  A.  I am very familiar with the Indian company.  I am not

21  interested in medical device.  We are now an FDA-approved site

22  and we will get in serious trouble if we are making drugs and

23  selling them at device.  We just got DIROBAN registered, by the

24  way.  We have to know a lot more before we can say more.

25  Without a plan in front of us, it will be difficult to commit

M1PTFIS7

1    to it.  If you have any high-level plan, that would be good to

2    review.

3    Q.  Looking at the final email in this chain at the very top of

4    page 1, that's an email from Seth Fishman to Mr. Ragavan dated

5    May 12, 2017 at 12:37 a.m.  Could you please read the body of

6    this email after Karthik.

7    A.  I have several high-level hunter jumper vets using the

8    Pentosan that I made.  They're very happy and they're

9    interested in making it 100 percent legitimate.  I know they

10   have the money behind them if they want to pursue the idea.  If

11   you feel your company is up to the task, please give me an

12   approximate cost to proceed.  In the interim, do you have

13   Pentosan to sell?  I purchased from the other group and the

14   product was good.  If you are now an FDA-approved site and

15   already in the USA, it would obviously be better to work with

16   your group.

17          MS. MORTAZAVI:  Thank you, Dr. Bowman.

18          Ms. Jung, you can take down this exhibit.

19          And your Honor, no further questions.

20          THE COURT:  Thank you very much.

21          All right.  Ladies and gentlemen, we're going to

22   conclude for the day then, and when we pick up tomorrow we'll

23   have cross-examination by Dr. Fishman's counsel.

24          So thank you all very much.  I hope you all have a

25   good evening.

M1PTFIS7

<table>
<tr><td>1</td><td>Dr. Bowman, you remain under oath, and we'll recall</td></tr>
<tr><td>2</td><td>you first thing tomorrow morning.</td></tr>
<tr><td>3</td><td>THE WITNESS:  Thank you.</td></tr>
<tr><td>4</td><td>THE COURT:  All right.  We'll adjourn for the day</td></tr>
<tr><td>5</td><td>then.  Thank you all very much for your attention today.</td></tr>
<tr><td>6</td><td>Please be back tomorrow morning at about 9:15 so we can start</td></tr>
<tr><td>7</td><td>about 9:30.  Thank you.</td></tr>
<tr><td>8</td><td>(Jury not present)</td></tr>
<tr><td>9</td><td>THE COURT:  Dr. Bowman, you're excused for the</td></tr>
<tr><td>10</td><td>evening.</td></tr>
<tr><td>11</td><td>Is there anything we need to discuss, Mr. Adams?</td></tr>
<tr><td>12</td><td>MR. ADAMS:  As soon as Dr. Bowman is out of the room</td></tr>
<tr><td>13</td><td>I'm happy to run through the batting order.</td></tr>
<tr><td>14</td><td>THE COURT:  Thank you.</td></tr>
<tr><td>15</td><td>MR. ADAMS:  Otherwise, nothing else from us.</td></tr>
<tr><td>16</td><td>(Pause)</td></tr>
<tr><td>17</td><td>THE COURT:  All right.  Mr. Adams?</td></tr>
<tr><td>18</td><td>MR. ADAMS:  Thank you, your Honor.  So I expect that</td></tr>
<tr><td>19</td><td>after cross-examination of Dr. Bowman and any redirect in the</td></tr>
<tr><td>20</td><td>morning we'll move to Dr. Cole, who I expect we'll finish the</td></tr>
<tr><td>21</td><td>direct and be into cross, assuming what cross-examination may</td></tr>
<tr><td>22</td><td>look like, and we may well begin with Ross Cohen in the</td></tr>
<tr><td>23</td><td>afternoon tomorrow.  And there's some possibility, depending on</td></tr>
<tr><td>24</td><td>length of cross-examination, that we would even start with</td></tr>
<tr><td>25</td><td>Special Agent Aaron Otterson.</td></tr>
</table>

M1PTFIS7

```
 1                THE COURT:  I'm sorry, I'm having trouble hearing you.
 2                MR. ADAMS:  Special Agent Aaron Otterson, who will
 3       walk through one of the searches.  I believe that we are on
 4       track -- again, with some assumptions about what
 5       cross-examination might look like, I believe the government is
 6       on track potentially to rest its case on Friday.
 7                THE COURT:  Okay.  All right.  Anything from you all,
 8       Mr. Sercarz?
 9                MR. SERCARZ:  Yes, your Honor.  Your Honor, we have
10       had periodic discussion about the parameters for expert witness
11       testimony.  I'm thinking ahead to the direct examination of
12       Dr. Cole, and I would point out that with this witness, and
13       this is just to orient you, my concerns on this subject of
14       opinion evidence regarding the safety and efficacy of my
15       client's products beyond the statement that a drug is deemed
16       unsafe pursuant to the FDA.
17                THE COURT:  And you're talking about Dr. Cole now.
18                MR. SERCARZ:  Yes.  The government has with this
19       witness -- and I did not object to it -- used the formulation
20       that there have been GRASE studies.  I'm not sure what that
21       last letter is for.  I understand GRAS is Generally Regarded As
22       Safe.  And that they have not found any studies to indicate
23       that Dr. Fishman's drugs are safe.  I would urge that upon the
24       Court and suggest that if Dr. Cole is going to come in and
25       start offering opinion testimony regarding the safety and
```

