M1QPFIS1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                        20 Cr. 160 (MKV)

SETH FISHMAN,

            Defendant.
                              Trial
------------------------------x

                              New York, N.Y.
                              January 26, 2022
                              9:24 a.m.

Before:

                   HON. MARY KAY VYSKOCIL,

                              District Judge
                              -and a Jury-

                      APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  ANDREW C. ADAMS
     SARAH MORTAZAVI
     ANDEN F. CHOW
     Assistant United States Attorneys

SERCARZ & RIOPELLE, LLP
     Attorneys for Defendant Fishman
BY:  MAURICE H. SERCARZ
     -and-
LAW OFFICE OF MARC FERNICH
BY:  MARC A. FERNICH

ALSO PRESENT:  KARLINE JUNG, Paralegal Specialist

M1QPFIS1

1          (Trial resumed; jury not present)

2          THE COURT:  Please be seated, everyone.  All right.  I

3     had one thing I wanted to raise with the parties.

4          Mr. Adams, I assume in connection with your plan to

5     call Ross Cohen, you've made disclosures to the other side, you

6     made a motion in connection with unsealing certain items?

7          MR. ADAMS:  Yes, your Honor.  And all of the 3500

8     material produced with respect to Mr. Cohen has been produced.

9     That includes things that were formerly under seal.

10          THE COURT:  All right.  Are you contemplating, though,

11     any limitations on his examination or cross-examination?

12          MR. ADAMS:  Not at this point, no, your Honor.

13          THE COURT:  All right.  So there's nothing we need to

14     talk about with respect to that?

15          MR. ADAMS:  No.

16          THE COURT:  Is it your intent to unseal everything?

17          MR. ADAMS:  With respect to Mr. Cohen, I expect so.

18          THE COURT:  All right.  Well, I'll wait for an

19     application from you.

20          MR. ADAMS:  Certainly.

21          THE COURT:  All right.

22          MR. ADAMS:  Once he's testified, I expect that the

23     reason for keeping it under seal would dissipate.

24          THE COURT:  That's what I anticipated.

25          Okay.  All right.  Mr. Sercarz?

1          MR. SERCARZ:  In that regard, and I just want to make

2     sure there hasn't been an oversight.  I have information

3     regarding the plea to one count of adulteration and

4     misbranding.  I do not have a written cooperation agreement.  I

5     don't know whether there is one.  And I may have overlooked it,

6     but I just want to make sure that this isn't a situation where

7     it hasn't been turned over.

8          MR. ADAMS:  It's marked in the 11,000 series in the

9     exhibits, but you should have it, and we'll confirm that you

10    do.

11         MR. SERCARZ:  Thank you.

12         MR. ADAMS:  Fair enough.

13         THE COURT:  Is there anything else we should discuss?

14         MR. SERCARZ:  Just briefly, your Honor, I represent to

15    the Court that I took a Covid test this morning.  It came back

16    negative.  I have the results on my cell phone.  They told us

17    that they are not transmitting that information to chambers.

18         THE COURT:  Correct.  I told you that yesterday.

19         MR. SERCARZ:  I just wanted you to know.  I thought

20    that would be advisable.

21         THE COURT:  Thank you.  What about Mr. Fernich and

22    Dr. Fishman?

23         MR. FERNICH:  I have not done mine yet.  I will do it

24    at the quickest break or lunch hour, but I don't plan to be in

25    the box today.

M1QPFIS1

1        THE COURT:  And Dr. Fishman?

2        THE DEFENDANT:  I'll take mine during lunch.

3        THE COURT:  Okay.  And the government, I assume you're

4   all squared away?

5        MR. ADAMS:  Yes, your Honor.  Dr. Cole tested

6   yesterday, but I was told this morning that she ought to test

7   again today, since she didn't take the stand.  So she's down

8   here doing it now, but there should be plenty of time between

9   now and when she gets on the stand.

10        THE COURT:  Okay.

11        MR. FERNICH:  Just to be clear, I had attempted to

12   test again yesterday, and they told me to wait until today.

13        THE COURT:  I mean, you all told me yesterday the

14   protocol is every other day.  I mean, Dr. Cole hadn't

15   previously tested, but in terms of the lawyers, you told me,

16   and the order clearly says, the protocol is every other day.

17        MR. FERNICH:  I'm pretty nuts about it.  I'll take as

18   many as I can take.

19        THE COURT:  That's fine.  I don't have a concern about

20   that.

21        All right.  Anything else we should talk about before

22   the jurors come on up?

23        MS. MORTAZAVI:  Nothing from the government.

24        MR. SERCARZ:  Did you have something you wanted to

25   discuss that you and me talked about?

1          MS. MORTAZAVI:  Briefly, your Honor.  Just for

2     purposes of clarification of the record and the exhibits that

3     have been entered, I asked Mr. Sercarz if I could retake the

4     stand and clarify certain hard exhibits.  I believe there's a

5     stipulation we may not have offered, that I'd like to now offer

6     and some clarification about what I did offer into evidence.  I

7     just ask for the opportunity to do it before cross-examination

8     begins.

9          MR. SERCARZ:  No objection.

10          THE COURT:  All right.  Thank you.  You know, I assume

11     you're all keeping copies of the exhibits that have been

12     admitted and keeping a list of them so that when we get to the

13     deliberations, if the jurors ask for things, you will be

14     prepared to provide copies.

15          MS. MORTAZAVI:  So, your Honor, at the end of each

16     day, we review the transcript to determine what has been

17     offered and admitted, and we are preparing and prepared to, at

18     the end of the trial, compile electronic copies of everything

19     that has been admitted.

20          THE COURT:  Yes.

21          MS. MORTAZAVI:  We'll confer with defense counsel to

22     ensure that there is agreement, and we'll have that available

23     to the Court.  I believe that's the courthouse's protocol

24     during Covid; so we will make that available if the jurors

25     request it.

1          THE COURT:  You're supposed to provide it to us on a

2     flash drive or thumb drive.  We at some point, not now because

3     I don't want to holdup the jury, have to talk about how we are

4     going to handle requests from the jurors for exhibits.

5          I'll tell you now, I'm not a big fan of giving the

6     jurors the thumb drive and saying, have at it, but we'll talk

7     about that, you know, at some point.

8          And as we see towards the end of the week where the

9     government's at with its case, whether you're on track to rest

10    on Friday, we should talk about scheduling a charging

11    conference too.  And I guess, at some point, Mr. Sercarz or

12    Mr. Fernich, we will need an estimate from you about how long

13    you anticipate your case will be, if any.  Okay?

14         MR. SERCARZ:  Yes, your Honor.

15         THE COURT:  All right.  Thanks.  So let me go check on

16    the status of the jury and, hopefully, we'll be ready to get

17    going.

18         (Recess)

19         THE COURT:  Please be seated, everyone.  We're told

20    the jurors are on their way.

21         (Pause)

22         (Jury present)

23         THE COURT:  Please be seated, everyone.

24         All right.  Good morning to our jurors, and thank you

25    all for being so punctual.  We're working very hard to try to

1    keep everything on schedule.  I told you I would update you

2    periodically; so it looks like everything is on schedule, as we

3    talked about during jury selection.  We may even be slightly

4    ahead of where we thought we would be, and I will continue to

5    update you as we get closer to the weekend.  Okay?

6            All right.  So I believe Ms. Mortazavi has a couple of

7    items for the record with respect to exhibits.  Please

8    remember, as I told you before, just as testimony is evidence,

9    so too are stipulations and exhibits.  So Ms. Mortazavi is

10   going to put a few things on the record, and then we'll have

11   the cross-examination of Dr. Bowman.

12           All right.  Ms. Mortazavi.

13           MS. MORTAZAVI:  Thank you, your Honor.  For purposes

14   of the record, I've read into the record yesterday Government

15   Exhibit 9014, which was a stipulation between the parties

16   governing a transcription.  I did not formally offer that

17   stipulation into evidence, and I do so now.

18           MR. SERCARZ:  No objection.

19           THE COURT:  It is received in evidence.

20           (Government's Exhibit 9014 received in evidence)

21           MS. MORTAZAVI:  Thank you, your Honor.

22           And yesterday, with respect to Government

23   Exhibit 9011, another stipulation between the parties, I had

24   entered into evidence certain exhibits.  I had intended to also

25   offer, with my offer of the exhibits contained in that

M1QPFIS1

1    stipulation, all of the subparts, which include the

2    transcriptions.

3            To the extent that's not clear from the record, I

4    would now like to offer Government 101-AT through 199-T and I'd

5    also like to offer Government Exhibits 203, 204 and 205 into

6    the record.

7            THE COURT:  All right.  That will all be part of the

8    evidence in this case.  It is received.

9            (Government's Exhibits 101-AT through 199-T, 203, 204

10   and 205 received in evidence)

11           MS. MORTAZAVI:  And if I could have one moment, your

12   Honor?

13           THE COURT:  Sure.

14           (Pause)

15           MS. MORTAZAVI:  And, your Honor, yesterday I read into

16   the record Government Exhibit 9005, which was yet another

17   stipulation between the parties.  Upon consent of the parties,

18   that stipulation has been amended to include one additional

19   exhibit, that's Exhibit No. 3458.  The changes have been made

20   to the original version of the exhibit that was offered.  We

21   will provide that copy to the Court for the record, and we now

22   offer Government Exhibit 3458.

23           THE COURT:  All right.  Government Exhibit 3458 and

24   the amended stipulation are received.

25           MS. MORTAZAVI:  Thank you, your Honor.

1            (Government's Exhibit 3458 received in evidence)

2            Nothing further.

3            THE COURT:  Thank you.  All right.  Will someone

4    please ask Dr. Bowman to return to the witness stand.  Thank

5    you.

6            Good morning, Dr. Bowman.

7            THE WITNESS:  Good morning.

8            THE COURT:  All right.  Good morning, Dr. Bowman.  I

9    remind you that you remain under oath.  This morning we'll have

10   cross-examination by Dr. Fishman's lawyers.  You may remove

11   your mask while you're in the witness stand with the enclosure

12   and the HEPA filter.  Thank you.

13           THE WITNESS:  Okay.

14           THE COURT:  Mr. Sercarz?  Yes, please.

15    JEAN BOWMAN, (Resumed)

16   CROSS-EXAMINATION

17   BY MR. SERCARZ:

18   Q.  Good morning, Dr. Bowman.

19   A.  Good morning.

20   Q.  My name is Maurice Sercarz.  I represent Dr. Fishman.

21           For several hours yesterday, you reviewed items on a

22   product list, Government's Exhibit 711; do you recall your

23   testimony?

24   A.  Yes, sir.

25   Q.  You were asked in each instance the name of the product,

1   correct?

2   A.  I think in most instances.

3   Q.  I'm sorry?

4   A.  I think in most instances.

5   Q.  All right.  Whether the Government's Exhibit 711 contained

6   any reference to the intended use; do you recall?

7   A.  Yes.  I didn't memorize the exhibits by the exhibit number.

8   Q.  That's all right, but just all on that product list, that's

9   what I'm going to ask you about.  Okay?

10  A.  Okay.

11  Q.  And whether there were any representations regarding the

12  effect of those products about which you testified yesterday;

13  am I correct?

14  A.  Yes.

15  Q.  You were asked whether, as a result of those

16  representations and those references, the item was a drug,

17  correct?

18  A.  Yes.

19  Q.  And whether it had FDA approval; am I correct?

20  A.  Yes.

21  Q.  You were asked, in light of the fact that it was a drug,

22  whether it -- withdrawn.

23          You were asked about the labels with the names of the

24  drugs on them, correct?

25  A.  Yes.

1   Q.  And you were asked to describe all of the many deficiencies

2   in the labels for those drugs; am I correct?

3   A.  Yes.

4   Q.  And then you were asked about something called a GRASE

5   analysis, correct?

6   A.  Yes.

7   Q.  All right.  Just so that I have the nomenclature correct,

8   the spelling of that is GRAS, correct?

9   A.  No, it's GRAS/E.

10  Q.  Slash E?

11  A.  Yes, generally recognized as safe and effective.

12  Q.  Safe and effective.  And by generally recognized, that

13  means that there is sufficient scientific literature that is

14  recognized by the FDA to support the introduction of that

15  product as an FDA approved drug; is that correct?

16  A.  Not exactly.  It's a standard that is equivalent to the

17  level of data that would be required for an approved product.

18  Q.  In other words, that the approval is generally recognized

19  in the scientific community; is that a fair description?

20  A.  No, no, not at all.  An approved product is not generally

21  recognized as safe and effective, and it's only recognized as

22  safe and effective within the confines of its approved

23  application.

24  Q.  I missed a word.  If you could speak a little closer to the

25  mic and raise your voice for me, I'd be grateful.

1  A.  No, approved products are not generally recognized as safe

2  and effective.  Approved products are only safe and effective

3  within their approved application, and all of the data in that

4  application is proprietary to the company that developed it; so

5  it's not publicly available.

6  Q.  Okay.  However, neither you nor anyone from the -- well,

7  withdrawn.

8          You did not examine the products themselves; am I

9  correct?

10          THE COURT:  What products?

11  Q.  Products that were seized, and that the jury observed in

12  those exhibits with photographs; am I correct?

13          MS. MORTAZAVI:  Objection, vague.

14          THE COURT:  I think you have to be specific about what

15  you're talking about, Mr. Sercarz.

16          MR. SERCARZ:  Yes, your Honor.

17  BY MR. SERCARZ:

18  Q.  In the course of your work for the government in this case,

19  you did not examine products; am I correct?

20  A.  Products, like in my hand, the container?

21  Q.  Products, meaning drugs with labels on them.

22  A.  I examined photographs of products with labels on them.  I

23  almost never have the opportunity to have an unapproved drug

24  sitting on my desk in front of me.  I review the evidence based

25  on photographs and transcripts and other data that's available.

1   Q.   Therefore, with regard to those items about which you

2   testified yesterday, you are unable to say whether the

3   ingredients that were listed on the products were indeed in the

4   products; isn't that correct?

5   A.   That is correct, but irrelevant to the conclusion.

6   Q.   Irrelevant to your conclusion, but correct nonetheless; am

7   I right?

8   A.   First of all, the ingredients were nonspecific on most of

9   the labels.  So, yeah, I don't -- I don't know what's in them

10  even if what's in them is supposed to be represented by the

11  ingredient statement that's on there because it was not

12  specific.

13  Q.   You didn't test any items to see whether they worked as

14  described on the labels, did you?

15  A.   No.

16  Q.   You did not have an opportunity to learn what the basis

17  was, if any, for the representations contained in Government's

18  Exhibit 711, that catalog of products about which you testified

19  yesterday; isn't that correct?

20  A.   Could you repeat that question?

21  Q.   May I have it read?

22       (Record read)

23  A.   It is correct to say that I was unable to do a deep dive on

24  the individual ingredients in each product because they weren't

25  listed on the label as required by law.  That law applies to

1    approved and unapproved drugs.

2    Q.  Now, you testified at the beginning of your testimony that,

3    if I'm not mistaken -- if I am, please correct me -- that the

4    purpose of the review that you conducted was to determine

5    whether the product was safe and effective for its intended

6    use; is that correct?

7    A.  That is not correct.  The purpose of the review is to

8    determine whether the products are generally recognized as safe

9    and effective by experts in the general open public literature

10   for the intended use in the specific species.  You can't apply

11   human data to horses.  You can't apply horse data to humans.

12   It's species specific.

13   Q.  In that regard -- and by the way, you were asked some

14   hypothetical questions yesterday by the government during the

15   course of your examination; am I correct?

16   A.  Yes.

17   Q.  All right.  Are you familiar with a product known as

18   glucosamine and chondroitin?

19   A.  Yes.

20   Q.  And you want to tell the ladies and gentlemen of the jury

21   what it is and what it's for?

22   A.  Glucosamine and chondroitin sulfate are components of

23   cartilage, and they are frequently used to treat arthritis and

24   synovitis in horses.  They can be administered by injection

25   directly into the joint.  There are some forms of it,

1    polysulfated glucosamine or glycans that can be injected

2    intramuscularly or intravenously to --

3    Q.   Now --

4    A.   -- get that effect.

5    Q.   I'm sorry, I didn't realize you weren't finished.

6            Now, it is most often administered to humans; isn't

7    that correct?

8    A.   I am not an expert on what humans get administered.

9    Q.   Is it considered a drug or a non-drug product?

10   A.   In humans, or in animals?

11   Q.   Let's start with humans.

12   A.   I'm not an expert in what it is considered in humans.

13   Q.   With regard to animals, it is considered a drug; is it not

14   correct?

15   A.   Yes, it is.

16   Q.   And it can be administered to an animal either by one of

17   the means you described or by being ground up and placed in

18   their food; isn't that correct?

19   A.   Yes.

20   Q.   There are separate regulations for seeking approval of a

21   feed product, as opposed to a drug product under the FDA; am I

22   correct?

23   A.   There are -- drugs that are administered in animal feeds

24   are still drugs.  Some of the rules, as far as developing the

25   application, are slightly different because of the different

1   dosage form, but if it's a drug administered in feed, it's a

2   drug.

3   Q.  Now, has a GRASE review ever been conducted on glucosamine

4   and chondroitin to determine whether it is safe and effective

5   for its intended use in animals?

6   A.  Honestly, I have no idea.  I would have to search the

7   archives.  I don't recall ever doing one myself.

8   Q.  Isn't it a fact that as to chondroitin, if you know,

9   chondroitin is on the list as a generally regarded as effective

10  and safe substance --

11          MS. MORTAZAVI:  Objection.

12  Q.  -- but that glucosamine -- withdrawn -- yes, that

13  glucosamine is not?

14  A.  There is --

15          THE COURT:  Hold on.  The objection is sustained.

16  A.  There is no generally --

17          THE COURT:  No, no.  When I sustain an objection, you

18  don't answer.

19          THE WITNESS:  Okay.

20  BY MR. SERCARZ:

21  Q.  Do you know whether glucosamine has been subjected to a

22  GRASE review?

23  A.  Again, for horses or for people?

24  Q.  For horses.

25  A.  As far as I'm aware, I am unaware of it -- it wouldn't

1  be -- first of all, GRASE review is done of a product, not of

2  an ingredient, and I don't think -- you're probably confusing a

3  GRAS for food, which is generally recognized as safe for food,

4  as opposed to generally recognized as safe and effective.

5          There's no list of products that are generally

6  recognized as safe and effective; that simply doesn't exist.

7  There is a list of ingredients that are generally recognized as

8  safe for specific purposes in food.

9  Q.  Is glucosamine generally recognized as safe and effective

10  for food for animals?

11          MS. MORTAZAVI:  Objection.

12  Q.  Specifically to relieve joint pain in horses?

13          THE COURT:  Sustained, specifically to the form of

14  your question, Mr. Sercarz.

15  Q.  Do you have any familiarity with the GRASE -- withdrawn.

16          Did you testify yesterday that when a drug consists of

17  more than one active pharmaceutical ingredient, that GRASE

18  reviews are done on all of the active pharmaceutical

19  ingredients?

20  A.  No, I did not.

21  Q.  Now, again, you told us yesterday that the purpose of the

22  FDA regime is to determine whether animal drugs are safe and

23  effective for their intended use; am I correct?  I'm not just

24  talking about the work that you did.  I'm talking about the FDA

25  regulatory regime.

1   A.  The FDA's mission is to ensure that the products marketed

2   for animal use are safe and effective.

3   Q.  All right.  And you told us that in making that analysis,

4   the intended use of the product is a paramount consideration;

5   am I correct?

6   A.  Yes.

7   Q.  And that would be the intended use as described in the

8   application before the FDA to seek approval of the product; am

9   I correct?

10  A.  For a product seeking approval, yes.

11  Q.  Suppose that the proponent of a product has one intended

12  use in mind, but the product can commonly be used for other

13  purposes?

14  A.  What's the question?

15  Q.  Does that affect the judgment of the FDA as to whether or

16  not to approve the drug?

17  A.  Probably not.  It could in some circumstances, but most

18  likely not.

19  Q.  Then if I may ask you a hypothetical question.  What if a

20  proposed product is offered for use in treating pain in

21  animals, such as horses, but it can also commonly be used

22  because it has a performance enhancing effect?

23          MS. MORTAZAVI:  Objection, there's no question.

24          THE COURT:  Sustained.  There's no question there.

25  Q.  How would that --

1           THE COURT:  Go ahead.

2    Q.  How would that affect the analysis by the FDA?

3           MS. MORTAZAVI:  Objection, vague.

4           THE COURT:  Are you able to answer, Dr. Bowman?

5           THE WITNESS:  I can give some context.

6           THE COURT:  Go ahead.

7    A.  So approved animal drug products are allowed to be used in

8    what's called off-label uses under the conditions set forth in

9    21 CFR 530, and in 21 CFR 530, the only way that products can

10   be used off label is if it's to alleviate animal suffering or

11   prevent death.  So performance enhancement would not meet the

12   criteria established in 21 CFR 530 for off-label use.

13   Q.  To be clear, I'm not asking about off-label usage.  I'm

14   asking about the product for seeking FDA approval of the drug

15   in the first instance.

16          And again, my question is, if the proponent indicates

17   that the intended use is to treat pain in an animal, but the

18   FDA is aware that the product is capable of other uses, such as

19   as a performance enhancing drug, will that affect the FDA's

20   consideration of the approval of that product?

21   A.  It could.  It would be case by case.

22   Q.  Would it be fair then to say that the FDA might approve of

23   a drug based on the proponent's explanation of its intended use

24   but that drug could still be used as a performance enhancing

25   drug?

1    A.  It couldn't be used as a performance enhancing drug

2    legally.  It would be illegal under the conditions in 21 CFR --

3    Q.  It would be illegal under?

4              THE COURT:  Let her finish.

5              Okay.  Go ahead, Dr. Bowman.

6    A.  You're describing an off-label use of an approved product.

7    Off-label uses are regulated under 21 CFR 530, and a

8    performance enhancing use would not fit under that use and

9    would, therefore, be illegal.

10   Q.  Now, in testifying about your background, you told us that

11   you spent a great deal of time working with the FDA; am I

12   correct?

13   A.  Yes.

14   Q.  And you also spent some time earlier in your career as a

15   veterinarian, practicing with large animals; is that correct?

16   A.  Yes, it is.

17   Q.  From your experience as a veterinarian, you know that the

18   FDA does not regulate the practice of veterinary medicine;

19   isn't that correct?

20   A.  That is correct.

21   Q.  And the FDA is not the entity that regulates horseracing;

22   is that correct?

23   A.  That is correct.

24   Q.  Those regulations are found in state and local regulatory

25   regimes; am I right?

1  A.  And there are some national organizations that provide the

2  background for those state laws.

3  Q.  With regard to the FDA regulations, you testified at some

4  length about the approval process of an animal drug yesterday,

5  correct?

6  A.  Yes.

7  Q.  At the end of the process, if a drug is approved, is it

8  entitled to bear on its label any sort of an insignia or

9  indication that the drug is FDA approved?

10  A.  Yes.  It's highly encouraged.

11  Q.  Now, you mentioned among the other requirements for

12  securing FDA approval, that there need to be studies regarding

13  its effectiveness and safety; am I correct?

14  A.  Yes.

15  Q.  And that would include safety and efficacy among different

16  animals; am I correct?

17  A.  I don't know what you mean by different animals.  It would

18  be in the target species for the intended use.

19  Q.  Fair enough.  That the FDA inspects the facilities that are

20  used to manufacture the products in order to ensure that they

21  meet the requirements and are capable of manufacturing to FDA

22  standards; am I correct?

23  A.  Yes.

24  Q.  The process for manufacturing the products must be listed

25  with the FDA; am I correct?

1    A.  Yes.  All manufacturers of all drugs, whether they're

2    approved or not, must be established and registered and their

3    drugs listed with the FDA.

4    Q.  There are separate labeling requirements, as you've

5    described them to the ladies and gentlemen of the jury; am I

6    correct?

7    A.  Separate from what?

8    Q.  I'll leave out the word "separate."

9         There are labeling requirements; am I correct?

10   A.  There are labeling requirements for all marketed animal

11   drugs, approved or not.

12   Q.  All right.  And they vary according to whether the drug is

13   to be marketed as an over-the-counter drug or a prescription

14   drug; am I correct?

15   A.  Yes.

16   Q.  With regard to prescription drugs, there are requirements

17   for what must be listed on a leaflet and the label; am I

18   correct?

19   A.  Yes.

20   Q.  All active pharmaceutical ingredients must be listed; am I

21   correct?

22   A.  For parenteral products, yes, all actives and inactives.

23   For oral products, it's not always required that all the

24   inactives be listed.

25   Q.  If those requirements are met -- withdrawn.

1              If those requirements are not met, then the drug is

2    deemed unsafe; am I correct?

3              MS. MORTAZAVI:  Objection, vague.

4              THE COURT:  No, if you're able to answer.  If you're

5    not, tell us.

6    A.  I was going to ask you to repeat the question.  I got lost

7    in it a little bit.

8    Q.  I'm sorry, may I have it reread.

9              (Record read)

10   A.  If you're referring to the requirements of the ingredients

11   that are required to be listed on the label depending on the

12   formulation, then, yes, the product would be unsafe, it would

13   be misbranded, and I think by -- I'm not an expert on all the

14   parts of the Act, but I think it would also be unsafe.

15   Q.  Now, with regard to the FDA regulatory regime, there are

16   requirements for what veterinarians are permitted to do with

17   regard to products; am I correct?

18   A.  Yes.

19   Q.  I'm sorry?

20   A.  Yes.

21   Q.  All right.  Veterinarians may be subject to different

22   regulations than other proponents when it comes, for example,

23   to off-label usage, as you've just described it; am I correct?

24             MS. MORTAZAVI:  Objection.

25             THE COURT:  Are you able to answer?  The question is

1    vague.

2    A.  I'm not sure what you're asking.

3    Q.  Are there circumstances under which a veterinarian can use

4    a drug for a purpose other than the one for which the drug was

5    proposed and received FDA approval?

6    A.  Yes.  As we talked about, under 21 CFR 530, a veterinarian

7    in a valid veterinarian client/patient relationship, is

8    permitted to use drugs off label for uses beyond the -- besides

9    what's the intended use on the official labeling, if it is

10   going to alleviate animal suffering or prevent death.

11   Q.  Are there circumstances under which a veterinarian is

12   permitted to compound drugs without seeking FDA approval of the

13   newly formulated drug?

14   A.  There are.

15   Q.  In order to understand who qualifies as a veterinarian, one

16   must examine state statutes in order to determine whether the

17   veterinarian is considered to be legitimately engaged in the

18   practice of veterinary medicine; am I correct?

19   A.  I'm not an expert on the state laws.  I assume so.

20   Q.  Are you familiar with something called the AVMA model code

21   for veterinary practice?

22   A.  Generally, not specifically.

23   Q.  But in order to make a judgment about whether or not a

24   particular substance comports with FDA requirements, one -- not

25   necessarily you, but one -- may have to be familiar with state

1    regulations regarding the practice of veterinary medicine;

2    isn't that correct?

3    A.  Yes, in all the states you practice in.

4    Q.  And in order to make the determination whether a product

5    approved by the FDA can be administered to a horse without

6    violating racing regulations, one needs to be conversant with

7    those racing regulations in addition to FDA requirements; isn't

8    that correct?

9    A.  One always needs to be conversant with the state

10   regulations; however, if it's in violation of 21 CFR 530, it's

11   still in violation regardless of what the state says or thinks.

12   Q.  In other words, a substance can be -- a product can fail to

13   meet the approval of the FDA and yet, it may not be outlawed by

14   local or state racing regulations; isn't that correct?

15   A.  I am not aware of any situations that fit that.

16   Q.  I asked whether that is correct as a matter of statutory

17   interpretation?

18             MS. MORTAZAVI:  Objection, vague.

19             THE COURT:  Sustained.  She answered your question.

20   Now you're just arguing.

21             MR. SERCARZ:  May I have one moment, your Honor?

22             THE COURT:  Sure.

23             (Pause)

24   BY MR. SERCARZ:

25   Q.  Now, with regard to the labels that you observed yesterday,

1  none of them bore the legend "FDA approved"; am I correct?

