1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                            20 Cr. 160 (MKV)

5  SETH FISHMAN,

6              Defendant.
                                         Trial
7  ------------------------------x
                                         New York, N.Y.
8                                        January 27, 2022
                                         9:28 a.m.
9  Before:

10               HON. MARY KAY VYSKOCIL,

11                                       District Judge
                                         -and a Jury-
12
                        APPEARANCES
13
   DAMIAN WILLIAMS
14      United States Attorney for the
        Southern District of New York
15 BY:  ANDREW C. ADAMS
        SARAH MORTAZAVI
16      ANDEN F. CHOW
        Assistant United States Attorneys
17
   SERCARZ & RIOPELLE, LLP
18      Attorneys for Defendant Fishman
   BY:  MAURICE H. SERCARZ
19      -and-
   LAW OFFICE OF MARC FERNICH
20 BY:  MARC A. FERNICH

21

22 ALSO PRESENT:  KARLINE JUNG, Paralegal Specialist

23

24

25

M1RTFIS1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning, everyone.  Have you all had

3    further discussions about the issue we were talking about at

4    the end of the day with regard to Ms. Hall?

5          MR. SERCARZ:  Yes, your Honor.  I think there's still

6    enough.  My request is going to be -- I think it's a joint

7    request -- at the end of the direct testimony of Ms. Hall we're

8    going to ask for a brief recess.

9          I understand that there are points of law that are

10   going to need to be discussed, and in the event that I am -- I

11   find it necessary to play portions of the tapes, and I am

12   permitted to play portions of the tapes, at that point I will

13   work -- and it should take very short time -- with the

14   paralegal to find exactly the parameters on the tape.

15         If you would like me to explain the logic behind that

16   I will do it.

17         THE COURT:  Why don't we hold back because the jurors

18   are on their way up, so we'll talk about it at the next break.

19         Can someone tell me who is Ms. Hall?

20         MR. ADAMS:  Your Honor, Ms. Hall is a small-time horse

21   trainer who purchased drugs from Dr. Fishman.

22         THE COURT:  That's enough.  I wanted to get some

23   sense.

24         So we'll pick it up, Mr. Sercarz, at the break.

25         MR. SERCARZ:  Thank you.

1           MR. FERNICH:  Judge, I wanted to let you know I'm not

2      going to be in the box today, and I attempted to do a Covid

3      test this morning and I think there must be a shortage.  I'm

4      not in the box.  They weren't able to administer one.

5           THE COURT:  Really?  We had a judges' meeting

6      yesterday and they talked about having an ample supply.  You

7      went to 6A?

8           MR. FERNICH:  Yes.  I'm surmising that's the reason

9      why.  They asked if I would be in the box and I said no and

10     they said sorry.

11          THE COURT:  All right.  I will make inquiry to make

12     sure they can help you today or tomorrow.

13          MR. FERNICH:  Thank you very much.

14          THE DEFENDANT:  Your Honor, I went at lunch and they

15     didn't want to give me one as well, and I asked them to call

16     your chambers to tell them that they didn't want to give me

17     one, then they decided to give me one.  If there is a shortage,

18     because they weren't going to give me one, I asked them to

19     inform the chambers.

20          THE COURT:  I will mention that one issue that was

21     mentioned at the board of judges' lunch -- I patched into it

22     most of it when we broke yesterday -- apparently in some of the

23     civil cases people are bringing their whole entire trial team

24     to try to get free Covid testing.  So there was a mention that

25     we have to clamp down and it has to be people who are truly

1  participating.  So that might have been part of what was

2  happening, but I will email right now.

3          MR. FERNICH:  Thanks.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Jury present)

2            THE COURT:  Good morning, and thank you all very much

3   for being so prompt and punctual.  We are actually a minute or

4   two ahead of schedule, and I think the lawyers are on track

5   with their presentation of evidence to you, so thank you all

6   very much.

7            And with that, do we have Special Agent Otterson with

8   us?

9            MR. CHOW:  Yes, he's in the witness room.

10           THE COURT:  Thank you.

11           THE WITNESS:  Good morning.

12           THE COURT:  Good morning, Special Agent Otterson.

13           Just as a reminder, you are under oath.

14           THE WITNESS:  Yes, your Honor.

15           THE COURT:  Good morning.

16           THE WITNESS:  Good morning.

17           THE COURT:  Mr. Chow.

18    AARON OTTERSON,     (Continued)

19        called as a witness by the Government,

20        having been previously sworn, testified as follows:

21   DIRECT EXAMINATION

22   BY MR. CHOW:

23   Q.  Special Agent Otterson, good morning.

24   A.  Good morning.

25   Q.  I would like to pick up where we left off yesterday.

1          MR. CHOW:  Ms. Jung, could we bring up Government

2     Exhibit 1100.

3     Q.  Do you recall what this was?

4     A.  Yes, this was a photo of the open refrigerator in the

5     medicine room at the search warrant premises.

6          MR. CHOW:  Ms. Jung, could we blow up the bottom

7     shelf, please.

8     Q.  And on the red, the label that has a little bit of red

9     color on it, could you read what it says on that one?

10    A.  It says VO2 Max.

11         MR. CHOW:  Ms. Jung, could we bring up 1104, please.

12    Q.  Do you recall this photo?

13    A.  Yes, this was a photo of one of the vials that was sitting

14    on the top shelf of the refrigerator.

15    Q.  Could you read what the name of this substance appears to

16    be?

17    A.  MHP 1.

18         MR. CHOW:  Ms. Jung, could we take that down.

19         Ladies and gentlemen of the jury, if you could open

20    your transcript binders, we're going to tab 131AT.

21         Ms. Jung, could we bring up the recording and a copy

22    of the transcript as well?

23         THE COURT:  Let's give everyone a moment.

24         MR. CHOW:  For the record, this is a call dated

25    April 14, 2019.  The participants are Seth Fishman and

1   Christopher Oakes.

2            All right.  Looks like we're all set.  Go ahead,

3   Ms. Jung.

4            (Audio recording played)

5            MR. CHOW:  Let's continue to the next tab 131BT.

6            And for the record, this is the same call

7   continuation.

8            Go ahead, Ms. Jung.

9            (Audio recording played)

10           MR. CHOW:  Can we take that down and bring up

11  Government Exhibit 401K.

12           And can we go to page 65, please.

13           This is a document that has been previously admitted

14  into evidence taken from the device from Seth Fishman.

15  BY MR. CHOW:

16  Q.  Special Agent Otterson, going from -- focusing on the top

17  four lines, can you read the messages going from bottom to top,

18  and include the date and time that they were sent, please.

19  A.  The first message is dated March 2nd, 2017 at 1:09 p.m. UTC

20  time.  Outgoing message that says:  Pure ITPP.

21           Next message March 2Nnd 2017, 2:14 p.m. UTC incoming

22  message:  How much?

23           Third message, March 2nd, 2017 at 2:17 p.m. UTC

24  outgoing message:  $55 per vial.

25           And the last message March 2nd, 2017, at 2:17 p.m.

1    UTC, outgoing message:  Not trying to sell you, just showing

2    you what it should look like.

3    Q.  Special Agent Otterson, it may be because I'm in like this

4    plastic thing, but I can't really hear you that well, so maybe

5    if you could pull it a little closer and speak up a little bit,

6    for my benefit?

7    A.  Yes, sir.

8             THE COURT:  Let me remind the jurors if any of you

9    can't hear, wave your hand and let me know that.

10            MR. CHOW:  Ms. Jung, could we go to page 64, please.

11   Q.  And again reading from the bottom to the top, could you

12   read these three messages.

13   A.  First message is March 2nd, 2017, at 2:24 p.m. UTC.  It's

14   an incoming message:  Send me ten and how to use it.

15            Next message, March 2nd, 2017 at 2:26 p.m. UTC time,

16   outgoing message:  There are two ways of using it that are most

17   popular.  The first day is the entire bottle preferably three

18   to four hours out.  The second way it half the bottle the day

19   before, usually the night before, and the remainder three to

20   four hours out.

21            Third message, March 2nd, 2017, at 2:27 p.m. UTC,

22   outgoing message:  You, on the other hand, may have the luxury

23   of training horses much closer in and might want to try it

24   maybe one to two hours out.

25            MR. CHOW:  Ms. Jung, could we go to page 63.

1   Q.  And same exercise, from the bottom to the top, please.

2   A.  First message, March 23, 2017, at 10:13 a.m. UTC, incoming

3   message:  If you can, call me please.  Navarro.

4           Next message, March 23rd, 2017, at 10:13 a.m. UTC,

5   incoming message:  Are you in Dubai?

6           Third message, March 23, 2017, 10:13 a.m. UTC,

7   incoming message is:  Jorge Navarro.

8           Next message, March 23rd, 2017, at 10:13 a.m. UTC,

9   incoming message:  Need to ask you about pills, how to use

10  them.

11          Next message, March 23rd, 2017, 10:28 a.m. UTC,

12  outgoing message:  I just landed in Qatar.  Going through

13  transfer.  Will call you in a few minutes.  I will be in Dubai

14  by 11 o'clock tonight.

15          Next message, March 23rd, 2017, 10:29 a.m. UTC,

16  outgoing message:  As for the pills, since it also has

17  antiinflammatory I generally load them over three days for

18  better horses.

19          MR. CHOW:  Ms. Jung, please go to page 61.  And can we

20  blow up the top three lines, please.

21  Q.  Special Agent Otterson, same exercise, from the bottom to

22  the top.

23  A.  First message, June 5, 2017, 11:19 a.m. UTC, incoming

24  message:  Need pills ASAP, please.

25          Next message, June 5, 2017, 11:19 a.m. UTC, outgoing:

M1RTFIS1                    Otterson - Direct

1    How many and where?

2              Third message, June 5, 2017, 11:19 a.m. UTC, incoming

3    message:  New Jersey.

4              MR. CHOW:  Ms. Jung, please pull up page 60, and the

5    whole page.

6    Q.  Special Agent Otterson, from the bottom up.

7    A.  First message, June 5, 2017, at 11:20 a.m. UTC, incoming:

8    1,000.

9              June 5, 2017, 11:21 a.m. UTC, outgoing message:

10   Address?

11             Next message, June 5, 2017, 11:21 a.m. UTC --

12   Q.  Here I'll interrupt you.  No need to read the whole

13   address.  We'll say it's an address in New Jersey.

14   A.  Okay.  And the next message, June 5, 2017 at 12:04 p.m.,

15   outgoing message:  1Z41RV580195611517.

16             Next message, June 5, 2017, 12:05 p.m. UTC, outgoing

17   message:  We sent out the last 1,200 pills and you will receive

18   tomorrow.

19             Next message, June 5, 2017, 12:06 p.m. UTC, incoming

20   message:  Okay.  Thank you.  Please send me a bill.  I want to

21   pay you.

22             And last message, June 5, 2017, 12:06 p.m., outgoing:

23   These pills are not always easy to get, so if you like them and

24   anticipate using them a lot, let me know because I'm reordering

25   more from overseas now.

1          MR. CHOW:  Ms. Jung, could we jump to page 40, please.

2     Q.  And just the top line.

3     A.  Message is dated October 8, 2017, 7:47 p.m. UTC, it's an

4     incoming message, one of two:  Seth, I am going to pay you, I

5     promise, just things are so crazy for me right now.  I won too

6     many races and they are trying to put me out of the game, but I

7     prom.

8     Q.  Could we go to page 39 and read the bottom line.

9     A.  Message dated October 8, 2017, 7:47 p.m. UTC, incoming

10    message, two of two:  I-S-E, continuation of promise, I am

11    going to paid you, boss, and I do appreciate what you have done

12    for me.

13         MR. CHOW:  All right.  And go to page 19, please.  And

14    why don't we blow up the whole page.

15    Q.  Special Agent Otterson, from the bottom to the top, please.

16    A.  First message, May 22nd, 2018 at 4:03 p.m. UTC, incoming

17    message:  Calling you in 40 minutes.

18         Next message, May 25, 2018, 5:28 p.m. UTC, outgoing

19    message:  Total amount owed on account is $6,119.

20         Next message, May 30, 2018, at 2:00 p.m. UTC,

21    incoming:  Send me an address, Boss, so my wife can send you a

22    check today.  And also, make check payable to who?

23         May 30, 2018, 2:03 p.m. UTC, incoming message:  Also

24    send me ten BB3 and 2,000 bleeder pills.  Thank you.

25         May 30, 2018, 2:05 p.m. UTC, incoming, it's a forward

1    of an address in New Jersey.

2              May 30, 2018, 2:12 p.m. outgoing message:  Seth

3    Fishman.

4              May 30, 2018, 2:12 p.m. UTC, incoming:  Address.

5              And May 30, 2018, 2:12 p.m. UTC, outgoing message with

6    an address in Highland Beach, Florida.

7              MR. CHOW:  Ms. Jung, could we bring up Government

8    Exhibit 401A, which is already in evidence.

9    Q.  And Special Agent Otterson, can I direct you to the top

10   left corner of the screen.  What does it say is there?

11   A.  Jorge Navarro Stables.

12   Q.  And on the top right of the screen, can you read the two

13   numbers and what it says underneath the two numbers?

14   A.  The first line is $3,025.50, it says open.

15             And the next line $3,025.50, overdue.

16             MR. CHOW:  Ms. Jung, could we highlight the center of

17   the screen, the chart.

18   Q.  Special Agent Otterson, for each row, can you read the due

19   date, the balance and the total and the status.  Why don't we

20   go from bottom to top.

21   A.  The first one, June 15, 2017, the balance is zero dollars,

22   the total is $20,915, the status is paid.

23             Next line, February 28, 2018, balance is zero, total

24   $5,204, and the status is paid.

25             Next line, January 1st, 2018, the balance is zero

M1RTFIS1                    Otterson - Direct

1    dollars, the total is negative $20,000 and the status is

2    closed.

3              Next line, June 13, 2018, the balance is $3,025.50,

4    the total is $5,075 and the status is overdue.

5              And the last line, July 12, 2018, the balance is zero

6    dollars, the total is negative $8,168.50 and the status is

7    closed.

8              MR. CHOW:  Ms. Jung, could we bring up Government

9    Exhibit 1048, please.  And this is already in evidence.  And

10   this is the Navarro tab on the Excel spreadsheet.

11   Q.  From the top, can we -- do you see where it says TB-7 in

12   the left-hand column?

13   A.  Yes.

14             MR. CHOW:  Ms. Jung, could we highlight TB-7 and also

15   highlight where it says BB3.

16             Can we highlight where it says BPB in the second row

17   on the top left.

18             And above that, could we highlight where it says BPR.

19             Then can we highlight where it says MHP1 BP and below

20   that can we highlight MHP1 DMT.

21             Can we take that down for a moment, and do you mind me

22   switching me over to the ELMO, please.

23             Your Honor, I'm now going to bring up a number of

24   physical exhibits that were entered pursuant to stipulation

25   90 -- the premises search.  These are all in the 9200 series

1   which have been previously admitted into evidence.

2              THE COURT:  Premises search of what premises?

3              MR. CHOW:  This is from the Navarro premises.  And I'm

4   starting with Exhibit 9200.

5              THE COURT:  Why don't you just hold it up so the

6   jurors could see what you're doing and then put it on the ELMO.

7              MR. CHOW:  Sure.

8   BY MR. CHOW:

9   Q.  Special Agent Otterson, can you read what's on the label of

10  this item?

11  A.  Yeah, it's titled TB-7.

12  Q.  I'm now publishing 9201.

13             Can you read what the name of this product is.

14  A.  TB-7.

15  Q.  This is Government Exhibit 9203 also seized from Navarro's

16  property.

17             Can you read what it says on the outside of that box.

18  A.  BB3.

19  Q.  Can you read what it says on the outside of that vial.

20  A.  BB3.

21  Q.  For the record, this is 9206.

22             Can you read what that says.

23  A.  BPB.

24  Q.  For the record I'm now publishing 9208.

25             Can you read what that says.

M1RTFIS1                    Otterson - Direct

1    A.  BPR.

2    Q.  I'm now publishing Government Exhibit 9211.

3         Could you read what the product name for that one was.

4    A.  MPH1 DMT.

5    Q.  I'm now publishing for the jury Government Exhibit 9212.

6         Could you read what the product name to for that one

7    was?

8    A.  MHP1 BP.

9         MR. CHOW:  Ms. Jung, could we switch back to

10   Government Exhibit 1600.  Can we blow up the header.

11   Q.  Special Agent Otterson, can you read the information that's

12   contained in the header of this email?

13   A.  It's from Seth Fishman to jnavarrostables@gmail.com,

14   subject:  Sorry, internet was out until now.  The date is

15   Friday, January 20, 2017 at 2:36 a.m.

16        MR. CHOW:  All right.  We can go back to the original

17   document.  Ms. Jung, can we blow up the paragraph that begins

18   BPR and BPB.

19   Q.  Special Agent Otterson, can you read what's on the screen?

20   A.  The strong analgesics BPR and BPB add 20 CC BW.  The

21   typical dose for a Standardbred (SB) is 1.0 CC three to five

22   hours.  I would suggest that for TB you go closer if possible.

23   IV will hit them harder and IM will be less consistent.  I have

24   never had a horse drop, but sometimes they will blow hard.  The

25   BPR was noted to cause more sedation.

1          MR. CHOW:  All right.  Ms. Jung, can we blow up the

2     next paragraph, please.

3     Q.  Special agent Otterson, could you read this paragraph to

4     the jury.

5     A.  MHP1-BP and DMT, add 20CC of BW.  SB dose between 0.5 to

6     1.0 CC five hours out.  BP is stronger version.

7          MR. CHOW:  Ms. Jung, please blow up the paragraph that

8     begins with "blood" and highlight.

9     Q.  Special Agent Otterson, can you read that paragraph?

10    A.  Blood, green cap, equine EPO typically used closer to race

11    for maintenance.

12         BP1, newest fraction and suggest you wait for more

13    feedback from people testing for me.

14         BB2, same as BB1.

15         BB3, made this some time ago.  It takes two weeks to

16    work.  Typically, one bottle per week for two weeks.  IV was

17    preferred over IM, then one shot every two to three weeks.  The

18    BB1 and BB2 are fractions and in theory may move blood faster.

19    It was studied but never brought to market or even discussed

20    much in literature.

21    Q.  Can we highlight the bottom of the page, just the last two

22    items, HP Bleeder and bleeder pills.

23         Special Agent Otterson, could you read this?

24    A.  HP Bleeder, natural vasodilator and analgesic.  For TB,

25    most using 10 to 20 CC IV three hours out.  Bleeder pills, can

1   use 20 to 40 pills six to eight hours.  I think closer not as

2   good.  I actually suggest in some cases to split the pills

3   between the night before and six to eight hours out.

4              MR. CHOW:  Can we go to page 2, Ms. Jung, and

5   highlight the paragraph beginning with PG2, please.

6   Q.  Special Agent Otterson, could you read this?

7   A.  PG2, muscle growth factor, two shots a week for two weeks

8   then once a week thereafter.  Helps with muscle development.

9   One bottle is one shot, so add three to five milliliters BW and

10  give IM or IV.

11             MR. CHOW:  Ms. Jung, could we take that down and bring

12  back up 401K, specifically page 12.

13             Can we highlight the top four lines, please.

14  Q.  Special Agent Otterson, could you read from bottom to top.

15  A.  First message, July 23, 2018 at 10:23 a.m. UTC, incoming

16  message:  Need 20 BB3.

17             Next message, July 23, 2018 at 10:23 a.m. UTC,

18  outgoing message:  Where you want me to send to?

19             Next message, July 23, 2018, at 10:29 a.m. UTC,

20  incoming message:  NJ address.

21             And last message, July 23, 2018, at 10:31 a.m. UTC,

22  incoming message:  Forward forward Jorge Navarro 120B

23  Eatoncrest Drive, Eatontown, New Jersey 07724.

24             MR. CHOW:  Ms. Jung, could we go to page 11 and

25  highlight the whole body.

1    Q.  Special Agent Otterson, from bottom to top, please.

2    A.  First message, July 23, 2018, at 12:28 p.m. UTC outgoing

3    message:  Not sure confusion but you have a balance still of

4    $3,025.50.

5            Next message, July 23, 2018, at 12:28 p.m. UTC,

6    outgoing message:  Can email Excel if you want.

7            Next message, July 23, 2018, 12:29 p.m. UTC, incoming

8    message:  Yes, please.

9            Next message, July 23, 2018, 12:29 p.m. UTC, incoming:

10   That's all info I had on me.

11           Next message, July 23, 2018 at 12:30 p.m. UTC,

12   incoming:  Whatever you send me, Boss.  You have helped me out

13   and I appreciate everything you have done for me.

14           MR. CHOW:  We can stop there.

15           Ms. Jung, can we keep Government Exhibit 401K, this

16   page on the left-hand side of the screen, and on the right-hand

17   side of the screen can we bring up Government Exhibit 1048.

18           On the right-hand side of the screen can we go to the

19   next page on the right-hand side of the screen.

20           Can we blow up the section that corresponds with

21   6.13.18, that paragraph.

22   Q.  Special Agent Otterson, could you read from left to right

23   and then from top down what the entries in this spreadsheet

24   say.

25   A.  BB3, 12, 6.13.18.

1            Bleeder pills, 2,000, 6.13.18.

2            VO2 Max, 1, 6.13.18.

3            HP Bleeder Plus, 3, 6.13.18.

4            Fed Ex overnight shipping 24.58, 6.13.18.

5            MR. CHOW:  Ms. Jung, could we then highlight the items

6    corresponding with 7.23.18.

7    Q.  Special Agent Otterson, could you do the same thing for

8    this portion of the spreadsheet, please.

9    A.  BB3, 20, 7.23.18.

10            30 milliliters bacteriostatic water, 4, 7.23.18.

11            Fed Ex overnight shipping 25.58.

12            MR. CHOW:  And keeping Government Exhibit 401K on the

13    left-hand side, on the right hand side can we bring but

14    Government Exhibit 3447.

15            Could we highlight the header and the body.

16    Q.  Special Agent Otterson, could you read the header

17    information for this email?

18    A.  It's from Mary Fox to Seth Fishman, subject Navarro order

19    7.23.18, the date Monday, July 23rd, 2018.

20    Q.  And the body of the email?

21    A.  20 BB3, 4 30-milliliter bacteriostatic water, Fed Ex

22    tracking number 772794381070.

23            MR. CHOW:  Can we take down the right-hand side of the

24    screen and put up Government Exhibit 3441.

25            Can we drop down to the fourth page of Government

1    Exhibit 3441, please.  If we could highlight the top half of

2    the screen there.

3    Q.  On the top left hand side of the screen, can you read what

4    the emblem says.

5    A.  Equestology, Seth Fishman, DVM.

6    Q.  And the address?

7    A.  2565 South Ocean Boulevard, Highland Beach, Florida, 33487.

8    Q.  Is there an email address listed there?

9    A.  Seth@equestology.com.

10   Q.  Who is it billed to?

11   A.  Jorge Navarro Stables.

12   Q.  What is the date of this invoice?

13   A.  July 23, 2018.

14   Q.  Under activity, can you read what it says there?

15   A.  BB3, EPM treatment, 14-day supply, quantity is 20, rate is

16   $250, the amount is $5,000.

17   Q.  And under the line that reads shipping?

18   A.  It says shipping, quantity is one, rate is $95 for a total

19   of $95.

20           MR. CHOW:  Ms. Jung, could we go to page 1 of 3441,

21   and can you just highlight the top email, please.

22   Q.  Special Agent Otterson, could you read the header

23   information and the body of the email.

24   A.  From Seth Fishman to jnavarrostables@gmail.com, subject,

25   forward invoice 2449 from Equestology, the date, Monday,

1  July 23, 2018 at 12:46 p.m.  Attachments, invoice 2449 from

2  Equestology PDF, payments and invoices JNS PDF.  The body

3  reads:  Here is the invoice and the accounting.  Thank you.

4          MR. CHOW:  Ms. Jung, can we put back up 401K and go to

5  page 10.  Just highlight the bottom two lines, please.

6  Q.  Special Agent Otterson, from the bottom to the top, can you

7  read for us.

8  A.  First message is July 23, 2018, 12:31 p.m. UTC, incoming:

9  Send me a total of everything.

10         Next message, July 23, 2018 at 12:33 p.m. UTC,

11  outgoing:  Just sent invoice for 20.  That's $5,095 plus old

12  balance $3,025.50.  Total now $8,120.50.

13         MR. CHOW:  Ms. Jung, go to page 9 of the same document

14  and highlight the second line from the bottom.

15  Q.  Special Agent Otterson, could you read this for us.

16  A.  August 3, 2018 at 1:34 p.m. UTC, incoming:  Please

17  overnight me or ASAP 3,000 pills.  Also let me know if you

18  receive check for 8,120.50.

19         MR. CHOW:  Ms. Jung, please leave this up on the left

20  side of the screen on the right side can you bring up

21  Government Exhibit 401O like Oscar.

22  Q.  On the right-hand side of the screen, Special Agent

23  Otterson, can you read who this check is from, top left of this

24  check.

25  A.  JN Racing Stables, Inc., 10477 Southwest 49th Place, Cooper

1    City, Florida 33328.

2    Q.  Can you read the date that this check was written?

3    A.  September 13, 2018.

4    Q.  Who is it paid to?

5    A.  Seth Fisher.

6    Q.  What is the amount?

7    A.  $8,120.50.

8    Q.  In the memo line, what does it state?

9    A.  Supplements, horses.

10   Q.  Who is it signed by?

11   A.  Jennifer Navarro.

12           MR. CHOW:  Can we take this down and bring up

13   Government Exhibit 401M like Mary.

14           Can we highlight the top six lines, please.

15   Q.  Special Agent Otterson, again from the bottom to the top,

16   could you read these text messages.

17   A.  First message, May 8, 2018 at 2:50 p.m. UTC, incoming:

18   Give me a call when you get a minute.

19           Next message, May 8, 2018, at 2:50 p.m. UTC, outgoing:

20   Call you in five.

21           Next message, May 9, 2018, at 3:59 p.m. UTC, outgoing:

22   Fed Ex tracking number 772192715769.

23           Next message, May 30, 2018, at 7:03 p.m. UTC,

24   incoming:  Send me two more boxes.  With a thumbs up emoji.

25           Next message, May 30 2018, 9:12 p.m. UTC outgoing:

1     32.

2               And last message, May 30, 2018 at 9:24 p.m. incoming:

3     Thumbs up emoji.

4     Q.   Before we take this down, who is listed under the party

5     name on the left hand -- in the left hand column?

6     A.   It's the phone number plus 1-570-991-3010, Chris Oakes.

7               MR. CHOW:  We can take that down.

8               I would like to ask the jury to open their transcript

9     binders to Government Exhibit 129A, and I ask Ms. Jung to bring

10    that up on the screen as well.

11              For the record, this is a call April 5, 2019 between

12    Seth Fishman and Mary Fox.

13              (Audio recording played)

14              MR. CHOW:  Can we take that down and bring up

15    Government Exhibit 1046 and highlight the top portion.

16    Q.   Special Agent Otterson, could you read, starting from the

17    bottom, does there appear to be an email?

18    A.   Mary.equestology@gmail.com.

19    Q.   And it says on April 5, 2019 at 2:49 that email address

20    wrote, and then what does it say in the body?

21    A.   It says:  Hello, Fed Ex tracking number 774898792789.  Have

22    a great day.

23    Q.   And at the top, can you read the header information and the

24    body?

25    A.   From sethfishman@hotmail.com sent April 5, 2019 at

1    2:50 p.m. to Mary Fox, email address is

2    mary.equestology@gmail.com, BCC sethfishman@hotmail.com,

3    subject RE Navarro order 3.5.19, and the body is the two hands

4    together emoji.

5              MR. CHOW:  All right.  Ladies and gentlemen of the

6    jury, if we could open our hymnals one more time to Government

7    Exhibit 190AT, please.

8              And Ms. Jung, if you could bring up the transcript and

9    the call, please.

10             For the record, this is a call January 25, 2019

11   between Jorge Navarro and Christopher Oakes.

12             (Audio recording played)

13             MR. CHOW:  Can we bring up Government Exhibit 191A and

14   191AT.

15             For the record, this is a call on January 27, 2019,

16   between Jorge Navarro and Seth Fishman.

17             (Audio recording played)

18             MR. CHOW:  Can we now turn to the next tab, 192A, and

19   bring up 192AT, please.

20             And for the record, this is a call on March 10, 2019

21   between Jorge Navarro and Manuel Peralta.

22             (Audio recording played)

23             MR. CHOW:  Can we now turn to 131C in your transcript

24   binders.

25             For the record, this is a call on April 14, 2019

1    between Seth Fishman and Christopher Oakes.

2                (Audio recording played)

3                MR. CHOW:  No further questions, your Honor.

4                THE COURT:  All right.  Thank you.

5                Mr. Sercarz.

6                MR. SERCARZ:  Thank you, your Honor.

7    CROSS-EXAMINATION

8    BY MR. SERCARZ:

9    Q.  Good afternoon, Agent.

10   A.  Good afternoon.

11   Q.  Refresh my recollection, were you in the courtroom when the

12   video of the Grand Shaheen horserace was played?

13   A.  No, I was not.

14   Q.  Do you happen to know the date or the approximate date when

15   that horserace took place?

16   A.  No, I do not.

17   Q.  With regard to the calls and text messages that you have

18   just reviewed, am I correct that they began in 2017 and

19   continued until early 2019?

20               MR. CHOW:  Objection.

21               THE COURT:  Ground?

22               MR. CHOW:  Scope.

23               THE COURT:  Overruled.

24   A.  I believe that's correct.

25               MR. SERCARZ:  Thank you, no further questions.

1              THE COURT:  Redirect?

2              MR. CHOW:  No, your Honor.

3              THE COURT:  Thank you very much, Special Agent

4    Otterson, you are excused.

5              THE WITNESS:  Thank you, your Honor.

6              Government's next witness.

7              MR. CHOW:  Your Honor, the government calls Adrienne

8    Hall.

9     ADRIENNE HALL,

10         called as a witness by the Government,

11         having been duly sworn, testified as follows:

12   DIRECT EXAMINATION

13   BY MS. MORTAZAVI:

14             THE COURT:  You can remove your mask, and please try

15   to speak into the microphone.  Thank you.

