M1SPFIS1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                          20 Cr. 160 (MKV)

5  SETH FISHMAN,

6            Defendant.
                                         Trial
7  ------------------------------x
                                         New York, N.Y.
8                                        January 28, 2022
                                         9:43 a.m.
9  Before:

10                 HON. MARY KAY VYSKOCIL,

11                                       District Judge
                                         -and a Jury-
12
                          APPEARANCES
13
   DAMIAN WILLIAMS
14      United States Attorney for the
        Southern District of New York
15 BY:  ANDREW C. ADAMS
        SARAH MORTAZAVI
16      ANDEN F. CHOW
        Assistant United States Attorneys
17
   SERCARZ & RIOPELLE, LLP
18      Attorneys for Defendant Fishman
   BY:  MAURICE H. SERCARZ
19      -and-
   LAW OFFICE OF MARC FERNICH
20 BY:  MARC A. FERNICH

21

22 ALSO PRESENT:  KARLINE JUNG, Paralegal Specialist

23

24

25

1            (Trial resumed; jury not present)

2            THE COURT:  Good morning, everyone.  Please be seated.

3    All right.  I've asked Ms. Dempsey to hold off bringing the

4    jury up just so we can talk about a couple of issues.  So,

5    first, I have on the bench, I guess, Government Exhibit 9003?

6    Oh, no, that's dealing with a different issue.  I don't know

7    why that is out of the binder.

8            Is there any report on the issue we were discussing at

9    the close of the day yesterday with respect to the rules and

10   regulations of the various states regarding gaming and horse

11   rules and regulations, racing rules and regulations?

12           MS. MORTAZAVI:  As of yesterday, your Honor, the

13   defense has indicated they might be amenable to a factual

14   stipulation.  The government put language together and

15   circulated it to defense counsel.  They then took the position

16   that they would not agree to the factual stipulation, and I

17   don't know what their position is this morning.  There was some

18   indication that they may have a counterproposal but I later

19   learned that they may simply object entirely.

20           So I'll leave it defense counsel to assert their

21   position, but we have copies of the proposed factual

22   stipulation, which it seems is moot, and the original

23   stipulation that the government had proposed seeking just to

24   move in the State regulations.

25           MR. FERNICH:  Your Honor, and I appreciate

1  Ms. Mortazavi's recitation, which is accurate, and I appreciate

2  their effort to draft a stipulation that would be mutually

3  agreeable.  Unfortunately, it doesn't work for us.

4       So our position is that we would rest on the arguments

5  that we made yesterday.  We don't think the reasons that I

6  stated, lack of notice, potential constructive amendment -- I'm

7  not going to belabor it.  Your Honor understands the arguments.

8  It should have been charged the way Rojas was charged if they

9  wanted us to -- well, let me -- we object to the admissibility

10  of the regulations for the reasons that I stated yesterday.

11       If your Honor rules against us on that, we will sign

12  the stipulation presented to your Honor yesterday without

13  prejudice to the arguments that I've made that the regulations

14  should not be admitted at all.

15       THE COURT:  All right.  I am not admitting the

16  regulations but not for the reasons you've stated, Mr. Fernich.

17  I don't think it has anything to do with notice or constructive

18  amendment.  There is no constructive amendment here.  The

19  indictment clearly talks in, I think, the first paragraph,

20  certainly in the third paragraph and all throughout, about the

21  rules and regulations governing horseracing and the fact that

22  these drugs would enhance performance and potentially violate

23  the various rules and regulations.

24       You, yourself, have admitted that that allegation is

25  relevant to the intent issue in the case, and you've been on

1  notice of that, or at least your client and your predecessor

2  counsel have been on notice of that, since day one.  So it is

3  not a notice issue.  It is not a constructive amendment issue

4  in --

5            MR. FERNICH:  403 issue.

6            THE COURT:  -- in the Court's mind.  It is also not a

7  403 issue.  I don't believe it's unduly prejudicial, if that's

8  what you mean.

9            MR. FERNICH:  No, more like confusing and misleading.

10           THE COURT:  So I do agree -- I spent a lot of time

11  thinking about this and looking at what you're proposing to put

12  into evidence, Ms. Mortazavi.  Jurors don't get a copy of the

13  statute under which the defendant is charged.  To now try to

14  give them a copy of rules and regulations under which he isn't

15  charged just complicates and confuses things.

16           And you did have an opportunity, and you do have an

17  opportunity, to argue, and you certainly elicited evidence

18  about the fact that various jurisdictions have rules and

19  regulations that govern the conduct of horseracing and that the

20  intent of these drugs was to enhance performance, which would

21  violate allegedly certain of these rules and regulations.

22           But the jurors don't need the text of the actual rules

23  and regulations, and I am not going to admit them into

24  evidence.

25           MS. MORTAZAVI:  We understand, your Honor, and we'll

M1SPFIS1

1    rely on the evidence that has been elicited so far.

2              THE COURT:  Okay.  So let me put this binder away

3    because that's a bulky issue.

4              I did receive this morning a copy of four additional

5    proposed instructions from Mr. Fernich.  I don't know if the

6    government has even had a chance to look at them, but we should

7    talk at a break about timing and sequencing of things here.

8              It had been my intent to do the charging conference

9    and to go into summations today, if time allowed.  Now, with

10   these last-minute requested additional instructions, there are

11   things that we need to talk about.

12             One of the proposed instructions is that I charge --

13   well, I'm not going to go into too much detail.  We'll talk

14   about it at the charging conference.

15             Mr. Fernich, I think you completely misapprehend what

16   the Rojas case and decision is about, and we'll talk about

17   that.  It dealt with a vet who administered the drugs him or

18   herself, which, to my knowledge, there's no allegation of that

19   here.

20             MR. FERNICH:  No, I'll amplify --

21             THE COURT:  Right.  We'll deal with it at the charging

22   conference, but I'm giving you a heads up.

23             With respect to the lesser-included offense charge,

24   I'm giving the government a heads up that I need to hear from

25   you with some legal authority on this issue.  All right?

M1SPFIS1

1          MR. ADAMS:  All right.

2          THE COURT:  All right.  So I don't want to keep the

3     jurors waiting.  What we're probably going to have to end up

4     doing is -- well, let's see how the morning goes, but it may

5     well be that we let the jurors go home early today, we do the

6     charging conference, and then you come back Monday and do

7     summations and then charging.  It had been my hope to move into

8     summations.

9          MR. FERNICH:  Judge, I didn't mean to sandbag anybody.

10    The evidence was coming in even at the end of the day.

11         THE COURT:  No, I understand.

12         MR. FERNICH:  It impacts -- I've been working on

13    this --

14         THE COURT:  I've seen you working on it.  I thought

15    you were working on your appeal throughout the whole trial.

16    You're certainly working on something.

17         MR. FERNICH:  I'm working, but stuff comes in and I --

18         THE COURT:  Well, you know, the purpose, by the way,

19    of the Court signing the order allowing electronic devices in

20    the courtroom was to assist in your defense in this case, not

21    for you to be conducting all your other business while --

22         MR. FERNICH:  Oh, no, I'm working on exactly what we

23    discussed, your Honor.

24         THE COURT:  Okay.

25         MR. ADAMS:  And, your Honor, with respect to the

M1SPFIS1

1    Court's proposal on timing, the government had a preliminary

2    opportunity to look at Mr. Fernich's filing, and I expect that

3    we'll be well in hand to have a charging conference this

4    afternoon, if it works for the Court.

5              THE COURT:  Oh, we're clearly having the conference

6    this afternoon.

7              MR. ADAMS:  There's no problem with the timing in that

8    respect, and then given the blizzard, in any event, I think the

9    parties are jointly going to propose --

10             THE COURT:  The parties what?

11             MR. ADAMS:  We were going to jointly propose to come

12   back for summations on Monday.

13             THE COURT:  Is that your preference, Mr. Sercarz?

14             MR. SERCARZ:  Agreed.  That's mine as well.

15             THE COURT:  All right.  From what the weather reports

16   is saying, this is not the blizzard.  This is the storm before

17   the storm, which may be a non-event, but in any event, all

18   right.

19             So today I see you have the physical evidence that we

20   talked about.  All right.  So where are we at, in terms of you

21   have, is it, Mr. Concannon that you said?

22             MR. ADAMS:  It is, your Honor, and he will be the

23   final witness.  We have a few calls to play, a few additional

24   pieces of evidence to move in, and a few clarifications for the

25   record that Mr. Chow will take care of.

M1SPFIS1

1          THE COURT:  Yes.

2          MR. SERCARZ:  Initially, your Honor, so things will

3     run more smoothly, when the jury does come up, the government

4     is proposing a stipulation that -- withdrawn.

5          The government is proposing to introduce evidence that

6     they feel they will need in order to demonstrate that the

7     enhancement is appropriate for conduct that occurs after the

8     defendant has been arrested and charged with a crime.

9          They have offered me the appearance bond and the

10    docket sheets that reflect the dates of the defendant's arrest

11    and removal.  I'm concerned that there is extraneous and

12    distracting information in the appearance bond, for example,

13    the amount of the bond, the fact that the defendant's father

14    was involved in posting it.

15         My preference would be a stipulation regarding the

16    date of the arrest, the date of the defendant's release on

17    bond, and that ought to be adequate for purposes of allowing

18    the government to offer their evidence regarding the

19    enhancement and whether or not it's applicable.  So perhaps if

20    we can do it that way, we can draft a stipulation and have it

21    signed, your Honor, at some point before we have to argue

22    before the jury.

23         MR. ADAMS:  There is no problem with a draft actual

24    stipulation.  We just need time to draft it.  This has been a

25    document that we produced some time ago, after a proposed

1    redaction previously.  If we get them now, we'll take care of

2    it.

3             THE COURT:  All right.  But you need to do it before

4    you rest.

5             MR. ADAMS:  Correct.  We will.

6             MS. MORTAZAVI:  That's correct, your Honor, and I

7    believe we were going to introduce it through Special Agent

8    Concannon.

9             THE COURT:  Why don't I let you all get to that.  I'm

10   going to make one other observation.  I spent a lot of time

11   last night working through the jury charges, which, obviously,

12   will have to be amended to reflect the fact that Ms. Giannelli

13   is not here.  But in addition, I saw nothing about this

14   enhancement argument in what you gave me.

15            MR. FERNICH:  Judge, in the government's defense,

16   there was something about it I think in the special verdict

17   form that we submitted, the draft verdict form, which may need

18   some further work.

19            THE COURT:  It will, obviously, since Ms. Giannelli

20   isn't here.

21            MR. FERNICH:  Right.  I think there was a question

22   that the government put in there, that somebody put in there,

23   about whether any conduct had been proved after the arrest

24   date.

25            THE COURT:  Nope, not that I recall.

M1SPFIS1

1          MS. MORTAZAVI:  I thought, your Honor, that that was

2     in there.

3          MR. FERNICH:  I thought the government had put it in

4     there.

5          MR. ADAMS:  We'll confirm.  If it's not, we'll

6     certainly propose a brief instruction.

7          THE COURT:  All right.  I mean, that's something that

8     we can talk about at the charging conference.  We don't really

9     need to deal with that, but you do need to talk to each other

10    about the stipulation.  Why you go ahead and do that.

11         MR. ADAMS:  And your Honor, since we're not with the

12    jury, I'd ask permission for me to step out, I'll go draft that

13    now, and we can proceed with Ms. Mortazavi and Mr. Chow.

14         THE COURT:  But how are you going to proceed if you

15    haven't had time to talk with Mr. Sercarz if you're intending

16    to do this during Mr. Concannon's testimony?

17         MR. ADAMS:  If we come to the morning break, I'm

18    relatively confident we'll be able to come to a factual

19    stipulation.  We're talking about merely the fact that he was

20    arrested and released on bond.

21         MS. MORTAZAVI:  Your Honor, what Mr. Chow has proposed

22    is that we handwrite it right now.

23         THE COURT:  That's what I was thinking you were going

24    to do.

25         MR. CHOW:  If your Honor would indulge us with five

1    minutes, we'll draft it and sign it.

2            THE COURT:  I thought that's what you were going to

3    do.  I'd rather get the jury here and just go through and not

4    have an up and down, up and down.  If we had the jury here in

5    the back in the normal way, then it would be fine.

6            So why don't you take a couple of minutes.  You can

7    let us know when you're ready, and we'll tell Ms. Dempsey it's

8    okay to bring the jury up.  Okay?

9            MR. ADAMS:  Thank you, your Honor.

10           THE COURT:  So I am going to leave you to that, and I

11   need to go retrieve something anyway.

12           MR. ADAMS:  Thank you.

13           THE COURT:  All right.  Thank you.

14           (Recess)

15           Please be seated.  The jurors are on their way.  I

16   understand you have finalized what you needed to do with regard

17   to the stipulation?

18           MR. CHOW:  Yes, your Honor.

19           THE COURT:  All right.  Thank you.

20           All right.  And, Mr. Chow, are you taking the lead

21   this morning?

22           MR. CHOW:  I am.

23           THE COURT:  Okay.  Thank you.

24           (Pause)

25           Back on the record.  While we're waiting, please don't

1   forget to do what you all expect to do with respect to

2   Mr. Cohen.  We talked about whether you're going to apply to

3   unseal the record, or how you're going to leave it; so just

4   don't forget that.  Okay?

5           MS. MORTAZAVI:  Yes, your Honor.

6           MR. ADAMS:  Yes, your Honor.

7           (Pause)

8           (Jury present)

9           THE COURT:  Please be seated, everyone.  All right.

10  Good morning, ladies and gentlemen, and thank you again for

11  your punctuality and also for your patience.  I know we've kept

12  you a little bit this morning past when I told you we were

13  ready to start.  The reason that we're a bit delayed is that

14  the lawyers and I did spend some time talking about some legal

15  issues in the hopes that we can streamline things a little bit.

16          We're going to try to move things along.  It's our

17  hope that we may be able to conclude early today.  We are

18  positively ahead of the schedule that I told you about for the

19  case, and I'll tell you more about scheduling and where we're

20  at later on in the morning.  Okay?

21          All right.  So we're going to continue with the

22  government's case.  Mr. Chow, your next witness?

23          MR. CHOW:  Yes, your Honor.  The government calls

24  Special Agent Jarrett Concannon.

25          THE COURT:  Good morning, Mr. Concannon.  You can

1   remove your mask, but please remain standing so Ms. Dempsey can

2   administer the oath.

3    JARRETT CONCANNON,

4        called as a witness by the Government,

5        having been duly sworn, testified as follows:

6              THE DEPUTY CLERK:  Thank you.  Please be seated, and

7   say and spell your name for the record.

8              THE WITNESS:  Special Agent Jarrett Concannon,

9   J-a-r-r-e-t-t, C-o-n-c-a-n-n-o-n.

10             THE COURT:  Thank you.  Mr. Chow.

11  DIRECT EXAMINATION

12  BY MR. CHOW:

13  Q.  Good morning.  Where do you work?

14  A.  I work at the Federal Bureau of Investigation.

15  Q.  What's your position at the Federal Bureau of

16  Investigation?

17  A.  I'm a special agent.

18  Q.  How long have you been with the FBI?

19  A.  Approximately 18 months.

20             MR. CHOW:  Your Honor, with the Court's permission,

21  we'd like to publish certain exhibits that have been entered

22  into evidence, in particular, the boxes and bins that have been

23  placed on the table.

24             THE COURT:  You may.

25             MR. CHOW:  And also with the Court's permission, I'm

1    going to have a couple of my colleagues assist me in publishing

2    some of the exhibits so that I don't have to keep walking back

3    and forth between podium and the table.

4           THE COURT:  That's fine because, otherwise, you have

5    to keep taking your mask on and off.

6           MR. CHOW:  Exactly.

7           THE COURT:  That's fine.

8           MR. CHOW:  Ms. Mortazavi, could you bring me one item

9    from Government Exhibit 9080, which is a bin that has been

10   labeled with the label NB 5.50.

11          THE COURT:  And these exhibits are all in evidence?

12          MR. CHOW:  They have all been admitted as evidence,

13   your Honor.

14          THE COURT:  Pursuant to some of the stipulations we've

15   dealt with earlier?

16          MR. CHOW:  Pursuant to stipulation 9015.

17          THE COURT:  Thank you.

18   BY MR. CHOW:

19   Q.  Special Agent Concannon, can you read the label assigned

20   this vial?

21   A.  "NBO5.50."

22   Q.  Ms. Mortazavi, could we bring a vial from bin 9079, which

23   is labeled "NB5.30."

24          And for the record, your Honor, these were all

25   admitted pursuant to stipulation 9015, as I mentioned, as a

1     result of the search of Equestology's offices.

2              THE COURT:  All right.  And everything on the table

3     and below the table is --

4              MR. CHOW:  From the same search.

5              THE COURT:  -- from that search?

6              MR. CHOW:  From that search, yes, your Honor.

7              While she's opening that one, why don't we jump to the

8     next one, which is Government Exhibit 9072, which is a box that

9     has label EMP/BB3 on it.

10             THE COURT:  And I'm sorry, Mr. Chow, remind us of the

11    date of the search.  Is that in the stipulation?

12             MR. CHOW:  Yes, it is.  This search occurred on

13    October 28th, 2019.

14             THE COURT:  Thank you.

15             MR. CHOW:  All right.  We're going to go back to one

16    of the vials from Government Exhibit 9079, which had a label on

17    it, NB5.3.0 -- sorry, 5.30.

18    BY MR. CHOW:

19    Q.  Special Agent Concannon, can you read the label on this

20    vial?

21    A.  "NBN5.30."

22    Q.  Going back to Government Exhibit 9072, this was a bin that

23    had a label on it EMP/BB3.

24             Special Agent Concannon, is there any label on this

25    vial?

1    A.  There is not.

2    Q.  Ms. Mortazavi, could we take one of the vials from the

3    Government Exhibit 9064, which has a label BPR DOM12.1.

4          Special Agent Concannon, is there any label on this?

5    A.  There is not.

6    Q.  All right.  Ms. Mortazavi, can we take out from Government

7    Exhibit 9083 the following items -- that's the box on the far

8    left -- labels VO2 Max, BH Bleeder, Serenity and IT Plus,

9    please.

10          Special Agent Concannon, can you read the name of this

11   product as according to this label?

12   A.  It's VO2 Max.

13   Q.  Where it says "Directions," could you read that to the

14   jury, please?

15   A.  "Administer intravenously 10 cc's, four to six hours prior

16   to strenuous exercise."

17   Q.  And under "Ingredients" would you read that?

18   A.  "Proprietary blend of amino acids."

19   Q.  On the left-hand side of the label, could you describe what

20   insignia appears?

21   A.  It's a horse, horse's head.

22   Q.  Great.  Going to the next label, can you read the first

23   line of the label on the top?

24   A.  "Serenity."

25   Q.  And read what it says under "Directions"?

1    A.  "Give five to ten cc's IV 24 hours and four hours before

2    stressful event."