M1PTFIS7

1    efficacy of Dr. Fishman's products, it is, A, duplicative, and

2    B, anything further than reference to the general scientific

3    consensus, which is necessary for FDA approval, would be highly

4    prejudicial and would carry no marginal additional probative

5    weight.  You may recall that I pulled for the Court Dr. Cole's

6    article regarding Equestology products.  I'm not certain where

7    she's going.

8                THE COURT:  I'm not either.

9                MR. SERCARZ:  I'm not certain how it differs.  But I

10   wanted the Court to see where we are at this stage in order to

11   consider how much further is necessary on the subject of safety

12   and efficacy of Dr. Fishman's products, because I'm going to

13   object to anything further.

14               Indeed, in the wake of the breadth and scope of this

15   testimony, I would renew my objection to preclude any testimony

16   by an additional witness going to the issue of the safety and

17   efficacy of Dr. Fishman's products.  If the Court does not find

18   that that is necessary, I would urge upon the Court that the

19   government should be allowed to do no more than refer to these

20   types of studies regarding products other than those that were

21   covered in Dr. Bowman's testimony.

22               THE COURT:  Anyone want to be heard from the

23   government?

24               MR. ADAMS:  Dr. Cole will be my witness, your Honor.

25   I think that Mr. Sercarz may be laboring under some

M1PTFIS7

1    misimpression about what Dr. Cole's testimony is really about.

2            What I expect to elicit from Dr. Cole is largely

3    expert testimony about the effect of the various substances

4    offered by Equestology, and specifically the effect in the body

5    of a racehorse and a racing animal, and even more specifically,

6    any performance-enhancing effect of those drugs, because it

7    goes to the fact that the substances themselves are drugs, that

8    they have an effect, and the intent of Dr. Fishman is squarely

9    at issue in this case.

10           THE COURT:  How does it go to the intent to defraud or

11   mislead?

12           MR. ADAMS:  Insofar as the drugs are performance-

13   enhancing drugs and non-testable performance-enhancing drugs,

14   it goes directly to his intent not to, in his words, provide

15   for the health and safety of the animals but rather to provide

16   for a secret non-testable agent to allow people to sneak past

17   anti-doping regulators.

18           THE COURT:  I think we'll have to see where the

19   questioning goes.  On a high plane level, academically it

20   sounds like it might be okay, but as I say, I will have to hear

21   your questions and your objections and I will rule on them

22   accordingly, but I will not preclude her from testifying.

23           Anything else?

24           MR. ADAMS:  Not from here, your Honor.

25           THE COURT:  Everybody have a good evening and I'll see

M1PTFIS7

1    you here about 9:15 tomorrow morning ready to go at 9:30.

2              If there's anything further, you need to let us know

3    by this evening so that we can all meet a little earlier if

4    need be.  I don't want to delay starting with the jury.  Okay?

5              MR. ADAMS:  Thank you, Judge.

6              THE COURT:  Thank you everyone.  Have a good night.

7              (Adjourned to January 26, 2022 at 9:15 a.m.)

8

9                        INDEX OF EXAMINATION

10   Examination of:                              Page

11    DANIEL FOLENSBEE

12   Direct By Ms. Mortazavi  . . . . . . . . . . 371

13    JEAN BOWMAN

14   Direct By Ms. Mortazavi  . . . . . . . . . . 386

15

16

17

18

19

20

21

22

23

24

25

```
 1                      GOVERNMENT EXHIBITS

 2   Exhibit No.                              Received

 3   9011, 101-A through 115-C, 117-A . . . . . . 382

 4           through 143-D, 160-A through

 5           173-A, 190-A through 192-A,

 6           and 199-A through 199-B

 7   9002   . . . . . . . . . . . . . . . . . . 431

 8   700 to 715   . . . . . . . . . . . . . . 432

 9   1000 to 1003, 1005 to 1011, and 1013 to . . . 437

10           1053

11   9012, 1400 through 1420, 9500 through . . . . 442

12           9505, 1500 through 1511, 9600

13           through 9604, 1200 through

14           1222, 9200 through 9216, 1100

15           through 1128, and 9300 through

16           9311

17   9006, 300 through 320E and 320FA through 331  454

18   9015, 9020-9086, 6000-6005, 1300-1317,  . . . 505

19           5000-5018, 9100-9122,

20           1800-1806, 9400-9414

21   9005, 3401-3410, 3412-3457, 3301-3314,  . . . 514

22           3316-3326, 3399-A, B, and C,

23           1600

24

25
```