2  A.  Yes.  That's not a terminology that we put on the labels

3  typically.

4  Q.  Regardless of what you may have put on the label, the

5  labels that you observed did not bear the legend "FDA

6  approved"; isn't that correct?

7  A.  That is correct.

8  Q.  You mentioned, in discussing the process of seeking FDA

9  approval, that you have a sit-down, I believe were your words,

10  with the proponent of the product to discuss the process; am I

11  correct?

12  A.  Generally, unless they choose not to avail themselves of

13  that.

14  Q.  You did not have any such sit-down with my client,

15  Dr. Fishman; am I correct?

16  A.  I could find no evidence that we've ever had a meeting with

17  Dr. Fishman.

18  Q.  In other words, there's no record that Dr. Fishman ever

19  sought FDA approval for any product; is that correct?

20  A.  Yes.

21  Q.  Then am I correct that Dr. Fishman made no representation

22  to the FDA regarding the ingredients contained in any of his

23  products, correct?

24  A.  Not that I'm aware of.

25  Q.  He made no representation regarding the manufacturing

1    products -- manufacturing process; am I correct?

2    A.   Direct to FDA?  No.

3    Q.   He made no representation to the FDA regarding the

4    ingredients in any of his products; am I correct?

5    A.   Yes.

6    Q.   Sorry?

7    A.   Yes.

8    Q.   He made no representation that the labels that you observed

9    were in compliance with FDA requirements in order for approval

10   of the drugs; am I correct?

11   A.   You are correct, but those labels still need to be in

12   compliance whether the drug is approved or not approved.  In

13   order to be legally marketed --

14            MR. SERCARZ:  Move to strike, your Honor.  That's not

15   an answer to my question.

16            THE COURT:  Hold on.

17            (Pause)

18            Yes, Dr. Bowman, you need to just answer the question

19   that's asked.

20   A.   Yes.

21            MR. SERCARZ:  May I have the question reread, your

22   Honor?

23            (Record read)

24   A.   Yes.

25   Q.   Indeed, would it be fair to say that the labels that you

1  observed yesterday in your examination didn't even come close

2  to the requirements for FDA approval?

3  A.  That is correct.

4          (Continued on next page)

M1QTFIS2                    Bowman - Cross

1              MR. SERCARZ:  May I have one moment?

2              THE COURT:  Sure.

3              (Pause)

4     BY MR. SERCARZ:

5     Q.  You testified yesterday regarding 21 CFR Section 530 and

6     the extra label drug use when it comes to non-food animals, am

7     I correct?

8              THE COURT:  When it comes to what, non-animals?

9              MR. SERCARZ:  Non-food producing animals.

10             THE COURT:  Thank you.

11    A.  We mentioned it.

12    Q.  And can you remind the ladies and gentlemen of the jury of

13    the requirements and the guidance of 21 CFR Section 530, Sub

14    30, in that regard?

15    A.  21 CFR 530.30?

16    Q.  Yes.

17    A.  I'm sorry, I don't have it memorized.  Do you want to read

18    it?

19    Q.  Didn't you testify yesterday in general terms that in order

20    to be permitted to use -- engage in extra label or off-label

21    use of an approved product that the animal has to be in serious

22    danger, that it has to be a matter of life and death for the

23    animal?

24    A.  It has to be used to relieve pain and suffering or to

25    prevent the death of the animal.

1    Q.  Can you tell me where in Section 530 of the CFR it limits

2    the off-label use of these products to situations involving

3    life and death?

4    A.  It's written in there in plain language, I can't -- I don't

5    have the whole section memorized.

6    Q.  But you agree that any time that it is necessary to prevent

7    pain and suffering it may be used, am I correct?

8    A.  There are also limitations on there on whether you've

9    already exhausted the approved uses for products that are

10   already approved for the particular use that you seek.

11   Q.  Isn't it correct that a veterinarian has the discretion to

12   prescribe for off label use?

13   A.  That discretion is there.  It's under caution that it

14   should be limited to situations where the drugs approved for

15   those uses are unavailable or have failed to work.

16   Q.  May I ask you this, in light of all of the requirements

17   that are necessary, in order to get a new drug approved by the

18   FDA, are you aware of any information regarding the average

19   cost of bringing a new drug to market?

20   A.  I don't have that information at my fingertips today, no.

21   Q.  I'm sorry?

22   A.  I don't have that information at my -- in my mind today,

23   no, I would have to check with the management at CVM to get

24   that number.

25   Q.  Isn't it correct that one of the reasons that compounding

1    by veterinarians is permitted is that the expense of treating

2    an animal with newly approved drugs can be -- withdrawn, that

3    the process of bringing a new drug to market is terribly

4    expensive?

5              MS. MORTAZAVI:  Objection.

6              THE COURT:  You have to rephrase your question.  You

7    withdrew it and then didn't ask a full question.

8    Q.  Are you aware of the reason that Section 530 permits

9    compounding of drugs by a veterinarian?

10             MS. MORTAZAVI:  Objection, outside the scope.

11             MR. SERCARZ:  Sorry, I didn't hear the answer.

12             THE COURT:  We have an objection, Mr. Sercarz, just

13   give me a moment.

14             (Pause)

15             THE COURT:  No, I think it's fair.  You can answer,

16   Dr. Bowman, if you're able.

17   A.  Generally compounding for animal drugs is allowed because

18   there's such a wide disparity in the sizes and types of animals

19   that veterinarians need to treat.  So the approved products may

20   not be available in an appropriate strength and dosage form to

21   treat, for example, a canary, and the veterinarian might need

22   to take what is available, which might be approved for a dog or

23   a horse, and create a dosage form that would be appropriate for

24   the canary.  And having that flexibility built into the law

25   allows veterinarians to treat everything that they see, from

M1QTFIS2                    Bowman - Cross

1    hamsters to horses, and in between.

2    Q.  It is not an uncommon event, therefore, for a veterinarian

3    to compound drugs during the course of his or her veterinarian

4    practice in treating an animal, am I correct?

5    A.  I think it's not unusual to have a veterinarian have a

6    compounding pharmacy compound a drug specifically for a patient

7    because the dosage form or strength doesn't exist in an

8    approved form.  I don't think that many veterinarians do the

9    compounding in-house except for very simple solutions.  That's

10   my personal opinion.  I have not seen that, in practice, it's

11   that common.  And in fact, veterinarians take a great risk when

12   they do compounding in-house.  It's much safer for the

13   veterinarian and his practice to have a professional

14   compounding pharmacy make that product and take that risk.

15   Q.  And it is appropriate for a veterinarian to seek

16   compounding from a professional pharmacy in order to alleviate

17   suffering in animals, isn't that correct?

18   A.  On a patient-by-patient basis.

19   Q.  Incidentally, in defining the term "patient," one need also

20   look to local and state regulations, isn't that correct?

21   A.  I only know one definition for the term "patient."

22            MR. SERCARZ:  Thank you very much.

23            THE COURT:  Are you concluded, Mr. Sercarz?

24            MR. SERCARZ:  I'm sorry, your Honor?

25            THE COURT:  Are you concluded?

1          MR. SERCARZ:  May I have one moment, your Honor?

2          THE COURT:  Yes.

3          (Pause)

4          MR. SERCARZ:  Forgive me, just to go over two things.

5    I apologize, your Honor.  Thank you, your Honor, for the

6    opportunity.

7    BY MR. SERCARZ:

8    Q.   Am I correct that the FDA regulatory regime contains an

9    exemption from the registration requirement under certain

10   circumstances?

11   A.   No, not that I'm aware of, none.

12   Q.   Doesn't 21, United States Code, Section 360(g)(2) contain

13   an exemption from the registration requirement for

14   practitioners licensed by law to prescribe drugs manufactured,

15   prepared, or processed solely for use in the course of their

16   professional practice?

17   A.   That is in the human drug section.  I would need to look at

18   that more carefully to see if it even applies.  Veterinarians

19   don't have to register or list products that they compound in

20   the course of their practice for individual patients.  That's

21   not the same thing as manufacturing.  And the animal side of

22   FDA has not -- on the human side they have started like

23   separate category of compounding pharmacies.  That has not been

24   something that the animal side has gone with.

25   Q.   Am I correct that there is an exception to the misbranding

1  or labeling requirements for animal drugs dispensed by or upon

2  a veterinarian's lawful written or oral order in the course of

3  their professional practice?

4  A.  That's true.

5         There are still requirements --

6  Q.  You have answered my question.

7         THE COURT:  You have answered the question, Doctor.

8  A.  There are still requirements --

9         THE COURT:  You have answered the question.

10        THE WITNESS:  Okay.

11 Q.  Am I correct -- I believe we have been over this, but am I

12 correct that Section 21, United States Code, Section 360(b),

13 (a), 4 and 5 provide an exemption from adulteration for extra

14 label usage of FDA approved drugs by or on the lawful written

15 or oral order of a licensed veterinarian within the context of

16 a veterinarian-client-patient relationship?

17        MS. MORTAZAVI:  Objection, asked and answered.

18        THE COURT:  I'll allow it.

19 A.  You quoted which section, 300 something?

20 Q.  I'm sorry, but I'm not allowed to respond to your

21 questions.  If necessary I will have it reread, and if you

22 can't answer it I will try to refine my question.

23 A.  Section 300 is all about human drugs, not veterinary drugs.

24 Q.  Are you saying then that 21, United States Code, Section

25 360(b), (a) within (4) does not contain within it reference to

1   veterinarians in the course of their relationship with the

2   animal?

3   A.   I don't have all of Section 300 memorized.  Could you read

4   it?

5   Q.   Well, let me do it this way, are you saying there is no

6   exemption in the regulatory regime from the adulteration

7   requirements when it comes to extra label usage of FDA approved

8   drugs by or on the lawful written or oral order of a licensed

9   veterinarian within the context of a VCPR?

10  A.   I'm unfamiliar with that part of the statute.  I don't know

11  why that would fall under adulteration.

12             MR. SERCARZ:  Thank you very much.

13             Thank you, your Honor.

14             MR. FERNICH:  Before he rests, may I have one word?

15             MR. SERCARZ:  Let it go.

16             THE COURT:  He rested twice now.

17             MR. SERCARZ:  Let it go.

18  BY MR. SERCARZ:

19  Q.   In connection --

20             MR. SERCARZ:  One more question?

21             Thank you, your Honor.

22  BY MR. SERCARZ:

23  Q.   In connection with your testimony today, did you consult

24  the FDA website?

25  A.   Today?

1   Q.  In connection with your testimony in this courtroom

2   yesterday and today, in preparation for your testimony, did you

3   consult the FDA website?

4   A.  Yes.

5   Q.  And did you find no information regarding the exemption

6   from the adulteration requirements that applies to

7   veterinarians?

8   A.  I haven't had any mention, in my review or in any of the

9   reviews about whether these drugs are adulterated, I did not

10  review the adulteration sections in the human side of the drug

11  regulations in 21 CFR 300.

12          MR. SERCARZ:  Thank you.

13          THE COURT:  Ms. Mortazavi, do you have redirect?

14          MS. MORTAZAVI:  I do, your Honor.

15  REDIRECT EXAMINATION

16  BY MS. MORTAZAVI:

17  Q.  Dr. Bowman, good morning.

18  A.  Good morning.

19  Q.  I want to ask you just a few questions regarding what you

20  just testified about while you were being questioned by

21  Mr. Sercarz.

22          In particular, you were asked a few questions about

23  compounding drugs.  Do you recall that?

24  A.  Yes.

25  Q.  Can you just explain what compounding a drug is?

1    A.  When someone compounds a drug they're creating a dosage

2    form usually that is different in some way from the approved

3    and available dosage forms.  It could be different in that it

4    has different active ingredients than any that are available in

5    an approved dosage form, or it could be a different

6    concentration or a different strength.  It could be that the

7    approved dosage form is it only available in an injection and

8    you need an oral liquid, or perhaps it's only available in a

9    tablet and you have an animal that you can't get tablets into

10   or it would take too many tablets, therefore, you need it made

11   in a different dosage form that would be more useful in the

12   patient that you're talking about.

13   Q.  Dr. Bowman, you mentioned the compounding would be

14   something that occurs on a patient-by-patient basis.  Do you

15   recall that?

16   A.  Yes.

17   Q.  What did you mean by that?

18   A.  I mean that in the course of examining and diagnosing an

19   animal, if you determine that it needs a particular drug and

20   that drug is not readily available in an approved dosage form

21   and strength that would be appropriate for that patient because

22   of its size or because of the client's inability to administer

23   certain dosage forms to certain animals, then you might request

24   that a special drug be compounded for that animal.

25   Q.  Would that mean that a veterinarian would first have to

1    make a diagnosis then issue a prescription or compound the drug

2    himself?

3    A.  Yes.

4    Q.  And you were also asked about off-label usage for drugs.

5    Do you recall that?

6    A.  Yes.

7    Q.  And can you just remind the jury your testimony regarding

8    off-label usage and under what circumstances that is permitted?

9    A.  So off-label use is the use of approved animal drugs in a

10   manner different than their labeling.  So if an approved animal

11   drug, maybe an antibiotic, is approved for use to treat urinary

12   infections in dogs, however, there's a lot of data out there

13   that shows that same antibiotic may be useful for other

14   infections so you will give it to a dog for a different type of

15   infection, that's an off-label use, and that's permitted under

16   21 CFR 530 as long as certain conditions are met:  You're

17   within that veterinarian-client-patient relationship, you have

18   made a determination that other drugs that are available that

19   might be approved for use to treat the specific infection this

20   animal has, that you believe that because of that patient that

21   drug is unlikely to be successful, maybe that patient has

22   kidney failure and it can't tolerate the drug that is approved

23   because that drug is metabolized by the kidneys, whatever those

24   reasons are, you made a determination and you document that

25   determination in the animal's medical record so that it's

1    documented why you chose to use the drug off label rather than

2    use the approved products.

3    Q.   So in other words, Dr. Bowman, is off-label usage of an

4    approved drug also a determination that occurs on a

5    patient-by-patient basis?

6    A.   Yes.

7               MR. SERCARZ:  Objection, leading.  It's redirect.

8               THE COURT:  Yes, that's fair.  Sustained.

9    Q.   Dr. Bowman, if a drug is compounded for one patient, can it

10   then be given to a second, third or fourth patient?

11   A.   Not properly, no.

12   Q.   Now you were also asked, Dr. Bowman, whether a veterinarian

13   can dispense a drug off label if it's done in the course of

14   their professional practice.  Do you recall being asked that

15   question?

16   A.   Yes.

17   Q.   And I believe you wanted to expand upon your answer.  Do

18   you recall testifying that there are still limits to that

19   principle?

20   A.   Exactly.

21   Q.   Can you explain?

22   A.   So under 21 CFR 530, there are limits, practical limits to

23   the ability of veterinarians to use drugs off label.  There's

24   actually a prohibited list.  Certain drugs are prohibited from

25   off label use, generally in food animals, although that may be

1  expanded to other species of animals if necessary.  There's a

2  place in the regulations for that.  And it's limited to use to

3  treat a serious disease, to limit animal suffering or prevent

4  death.  It's not intended to be used for -- to change the color

5  of Fluffy's coat or some use that might be technically a drug

6  use but would not benefit the patient.

7  Q.  Dr. Bowman, you were also asked about searches that you had

8  done of FDA databases regarding any contact between the FDA and

9  Seth Fishman, the defendant.  Do you recall those questions?

10 A.  Yes.

11 Q.  And do you recall your testimony that there was no record

12 that Seth Fishman had ever tried to get his drugs approved by

13 the FDA?

14 A.  Yes.  There's no record that there was any official contact

15 even a general correspondence.

16 Q.  All right.  And by official contact, you mean in the

17 context of submitting an application for approved -- or pardon

18 me, for a new animal drug?

19 A.  Well, even before you get to the stage where you're

20 submitting an application, there's generally a general

21 correspondence where people will write in and ask for

22 information or send an email.  There's even -- we have I guess

23 a web address where it calls to ask CVM.  So if someone were to

24 ask a question that says I'm interested in learning about the

25 drug approval process, how do I get started, then even that

1   would get transferred to the appropriate division within the

2   Office of New Animal Drug Evaluation and they would set up a

3   general correspondence with that person.

4   Q.  Now Dr. Bowman, are you familiar with the enforcement

5   division side of FDA CVM?

6           MR. SERCARZ:  Objection.  I would like to be heard.

7           THE COURT:  I will see you and Ms. Mortazavi at the

8   sidebar.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. SERCARZ:  I object on the grounds that this line

3     of questioning is beyond the scope of the cross.

4          THE COURT:  No, it isn't.  You asked --

5          MR. SERCARZ:  May I be heard?

6          THE COURT:  Let me finish.  You asked:  Did you search

7     the FDA websites in connection with your testimony?  Didn't

8     you?

9          MR. SERCARZ:  It was narrower than that.

10          THE COURT:  No, that's the exact question, I believe.

11          MR. SERCARZ:  Your Honor --

12          THE COURT:  First you said in connection with your

13     testimony today, and then you broadened it and said yesterday

14     or today.  You opened the door.

15          MR. SERCARZ:  My recollection is -- and if the Court

16     is correct -- the import of my questions was, and it is clear

17     that this line of questioning is with regard to the absence of

18     any representations my client made regarding labeling, safety

19     efficacy or anything of that nature.

20          THE COURT:  Your question was not so limited.

21          Ms. Mortazavi, let me let you make your record.

22          MR. SERCARZ:  I don't it have in front of me and I

23     don't have a photographic memory, but that was the import of my

24     questioning.

25          THE COURT:  It may have been what you intended,

1    Mr. Sercarz, but it's not the words that you used.

2              MR. SERCARZ:  I have my objection.  It's beyond the

3    scope of cross-examination.

4              MS. MORTAZAVI:  Your Honor, for the record, I recall

5    that the question posed by Mr. Sercarz were general questions,

6    not limited to any database, simply contact with the FDA.  I

7    think it's fair to explore which division of the FDA Dr. Bowman

8    referenced when answering those questions.

9              MR. SERCARZ:  Your Honor, the introduction -- my

10   recollection, the introduction to those questions is:  You did

11   not have the sit down that you described --

12             THE COURT:  Right.

13             MR. SERCARZ:  -- and he did not go through the

14   approval process with you.

15             And then my next line of questioning was:  Therefore,

16   he made no representations regarding -- and I gave her the

17   litany.  The scope of the questions was clear.

18             THE COURT:  And then Mr. Fernich came up and you said

19   one more, and you asked as I believe your final -- you said

20   one, but it was two questions --

21             MR. SERCARZ:  It was.

22             THE COURT:  -- did you search any database?

23             Mr. McDaniel, are you able to go back and find that

24   final question or two.

25             COURT REPORTER:  Yes, your Honor.

1          THE COURT:  Do you have realtime?

2          MR. SERCARZ:  No.

3          (Record read)

4          MR. SERCARZ:  Those were the questions.

5          THE COURT:  Yes, those were the questions.  You said:

6     Did you consult the website?  She's entitled to follow up on

7     that.  You put no limitation.

8          MR. SERCARZ:  With all due respect, I didn't put a

9     limitation on the first question because I needed to get a yes

10    or no answer in order to determine whether or not she consulted

11    the one site on the issue of 530 CFR.  There's no other way to

12    ask it.  Had I asked it all in one, there would have been an

13    objection that it's a compound question and I would have had to

14    break it down.

15         THE COURT:  Wrong.  You could have asked:  Did you

16    consult the website to see whether he applied in connection

17    with whatever CFR provision you wanted to ask about.  That's

18    not what you asked.

19         The objection is overruled.

20         Before we go back, I want to break with the jury at

21    11, so you should plan accordingly.

22         MS. MORTAZAVI:  It's 10:45, your Honor?

23         THE COURT:  Roughly.  I have a hard time seeing the

24    clock.

25         MS. MORTAZAVI:  Very good.

1              (In open court)

2              MS. MORTAZAVI:  If we could have the court reporter

3     read back the question.

4              (Record read)

5     A.  Yes.

6     BY MS. MORTAZAVI:

7     Q.  What is the enforcement side of the FDA CVM tasked with?

8              MR. SERCARZ:  Objection, beyond the scope, as to that

9     question.

10             THE COURT:  Sustained.

11             MS. MORTAZAVI:  Your Honor, I'm laying the foundation

12    for my next question.

13             THE COURT:  Ask your next question.

14    Q.  Dr. Bowman, did you consult the databases of the

15    enforcement division of FDA CVM in connection with your

16    testimony?

17    A.  I'm not sure what you mean.  We searched the export and

18    import -- the export certificate databases.

19    Q.  So why don't you tell us, Dr. Bowman, which databases you

20    consulted in preparation for your testimony today regarding

21    whether Dr. Seth Fishman had any contact with the FDA.

22    A.  I searched the STARS database, which is our internal

23    tracking system for all the preapproval contacts with firms and

24    companies.  And I do that as broadly as I can to make sure that

25    nothing gets missed, because typically drugs in the preapproval

1    section don't have trade names yet, and since I didn't have

2    ingredients for all the products, it made it a challenge.  So I

3    did search by trade name, I searched by company names, all the

4    company names that I was provided, and I searched by active

5    ingredients such as I had from the labels, and found nothing.

6    Q.  When you testified you stated, if you recall, that there

7    had been no record of any email communication with Dr. Fishman

8    separate and apart from any new animal drug application that

9    had been submitted, is that correct?

10   A.  Those records include all types of communication that are

11   considered kind of official communication.  It wouldn't include

12   an unofficial phone call, if there was a random phone call to a

13   reviewer, which could happen because all of our phone numbers

14   are publicly available, that wouldn't necessarily get archived.

15   However, it would include all general correspondence, which

16   could be as simple as an email requesting information, or

17   direct communication by email would often get our general

18   correspondence number, especially if there was any expectation

19   that there would be a next step taken or that company or that

20   individual would be interested in coming in and having a

21   meeting or a sit down to discuss how a drug gets approved and

22   what the next steps would be if they're interested in seeking

23   an approval.

24   Q.  That STARS database that you described, does that contain

25   all of the email records of every employee of the FDA CVM?

1    A.  No.

2    Q.  Does that contain all of the phone records of everybody at

3    the FDA CVM?

4    A.  No.

5    Q.  Does that contain all of the records of warning letters

6    that the FDA CVM has issued?

7    A.  No, because it's --

8               MR. SERCARZ:  Move to strike, leading.

9               THE COURT:  You don't strike because of leading.  You

10   can object, but --

11              MR. SERCARZ:  I object to the question.

12              THE COURT:  But no, that's not leading.  She can

13   answer yes or not.  It's not leading.

14   Q.  Dr. Bowman, to the extent it was unclear, I asked if that

15   database that you described contains FDA CVM warning letters

16   that have been issued.

17   A.  No, it doesn't, because it's all preapproval.

18              And for the record, I did not search --

19              THE COURT:  There's no question pending, Dr. Bowman.

20              THE WITNESS:  Okay.

21   Q.  Thank you, Dr. Bowman.

22              Now do you recall being asked about a veterinarian

23   issuing prescriptions in the course of his or her professional

24   practice?

25   A.  Yes.

1  Q.  Do you recall testifying yesterday about the steps that a

2  veterinarian would typically take before issuing a

3  prescription?

4  A.  Yes.

5  Q.  Does a veterinarian typically issue a prescription for

6  hundreds or thousands of drugs at a time?

7  A.  No.

8  Q.  Does a veterinarian typically issue a prescription without

9  knowing which animal is receiving the product?

10 A.  No.

11 Q.  And you also testified, Dr. Bowman, that if an ingredient

12 list is not present on the label of a drug it would be

13 considered unsafe, is that accurate?

14 A.  I don't recall using that exact term, but yes, that would

15 be unsafe and it would be misbranded, the product is

16 misbranded.

17 Q.  Why would it be considered unsafe?

18 A.  It's unsafe because --

19          MR. SERCARZ:  Objection.

20          THE COURT:  Grounds?

21          MR. SERCARZ:  Beyond the scope.

22          THE COURT:  Overruled.

23 A.  If you don't have the ingredient list, then you can't avoid

24 products with ingredients that may be allergens to a particular

25 patient.  For the same reasons that ingredients have to be

1    listed on human drug labels, they also have to be listed on

2    animal drug labels.

3    Q.  You were also asked about your review of the labels of

4    certain products in connection with your testimony today.  Do

5    you recall that?

6    A.  Yes.

7    Q.  I believe you were asked about whether you had actually

8    held those products in your hand.  Do you remember that?

9    A.  Yes.

10   Q.  And do you recall being asked whether you conducted any

11   tests of those products to see what the actual chemical

12   substance was?  Do you recall those questions?

13   A.  I do.

14   Q.  Is it necessary to test a drug in order for you to reach

15   your conclusions?

16   A.  No.  In fact, I can't recall a situation where I ever had

17   that information.

18   Q.  Why is that?

19   A.  First of all, we don't test drugs within CVM, that's not

20   part of what we do.  If the drug needs to be tested, if, for

21   example, there's adverse events associated with an unapproved

22   drug and we're concerned that it's contaminated, that has to be

23   sent to an official FDA lab for evaluation.  We don't do that

24   in-house in CVM.

25           And for the purposes of the GRASE analysis, we are

1    looking at the intended use as described in the product

2    labeling.  And searching the publish the literature, I

3    typically use PubMed, sometimes also use Embase, which are huge

4    databases that encompass journals and literature from thousands

5    of sources.  And we're searching for information on that

6    specific drug product, not just the active ingredient, although

7    if I know the active ingredients I can search for broadly in

8    case the trade name is mentioned in passing, but wasn't a key

9    word.

10   Q.  Dr. Bowman, just to remind the jurors, your GRASE analysis

11   is an analysis whether something is generally recognized as

12   safe and effective, correct?

13   A.  Correct.

14   Q.  So even if a drug was effective, it may not be safe, is

15   that fair to say?

16   A.  Yes.

17   Q.  Even if the ingredients on a drug were accurate, it may

18   still not be generally recognized as safe and effective, is

19   that right?

20   A.  Absolutely.

21   Q.  Can testing tell whether a drug actually does what it says

22   it will if the ingredients are not listed?

23   A.  No.

24        MS. MORTAZAVI:  Ms. Jung, please pull up Government

25   Exhibits 1018, 1028 and 1025, which are all in evidence.  And

1  for the record, these are electronic extractions from an

2  electronic device seized from Seth Fishman's residence.

3          THE COURT:  A few of the screens are not working, so

4  why don't we pause for a moment.

5          (Pause)

6          THE COURT:  Is everyone okay?

7          All right.  Thank you.

8          MS. MORTAZAVI:  Ms. Jung, if we could focus on the

9  labels on each of those exhibits so it's more legible.

10 BY MS. MORTAZAVI:

11 Q.  Dr. Bowman, could you read the ingredients on this label?

12 A.  Ingredients:  Proprietary blend of complex amino acid

13 structures.

14 Q.  Dr. Bowman, can you tell from that description what's in

15 this drug?

16 A.  No.

17         MS. MORTAZAVI:  Ms. Jung, if you could take that down

18 and please focus on Government Exhibit 1028.

19 Q.  Dr. Bowman, can you read the ingredients on this label?

20 A.  Ingredients:  Proprietary blend of amino acids.

21 Q.  Can you tell what is contained in this drug from that list?

22 A.  No.

23         MS. MORTAZAVI:  Ms. Jung, please take that down and

24 turn to Government Exhibit 1025.

25 Q.  If you could read the ingredients there.

1  A.   Ingredients:  MSM 2 grams, DMG 1 gram, 1.25 grams

2  proprietary amino acids and sugars.

3  Q.   Dr. Bowman, you read out amino acids, could you read

4  precisely what is on this exhibit?

5  A.   If actually says proprietary AAs and sugars.

6  Q.   Assuming it does reference amino acids as you originally

7  read, does this tell you the chemical components of this

8  particular drug?

9  A.   It tells us some of the chemical components but not all.

10 Q.   You were also asked, Dr. Bowman, about whether a GRASE

11 analysis is focused on the individual ingredients or on the

12 drug as a whole.  Do you recall those questions?

13 A.   Yes.

14 Q.   Is it sufficient if one ingredient is generally recognized

15 as safe and effective in a drug that has many ingredients?