16   BY MS. MORTAZAVI:

17   Q.  Good morning, Ms. Hall.

18   A.  Good morning.

19   Q.  Could you tell us the city and state where you currently

20   live?

21   A.  Cream Ridge, New Jersey.

22   Q.  What do you currently do for a living?

23   A.  I'm a Standardbred racehorse trainer.

24   Q.  Do you currently have any horses listed as horses that you

25   train?

1    A.  Not at the moment.

2    Q.  How far did you go in school?

3    A.  I have a bachelor's degree.

4    Q.  And a degree in what?

5    A.  Media communications.

6    Q.  Where did you get that degree?

7    A.  East Stroudsburg University.

8    Q.  After you graduated, what kind of work did you do?

9    A.  I worked in real estate and home finance.

10   Q.  How long did you work there?

11   A.  Probably about five years.

12   Q.  And what type of work did you do after that?

13   A.  I got a job at a Thoroughbred breeding farm.

14   Q.  How long were you in that job?

15   A.  Almost five years.

16   Q.  And what did you do next?

17   A.  I had a little break where I just worked at another smaller

18   breeding farm, then I got a job working for Todd Pletcher

19   Racing Stable.

20   Q.  When you worked for the first Thoroughbred breeding farm,

21   what was your job title?

22   A.  I was part of their office staff, but I helped them with

23   public sales, private sales, planning breedings, dealing with

24   clients.

25   Q.  The second job that you had, what job title did you hold

1    there?

2    A.   With the farm I was basically helping take care of the

3    horses a little bit.

4    Q.   When you started working for Mr. Pletcher, what job title

5    did you hold?

6    A.   I was part of his administrative team as well.

7    Q.   Were you involved in training horses?

8    A.   No.

9    Q.   At any point have you owned any racehorses?

10   A.   Yes.

11   Q.   Were those Standardbred or Thoroughbreds?

12   A.   Both.

13   Q.   What's the difference?

14   A.   Standardbreds have the cart behind them that they pull and

15   Thoroughbreds, they have the jockey on top of them and gallop.

16   Q.   And you mentioned that you are now employed as a trainer,

17   is that right?

18   A.   Yes.

19   Q.   And when were you first licensed as a trainer?

20   A.   I got my trainer's license in December of 2017.

21   Q.   What kind of horses have you trained between 2017 and

22   today?

23   A.   Standardbreds.

24   Q.   Have you ever raced Thoroughbred horses?

25   A.   Not as a trainer, no.

1   Q.  Are you familiar with a company called Equestology?

2   A.  Yes.

3   Q.  What is your understanding of the business that Equestology

4   is engaged in?

5   A.  Pharmaceutical sales.

6   Q.  Have you met anyone from Equestology?

7   A.  I met Dr. Seth Fishman.

8   Q.  Did you meet him in person or did you just communicate with

9   him?

10  A.  Both.

11  Q.  Have you had contact in any form with anyone else from

12  Equestology?

13  A.  Lisa Ranger.

14  Q.  And how did you communicate with Lisa Ranger?

15  A.  Phone, text, email.

16  Q.  Have you ever met her in person?

17  A.  No.

18  Q.  Prior to testifying today, Ms. Hall, did there come a time

19  when you started meeting with the prosecutors in this case?

20  A.  Yes.

21  Q.  Approximately when was that?

22  A.  A few months ago.

23  Q.  Have you spoken with me prior to today?

24  A.  Yes.

25  Q.  More than once?

1   A.  Yes.

2   Q.  After meeting with the government, did you enter into an

3   agreement with the government?

4   A.  Yes.

5   Q.  Was that agreement in writing?

6   A.  Yes.

7          MS. MORTAZAVI:  Ms. Jung, could we pull up just for

8   the witness and parties, not the jury, Government

9   Exhibit 11003.

10         Ms. Hall do you see that document in front of you,

11  Government Exhibit 11003?

12  A.  Yes.

13  Q.  Do you recognize it?

14  A.  Yes.

15         MS. MORTAZAVI:  Ms. Jung, if you could go to the last

16  page of this exhibit.

17  Q.  Is that your signature on this agreement, Ms. Hall?

18  A.  Yes.

19  Q.  And do you see my signature on there as well?

20  A.  Yes.

21  Q.  What's your understanding of what you're required to do

22  under your agreement with the government?

23  A.  Be honest, tell the truth.

24  Q.  What else?

25  A.  Be available, provide any information that they need that I

1    might have.

2    Q.  If you do those things, what's your understanding of what

3    the government will do?

4    A.  I will not be prosecuted.

5    Q.  Not prosecuted for what?

6    A.  Giving my horses performance-enhancing drugs.

7    Q.  Does the outcome of this trial have any impact on this

8    agreement with the government?

9    A.  No.

10           MR. SERCARZ:  Objection, calls for conjecture.

11           THE COURT:  No, she's testifying to her understanding

12   of the agreement she entered into.

13           Correct?  Is that what you're asking for?

14           MS. MORTAZAVI:  Yes, your Honor.

15           THE COURT:  Is that what you have given us?

16           THE WITNESS:  Yes.

17           THE COURT:  Overruled.

18   Q.  What's your understanding of what could happen today if you

19   do not tell the truth?

20   A.  I could be prosecuted.

21   Q.  And what happens to this agreement?

22   A.  It's void.

23   Q.  Could you be prosecuted for any other crimes besides the

24   ones that are in the agreement?

25   A.  No.

1    Q.  Could you be prosecuted for committing perjury?

2    A.  Yes.

3    Q.  Ms. Hall, I would like to ask you about the time you began

4    training horses.  In 2017 you said that you were first licensed

5    as a trainer, is that right?

6    A.  Yes.

7    Q.  When in 2017, approximately?

8    A.  December.

9    Q.  Why did you want to be a trainer?

10   A.  I had gotten married and moved to Ohio and I had to give up

11   my job with Pletcher.  And there was a harness track about ten

12   minutes from my house in Ohio, and I missed the racetrack so

13   much that I just started going by it to see what it was all

14   about.  And I ended up actually meeting some people.  I claimed

15   my first Standardbred, and I given it to somebody else to

16   train, but I wasn't really happy with the care that she was

17   getting so I started going to the track every, and the more I

18   started going I realized that I really wanted to do this full

19   time.

20              (Continued on next page)

21

22

23

24

25

1   Q.  And, Ms. Hall, you testified that you became licensed as a

2   trainer?

3   A.  Yes.

4   Q.  Where were you licensed initially in December 2017?

5   A.  That was in Ohio.

6   Q.  And what did you have to do to obtain your trainer's

7   license?

8   A.  I had to get a license with the United States Trotting

9   Association first.

10  Q.  What is the United States Trotting Association?

11  A.  It's the governing body of harness racing.

12  Q.  Is that sometimes called the USTA?

13  A.  Yes.

14  Q.  And besides getting a membership with the USTA, what else

15  did you have to do?

16  A.  Then I had to get the actual owner and trainer license with

17  the Ohio State Racing Commission.

18  Q.  What's your understanding of what the Ohio State Racing

19  Commission does?

20  A.  They're like the governing body of the state of horseracing

21  in the state.

22  Q.  And were they the ones who issued your license to you?

23  A.  Yes.

24  Q.  Apart from Ohio, over the course of your career, did you

25  obtain your trainer's license in any other states?

1   A.  Yes.

2   Q.  Which ones?

3   A.  So I had Ohio, Kentucky, Florida, New York, New Jersey and

4   Pennsylvania.

5   Q.  Okay.  Focusing on Florida for a moment, did you have to

6   apply for your trainer's license in Florida?

7   A.  Yes.

8   Q.  What agency granted you your license?

9   A.  The Florida State Racing Commission.

10  Q.  And what's your understanding of what that commission does?

11  A.  The same thing.  They're in charge of the rules and

12  regulations in Florida horseracing.

13  Q.  And in New York, did you have to apply for your license

14  there?

15  A.  Yes.

16  Q.  What agency granted you your license?

17  A.  The New York Gaming Commission.

18  Q.  And what's your understanding of what they do?

19  A.  The same.  They make the rules and regulations for

20  horseracing in the state.

21  Q.  And as a result of being licensed in each of those states,

22  do you have to be familiar with the rules and regulations that

23  apply to horseracing in each state?

24  A.  Yes.

25  Q.  Are you aware of the penalties if you violate rules?

M1RPFIS2                    Hall - Direct

1  A.  Yes.

2  Q.  And do those include rules regarding the administration of

3  drugs to racehorses?

4  A.  Yes.

5  Q.  I want to move you to October 2018.  At that point, were

6  you licensed as a trainer in Florida?

7  A.  Yes.

8  Q.  And around that time, approximately how many different

9  racehorses did you train?

10  A.  Two.

11  Q.  They were both Standardbred?

12  A.  Yes.

13  Q.  Did you own them?

14  A.  Yes.

15  Q.  And moving through the course of your career as a trainer,

16  at your peak, how many horses did you run at -- did you train,

17  at most?

18  A.  I believe my max was five.

19  Q.  And at most, how many horses did you own?

20  A.  Five.

21  Q.  So again, turning you back to October 2018, I'd like to

22  talk to you about the first time you had contact with Lisa

23  Ranger from Equestology.

24  A.  Mmm, hmm.

25  Q.  When did you first make contact with her, approximately?

1    A.  I believe it was in October of 2018.

2    Q.  And how did you initially make contact with her?

3    A.  I either called her first or sent her an e-mail.

4    Q.  How did you get her contact information, whether it was her

5    phone number or her e-mail address?

6    A.  I believe another trainer in Ohio gave it to me.

7    Q.  Did you ask for her information?

8    A.  I asked where they had been getting their products from.

9    Q.  And what did they tell you?

10   A.  That they were reputable and their pricing was good.

11   Q.  Okay.  And as far as you were aware, where was Lisa Ranger

12   located?

13   A.  Delaware.

14   Q.  And at that time, where were you located?

15   A.  Ohio.

16   Q.  And why did you think that Lisa Ranger was located in

17   Delaware?

18   A.  Her phone number was a Delaware area code and the invoices

19   I got had a Delaware address.

20   Q.  Were you aware either way if she had an office in Ohio?

21   A.  No.

22   Q.  And did you ever end up purchasing medications from Lisa

23   Ranger?

24   A.  Yes.

25   Q.  Approximately when?

1   A.  October of 2018.

2   Q.  Ms. Jung, could you please pull up for the witness and the

3   parties only Government Exhibit 1915.

4          Ms. Hall, do you recognize this exhibit?

5   A.  Yes.

6   Q.  What is it?

7   A.  An e-mail from Lisa to myself.

8   Q.  How do you know that?

9   A.  It's my e-mail address.

10          MS. MORTAZAVI:  Your Honor, the government offers

11   Government Exhibit 1915.

12          MR. SERCARZ:  No objection.

13          THE COURT:  It will be received in evidence.

14          (Government's Exhibit 1915 received in evidence)

15          MS. MORTAZAVI:  Ms. Jung, if you could publish it for

16   the jury, please.  I don't know if it's up on the jurors'

17   screens yet.  Okay.  I see some nodding heads.

18          THE COURT:  Is there anybody who doesn't have it?

19          JUROR:  Yeah, I don't have it.

20          THE COURT:  Okay.  We'll try to fix your screen.

21          (Pause)

22          Okay?  All right.  Thank you, Ms. Mortazavi.

23   BY MS. MORTAZAVI:

24   Q.  Ms. Hall, looking at the header information on this e-mail,

25   can you just explain who the e-mail is sent from, who it's sent

1    to and the date?

2    A.  It's sent from LisaRangerEquestology@Gmail.com.  The date

3    is Tuesday October 16th, 2018 at 12:38 p.m.  The subject is

4    Hall Racing, and it's to HallRacingStable@Gmail.com.

5    Q.  Is that your e-mail address?

6    A.  Yes.

7    Q.  Can you read the body of the e-mail?

8    A.  It says:  "Here's the product sheet, but we are always

9    adding to it.  If you don't see it, just ask.  Thanks, Lisa."

10   Q.  Did this e-mail contain attachments?

11   A.  Yes.

12   Q.  Ms. Jung, could you please turn to the second page of this

13   exhibit?

14           Do you recognize this as the attachment to the e-mail,

15   Ms. Hall?

16   A.  Yes.

17   Q.  And, Ms. Jung, could you please turn to page 3 of this

18   exhibit?

19           Ms. Hall, do you see, halfway down the page, a

20   category DOC between the categories Delaware and EPM?

21   A.  Yes.

22   Q.  And do you see there that there are some product listed?

23   A.  Yes.

24   Q.  Could you read out those product names?

25   A.  "ATP/B-12, BB3, BPR Blue, Equimass-PG2, Homeogesic-M-D-P,

1   IT Plus, IT Plus Purple, MHP1BP, MHP1DMT, Oxygenator, Serenity,

2   SODHSP-C, TB-7 thymosin, and VO2 Max."

3   Q.  Ms. Hall, do you recognize on that list any of the products

4   that you have ever received from Seth Fishman?

5   A.  Yes.

6   Q.  Can you list out some of them?

7   A.  VO2 Max.

8   Q.  Anything else?

9   A.  TB-7.

10  Q.  Anything else?

11  A.  BB3.

12  Q.  Thank you.

13          Ms. Jung, can you please turn to page 6 of this

14  exhibit.

15          And, Ms. Hall, was this also an attachment to the

16  e-mail that we just reviewed?

17  A.  Yes.

18  Q.  Looking at this first page, is there anything on this first

19  page that you ever received from either Lisa Ranger or Seth

20  Fishman?

21  A.  No.

22  Q.  Ms. Jung, could you turn to the second page.

23          Anything there that you ever received?

24  A.  No.

25  Q.  Ms. Jung, could you turn to the next page.

M1RPFIS2                      Hall - Direct

1      How about here, Ms. Hall, anything here on this page

2   that you ever received?

3   A.  TB-7.

4   Q.  Okay.  Ms. Jung, could you please turn to the next page in

5   this exhibit.

6      Anything here that you received, Ms. Hall?

7   A.  No.

8   Q.  Ms. Jung, the next page.

9      Anything here that you received?

10  A.  EGH.

11  Q.  Is that No. 11 on this list?

12  A.  Yes.

13  Q.  Are you aware of what EGH stands for?

14  A.  Equine growth hormone.

15  Q.  Are you familiar we equine growth hormone?

16  A.  No.

17  Q.  Are you familiar, not with this particular product, but

18  generally what the concept of equine growth hormones?

19  A.  Not really.

20  Q.  Okay.  Ms. Jung, you can please take down this exhibit, and

21  could you please pull up -- just for the witness and the

22  parties, not the jury -- Government Exhibit 1914.

23      Ms. Hall, do you see this document in front of you?

24  A.  Yes.

25  Q.  Do you recognize it?

SOUTHERN DISTRICT REPORTERS, P.C.
                (212) 805-0300

1    A.   Yes.

2    Q.   What is it?

3    A.   An e-mail from Lisa to myself.

4    Q.   And how do you recognize it?

5    A.   It's my e-mail address.

6             MS. MORTAZAVI:  The government offers Government

7    Exhibit 1914.

8             MR. SERCARZ:  No objection.

9             THE COURT:  It will be received into evidence.

10            (Government's Exhibit 1914 received in evidence)

11            MS. MORTAZAVI:  Ms. Jung, please publish it for the

12   jury.

13   BY MS. MORTAZAVI:

14   Q.   Okay.  And it looks like everyone is looking at their

15   screens.  Ms. Hall, can you read out again the header

16   information on this e-mail, and then the body of the e-mail?

17   A.   It's from Equestology@Gmail.com.  The date is Tuesday,

18   October 16th, 2018, at 1:51 p.m. and it's to

19   HallRacingStable@Gmail.com.

20   Q.   And the body of the e-mail?

21   A.   Says:  "Thank you.  Free shipping when order is over $400.

22   Lisa."

23   Q.   Ms. Jung, could you turn to the next page of this exhibit.

24            Do you see in the top left corner, Ms. Hall, the

25   company name Equestology and then an address?

1    A.  Yes.

2    Q.  Can you read out the address, please?

3    A.  125 Jennifer Lane, Felton, Delaware 19943.

4    Q.  And below that, next to the word "for," do you see your

5    name written there?

6    A.  Yes.

7    Q.  And do you see an address under it?

8    A.  Yes.

9    Q.  Do you recognize that address?

10   A.  Yes, that's where I was living at the time.

11   Q.  And that's an address in Delray Beach, Florida?

12   A.  Correct.

13   Q.  So at around October 2018, were you in Ohio at the time or

14   in Florida?

15   A.  Florida.

16   Q.  Okay.  And could you please read out the description of the

17   items that are on this invoice?

18   A.  So the first one, it says, LRS 3-liters.  Those are

19   electrolyte jugs or bottles.  The second one is iron sucrose.

20   The third is folic acid.  Then vitamin B-12, then Caco copper

21   with iron, then Amicar, vitamin C, and then postal shipping.

22   Q.  Did you actually receive these items after you placed the

23   order for them?

24   A.  Yes.

25   Q.  Does this reflect an order that you placed with Lisa

1    Ranger?

2    A.  Yes.

3    Q.  And before you placed this order, did Lisa Ranger ask you

4    for a prescription?

5    A.  No.

6    Q.  Did she ask you for your veterinarian's name?

7    A.  I don't believe so, no.

8    Q.  Did she ask you about your horses?

9    A.  No.

10   Q.  At the time, did you believe that Lisa Ranger was a

11   veterinarian?

12   A.  No.

13   Q.  And looking at these items, Ms. Hall, are any of these

14   items injectable products?

15   A.  Yes.

16   Q.  Which ones?

17   A.  All of them, except for the three liter bottles.  It could

18   either be injected, or I would also pour them over their bran

19   mash.

20   Q.  Ms. Jung, you can take this exhibit down.  Thank you.

21          Ms. Hall, did there come a time when you made direct

22   contact with Seth Fishman?

23   A.  Yes.

24   Q.  When was that?

25   A.  I believe I reached out to him in October of 2018.

1    Q.  And how were you in touch with him?

2    A.  I believe I got his number from Lisa.

3    Q.  Do you recall the conversation you had with Lisa Ranger?

4    A.  Yes.

5    Q.  Regarding Seth Fishman, that is?

6    A.  Yes.

7    Q.  What did you ask her in that conversation?

8    A.  I had told her I had just moved down to south Florida, I

9    did not have a vet, and I was hoping to have Dr. Fishman come

10   out and do some lameness exams on my horses.

11   Q.  What is a lameness exam?

12   A.  It's when a vet flexes their legs to see if they are sore

13   anywhere.

14   Q.  So that's an in-person physical exam of the horse?

15   A.  Yes.

16           MR. SERCARZ:  I apologize, your Honor.  Could I have

17   those last two answers be read?  I really didn't hear them.

18           THE COURT:  Can we do that.  If you can, please.

19   Mr. Sercarz, you do not have a copy of the transcript?

20           MR. SERCARZ:  The transcript.  I don't have realtime

21   of the trial transcript, if that's what you're asking.  I

22   apologize.

23           THE COURT:  You know what, we're going to take a break

24   so you can review it over the break.  I'd like to keep moving.

25           Would now work for a break, Ms. Dempsey?

1              All right.  Ladies and gentlemen of the jury, why

2    don't we take our mid-morning break now.  You can leave your

3    materials on your chair.  Please remember, don't discuss the

4    case over the break.

5              And, Ms. Hall, you remain under oath and may not speak

6    to anyone about your testimony over the break.  Okay?

7              (Jury not present)

8              All right.  Ms. Hall, you can be excused.

9              And ladies and gentlemen, please have a seat just for

10   one moment.

11             (Witness temporarily excused)

12             All right.  Let me just turn first -- this is fine

13   while Ms. Hall is walking out.  Let me turn first to, I spoke

14   with, communicated by e-mail, as I said, with the District

15   Executive.  The issue is that we're on an every-other-day

16   schedule; so that I think was the problem with you,

17   Mr. Fernich.

18             Dr. Fishman, the issue with you is the tests are

19   really supposed to be for people who are going to be in the box

20   and taking off their masks.  But I did ask the District

21   Executive, as an accommodation to you, please, given issues

22   we've talked about earlier and the fact that Mr. Fasulo was

23   around, would he please accommodate you with a test, and he

24   said he will do that, but only on the same every-other-day

25   schedule as the rest of the participants.  All right?

1        MR. FERNICH:  That's fine.  Work prohibited my getting

2   down there yesterday.  I apologize.

3        THE COURT:  All right.  Mr. Sercarz, you can review

4   the transcript over the break.

5        MR. SERCARZ:  Thank you, your Honor.

6        THE COURT:  All right.  Thank you.  We'll see everyone

7   in roughly ten, 15 minutes.  All right?

8        (Recess)

9        THE COURT:  You can be seated momentarily, but the

10  jurors are here.  Do you want to get the witness, please?

11       MR. SERCARZ:  Your Honor, we have a legal issue before

12  the witness.

13       THE COURT:  All right.  Do you want to -- let

14  Ms. Dempsey know not to bring the jury.

15       You really should have let me know that before the

16  jurors came up.

17       MR. SERCARZ:  I apologize.  I didn't know they were on

18  the way up.  I apologize, your Honor.

19       THE COURT:  What's your issue?

20       MR. FERNICH:  Judge, I'll make it very quickly.  It

21  pertains to what we discussed at sidebar yesterday.  I

22  understand that the government is now going to attempt to --

23  forgive me -- introduce into evidence a compendium or a series

24  of New York State racing regulations, and I'm reiterating what

25  I said at the sidebar yesterday.

1        I don't think the substance of these regulations

2   should come into evidence for the following reasons:  A,

3   although this is a very extensive, 46-page speaking indictment

4   that cites a great deal of very specific provisions of the

5   FDCA, there's not a word about any specific state -- well, let

6   me back up.

7        The first thing I said at the sidebar is that

8   Dr. Fishman is not charged with violating any state racing

9   regulations.  He's charged with violating the FDCA.

10       THE COURT:  And I agreed with that, and you wanted me

11  to instruct the jury in the middle of the trial that he is not

12  charged with something.

13       MR. FERNICH:  Right.

14       THE COURT:  And I said, on your consent -- or let me,

15  I read to the jury, as an opening instruction, a summary of the

16  charges, which summary you had consented to.

17       MR. FERNICH:  Right.  I have no problem with that.

18  Right now, I'm opposing the introduction of the state

19  regulations into evidence because he's not charged with

20  violating them because this is an FDCA violation case, not a

21  state racing violation case.

22       As I pointed out yesterday, in Rojas, the case could

23  have been charged in a different way, under a different theory,

24  under different statutes.  In Rojas, they specifically spelled

25  out as the predicate for the mail and wire fraud charges the

1    very specific Pennsylvania race regulations that the defendant

2    was charged with violating there.

3            That's not the case with respect to this indictment.

4    This indictment spells out a variety of jurisdictions in which

5    Dr. Fishman allegedly was involved in or acted in a way that

6    was contrary to race regulations.  It doesn't specify any

7    particular race regulations.

8            THE COURT:  It does name certain states.

9            MR. FERNICH:  It does name certain states, your Honor.

10           THE COURT:  Including New York.

11           MR. FERNICH:  Including New York, but my concern is

12   the following about the constructive amendment.  If they are

13   trying to allege, as a material part of this crime, that

14   discrete race regulations were violated, it goes beyond the

15   issue of notice to us, which I assume we could have

16   theoretically scoured all the race regulations in all the

17   different jurisdictions noticed.  Notwithstanding that we

18   shouldn't have to do that, we could have.

19           But they should have been presented to the grand jury

20   as the theory of the case, the crux of the case, and a grand

21   jury should have passed on those allegations.  That's never

22   happened because it's not reflected in the indictment.  And now

23   they're trying to expand the bases for conviction to race

24   regulations that were never presented to a grand jury on a

25   theory that was never presented to a grand jury.

1          The theory was that this was the background or the

2     motive or the intent for engaging in the activity, the intent

3     to -- and I'm paraphrasing their opening statement -- the

4     intent to rig races unfairly and earn money from them by

5     evading PED regulations without specifying, and that was the

6     reason why they engaged in adulteration and misbranding to

7     violate the FDCA.

8          THE COURT:  No, I think the fair reading is that the

9     intent was to defraud, among others -- and the "others" include

10    the FDA and Custom and Border Control -- including racing

11    regulators.  That's the intent.

12         MR. FERNICH:  No problem with that.

13         THE COURT:  The intent is not to harm horses.

14         MR. FERNICH:  No problem with that.

15         THE COURT:  And you conceded yesterday that to prove

16    intent, it is relevant to say that you were evading racing

17    regulations, and testability is part of all of this mix, too.

18         MR. FERNICH:  Absolutely no problem with that.

19         THE COURT:  Okay.

20         MR. FERNICH:  They elicited it already through

21    witnesses.

22         THE COURT:  Yes, right.  All right.  I understand your

23    point.  So let me, and I may I agree to a certain extent, but

24    let me just hear from Ms. Mortazavi about exactly what it is

25    you're intending to do and how long are we going with this

1  because the jurors are literally standing in the hallway.  I

2  mean, can this wait until the lunch break?

3         MS. MORTAZAVI:  Your Honor, I believe this was raised

4  because defense counsel anticipated that I would attempt to

5  enter in as a stipulation several racing regulations.  I do not

6  plan to do that at this moment.  So I think this can wait, and

7  we can bring the jurors up.  Is that sufficient?

8         THE COURT:  All right.  Thank you.  Let's do that

9  then, but I understand your argument, and we will take it up,

10 Mr. Fernich.

11        All right.  Ms. Popper, do you want to let Ms. Dempsey

12 know?

13        (Jury present)

14        Please be seated, everyone.  Do we have Ms. Hall?

15        All right.  Ms. Hall, you remain under oath and you

16 can remove your mask.  Thank you.

17        Ms. Mortazavi, please.

18        MS. MORTAZAVI:  Thank you, your Honor.

19 BY MS. MORTAZAVI:

20 Q.  Ms. Hall, I just want to orient you to what we were

21 discussing right before the break.  Do you recall that you were

22 testifying about a conversation you had with Lisa Ranger?

23 A.  Yes.

24 Q.  About Seth Fishman?

25 A.  Yes.

1    Q.  And do you recall testifying that you had just moved down

2    to south Florida, and you were looking for a veterinarian to

3    perform a lameness exam?

4    A.  Correct.

5    Q.  And I asked you whether a lameness exam required a physical

6    in-person examination?

7    A.  Correct.

8    Q.  Is that right?

9    A.  Yes.

10   Q.  And when you asked Lisa Ranger if Seth Fishman could

11   perform this lameness exam, did she respond?

12   A.  Yes.

13   Q.  What did she say?

14   A.  I believe her words were, unfortunately, he doesn't do that

15   type of work anymore because he has a bad back, I believe, is

16   what she said.

17   Q.  Did she indicate that he would be available to perform a

18   physical examination of your horses?

19   A.  No.

20   Q.  Did you ultimately reach out to Seth Fishman anyway?

21   A.  Yes.

22   Q.  Why did you do that?

23   A.  I wanted his help with pre-racing my horses.

24   Q.  What does it mean to pre-race your horses?

25   A.  The drugs, medications you would give to a horse leading up

1   to a race to improve its performance.

2   Q.  Ms. Jung, could you please pull up Government

3   Exhibit 900-A, which is an extraction from an electronic device

4   seized from Seth Fishman.

5           And, your Honor, this has already been admitted into

6   evidence.

7           Ms. Hall, could you read the participants of this

8   particular next exchange?

9   A.  Seth Fishman and Adrienne Hall.

10  Q.  And what's the e-mail address associated with Seth Fishman?

11  A.  SethFishman@Hotmail.com.

12  Q.  And here I see "Adrian" Hall.  Is that the correct spelling

13  of your name?

14  A.  No.

15  Q.  Do you see the phone number above your name?

16  A.  Yes.

17  Q.  Do you recognize that number?

18  A.  Yes.

19  Q.  Is that your number?

20  A.  It was my number at the time.

21  Q.  And then, Ms. Jung, if we could look at the exhibit as a

22  whole.

23          Looking at this particular exhibit, Ms. Hall, are the

24  blue bubbles the messages that you sent and the green bubbles

25  the messages that you received from Seth Fishman?

1    A.  Yes.

2    Q.  Could you read the first blue chat message from you to Seth

3    Fishman, dated October 21st, 2018?

4    A.  "Hi, my name is Adrienne and I am a harness trainer at

5    Sunshine Meadows.  I got your number from Lisa.  I was

6    wondering if you can help me come up with some pre-race options

7    for a new horse I just got in.  I could e-mail you his recent

8    blood work, if so."

9    Q.  Did you hear back from Seth Fishman right away?

10   A.  No.

11   Q.  Ms. Jung, could you please pull up the second text message

12   in the green bubble.

13        That's a message from Seth Fishman to you, dated

14   November 4th, 2018.  And can you read the message?

15   A.  "I tried calling you a few times from Europe."

16   Q.  Ms. Jung, if you could please take this exhibit down.  I'd

17   ask you to pull up Government Exhibit 320-FJ, which is already

18   in the record as a record of Equestology, Inc.

19        Ms. Hall, do you see that there are two participants

20   to this particular text exchange?

21   A.  Yes.

22   Q.  Are you one of the participants?

23   A.  No.

24   Q.  Have you seen this exhibit before?

25   A.  No.

1   Q.  Who are the two participants here?

2   A.  Seth AA and Lisa Ranger.

3   Q.  Okay.  Ms. Jung, could you please blow up, for the witness,

4   the text message dated October 21st, 2018, 5:54 p.m.