3    Q.  Can you read what it says under "Ingredients"?

4    A.  "Proprietary sugars and amino acid blend."

5    Q.  On the left-hand side of the label, can you describe what

6    you see?

7    A.  It's the same horse head as the previous label with the

8    words "Equi-Tech" underneath.

9    Q.  All right.  Going to the next label.  Can you read the

10   first line on the right-hand side of the label?

11   A.  "HP Bleeder Plus."

12   Q.  And under that, what does it say?

13   A.  "Homeopathic bleeder and analgesic."

14   Q.  Under "Directions" what does it say?

15   A.  "Administer 10 cc IV or IM five to six hours before

16   exercise.  This product contains no known testable

17   ingredients."

18   Q.  And under "Ingredients"?

19   A.  "Proprietary blend of homeopathic and complex amino acid

20   structures."

21   Q.  On the left-hand side of the label, are you able to make

22   out any letters or words?

23   A.  "SPC, Specialized Performance Compounds."

24   Q.  All right.  Going to the next label.  Can you read what it

25   says on the top line there?

1    A.  "IT Plus."

2    Q.  And under "Directions" can you read what it says?

3    A.  "Reconstitute with 30-milliliters bacteriostatic water and

4    administer 15-milliliters 24 hours and four hours before

5    exercise."

6    Q.  Thank you.  From Government Exhibit 9082, can we pull out

7    the folders that have been labeled for Homeopathic Bleeder

8    Paste, DPM, Geoff Vernon, TB-7 and MPX.

9         All right.  Let's start with the bleeder paste folder.

10   All right.  Special Agent Concannon, can you read the top of

11   this label?

12   A.  "Homeopathic bleeder and analgesic."

13   Q.  And on the left-hand side, is there an emblem?

14   A.  It is.  It's a horse's head.  It says "Equi-Tech"

15   underneath.

16   Q.  And in red font, what does it say?

17   A.  "Oral paste."

18   Q.  Under "Directions" could you read that?

19   A.  "Administer five cc's per 100 kilograms body weight six to

20   eight hours before exercise.  For intense bleeders, administer

21   a loading dose 24 hours before exercise."

22   Q.  And under "Ingredients" what does it say?

23   A.  "Proprietary blend of natural extracts."

24   Q.  All right.  Can we bring up the EPM folder, please.

25        All right.  Can you read the first line of this label?

1    A.  "EPM Double Kill."

2    Q.  And under that, what does it say?

3    A.  "Toltrazuril and diclazuril oral paste."

4    Q.  On the left-hand side, is there an insignia?

5    A.  There is.  It's the horse's head.

6    Q.  What does it say under "Directions"?

7    A.  "Give half a tube and repeat in two weeks.  Best results

8    when administered in lower doses more frequently, as this is a

9    one month supply."

10   Q.  And in the white text on the right-hand side underneath

11   that, what does it say?

12   A.  "60 cc multiple-dose syringe."

13   Q.  All right.  Going to the next folder, can we show the Geoff

14   Vernon folder, please.  Okay.  And flipping inside, can we go

15   to the TB-7.  Great.

16           Special Agent Concannon, can you read starting from

17   the top?

18   A.  "TB-7.  Acetylated Thymosin B4 and B10.  Directions:

19   Reconstitute with three milliliters saline and administer

20   either IV, IM or SQ.  Best results when used post event and

21   five to seven days prior to event."

22   Q.  In red text what does it say there?

23   A.  "For R and D and clinical trial use only."

24   Q.  The background of the label, are you able to make out an

25   insignia?

1    A.  It's the same horse head symbol.

2    Q.  Next, can we go to the TB-7 folder.  Could you read one of

3    these labels for the jury?

4    A.  "TB-7, Acetylated Thymosin B4 and B10.  Directions:

5    Reconstitute with 3 milliliters saline and administer either

6    IV, IM or SQ.  Best results when used post event and five to

7    seven days prior to event."

8    Q.  Special Agent Concannon, anywhere on this label do you see

9    the word "breezing"?

10   A.  I do not.

11   Q.  All right.  Can we go to the NPX folder.  Could you read

12   what it says on this label?

13   A.  "NPX."

14   Q.  On this label, do you see any ingredients?

15   A.  I do not.

16   Q.  Do you see any instructions for use?

17   A.  I do not.

18   Q.  Do you see any insignia?

19   A.  I do not.

20   Q.  All right.  If we could go to Government Exhibit 9083, the

21   bin that has the label HP Bleeder.  And while you're there, you

22   can probably grab one from Government Exhibit 9040, which is a

23   bin labeled HP Bleeder Plus.

24          (Continued on next page)

25

1    BY MR. CHOW:

2    Q.  From 9040, can you describe for the jury what we're looking

3    at here?

4    A.  It's a vial with some type of liquid inside with a green

5    cap.

6    Q.  And that's from the bin 9040 it which was labeled HP

7    Bleeder Plus.

8           And from 9083 can you describe what we're looking at

9    here.

10   A.  It's a vial with some type of liquid in it with a green

11   cap.

12   Q.  Finally can we bring one sample from 9052, which is a bin

13   that has the label EGH, and one exhibit from Government

14   Exhibit 9051.  9052 and 9051.

15          From 9051, Special Agent Concannon, can you describe

16   what we're looking at?

17   A.  It's a vial with some type of liquid in it with a red cap

18   with an Equiscience label on the front with the horse head

19   symbol with EGH.

20   Q.  Under that what does it say?

21   A.  Equine growth hormone.

22   Q.  And the white text underneath that?

23   A.  3 milligrams/millimeters DHEA.

24   Q.  Under directions, can you read what that says?

25   A.  Dose 4-500 kilogram horse 5 millimeters IM two times per

1    week for eight weeks.

2    Q.  And 9051, if we could read the text.

3    A.  Federal law prohibits dispensing without a prescription.

4    Store at controlled room temperature 15 to 30 degrees Celsius

5    or 58 to 86 degrees Fahrenheit, protect from light,

6    intramuscular use only, 10 milliliters, multiple dose vial.

7    Q.  And from 9052, a bin that had the label EGH?

8    A.  It's a clear vial with liquid in it with a red cap.

9              MR. CHOW:  Your Honor, that concludes the presentation

10   from the items seized from Equestology offices on October 28,

11   2019.

12             At this time, I will like to read a stipulation into

13   the record.  This one is marked for identification as

14   Government Exhibit 9016.

15             THE COURT:  All right.  It will be received and you

16   may read from it.

17             (Government's Exhibit 9016 received in evidence)

18             MR. CHOW:  The parties stipulate and agree to the

19   following facts:  On or about October 28, 2019, Seth Fishman,

20   the defendant, was arrested and charged in connection with this

21   case and released on bail under the terms of Chapter 206 of

22   Title 18, United States Code.

23             While on bail, he was subjected to supervision.  One

24   of the conditions of his bail was that he not violate federal,

25   state or local law while on bail.  Seth Fishman has remained on

1    bail at all relevant times since October 28, 2019, up to and

2    including January 28, 2022.

3            It is further stipulated and agreed by and between the

4    parties that this stipulation, which is Government

5    Exhibit 9016, may be received in evidence at trial the.

6            At this time the government offers Government

7    Exhibit 9016.

8            THE COURT:  It is received in evidence, and this

9    stipulation is evidence in this case.

10           MR. CHOW:  Ms. Jung, could we switch back to Trial

11   Director and bring up Government Exhibit 314K.  And this

12   evidence that has been admitted subject to a prior stipulation

13   as well.

14   BY MR. CHOW:

15   Q.  Reading from the bottom here, let's take the bottom email,

16   can you read who the bottom email was from, who it went to, and

17   when it was sent.

18   A.  The email is from Lisa Ranger at equestology@gmail to Mary

19   Fox at mary.equestology@gmail as well as sethfishman@hotmail.

20   The subject is FYI.  States:  Hello, I am just down to five EPM

21   paste, need ASAP, please.

22   Q.  Can you read the sent date for the email on the bottom.

23   A.  It was sent Monday, January 20, 2020 at 4:06 p.m.

24   Q.  And the middle email, can you read the date on which that

25   was sent?

1   A.  On Monday, January 20, 2020 at 4:12 p.m.

2   Q.  Who is the email from?

3   A.  Seth Fishman, sethfishman@hotmail.com.

4   Q.  What is the body of that email?

5   A.  Will work O getting out this week if I can get API in next

6   few days.

7   Q.  All right.  Can we bring up Government Exhibit 314G.

8           All right.  Special Agent Concannon, at the top of the

9   page do you see where it says "Equestology" and then "deposit

10  slip?"

11  A.  I do.

12  Q.  To the left can you read the date and the for?

13  A.  The date is February 10, 2020, for November 1st, 2019 to

14  November 15, 2019.

15          THE COURT:  Could we zoom in it on it?  I can't see

16  it.  I don't know if the jurors can.

17          Thank you.

18          MR. CHOW:  All right.  Ms. Jung, can we go to page 2,

19  please.  And if you could blow up the total deposit amount.

20  Q.  Can you read that total deposit amount?

21  A.  50,813.65.

22  Q.  Could we bring up Government Exhibit 314F.  Can we blow up

23  the top two lines, please.

24          To the left of where it says Equestology deposit slip,

25  can you read the date on and the for, please?

1   A.  The date is February 10, 2020, for November 16, 2019 to

2   November 30, 2019.

3            MR. CHOW:  Can we go to page 2, Ms. Jung, and blow up

4   total deposit amount.

5   Q.  And what is the number that is appears there?

6   A.  Total deposit amount 32,757.43.

7            MR. CHOW:  Can we go to Government Exhibit 314E,

8   please.  And again blowing up the top two lines.

9   Q.  To the left of where it says Equestology deposit slip,

10  could you read the date and the for?

11  A.  The date is February 10, 2020 for December 1st, 2019 to

12  December 15, 2019.

13  Q.  Can we go to page 2.  Blow up the total deposit amount.

14           Could you read that for the jury, please.

15  A.  Total deposit amount 35,853.12.

16  Q.  Can we bring up Government Exhibit 314D, and blow up the

17  top two rows.

18           To the left of where it says Equestology deposit slip,

19  could you read the date and the for.

20  A.  The date is February 10, 2020 for December 16, 2019 to

21  December 31, 2019.

22  Q.  Can we go to page 2, please, and blow up total deposit

23  amount.

24           Could you read that for the jury.

25  A.  Total deposit amount 36,091.99.

1    Q.  Can we bring up Government Exhibit 314N like Nancy.

2            Starting from the bottom, do you see header

3    information for the email from -- the email on the bottom?

4    A.  I do.

5    Q.  Can you read just the header information?

6    A.  From Mary Fox at mary.equestology@gmail sent on Friday,

7    December 6, 2019 at 12:57 p.m. to Seth Fishman at

8    sethfishman@hotmail, and the subject is:  Lisa's needs.

9    Q.  Could you read the body of the email?

10   A.  Hello.  Hello.  So this is what I am in desperate need of,

11   Homeopathic Bleeder Plus, VO2 Max, Power Block, Omeprazole

12   liquid, BPR Blue, eventually potentially need but here is where

13   I can get them at the compound price, see if worth making a

14   batch or just get sourced through Boothwym or Rapid Equine,

15   Acetylcysteine, Rapid price $16.88, Folex (ph) five times Rapid

16   price $19.80, labels need to meet or exceed what is FDA

17   required before you send to me.  Have a great day.

18   Q.  All right.  If we could blow up the response in the middle.

19           Could you read the header information for this email.

20   A.  On December 6, 2019 at 2:00 p.m., Seth Fishman at

21   sethfishman@hotmail wrote:  Tell Lisa I will negotiate a better

22   price with Jamie on a few items.  Other items doing best to

23   work.

24   Q.  And finally, can we blow up the top email.

25           And can you read the header information first.

M1STFIS5                    Concannon - Direct

1    A.  From Mary Fox at mary.equestology@gmail, sent Friday,

2    December 6, 2019 at 2:03 p.m. Eastern Standard Time to Seth

3    Fishman at sethfishman@hotmail.  Subject:  This response to

4    Lisa's needs.  Hello, I will let her know.  Also, when you have

5    a list of FDA label requirements, let me know so we can get

6    ahead start redoing labels.  Thank you, have a great day.

7              MR. CHOW:  All right.  If we could take that down.

8              Can we bring up Government Exhibit 314Q.

9    Q.  All right.  Can we start with the bottom email.  I guess it

10   starts near the top of the page on February 10.  Can you just

11   read the header information, please.

12   A.  On February 10, 2020, at 12:02 p.m. Mary Fox at

13   mary.equestology@gmail wrote.

14   Q.  Can you read the last line of the body, at the bottom of

15   this blow up.

16   A.  EGH and VO2 Max being shipped out by end of week.

17   Q.  If we could go back to the top email then.

18              And can you start by reading the header information

19   for this email.

20   A.  From Seth Fishman at sethfishman@hotmail, sent Monday,

21   February 10, 2020, 12:41 p.m. Eastern Standard Time to Mary Fox

22   at mary.equestology@gmail subject is in response to update.

23   How many VO2 Max and EGL?  Also he needs to make 600 PSDS.

24   They should be able to do all three projects this week.  PSDS

25   should be done before EGH.

1          MR. CHOW:  All right.  We can take that down.

2     Q.  Special Agent Concannon, during your time at the FBI, have

3     you participated in searches of physical locations?

4     A.  Yes.

5     Q.  Approximately how many times?

6     A.  Approximately three.

7     Q.  Directing your attention to December 3rd, 2021, did you

8     participate in a search of a location on that date?

9     A.  I did.

10    Q.  What location did you search?

11    A.  I searched the Equestology office at 3500 Northwest Boca

12    Raton Boulevard, Boca Raton, Florida.

13    Q.  What kind of location was it?

14    A.  It was an office as well as a storage or warehouse.

15    Q.  When you arrived at the property, who was present?

16    A.  When we arrived at the property we did not think anyone was

17    present.

18    Q.  Did you later learn that someone was present?

19    A.  Yes.  Approximately five minutes after arriving we called

20    Mary Fox, one of the employees who was inside, and she opened

21    the door for us.

22    Q.  Did she give you consent to enter the property and conduct

23    a search?

24    A.  She did.

25    Q.  Approximately what time of day was this?

1    A.   Approximately 10:30 in the morning.

2    Q.   How many other agents conducted the search with you?

3    A.   It was myself and two other agents.

4    Q.   How did you conduct the search?

5    A.   We conducted the search by first entering the office area

6    and taking entry photos, and then we continued to move

7    throughout the office taking additional photos of the office

8    space, the storage area in the office space, and then we moved

9    into the space out back, which is a garage that was turned into

10   a warehouse, taking photos of the entire office.

11   Q.   Okay.  Just so we can have a better sense of what the place

12   looked like, can you describe the layout of the location as you

13   were walking into the door?

14   A.   Yes.  So when you walk in, Mary Fox's desk is right there,

15   and then along the right side of the wall is like a kitchen

16   counter with kitchen cabinets and a sink, and if you go past

17   that there's a bathroom, and to your right is a door that moves

18   into the garage or warehouse area.

19   Q.   Did you seize anything that day?

20   A.   We did not.

21   Q.   After taking the various photographs that you just

22   mentioned, what did you do?

23   A.   When we took the various photographs, we were leaving, and

24   Mary Fox offered if she could write the time that we departed

25   as well as everything was in good order on the consent to

1    search form.

2    Q.  Approximately how long were you at the location?

3    A.  About one hour.

4    Q.  Special Agent Concannon, in front of you on the dais there

5    should be a binder with government exhibits that have been

6    marked for identification as Exhibit 3900 through 3911.

7              MR. CHOW:  And your Honor, I have given a courtesy

8    copy to defense counsel already.

9              THE COURT:  All right.  Thank you.

10   BY MR. CHOW:

11   Q.  Special Agent Concannon, can you flip through all of those?

12   A.  Okay.

13   Q.  Do you recognize those photos?

14   A.  I do.

15   Q.  What are they?

16   A.  They're photos from the day of the search.

17   Q.  Do those photos fairly and accurately depict the premises

18   and the items as you observed them the morning of December 28,

19   2021?

20   A.  They do.

21             MR. CHOW:  The government moves Exhibits 3900 through

22   3911 into evidence.

23             MR. SERCARZ:  No objection.

24             THE COURT:  They are received.

25             (Government's Exhibits 3900 through 3911 received in

1   evidence)

2          MR. CHOW:  May they be published to the jury?

3          THE COURT:  Yes.

4          MR. CHOW:  Ms. Jung, let's start with 3905.

5   Q.  Special Agent Concannon, what is this?

6   A.  This is a document that was laid out on the counter prior

7   to our arrival by Mary Fox.

8   Q.  Can you read what it says in underline in bold at the top.

9   A.  Omeprazole.

10  Q.  Can you read the -- just start reading down, I guess.

11  A.  Makes five 500 milliliters bottles with size 28 insert and

12  white cap.  50 milliliters, apple flavor, half a teaspoon

13  propylparaben, one kilogram or one container of omeprazole

14  powder, 1,750 milliliters propylene glycol, 16 ounces baking

15  soda.

16          Measure all ingredients into mixing bowl.  Start mixer

17  on first speed to begin, then increase to third speed and mix

18  until smooth.  Stop mixer and scrape sides to incorporate all

19  ingredients.  Mix again for about four minutes.  Pour into

20  500-millimeter glass beaker and fill plastic bottles.  Put

21  stopper insert into bottle, follow with white cap and label.

22          MR. CHOW:  Ms. Jung, could we bring up Government

23  Exhibit 3900.

24  Q.  Special Agent Concannon, what are we looking at here?

25  A.  These are syringes that I'm holding the day of the search

1   that we found.

2   Q.  What does the label on the bag say?

3   A.  Send with omeprazole.

4        MR. CHOW:  If we could take down the blow up.

5   Q.  In the background of the bag, what are we looking at?

6   A.  It's shelving that had additional syringes as well as other

7   products on the shelves.

8   Q.  Can we bring up 3907, please.

9        Special Agent Concannon, what are we looking at here?

10  A.  This is shelving that was in the office space on the right

11  side across from Mary Fox's desk with disposable syringes,

12  needles and other accessories.

13  Q.  Can we bring up Government Exhibit 3904.

14       What are we looking at here?

15  A.  This is shelving that was out back in the garage area with

16  different types of caps that were all in packaging.

17  Q.  And can you describe for the jury what color caps we appear

18  to be looking at here.

19  A.  There are silver caps, maroon caps, blue caps, another

20  color blue cap, a striped blue and silver cap, red and silver

21  striped caps, as well as back and silver striped caps.

22  Q.  Could we bring up Government Exhibit 3902.

23       What is this?

24  A.  This is another document that was laid out in the office

25  space across from Mary Fox's desk prior to our approval.

M1STFIS5                    Concannon - Direct

1    Q.  Could you read this one for the jury?

2    A.  EPM Paste, makes 50 60 CC syringes, 750 grams Toltrazuril,

3    175 grams Diclazuril, 400 milliliters propylene glycol, 1,700

4    milliliters glycerin.