16 A.   No.

17 Q.   Why is that?

18 A.   Partly because you don't know which -- for example, there's

19 an intended use for this product and you don't know how much of

20 that intended use is fulfilled by each ingredient.  These are

21 presumably only the active ingredients that are listed here, so

22 they're all considered active.  So it's a proprietary blend,

23 the entire product, and so it's a product evaluation, not

24 ingredient by ingredient.

25           MS. MORTAZAVI:  Thank you.  And Ms. Jung, you can take

1   down these exhibits.

2   Q.  Dr. Bowman, do you recall being asked questions about

3   Glucosamine and Chondroitin?

4   A.  Yes.

5   Q.  Do you recall being told by Mr. Sercarz and I believe you

6   testified that it treats arthritis in horses, is that right?

7   A.  That's one of its uses, yes.

8   Q.  Do you recall being informed that it can be ground up into

9   a powder and mixed in with feed?

10  A.  Yes.

11  Q.  Can a drug be both oral and injectable?

12  A.  Yes.

13  Q.  So in other words, even if something is a paste that a

14  horse would eat, that could still be considered a drug,

15  correct?

16  A.  Oh, yes.  Even a powder within feed can be a drug.

17  Q.  What determines whether or not it's a drug?

18  A.  Whether or not it's a drug is determined by whether it

19  meets the definition of a drug found in the act.

20  Q.  And if a veterinarian wanted to take one form of drug, say

21  something in a powder form, and turn it into a paste, would

22  that count as compounding?

23  A.  Yes.

24  Q.  And would that also require a veterinarian prescription?

25  A.  Yes, unless the veterinarian was doing it to dispense

directly to the client.  Typically, in practice, you don't

write a prescription for a drug that you are providing directly

to the client for the patient that you treat.

Q.  So let me ask the question a different way.  Would there

have to be a diagnosis made before a product is compounded and

either given by a veterinarian or a prescription delivered by a

veterinarian?

A.  Yes.

THE COURT:  Ms. Mortazavi, could you find a convenient

breaking point?

MS. MORTAZAVI:  Your Honor, if I could display one

more exhibit I think I'll be able to conclude.

THE COURT:  Sure.

MS. MORTAZAVI:  Ms. Jung, could we please pull up

Government Exhibit 106ET, and I will direct the jurors to their

transcript binders to the tab 106ET.  I will have Ms. Jung

prepare Government Exhibit 106E.

THE COURT:  Anybody need more time?

MS. MORTAZAVI:  Ms. Jung, please play Government

Exhibit 106E.

(Audio recording played)

MS. MORTAZAVI:  Thank you, your Honor, no further

questions.

THE COURT:  All right.  We'll take our morning break

now.  If you could try to be ready to be back down here in 15

M1QTFIS2

1   minutes, I would really appreciate it.  You can leave your

2   binders and notebooks there.  And I just remind you that when

3   we do take breaks, please don't discuss the case.  You

4   shouldn't form any judgments about the case until the

5   conclusion of all of the evidence and your deliberations begin.

6   Thank you.

7           Dr. Bowman, you remain under oath.

8           (Jury not present)

9           THE COURT:  I'll see everyone slightly before 11:15.

10          (Recess taken)

11          MR. ADAMS:  Your Honor, I'm passing up a binder for

12  the next witness for ease of reference.  This is everything but

13  transcripts in the transcript binder.

14          THE COURT:  Okay, thank you.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1    (Jury present)

2        THE COURT:  Okay, Mr. Sercarz, recross?

3        MR. SERCARZ:  Yes, your Honor, very briefly.

4    RECROSS EXAMINATION

5    BY MR. SERCARZ:

6    Q.  Dr. Bowman, does the CVM website contain a disclaimer

7    saying that the CVM does not regulate the practice of

8    veterinarian medicine?

9    A.  We do not regulate the practice of veterinarian medicine.

10   I can't say whether that's on the website.

11   Q.  Does the website also say if you have a complaint about

12   your veterinarian or questions about veterinarian standard of

13   care, contact the veterinary medical board in your state?

14   A.  Most likely it does.

15   Q.  On my cross-examination I had asked you questions about CFR

16   Section 530.30.  It provides guidance to animal and human

17   drugs, isn't that correct?

18   A.  No.

19   Q.  With regard to extra label usage, doesn't it say that --

20   withdrawn?

21       MR. SERCARZ:  Your Honor, may I approach the witness

22   with something to see if it refreshes her recollection?

23       THE COURT:  I would like to see what the something is.

24       THE WITNESS:  I may have misunderstood your question.

25       THE COURT:  There's no question pending.

M1QTFIS2

1      MS. MORTAZAVI:  Your Honor, to the extent Mr. Sercarz

2  is looking to to refresh her recollection, I object.

3      THE COURT:  She hasn't had a failure of recollection,

4  in the first instance, and second, I don't know what it is you

5  want to give to her.  So the objection is sustained.

6  BY MR. SERCARZ:

7  Q.  Isn't it a fact that Section 530.30 speaks to both animal

8  and human drugs and says that extra label usage is permitted

9  unless it poses a threat to the public health?

10     MS. MORTAZAVI:  Objection.  Asked and answered.

11     THE COURT:  Overruled.

12 A.  So I misunderstood your question the first time.  I'm

13 sorry.  Section 530 does talk about the extra label use of

14 human drugs in animals, not extra label use of animal drugs in

15 people.  So I misunderstood your question as far as it does say

16 that you can use human drugs extra labelly under the conditions

17 that are stated there in the regulation.

18     Did I answer your question?

19     MR. SERCARZ:  Thank you, no further questions.

20     THE COURT:  Thank you.

21     MS. MORTAZAVI:  Nothing further, your Honor.

22     THE COURT:  All right.  Dr. Bowman, you're excused

23 with the thanks of the Court.

24     THE WITNESS:  Thank you.

25     THE COURT:  Have a good rest of the day.  Thank you.

M1QTFIS2

1          The government's next witness?

2          MS. MORTAZAVI:  Your Honor, prior to calling our next

3   witness, we would like to enter some exhibits or publish some

4   exhibits for the jury.

5          THE COURT:  That's fine.

6          MS. MORTAZAVI:  While our witness is leaving the

7   courtroom, I will just ask the jurors to retrieve their

8   transcription binders.  And I will ask them to turn to

9   Government Exhibit 140D, as in dog, T, and I will have Ms. Jung

10  pull up the same exhibits on the screen, as well as

11  Exhibit 140D.

12         And for the record, this is a portion of an

13  intercepted call taking place on June 5, 2019 between Seth

14  Fishman and an unidentified female.

15         And the number again is 140DT in the jurors'

16  transcription binders.

17         THE COURT:  Okay.

18         MS. MORTAZAVI:  Ms. Jung, please play Government

19  Exhibit 140D.

20         (Audio recording played)

21         MS. MORTAZAVI:  I would like to direct the jurors to

22  tab 140FT in their binders and I will have Ms. Jung pull up

23  140FT and 140F.

24         For the record, this is a portion of the same

25  intercepted call on June 5, 2019.

M1QTFIS2

1                Ms. Jung, please play Government Exhibit 140F.

2                (Audio recording played)

3                (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

596

M1QPFIS3

1      MS. MORTAZAVI:  And I'll direct the jurors to tab

2  910-T in their binders, and I'll have Ms. Jung pull up, please,

3  Government Exhibit 910-T and Government Exhibit 910.

4      All right.  It appears the jurors have all found their

5  place in the binders; so, Ms. Jung, if you could play

6  Government Exhibit 910.

7      (Audio recording played)

8      And for the record, that was a recording that was

9  retrieved from an iPad seized from Seth Fishman.

10      Ms. Jung, if you could please pull up Government

11  Exhibit 912-A.

12      And for the record, this is also a recording that was

13  retrieved from the iPad seized from Seth Fishman.

14      And, Ms. Jung, if you could please play this exhibit.

15      (Audio recording played)

16      Thank you, Ms. Jung.  You can take down the exhibits.

17      And the jurors can put away their transcription

18  binders.

19      And the government would like to call its next

20  witness, Dr. Cindy Cole.

21      THE COURT:  All right.  Is Dr. Cole outside?

22      MR. ADAMS:  Yes, your Honor.

23      THE COURT:  All right.

24  CYNTHIA COLE,

25      called as a witness by the Government,

1            having been duly sworn, testified as follows:

2                  THE DEPUTY CLERK:  Please say and spell your name for

3      the record.

4                  THE WITNESS:  Cynthia Cole, C-y-n-t-h-i-a, C-o-l-e.

5                  THE COURT:  You may be seated.  Thank you.

6                  MR. ADAMS:  May I proceed, your Honor?

7                  THE COURT:  Mr. Adams.

8      DIRECT EXAMINATION

9      BY MR. ADAMS:

10     Q.  Good morning, Dr. Cole.

11     A.  Good morning.

12     Q.  What is your profession?

13     A.  I'm a veterinary pharmacologist.

14     Q.  And where are you employed?

15     A.  In the University of Florida in the racing laboratory.

16     Q.  Can you tell us your title at the racing laboratory at the

17     University of Florida?

18     A.  I am director and associate clinical professor.

19                 THE COURT:  Dr. Cole, can you pull the microphone,

20     bend it so it's pointing right at your mouth.  Thank you very

21     much.

22                 THE WITNESS:  Is that better?

23                 THE COURT:  Yes.

24                 I'm sorry, go ahead.

25                 MR. ADAMS:  Thank you, your Honor.

1    BY MR. ADAMS:

2    Q.  Dr. Cole, how long have you held that position?

3    A.  In this current time period now, the last three years.

4    Q.  And was there a time period before the last three years

5    where you held a similar position?

6    A.  Yes.  From 2002 to 2006 I was also director of the

7    laboratory.

8    Q.  And can you describe your duties as director of that

9    laboratory?

10   A.  So we are a forensic or drug testing program.  Our largest

11   client is the Division of Pari-mutuel Wagering for the State of

12   Florida; so they oversee all of the drug testing that is done

13   on the racehorses in the state.  We receive blood and urine

14   samples from the horses.  We test those samples for

15   non-permitted medications and for the presence of overages of

16   permitted medications.

17         We also conduct research studies in collaboration with

18   the College of Veterinary Medicine in a herd of exercised

19   racehorses or ex-racehorses, reviewing and trying to determine

20   the effects of drugs and medications on horses, their health,

21   welfare and racing potential.

22   Q.  Can you describe your educational background, please?

23   A.  I have a Bachelor's degree in zoology, a Doctor of

24   Veterinary Medicine, and a Ph.D. in Cardiovascular

25   Pharmacology, all from the University of Florida.

1          I completed an internship in equine sports medicine

2    and surgery at Tufts, and I returned to Florida and completed a

3    post-doctoral fellowship in molecular pharmacology.

4    Q.  And do you today hold any licenses from any regulatory

5    bodies?

6    A.  I have a license to practice veterinary medicine in the

7    State of Florida.

8    Q.  Do you hold -- in addition to the degrees that you just

9    mentioned, do you hold any other sorts of professional

10   credentials?

11   A.  I am a member of the American College of Veterinary

12   Clinical Pharmacology, which is a specialty college

13   demonstrating an expertise in the area of clinical

14   pharmacology.

15   Q.  Have you, in the past, lectured in the field of clinical

16   pharmacology?

17   A.  Yes.  I lectured both to veterinary students in the past,

18   as well as providing CE, which is continuing education, courses

19   to veterinarians.

20   Q.  And you've mentioned some of these, I believe, but are you

21   currently a member in any professional organizations related to

22   your field?

23   A.  So I am just past president of my specialty board, American

24   Clinical Pharmacology, and I also am a member of the American

25   Association of Equine Practitioners and the American

1    Association of Veterinary Pharmacology and Therapeutics.

2    Q.  Okay.  Have you published any -- have you published

3    articles in your field?

4    A.  I've published currently 39 peer-reviewed publications,

5    either as author or co-author; and I've also authored, either

6    as primary author or co-author, approximately ten book

7    chapters; and I am the lead editor in a textbook entitled

8    Equine Clinical Pharmacology.

9    Q.  And you've mentioned clinical studies previously.  Have you

10   overseen clinical studies in the field of equine pharmacology?

11   A.  Yes, that's something that's been a primary responsibility

12   during my time as director and during previous employment at

13   the University of California Davis as a clinical

14   pharmacologist.

15   Q.  And can you describe, in general, the categories of

16   substances that have been the subject of your studies?

17   A.  So they're pretty diverse.  We're interested in

18   characterizing medications, how they can best be used in horses

19   for clinic treatment of clinical conditions, but we're also

20   interested in the potential of drugs that should not be

21   administered to horses that have no clinical usefulness, and so

22   being able to detect those drugs and understand how they might

23   alter a horse's performance.

24          These could include anything from painkillers, so

25   anti-inflammatory drugs, nonsteroidal, as well as steroidal

1   anti-inflammatory drugs, opiates, local anesthetics,

2   bronchodilators.  There's a broad swath of different types of

3   classes of drugs that we've studied in horses.

4   Q.  And have you previously studied the ability of laboratories

5   to detect certain classes of drugs in the body of a horse?

6   A.  Yes.  That's one of our areas of particular interest, is

7   developing new methods to detect drugs that previously were

8   undetectable by the laboratories.

9   Q.  Have you previously testified as an expert in the field of

10  veterinary medicine and pharmacology?

11  A.  Yes, I have.

12  Q.  In preparation for your testimony today, have you also

13  reviewed certain materials provided to you by my office?

14  A.  Yes, I did.

15          MR. ADAMS:  Ms. Jung, if we could please put up

16  Government Exhibit 300, which is in evidence through

17  stipulation 9006.

18          MR. SERCARZ:  Your Honor, I'm going to object.

19          THE COURT:  You can stay seated.

20          MR. SERCARZ:  No objection to the witness'

21  qualifications.  Object to the line of question.

22          THE COURT:  Are you stipulating to her testifying as

23  an expert?

24          MR. SERCARZ:  Her qualifications are exceptional.  I

25  object to the line of questions for the reasons discussed

1    yesterday and in the in limine motion.

2                THE COURT:  I don't know, are you talking about her

3    qualifications when you say "the line of questions"?

4                MR. SERCARZ:  No, not her --

5                THE COURT:  You're anticipating?

6                MR. SERCARZ:  Withdrawn.

7                THE COURT:  Okay.  Mr. Adams?

8                MR. ADAMS:  Your Honor, in light of -- your Honor, the

9    government tenders Dr. Cole as an expert in the fields of

10   equine veterinary medicine and pharmacology.

11               MR. SERCARZ:  No objection to her qualifications.

12               THE COURT:  She will be recognized as an expert in

13   those fields.

14               MR. ADAMS:  Thank you, your Honor.

15   BY MR. ADAMS:

16   Q.  With respect to Government Exhibit 300, Dr. Cole, have you

17   previously had a chance to review this document?

18   A.  Yes, I have.

19   Q.  Have you reviewed certain terms and phrases throughout this

20   document?

21   A.  Yes, I have.

22   Q.  And from your experience as an expert in the fields of

23   veterinary medicine and equine pharmacology, were you familiar

24   with terms relating to various kinds of drugs throughout this

25   document?

1    A.   Yes.  Most of them are fairly straightforward and fairly

2    commonly used in clinical pharmacology.

3    Q.   Okay.  Dr. Cole, I'd like to walk through certain portions

4    of this document, and I'll focus you, for your opinion, on the

5    meaning of certain phrases as we get to them.

6            To begin with, on page 1, Ms. Jung, if you don't mind

7    zeroing in on the top paragraph, please.

8            Dr. Cole, are you familiar with the term

9    exercise-induced pulmonary hemorrhage?

10   A.   Yes, I am.

11   Q.   Can you explain what exercise-induced pulmonary hemorrhage

12   is?

13   A.   So all horses, probably if they exercise to an extreme

14   level of intensity, will rupture small molecules -- small

15   vessels called capillaries in their lungs.  We don't entirely

16   understand the mechanism by which this occurs.  Our current

17   level of understanding is that the horse, likely because he's

18   been selected over the last several hundred years to be an

19   extreme athlete, has been selected to have a very high heart, a

20   very strong heart and this pump, if you will, produces very

21   high pulmonary pressures; so pressures in the circuit between

22   the heart through the lungs and those small capillaries can't

23   withstand that high pressure and they rupture.

24            MR. SERCARZ:  Move to strike this.

25            THE COURT:  You can stay seated and speak into the

1   microphone.

2           MR. SERCARZ:  Move to strike as not responsive to the

3   question.

4           THE COURT:  Overruled.

5   Q.  Dr. Cole --

6           THE COURT:  You may continue, Dr. Cole.

7   A.  So --

8           THE COURT:  Had you completed your answer?

9           THE WITNESS:  No, I had one more thing.

10          So some horses bleed a small amount in the lungs, and

11  other horses may have a significant amount of rupture and

12  produce a lot of blood in the lungs, and in that way, some

13  horses are mildly and other horses can be moderately affected

14  in their ability to race when they suffer from EIPH.

15          THE COURT:  All right.  The last part is stricken,

16  about their ability to race.

17  Q.  Dr. Cole --

18          THE COURT:  Stricken.

19          MR. ADAMS:  Thank you.

20  Q.  Dr. Cole, does EIPH have an effect on the performance of a

21  racing horse?

22  A.  It certainly can.

23          MR. SERCARZ:  Objection.

24          THE COURT:  Grounds?

25          MR. SERCARZ:  Grounds stated in the in limine,

M1QPFIS3                    Cole - Direct

1    prejudice, rule 403.

2            THE COURT:  I ruled on the in limine motion.  The

3    ruling stands.  The objection is overruled.

4    BY MR. ADAMS:

5    Q.  Dr. Cole, you may answer.

6            THE COURT:  You can answer it, Dr. Cole.  I'm sorry.

7    A.  Yes, it can.  In some horses, probably the effect is

8    minimal but in horses, particularly that bleed severely, to the

9    extent in some cases it can actually be present in their nose,

10   it can be severely effecting and limiting in their ability to

11   race.

12   Q.  Dr. Cole, if you would look on the second line of what's

13   been highlighted on the screen here, the word "analgesic."

14   What is an analgesic?

15   A.  The best common term would be a painkiller.

16   Q.  Does the administration of analgesic drugs have any effect

17   on EIPH?

18   A.  I'm unaware of any evidence that indicates that a drug that

19   relieved pain would decrease the severity or incidence of the

20   condition.

21   Q.  Thank you.

22           And, Ms. Jung, if we could go back to the third

23   paragraph here, beginning "HP Bleeder Plus contains the

24   strongest test-free vasodilators available on the market."

25           Dr. Cole, are you familiar with the concept of

M1QPFIS3                    Cole - Direct

1   vasodilation?

2   A.  I am.

3   Q.  And can you explain what that means?

4   A.  So our blood vessels and the horses' blood vessels

5   generally have a resting level of tone to them, and certain

6   drugs and medications and certain endogenous substances can

7   cause those vessels to dilate, which would lower the amount of

8   pressure that's going through those vessels.

9   Q.  How would drugs that increase vasodilation effect

10  performance in a racing horse?

11              MR. SERCARZ:  Objection.

12              THE COURT:  Overruled.

13  A.  If a drug could selectively dilate the pulmonary vessels,

14  it would be expected to lower the pressure that those small

15  capillaries would be under and might -- would be expected, if

16  our understanding of the pathogenesis of this condition, the

17  cause of this condition, it would be expected to decrease the

18  severity of this condition in the racehorse.  The difficulty is

19  finding a drug that only worked on the pulmonary --

20              THE COURT:  You've answered the question, Dr. Cole.

21  Q.  Dr. Cole --

22              THE COURT:  Excuse me.  The last part from "the

23  difficulty" on is stricken.  So the jury should disregard.

24  Q.  Dr. Cole, are there some drugs that act as a vasodilator

25  for the pulmonary system generally, as opposed to for a

1    pulmonary system for particular parts of the horse's body?

2    A.   There are no drugs that have been studied and found to be

3    selective pulmonary vasodilators in the horse.

4    Q.   And I'm sorry, can you explain what you mean by "selective

5    pulmonary"?

6    A.   As in there are no drugs that have been studied, that I'm

7    aware of, that would only cause vasodilation in the lungs.

8    Q.   From your studies, can you say whether there are potential

9    effects, potential negative effects on performance for the

10   over-administration of vasodilation drugs?

11              MR. SERCARZ:  Objection.

12              THE COURT:  Is your objection on the same ground?

13              MR. SERCARZ:  Yes, your Honor.

14              THE COURT:  You have a standing objection.

15              MR. SERCARZ:  Thank you.

16              THE COURT:  Overruled.  You can answer, Doctor.

17   A.   Thank you.

18              The concern would be that you could cause vasodilation

19   in the systemic circulation, which would cause -- might cause

20   hypotension and, thus, the horse could suffer episodes of

21   weakness or stumbling, what we would call syncope, where they

22   might intermittently lose consciousness.

23   Q.   Ms. Jung, if we could come out of this, please, and if we

24   could focus on the last paragraph on this page, just under --

25   I'm sorry, just under No. 2, Bleeding Pills, beginning with

1    "Bleeder pills increase vascular integrity."

2            Dr. Cole, are you familiar with a class of drugs known

3    as corticosteroids?

4    A.   Yes, I am.

5    Q.   What are corticosteroids?

6    A.   They're a class of molecules that -- there are a number of

7    synthetic compounds that are corticosteroids, and the body

8    produces several of its own corticosteroids class of compounds.

9    They have a wide-ranging effect on the body, on things like

10   glucose or sugar metabolism.  But for racings, the most

11   important concern would be that they are anti-inflammatory

12   drugs.  So in the setting of something of inflammation, an

13   injury that is inflamed, these drugs would decrease that

14   inflammation and, thus, would be painkillers.

15   Q.   And with respect to their potential as painkillers, what

16   performance-enhancing effect, if any, would the administration

17   of corticosteroids have in the body of a racing horse?

18   A.   Well, the concern that we have about the use of

19   corticosteroids in the racehorse and the reason that we

20   regulate them quite closely, in that we don't allow them to be

21   administered within 24, if not longer periods of time before a

22   race, is that they are painkillers.

23           And so if the horse has an injury and we take away

24   that pain, the horse may run to a level that causes additional

25   injury to that limb or to the horse, and he can suffer what's

1    known as, in a worst-case scenario, a catastrophic breakdown

2    injury, where he breaks a leg.

3         Because of the structure of the horse, these types of

4    injuries are often hard to repair; so it often causes the horse

5    to lose its life, and there is usually a jockey on the back of

6    that horse that can become injured or killed, and other horses

7    racing in that race can also become injured if they were to

8    fall.

9         MR. SERCARZ:  Move for a mistrial.

10         THE COURT:  Overruled.

11   Q.  Dr. Cole --

12         THE COURT:  Hold on, hold on.

13         (Pause)

14         All right.  Everything from the comment about "because

15   of the structure of the horse" and the catastrophic nature of

16   the injury and the potential for harm to other horses and

17   jockeys is stricken and should be disregarded by the jury.

18         Dr. Cole, I'm going to admonish you to please limit

19   your answers to just the question that was asked, please.

20         MR. ADAMS:  Ms. Jung, if we could please pull up

21   Government Exhibit 124-A.

22         And for the jurors, the transcript binder 124-AT.

23         THE COURT:  All right.  Before you go on, I just want

24   to pause and remind the jury that when I strike evidence, it is

25   not something you may properly consider in connection with your

1   deliberations.  It is not part of the evidence in this case,

2   and you need to disregard it.  All right?  Thank you.

3           Mr. Adams, whenever you're ready.

4           MR. ADAMS:  Thank you, your Honor.

5           And just to read for the record, this is a call on

6   April 3rd, 2019, between Seth Fishman and Lisa Giannelli.

7           And, Ms. Jung, you can go ahead and play it.  Thank

8   you.

9           (Audio recording played)

10          MR. ADAMS:  Thank you, Ms. Jung.

11  BY MR. ADAMS:

12  Q.  Dr. Cole, a moment ago you made a reference to, I believe

13  you used the word "we" and limitations on the timing of

14  administration of corticosteroids, who did you mean by "we"?

15  A.  In the State of Florida it is not permitted to administer

16  corticosteroids within 24 hours of a race.

17  Q.  And who governs the administration of drugs to racing

18  horses in the State of Florida?

19  A.  That would be the Division of Pari-mutuel Wagering.

20  Q.  Ms. Jung, if we could re-call Government Exhibit 300, and

21  go to the second page, under No. 3, VO2 Max.

22          Dr. Cole, are you familiar with the phrase VO2 Max?

23  A.  I am.

24  Q.  And what does VO2 Max mean in the context of your field?

25  A.  It is the maximum amount of oxygen that a horse will

1   consume when exercising at his 100 percent capacity.

2   Q.  Does an increase in oxygen consumption by an exercising

3   racehorse have any effect on the performance of the racing

4   horse?

5   A.  The ability to --

6           THE COURT:  That's a yes or no question, please.

7   A.  Yes.

8   Q.  What is that effect?

9   A.  It affects the duration and amount of -- duration of time

10  and the amount of energy that a horse can expend.

11  Q.  And if we can go now to line 4, reading "Homeogesic

12  (Natural analgesic - painkiller).

13          Dr. Cole, what performance-enhancing effect, if any,

14  can the administration of analgesic drugs have on the body of a

15  racing horse?

16  A.  If the horse is injured, the removal of that pain will

17  allow the horse to compete at a level above what he would

18  compete at with that injury untreated.

19  Q.  And pointing you to the second line in the first paragraph

20  here, the reference to MSM and DMG, are those acronyms familiar

21  to you from your field?

22  A.  Yes, they are.

23  Q.  Can you tell us what MSM means?

24  A.  It is methylsulfonylmethane.

25  Q.  And can you tell us what DMG means?

1   A.   Dimethyl-glycine.

2   Q.   And can you describe what performance-enhancing effect, if

3   any, the administration of MSM might have in the body of a

4   racing horse?

5   A.   In terms of exercise performance, MSM is a mild analgesic

6   or a mild anti-inflammatory agent; so it could remove pain.

7   Q.   And what performance-enhancing effect, if any, does DMG

8   have in the body of a racing horse?

9   A.   It is a anti-oxidant, which would be unlikely to have

10  effects, direct effects, on exercise performance acutely,

11  meaning immediately.  But it is also a buffering agent, and in

12  that regard, it could have a performance-enhancing effect.

13  Q.   Can you describe what you mean by a buffering agent?

14  A.   So when horses exercise intensely, when any human or

15  mammalian species exercises intensely, one of the by-products

16  of muscle metabolisms, is acids, particularly lactic acids.

17  When those acids build up into the muscles, it is generally

18  accepted that they can cause fatigue in that muscle; so agents

19  such as DMG that can buffer or absorb some of those acids can

20  prevent fatigue in the muscle.

21  Q.   Thank you.  If we could go to No. 5, PSDS, reading,

22  (Natural analgesic - Painkiller),  and in the bolded top line,

23  reading, "This product is based on the original Panacin

24  formulation, it has 2.5 times more D-Phenylalanine than all

25  other compounded and production versions."

1            Are you familiar with a drug referred to as Panacin?

2    A.   No.

3    Q.   Are you familiar with a substance known as D-Phenylalanine?

4    A.   Yes.

5    Q.   What is D-Phenylalanine?

6    A.   Phenylalanine itself is an amino acid, one of the essential

7    amino acids that must be obtained in the diet.  The most common

8    form in nature is the L-phenylalanine form.  The D form is an

9    isomer or a mirror image of the L form, and is not well

10   described in terms of its effects in the scientific literature.

11   Q.   If we could go to No. 6, please.  And as I preview, I'm

12   going to call out some more transcripts in just a moment.  But

13   before I do that, let me focus first on No. 6, Equi-Mass PG-2,

14   (Muscle Growth Factor).  Are you familiar with the phrase

15   "muscle growth factor"?

16   A.   I'm familiar with the phrase.

17   Q.   What is a growth factor?

18   A.   A growth factor is a substance produced by the body that

19   stimulates growth, development, cell division or maturation of

20   a tissue.