5           And could you please read out the text?

6   A.  "Just landed in California and got this text:  'Hi, my name

7   is Adrienne, and I'm a harness trainer at Sunshine Meadows.  I

8   got your number from Lisa.  I was wondering if you can help me

9   come up with some pre-race options for a new horse that I just

10  got in.  I can e-mail you his most recent blood work, if so.'"

11  Q.  And, Ms. Jung, can you blow up the two responses in gray.

12          And for the record, these are messages sent from Lisa

13  Ranger's cell to Seth Fishman.

14          Do you see the number beside Lisa Ranger's cell,

15  Ms. Hall?

16  A.  Yes.

17  Q.  Do you recognize that number?

18  A.  No.

19  Q.  All right.  If you could please read out the first message

20  that's dated October 23rd, 2018, at 10:19 a.m.?

21  A.  "Hey, can you please try to call that Adrian Hall today."

22  Q.  I'm sorry, the message above that, starting with "She is

23  going to send you"?

24  A.  "She is going to send you a blood work that she has.  She

25  is a referral of Daniel Mier and has been ordering supplies

1  from us.  Go ahead and talk to her.  She doesn't have much

2  knowledge.  As you can surmise from the text.  Old Poliseno

3  client.  Tired of his BS."

4  Q.  Do you know a Daniel Mier?

5  A.  Yes.

6  Q.  Who is that?

7  A.  He's a harness trainer as well.

8  Q.  Had you talked to Daniel Mier about either Seth Fishman or

9  Lisa Ranger before?

10 A.  Yes.

11 Q.  There's a reference to "Old Poliseno"; do you know who that

12 is?

13 A.  Tony Poliseno.

14 Q.  How do you know him?

15 A.  He would come to the Ohio tracks, and he was always selling

16 medication and drugs to trainers.

17 Q.  Would he sell pre-race options?

18 A.  Mmm, hmm; yes.

19 Q.  And then you had read out the second message.  I just want

20 to have you read it out again.  The date on that is

21 October 31st, 2018.

22 A.  It says, "Hey, can you please try to call that Adrian Hall

23 today."

24 Q.  Ms. Jung, can we please turn to page two of this particular

25 exhibit, and if you could please expand the three messages on

1    November 29, 2018, from 1:36 p.m. to 1:38 p.m.

2    A.   "Adrienne Hall" --

3    Q.   And I'm sorry, just for the record, you're reading out loud

4    from the exhibit a message from Lisa Ranger to Seth Fishman

5    dated November 29, 2018, 1:36 p.m.  Go ahead.

6    A.   "Adrienne Hall is at training facility in Delray Beach.

7    She wants to know, is there any other local vet Dr. Fishman

8    would recommend.  I call for injections down here."

9    Q.   What was his response?

10   A.   "Not sure who to recommend."

11   Q.   And what did Lisa respond?

12   A.   "That's what I thought, but I figured I would ask."

13   Q.   Okay.  Did you ever end up finding a veterinarian who could

14   perform a lameness exam on your horses?

15   A.   Yes.

16   Q.   Who was that?

17   A.   His name was Dr. Carinda.

18   Q.   And did he, apart from that lameness exam, serve as the

19   veterinarian for your horses for an extended period of time?

20   A.   Yes.

21   Q.   Would he physically examine your horses?

22   A.   Yes, he did.

23   Q.   Had you ever asked Dr. Carinda for pre-race options?

24   A.   I don't believe I did, no.

25   Q.   Ms. Jung, could you please turn to the next page of this

1    exhibit.  Could you please expand the message from Lisa Ranger

2    to Seth Fishman, dated December 28th, 2018, 12:56 p.m.

3              And, Ms. Hall, ignore

4              MR. FERNICH:  The first line that starts with "File

5    attachment."  Could you start reading from "Adrian Hall is

6    going to text"?

7    A.  "Adrian Hall is going to text you.  Can you please get up

8    with her when you get a chance.  She has some questions."

9    Q.  All right.  Ms. Jung, you can take down this exhibit.

10   Thank you.

11             So, Ms. Hall, you said that you ultimately did get in

12   touch with Seth Fishman, correct?

13   A.  Yes.

14   Q.  Ms. Jung, can we please return to Government Exhibit 900-A,

15   and please turn to page 3 of that exhibit.

16             And, Ms. Hall, can you read the messages on this page,

17   again?  Does it appear to you that the blue bubbles are

18   messages sent by you?

19   A.  Yes.

20   Q.  Okay.  Can you go ahead and read the text exchange?

21   A.  "Hey, are you still able to meet tomorrow or Thursday?"

22   Q.  And what did Seth Fishman respond?

23   A.  "Tomorrow good."

24   Q.  And your response after that?

25   A.  "Okay.  Just let me know where and when.  Thanks."

M1RPFIS2                        Hall - Direct

1    Q.   And what was his response?

2    A.   "Atlantic Avenue, 5:00 p.m."

3    Q.   These messages are all dated January 2nd, 2019, correct?

4    A.   Yes.

5    Q.   Do you recall having an in-person meeting with Seth Fishman

6    around this time?

7    A.   Yes.

8    Q.   What did you discuss with him during that meeting?

9    A.   I don't recall too many specifics.  I'm sure I was talking

10   about my horses.  The only thing that really stood out in my

11   mind, when I asked him who his clients were.

12   Q.   Did he respond?

13   A.   He said he was currently helping one of the leading

14   thoroughbred trainers in the country.

15   Q.   Did he give you any other details besides that?

16   A.   He said that he was a minority.

17   Q.   As in the -- one of the leading thoroughbred trainers was a

18   minority?

19   A.   Yes.

20   Q.   From that description, did you understand who he was

21   talking about?

22   A.   I believe I said:  Oh, you're helping Navarro.

23   Q.   Do you know Navarro's first name?

24   A.   Jorge.

25   Q.   Do you know him by any other name?

1    A.   George.

2    Q.   What else happened during that meeting, if you recall?

3    A.   He asked me to walk to his car after the dinner, and he

4    gave me a gift bag that had some samples of some drugs in it.

5    Q.   Do you remember what was in that gift bag?

6    A.   I don't recall everything that was in there, but I think

7    that there were some bottles of VO2 Max and some syringes of

8    like a bleeder paste.

9    Q.   Okay.  Ms. Jung, could you please pull up Government

10   Exhibit 1117, which is a photograph that was taken during a

11   search of a premises that we've discussed previously.

12        Ms. Hall, looking at this particular photo, does this

13   look familiar to you?

14   A.   Yes.

15   Q.   Is this the bottle of VO2 Max that was in the gift bag that

16   you just described?

17   A.   It looks like the same bottle, yes.

18   Q.   Okay.  And when you received this bottle in the gift bag,

19   did Seth Fishman explain anything about how to administer it?

20   A.   I'm sure that he did.  I don't remember exactly what he

21   said about it.

22   Q.   Okay.  Can you please, if you can make it out, read the

23   label, the red text in silver, starting with "Administer"?

24   A.   "Administer intravenously 10 cc's four to six hours prior

25   to strenuous exercise.  Proprietary blend of amino acids."

1   Q.  Did you know when you were supposed to administer VO2 Max

2   to your horse?

3   A.  I was under the impression it was best used on race day.

4   Q.  Okay.  And had you used VO2 Max on your horses ever?

5   A.  No.

6   Q.  And that's even prior to receiving VO2 Max?

7   A.  Correct.

8   Q.  Correct.  After you received VO2 Max, did you use it on

9   your horse?

10  A.  I did.

11  Q.  And when you used it, when did you use it?

12          MR. SERCARZ:  Objection, relevance.

13  A.  Do you mean when in terms --

14          THE COURT:  Hold on.  There is an objection.

15          MS. MORTAZAVI:  Your Honor, I'd like to withdraw the

16  question and rephrase it.

17          THE COURT:  All right.

18  BY MS. MORTAZAVI:

19  Q.  Ms. Hall, you received this bottle of VO2 Max from Seth

20  Fishman, correct?

21  A.  Correct.

22  Q.  Did you end up administering that drug to your horse?

23  A.  Yes.

24  Q.  And in relation -- did you administer it to your horse

25  before a race?

1    A.  Yes.

2    Q.  How far in advance of a race did you administer that bottle

3    to your horse?

4    A.  The morning of.

5    Q.  What's your understanding of whether you can administer VO2

6    Max to your horse the day of a race?

7    A.  I'm not allowed.

8    Q.  Not allowed according to what?

9    A.  To the gaming commission rules.

10   Q.  Are those the gaming commission rules in Florida?

11   A.  Yes, but pretty much every state has that rule, and I

12   believe it's USTA rule.

13          MR. SERCARZ:  Objection.

14          THE COURT:  Sorry.

15          MR. SERCARZ:  Move to strike.

16          THE COURT:  Please sit and speak into the mic.

17          MR. SERCARZ:  I'm sorry.  Move to strike the latter

18   part of the answer for the reasons discussed earlier.

19          THE COURT:  Overruled.

20          MS. MORTAZAVI:  Ms. Jung, could you please take down

21   this exhibit and pull up Government Exhibit 900-B, which is

22   already in evidence, and again, another electronic extraction

23   from a device of Seth Fishman's.

24   BY MS. MORTAZAVI:

25   Q.  Ms. Hall, again, are the two participants on this text

1   exchange you and Seth Fishman?

2   A.  Yes.

3   Q.  Ms. Jung, could you please pull up and expand the two

4   bottom messages.

5           And, Ms. Hall, I'm going to have you read those out

6   loud into the record.

7   A.  "Do you sell a good blood builder?"

8   Q.  Is that a message from you to Seth Fishman?

9   A.  Yes.

10  Q.  And did he respond?

11  A.  Yes.

12  Q.  What was his response?

13  A.  "Several types."

14  Q.  When you said "blood builder," what did you mean by that

15  term?

16  A.  Something that could help build red blood cell counts in my

17  horses to help them race better.

18  Q.  At the time you asked this, were your horses sick?

19  A.  I don't believe they were at the time, no.

20  Q.  And at the time you asked this, did you have Dr. Carinda as

21  your horses' veterinarian?

22  A.  I believe he was helping me, yes.

23  Q.  Why were you looking for a blood builder?

24  A.  I was trying to improve my horse's performance.

25  Q.  Had you purchased blood builders from other people before

1    you reached out to Seth Fishman?

2    A.   There was another blood builder that I had tried, yes.

3    Q.   Did it work?

4    A.   I don't believe so.

5    Q.   And, again, you said you were familiar with the racing

6    rules in Florida?

7    A.   Yes.

8    Q.   In your mind, were you permitted to add more blood builders

9    to your horses?

10   A.   Not intravenously, no.

11   Q.   And what could happen to you if you were caught by the

12   commission administering blood builders to your horses?

13            MR. SERCARZ:  Objection.

14            THE COURT:  Grounds?

15            MR. SERCARZ:  Does she know?

16            THE COURT:  Every question is if the witness knows.

17            If you don't know, you need to say I don't know.

18            Overruled.

19   BY MS. MORTAZAVI:

20   Q.   Ms. Hall, if you know, what would be the consequences if

21   you were caught administering a blood builder to your horses?

22   A.   I could lose my license.  I would probably most definitely

23   be suspended and fined.

24   Q.   If you were caught doing that before a race, would your

25   horse be allowed to race?

1  A.  No.

2  Q.  And if you were caught doing that after a race, would you

3  be allowed to keep any money that you'd earned from the race?

4  A.  Do you mean if I got a positive test or --

5  Q.  That's right.

6  A.  No, I would not be allowed to keep the purse money.

7  Q.  Ms. Jung, could you please pull down this exhibit and bring

8  up Government Exhibit 900-C, which is also in evidence.

9          And again, Ms. Hall, do you see that the participants

10  here are you and Seth Fishman?

11  A.  Yes.

12  Q.  Okay.  Ms. Jung, can you pull up these messages starting

13  with the second, down to the one dated March 4th, 2019,

14  3:09 a.m.

15          And, Ms. Hall, can you read those out loud, starting

16  with your message to Seth Fishman?

17  A.  Which one did you want me to start with?  I'm sorry.

18  Q.  Start with "let me know what you'd suggest."

19  A.  Okay.  "Let me know what you'd suggest."

20  Q.  And his response?

21  A.  "Depends on your budget."

22  Q.  What did you write?

23  A.  "If it works, I don't care."

24  Q.  What did he say back to you?

25  A.  "It's about 400 to $800 per month per horse."

1    Q.  And you wrote back to him?

2    A.  "That's fine if it helps."

3    Q.  And his response in the last message?

4    A.  "A good program for blood, tissue regeneration and muscle

5    factors is normally 1,250 to $1,500 per horse per month.  I

6    will discount you to 750 per horse per month.  This is stuff we

7    use on top horses a."

8    Q.  This discussion of a program, did you have an idea of what

9    you two were talking about?

10   A.  Pre-race program, blood building.

11   Q.  And why were you looking for that?

12   A.  I was hoping to improve my horses' performance.

13   Q.  So, Ms. Hall, in addition to texting with Seth Fishman and

14   the meeting that you described with Seth Fishman, have you had

15   any prior in-person meetings with him?

16   A.  The one dinner, and then I had met him one other time.

17   Q.  Okay.  And other than texting and meeting in person, did

18   you have any phone calls with him?

19   A.  Yes.

20   Q.  I'd like to direct the jurors to their transcript binders,

21   Government Exhibit 101-BT.

22          And, Ms. Jung, I'll ask you to pull up that

23   exhibit and Government Exhibit 101-B.

24          And for the record, this is a call between Seth

25   Fishman and Adrienne Hall that took place March 5th, 2019.

1          Ms. Jung, I think everyone's found their place, would

2     you please play the call.

3               (Audio recording played)

4          And if the jurors could turn to the next tab, that's

5     101-CT, and I'll have Ms. Jung pull that up on the screen and

6     also have ready 101-C.

7          Ms. Jung, if you could please play this call.

8          And for the record, this is a continuation of the same

9     call that we just listened to on March 5th, 2019, between Seth

10    Fishman and Adrienne Hall.

11              (Audio recording played)

12    BY MS. MORTAZAVI:

13    Q.  Ms. Hall, on that call there was a reference to a referral

14    fee?

15    A.  Yes.

16    Q.  What were you talking about there?

17    A.  I believe if I was able to get him connected with any

18    trainers, any business they did I could get a commission off

19    of.

20    Q.  And prior to this call taking place on March 5th, 2019, had

21    Seth Fishman ever examined your horses?

22    A.  No.

23    Q.  And did he ever diagnose your horses with any medical

24    conditions?

25    A.  No.

1   Q.  And let me just ask, for the sake of clarity, at any point

2   had he physically examined your horses?

3   A.  No.

4   Q.  At any point had he told you a medical diagnosis for your

5   horses?

6   A.  No.

7   Q.  I'd like to direct the jurors to Government Exhibit 102-AT

8   in their binders, and I'll have Ms. Jung please pull up

9   Government Exhibit 102-AT and Government Exhibit 102-A.

10          And for the record, this is a call dated March 7th,

11  2019, between Seth Fishman and Adrienne Hall, approximately two

12  days before the last call that we just heard.

13          Ms. Jung, if you could please play this call.

14          (Audio recording played)

15  BY MS. MORTAZAVI:

16  Q.  Ms. Hall, do you know what Epogen is?

17  A.  I don't know the actual medical term for it.

18  Q.  But what's your understanding of the term Epogen, if you're

19  familiar with it?

20  A.  It's a drug that like dramatically improves -- increases

21  red blood cell count.

22  Q.  And there's a reference here to some other words.  "Growth

23  factors," for example, are you familiar with growth factors?

24  A.  No.

25  Q.  Are you familiar with Thymosin peptides?

1    A.   No.

2              MS. MORTAZAVI:   I'd like to direct the jurors to

3    Tab 102-CT in their binders.

4              And, Ms. Jung, if you could please pull up that

5    transcript and the corresponding call Government Exhibit 102-C.

6              And again, for the record, this is a continuation of

7    the last call that we heard.

8              (Audio recording played)

9              And, Ms. Jung, you can take this exhibit down.

10   BY MS. MORTAZAVI:

11   Q.   Ms. Hall, did you ever have any conversations with Seth

12   Fishman about whether or not his products would test?

13   A.   I believe so, yes.

14   Q.   And what does it mean for a product to test?

15   A.   Basically show up in a horse's blood after it races,

16   triggering a positive.

17   Q.   Triggering a positive drug test?

18   A.   Yes.

19   Q.   And who administers those drug tests?

20   A.   The gaming commission in each state sends it to a lab and

21   they test the blood.

22   Q.   And what did Seth Fishman tell you about the testability of

23   his products?

24   A.   I believe he was pretty confident that they did not test.

25   Q.   Did Seth Fishman ever tell you to use his drugs consistent

1  with racing rules?

2  A.  I don't believe so.

3          MR. SERCARZ:  Object to the leading.

4          THE COURT:  That's not leading.

5  Q.  And you talked about your horses with Seth Fishman,

6  correct?

7  A.  Yes.

8  Q.  You mentioned that they were racehorses; is that right?

9  A.  Yes.

10         MS. MORTAZAVI:  Ms. Jung, could you please pull up

11  Government Exhibit 102-DT.

12         And I'll ask the jurors to turn to that tab in their

13  transcript binders.

14         And, Ms. Jung, if you could also prepare Government

15  Exhibit 102-D.

16         And again, this is a continuation of the same

17  March 7th, 2019 call.

18         Ms. Jung, if you could please play the recording.

19         (Audio recording played)

20         (Continued on next page)

21

22

23

24

25

1  BY MS. MORTAZAVI:

2  Q.  Ms. Hall, when Seth Fishman was referencing Hong Kong, I

3  believe a track in Hong Kong in relation to testing, what did

4  you understand that to mean?

5  A.  Hong Kong, I believe Japan in general, has one of the

6  cleanest racing jurisdictions in the world.

7  Q.  You mentioned Japan, do you mean Hong Kong specifically?

8  A.  Yes.

9  Q.  And there's a reference here to jurisdictions.  Do you know

10  what he was talking about?

11  A.  I believe he meant the racing commissions, the individual

12  racing commissions would send drugs there to be tested to find

13  out what they were.

14  Q.  Ms. Hall, I asked you this previously but I just want to

15  clarify, did Seth Fishman ever tell you when he gave you his

16  drugs to follow the racing rules when you used them?

17  A.  That was never discussed, no.

18          MS. MORTAZAVI:  Ms. Jung, could you please play

19  Government Exhibit 102ET -- sorry, pull up Government

20  Exhibit 102ET, and if the jurors could turn to that page in

21  their transcript binders.

22          And Ms. Jung, please prepare Government Exhibit 102E.

23  This is a continuation of the same call.

24          Ms. Jung, if you could please play it.

25          (Audio recording played)

1          MS. MORTAZAVI:  Ms. Jung, if you could turn to

2   Government Exhibit 102FT and Government Exhibit 102F, and if

3   the jurors could turn to that page in the transcript binders.

4   Q.  And Ms. Jung, before we play that particular call,

5   Ms. Hall, I would like to ask you, there was a reference on

6   that prior call to cloudy tests.  Do you know what that means?

7   A.  I believe it's when a positive is triggered but they're not

8   quite sure what the drug is, why it's showing up abnormal.

9   Q.  And you were referring to "they," do you mean the racing

10  commissions?

11  A.  The lab.

12  Q.  And again, by the lab, what do you mean?

13  A.  The commissions contract labs, that's where the blood goes,

14  and the lab is responsible for actually running the test.

15         MS. MORTAZAVI:  Thank you.

16         Ms. Jung, could you please play this government

17  exhibit.

18         (Audio recording played)

19         MS. MORTAZAVI:  You can take down this exhibit,

20  Ms. Jung.

21  BY MS. MORTAZAVI:

22  Q.  Ms. Hall, do you know a Mary who was associated with Seth

23  Fishman.

24  A.  Yes.

25  Q.  Who was that, as far as you understood?

1    A.  I wasn't sure if she was an employee or just ran errands

2    for him.

3    Q.  Did you ever meet with a Mary?

4    A.  Yes.

5    Q.  Can you describe that meeting?

6    A.  I met her in a parking lot and she just gave me some more

7    samples.

8    Q.  Did you ever learn her last name?

9    A.  I believe it was Fox.

10   Q.  And you mentioned that you met her in a parking lot and you

11   got some samples from her?

12   A.  Yes.

13   Q.  What did you receive from her?

14   A.  I believe I got some samples of the blood builders that he

15   was talking about.

16   Q.  Do you remember the names of the product that you received?

17   A.  That was the BB3, I think it was TB-7.

18   Q.  Anything else?

19   A.  And I forget the third name.

20   Q.  The BB3 that you received, did that have a label on it?

21   A.  I don't remember if that had a label or going off the color

22   of the top.

23           MS. MORTAZAVI:  Ms. Jung, could you please pull up

24   Government Exhibit 1220, which is a photograph that was taken

25   during a search of a residence that we previously discussed.

1  Q.  Ms. Hall, does this look like the BB3 that you received?

2  A.  Yes.

3  Q.  And as far as you remember, did it have any additional

4  labels beyond what you're seeing there?

5  A.  Not that I recall, no.

6  Q.  And it could have been that it was not labeled at all, is

7  that right?

8  A.  Correct.

9  Q.  And you mentioned that you also received TB-7?

10  A.  Yes.

11  Q.  Now with the BB3, Ms. Hall, did you have an understanding

12  of how you were supposed to administer that?

13  A.  He had given me instructions on how to do that.

14  Q.  "He" meaning Seth Fishman?

15  A.  Yes.

16  Q.  What did he tell you?

17  A.  I don't remember the exact instructions on that.

18  Q.  Do you remember generally what the instructions were?

19  A.  I know it was to be given IV, and I don't remember exactly

20  how many days out.

21  Q.  Were you supposed to give it in this form?

22  A.  It had to be mixed with a bottle of water, a little

23  bacteriostatic water.

24  Q.  And you said it was supposed to be administered IV?

25  A.  Yes.

1   Q.  Did you end up administering BB3 on any of your horses at

2   any time?

3   A.  Yes, one horse.

4   Q.  And did you prepare the BB3 in the manner that you're just

5   describing?

6   A.  Yes.

7   Q.  Did you personally inject your horse?

8   A.  Yes.

9   Q.  Why didn't you ask a vet to do it?

10  A.  Because no vet would do that.

11  Q.  You mentioned that you also --

12          MR. FERNICH:  Objection.

13          THE COURT:  I will sustain that.  I will strike it.

14          MS. MORTAZAVI:  It's as to her state of mind, your

15  Honor.

16          THE COURT:  Then you can ask it that way.

17  BY MS. MORTAZAVI:

18  Q.  Ms. Hall, you mentioned you injected BB3 yourself into your

19  horse, correct?

20  A.  Yes.

21  Q.  And that was after you mixed it?

22  A.  Yes.

23  Q.  And you knew it was supposed to be administered IV?

24  A.  Yes.

25  Q.  Before you administered it, is there a reason why you

1    didn't ask a veterinarian to administer it to your horse IV?

2    A.  I think it would have been stupid because I think I could

3    have probably gotten -- I think the vet would have gone to the

4    commission and told them what I was doing.  And second, it's a

5    liability for a vet to take an unknown product that they didn't

6    draw personally and give it to a horse.

7              MR. FERNICH:  Objection.

8              THE COURT:  She's testifying to what her state of mind

9    was, not for the truth of the matter.

10   Q.  And Ms. Hall, you mentioned that you received TB-7,

11   correct?

12   A.  Yes.

13             MS. MORTAZAVI:  Ms. Jung, could you please pull up

14   Government Exhibit 1259.

15             Sorry, Ms. Jung, please pull up Government

16   Exhibits 1111, 1112 and 1113.

17   Q.  Ms. Hall, looking at the collection of exhibits, does this

18   resemble the bottle of TB-7 that you received?

19   A.  Yes.

20             MS. MORTAZAVI:  And if you are able to, Ms. Jung,

21   could we possibly pull up -- expand the label in Government

22   Exhibit 1112.

23   Q.  And Ms. Hall, could you try to read the --

24             MS. MORTAZAVI:  Sorry, Ms. Jung, if you could move it

25   a little to the side so there's a view of the entirety of the

1    label.

2         Sorry, Ms. Jung, move that to the middle and also

3    expand Government Exhibit 1111.

4    Q.  And could you read the directions that appear here,

5    Ms. Hall?

6    A.  Reconstitute with 3 milliliters saline and either IV, IM or

7    SQ.

8    Q.  Do you know what reconstitute means?

9    A.  Mix.

10   Q.  And the terms IV, IM or SQ, do you know what any of those

11   mean?

12   A.  IV and IM.

13   Q.  What do those mean?

14   A.  IV is intravenous.

15   Q.  What does IM mean?

16   A.  Intramuscular.

17   Q.  Had you discussed how to administer TB-7 with Seth Fishman?

18   A.  Yes.

19   Q.  What did he tell you?

20   A.  I don't remember the exact instructions but I believe it

21   was similar to what was on the label.

22   Q.  So in other words, this was injectable?

23   A.  Yes.

24   Q.  Was it supposed to be administered in this form?

25   A.  No, I had to mix that with water also.

1  Q.  And again, did you personally administer this to your horse

2  or did you ask someone else to do it?

3  A.  I did it.

4  Q.  And again, just looking back to what you with were thinking

5  at the time before you did it, why is it that you didn't ask a

6  veterinarian to do that?

7  A.  I think they would have told me no way.

8       MS. MORTAZAVI:  Ms. Jung, could you please take down

9  these exhibits and pull up Government Exhibit 900D.

10 Q.  And Ms. Hall, could you read the text message at the very

11 bottom of the page, this is a message from Seth Fishman to you,

12 starting with:  Here's reality.

13 A.  Here's reality.  I was tortured so much by race commission

14 without a client ever getting a single positive other than

15 stupid shit like Bute given by another vet.  I voluntarily gave

16 up my license and then the veterinary board had me investigated

17 for BS.  They even accused Lisa of practicing veterinary

18 medicine.  I spent $25,000 in legal fees and had a personal

19 political favor called in to end the BS.

20 Q.  Had Seth Fishman ever told you anything about being

21 investigated by a race commission?

22 A.  I think he had one conversation with me about it.

23 Q.  Do you remember anything about that conversation?

24 A.  I don't really remember too much about it.

25 Q.  Had he ever talked to you about being investigated by a

1  veterinary board?

2  A.  I think that was, again, part of a conversation, but I

3  don't really recall all of it.

4        MS. MORTAZAVI:  Ms. Jung, could you take down this

5  exhibit and please pull up Government Exhibit 900E, and please

6  turn to the top of page 2.

7  Q.  Ms. Hall, do you see again that these are text messages

8  between you and Seth Fishman?

9  A.  Yes.

10 Q.  Could you read the text from Seth Fishman to you at the

11 very top of the page?

12 A.  It's Seth trying to call you.  Reconstitute TB-7 with two

13 to three milliliters bacteriostatic water and give one dose IV.

14 For horse you want to build blood, take the one green cap

15 bottle and one navy cap ample bottle and reconstitute with two

16 to three milliliters and give IV.

17       MS. MORTAZAVI:  Thank you, Ms. Jung, you can take that

18 down.

19 Q.  Ms. Hall, often did you receive drugs from Seth Fishman?

20 A.  I think I got three sample sets from him.

21 Q.  And did that include samples that you received from Mary?

22 A.  Yes.

23 Q.  So any one from --

24 A.  It would have been four because I met Mary twice and I met

25 him twice.

1  Q.  So between Mary and Seth Fishman you received about four

2  different orders --

3  A.  Yes.

4  Q.  -- of the drugs?

5  A.  Yes.

6  Q.  And did each order have various different drugs?

7  A.  Yes.

8  Q.  Did you use all the drugs that Seth Fishman provided to

9  you?

10  A.  No.

11  Q.  Why not?

12  A.  When I left for New Jersey to drive to Florida I didn't

13  want to take all of that stuff with me.

14  Q.  And before you left for New Jersey, did you use all the

15  drugs that he had given you up to that point?

16  A.  No.

17  Q.  Why not?

18  A.  Some of the blood builder stuff I wasn't very comfortable

19  mixing and administering.  I didn't want to screw something up.

20  Q.  What do you mean you weren't comfortable mixing it?

21  A.  It was a little sophisticated, the color coding and the

22  withdrawal times and the mixing, and I just got nervous.

23  Q.  You mentioned the color coding, what do you mean by that?

24  A.  Just going by the cap.

25  Q.  The cap color, is that how you and Seth Fishman would

1  describe the drugs when you were talking about them?

2  A.  I believe so, yes.

3           MS. MORTAZAVI:  I would like to direct the jurors to

4  their transcript binders, tab 103AT.  And Ms. Jung, if you

5  could pull up that exhibit and Government Exhibit 103A.

6           And for the record, this is a portion of a March 12,

7  2019 call between Seth Fishman and Adrienne Hall.

8           If you could please play the call.

9           (Audio recording played)

10           MS. MORTAZAVI:  Ms. Jung, you can take down these

11  exhibits.

12           Could you please pull up Government Exhibit 900E and

13  turn to page 4.

14  Q.  Ms. Hall, I'm going to read out these text messages and

15  have you explain what you mean, starting with the message that

16  you sent on March 19, 2019 to Seth Fishman, writing:  The green

17  cap and blue cap are the blood builders, correct?

18           And he responds:  Yes.

19           When you testified a moment ago, Ms. Hall, you said

20  that the cap color was how you discussed the drugs, is that

21  right?

22  A.  Yes.

23  Q.  Do you remember what the green cap referred to?

24  A.  I don't remember which bottle that was.

25  Q.  Do you remember what the blue cap referred to?

1    A.  I don't remember.

2    Q.  Is there a reason that you referred to the cap color

3    instead of a product name?

4    A.  I don't think they had actual product names that I

5    remember.

6    Q.  Were all the drugs that you received from Seth Fishman

7    labeled?

8    A.  I don't remember if they all were.

9         MS. MORTAZAVI:  I would like to direct the jurors to

10   tab 105BT in their transcript binders, and I will have Ms. Jung

11   pull up 105BT and 105B.

12        And for the record, this is a portion of a call

13   between Seth Fishman and Adrienne Hall dated March 20, 2019.