5         Measure all ingredients into mixing bowl.  Start mixer

6    on first speed to begin then increase to fourth speed and mix

7    until smooth.  Stop mixer and scrape sides to incorporate all

8    ingredients.  Mix again for about four minutes.  Fill 60 CC

9    syringes.  Put stopper in syringe using a piece of fishing wire

10   across opening to get rid of air bubbles.  Clean syringe with

11   Q-tips and paper towels as necessary.

12        MR. CHOW:  Can we bring up Government Exhibit 3901.

13   And actually can we also throw on the screen 3908 and 3906.

14   Q.  Starting from the left-hand side, can you tell us what

15   we're looking at here?

16   A.  These were labels found out back that I'm holding in the

17   storage area.

18   Q.  Going to the top right, what are with he looking at there?

19   A.  These are also labels that were found out back in the

20   storage area.

21   Q.  And going to the bottom right, what are we looking at here?

22   A.  This is another ingredient list piece of paper that Mary

23   Fox had laid out for us prior to our arrival.

24   Q.  Next can we take a look at Government Exhibit 3903.

25        And before we get to the item that has been pulled

1    out, what are we looking at here, what area of the premises?

2    A.  So this is the storage area out back.  You can see that

3    there's metal shelving.  This metal shelving expanded the whole

4    length of the storage area on both sides approximately four or

5    five storage levels high filled with different products or

6    packaging.

7    Q.  And there appears to be one that is pulled out here.  Can

8    you read for us or identify any portions for us that are

9    legible.

10   A.  It's the horse head symbol with the words Equi-Tech and VO2

11   Max underneath.

12   Q.  Can we go to Government Exhibit 3909.

13           Can you describe what we're looking at here?

14   A.  This is the same shelving out back in the storage area with

15   the product boxing EGH with the horse head symbol SP Brands.

16   Q.  Can we bring up 3911, please.

17           Can you describe for us where this picture was taken?

18   A.  This picture is from the storage area out back on

19   additional shelving.

20   Q.  And what does it say on the label outside the bin that's

21   depicted here?

22   A.  HP Bleeder, homeopathic bleeder.  Directions:  Administer

23   5 CCs IV or IM.  I am having trouble making out the rest of

24   that line.

25   Q.  That's fine.  On the left-hand side are you able to make

1    out anything?

2    A.   The letters SPC.

3    Q.   And Government Exhibit 3910, please.

4            What are we looking at here?

5    A.   This is product that was on that shelving that we pulled

6    out to take a photo of.

7    Q.   Are you able to read anything off of the label of this

8    vial?

9    A.   So the vial says Bleeder, homeopathic bleeder.  And I can

10   make out the IM 6 to 8 hours before exercise and then the line

11   below it with:  No known testable ingredients.

12   Q.   If we could take that down.

13           So those were all pictures taken on December 3rd,

14   2021, is that right?

15   A.   That is correct.

16   Q.   So that's less than three months ago?

17   A.   That's correct.

18           MR. CHOW:  Your Honor, at this point I would like to

19   ask the jurors to open their transcript binders to tab 912B

20   like boy.

21           And on the screen, Ms. Jung, could we bring up 912B

22   and 912BT.

23           For the record, this is a recording, the date is

24   November 18, 2018, and the participants are Seth Fishman and

25   Bambang.

1          THE COURT:  All right, Mr. Chow.

2          MR. CHOW:  Go ahead, Ms. Jung.

3          (Audio recording played)

4          MR. CHOW:  Your Honor, at this time could I maybe

5    reoffer a couple of exhibits.  I believe earlier when we had

6    offered them into the record we had mispronounced the exhibit

7    number, so I just want to make clear that we have admitted all

8    the exhibits that we intended.

9          THE COURT:  If some exhibits came in that you didn't

10   intend because you mispronounced the number, you need to let me

11   know that.

12         MR. CHOW:  I don't think that is what happened.  I

13   think what happened here is we said -- when we entered the

14   transcript numbers 101A-T through 199T, we should have

15   specified that it's 199B-T.

16         (Government's Exhibits 101A-T through 199B-T received

17   in evidence)

18         THE COURT:  And those are the transcripts in the

19   binders?

20         MR. CHOW:  Correct.

21         THE COURT:  Okay.

22         MR. CHOW:  Then we entered 1102, we meant to say

23   11002, an extra zero in there.

24         THE COURT:  11002.  No objection?

25         MR. SERCARZ:  No objection.

MISTFIS5

1          THE COURT:  11002 is admitted.

2          (Government's Exhibit 11002 received in evidence)

3          MR. CHOW:  And we offered 9300, we meant to say 9003.

4    There is no 9300 exhibit.

5          THE COURT:  There is no 9300?

6          MR. CHOW:  Let me double-check.

7          THE COURT:  Or 9300 is not in evidence.

8          MR. CHOW:  We meant to say 9003 for the stipulation

9    yesterday when we were offering the stipulation.  Reading the

10   transcript overnight, it appears we may have said 9300 instead

11   of 9003.

12         THE COURT:  9003 is the stip?

13         MR. CHOW:  Is the stipulation, yes.

14         THE COURT:  So one of the stipulations we talked about

15   yesterday is not 9300 it's 9003.

16         (Government's Exhibit 9003 received in evidence)

17         MR. CHOW:  Thank you, your Honor.

18         Ms. Jung, can we bring up 119D, like David, and if the

19   ladies and gentlemen of the jury could flip to 119DT in their

20   binders.

21         For the record, this is a call February 26 between

22   Seth Fishman and Lisa Giannelli.

23         Looks like we're all set.

24         (Audio recording played)

25         MR. CHOW:  No further questions, your Honor.

M1STFIS5

| | |
|---|---|
| 1 | THE COURT:  All right.  Thank you. |
| 2 | Cross? |
| 3 | MR. SERCARZ:  I have no questions for this witness. |
| 4 | THE COURT:  All right.  Sir, you are excused then with |
| 5 | the thanks of the Court.  Thank you very much. |
| 6 | THE WITNESS:  Thank you, your Honor. |
| 7 | THE COURT:  Mr. Chow? |
| 8 | MR. CHOW:  At this time the government rests its case. |
| 9 | THE COURT:  All right.  Ladies and gentlemen of the |
| 10 | jury, I think we're going to take our morning break now and |
| 11 | we'll see you back here in about 10 or 15 minutes. |
| 12 | Please leave your notes here.  Please do not discuss |
| 13 | the case until it's turned over to you to deliberate.  Thank |
| 14 | you. |
| 15 | (Jury not present) |
| 16 | THE COURT:  Mr. Sercarz? |
| 17 | MR. SERCARZ:  Your Honor, when the jury returns, it's |
| 18 | my intention to rest. |
| 19 | THE COURT:  Are there any motions at this time? |
| 20 | MR. FERNICH:  Just for the record, a pro forma motion |
| 21 | to dismiss both counts of the indictment on the ground that the |
| 22 | government has failed to prove the elements of the offense |
| 23 | beyond a reasonable doubt.  We don't need any argument on that. |
| 24 | The only thing of substance that I have that is not |
| 25 | for the record, could the government just marshal the venue |

1  evidence for Count One as opposed to Count Two?  I didn't catch

2  it.

3          THE COURT:  Hold on about that.  Is there anything

4  more you want to say with respect -- I assume you mean a motion

5  under Rule 29.

6          MR. FERNICH:  Yes.  If I didn't say it, that's what I

7  mean.

8          THE COURT:  Does the government wish to be heard?

9  It's not necessary.

10          MS. MORTAZAVI:  No, your Honor.  There was a specific

11  request for our venue proof on Count One.

12          THE COURT:  Sorry, is that in connection with your

13  motion?

14          MR. FERNICH:  Yeah.

15          THE COURT:  Sorry.

16          MR. FERNICH:  That's the only specific.

17          THE COURT:  Go ahead.

18          MS. MORTAZAVI:  Certainly.  Your Honor, we stipulated

19  into the record the GPS coordinates for certain calls that took

20  place.  They were calls where Seth Fishman was located in

21  Manhattan.  And those calls had to do with him fulfilling an

22  order for bleeder pills that was requested by Jorge Navarro in

23  advance of the race, and I think that satisfies the venue

24  requirement.

25          MR. FERNICH:  Understood.  It certainly suffices to go

M1STFIS5

1  to the jury.  Thank you, your Honor.

2         THE COURT:  All right.  As Mr. Fernich has just

3  conceded, at least with respect to the venue point, there is

4  sufficient evidence to go to the jury with respect to Count

5  One.

6         In any event, the motion under Rule 29 is denied.  As

7  you know, I have to draw every reasonable inference in favor of

8  the government, view all the evidence in the light most

9  favorable to the government, crediting any inference that can

10  be drawn in its favor, and deferring to the jury's assessment

11  on credibility and weight of the evidence.  There is certainly

12  sufficient evidence that has been introduced for this case to

13  go to the jury on both counts.

14         Anything further from the defendants?

15         MR. FERNICH:  Not at this time, your Honor.

16         THE COURT:  And Mr. Sercarz, you said it's your intent

17  to rest?

18         MR. SERCARZ:  Yes, your Honor.

19         THE COURT:  Let me just again confirm with

20  Dr. Fishman.

21         You understand, Dr. Fishman, that you have the right

22  to testify, but you, by no means, are obligated to testify.

23  You understand that, correct?

24         THE DEFENDANT:  Yes, I do, your Honor.

25         THE COURT:  And you understand that ultimately, while

1  your lawyers may give you advice, it is your decision whether

2  to take the stand or not, correct?

3          THE DEFENDANT:  That is correct, your Honor.

4          THE COURT:  And it is your decision not to testify,

5  correct?

6          THE DEFENDANT:  That is correct, your Honor.

7          THE COURT:  All right.  Thank you.

8          All right.  Then we'll stand in recess until around

9  11:15 or so.  Thank you.

10          (Recess taken)

11          THE COURT:  All right.  Be seated everyone, the jurors

12  are on their way up.

13          (Jury present)

14          THE COURT:  All right.  Mr. Sercarz?

15          MR. SERCARZ:  The defense rests, your Honor.

16          THE COURT:  All right.  Ladies and gentlemen, that

17  means we have come to the conclusion of the evidence or the

18  presentation of evidence in this case.  So what we're going to

19  do then is I need to talk with the lawyers about some legal

20  issues, but we are going to release you for the rest of the day

21  then.  I told you I thought we were ahead of schedule and I

22  would try to get you out of here with the weather, so I'm going

23  to excuse you for the rest of the day and I hope everyone has a

24  nice weekend.

25          I will ask you to please be back Monday morning at

M1STFIS5

1    10:00 a.m., and at that time you will hear the closing

2    arguments from each side.  Then I will instruct you on the law

3    and you will retire and begin deliberating and deciding this

4    case.

5         So I hope everyone has a nice weekend.  I just remind

6    you again, please do not discuss this case with anyone,

7    including your family and friends.  Don't read about the case,

8    please don't do any independent research, and I hope everyone

9    has a nice weekend.

10        You can take your notebooks with you and leave them in

11   the jury room because that will get locked up.  The binders you

12   can leave on your chairs.

13        Thank you everyone.

14        (Jury not present)

15        THE COURT:  All right.  So let's just talk logistics.

16   Obviously, I will meet with the lawyers and we'll do a charging

17   conference.  Do people need time to consider and talk about the

18   newly proposed charges from the defendant or are you ready to

19   proceed?  What's everybody's pleasure?

20        MS. MORTAZAVI:  Your Honor, we would like a little bit

21   of additional time to review the proposal from this morning.

22        THE COURT:  All right.  Is there anything else that we

23   should talk about?

24        MR. ADAMS:  Your Honor, we will also submit in writing

25   a proposal for the 3147 charge enhancement.  It is missing from

1    the RTCs.  It's included in the government verdict form, but

2    we'll submit proposed language shortly.

3            MS. MORTAZAVI:  And sorry to be tag teaming this, but

4    we also understand that defense counsels' request is that the

5    verdict sheet be changed to include the lesser included count,

6    and so we would like to discuss with defense counsel what that

7    proposal would look like and see if we can come to an

8    agreement, and otherwise we will bring it to the Court's

9    attention.

10           THE COURT:  Obviously if you come to some agreement on

11   that, that means you come to some agreement on the charge

12   request, too, correct?

13           MS. MORTAZAVI:  Correct.

14           THE COURT:  Let me ask you this -- I don't really want

15   to do this in open court.

16           MR. FERNICH:  You don't want to do it piecemeal.

17           THE COURT:  No, I don't want to do it in open court,

18   so maybe we can talk briefly in the robing room, on the record

19   but in the robing room.  Then I will give you all a break so

20   you can talk to each other and let me know how long you need

21   and we'll resume to do the rest of the charging conference

22   then.

23           MS. MORTAZAVI:  Thank you, your Honor.

24           (In jury room, counsel for the parties, judge and law

25   clerk present)

M1STFIS5

1 　　　　THE COURT:  So the main thing I wanted to talk to you

2 all about, but I didn't want to do this in open court, is

3 Ms. Mortazavi, you said that you're going to talk with

4 Mr. Fernich and Mr. Sercarz about the verdict form.  The

5 amendment to the verdict form would be if we are going to

6 charge with respect to the lesser included offense.  So do I

7 take it from your comments that the government is not opposing

8 charging the lesser included offense?

9 　　　　MS. MORTAZAVI:  Well, that's what we wanted to

10 discuss, first to see what language they would propose in the

11 verdict form, and if they have a separate request to charge we

12 want to see that.

13 　　　　THE COURT:  That was in the stuff you got this

14 morning, right?

15 　　　　MR. FERNICH:  I'm sure she hasn't --

16 　　　　THE COURT:  You haven't had a chance to look.  Fair

17 enough.  You caught me a little off guard because I took from

18 that you were okay with the lesser included offense, but you

19 haven't decided yet.

20 　　　　MS. MORTAZAVI:  Correct.  I wanted to signal if the

21 parties can reach an agreement, we would try before the

22 charging conference.

23 　　　　THE COURT:  Fair enough.  How long do you all think

24 you need?

25 　　　　MR. SERCARZ:  Your Honor, while we're in here, may I

1    ask what your intention is with regard to Mr. Fishman?  Should

2    he be released?  Do you want him to stick around?

3            THE COURT:  He's free to leave.  That's your call.  As

4    you know, I'm not sure that he has a right to be at a charging

5    conference.

6            MR. FERNICH:  We will waive any right.

7            THE COURT:  Are you waiving his right, for the record?

8            MR. FERNICH:  Yes, we waive his right to be present

9    for the legal proceedings to take place during the rest of the

10   day.

11           THE COURT:  Then he's free to leave.

12           MR. SERCARZ:  I will let him know when we break.

13           THE COURT:  All right.  So it's 11:30.

14           MS. MORTAZAVI:  Your Honor, if we could reconvene at

15   2:00 p.m.

16           THE COURT:  I would give you an hour to talk, but then

17   we're running into the lunch hour.

18           Does that work for you?

19           MR. FERNICH:  Yes, I want to get the test.

20           THE COURT:  I don't know what you're going to do

21   because you're not going to be unmasking.

22           MR. FERNICH:  Let me see if they'll give it.

23           THE COURT:  You're welcome to try, but I think that's

24   the point of it, so you can unmask.

25           So 2 o'clock.  I will see everybody back here at

MISTFIS5

1    2 o'clock.  Thank you.

2              (Recess taken)

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                A F T E R N O O N   S E S S I O N

2                       2:11 P.M.

3          (In open court; jury not present)

4          THE COURT:  Good afternoon.  Originally, I thought we

5   were going to do it inside, and since you're all settled, we

6   may as well just do it in here.

7          All right.  So we're assembled for the charging

8   conference in this case.  The folks in the back are all part of

9   your team?

10         MR. ADAMS:  They are, your Honor.

11         THE COURT:  Okay.  We have no one with us except for

12  the trial teams for the defendant and for the government.

13         I have the proposed request to charge that was

14  submitted to me at the outset of the case, which I had

15  understood to be on consent with the exception of a few

16  objections that were noted.

17         I've now received this morning supplemental defense

18  requests to charge, and right over the lunch break we received

19  from Mr. Adams a request 15 relating to the allegation that the

20  defendant continued to commit the offense charged in Count Two

21  after he was released on bail, and a request 16 on the

22  lesser-included offense.

23         So let me first just ask the government, you do

24  consent to a charge on the lesser-included offense?

25         MS. MORTAZAVI:  We do, your Honor, and we have a

1    proposed verdict form, but I understand defense counsel does

2    not object to, and we provided to the Court consistent with the

3    charge.

4            THE COURT:  All right.  Look, it may be simplest if we

5    talk about the verdict form first.

6            MS. MORTAZAVI:  Sure.

7            THE COURT:  My -- I'll be candid, my initial reaction

8    when I got the proposed verdict form at the very beginning was,

9    shouldn't it read, when we had two defendants:  With respect to

10   this count, how do you find; guilty or not guilty?  And then a

11   follow-up question:  If guilty, do you find that the defendant

12   acted with an intent to defraud or mislead?  Yes or no.

13           That just seems so much simpler to me, and at that

14   point, I guess I was assuming that you might have a

15   lesser-included offense charge.  Turned out in the beginning

16   you didn't agree on that, but now you do.  This that you've

17   given me just seems so confusing.

18           MS. MORTAZAVI:  I understand, your Honor, and where we

19   started was looking at the Sand instructions on

20   lesser-included, and then attempting to pull other verdict

21   forms that we were able to collect in the time we had this

22   afternoon.  And it appears, based on the Sand instructions, the

23   notion was that the jury should first be presented with the

24   charge in the indictment to consider and then proceed, if they

25   cannot reach an agreement on that charge, to a lesser-included

1  consideration.  But we do acknowledge, your Honor, there is

2  another way of doing things, and it is the way that the Court

3  has proposed.

4           THE COURT:  I mean, look, I'm going to be very candid

5  with you all.  It's no secret that I'm not an experienced

6  criminal law practitioner, and so I honestly did not know if

7  there's some legal reason why it has to be framed the way

8  you're framing it.

9           MS. MORTAZAVI:  There's no legal or constitutional

10 requirement to the framing.  I think it could be posed in the

11 way that the Court just described.

12          THE COURT:  So let me hand to you -- I mean, we've

13 done a lot of work trying to find other drug adulteration and

14 misbranding cases in this district.  For what it's worth, I had

15 a lot of reactions about, are you kidding, a lesser-included

16 offense?  But that's neither here nor there.

17          This is another drug adulteration and misbranding

18 case, where I have looked at the instructions.  This is a case

19 that Judge Buchwald had that went to the jury, I think, in

20 2015; so it's some time ago.  Some of you may know this case,

21 and by coincidence, I mean, I had the independent thought

22 reading your initial verdict form that, why wouldn't you just

23 say:  If guilty, did he have the intent to defraud or mislead?

24 Yes or no?

25          And then we came across just now, I asked Ms. Popper

1    to pull the verdict form that Judge Buchwald used because I had

2    been looking at her jury charges, and lo and behold, she did it

3    exactly the way I thought seemed the simplest way to do it.