21   Q.   And on the first line, where it reads "human growth

22   hormone," are you familiar with human growth hormone from your

23   studies?

24   A.   Yes.

25   Q.   What performance-enhancing effect, if any, would the

1    administration of human growth hormone have in the body of a

2    racing horse?

3    A.   Human growth hormone likely also reacts with the receptors

4    in the horse, and so it would likely produce growth and

5    development of a lot of different tissues, including muscle,

6    skeletal, and other areas that might make the horse grow larger

7    than would -- or she would at that particular age.  They would

8    be more mature than they typically would if only under the

9    influence of their own growth hormone.

10   Q.   And with respect to growth factors, what

11   performance-enhancing effect, if any, would the administration

12   of growth factors have in the body of a racing horse?

13   A.   It's really difficult to tell because the phrase is so

14   nebulous of what exactly a growth factor is.  They just

15   generally would be a factor that stimulates cells to divide or

16   to differentiate, and it's really hard to know because one

17   doesn't really know what that growth factor is.

18   Q.   If a drug was labeled simply as growth factor, would you be

19   able to tell what that drug was?

20   A.   No, I would not.

21   Q.   Would you be able to tell how that drug ought to be safely

22   administered?

23   A.   I could not.

24        MR. ADAMS:  If we could please call up Government

25   Exhibit 127-A and T in the binders.  We'll put it on the screen

1    as well.

2              And, your Honor, this is a call on April 4th, 2019,

3    between Seth Fishman and an individual identified as Nick

4    DeVita.

5              THE COURT:  All right.  Give everyone a minute to find

6    it.

7              MR. ADAMS:  Certainly.

8              (Pause)

9              THE COURT:  All right, Mr. Adams.

10             MR. ADAMS:  All right.  Ms. Jung, if you could please

11   play 127-A.

12             (Audio recording played)

13             Thank you, Ms. Jung.

14             If we could turn to Government Exhibit 111-AT and the

15   audio, 111-A.  And this is a call on February 20th, 2019,

16   between Seth Fishman and John Pundyk.

17             THE COURT:  All right.

18             MR. ADAMS:  And, Ms. Jung, you can play.

19             (Audio recording played)

20             Thank you, Ms. Jung.  You can take that down, and

21   we'll go back to Government Exhibit 300, please.

22   BY MR. ADAMS:

23   Q.  Dr. Cole, in that call we heard a reference to the term

24   "androgenic."  If we could look at No. 7 here reading "GNRH

25   (Factrel Androgenic Hormone), what is an androgenic hormone?

1    A.  It is considered a hormone that has muscle-building

2    capability, often associated with the male androgens that are

3    produced; so testosterone and related compounds.

4    Q.  Thank you.  And are you familiar with a drug known as GNRH?

5    A.  I am.

6    Q.  What is GNRH?

7    A.  It is a gonadotropin-releasing hormone.

8    Q.  And what effect, if any, does the administration of GNRH

9    have with respect to performance of a racing horse?

10   A.  GNRH triggers the pituitary gland, which is a small gland

11   in the center of the brain, to release two different hormones,

12   LH and FSH.  In male horses, these hormones stimulate the

13   release of testosterone from the testes.

14         In females horses, they stimulate the development and

15   maturation of ovarian follicles, otherwise called eggs, and the

16   associated hormones that would be produced by those developing

17   follicles.

18   Q.  With respect to horses that will be racing, is there a

19   performance-enhancing effect associated with GNRH?

20   A.  So certainly in intact male horses, you would have an

21   increased production of testosterone and in fillies and mares,

22   you would have an alteration in their estrus cycle, which could

23   have effects on their behavior and their attitude in racing.

24   Q.  What is a filly?

25   A.  Filly is an intact female horse less than four years of

1    age.

2    Q.  And just to complete, for completeness' sake, what is a

3    mare?

4    A.  Mare is an intact, any female horse greater than four years

5    of age.

6         MR. ADAMS:  Ms. Jung, can we please put up

7    simultaneous, please, Government Exhibits 4028, 4029 and 1023,

8    all in evidence.

9         Your Honor, 4028 and 4029 are in evidence through

10   Mr. Folensbee, and 1023 through from stipulation and derived

11   from an electronic device seized from Seth Fishman.

12   BY MR. ADAMS:

13   Q.  And, Dr. Cole, are you able to read what's on the right

14   side of your screen?

15   A.  The large type.

16   Q.  Can you read the large type, please?

17   A.  It's GNRH.

18   Q.  Thank you, Ms. Jung.  We can go back to Government

19   Exhibit 300.  If we could go to No. 8, reading "ITTP Plus."

20        Dr. Cole, are you familiar with a substance known as

21   ITTP Plus?

22   A.  I am.

23   Q.  What is that?

24   A.  It is an inositol tripyrophosphate.

25   Q.  And can you describe its effect in the body of a racing

1   horse?

2   A.   It has not been studied in the horse.

3   Q.   Has it been studied in any animal?

4   A.   It has been studied in mice and in humans.

5   Q.   And do the studies that you consulted reflect any effect on

6   the body of the mice or humans into which it's been

7   administered?

8   A.   Yes.  What this compound does is it binds to hemoglobin,

9   and hemoglobin is the protein that is present in red blood

10  cells that carries oxygen.  And what this compound does is it

11  alters the structure of the hemoglobin to favor release of

12  oxygen at the tissues.

13  Q.   And, Dr. Cole, in your professional experience, is it

14  possible to safely assume what the effects in the body of one

15  species will be on the basis of studies done on the bodies of a

16  different species?

17              MR. SERCARZ:  Objection.

18              THE COURT:  Grounds?  You need to speak -- I'm sorry

19  to keep reminding you.

20              MR. SERCARZ:  Beyond the scope.

21              THE COURT:  Beyond the scope of what?

22              MR. SERCARZ:  Her expertise.

23              THE COURT:  Oh, if that's so, she will say she doesn't

24  know.

25              The question was, in your professional experience; so

M1QPFIS3                    Cole - Direct

1    if this is outside of your expertise, you need to tell us that,

2    please.

3    A.  It is not.  It is very basic pharmacology that you cannot

4    extrapolate the safety and efficacy of a drug from one species

5    to another.

6    Q.  Ms. Jung, if we could please call up two calls, first,

7    Government Exhibit 143-C and 143-CT, which is a call on

8    June 12th, 2019.  The participants are Seth Fishman, John

9    Pundyk and Geoff Vernon.  And I think we're ready to play.

10            (Audio recording played)

11            Thank you, Ms. Jung.  And can we please call up

12   Government Exhibit 126-A and 126-AT.

13            This is a call dated April 4th, 2019, between Seth

14   Fishman and Jordan Fishman.  Just one moment, Ms. Jung.

15            (Pause)

16            All right.  Thank you.

17            (Audio recording played)

18   BY MR. ADAMS:

19   Q.  Dr. Cole, are you familiar with a drug known as EPO?

20   A.  I am.

21   Q.  What is EPO?

22   A.  It's erythropoietin.

23   Q.  And what effect, if any, does erythropoietin, or EPO, have

24   on the body of a racing horse?

25   A.  It would stimulate the production of red blood cells, and

M1QPFIS3                    Cole - Direct

1    red blood cells, as I indicated, carry oxygen through the body.

2    Q.  Does the stimulation of the creation of red blood cells

3    have any performance-enhancing effect on a racehorse?

4    A.  It is possible, yes, because it's -- yes.

5    Q.  And can you describe what that possible

6    performance-enhancing effect would be?

7    A.  As we indicated, the maximum amount of oxygen that a horse

8    can utilize during intense exercise, VO2 max, could be

9    increased if you increase the ability of his blood to carry

10   more oxygen at any given time.

11   Q.  Are you familiar with the term EPO mimetic?

12   A.  I am familiar with the term.

13   Q.  What is a mimetic?

14   A.  It is something that is similar to or a copy of.

15   Q.  Thank you.  If we could turn back to Government

16   Exhibit 300, please, and we'll go to the line -- it's line 13

17   on page 4, I believe.  Here we go.  Reading, "ACTH."

18           Dr. Cole, are you familiar with the substance known as

19   ACTH?

20   A.  Yes, I am.

21   Q.  What is ACTH?

22   A.  Adrenocorticotropic hormone.

23   Q.  Can you say that one more time slowly?

24   A.  Adrenocorticotropic hormone.

25   Q.  Thank you.  I will say ACTH.  What is ACTH?

1   A.   It is a hormone that is produced by the pituitary gland

2   that stimulates release of a number of different groups of

3   compounds from the adrenal glands.  One group is responsible

4   for water and electrolyte balance in the body.  Electrolytes,

5   being small molecules, substances, salt, so sodium chloride,

6   potassium, magnesium, and the balance between those and water

7   are maintained as part of the release of these substances.

8        ACTH also stimulates the release of an endogenous

9   corticosteroid called cortisol, and it stimulates the release

10  of adrenal androgens, which are substances that are precursors

11  to testosterone in the body.

12  Q.   And what performance-enhancing effect, if any, would the

13  administration of ACTH have in the body of a racing horse?

14  A.   The primary effect would be the effect of the cortisol,

15  which has -- a corticosteroid would suppress inflammation and

16  relieve pain in the horse if there was an inflammatory cause

17  for pain.  It would also enhance glucose production, which

18  glucose is the primary nutrient or substance which is burned

19  during intense exercise.

20  Q.   Thank you.  And you referenced the anti-inflammatory effect

21  of this drug.  Is there a difference between reducing

22  inflammation caused by an injury and healing the injury?

23  A.   Yes.  The reduction of inflammation can be part of the

24  healing process, but it's a long-term process.  So the

25  immediate release or prevention of inflammation or lessening of

1   inflammation does nothing to actually heal the injury acutely.

2   Q.  Thank you.  Can we please call up Government Exhibit 1022.

3          MR. ADAMS:  Also in evidence, your Honor, through the

4   same stipulation, 9008.

5          THE COURT:  Yes.

6   Q.  Dr. Cole, are you familiar with the term "safety margin"?

7   A.  Yes, I am.

8   Q.  What is a safety margin as it applies to the administration

9   of drugs?

10         MR. SERCARZ:  Objection.

11         THE COURT:  Grounds?

12         MR. SERCARZ:  Prejudicial.

13         THE COURT:  Overruled.

14  A.  So the safety margin when we are referring to drugs, is the

15  margin between what is a safe and efficacious dose; so a dose

16  that produces the effect that you want and the dose that might

17  produce or typically would produce a negative effect or a

18  harmful effect to the horse.

19  Q.  What does it mean for a drug to have a wide safety margin?

20  A.  It means that I can administer a dose range, a very high

21  dose range, and not be concerned about whether or not I would

22  produce a side effect or an adverse event in the horse.

23  Q.  And conversely, what does it mean to have a narrow safety

24  margin?

25  A.  It means I must be very limited in the dose range that I

1    use.

2    Q.  Is there a relationship between a drug's safety margin and

3    the size of a horse into which a dose is being administered?

4    A.  Yes.

5    Q.  What is that relationship?

6    A.  Most commonly in horses, we administer a dose based on

7    their weight; so a particular milligram per kilogram of body

8    weight or pound of body weight, as opposed to administering a

9    single dose per horse.  This is because horses can vary in --

10             MR. SERCARZ:  Objection to the "this is because."

11             THE COURT:  Sustained.

12             You've answered the question, Dr. Cole.

13   Q.  Thank you, Dr. Cole.

14             Is there a relationship with respect to safety

15   margins, is there a relationship between a drug and its method

16   of administration, for example, intramuscular versus

17   intravenous administration?

18   A.  Some drugs, because they are an irritant, can only be

19   administered intravenously, and other drugs have to be

20   administered intramuscularly.  Yes, it depends on the drug, the

21   route of administration.

22   Q.  And from your experience, does ACTH have a wide or a narrow

23   safety margin?

24             MR. SERCARZ:  Objection.

25             THE COURT:  Grounds?

1           MR. SERCARZ:  Again, we're heading into the area I

2      find objectionable.

3           THE COURT:  Overruled.

4      A.  ACTH has a relatively moderate safety -- it is a -- It has

5      a moderate safety margin.

6      Q.  What are the factors of ACTH that make it such that it has

7      a moderate safety margin?

8      A.  Because its effects are so broad ranging and in so many

9      different body systems, we have to be very specific in how we

10     administer the drug.

11     Q.  If we could take this down, please.  Go back to

12     Exhibit 300, and to line 16 now.  Reading "EGH (Increases

13     Testosterone)."

14          Dr. Cole, are you familiar with a substance known as

15     EGH?

16     A.  It typically --

17          THE COURT:  That's a yes or no.

18     A.  No.

19     Q.  Are you familiar with a substance known as equine growth

20     hormone?

21     A.  Yes.

22     Q.  What is equine growth hormone?

23     A.  It is the hormone that is produced by the horse that is

24     referred to as growth hormone.

25     Q.  Is there a substance of which you are aware, commercially

1    available, referred to as EGH in the United States?

2    A.  No.

3    Q.  Is there such a substance commercially available outside of

4    the United States, to your knowledge?

5    A.  To my knowledge, there is an approved product that is

6    available in Australia that is equine growth hormone.

7    Q.  Are you familiar with the effects of equine growth hormone

8    in the body of a racing horse?

9    A.  Yes.

10   Q.  What are the effects in the body of a racing horse?

11   A.  Growth hormone would be responsible for increasing muscle

12   development, both growth, maturation of those tissues, as well

13   as growth and development of a number of other body systems.

14   Q.  Looking at the same portion of this exhibit, reading DHEA,

15   are you familiar with that acronym?

16   A.  I am.

17   Q.  Can you slowly tell us what DHEA refers to?

18   A.  I can't.  I don't remember.

19   Q.  Notwithstanding the acronym, are you familiar with the

20   effect of DHEA?

21   A.  Yes, I am.

22   Q.  What is DHEA's effect in the body of a racing horse?

23   A.  It is produced by the adrenal gland, and its effects is a

24   pre-testosterone; so it is converted to testosterone.

25   Q.  And what is the effect of testosterone in the body of a

1   racing horse?

2   A.   Testosterone is the major anabolic steroid produced by both

3   male and females, males producing a lot more and that hormone

4   is responsible for the secondary sexual characteristics that we

5   associate with males; so larger muscles, bigger bones,

6   behavioral effects generally associated with increased

7   aggressiveness.

8   Q.   And what performance-enhancing effects, if any, do drugs

9   containing testosterone or causing the increase of testosterone

10  have in the body of a racing horse?

11  A.   Potentially they -- with more muscle and bigger bone, we

12  end up with a horse that can race faster and longer

13  potentially.

14  Q.   Thank you.

15          Ms. Jung, if we could continue to No. 17, Equifactor.

16  If you could blow that up, please.

17          And just to read from the bottom portion of this

18  paragraph regarding Equifactor "Since the molecule is altered,

19  the labs could never detect unless a snitch tuned a bottle in

20  and the racing authorities decided to make a test.  This is

21  highly unlikely, but a possibility."

22          Dr. Cole, in your experience with the Florida racing

23  lab, do you develop or have you assisted in developing tests

24  for detecting certain performance-enhancing drugs?

25  A.   Yes, I have.

1    Q.  In doing so, does the molecular weight of a particular

2    compound play a role in whether you can or cannot detect the

3    presence of that compound?

4    A.  Yes.  The molecular weight is important in our current

5    methods for detecting many substances.

6    Q.  And can you describe, in general, what molecular weight

7    refers to?

8    A.  It's the weight of the compound.

9    Q.  And if we could now turn to the last page of Government

10   Exhibit 300.  No. 19, Serenity.  If we could blow this up,

11   please.

12          Dr. Cole, have you, in the course of your experience,

13   studied the effects of sedatives on the body of racing horses?

14   A.  Yes, I have.

15   Q.  Are there performance-enhancing effects associated with the

16   administration of sedatives in horses?

17   A.  In some horses they can be performance enhancing.

18   Q.  Can you describe the way in which sedatives can have a

19   performance-enhancing effect?

20   A.  It is counterintuitive, but stress and anxiety and

21   nervousness is a major problem in many, particularly young,

22   racehorses, and so the ability to produce mild sedation, take

23   the edge off, if you will, in a racehorse can actually help the

24   horse perform better in a particular race.

25          MR. ADAMS:  And, Ms. Jung, if we could please call up

1    Government Exhibit 127-C and 127-CT, which is the transcript.

2              And this is a call on April 4th between Seth Fishman

3    and Nick DeVita.

4              And you can go say head and play, Ms. Jung.

5              (Audio recording played)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1QTFIS4                    Cole - Cross

1          MR. ADAMS:  Thank you, Ms. Jung.

2          Your Honor, no further questions.

3          THE COURT:  All right.  Thank you.

4          Mr. Sercarz, do you wish to begin or do you want to

5    take the lunch -- let me see, is the lunch break an option now?

6          DEPUTY CLERK:  Probably another ten minutes.

7          THE COURT:  Why don't with go forward for 10 or 15

8    minutes then we'll break for lunch.

9    CROSS-EXAMINATION

10   BY MR. SERCARZ:

11   Q.  Good afternoon, Dr. Cole.

12   A.  Good afternoon.

13   Q.  Doctor, have you ever worked as a practicing veterinarian?

14   A.  Yes, I have.

15   Q.  And when was that?

16   A.  During my internship and intermittently over the last 25

17   years on my own horses and friends' and family's.

18   Q.  Are you familiar with the term breezing?

19   A.  Yes, I am.

20   Q.  Breezing a horse.

21        Am I correct that the training that racehorses undergo

22   is itself stressful to the horse?

23   A.  Yes.

24   Q.  And are there medications that are appropriately prescribed

25   to assist horses in dealing with the stress of training?

M1QTFIS4                    Cole - Cross

1    A.   Yes.

2    Q.   Is Lasix, for example, a substance that is administered to

3    horses when they are training, separate and apart from

4    competition?

5    A.   At certain times, yes.

6    Q.   If a product is recommended to assist the horse in dealing

7    with strenuous exercise, does that indicate to you it may be

8    used for training as well as competition?

9              MR. ADAMS:   Objection.

10             THE COURT:   Are you able to answer, Dr. Cole?

11             THE WITNESS:   Yes.

12             THE COURT:   Overruled.

13   Q.   You may answer, I believe.

14   A.   Yes, the answer was there are drugs that could be used in

15   both training and racing.

16   Q.   Incidentally, you have testified about something called the

17   24-hour rule in Florida?

18   A.   Yes.

19   Q.   Do you recall that?

20             Racing regulators set standards for the use of

21   substances within a certain it timeframe of race, am I correct?

22   A.   That's correct.

23   Q.   And that may vary from state to state and location to

24   location, am I correct?

25   A.   State to state, yes.

 1   Q.  All right.  You just testified moments ago, I believe, in

 2   connection with a product called Equifactor.

 3          MR. SERCARZ:  In fact, may I ask that Government

 4   Exhibit 300 be brought up on the screen again and we go to

 5   No. 17?

 6          THE COURT:  All right.

 7   Q.  Do you see the last two sentences beginning with:  Some

 8   have noticed the increase in RBCs using the product.

 9          It's actually the last three sentences.  Do you see

10   those three sentences?

11   A.  I do.

12   Q.  And the next sentence reads:  I cannot recommend using

13   within four days, but there are some using the day before for

14   tie up horses.

15          Do you see that?

16   A.  Yes, I do.

17   Q.  By the way, the term "tie up," what does that reference?

18   A.  Generally refers to a horse that has a muscle condition

19   where they become very painful, swollen and have difficulty

20   walking.

21   Q.  All right.  The next sentence reads:  Since the molecule is

22   altered, the labs could never detect unless a snitch tuned,

23   T-U-N-E-D, a bottle in and the racing authorities decide to

24   make a test.

25          Do you see that?

1   A.  I do.

2   Q.  Now by the way, the word "tuned" appears to be a

3   misspelling of the word "turned," fair enough?

4           It then says:  This is highly unlikely, but a

5   possibility.  Do you see that?

6   A.  I do.

7   Q.  You mentioned earlier that appropriate dosage for a horse

8   may depend upon its size and weight, is that correct?

9   A.  That is correct.

10  Q.  And among the regulations that are imposed on horses in

11  order to ensure the integrity of a horserace are rules

12  regarding the amount of a substance in the body of the horse,

13  am I correct?

14  A.  I'm not entirely sure of the question.

15  Q.  If a substance is forbidden and a test discloses the

16  presence of the substance in an abnormal degree, that horse can

17  be disqualified, is that correct?

18  A.  That is correct.

19  Q.  Would it be fair to say that sometimes determining when you

20  have to withdraw a medication in order that a horse not have an

21  inordinate amount of a disapproved substance is an art rather

22  than a science?

23           MR. ADAMS:  Objection.

24           THE COURT:  Sustained.

25  Q.  Is it always clear when one must stop administering a

1    substance in order to ensure that a horse will not have a

2    positive outcome on a blood test?

3              MR. ADAMS:  Objection.

4              THE COURT:  Sustained.

5    Q.  You mentioned earlier in your testimony that there are some

6    products that are approved in the United States -- withdrawn,

7    that are approved outside is the United States that are banned

8    within the United States, is that correct?

9    A.  They are not allowed -- they're not banned per se, but if

10   they were not approved, they are typically not allowed unless

11   you have an FDA exemption.

12   Q.  And does the term "not allowed" also refer to whether or

13   not they are allowed in the body of a racehorse during a race?

14   A.  The FDA -- currently the Racing Commissioners International

15   classification system recommends that no drug be present in the

16   horse that is not approved by the FDA.

17   Q.  That's here in the United States, correct?

18   A.  Correct, but there is some variation in state-to-state

19   interpretation.

20   Q.  Is there a variation between locales here in the United

21   States and the rules abroad?

22   A.  Yes, there are.

23   Q.  And are there countries that allow greater latitude in what

24   is permitted within the system of a racehorse?

25             MR. ADAMS:  Objection.

1              THE COURT:  Overruled.

2    A.   I'm unaware of countries that have more lax rules than the

3    U.S.

4    Q.   You testified about the effect of certain substances on

5    inflammation and healing.  Do you recall that testimony?

6    A.   I do.

7    Q.   There are substances that reduce inflammation and promote

8    healing but which also may have a performance-enhancing aspect

9    when it comes to the horse, is that correct?

10   A.   That is correct.

11   Q.   Are you familiar with the veterinarian's oath?

12   A.   I am.

13   Q.   And part of the veterinarian's oath is to prevent animal

14   suffering, is that correct?

15             MR. ADAMS:  Objection, scope.

16             THE COURT:  I'm going to allow it.

17   A.   Yes.

18   Q.   If a veterinarian is confronted with a horse and makes a

19   diagnosis that that horse is suffering from inflammation, might

20   it be appropriate to prescribe medicine that would alleviate

21   the inflammation and promote healing in the racehorse?

22   A.   In some situations it would.

23   Q.   Are there drugs that have beneficial effects for horses but

24   which also may have performance-enhancing effects?

25   A.   In some situations, yes.

1   Q.  You're familiar with the drug called Clenbuterol, am I
2   correct?
3   A.  Yes.
4   Q.  Am I correct that Clenbuterol was -- had many positive
5   effects in the treatment of the racehorses?
6   A.  No, I would not agree with that.
7           MR. SERCARZ:  May I have one moment?
8           (Pause)
9   Q.  Is it your view that if used appropriately -- this a
10  horse -- Clenbuterol has worthwhile legitimate medication
11  effects?
12  A.  Yes.
13  Q.  It is a bronchodilator, am I correct?
14  A.  That is correct.
15  Q.  And tell the ladies and gentlemen of the jury what
16  bronchodilatation does.
17  A.  So bronchodilatation is basically dilating the bronchioles
18  or the airways.  If any of you have asthma, you may have used a
19  bronchodilator to reverse that bronchodilatation during an
20  asthmatic attack.
21  Q.  Am I correct that Clenbuterol also has been found to have
22  performance-enhancing effects?
23  A.  I'm unaware of its performance-enhancing effect.
24  Q.  Let me use a different word.  You testified about a number
25  of products having anabolic effects?

1    A.   Yes.

2    Q.   Is Clenbuterol a drug that has anabolic effects?

3    A.   It has a drug that has been shown to have anabolic effects.

4    Q.   Are those anabolic effects potentially performance

5    enhancing?

6    A.   Potentially they could be performance enhancing.

7    Q.   Indeed, isn't it a fact that as a result of those anabolic

8    effects, Clenbuterol was banned from use during a race in many

9    jurisdictions?

10   A.   That is correct.

11   Q.   And indeed, notwithstanding that it was banned, you agree

12   that it is a very worthwhile legitimate medication when used

13   appropriately, correct?

14   A.   When used appropriately, correct.

15   Q.   So then would it be fair to say that a veterinarian can

16   prescribe a drug that has worthwhile legitimate medication

17   effects when used appropriately and that drug can be used as a

18   performance-enhancing drug?

19   A.   It's difficult to answer that yes or no.

20   Q.   Prior to 2008, was Clenbuterol prescribed by veterinarians?

21   A.   Yes.

22   Q.   Prescribed for its use as a bronchodilator, correct?

23   A.   That was one of the uses, correct.

24   Q.   After 2008 the drug was banned in racing, isn't that

25   correct?

1  A.  That is not correct.

2  Q.  Did anything happen to restrict the usage of Clenbuterol

3  after 2008 in racehorses?

4  A.  I don't know the exact year, but in some jurisdictions the

5  use of Clenbuterol has been forbidden, so the presence of any

6  Clenbuterol would be a violation.  But for example, in the

7  State of Florida, Clenbuterol can still be administered via the

8  rules of the division of parimutuel wagering.

9          THE COURT:  Mr. Sercarz, can you find a convenient

10  breaking point?

11          MR. SERCARZ:  This would be a good one, your Honor.

12          THE COURT:  We will take our lunch break now then.  I

13  just remind you all, please leave your notebooks and the

14  transcript binders on your chair.  Please do not discuss the

15  case or any of the evidence until the conclusion of the case

16  and you retire for your deliberations.

17          Have a good lunch, everyone.

18          Dr. Cole, I remind you you remain under oath and may

19  not talk with the lawyers for government over the break --

20          THE WITNESS:  Yes, ma'am.

21          THE COURT:  -- about the case.

22          (Jury not present)

23          THE COURT:  You're excused, Dr. Cole.

24          Everyone else please be seated.

25          (Witness not present)

M1QTFIS4                    Cole - Cross

1          THE COURT:  All right.  I just really want to get a

2     sense of timing for the rest of the day.

3          Mr. Sercarz, do you have any sense?  I'm not rushing

4     you.

5          MR. SERCARZ:  Understood.  I do not have much more for

6     this witness.

7          THE COURT:  Then you have your next witnesses lined

8     up, Mr. Adams?

9          MR. ADAMS:  I do, your Honor, very short redirect, I

10    imagine for Dr. Cole, then Ross Cohen next.

11         THE COURT:  All right.  Anything else?

12         All right.  Everyone have a good lunch and I will see

13    you back here.  I should have said it to the jury, but

14    Ms. Dempsey will take care of them.

15         I will see you back here say 1:45.

16         Thank you.

17         (Luncheon recess taken)

18         (Continued on next page)

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                            (1:50 p.m.)

3              (Jury present)

4              THE COURT:  Good afternoon, everyone, I hope you had a

5    pleasant lunch break.

6              Mr. Sercarz.

7              Do we have our witness?

8              MR. ADAMS:  Coming in now.

9              THE COURT:  Good afternoon, Dr. Cole.  You remain

10   under oath and you may remove your mask.  Thank you.

11             THE WITNESS:  Thank you.

12   BY MR. SERCARZ:

13   Q.  Dr. Cole, I have a few more questions about some of the

14   substances you testified about earlier.  You recall testifying

15   about HGH?

16   A.  Yes.

17   Q.  Would a specific growth factor with few reported side

18   effects be a safer option than HGH?

19             MR. ADAMS:  Objection, form.

20             THE COURT:  Sustained.

21   Q.  Am I correct that many, if not most, racehorses suffer from

22   gastric issues and ulcers?

23   A.  Yes, you would be correct.

24   Q.  Would a preventive therapy be an appropriate regimen for

25   horses?