14        Ms. Jung, if you could please play this call.

15        (Audio recording played)

16        MS. MORTAZAVI:  If I could have the jurors turn to the

17   next tab, 105CT.  And Ms. Jung, if you could pull up that

18   exhibit and Government Exhibit 105C.

19        And for the record, this is a continuation of the same

20   call.

21        Ms. Jung, if you could please play.

22        (Audio recording played)

23   Q.  Ms. Hall, Seth Fishman referred on that call to mother

24   nature being a bitch and how if you want to take from her you

25   are going to have to give back.  What did you understand him to

1    mean?

2    A.  If you're chemically enhancing a horse to perform above its

3    ability, eventually that's going to wear off and that horse is

4    going to come down.

5    Q.  And there's a reference on that call to a horse crashing.

6    What does it mean for a horse to cash?

7    A.  I would refer to it like someone detoxing, like coming off

8    of something and becoming very sick, falling apart.

9              MS. MORTAZAVI:  Ms. Jung, could you please play or

10   pull up Government Exhibit 105DT.  And I will ask the jurors to

11   please turn to that tab, which should be the next tab in their

12   binders.  And Ms. Jung, if you could please also pull up

13   Government Exhibit 105D.

14             And for the record, this is a continuation of the same

15   call.

16             Ms. Jung, if you could please play.

17             (Audio recording played)

18             MS. MORTAZAVI:  Ms. Jung, if you could take down this

19   exhibit and please pull up Government Exhibit 900F and turn to

20   page 2.

21             And if you could please expand the bottom two messages

22   in the blue bubbles.

23   BY MS. MORTAZAVI:

24   Q.  Ms. Hall, do you see that you sent these messages to Seth

25   Fishman?

1   A.   Yes.

2   Q.   And that you listed there horse A and horse B --

3   A.   Yes.

4   Q.   -- in each message?

5   A.   Yes.

6   Q.   Was that the name of your horses?

7   A.   No.

8   Q.   Why didn't you write your horses' names?

9   A.   He told me just to refer to them as horse A or horse one.

10  Q.   And there are some dates here and then some letters.  What

11  does that represent, starting with the series under horse A?

12  A.   The date and what I had given on that date.

13  Q.   Are these letters all products that you received from

14  either Seth Fishman or Mary?

15  A.   Yes.

16  Q.   I see here the BB and the TB-7 which we discussed before.

17  Do you see EGH on here?

18  A.   Yes.

19  Q.   Can you just remind us, what does EGH stand for?

20  A.   Equine growth hormone.

21  Q.   Do you recall if the bottle of EGH that you received was

22  labeled?

23  A.   Yes, I believe it was.

24         MS. MORTAZAVI:  Ms. Jung, please pull up Government

25  Exhibit 1020, if you could do it alongside 900F, please.

1           If you could expand the label.

2    Q.  Ms. Hall, does this look like the label that appeared on

3    the bottle of EGH that you received?

4    A.  It looks like it, yes.

5    Q.  Do you see the name Equestology anywhere on this label?

6    A.  No.

7           MS. MORTAZAVI:  And Ms. Jung, if you could take down

8    the expanded view of Government Exhibit 1020.

9    Q.  And turning back to page 2 of 900F, why were you sending

10   Seth Fishman that list of dates and products that you had given

11   to your horses on each date?

12   A.  On one of our phone calls he asked me to see what the

13   schedule was, how I was doing it.

14   Q.  What did you think he wanted by asking that?

15   A.  I figured he wanted to make sure I was doing it correctly.

16          MS. MORTAZAVI:  Ms. Jung, could you please take down

17   these exhibits.  And I will ask the jurors to turn to tab 106AT

18   in their binders.  And Ms. Jung, if you could please pull up

19   that exhibit and the audio, Government Exhibit 106A.

20          And for the record, this is a portion of a call dated

21   April 2nd, 2019, between Seth Fishman and Adrienne Hall.

22          Ms. Jung, if you could please play.

23          (Audio recording played)

24          MS. MORTAZAVI:  I will ask the jurors to turn to the

25   next tab, that's tab 106BT in their binders, and have Ms. Jung

1    pull up that exhibit and Government Exhibit 106B.

2              And for the record, this is a continuation of that

3    same April 2nd call.

4              Ms. Jung, if you could please play.

5              (Audio recording played)

6    BY MS. MORTAZAVI:

7    Q.  Ms. Hall, how much did you pay for Seth Fishman's products?

8    A.  I didn't pay for any of it.

9    Q.  Were you receiving them for free?

10   A.  Yes.

11   Q.  In 2019, how much did you earn in purse winnings for your

12   horses?

13   A.  I believe around $60,000.

14   Q.  Did you keep all of that money?

15   A.  No.

16   Q.  Of the $60,000 in purse winnings that you got, where did

17   that money go?

18   A.  About five percent is given to the driver of the horse for

19   each race, some of the money is probably taken out for

20   different fees, some tracks charge a starting fee, and the rest

21   of it went to bills.

22   Q.  And at the end of 2019, had you made any profit?

23   A.  No.

24              MS. MORTAZAVI:  I want to direct the jurors to tab

25   107AT.  And Ms. Jung, if you could please ready Government

1   Exhibit 107AT and Government Exhibit 107A.

2   BY MS. MORTAZAVI:

3   Q.  And before we play this particular call, Ms. Hall, you had

4   testified before about your initial conversation with Seth

5   Fishman where he mentioned to you one of his clients being a

6   leading Thoroughbred trainer, is that right?

7   A.  Yes.

8   Q.  And did you ever have any other conversations with Seth

9   Fishman about that particular trainer?

10  A.  Not that I recall, no.

11          MS. MORTAZAVI:  Ms. Jung, could you please play this

12  exhibit.

13          (Audio recording played)

14  BY MS. MORTAZAVI:

15  Q.  At the end, Ms. Hall, when you talk about speculation about

16  why that guy wins so many races, who were you talking about?

17  A.   Jorge Navarro.

18          MS. MORTAZAVI:  Ms. Jung, please take down this

19  exhibit and pull up Government Exhibit 715, which is an

20  electronic record retrieved from a computer found at Lisa

21  Giannelli's residence.

22  Q.  Ms. Hall, have you seen this exhibit before?

23  A.  No.

24  Q.  I would like to take a moment to look through this

25  particular exhibit.

1          Do you see at the top the word Equestology, in bold?

2   A.  Yes.

3   Q.  And what's written underneath that?

4   A.  AVI client list with phone numbers.

5   Q.  And scrolling at the bottom, do you see the name Allard

6   under last name, then under the column first name, Rene?

7   A.  Yes.

8          MS. MORTAZAVI:  Ms. Jung, if you could please turn to

9   page 2 of this particular exhibit.

10  Q.  And Ms. Hall, do you see under last name the last name

11  Banca and the first name Rich?

12  A.  Yes.

13  Q.  Do you see if you go all the way over, do you see there's

14  an address associated with Rich Banca?

15  A.  Yes.

16  Q.  Can you read out that address?

17  A.  PO Box 344, Otisville, New York, 10963.

18         MS. MORTAZAVI:  And Ms. Jung, if we could turn to page

19  6 of this exhibit.

20  Q.  And do you see, Ms. Hall, under last name Cohen, first name

21  Ross, and then an address associated with that name?

22  A.  Yes.

23  Q.  Could you please read out the address associated with Ross

24  Cohen.

25  A.  PO Box 1056, Pine Bush, New York, 12566.

M1RTFIS3                      Hall - Direct

1              MS. MORTAZAVI:  Ms. Jung, if we could turn to the next

2    page, page 7 of this exhibit.

3    Q.  Looking at the bottom, Ms. Hall, do you see the last name

4    Davidovich and the first name Jamen with an address associated

5    with that?

6    A.  Yes.

7    Q.  Can you read out the address?

8    A.  426 Quarry Street, Mount Pleasant, PA, 15666.

9              MS. MORTAZAVI:  Turning to page 12 of this exhibit,

10   please, Ms. Jung.

11   Q.  Under the last name, do you see Guido and the first name

12   Tom?

13   A.  Yes.

14   Q.  Could you please read out the address associated with that

15   individual?

16   A.  261 Bullville Road, Montgomery, New York, 12549.

17             MS. MORTAZAVI:  If you could, on that Government

18   Exhibit 715, turn back to page 12.

19   Q.  Ms. Hall, do you see your name on this list?

20   A.  Yes.

21   Q.  And the address that's associated with it is an address in

22   Monroe, New Jersey, correct?

23   A.  Yes.

24   Q.  Do you recognize the address?

25   A.  Yes.

1              MS. MORTAZAVI:  Ms. Jung, could we turn to page 22 of

2      this exhibit.

3      Q.  Ms. Hall, under the last name Oakes, do you see an

4      individual listed there?

5      A.  Yes.

6      Q.  With the first name Chris?

7      A.  Yes.

8      Q.  And another individual with the first name Sue?

9      A.  Yes.

10     Q.  Are they both associated with the same address?

11     A.  No.

12     Q.  All right.  Is Sue Oakes associated with an address?

13     A.  Yes.

14     Q.  What is that?

15     A.  Sandy Valley Farm, White Haven, PA, 18661.

16     Q.  Are you familiar with an individual named Chris Oakes?

17     A.  I have never met him but I know of him.

18     Q.  Who is he?

19     A.  He was a harness trainer.

20             MS. MORTAZAVI:  Ms. Jung, could we take down that

21     government exhibit and please pull up Government Exhibit 713.

22             And again, this is an electronic extraction from a

23     computer found in Lisa Giannelli's residence.

24     Q.  Ms. Hall, have you seen this exhibit before?

25     A.  No.

1    Q.   Looking at the top, do you see where it says Equestology?

2    A.   Yes.

3    Q.   What's written directly under that?

4    A.   New York clients.

5    Q.   Can you list out the first name and address that appears on

6    this list?

7    A.   Maurino, old, Chris, 901 Recency Court, Middletown, New

8    York.

9    Q.   Looking solely at the city and state columns --

10        MS. MORTAZAVI:   Ms. Jung, if you could focus on those

11   for a minute.

12   Q.   -- do you see any city and state addresses for New

13   York-based clients in New York, New York?

14   A.   Yes.

15   Q.   Pine Bush, New York?

16   A.   Yes.

17   Q.   Yonkers, New York?

18   A.   Yes.

19   Q.   The Bronx, New York?

20   A.   Yes.

21        MS. MORTAZAVI:   Ms. Jung, you can take down this

22   exhibit.   Thank you.

23   Q.   Ms. Hall, did you consider Seth Fishman your veterinarian?

24   A.   No.

25   Q.   What was he to you?

1   A.  Someone that I got advice from and help with prerace.

2   Q.  At the time you reached out to Seth Fishman, had you had

3   much experience in racing?

4   A.  Not the hands-on training aspect, no, I was always more on

5   the business side of it.

6          MS. MORTAZAVI:  One moment, your Honor.

7          (Pause)

8          MS. MORTAZAVI:  Thank you, Ms. Hall, no further

9   questions.

10         THE COURT:  All right.  Thank you.

11         Mr. Sercarz.

12         MR. SERCARZ:  Thank you, your Honor.

13         THE COURT:  Mr. Sercarz, are you able to proceed

14  without us talking about the issue?

15         MR. SERCARZ:  I think we can get through it without

16  the need for the conference.

17         THE COURT:  Terrific.

18         MR. SERCARZ:  If not, I will let you know, your Honor.

19         THE COURT:  All right.  Thank you.

20  CROSS-EXAMINATION

21  BY MR. SERCARZ:

22  Q.  Good afternoon, Ms. Hall.

23  A.  Hello.

24  Q.  My name is Maurice Sercarz, I represent Dr. Fishman.

25         Now you mentioned that there came a time when you

1    moved from Ohio to Florida and you recognized -- well, let me

2    stop there.  When was that, if I may ask?

3    A.  I believe it was October of 2018.

4    Q.  And you worked with a gentleman named Pletcher in Ohio, is

5    that correct?

6    A.  No, in New York.

7    Q.  But I believe you told us that when you got to Florida, you

8    recognized that you missed being at the track and working with

9    horses, am I correct?

10   A.  No, I had said when I got married and moved to Ohio I had

11   to give up my job with Pletcher, and living in Ohio made me

12   realize how much I missed being at the racetrack.

13   Q.  You wanted to get involved with horses again, correct?

14   A.  I missed the racetrack, yes.

15   Q.  And you enjoyed participating in horseracing, am I correct?

16   A.  Yes.

17   Q.  At that time you didn't have it in mind to violate the law,

18   am I correct?

19   A.  No.

20   Q.  Your desire was to be around the animals that you loved and

21   involved in the sport that you loved, am I correct?

22   A.  Correct.

23   Q.  And there came a time later on when you -- I believe you

24   used the word "claimed" some horses, is that correct?

25   A.  I claimed one horse.

1   Q.  Can you explain to me and to the ladies and gentlemen of

2   the jury the meaning of the term "claimed?"

3   A.  It's a type of race.  A claiming race basically means any

4   horse that is entered in that race is technically for sale.  So

5   if I'm a licensed trainer and owner, I can go to the track that

6   day, come with a certified check or have money in my account

7   there, fill out the claim form, drop the slip, and when the

8   race is over, if I'm the only one that put the claim in on that

9   horse or if I won the shake, that horse is now owned by me.

10  Q.  And indeed, there came a time you went to one of those

11  races and ended up owning the horse, is that correct?

12  A.  Correct, yes.

13  Q.  And that was the first horse you ever owned, is that

14  correct?

15  A.  The first Standardbred that I ever owned.

16  Q.  At the time that you came into possession of that horse,

17  you had no intention of violating the law, am I correct?

18  A.  No.

19  Q.  You had no intention of resorting to anything that would

20  violate commission rules in order to race that horse, am I

21  correct?

22  A.  Correct.

23  Q.  You were in it for the love of the sport, isn't that right?

24  A.  The love of the horse, yes.

25  Q.  The love of the horse.  And in fact, throughout your career

MIRTFIS3                    Hall - Cross

1    as a trainer, your prime motivation was the love of horses and

2    being around horses, isn't that true?

3    A.  Yes.

4    Q.  All right.  There came a time when one of your horses ended

5    up being lame, I believe is the word you used to describe it,

6    is that correct?

7    A.  I mean I had many horses that had soundness issues.  I

8    don't know which horse you're talking about.

9    Q.  There was an occasion in Florida --

10              THE COURT:  Could I ask, finish your question then

11   give your answer.  You're stepping on each other's questions

12   and answers, please.  All right?

13              MR. SERCARZ:  Yes, your Honor.

14   Q.  Did there come a time after you left Ohio and moved to

15   Florida that you had a problem with a horse that was lame?

16   A.  I like to do soundness exams on my horses pretty often.  I

17   don't remember at the particular time how lame the horse was,

18   but I might have just wanted to do some thorough going over the

19   horse to make sure he was okay to continue.

20   Q.  And that was for the purpose of ensuring the health and

21   welfare of the horse, am I correct?

22   A.  Yes.

23   Q.  And its suitability to race, is that correct?

24   A.  Yes, correct.

25   Q.  In connection with that desire, you were put in touch with

1   Dr. Fishman, isn't that correct?

2   A.  Yes.

3   Q.  I believe you said that you first contacted Ms. Ranger and

4   that then she put you in touch with Dr. Fishman, am I correct?

5   A.  She had given me his number, yes.

6   Q.  And the purpose in your reaching out to Dr. Fishman was to

7   perform an examination to ensure the health and welfare of the

8   horse, am I correct?

9   A.  Correct.

10  Q.  At that point you weren't looking for any performance-

11  enhancing drugs for your horse, am I correct?

12  A.  Correct.

13  Q.  And you indicated to the ladies and gentlemen of the jury

14  that you had been given a recommendation that led you to try

15  and get in touch with Dr. Fishman, am I right?

16  A.  Yes.

17  Q.  Can you remind me who gave you that recommendation?

18  A.  I believe it was another harness trainer in Ohio, Danny

19  Mayer (ph), that referred him.

20  Q.  And I believe the words you used to describe the

21  recommendation was that the person being recommended was

22  reputable and reasonable, is that correct?

23  A.  Reasonable priced, yes, correct.

24  Q.  And reputable.  Am I correct about that part, too?

25  A.  Yes, correct.

1    Q.  Now at the time you hadn't discussed with this gentleman in

2    Ohio that made the recommendation your desire to find

3    performance-enhancing drugs, am I correct?

4    A.  Correct.

5    Q.  What did you understand him to mean when he said that this

6    is a reputable trainer -- or withdrawn, a reputable

7    veterinarian?

8    A.  Well, when we were discussing, it was more talking about

9    the Equestology business.  And by "reputable" he meant the

10   products that they were selling were actually the products as

11   they were labeled.

12   Q.  There came a time when you contacted Ms. Ranger, is that

13   correct?

14   A.  Yes.

15   Q.  And ultimately she put you in touch with Dr. Fishman, am I

16   correct?

17   A.  She gave me his phone number, yes.

18   Q.  And you called him, am I correct?

19   A.  I cannot remember if I called him or texted him the first

20   time.

21   Q.  In that initial discussion, did the subject of performance-

22   enhancing drugs come up?

23   A.  In our first phone conversation?

24   Q.  Yes.

25   A.  I don't remember, but it might have.

1    Q.  Didn't there come a time when you asked someone whether

2    Dr. Fishman could perform a lameness exam?

3    A.  Lisa, yes.

4    Q.  It was Lisa to whom you posed the question, am I correct?

5    A.  Yes.

6    Q.  And fair to say then that when you contacted Lisa you were

7    looking for a reputable veterinarian to practice veterinarian

8    medicine by performing the type of exam customarily

9    administered by a veterinarian?

10   A.  Yes.

11   Q.  Then at that point, there had been no discussion of

12   performance-enhancing drugs, am I correct?

13   A.  Correct.

14   Q.  Now you were told that Dr. Fishman could not come out to

15   see your horse, is that correct?

16   A.  Correct.

17   Q.  I may not have heard the answer, so forgive me, but they

18   gave you the reason that he had back trouble, isn't that

19   correct?

20   A.  I believe that was what she said, yes, that he had a bad

21   back.

22   Q.  All right.  Nonetheless, you contacted Dr. Fishman, am I

23   correct?

24   A.  Yes.

25   Q.  When you heard that Dr. Fishman had a bad back and couldn't

1   perform the lameness exam, you didn't immediately change the

2   subject of that conversation with Ms. Ranger to performance-

3   enhancing drugs, am I right?

4   A.  I don't believe so, no.

5   Q.  Did you ever order any performance-enhancing drugs from

6   Ms. Ranger?

7             MS. MORTAZAVI:  Objection, scope.

8             THE COURT:  I'm going to allow it.  You can answer.

9   A.  I ordered vitamins from her, I ordered electrolytes from

10  her, and I ordered two bottles of VO2 Max from her.

11  Q.  This is before you ever went to see Dr. Fishman, isn't that

12  correct?

13  A.  I did not order the VO2 Max until after I met Dr. Fishman,

14  but the other products, yes.

15  Q.  Now did there come a time when you met with Dr. Fishman, am

16  I correct?

17  A.  Yes.

18  Q.  I believe you indicated that you had a dinner with him, is

19  that right?

20  A.  Yes.

21  Q.  And you discussed your experience in racing and your

22  desires for the horses, am I correct?

23  A.  I don't recall all the details of that night, but probably.

24  Q.  Would it refresh your recollection if I asked you:  Did you

25  explain to the doctor that these horses -- you had very few

1   horses and you wanted to take good care of them?

2   A.  I believe that was on our very first phone call we had a

3   very long discussion about that.

4   Q.  During the discussion, the subject came up of your desire

5   to preserve the health and welfare of animals, is that correct?

6   A.  Yes, I made it clear to him how much I love them and I

7   didn't want to give them anything bad.

8           MR. SERCARZ:  If I may have one moment.

9           THE COURT:  Of course.

10          (Pause)

11  Q.  Now there came a time when Dr. Fishman recommended a

12  program for your horses, is that correct?

13  A.  Yes.

14  Q.  He designed the program for your horses, am I correct?

15  A.  I don't know if he designed them specifically for my

16  horses, but he had given me some samples that he thought would

17  help them.

18  Q.  And do you recall what it was that you told him about your

19  horses that prompted him to design the program that he

20  designed?

21  A.  Yes.

22  Q.  What was it?

23  A.  In our first conversation I had made it clear do him that I

24  did not want to use Epogen, I did not want to be giving them

25  baking soda by tube, I just really was desperate to find some

1    help giving my horses an edge.  I needed to be able to compete

2    or I was going to lose them.

3    Q.  Did you tell him that you had ever used performance-

4    enhancing substances before?

5    A.  Yes.

6    Q.  And did you describe for him, without giving me the

7    details, the nature of the performance-enhancing drugs that had

8    been given to you for your horses on prior occasions?

9    A.  Yes.

10   Q.  And it was in response to the information that you imparted

11   in that call that Dr. Fishman prepared the program for you,

12   correct?

13   A.  I believe that was in our very first call.  So at the

14   meeting he had given me some samples of VO2 Max and the bleeder

15   paste, and it was after that I believe I asked for blood

16   builders when my horses weren't really improving that much.

17   Q.  Do you remember who it was that had previously provided you

18   with the program for performance-enhancing drugs for your

19   horses?

20   A.  Yes.

21   Q.  Who was it?

22   A.  Tony Poliseno.

23   Q.  Did you make it clear in that first conversation you had

24   with Dr. Fishman that you wanted a less toxic program than the

25   one that had been provided to you by Mr. Poliseno?

1    A.  I did not say less toxic, but I do recall having a

2    conversation with him where I had said -- by the time I had

3    left Ohio or when I was getting ready to leave Ohio, a lot of

4    trainers were getting fed up with Poliseno.  There were rumors

5    that he was selling them products that were not as they were

6    labeled.  Horses were having bad reactions.  Some of it they

7    thought could have just been saline, so they were wasting

8    money.  A lot of people were stopping buying from him, and

9    that's kind of how I came across Equestology.

10   Q.  During the course of that long conversation, did you also

11   tell Dr. Fishman anything about your particular wants with

12   regard to the program that was to be developed for you?

13   A.  Yes.

14   Q.  And didn't you tell him in words or substance that you

15   wanted a program that would not be toxic?

16   A.  Yes.

17          MR. SERCARZ:  I would like to ask that Government

18   Exhibit 103A be replayed for the jury and that the jurors look

19   at 103AT, the transcript.

20          (Continued on next page)

21

22

23

24

25

1  BY MR. SERCARZ:

2  Q.  And if we could, when the jurors are ready, we could replay

3  lines one through six?

4          THE COURT:  All right.  Let's give everyone a minute.

5          MR. SERCARZ:  Yes, your Honor.

6          (Pause)

7          THE COURT:  Okay.  I think we are ready, Mr. Sercarz.

8          MR. SERCARZ:  Thank you, your Honor.

9          (Audio recording played)

10  BY MR. SERCARZ:

11  Q.  Now, in that conversation, and throughout the

12  conversations, the many conversations that you had with

13  Dr. Fishman, he would brag about the places where he had sold

14  his product and the people to whom he had sold it; isn't that

15  true?

16  A.  I don't know if that's what you call bragging.  He mentions

17  some people.

18  Q.  Did he appear to you to be knowledgeable about the programs

19  that he was developing?

20  A.  Very much so.

21  Q.  And did he appear to you to be committed to the programs

22  that he was developing?

23  A.  Very much so, yes.

24  Q.  And was he -- did he appear to you to be committed to the

25  fact that they were a less toxic alternative to what the likes

1   of Mr. Poliseno had been giving you?

2            MS. MORTAZAVI:  Objection.  Relevance.

3            THE COURT:  She can testify to her understanding.

4   It's within the scope.  You may answer.

5            THE WITNESS:  I'm sorry can you repeat the question?

6            MR. SERCARZ:  May I have it reread, your Honor?

7            (Record read)

8   A.  Yes.

9   BY MR. SERCARZ:

10  Q.  He described the program as one that would cause results to

11  develop slowly; am I correct?

12  A.  Yes.

13  Q.  He did not indicate that this was a program that you could

14  administer hours before a race that would show immediate

15  effects; isn't that correct?

16  A.  In reference to the blood builders, that is what he said

17  took time.

18           MR. SERCARZ:  All right.  I'd like to turn your

19  attention to Government's Exhibit 105, if I may, 105-B, and ask

20  the jury to take a look at the transcripts.

21           And I would ask, when the jury is ready, if you could

22  play lines one through 11.

23           (Audio recording played)

24  BY MR. SERCARZ:

25  Q.  Thank you.  Now, in this conversation, Ms. Hall, you're

1    very enthusiastic about the performance of one of your horses

2    in a race; am I correct?

3    A.  I was very emotional, yes.

4    Q.  All right.  And I don't know whether you have a transcript

5    in front of you, but if you could take a look at line 11.  Do

6    you have one in front of you?

7    A.  Yes.

8    Q.  All right.  Do you see the line:  "Yeah, well, if you think

9    it's a pet horse, you got to race it a few more times and then

10   fucking" -- pardon my language -- "fucking find it a home."  Do

11   you see that?

12   A.  Yes.

13   Q.  You had told Dr. Fishman that you felt the horse was like a

14   pet to you; isn't that correct?

15   A.  Yes.

16   Q.  And he was telling you in this paragraph not to overdo it

17   in racing the horse; am I correct?

18   A.  Yes.

19   Q.  I'd like to call your attention to Government's

20   Exhibit 105-C.

21           Ask the jury to bring up the transcript, and ask that

22   the entire conversation be replayed for the jury.

23           (Audio recording played)

24           You had a conversation, am I correct, that Dr. Fishman

25   was warning you not to race the horse too often because it

1    could be injured or damaged by that process?

2    A.   Along those lines, yes.

3    Q.   I'm sorry?

4    A.   Along those lines he was referring to that, yes.

5    Q.   Now, I'd like for you to take a look at Government's

6    Exhibit 105-D.

7         And ask that that conversation be played in its

8    entirety.

9         MS. MORTAZAVI:  Your Honor, may we approach on this?

10        THE COURT:  Yes.

11        (Pause)

12        MR. SERCARZ:  Your Honor, I think we solved the

13   problem.

14        THE COURT:  All right.  I was told you had some

15   resolution of whatever you wanted to talk about?

16        MR. SERCARZ:  Yes.  To be clear, for the record, my

17   request is to have the portion that has been marked as 105-D

18   played in its entirety.

19        MS. MORTAZAVI:  And on that, no objection.

20        THE COURT:  All right.

21        (Audio recording played)

22   BY MR. SERCARZ:

23   Q.   Now, Ms. Hall, in the portion of the conversation that's

24   found in paragraph 3 of the transcription, you are discussing

25   the Hong Kong testing regime and the use of pre-race programs

1    six days out.  Do you see that?

2    A.  Yes.

3    Q.  And in paragraph 4, you changed the subject and say:

4    "Right, um, all I gave them on race day was that VO2;" do you

5    see that?

6    A.  Yes.

7    Q.  Did you notice that there was a pause in the conversation

8    after you said that?

9    A.  No.

10            MR. SERCARZ:  Is it possible just to have that portion

11   replayed again, beginning with No. 4 in the transcription?

12            THE COURT:  I don't know.  Ms. Jung, are you able to

13   help?

14            MS. MORTAZAVI:  I believe we need the timestamp, your

15   Honor, in order to do that.

16            MR. SERCARZ:  All right.  I'll let it go.

17   BY MR. SERCARZ:

18   Q.  In any event, Ms. Hall, prior to this conversation, you

19   didn't tell Dr. Fishman that you planned on administering VO2

20   to your horse on race day, did you?

21   A.  I don't remember if I did or not.

22   Q.  And when you look at Dr. Fishman's response, that took him

23   by surprise, didn't it?

24   A.  No.

25            MS. MORTAZAVI:  Objection.

1          THE COURT:  The objection is overruled because she

2     answered.

3          But you've got to wait when there's an objection,

4     okay?

5          THE WITNESS:  Sorry.

6          THE COURT:  It's not overruled because she answered.

7     It's overruled, and in any event, she answered.

8          MS. MORTAZAVI:  Understood, your Honor.

9          (Pause)

10          MR. SERCARZ:  If I may have one moment, your Honor?

11          THE COURT:  Yes.  Are you getting to the end of your

12     examining?

13          MR. SERCARZ:  Yes.

14          THE COURT:  Okay.

15          (Pause)

16          MR. SERCARZ:  In fact, I'll end it right there, your

17     Honor.  Thank you very much.

18          THE COURT:  All right.  Thank you, Mr. Sercarz.

19          I asked because, otherwise, it's about time for the

20     lunch break.  So we'll break at this point.  I remind you,

21     Ms. Hall, you remain under oath.  You may not speak to anybody

22     about the case until -- before we come back from the lunch

23     break, at which time, Ms. Mortazavi will have the option --

24          Do you know now whether you're going to have redirect?

25          MS. MORTAZAVI:  I will have a few questions.

1          THE COURT:  So we need you back after lunch, please.

2     But, please, don't talk about the case with anyone.

3          And for our jurors, I hope you all have a good lunch.

4     You can leave whatever you want on your chairs.  Please don't

5     talk about the case among yourselves over the lunch break, or

6     at any time before the conclusion of the evidence and the start

7     of your deliberations.  Okay.  Thank you.  Have a good lunch,

8     everyone.  We'll see you back here around 1:45.

9          (Jury not present)

10         All right.  Ms. Hall, you're excused.  Thank you.

11         (Witness temporarily excused)

12         All right.  Please be seated, everyone.

13         Mr. Sercarz, is there anything we need to talk about?

14         MR. SERCARZ:  No, your Honor, not at this point.

15         THE COURT:  Okay.  Thank you.  I just wanted to make

16    sure you got what you needed from the transcript.

17         How about from the government?

18         MS. MORTAZAVI:  Nothing from the government, your

19    Honor.

20         THE COURT:  All right.  I'll see everyone back at

21    1:45, ready to go at 1:45.  Thank you.