4    The second page you can ignore because that's about additional

5    charges for wire and mail fraud.

6         MS. MORTAZAVI:  Your Honor, we had also come across

7    that verdict form and did have discussions about the best way

8    to format it.  Again, where we landed was using the Sand

9    instructions in this flashpoint, but I do agree there is

10   another way of doing things, but we would need to revise the

11   standard instructions to reflect the verdict form.

12        THE COURT:  I know.  That's why I wanted to start with

13   the verdict form and work backwards because if everyone agrees

14   on a simpler verdict form -- I think a general observation

15   about the charges you gave me, they're largely consensual, and

16   so I'm not going to spend a lot of time tinkering with them.

17   But I do find they're denser and more confusing than they need

18   to be in places.

19        So, you know, that's just an observation for you all.

20   As I say, I'm not going to tinker with them unless an objection

21   has been raised, but for example, it seems to me Count One and

22   Count Two both charge conspiracies to adulterate or misbrand

23   drugs.  They have different time frames, and they have

24   different alleged overt acts.  And as I'm recalling, I think

25   they have three objects in common, and one of them has a fourth

1    object, but you say it in a very repetitive way.  But it is

2    what it is.

3           I'm not going to ask, unless you all want to go back

4    and streamline.  But with respect to this, and with respect to

5    your proposed charge on the lesser-included offense, I find it

6    very confusing.

7           So do you want to talk to each other and see if -- I

8    mean, look, if you're hell bent and you're in agreement on this

9    form, we'll use it, but I prefer to have things understandable

10   so we don't invite error or confusion.

11          MR. FERNICH:  Judge, let me see if I can help with the

12   verdict form, and I mean that.  I am familiar with this case

13   because she came to see me a few times.  What I think the

14   problem is -- first of all, conceptually, I agree with the

15   Court, that this is a simpler way to do it.

16          What I think the problem is, when you ask in question

17   one or when the form asks in question one:  "With respect to

18   Count One, how do you find the defendant, guilty or not

19   guilty?" I think -- and Mr. Adams had alluded to this with me

20   back in the robing room on a different subject -- you know,

21   guilty under the Apprendi line of cases is sort of problematic

22   because, you know, any necessary offense element creates a

23   separate crime even if it's just a penalty enhancer.

24          So conceptually, I like this.  What I would suggest is

25   the following:  With respect to Count One, did you find that

1    Dr. Fishman participated in a conspiracy to adulterate or

2    misbrand; yes, no?  If yes, do you find that he had intent to

3    defraud or mislead; yes, no?

4              That would take out the guilty --

5              THE COURT:  I don't like taking the "guilty" out all

6    together.  And to be honest, that was my hesitation, and that's

7    why I asked Ms. Popper to pull the Lasher form because in a

8    criminal case it just seems to me somewhere the jury ought to

9    be asked to say "guilty" or "not guilty."

10             And I wondered if I was wrong even to say, on the

11   intent, that they could say "yes" or "no," when I was trying to

12   think of a way to frame that in terms of guilty or not guilty

13   when I saw this.

14             MR. FERNICH:  Well, perhaps, perhaps we could work in

15   the guilty or not guilty under the intent to defraud.  So --

16             MR. ADAMS:  No.  I'm sorry, your Honor.  If I could --

17   the Lasher form that you have is correct, and it's clearer.  If

18   we could have two minutes to talk about what's in the Sand

19   instruction, I think we can resolve this.

20             THE COURT:  I think that's what you should do.  I

21   really do.  And let me tell you my one particular thing, before

22   I let you talk, on Sand that I find.  I take it this might go

23   to the point Mr. Fernich was addressing, but on the second

24   page, "If you find that the government has not satisfied its

25   burden of proof on any of those elements" -- I'm going to skip

1   the parenthetical -- "then before you render a verdict of

2   guilty, not guilty, proceed to whether the government has

3   proven that they committed without the intent."  That, to me,

4   is not right.

5           I don't know if you took this right out of Sand, but

6   that seems wrong to me because suppose, in this first part, the

7   elements that the jury finds missing has nothing to do with

8   intent.  It has to do with one of the substance developments,

9   I'm going to call it, as opposed to the intent elements.

10  You're directing them to go ahead and consider the

11  lesser-included offense, but you don't get to the

12  lesser-included offense unless you first find that there was

13  adulteration and misbranding.  And then the question is, was

14  there intent or not?  Do you follow what I'm saying?

15          MR. ADAMS:  I do.

16          THE COURT:  You look puzzled, Ms. Mortazavi.

17          MS. MORTAZAVI:  No.  No, your Honor.

18          THE COURT:  I don't think it's if you haven't

19  satisfied your burden of proof on any of those elements.  I

20  think it's you find that they haven't satisfied their burden of

21  proof on intent, then you go to the lesser-included charge.

22          MS. MORTAZAVI:  Well, your Honor, it may be moot

23  because I think we can use this --

24          THE COURT:  Why don't I let you try to work on that.

25  All right?  And then just let us know when you're ready.

1    MR. FERNICH:  Your Honor, it wouldn't be the first,

2    you know, Rosamondo.  It wouldn't be the first time that the

3    Sand charge is wrong --

4    THE COURT:  Okay.  That doesn't help me so much.

5    MR. FERNICH:  No, but I --

6    THE COURT:  Honestly, I didn't go back and look at

7    Sand.  I told you I'm not an expert in this, but this just

8    doesn't even make sense to me.  So if it doesn't make sense to

9    me, I'm loathed to use it with the jury.

10    MR. FERNICH:  You're talking about the one that we

11    just submitted?

12    THE COURT:  Yes.  Okay.  So why don't I let you talk

13    about it.  I'll be back in a minute.

14    MS. MORTAZAVI:  Thank you, your Honor.

15    MR. ADAMS:  Thank you.

16    THE COURT:  All right.  We'll be back momentarily.

17    Thank you.

18    (Recess)

19    THE COURT:  So can I just make a suggestion, please?

20    Why don't we talk about the other disputed issues, and then I

21    can leave you to talk about this, and you can just send me

22    whatever you agree on.  Does that work?

23    MR. SERCARZ:  Yes.

24    MS. MORTAZAVI:  Fine for the government.

25    THE COURT:  All right.  And I heard a "yes" from the

1   back too.

2           MS. MORTAZAVI:  And on that, your Honor, we have

3   proposed language.  I think we'll be close.

4           THE COURT:  Okay.  Good.  All right.  So let me just

5   ask the other charge that was handed up to me by Mr. Adams, the

6   offense committed while released on bail, is that on consent?

7           MR. FERNICH:  No objection to that.

8           THE COURT:  I'm sorry, I heard Mr. Fernich, no

9   objection.  Ms. Mortazavi, were you saying something?

10          MS. MORTAZAVI:  Oh, I was going to repeat the same

11  thing, I believe it's on consent.

12          THE COURT:  Okay.  Thank you.  All right.

13          So in the first batch of instructions that were

14  submitted, you know, before the start of the trial, after I

15  issued an order and then counsel for both sides conferred, it's

16  my understanding that but for what was included in red or blue,

17  all of the charges are agreed, correct?

18          MR. FERNICH:  Yes.

19          MS. MORTAZAVI:  The blue and red text are the disputed

20  portions, yes.

21          THE COURT:  Yes, that's what I'm saying, everything

22  else is on consent, right?

23          MS. MORTAZAVI:  Correct.

24          THE COURT:  Okay.  And then I have the supplemental

25  requests that I received from Mr. Fernich and Mr. Sercarz this

1    morning.  I assume those are not on consent?

2              MS. MORTAZAVI:  They are not on consent.

3              THE COURT:  Okay.  So let's look at the disputed

4    areas, and then I'm going to just quickly run through.  There

5    are a few other things about this consensual set that I want to

6    tell you.  Obviously, we're going to -- well, I'll tell you now

7    we're going to revise the consensual set, obviously, to delete

8    the reference to Ms. Giannelli being a defendant.

9              The "defendants" all have to be made singular.  The

10   places where it says "they conspired together and/or with

11   others," should now be "they conspired with others."  So those

12   are kind of global.

13             I do have some edits throughout that maybe we should

14   just walk through, and then I'll pause when I get to -- it's

15   pages 20, 21 -- well, requests 10 and 11 where there were

16   disagreements.  So why don't we just walk through them.

17             All right.  I'll go quickly to tell you what I'm

18   proposing.  And my suggestion is, since you need to pull in

19   these two new charges and anything we add at the request of the

20   defendant, you need to make these edits about singular, plural

21   and all, are you all going to generate a new draft?

22             MS. MORTAZAVI:  Yes, your Honor.

23             THE COURT:  Okay.  I like the table of consents.  I

24   appreciate that, and I think the jurors will too.  I have seen

25   others that don't have that.

1          Could you please make it larger font?

2          MS. MORTAZAVI:  Yes, do you have a font or should we

3    use our judgment?

4          THE COURT:  What is it?

5          MS. MORTAZAVI:  These are size 12.

6          THE COURT:  Maybe mine is smaller because I did it

7    with the track changes showing; so that might be part of the

8    problem.  But I don't know, I wouldn't mind 14, I guess.

9          MS. MORTAZAVI:  All right, your Honor.  Your Honor, we

10   plan to submit a Word version as well.

11         THE COURT:  That would be great.  Then we can change

12   it.  I'm going to add a little bit of an introduction that just

13   says something like, you know, "The evidence is closed, and now

14   it's time for you to do your job" kind of thing.  All right?

15         Page 2 of charge No. 1, there's a paragraph in the

16   middle that says "the evidence before you consists of."  Is

17   everyone with me?

18         MR. SERCARZ:  Yes.

19         MS. MORTAZAVI:  Yes, your Honor.

20         MR. ADAMS:  Yes.

21         THE COURT:  I would like the paragraph that says "You

22   may also consider stipulations" to be part of that same

23   paragraph about what the evidence is, and I want it to read as

24   follows:  "You may also consider the stipulations of the

25   parties as evidence and the exhibits received pursuant to

1    certain of those stipulations, including the audio recordings

2    and physical evidence that were admitted."  Well, you don't

3    need "that were admitted," that's redundant.  Sorry?

4              MR. FERNICH:  I'm talking to my colleague.

5              THE COURT:  I didn't know if we had an objection.

6              All right.  I don't recall that I asked any questions;

7    so you say in the next paragraph "I also ask you to draw no

8    inference from the fact that on occasion I asked questions."  I

9    may have asked a couple of clarification points to the lawyers;

10   so please just change it to say that I "interacted with the

11   witness."  Okay?

12             And then anything I said "was intended only for

13   clarification."

14             I'm not going to pause on all of the plurals and

15   singulars and Giannelli issues.  Okay?

16             MS. MORTAZAVI:  Yes, your Honor.

17             THE COURT:  Coming over to request No. 5, at the end

18   of the first paragraph, I would like to insert the following,

19   which is from Sand.

20             MS. MORTAZAVI:  I'm sorry, where did you plan to

21   insert it?

22             THE COURT:  Right after where you say "The indictment

23   is a charge or accusation, it is not evidence," right there.  I

24   want to make the following insert, it's from Sand 3-3:  "The

25   defendant is not charged with committing any crime other than

M1SPFIS3                     Charge Conference

1    the offenses contained in the indictment."

2            And as I'm going through this, if there are

3    objections, you should let me know.

4            MS. MORTAZAVI:  Yes, your Honor.

5            THE COURT:  Because I'm going to, at the end, assume

6    this is all on consent.

7            All right.  The next page, "In a moment I will begin

8    to read instructions," if you would please change that to "I

9    will instruct you on the law."

10           At the end of that paragraph, I mean, this is relating

11   to Giannelli, "or the law as it applies to one but not both of

12   the defendants," comes out.  And then take out the word

13   "below."  "I will note for you."  Okay?

14           MR. FERNICH:  This is the last paragraph, yes?

15           THE COURT:  Sorry?

16           MR. FERNICH:  I'm sorry, we were talking about the

17   last paragraph?

18           THE COURT:  Yes.

19           MR. FERNICH:  In request No. 5?

20           THE COURT:  Yes.  In other words, this reads as

21   though -- I'm going to be speaking it.

22           Although, just so there's no confusion, I do intend to

23   give a hard copy to the jurors only because I do think it's

24   dense in places, and it will be easier for them to follow

25   along.  I assume no objection to that?

1           MS. MORTAZAVI:  No.

2           THE COURT:  Defense?

3           MR. FERNICH:  No, no objection.

4           THE COURT:  All right.  Thank you.

5           Request No. 7, you have bracketed requests that I read

6     the statutory allegations of Count One.  Can you please include

7     them in this?  And I assume you mean, with respect to Count

8     One, paragraphs 24 through 28 of the indictment, and with

9     respect to Count Two, I'm understanding that to mean paragraphs

10    34 through 37 of the indictment.

11          The specific question that I'm asking is, I assume you

12    are not asking me to read the paragraph that continues with the

13    alleged overt acts?

14          MS. MORTAZAVI:  That's correct, your Honor.

15          THE COURT:  Okay.  Defendants, you're onboard?

16          MR. FERNICH:  Onboard.

17          THE COURT:  Okay.  Thank you.

18          All right.  The next several pages are the ones where

19    I'd ask you to go back and look.  It's request 9, and

20    particularly the discussion about the objects of the

21    conspiracy.  If you could just see if there's any way to

22    streamline this, and maybe there isn't, but if you just would

23    take a look at that, I'd appreciate it.  Okay?

24          MR. ADAMS:  Sure.

25          THE COURT:  All right.  Request 10, this is just

1  stylistic, but I want it to begin "As I mentioned" take out

2  "above that."

3         Okay.  Then we come to page 20, which is the first

4  place where I believe there's a substantive disagreement

5  between the parties.

6         Oh, I'm sorry, before we get to the competing blue and

7  red paragraphs, at the very top, it begins at the end of the

8  first line, there's something that is not a sentence:  "If

9  other evidence establishes this intended use, such as the

10 marketing, promotion or previous labeling of the product by the

11 manufacturer, seller or dispenser;" it's just hanging.

12        MR. FERNICH:  Yeah, I remember that.

13        THE COURT:  So if you'd please fix that.  I don't know

14 what you're intending to say.

15        MS. MORTAZAVI:  Your Honor, we propose adding "you may

16 consider it."

17        THE COURT:  Mr. Fernich or Mr. Sercarz?

18        MR. FERNICH:  I didn't hear, I apologize.

19        THE COURT:  You proposed?

20        MS. MORTAZAVI:  Could I read the entirety of the

21 sentence?

22        THE COURT:  Yes.

23        MS. MORTAZAVI:  "If other evidence establishes this

24 intended use, such as the marketing, promotion, or previous

25 labeling of the product by the manufacturer, seller or

1    dispenser, you may consider it."

2           THE COURT:  Well, why don't we say "you may consider

3    such evidence."

4           MS. MORTAZAVI:  That's fine, your Honor.

5           MR. FERNICH:  No objection.

6           THE COURT:  Okay.  Then we come down to the disputes

7    between the parties, and the first dispute, as I understand it,

8    is the definition of or the instruction with respect to when a

9    drug is misbranded.  As I understand it, the government is

10   proposing for me to include the following words "which includes

11   a lot number and an expiration date, list of active

12   ingredients."

13          I do think, and as I understand it, the defense

14   objects to that because that comes out of the regulations and

15   not out of the statute itself, correct?

16          MR. FERNICH:  To be candid, Judge, a lot of this has

17   been overtaken by intervening events at trial.  That was part

18   of my objection.

19          THE COURT:  All right.  Well, then I'd ask you to go

20   back and get me --

21          MR. FERNICH:  I'm looking at what I wrote right now.

22   I'll just maintain what I wrote there.

23          THE COURT:  All right.  Well, my point is the

24   following, then.  The indictment certainly references the CFR.

25   The defendants questioned witnesses about the CFR, and I think

1    you've acknowledged that, Mr. Fernich.

2              MR. FERNICH:  Yes.

3              THE COURT:  And in any event, when you have a

4    statutory scheme that delegates to an agency rule making or

5    regulatory authority, it seems to me that those regulations are

6    part of the statutory scheme.  Having said that, I really -- I

7    tried to parse this phrase by phrase, and I honestly do not

8    think the government needs or is necessarily entitled to this

9    list of lot number, expiration date and list of active

10   ingredients.

11             With respect to the next dispute in these two

12   competing paragraphs, the government calls it a "prescription

13   animal drugs" and the defendants call it the "veterinary

14   prescription drug."  I believe the statute uses "veterinary

15   prescription drug;" does it not?

16             MS. MORTAZAVI:  Your Honor, the statute uses it in the

17   title.  However, "prescription animal drug" is the nomenclature

18   used by FDA CVM, and it's used in other cases that involve

19   animal drugs that require a prescription.  It is that way in

20   the Rojas case, before the Third Circuit, in the lower court,

21   and before the Supreme Court.  It is the nomenclature, as I

22   mentioned, that Dr. Bowman uses and the FDA CVM uses.

23             THE COURT:  Prescription animal drugs?

24             MS. MORTAZAVI:  Prescription animal drugs.  Because

25   the categories that FDA CVM recognizes are animal drugs and

M1SPFIS3                    Charge Conference

1    drugs, which are drugs intended for man.  So I acknowledge

2    there is a caption that reads "veterinary prescription drugs"

3    but that simply doesn't track the common usage or the common

4    understanding of how that term is referenced.

5         THE COURT:  I see you nodding your head, Mr. Fernich.

6    Are you in agreement?

7              MR. FERNICH:  So, well, I'll let Ms. Mortazavi finish.

8              THE COURT:  Yes.  I didn't realize.  I'm sorry.

9              MS. MORTAZAVI:  One final point, your Honor, which is

10   "veterinary prescription drugs," given the facts here, is

11   slightly misleading, or at least can be slightly confusing

12   because the defendant is a veterinarian.  He does distribute

13   drugs.

14             THE COURT:  Well, I think that's why they want it.

15             MS. MORTAZAVI:  I agree, but that's not --

16             THE COURT:  All right.  I understand.

17        Mr. Fernich, I do think Ms. Mortazavi may be right on

18   this.

19             MR. FERNICH:  Okay.  So let me say three quick things.

20   Okay?  Of course, your Honor is correct, as a general matter

21   about deference to administrative regulations, Chevron,

22   et cetera, et cetera.  I lodged this --

23             THE COURT:  No, I'm not saying that's under Chevron.

24   I'm saying if you have a statute.  This is not construction of

25   the statute.  This is a question of whether the regs are part

1   of the statutory scheme.  That's a different question than

2   Chevron.

3           MR. FERNICH:  Right.  So in part, I bring this

4   objection because there is, obviously, an ongoing debate in the

5   Supreme Court about the appropriateness of relying upon

6   administrative regulations as the predicate for a criminal

7   conviction.  That's for a different audience.

8           If your Honor would dig into these particular

9   regulations, which I have the distinct displeasure of having

10  done, several of these regulations at issue were not passed

11  pursuant to ordinary notice and comment and rule making under

12  the APA, which is the second reason why I included these

13  objections.