1   A.   Yes.

2   Q.   Including racehorses?

3   A.   Yes.

4   Q.   Are there instances where such preventive therapies have

5   been found to have performance-enhancing effects?

6   A.   Not to my knowledge.

7   Q.   Am I correct that in Florida, according to the racing

8   regulations that you earlier described, Florida allows certain

9   corticosteroids on race day?

10  A.   No, that is not true currently.

11  Q.   And am I correct that with regard to new anabolics, they

12  were once lawful but they are now banned?

13  A.   Correct.  In the State of Florida there's some exception.

14  Q.   There is -- I'm sorry?

15  A.   In the State of Florida they have a limited use -- ability

16  to use them in a limited fashion.

17            MR. SERCARZ:  Thank you, no further questions.

18            THE COURT:  Thank you.

19            Mr. Adams?

20            MR. ADAMS:  Briefly, your Honor.

21            THE COURT:  Sure.

22  REDIRECT EXAMINATION

23  BY MR. ADAMS:

24  Q.   Dr. Cole, is human growth hormone a drug for the treatment

25  of gastric ulcers in racehorses?

1    A.  No, it is not.

2    Q.  Is ACTH?

3    A.  No, it is not.

4    Q.  Is GNRH?

5    A.  No.

6    Q.  How about sedatives?

7    A.  No, they are not.

8         MR. ADAMS:  Ms. Jung, could you please pull up

9    Government Exhibits -- what's in evidence as 1025, 1027 and

10   1028, all files recovered off of a device seized from a person

11   of Seth Fishman.

12        And Ms. Jung, if you could rotate 1028.  If it's

13   possible to blow up one of the rectangles of IT Plus, please.

14   Q.  Dr. Cole, do you recall questions regarding applicable

15   racing regulations surrounding performance-enhancing drugs

16   across multiple jurisdictions on cross-examination?

17   A.  I do.

18   Q.  Are you aware of any racing jurisdiction that allows for

19   the administration of blood-building drugs on the day of a

20   race?

21   A.  I'm not aware of any that allows that.

22   Q.  Are you aware of any jurisdiction that allows the

23   administration of performance-enhancing drugs generally on the

24   day of a race?

25   A.  I'm not aware of any.

1    Q.  Are you aware of any jurisdiction that allows for the

2    administration of Epogen to a racing horse at any time?

3    A.  I am unaware of any in the U.S. that allows.

4    Q.  In the State of Florida in particular, are there any

5    restrictions on the use of non-FDA-approved products with

6    respect to racing horses?

7    A.  Non-FDA-approved products are not allowed to be

8    administered to racehorses.

9    Q.  Dr. Cole, are you familiar with an organization referred to

10   as FEI or in English the International Equestrian Federation?

11   A.  Yes, I am.

12   Q.  What is FEI?

13   A.  It's the Federation Equestrian International.  In English,

14   it is an international regulatory body for Olympic-type events,

15   Olympic-caliber events.

16   Q.  Does FEI publish regulations regarding performance-

17   enhancing drugs in racehorses?

18   A.  Not in racehorses.

19   Q.  In any kind of animal?

20   A.  Yes, in the competitive horses and the competitive events

21   that they regulate.

22   Q.  Do those, to your knowledge, include limitations on the use

23   of Epogen?

24            MR. SERCARZ:  Objection, hearsay, beyond the scope.

25            THE COURT:  The scope objection is sustained.

1    Q.  Dr. Cole, in the course of your professional life have you

2    become familiar with a class of drugs known as blood builders?

3    A.  Yes, I am.

4    Q.  Is Epogen a blood builder?

5    A.  Yes, it is.

6              MR. ADAMS:  Ms. Jung, if we could call up what's in

7    evidence as Government Exhibit 118A.  And this will be in the

8    jury binders as 118A-T.  This is a February 26, 2019 call

9    between Seth Fishman and an unidentified male.

10             Ms. Jung, if you give us one moment for the jury to

11   collect the binders.

12             THE COURT:  I think we're ready whenever you are.

13             (Audio recording played)

14             MR. ADAMS:  Can we go now to 136C and the

15   corresponding transcript, please.  136C.  This is a May 6, 2019

16   call between Seth Fishman and John Pundyk, for the record.

17             And Ms. Jung, we can go ahead and play.

18             (Audio recording played)

19             MR. ADAMS:  Ms. Jung, if we could call up 141A,

20   please.  And the corresponding transcript, 141A-T is in the

21   jury binders.  This is June 6, 2019 call between Seth Fishman

22   and John Pundyk.

23             THE COURT:  Okay.

24             MR. ADAMS:  Thank you, your Honor.

25             Ms. Jung, you can play.

644

M1QTFIS4                    Cole - Redirect

1           (Audio recording played)

2           MR. ADAMS:  Ms. Jung, if we could go to 141B, please,

3    continuation of the same call.

4           You can go ahead.

5           (Audio recording played)

6           MR. ADAMS:  If we could go to 141C, please,

7    continuation of the same call.

8           (Audio recording played)

9           MR. ADAMS:  If we could do 141D, please, continuation

10   of the same call.

11          (Audio recording played)

12   BY MR. ADAMS:

13   Q.  Dr. Cole, to your knowledge, is it legal or illegal to deal

14   cocaine in the United States?

15   A.  Illegal.

16          MR. ADAMS:  No further questions, your Honor.

17          THE COURT:  Mr. Sercarz?

18          MR. SERCARZ:  Nothing further, thank you.

19          THE COURT:  All right.  Dr. Cole, thank you very much.

20   You are excused with the thanks of the Court.

21          And your next witness, Mr. Adams?

22          MR. ADAMS:  Your Honor, the government will be calling

23   Ross Cohen.

24          (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    ROSS COHEN,

2          called as a witness by the Government,

3          having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. ADAMS:

6    Q.   Good afternoon, Mr. Cohen.

7    A.   Good afternoon.

8    Q.   How old are you?

9    A.   Fifty years old.

10   Q.   And where were you born?

11   A.   New York City.

12   Q.   Did you attend college?

13   A.   Yes, I did.

14   Q.   Where did you attend college?

15   A.   State University of New York at Morrisville.

16   Q.   What did you study at Morrisville?

17   A.   I studied animal science, Standardbred racing.

18   Q.   Did you receive any degrees in animal science or

19   Standardbred racing?

20   A.   Yes, an associate's in applied science.

21   Q.   When did you graduate from Morrisville?

22   A.   1991.

23   Q.   After you graduated from Morrisville, what did you do to

24   earn money?

25   A.   I went to work as a groom and assistant trainer in Goshen,

1    New York.

2    Q.  What does a groom do?

3    A.  A groom basically gets up early in the morning and makes

4    sure the horses are fed, and if you're at a farm you will --

5    once the horses are done eating you will take them out to a

6    field and let them run and kick while you go back in and clean

7    the stalls, scrub your water buckets, make sure you set up

8    grain for the following morning.  And then you would either

9    bring the horses in and brush them, let them have a drink, and

10   then you would get their equipment and put their equipment on

11   them to exercise or jog.

12        So they go out on the track, either you would jog them

13   or somebody else that works for the trainer would jog them, and

14   then when they came in you would take their equipment off, give

15   them a bath, then put a blanket on and put them in their

16   stalls, let them have hey, and move on to your next animal.

17        And once you're done with your amount of horses, you

18   would brush them up, put liniments on their legs, take care of

19   their feet, any scratches or anything, and then put them in the

20   stall and have them have their lunch and eat their hey and move

21   forward.

22   Q.  As a groom, did you have any supervisor?

23   A.  Usually the assistant trainer or the trainer.

24   Q.  And can you describe the duties of a trainer?

25   A.  The trainer makes up the schedule for the animals and

1    communicates with the owners of the animals and is in charge of

2    all the employees and makes sure the horses are put into race

3    and basically is the boss.

4    Q.  When you say "put into race," what do you mean?

5    A.  Like enter in their proper races, like by conditions, money

6    earnings, claiming, just different conditions.

7    Q.  And when you were working as a groom after graduating from

8    Morrisville, were you working with any particular kind of

9    horse?

10   A.  Standardbred horses.

11   Q.  Is there a difference between Standardbred and Thoroughbred

12   horses?

13   A.  Yes, Standardbred has a cart behind them and Thoroughbreds

14   have a jockey on top of them.

15   Q.  So they race at different racetracks?

16   A.  Yes.

17   Q.  How long did you work as a groom, approximately?

18   A.  So that was in '91 I worked as a groom, assistant trainer

19   for about three, four years.

20   Q.  And after three or four years, did your role change in some

21   way?

22   A.  I took an owner on and horses on and opened up my own

23   public stable.

24   Q.  And at that time did you become a trainer?

25   A.  Yes.  Well, I had my trainer's license before that, but I

1    went on my own then.

2    Q.  When did you obtain your trainer's license?

3    A.  In Morrisville we took a course on the test and we took the

4    test in college.

5    Q.  And with what state were you licensed at the time that you

6    took on your own stable?

7    A.  New York.

8    Q.  Have you ever been licensed in any other states?

9    A.  I was licensed in New Jersey, Pennsylvania, Massachusetts,

10   and New Hampshire.

11   Q.  Is that all as a racehorse trainer?

12   A.  Correct, yes.

13   Q.  Did there come a time that you began working at Yonkers

14   Raceway?

15   A.  Yeah, that was in the 1994 timeframe.

16   Q.  And can you describe the operation that you had at Yonkers?

17   A.  I had a few horses to begin with and then acquired more and

18   more while stabled at Yonkers.

19   Q.  And for the jury, can you describe physically the layout of

20   where the horses are at the racetrack?

21   A.  At Yonkers there's a stable area with stalls, an upper

22   level and a lower level, and the horses are stabled there on

23   the grounds.

24   Q.  Are you familiar with the term "backstretch?"

25   A.  Yes.

1    Q.  What's the backstretch?

2    A.  That's where the horses are stabled, where the stalls are.

3    Q.  And do horses that are stabled at Yonkers also compete at

4    Yonkers?

5    A.  Yes.

6    Q.  Was Yonkers racetrack the only racetrack that you competed

7    at when you were stabled at Yonkers?

8    A.  I would once in a while have horses racing at Monticello

9    and Meadowlands.

10   Q.  Sorry, at?

11   A.  Meadowlands in New Jersey.

12   Q.  With respect to the license that you maintained in New

13   York, in general, what set of rules are you required to follow

14   to maintain your license?

15   A.  You need to follow the rules of the New York State.  Then

16   it was the Racing and Wagering Board, but it's the New York

17   State Gaming Commission now.

18   Q.  Do the rules of the New York State Gaming Commission relate

19   in any way to the administration of drugs to the racehorses

20   under your care?

21   A.  Yes.

22   Q.  What were some prohibited practices that applied to you as

23   a trainer in New York State?

24            MR. SERCARZ:  What's the date for this, your Honor?

25            THE COURT:  Can you clarify, Mr. Adams?  I think he

1   said, but you can clarify.

2            MR. ADAMS:  Certainly.

3   BY MR. ADAMS:

4   Q.  Mr. Cohen, roughly what years were you stabled at Yonkers

5   Raceway?

6   A.  From 1994 to 1997.

7   Q.  And in that period, to begin with, what were some of the

8   prohibited practices that applied to you with respect to

9   medications?

10           MR. FERNICH:  I'm going to object to this testimony.

11  I would like to approach, please.

12           THE COURT:  Okay.  I will see you and Mr. Adams at the

13  sidebar.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1        (At sidebar)

2        MR. FERNICH:  Your Honor, I'm growing increasingly

3    concerned by the testimony of the last witness and now what's

4    being elicited from this one that we're moving far away from an

5    adulteration and misbranding case and into a case about

6    conspiracy to dope racehorses.  As your Honor observed in one

7    of my first pretrial conferences here, this is not a wire or

8    mail fraud case that they charged against this defendant.  They

9    could have done so, they did not do so.

10       If your Honor looks at the Rojas indictment in the

11   Middle District of Pennsylvania --

12       THE COURT:  I read it.

13       MR. FERNICH:  So that indictment sets forth very

14   specific state regulations that a defendant is charged with

15   violating, including the provision that the prior witness

16   testified to, a 24-hour restriction gives the defendants ample

17   notice of what they're being charged with and doesn't, by the

18   way, incorporate those state charges into the adulteration and

19   misbranding counts, just lifts them straight up into the wire

20   fraud counts.  Now, admittedly, some of this evidence has

21   relevance.  I'm not disputing that.

22       What I'm concerned with, and I would like an

23   instruction from the Court to the jury, that this defendant is

24   not charged with violating any state racing rules or

25   regulations, and I will instruct you on the law, the

1    appropriate law at the close of this case.  That's the relief

2    I'm requesting now.  I'm quite concerned we're getting into

3    constructive amendment territory here.

4             THE COURT:  I'm not doing that now.

5             Let me hear from Mr. Adams.

6             MR. ADAMS:  The intent to defraud in this case goes

7    directly to the intent to defraud state racing regulators with

8    respect to the administration of performance-enhancing drugs.

9    The Court already ruled on this in the context of the motion to

10   dismiss.

11            This does not relate to anything in the context of the

12   question I just asked and was about to elicit, but in any event

13   there's no constructive amendment, this has been well trod

14   multiple times.

15            Mr. Cohen -- in addition to the fact that all of this

16   is relevant, all of it goes to intent, Mr. Cohen and the

17   cooperators have already had their credibility called into

18   question.  Mr. Cohen is about to talk about his own doping

19   operation, and it's perfectly fair for him to talk about that

20   in an open and candid way, given that his credibility and the

21   credibility of all the government's cooperating witnesses is

22   under attack.

23            THE COURT:  Are you claiming he's a co-conspirator?

24            MR. ADAMS:  Yes.

25            THE COURT:  Look, I don't know how one can talk about

1    an intent to defraud or mislead, among others, racing officials

2    and the FDA, and the motions to dismiss where I dealt with this

3    issue before you were in the case --

4          MR. FERNICH:  I'm fully familiar with your Honor's

5    decision.

6          THE COURT:  -- talked very clearly about there are

7    broad range of potential victims and no limitation, frankly, on

8    the face of the statute.

9          The Rojas case that you referenced is a very different

10   case than this case and the issue on which it was vacated or

11   the judgment and conviction was vacated is a different issue

12   than anything we're dealing with in this case.  But one can't

13   talk about an intent to defraud or mislead by making drugs that

14   are untestable if you don't talk about testable with respect to

15   what?  You haven't stipulated that these products are drugs.

16         MR. FERNICH:  All I'm asking for -- and I disagree

17   with Mr. Adams' view of the nature of the intent at issue in

18   the case.  I do agree that the evidence is certainly relevant

19   to motive and potentially relevant to intent.  We'll get into

20   at the appropriate time the thrust of the intent, and I'm not

21   suggesting remotely that state regulators cannot be cognizable

22   victims in the case, all I'm requesting right now is an

23   instruction that he is not charged with violating state racing

24   rules and regulations and I will instruct you on the

25   appropriate law at the close of the case.

1          THE COURT:  He's not charged with a lot of things.

2     I'm not going to give a charge on all the things he's not

3     charged with.

4          MR. FERNICH:  The great focus of the last witness's --

5     look, we have all studied this quite a bit and it's not easy

6     material.  Right now these jurors are sitting there and the

7     entirety of the last witness's testimony concerned violations

8     of state racing regulations and performance-enhancing drugs.

9     I'm not suggesting that PED's --

10         THE COURT:  I don't agree with your characterization,

11    for the record.

12         MR. FERNICH:  Let's just say there was substantial

13    testimony about those subjects.  If I'm sitting there right now

14    on that jury, I'm thinking the guy is a horse doper and let's

15    be done with it.  That's not what the charge here.

16         THE COURT:  You're correct about that.

17         MR. FERNICH:  So your Honor I'm flagging this now

18    because I'm concerned that we're getting into a constructive

19    amendment of the indictment.  To the extent they are permitted

20    to convict him because he is doping racehorses based on

21    violating state racing rules and regulations, that is, in my

22    view, a constructive amendment of this indictment.  They made a

23    considered decision to charge this case a certain way and it's

24    not a straight up wire and mail fraud case.  It was a very

25    pointed remark your Honor made and I took it.

1            THE COURT:  You're right about all of that.

2            MR. FERNICH:  I've been taking it for months.

3            THE COURT:  You're correct about that.

4            MR. FERNICH:  Not months, when I came in.

5       And it's angels dancing at the head of a pin for a lay

6  jury to distinguish between doping racehorses on the one hand

7  and adulterating and misbranding drugs on the other.

8            THE COURT:  With an intent to defraud and mislead.

9  You keep leaving that off.

10            MR. FERNICH:  No, the intent to defraud and mislead is

11  vital to the case.

12            THE COURT:  Correct.

13            MR. FERNICH:  One question that was not raised before

14  and was not resolved by your Honor's decision, intent to

15  defraud or mislead not whom, but intend to defraud or mislead

16  about what?

17            THE COURT:  You had a chance to make whatever motions

18  you wanted to make and you chose not to make them.

19            MR. FERNICH:  I wasn't in the case, but that's neither

20  here nor there, but it's a sufficiency of the evidence

21  question.  For now I'm asking for -- if your Honor wants to do

22  it at the end of case, that's fine.  I'm concerned that this

23  jury is going to be misled and confused into thinking that

24  they're charging violations of horse -- of state racing

25  regulations and rules and it's enough to convict him if he

1  doped horses in violation of those rules, and that is not the

2  case.

3            THE COURT:  I'm going to say again:  I gave a

4  preliminary instruction, which you all agreed to --

5            MR. FERNICH:  Okay.

6            THE COURT:  -- about what the indictment charged, that

7  was on consent, and at the end of the case, I will give charges

8  with respect to the law relating to the two counts in the

9  indictment, and I have no intent of giving instructions on the

10  myriad of things that have not been charged.

11            MR. FERNICH:  Okay.  I understand the Court's position

12  and your Honor understands mine.  It's sufficient for now.  I'm

13  requesting the instruction --

14            THE COURT:  Don't repeat.  I understand.

15            Anything further for the record from the government

16  since I didn't give you a chance really to speak?

17            MR. ADAMS:  All of this is completely neither here nor

18  there with respect to the question to this witness.

19            THE COURT:  Okay.  You have my ruling.

20            (Continued on next page)

21

22

23

24

25

1              (In open court)

2              THE COURT:  All right.  I was trying to see --

3    Mr. McDaniel, are you able to go back to before the sidebar,

4    and just read the question?  And I believe there was an

5    objection which I did not rule on; is that correct?

6              THE REPORTER:  There is a question that was not

7    answered.

8              THE COURT:  Could you read the question?

9              THE REPORTER:  I can, your Honor.  It looks like it

10   might be tied into the prior question, as far as the timeframe.

11   Would you like me to read the prior question as well?

12             THE COURT:  If you would, please.

13             (Record read)

14             And then there was an objection?

15             THE REPORTER:  That's correct, your Honor.

16             THE COURT:  The objection is overruled.

17             Mr. Adams.

18   BY MR. ADAMS:

19   Q.  Mr. Cohen, you can respond to the question as it was just

20   reread.

21   A.  You were not allowed to administer any medications race

22   day.

23   Q.  Now, keeping you in 1997, did you receive a letter of

24   removal from a racetrack in that year?

25   A.  Yes, I received a certified letter from Monticello Raceway.

M1QPFIS5                    Cohen - Direct

1    Q.  And to your understanding, what was the ground for removal?

2    A.  They just said "in their best interest" was what the letter

3    said.

4    Q.  And to your knowledge, was that -- was the content of that

5    letter transmitted to other racetracks?

6    A.  Yonkers Raceway found out about the letter and gave me 48

7    hours to remove from the grounds.

8    Q.  And did you, in fact, remove yourself and your horses from

9    the grounds at Yonkers Raceway?

10   A.  Yes, I did.

11   Q.  After that revocation, what did you do for a living?

12   A.  I still trained horses at Big Z's stables with somebody

13   else as trainer.

14   Q.  Who was that other person?

15   A.  At first it was Richard Fulfree, then it was Andrew

16   ElSanteramo, and then it was Michael Bickham.

17   Q.  Let me jump forward in time a bit to roughly the fall of

18   2001.

19   A.  Okay.

20   Q.  Were you still training horses in the fall of 2001?

21   A.  Yes, I was.

22   Q.  And where were you living at that time?

23   A.  I was living with Tom Guido in Wertzville, New York.

24   Q.  For the witness, please, and not for the jury, can we

25   please pull up what's been marked for identification as

1   Government Exhibit 10,007.

2           Mr. Cohen, do you see the image on your screen?

3   A.  Yes, I do.

4   Q.  Do you recognize that person?

5   A.  Yes, that's Tom Guido.

6           MR. ADAMS:  Your Honor, offering 10,007.

7           MR. SERCARZ:  No objection.

8           THE COURT:  It will be received.

9           MR. ADAMS:  And we can publish, please?

10          JUROR:  We don't see it.

11          THE COURT:  That's what they mean when they ask for my

12  permission to publish.

13          (Government's Exhibit 10,007 received in evidence)

14          THE COURT:  Is it up?  They still can't see it.

15          Okay.  Go ahead, Mr. Adams.

16  BY MR. ADAMS:

17  Q.  Mr. Cohen, where were you living with Tom Guido in the fall

18  of 2001?

19  A.  In Wertzville, New York.

20  Q.  And at that time, what was Tom Guido's job?

21  A.  He trained racehorses.

22  Q.  At any point while you were living with Tom Guido, did Tom

23  Guido provide you with any performance-enhancing drug?

24  A.  Yes.

25  Q.  What performance-enhancing drug was Tom Guido providing you

1   with in late 2001?

2   A.  There was something called an X-Breather.

3   Q.  And what was your understanding of what that drug did?

4   A.  It helped increase the airways on a racehorse.

5   Q.  Were there any other performance-enhancing drugs that Guido

6   was providing you at that time?

7   A.  There was a bleeder medication.

8   Q.  And what was your understanding of what that drug was used

9   for?

10  A.  It helped stop the exercised induced pulmonary hemorrhage

11  in a racehorse.

12  Q.  At any time that you were living with Tom Guido, did you

13  discuss Seth Fishman with Tom Guido?

14  A.  Yes, we've had conversations.

15  Q.  Can you describe those conversations?

16          MR. SERCARZ:  Objection.  Can you lay a foundation

17  that it's in the furtherance, your Honor?

18          THE COURT:  Yes, please.

19  BY MR. ADAMS:

20  Q.  Mr. Cohen, did you discuss performance-enhancing drugs as

21  they relate to Seth Fishman with Tom Guido?

22  A.  Yes.

23  Q.  Did you discuss providing -- Tom Guido providing you with

24  performance-enhancing drugs at that time?

25  A.  Yes.

1    Q.  Did you discuss providing performance enhancing drugs from

2    Seth Fishman through Tom Guido to you?

3    A.  No.

4    Q.  What did you discuss regarding Seth Fishman's provision of

5    performance-enhancing drugs?

6    A.  We discussed the Frozen Pain product and if they had

7    anything else that might help in racing.

8    Q.  If who had anything else?

9    A.  If Dr. Fishman did.

10   Q.  Did you still have horses under your care as of fall of

11   2001?

12   A.  Yes.

13   Q.  And where were those horses stabled in the fall of 2001?

14   A.  At Mount Hope Training Center.

15   Q.  Where is Mount Hope Training Center?

16   A.  In Otisville, New York.

17   Q.  Do you know what county that's in?

18   A.  Orange County.

19   Q.  Were you the only trainer stabled at Mount Hope?

20   A.  No.

21   Q.  Roughly how many trainers were stabled at Mount Hope in

22   late 2001?

23   A.  Approximately ten to 15.

24   Q.  And at that time, what racetracks were you racing at?

25   A.  I was racing at Yonkers Raceway, Monticello Raceway, Pocono

1    Downs, mostly.

2    Q.  So had there come a point that Yonkers allowed you to race

3    at Yonkers Raceway again?

4    A.  Yes.

5    Q.  Approximately when did that happen?

6    A.  Around then.

7    Q.  And did there come a time that you were again suspended

8    from Yonkers Raceway?

9    A.  Yes.

10   Q.  What is a TCO2 positive?

11   A.  It is for a high level of baking soda that creates a high

12   TCO2 in a horse's bloodstream.

13   Q.  And to your understanding, what is TCO2?

14   A.  It's a total bicarbonate level.

15   Q.  And did you, in fact, administer baking soda to horses

16   under your care?

17   A.  Yes, I did.

18   Q.  What's the purpose for administering baking soda to horses?

19   A.  It helps the horse remove lactic acid from its muscles, so

20   that it doesn't get tired.

21   Q.  And does that have a performance-enhancing effect, to your

22   knowledge?

23   A.  Yes, it does.

24   Q.  What were the consequences of the TCO2 positive that you

25   received?

1   A.   There's a fine and a suspension.

2   Q.   And were you, in fact, suspended again at that point?

3   A.   Yes.

4   Q.   And for approximately how long were you suspended?

5   A.   Six months, I believe.

6   Q.   Mr. Cohen, have you ever administered Epogen to your

7   horses?

8   A.   Yes, I have.

9   Q.   What is Epogen, to your understanding?

10  A.   Epogen helps the body produce more red blood cells and a

11  healthy hematocrit and hemoglobin.

12  Q.   Does that have a performance-enhancing effect, to your

13  understanding?

14  A.   Yes, it does.

15  Q.   When was the last time you used Epogen on a horse?

16  A.   At least ten to 15 years ago, or ten to 12 years ago.

17  Q.   Are you familiar with a process referred to as drenching?

18  A.   Yes.

19  Q.   What is drenching a horse?

20  A.   Drenching is putting a nasogastric tube into the horse's

21  nostrils, into the stomach to directly administer fluids or

22  other substances.

23  Q.   When you say "or other substances," what kind of substances

24  would you drench a horse with?

25  A.   Yogurt, Gatorade, water, electrolytes and baking soda.

1   Q.  And when -- have you ever drenched a horse with baking
2   soda?
3   A.  Yes, I have.
4   Q.  Have you also drenched a horse with drugs?
5   A.  Yes.
6   Q.  What kind of drugs?
7   A.  Bleeder pills, bleeder medicine.
8   Q.  And to your understanding, what are bleeder pills?
9   A.  They help the horse from having exercised-induced pulmonary
10  hemorrhaging.
11  Q.  How would you administer a bleeder pill through a drench?
12  A.  You would crush it up and dissolve it in water and
13  administrator that drench.
14  Q.  Was it possible to administer Epogen through a drench, or
15  do you have to use another method?
16  A.  No, you have to use intravenous.
17  Q.  Would you personally to intravenous drugs to horses in your
18  care?
19  A.  Yes.
20  Q.  Is Epogen, is that sometimes referred to as a blood
21  builder?
22  A.  Yes.
23  Q.  After your TCO2 positive, did you also receive positive
24  tests for other substances in horses?
25  A.  Yes, I did.

1   Q.  Positive tests for Percocet?

2   A.  Yes.

3   Q.  Vicodin?

4   A.  Yes.

5   Q.  Did you personally administer those drugs to your horses?

6   A.  No, I did not.

7   Q.  Sitting here today, do you have personal knowledge as to

8   how those drugs got into the horses that were under your care?

9   A.  No.

10  Q.  Were you, nevertheless, disciplined for the positive tests

11  for those drugs?

12  A.  Yes, I was.

13  Q.  What happened?

14  A.  I was given a five-year, reduced to two-year, suspension

15  and a fine.

16  Q.  After that incident, did you continue to train that same

17  stable of horses?

18  A.  I did.

19  Q.  Let me turn to Mount Hope again for a moment.  From

20  approximately when to when were you training at Mount Hope?

21  A.  I was there probably until 2009.

22  Q.  And when you began training at Mount Hope, who was the

23  owner?

24  A.  Larry Thompson.

25  Q.  And did that change at some point?

M1QPFIS5                          Cohen - Direct

1    A.   Yes.

2    Q.   Who became the owner?

3    A.   Richie Banca bought the farm.

4    Q.   Can we please pull up what's in evidence as Government

5    Exhibit 1908, please.

6            And for the record, this is a December 21st, 2013,

7    e-mail at the top from LisaRangerEquestology@Gmail.com to

8    Courtney Adams.  "Doc said to send you an e-mail.  Stuff for

9    Richard Banca, you can send to me or to them directly."

10           And can we please pull up now just for the witness,

11   Ms. Jung, what's -- I'm sorry, what's been marked for

12   identification as Government Exhibit 10,000.