22         (Luncheon recess)

23         (Continued on next page)

24

25

| | |
|---|---|
| 1 | A F T E R N O O N   S E S S I O N |
| 2 | 1:47 P.M. |
| 3 | (In open court; jury not present) |
| 4 | THE COURT:  Please be seated, everyone.  All right. |
| 5 | So I understand you're all suggesting that we deal with the |
| 6 | issue of the witness who's going to invoke?  I think that makes |
| 7 | good sense, to take care of it so we don't have to break again |
| 8 | once we have the jurors back up here. |
| 9 | So is that witness and the witness' counsel with us? |
| 10 | MR. CHOW:  He's in the witness room.  He'll be right |
| 11 | in. |
| 12 | THE COURT:  Okay.  Thank you. |
| 13 | All right.  Sir, would you please stand and raise your |
| 14 | right hand. |
| 15 | (Jamen Davidovich sworn) |
| 16 | THE LAW CLERK:  Please sit and state and spell your |
| 17 | name into the microphone. |
| 18 | THE COURT:  You can take your mask off while you're in |
| 19 | the witness stand. |
| 20 | And now could you please speak into the microphone and |
| 21 | say your name and spell it for the record. |
| 22 | THE WITNESS:  My name is Jamen Davidovich, and that's |
| 23 | J-a-m-e-n, D-a-v-i-d-o-v-i-c-h. |
| 24 | MR. CHOW:  Good afternoon, Mr. Davidovich.  How old |
| 25 | are you? |

852

M1RPFIS4

1              THE WITNESS:  Thirty-one years old.

2              MR. CHOW:  How far did you go in school?

3              THE WITNESS:  High school.

4              MR. CHOW:  Have you ever doped a racehorse?

5              THE WITNESS:  I'd like to invoke -- or with my

6    counsel, I'd like to invoke my Fifth Amendment rights.

7              MR. CHOW:  At this point, your Honor, the government

8    has made an application that this witness be compelled to

9    answer the questions at today's proceeding.

10             THE COURT:  All right.  So, sir, is your counsel in

11   the courtroom?

12             THE WITNESS:  Yes, ma'am.

13             THE COURT:  All right.  Sir, can you state your name

14   for the record, sir?

15             MR. FEINSTEIN:  Yes, Miles Feinstein, representing the

16   witness.

17             THE COURT:  Could you spell your name for the record?

18             MR. FEINSTEIN:  Sure. Miles, M-i-l-e-s; last name,

19   Feinstein, F-e-i-n-s-t-e-i-n.

20             THE COURT:  All right.  Thank you.  And you've

21   discussed with your client the issue of his testimony today,

22   and his invocation of his constitutional right?

23             MR. FEINSTEIN:  Absolutely, your Honor.

24             THE COURT:  All right.  And have you discussed with

25   the government the intended areas of examination?

M1RPFIS4

| | |
|---|---|
| 1 | MR. FEINSTEIN:  Yes, your Honor. |
| 2 | THE COURT:  All right.  And is it your client's intent |

1     MR. FEINSTEIN:  Yes, your Honor.

2     THE COURT:  All right.  And is it your client's intent

3  to invoke his Fifth Amendment rights with respect to the entire

4  line of questioning?

5     MR. FEINSTEIN:  It is.

6     THE COURT:  All right.  Thank you.

7     Sir, is that, in fact, the case, you do invoke your

8  Fifth Amendment rights with respect to whatever questions the

9  government intended to put to you?

10     THE WITNESS:  Yes, ma'am.

11     THE COURT:  All right.  I have, from the government, a

12  declaration, first of all, signed by Damian Williams, the

13  United States Attorney for the Southern District of New York,

14  supported by a letter authorizing from Jennifer Hodge at U.S.

15  Department of Justice that Mr. Davidovich be compelled to

16  testify and that he be offered immunity with respect to his

17  testimony.

18     Have you seen the application?

19     MR. FEINSTEIN:  Yes, your Honor.

20     THE COURT:  All right.  And have you discussed it with

21  your client?

22     MR. FEINSTEIN:  Yes, your Honor.

23     THE COURT:  All right.  Mr. Sercarz, is there anything

24  further you want me to address on the record?

25     MR. SERCARZ:  No, your Honor.

1           THE COURT:  Mr. Chow?

2           MR. CHOW:  No, your Honor.

3           THE COURT:  All right.  So pursuant to the application

4    of the government, I will sign the order directing,

5    Mr. Davidovich, that you answer the questions put to you by the

6    government, and that you will have immunity pursuant to this --

7    you've seen the order, sir?

8           MR. FEINSTEIN:  Yes.

9           THE COURT:  And you've discussed it with your client?

10          MR. FEINSTEIN:  Yes.

11          THE COURT:  And that pursuant to the order, you will

12   have immunity pursuant to the application and the order, and I

13   will sign that order now.

14          MR. FEINSTEIN:  Thank you.

15          THE COURT:  All right.  Anything further, Mr. Chow,

16   right now?

17          MR. CHOW:  No, your Honor.

18          THE COURT:  Mr. Sercarz?

19          MR. SERCARZ:  No.  Thank you, your Honor.

20          THE COURT:  All right, sir.  You can step down for

21   now.  Put your mask back on, please, and do that and then we

22   will be recalling you.  We just need to finish up with one

23   other witness.

24          THE WITNESS:  Yes, ma'am.

25          THE COURT:  All right.  Thank you.

1           (Witness temporarily excused)

2           THE COURT:  All right.  I assume I will give the

3  original of this to Ms. Dempsey to file on the docket, right?

4           MR. CHOW:  Yes, your Honor.

5           THE COURT:  All right.  Thank you.

6           All right.  We'll let Ms. Dempsey know she can bring

7  up the jury then.

8           Is there anything else that we needed to talk about

9  before Ms. Mortazavi does her redirect?

10          MR. SERCARZ:  I don't believe so, your Honor.

11          THE COURT:  All right.  Thank you, Mr. Sercarz.

12          MS. MORTAZAVI:  Not from the government, your Honor.

13  If I may just go back to the podium?

14          THE COURT:  Sure, absolutely.  Thank you.

15          MS. MORTAZAVI:  Since I'll be beginning.  And, your

16  Honor, may we have Ms. Hall take her place on the witness

17  stand?

18          THE COURT:  Yes.  I think that makes good sense.

19  Thank you.

20          Good afternoon, Ms. Hall.  You remain under oath.  You

21  can remove your mask while you're in the witness stand, and the

22  jury is on its way up.  All right?  I don't know if anyone told

23  you, but we stand when the jury comes in.  That's what we were

24  doing.  Okay?  All right?

25          THE WITNESS:  Okay.

1              THE COURT:  Thank you.

2              (Jury present)

3              All right.  Please be seated, everyone.

4              Good afternoon, Ms. Hall.  As I said a minute ago, you

5    remain under oath.  All right?

6              Ms. Mortazavi, please.

7    REDIRECT EXAMINATION

8    BY MS. MORTAZAVI:

9    Q.  Thank you.  Ms. Hall, I just have a few more questions for

10   you today.  Do you recall before the lunch break you were asked

11   some questions about when you first reached out to Seth

12   Fishman?

13   A.  Yes.

14   Q.  And do you recall testifying that you had heard that his

15   drugs were reputable and reasonably priced?

16   A.  Yes.

17   Q.  Is that right?

18   A.  Yes.

19   Q.  What was Seth Fishman's reputation with respect to

20   pre-racing horses?

21   A.  One of the things I had heard was that if you want to win

22   races, you need to call him.

23   Q.  And you were also asked about whether you wanted a program

24   from Seth Fishman that would be nontoxic; do you recall that?

25   A.  Yes.

1   Q.  And you didn't want a toxic program for your horses; is

2   that fair to say?

3   A.  Yes.

4   Q.  And you mentioned that when you talked about the drugs that

5   you received from Seth Fishman, you talked about them by the

6   cap color; is that right?

7   A.  Correct, yes.

8   Q.  You referred to blue caps and green caps; is that correct?

9   A.  Yes.

10  Q.  Can you remind the jury what the process was for preparing

11  the shots that you gave to the horses?

12  A.  Drawing water out of one vial, putting it into another

13  vial, mixing it, drawing that out and then administering it to

14  the horse.

15  Q.  And you had to administer it IV, correct?

16  A.  Yes.

17  Q.  And you also testified that you didn't use all the drugs

18  that you received from Seth Fishman, correct?

19  A.  Correct.

20  Q.  Why is that?

21  A.  Some of it, I just didn't feel safe using on my horses.  I

22  was nervous I was going to hit the wrong vein, or put it in the

23  muscle or just administer it incorrectly or just somehow harm

24  them.

25  Q.  Are you trained as a veterinarian?

1    A.  I am not, no.

2    Q.  Have you ever worked as a veterinarian?

3    A.  No.

4    Q.  And did you ask the veterinarian to prepare the drugs

5    before you injected them in the horses?

6    A.  No.

7    Q.  Ms. Jung, can you please pull up the transcript only for

8    Government Exhibit 103-AT.

9            Which I believe you were asked about, Ms. Hall, when

10   Mr. Sercarz was asking you questions a few minutes ago.

11           And if you could, turn to the next page, Ms. Jung.

12           Do you see at the very bottom, this is next to line 8,

13   Seth Fishman stating:  "Nothing I have is caustically

14   dangerous"?

15   A.  Yes.

16   Q.  Do you know what "caustically dangerous" means?

17   A.  I don't know what "caustically" means, no.

18   Q.  Okay.  Did he explain on that call what caustically

19   dangerous means?

20   A.  No.

21   Q.  And you mentioned -- and Ms. Jung, we can take this exhibit

22   down, thank you.

23           You testified that you had received drugs from a

24   person named Poliseno, correct?

25   A.  Correct.

1    Q.  Tony Poliseno; is that right?

2    A.  Yes.

3    Q.  And you testified that others had told you that they

4    thought his drugs didn't work, right?

5    A.  Yes.

6    Q.  What had other people told you about Poliseno's drugs?

7    A.  Some speculation was that he was selling stuff that was not

8    really the drug that it was supposed to be, mislabeled,

9    possibly saline, possibly a different drug other than what it

10   was supposed to be.

11   Q.  And you purchased drugs from Poliseno, right?

12   A.  Yes.

13   Q.  And you used those drugs; is that correct?

14   A.  Yes.

15   Q.  Before you used those drugs, did you believe that they were

16   toxic?

17   A.  No.

18   Q.  And before you used Seth Fishman's drugs, did you believe

19   that they were toxic?

20   A.  No.

21   Q.  Did you believe that they would improve your horse's

22   performance?

23   A.  Yes.

24   Q.  And what did you think would happen if you'd been caught by

25   the racing commission giving one of those drugs to your horses?

1   A.  I would have been in big trouble.

2   Q.  You were also asked about claiming races; do you remember

3   testifying about that?

4   A.  Yes.

5   Q.  What are -- or have you heard of the term claimers?

6   A.  Yes.

7   Q.  What are claimers?

8   A.  Horses that run for a price tag.  They're technically for

9   sale when they're entered, or for whatever price that you are

10  entering them for, you know, 15,000, 20,000 there's a wide

11  variety of levels the horse is for sale.

12  Q.  So a claimer refers to a horse that races in a claiming

13  race?

14  A.  Yes.

15  Q.  And you mentioned that you claimed your first horse?

16  A.  Right.

17  Q.  Is that how you got the first horse that you owned?

18  A.  Yes.

19  Q.  Is the cost to claim a horse tied to how well the horse

20  races?

21  A.  There is different levels.  There's cheap claimers, and

22  there's high-level claimers.

23  Q.  The horse that you claimed, was it cheap or high level?

24  A.  She was cheap.

25  Q.  And you were also asked questions about Government

1    Exhibit 105-BT.

2              Ms. Jung, no need to pull up the exhibit.

3              This was a call in which you discussed with Seth

4    Fishman horses crashing.  Do you remember generally talking to

5    Seth Fishman about crashing horses?

6    A.  Yes.

7    Q.  And do you remember testifying about your understanding of

8    what it means when a horse crashes?

9    A.  Yes.

10   Q.  Could you remind us what that means?

11   A.  Kind of like detox, like coming off a program of drugs and

12   falling apart.

13   Q.  And if a horse crashes, is it going to race well?

14   A.  No.

15   Q.  Ms. Jung, if you could please pull up government

16   Exhibit 105-CT and turn to page 2, please.

17             Next to line 7, Ms. Jung, if we could please expand

18   Seth Fishman's statements on this call.

19             Ms. Hall, do you see here in the transcript where Seth

20   Fishman said on this call:  "I got clients that are going to

21   race a horse for three months and that horse may never race

22   again.  Okay?"

23             Do you see that on the transcript?

24   A.  Yes.

25   Q.  The two horses that you raced in the first half of 2019,

what were the names of those horses?
A. The Spy Who Loves Me.
Q. And?
A. And Las Vegas.
Q. And how long did you own those horses?
MR. SERCARZ: Objection, beyond the scope.
MS. MORTAZAVI: Mr. Sercarz asked questions about this particular transcript, your Honor.
THE COURT: It's not the transcript. Where are you going about these horses?
MS. MORTAZAVI: I'm trying to determine how long Ms. Hall owned those horses.
THE COURT: I'll allow that bit.
BY MS. MORTAZAVI:
Q. Ms. Hall, the two horses that you referenced, how long did you own them?
A. At the time or currently?
Q. When did you first acquire those horses?
A. Spy, I acquired in 2018, and Vegas, I acquired in 2019.
Q. And how long did you open Spy for?
A. I still own him now.
Q. And your second horse, how long did you own that horse for?
A. I owned him for a year, and now he's a retired show horse.
Q. Okay. A retired show horse that you own or that someone else owns?

1   A.  No, somebody adopted him in Ohio.

2   Q.  So in both of those cases, you owned those horses for

3   longer than three months?

4   A.  Yes.

5   Q.  Is that right?

6   A.  Yes.

7   Q.  And do you recall, Ms. Hall, speaking to Seth Fishman about

8   your horses, generally?

9   A.  Yes.

10  Q.  And do you remember him referring to your horses as pet

11  horses?

12  A.  Yes.

13          MS. MORTAZAVI:  Ms. Jung, we can take down this

14  exhibit, please.  Thank you.

15  Q.  Ms. Hall, you also testified about a referral fee that you

16  discussed with Seth Fishman, correct?

17  A.  Yes.

18  Q.  What was that referral fee for?

19          MR. SERCARZ:  Objection.  I didn't go into this on

20  cross-examination.

21          THE COURT:  We had testimony about a referral fee.

22          MR. SERCARZ:  I'm sorry, your Honor?

23          THE COURT:  We had testimony about this.  Overruled.

24  You can answer.

25  A.  I'm sorry, can you repeat the question?

M1RPFIS4                    Hall - Redirect

1              MS. MORTAZAVI:  Can we have the court reporter please

2       read that back.

3              (Record read)

4       A.   If I could bring in any new business for him, I would get a

5       cut of the profit.

6       Q.   And did you discuss with Seth Fishman who you might be

7       referring to him?

8       A.   Yes, he was interested in two trainers.

9       Q.   Who were they?

10      A.   Mainly Tony Alagna.

11      Q.   And had you discussed that trainer with Seth Fishman?

12      A.   Yes.

13      Q.   You were getting drugs without paying for them, correct,

14      from Seth Fishman or Mary, as we discussed?

15      A.   Correct.

16      Q.   Did Seth Fishman ever tell you why he was giving you these

17      drugs for tree?

18      A.   No.

19      Q.   Why did you think you were getting them for free?

20             MR. SERCARZ:  Objection.

21             THE COURT:  Rephrase.

22      Q.   In your mind, when you were receiving these drugs, did you

23      have an understanding of what you were going to do in exchange

24      for them?

25             MR. SERCARZ:  Objection, on this issue state of mind

1    is not relevant.

2              THE COURT:  But you asked her specifically,

3    Mr. Sercarz, did she pay for the drugs that she got.  This is

4    fair --

5              MR. SERCARZ:  Your Honor, I don't recall having done

6    so.  There's reference in the transcript, but I didn't ask it.

7              THE COURT:  Please.  You have my ruling.  Overruled.

8              MR. SERCARZ:  Yes.

9              THE COURT:  You can answer.

10   BY MS. MORTAZAVI:

11   Q.  Ms. Hall, in your mind, what was the exchange when you were

12   getting the drugs for free?

13   A.  One of the people helping me at the time was an assistant

14   to Tony Alagna; so I think he thought that I had a connection

15   there, and it helped bring that business in.

16   Q.  Now, you stated in another recorded call --

17             MS. MORTAZAVI:  Ms. Jung, if we could please pull up

18   Government Exhibit 105-DT.  This is the transcript of the

19   recorded call.  And if we could expand line 4, please.  This is

20   Ms. Hall's statement.

21   Q.  You stated here to Seth Fishman:  I gave him on race day --

22   "All I gave him on race day was that VO2;" is that right?

23   A.  Yes.

24   Q.  That was a reference to VO2 Max, correct?

25   A.  Yes.

1  Q.  And do you recall being asked whether Seth Fishman sounded

2  surprised when you said this?

3  A.  Yes.

4          MS. MORTAZAVI:  Ms. Jung, could we take down this

5  exhibit and pull up Government Exhibit 1117, and could you

6  please expand the silver portion of the label just underneath

7  the name.  Thank you.

8  Q.  And, Ms. Hall, could you read the silver portion of the

9  label?

10 A.  "Administer intravenously 10 cc's four to six hours prior

11 to strenuous exercise.  Proprietary blend of amino acids."

12         MS. MORTAZAVI:  Ms. Jung, if you could take this down,

13 and please pull up Government Exhibit 1028, which is already in

14 evidence, and if we could rotate that, please, and then expand

15 on one of these labels.

16 Q.  And, Ms. Hall, could you read out the directions only on

17 this label?

18 A.  "Administer intravenously 10 to 20 cc's one to four hours

19 prior to strenuous exercise."

20 Q.  And what's the name of this product that appears on this

21 label?

22 A.  VO2 Max.

23 Q.  Ms. Jung, could you please take that down.

24         And, Ms. Hall, after that conversation with Seth

25 Fishman, did you continue to order VO2 Max either from Lisa

1   Ranger or Seth Fishman?

2   A.  I ordered two bottles from Lisa Ranger.

3   Q.  Ms. Jung, can we please pull up Government Exhibit 608,

4   which is in evidence.

5        Ms. Hall, looking at the top left portion of the

6   screen, do you see the company name Equestology?

7   A.  Yes.

8   Q.  And that Felton, Delaware, address, is that the same

9   address that appeared on invoices of Equestology that you

10  received from Lisa?

11  A.  Yes.

12  Q.  Okay.  And you see next to the "for," there's your name?

13  A.  Yes.

14  Q.  And do you recognize the name under that?

15  A.  Yes.

16  Q.  What's the first item on this invoice?

17  A.  VO2 Max.

18  Q.  And what's the date of this invoice?

19  A.  June 3rd, 2019.

20  Q.  Ms. Jung, you can take this down.

21       Ms. Hall, during the time that you were using Seth

22  Fishman's drugs, did the Racing Commission pull blood from your

23  horses for testing?

24  A.  Yes.

25  Q.  Have your horses ever tested positive?

1    A.   No.

2    Q.   Sitting here today, how do you feel about having injected

3    Seth Fishman's drugs into your horses?

4              MR. SERCARZ:  Objection.

5              THE COURT:  Sustained.

6              MS. MORTAZAVI:  No further questions.

7              THE COURT:  Thank you.

8              Any recross?  That's a yes?  Okay.  Let's give

9    Ms. Mortazavi a minute.

10             All right, Mr. Sercarz.

11             MR. SERCARZ:  Thank you.

12   RECROSS EXAMINATION

13   BY MR. SERCARZ:

14   Q.   Without bringing it back up on the screen, the label of I

15   believe it was TB-7 and VO2 Max that we looked at made

16   reference to strenuous exercise; did you see that?

17   A.   Yes.

18   Q.   Do you know what breezing a horse means?

19   A.   Yes.

20   Q.   Breezing a horse refers to training in which the horse is

21   made to undergo strenuous exercise; isn't that correct?

22   A.   Yes.

23   Q.   You were asked questions on the redirect examination about

24   the referral fee; do you recall that?

25   A.   Yes.

Q.  Can you remind the ladies and gentlemen of the jury how

long it -- how long did your relationship with Dr. Fishman

last?

A.  A few months.

Q.  Was it at the beginning of the relationship when this

discussion took place regarding Dr. Fishman's purported

interest in Mr. Alagna and Mr. Pelcher as potential customers?

        THE COURT:  Pletcher.

Q.  Pletcher, beg your pardon.

A.  I'm sorry, I don't recall exactly when it came up, but it

was most likely at the beginning.

Q.  All right.  Over the next few months, did you call

Mr. Pletcher?

A.  No.

Q.  Did you call Mr. Alagna?

A.  No.

Q.  You had represented to Dr. Fishman that you would do so in

exchange for receiving the free product; am I correct?

A.  Yes.

Q.  And yet, you did not do so; am I correct?

A.  Correct.

Q.  Did Dr. Fishman ever demand money from you?

A.  No.

Q.  Did he ever send you a bill for the substances that he had

provided to you?

1   A.  No.

2              MR. SERCARZ:  Thank you.  No further questions.

3              THE COURT:  All right.  Thank you.

4              Anything?

5              MS. MORTAZAVI:  Briefly, your Honor, yes.  And I

6   apologize for removing my mask.

7              THE COURT:  I'm sorry?

8              MS. MORTAZAVI:  I apologize, your Honor, for adjusting

9   my mask.

10             THE COURT:  Not a problem.

11  FURTHER REDIRECT EXAMINATION

12  BY MS. MORTAZAVI:

13  Q.  Ms. Hall, you were just asked some questions about

14  Mr. Pletcher and Mr. Alagna; do you recall that?

15  A.  Yes.

16  Q.  With respect to Mr. Pletcher, you said that you did not

17  reach out to him regarding Seth Fishman's drugs, correct?

18  A.  Correct.

19  Q.  Why is that?

20             MR. SERCARZ:  Objection.

21             THE COURT:  Overruled.

22  BY MS. MORTAZAVI:

23  Q.  You can answer the question, Ms. Hall.

24             THE COURT:  Yes, you may answer.

25  A.  He would never take my advice or opinion seriously; so I

1   would never approach him about something like that.

2   Q.  And you testified that you never called Tony Alagna,

3   correct?

4   A.  Correct.

5   Q.  Did you call someone else who was in contact with Tony

6   Alagna?

7   A.  I didn't call somebody, but the person that was helping me

8   at the time had talked to Tony.

9   Q.  And had you mentioned that to Seth Fishman?

10  A.  Yes.

11  Q.  Had you mentioned that to Seth Fishman more than once?

12  A.  I believe so.

13          MS. MORTAZAVI:  No further questions.

14          THE COURT:  Thank you.

15          Anything, Mr. Sercarz?

16          MR. SERCARZ:  No.  Thank you, your Honor.

17          THE COURT:  All right.  Thank you very much.  You're

18  excused with the thanks of the Court.

19          (Witness excused)

20          And who is the government's next witness?

21          MR. CHOW:  Yes, your Honor.  Would it be possible to

22  wait --

23          THE COURT:  Yes, that's fine.

24          (Pause)

25          MR. CHOW:  Before the witness takes the --

872

M1RPFIS4                    Davidovich - Direct

1              THE COURT:  You should be okay now.  Thank you.

2              MR. CHOW:  I was just going to place a couple of items

3    in the witness stand before the witness took the witness stand.

4              THE COURT:  All right.  You can walk up and hand them

5    to him.

6              MR. CHOW:  Okay, great.

7              THE COURT:  If you just put those down for now, sir,

8    and Ms. Dempsey is going to administer the oath to you.

9     JAMEN DAVIDOVICH,

10         called as a witness by the Government,

11         having been duly sworn, testified as follows:

12             THE DEPUTY CLERK:  Please be seated and spell and say

13   your name for the record.

14             THE WITNESS:  My name is Jamen --

15             THE COURT:  Please, first get comfortable.  Pull your

16   seat up and speak into the microphone.  Thank you, sir, very

17   much.

18             THE WITNESS:  My name is Jamen Davidovich, and that's

19   J-a-m-e-n, D-a-v-i-d-o-v-i-c-h.

20             THE COURT:  All right, Mr. Chow.

21   DIRECT EXAMINATION

22   BY MR. CHOW:

23   Q.  Good afternoon, Mr. Davidovich.  In order to make sure that

24   everybody in the courtroom can hear you, can you just pull the

25   microphone close to your face and speak into it when you're

1    answering questions.

2            THE COURT:  Yes, you should be good.

3    Q.  How old are you?

4    A.  Thirty-one.

5    Q.  Where were you born?

6    A.  Greensburg, Pennsylvania.

7    Q.  How far did you go in school?

8    A.  High school.

9    Q.  Where do you live now?

10   A.  Mount Pleasant, Pennsylvania.

11   Q.  What do you currently do for work?

12   A.  Currently me and my brothers run a business where we mow

13   interstate highways for the Department of Pennsylvania.

14   Q.  Do you do anything else for money?

15   A.  Yes.  I have a four Thoroughbred racehorses on the side

16   that I kind of just do for fun.

17   Q.  What is a Thoroughbred racehorse?

18   A.  Thoroughbred racehorse is -- the best way I can explain it

19   is Kentucky Derby-style horses.  They run around racetracks.

20   Q.  How did you first get involved in the business of

21   horseracing?

22   A.  My dad did it when I was a very young kid, and then he got

23   out of it for a while.  And he got back into it right around

24   2001, I want to say.

25   Q.  And what was your dad's involvement in horseracing?

1  A.  It was very minor.  He just had five, six horses that he

2  did as a hobby.

3  Q.  Did there come a time when you started training racehorses

4  on your own?

5  A.  Yes.

6  Q.  How old were you at the time?

7  A.  I was about 24 years old.

8  Q.  At some point, did you get your own trainer's license?

9  A.  Yes, 2014.

10  Q.  After that, have you continued in the business of

11  horseracing?

12  A.  Yes.

13  Q.  Was there a period of time where you were more serious

14  about it?

15  A.  Yes, right around 2015 or '16.

16  Q.  During those years, approximately how many horses did you

17  own and train?

18  A.  Fourteen.

19  Q.  Can you explain to the jury the income and expenses

20  associated with your owning and training of racehorses?

21  A.  It is -- I mean, whenever -- the income is, obviously,

22  based on winning races and/or running second or third.  In the

23  horseraces, there's a ton of expenses.  You have your feed, you

24  have bedding, you have the actual animal itself.

25          Because I owned most of the horses I trained, so I,

1   obviously, had to purchase the horse.  There's very -- you

2   know, and the list goes on.  Obviously, you have veterinarian

3   fees.  You have shipping costs.  You have, you know, hay.  You

4   know, there's a long list of different types of expenses with

5   the business.

6   Q.  During that time that you were more serious about owning

7   and racing horses, how much money did you make?

8   A.  I want to say in 2015, the horses I trained earned right

9   around a little over 320,000.  Right around there.

10  Q.  Do you have a trainer's -- sorry, since 2015, in what

11  states have you entered horses for racing?

12  A.  Pennsylvania, West Virginia, Ohio, Maryland, New York,

13  Kentucky.

14  Q.  Do you have a trainer's license in all of those states?

15  A.  At the current time, I think I have a trainer's license in

16  New York, Ohio, and West Virginia.

17  Q.  Prior to that, did you have licenses in other states as

18  well?

19  A.  Yes.

20  Q.  Approximately how many -- withdrawn.

21          Are you still own and racing horses currently?

22  A.  Yes, sir.

23  Q.  Approximately how many horses do you own and train now?

24  A.  Four.

25  Q.  How come you own and train fewer horses than before?

1   A.  I -- I kind of stepped away from the business.  Me and my

2   brothers expanded our other business, and like I said, I just

3   kind of do it as a hobby now, and I pretty much help my other

4   brothers with my other business mostly.

5   Q.  When you say the other business with you and your brother,

6   what business are you referring to?

7   A.  Our mowing and contracting business.

8   Q.  During your time owning and training racehorses since 2014,

9   have you administered performance enhancing drugs to your

10  horses?

11  A.  I have.

12  Q.  Did you administer those performance enhancing drugs for

13  the purpose of trying to win races?

14  A.  Yes, sir.

15  Q.  Are you familiar with a term to dope a horse?

16  A.  I am.

17  Q.  What does the term mean?

18  A.  To give your horse a performance enhancing substance to try

19  to earn more money on the racetrack.

20  Q.  Is that what you did?

21  A.  Yes.

22  Q.  Did you dope your horses knowing that it was against the

23  racing rules?

24  A.  Yes.

25  Q.  What kinds of performance enhancing drugs did you use to

1    dope your horses over the years?

2    A.  Growth hormones, clenbuterol, blood builders, stuff like

3    that.

4    Q.  When did you start doping your horses?

5    A.  2015.

6    Q.  Have any of your horses tested positive for the performance

7    enhancing substances in connection with a race?

8    A.  Yes.

9    Q.  How many times?

10   A.  I believe five.

11   Q.  What did they test positive for?

12   A.  I had four horses test positive for clenbuterol.  I think

13   two of them in 2016, and one horse tested for a very minor

14   overage of testosterone that he was gelded recently before that

15   race but, obviously, the horse had high testosterone levels; so

16   the horse had a positive test for it.

17   Q.  Okay.  Let's break that down a little bit.  So you had one

18   positive test because a horse had too much testosterone in its

19   system?

20   A.  Correct.

21   Q.  And you mentioned that the horse had previously been

22   gelded?

23   A.  Yes.

24   Q.  What does "gelded" mean?

25   A.  Gelded means that, I guess whenever a horse gets his balls

1    cut off.

2    Q.  And you mentioned that you also had horses test positive

3    for clenbuterol?