14          It's a case called Franks Compounding out of Florida,

15  a federal case that traces this history in 80 pages of detail,

16  but leaving that to one side, I do agree with Ms. Mortazavi

17  that phrase "prescription animal drugs" crops up in these other

18  cases.  And it was a puzzlement to me; so I tried to find the

19  source for it in either the CFR or the FDCA, and I can't find

20  it.  The only thing I find in the statute is the phrase

21  "veterinary prescription drug."

22          THE COURT:  No, but that's in the caption.

23          MR. FERNICH:  Right, but it's also -- and I can find

24  it for the Court in a minute -- it's also in the CFR, and it's

25  also in the AVMA model code, which talks about the CFR.  So I

1   don't know where -- to be candid, I don't know where this

2   phrase -- I understand it may be something that the agency uses

3   internally, or even on its website.

4         But in the statutes, the regs, and even in the AVMA

5   model code, which discusses the CFR and what they call the

6   AMDUCA, which is the extra-label use exemption that was put

7   into 360(b) in 1996 or '97 for veterinarians, the only phrase

8   that I've seen is "veterinary prescription drug."

9         I was nodding my head because I agree with

10  Ms. Mortazavi that in those other two cases, like Sloane and

11  Rojas, that phrase "prescription animal drug" comes up.  I'm

12  just not sure of the origin for it, and this accurately tracks

13  the statute.  It tracks the CFR.

14        I did word searches for these things, and it also

15  tracks the AVMA model code.  I just don't see that phrase

16  anywhere in things that we're charged with violating.  And,

17  yeah, I do prefer this formulation, as the Court has intuited,

18  but I also think it's faithful to the statute.  I just don't

19  see that in there anywhere.

20        MS. MORTAZAVI:  And, your Honor, if I may make one

21  observation?

22        THE COURT:  Go ahead.

23        MS. MORTAZAVI:  We are looking to simplify things for

24  the jury, and we are looking at the evidence that the jury has

25  heard.  And the jury has heard testimony from Dr. Bowman that

1   these are referred to as animal drugs and animal drugs that

2   require a prescription.

3          It simply seems more intuitive for the jury to hear

4   the terms that they have heard previously over the course of

5   this case, regardless of what Mr. Fernich can cite to with

6   respect to what is in existence in either regulations or

7   guidance on the internet.

8          We are looking at what this jury is going to

9   understand and digest, and I think "prescription animal drugs"

10  is more faithful to the evidence that's been presented.

11         THE COURT:  All right.  If you look at -- I'm going to

12  go with the government's formulation of "prescription animal

13  drug" and the reason I'm doing it is the following.  I mean,

14  Mr. Fernich, your's is kind of whole academic thing about --

15         MR. FERNICH:  Your Honor, it's not the biggest point

16  in the world, and I'm not sitting here trying to split hairs or

17  quibble over it.  I'm really not.  I just wondered how it had

18  gotten --

19         THE COURT:  All right.  Are you consenting, then?

20         MR. FERNICH:  No, I'm not.

21         THE COURT:  Let me tell you my thinking.  If you look

22  at 21, United States Code, Section 321, which is the definition

23  section, when it talks about the term "new drug," it uses

24  repeatedly the expression "animal drug."  And if you look at

25  the definition of a drug, as I recall, it talked about having

1    an impact on the body of an animal.

2         I mean, it's throughout the whole statutory scheme

3    that what it's intended to regulate is substances that have an

4    impact.  The term "drug" means, and then if you read it, it's

5    having an impact on the system or the body of a human or an

6    animal respectively.  And this whole case is about the impact

7    of drugs, the use of drugs that impact animals.

8         So it just is simpler and clearer for the jury to talk

9    about "prescription animal drugs," and I do think, even though

10   the title "veterinary prescription drug" may be used in the

11   statute, throughout the body of this whole series of

12   interrelated statutes, including most importantly the

13   definitions in 321 which are incorporated into the substantive

14   charges, track more closely to the government's proposal.

15        Now, the next issue you both have here is -- blue is

16   the government, right?

17        MS. MORTAZAVI:  Yes, your Honor.

18        THE COURT:  The government is proposing "failed to

19   have the term 'Rx only.'"  And the defendant proposed in red,

20   "It lacks the statement 'Caution:  Federal law restricts this

21   drug's use by or on the order of a licensed veterinarian.'"

22        Does anyone want to be heard?

23        MR. FERNICH:  Judge, I understand your prior ruling,

24   and I'm not -- I get it.  This is not going to be a point that

25   makes or breaks the case.  I just want to put this on the

1    record.  Okay?

2              In the AVMA it's model code discussing VCPR, the

3    Veterinary Client Patient Relationship, as used in 360(v) of

4    Title 21, they used the phrase "veterinary prescription drug"

5    means a drug that may not be dispensed without the prescription

6    of a licensed veterinarian, and that bears the label statement

7    "Caution:  Federal law restricts this drug's use by or on the

8    order of a licensed veterinarian."

9              THE COURT:  What are you reading from?

10             MR. FERNICH:  I am reading from the American

11   Veterinary Medical Association.

12             THE COURT:  That's not a statute.

13             MR. FERNICH:  No, but what this code is, and what we

14   thought we elicited from Dr. Bowman on the examination -- and I

15   can give it to you, your Honor -- this is the template for all

16   the state veterinary practice codes, and it also harmonizes

17   those codes to, quote, both the FDCA and the interpretive

18   provision in the FDCA in 21 CFR and this is tracking back now

19   to the 360(b) provision in the FDCA, and it's mirroring the

20   language in -- it's mirroring the language in there that we're

21   talking about right now, the dispute, such as it is, a very

22   minor dispute, "Caution:  Federal law restricts this drug to be

23   used by or on the order of a licensed veterinarian."

24             So this phrase "veterinary prescription drug" has

25   meaning in the statutory context and also in the veterinary

1   profession.  And this is what veterinarians consult, and I'm

2   happy to hand it up or tell your Honor where to look at it.

3   I'm not speaking out of school here.  It's construing right

4   here, it says, extra-label use is the --

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1STFIS4                    Charge Conference

1    THE COURT:  But what you're reading is not the

2  statute.

3    MR. FERNICH:  But it's defining the terms in -- it's

4  using the same language in the statute.  For example, 211,

5  extra label use, which is the term from 360(b), is defined as

6  written in the Federal Regulation 21 CFR --

7    THE COURT:  Which you don't want me to consider.

8    MR. FERNICH:  We're past that now.

9    -- 533.8, 2018, which implements the Animal Medicinal

10  Drug Classification Act, AMDUCA, with the exception that the --

11  what I'm trying to say is AMDUCA is 360(b) of the FDCA, which

12  was implemented in 1996, and that's the provision for extra

13  label use.  So it's defining the terms or expanding upon the

14  terms as used in the statute so that veterinarians know what

15  they're doing.

16    I don't know where this -- I get that somewhere in FDA

17  parlance in the agency there's this term "new animal drug."

18    THE COURT:  No, it's in the statute.

19    MR. FERNICH:  I mean prescription animal -- I'm sorry,

20  there's a lot of different terms floating around here, this

21  term "prescription animal drug," I get within the agent somehow

22  it's a term they're using.

23    THE COURT:  It's not just at the agency.  I pointed

24  you to it in the definitions in Section 321 of Title 21.

25    You have my ruling on the prescription animal drug.

1    On the next one, is there a reason you can't combine

2  these?  It says fail to have the term RX only or caution

3  federal law predicts this drug.

4    MS. MORTAZAVI:  Your Honor, our concern is the

5  verbiage proposed by the defendants may not track the statute

6  or the regulations.  I believe the regulations require the

7  following language:  Caution, federal law prohibits dispensing

8  without prescription.

9    It's a fine distinction.  the government has no

10  opposition to including both proposals, but I want to make sure

11  that it's accurate.

12    THE COURT:  Can you read it to me again, what you were

13  just reading from?  It's the CFR, right?

14    MS. MORTAZAVI:  I believe so, your Honor, caution,

15  federal law prohibits dispensing without prescription.

16    MR. FERNICH:  What section of the CFR is that?

17    MS. MORTAZAVI:  Your Honor, why don't we do this and

18  have the parties go back --

19    THE COURT:  I would like you to do that because you're

20  saying, Mr. Fernich, it's not that big a deal, it's not a major

21  issue.  Some of this, frankly, I think you're fighting about

22  semantics or labels without any meaning, I really do.

23    MR. FERNICH:  I don't disagree with the Court.  As I

24  indicated earlier, things have changed with the addition of the

25  evidence, but the fact is this RX only comes from a different

M1STFIS4                    Charge Conference

1    provision of the statute that deals with human drugs.  And as

2    the witness pointed out, and as is I don't think a subject of

3    dispute, there are slightly different laws applicable to vets

4    and MDs.  They don't really matter as the evidence has come out

5    for purposes of this case, but if we're going to get into

6    statutory terminology, I'm not sure we need to anymore, we

7    should try to do it right to the extent that we can, and I

8    acknowledge that this is not easy.

9                THE COURT:  Okay.  So I'm going to leave you to go

10   back and confer with respect to request 10, the paragraph about

11   when a drug is misbranded.

12               MS. MORTAZAVI:  Where it fails to have the

13   prescription statement.  This is Section III.

14               THE COURT:  Well, I meant all of it, because it sounds

15   like Mr. Fernich may be backing off of some of what he

16   proposed.  If he doesn't, he doesn't.

17               MS. MORTAZAVI:  Understood.

18               THE COURT:  And if not, you have my ruling on some of

19   it.

20               MS. MORTAZAVI:  Thank you.

21               THE COURT:  Page 21.  I am not including the red

22   language that says you must be unanimous.  However, as to the

23   way or ways in which the drug were misbranded, that is not the

24   law.  The defendant is not charged with the substantive

25   offense, he's charged with conspiracy, and then there are a

1   number of alleged objects and overt acts.  There does not need

2   to be agreement with respect to the overt acts.  I think the

3   law is pretty clear on that.  So I'm not including the language

4   in red that you must be unanimous, however.

5        Everyone with me?

6        MS. MORTAZAVI:  Yes, your Honor.

7        MR. FERNICH:  Understood.

8        THE COURT:  The next disagreement is about the term

9   "adequate directions for use."  And as I understand the

10  dispute, the government wants to insert the word "lay" before

11  the word "person" and say a lay person can use, whereas the

12  defendant wants to say under which a person, not qualified to

13  be a lay person, administering or using the drug can do so

14  safely.

15       Am I understanding the distinction correctly?

16       MR. FERNICH:  Yes.

17       THE COURT:  But you also have a note that we shouldn't

18  even define it.

19       MR. FERNICH:  I would be happier with all of it out,

20  but if we're going to do it, I prefer my formulation.  And I

21  don't think "lay person" appears in the statute, and my problem

22  with it is that trainers, the evidence in this case shows

23  particularly the witness who is a trainer who testified that

24  his father has, rightly or wrongfully, taught him out to give

25  horses shots when he was in knee pants, trainers aren't really

1       lay people.

2               Again, I know that the AVMA model code isn't in

3       evidence, but we asked Dr. Bowman questions about it.  The

4       trainer is generally an owner's -- clients are owner's agents,

5       and they're not people off the street with no experience with

6       horses or animals.  As a functional matter, obviously they have

7       been giving shots forever, but leaving that to one side, they

8       have substantial, substantial knowledge about animal physiology

9       or horse physiology that the average Joe on the corner just

10      doesn't have.  This is their life's calling.  And to me it's

11      misleading to throw the term "lay person" in there.  A lot of

12      clientele, they weren't your average Joes.

13              MS. MORTAZAVI:  Your Honor, I don't want to belabor

14      this point.  We're happy take out the term "lay."  I think

15      Mr. Fernich is misapprehending what the instructions are

16      supposed to do.  The term "adequate directions for use" refers

17      to what the FDCA contemplates with respect to labeling.  It is

18      not tailored to trainers or people who may have exposure to

19      some kind of medical field about being a qualified medical

20      profession.

21              MR. FERNICH:  I take that point.  I don't know where

22      this lay person bit is coming from.

23              THE COURT:  We're taking out the word "lay."

24              MS. MORTAZAVI:  Correct, your Honor.

25              THE COURT:  And then the distinction is:  Are we

M1STFIS4                    Charge Conference

1  saying can use the drug safely or saying administer or use the

2  drug safely?  That's the distinction we're talking about.

3          MS. MORTAZAVI:  We're happy to include "can administer

4  or use."

5          THE COURT:  So we'll go with the defendant's

6  formulation of the first paragraph, the term adequate direction

7  for use.

8          Okay?

9          MR. FERNICH:  Yes.

10          THE COURT:  Then I already said that I will say

11  prescription animal drug, not a veterinary prescription drug,

12  so wherever that lands it has to be consistent throughout.

13          MR. FERNICH:  Understood.

14          MS. MORTAZAVI:  Yes, your Honor.

15          THE COURT:  And then red again is the defendant?

16          In the defendant's formulation you're not even

17  capturing an animal drug.

18          MR. FERNICH:  Where are you, now, your Honor?

19          THE COURT:  I'm in the competing paragraphs, a product

20  is.

21          MR. FERNICH:  I see where you are.

22          THE COURT:  I told you I will call it a prescription

23  animal drug.

24          Then I don't think you have any more disagreement, do

25  you?  Ah, the disagreement is the defendants want to say a

1  veterinary prescription drug, but we said it will be

2  prescription animal drug, is a drug that can be dispensed only

3  on the lawful written oral order -- you're inserting the word

4  dispense, whereas the government says can be administered.

5            MR. FERNICH:  I see.

6            THE COURT:  I don't think the statute is limited to

7  dispensing.

8            MR. FERNICH:  No, whatever the statutory language says

9  I want to track that.

10            MS. MORTAZAVI:  Your Honor, I want to be clear that

11  the reason that we had included in here this particular

12  language, which contemplates that a veterinarian could directly

13  administer a prescription drug to an animal, and that would be

14  a permissible method of --

15            THE COURT:  I didn't know.  So I lost this, I'm sorry.

16  You have the additional language:  Can be administered only by

17  a licensed veterinarian in the course of the veterinarian's

18  professional practice.

19            MS. MORTAZAVI:  Correct.

20            THE COURT:  Which doesn't appear in the defendant's

21  draft and that should be included.  I'm sorry.

22            MS. MORTAZAVI:  Yes.

23            THE COURT:  Then the defendant wants to insert --

24  that's the only distinction then.

25            MS. MORTAZAVI:  That is the only distinction, your

1    Honor.  And the reason for it is because of the *Rojas* case and

2    the solicitor general's confession of error.  This is

3    consistent with that.  The *Rojas* jury instructions are now

4    going to be reconsidered by the Third Circuit.  I don't think

5    that we have to invite an appellate issue.

6              THE COURT:  But I think the way you have this phrased

7    is not correct, because I think *Rojas* deals with if it's a

8    veterinarian who is administering it, it has to be in the

9    course of the ordinary practice, but it doesn't have to be on a

10   written or oral prescription because it's in the ordinary

11   course of that veterinarian's practice.  You say that can be

12   administered only by a licensed veterinarian in the course of

13   that veterinarian's practice, and I don't think that's correct,

14   I think it can be administered by somebody else if they have a

15   prescription from a veterinarian.

16             MS. MORTAZAVI:  And so the --

17             THE COURT:  But your "only" is in the wrong place.

18             MS. MORTAZAVI:  We can take out "only" to the extent

19   it's confusing, your Honor.  We did intend to encapsulate both

20   categories.  We have here:  Can be administered only by a

21   licensed veterinarian in the course of the veterinarian's

22   professional practice or dispensed only upon the lawful written

23   or oral order of a licensed veterinarian.

24             THE COURT:  But my point is after the "or" you're

25   losing the administered concept.  So when a veterinarian writes

1    a prescription and gives it to someone else who knows how to

2    administer it, that's okay.

3              MS. MORTAZAVI:  Yes, and that's what was intended by

4    dispensed, because the veterinarian --

5              THE COURT:  But I don't think it captures it.  I think

6    you have to say:  Can be administered you a licensed

7    veterinarian only in the course of that veterinarian's

8    professional practice, right?

9              MS. MORTAZAVI:  Yes.

10             THE COURT:  Or administered and dispensed or dispensed

11   upon a lawful written or oral order of a licensed veterinarian

12   in the course of that veterinarian's professional practice.

13             MS. MORTAZAVI:  And that structure is perfectly fine

14   for the government.

15             THE COURT:  Defendant?

16             MR. FERNICH:  Okay, I object to this because it's

17   contrary to the language.  This is attempting to charge under

18   21, U.S. Code, 353(f), whatever you want to call it, this is

19   mirroring the language in the section that's captioned:

20   Veterinarian Prescription Drugs.

21             THE COURT:  Let me catch up with you.

22             MR. FERNICH:  Yes.

23             MS. MORTAZAVI:  Your Honor, may I have a minute with

24   defense counsel for a minute while the Court finds its place?

25             THE COURT:  Yes.

1   (Pause)

2   MS. MORTAZAVI:  Your Honor, thank you for giving us

3   the time to confer.  I believe that the parties can agree to

4   amend this language to demonstrate that it is an either/or

5   scenario.  So the proposed language would be a prescription

6   animal drug is a drug that either be administered by a licensed

7   veterinarian in the course of the veterinarian's professional

8   practice or administered or dispensed upon the lawful written

9   or oral order of a licensed veterinarian in the course of the

10  veterinarian's professional practice.

11  Now I would submit that including "administered or

12  dispensed" is repetitive and that we may be able to stick to

13  the language "dispensed upon the lawful written or oral order,"

14  but I'm happy to hear the Court's reaction to the proposed

15  amendment.

16  MR. FERNICH:  I don't want the second "administered"

17  in there.

18  THE COURT:  Neither does Ms. Mortazavi, correct?

19  MS. MORTAZAVI:  Correct.

20  THE COURT:  We'll take it out.  It will now read:  A

21  prescription animal drug is a drug that can either be

22  administered by a license veterinarian in the course of the

23  veterinarian's professional practice or can be dispensed --

24  Are we taking out "only?"

25  MS. MORTAZAVI:  We would ask that it be he left in,

1    your Honor.

2           THE COURT:  Only upon the lawful written or oral order

3    of a licensed veterinarian in the course of the veterinarian's

4    professional practice.

5           MR. FERNICH:  No objection.

6           THE COURT:  Perfect.

7           Okay.  On page 23, I'm going to run through a couple

8    of these clean up things quickly.  There's a numbered list 1,

9    2, 3, 4, 5.

10          In number 4, I think you need the word "the" in front

11   of the second product.  It says prior to the misbranding or

12   adulteration of the product, the product or a compound of the

13   product had moved or been shipped in interstate commerce is the

14   way it should read.

15          MS. MORTAZAVI:  And your Honor, to be clear, I read

16   the word "component" on the page, did you intend to replace

17   that with compound?