13           Mr. Cohen, do you see that image?

14   A.   Yes, I do.

15   Q.   Do you recognize that person?

16   A.   Yes.

17   Q.   Who is that?

18   A.   That's Richie Banca.

19           MR. ADAMS:  Your Honor, the government offers 10,000.

20           MR. SERCARZ:  No objection.

21           THE COURT:  It may be received, and you may publish it

22   to the jury.

23           MR. ADAMS:  Thank you.

24           (Government's Exhibit 10,000 received in evidence)

25           MR. ADAMS:  And is that up on the screen?

1          THE COURT:  Not everybody has it yet, it seems.

2          MR. ADAMS:  Okay.  I see nods.  Thank you.

3     BY MR. ADAMS:

4     Q.  Mr. Cohen, while you were working at Mount Hope, did there

5     come a time that you encountered a person named Lisa Ranger?

6     A.  Yes.

7     Q.  Had you encountered Lisa Ranger before arriving at Mount

8     Hope?

9     A.  Yes.

10    Q.  When did you first meet this person, Lisa Ranger?

11    A.  I had visited Tom Guido down in Florida at the South

12    Florida Trotting Center on a visit, and Lisa was working for

13    Dr. Fishman, who was Mr. Guido's veterinarian at the time.

14    Q.  Do you recall what time that was, approximately?

15    A.  Not exactly, but I would say approximately in the 1998, '99

16    range.

17    Q.  Thank you.

18          And, Ms. Jung, just for the witness, could we please

19    show what's been marked for identification as Exhibit 10,001.

20          Mr. Cohen, do you recognize that person?

21    A.  Yes.

22    Q.  Who is that?

23    A.  That's Lisa Ranger.

24          MR. ADAMS:  Your Honor, the government offers 10,001.

25          MR. SERCARZ:  No objection.

1          THE COURT:  It will be received and you can publish

2     it.

3          (Government's Exhibit 10,001 received in evidence)

4     BY MR. ADAMS:

5     Q.  Mr. Cohen, when you were at the South Florida Trotting

6     Center, did there come a time that you met Seth Fishman?

7     A.  Yes.

8     Q.  Did you speak with Seth Fishman at that time?

9     A.  It was just a cordial "hello" and that was it.

10    Q.  Did you hire him as your veterinarian at that time?

11    A.  No, I did not.

12    Q.  Jumping back to the Mount Hope Training Center,

13    approximately how often would you see Lisa Ranger at the Mount

14    Hope Training Center?

15    A.  About once a week.

16    Q.  And --

17    A.  If I was up early, you know.

18    Q.  And what, if anything, would you discuss with Lisa Ranger

19    at the Mount Hope Training Center?

20    A.  At first, I did not have conversations with her until a

21    relationship was set forth.

22    Q.  Okay.  Did that change at some point?

23    A.  Yeah.  Richie Banca and I became friendly, and he said he

24    would -- I was purchasing different products to run my stable,

25    and it was getting costly, and he said that he would set me up

1   with Lisa Ranger to buy products less expensive.

2   Q.  When you say "products," what do you mean?

3   A.  Like different products that I used in the barn, which was

4   like phenylbutazone or flunixin and banamine, which are

5   non-steroidal anti-inflammatories, and Hip Iron and other

6   vitamins like Caco copper and B complex and B12.

7   Q.  The products you just mentioned, did those include

8   prescription drugs?

9   A.  You needed a prescription for some of them, yes.

10  Q.  Is banamine a prescription drug?

11  A.  Yes.

12  Q.  Did those include injectable substances?

13  A.  Those were all injectable.

14  Q.  You mentioned Hip Iron, what's your understanding of what

15  Hip Iron is used for?

16  A.  It helps in an iron deficiency, and helps the body produce

17  healthier red blood cells.

18  Q.  Okay.  And what's the purpose -- what was the purpose, in

19  your mind, of producing red blood cells?

20  A.  To increase oxygen in the horse's bloodstream.

21  Q.  Did that have a performance-enhancing effect?

22  A.  Yes.

23  Q.  At any time that you were interacting with Lisa Ranger, did

24  you tell her that you were a veterinarian?

25  A.  No.

1    Q.  Did you have a prescription for any of the drugs that you

2    purchased from Lisa Ranger?

3    A.  I did not.

4    Q.  Did you tell Lisa Ranger that you had a prescription for

5    those drugs?

6    A.  No, I did not.

7    Q.  Did she ever is ask you for a prescription for those drugs?

8    A.  No.

9    Q.  Who, if anyone, did Ranger tell you that she worked for at

10   the time that you were interfacing with her at Mount Hope?

11   A.  She said she worked for Dr. Fishman.

12   Q.  Are you familiar with a company called Equestology?

13   A.  Yes.

14   Q.  Which drugs, if any, did Ranger sell you with Equestology

15   on the label?

16   A.  I don't recall exactly what drugs came with a label that

17   said Equestology on it.

18   Q.  Let me ask about a different drug.  Are you familiar with

19   something called ACTH?

20   A.  Yes.

21   Q.  Did you purchase ACTH from Lisa Ranger?

22   A.  Yes, I did.

23   Q.  Do you recall how that was labeled?

24   A.  There was an Equestology label on that.

25   Q.  What was the purpose of administering ACTH to your horses?

1    A.   It helped stimulate a horse.  It helped their adrenal

2    glands.  It just had a performance-enhancing effect.

3    Q.   And how did ACTH, provided to you by Ranger, physically

4    arrive into your hands?

5    A.   She would drop off a box with my order once a week, whether

6    it was before I got to the barn or when I was there.

7    Q.   Apart from injectables that you just described, did Ranger

8    ever sell you drugs in any other form?

9    A.   There were bleeder pills that she had told me to try or

10   suggested.

11   Q.   And what, if anything, did she tell you about the effect of

12   the bleeder pills?

13   A.   That they would help stop a horse with exercise-induced

14   pulmonary hemorrhage issues.

15   Q.   What, if anything, did Ranger tell you that Seth Fishman

16   had said about bleeder pills?

17   A.   He said I should try them and that they would help.

18   Q.   And what did she tell you about when you should administer

19   the bleeder pills?

20   A.   She had said to give them the night before the race and day

21   of.

22   Q.   And did you do that?

23   A.   Yes.

24   Q.   Are you allowed to administer bleeder pills on the day of a

25   race?

1    A.  No.

2    Q.  Did you know that at the time?

3    A.  Yes.

4    Q.  What, if anything, did Ranger tell you about whether or not

5    the substance in the bleeder pills could be tested for?

6    A.  She had said that there's always a risk but that they were

7    not testing right now.

8    Q.  Did you ever receive a drug from Lisa Ranger that

9    specifically told you not to use the drug on race day?

10   A.  No.

11   Q.  Did you ask Ranger any questions about the testability of

12   the products that she was selling to you?

13   A.  Yes.

14   Q.  What did she -- what was her response?

15   A.  What I had just said, that they did not test as a positive

16   test right now, but there's always a risk.

17   Q.  Okay.  Was testability of those drugs an important factor

18   for you in deciding whether to purchase them?

19   A.  Yes.

20   Q.  While you were at Mount Hope, while you were stabled at

21   Mount Hope, did you ever meet Seth Fishman at that time?

22   A.  Yes.  He had come around with Lisa one time.

23   Q.  I'm sorry, he had come around?

24   A.  With Lisa one time.

25   Q.  Okay.  Was he your veterinarian at that point?

1    A.   No, he was not.

2    Q.   That one time that he came around, did he come to your

3    barn, in particular?

4    A.   Yes.

5    Q.   Who was with him at that time?

6    A.   Lisa Ranger.

7    Q.   And what, if anything, did Lisa tell you about the purpose

8    for Seth being there?

9    A.   That he needs to come around to say that he's looked at the

10   horses in order to provide the prescriptions for the

11   medications that were being purchased.

12   Q.   Did he, in fact, examine your horses?

13   A.   No.

14   Q.   Did he ask you if he could examine your horses?

15   A.   No.  We just had casual conversation about different issues

16   with some of the horses, and I might have had him look at some

17   blood work that I had on the horses.

18   Q.   Did he do that for all of your horses?

19   A.   No, just a couple.

20   Q.   And apart from the one time, did he ever come back to your

21   barn?

22   A.   No.

23   Q.   Did he ever call you with concerns about your horse's

24   health?

25   A.   We had conversations on the phone when I had an issue here

1   and there.

2   Q.  Can you describe the issues that you had that you discussed

3   with Seth Fishman over the phone?

4   A.  I had some horses that were not performing well.  I had

5   sent them copies of the blood work to look at to get his

6   opinion.

7   Q.  And when you say the blood work, what's your understanding

8   of what blood work paperwork shows?

9   A.  It's a CBC and chemistry, just like a person gets done of

10  their muscle enzymes, their red blood cells, white blood cells,

11  liver enzymes, kidney function, just different.

12  Q.  Does it reflect red blood cell count?

13  A.  Yes.

14  Q.  Were you concerned that your red blood cell count might be

15  lower than optimal for performance?

16  A.  On some.

17  Q.  Are you familiar with the drug referred to as Frozen Pain?

18  A.  Yes.

19  Q.  What is Frozen Pain?

20  A.  In a conversation with Dr. Fishman, it's the peptides that

21  are mixed up that help take away some pain and stop horses from

22  getting tired, really.

23  Q.  And when you say "stop horses from getting tired," is that

24  getting tired in a race or in some other context?

25  A.  In a race because it had a performance-enhancing effect.

M1QPFIS5                    Cohen - Direct

1  Q.  Ms. Jung, if we could please publish what's in evidence now

2  as Exhibit 10,000.

3          Mr. Cohen remind us who this is?

4  A.  That's Richie Banca.

5  Q.  Did Richie Banca ever provide you with Frozen Pain?

6  A.  Yes.

7  Q.  What did he tell you about where he got it from?

8  A.  He said he had gotten it from Dr. Fishman.

9  Q.  And did you use the Frozen Pain?

10 A.  Yes.

11 Q.  What was the effect, if any, that you observed?

12 A.  There were some bottles that had a great effect, where most

13 of the horses would win when administered it, and there were

14 some bottles where there was minimal to no effect.

15 Q.  Inconsistent in its effect?

16 A.  Yes.

17 Q.  Did you ever have any conversations with Seth Fishman about

18 that inconsistency?

19 A.  Yes.

20 Q.  Can you describe those conversations?

21 A.  I expressed some feelings that they were not consistent,

22 and in the conversation he said it was very hard to keep stable

23 and to have proper employees make it, and that that's why he

24 was going to stop making it.

25 Q.  Do you know one way or the other whether he stopped making

1   it at that time?

2   A.  I do not know.

3   Q.  Did you ask to obtain more Frozen Pain from Ranger or

4   Fishman?

5   A.  Yes, I did.

6   Q.  And did you receive any?

7   A.  No.

8   Q.  Did there come a time that you left Mount Hope Training

9   Center?

10  A.  Yes, in 2009.

11  Q.  And where did you move at that time?

12  A.  To the Pine Bush training facility in Pine Bush, New York.

13  Q.  And do you, offhand, know the county of where Pine Bush is

14  located?

15  A.  Ulster, New York, Ulster County.

16  Q.  When you moved to Pine Bush, did you continue to purchase

17  drugs from Lisa Ranger?

18  A.  Yes.

19  Q.  Which drugs did that include?

20  A.  The same that I had been purchasing, the vitamins and the

21  phenylbutazone and flunixin, just different products at the

22  barn, including electrolyte drugs.

23  Q.  Did they include prescription drugs?

24  A.  Yes.

25  Q.  Did you have a prescription for those drugs at that time?

1   A.  No.

2   Q.  Did you administer those drugs, nevertheless?

3   A.  Yes.

4   Q.  Who was the doctor associated with the prescription when

5   you received the bottles?

6   A.  Dr. Fishman.

7   Q.  Was Dr. Fishman your vet?

8   A.  No.

9   Q.  When you moved to Pine Bush, did you ever see Dr. Fishman?

10  A.  No.

11  Q.  Did he ever ask to come visit you at Pine Bush?

12  A.  No.

13  Q.  Did you, nevertheless, continue to see Lisa Ranger at Pine

14  Bush?

15  A.  Yes.

16  Q.  What did you see her doing there?

17  A.  She would come by about once a week and then every two

18  weeks, where she would drop off boxes of supplies to different

19  trainers at the facility.

20  Q.  Okay.  Mr. Cohen, are you familiar with a person named Rene

21  Allard?

22  A.  Yes.

23  Q.  Who is Rene Allard?

24  A.  He was one of the leading trainers in racing, Standardbred

25  racing.

M1QPFIS5                    Cohen - Direct

1    Q.   I'm sorry, what kind of racing?

2    A.   Standardbred racing.

3    Q.   And if you know, where is he stabled?

4    A.   He was stabled at Mount Hope.

5    Q.   Is that the same facility that you had been stabled at?

6    A.   Yes, but he was not there when I was there.

7    Q.   And are you familiar with a facility known as Golden Shoe?

8    A.   Yes.

9    Q.   And do you know where that's located?

10   A.   It's in Bullville, New York.

11   Q.   What kind of facility is Golden Shoe?

12   A.   That's also a Standardbred training facility.

13   Q.   Who owns it?

14   A.   Tom Guido.

15   Q.   And is that the same Tom Guido that we discussed earlier?

16   A.   Yes.

17   Q.   Are you familiar with Montgomery, New York?

18   A.   Yes.

19   Q.   Are there any -- have you ever visited a Golden Shoe

20   facility in Montgomery, New York?

21   A.   I visited.

22   Q.   Is that the same Golden Shoe facility?

23   A.   Yes.  I always thought it was Bullville, not Montgomery.

24           MR. ADAMS:  Your Honor, I'll read from Government

25   Exhibit 9012 which is a stipulation.

1          THE COURT:  Okay.

2          MR. ADAMS:  And skipping the top matter:

3          If called to testify at trial, law enforcement agents

4     with the Federal Bureau of Investigation would testify that on

5     March 9th, 2020, law enforcement agents with the Federal Bureau

6     of Investigation conducted a search of the Golden Shoe Training

7     Center, a racehorse training facility, at street address 261

8     Bullville Road, Montgomery, New York 12549, which is the

9     Bullville property.

10         Government Exhibits 1400 through 1420 and 9500 through

11    9505 are:  One, physical items, including paper records, seized

12    from the Bullville property at the time of the search; or, two,

13    photographs fairly and accurately depicting the Bullville

14    property or photographs fairly and accurately depicting the

15    items taken during the search of the Bullville property.

16         Your Honor, the stipulation continues with respect to

17    additional properties and additional exhibits associated with

18    each property.

19         It's further stipulated and agreed by and between the

20    parties that the aforementioned government exhibits in this

21    stipulation, which is Government Exhibit 9012, may be received

22    in evidence at trial.  The government moves for the admission

23    of 9012 and the exhibits listed through the stipulation.

24         THE COURT:  Are you moving them all or just the ones

25    with respect to Bullville?

1          MR. ADAMS:  I'll move them all today.

2          THE COURT:  All right.  The stipulation will be

3    received, and pursuant to the stipulation, all of the

4    referenced exhibits including those that Mr. Adams specified on

5    the record are a part of the evidence in this case.  They are

6    admitted.

7          (Government's Exhibits 9012 and all of the referenced

8    exhibits received in evidence)

9          MR. ADAMS:  Thank you, your Honor.

10         And now, Ms. Jung, if we could call up 1401 and 1402,

11   which are among the exhibits associated with the Golden Shoe

12   Facility.

13   BY MR. ADAMS:

14   Q.  Mr. Cohen, did you purchase ACTH from Lisa Ranger at any

15   point?

16   A.  Yes.

17   Q.  Did you personally bring ACTH to the Golden Shoe facility?

18   A.  No.

19   Q.  Can we please call up 1404 and 1405, also from the Golden

20   Shoe facility?

21         THE COURT:  Just to be clear, Mr. Adams, I think the

22   same stip and exhibits were admitted through Dr. Bowman, no?

23         MR. SERCARZ:  I'm sorry, I can't hear you.

24         THE COURT:  I said, I think the stipulation and the

25   exhibits were admitted with Dr. Bowman; is that not correct?

1        MR. ADAMS:  If it is correct, then I apologize for the

2    waste of time.

3        THE COURT:  No problem.

4    BY MR. ADAMS:

5    Q.  Mr. Cohen, did you ever purchase GNRH from Lisa Ranger?

6    A.  No.

7    Q.  Did you ever bring a bottle of GNRH to the Golden Shoe

8    facility?

9    A.  No.

10   Q.  If we could please pull up 1407 and 1408, also from the

11   Golden Shoe facility.

12       Mr. Cohen, did you ever purchase a drug known as HP

13   Bleeder from Lisa Ranger?

14   A.  No, I did not.

15   Q.  Did you ever bring a drug referred to as HP Bleeder to the

16   Golden Shoe facility?

17   A.  No, I did not.

18   Q.  Okay.  Apart from Lisa Ranger, have you also obtained

19   performance-enhancing drugs from other sources?

20   A.  Yes.

21   Q.  Have you also sold performance enhancing drugs yourself?

22   A.  Yes.

23   Q.  Who created the drugs that you sold?

24   A.  Dr. Greg Skelton.

25   Q.  Can we please, for the witness only, pull up Exhibit

M1QPFIS5                    Cohen - Direct

1    10,006.

2           Mr. Cohen, do you recognize that exhibit?

3    A.  Yes, that's Dr. Greg Skelton.

4           MR. ADAMS:  Your Honor, the government offers 10,006.

5           MR. SERCARZ:  No objection.

6           THE COURT:  It will be received, and you may publish,

7    if you wish.

8           MR. ADAMS:  Thank you.

9           (Government's Exhibit 10,006 received in evidence)

10   BY MR. ADAMS:

11   Q.  Mr. Cohen, where is Dr. Skelton based?

12   A.  He, at the time, was in Illinois and moved to Indiana.

13   Q.  How did you originally meet Mr. Skelton?

14   A.  When I was training at Mount Hope Training Center, he came

15   to do veterinary work for Joe Anderson.

16   Q.  Did he, in fact, perform veterinary work at Mount Hope

17   Training Center?

18   A.  Yes.

19   Q.  Did you see that?

20   A.  Yes.

21   Q.  Did you ever see Seth Fishman perform veterinary work at

22   Mount Hope?

23   A.  No.

24   Q.  What were some of the products that you sold for Greg

25   Skelton?

1   A.  Something called Sulfur, Bleeder, Cane, Blood Builder, Tie

2   Up and Joint Block.

3   Q.  And for the witness only, please.

4           Mr. Cohen, I'd like to have you look at what's been

5   marked for identification only as Exhibit 1102 -- I'm sorry,

6   11 -- apologies, your Honor.  11,002, thank you.

7           THE COURT:  No problem.

8           Are you able to see it?

9           THE WITNESS:  Yes.

10          THE COURT:  Thank you, Mr. Cohen.  Okay.

11  BY MR. ADAMS:

12  Q.  Mr. Cohen, do you recognize this document?

13  A.  Yes.

14  Q.  What is it?

15  A.  It is my cooperation agreement.

16  Q.  Pursuant to this cooperation agreement, did you agree to

17  plead guilty to a felony?

18  A.  Yes.

19  Q.  What felony was that?

20  A.  Mislabeling, misbranding performance-enhancing drugs.

21  Q.  Was that with an intent to defraud or mislead?

22  A.  Yes.

23  Q.  Under the terms of this agreement, what are you required to

24  do?

25  A.  I'm required to tell the truth, and I'm required to testify

1   when needed.

2   Q.  Are you required to meet with the government when asked?

3   A.  Yes.

4   Q.  Are you required to provide information, if asked by the

5   government?

6   A.  Yes.

7   Q.  And were you required to be truthful in meeting with the

8   government even before testifying today?

9   A.  Yes.

10  Q.  If you hold up your obligations under this agreement, what

11  is your understanding of what the government will do for you?

12  A.  The government will hopefully write a 5K letter, a

13  recommendation to the Court for sentencing, but it is still the

14  Court's discretion as per my sentence.

15  Q.  Can you tell us what your understanding of what the 5K

16  letter is?

17  A.  It is just a reduction of -- the possibility of a reduction

18  of my sentence.

19  Q.  Does it guarantee you a reduction of sentence?

20  A.  No.

21  Q.  What's the maximum sentence of imprisonment that you face

22  under your guilty plea?

23  A.  Five years.

24  Q.  Are you promised that you'll get less than five years under

25  this agreement?

1   A.   There's no promise.

2   Q.   On page 2 of the agreement, if I can turn you there, have

3   you also, as part of this agreement, made any agreements with

4   respect to offenses other than misbranding and adulterating

5   drugs?

6   A.   Yes.

7   Q.   Did you, at some point, participate in a bribery scheme

8   relating to horseracing?

9   A.   Yes.

10  Q.   What did you do?

11  A.   I paid drivers for somebody to hold their horses back in

12  races.

13  Q.   Did you stand to make money from that?

14  A.   Yes.

15  Q.   And did you make money from that?

16  A.   Yes.

17  Q.   Did other people make money from that?

18  A.   Yes.

19  Q.   Did you know that it was wrong at the time that you did it?

20  A.   Yes.

21  Q.   Is there another offense that this agreement refers to as

22  well?

23  A.   It refers to selling small amounts of marijuana.

24  Q.   How often did you do that?

25  A.   Just a few times.

1    Q.   Where did you do that?

2    A.   In Orange County and Sullivan County.

3    Q.   Were you paid for the deliveries that you made?

4    A.   Yes.

5    Q.   And were the people to whom you delivered marijuana adults

6    or minors?

7    A.   Adults.

8    Q.   Now, if you live up to your obligations under this

9    agreement, what is it you expect the government will do with

10   respect to these crimes?

11   A.   To not prosecute me for them.

12   Q.   Even if you're not charged with respect to those two

13   additional crimes, what's your understanding as to whether your

14   sentencing judge will be made aware of those crimes?

15   A.   Yes, the judge will.

16   Q.   And, Mr. Cohen, what's your understanding of what happens

17   to this agreement if you lie on the stand today?

18   A.   It's null and void.

19   Q.   Ms. Jung, if we could please put up just for the witness,

20   please, Exhibit 10,004.  Mr. Cohen, do you recognize that

21   person?

22   A.   Yes.

23   Q.   Who is that?

24   A.   Chris Oakes.

25              MR. ADAMS:  Your Honor, the government offers 10,004.

M1QPFIS5                    Cohen - Direct

1              MR. SERCARZ:  No objection.

2              THE COURT:  It's received and you may publish.

3              (Government's Exhibit 10,004 received in evidence)

4              MR. ADAMS:  Thank you.

5    BY MR. ADAMS:

6    Q.  Mr. Cohen, where is Mr. Oakes based?

7    A.  He was based in Wilkesboro, Pennsylvania.

8    Q.  And at what period of time was he based in Wilkesboro, as

9    far as you know?

10   A.  As far as I know, ten to 15 years; from 2005, I think,

11   until 2020, or even maybe currently.

12   Q.  Did you ever sell Greg Skelton products to Chris Oakes?

13   A.  Yes.

14   Q.  Which products did you sell?

15   A.  All of the ones I talked about Pain, Bleeder, Blood

16   Builder, Tie Up, Joint Block, Sulfur.

17   Q.  And if we could take down Mr. Oakes' photo, and for the

18   witness only, 10,009, please.

19              Mr. Cohen, do you recognize this person?

20   A.  Yes.

21   Q.  Who is that?

22   A.  Marcos Zulueta.

23              MR. ADAMS:  Your Honor, the government offers 10,009.

24              MR. SERCARZ:  No objection.

25              THE COURT:  It is received and you can publish it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1            (Government's Exhibit 10,009 received in evidence)

2            MR. ADAMS:  Thank you.

3    BY MR. ADAMS:

4    Q.  Mr. Cohen, did you ever sell Skelton products to Marcos

5    Zulueta?

6    A.  Yes.

7    Q.  Which products?

8    A.  Same Pain, Blood Builder, Bleeder, Sulfur, Joint Blocker,

9    Tie Up.

10   Q.  And, Ms. Jung, if we could take this down and, just for the

11   witness, please, 10,003.

12           Mr. Cohen, do you recognize this person?

13   A.  Yes.

14   Q.  Who is this?

15   A.  That's George Navarro.

16           MR. ADAMS:  Your Honor, the government offers 10,003.

17           MR. SERCARZ:  No objection.

18           THE COURT:  It's received and you can publish.

19           (Government's Exhibit 10,003 received in evidence)

20   BY MR. ADAMS:

21   Q.  Mr. Cohen, are you familiar with a horse called XY Jet?

22   A.  Yes.

23   Q.  Directing your attention now to on or about March 30th of

24   2019, did you watch XY Jet run in a race on that day?

25   A.  Yes, I did.

1    Q.  What race did you watch him run in?

2    A.  The name, I think, is Mod El Sheen.  I don't know it

3    exactly, but it was in Dubai.

4    Q.  It was in, I'm sorry?

5    A.  It was in Dubai.

6    Q.  And were you in Dubai for that race?

7    A.  No.

8    Q.  How did you watch it?

9    A.  I watched it either on TV or my tablet.

10   Q.  What was the outcome of that race?

11   A.  He won.

12   Q.  And who was the trainer of XY Jet?

13   A.  George Navarro.

14   Q.  And if we could call up Government Exhibit 401-K, which is

15   in evidence through Government Exhibit 9008.  These are

16   messages obtained from an Apple iPhone found on Seth Fishman's

17   person on April 1st, 2019.

18         And, Ms. Jung, we're actually going to walk through

19   this from the bottom up.  If we could please go to page 68 to

20   begin with.  And, Ms. Jung, if you could take that down for the

21   jury for one moment.

22         MR. ADAMS:  Your Honor, to the extent it wasn't

23   previously offered, this is in through the stipulation 9008,

24   and we've offered a series of the exhibits on this stipulation,

25   specifically 401-A through 401-G.  I'll offer now 401-I through

1   401-II, which is exhibits off the Apple iPhone X from Seth

2   Fishman's person on April 1st, 2019, as well as the additional

3   exhibits listed through the remainder of the stipulation.

4           THE COURT:  Right.  Has the stipulation itself already

5   been offered.

6           MR. ADAMS:  It has, it's in, your Honor.  It's the

7   electronic stipulation, 9008.

8           MR. SERCARZ:  No objection.

9           THE COURT:  All right.  It is received, along with

10  all -- well, it has been received already, and all of the

11  exhibits listed in that stipulation, as agreed to between the

12  parties, are admitted.

13          MR. ADAMS:  Thank you, your Honor.

14          (Government's Exhibits 9008 and all of the exhibits

15  listed in the stipulation received in evidence)

16          MR. ADAMS:  And we can put 401-K back up.  And if we

17  can go to page 68.  Thank you.  And reading on the bottom line

18  and then rising up from here.

19          March 10, 2016.  Outgoing text, reading, "Seth

20  Fishman."  And immediately above that, an incoming text to the

21  same phone from a person indicating being George V, reading,

22  "Is Jorge.  If you can, please call me.  Thank you."

23          If we could please go to the next page, page 67, and

24  the second line.  Reading:  "JNavarroStables@Gmail.com," and

25  immediately above that, the top line, reading:  "All I need is

1    instructions how to use everything and how much do I owed you.

2    Thank u."

3            If we could go to page 66 next, and starting at the

4    bottom.  Incoming from George V:  "Call me when u can, please."

5    The next line:  "TB-7 once a week hole bottle IM or IV."  And

6    outgoing message from the Seth Fishman phone:  "I prefer IV for

7    both TB-7 and PG2.  Whole bottle for both."

8            And going up.  I'm sorry.  From there to page 65.

9    That's good, Ms. Jung.  Thank you.  The fourth line from the

10   top, an outgoing message from the Fishman phone.  Reading:

11   "Pure ITPP."  Response:  "How much."  And an outgoing message:

12   "$55 per vial."