4    A.  Yes, sir.

5    Q.  What is clenbuterol?

6    A.  Clenbuterol is a drug that is used to clean out the horse's

7    airways, you know, because a lot of horses, they bleed or get,

8    I guess, phlegm or, you know, different types of mucus in their

9    throat.  And I used the clenbuterol to clean out their airways

10   so they don't get pneumonia and/or different types of

11   infections.

12   Q.  Had you, in fact, administered clenbuterol to your horses?

13   A.  Yes.

14   Q.  Why had you administered it to your horses?

15   A.  At the racetrack, there was also another type of idea that

16   the clenbuterol would give the horses an anabolic-like effect

17   if you gave it on a daily basis.

18   Q.  What does "anabolic effect" mean?

19   A.  Anabolic effect is like a steroid.  Like, if you were going

20   to use like a Winstrol or a some type of anabolic agent, and it

21   would make the horses eat a little bit better, which,

22   therefore, they would carry more weight.  And the more weight

23   that they had, you could, obviously, train them harder, and the

24   fact that you could train them harder, they would be able to

25   run a little bit further in the horserace.

1    Q.  At the time, did you know that you were violating the

2    racing rules by administering clenbuterol?

3    A.  Yes.

4    Q.  What penalty did you receive as a result of your horses

5    testing positive?

6    A.  The first time, in 2016, it was a 15-day suspension, and

7    then the second time, it was a 30-day suspension; so I served

8    45 days, I believe, in 2016.

9    Q.  And you mentioned that you had two other positive tests?

10   A.  Yes.

11   Q.  Were you penalized as a result of those?

12   A.  Yes.  I had 30 days for those two.

13   Q.  Can we bring up, for just the witness and the parties, as

14   well as the Court, what has been marked as Government

15   Exhibit 10,005.

16           Do you recognize that individual?

17   A.  Yes, sir.

18   Q.  Who is it?

19   A.  Dr. Seth Fishman.

20           MR. CHOW:  The government offers Exhibit 10,005.

21           THE COURT:  I think it may be in evidence, but if not,

22   is there an objection?

23           MR. SERCARZ:  No.

24           THE COURT:  All right.  I think it may be in evidence,

25   but if not, it's received.

1              (Government's Exhibit 10,005 received in evidence)

2              MR. CHOW:  May it be published to the jury?

3              THE COURT:  Yes.  Can you all see?

4              JUROR:  No.

5              THE COURT:  So let's wait a minute.  Anybody who

6      doesn't have it now?

7              Okay, Mr. Chow.

8      BY MR. CHOW:

9      Q.  Did you dope your horses using drugs you obtained from

10     Mr. Fishman?

11     A.  Yes.

12     Q.  Approximately when did you first meet Mr. Fishman?

13     A.  It was sometime in, I believe, the winter of 2017.  I was

14     at Mr. Ford's farm, and it was very brief, and I just

15     introduced myself to Dr. Fishman.

16     Q.  Okay.  Let's talk about that a little bit.  Who is

17     Mr. Ford?

18     A.  Mr. Mark Ford is a guy that owns a Standardbred facility.

19     I believe it's in New York or Pennsylvania.  It's like right on

20     the border, somewhere over there.

21     Q.  And what were you doing there?

22     A.  I was getting one of my horses examined by another

23     veterinarian.

24     Q.  Who initiated the conversation between you and Mr. Fishman?

25     A.  I did.

1   Q.   Why did you initiate a conversation with Mr. Fishman?

2   A.   Well, his reputation preceded him.

3   Q.   What reputation was that?

4   A.   The reputation that I had heard about Dr. Fishman is that

5   he --

6           MR. SERCARZ:  Objection, hearsay.

7           THE COURT:  Sustained.

8   Q.   What was your motivation for talking to Mr. Fishman that

9   day?

10  A.   My motivation for talking with Mr. Fishman was to obtain --

11  or to start to obtain a relationship with him.

12  Q.   How long did your conversation with Mr. Fishman last?

13  A.   It was very brief, I don't know, maybe 15 seconds.

14  Basically like an introduction, hey, how are you, and shook his

15  hand.

16  Q.   Did Mr. Fishman examine your horse that day?

17  A.   No, sir.

18  Q.   Did you observe him examining any other horses that day?

19  A.   No.

20  Q.   After that day, did you have occasion to meet Mr. Fishman

21  again?

22  A.   Yes.

23  Q.   Approximately when was that?

24  A.   I believe sometime in the -- in the winter of 2017.  And

25  for the record, I think I messed up my first timeline.  I

1    believe I met Dr. Fishman in the winter of 2016 at Mark Ford's

2    farm.

3    Q.  I see.  So the meeting at Mr. Ford's farm --

4    A.  Yes.

5    Q.  -- took place in 2016?

6    A.  Yes.

7    Q.  And you believe that the next time you met Mr. Fishman was

8    in the winter of 2017?

9    A.  Correct.

10   Q.  All right.  How did that meeting come about?

11   A.  I had an owner that got me in touch with him.

12   Q.  Where did the meeting take place?

13   A.  Fort Lauderdale.

14   Q.  Any particular place in Fort Lauderdale?

15   A.  It was a sushi restaurant in downtown Fort Lauderdale.

16   Q.  Who was present for that lunch?

17   A.  Me, Seth and my owner.

18   Q.  During your lunch with Mr. Fishman, was the topic of

19   performance enhancing drugs discussed?

20   A.  Yes, sir.

21   Q.  How did that topic come up?

22   A.  We were talking about different things to, obviously, make

23   the horses run better.

24   Q.  What did Mr. Fishman say about the drugs that he sold?

25   A.  That they were untestable.

1    Q.  What did he say about the testability of his drugs?

2    A.  He said that they wouldn't show up in a post-race test for

3    the horse.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. CHOW:

2    Q.  Did Mr. Fishman describe that day any particular drugs as

3    not testable?

4    A.  Yes.

5    Q.  What drug did he mention in particular?

6    A.  The BB3.

7    Q.  How did he explain the untestability of BB3?

8    A.  He explained it to me -- he had picked up a napkin on the

9    table when we were sitting down for sushi, and he ripped the

10   corner off of it -- I believe two corners off of it, and said

11   that he changed molecular weight of it, and they were looking

12   for the molecular weight of this drug and he changed it to

13   this.

14   Q.  Looking at the counter in front of you, do you see a few

15   napkins?

16   A.  I do.

17   Q.  What are those?

18   A.  Just regular napkins.

19   Q.  Are these the approximate size of the napkin used by

20   Dr. Fishman at that lunch?

21   A.  Yes, sir.

22   Q.  What color was the napkin that was used by Dr. Fishman at

23   lunch?

24   A.  White.

25   Q.  Other than the color, are the napkins in front of you a

1    fair and accurate representation of the napkin that was --

2                MR. SERCARZ:  Objection.

3    Q.  -- used by Dr. Fishman at lunch?

4    A.  Yes.

5                THE COURT:  Hold on.  When there's an objection, you

6    have to wait for me to hear.

7                I couldn't hear you, Mr. Sercarz, but I know you

8    objected.

9                MR. SERCARZ:  It's a relevance objection.

10               THE COURT:  Overruled.

11   Q.  Can you take one of the napkins and put a sticker, the one

12   that's labeled Exhibit 14028, on it.

13               MR. CHOW:  Your Honor, the government offers

14   Exhibit 14028 into evidence.

15               MR. SERCARZ:  Same objection.

16               THE COURT:  That one is sustained.

17   Q.  Mr. Davidovich, now if you could take the second napkin and

18   demonstrate and explain to the jury what Mr. Fishman said and

19   did with the napkin.

20   A.  Mr. Fishman took the napkin, it was sitting on the table,

21   and he had opened it up for me and ripped the corner off like

22   this.  And he took the other side and ripped the other side

23   off, his lines were a little straighter than mine, and looks

24   something like this.

25   Q.  Can you take the sticker saying 14029 and put it on the one

1    that you ripped.

2              MR. CHOW:  Your Honor, the government offers

3    Exhibits 14028 and 14029 into evidence.

4              MR. SERCARZ:  Objection, relevance.

5              THE COURT:  I'm not receiving it in evidence but not

6    on that grounds.

7    Q.  What was your understanding of who Mr. Fishman was

8    referring to when he described the people testing for his

9    drugs?

10   A.  The racing testing labs.

11   Q.  Did Mr. Fishman explain to you what the purpose of BB3 was?

12   A.  Yeah, to help the horse's red blood count.

13   Q.  Did Mr. Fishman discuss any other drugs that he sold

14   besides BB3 that day?

15   A.  Yes.

16   Q.  What other drugs did Mr. Fishman mention?

17   A.  He mentioned a PG2.  He mentioned that he had different

18   types of pain killers.  He mentioned that he had bleeder pills,

19   I believe a product called Serenity.

20   Q.  Did Mr. Fishman say what the effect of PG2 was?

21   A.  Yes, it was supposed to be like a growth hormone-type

22   product that had regenerative tissue repair.

23   Q.  Did Mr. Fishman describe what the effect of the bleeder

24   pills he sold was?

25   A.  Yes, it was to help horses not bleed in their lungs while

1    they were running.

2    Q.  And what's your understanding of why you wouldn't want your

3    horse to bleed while running?

4    A.  Well, first off, it's obviously not good for the horse

5    whenever they're bleeding in their lungs.  Second off, whenever

6    a horse is in a race and they bleed, they stop, and whenever

7    they stop, obviously they're not going to be able to earn any

8    money in the race.

9    Q.  During that lunch with Mr. Fishman, did Mr. Fishman discuss

10   any occasions where he claimed to have had a run-in with

11   someone from law enforcement?

12   A.  Yes.

13   Q.  What did Mr. Fishman tell you?

14   A.  He said that he was --

15            MR. SERCARZ:  Objection.

16            THE COURT:  Ground?

17            MR. SERCARZ:  Part of that conversation may be

18   hearsay, your Honor.

19            THE COURT:  Part of it?

20            MR. SERCARZ:  Yes.

21            MR. CHOW:  Your Honor, the witness is relaying what he

22   heard from the defendant.

23            MR. SERCARZ:  From the defendant.  Withdraw the

24   objection if it's limited in that fashion.

25            THE COURT:  The question was:  What did Mr. Fishman

888

M1RTFIS5Davidovich - Direct

1    tell you?

2              You may answer.

3    A.  Mr. Fishman told me that there was a law enforcement agent

4    that he was at dinner with, and there was a lady there, and the

5    law enforcement agent was asking him --

6              MR. SERCARZ:  Objection.

7              THE COURT:  Sustained.

8              MR. CHOW:  You should stop when the objection is

9    sustained you.

10             THE COURT:  Yes.  When I sustain an objection, you

11   should not answer.  If I say overruled, you may answer.

12   Q.  At the end of the lunch, what, if anything, did Mr. Fishman

13   say he would do for you?

14   A.  He would send me a package to give my horses a program to

15   start me off on.

16   Q.  "Program," is that a word used by him or by you?

17   A.  By him.

18   Q.  Did you in fact subsequently receive a package from

19   Mr. Fishman?

20   A.  Yes, sir.

21   Q.  Approximately when did you receive this package?

22   A.  I believe sometime in early 2018.

23   Q.  What was in the package?

24   A.  In that particular package there was PG2, TB-7, and BB3.

25   Q.  Were there any bleeder pills in that package?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   A.  Yes, correct.

2            MR. CHOW:  Can we bring up Government Exhibit 14027

3   just for the witness and the parties, please.

4            THE COURT:  Want to do it the old-fashioned way?

5            MR. CHOW:  The old-fashioned way, your Honor.

6            THE COURT:  Okay.

7   Q.  Mr. Davidovich, are you able to see what's on your screen?

8   A.  Yes.

9   Q.  What is that?

10  A.  That's the bleeder pills that Seth sent to me.

11  Q.  Did you take this photo?

12  A.  Yes, I did.

13           MR. CHOW:  The government moves Government

14  Exhibit 14027 into evidence.

15           MR. SERCARZ:  No objection.

16           THE COURT:  It's received in evidence and you may

17  publish it.

18           (Government's Exhibit 14027 received in evidence)

19  Q.  Could you read what the label says?

20  A.  500 bleeder pills.

21  Q.  After receiving the package, did you speak with

22  Mr. Fishman?

23  A.  Yes.

24  Q.  How did you speak with him?

25  A.  By phone.

1  Q.  During that conversation, did you discuss the products you

2  had received?

3  A.  Yes.

4  Q.  Did you ask Mr. Fishman what TB-7 was?

5  A.  Yes, I did.

6        MR. CHOW:  We can take this down.

7  Q.  What did he say?

8  A.  I honestly don't recall exactly what TB-7 was for.

9  Q.  Did Mr. Fishman provide you any instructions regarding the

10  use of the products in the package?

11  A.  Yes.

12  Q.  Let's talk about each of them.  Did he explain to you what

13  you should do with the PP2?

14  A.  Yes, I should give it once a week no closer than 72 hours

15  before a race.

16  Q.  Did he explain to you what you should do with the BB3?

17  A.  Yes, I believe start them off on like two and then go from

18  there and see how the horse was doing.

19  Q.  Did he give you any instructions with regard to the

20  bleeding pills?

21  A.  Yes.

22  Q.  What instructions did he give you?

23  A.  The instructions were to give so many bleeding pills 24

24  hours out and 48 hours out.

25  Q.  Did you administer any of the drugs from that package to

1    your horses?

2    A.   Yes.

3    Q.   Which ones?

4    A.   I administered the PG2, the BB3.

5    Q.   How many horses did you administer it to?

6    A.   One horse.

7    Q.   What was the name of the horse?

8    A.   Flashy Jewel.

9    Q.   Why did you administer only those two drugs?

10   A.   Because the other drugs that he sent me were painkillers,

11   and I do not -- I never gave my horses painkillers.

12   Q.   In connection with the first package, did you pay

13   Mr. Fishman?

14   A.   No, sir.

15   Q.   In connection with the first package, did Mr. Fishman

16   examine any of your horses?

17   A.   No, sir.

18   Q.   At the time, had any of your horses been diagnosed with any

19   medical conditions for which those drugs were intended to

20   treat?

21   A.   No.

22   Q.   After receiving the first package, did you continue to have

23   phone conversations with Mr. Fishman in the following months?

24   A.   Yes, phone and text.

25   Q.   During those phone conversations, did you ever discuss the

1    performance of your horses with Mr. Fishman?

2    A.  Yes.

3    Q.  What would you talk about?

4    A.  I told him that I didn't think that the BB3 was doing much

5    because the one horse that I gave it to was basically running

6    worse.

7    Q.  When you say running worse, could you explain a little more

8    what that means?

9    A.  Yeah, the horse was not performing as well.

10   Q.  In races?

11   A.  Yes.

12   Q.  After you received that first package, did you subsequently

13   order additional products from Mr. Fishman?

14   A.  Yes.

15   Q.  How many times?

16   A.  I believe twice.

17   Q.  Let's talk about the first order.  What did you order?

18   A.  Dr. Fishman sent me some omeprazole.

19   Q.  What is omeprazole?

20   A.  Omeprazole is an ulcer medication that is used to treat the

21   gut health of a horse.

22   Q.  How much omeprazole did you order?

23   A.  I believe I bought $2,000 worth.  I believe they were $400

24   a bottle, I want to say five bottles.

25   Q.  Why did you order all that omeprazole?

1   A.  At the time Seth asked me if I wanted to sell some products

2   for him.

3   Q.  Can you explain a little more about that conversation that

4   you had with Mr. Fishman?

5   A.  Yeah, he wanted to I guess kind of expand his business a

6   little bit and asked me if I wanted to sell omeprazole and

7   regular vet products and make a percentage off of it.

8   Q.  When did Mr. Fishman express this to you?

9   A.  Over a phone call.

10  Q.  Is omeprazole a prescription drug?

11  A.  Yes.

12  Q.  Did you have a prescription for omeprazole for your horses?

13  A.  I never sought one.

14  Q.  I'm showing you what has been marked as Government

15  Exhibit 14026.

16          MR. CHOW:  Could we just show it to only the witness

17  and the parties, please.

18          One moment, your Honor.

19          (Pause)

20          MR. CHOW:  We're encountering technical difficulties

21  so we'll go old school again.

22          THE COURT:  Okay, no problem.

23  BY MR. CHOW:

24  Q.  Can you see that on your screen, sir?

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          THE COURT:  Right now this is just for the witness and

2     the parties and me.

3     Q.  Mr. Davidovich, do you recognize this?

4     A.  Yes.

5     Q.  What is this?

6     A.  This is a price list that Seth sent me.

7          MR. CHOW:  The government offers 14026 into evidence.

8          MR. SERCARZ:  No objection.

9          THE COURT:  It is received.

10         (Government's Exhibit 14026 received in evidence)

11         THE COURT:  Now you may publish it.

12    Q.  Can you read who this email is from?

13    A.  Yes, it's from Seth Fishman.

14    Q.  And in the "to" line it says jamenhorseracing@gmail.com.

15    Whose email address is that?

16    A.  That is mine.

17    Q.  What is the subject of this email?

18    A.  Initial list.

19    Q.  What's the date of the email?

20    A.  February 27, 2018.

21    Q.  Prior to this email, had you asked Mr. Fishman to send you

22    a price list for his products?

23    A.  I believe so.

24    Q.  Why did you ask him for that?

25    A.  So I could obviously get the prices for everything that he

1    was selling.

2    Q.  Can you read the names of the products on this list and the

3    prices next to each one.

4    A.  Yes, the first one is TB-7 thymosin a/k/a TB500 10

5    milligrams, $50.  Omeprazole, 80 to 100 doses, $400.  ITP Plus,

6    $60.  HP Bleeder Plus, $35.  PG2, $32.50.  ACTH freeze dried,

7    four doses, $30.  Serenity, $35.  Folic five times $45.  Double

8    Kill EPM, one month supply, $75.  Pentosan, three doses, $75,

9    Pentosan five way, $50.  Oxygenator, $75.  Various analgesics,

10   TBD.

11   Q.  Are you a veterinarian, Mr. Davidovich?

12   A.  No, sir.

13   Q.  Have you received any training as a veterinarian?

14   A.  No.

15   Q.  Going back to the omeprazole you had ordered from

16   Mr. Fishman, did you have a buyer lined up for that omeprazole?

17   A.  I did.

18   Q.  What happened with that buyer?

19   A.  That buyer ended up getting Gastrogard from a veterinarian

20   because it took Mr. Fishman a while to give me the product.

21   Q.  So what did you do with the omeprazole when you received

22   it?

23   A.  It sat in my room and ended up going bad and I ended up

24   throwing it away.

25   Q.  Let's talk about the final order you placed with

M1RTFIS5                          Davidovich - Direct

1    Mr. Fishman.  Do you recall what sorts of products you ordered?

2    A.  Yeah, there was some painkillers in there, BB3, I believe

3    some PG2 as well.

4    Q.  When you received the -- did you subsequently receive a

5    package from Mr. Fishman?

6    A.  Yes.

7    Q.  And when you received that package, what did you receive as

8    part of your order?

9    A.  PG2, BB3, and some painkillers that were SOD with a bunch

10   of numbers after them, and I believe there was some KA-77 and

11   PDP as well.

12   Q.  After receiving these products, did you speak with

13   Mr. Fishman about the products you had received?

14   A.  Yes.

15   Q.  Did you administer any of the products you received on your

16   horses?

17   A.  I did not administer any of the painkillers, and that

18   particular order of BB3 I gave to somebody else.

19   Q.  What happened to the rest of the drugs that you didn't use?

20   A.  I turned them over to the government, and that's everything

21   that I had left.

22           MR. CHOW:  Can we change it just to the witness and

23   the parties, and let's keep it on the ELMO.

24   Q.  Are you able to see on your screen what I'm showing you?

25   A.  Yes, sir.

1    Q.   What is it?

2    A.   This is the box I had given to you guys.

3    Q.   And do you see on the government exhibit tab there are some

4    initials on it?

5    A.   Yes.

6    Q.   Whose initials are those?

7    A.   They're mine.

8    Q.   When did you initial it?

9    A.   Last night.

10         MR. CHOW:  The government moves Exhibit 14024 and its

11   contents into evidence.

12         MR. SERCARZ:  No objection.

13         THE COURT:  It is received and it is evidence.

14         (Government's Exhibit 14024 received in evidence)

15         THE COURT:  Are you intending to publish this?

16         MR. CHOW:  Yes, your Honor, thank you.

17         This is Government Exhibit 14024.  I'm going to open

18   the box now.

19   BY MR. CHOW:

20   Q.   Does the evidence appear in the same state that it was when

21   you turned it over to the government?

22   A.   Yes.

23   Q.   I'm going to pull out one vial at a time such that you can

24   see it and everybody else can see it, then I will step back in

25   and ask you to read the label on each of the vials.

1    A.   Okay.

2    Q.   Starting from left to right, let's do the first three,

3    because I think the last two may be a little tougher to read

4    with the ELMO, but the one all the way on the left, what does

5    the label there say?

6    A.   BB3.

7    Q.   And the one next to it?

8    A.   PDP.

9    Q.   And the one next to that?

10   A.   KA-77.

11   Q.   After receiving the order, did you ask Mr. Fishman what

12   KA-77 was?

13   A.   Yes.

14   Q.   What did Mr. Fishman tell you?

15   A.   It was one of his painkillers.

16   Q.   I'm going to try to rotate the last two for you and we'll

17   see if you can read them.

18          THE COURT:  Maybe one of your colleagues can help you

19   while you question.

20   Q.   Mr. Davidovich, were you able to read that?

21   A.   Yes.

22   Q.   What did it say?

23   A.   SOD, I believe HSP-C.

24          THE COURT:  Mr. Adams is a good assistant.

25          MR. CHOW:  He's the best.

1   Q.  Were you able to read that one?

2   A.  Yes.

3   Q.  What did it say?

4   A.  SOD HSP.

5   Q.  Did you ask Mr. Fishman what the SOD products were?

6   A.  Yes.

7   Q.  What did he tell you?

8   A.  Those were supposed to be painkillers that worked on

9   different receptors in the body.

10          MR. CHOW:  We can turn off the screen.  Thank you.

11  Q.  During your conversations with Mr. Fishman, did he ever

12  mention any other clients that he had?

13  A.  Yes.

14  Q.  What other client or clients did Mr. Fishman mention to

15  you?

16  A.  He mentioned Chris Oakes, Jorge Navarro, and the third guy,

17  I do not know his name, but it was a veterinarian who worked on

18  Olympic horses.

19  Q.  Do you know who Jorge Navarro and Chris Oakes are?

20  A.  Yes.

21  Q.  Who is Chris Oakes?

22  A.  He's a Standardbred horseracing trainer.

23  Q.  And who is Jorge Navarro?

24  A.  Thoroughbred racing trainer.

25  Q.  What did Mr. Fishman say about his business with

1    Mr. Navarro?

2    A.   He had said that Navarro owes him a bunch of money and he

3    was going to cut him off if he didn't pay up.

4    Q.   Did Mr. Fishman express any other concerns about

5    Mr. Navarro?

6    A.   Yes.

7    Q.   What concerns did he express?

8    A.   He didn't want him to sink the entire ship because he

9    referenced himself to being a juice man.

10   Q.   When he said referenced himself to being the juice man, who

11   was referring to themselves as the juice man?

12   A.   Jorge Navarro.

13   Q.   To the best of your recollection, what were the words that

14   Mr. Fishman used?

15   A.   He said that he didn't want to be taken down by somebody

16   with a loud mouth like Mr. Navarro.

17   Q.   Have you ever seen Navarro refer to himself as the juice

18   man?

19   A.   Yes.

20   Q.   Where did you see him do that?

21   A.   A video that was taken on YouTube at Monmouth Park.

22   Q.   What did Mr. Fishman say about the other vet he mentioned?

23   A.   He said that he was using his products on the Olympic

24   horses.

25   Q.   Who was using whose products?

1    A.  The Olympic veterinarian was using Dr. Fishman's products.

2    Q.  Mr. Davidovich, are you testifying here pursuant to a

3    subpoena?

4    A.  Yes.

5    Q.  And in connection with that subpoena, are you also under

6    what's called a compulsion order?

7    A.  I am.

8    Q.  Who issued that compulsion order?

9    A.  The government.

10   Q.  What is your understanding of what the compulsion order

11   means?

12   A.  Anything I say today cannot be used against me.

13   Q.  To be clear, can any of your testimony today be used to

14   prosecute you for the topics of your testimony?

15   A.  Yes.

16   Q.  The statements can or cannot be used against you?

17   A.  They can't be used against me but I can be charged.

18   Q.  So if you committed crimes, can you be prosecuted for them

19   based on other evidence?

20   A.  Yes.

21   Q.  Has anybody made any promises about whether you will be

22   prosecuted for anything?

23   A.  No, they have not.

24   Q.  Do you understand that you are still under oath and

25   required to tell the truth today?

1    A.   Yes.

2    Q.   What would happen if you didn't tell the truth?

3    A.   I would be prosecuted for perjury.

4    Q.   What is your understanding of what impact that order has on

5    the possibility of any crimes you may have committed in the

6    past?

7    A.   Sorry, say one more time?

8    Q.   What is your understanding of what impact the compulsion

9    order has on the possibility of being prosecuted for any crimes

10   you've committed in the past?

11   A.   That I could still be prosecuted for them.

12   Q.   Have you committed crimes?

13   A.   I have.

14   Q.   What crimes have you committed?

15   A.   I doped racehorses.

16   Q.   When did you stop doping racehorses?

17   A.   Somewhere around the fall of 2018.

18   Q.   What caused you to stop?

19   A.   I met a guy by the name of Dr. Steven Allday.

20   Q.   What about meeting Mr. Allday caused you to stop doping

21   racehorses?

22   A.   He was probably the first person in the business that kind

23   of took me under his wing and taught me a different way of

24   being involved with racehorses.

25   Q.   What was the way of being involved with racehorses that you

1  were before?

2        MR. SERCARZ:  Objection.

3  A.  Before that --

4        THE COURT:  Hold on.  There's an objection.

5        THE WITNESS:  I didn't hear him, sorry.

6        THE COURT:  Overruled.

7  A.  Before that I didn't really have anybody to kind of show me

8  or teach me the right way of doing things, and Dr. Allday -- I

9  rode around with him for about a year and a half in his car and

10  he explained to me how doping horses changes the breed,

11  different --

12        MR. SERCARZ:  Objection.

13  Q.  Just stick to why you stopped.

14        THE COURT:  Hold on, there's an objection.

15        MR. SERCARZ:  Hearsay.

16        THE COURT:  Make your record.  I can't hear you.

17        MR. SERCARZ:  Objection, hearsay.

18        THE COURT:  Sustained.

19  Q.  Just stick to why you -- your motivations for stopping

20  doping.

21  A.  Because I knew what I did was wrong and I wanted to move

22  forward in a better way of being able to train a racehorse.

23  Q.  Did you make this decision prior to anyone from law

24  enforcement coming to speak to you?

25  A.  Yes.

1   Q.  When was the last communication you had with Mr. Fishman?

2   A.  January 14, 2022.

3   Q.  So that's just under two weeks ago?

4   A.  Yes.

5   Q.  What type of communication was it?

6   A.  He texted me.

7   Q.  Who was on the text chain?

8   A.  Dr. Fishman and a guy he referenced named Keith.

9   Q.  Prior to receiving that text message, when was the last

10  time you had spoken to Mr. Fishman?

11  A.  It was a phone call somewhere in the winter of -- early

12  winter of 2020.

13  Q.  So almost two years prior?

14  A.  Correct.

15  Q.  There was no communications in between?

16  A.  No.

17  Q.  I'm showing just you and the parties what has been marked

18  for identification as Government Exhibit 1400.

19          Do you recognize it?

20  A.  I do.

21  Q.  What is this?

22  A.  This is the text that Dr. Fishman sent me.

23          MR. CHOW:  Sorry, 14000, for the record.

24  Q.  Is this a screen shot from your phone?

25  A.  It is.

1      MR. CHOW:  The government moves 14000 into evidence.

2      THE COURT:  Give me a minute to finish reading it.

3      MR. SERCARZ:  No objection.

4      THE COURT:  It will be received.

5      (Government's Exhibit 14000 received in evidence)

6      MR. CHOW:  May it be published to the jury?

7      THE COURT:  Yes, it may.

8      MR. CHOW:  I'm getting a thumbs up symbol from the

9  jurors, so I think we're good to go.

10 BY MR. CHOW:

11 Q.  Mr. Davidovich, could you read this text message out loud?

12 A.  Yes.  Jamen, it's Seth.  I have been silent for obvious

13 reasons.  I am headed to trial next week.  Your name appears on

14 exhibits provided.  I already explained you are a part-time

15 trainer with a few horses.  I am unaware if you even raced any

16 of your horses since we met.  Other than that, I had nothing

17 more to say nor feel I could say with any certainty.  I copied

18 my investigator and wondering if we could have a call together.

19 I do not know if you are a witness, so I am respectfully making

20 the introduction and letting you know Keith works for my

21 attorney.  Thank you.

22 Q.  Can we focus on the center paragraph, please, the one that

23 starts with:  I already explained.

24 A.  Yes.

25 Q.  Do you see where it says I am aware -- I am unaware if you

1    even raced any of your horses since we met.

2              Do you see where it says that?

3    A.  Yes.

4    Q.  Is that true?

5    A.  That would be false.

6    Q.  How is it false?

7    A.  We had a phone conversation about the horse I gave the BB3

8    to that I didn't think it did anything for the horse.

9    Q.  How did you interpret him sending you this text message

10   with something that you knew to be false?

11   A.  To see what I had said or not had said to the government.

12   Q.  At the time, had the government even contacted you about

13   being a witness?

14   A.  No.  I didn't know I was a witness until obviously he told

15   me that I was a witness on the witness list in this text.

16   Q.  Did you respond to this text message?

17   A.  I did not.

18             MR. CHOW:  Your Honor, because of the technical issues

19   we have been having, I am going to hand up a set of exhibits,

20   it's exhibits marked 14001 through 14023 to the witness.

21             THE COURT:  Are these in evidence?

22             MR. CHOW:  They are not, I will have the witness

23   identify them.