18          THE COURT:  No, I'm sorry, I misspoke, I meant

19   component.

20          MS. MORTAZAVI:  Understood, your Honor.

21          THE COURT:  Mr. Fernich, Mr. Sercarz?

22          MR. FERNICH:  No problem.

23          THE COURT:  Okay.  The next area of disagreement and

24   the next comment that I have is coming over to page 26.  This

25   is really just a stylistic thing.  Could you please start a new

1   paragraph before "To act with intent to defraud" in the middle

2   of the first paragraph on line 3 towards the end.

3             MS. MORTAZAVI:  Yes, your Honor.

4             THE COURT:  But more substantively, the fact that --

5   the defendant proposes that we insert in the second paragraph a

6   fact is "material," in quotes, if a reasonable person under the

7   circumstances would consider it important in making a decision

8   or determining a course of action.

9             First of all, Mr. Fernich, I don't know what you mean

10  when you say *Hebert* charge.

11            MR. FERNICH:  A *Hebert* charge is I think the

12  government -- I think the government relies on it elsewhere or

13  I cited it.

14            THE COURT:  Is that a case?

15            MR. FERNICH:  Yeah.  I must have cited it in one of

16  the bubbles above.

17            THE COURT:  Is it a securities fraud case?

18            MR. FERNICH:  No, it's a veterinarian -- it's a

19  veterinarian charged under the FDCA.  There's not too many of

20  these charges.

21            THE COURT:  All right.  I am not inclined to give

22  this.  This, to me, reads like a charge for a securities fraud

23  case.

24            MR. FERNICH:  So I cited it up in the bubble.  The

25  first of the cites occurs on the bubble at page 21.

1    THE COURT:  You want to read into the record what the

2    cite is so I don't keep flipping?

3    MR. FERNICH:  Sure, *U.S. V. Hebert*, 17 CR 39, Western

4    District of Louisiana, November 6, 2017, ECF 104.

5    And what page are we on now of this charge?

6    THE COURT:  26.

7    MR. FERNICH:  So page 15 of the *Hebert* charge at the

8    cite that I just mentioned.

9    THE COURT:  All right.  I will take a look at it, but

10   my current view is I'm not including that.

11   MR. FERNICH:  I just pulled it almost verbatim from

12   there.

13   MS. MORTAZAVI:  And your Honor, two points to make on

14   this.  We had pulled our language from the *Lasher* case that

15   your Honor had referenced.  That is *U.S. v. Lena Lasher* in this

16   district before Judge Buchwald.  If the Court is inclined to

17   include this language or something similar or at least this

18   concept proposed by defense counsel, we would like to be heard

19   on a potential amendment to this proposal so that it tracks the

20   facts here.  Frankly, the reference to a decision does not

21   appear to be on all fours with --

22   THE COURT:  My ruling is I'm not going to include it

23   unless I go back and look at the case and something changes my

24   mind.  But out of curiosity, why isn't *Lasher* listed in your

25   list of authorities on the next page?

M1STFIS4                    Charge Conference

1          MS. MORTAZAVI:  It should have been, your Honor, I

2     apologize for that.

3          THE COURT:  Okay.

4          MR. FERNICH:  The language from *Hebert*, and you will

5     see it on page 15, and this is the intent to defraud or mislead

6     provision of the FDCA at issue, to act with "intent to mislead"

7     means to acts with the specific intent to create a false

8     impression by misstating, omitting or concealing material

9     facts.  A fact is "material" if a reasonable person under the

10    circumstances would attach importance to it in making a

11    decision or determining a course of action.

12         THE COURT:  Okay.  Thank you.  But I'm going to look

13    at the whole case.  The facts may be completely inapposite.

14         Now are you all going back and revising these based on

15    your lesser include offense charge or not?  The rest of this,

16    is it impacted by the lesser included offense or is that a

17    separate insert?

18         MS. MORTAZAVI:  It would be a separate insert.

19         THE COURT:  I see.

20         MS. MORTAZAVI:  It would impact the numbering but not

21    the substance.

22         THE COURT:  So when we look at the next area of the

23    disagreement is on page 27.  The government wants to say state

24    regulators, the defendant wants to say state racing and drug

25    regulators.  The government wants to say some other

1  identifiable federal or state government authority, the

2  defendant wants to say the Food & Drug Administration, U.S.

3  Customs & Border Protection or other federal drug enforcement

4  authorities.

5         I'm going to use the defendant's language.

6         MS. MORTAZAVI:  Your Honor, would it be possible,

7  rather than restricting it to federal drug enforcement

8  authorities, to enlarge that category?  I believe that's

9  consistent with this Court's opinion and the language of the

10  FDCA which is not constrained in the way that language suggests

11  it is.

12         THE COURT:  I have to say this, Customs & Border

13  Protection isn't normally thought of as a drug enforcement

14  authority.  It has that within its ambit, so I do see your

15  point about "other."  So you want me to say other federal

16  authorities instead of other federal drug enforcement

17  authorities?

18         MS. MORTAZAVI:  Correct, your Honor.

19         THE COURT:  Mr. Fernich?

20         MR. FERNICH:  So we object to that.  And the reason

21  for this is that I went back and studied your Honor's opinion

22  very carefully.  And in the litigation leading up to that

23  opinion, the government took the position that Ms. Mortazavi

24  just enunciated, which is that the statute -- the phrase

25  "intent to defraud or mislead" is entirely unconstrained and

1  limitless, and the Court left that question open, did not

2  resolve that question.

3          THE COURT:  I didn't feel I had to go that far.

4          MR. FERNICH:  Understood.  I'm aware of it.

5          THE COURT:  I think that's what I said in the opinion.

6          MR. FERNICH:  Yes, I understand.  And so the way that

7  I annotated the request to charge was to loop in there

8  everything that I thought your Honor had ruled, every entity

9  that your Honor at that point had ruled was a cognizable

10  victim, direct or indirect.

11          THE COURT:  I'm going to go with the defendant's

12  language.  In fairness, I also believe it tracks the

13  indictment, which I studied very carefully in ruling on the

14  motion to dismiss.  So we're going with the defendant's

15  language.

16          MS. MORTAZAVI:  Your Honor, may I make one point?

17          THE COURT:  You can make a record, sure.

18          MS. MORTAZAVI:  I understand the Court's ruling, but,

19  for example, it is not necessarily clear if we delineated as a

20  federal drug enforcement authority that the FBI, for example,

21  or the U.S. Attorney's Office would be a contemplated victim,

22  and the defendant has been charged with continuing his crime

23  following his arrest while he was on bail when he was aware of

24  the FBI's existence, he was aware of the U.S. Attorney's

25  Office, and he was under the supervision of the Court.

1        THE COURT:  But you didn't argue that in connection

2   with your opposition to the motion to dismiss.

3        MS. MORTAZAVI:  I understand, your Honor.

4        THE COURT:  The indictment was after, but you didn't

5   argue that to me.  You really didn't.

6        MS. MORTAZAVI:  I understand, your Honor.

7        THE COURT:  I'm going to go with the defendant's

8   language.

9        Request No. 12, there's a lot of edits to reflect

10  Ms. Giannelli no longer being here.  Nothing substantive for

11  me.

12       Request 13.  Obviously you need to edit the first

13  paragraph where you have Giannelli and Fishman in bold.  If you

14  come down to paragraph 4 on the first line, I think the word

15  "not" is missing.

16       MS. MORTAZAVI:  Sorry, your Honor, what page are you

17  referring to?

18       THE COURT:  32, request No. 13, fourth paragraph, line

19  1.  In that regard, you should bear in mind that you need reach

20  unanimous agreement.  I think you're missing the word "not."

21       MS. MORTAZAVI:  I believe that's correct, your Honor.

22       THE COURT:  Mr. Fernich?

23       MR. FERNICH:  Yes.

24       THE COURT:  All right.  Request No. 14, you have a

25  bracketed "if applicable."  It's conscious avoidance Counts One

1   and Two.  For the Court, it seems it's arguably applicable.  I

2   just want to confirm on these where you have bracketed notes.

3            Are we in agreement?

4            MS. MORTAZAVI:  Your Honor, we would contend that it

5   is applicable.

6            THE COURT:  Yeah.  That's what I said, I think it is

7   applicable.  I'm wanting everyone to agree or not agree.

8            Mr. Fernich?

9            MR. FERNICH:  No, we object to it and don't think

10  there's a record predicate for it.  We think he either did it

11  with a bad intent and he did it deliberately knowing exactly

12  what it is, we don't see how he stuck his head in the sand

13  about anything here.  We don't see a record predicate for that.

14           MS. MORTAZAVI:  Your Honor, if I may respond to that.

15  There is certainly the insinuation that Ms. Giannelli was

16  acting on her own and of her own volition in distributing Seth

17  Fishman's drugs.  That's an argument that we have to contend

18  with.

19           I also anticipate that there will be -- given the

20  objections to entering through the racing regulations, for

21  example, there may be arguments made that the defendant was

22  unaware of the regulations that applied to those participating

23  in horseracing.  So this is certainly applicable as to

24  co-conspirators and their activities and their further

25  distribution of the defendant's drugs.  Ms. Giannelli was not

1    the only distributor.  And the testability of those drugs and

2    the intent of the consumers to evade racing regulations, both

3    of those are directly on point.

4              THE COURT:  So convincing to me -- and then I will let

5    you make your record, Mr. Fernich -- is the fact that you

6    argued in the opening statement -- and I think it was not

7    proper, but you did it -- that the whole statutory scheme in

8    the FDCA is so incomprehensible, it's this patchwork that he

9    couldn't understand.

10             MR. SERCARZ:  Your Honor, may I be heard with regard

11   to that opening statement?  It was mine, and I think you will

12   find that my description of the statutory scheme occurs in two

13   places.  It occurs --

14             MR. FERNICH:  Can I speak with Maurice for just one

15   second before we continue?

16             Let me make sure we're on the same page.

17             THE COURT:  Gentlemen, let's not do this.  Finish what

18   you want to say then I will hear you, Mr. Fernich.

19             MR. FERNICH:  Go ahead, I don't want to waste your

20   time.

21             MR. SERCARZ:  The first time that I --

22             THE COURT:  Where are you looking Mr. Sercarz?  Tell

23   me a page, please?

24             While you're looking, I'm going to say two things.  It

25   is not the role of an opening statement for you to comment on

1    the law.  And that's what you were doing.  Second, it is not

2    the role in an opening statement for you to argue, and that's

3    what you were doing.  That's my objection.  But it is what it

4    is.  There was no objection from the government and so it came

5    in.  So I don't know we're wasting time on it now.

6             MR. FERNICH:  So here's my response to what the Court

7    had to say.  Ignorance of the relevant regulations isn't enough

8    for a conscious avoidance charge, he has to show willful

9    blindness, deliberate steps taken to avoid knowing.  That's

10   what the essence of conscious avoidance is.  And I'm looking up

11   the pivotal Supreme Court case, it's a civil case from several

12   years ago but it's routinely been applied in criminal cases.

13   It's not enough that he doesn't know, he has to deliberately

14   shield himself from learning the applicable regulations.  So

15   we're perfectly permitted to argue that the regulations are so

16   Byzantine that somebody even acting in good faith could screw

17   them up honestly.  That's a different argument.

18            THE COURT:  I don't think you can argue that.

19            MR. FERNICH:  Sure we can.

20            THE COURT:  Look, at the end of the day, the problem

21   Dr. Fishman has is that he was engaging in a business not as a

22   veterinarian but as a manufacturer of drugs.  If you're going

23   to engage in the business of manufacturing drugs, you're

24   charged with knowing what the rules and the regulations and the

25   guidelines are.

1          MR. FERNICH:  Well, it's for the jury to determine.

2          THE COURT:  I agree with that.  I agree with that.  I

3   don't mean to say it's a foregone conclusion, I mean that's the

4   charge though.

5          MR. FERNICH:  I understand, but the jury can

6   determine -- there are multiple possibilities that a jury could

7   determine.  The jury could determine that he was making a good

8   faith effort to practice veterinarian medicine and that he

9   screwed it up.

10         MR. ADAMS:  Sorry to interject, Mr. Fernich.  The

11  question of whether we can carry our burden on the willful

12  blindness theory is different than the question of whether or

13  not it's proper to include it in the charge.

14         THE COURT:  I agree.  And Mr. Fernich, you didn't

15  object to this.

16         MR. ADAMS:  Sorry, if I could make this part of the

17  record.  The only thing that's required to include as part of a

18  charge is that knowledge be put at issue, and it's been put in

19  issue in multiple ways, as the Court mentioned.

20         MR. FERNICH:  There has to be, though -- the reason we

21  didn't object is because it says "if applicable," which is

22  right.  And that depends on the way the evidence develops at

23  trial.  There's no evidence in the record, none, that he took

24  deliberate steps to avoid learning of the regulations.  That's

25  what conscious avoidance is, not unaware of the regulations.

1          THE COURT:  We're going bring this to a close at some

2   point, so --

3          MR. SERCARZ:  Your Honor --

4          THE COURT:  Hold on.  Don't keep interrupting each

5   other.

6          By the close of -- today is Friday, it's 3:35.  By

7   tomorrow morning you can submit a brief, and I mean brief,

8   letter.  Mr. Adams is telling me the law says knowledge is at

9   issue.  You're telling me the law says there has to be some

10  showing beyond that.  I honestly don't know the answer, so you

11  each can have the opportunity to give me something, no more

12  than two pages in writing, and I will make a decision before we

13  charge the jury on Monday.

14         So please keep including it.  My current inclination

15  is that it is applicable.

16         MR. ADAMS:  Your Honor, in addition to the regulations

17  themselves, there have been cross-examinations and issues put

18  in front of the jury with respect to whether Dr. Fishman knew

19  that his clients were using these drugs in advance of races, as

20  opposed to breezing or exercise.  That's another way in which

21  the question of knowledge has been put in issue here, whether

22  Ms. Giannelli --

23         THE COURT:  I don't think that's what they were

24  arguing.  I think they are arguing that the strenuous exercise

25  label applies to breezing, not to a race.

1    MR. ADAMS:  Correct.  Then the question is:  Does

2  Dr. Fishman know that his trainers have effectively gone rogue

3  on him?  That's been put at issue.

4    THE COURT:  Here's why right now this is in.  That's

5  my ruling as of now.  And I will let you put in by tomorrow

6  morning a two-page letter from either side convincing me

7  otherwise.  But you quote on the last page:  A conscious

8  avoidance charge is appropriate where the defendant claims a

9  lack of knowledge of the relevant acts but the surrounding

10  circumstances would permit a reasonable juror to conclude that

11  the defendant should have known about them.

12    You did certainly try to create the impression that

13  Lisa Giannelli was out selling things and doing things on her

14  own.  And yet there's record evidence that refutes that.  So

15  there is a question with respect to that alone.  That's just

16  one example.  So you can submit something tomorrow by tomorrow

17  morning in writing but as of now it's in.

18    MR. SERCARZ:  In less than 30 seconds, point of

19  personal privilege with me --

20    THE COURT:  Go ahead.

21    MR. SERCARZ:  -- if you look at page 39 of the

22  transcript, in my opening statement --

23    THE COURT:  What day?

24    MS. MORTAZAVI:  I believe he means the first day.

25    MR. SERCARZ:  January 20.

1    THE COURT:  I don't know if I have it here.

2    MR. SERCARZ:  I could read it to you, Judge, or I

3    could hand it up to you.

4    THE COURT:  Go ahead.

5    MR. SERCARZ:  The reference to the regulations and the

6    regiment occurs twice in my opening statement.  The first time

7    I speak about it even tangentially, I say that with respect to

8    the new animal drugs that the government has described to you,

9    on the issue of whether Dr. Fishman, a small independent

10    creator and distributor of animal products, met all of the many

11    and varied requirements and regulations of the Food, Drug &

12    Cosmetic Act, as implemented by the FDA, I respectfully submit

13    that he did not.  And I will tell you up front that he did not.

14    THE COURT:  Right, but I think --

15    MR. SERCARZ:  It was later in my opening statement

16    with regard to the meeting of the term "testability" that I

17    referred to what you have called the pastiche of regulations

18    and argued that my client may have been seeking to avoid

19    inadvertent positive tests on the part of his clients.  It was

20    then and only then that I referred to what the Court has

21    described as an overlapping pastiche of state and federal

22    tests.

23    So on the subject of conscious avoidance and on other

24    subjects you have discussed, I don't think I have done anything

25    to change the state of play with regard to the issue of intent

1  on this opening statement.

2          THE COURT:  Okay.  The record is what it is,

3  Mr. Sercarz, and I don't think that I ever used the word

4  "pastiche," by the way.

5          MR. FERNICH:  It's a good word.

6          THE COURT:  It is.

7          MR. FERNICH:  My cite is *Global-Tech Appliances*, 563

8  U.S. 754, 769, Supreme Court, (2011).  While the courts of

9  appeals articulate the doctrine of willful blindness, which is

10  conscious avoidance, in slightly different ways, all appear to

11  to agree on two basic requirements:  (1), the defendant must

12  subjectively believe that there is a high probability that a

13  fact exists; and (2), the defendant must take deliberate

14  actions to avoid learning of that fact.  Here's the money shot

15  in the opinion:  We think these requirements give willful

16  blindness an appropriately limited scope that surpasses

17  recklessness and negligence.  So the Supreme Court -- and

18  earlier in this opinion talks about criminal cases -- expressly

19  endorses this formulation.  Number 2, element no. 2, the

20  defendant taking deliberate actions to avoid learning of

21  whatever fact is in issue, there is no adequate record

22  predicate for that to my knowledge, and that's my objection.

23          THE COURT:  Okay.  Thank you.

24          Request no. 18, venue.  So this is just wrong.  The

25  Southern District does not include, among other places, this

M1STFIS4                    Charge Conference

1  list of counties.  It includes the list of counties and that's

2  it.  And I also don't know how you can ask someone to find

3  venue, even if it were right -- if you ask someone to find

4  venue when say among other places, so they don't even know what

5  you're talking about.  But it's wrong.  These are the list of

6  the counties.  To the best of my knowledge, there's no others

7  unless someone tells me I'm missing something.

8           MR. ADAMS:  You're correct.  That came from a holdover

9  where only the Manhattan and the Bronx were --

10           THE COURT:  All right.  Page 41, this is just

11  stylistic.  The paragraph that begins "The process of drawing

12  inferences," second sentence, "An inference is a deduction or a

13  conclusion that you, the jury, are permitted" -- take out "to

14  draw," and put a comma, please, are permitted, but not

15  required, to draw from the facts.

16           Charge 21.  You have an "if applicable," and it says

17  in the first line:  You heard reference in the arguments of

18  defense counsel in this case to the fact that certain

19  investigative techniques were not used by the government.

20           Are you contending it's applicable?

21           MR. ADAMS:  If the defense is not arguing it in

22  summation, then I don't think it will be.

23           THE COURT:  Mr. Fernich or Mr. Sercarz, do you have a

24  view or do you want to reserve on this, which you're entitled

25  to do, I suppose.