13           Can we go to the next page, 64, middle line.  Outgoing

14   from the Seth Fishman phone:  "There are two ways of using it

15   that are most popular.  The first day is the entire bottle

16   preferably three to four hours out.  The second way is half the

17   bottle the day before usually the night before, and the

18   remainder 3 to 4 hours out."

19           If we could now jump a bit to page 26, please.  I'll

20   direct the Court's attention and the jury's attention to the

21   middle line.  Incoming message from George V, reading:  "Need

22   pills for Dubai ASAP."  Response above that is:  "Please."  I'm

23   sorry, a further message, incoming, reading:  "Please."

24   Response:  "How many pills you want?  What address do I send

25   them?"  And at the top, an address reflecting Cooper City,

1    Florida.  This chain dated March 18th, 2018.

2              If we could go to next, page 25, bottom line:  "1,000

3    pills.  Once I get back I wanna sit down with u and talk about

4    blood product also boss.  Thank u."  Also on March 18th, 2018.

5              If we could jump now to page 16, second to top line.

6    Outgoing:  "Where you want pills and BB3 sent."  Response:

7    "Eatontown, New Jersey."

8              If we could go to page 12, please, middle of the page.

9    Incoming message from George V:  "Need 20 bb3."  July 23rd,

10   2018.  Above that "Where you want me to send to?"  Response:

11   "NJ address."

12             Page 5, please, Ms. Jung, and reading from the bottom.

13   Outgoing from the Seth Fishman phone:  "You never gave me

14   feedback on blood builder.  Also had the bleeding paste."

15   Incoming response:  "I love it."  Outgoing from the Fishman

16   phone:  "Which?  Never sent bleeding paste."

17             Ms. Jung, can we go to page 1, please.  I'm sorry,

18   Ms. Jung.  Actually, if we could take that down, and for the

19   witness only, could we please, for the witness only, please.

20   Thank you.  Can we please display what's marked for

21   identification as Government Exhibit 13,000 and can we please

22   mute.  Let me know when you're muted.  Thank you and can we

23   pause here, please.

24   BY MR. ADAMS:

25   Q.  Mr. Cohen, do you recognize the clip that just played in

1    front of you?

2    A.  Yes, that was the Dubai race of XY Jet.

3    Q.  Your Honor -- Have you reviewed that video prior to your

4    testimony?

5    A.  Yes.

6              MR. ADAMS:  Your Honor, the government offers

7    Exhibit 13,000.

8              MR. SERCARZ:  No objection.

9              THE COURT:  It will be received.

10             (Government's Exhibit 13,000 received in evidence)

11             MR. ADAMS:  And, Ms. Jung, now please, if you could,

12   turn the volume up and publish for the jury.

13             (Video being played)

14   BY MR. ADAMS:

15   Q.  Mr. Cohen, do you recognize the person who appears in the

16   picture in picture?

17   A.  Yes, that's George Navarro.

18   Q.  Who won the race that we just watched?

19   A.  XY Jet.

20   Q.  How much was the purse from that race, if you recall?

21   A.  I don't recall.

22             MR. SERCARZ:  Objection.

23   Q.  If we could go to Government Exhibit 401-K one more time?

24             THE COURT:  For the record, the objection is

25   sustained, but the answer was "I don't recall."

1                    MR. SERCARZ:  Yes, your Honor.

2                    MR. ADAMS:  If we could go to 401-K, please, and

3          directing the attention here to the first line from the bottom

4          up, reading March 30th, 2019.  Outgoing from the Fishman phone:

5          "Congratulations, just saw your race."  Incoming response:

6          "Thank you, boss.  You're a big part of it."

7                    No further questions, your Honor.

8                    THE COURT:  All right.  Why don't we take the

9          afternoon break now, and then, Mr. Sercarz, you'll be up for

10         cross.  All right?

11                   Excuse me.  Before we go, Mr. Cohen, you remain under

12         oath.  You cannot speak about the case with anybody while you

13         remain under oath.

14                   Ladies and gentlemen, you can leave your materials

15         here, and just as a reminder, please don't discuss the case

16         while you're on your break.  All right?  Thank you.

17                   (Jury not present)

18                   THE COURT:  All right.  Please be seated for a moment.

19                   Just for the record, Mr. Cohen asked me, by mouthing,

20         does he stay here when the jury walked out, and I told him yes.

21         Please stand for the jury out of respect for the jury system,

22         and you don't move while the jury is moving.

23                   But you're free to leave the witness stand now, but

24         subject to my admonition that you not discuss the case because

25         you remain under oath.  All right?

1              (Witness temporarily excused)

2              So I'll see everyone back here in 10 to 15 minutes.

3    Thank you.

4              (Recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Jury present)

2           THE COURT:  Mr. Sercarz, cross-examination.

3           And Mr. Cohen, you remain under oath.

4           THE WITNESS:  Yes.

5  CROSS-EXAMINATION

6  BY MR. SERCARZ:

7  Q.  Mr. Cohen, my name is Maurice Sercarz.  I represent

8  Dr. Fishman.

9           You told the ladies and gentlemen of the jury that you

10  had a bachelor's degree that you earned here in New York at the

11  state university, is that correct?

12  A.  No, sir.

13  Q.  I'm sorry, I misunderstood you.

14  A.  It's an associate's in appliance science degree.

15  Q.  And the degree had to do with horses, am I correct?

16  A.  Yes, sir.

17  Q.  What exactly was the degree?

18  A.  It's an associate's in applied science, it's an animal

19  science degree but it was in Standardbred racehorses.

20  Q.  After you finished your degree you got a job working as a

21  groom, is that correct?

22  A.  A groom, assistant trainer, yes.

23  Q.  And eventually you ascended to the role of a trainer, is

24  that correct?

25  A.  Yes, sir.

1    Q.  By the way, you referred to the trainer as the boss, is

2    that correct?

3    A.  Yes, sir.

4    Q.  The trainer is the one who is ultimately responsible for

5    the horses, is that correct?

6    A.  Yes, sir.

7    Q.  In order to become a trainer you need to have a license, am

8    I correct?

9    A.  Yes, sir.

10   Q.  Is there a course of study in order to obtain the license?

11   A.  You need to pass a written test and then you need to

12   harness a horse in front of a person and then you need to train

13   or exercise the horse in a certain time that is recorded in

14   front of a person who will then approve of your license.

15   Q.  During the course of your study to become a trainer, did

16   you learn how to administer medication to a horse?

17   A.  No, not in school.

18   Q.  Did you have experience in administering medication to a

19   horse under the tutelage of a veterinarian?

20   A.  I watched a veterinarian do it and some veterinarians will

21   show you.

22   Q.  Now before you ever -- you began working at the tracks in

23   approximately 1994, am I correct?

24   A.  I graduated school in 1991, so I started working around

25   racetracks then.

1    Q.  All right.  And remind us when it was that you first met

2    Lisa Ranger, in or about.

3    A.   In or about '99, I think.

4    Q.   Now during the eight-year period before you ever met Lisa

5    Ranger, you were suspended for prohibited practices with regard

6    to medication by the New York State Gaming Commission, is that

7    correct?

8    A.   Yes, sir.

9    Q.   You were removed from Monticello racetrack, is that

10   correct?

11   A.   I was sent a trespass notice certified letter.

12   Q.   You were sent a comparable letter and asked not to appear

13   any further at Yonkers Raceway, is that correct?

14   A.   No, I did not receive a letter from Yonkers Raceway, they

15   just called me in and verbally told me.

16   Q.   After you were told to leave those two racetracks, you

17   mentioned you continued to train horses, is that correct?

18   A.   Yes, sir.

19   Q.   Was that a violation of the terms of your removal from

20   those two race tracks?

21   A.   There were no terms in the letters, but it was assumed that

22   I shouldn't race there, but at the time my license was not

23   suspended.

24   Q.   All right.  In the fall of 2001 you lived with Mr. Guido,

25   am I pronouncing his name correctly?

1    A.  Yes, sir.

2    Q.  And he was a trainer, am I correct?

3    A.  Yes, sir.

4    Q.  And he provided you with performance-enhancing drugs in

5    connection with your horses at that time, is that correct?

6    A.  Yes, sir.

7    Q.  You were readmitted to Yonkers Raceway after the period of

8    your suspension, is that correct?

9    A.  Yes, sir.

10   Q.  And you were once again fined and suspended when some of

11   your horses had false positives, is that correct?

12   A.  Yes.

13   Q.  And among the drugs that you were responsible for

14   administering to them that generated the false positives that

15   got you in trouble were TCO2, am I correct?

16   A.  I did receive TCO2 positives, yes.

17   Q.  Epogen, am I correct?

18   A.  I did not.

19   Q.  You did not?

20   A.  Administer Epogen.

21   Q.  Now you mentioned that you were disciplined in connection

22   with the fact that horses tested positive for Percocet and

23   Vicodin, is that correct?

24   A.  Correct.

25   Q.  This is all during the period before you ever met Lisa

1    Ranger, isn't that correct?

2    A.  No, it was after.

3    Q.  In 2009 you mentioned that Richie Banca, B-A-N-C-A, became

4    the owner of Mount Hope Raceway, is that correct?

5    A.  No, I did not mention the year.

6    Q.  Was it in or about that time that he became the owner of

7    Mount Hope?

8    A.  I think it was earlier than that, sir.

9    Q.  All right.  And it was sometime thereafter that you

10   encountered Lisa Ranger at the South Florida Training Center,

11   am I correct?

12   A.  No, that was in 1999.

13   Q.  That was your first encounter with Lisa Ranger?

14   A.  Yes.

15   Q.  But you did no business with her on that occasion, is that

16   right?

17   A.  Correct.

18   Q.  So when you began purchasing products from Lisa Ranger,

19   that was in or about 2009?

20   A.  It was way earlier than that, sir.

21   Q.  When was it?

22   A.  Probably around the 2000 to 2001, maybe -- in the early

23   2000s.

24   Q.  And you testified about the fact that there came a time

25   when Lisa Ranger dropped off to you some Breeder Plus and she

1   suggested to you that it was recommended by Dr. Fishman, do you

2   recall that?

3   A.  Bleeder pills not Bleeder Plus.

4   Q.  Bleeder pills?

5   A.  Yes, sir.

6   Q.  When was that?

7   A.  It was probably in the early 2000 area or 2005 area.

8   Q.  Now it was Lisa that told you that Dr. Fishman suggested

9   that these would be good products to administer to your horses,

10  is that correct?

11  A.  Yes, sir.

12  Q.  The recommendation came from her, is that correct?

13  A.  Yes, sir.

14  Q.  When you administered those drugs, you found that they

15  didn't work, isn't that correct?

16  A.  They didn't work to my satisfaction.

17  Q.  You told the ladies and gentlemen of the jury that you had

18  a conversation with Dr. Fishman about these substances later

19  on, am I correct?

20  A.  Yes, sir.

21  Q.  And Dr. Fishman told you that they were unstable, he

22  couldn't keep them stable, is that correct?

23  A.  Not the bleeder pills, we talked about the Frozen Pain.

24  Q.  The Frozen Pain.  You suspected that the medication that

25  you received was a placebo, isn't that correct?

1    A.  I didn't say placebo, I said that they're peptides is what

2    I was under the assumption.

3    Q.  Didn't you suspect that the product you received from Lisa

4    Ranger just didn't work?

5    A.  Yes.

6    Q.  And this was a product that you claimed Dr. Fishman was

7    recommending to you, is that correct?

8    A.  The bleeder pills were recommended by Lisa, not Dr. Fishman

9    directly.

10   Q.  Now after engaging in business with Lisa Ranger, you had

11   occasion to purchase performance-enhancing drugs from a

12   different veterinarian, isn't that correct?

13   A.  Yes, sir.

14   Q.  That was Dr. Skelton, am I correct?

15   A.  Yes, sir.

16   Q.  And you were able to purchase from Dr. Skelton Sulker,

17   correct?

18   A.  Yes.

19   Q.  Breeder, correct?

20   A.  Yes.

21   Q.  Tie Up, correct?

22   A.  Yes.

23   Q.  Joint Block, is that correct?

24   A.  Yes.

25   Q.  And pain medication of some type, am I correct?

1    A.  Yes.

2    Q.  With regard to the products that you purchased from

3    Dr. Skelton, you used them on horses that you were training, am

4    I correct?

5    A.  Yes.

6    Q.  And you also resold them for personal property, am I

7    correct?

8    A.  Yes.

9    Q.  To a gentlemen name Marcos Zulueta, am I correct?

10   A.  Yes.

11   Q.  To Jorge Navarro, am I correct?

12   A.  No, I never sold directly to Jorge Navarro.

13   Q.  Incidentally, with regard to Mr. Navarro, you were seated

14   in the witness chair while a series of emails were placed on

15   the screen.  Did you see those?

16   A.  Yes, I did.

17   Q.  Now Mr. Navarro never discussed with you his relationship

18   with Dr. Fishman, did he?

19   A.  I only met Mr. Navarro once in my life for a 30-second

20   period.

21   Q.  You met Dr. Fishman on an occasion when he came to Mount

22   Hope Training Center, is that correct?

23   A.  Yes, sir.

24   Q.  And it was your testimony that he was there just to pretend

25   he was examining horses, is that correct?

 1  A.  Yes, sir.

 2  Q.  Did Lisa Ranger tell you that?

 3  A.  Yes, sir.

 4  Q.  But it just so happened that you showed him blood work

 5  regarding your horses, isn't that correct?

 6  A.  Correct.

 7  Q.  And that, according to your testimony on direct, you

 8  consulted with him when your horses seemed to be tired and

 9  weren't performing well, isn't that correct?

10  A.  Yes, sir.

11          MR. SERCARZ:  May I have Government Exhibit 1102 put

12  back on the screen, please, the cooperation agreement.

13          THE COURT:  It's not in evidence, Mr. Sercarz.

14          MR. SERCARZ:  Okay, sorry.

15          MR. ADAMS:  I'm happy to put it on the screen for the

16  witness.

17          THE COURT:  For the witness only.

18  BY MR. SERCARZ:

19  Q.  I can ask you questions without the need to put it on the

20  screen.

21          Am I correct that in or about June 23rd of 2020 you

22  entered into a plea and cooperation agreement with the

23  government?

24  A.  Yes, sir.

25  Q.  And before you got this agreement were you interviewed by

1    the government on one or more occasions pursuant to a limited

2    immunity agreement?

3    A.   Never had any offer of a limited immunity at all.

4    Q.   Do you recall any conversations that you had with agents

5    before you and your attorney signed this agreement?

6    A.   There was no offer.  I had meetings with the government

7    called proffers.

8    Q.   Those proffer meetings are what I'm referring to.  Do you

9    remember approximately how many you had?

10   A.   There was approximately one in person and then a couple via

11   Zoom meetings.

12   Q.   Would it refresh your recollection if I asked you whether

13   in connection with those meetings, both the Zoom meeting and

14   the in-person meeting, you signed what are called proffer

15   agreements?

16   A.   Yes, I did.

17   Q.   And you recall that those proffer agreements indicated that

18   none of the statements that you were making would be used

19   against you under certain circumstances?

20   A.   I don't recall reading that off the top of my head, sir.

21   Q.   What was your understanding of the purpose of those proffer

22   agreements that you had been provided?

23   A.   To tell the truth of what I know of the crimes I committed.

24   Q.   At that time you hadn't pled guilty to anything, am I

25   correct?

1    A.  Correct.

2    Q.  At that time you were facing charges for a host of crimes,

3    am I correct?

4    A.  I was of facing charges for the crimes that I admitted

5    guilt to.

6    Q.  They included purchases of performance-enhancing drugs from

7    Dr. Skelton and a variety of other people, isn't at that

8    correct?

9    A.  They were mislabeling, misbranding and selling

10   performance-enhancing drugs.

11   Q.  But drugs that were sold to you by Dr. Skelton and others,

12   am I correct?

13   A.  Yes, sir.

14   Q.  You also mentioned to the ladies and gentlemen of the jury

15   that you were involved in fixing races.  Do you recall that

16   testimony?

17   A.  Yes.

18   Q.  And you knew that you might be in jeopardy for those

19   crimes, isn't that correct?

20   A.  Yes.

21   Q.  So you spoke to the government, the agents, about those

22   crimes and answered their questions, am I correct?

23   A.  Yes, sir.

24   Q.  Subject to this limited immunity agreement, correct?

25   A.  The proffer agreements.

1  Q.  And among the people that they asked you about was Dr. Seth
2  Fishman, am I correct?
3  A.  Yes, sir.
4  Q.  And it was pursuant to the terms of the proffer agreement
5  that you answered those questions, am I correct?
6  A.  Yes.
7  Q.  Did you think it was in your interest to provide
8  incriminating information on the subject of Dr. Fishman?
9  A.  I just spoke the truth and answered truthfully.
10  Q.  When you were suspended from Yonkers Raceway, in order for
11  you to get back in good standing did you have to make any
12  agreement with them?
13  A.  I made an oral agreement, there was no written agreement.
14  Q.  But the oral agreement that you made was one in which you
15  indicated that you would not engage in any criminal activity,
16  isn't that correct?
17  A.  Correct, sir.
18  Q.  How long did it take after you were reinstated before you
19  started violating the rules of the racetrack?
20  A.  Almost immediately.
21  Q.  Now you have testified for the ladies and gentlemen of the
22  jury as to your understanding of the plea and cooperation
23  agreement with the government, and you indicated that it is the
24  Court that ultimately decides upon your sentence, am I correct?
25  A.  Correct.

M1QTFIS6                    Cohen - Cross

1    Q.  But the sentence is capped by your plea of guilty to one

2    count of conspiracy to engage in adulteration and misbranding,

3    am I correct?

4    A.  That's my understanding.

5    Q.  You are hoping to get a reduction in your sentence based

6    upon your cooperation with the government, am I correct?

7    A.  Yes, sir.

8    Q.  And the agreement requires you to, among other things,

9    attend meetings with the government, am I correct?

10   A.  Yes.

11   Q.  Provide them with documents and evidence if they should ask

12   for it, am I correct?

13   A.  Yes, sir.

14   Q.  And to tell the truth, am I correct?

15   A.  Yes, sir.

16   Q.  And the understanding is that you will receive this letter,

17   this 5K1 letter that you described, in support of an

18   application for leniency at sentencing should the government

19   decide that you have fulfilled the terms of your cooperation

20   agreement, am I correct?

21   A.  Yes, sir.

22   Q.  Who is it that decides whether or not you have given the

23   government all the documents that it requested?

24   A.  I do not know.

25   Q.  It's the government that decides, isn't it?

1   A.  I would assume, I don't know for a fact.

2   Q.  Who is it that decides whether or not whether or not they

3   view your cooperation as substantial?

4   A.  The government.

5   Q.  And is the word "substantial" anywhere defined in the

6   agreement?

7   A.  I do not know.

8   Q.  And who is it that decides whether or not you have told the

9   truth?

10  A.  I assume the government.

11          MR. SERCARZ:  I have no further questions.  Thank you.

12          THE COURT:  Thank you, Mr. Sercarz.

13          Mr. Adams.

14          MR. ADAMS:  Thank you.

15  REDIRECT EXAMINATION

16  BY MR. ADAMS:

17  Q.  Mr. Cohen, you were just asked questions on cross towards

18  the end regarding certain agreements that you've had with the

19  government.  Do you recall those questions?

20  A.  Yes.

21  Q.  Do you recall the questions about your proffer agreements

22  in particular?

23  A.  Yes.

24  Q.  And you were asked questions about protections that you

25  received for statements you made in those proffers under

1   certain circumstances.  Do you recall those questions?

2   A.  Yes.

3   Q.  Were you protected from charges of perjury or obstruction

4   if you lied to the government in the proffer?

5   A.  No.

6   Q.  Are you protected today from charges if you lie on the

7   stand?

8   A.  No.

9   Q.  What happens to your agreement if you lie on the stand

10  today?

11  A.  It's null and void and ripped up.

12  Q.  Is it in your interest to lie today?

13  A.  Absolutely not.

14           MR. ADAMS:  Your Honor, on the basis of Mr. Cohen's

15  testimony and cross-examination, the government offers 1102

16  into evidence.

17           THE COURT:  Mr. Sercarz?

18           MR. SERCARZ:  No objection.

19           THE COURT:  It will be received.

20           (Government's Exhibit 1102 received in evidence)

21  BY MR. ADAMS:

22  Q.  Mr. Cohen, does this document anywhere guarantee you a

23  particular sentence?

24  A.  Absolutely not.

25  Q.  Who gets to determine your sentence?

1   A.   The judge.

2   Q.   And what is it that you expect -- what information do you

3   expect the government will provide to your sentencing judge in

4   a 5K letter, if you get one?

5   A.   That I fully cooperated, told the truth.

6   Q.   Go to page 2 of this agreement, please.

7          And with respect to the other offenses that are listed

8   in this agreement, what is your understanding to what will be

9   told to the judge, the sentencing judge, about these offenses?

10  A.   The judge will be told about those offenses.

11  Q.   Is it your understanding that your sentencing judge learns

12  both the good and the bad about what you've told the

13  government?

14  A.   Absolutely, yes.

15  Q.   You were asked on cross-examination about the stability or

16  inconsistency of the Frozen Pain.  Do you recall those

17  questions?

18  A.   Yes.

19  Q.   Again what was your understanding of what Frozen Pain was

20  intended to do?

21  A.   To stimulate the equine athlete to perform better.

22  Q.   Were you disappointed in the Frozen Pain that you had

23  received?

24  A.   Sometimes yes and sometimes no.

25  Q.   In the circumstances where you weren't disappointed, what

1   did you observe?

2   A.   The horses just won.  They competed at a very high level.

3   Q.   And when you were disappointed, who did you call about

4   that?

5   A.   I said something to Lisa who then would refer me to

6   Dr. Fishman sometimes in a conversation.

7   Q.   Did you have a conversation with Fishman about that?

8   A.   Yes.

9   Q.   Why did you reach out to Lisa when you were disappointed

10  about Frozen Pain?

11  A.   I didn't have a direct line to Dr. Fishman.

12  Q.   Did you eventually get a direct line to Dr. Fishman?

13  A.   Yes.

14  Q.   You were asked separately about sales with Dr. Skelton.  Do

15  you recall those questions?

16  A.   Yes.

17  Q.   And you were asked questions about Jorge Navarro's use of

18  Dr. Skelton's products.  Do you recall that?

19  A.   I recall being asked a question about Jorge Navarro, if I

20  had sold to him.

21  Q.   Did you personally sell to Jorge Navarro?

22  A.   No, I did not.

23  Q.   Were Skelton products provided to Navarro?

24  A.   Dr. Skelton sold them directly.

25  Q.   Thank you.  And you were asked questions about your

1  training and your education.  Do you recall those questions?

2  A.  Yes.

3  Q.  You testified on cross-examination that you watched

4  veterinarians at different points in your career, is that

5  correct?

6  A.  Correct.

7  Q.  Did you ever study pharmacology?

8  A.  No.

9  Q.  Do you have any higher degrees in pharmacology?

10  A.  No, sir.

11  Q.  How about veterinarian medicine?

12  A.  No, sir.

13          MR. ADAMS:  No further questions, your Honor.

14          THE COURT:  Thank you.

15          Any recross?

16          MR. SERCARZ:  No, thank you, your Honor.

17          THE COURT:  All right.  You are excused with the

18  thanks of the Court, Mr. Cohen.

19          Your next witness, Mr. Adams.

20          MR. ADAMS:  Your Honor, the government calls Special

21  Agent Aaron Otterson.

22          THE COURT:  Are you Mr. Otterson?

23          THE WITNESS:  Yes, I am.

24          THE COURT:  Please remain standing and Ms. Dempsey

25  will administer the oath.

1    AARON OTTERSON,

2          called as a witness by the Government,

3          having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. CHOW:

6          THE COURT:  And while you're in the witness stand,

7    Mr. Otterson, you can take your mask off because we have a HEPA

8    filter and you're within the enclosure.

9          MR. CHOW:  May I proceed, your Honor?

10         THE COURT:  Yes, thank you.

11   BY MR. CHOW:

12   Q.  Good afternoon.

13         Where do you work?

14   A.  I work at the Federal Bureau of Investigation.

15   Q.  Is that also referred to as the FBI?

16   A.  That's correct.

17   Q.  What is your position?

18   A.  I am currently a supervisory special agent at FBI

19   headquarters in Washington, DC.

20   Q.  How long have you been a supervisory special agent?

21   A.  Approximately six months.

22   Q.  Prior to that what position did you hold?

23   A.  I was a special agent here in the FBI New York office on

24   the Eurasian organized crime task force.

25   Q.  How long have you been with the FBI?

1    A.  Almost seven years now.

2    Q.  During your time with the FBI, have you participated in the

3    execution of search warrants of physical locations?

4    A.  Yes, I have.

5    Q.  Approximately how many times?

6    A.  More than ten.

7    Q.  Directing your attention to March 14, 2019, did you

8    participate in a search on that date?

9    A.  Yes, I did.

10   Q.  What location did you search?

11   A.  It was at 121 Bald Mountain Road, Bear Creek Village,

12   Pennsylvania.

13   Q.  What kind of location was it?

14   A.  It was a large single-family residence with a barn also

15   located on the residence.

16   Q.  Who did the property belong to?

17   A.  Chris Oakes.

18   Q.  Was a search warrant obtained prior to conducting the

19   search?

20   A.  Yes, the search warrant was obtained on March 13, 2019.

21   Q.  What kind of search warrant was it?

22   A.  It was a surreptitious search and seizure warrant.

23   Q.  What is a surreptitious search and seizure warrant?

24   A.  It basically means it's a warrant that allows you to

25   conduct the search warrant without notifying the owner or the

1  occupant of the premises.

2  Q.  How come you did not want to notify the owner or occupant

3  of the property?

4  A.  This was an ongoing investigation at the time, and to that

5  point it was a covert investigation that we did not want to

6  alert the owner of the premises that there was an ongoing

7  investigation.

8  Q.  How many agents participated in the search?

9  A.  There were nine law enforcement agents there total,

10  including myself.

11  Q.  How did the operation to search Oakes' property begin?

12  A.  The actual search began at about midnight, which would be

13  12:00 a.m., on March 14, 2019.

14          We initiated the search by sending two agents on to

15  the property to set up surveillance positions where they could

16  see both the single-family residence and the barn.  And that

17  was a safety precaution on our part taken to make sure that we

18  were not going to be alerting anybody if they were home at the

19  residence at the time of the search.

20  Q.  What happened next?

21  A.  After about an hour we had determined it was safe for the

22  rest of the agents to enter the property.  The reason for that

23  is safety is our primary concern when conducting a

24  surreptitious search warrant.  If we end up alerting the

25  residents that we are there, they might not know who we are.

1    Q.  At that point did you and the other agents enter the

2    property?

3    A.  Yes, I believe four or five of us entered at that time in

4    addition to the two that stayed in their original locations for

5    surveillance positions.

6    Q.  As you and the other agents entered the property, what

7    steps did you take to remain undetected?

8    A.  So the way the property was laid out it was a large

9    property enclosed by a white picket fence.  Bear Mountain Road

10   or Bald Mountain Road ran east/west.  The residence was set

11   back north of the road a little ways and then the barn was to

12   the northeast of the residence at the end of the property.  The

13   driveway was running north/south from Bald Mountain Road and

14   then there was a service road also running north/south from

15   Bald Mountain Road that was to the east of the property.  So

16   that's what we used to walk back to the barn because that

17   service road led right to the barn.

18   Q.  Did you take any precautions to remain undetected?

19   A.  Yes.  We purposely chose to conduct the search in the

20   middle of the night so we had the cover of darkness.  We used

21   flashlights extremely sparingly to not let anybody see we were

22   there.  A couple of the agents had night vision goggles they

23   were using for surveillance reasons and also to be able to

24   determine if there were any surveillance cameras on the

25   property that could alert the occupants to our presence.

1    Q.  Where did you go once you entered the property?

2    A.  Once we got to the barn we entered on the east side of the

3    barn via the service road.  Myself and one other agent stayed

4    posted up outside to be able to alert the agents that went

5    inside the barn for the initial sweep to let them know if

6    anybody was coming.