24             THE COURT:  If you could give them to Ms. Dempsey, she

25   will give them to the witness.

1      Have you shown them to Mr. Sercarz?

2              MR. CHOW:  We turned them over, but I'm happy to let

3  him take a look at this.

4              THE COURT:  Why don't we do that first.

5              Are you okay, Mr. Sercarz?

6              MR. SERCARZ:  I'm okay.  I think the government will

7  help me locate them in one of my binders.

8              THE COURT:  In the meantime, why don't you hand them

9  up to the witness.

10             Do you have an objection to letting the witness start

11 looking at them?

12             MR. SERCARZ:  No, your Honor, no objection.

13             THE COURT:  Give them to Ms. Dempsey then do double

14 duty and help Mr. Sercarz locate them.

15             Please don't say anything, just look at them.

16 BY MR. CHOW:

17 Q.  Mr. Davidovich, have you had an opportunity to review?

18 A.  Yes, I have.

19             THE COURT:  Are you ready, Mr. Sercarz?

20             MR. SERCARZ:  Yes, your Honor.

21             THE COURT:  Sorry, Mr. Chow, go ahead.

22 Q.  Do you recognize these photos?

23 A.  I do.

24 Q.  Are these photos that you took?

25 A.  Yes.

1          MR. CHOW:  The government now offers them into

2     evidence.  This is Government Exhibits --

3          MR. SERCARZ:  No objection.

4          MR. CHOW:  -- 14001 through 14023.

5          THE COURT:  They are all received in evidence without

6     objection.

7          (Government's Exhibits 14001 through 14023 received in

8     evidence)

9          MR. SERCARZ:  Correct.

10         THE COURT:  Thank you.  You may publish them,

11    Mr. Chow, if you wish.

12         MR. CHOW:  Your Honor, I think we had a wonderful

13    little sojourn on the ELMO, so I think I'm going to forego

14    popping them on the screen as well.

15         THE COURT:  All right.

16    BY MR. CHOW:

17    Q.  Mr. Davidovich, I would like to return for a moment to the

18    lunch you had with Mr. Fishman, if I may.  I would just like

19    you to focus only on statements that were made to you by

20    Mr. Fishman on the topic of him meeting with the law

21    enforcement agent.

22    A.  Okay.

23    Q.  Limiting yourself only to what Mr. Fishman told you, can

24    you relay to the jury what he said?

25    A.  That he evaded a law enforcement officer.

1    Q.  How did he evade a law enforcement officer?

2    A.  By something that the law enforcement did, he realized he

3    was a law enforcement officer and did not sell him any product.

4    Q.  He did not sell him any product?

5    A.  Yes.

6    Q.  Did Mr. Fishman give any explanation of what he meant by

7    "did not sell him any product?"

8    A.  The law enforcement officer was asking him for some of the

9    different things that he sold, and Dr. Fishman told me that he

10    did not have any -- he did not carry any of his product on him,

11    and the law enforcement officer got mad and stormed out.

12    Q.  And what was Mr. Fishman's conclusion on the basis of that

13    story?

14    A.  That he evaded a law enforcement officer.

15          MR. CHOW:  No further questions, your Honor.

16          THE COURT:  Thank you.

17          All right.  Mr. Sercarz, it might make sense if we

18    take the afternoon break first.

19          MR. SERCARZ:  That's fine, your Honor.

20          THE COURT:  Why don't we do that, ladies and

21    gentlemen.  It's about 3:10, a couple of minutes before, so try

22    to be back by 3:20, 3:25, so we can get you out of here at a

23    decent hour today.

24          Mr. Davidovich, you remain under oath.  Please don't

25    talk to anyone under the break.

1              (Jury not present)

2              THE COURT:  You may be excused until we recall you

3     after the break.

4              THE WITNESS:  Okay.

5              (Witness not present)

6              THE COURT:  Is there anything that we need to talk

7     about?

8              MR. SERCARZ:  No, your Honor.

9              MR. ADAMS:  Nothing here, your Honor.

10             THE COURT:  All right.  Thank you.  I will see

11    everyone in about 10, 15 minutes.

12             (Recess taken)

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1            (Jury present)

2            THE COURT:  We'll pause far a moment while the witness

3    takes the stand.

4            Thank you.  Good afternoon, you remain under oath.

5            Mr. Sercarz.

6            MR. SERCARZ:  Thank you, your Honor.

7    CROSS-EXAMINATION

8    BY MR. SERCARZ:

9    Q.  Mr. Davidovich, when was it that you were first approached

10   by agents of law enforcement?

11   A.  First approached by agents of law enforcement would have

12   been after Seth had sent me his text.

13   Q.  I'm looking for a date, sir, an approximate date if you

14   have one.

15   A.  January 14.

16   Q.  Of what year?

17   A.  2022.

18   Q.  Is your testimony that prior to being approached by agents

19   of law enforcement on that date, you had no conversation with

20   any agents of law enforcement in which they indicated to you

21   that you might be under investigation?

22   A.  Correct.

23   Q.  Now you talked to us at the beginning of your examination

24   about the business of being a trainer and described some of the

25   expenses that you had to undertake.  Do you recall that

1   testimony?

2   A.  Yes, sir.

3   Q.  You also spent considerable sums of money purchasing

4   performance-enhancing drugs for your horses, isn't that

5   correct?

6   A.  Yes.

7   Q.  Did you purchase either the raw materials or actual

8   performance-enhancing drugs from Weatherford Compounding?

9   A.  Yes.

10  Q.  Dan Ferchella (ph)?

11  A.  Yes.

12  Q.  Did you purchase Epogen from a buddy of yours?

13  A.  I think so, yes.

14  Q.  Did you purchase snake venom from a veterinarian other than

15  Dr. Fishman?

16  A.  No.

17  Q.  Did you ever purchase performance-enhancing drugs from a

18  website called HorsePreRace.com?

19  A.  Yes.

20  Q.  And all of those purchases were made before you ever made

21  contact with Dr. Fishman, isn't that correct?

22  A.  Yes.

23  Q.  Now incidentally, were some of these drugs injectable

24  drugs?

25  A.  Yes, sir.

1    Q.  And did you administer these drugs to your horses?

2    A.  Yes.

3    Q.  And how did you learn how to administer those drugs to your

4    horses?

5    A.  I learned how to give a shot from my dad as a child -- not

6    a child but as an early teen when my dad had his horses.

7    Q.  Did you actually observe veterinarians giving injections to

8    horses?

9    A.  Yes.

10   Q.  Were there other instances in which you observed other

11   trainers administering injections to horses?

12   A.  Yes.

13   Q.  And all of this contributed to your knowledge of how to

14   administer an injection to a racehorse, is that correct?

15   A.  Yes, sir.

16   Q.  Is it, to your knowledge, common among horse trainers that

17   they are capable of administering injections to horses?

18   A.  Yes, sir.

19   Q.  In order to supplement your income as a trainer, you also

20   sold performance-enhancing drugs to others in the business,

21   isn't that correct?

22   A.  I don't believe so, no.

23   Q.  Isn't there an individual who is presently under

24   investigation -- I don't have his name -- who received

25   performance-enhancing drugs sold to him or her by you on more

1   than one occasion?

2   A.  It's possible.  I'm not sure of the individual.

3   Q.  May I take it then that you have some recollection of

4   having taken performance-enhancing drugs that you purchased

5   from others and resold them?

6   A.  I never resold, I may have -- how should I say this.  I

7   never resold a drug, I may have just -- how should I say this,

8   not resold, but got the money for the drug that I had paid, if

9   that makes sense.  I don't know if that makes sense or not.  I

10  never made any money selling a drug is what I'm trying to say.

11  If I purchased something and I paid for it, whoever I had given

12  it to paid me what I had paid.

13  Q.  You never tried to make a profit on any of these drugs?

14  A.  No.

15  Q.  There were no instances in which you used the names of the

16  source of that drug in order to resell it and try and make a

17  profit?

18  A.  Not that I recall.

19  Q.  There were no instances in which you claim that drugs had

20  come from Dr. Fishman and sold them to someone else for the

21  purpose of obtaining a profit on the drugs, is that correct?

22  A.  Not that I recall.

23  Q.  Not that you recall?

24  A.  That's what I said, yes.

25  Q.  In other words, you can't say with certainty that it didn't

1   happen?

2   A.  I can't say with certainty, but not that I recall, and I

3   know that I would have never made any money on anything.

4   Q.  Now with regard to this gentleman named Steven Allday, you

5   testified about encounters that you had with him, is that

6   correct?

7   A.  Yes.

8   Q.  And he, according to your testimony, is the one that showed

9   you a different way to be with horses, is that correct?

10  A.  Yes, sir.

11  Q.  He at no time assisted you in giving performance-enhancing

12  drugs to horses?

13  A.  No, sir.

14  Q.  On the subject of the costs of being a trainer, the

15  government put into evidence a price list, Government

16  Exhibit 14026.

17          MR. SERCARZ:  Is it possible to put that up on the

18  screen?

19          THE COURT:  Excuse me one moment.  You're coming up on

20  the screen with whatever you're doing.

21          Not you, Mr. Sercarz.

22          Thank you.

23          Mr. Sercarz asked if you could put up this exhibit for

24  him.

25          MR. SERCARZ:  Thank you.

1      THE COURT:  Are your screens showing this?

2      JUROR:  Yes.

3      THE COURT:  I think you're set, Mr. Sercarz.

4  BY MR. SERCARZ:

5  Q.  This is a price list that you received from Dr. Fishman, am

6  I correct?

7  A.  Yes, sir.

8  Q.  And it describes the prices for a variety of substances, is

9  that correct?

10  A.  Yes.

11  Q.  And the price is based upon the number of doses that are

12  contained within the product, is that correct?

13  A.  Yes.

14  Q.  And customarily you receive these invoices after you have

15  received the product from Dr. Fishman, the invoices seeking

16  money for these items, is that correct?

17  A.  I don't recall receiving an invoice from Dr. Fishman.

18  Q.  All right.  But do these prices on this exhibit, Government

19  Exhibit 14026, fairly and accurately represent the cost of

20  purchasing these drugs from Dr. Fishman?

21  A.  Yes, sir.

22  Q.  Now you told the ladies and gentlemen of the jury that the

23  amount of money that you make as a trainer is dependent upon

24  whether horses that you race win, lose or show, is that

25  correct?

1   A.  Correct.

2   Q.  According to this exhibit, the amount of money that

3   Dr. Fishman charged you was the same regardless of whether your

4   horses did well or poorly in a race, isn't that correct, sir?

5   A.  Yes, sir.

6   Q.  You were getting paid purely -- withdrawn.

7           You were paying Dr. Fishman purely according to the

8   product that he supplied you, am I correct?

9   A.  Yes, sir.

10  Q.  And the prices were not based on the outcome of the horse

11  in any race, isn't that correct, sir?

12  A.  Yes, sir.

13          MR. SERCARZ:  I have no further questions.  Thank you.

14          THE COURT:  All right.  Thank you, Mr. Sercarz.

15          Anything further?

16          MR. CHOW:  No further questions.

17          THE COURT:  All right.  Thank you.  Thank you, sir,

18  you're excused.

19          Mr. Chow?

20          MR. CHOW:  Your Honor, at this time I'm going to read

21  a few stipulations into the record.

22          THE COURT:  Thank you.

23          You may step down, sir, you're excused.

24          THE WITNESS:  Should I leave these here?

25          THE COURT:  Leave everything there.

1          These are, Mr. Chow, marked for identification, so you

2   should retrieve them.

3          MR. CHOW:  I will, your Honor.

4          THE COURT:  But they're not admitted, as you know.

5          MR. CHOW:  Your Honor, I'm going to read three

6   government exhibits into evidence.  I'm going to do it in a

7   slightly different order than we have been doing it in the

8   past.  I will read the last paragraph first and then offer it

9   as an exhibit such that it will go on the screen for everyone

10  and then we can all read it together.  That way the court

11  reporter also has an opportunity to view it.

12         So I'm starting with Government Exhibit 1.

13         THE COURT:  These are in evidence or they're not in

14  evidence?

15         MR. CHOW:  They're not in evidence.  I'm going to

16  offer them into evidence.

17         THE COURT:  How could you read them if they're not in

18  evidence yet?

19         MR. CHOW:  I'm just going to read the first paragraph

20  and the last paragraph.

21         THE COURT:  I'm sorry, go ahead.

22         MR. CHOW:  So this is Government Exhibit 9001.  It is

23  hereby stipulated between the parties --

24         THE COURT:  It's a stipulation.  Okay.

25         MR. CHOW:  Yes.  It is further stipulated and agreed

1   by and between the parties that the aforementioned government

2   exhibits and the stipulation, which is Government Exhibit 9001

3   may be received in evidence at trial.

4           At this time, the government offers Exhibit 9001.

5           THE COURT:  I assume no objection since it's a

6   stipulation.  It will be received.

7           (Government's Exhibit 9001 received in evidence)

8           MR. CHOW:  May I publish it, your Honor?

9           THE COURT:  Yes, you may.

10          MR. CHOW:  I'm going to start reading from paragraph

11  1.  If called as a witness at trial, a records custodian for

12  the entity T-Mobile, Inc. ("T-Mobile"), and for each of the

13  government exhibits identified below, would testify as follows:

14          A.  T-Mobile provided law enforcement agents with

15  historical location data, subscriber records, and other

16  information for a cellular phone with call number 561-270-9286

17  ("the 9286 phone").  Government Exhibits 3600 and 3601 consist

18  of account information and call detail records associated with

19  the 9286 phone.

20          B.  Government Exhibit 3602 consists of call detail

21  records and historical location information associated with the

22  9286 phone.  Government Exhibits 3600 through 3602 are true and

23  correct copies of records of T-Mobile maintained by T-Mobile

24  and are records of regularly-conducted activities of T-Mobile

25  that were.

1        1.   Made at or near the time by, or from information

2   transmitted by, someone with knowledge of the information

3   contained therein.

4        2.   Kept in the course of regularly-conducted

5   activities of T-Mobile, and

6        3.   Made as a regular practice of activities of

7   T-Mobile.

8        Paragraph 2.  If called as a witness at trial, a

9   record custodian for the entity Verizon Wireless ("Verizon")

10  and for each of the government exhibits identified below, would

11  testify as follows:

12       A.   Verizon provided law enforcement agents with

13  historical location data, subscriber records, and other

14  information for a cellular phone with call number 302-222-2220

15  ("the 2220 phone").  Government Exhibits 3603 through 3605

16  consist of account information and call detail records

17  associated with the 2220 phone.

18       B.   Government Exhibit 3606 consists of call detail

19  records and historical location information associated with the

20  2220 phone.  Government Exhibits 3603 through 3606 are true and

21  correct copies of records of Verizon maintained by Verizon and

22  are records of regularly-conducted activities of Verizon that

23  were.

24       1.   Made at or near the time by, or from information

25  transmitted by, someone with knowledge of the information

1    contained therein.

2              2.  Kept in the course of regularly-conducted

3    activities of Verizon, and

4              3.  Made as a regular practice of the activities of

5    Verizon.

6              And I previously read the paragraph on the last page,

7    and at this time the government offers the aforementioned

8    exhibits into evidence.

9              MR. SERCARZ:  No objection.

10             THE COURT:  All of the exhibits mentioned in this

11   stipulation together with the stipulation are evidence in this

12   case.  They are received.

13             (Government's Exhibits 3600 through 3606 received in

14   evidence)

15             MR. CHOW:  Next the government offers Government

16   Exhibit 9004, which is another stipulation between the parties.

17             It is further stipulated and agreed by and between the

18   parties that the aforementioned government exhibits and this

19   stipulation, which is Government Exhibit 9004, may be received

20   in evidence at trial.

21             At this time, the government offers Exhibit 9004.

22             THE COURT:  It is received.

23             (Government's Exhibit 9004 received in evidence)

24             MR. CHOW:  If we could publish it to the jury,

25   Ms. Jung.

1          It's hereby stipulated between the parties paragraph

2     1.  If called as a witness at trial, a record custodian for Fed

3     Ex Services ("Fed Ex"), and for each of Government Exhibits

4     8000 through 8536 would testify that Government Exhibits 8000

5     through 8536 are true and correct copies of records of Fed Ex

6     maintained by Fed Ex and are records are regularly-conducted

7     activities of Fed Ex that were:

8          A.  Made at or near the time by, or from information

9     transmitted by, someone with knowledge of the information

10    contained therein.

11         B.  Kept in the course of regularly-conducted

12    activities of Fed Ex, and

13         C.  Made in the regular practice of the activities of

14    Fed Ex.

15         And I had previously read this paragraph, and now the

16    government offers Exhibits 8000 through 8536 into evidence.

17         MR. FERNICH:  No objection, your Honor.

18         THE COURT:  Based on the stipulation, Government

19    Exhibits 8000 through 8536 are received in evidence together

20    with the stipulation.

21         (Government's Exhibits 8000 through 8536 received in

22    evidence)

23         MR. CHOW:  I would now like to read from Government

24    Exhibit 9007, which is another stipulation between the parties.

25         It's hereby stipulated and agreed between the parties

1    that the aforementioned government exhibit and this

2    stipulation, which is Government Exhibit 9007, may be received

3    in evidence at trial.

4          At this time, the government offers Exhibit 9007,

5    which is a stipulation.

6          THE COURT:  The stipulation is received as evidence in

7    this case.

8          (Government's Exhibit 9007 received in evidence)

9          MR. CHOW:  Let's break up 9007 for everybody.

10          It is hereby stipulated and agreed that, if called as

11    a witness at trial, a records custodian for United Parcel

12    Service ("UPS") and for Government Exhibit 3800, would testify

13    that Government Exhibit 3800 is a true and correct copy of

14    records of UPS maintained by UPS, and are records of regularly-

15    conducted activities of UPS that were:

16          A.  Made at or near the time by, or from information

17    transmitted by, someone with knowledge of the information

18    contained therein.

19          B.  Kept in the course of regularly-conducted

20    activities of UPS, and

21          C.  Made as a regular practice of activities of the

22    UPS.

23          At this time, the government would offer Exhibit 3800

24    into evidence.

25          MR. SERCARZ:  No objection.

M1RTFIS5                    Davidovich - Cross

1              THE COURT:  Government Exhibit 3800 is received,

2      pursuant to the stipulation 9007, into evidence in this case.

3              (Government's Exhibit 3800 received in evidence)

4              MR. CHOW:  Your Honor if we could have a transition

5      minute, I will retrieve some materials and then Ms. Mortazavi

6      will call our next witness.

7              THE COURT:  Okay.  Thank you.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1RPFIS6                    Rubino - Direct

1          MS. MORTAZAVI:  Thank you, your Honor.  The government

2     calls John Rubino to the stand.

3          THE COURT:  Good afternoon, Mr. Rubino.  You can come

4     up to the witness stand here.

5          Ms. Dempsey.

6      JOHN RUBINO,

7          called as a witness by the Government,

8          having been duly sworn, testified as follows:

9          THE DEPUTY CLERK:  Please sit down and say and spell

10    your name for the record.

11         THE WITNESS:  My name is John Rubino.  J-o-h-n; last

12    name is spelled, R-u-b-i-n-o.

13    DIRECT EXAMINATION

14    BY MS. MORTAZAVI:

15    Q.  Good afternoon, Mr. Rubino.

16    A.  Good afternoon.

17    Q.  Could you tell us where you work?

18    A.  I work for the FBI.

19    Q.  Is that the Federal Bureau of Investigation?

20    A.  Correct.

21    Q.  And what title do you have at the FBI?

22    A.  I'm a forensic accountant.

23    Q.  How long have you worked at the FBI as a forensic

24    accountant?

25    A.  I've been here for about three-and-a-half years.

1    Q.  And where did you work before you joined the FBI?

2    A.  Prior to the FBI, I was working for about two-and-a-half

3    years with KPMG.  It's an accounting firm.

4    Q.  And what position did you have at KPMG?

5    A.  I was a financial auditor.

6    Q.  How far did you go in school?

7    A.  I have a college education, a Bachelor's.

8    Q.  A Bachelor's in what?

9    A.  Accounting.

10   Q.  Did there come a point in time where you were asked to

11   review some records in connection with your testimony today?

12   A.  Yes.

13   Q.  What were you asked to do?

14   A.  I was asked to review bank docs and also schedule out the

15   deposit -- summarize and --

16           THE COURT:  Can you hold on one moment?  Okay.  Why

17   don't you try again, sorry.

18   A.  I was asked to -- can you hear me?

19           THE COURT:  You need to speak into the microphone.

20           Are you able to adjust the volume, Ms. Dempsey?

21           THE DEPUTY CLERK:  Yes, I just did.

22           THE COURT:  Try again, Mr. Rubino.

23   A.  I was asked to review bank docs, and I also summarized the

24   deposit entries.

25   Q.  Were you asked to summarize bank records?

1    A.  Correct.

2    Q.  And when you say deposit entries, can you explain what

3    those are?

4    A.  They're typically just -- they were coming in the forms of

5    checks and ACH transfers.

6            MS. MORTAZAVI:  Your Honor, may I please hand up some

7    exhibits to the witness?

8            THE COURT:  Sure.

9            MS. MORTAZAVI:  Thank you.

10           THE COURT:  Through Ms. Dempsey, please.

11   BY MS. MORTAZAVI:

12   Q.  And, Mr. Rubino, for the record, I handed to Ms. Dempsey,

13   and Ms. Dempsey is handing to you what's been marked as

14   Government Exhibits 3700 through 3705.  Do you have those

15   records in front of you, sir?

16   A.  Correct, yes.

17   Q.  Were these the records that you were asked to review in

18   connection with your testimony today?

19   A.  Yes.

20           MS. MORTAZAVI:  Your Honor, at this time, I'd like to

21   read a stipulation into the record.  It's been marked as

22   Government Exhibit 9003.

23           And with the Court's permission, I'll skip some of the

24   introductory lines and start with paragraph 1.

25           If called as a witness at trial, a record custodian

1    for WSFS Bank, WSFS, and for each of Government Exhibits 3700

2    through 3705, would testify that Government Exhibits 3700

3    through 3705 are true and correct copies of records of WSFS,

4    maintained by WSFS, and are records of regularly conducted

5    activities of WSFS that were made at or near the time, by or

6    from information transmitted by someone with knowledge of the

7    information contained therein, kept in the course of regularly

8    conducted activities of WSFS, and made as a regular practice of

9    the activities of WSFS.

10          It is further stipulated and agreed by and between --

11          THE COURT:  Slow down a little.

12          MS. MORTAZAVI:  Pardon me, your Honor.

13          THE COURT:  Go ahead.  But just a little slower,

14   please.

15          MS. MORTAZAVI:  It is further stipulated and agreed by

16   and between the parties that the aforementioned government

17   exhibits in this stipulation, which is Government Exhibit 9003,

18   may be received in evidence at trial.

19          And the government offers Government Exhibit 9003 and

20   all the records referenced therein, Government Exhibits 3700

21   through 3705.

22          THE COURT:  All right.  The stipulation 9003 is

23   received as evidence in this case and all of the exhibits

24   referenced therein, Government Exhibit 3700 through 3705 are

25   admitted into evidence.

1          (Government's Exhibits 9300, 3700 through 3705

2    received in evidence)

3    BY MS. MORTAZAVI:

4    Q.  And, Mr. Rubino, you testified that these are the records

5    that you were asked to review before your testimony?

6    A.  Yes.

7    Q.  Ms. Jung, could you please pull up Government Exhibit 3703

8    and please turn to page 2.

9          Mr. Rubino, under the line "customer's name" -- and,

10   Ms. Jung, if we could just focus on the top three lines, thank

11   you -- does there appear to be a name beside the "customer's

12   name" portion?

13   A.  Yes.

14   Q.  Can you read it out?

15   A.  It's Equestology.

16   Q.  And next to that there are two other names.  Could you read

17   those out?

18   A.  They are Seth Fishman and Lisa Giannelli.

19   Q.  Thank you.

20         Ms. Jung, can we turn to page 3 of Government

21   Exhibit 3703, and if you could expand lines 5 and 7 -- pardon

22   me.  Before you do that --

23         Mr. Rubino, at the top, could you read the company

24   name that appears to be handwritten?

25   A.  Yes.

1   Q.  Go ahead and read it out there.

2   A.  Equestology.

3   Q.  And what's the title on this particular page of the

4   government exhibit?

5   A.  It's the Enhanced Due Diligence for High-Risk Customers.

6   Q.  And, Ms. Jung, if you could please expand lines 6 and 7.

7   Thank you.

8           Mr. Rubino, on line 6 it's written here in type, in

9   typed letters "If this is a business account, describe business

10  type."  And then there's some language there that's

11  handwritten.  Could you read that out?

12  A.  It's "Horse meds."

13  Q.  And then on line 7 there's some text that is typed out

14  "Description of business, primary customer trading area"; could

15  you read out the lines that follow that appear to be

16  handwritten?

17  A.  "Racing horses."

18  Q.  We could take that down, Ms. Jung, and please turn to page

19  5 of this particular exhibit.

20          What document is this, Mr. Rubino?

21  A.  This is a Certificate of Incorporation.

22  Q.  For Equestology, Inc., sir?

23  A.  Correct.

24  Q.  And turning to the next page, Ms. Jung, zooming in on the

25  very bottom, the portion that appears to be grayed out with the

1    handwriting underneath.

2              Do you see here, Mr. Rubino, the name Seth I. Fishman,

3    DVM, and Lisa M. Giannelli?

4    A.   Yes.

5    Q.   And the two handwritten addresses, one in Highland Beach,

6    Florida, and one in Felton, Delaware, do you see those as well?

7    A.   Yes.

8    Q.   Ms. Jung, we can take down this exhibit.  Thank you.

9              Mr. Rubino, turning back to the records you reviewed,

10   what time period was covered by the bank records that you

11   looked through that are in Government Exhibits 3700 through

12   3705?

13   A.   Covered January 2015 to the end of the month of

14   January 2020.

15   Q.   Was there any gap in that range?

16   A.   Yes.

17   Q.   Approximately when was that?

18   A.   The gap started, it was August 1st of 2018 to

19   December 31st, 2018.

20   Q.   So other than that time period, you had bank account

21   records for the Equestology, Inc. bank account at WSFS between

22   January 2015 and January 2020, correct?

23   A.   Correct.

24   Q.   And for that time period, what was the total amount of

25   deposits into the account?

1    A.  The total amount was approximately 4.5 million.

2              MS. MORTAZAVI:  No further questions.

3              THE COURT:  Thank you.  Mr. Sercarz?

4              MR. SERCARZ:  Thank you.  Nothing, your Honor.

5              THE COURT:  All right.  Thank you, sir.  You are

6    excused.

7              (Witness excused)

8              And we'll just give the witness a minute to collect

9    his things and leave us, and then I'll ask the government to be

10   prepared to call its next witness.

11             Thank you very much.  You're excused with the thanks

12   of the Court.

13             All right.  Ms. Mortazavi?

14             MS. MORTAZAVI:  Your Honor, if I could have just one

15   minute, I have one record to locate.  It's a stipulation I'd

16   like to read into the record.

17             THE COURT:  Okay.

18             MS. MORTAZAVI:  Thank you.

19             (Pause)

20             All right.  With thanks to my colleague, I'd like to

21   read Government Exhibit 9013 into the record, which is a

22   stipulation between the parties.

23             And once again, I'm going to skip the front matter and

24   start with paragraph one of this particular stipulation.

25             If called as a witness at trial, Benjamin Schwartz,

1    Esquire, would testify that Government Exhibit 3000 is a true

2    and correct copy of a letter dated March 31st, 2011, prepared

3    and signed by Mr. Schwartz in connection with an investigation

4    and complaint by the Delaware Division of Professional

5    Responsibility relating to Mr. Schwartz's clients, the

6    defendant, Seth Fishman.

7            Included with the letter contained in Government

8    Exhibit 3000 are true and correct copies of notarized

9    attestations by the defendant, Seth Fishman, submitted in

10   connection with Mr. Schwartz's letter contained in Government

11   Exhibit 3000.

12           Government Exhibit 3001 is a true and correct copy of

13   the complaint filed by the Delaware Division of Professional

14   Responsibility referenced in Government Exhibit 3000.

15           Government Exhibit 3100-A and 3100-B are true and

16   correct copies of portions of an interview of Lisa Giannelli,

17   then using the name Lisa Ranger, conducted on July 3rd, 2012,

18   by an investigator employed by the Delaware Division of

19   Professional Responsibility in connection with the

20   investigation of the complaint contained in Government

21   Exhibit 3001.

22           It is further stipulated and agreed that on or about

23   July 11th, 2012, the Delaware Division of Professional

24   Responsibility referred the matter in Government Exhibit 3000

25   to the Delaware State Attorney General's Office for

1    prosecution.

2            On or about March 15th, 2013, in a letter signed by a

3    deputy attorney general, the Delaware State Attorney General's

4    Office dismissed the matter in Government Exhibit 3000 based on

5    insufficient evidence.

6            It is further stipulated and agreed by and between the

7    parties that this stipulation, which is Government

8    Exhibit 9013, may be received in evidence at trial.

9            So, your Honor, the government offers Government

10   Exhibit 9013 and Government Exhibits 3000, 3001, 3100-A and

11   3100-B.

12           THE COURT:  All right.  The stipulation is received

13   and is evidence in this case.  Exhibits 3000, 3001, and 3100-A

14   and B are also received as evidence in this case.

15           (Government's Exhibits 9013, 3000, 3001, 3100-A and

16   3100-B received in evidence)

17           MS. MORTAZAVI:  Thank you, your Honor.  If we could

18   please publish Government Exhibit 3001, and I'd like to review

19   certain of those lines in Court with the jury.

20           THE COURT:  Yes.

21           MS. MORTAZAVI:  Ms. Jung?  Ms. Jung, if you could zoom

22   in on the first paragraph -- I'm sorry, the second paragraph,

23   "talked to the grooms in the barn."  "Talked to the grooms in

24   the barn.  Gave the animal Pentosan Gold injectable, 12

25   milliliter IV slowly over the course of around one to two

minutes, felt confident in the vein."