1          MR. SERCARZ:  No, I'm not going to argue it.

2          THE COURT:  So we can take this out?

3          MR. FERNICH:  Yes.

4          MR. SERCARZ:  Yes.

5          THE COURT:  Thank you.  22 says if applicable.  All

6     available evidence need not be introduced.

7          MR. SERCARZ:  It is not something what I intend to

8     argue.

9          THE COURT:  So should we take it out?

10          MR. FERNICH:  Yes.

11          MS. MORTAZAVI:  Yes, your Honor.

12          THE COURT:  22 is out.

13          23, stipulations.  You have some material in brackets.

14     I assume that was because at that point it sounded like --

15     until today it sounded like the only stipulations you had were

16     with respect to exhibits, but today you stipulated to certain

17     facts.

18          MS. MORTAZAVI:  That's correct, your Honor.

19          THE COURT:  So the brackets should come out?

20          MS. MORTAZAVI:  That would be the government's

21     proposal.

22          THE COURT:  Mr. Fernich or Mr. Sercarz?

23          MR. FERNICH:  I'm sorry, I was dealing with my

24     colleague about logistics for his departure.  Can you repeat

25     that, please?

1           THE COURT:  On request 23 --

2           MR. FERNICH:  Yes, ma'am.

3           THE COURT:  -- I was saying the bracket should come

4    out now because today you stipulated to certain facts.  Before

5    you were just stipulating about the admissibility of exhibits.

6           MR. FERNICH:  Did we do any fact stipulations?

7           THE COURT:  Yes, to the date of arrest and the date of

8    bail.

9           MR. SERCARZ:  Agreed.

10          THE COURT:  So the brackets -- the material remains,

11   the brackets themselves come out.

12          24.  Charts and summaries.  I don't recall any charts

13   and summaries.

14          MS. MORTAZAVI:  No, your Honor, it's not requested by

15   the government.

16          THE COURT:  Mr. Fernich or Mr. Sercarz?

17          MR. FERNICH:  It's fine.

18          THE COURT:  Take it out?

19          MR. FERNICH:  Yeah, take it out.  Anyway we can

20   shorten this.

21          THE COURT:  I agree.  That's why I'm taking the time

22   to do this.

23          28.  Preparation of witnesses.  I just flagged this

24   for myself because, to be honest, I didn't remember a lot of

25   discussion about preparation of witnesses, although I guess

M1STFIS4                    Charge Conference

1  there might have been some.  I don't have any problem with it,

2  but I want to make sure you all want this.

3          MS. MORTAZAVI:  Your Honor, I believe there were

4  questions about proffer sessions that at least one witness had

5  engaged in.  I believe the proffer agreement may have been --

6  certainly shown to the defendant, I think it may be Defense

7  Exhibit 1.

8          THE COURT:  Okay.  Mr. Fernich, are you in agreement,

9  we should leave it?

10         MR. FERNICH:  We don't have a strong view.  If the

11 government wants it, it's fine.

12         THE COURT:  Okay.  29.  Persons not on trial.

13 Generally I don't know that you really need this, but it seems

14 to me that in this case, since Ms. Giannelli was here at the

15 start and then she disappeared, I did say at the beginning I

16 instructed the jury and I said when we get to the end of the

17 case that I would again, so I think it's in order.

18         Mr. Sercarz and Mr. Fernich?

19         MR. FERNICH:  You want to leave it in, you're saying?

20         THE COURT:  I'm saying I want to add the same

21 instructions I gave in the beginning about Ms. Giannelli,

22 unless you think that's highlighting it.  That's why I'm giving

23 you the opportunity to be heard.

24         MR. FERNICH:  That's fine.

25         THE COURT:  What's fine?  You want me to put something

1  in here about her or not?

2          MR. FERNICH:  Yes.

3          THE COURT:  And specifically mention Ms. Giannelli?

4  So in other words, at the end of the first paragraph we add

5  something back in that, as I told you at the outset of this

6  case, the fact that Ms. Giannelli was not part of the trial

7  after the first day or two --

8          MR. SERCARZ:  Agreed.

9          THE COURT:  Ms. Mortazavi?

10          MS. MORTAZAVI:  Agreed, your Honor.

11          THE COURT:  So I'm going to leave it to you to propose

12  what goes in there.  It should be short.  I don't think we need

13  to beat a dead horse.

14          MS. MORTAZAVI:  And your Honor, our proposal would be

15  that we mimic the language that you have already delivered to

16  the jurors.

17          THE COURT:  Yes.

18          MR. FERNICH:  Yes.

19          THE COURT:  All right.  Uncalled witnesses equally

20  available.  It says:  If applicable.

21          MS. MORTAZAVI:  The government doesn't request it.

22          MR. FERNICH:  It can go out.

23          THE COURT:  Okay, terrific.

24          31.  Use of informants.  Did we really have any

25  informants here?

1     MS. MORTAZAVI:  The government doesn't request that we

2  include this instruction, given what was elicited.

3     THE COURT:  Mr. Fernich and Mr. Sercarz, they're

4  comfortable getting rid of this, are you?

5     MR. SERCARZ:  What's the government's opinion on this

6  one?

7     THE COURT:  It's not necessary.

8     MR. SERCARZ:  I agree.

9     THE COURT:  You agree?

10     MR. SERCARZ:  Yes.

11     THE COURT:  So we'll get rid of 31 as well.

12     Charge No. 32 on testimony of cooperating witnesses.

13  At the very end you have a paragraph that says:  As with any

14  witness, let me emphasize that the issue of credibility need

15  not be decided in an all-or-nothing fashion.  Even if you find

16  that a witness testified falsely in one part, you may still

17  accept his testimony in other parts or may disregard all of it.

18     There's kind of a standard charge that if a witness is

19  false in one part you can consider him false in all.

20     MR. FERNICH:  So Judge, Sand doesn't provide for the

21  false-in-one-false-in-all charge.  We would request the charge

22  from Devitt and Blackmar which has a standard false-in-one-

23  false-in-all charge.

24     THE COURT:  I'm sorry, tell me from what?

25     MR. FERNICH:  The source is the other treatise when

1  Sand doesn't have it, Devitt, D-E-V-I-T-T, and Blackmar,

2  B-L-A-C-K-M-A-R, that has a standard false-in-one-false-in-all

3  charge, which we would request.  I didn't want to make a huge

4  deal out of this before.

5          THE COURT:  I don't mean to make a huge deal of it

6  either, and I guess "or may disregard all of it," that's an

7  intent to capture that.  But it just seems to me that, in

8  fairness, if you're going to say the first part, that you may

9  accept some of it, you should also say that you may also do the

10 flip.  So I would put a period after "may accept his testimony

11 in other parts," period, and then add the something about

12 conversely, and pick up the charge.

13         MR. FERNICH:  I will get it to the government.

14         THE COURT:  I was going to ask you, Mr. Fernich --

15         MR. FERNICH:  Yes.

16         THE COURT:  -- would you mind sending it to the Court

17 as well.

18         MR. FERNICH:  Not at all, I just have to dig it out.

19         THE COURT:  No problem, thank you.

20         33 is use of evidence obtained in searches, and the

21 second line talks about searches of vehicles.  Did we have any

22 of that in this case?

23         MS. MORTAZAVI:  We did not.

24         THE COURT:  That shouldn't be in here.

25         Then you did have evidence about location based on

1    cellphones, right?  That was today you talked about the call

2    that you got the location because --

3                   MS. MORTAZAVI:  Perhaps, your Honor, we could adapt it

4    to you have seen evidence, or there is evidence in this case,

5    because there is geolocation evidence in this matter.

6                   THE COURT:  That's what I'm talking about.

7                   MS. MORTAZAVI:  So I think if we adapt the language to

8    reflect the fact that they haven't heard it but it is in

9    evidence.

10                  THE COURT:  So similarly, there is evidence --

11                  MS. MORTAZAVI:  Yes.

12                  THE COURT:  -- concerning the location of individuals.

13                  Is it only Dr. Fishman?

14                  MS. MORTAZAVI:  I think and individuals is

15   appropriate.  There is geolocation that was admitted for

16   Ms. Giannelli admitted by stipulation.

17                  THE COURT:  So you need to -- I'm trying to conform it

18   to what actually happened, that's all.

19                  MR. FERNICH:  Your Honor, Mr. Sercarz will handle this

20   a few minutes so I could use the facilities.

21                  THE COURT:  Do you want to take a break?

22                  MR. FERNICH:  No, it's okay.

23                  MR. ADAMS:  Your Honor, to turn back to vehicles for a

24   moment, it wasn't highlighted particularly, but among the

25   photographs in Ms. Dwayne's search are photographs of the

1    search of the truck.

2              THE COURT:  So leave it in then.

3              34.   Statements of a defendant.  Is this applicable?

4              MS. MORTAZAVI:  I believe it is, your Honor, because

5    we admitted Dr. Fishman's statements to the U.S. Attorney's

6    Office in the Eastern District of New York and the FBI there.

7              THE COURT:  That's true.

8              MR. SERCARZ:  I couldn't hear Ms. Mortazavi, but

9    there's a statement on a form with regard to the Delaware

10   investigation.

11             THE COURT:  And she was referencing the Eastern

12   District conversations about I guess Brooks.  So that's fine.

13   You need to fix the bracketed, each of the defendants.

14             MS. MORTAZAVI:  Yes, your Honor.

15             THE COURT:  The defendant.

16             Defendant's testimony obviously comes out, 35.

17             But we need 36 then, I assume.  Right, Mr. Sercarz?

18             MR. SERCARZ:  Yes.

19             THE COURT:  So if asked by defendant, it's now been

20   requested.  Then obviously you need to fix it about he or she

21   and all that.

22             And I just have a question for you all, why are you

23   using something from Judge Oetken?  Isn't there a Sand

24   instruction on this?  It seems like such a fundamental issue

25   that there must be a pattern instruction.  Not that I have

1   anything against Judge Oetken.

2           MR. ADAMS:  I imagine it's embedded in the Judge

3   Oetken instruction.

4           THE COURT:  If you take a look at the Sand instruction

5   and assure yourself that you're comfortable with this, that's

6   all.  Whenever you start using a case specific one it makes me

7   nervous it was somehow tailored to that case, and I did not

8   take the time to go back and compare to Sand where you're not

9   referencing it.

10          37.  It is the Court's understanding that the

11  recordings were admitted into evidence but the transcripts were

12  not.

13          MS. MORTAZAVI:  The transcripts were admitted into

14  evidence.  The clips were marked, for example, 101A and --

15          THE COURT:  And these were T.

16          MS. MORTAZAVI:  And these were T.  And the government

17  did move those into evidence, and I believe Mr. Chow corrected

18  a few of the transcripts, the T exhibits that we had not moved

19  in.  So they are in evidence.

20          THE COURT:  So you have the second sentence that says

21  what I thought, the transcripts of the English language

22  recordings have been offered as aids, but if they are in

23  evidence, you should say that.

24          MS. MORTAZAVI:  We will amend it, your Honor.

25          THE COURT:  Because the question I had was really your

1   next sentence about if they weren't in evidence, were they

2   entitled to have the transcripts.  But they have been admitted,

3   then they're evidence.

4           MS. MORTAZAVI:  And we will amend the first sentence

5   to include transcripts, and I think we can remove the second

6   sentence entirely.

7           THE COURT:  Yes.

8           Number 38.

9           MR. SERCARZ:  May I ask a question about that?  From a

10  logistical standpoint, do I assume that in the event that the

11  jury asks either to listen to a recording or to review a

12  transcript that that will be done in open court?

13          THE COURT:  Yes.

14          MR. SERCARZ:  Thank you.

15          MR. ADAMS:  Your Honor, with respect to listening to

16  the recording, I think we have to do it in the courtroom.  With

17  respect to the transcripts, the requested transcripts, we

18  logistically should send them back if they only requested that.

19          THE COURT:  If they only request a transcript,

20  Mr. Sercarz.

21          MR. SERCARZ:  That was my question, and I thought

22  everyone agreed that they will get the binders here in open

23  court.

24          THE COURT:  Well, they're not going to get the binder.

25  If they say "Can I see a transcript of a call on X date," they

1  won't get the whole binder, they will get what they asked for.

2          MR. SERCARZ:  Agreed.

3          THE COURT:  Why can't that go back to them?

4          You can read it just like they can.  It's like any

5  other piece of evidence then, isn't it?

6          MR. SERCARZ:  It's unlike every piece of evidence in

7  one regard:  When the jury listened to the tapes and had the

8  transcripts, each juror had one, and I am concerned that if one

9  copy of the transcript were sent back there might be some

10 unfairness in the jury's handling of that single copy of the

11 exhibit.

12         THE COURT:  That's true with every single exhibit.

13         MR. SERCARZ:  It's true with regard -- the potential

14 exists with regard to every exhibit, but in connection with

15 transcripts, when they had the opportunity in court, everyone

16 had their own transcript, so it's slightly different

17 circumstance.

18         THE COURT:  I don't see the issue, frankly, if they

19 were admitted into evidence.  My point starting was I thought

20 they were not.  I thought they were aids.  And the fact that

21 you said they were aids reinforced what I understood.  Because

22 you had the T, I thought the T didn't go in and the recording

23 went into evidence, and my point to you was going to be then

24 they don't go back, because they're an aid, they're not

25 evidence.

1    MR. SERCARZ:  I understand.

2    THE COURT:  But now you're telling me they were

3    admitted and you didn't object to their being admitted,

4    Mr. Sercarz, so I don't see what the problem is.  If something

5    is an exhibit, and it is, why can't it go back to the jury?

6    MR. SERCARZ:  I don't think it's an earthshaking

7    development particularly for now, but to make my point, do

8    twelve go back or does one go back?

9    THE COURT:  What happens with every exhibit the jury

10   asks for?  How is it any different?

11   MR. SERCARZ:  If there's a drug vial or if there is

12   another document, there's only one that's offered into

13   evidence, there's only one that's been used, and if the jury

14   therefore asks to see it in the jury room, there's one and only

15   one.  With regard to transcripts every juror had one.

16   THE COURT:  And they were all exactly the same and

17   every juror had every exhibit on the screen at the same time.

18   If they ask for the transcript, a copy of the transcript goes

19   back, as with every other hard copy documentary exhibit.  If

20   they ask to hear the recording, then we come into open court

21   and we hear it in open court.

22   MR. SERCARZ:  I have your ruling, your Honor, I

23   understand.

24   THE COURT:  Ms. Popper just reminded me, and I

25   mentioned to you all you're supposed to under the protocol give

1  me a thumb drive with the exhibits.  And frankly, I had a note

2  and intended to speak to everybody about this.  I need to

3  confirm the Court protocol about this.  I find it troubling to

4  think that we're going to give the jurors the flash drive,

5  thumb drive, whatever you want to call it, and they can have at

6  it.  And if they want an exhibit they're supposed to scroll

7  through this thing and find it.

8          I understand that in the height of Covid when people

9  thought Covid could be passed on surfaces we were then limiting

10  the using of hard copy documents, everything had to be

11  electronic under the protocols then, you had to have the flash

12  drives, we had to spray every document if there was some reason

13  you had to have physical evidence, but I think we moved past

14  that.  So I just need to confirm that, but it would be my

15  intention to send a hard copy back.

16          MS. MORTAZAVI:  Your Honor, we join in the Court's

17  concern with simply handing over all the exhibits.  I think it

18  makes good sense to have the Court maintain a copy of what has

19  been admitted and deal with requests as they come in.

20          THE COURT:  I take it from all the nodding,

21  Mr. Sercarz and Mr. Fernich, you agree, right?

22          MR. FERNICH:  Yes.

23          MR. SERCARZ:  I do agree.

24          THE COURT:  I mean that's the way we're going to

25  operate.

M1STFIS4                        Charge Conference

1    38.  Redaction.  I think that there were some exhibits

2    that were redacted, correct, so this stays?

3              MS. MORTAZAVI:  Correct, your Honor.

4              MR. SERCARZ:  Yes.

5              THE COURT:  Okay.  All right.

6    39.  You've heard testimony, is that true?

7              MR. ADAMS:  Yes, in this the form of the Delaware

8    letter.

9              THE COURT:  Sorry, Mr. Adams?

10             MR. ADAMS:  At the very least in the form of the

11   Delaware letter, that includes things like --

12             THE COURT:  That's true.  Okay.

13   So 39 stays and there is no objection, correct?

14             MR. SERCARZ:  Correct.

15             MR. FERNICH:  There's no objection.

16             THE COURT:  Character testimony.  Comes out?

17             MR. SERCARZ:  Comes out.

18             MR. ADAMS:  Out.

19             THE COURT:  41.  Right to see exhibits and hear

20   communications.  This is the point we were just talking about.

21   So let me just read this, please.

22             This is fine as it reads because it doesn't commit one

23   way or the other, it says they will be sent to you or you will

24   be brought back, so we can deal with it when and if it happens.

25   It doesn't mention transcripts.  So my only suggestion would be

1   if you want to hear or see or see or hear any of the exhibits

2   and not add anything any more specific about the recordings.

3           MR. SERCARZ:  Agreed.

4           THE COURT:  I see nodding heads, yes?

5           MS. MORTAZAVI:  Yes.

6           MR. SERCARZ:  Yes.

7           THE COURT:  Thank you.  Note taking.

8           And I may modify the conclusions a little bit, but

9   they won't be about substantive things, so if I had something I

10  will let you know about that on Monday.

11          Okay.  So that's the joint set with the areas of

12  disagreement dealt with, and you will all get back to me about

13  your conversations about the open items that we talked about on

14  request 10 or 11 or both.

15          MS. MORTAZAVI:  Yes, your Honor.

16          MR. SERCARZ:  Yes.

17          THE COURT:  Thank you.  Now with regard to bullet 15,

18  which is on consent, the post-bail conduct, the lesser included

19  offense, you're going to take a look at.

20          MR. FERNICH:  We'll work it out with the government.

21          THE COURT:  Thank you very much.  Your supplemental

22  requests, I am not giving request 1.

23          MR. FERNICH:  Understood.  In anticipation of that, we

24  would request in the alternative the good faith charge from

25  Sand that I cited in the authority section.

1    THE COURT:  Sorry, you cited it?  I didn't hear you,

2  Mr. Fernich.

3    MR. FERNICH:  I cited it as authority for request 1,

4  if you see, your Honor, on what's labeled page 3, the

5  penultimate citation.

6    THE COURT:  Yes.

7    MR. FERNICH:  We were just request the generic good

8  faith instruction from Sand that is there.

9    THE COURT:  I think the defendant is entitled to that,

10  that the defendant contends that he acted in good faith and did

11  not have an intent to defraud or mislead.  And then there would

12  be an instruction on what it means.

13    MS. MORTAZAVI:  Your Honor, it's hard to agree without

14  knowing what the language says.