7    Q.  What is an initial sweep?

8    A.  So every time we do a search warrant we will do an initial

9    security sweep of the premise to make sure nobody's there,

10   there's nothing that could cause danger or a safety hazard to

11   any of the agents involved in the search.

12   Q.  What happened once the initial sweep was complete?

13   A.  Once the initial sweep was complete and we had an idea of

14   the layout of the barn and where items may be located that we

15   were interested in, we came up with a plan and split up to see

16   who would start searching which portions of the barn.

17   Q.  Can you give the jury a sense of what the layout was once

18   you entered the barn.

19   A.  So as I said, we didn't use flashlights.  So it was a large

20   barn.  It was a multilevel structure.  There was a series of

21   stalls with horses in them.  There were multiple like alcoves

22   or various rooms, openings where they kept supplies and things

23   for the horses.  And then there was a locked room that we found

24   on the base level of the barn that we ended up searching.

25   Q.  Did you enter the locked room?

1   A.  Yes, we were able to obtain entry to the locked room which

2   we believed at that time, based on wire intercepts, to be the

3   medicine room that we had overheard them referring to on the

4   wire intercepts.

5   Q.  Once you entered the room, could you describe what the

6   layout looked like?

7   A.  Yes.  It was a pretty small room with wood paneled walls,

8   probably I would say no bigger than 10 by 12 feet, rectangular

9   room.  Once you entered the room, on the left side of the room

10  there was cabinets on the ground with a countertop over those,

11  and then there were cabinets above those on the wall.  And also

12  in the back left corner of the room there was a full-sized

13  refrigerator, then on the right side of the room there was a

14  metal shelving unit with various supplies and items stacked on

15  that.

16  Q.  Did you observe what was on the shelves?

17  A.  Yeah, there were some boxes, there was a bag of what

18  appeared to be pills with some syringes in it, and I think

19  there was one or two shock machines that they used on the

20  horses.

21  Q.  And did you open the refrigerator?

22  A.  Yes, I did.

23  Q.  What was in the refrigerator?

24  A.  There were a number of cardboard boxes in there that

25  contained vials of different substances as well as some other

1    miscellaneous substances scattered throughout the refrigerator.

2    Q.  What once you surveilled the room, what did you do next?

3    A.  We started taking pictures of the room as we found it.  And

4    then once we had taken those pictures we started looking

5    through everything.  On the counter to the left there was a

6    number of notebooks that we started looking through and taking

7    pictures of the pages as well as in the cabinets we searched

8    everything and found various substances.

9    Q.  Did you end up seizing anything that day?

10   A.  Yeah, we seized approximately 20 items from the room.

11   Q.  Generally speaking, what sorts of items did you seize?

12   A.  We tried to take samples of whatever we could of the

13   various substances that we were finding in there which we

14   assumed to be performance-enhancing drugs.

15   Q.  When you say substances, what format did those substances

16   come in?

17   A.  Mostly pill or like powder form.

18   Q.  Did you take all of the substances that you observed in the

19   room?

20   A.  No, we did not.

21   Q.  How come?

22   A.  Because it was a surreptitious search warrant and we did

23   not want to alert the owner of the premises of the ongoing

24   investigation.  We strategically found substances where there

25   was enough of them that we could take a sample of it without

1    Mr. Oakes noticing that we had taken something.  So we had to

2    determine which items that we could take without him noticing.

3    Q.  After seizing those items, what did you do next?

4    A.  We labeled each one of those items and put it in a bag and

5    then we took a picture of each one of those items that was

6    labeled 1 through 20, I think it was.

7    Q.  And once you were done seizing the items, what did you do?

8    A.  They were transported back to the FBI field office to be

9    processed as evidence.

10   Q.  How did you leave the property?

11   A.  We tried to put everything back in places as carefully as

12   we could to make it seem that nobody had been there.  We locked

13   the room as we left and then we entered the premises the same

14   way that we -- or we exited the premises the same way that we

15   entered on the service road to the east of the property.

16   Q.  You mentioned that you transported the items out from the

17   premises.  Where did you take them after you left the location?

18   A.  We went back to our staging location, which was a mile or

19   two away in a parking lot, and then we had gathered the

20   evidence items there, determined who was going to be

21   transporting them back to the field office here in New York.

22   Q.  Once you arrived back at the field office, what steps were

23   taken to inventory the items that you had taken?

24   A.  So when we conduct a search we have a piece of paper that's

25   a collected items log.  We'll write down on the piece of paper

1   the item that that we found, where we found it, the agents that

2   seized it and witnessed it, and a description of the item.

3            Once we get back to the office we take each one of

4   those items from the collected item log and we enter that in

5   our records management system that is assigned to a specific

6   case number.  Once that collected item log gets approved

7   through our records management system it gets assigned what's

8   known as a 1B number which is specific to that piece of

9   evidence for that case number.

10  Q.  Are you familiar with the term "chain of custody?"

11  A.  Yes, I am.

12  Q.  What steps did you take to maintain -- withdrawn.

13           What is chain of custody?

14  A.  Well, it's a form that we use to document who seized an

15  item initially and then where that item has transferred custody

16  throughout its life cycle of processing and getting it into our

17  evidence room at the FBI.

18  Q.  Is the process you just described efforts to maintain that

19  chain of custody?

20  A.  That's correct.

21           MR. CHOW:  Your Honor, previously the government read

22  into evidence Exhibit 9012, which is a stipulation between the

23  parties.

24           THE COURT:  Yes.

25           MR. CHOW:  Through that stipulation the government

1    offered the Exhibits 1100 through 1128 and 9300 through 9311,

2    which I believe were all entered into evidence.  I would like

3    to now show the witness some of them.

4               THE COURT:  Yes, that's correct, and you may do so.

5               MR. CHOW:  Ms. Jung, could we bring up Government

6    Exhibit 1100 for everyone, please.

7    BY MR. CHOW:

8    Q.  Special Agent Otterson, are you able to see what is on your

9    screen?

10   A.  Yes, sir.

11   Q.  What are we looking at here?

12   A.  This is a photograph of the refrigerator in the medicine

13   room that we searched.

14               MR. CHOW:  Can we blow up the top shelf with the two

15   vials on the --

16               Actually take that down.  Let's go with the bottom

17   shelf.  Highlight that, please.

18   Q.  Special Agent Otterson, are you able to see what's on the

19   top of any of those boxes?

20   A.  Yeah, the white box in the middle I can make out ITP, and

21   then the larger box on the right-hand side is upside down but I

22   believe it says VO2 Max.

23   Q.  Previously you saw that there was two vials on the top

24   shelf of the refrigerator, is that right?

25   A.  That's correct.

1          MR. CHOW:  Can we bring up Government Exhibit 1104,

2     please.

3     Q.  What is this item?

4     A.  I believe this is one of the vials that was on the top of

5     the fridge in the picture we just saw.

6     Q.  Can you read anything that you can off of the label of this

7     vial?

8     A.  It says NHP1.  Directions:  Reconstitute with

9     bacteriostatic water.  Use as directed.  Store in freezer and

10    refrigerate.

11         MR. CHOW:  Ms. Jung, can we bring up Government

12    Exhibits 1106, 1107 and 1108 all together, please.

13    Q.  Starting from the top left on your screen, could you read

14    what is on the outside of the box?

15    A.  Lime green NBO550 50Cs in bottle 1 CC P/dose IV clear cap

16    NVM 5.30 5 CC bottle 1 CC P/dose IV stripe green AV 1.50 TQ 5CC

17    bottle 1CC IM.

18    Q.  And in the photograph on the right-hand side, can you read?

19    A.  NVO 5.50.

20         MR. CHOW:  Ms. Jung, could you take that down and can

21    we put up 1109 and 1110 side by side, please.

22    Q.  Special Agent Otterson, can you read what it says on the

23    cover of the box on the left-hand side, please?

24    A.  15 gold cap growth factor IV circle two days out day after

25    muscles soreness and recovery.

1          MR. CHOW:  Can we bring up Government Exhibit 1128,

2    please.

3    Q.   What is this photo of?

4    A.   This is a photo of a vial of one of the substances that we

5    located and seized at the premises.

6    Q.   Can you read what it says on the label, please.

7    A.   It says PG2, one milligram.

8          MR. CHOW:  Can we take this down and put up Exhibits

9    111 and 112 side by side, please.

10   Q.   To the extent you are able to, can you read what's on the

11   label?

12   A.   Yes, this is a photo of the same bottle, two different

13   angles, it says TB-7, acetylated thymosin B4, and I can't read

14   the rest of that.  The directions, reconstitute with three

15   milliliters saline and either IV, IM or SQ, best results

16   when -- I don't see the rest of that -- event and five to seven

17   days prior to event.

18         MR. CHOW:  I may have said 111, I meant 1011 so 1111.

19         Can we bring up Exhibit 1102, please.

20   Q.   Is this a photo of another item that you encountered during

21   the search?

22   A.   Yes, part of one of the notebooks that we found and took

23   photographs of it.

24   Q.   Can you please read the entire text?

25   A.   Begins with:  Captain Hill one half CC pink, 5 CC Factrel,

1  10 CC VO2, 20 CC clear, 6 CC orange-drench aminos, CMPK bleeder

2  tube.

3          Second entry:  Ella Rose, 6 CC orange, 10 CC VO2, 20

4  clear, one half CC pink drench aminos CMPK, bleeder pills,

5  bleeder tube.

6          MR. CHOW:  Can we take that down and put up 1125 with

7  1126 and 1127 together, please.

8  Q.  Starting with the left-hand side, you testified earlier

9  that you encountered some pills with some syringes.  Can you

10  describe for us what we're looking at in Government

11  Exhibit 1125?

12  A.  Yes.  So in 1125 that is the metal shelving that I referred

13  to on the right-hand side of the room as you walked in, and

14  this is the bag of pills with the two syringes in the bag as

15  well.

16  Q.  Going to the right-hand side, 1126 and 1127, are you able

17  to read the first line of 1126?

18  A.  It says homeopathic bleeder and analgesic oral paste,

19  directions:  Administer 5CC per 100-kilogram body weight six to

20  eight hours before exercise.

21          MR. CHOW:  All right.  If we could blow up the bottom

22  photo for the agent.  Thank you.

23  Q.  And can you continue reading.

24  A.  After before exercise it says for intense bleeders

25  administer a loading dose 24 hours before exercise.

1           MR. CHOW:  All right.  Can we bring up Government

2    Exhibit 3458, please.

3           And your Honor, this was subject to the revised

4    stipulation from this morning to add this exhibit.

5           THE COURT:  All right.  Thank you.

6    Q.  Starting from the top, can you read who the email is from

7    and who the email is to.

8    A.  The email is from sethfishman@hotmail.com and it was sent

9    to John Pundyk.  The subject is:  RE new products.

10   Q.  The date that it was sent?

11   A.  Friday, January 27, 2017, at 3:30 a.m.

12   Q.  And the body of the email, the top email, please.

13   A.  It says see below.

14   Q.  And below you see that there was an email previously.  Can

15   you read the header information, so who it's from, who it's

16   sent to, the subject and the date, please.

17   A.  It was from John Pundyk, sent Thursday, January 26, 2017,

18   at 4:55 p.m., and it was sent to sethfishman@hotmail.com, the

19   subject says new products.  The body says:  Hi Seth, here's a

20   list of what you sent me.  PSDS.  This one is self-explanatory

21   and I have customers that already use these amino acids in an

22   oral form so they know what they are to expect.

23   Q.  In this next portion, let the record reflect this next

24   portion is in red text.  Go ahead.

25   A.  I suggest bacteriostatic water always because any bacteria

1   introduced will feed on peptides.  All the below doses at for

2   racehorses.  You may consider going higher if not happy.

3   Q.  All right.  Back to black text.

4   A.  MHP1, one vial.  White powder, tall vial, black and silver

5   striped top.  How much sterile water and what is the dose?

6   Q.  Red text again.

7   A.  30 milliliters.

8   Q.  Black text again.

9   A.  What is this one supposed to do?

10  Q.  Now red text.

11  A.  Two milliliters for analgesic/sedation.

12  Q.  And back to black text.

13  A.  MHP1BP one vial, white powder, short vial, black and silver

14  striped top.  How much sterile water and what is the dose?

15  Q.  Red text.

16  A.  20 milliliters.

17  Q.  Black text.

18  A.  What is this one supposed to do?

19  Q.  Red text.

20  A.  Two milliliters for analgesic/sedation.

21  Q.  Black text.

22  A.  MHP1DMT one vial, pink powder, shorter vial, solid black

23  top.  How much sterile water and what is the dose?

24  Q.  Red text.

25  A.  20 milliliters.

1    Q.  Black text.

2    A.  What is this one supposed to do?

3    Q.  Red text.

4    A.  Two milliliters for analgesic/sedation.

5    Q.  Black text.

6    A.  NBN 5.30 two vials white powder looks like 10 CC vial,

7    silver top with see-through pop top.

8    Q.  Go to the next page.  Let's read the first two lines.

9    A.  How much sterile water and what is dose?

10   Q.  Red text.

11   A.  Six milliliters.

12   Q.  Black text.

13   A.  What is this one supposed to do?

14   Q.  Red text.

15   A.  Strong analgesic, give two milliliters.

16   Q.  I would like to skip down to -- do you see where it says

17   NBO 3.20?

18   A.  Yes.

19   Q.  Can we start reading from there the black text?

20   A.  NBO 3.20 four vials white powder, looks like a 3 CC vial,

21   silver top with solid while flip-off cover.  How much sterile

22   water and what is dose?

23   Q.  Red text.

24   A.  Two CC and give one CC.

25   Q.  Black text.

1    A.   What is this one supposed to do?

2    Q.   Red text.

3    A.   Strong analgesic/sedation.

4    Q.   Black text.

5    A.   NBO 5.50 two vials white powder looks like a 10 CC vial

6    with solid lime green flip-off cover.  How much sterile water

7    and what is dose?

8    Q.   Red text.

9    A.   Six milliliters.

10   Q.   Black text.

11   A.   What is this one supposed to do?

12   Q.   Red text.

13   A.   Two milliliters for analgesic/sedation.

14           MR. CHOW:  Briefly can we take this down and put back

15   up 1106 and 1108, please.

16   Q.   Do you see in the first row where it says NBO 550?

17   A.   Yes.

18   Q.   Sorry, on the box on the left-hand side, underneath that

19   next to "clear cap," what does that say?

20   A.   NBN 5.30.

21   Q.   And the label on the right side, what does that say?

22   A.   NBO 5.50.

23           MR. CHOW:  Could we take that down and put up

24   Government Exhibit 1118, please.

25   Q.   Was this another item that was encountered during the

1    search?

2    A.   Yes, it was.

3    Q.   Can you read anything you can from the label?

4    A.   Yes.  So it appears the brand is Equiformance, ITTP Plus.

5    Directions:  Reconstitute with 30 milliliters bacteriostatic

6    water and administer 15 milliliters IV 24 hours and four hours

7    before exercise.

8              MR. CHOW:  Great.  We can take that down.

9              Please bring up Government Exhibit 128B, like boy, and

10   I would like to direct the jurors to take a look in their

11   binders for tab 128B, like boy, dash T.

12             And for the record, this is a call on April 5, 2019,

13   between Seth Fishman and an unidentified male.

14             I think everybody has flipped the page.

15             THE COURT:  Let's give everyone another minute.

16             MR. CHOW:  Okay.

17             THE COURT:  Okay.

18             (Audio recording played)

19             MR. CHOW:  Why don't we stay in our transcript

20   binders.  Can we bring up 199A, like apple, and if the jurors

21   could flip to tab 199AT.

22             And for the record, this is a call on February 19,

23   2019.  The participants are Christopher Oakes and Seth Fishman.

24             (Audio recording played)

25             MR. CHOW:  All right.  Can we stay in our transcript

1  binder to 199B, like boy, the continuation of the call.

2  (Audio recording played)

3  MR. CHOW:  Can we take that down and bring up

4  Government Exhibit 401K.

5  Your Honor, I intended to go through this exhibit and

6  actually quite a few more.  I don't know how late you intended

7  to go today, but we could take a break here.

8  THE COURT:  If we're at a convenient breaking point we

9  should break for the day because I promised jury we would aim

10  for 4:30 and we're well past that.

11  If you're starting a new line, we could break here.

12  MR. CHOW:  This is a natural breaking point.

13  THE COURT:  Ladies and gentlemen, we'll recess for the

14  day.  Leave your transcript binders here.  You can leave your

15  notebooks in the jury assembly room.  Please don't take them

16  home with you.  And please remember not to talk about the case

17  with anyone, and that includes your family members and your

18  friends.  And please do not read about the case or

19  independently do any research about the case or anything

20  involved with the case.

21  All right.  Thank you all, and I hope everyone has a

22  nice evening.  We'll be back here tomorrow ready to start at

23  9:30 a.m.

24  (Jury not present)

25  THE COURT:  Mr. Otterson, thank you very much you're

M1QTFIS6

1    excused for the day.  You remain under oath, so please do not

2    talk about your testimony or about the case with anybody before

3    you resume the stand tomorrow, okay.

4            THE WITNESS:  Thank you, your Honor.

5            THE COURT:  Thank you and have a good evening.  Thank

6    you for being here.

7            MR. CHOW:  Your Honor, I'm going to hand the witness

8    the exhibits just to maintain custody.

9            THE COURT:  That's fine.

10            (Witness not present)

11            THE COURT:  All right.  Thank you.  I really just

12    wanted to get a sense of where we are going next.  And you had

13    talked at some point about you needed to put a table with

14    physical evidence.  Have you dispensed with that now?

15            MR. ADAMS:  We haven't dispensed with it.  We did

16    shift it back in the batting order, so to speak, so we're

17    likely to do that tomorrow afternoon would be my guess,

18    potentially Friday morning.

19            THE COURT:  What is next after Special Agent Otterson,

20    bearing in mind that Mr. Sercarz, of course, will have time

21    with him.

22            MR. ADAMS:  So once Agent Otterson is off the stand we

23    intend to call Adrienne Hall.

24            THE COURT:  F-A-L-L?

25            MR. ADAMS:  H-A-L-L.  Followed by Jamen James

1    Davidovich, D-A-V-I-D-O-V-I-C-H.  And if we get through the

2    rest of Mr. Otterson, Ms. Hall, Mr. Davidovich, then Jarret

3    Concannon, J-A-R-R-E-T-T, C-O-N-C-A-N-N-O-N.  And if we get

4    through Mr. Concannon then we expect we will have some calls to

5    play and some exhibits to put in, but the government's last

6    witness is likely Mr. Concannon.

7              MR. SERCARZ:  I couldn't hear the end of the comment.

8              MR. ADAMS:  The government's last witness is likely

9    Mr. Concannon.

10             THE COURT:  You will update us tomorrow.

11             MR. ADAMS:  Just on the basis of today, your Honor, I

12   expect we're still on the same track we were yesterday, Friday

13   morning to have our last witness.

14             THE COURT:  Okay.  Anything else from the government

15   before you take a seat?

16             MR. CHOW:  Your Honor, may I just flag one thing?

17             Mr. Davidovich, prior to taking the stand, I believe

18   we may want to consider having a brief ex parte -- I mean

19   outside the presence of the jury proceeding with regard to his

20   invocation and then a compulsion order issued by the Court.  I

21   don't know how your Honor would like to do that, but in the

22   past what I have experienced is outside the presence of the

23   jury he's asked a question, he invokes, and then there's a

24   compulsion order that is issued requiring his testimony.

25             THE COURT:  Who is he?

1      MR. ADAMS:  Mr. Davidovich is a trainer.  He does have

2  exposure.  He has counsel.  We expect he will invoke the Fifth

3  before he testifies, and the Court will get a draft immunity

4  order this evening.

5      THE COURT:  I will take a look at it then.  So you'll

6  remind me of that before he takes it the stand.

7      MR. ADAMS:  And your Honor, the last thing that I will

8  mention is we have received no witness list from the defense.

9  We have no defense exhibits whatsoever other than the one

10  that's been entered in the course of the trial.  We have not

11  received any discovery under 26.2.  And so if the defense

12  intends to call any witnesses or put in anything in, we expect

13  that that will be provided tomorrow morning.  And we would like

14  to set a time by which Mr. Fishman needs to make his decision

15  as to whether he's taking the stand or not.

16      THE COURT:  Mr. Sercarz?

17      MR. SERCARZ:  If the Court is going to impose a

18  deadline on us to notify the government as to any exhibits and

19  as to whether Mr. Fishman will take the stand I will be guided

20  by the Court's orders in that regard.  I can tell you that as

21  of now I have no concrete information to provide to the

22  government on this score.

23      THE COURT:  On any of those issues or on Dr. Fishman?

24      MR. SERCARZ:  The other witness that I had intended to

25  call was to make an arrangement to call Adrienne Hall as an

1    adverse witness, and the government has obviated the need for

2    me to do that.

3            THE COURT:  So are there discovery materials that you

4    need to turn over?

5            MR. SERCARZ:  With regard to Ms. Hall, no.  There are

6    other portions of her conversations that I may wish to play.

7    We're seeking to have them transcribed as we speak and I can

8    talk to the government about that.  They have them, and I can

9    probably give the government time stamps so that they can play

10   them even without transcripts.  And that would take place on

11   the cross-examination of the witness now under certain

12   circumstances.

13           With regard to Dr. Fishman --

14           THE COURT:  No, it's fair, I think, for you to reserve

15   your rights on Dr. Fishman.

16           MR. SERCARZ:  Thank you.

17           MR. ADAMS:  Your Honor, with respect to the time

18   stamps for Ms. Hall, it will be very inefficient if we are

19   provided transcripts live at trial.  If we could get them

20   tonight and get the transcripts we could decide to agree

21   whether they're accurate.

22           Then with respect to Mr. Fishman, it's well within the

23   Court's discretion to set a time, doesn't need to be today,

24   obviously, but a time by which he has to announce that

25   decision.

1                THE COURT:  Obviously, but it's not going to be today.

2                MR. ADAMS:  But I would propose that it be Friday

3      morning, because we are likely to rest the government's case,

4      we go directly into the defense case.

5                THE COURT:  I think we'll see how your case is

6      proceeding.  I'm not going to force him to make a decision

7      until he hears virtually your entire case.

8                MR. ADAMS:  Thank you, your Honor.

9                THE COURT:  Mr. Sercarz, why can't you get these

10     transcripts done and in order?  If you are going to be calling

11     her as a witness, haven't you started that process?

12               MR. SERCARZ:  I have started that process, your Honor.

13               THE COURT:  Well, in fairness, we can't really have

14     transcript recordings played without transcripts.

15               MR. SERCARZ:  In the event that I called her, I was

16     going to have my investigator authenticate the transcripts.

17     The transcripts have not even been prepared yet.  And given

18     that she is going to be testifying as a government witness,

19     then I think that my responsibility would be complete if I can

20     provide the government with time stamps for conversation.

21               It may very well be that on her direct examination she

22     makes reference to portions of the conversations other than

23     those that the government will play and there won't be any

24     necessity for this.  It's going to be in the nature of

25     cross-examination that I seek to play other portions presumably

1    for context.  There are limits on what I'll be allowed to

2    introduce, I presume.  So it's very tough for me to give the

3    government the kind of discovery that they're seeking when it's

4    going to be their witness and my cross-examination, your Honor.

5              THE COURT:  I'm telling you this, if you haven't given

6    them the transcript and we don't have an agreed exhibit, which

7    is the transcription, then you're not playing the audio

8    recording and you can recall her in your case.

9              MR. SERCARZ:  Would it be inappropriate, your Honor,

10   for me on cross-examination to elicit from the witness a

11   foundation for playing an extra portion of the tape and then

12   simply to have it played without a transcript?

13             THE COURT:  Yes, because --

14             MR. SERCARZ:  She would be laying the foundation which

15   would govern the issue of admissibility, and there's no

16   requirement that that a jury have a transcript to assist them

17   in listening to a tape.

18             MR. ADAMS:  Your Honor, I don't disagree.  I do think

19   it would be useful to have a transcript, but it's not strictly

20   necessary.

21             Two logistical points though:  One, to the extent that

22   Mr. Sercarz does want a transcript, the only reason I flag this

23   in advance is for efficiency sake so we can review it for

24   accuracy tonight.  It's not really a question of authenticity.

25   I don't think that we would need an extra witness.

1    THE COURT:  I would agree with that if you're going to

2  be introducing them.

3    MR. ADAMS:  As a practical point, to the extent there

4  are clips or calls not in evidence through the government's

5  case that need to be authenticated or reviewed by Ms. Hall,

6  quote, unquote, outside of the presence of the jury or just for

7  her, we'll need some headphones provided.  My office I'm sure

8  can provide headphones so she can listen to calls in advance,

9  but again, if we know in advance which parts we're talking

10  about, I'm happy to talk with Mr. Sercarz in advance.  This may

11  be completely unnecessary.

12    THE COURT:  All I can say is this:  Dr. Fishman is

13  entitled, or his lawyers on his behalf are entitled to hear

14  your case and to react as they choose to do based on what you

15  do during your case in chief.  And he's not obligated to

16  anticipate your case or anything like that.

17    All I was suggesting, Mr. Sercarz, is since you told

18  me you are going to be calling this person as a witness anyway

19  in your case in chief and now you may be able to do whatever

20  you wanted to do as part of cross -- although, of course, that

21  depends on the scope of the direct -- I would have hoped that

22  you could work cooperatively on this.  But if you can't, you

23  can't, and we'll do it as it plays out.

24    MR. SERCARZ:  Your Honor, I will make my best effort,

25  and I can tell you the government has been extremely

1    cooperative with me throughout the trial.

2             THE COURT:  It appears that way, which is helpful to

3    me and to the jury.

4             MR. ADAMS:  Otherwise nothing else, your Honor.

5             THE COURT:  Anything else from you, Mr. Sercarz?

6             MR. SERCARZ:  No, your Honor, thank you.

7             THE COURT:  All right.  You're welcome.  Everyone have

8    a good evening.

9             Thank you to our two court reporters who are here.

10   Thank you both very much.

11            (Adjourned to January 27, 2022 at 9:30 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          INDEX OF EXAMINATION

2    Examination of:                          Page

3     JEAN BOWMAN

4    Cross By Mr. Sercarz . . . . . . . . . . . . 545

5    Redirect By Ms. Mortazavi  . . . . . . . . . 572

6    Recross By Mr. Sercarz . . . . . . . . . . . 592

7     CYNTHIA COLE

8    Direct By Mr. Adams  . . . . . . . . . . . . 597

9    Cross By Mr. Sercarz . . . . . . . . . . . . 629

10   Redirect By Mr. Adams  . . . . . . . . . . . 640

11    ROSS COHEN

12   Direct By Mr. Adams  . . . . . . . . . . . . 645

13   Cross By Mr. Sercarz . . . . . . . . . . . . 696

14   Redirect By Mr. Adams  . . . . . . . . . . . 709

15    AARON OTTERSON

16   Direct By Mr. Chow . . . . . . . . . . . . . 714

17

18

19

20

21

22

23

24

25

1                        GOVERNMENT EXHIBITS

2    Exhibit No.                                    Received

3    9014    . . . . . . . . . . . . . . . . . 543

4    101-AT through 199-T, 203, 204 and 205  . . . 544

5    3458    . . . . . . . . . . . . . . . . . 545

6    10,007  . . . . . . . . . . . . . . . . . 659

7    10,000  . . . . . . . . . . . . . . . . . 666

8    10,001  . . . . . . . . . . . . . . . . . 668

9    9012 and all of the referenced exhibits  . . 680

10   10,006  . . . . . . . . . . . . . . . . . 682

11   10,004  . . . . . . . . . . . . . . . . . 687

12   10,009  . . . . . . . . . . . . . . . . . 688

13   10,003  . . . . . . . . . . . . . . . . . 688

14   9008 and all of the exhibits listed in  . . . 690

15            the stipulation

16   13,000  . . . . . . . . . . . . . . . . . 693

17   1102    . . . . . . . . . . . . . . . . . 710

18

19

20

21

22

23

24

25