     If we could take that down, and starting with "drug in question" expand the text that follows.  Thank you, Ms. Jung. "Drug in question is:  Pentosan Gold, batch 10334, EXP 09-13, DOM 9-10.  Asked about where the medication came from because I did not dispense it.  They bought it from Lisa M. Ranger, who sells drugs for Seth I. Fishman (Florida license number N1-0002244).  I am suspicious this veterinarian does not have a client/patient relationship, and I am positive the individual driving around the farms selling drugs behind/under Dr. Fishman's name is not a licensed veterinarian.  Dr. Fishman is not licensed in Delaware from what I can research online."

     And, Ms. Jung, could you then expand the rest of this page that I've not yet read.

     "I did call him and inform him of what happened, and he was surprised and expressed he had just returned stateside from being out of the country (I believe he said Brazil) for an extended period of time.  So once again, I am suspicious he does not have a stable patient/client relationship.  He also stated that half of that batch number (10334) went to Hong Kong, and he has heard no reports of adverse drug reactions to the implicated medication.  I am concerned this veterinarian is not physically examining these animals and is in this medications sales situation strictly for profit.

     "My biggest concern with this case is that Lisa M.

1    Ranger (Delaware 19943) is not a licensed veterinarian, and she

2    is driving around this state selling medications, needles and

3    syringes" -- and, Ms. Jung, if we could turn to the next page.

4              -- "medications, needles, syringes and prescription

5    drugs without a license and no professional training in regards

6    to the medications she is dispensing.  I have observed her

7    selling products out of her vehicle at farms in Harrington,

8    Dovington Training Center, Gateway Farms and now Seaford.  She

9    is also dispensing medications that are not approved in the

10   U.S., which is also a FDA and potentially a DEA violation.  It

11   is, to my understanding, she is also selling anabolic

12   steroids."

13             Ms. Jung, if you could pull this exhibit down.

14             And, your Honor, I'm going to take a page out of my

15   colleague's book and use the ELMO for the next exhibit.

16             THE COURT:  Okay.

17             MS. MORTAZAVI:  Thank you.  And per the stipulation,

18   your Honor, this is the response that was submitted by

19   Mr. Benjamin Schwartz on behalf of Seth Fishman.

20             "Please accept this letter as Dr. Seth Fishman's and

21   Ms. Lisa Ranger's response to the board complaints filed under

22   the complaint numbers listed above."

23             And I'm going to skip a few lines down to the middle

24   of the second paragraph.  "Ms. Ranger is employed by Dr. Seth

25   Fishman and his business, Equestology.  Ms. Ranger's duties

1   include, but are not limited to, collecting payments from

2   clients, coordinating Dr. Fishman's visits and teleconferences

3   with clients, delivering products and medications prescribed by

4   Dr. Fishman and acting as receptionist and secretary to

5   Dr. Fishman.  Ms. Ranger does not give veterinary medical

6   advice."

7        And again, halfway down page 2 of Government

8   Exhibit 3000, "Lisa Ranger does not sell drugs for Dr. Fishman.

9   Ms. Ranger delivers supplies for Dr. Fishman.  She collects and

10  posts payments made to Dr. Fishman by Dr. Fishman's clientele.

11  It is incorrect and professionally irresponsible to claim that

12  she 'sells drugs for Seth I Fishman'."

13       And then turning to the bottom paragraph:  "The

14  complaint also alleges in paragraph No. 6 of the medical

15  records that 'I am concerned this veterinarian is not

16  physically examining these animals and is in the medication

17  sales situation strictly for profit.'  Dr. Fishman physically

18  examines all animals he treats."

19       Turning to page 3 of the government exhibit.  I

20  believe it's now in focus.  Looking to the last line in this

21  paragraph:  "Again, in regards to selling products, Lisa Ranger

22  is nothing more than a delivery person for Dr. Fishman's

23  practice."

24       And the final lines in the letter by Mr. Schwartz:

25  "Because there are no violations of the laws or regulations

1    governing veterinarians, we respectfully request that the

2    complaint be dismissed."

3           And two pages over from the page that we were just

4    reading is the notarized attestation of Dr. Seth Fishman.

5           Your Honor, if I could have one moment.

6           THE COURT:  Sure.

7           MS. MORTAZAVI:  Thank you.

8           (Pause)

9           Your Honor, if I could please have Ms. Jung pull up

10   Government Exhibit 900-D.

11          And, Ms. Jung, if you could focus on the very bottom

12   text message in green.

13          MR. FERNICH:  Your Honor, I don't mean to interrupt.

14   Could I be heard at sidebar before we turn on to another topic

15   briefly?

16          MS. MORTAZAVI:  Your Honor, this is connected, but I'm

17   happy to be heard at sidebar.

18          THE COURT:  If this is connected, let's finish this

19   up.

20          MS. MORTAZAVI:  All right.

21          THE COURT:  Is this in evidence?

22          MS. MORTAZAVI:  It is in evidence, your Honor.

23          THE COURT:  Let's just finish.

24          MS. MORTAZAVI:  Government Exhibit 900-D, which

25   consists of text messages from electronic devices associated

1    with Seth Fishman.  I'd just like to read this text message

2    from Seth Fishman to Adrienne Hall into the record:  "Here's

3    reality.  I was tortured so much by race commission without a

4    client ever getting a single positive, other than stupid shit

5    like bute given by another vet.  I voluntarily gave up my

6    license, and then the veterinary board had me investigated for

7    BS.  They even accused Lisa of practicing veterinary medicine.

8    I spent $25,000 in legal fees and had a personal political

9    favor called in to end the BS."

10              And, your Honor, if Mr. Fernich would like to be heard

11   at sidebar, the government is available.

12              THE COURT:  What are we having a sidebar about?

13   There's no question pending.

14              MR. FERNICH:  No, it's a request for instruction.

15              THE COURT:  I'm not giving an instruction at this

16   time.

17              Ms. Mortazavi?

18              MS. MORTAZAVI:  Yes, your Honor.  At this time, we

19   would like to play a few calls into the record.  If Ms. Jung

20   could please pull up Government Exhibit 119-BT and Government

21   Exhibit 119-B.

22              THE COURT:  These are in the binder?

23              MS. MORTAZAVI:  Yes, your Honor.  These are in the

24   binder, in the binders before the jurors under Tab 119-BT.

25              And I'm sorry, your Honor, I should have been more

1    clear 119-D, as in dog; not B, as in boy.

2            All right.  And for the record, this is a

3    February 26th, 2019, call between Seth Fishman and Lisa

4    Giannelli.

5            Ms. Jung, if you could please play the call.

6            (Audio recording played)

7            Ms. Jung, could you please play and pull up Government

8    Exhibit 119-AT and Government Exhibit 119-A, and I'll have the

9    jurors please turn back to that portion of their transcript

10   binders.

11           And for the record, this is the same February 26th,

12   2019, call.  It's a portion from earlier in the call.

13           Ms. Jung, if you could please play.

14           (Audio recording played)

15           And, Ms. Jung, could you please pull up Government

16   Exhibit 135-BT -- that's B, as in boy -- and I'll have the

17   jurors please turn to Government Exhibit 135-BT in their

18   transcript binders.

19           And, Ms. Jung, if you could prepare Government

20   Exhibit 135-B.

21           For the record, this is a May 5th, 2019, call between

22   Seth Fishman and Jordan Fishman.

23           Ms. Jung, could you please play this call.

24           (Audio recording played)

25           And I'll ask Ms. Jung to please pull up Government

M1RPFIS6                    Rubino - Direct

1      Exhibit 143-B, as in boy, and 143-BT, and have the jurors

2      please turn to that tab in their transcript binders.

3            And for the record, as people are finding their place,

4      this is a June 12th, 2019, call between Seth Fishman, John

5      Pundyk and Geoff Vernon, and I think everyone seems to have

6      found their place.

7            Ms. Jung, if you could please play this call.

8            (Audio recording played)

9            And, Ms. Jung, I'm going to ask you to play one more

10     call, that's Government Exhibit 118-AT and Government

11     Exhibit 118-A.

12            And if the jurors could turn back to that tab in their

13     transcript binders.

14            And for the record, this is a February 26th, 2019,

15     call between Seth Fishman and an unidentified male.

16            Ms. Jung, please play this call.

17            (Audio recording played)

18            Thank you, Ms. Jung.  You can take down these

19     exhibits.

20            Your Honor, we have our next witness available, but

21     given the hour, I know that the Court likes to dismiss the

22     jurors at around 4:30, and I wanted to propose that this might

23     be a good break point.

24            THE COURT:  Why don't we break a little bit early

25     today, just so we don't -- by the time the witness gets seated

1    and all, he or she will barely get time before it's time to

2    finish for the day.

3         So just to update everybody, I told you yesterday we

4    appear to be very much on track, maybe even a little bit ahead

5    of schedule, and that still seems to be the case.  So we're

6    optimistic that we'll be able to get you to your deliberations

7    sooner than we thought, but we'll see.

8         So I'll see everybody tomorrow morning at 9:30.  I

9    just remind you, please leave your notebooks in the jury room.

10   They'll be there when you come back tomorrow.  You can leave

11   your transcript binders here in the courtroom.  Please remember

12   not to discuss the case with anyone, including any friends or

13   family members, and please do not do any independent research

14   about the case.  Don't read anything about it, and if you

15   happen to come across anything about the case, or any of the

16   parties involved, you need to let me know that.  All right?

17        So have a good evening everyone.  Thank you.

18        (Jury not present)

19        All right.  So please have a seat, everyone.

20        MS. MORTAZAVI:  Your Honor, I --

21        THE COURT:  Just for the record, the one juror, I

22   think the third or second alternate, mentioned as she passed by

23   her binder came apart; so I simply said we'll take care of it,

24   don't worry.  So if somebody on your team could please do that

25   over the break, Ms. Mortazavi?

M1RPFIS6                    Rubino - Direct

1          MS. MORTAZAVI:  And, your Honor, I overheard that

2      statement, and I was going to ask, would the Court like our

3      paralegal to put together the binder that was dropped or

4      replace it entirely?

5          THE COURT:  I think it's fine to put it back together.

6          Any objection, Mr. Sercarz?

7          MR. SERCARZ:  No objection.

8          THE COURT:  Thank you.

9          MS. MORTAZAVI:  All right.  One of our paralegals will

10     see to it.  Thank you.

11         THE COURT:  Thank you.

12         Mr. Fernich, did you want to make a record?

13         MR. FERNICH:  Yes, yes.  Just for the record, and I

14     appreciate the opportunity, Judge --

15         THE COURT:  Sure.

16         MR. FERNICH:  -- after Ms. Mortazavi had read the

17     material from the Delaware investigation, I was just going to

18     request a charge that said, in substance -- a limiting

19     instruction that said, in substance:  Dr. Fishman is not

20     charged with violating or conspiring to violate state or local

21     racing or veterinary practice regulations.  The evidence you

22     have just heard was admitted solely insofar as it bears on

23     Dr. Fishman's state of mind.  I will instruct you on the

24     applicable law at the end of the case.

25         THE COURT:  All right.  And does anyone from the

1   government want to be heard?

2          MR. ADAMS:  Yes.  It's not entirely correct that the

3   evidence that came in bears only on his state of mind.  I'm not

4   exactly sure which piece of evidence this is objecting to.

5          THE COURT:  All right.  In any event, as I said at the

6   sidebar the other day, I'm not going to give instructions,

7   particularly not in the middle of the case, about what the

8   defendant is not charged with.

9          At the outset of the case, I gave a charge summarizing

10  the case and the two counts in the indictment.  That summary

11  was prepared by the parties and was on consent, and I'm not

12  going to stop the evidence to give interlocutory instructions,

13  and I'm not inclined at any point to instruct the jury on what

14  is not charged in this case.  All right.

15         MR. FERNICH:  That's fine.  My specific concern was

16  the purposes for which that evidence was just received, and

17  that the --

18         THE COURT:  You should have objected to the evidence

19  when it was offered.

20         MR. FERNICH:  Well, we litigated the admissibility of

21  the evidence prior to trial, and it was resolved.  I just

22  wanted the standard cautionary instruction to the effect that

23  they should not infer guilt solely from the fact that this

24  prior investigation and whatever purpose the government thinks

25  it was offered for, it should be so limited.

1          THE COURT:  All right.

2          MR. FERNICH:  My understanding is that it was covered

3     principally for Dr. Fishman's state of mind.  That was the

4     primary arguments made in the in limine motions.  If the

5     government thinks it has some other direct bearing on the

6     charges at issue here, you know, they can make whatever use

7     they want to try to make of it in summation and, you know, if

8     it's appropriate, it's appropriate.  And if we think it's not

9     appropriate, we'll act accordingly.

10          But as the record stands now, it's better to have some

11     sort of limiting instruction contemporaneously with the receipt

12     of the evidence but, obviously, now that that's gone, I don't

13     want to -- the ship is gone.  I don't want to call extra

14     attention to it, but I understand the Court's ruling.

15          THE COURT:  Right.  And if you wanted evidence

16     submitted for a limited purpose, you should have objected then,

17     said that at the time.  You waited until the evidence was in

18     and then said you wanted me to give a limiting instruction.  We

19     are where we are and the record is what the record is.

20          MR. FERNICH:  Yes, I agree that the record is what the

21     record is.

22          THE COURT:  All right.  Anything else from anyone?

23          MR. ADAMS:  Your Honor, tomorrow morning, we'll plan

24     to call our final witness, Jarrett Concannon.

25          MR. SERCARZ:  Who is it?  I'm sorry?

1           MR. ADAMS:  Jarrett Concannon.

2           THE COURT:  This is the witness you told us about

3   yesterday?

4           MR. ADAMS:  Yes, your Honor.

5           THE COURT:  And about how long do you think you're

6   going to be?

7           MR. ADAMS:  I would estimate a half an hour,

8   approximately.  And in connection with Agent Concannon's

9   testimony, the government would like to bring in the table that

10  we talked about earlier, put it in front of the bar, in front

11  of the jury box, and this will involve a bunch of physical

12  exhibits that will sit on the stable.

13          THE COURT:  All right.  Have you discussed this with

14  Mr. Sercarz?

15          MR. ADAMS:  Previously, I think, as we all said.

16          MR. SERCARZ:  There's no objection to the cart.  I'm

17  aware of the witness.

18          THE COURT:  Okay.  And you said I have no objection to

19  the card?

20          MR. SERCARZ:  The government talked about --

21          THE COURT:  Oh, cart.  I'm sorry, the cart with the

22  physical evidence.  Okay.  Thank you.  So I assume you'll all

23  work out the logistics in the morning, in terms of whatever

24  needs to be done, and we'll be ready to go at 9:30.

25          You all need to get your testing tomorrow, too.  So if

1  you're running late, you need to let us know that so we'll just

2  tell the jurors.  All right.

3            MR. ADAMS:  We'll be here on time.

4            THE COURT:  All right.  So you intend then to rest

5  somewhere probably before lunch tomorrow, correct?

6            MR. ADAMS:  That's what I would expect.

7            THE COURT:  All right.  And then, Mr. Sercarz, where

8  are we going?

9            MR. SERCARZ:  Either Dr. Fishman will testify, or I

10  will rest immediately thereafter.  And I am seeking a solid

11  indication from the client as to what his predilection is.  And

12  I will ask, if we do rest, that the Court admonish the

13  defendant regarding his right to testify before we rest, and

14  then we can proceed, your Honor, with the charge conference.

15            MR. FERNICH:  Just to be clear, in the event that he

16  waives his right to testify, it would be our preference that

17  the Court advise him that the decision is solely his at the end

18  of the day and, you know, lawyers are entitled to give him

19  advice, but ultimately, the decision, the final decision, rests

20  exclusively with him.

21            THE COURT:  And are you wanting me to do this in front

22  of the jury?

23            MR. FERNICH:  No.

24            THE COURT:  So why don't I just do it right now?

25            MR. FERNICH:  That's entirely appropriate.

1           THE COURT:  All right.  So, Dr. Fishman, you do

2     understand that you have the right to testify, but you also

3     have the right not to testify?  Do you understand that?

4           THE DEFENDANT:  Yes.  I do, your Honor.

5           THE COURT:  And you understand that while your lawyers

6     can give you advice on the wisdom of testifying or not

7     testifying, the decision ultimately is solely your decision?

8     You understand that, correct?

9           THE DEFENDANT:  Yes.  I do, your Honor.

10          THE COURT:  All right.  And then I will ask you to

11    confirm tomorrow, once I know what the decision is, that this

12    is in fact your decision.  All right?

13          THE DEFENDANT:  Yes, your Honor.

14          THE COURT:  All right.  Thank you.

15          Anything else?

16          MS. MORTAZAVI:  Your Honor, there's one further matter

17    we just want to bring to the Court's attention.  There are

18    several versions of codes and regulations of various states

19    pertaining to harness and Thoroughbred racing that the

20    government would hope would be the subject of a stipulation

21    between the parties.

22          It does not appear that the parties will be able to

23    agree to a stipulation to have these admitted, given defense

24    counsel's standing objections.  The government may then bring

25    these exhibits to the Court's attention.  They've been in the

1    exhibit binder, but we may ask the Court to take judicial

2    notice of those statutory portions of various state codes and

3    regulations.

4              THE COURT:  Do you want to tell me in advance or, you

5    know, file something on the docket with what you're -- I have

6    no objection to you doing this by e-mail, do you?

7              MR. FERNICH:  Judge, let me see if I can cut through

8    this.  We have no objection to the stipulation, to the accuracy

9    of the code provisions recited in the stipulations.  So your

10   Honor can have a look at the stipulation and, hopefully, that

11   put down everything that the government talks about.

12             THE COURT:  Right.

13             MR. FERNICH:  Your Honor I think understands my

14   position from earlier that I don't think they should come into

15   evidence and go before the jury.  That's my objection to it.

16             THE COURT:  I understand.

17             MR. FERNICH:  And --

18             THE COURT:  And I don't think I've ruled definitively

19   on that.

20             MR. FERNICH:  No, no, your Honor has not.

21             THE COURT:  I'd like to see the stipulation, and I'll

22   have a ruling for you in the morning.

23             MR. FERNICH:  That's fine.  I just want to point your

24   Honor to paragraphs 1 and 2 of the indictment, and it says that

25   the participants sought to improve race performance, increase a

1   horse's frequency of competition and obtain prize money from

2   racetracks throughout the United States and other countries,

3   including in New York, New Jersey, Florida, Ohio, Kentucky and

4   the UAE.

5           Under this indictment, we're supposed to be on notice

6   of every regulation in every jurisdiction.  Everywhere in the

7   country and in unspecified other countries is not sufficient to

8   give us notice of the race regulations at issue.  And the way

9   it should be done, consistent with appropriate notice and the

10  constructive amendment concerns I raised, is the way it was

11  done in Ramos, spelled out the exact --

12          THE COURT:  I think you mean Rojas.

13          MR. FERNICH:  I'm sorry, Judge.  Sorry, Rojas.  Where

14  it spelled out the very precise provisions of the PA code that

15  were sought to be evaded, and maybe we would have defenses to

16  those different regulations.

17          Now, your Honor, I'm not going to beat, again -- I'm

18  not going to beat this to death.  I know the Court is not going

19  to be giving a limiting instruction now, and Ms. Mortazavi very

20  graciously has advised me that the government doesn't plan to

21  make any substantive use of these things right now, and I

22  appreciate that.

23          My concern is that, you know, I see this flashed up --

24  the provisions flashed up in summation, and we won't have had

25  an instruction at that point.  And that's when the concerns

1    that I've raised about constructive amendment would really be

2    crystallized.

3           It's my preference, of course, that these things not

4    be introduced.  I think there's ample testimony in the record

5    in which the jury can infer, if it so desired, that Dr. Fishman

6    was seeking to evade race regulations in myriad, myriad

7    jurisdictions.  So I don't think they need the specifics of it,

8    and we're not going to be arguing, in fact, that he didn't seek

9    to do that.  So I don't know why these things are only coming

10   in.

11          THE COURT:  All right.  So I'm not ruling.  I will

12   give you my preliminary reactions.  I'm inclined to agree with

13   Mr. Fernich on this one.  Hold on, hold on.  I'm not ruling.

14   It is fair grounds for the government to say, in connection

15   with the intent aspect of this case and other aspects of the

16   case, and they have elicited evidence to the effect that

17   Dr. Fishman intended to enhance the performance of racehorses.

18          Numerous witnesses have testified that they knew that

19   if they were doing that, that would violate the rules and

20   regulations of various pari-mutuel or gaming regulators

21   throughout various different states.  So that issue and that

22   argument is fair game.

23          But it is true Dr. Fishman was not charged with

24   violation of the gaming commission rules.  I'm not even sure

25   that would be a federal offense, frankly, but in any event,

1    that's not what he's charged with.  It is part of your

2    narrative, but it seems to me, preliminarily -- I'm going to

3    review the stipulation and what it is you want to have -- that

4    having all of these rules and regulations, in addition to the

5    statutory scheme, is just going to complicate things for the

6    jury.

7            That's my initial reaction without ruling at this

8    time.  I'm prepared to hear from the government.

9            MR. ADAMS:  Your Honor, I appreciate you taking it

10   under advisement.  One thing I point out, until we come back,

11   is it's certainly true that there's sufficient evidence right

12   now for Dr. Fishman to be convicted of the charges that we --

13           THE COURT:  I'm not saying that.  I'm simply saying

14   you have elicited evidence on the issue.  That's all I said.

15           MR. ADAMS:  What I will say is it is our burden to

16   carry each one of these elements, including the element with

17   respect to intent.  The existence of these rules and, in

18   particular, the existence of certain clearcut rules, which are

19   the subject of these stipulations, makes it more likely than

20   not that he had an intent to evade the regulation.  If there

21   was not such an a regulation, it would be less likely that such

22   an intent existed.

23           On cross-examination of Dr. Cole, of Mr. Cohen, the

24   defense has elicited certain ambiguity with respect to these

25   rules.

1          THE COURT:  Look -- I'm sorry, I didn't mean to cut

2    you off, Mr. Adams.  Were you finished?

3          MR. ADAMS:  Only to the conclude by saying the

4    stipulation, which goes plainly to something that is at issue

5    is also relevant and ought to come in for that purpose.

6          THE COURT:  All right.  I will say this, Mr. Sercarz,

7    in your opening statement, as I recall, and I actually asked

8    for the transcript because I wanted to go back and look at

9    this.  I recall you saying something like -- and maybe you were

10   talking about the FDCA, that's why I want to go back and look

11   at it -- this is some complicated patchwork of rules and

12   regulations.

13         You said that in your opening, which, by the way, is

14   probably not even proper for an opening statement, but there

15   was no objection.  You may have introduced this.  I don't know.

16   I need to go back and look at this.

17         Second, you positively questioned, after objecting

18   about the regulations both in connection with the charges to

19   the jury and now on this issue, you questioned, I don't

20   remember if it was -- I think it was Dr. Bowman, you kept on

21   talking about 360B of the CFR.  I know that's different than

22   these regulations, but you can't pretend that the only thing

23   that's part of this indictment is the FDCA itself.

24         Not only that, the indictment specifically talks

25   about, I think in the third paragraph or maybe the fourth

1    paragraph, specifically talked about the rules and regulations

2    of the various gaming commissions.  So I need to go back and I

3    need to look at this.  I need to see exactly what it is that

4    you're proposing to introduce.

5           All of the exhibit numbers are in the 1200 range,

6    Ms. Mortazavi?

7           MS. MORTAZAVI:  That's correct, your Honor.

8           And if I may add one point?  It's going to be clear

9    from the language in the stipulation itself, but what I do just

10   want to point out is that the witnesses who testified today are

11   limited in terms of geography and time frame.

12          What we have proposed here, and what we are asking the

13   Court to take judicial notice of, are the regulations as they

14   appeared at various points during the conspiracy, at the

15   beginning, at the middle and the end.  And that's not something

16   that the witnesses' testimony will necessarily cover.

17          Now, certainly, defense can make arguments as to the

18   defendant's knowledge of these background rules, but again, as

19   Mr. Adams pointed out, it is our burden.  We have the burden

20   for the entirety of the conspiracy, and the existence of these

21   regulations does tend to show that there was intent.

22          THE COURT:  All right.  But is it not possible for you

23   to propose a stipulation that there were rules and regulations

24   in effect on this date that prohibited X without, as you're

25   trying to do here, to offer the actual code into evidence?

1          MS. MORTAZAVI:  If defense counsel would be amenable

2     to that stipulation, we certainly would be, your Honor.

3          THE COURT:  Well, why don't you talk to each other?

4     Because it seems to me that that ought to be something the

5     parties could stipulate to because that I could take judicial

6     notice of, but I'm not inclined to have the whole code in

7     evidence and going back into the jury room.

8          MS. MORTAZAVI:  And, your Honor --

9          THE COURT:  Statutes and codes and rules and

10     regulations are not normally evidence.

11          MS. MORTAZAVI:  And, your Honor, to the extent it

12     addresses that concern, and you'll see from the exhibits that

13     we have picked out particular sections and not the entirety of

14     the code and, in fact, redacted portions that are simply

15     irrelevant to try to reduce the confusion.  I understand your

16     Honor's point.

17          MR. FERNICH:  I think we can work it out, but in my

18     view that makes it worse because --

19          THE COURT:  I hear you.  I don't disagree.

20          MR. FERNICH:  I just want to say one thing in defense

21     of my friend, Mr. Sercarz.  He meant to say 21 U.S.C. 360,

22     little B, which is the U.S.C. as opposed to CFR.

23          THE COURT:  But that's not what he said, and he said

24     it repeatedly.

25          MR. FERNICH:  Judge, I know what he said.  I know that

1    he misspoke.

2              THE COURT:  All right, but --

3              MR. FERNICH:  I recall what your Honor said in the

4    opening statement, and I can tell you, in good faith, we're

5    referring to the pastiche of veterinary regulation, not the

6    gaming regulations or pari-mutuel regulations.

7              THE COURT:  Yes, but you know you argued, which is

8    what you were doing in an opening statement, that something was

9    difficult to comprehend and that's why my client may or may not

10   have complied with it, is improper for an opening statement, in

11   my view.  There was no objection, and it's not my habit to

12   interrupt opening statements but --

13             MR. FERNICH:  We don't intend to argue that there was

14   a lack of intent to violate state racing regulations.  That's

15   not a material defense in this case.

16             THE COURT:  Are you prepared to stipulate?

17             MR. FERNICH:  I'll discuss that with Mr. Sercarz.

18             THE COURT:  That's fair.  And with Ms. Mortazavi and

19   Mr. Adams and Mr. Chow.  I mean, if you all can -- it seems to

20   me that the gulf is not that wide, unless you're hell bent on

21   putting the whole code or, you know, redacted portions of the

22   code, which I do view as problematic.

23             If you're set on that, then you're probably not going

24   to come to an agreement, but otherwise, it sounds like this is

25   something you ought to be able to come to some agreement on.

1          But, look, you each have to represent your respective

2    interests; so I'm going to leave it at that.

3          And I started to ask you, these are all 1,200 series,

4    Ms. Mortazavi?

5          MS. MORTAZAVI:  12,000 series.

6          THE COURT:  All right.  Is that one particular binder?

7    Can someone help me with that before we recess?

8          Is there anything else, then?

9          MS. MORTAZAVI:  Nothing else from the government.

10   Thank you.

11         THE COURT:  Mr. Sercarz or Mr. Fernich?

12         MR. FERNICH:  Not from me, your Honor.

13         MR. SERCARZ:  No, your Honor.

14         MR. FERNICH:  Thank you for hearing me.

15         THE COURT:  Of course.  All right.  Everyone, have a

16   good evening, and I will see you back here around 9:30 tomorrow

17   morning and, hopefully, you'll tell me you've made progress.

18         MR. FERNICH:  I hope so.  Thank you.

19         MR. ADAMS:  Thank you.

20         (Adjourned to January 28, 2022, at 9:30 a.m.)

21

22

23

24

25

958

```
1                    INDEX OF EXAMINATION

2    Examination of:                         Page

3     AARON OTTERSON

4    Direct By Mr. Chow . . . . . . . . . . . . . 747

5    Cross By Mr. Sercarz . . . . . . . . . . . . 767

6     ADRIENNE HALL

7    Direct By Ms. Mortazavi  . . . . . . . . . . 768

8    Cross By Mr. Sercarz . . . . . . . . . . . . 833

9    Redirect By Ms. Mortazavi  . . . . . . . . . 856

10   Recross By Mr. Sercarz . . . . . . . . . . . 868

11   Further Redirect By Ms. Mortazavi  . . . . . 870

12    JAMEN DAVIDOVICH

13   Direct By Mr. Chow . . . . . . . . . . . . . 872

14   Cross By Mr. Sercarz . . . . . . . . . . . . 911

15    JOHN RUBINO

16   Direct By Ms. Mortazavi  . . . . . . . . . . 925

17

18

19

20

21

22

23

24

25
```

959

```
 1                    GOVERNMENT EXHIBITS

 2    Exhibit No.                              Received

 3    1915    . . . . . . . . . . . . . . . . . 779

 4    1914    . . . . . . . . . . . . . . . . . 783

 5    10,005  . . . . . . . . . . . . . . . . . 880

 6    14027   . . . . . . . . . . . . . . . . . 889

 7    14026   . . . . . . . . . . . . . . . . . 894

 8    14024   . . . . . . . . . . . . . . . . . 897

 9    14000   . . . . . . . . . . . . . . . . . 905

10    14001 through 14023  . . . . . . . . . . . 908

11    9001    . . . . . . . . . . . . . . . . . 919

12    3600 through 3606  . . . . . . . . . . . . 921

13    9004    . . . . . . . . . . . . . . . . . 921

14    8000 through 8536  . . . . . . . . . . . . 922

15    9007    . . . . . . . . . . . . . . . . . 923

16    3800    . . . . . . . . . . . . . . . . . 924

17    9300, 3700 through 3705  . . . . . . . . . 929

18    9013, 3000, 3001, 3100-A and 3100-B  . . . . 934

19

20

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300