15    THE COURT:  Mr. Fernich, provide it.  Okay?

16    MR. SERCARZ:  Yes.

17    (Continued on next page)

18

19

20

21

22

23

24

25

1     THE COURT:  And if you take a look at Lasher, I do

2  know that Judge Buchwald included a good faith charge.  I mean,

3  once you agree to include the lesser-included offense, I think

4  it has to be part of this.

5     MS. MORTAZAVI:  And again, it's conceptually probably

6  not an issue, but we do need to see the language.

7     THE COURT:  Okay.

8     MR. FERNICH:  Yes, I don't -- I expect it won't be

9  controversial.  It will just come straight out of Sand without

10  reference to the facts.

11     THE COURT:  Okay.  Request 2 I don't think is

12  appropriate.

13     Request 3, I also do not see why you need this.  If

14  we're having the lesser-included offense charge and all, or

15  what this adds to anything.  I mean, you're talking about

16  unless the government proves that he intended to defraud or

17  mislead, and then we're going on and having the lesser-included

18  offense, and then it conflicts with this, and then you talk

19  about interstate commerce, and there's a separate charge on

20  interstate commerce.  Is there not?

21     MR. FERNICH:  Okay.  Let me -- I'm not going to

22  belabor any of this.  Let me just make a very brief record as

23  to all of this.

24     THE COURT:  Sure.

25     MR. FERNICH:  I've got your Honor's ruling on request

1    one.  The Court telegraphed it already.  My contention is that

2    if a jury were to find that Dr. Fishman carried on the activity

3    alleged in the indictment believing in good faith, and without

4    intent to defraud or deceive that he was engaged in the

5    practice of veterinary medicine, that a conviction in the face

6    of those facts under this statute would be -- would render the

7    statute unconstitutional, as applied to the conduct charged in

8    this case, in violation of the Fifth Amendment's right to due

9    process and fair notice, and also Tenth Amendment federalism

10   principles.  That's the purpose of that request.

11          THE COURT:  All right.  I think you're ignoring the

12   allegations, and you're ignoring the evidence that came in,

13   that Dr. Fishman did far more than practice veterinary

14   medicine --

15          MR. FERNICH:  No, no, I understand.

16          THE COURT:  -- or that he didn't practice veterinary

17   medicine.

18          MR. FERNICH:  I understand that, but to the extent

19   that a jury could find that he believed in good faith, albeit

20   mistakenly, that he was engaged in the practice of veterinary

21   medicine, but he was wrong about it, I think applying that --

22   this statute to that set of facts to criminalize that behavior

23   would violate the proscriptions that I've just enumerated.

24          THE COURT:  Yes, but I think you're going to propose a

25   good faith charge, right?

1    MR. FERNICH:  We could argue the veterinary stuff in

2    the good faith charge, right?

3    THE COURT:  Yes, okay.  And I'm not shutting that

4    down.

5    MR. FERNICH:  I know.

6    THE COURT:  Okay.

7    MR. FERNICH:  Now, No. 2 is, in my view, a much more

8    critical charge, and there is a state of -- a way of

9    interpreting this record, where a jury could find that

10   Dr. Fishman gave not a whit about FDA rules, regulations,

11   misbranding, adulteration, and all of that, and his sole intent

12   was to boost the performance of racehorses solely for purposes

13   of competitive advantage.  If the jury were to find that --

14   THE COURT:  May I ask you a question?  I'm sorry to

15   interrupt.  When you say competitive advantage, are you talking

16   about competitive advantage in horseracing --

17   MR. FERNICH:  Yes.

18   THE COURT:  -- or competitive advantage in the sale of

19   his product?

20   MR. FERNICH:  No, no, no, in horseracing.  So it's

21   exactly as I write here.  I mean, frankly, it's my impression

22   from the record that that's very close to the true state of

23   affairs, but whether a jury finds that is up to them.  I think

24   that this case is about -- statutorily about the adulteration

25   and misbranding of drugs.

1          THE COURT:  Correct.

2          MR. FERNICH:  But, really, the -- and so that is, as

3   we all know, a public welfare statute.  And what Fishman was

4   really doing, I submit, or reasonable view of the evidence

5   supports that he doesn't care about that stuff at all.

6          THE COURT:  What stuff?  That's not what --

7          MR. FERNICH:  Adulteration, misbranding.

8          THE COURT:  Correct.

9          MR. FERNICH:  He doesn't care about -- it's a matter

10  of complete indifference to him, the FDA and the FDA rules and

11  regulations.  What he really cares about is doping horses and

12  beating the testability regimes.  That's why, when the

13  government gets up, and they're totally entitled to make the

14  argument, he wants to avoid detection at all costs.

15         And one theory of the evidence is that he wants to

16  avoid detection because he wants the horses to win; he's doping

17  horses.  And, ultimately, this statute is not about the

18  competitive integrity of horseracing.  That's a matter for

19  state and local racing authorities.  This statute has a

20  different ambit of concern, and if a jury were to find that he

21  lacked that intent that's connected to adulterated or

22  misbranding of drugs and that the only thing he cared about was

23  doping horses to win, that's not this law.

24         It might be a wire fraud law with doping regulations

25  and state law as a predicate for the wire fraud charge.  You

1    know, that's a great way to charge a doping case, in my

2    opinion.  This is a different thing, and the government said --

3    and it's a totally legitimate argument to make, I'm

4    paraphrasing -- that he was manufacturing drugs in the guise of

5    practicing veterinary medicine.

6           And one view of the evidence is that this prosecution

7    is intended -- is trying to regulate performance enhancing

8    drugs in the guise of an adulteration and misbranding public

9    welfare statute.  And that's not what this is about.  And

10   that's why there are these state and there are federalism

11   concerns implicated, and that's why, as your Honor wrote in her

12   pretrial ruling, that's why, subsequently, there has been a

13   civil federal regulatory statute that deals with the doping of

14   races and the integrity of horseracing; so that's an argument

15   that we could make, that the intent --

16          THE COURT:  I didn't make it, and that's why I

17   addressed it in my opinion.  I didn't raise it in my opinion.

18   I rejected the arguments by the defendants that the fact that

19   there is --

20          MR. FERNICH:  No, that statute is not preclusive.  The

21   defense argued --

22          THE COURT:  Correct, and that's what I said.

23          MR. FERNICH:  No way does it preclude this

24   prosecution.  What I'm saying is they brought the case --

25          THE COURT:  But that's what some of the defendants

1    argued.  That's why I commented on the statute; so now you're

2    conceding the correctness of -- and I don't remember whether

3    Dr. Fishman joined in that argument or not.

4            MR. FERNICH:  That argument is not an argument that I

5    would have made that the defendants made.  What I'm saying is

6    something -- I'm not assailing the Court's ruling at all.  I'm

7    using the Court's ruling, in part --

8            THE COURT:  Yes, but you're saying that I

9    affirmatively made a statement about the Horse Integrity

10   Security Act.  And the only reason I addressed it was because

11   it was the grounds on which the defendants, some or all of

12   them -- perhaps including your client, I don't remember --

13   moved to dismiss.

14           MR. FERNICH:  It's not an argument that holds any

15   water.  Let's just put that point to one side.  A jury could

16   find that Dr. Fishman -- it was a matter of FDA, all of it, it

17   was a matter of complete indifference to him, and all he cared

18   about was doping racehorses.  That is not a violation of the

19   FDCA.  It may violate state and local racing rules.  It may

20   violate other federal statutes.  It doesn't violate this one,

21   and that's why I want the charge.

22           THE COURT:  Okay.  So I hear all of what you're

23   saying, and I don't even necessarily disagree with some of it.

24   But I go back to what I said to you yesterday, I am not going

25   to charge the jury on what a statute does not do or what is not

1    charged in the complaint.  You can certainly argue that in your

2    summation, but I'm not going to charge that --

3              MR. FERNICH:  Okay.

4              THE COURT:  -- any more than I'm not going to charge

5    the government's theory of the case.

6              MR. FERNICH:  Well, Judge, we're on different footing

7    than the government, and I take your Honor's point.  In a

8    criminal case, if we -- we're entitled to a defense theory

9    charge if it accurately states the law and conveys our theory,

10   and this is one of our theories.  I mean, this is dense obtuse

11   material, and a lot of stuff is being thrown at them, and I'm

12   just trying to put myself in the shoes of a regular juror.

13             THE COURT:  All right.  I'm not giving request 2.

14             MR. FERNICH:  Okay.  Got it.

15             THE COURT:  I find it completely misleading and --

16             MR. FERNICH:  Okay.

17             THE COURT:  -- I'm not giving it.

18             MR. FERNICH:  Understood.

19             THE COURT:  We're on No. 3.  Why do we even need this?

20   It conflicts with your own request for a lesser-included

21   offense charge.

22             MR. FERNICH:  Well, not exactly.

23             THE COURT:  You may not convict him of the felony.

24   Okay.  You add "the felony" label, which the other problem I

25   have with that is are you trying to subtly introduce concepts

1    of punishment?

2            MR. FERNICH:  No, not at all.

3            THE COURT:  But that's what you're doing.  And then

4    you're talking to interstate commerce, which has its own

5    separate charge, and you're talking to intent to defraud or

6    mislead, which has its own separate charges, and now has the

7    lesser-included offense charge that you asked for.  So I'm not

8    seeing what No. 3 even adds.

9            MR. FERNICH:  I'll explain it.  Okay?  This goes to

10   the argument that we began addressing a little bit earlier, and

11   it goes to the argument that the government raised in the

12   pretrial motions and that your Honor said, rightly, that the

13   Court didn't need to decide back then.

14           The government is pressed -- the government's view is

15   that any intent to defraud or mislead suffices to satisfy the

16   statute, and I'm saying that it has to be by the plain language

17   of the statute, plain reading of section 333(a), that the

18   intent to defraud has to be in connection with the offenses

19   charged in 331; i.e. an intent to defraud or mislead

20   authorities connected to the dissemination in interstate

21   commerce of adulterated or misbranded drugs.

22           That's what this statute charges, and the

23   unconstrained view that any intent to defraud or mislead

24   suffices would run into the problem that I've -- and this is

25   basically in common parlance, on lawyer's parlance a nexus

1    requirement.  I think it's supported by the plain language of

2    the statute, and it's supported by these myriad authorities

3    that I've cited here in other white-collar criminal case

4    context.

5              THE COURT:  Okay.  I understand your point, which I

6    did not understand from this.  If you want to propose language

7    that the intent to defraud or mislead must, in some way, be

8    connected to the misbranding --

9              MR. FERNICH:  Yes.

10             THE COURT:  -- I'll consider it.  That's not what this

11   says to me.

12             MR. FERNICH:  Okay.  I'll redo it.  I tried to be

13   fair.  That's why the "in connection with" that's the key

14   language.

15             MS. MORTAZAVI:  Your Honor --

16             MR. FERNICH:  In connection with disseminating

17   interstate commerce or causing to be so disseminated,

18   adulterated or misbranded drugs.  That's the only thing I'm

19   trying to do here.

20             THE COURT:  Okay.  I told you I now understand what

21   you're trying to do, but this, to me, is totally confusing.

22             MR. FERNICH:  I didn't want to say, Judge, that they

23   must acquit, straight up, because they could get a conviction

24   on the lesser-included offense.  That's all I was trying to say

25   by the use of the word "felony," if that defense won't work on

1    the misdemeanor, that's all.

2              THE COURT:  The point is, back to my suggestion, back

3    when we were talking about the definition of an intent to

4    defraud or mislead, if you want to propose some language about

5    the fact that that intent to defraud or mislead has some how

6    been connected to --

7              MR. FERNICH:  That's all.

8              THE COURT:  -- the charged offense, propose something

9    like that.

10             MR. FERNICH:  That's in --

11             THE COURT:  I said propose it.

12             MR. FERNICH:  I'll propose to put it into the extant

13   defense charge.  That's the sole purpose of this proposal.

14             THE COURT:  So propose it to Ms. Mortazavi.  Let her

15   look at it, and if you put that simple sentence in there, that

16   might take care of what you're trying to do, without creating

17   this whole other concern I have.

18             MR. FERNICH:  Okay.

19             THE COURT:  All right.  Fair enough, now that I

20   understand what you're trying to do.

21             And request No. 4 now is going to be superseded by

22   whatever you're agreeing to, right?

23             MR. FERNICH:  Yes, correct.

24             MS. MORTAZAVI:  Correct.

25             THE COURT:  Okay.  So request 4, in your submission of

1  supplemental defense requests to charge, is withdrawn.

2           MR. FERNICH:  Yeah, we're going to consolidate it with

3  what Ms. Mortazavi and the defense is working on.  We're almost

4  there.

5           THE COURT:  Okay.  Anything further?

6           MS. MORTAZAVI:  Nothing from the government, your

7  Honor.  I imagine you would like to see a copy of this tomorrow

8  morning?

9           THE COURT:  As soon as you can do it.

10          MS. MORTAZAVI:  All right.

11          THE COURT:  I mean, I'm not going to be unreasonable

12  about this.  It's lousy out, and it's going to get more lousy

13  out; so as soon as you can do it.

14          MS. MORTAZAVI:  Thank you.

15          THE COURT:  If you can do it at some point in the day

16  tomorrow, that would be fantastic.

17          MR. FERNICH:  We'll deal with it.

18          THE COURT:  All right.  Thank you, all.  I appreciate

19  it, and I do appreciate that, by and large, you have been

20  working cooperatively.  I really do.

21          MR. FERNICH:  They're great to work with, your Honor.

22          THE COURT:  All right.  Thank you all then.  Anything

23  else on any other subject from anybody?  Ms. Mortazavi?

24          MS. MORTAZAVI:  Nothing further, your Honor.

25          THE COURT:  Defense?

1    MR. SERCARZ:  No.  Thank you, your Honor.

2    THE COURT:  So let me just ask you a couple of quick

3    questions, then.  Without, you know, pinning anybody down, do

4    you have a sense of how long we need for summations?

5    MS. MORTAZAVI:  For the government, it may be an hour,

6    or an hour and a half, your Honor, but that will --

7    THE COURT:  Okay.  And is that for both your summation

8    and your rebuttal?

9    MS. MORTAZAVI:  That is just for summation, and I'll

10   turn to Mr. Adams for an estimate of rebuttal.

11   MR. ADAMS:  Roughly a half hour.

12   THE COURT:  Okay.  And for the defense?

13   MR. SERCARZ:  An hour, and I'll try and do it more

14   briefly.

15   THE COURT:  All right.  Look, as I say, I'm not

16   constraining anybody.  I'm just trying to anticipate how Monday

17   is going to unfold.  I'd like, if there's any way possible, for

18   us to do this -- for us to be ready to start with the jury at

19   9:30, that's when they -- what time did we ask them to be back,

20   Ms. Dempsey?

21   MR. SERCARZ:  Your Honor, you told them 10:00.

22   THE COURT:  Oh, terrific.  I thought ahead.  So that

23   gives us a little bit of time, if we need it, on Monday

24   morning, but because I want to give the jurors a hard copy of

25   the charge -- I think I said that to you all, right?

1    MS. MORTAZAVI:  Yes.

2    THE COURT:  Okay.  I just think this is so long and so

3  dense, I'm generally not in favor of it, but I think here it

4  would facilitate things, and you all said you're in agreement;

5  so --

6    MR. FERNICH:  We have no objection to that.

7    THE COURT:  So why don't we plan to meet at 9:00.  If

8  there are things we need to discuss, we'll do that.  We'll take

9  care of it.  We'll be ready to go at 10:00 with the charge.

10  Even as lengthy as it is, we'll certainly be finished before

11  lunchtime.  I am open to your thoughts.

12    As a practicing lawyer, I would not want to be

13  interrupted once I start; so if we finish the charge at 11:00,

14  11:30 --

15    MS. MORTAZAVI:  Your Honor, is your intention to first

16  charge the jury and then have summations?

17    THE COURT:  I'm sorry.  What am I talking about?  No,

18  of course not.  Yes, you're right, you're right.

19    MS. MORTAZAVI:  All right.

20    THE COURT:  I wanted you to know the charges so that

21  when you do your summations, you have the benefit of it.

22    MS. MORTAZAVI:  Yes.

23    THE COURT:  I'm sorry.  So you're right.  We'll start

24  with your summation then at --

25    MS. MORTAZAVI:  At 10:00 a.m.

1    THE COURT:  -- at 10:00 a.m.

2    MS. MORTAZAVI:  Very good.

3    THE COURT:  And then you'll be finished by 11:30, at

4    the latest.

5    MS. MORTAZAVI:  Correct.

6    THE COURT:  And you could go until 12:30, if need be.

7    Then, Mr. Adams, do you want to keep going or --

8    MR. ADAMS:  I'll take a lunch break.  At that point,

9    they will probably need it anyway.

10   THE COURT:  Yes, I think jurors can't listen that

11   long.  So that's what I would propose we do then, but I don't

12   know, obviously, we're going to have to be flexible.  As

13   Mr. Fernich has said, trials are fluid, and depending on what

14   happens and how the timing works, it may be the jury wants a

15   break after the government's summation, before Mr. Sercarz

16   starts, and then I'm not going to time it so that you get

17   interrupted, Mr. Sercarz, obviously.

18   So we'll play it by ear, but that will be the

19   tentative game plan, that we'll get the first, your summation,

20   then your summation, Mr. Sercarz.  We'll break for lunch.

21   We'll have Mr. Adams' summation, then I'll charge the jury, and

22   then we will let them retire and begin deliberating.

23   MS. MORTAZAVI:  Very good.

24   THE COURT:  Okay?  I think I mentioned I'm going to

25   add a foreperson charge.  If I didn't say that, I should have.

1  It's missing here.  Ms. Popper, can you -- oh, right, and a

2  charge on discharging, releasing the alternates.  So we really

3  should talk about that.

4         It's my intent to release all four alternates, but to

5  ask them to please not talk about the case, and Ms. Dempsey has

6  their contact information, and tell them that it could develop

7  that we might have to ask some of them to come back.

8         MR. ADAMS:  Absolutely.

9         THE COURT:  And then the foreperson, it is my intent

10  to designate the juror in seat one, I don't even know who that

11  is, as the foreperson.  Some judges send them back to vote, but

12  personally I don't want them wasting half a day on voting for

13  the foreperson.

14         MR. ADAMS:  Good.

15         THE COURT:  Any objection?

16         MR. SERCARZ:  No, your Honor.

17         THE COURT:  All right.  Terrific then.  Thank you,

18  everybody.  Have a good weekend, and hopefully the storm won't

19  be so bad.

20         MR. ADAMS:  Thank you, your Honor.

21         MS. MORTAZAVI:  Thank you, your Honor.

22         MR. FERNICH:  All right.

23         (Adjourned to January 31, 2022, at 9:00 a.m.)

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

 JARRETT CONCANNON

Direct By Mr. Chow . . . . . . . . . . . . . 972

                    GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 9016    . . . . . . . . . . . . . . . . . . . 981

 3900 through 3911   . . . . . . . . . . . . 989

 101A-T through 199B-T   . . . . . . . . . . 995

 11002   . . . . . . . . . . . . . . . . . . 996

 9003    . . . . . . . . . . . . . . . . . . 996