M21PFIS1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          20 Cr. 160 (MKV)

5   SETH FISHMAN,

6              Defendant.
                                           Trial
7   ------------------------------x
                                           New York, N.Y.
8                                          February 1, 2022
                                           9:17 a.m.
9   Before:

10                 HON. MARY KAY VYSKOCIL,

11                                         District Judge
                                           -and a Jury-
12
                           APPEARANCES
13
    DAMIAN WILLIAMS
14       United States Attorney for the
         Southern District of New York
15  BY:  ANDREW C. ADAMS
         SARAH MORTAZAVI
16       ANDEN F. CHOW
         Assistant United States Attorneys
17
    SERCARZ & RIOPELLE, LLP
18       Attorneys for Defendant Fishman
    BY:  MAURICE H. SERCARZ
19       -and-
    LAW OFFICE OF MARC FERNICH
20  BY:  MARC A. FERNICH

21

22  ALSO PRESENT:  KARLINE JUNG, Paralegal Specialist

23

24

25

M21PFIS1

1          (In open court; jury not present)

2          THE COURT:  Good morning, everyone.  We are going to

3     assemble in the robing room to deal with the legal issue that

4     we have to deal with, and then we'll be back here for

5     summations.  So I'll see you inside in a moment.

6          (Continued on next page)

7          (Pages 1191 through 1199 SEALED by order of the Court)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M21PFIS1

1          (Recess)

2          (In open court; jury not present)

3          THE COURT:  Please be seated, everyone.

4          (Pause)

5          (Case called)

6          MR. ADAMS:  Good morning, your Honor.  Andrew Adams,

7     Sarah Mortazavi and Anden Chow for the government.

8          THE COURT:  Good morning.

9          MR. SERCARZ:  For the defendant Fishman, Maurice

10    Sercarz and Mark Fernich.

11         MR. FERNICH:  Good morning, your Honor.

12         THE COURT:  Good morning.

13         Good morning, ladies and gentlemen.  The jurors are on

14    their way up; so we'll be resuming momentarily.

15         (Pause).

16         (Jury present)

17         THE COURT:  Good morning, ladies and gentlemen.

18    Please be seated, everyone.

19         So good morning, everyone, and thank you again very

20    much for your patience and understanding with the delays that

21    we've had while we deal with some legal issues.

22         So we've reached the stage of the case where we're

23    going to hear the summations, the closing arguments from the

24    lawyers.  The evidence is closed at this stage.  The

25    evidentiary record is closed, and I remind you that what the

1    lawyers say to you is not evidence.

2            It's simply the opportunity for the lawyers to point

3    out to you the evidence that they think is particularly

4    important and to present to you the arguments that they wish

5    for you to consider during your deliberations.

6            It's your recollection of the evidence that controls,

7    and I'm confident that you will give the lawyers your full

8    attention during their arguments to you.

9            One further instruction I want to give you before we

10   hear from the government.  You may notice that the defendant,

11   Dr. Fishman, is not present in the courtroom today.  Please do

12   not speculate as to why he's absent.  Under the law, in these

13   circumstances, we may proceed in his absence and that is what

14   we are going to do.  I instruct you not to draw any inference

15   as to Dr. Fishman's guilt or innocence based on his absence.

16           All right.  So we are ready to proceed with closing

17   arguments.  Ms. Mortazavi?

18           MS. MORTAZAVI:  Thank you, your Honor.

19           Before we begin, if I could ask the jurors if they're

20   seeing any image on their screens?  They are?  Okay.  Very

21   good.

22           Ladies and gentlemen, good morning.  I want to start

23   off by thanking you again for your patience over the course of

24   this trial, and I'm thanking you on behalf of all the parties

25   to this case.

1    THE COURT:  And the Court.

2    MS. MORTAZAVI:  And the Court.  You've been listening

3    to the testimony.  You've been carefully weighing the evidence,

4    and you've been listening and following the government's proof,

5    and all of that tells you that you know what the defendant,

6    Seth Fishman, is all about.

7    You know that the entire point of the defendant's

8    business was to pedal adulterated and misbranded drugs, illegal

9    performance enhancing drugs designed by him to cheat at

10   horseraces.  And you know that he did that all without getting

11   caught; that he tried his best to hide what he was doing.

12   At the beginning of this trial, my colleague,

13   Mr. Chow, asked you to use your common sense, and I'm going to

14   ask you to do the same thing because your common sense tells

15   you that when someone says that their drugs are meant to dope a

16   horse, that's exactly what they mean.

17   (Audio recording played)

18   If someone says that they're trying to cheat the

19   system, that's exactly what they're doing.

20   (Audio recording played)

21   And if someone says that their illegal drug

22   distribution business is like a cocaine dealer smuggling

23   cocaine, they know that what they're doing is wrong and

24   illegal.

25   (Audio recording played)

1    The defendant made hundreds of drugs, drugs that were

2  specifically designed by him to enhance horses' performance in

3  a lot of different ways.  He sold them to racehorse trainers

4  and to others in the racehorse industry.  He knew he wasn't

5  supposed to sell them.  He knew trainers weren't supposed to

6  use them, and so he built his corrupt, multi-million dollar

7  drug distribution business around deceit all so the defendant

8  and his clients could avoid getting caught.

9    And this morning I'm going to walk you through the

10  many ways in which the defendant tried his best to shield

11  himself, shield his business and shield his clients from

12  accountability because he knew that what he was doing was wrong

13  and illegal.

14    During your deliberations, you're going to be asked to

15  consider whether Seth Fishman is guilty of two counts.  The

16  first is whether the defendant participated in a conspiracy

17  with a thoroughbred racehorse trainer called Jorge Navarro, or

18  George Navarro.  A conspiracy that had as its goal the

19  distribution of adulterated and misbranded performance

20  enhancing drugs in order to help Navarro dope his thoroughbred

21  horses.

22    The second is whether the defendant participated in

23  the conspiracy with others, apart from Navarro, that involved

24  the distribution of the defendant's illegal performance

25  enhancing drugs in order to help people in the racehorse

 1    industry dope their Standardbred and Thoroughbred racehorses.

 2    And you will be asked whether he did both of those things with

 3    the intent to defraud or mislead.

 4         Now, as the Court told you, Judge Vyskocil is going to

 5    instruct you on the law in the case.  What I say this morning

 6    is not evidence, and it's not the law.  Judge Vyskocil's

 7    instructions are going to control your deliberations.

 8         But I expect that Judge Vyskocil will tell you that as

 9    to both of those counts, they contain the same elements.

10    First, you'll have to consider whether there was an unlawful

11    agreement; second, whether the defendant joined in that

12    unlawful agreement; and, finally, whether one member committed

13    some act to further the agreement.

14         Now, the goals of each conspiracy in Count One and

15    Count Two are slightly different, as you're going to hear from

16    Judge Vyskocil when she gives you your instructions.  But

17    here's what they have in common.  In each case, what we're

18    talking about are drugs, and not just drugs, drugs that are

19    adulterated or misbranded or both.

20         You're going to be asked whether the defendant sent or

21    received these drugs across state lines and out of the country.

22    You're going to be asked whether he did something to adulterate

23    and misbrand drugs that were already moving across state lines.

24    And you'll be asked whether he did all that with the intent to

25    defraud or mislead.

1    So this morning, I'm going to start in reverse order

2   and talk to you first about Count Two.  This is the conspiracy

3   that centered around the defendant and his company,

4   Equestology, and its employees, people like Lisa Giannelli or

5   Lisa Ranger, people like Mary Fox, people who partnered with

6   Equestology, like Jordan Fishman.

7    Now, there's a lot that's not in serious dispute about

8   Count Two.  First, there's going to be no real dispute here

9   that what we're talking about here are drugs.  You heard the

10   testimony from Dr. Bowman.  According to the FDA, it considers

11   a substance either a food or a drug, and you know that these

12   substances are drugs because of what they were intended to do.

13    Remember when Dr. Bowman went over the promotional

14   material for Equestology?  That's Government Exhibit 711.  It

15   described exactly what these drugs were intended to do, to

16   affect the structure or function of an animal, to diagnose,

17   treat or prevent disease.  And you know that not just from this

18   one exhibit but from everything you've heard over the course of

19   this trial, from the defendant's own words when he was talking

20   to clients, from what his main sales rep, Lisa Giannelli or

21   Lisa Ranger, told to his clients.  You know that from their

22   calls, their e-mails, their text messages, even the drug names

23   themselves.  You also know that from the testimony of the

24   expert witnesses, Dr. Bowman and Dr. Cynthia Cole, and you know

25   that these are drugs because of your common sense.

1      What we're talking about are injectable medications,

2  intravenous, IV, intramuscular, IM.  We're talking about little

3  vials that need a needle and syringe.  We're talking about

4  pills.  We're talking about pastes.  We're not talking about

5  hay and oats and apples.  So that's not going to be in serious

6  dispute.

7      Now, you also know that these drugs are adulterated or

8  misbranded or both, and that is not in serious dispute either.

9  You remember the testimony from Dr. Bowman.  She told you that

10  an adulterated drug is one that is not approved by the FDA, and

11  it is not generally recognized as safe and effective.

12  Dr. Bowman took just a few of the hundreds of drugs that the

13  defendant has produced and she told you not approved by the

14  FDA, and looking at all the literature, not recognized as safe

15  and effective.

16      So that part you know.  But those drugs and others

17  were also misbranded.  There can be no real dispute that the

18  drugs were misbranded either.  Look at these labels.

19  Dr. Bowman talked to you about what's missing on these labels;

20  no correct manufacturer name, no manufacturer contact

21  information, no indications, no list of ingredients, no active

22  pharmaceutical ingredients, APIs, no adequate directions for

23  use.

24      And for many of these drugs, which were injectables,

25  that did require a prescription, they didn't have the required

1  prescription statement:  Caution, federal law restricts this

2  drug to use by or on the order of a licensed veterinarian.  In

3  other words, the information that all drugs that are legally

4  distributed are required to have.

5       And, of course, you know that some of these drugs had

6  no label at all, like BB3.  It doesn't take an expert to see

7  what's wrong here.  All you have is a name.  This is Seth

8  Fishman's infamous blood builder drug, BB3, as in blood builder

9  3.  Completely and utterly lacking in any information that the

10  FDA would require; no ingredients, no directions, no

11  manufacturer name, no warning, no prescription language.

12       And you know that the only way that they could

13  identify these drugs with customers was to talk about them by

14  cap color; blue caps and green caps.  So your common sense

15  tells you these drugs are misbranded.

16       And in addition to all of that, Seth Fishman and his

17  companies and his partner were not registered with the FDA to

18  manufacture drugs.  The parties had already agreed to that.

19  They agreed to that in the stipulation; so it's not in dispute.

20  Everything that was made, even if it had been properly labeled,

21  would still be misbranded because it was still produced by

22  companies that didn't register with the FDA.

23       And, of course, as we're going to talk about over the

24  course of this morning, many of these drugs required a

25  prescription, but these drugs did not have a prescription.

1     Now, there's also no serious dispute that these drugs

2  were moved across state lines.  They were sent across there by

3  the defendant and his co-conspirators.  You know that Seth

4  Fishman lived in Florida, that his office was in Florida.  The

5  defendant's main sales representative, Lisa, was located in

6  Delaware.  And the defendant's supplier, 21st Century, the

7  company that made the defendant's illegal drugs, was located in

8  Massachusetts.

9     So you know, at the very least, the drugs had to move

10 among at least three places.  But you also know that customers

11 were located across the United States; Ohio, Pennsylvania,

12 New Jersey, Illinois, including customers right here in the

13 Southern District of New York -- that's the district that we're

14 sitting in right now -- customers in Middletown, New York, in

15 Orange County, customers in New York, New York, just a few

16 minutes ride from where we're sitting today.  So you also know

17 that the defendant's crimes touched this district.

18     You also heard that the defendant's drugs were found

19 at racehorse training centers in this district, at the Golden

20 Shoe racehorse training facility in Montgomery, New York, drugs

21 like GNRH and ACTH.  You also know that drugs were found at the

22 Mount Hope racehorse training center in Middletown, New York,

23 in Orange County.  So again, you know these drugs had to move

24 across state lines, and you know that these drugs ended up in

25 this district.

1    So again, there's no serious dispute about most of

2    this conspiracy.  The only point in serious dispute, what

3    you're going to be considering during your deliberations, is

4    whether the defendant did this all with the intent to defraud

5    or mislead.  And you know from all the evidence you heard over

6    the course of this trial, from the very statements the

7    defendant made in his own private phone calls, you know that

8    when he joined in an unlawful agreement with others to create

9    and distribute his illegal drugs, the very foundation of that

10   agreement was built on deception.

11   Now there's no question that the defendant knew that

12   his business was illegal.  And the thing is, if you make and

13   sell illegal drugs, people try to stop you unless you take

14   steps to hide what you're doing.  And that brings us to whether

15   the defendant intended to defraud or mislead.

16   First, we're going to talk about who the defendant

17   tried to defraud or mislead, and second, we're going to walk

18   through the many ways you know how the defendant attempted to

19   defraud or mislead people, to hide what he was doing, to avoid

20   accountability.  We're going to talk about how he created

21   untestable drugs, how he siloed customers, that is, he created

22   different product lines for different trainers to minimize the

23   chances of any of his customers getting caught and having his

24   business taken down, how he and his customers tried to avoid

25   snitches, how he put misleading, false information on his

1   labels, and how Seth Fishman used his vet license as a shield.

2           So like I said, let's start by talking about the

3   people that the defendant tried to defraud or mislead.  The

4   defendant knew that the FDA might stop him from selling illegal

5   drugs to racehorse trainers.  Remember, Seth Fishman had an FDA

6   issue years ago.  He talked about himself in a private

7   conversation when the defendant didn't know that his phone was

8   being wiretapped:  I did have an FDA issue that nobody could

9   figure out and it didn't get taken care of.

10          Again on that same call:  He kind of gave me on the

11  low down that it was an FDA complaint.  Courtney -- that is

12  Courtney Adams, the very first witness who testified at the

13  trial, an Equestology employee -- Courtney got approached then

14  Courtney told something to whatever and they approached one

15  other person.  And repeatedly a reference to an FDA thing.

16          And what did the defendant do in response?  Well, he

17  set up a corporation in Panama.  Remember that recording that

18  the defendant made himself and saved to his own iPad talking

19  about setting up a Panamanian corporation to hide from the FDA?

20  What happened?  It was an FDA issue.  It was an issue where I'm

21  the U.S. -licensed doctor doing international, I didn't want an

22  FDA issue.  So I set it up as a shield against FDA, because

23  then they say oh, it's a Panamanian corporation, they have no

24  jurisdiction there, end of story.

25          That was Seth Fishman's business model, shielding

1    himself from anyone who could stop him.

2           He didn't stop there.  He tried to get Courtney Adams

3    to sign an NDA, a non-disclosure agreement, and even said why

4    he did that, again in a recording that he created himself and

5    saved to his own iPad:  So if some kind of regulatory body

6    comes to her, the beautiful thing is that she shows that piece

7    of paper and she can't talk to that regulatory authority unless

8    I'm there.  That's how I protect everyone.

9           Even back in 2017, the defendant knew that the FDA

10   could stop him.  Remember this email?  The defendant reached

11   out to a compounder in the United States, someone who was

12   legally doing business here, because he wanted one of his

13   products, Pentosan, to be in his words, a hundred percent

14   legitimate.

15          And he was told by this compounder in 2017 exactly

16   what it would take:  Two to three million dollars, five years,

17   an entire dossier to CVM, that is the Center for Veterinary

18   Medicine within the FDA.  There's no question that the

19   defendant knew what he was doing was illegal by manufacturing

20   these drugs at his partner's warehouse in Massachusetts and

21   doling them across the country.  And he knew that the FDA could

22   shut him down.

23          Not only that, the defendant knew he could be

24   criminally charged for what he was doing.  Look at this email

25   sent to Seth Fishman from one of his co-conspirators, Geoff

1  Vernon.  It's an email forwarding a newsletter with the

2  headline at the very top:  Veterinarian charged with plot to

3  drug horses before races.  He didn't even need to click on this

4  article to understand what it was about.  It says it right

5  there in the body of the email.  A Louisiana veterinarian has

6  been charged with engaging in a scheme to influence the outcome

7  of horseraces by illegally treating the animals with a

8  synthetic version of the drug known as frog juice.

9         So the defendant knew what the law required.  The

10  defendant knew the consequences of getting caught and the

11  defendant knew that the FDA might stop him, but the defendant

12  also knew that customs might stop him, that they might seize

13  one of his shipments that was going overseas.  And you know

14  that from his phone call with Jeff Gillis, a client who said he

15  was in Canada.  Gillis asks Seth Fishman whether he could ship

16  to Canada and the defendant responded:  Well, you can never

17  anticipate what is going to go on.  He doesn't like to

18  guarantee that shipments can make it over the border because

19  every time he says yes, it doesn't happen.

20         So Seth Fishman, knowing that there could be problems

21  at the border, lied on customs forms.  You know that from

22  Courtney Adams' testimony.  Look at their text messages,

23  Government Exhibit 402H from the defendant's phone.  On customs

24  forms, Courtney Adams asked him how much to list as the value

25  of a bleeder, and the defendant said 75 cents.  Why?  Well, she

1    told you:  To keep the total commercial value under a certain

2    limit.

3           So right here he's telling Courtney to list a shipment

4    as worth approximately $700, which is a lie, because $700

5    doesn't sound like a whole lot.  But you know that that was a

6    lie because of what Seth Fishman actually charged for his

7    bleeder products.  Look at this list.  We don't know exactly

8    what drug they were talking about, but we do know that it was

9    at least $12 and as much as $190 per bottle.  The defendant

10   lied because he knew that if he raised suspicions with overseas

11   shipments, customs could stop him at the border.

12          And the defendant also knew that state drug regulators

13   might stop him.  Do you remember that complaint that we went

14   over?  It was a 2011 complaint filed with the Delaware Division

15   of Professional Responsibility where these allegations are made

16   against Seth Fishman, quote:  "I am suspicious this

17   veterinarian does not have a client-patient relationship, and I

18   am positive the individual driving around farms selling drugs

19   behind or under Dr. Fishman's name is not a licensed

20   veterinarian.  I'm concerned this veterinarian is not

21   physically examining these animals and is in this medications

22   sales the situation strictly for profit.  She" -- meaning Lisa

23   -- "is also dispensing medications that are not approved in the

24   U.S., which could be an FDA violation."

25          And what did Seth Fishman do in response?  He lied.

1  The defendant submitted a letter in response to the complaint

2  with his notarized statement attached, and the letter said:

3  Dr. Fishman physically examines all animals he treats.  That

4  was a lie.

5        The letter said:  It is incorrect and professionally

6  irresponsible to claim that Lisa sells drugs for Seth Fishman.

7  That was a lie, too.

8        And what happened next?  Well, you know from the

9  parties' stipulation that the matter was referred to the

10 Delaware Attorney General's office.  And you know that that

11 office decided not to move forward with charges.  And you also

12 know why.  The defendant said it himself in a text message to

13 Adrienne Hall.  The veterinarian board had me investigated for

14 BS.  I spent $25,000 in legal fees and had a personal political

15 favor called in to end the BS.

16       Because that's what the defendant did when he got

17 caught.  He lied, he fought, he pulled strings, he got out of

18 it.  And through it all, he learned that if state drug

19 regulators get too close, they're going to stop him and stop

20 his business.

21       And finally, the defendant knew that state racing

22 regulators could stop him.  Those are the agencies that that

23 oversee horseracing in each state.  Now you know the whole

24 point of the defendant's business was to target racehorse

25 trainers and others in the industry, and he knew that in the

1    industry racehorses are subject to drug testing.  And if a

2    horse tests positive, well, two things could happen:  First,

3    your client, the person who bought your drugs, might flip on

4    you and turn you in; and second, even if they didn't, well,

5    then that product would become known, and the agency could then

6    create a test to detect what was previously a secret drug.  If

7    these racing commissions even found one of the bottles of Seth

8    Fishman's drugs, they could reverse engineer a test to detect

9    that drug on future drug screens.  And if the product could be

10   tested, well, then it was useless.  It would defeat the purpose

11   of cheating.  It would defeat the purpose of Equestology.

12          And Seth Fishman knew that.  Look at the email from

13   June 2012 from Seth Fishman to Wisdom Veterinary Medicines with

14   the subject:  To keep you updated on latest testing.

15          Now the lesson here is that when a bottle is found

16   with the product either labeled or easily identified, as it is

17   by itself, things are very easy for the racing jurisdictions to

18   make tests for.  And in that same email:  Trainers were found

19   with bottles labeled Dermorphin and they basically let

20   commission know exactly what to test for.

21          A few years later, 2015, when Lisa and the defendant

22   discussed a client that wanted Equestology drugs sent to a

23   racetrack, they laughed at the request.

24          Lisa:  She wanted me to send this to the racetrack

25   stable gate, I said absolutely not.

1    The defendant:  Ask her why not send it to race

2  commission office.

3    Lisa:  LOL, I know.

4    Because it was a joke to think that their products

5  were legal.  It was a joke to think that the racing commissions

6  would be okay with what they were selling.

7    So now we have talked about who the defendant had in

8  mind when he was trying to conceal his activities.  So let's

9  spend some time on how you know that the defendant's goal was

10  to defraud and mislead people.  The core of Seth Fishman's

11  business was to design performance-enhancing drugs that would

12  not test positive on drug tests.  How can you deceive racing

13  commissions if horses test positive for PEDs that you are not

14  allowed to use?  How do you cheat if you're getting caught?

15    And you heard it from the trainers who testified at

16  this trial, Adrienne Hall, Ross Cohen, Jamen Davidovich, a

17  positive drug test to lead to a horse getting disqualified.  A

18  trainer could be fined or they could lose their license.  And

19  Equestology was built around the requirement that these drugs

20  be untestable.  Courtney Adams told you that.  Equestology

21  specialized in making performance products.  For what purpose?

22  For horses.  Products that were untestable.

23    Seth Fishman described his business himself to a new

24  potential client.  Look at this email from 2018:  As for

25  doping, I make all my products non-testable.  I have no other

1   clients looking for detectable know substances.

2           Seth Fishman didn't even bother trying to make drugs

3   that could be caught on a drug test because what's the point if

4   all your customers are trying to cheat?  And of course, that's

5   what his clients wanted.  Look at this email between the

6   defendant and a client where the client writes to confirm a

7   phone conversation between the defendant and someone named

8   Mansour.  I gave you my mobile to talk to Mansour about the

9   drugs that you could make so to not appear in tests.

10          Fishman talked about this with clients a lot.  In 2017

11  a client asked Lisa:  Does a particular drug test in PA?

12  Meaning Pennsylvania.  And the defendant responded:  It will

13  not test anywhere.

14          Another text message the year before in 2016, Ross

15  Cohen, the trainer that you heard testifying at this trial, who

16  told you that he used Seth Fishman's drugs to dope his horses.

17  He reached out about a particular drug to see if it would test,

18  and Seth Fishman said:  Half, but it tests.

19          So you know it's at the core of the business.  It's

20  plain as day.  One of the ways Seth Fishman tried to defraud

21  and mislead people was by creating these untestable drugs.

22          And I want to spend just a minute talking about that

23  word "untestable or the words "not testable."  "Untestable"

24  does not mean permitted.  You heard the defendant say that

25  himself.  In his phone call, any time you give something to a

1  horse to make it better, that's doping.  Whether or not they

2  test for it is another story.

3       Because you know that there's a difference between

4  following the rules and not getting caught.  Seth Fishman's

5  drugs were not intended to follow the rules.  That's not how he

6  described them.  That's not how he designed them.  They were

7  intended to avoid getting caught.

8       And how do you know that?  Well, I'm going to talk

9  about just two examples.  One, blood builders, that substance

10  that builds up a horse's red blood count that increases their

11  performance; and two, drugs that were designed by the defendant

12  to be administered the day of a race.  These two types of drugs

13  show you absolutely without a doubt that the defendant knew

14  that he was breaking the rules and just doing it in a way that

15  he and his clients wouldn't get caught.

16       So let's talk about blood builders.  Adrienne Hall

17  testified that blood builders are not allowed.  If the racing

18  commission found out, you could get in big trouble for using

19  it.  Suspended or fined.

20       Now remember, Adrienne Hall is a relatively young

21  trainer.  She only he got her trainer's license in

22  December 2017.  She spent far less time in the racehorse

23  industry than the defendant, who has been doing this for about

24  two decades.  But even Adrienne Hall knows that you cannot give

25  blood builders to a horse.  And if she knows the rules, then

1    Seth Fishman does, too.

2          You heard Dr. Cynthia Cole testify about blood

3    builders as well.  She told you that Epogen is a class of drug

4    known as a blood builder, and she is aware of no jurisdiction

5    that permits Epogen to be administered to a racing horse at any

6    time.

7          But blood builders are exactly what the defendant

8    sold, like BB3.  Remember that tiny vial with the blue cap.

9    That's what the defendant offered to trainers.  And he knew how

10   important blood builders are to athletes in any sport.

11         (Audio recording played)

12         MS. MORTAZAVI:  So even though blood builders aren't

13   allowed at any time in any jurisdiction, Seth Fishman still

14   sold them to trainers.

15         But it's not just blood builders, it's also those

16   drugs that were designed to be administered to a horse injected

17   into a horse the day of a race.  And you know that that is not

18   allowed in pretty much every state.  Adrienne Hall testified to

19   that.  She told you her understanding:  You are not allowed to

20   administer a drug to your horse the day of a race, VO2 Max, and

21   pretty much every state has that rule.  Adrienne Hall knows it.

22   And she's only been doing this for four years.

23         Now you also know that the defendant understood that

24   you weren't allowed to give drugs the day of a race because of

25   his private phone call with Lisa.  He talked about trainers

1    that did that, trainers who would hit their horse in the gas

2    station right before pulling up to the track, and he said

3    that's a crime.

4            (Audio recording played)

5            MS. MORTAZAVI:  So the defendant knew:  Race day

6    drugs, that's not allowed.  And yet the defendant designed

7    drugs that were intended to be used the day of a race.  And we

8    went over some of these drugs, drugs like VO2 Max, administer

9    intravenously one to four hours prior to strenuous exercise; HP

10   Bleeder, administer IV or IM six to eight hours before

11   exercise; pain shot, four to six hours prior to strenuous

12   exercise, administer IM or IV.

13           Now I expect that someone might look at this and say

14   well, these labels say "exercise," they don't say "race."  But

15   don't let those labels fool you, don't let the term "exercise"

16   fool you, because that's exactly what the defendant wants.

17   That's exactly why he put "exercise" on these labels.  That is

18   misleading.  Because on these labels, these labels that might

19   be found by the racing commission, he put "exercise," but in

20   the defendant's private conversations, his texts, his emails,

21   his phone calls, he and his clients talked about using these

22   the day of a race.

23           Adrienne Hall told Seth Fishman outright she used the

24   VO2 Max race day.

25           (Audio recording played)

1     MS. MORTAZAVI:  Now she also testified that the

2    defendant never told her to follow the racing rules when she

3    used his drugs.  That means that even after the defendant

4    learned under no uncertain terms that she had broken the racing

5    rules, he never told her hey, wait, stop, you should use these

6    according to the rules in your jurisdiction.

7         Look at these text messages between the defendant and

8    the trainer Jorge Navarro.  Navarro asks if he can give his

9    horse pills right up until the race, and the defendant says

10   yes.  No qualifiers, no instructions.

11        And look at the defendant's own description of VO2

12   Max, a description that he gave to his main sales rep Lisa to

13   pass along to trainers.  He said it himself in this email, he

14   wrote this description of VO2 Max:  Use four to five fors --

15   meaning hours -- prior to race.  So in private, there was no

16   question the defendant knew that his drugs would be used the

17   morning of a race, and in private the defendant knew "exercise"

18   means "race."  And putting down "exercise" on his labels, well,

19   that was just another lie, another lie that the defendant used

20   to avoid getting caught.

21        And the defendant already told Adrienne Hall on a

22   wiretapped call that he lied on his labels.  In one call he

23   told her that he put six days out on the label of a bottle he

24   gave her, meaning six days in advance of a race.  And why did

25   he do that?  Not because you were supposed to use that drug six

days in advance of a race, but if a bottle gets turned in, then

at least when they see "use six days out," they don't think it

is a prerace as well.  So when jurisdiction finds something and

they see "use six days out," then it is almost like they don't

pay too much attention to it because it's like a disclaimer

that it is not a prerace.

            The defendant knew that labels mattered when it came

to drugs that were being administered on the day of a race,

when it came to avoiding being caught, because someone could

pick up a bottle and read the label.  And the reason he lied on

those labels is because he knew it was wrong, he knew race day

drugs violated the rules.

            So that's how you know.  When the defendant talks

about a drug that is not testable, he is not talking about

following the rules, he is talking about cheating and getting

away with it.

            So let's talk about the next way you know that the

defendant tried to defraud and mislead people, by siloing

customers, that is, by offering to create exclusive products

customer by customer, different drugs for different trainers.

That way he made sure that if one trainer got busted, it

doesn't take down his whole operation, it doesn't take down any

other client.  And this was a service that he offered to people

who could afford to pay it.

            So what does that mean for your deliberations?  Well,

1  it means that Seth Fishman made more and more untestable,

2  unapproved, misbranded drugs.  He didn't wait to go through FDA

3  CVM's drug approval process for each of the hundreds of drugs

4  that he created.  That was part of his crime, creating and

5  selling unapproved drugs quickly, limiting the fallout to the

6  rest of his business if one trainer was caught.

7          And how do you know that?  Well, the defendant said so

8  himself.  Look at these text messages from one of the

9  defendant's phones:  I make custom bioengineered products.

10  Owners prefer to pay more for exotic stuff knowing they are

11  less likely to get caught.  And on this phone call the

12  defendant explained:  Most of the products I make are private

13  and custom.

14          And he even told people why he did that; the exact

15  same reasons we have gone over, because if one trainer gets

16  caught using the defendant's drug and the commission designs a

17  test for it, it's bad, but it won't take down the whole

18  business.  It won't affect other trainers.  It won't affect

19  other product lines.

20          Look at this call, this is a call between Seth Fishman

21  and Adrienne Hall:  Unless somebody turns you into the race

22  jurisdiction, nobody is going to test for it because it's not

23  known until it is known.  That's why I make different ones for

24  different trainers, because some trainers want to have

25  something that's more exclusive.  You won't have to worry about

1   trainer A doing something stupid.

2           And he even explained it on another call:  The reason

3   I say that certain people want exclusivity is because you know

4   if these horses are being tested and they have something that

5   somebody else has and that person is irresponsible, then it

6   becomes a problem for them.

7           So that's also how you know how the defendant tried to

8   defraud and mislead people, by creating hundreds of drugs,

9   offering to create exclusive custom lines for individual

10  clients who were willing to pay for it, to avoid drug tests, to

11  avoid compromising his business if someone gets caught, so the

12  defendant couldn't be stopped.

13          And how else do you know that the defendant was trying

14  to defraud or mislead people?  Because he was careful with who

15  he worked with.  He wanted to make sure that people buying his

16  products could be trusted, that they wouldn't turn him in.  He

17  wanted to avoid snitches.  "Snitches" is his word, that's not

18  my word.  That is how the defendant described people that he

19  thought might threaten his business.

20          Look at this description of one of the defendant's

21  drugs, Equifactor.  This was a list of products that Seth

22  Fishman and Lisa Giannelli compiled together to give to

23  clients:  The labs could never detect unless a snitch turned a

24  bottle -- tuned a bottle in -- and the racing authorities

25  decided to make a test.

1    He spells it out right there, who he's trying to

2    deceive, what he's trying to avoid, the risk of getting caught.

3    The defendant in a wiretapped call says, in his own words:  I

4    don't know how many FEI snitches there are like there are

5    racehorse snitches.  At any given time you know ten percent of

6    the equine population racing Standardbreds will snitch.

7        In an email from the defendant to Lisa he describes

8    BB3, that blood builder that we talked about, the one with no

9    label.  He describes it as a long-acting blood builder and

10   makes sure that she knows would only let trusted clients have

11   this.

12       In another email that Seth Fishman sent again to the

13   Lisa describing B3, what's likely a typo for BB3, he writes:  I

14   would really stay low key on this one.

15       Why BB3 more than anything else?  Because he knows

16   it's a blood builder and blood builders are banned.

17       Here's the thing, ladies and gentlemen, use your

18   common sense.  If you are doing something legal, if you are

19   selling legal products that comply with all the rules, you

20   don't have to worry about snitches.  You could sell to anyone

21   because you have nothing to hide.  But the defendant and his

22   co-conspirators hid a lot because they had a lot to lose.

23   Their whole operation could be shut down.

24       So they vetted clients.  Look at these messages from

25   2017 between Lisa and the defendant.  Lisa says they have a new

1   client, she set up payment information, credit card on file,

2   and the defendant doesn't ask about the patient, the horse, he

3   asks:  Can he be trusted?  And Lisa says:  I will ask around.

4        Look at these text exchanges between Lisa and the

5   defendant where they discuss whether they can trust clients.

6   This text exchange at the top from 2019, the defendant asks:

7   Can you trust Corey?  And Lisa responds:  Yes.

8        Other text messages, later in 2019, Lisa brings to the

9   defendant's attention a particular customer, Brady Gallaghers.

10  She says she spoke to someone who knew him, who could vouch for

11  him.  But she still says proceed slowly, he needs to become a

12  regular client and get the everyday supplies before opening the

13  door to bigger stuff.  And only then, only once Lisa reassures

14  the defendant about this person does the defendant agree to

15  speak with her.

16       And on a call between the defendant and Lisa, he says

17  he didn't really want to talk to a customer because he wasn't

18  sure that they were trustworthy.

19       (Audio recording played)

20       MS. MORTAZAVI:  On a wiretapped call on June 6, 2019,

21  the defendant learned that one of his products was extremely

22  popular.  And he told his partner, John Pundyk, who was

23  distributing drugs as part of the conspiracy:  You got to kind

24  of feel them out on a scale of one to five, five being awesome

25  solid and one being as soon as something goes wrong, they're

1  crying.

2          The defendant was telling Pundyk to do exactly what

3  Lisa did every day, categorize people before you sell to them,

4  check out customers, ask around.  Are they going to be awesome

5  solid or are they going to be snitches?

6          And this same partner, Pundyk, emailed the defendant

7  about a client, doing the exact same thing Lisa did, subject,

8  customer, and in the email:  Please call him today.  I checked

9  up on him and he is clear.

10          And don't forget Adrienne Hall.  Remember, she reached

11  out to him, but she told you that the defendant didn't get back

12  to her right away when she texted him about prerace options.

13  First, Lisa had to tell the defendant that she had found

14  somebody who could vouch for Adrienne Hall, another trainer

15  that they trusted.  She's a referral of Danielle Maier.  And

16  only after that did the defendant reach out.

17          Screening clients, checking to see if they were a

18  snitch, checking to see if they were trustworthy, that is also

19  how you know that the defendant tried to defraud and mislead

20  people.

21          Next, you know that the defendant tried to defraud and

22  mislead people because of how he labeled or didn't label his

23  drugs.  We talked about some of this already.  The defendant

24  put down "exercise" when what he really meant was "race."  The

25  defendant put six days out on a drug label so it didn't look

1   like it was going to be used right before a race.

2         But he did more than that.  Now at this trial you

3   heard a lot about the defendant's company, Equestology.  But

4   you wouldn't know the name of his company if you were to look

5   at the bottles of his drugs.

6         Look at all the labels in this case, photographs,

7   files on the defendant's computer and Dropbox account, stickers

8   that were seized from the defendant's office, hundreds of vials

9   of drugs that were taken from the defendant's office from

10  Lisa's home, from racehorse training centers, almost none of

11  them contained the name of the defendant's company Equestology.

12        Equestology is the name that is listed on invoices

13  sent to trusted clients, Equestology is the name that was given

14  to the bank when they opened up a corporate bank account, but

15  that is not the name that you are going to see on Seth

16  Fishman's bottles; Equi-Tech, Equifactor, Equimass, SPC or

17  Specialized Performance Compounds, or no name whatsoever, drugs

18  that are with just identified by cap color and maybe a very

19  simple line, BB3.  Across these labels, no manufacturer's

20  address, no contact information; in other words, no way to

21  trace these drugs back to Seth Fishman.

22        And the defendant didn't just leave out information

23  that should have been on these labels, he added information on

24  these labels that were lies, like the phrase R and D, meaning

25  research and development.  Well, that's a lie.  Look at these

1    labels, this product is for R and D and clinical evaluation,

2    for R and D and clinical trial use only.  Seth Fishman was no

3    researcher, and neither were his clients.  But they knew that

4    anybody who saw these labels might think that these drugs, even

5    if they didn't look exactly like they were FDA approved, that

6    they might be okay, they might be part of a clinical trial,

7    they might be something other than what they were, illegal

8    drugs.

9          Look at these series of texts where Equestology

10   employee Mary Fox and Seth Fishman discuss an order for Jamen

11   Davidovich.  That's the racehorse trainer who testified at this

12   trial.  Mary asks:  Which label do you want used for TB-7 for

13   Jamen order?  The defendant responds:  Use nicer label.

14         Then Mary Fox, the defendant's employee warns him,

15   wanted to be sure as it has no directions, and says:  For R and

16   D, for clinical trial use only.  And the defendant says:  Well,

17   that's okay.

18         Did Jamen Davidovich seem like a researcher to you?

19   Did it seem like he was involved in clinical trials?  Or did it

20   seem like it was exactly what he told you, that he was a

21   racehorse trainer trying to dope his horses.

22         But that's not the only false information that the

23   defendant put on his labels.  He added language to make it

24   appear that these drugs were prescribed, again so that someone

25   picking them up might think, well, I haven't seen this drug

1    before, but if a vet gave it out, it must have been prescribed,

2    it must be okay.

3         But you know that Seth Fishman didn't prescribe each

4    of the drugs that he sold.  Lisa sold these drugs for him in

5    bulk.  The defendant sold these drugs in bulk.  Customers asked

6    for the drugs by name and they got them.  No diagnosis, no

7    prescription, no mention of an animal.  Look at these labels:

8    IM or IV for as or as prescribed by veterinarian.  Federal law

9    prohibits dispensing without a prescription.  This device is

10   restricted to use by or on the order of a licensed

11   veterinarian.  Lies and lies.

12        Picture the person who picks up one of Seth Fishman's

13   drugs, whether you're an agent from the FDA or from customs,

14   whether you're from a state drug regulator like the Delaware

15   Division of Professional Responsibility or whether you're an

16   employee of a state racing commission, you find one of these

17   bottles with one of these labels, could you know that it came

18   from Equestology?  Could you know who to contact if you had

19   questions about the drug?  Could you know what to test for?

20   Could you even know from the bottle what the drug is supposed

21   to do?

22        No, you could not.  And that was the point.  The

23   labeling itself was designed precisely to mislead.  The

24   information that was put in this, the information that was left

25   out, the way these labels were designed tells you that it's not

SOUTHERN DISTRICT REPORTERS, P.C.

1   just that they were misbranded, they were also deceptive.

2           And finally, you know the defendant intended to

3   defraud and mislead people because he used his status as a

4   veterinarian as a cover so that no one would question why he

5   was distributing so many drugs.

6           Now make no mistake, Seth Fishman was a drug

7   manufacturer, but he knew that if he maintained his vet

8   license, well, then the lines might get a little blurry.  It

9   would be too difficult to challenge him.  And he could say that

10  all these performance-enhancing drugs that he was peddling,

11  well, they were just therapeutics, they were medically

12  necessary, they were prescribed off label.

13          Now the defendant has no burden of proof in this case.

14  I want to make that perfectly clear.  Throughout this trial,

15  from beginning to end, the burden of proof rests with the

16  government.  The defense is under no obligation to present any

17  evidence.  They're not even under any obligation to make an

18  argument.  But if the defense does choose to make arguments,

19  then you have the right to scrutinize them.  You have the right

20  to question it.  You have the right to ask if those arguments

21  are consistent with the evidence that you have seen, with the

22  calls, the text messages, the emails, the testimony.

23          And you heard over the course of this trial questions

24  about whether the defendant cared about the health and

25  wellbeing of horses.  Those questions are a total distraction.

1   The defendant's vet status is part of his cover story.  He

2   maintained his vet license for a day just like this when he

3   would have to answer for his crimes.  His vet license was yet

4   another way that the defendant tried to defraud and mislead

5   people, to make it seem like he was practicing veterinary

6   medicine when what he was doing was running an illegal drug

7   manufacturing business.

8          Remember the search of Equestology back in 2019, the

9   piles of drugs that were seized from his unit that we brought

10  into the courtroom last Friday, some of the drugs that are

11  right here in front of you today.  That is not a vet's office,

12  that is a drug warehouse.

13         Remember when Courtney Adams testified at the very

14  beginning of this trial, in the entire time she worked at

15  Equestology, for about four years, Seth Fishman only touched a

16  horse once or twice, maybe.

17         And remember what the defendant said in a recording

18  that he made that was saved to his iPad.  At that point, he

19  hadn't touched a horse in four years.

20         (Audio recording played)

21         MS. MORTAZAVI:  And remember when Adrienne Hall asked

22  Lisa if the defendant would conduct a lameness exam, a physical

23  exam of one of her horses, and Lisa said Seth Fishman doesn't

24  examine horses.

25         And just look at how he interacts with his customers.

1  Look at these messages with Tom Guido on Seth Fishman's phone.

2  No mention of an animal or a prescription or a diagnosis.  This

3  is a drug distributor taking orders, this is not a veterinary

4  prescribing medication.

5       And you also know that Seth Fishman is using his vet

6  license as a cover story because he already did it once before.

7  Remember that complaint that we went over with the Delaware

8  Division of Professional Responsibility.  The defendant was

9  accused of not practicing veterinary medicine.  He was accused

10  outright of just being in this drug distribution business for

11  profit.  And Seth Fishman lied.  He said Lisa doesn't sell

12  drugs, and he said I am a vet who physically examines all the

13  animals I treat.

14       So those lies, that cover story, the fact that the

15  defendant happens to be licensed as a veterinarian, well,

16  that's all part of his scheme.  That's already built into the

17  conspiracy.  That shows you that he wanted people to be misled.

18       So those are all the reasons, ladies and gentlemen,

19  that you know what was in the defendant's mind when he

20  participated in this conspiracy.

21       And you also know that he's been doing this for an

22  extremely long time.  On a wiretapped call in 2019, Lisa told

23  Seth Fishman they have been doing this for about 15 or 18

24  years.  And you heard testimony from Ross Cohen, the racehorse

25  trainer, that he has known that Lisa sells drugs for Seth

1    Fishman going back as early as 2001.

2           Now when you go back to begin your deliberations,

3    you're going to be asked whether Seth Fishman is guilty or not

4    guilty of Count Two.  But you're also going to be asked an

5    additional question, you are going to be asked whether he

6    continued his crimes while he was on bail, after he was

7    arrested on October 28, 2019.  You heard that he was arrested

8    and then placed on bail as of that date and that he has

9    continued to be on bail up until this trial.  You also heard

10   that a condition of his bail is that he not commit any crimes.

11   But you also know that the defendant kept his illegal business

12   going even while he was out on bail.

13          Look at these text messages between the defendant and

14   Lisa, and look at the dates.  Only a few weeks after Seth

15   Fishman is arrested in connection with this race, after he's

16   placed on bail, he still keeps his business going, he tells

17   Lisa:  Send Mary a list of what is needed and priorities.

18          And a few months later Lisa asks how much he wants to

19   charge per tube of his bleeder paste, and he responds:  45.

20   Seth Fishman, even on bail, is still calling the shots.

21          Look at these text messages, not including Fishman,

22   but between Mary Fox and Lisa Giannelli, two of his

23   co-conspirators.  They talk about fulfilling orders, getting

24   product out, using old labels.

25          And look at the message on the top:  I will email him

1   again and get back with you.  January 17, 2020.  They're also

2   talking about checking in with the defendant, making sure he

3   knows, because he is still keeping the business alive.

4           You also know that from the emails between the

5   defendant, Mary Fox and Jordan Fishman, the supplier to the

6   defendant.  You know from the emails between all of them that

7   the defendant kept committing crimes.  In this January 29, 2020

8   email, Jordan Fishman writes to say VO2 Max is formulated and

9   is being vialed.

10          February 10, 2020, the defendant writes Mary Fox to

11  ask questions about their inventory, and he is asking about the

12  exact same drugs that they distributed before Seth Fishman was

13  ever arrested, VO2 Max, EGH.  You remember EGH, that's the

14  equine growth hormone.  You heard about it at this trial.

15  PSDS, that's the defendant's pain shot.  You heard about that,

16  too.

17          In more emails, January and February 2020, months

18  after the defendant was arrested, Mary Fox writes Seth Fishman

19  and talks about the amount of drugs they are producing with

20  reference to pallets:  Pallet 2 from 21 shipping today with VO2

21  and PSDS, EGH to be completed and shipped ground next week.

22          January 20, 2020, Mary Fox sending Seth Fishman a list

23  of orders.  Here's a list of everything needed, EGH a thousand,

24  meaning a thousand bottles, VO2 Max, 500, PSDS, 600.

25          You also saw the deposit slips from Equestology, and

1    these are all dated from just a few weeks after the defendant

2    was arrested up through the end of 2019, all while Seth Fishman

3    was out on bail.

4         And you heard about the search that occurred of

5    Equestology's business.  It happened just a few months ago in

6    December 2021, right before this trial, FBI agents went to Seth

7    Fishman's office and warehouse space again.  They found drug

8    packaging there, again, and they found drugs there, again, the

9    exact same drugs that Seth Fishman had been distributing before

10   his arrest.

11        And look at the date of manufacture on this drug, the

12   DOM as it's listed, January 2021, over one year after the

13   defendant was first put on bail.  And agents also found

14   instructions in his office for making drugs.  Because Seth

15   Fishman never stopped; even after his arrest in this case, he

16   kept committing crimes.

17        So ladies and gentlemen, all of that was Count Two.

18   I'm going to talk to you very briefly on Count One.

19        Count One is the conspiracy involving Jorge Navarro.

20   Navarro was one of the most successful Thoroughbred trainers in

21   the country, The Juice Man, someone who got drugs to dope

22   horses from multiple people, not just the defendant, someone

23   the defendant sold to for years.

24        Now when you deliberate, you're going to be asked

25   whether Seth Fishman joined in a conspiracy centered around

1    Navarro's own doping operation with the goal of moving

2    performance-enhancing drugs around the country so Navarro could

3    dope his horses.  And the proof on this is simple.  The drugs

4    Navarro bought from the defendant, BB3, bleeder pills, VO2 Max,

5    drugs that were not FDA approved, not manufactured in a

6    registered facility, not labeled properly; in other words,

7    adulterated and misbranded, drugs that moved across state

8    lines.  Remember, they were made up in Massachusetts by Jordan

9    Fishman, they were shipped down to Florida where Equestology is

10   located, and they were shipped to Navarro, at his addresses,

11   one in New Jersey, and one in Florida.  That's all in

12   Exhibit 401K, which are the text messages between Navarro and

13   the defendant.

14        And you know what Navarro ordered from the defendant

15   because of his order history with Seth Fishman:  BB3, bleeder

16   pills, VO2 Max, HP Bleeder Plus.

17        And you know that Navarro ordered these from the

18   defendant because of their text messages.  Between Navarro and

19   Seth Fishman:  Do you have any bleeding pills?  If you do, send

20   me a thousand.  Need them by this weekend.

21        A call when Navarro discusses VO2 Max, what he

22   describes as the amino acid, something so powerful that when he

23   gave it to his horses, the horse galloped.  VO2 Max, which we

24   talked about, that's the drug that has to be administered the

25   day of the race.  That's the drug Adrienne Hall administered to

1    her horse the day of a race.

2         BB3, the infamous blue cap blood builder, a drug that

3    Navarro told Fishman he loved.

4         And you also know from the proof in this case that

5    when Navarro won a big race on March 30, 2019, he gave the

6    defendant credit.  The defendant wrote:  Congratulations, just

7    saw your race.  And Navarro wrote back:  Thank you, Boss, you

8    were a big part of it.

9         And finally, you know that Count One, the Navarro

10   doping conspiracy, touched this district, the Southern District

11   where we're sitting, because Seth Fishman, while he was in

12   Manhattan, placed a phone call to one of his employees to

13   fulfill an order for Jorge Navarro.  This is an intercepted

14   call between Seth Fishman and his employee, Mary Fox, making

15   sure that they had set things up for an order with Jorge

16   Navarro.  In other words, he took an act to promote the

17   conspiracy while located in this district.

18        So ladies and gentlemen, you've heard a lot of

19   evidence in this case.  You've heard me talking about both

20   counts that you're going to consider.  But really, the facts

21   here are simple:  The defendant for years thought he could

22   cheat the system.  He thought he could cheat FDA.  He thought

23   he could cheat customs.  He thought he could cheat state drug

24   regulators.  He thought he could cheat racing commissions, and

25   he and his clients thought they could cheat at horseraces.

M21TFIS2

1          Seth Fishman cheated the system for a very long time,

2     and he made millions of dollars doing it.  But the defendant

3     can't lie and cheat the system forever.  And today we're asking

4     you, ladies and gentlemen, to use your common sense and reach

5     the only verdict that is consistent with the law and the

6     evidence, that the defendant, Seth Fishman, is guilty on all

7     counts.

8          Thank you, your Honor.

9          THE COURT:  All right.  Thank you, Ms. Mortazavi.

10         Ladies and gentlemen, at this time we're going to hear

11    from -- well, we're going to take first the morning break, and

12    then we'll hear from Dr. Fishman's counsel, Mr. Sercarz.

13         I remind you, please, do not talk about the case or

14    about the government's argument.  Keep an open mind until you

15    hear from everyone and you retire to deliberate.

16         Have a good break, and I will see you back here in

17    about 15 minutes.  Thank you.

18         (Jury not present)

19         THE COURT:  All right.  I will see everyone back here

20    at 11:30.

21         MR. FERNICH:  Judge, there's nothing that comes up on

22    this screen.

23         THE COURT:  I will see if we can look at that during

24    the break.  Thank you.

25         (Recess taken)

1    (In open court; jury not present)

2    THE COURT:  All right.  You can be seated, everyone.

3  The jury is on its way up.

4    (Pause)

5    (Jury present)

6    THE COURT:  Please be seated, everyone.

7    Mr. Sercarz, are you ready to proceed on behalf of

8  Dr. Fishman?

9    MR. SERCARZ:  Yes, your Honor.

10    THE COURT:  All right.  Please.

11    MR. SERCARZ:  May we have a check to see if all the

12  screens are working?

13    THE COURT:  I believe we checked over the break.

14    MR. SERCARZ:  Okay.  Thank you, your Honor.

15    THE COURT:  You just needed to turn it on, I believe.

16    MR. SERCARZ:  May it please the Court, the government,

17  Mr. Fernich, ladies and gentlemen of the jury.

18    Let's put it this way.  It was a dark night, and I

19  came upon a gentleman standing under the light of a street

20  lamp, and there was a look on his face that indicated that he

21  was quite agitated about something.  And so in an effort to be

22  helpful, I approached him and I said:  Sir, is there anything I

23  can do for you?  And he told me:  I've lost the thing that was

24  most important to me in life.  And I asked him to describe it,

25  and he did.

1    And it was clear that the pain and the anxiety just

2    wouldn't go away, and so again, in an effort to be helpful, I

3    asked him:  Well, where was it when last you had it?  And he

4    pointed away from the streetlight, across the road, down to a

5    dark and obscure place, and he said:  That's where I had it

6    when last I remember holding onto it.  So I asked:  Him why are

7    you looking over here?  And he looked at me with a look of

8    self-confidence, not unlike the looks that we've seen displayed

9    in this courtroom during the trial, and he said:  The light is

10   better over here.

11        The government plays a portion of a tape that has the

12   words "cheat the system" in there because they want you to hear

13   the words coming out of my client's mouth; never mind the

14   context in which it is spoken; never mind that the person on

15   the receiving end of the comments, if I have the right message,

16   is one Adrienne Hall.  A lot more about her later.  We need the

17   words "cheat the system."  Stay here.  The light's better over

18   here.

19        I don't begrudge the government the opportunity to

20   prove their case by whatever means are most appropriate, but I

21   will remind you, ladies and gentlemen of the jury, that on my

22   opening statement, I told you that Seth Fishman did not comport

23   his behavior to all of the -- my words -- mind-numbing

24   regulations of the Food, Drug and Cosmetic Act as administered

25   by the FDA.

1    I told you that upfront and, yet, ladies and gentlemen

2    of the jury, you were guests at the parade, day after day,

3    witness after witness, exhibit after exhibit, even left here

4    piled up, ladies and gentlemen of the jury.  If I were a couple

5    of inches smaller, you wouldn't be able to see me.  Stay here,

6    they say.  The light's better over here.

7    The government says that if you don't warn customers

8    in advance that your product may violate Food, Drug and

9    Cosmetic Act regulations, that's proof of an intent to mislead.

10   On the other hand, if you put things on your label, directions

11   on your label, that's proof of an intent to mislead.  Come to

12   your conclusion of guilt, assume guilt, and it all falls into

13   place.  Stay here, they say.  We have the vials, we have the

14   labels.  Stay here, they say.  The light's better over here.

15   They tell you I'm about to offer evidence of Seth

16   Fishman's good faith, his good behavior, and they label it "a

17   distraction."  You'll hear the Judge offer an instruction on

18   good faith.  More about that later.  But when you presume

19   guilt, demonstrating that there's another side to the

20   defendant, demonstrating it based on their own evidence, is a

21   distraction.  Stay here, they say.  The light is so much better

22   over here.  Here, in the bright light of hindsight; here, in

23   the bright light of the courtroom, stay here, they say.  The

24   light's better over here.

25   My client, I tell you again, did not comport with the

1   process that was described by Dr. Bowman, that Food, Drug and

2   Cosmetic Act regime involving research, testing, registration

3   of manufacturing facilities, proof of what they called CGMP,

4   good manufacturing practice, labeling requirements, including

5   labeling the ingredients, the usage instructions,

6   over-the-counter labeling clear to the layperson, prescription

7   labeling that has to go to a more detailed level because of the

8   warnings that need to be administered on the product.

9           All of it in the well-intentioned -- in the

10  well-intentioned -- to the well-intentioned purpose, part of

11  the well-intentioned design to ensure the safety and efficacy

12  of drugs.  But in the process, in the process, ladies and

13  gentlemen of the jury, what is the cost?  What is the expense?

14          You know, Dr. Bowman used a very interesting turn of

15  phrase during the course of her examination.  I asked her about

16  the process, and among the things she said is that we have a

17  sit down; we have a sit down with the companies.  We go over

18  the protocols, explaining to them how to meet our requirements

19  as to all of these portions of the regime in order to secure

20  safety and efficacy, companies.  And then she kept referring to

21  her clientele, the consumers that come before her, as "firms,"

22  over and over again, ladies and gentlemen of the jury.

23          Big pharma, come on in.  We want to sit with you and

24  talk to you.  Moderna, Pfizer, please, there's room at the

25  table for you, but for the independent, independent

1  veterinarian, who wishes to go into the business of

2  pharmaceuticals, well, that may be slightly cost prohibitive.

3       And the government, the government, their evidence,

4  the government points you to a tape about an effort from my

5  client to manufacture pentosan, and sell it for use in India,

6  and you're told two to $3 million and the entire process, if

7  that's what you're going to do.

8       So, yes, ladies and gentlemen of the jury, my client

9  determined to sell his pharmaceutical products outside of FDA

10  channels, and I'll go a step further with you.  His interest

11  was in performance, athletic performance, and that ought to be

12  clear to you as well.

13       Nonetheless, ladies and gentlemen of the jury, the

14  Court is going to give you an instruction on the subject of

15  good faith.  We contend in this case that having made the

16  decision, the improvident decision, okay? -- the improvident

17  decision to market his products outside of FDA channels, he

18  attempted to do so properly, properly in accordance with his

19  oath as a veterinarian, to provide for the health and welfare

20  of animals, ladies and gentlemen of the jury.  And the

21  government labels that a distraction.  You'll hear the

22  instructions by the Court.  But stay here, they say.  The

23  light's better over here; here, where the labels are; here,

24  where the bins are.

25       Did the government exercise quality control in the

1    introduction of their evidence?  Jamen Davidovich, one of the

2    informants that accuses my clients of selling drugs, whose

3    texts and whose conversations are prominently displayed in this

4    courtroom, began training racehorses seriously in 2014.  From

5    the very inception he was giving them performance enhancing

6    drugs, growth hormones, clenbuterol, blood builders.

7            He admits to purchasing either the raw materials or

8    the drugs themselves from the likes of Weatherford Compounding,

9    Dan Frascella, a website called HorsePrerace.com, and Epogen

10   from a buddy of his before he ever met Dr. Fishman.  He claims

11   he met Dr. Fishman in 2016 and again in 2017, through an owner

12   that he knew.

13           And at that second meeting, Dr. Fishman -- you

14   remember, Dr. Fishman, my client, the guy with that obsession

15   for secrecy, siloing his customers -- Dr. Fishman described,

16   according to Mr. Davidovich, his full menu of drugs, and he

17   gave that dramatic demonstration with the napkin, showing how

18   he defeated testing.

19           He even sent Davidovich, according to Davidovich, a

20   package of drugs after that first meeting.  And Davidovich

21   claims that on two subsequent occasions he orders and receives

22   drugs from my client, and then inexplicably, inexplicably, both

23   orders contain painkillers and, yet, he tells you:  I don't use

24   painkillers on my horses; so I threw them out, or I gave them

25   away.  And then there's another order that comes and that, too,

1    contains painkillers.  I don't use painkillers; I throw them

2    away.

3            Their evidence.  Their witnesses, who are supposed to

4    tell the truth, according to the terms of their cooperation

5    agreement.  And on cross-examination, I pressed him to

6    determine whether he wasn't selling product and using my

7    client's name to tout the drugs and make money in the process.

8            And he admitted that, at least on one occasion, he had

9    to line up a customer from some omeprazole that he ordered, but

10   his customer ended up purchasing GastroGard from somewhere

11   else.  Yes, I was reselling drugs, in other words.

12           And with regard to those painkillers, the ones he

13   ordered but never used?  He suggested he never sold them for

14   profit.  So why did he get them in the first place?  See,

15   that's a bad thing when a defense lawyer begins asking

16   questions.  When you start pulling at the threads, at the

17   fabric of the government's proof in a case like this.

18           Ladies and gentlemen of the jury, as to these

19   informants, you don't have to leave your common sense at the

20   door.  No mention of Davidovich on the government's summation,

21   no mention of the decision to call those witnesses.  Much

22   better to just point to the labels and then go straight to

23   guilt.  Stay here, they beseech you.  Stay here.  The light's

24   so much better over here.

25           And then we come to a character by the name of Ross

1  Cohen.  Ross Cohen not only purchased drugs for use on his

2  horses, but he sold drugs as well.  He began working as a

3  trainer at Yonkers Raceway in 1994.  Now, in New York, you

4  couldn't administer any medications on race day, but he did it

5  so often and had so many false positives that by 1997, he

6  received a letter of removal from Monticello Raceway, and then

7  Yonkers Raceway followed suit, and they removed him as well.

8       By 2001, he was reinstated and receiving performance

9  enhancing drugs from a gentleman named Tom Guido.  Again,

10  suspended from Yonkers Raceway for six months.  He admits to

11  administering a variety of drugs obtained from a veterinarian

12  named Dr. Skelton.

13       And in addition to IV drugs, you're introduced by this

14  colorful character to the concept of drenching a racehorse with

15  performance enhancing drugs, putting a tube down their throat

16  in order to administer the drugs to them in their stomach.

17       His horses have tested positive in tests involving

18  Percocet and Vicodin.  He not only purchased drugs for use on

19  his own horses, he admits to reselling drugs.  He not only

20  engaged in the use of performance enhancing drugs, but he fixed

21  races by paying jockeys to pull up their horses and then

22  betting on the opposition.

23       The government quizzed their witnesses about their

24  cooperation agreements, their proffer, limited immunity

25  agreements, their non-prosecution agreements, and they put the

1    language forward to you as an example of securing the truth,

2    ensuring the truth from their witnesses.

3         They came to you and, in effect, said:  What incentive

4    do they have to lie?  What incentive do they have to lie?

5    After this litany of misconduct, this colorful character, Ross

6    Cohen, pleads guilty to one count, one count of adulteration

7    and misbranding conspiracy capped at five years.  Let me repeat

8    that.  One count of adulteration and misbranding conspiracy in

9    exchange for this litany of misconduct.

10        But they don't want me tugging too hard at the strings

11   of whether or not their witnesses were credible, whether or not

12   they exercised any quality control.  Don't worry about the

13   informants, we got the labels here.  We got the bins here.  We

14   got the tapes here.  Stay here.  The light is so much better

15   over here.

16        And when I asked him about the terms of his

17   cooperation agreement, he stated it's the government who

18   decides whether I deserve my 5K1.1 letter; it's the government

19   who decides whether this cooperation has been complete,

20   substantial and truthful.

21        The government tells you he has no incentive to lie,

22   but you might want to recall that after Mr. Cohen was suspended

23   from Yonkers Raceway, he was permitted to return, pursuant to

24   an oral agreement that he not commit any crimes, that he not

25   violate racing regulations.  And I asked him how long did it

1   take, how long did it take after you were permitted to return,

2   after you agreed orally to abide by the rules of the racetrack,

3   how long did it take for you to begin breaking those rules

4   again?  His words "it was almost instantaneous."

5        Mr. Sercarz, don't waste their time.  Don't distract

6   them.  Don't tug too hard at the fabric of their well-placed

7   and well-put-together prosecution.  Stay here, ladies and

8   gentlemen of the jury.  The light's better over here.

9        I want to provide you with a framework for resolving

10  this case.  The Court will instruct you that we have no

11  obligation to produce witnesses, no obligation to introduce

12  evidence, that there's no requirement for a defendant to

13  testify.  The burden is on the government.  It never shifts.

14       The burden is to prove each and every element of the

15  crimes charged beyond a reasonable doubt, and so it's been my

16  endeavor to use their evidence, their witnesses and their tapes

17  to try and take a deeper dive into the character of Seth

18  Fishman; to demonstrate to you, ladies and gentlemen of the

19  jury, using their own evidence that the evidence put forth by

20  the government does not meet the crimes charged in the

21  indictment.

22       You will hear an instruction from the Court, and I

23  want to read it to you, charge No. 5, and I quote:  "The

24  defendant is not charged with committing any crime other than

25  the offenses in the indictment."  My client is not charged in

1    this courtroom with horse doping, ladies and gentlemen of the

2    jury.  He is charged with a conspiracy to engage in conduct

3    involving the adulteration and misbranding of his products, not

4    horse doping.

5          Dr. Bowman testified that she considers any product

6    intended for animals a drug if intended to treat a disease or

7    effect a structure or function of the animal.  She described

8    the multiple hurdles that must be overcome in order to get a

9    product approved, and I won't repeat them for you yet again.

10         She also told you that even if the drug is approved,

11   any change in ingredients, any change in manufacturing

12   location, any modification of the intended use requires a

13   supplemental approval, and if a drug is not approved, it is

14   deemed unsafe unless it passes something called G-R-A-S-E

15   analysis, generally regarded as safe and effective, generally

16   within the larger scientific community.

17         This well-intentioned set of regulations can result in

18   their share of what I would call illogic, and I tried to use

19   for the good doctor as an example the product glucosamine and

20   chondroitin.  It was kind of like pulling teeth, with all due

21   respect.  Is it considered a drug in humans?  I'm not an expert

22   on what is considered a drug for humans, says the good doctor.

23   Is it used in animals?  Yes, it's used to treat arthritis in

24   horses.  Has a GRASE analysis ever been conducted?  Honestly, I

25   have no idea, says the good doctor, because I never did one

1    myself.

2            In other words, for a 150-pound human, Glucosamine and

3    chondroitin may be perfectly okay to treat joint pain, but for

4    a thousand-pound racehorse, no GRASE analysis ever performed.

5    If somebody like Seth Fishman wanted to develop a Glucosamine

6    and chondroitin product, it would be deemed a dangerous drug

7    and, therefore, unsafe, ladies and gentlemen of the jury.

8            When I asked her about the cost of bringing a new

9    animal drug to market, well, I don't have the data at my finger

10   tips.  But Government's Exhibit 3404 is that e-mail stream --

11   the government actually played a portion of it on their final

12   argument -- between Dr. Fishman and a gentleman named Karthik

13   Ragawan, a discussion of bringing a drug named pentosan to

14   market in India, and you heard something about the cost.  You

15   also heard in the process something about my client's

16   reputation for creating new product.

17           The Court will instruct you, ladies and gentlemen of

18   the jury, on the concept of good faith.  If the defendant had a

19   good-faith belief that he was acting properly, even if wrong,

20   ladies and gentlemen of the jury, even if it turned out to be

21   harmful, you must consider that.  And the burden of proof on

22   the issue of intent is on the government to disprove the

23   defendant's good faith.  We have no burden of proof here.

24   They're the ones with the burden of proof, and it doesn't

25   shift.

1    I want to talk to you a little bit about Dr. Fishman

2    and what you've learned about him in this evidence in the

3    context of that good-faith instruction.  In my opening

4    statement, I described what I called the crazy quilt of

5    overlapping federal, state and local regulations that can

6    affect the practice of veterinary medicine.

7    Dr. Bowman told you something that I want you to bear

8    in mind when you consider the charges in this case, not the

9    horse doping case that may be tried in some other courtroom in

10   some other jurisdiction but in this case.  It is not the

11   province of the FDCA or the FDA to regulate the practice of

12   veterinary medicine.

13   The FDCA is not a racing authority.  She also

14   acknowledged to you that there are exemptions for compounding

15   drugs and off-label usage when veterinarians are the ones that

16   are dispensing or administering the drugs, and the concept of

17   the veterinary relationship with the animal and caregiver, what

18   they called VCPR, that's the subject of state regulations, and

19   it was never fully defined for you in this courtroom.  The

20   parameters were never fully exposed for you in this courtroom,

21   ladies and gentlemen of the jury.

22   So I ask you to consider whether or not, from what

23   you've learned about Seth Fishman, he was a veterinarian who

24   devoted himself to performance -- and by the way, performance

25   not only in animals, but in humans -- not only in horses, but

1    in camels.

2          You heard some of this from the evidence as well, he

3    attempted properly, in the context of a dirty business, a rough

4    neighborhood -- the neighborhood where Jamen Davidovich and

5    Ross Cohen and Tom Pellegrino and the others live, the others

6    you've heard about -- to wean his customers off of the toxic

7    drugs and to give them more benign substances, all in the

8    effort to promote the health and well-being of animals or, in

9    short, what the government calls the distraction.

10         The government suggested in examining witnesses that

11   IV drugs ought not to be administered by a trainer because of

12   the risks involved.  I will make the observation to you that

13   according even to Ross Cohen, the trainer is the boss, in

14   quotes, when it comes to the horses in the stable.  They are

15   quite familiar with injecting their horses.  Jamen Davidovich

16   learned how to inject a racehorse at the knee of his father.

17   He did it often.

18         Dr. Cole told you that racing regulators set standards

19   for the use of substances within a certain time frame of a

20   race.  The parameters vary from state to state.  The nature of

21   the substances ban vary from state to state.  The full

22   parameters of racing regulations were not explored in this

23   courtroom, ladies and gentlemen of the jury.

24         On cross-examination of Dr. Cole, I had her describe

25   the veterinarian's oath and, in particular, the prevention of

1    animal's suffering, and she acknowledged that it can make for

2    some hard choices.  We used, as an historical example, the drug

3    clenbuterol.  Clenbuterol a bronchodilator, which she described

4    as often a beneficent drug used for appropriate purposes to

5    clear the lungs of a horse, and yet, it was discovered later on

6    that that drug also had anabolic properties and, therefore, it

7    was banned at various racetracks in various locales across the

8    country.

9          The government has done a masterful job of compiling

10   its greatest hits album of Dr. Fishman's greed, his arrogance,

11   his locker room bravado, but if you look carefully at their own

12   evidence, it emerges that he's a complicated individual, like

13   all of the rest of us, with aspirations, I respectfully submit,

14   to do good and to do well in the care of horses, even allowing

15   for his flaws.

16         Remember the testimony by Courtney Adams, who was

17   hired to work as Dr. Fishman's administrative assistant, who

18   began by running errands and picking up his dry cleaning and

19   was later called upon to organize his life and then his

20   business?  If anyone was intimately acquainted with my client

21   and the way he conducted his business, it would be Courtney

22   Adams, ladies and gentlemen of the jury.

23         She told you she would never work for someone she knew

24   to be violating the law.  She worked closely with Dr. Fishman

25   for more than five years.  She began by maintaining her office

1   in the very apartment where he lived in a spare bedroom, and

2   from there, organized everything to do with Equestology.

3          She tracked his e-mails.  She kept track of his

4   inventory.  She even went into the labeling part of the

5   practice for Dr. Fishman.  She met his customers, including

6   Geoffrey Vernon, the veterinarian, the captain of the U.S.

7   Olympic team, the equestrian team.  She even traveled with him

8   overseas to Dubai.

9          During her tenure with Equestology, she moved to Idaho

10  for a year and never thought about leaving his employ.  When

11  she moved back east, she continued to work with Dr. Fishman,

12  and he was anxious to have her get involved in the sales of his

13  product.  She didn't leave his employ until 2017, and even

14  then, she left only when, to use her words, she was "over it,"

15  and he had accused her of using his credit card for her

16  personal benefit and taking his personal property.

17         Only when that false allegation emerged and arguments

18  emerged between the two of them and, yet, she testified on that

19  witness stand, under oath, the government's witness, that she

20  never knew him to be engaged in any sort of an unlawful

21  enterprise.  Dr. Fishman was conscientious.  He used capable

22  sources to manufacture his products, again, not in conformity

23  with FDA requirements.  I tell you again, ladies and gentlemen

24  of the jury.  Nemera Pharmacy, 21st Century Biochemical.

25         Dr. Fishman contributed money to 21st Century

1    Biochemical, bought them equipment to help them manufacture to

2    his specifications.  When his pain shot was unstable, he

3    refused to sell it.  It's in the evidence.  Courtney Adams

4    testified when he received occasional complaints about the

5    color of the product, when it was cloudy, he was worried about

6    it.  He checked back with the lab to figure out what the

7    product was, what was wrong with it.  He kept after it until

8    the company stopped and the complaints dissipated.  That's

9    Dr. Fishman, too, ladies and gentlemen of the jury.

10           And while Fishman did not include the ingredients of

11   his proprietary formulas, he was careful to include on the

12   labels instructions for use.  Exhibit 401-Y, you don't have to

13   look at it now, ladies and gentlemen of the jury, an e-mail or

14   a text involving the drug butamine.  And he warned people to

15   administer it very slowly because of its potential toxic

16   effects.  He warned customers, even other veterinarians,

17   regarding the side effects of his products and the possibility

18   of false positive tests.  Look at 401-LL when you're in the

19   jury room, ladies and gentlemen of the jury.

20           But among his flaws was his arrogance, including --

21   and this is Courtney Adams speaking -- his arrogance regarding

22   his knowledge of veterinary medicine and the products that he

23   was selling.  The Court will instruct you on good faith, ladies

24   and gentlemen of the jury.  A good faith belief that you are

25   acting properly, even if wrong, even if potentially harmful, is

1   a complete defense to the allegations relating to intent in

2   this case.

3           Yes, ladies and gentlemen of the jury, they have their

4   labels.  Yes, ladies and gentlemen of the jury, they have their

5   bins.  But this is a side of my client as well.  I ask you,

6   please, to consider this evidence no matter how they implore

7   you, no matter how they cajole you, no matter how they beseech

8   you, stay here, stay here; the light's better over here.

9           Adrienne Hall, she first sought to contact Dr. Fishman

10  to give one of her horses a lameness exam, but she learned he

11  no longer went to the track to examine animals because he had

12  back problems.  Subsequently, she came to see him regarding

13  performance enhancing drugs.  We're not running away from it.

14  I'm not hiding from it.  I'm not distracting you from it.

15          She was getting them from a guy named Poliseno, Tony

16  Poliseno, and she didn't like what his drugs were doing to her

17  animals.  She wanted something less toxic.  She had heard about

18  Dr. Fishman from another trainer, and what was it that she

19  heard?  If you'll forgive me, another distraction.  That he was

20  reputable, that he was reasonable.

21          Before you see only the ugliness in horseracing,

22  ladies and gentlemen of the jury, before you seek to classify

23  every one of my client's customers as a Guido or a Poliseno or

24  a Ross Cohen, take a look at the world through the eyes of

25  Adrienne Hall.  You met her on the witness stand.

1      This lovely woman, who graduated with a degree, I

2  believe it was, in media communications, found when she was

3  working a job, that she couldn't stay away from the lure of the

4  track, the beauty in the sport, the real beauty in the sport.

5  Life is more complicated than it is portrayed in hindsight, in

6  the bright lights of this courtroom, ladies and gentlemen.

7      Dr. Fishman offered her a program, in quotes, to build

8  up the blood of her horses, not a quick shot a few hours before

9  race time, ladies and gentlemen of the jury.  May I ask that

10  Exhibit 103-A, the tape recording 103-A, be played for the

11  ladies and gentlemen of the jury, please?

12      (Audio recording played)

13      I respectfully submit to you that Dr. Fishman was

14  talking to a kindred spirit, someone who cared for the health

15  and safety of her own hourses.  May I ask the government to

16  play 105-B, please.

17      (Audio recording played)

18      Thank you.  Dr. Fishman counseled treating the animals

19  with care, ladies and gentlemen of the jury.  May I ask that

20  you play the beginning of 105-C for the jury, please.

21      (Audio recording played)

22      Looky there, ladies and gentlemen of the jury, "cheat

23  the system."  They've got my client saying "cheat the system,"

24  quoted by Ms. Mortazavi at the beginning of her summation.

25  Never mind that we take things out of context in order to

1    improve upon them.  Never mind that we want to paint the

2    innocent consistent picture.  Never mind that we view the world

3    through the clear light of hindsight, ladies and gentlemen of

4    the jury.  Don't be bothered by the distractions of the

5    defense, going into those dark places.  Stay here, they say.

6    As the light is so much better over here.

7            Ladies and gentlemen, in order for the government to

8    establish the aggravating element of intent to defraud or

9    mislead, the requisite intent must be connected -- you will

10   hear this in the charge -- related in time, causation or logic

11   to the dissemination of adulterated or misbranded drugs, not an

12   intent to mislead with regard to horse doping, ladies and

13   gentlemen of the jury.

14           Intent to mislead with a nexus, a causal nexus to the

15   crimes charged in this indictment, the intent charged in this

16   indictment, the intent to adulterate and misbrand the products,

17   ladies and gentlemen of the jury.  I respectfully submit that

18   if what I'm about to say departs from the law, reject it.

19           You will hear the instruction from the Judge, but I

20   submit it needs, at the very least, that there must be a

21   cognizable victim and that there must be a nexus between the

22   intent and the adulteration and misbranding that's charged in

23   this indictment.  That's why on my opening statement, I began

24   to talk about who, and asked you to make the government

25   indicate who the cognizable victim is of this alleged intent to

1  deceive and mislead.

2          Now, the government spent a lot of time on that how,

3  how, untestable, siloing drugs, avoid snitches, deceptive

4  labels, used his license as a shill.  That's the how in the

5  intent to mislead according to the government.  But intent to

6  defraud or mislead as to what?  Please ask that question in the

7  jury room, ladies and gentlemen of the jury.

8          First of all, what about the customers?  The customers

9  who purchased Dr. Fishman's products were sophisticated

10  consumers.  He consulted with and sold to other veterinarians,

11  Dr. Vernon, Dr. Adel, Dr. Zanaty in Saudi Arabia.  His

12  customers included purchasers in the United States, the United

13  Arab Emirates, Saudi Arabia, Dubai, Singapore.  The owners and

14  trainers who purchased from Dr. Fishman were knowledgeable

15  about their horses and the products that they were buying.

16          In the words of Adrienne Hall, they sought Dr. Fishman

17  because he was reputable and reasonable.  He made no material

18  misrepresentations to his customers.  His product lists did not

19  go beyond what could be called mere puffery.  He did not intend

20  to defraud or mislead them.

21          I respectfully submit, ladies and gentlemen of the

22  jury, that the government failed to prove beyond a reasonable

23  doubt that Dr. Fishman intended to defraud the FDA.  On

24  cross-examination, I made a point of asking Dr. Bowman whether

25  she and Dr. Fishman ever had that sit down that she described.

1    There was no sit down.  There were no representations made to

2    the FDA regarding the existence of studies or clinical trials,

3    the content of Dr. Fishman's products, the method of

4    manufacture.

5         Regarding the labeling, there was no effort to mislead

6    as to the contents.  I asked Dr. Bowman, and she said these

7    labels, they didn't even come close to adhering to FDA

8    requirements.  There was nothing on these labels that indicated

9    that they were FDA approved drugs.

10        You know, at one point, the doctor told you something

11   about what would constitute defrauding and misleading the FDA

12   and what the statute was really designed to avoid.  This

13   statute, the one we're dealing with in this courtroom.  She

14   gave you two examples, magic water that it is claimed will cure

15   cancer when the representation regarding the intended use is

16   clearly and patently false, and eye drops that actually contain

17   some caustic substance that is going to damage the eye.

18        That's the heartland, the heartland purpose of this

19   statute.  That's the kind of misleading and fraudulent

20   deceptive content that they are seeking to avoid in order to

21   protect their consumers.  It is not the province of the FDA to

22   regulate horseracing, ladies and gentlemen of the jury.

23        I respectfully submit that Dr. Fishman's in the same

24   position as someone who, at his worst, decided not to pay

25   taxes, never filed a return, and never sent a check to the IRS.

1  Did he do something that violates a regulatory regime?  Yes, he

2  did.  But an intent to defraud and mislead the Internal Revenue

3  Service, an act of tax fraud?  I don't think so, ladies and

4  gentlemen.

5       Is there proof beyond a reasonable doubt of an intent

6  to defraud or mislead racing regulators regarding the fact that

7  his products did not go through FDA channels?  I respectfully

8  submit that there is no such proof.

9       During my cross-examination of Jamen Davidovich, I

10  showed him Dr. Fishman's order list.  Dr. Fishman paid --

11  withdrawn.  Dr. Fishman charged by the order.  His customers

12  paid by the order.  They did not pay Dr. Fishman more if their

13  horse won, placed or showed in a horserace.

14       To demonstrate the lack of a causal connection, I

15  offer you the following hypothetical, ladies and gentlemen.  A

16  veterinarian provides a trainer with an FDA-approved product,

17  say an FDA-approved blood builder.  They agree to secretly

18  administer it to the horse close to race time, and they do it

19  deliberately for the purpose of improving that horse's

20  performance in a race.

21       The use of the drug violates racing regulations.  Does

22  it matter whether the drug is FDA approved or not?  Most

23  respectfully, for purposes of the racing regulators, it does

24  not.  Conversely, the trainer uses one of the veterinarian's

25  non-FDA-approved drugs, but he uses it in a way that causes the

1  drugs to clear the system of the racehorse days before the

2  race.  So there is no violation of the pertinent racing

3  regulations.  Do you find that veterinarian guilty anyway?

4  Look, he did a bad thing, any statute will do?  Or do you

5  follow the law and look for the causal nexus that is required

6  by the statutes?

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    MR. SERCARZ:  If Dr. Fishman set about to deceive

2  regulators, he did so by making his products untestable, not by

3  adulterating and misbranding his products, ladies and gentlemen

4  of the jury.

5    And the same applies to contacts with customs

6  regulators and the possibility that border items are being

7  violated, the export of the drugs across the border, price

8  lists are being violated for customs purposes, they're being

9  downgraded.  You got to find a nexus, a nexus between any

10  effort to defraud or mislead and the specific elements of the

11  statute in this case, ladies and gentlemen of the jury, and I

12  respectfully submit to you that everything else is a

13  distraction.

14    At the end of the day, Seth Fishman chose,

15  improvidently chose to live in a rough neighborhood among

16  racehorse owners and trainers who were desperate for a

17  chemically-induced competitive advantage.  I submit he made a

18  good faith effort to wean them off of the more toxic drugs they

19  were using, to provide them with a safer alternative, and

20  thereby to adhere to his oath as a veterinarian to provide for

21  the health and wellbeing of the animals.  And if he violated a

22  regulatory regime in the process, ladies and gentlemen of the

23  jury, they still have to prove his malevolent intent beyond a

24  reasonable doubt, and I respectfully submit that at the end of

25  the day, the government has failed to meet their burden of

1  proof.

2       And with regard to the crime, the aggravating factor

3  that the crime must be committed with an intent to defraud or

4  mislead, I respectfully submit, ladies and gentlemen of the

5  jury, that regardless of the "how," as demonstrated in the

6  government's opening summation, they did not demonstrate that

7  kind of an intent with the appropriate causal connection to the

8  statute that we're considering, they did not prove an intent to

9  defraud or mislead as to adulteration and misbranding as set

10  forth in the indictment.

11       Ladies and gentlemen of the jury, when I sit down, no

12  one else can rise to speak for Dr. Fishman.  In the interest of

13  focusing your attention on what I submit to you was important

14  in this case, I did not deal with every item of evidence or

15  every argument raised by the government.

16       The government has an opportunity to get up and

17  respond to what I have said.  I have no more opportunities to

18  speak on Dr. Fishman's behalf.  So I say to you, if you feel

19  there's something I should have discussed, ask yourselves:

20  What would Dr. Fishman's lawyer say?  If there's an argument

21  that I haven't dealt with, ask yourselves:  What would

22  Dr. Fishman's lawyer say?

23       The government was nothing if not thorough in the

24  time, energy and resources they devoted to their proof.  But

25  there's something that they couldn't account for, ladies and

gentlemen of the jury, they couldn't account for you, people who were willing to step away from what is convenient, what appears on the screen, and look in the dark corners to see what was really going on in my client's mind, to really probe the four corners of his intent, and then audit this proof and see whether the government has met their burden in this case.

Ladies and gentlemen of the jury, my time is at an end. Your time will soon be at hand. Have the wisdom to follow the law. Look in every dark corner until you find the truth in this case and then have the courage to be fair to Seth Fishman.

Thank you.

THE COURT: Thank you, Mr. Sercarz.

Ladies and gentlemen, we're going to take our lunch break now. I remind you, again, please do not talk about the case until after you hear the rebuttal argument from the government and I charge you on the law and you retire back to the jury room to begin your deliberations.

Please have a good lunch and I will see everyone back here at 2 o'clock.

(Jury not present)

THE COURT: Everyone have a good lunch and I will see everyone slightly before 2 o'clock so we're ready to go at 2:00.

(Luncheon recess taken)

AFTERNOON SESSION

(2:05 p.m.)

THE COURT:  The jurors are on their way.

(Jury present)

THE COURT:  All right.  As we told you before the
lunch break, the final lawyer we'll hear from is Mr. Adams, who
will give a final closing statement on behalf of the
government.

Mr. Adams, please.

MR. ADAMS:  Thank you, your Honor.

I will be brief with these remarks this afternoon.

Misquotes of the transcript, blatant misstatements of
the law, winding discussions of things that are totally
irrelevant to this case, that's what you got from Seth Fishman
this afternoon.  Yes, those were distractions.

Fishman's charged here with agreeing with other people
to do various things with misbranded drugs; principally, as
you're going to hear, to distribute them, to receive them, to
put them into commerce, to deliver them.  And since the defense
spent much of its time speaking to you conceding that the drugs
are misbranded, as he must in the face of the evidence, the
question is just what Ms. Mortazavi put to you this morning:
Did he do these things?  Did he distribute?  Did he deliver?
Did he put these drugs into commerce with the intent to defraud
and mislead?  Was the purpose of the distribution, the purpose

1    of putting the drugs into commerce, to defraud and mislead?

2              There's zero requirement that the victim of this fraud

3    be the customer.  You will not hear that today.  Of course not.

4    The customers are Dr. Fishman's co-conspirators in this case.

5    There is zero requirement that the lie being told, that the

6    object of the fraud be a lie about the fact that the drugs are

7    misbranded, that is not a requirement.  That is a made-up piece

8    of law that Mr. Fishman is floating as a distraction.

9    "Distraction" is the kind way to put it, and the Court is going

10   to set everybody straight on that in just a moment, as I

11   expect.

12             Look, over the course of 20 years, Seth Fishman set up

13   a core story.  It's a false story.  It's a string of lies.

14   It's designed to get him out of trouble in a situation exactly

15   like the one that he is in today.  Lies about the notion that

16   he wasn't a drug dealer, that he was a veterinarian acting in

17   good faith, that he wasn't doping horses for money, that he was

18   caring for the safety and health of his patients, that his

19   drugs weren't for races, they were for horse workouts or

20   something.  All of those are lies.  You know all of that

21   because you have been paying attention to the evidence over the

22   last many days.

23             And I don't envy Mr. Sercarz's task here today.  He

24   fought hard for his client.  But he does not have much to work

25   with, and he's not a magician.  He cannot make the evidence

1   disappear.  He can't make the emails or the text messages or

2   the wiretap recording or the small mountain of drugs or the

3   iPad recordings or the bank records or the shipping records or

4   the photographs of his client's drugs found at barns across the

5   country disappear.  So with no real defense to offer, with

6   nothing to say about the actual evidence in the case,

7   misstating the law and misquoting the transcript and ignoring

8   the evidence is what they have to offer.

9          So I'm not going to respond to everything that

10  Mr. Sercarz said.  Ms. Mortazavi anticipated and largely

11  disseminated everything that he had to say before I ever had to

12  stand up here.  But I do want to touch on a couple of points

13  that were made, and this is all with the goal of redirecting

14  this process towards what actually matters, towards the

15  evidence and towards the law.

16         So let me start with this notion of good faith,

17  Dr. Fishman just wanted to help the horses, that he wanted to

18  act as a legitimate veterinarian.  That's not true.

19  Dr. Fishman wanted horses to run faster.  He wanted them to run

20  more often.  He wanted them to run through things like chronic

21  pain.  He wanted to manipulate their blood.  He wanted to

22  manipulate their vasculature, their adrenal glands, their

23  hormones.  He wanted to do that so his clients could make money

24  while slipping under the regulatory regimes.  He was a drug

25  dealer, he's not a doctor.

 1          And you didn't hear at all in the defense summation

 2     any notion that his clients were his patients.  That just

 3     didn't come up.  Of course that didn't come up.  They weren't

 4     his patients.  He had no relationship with his animals.

 5     Whatever the boundaries of a valid client-patient relationship

 6     might be, Dr. Fishman had none.  If you have a dog at home,

 7     Dr. Fishman has the same veterinary relationship to your dog he

 8     has had to Ross Cohen's horses or Jamen Davidovich's horses or

 9     Adrienne Hall's horses.

10          So what does it say about his good faith if you

11     actually look at the evidence in this case?

12          Ms. Jung, if we could pull up 118AT.

13          This is a call captured on a wiretap, not mentioned by

14     Mr. Sercarz at all.  This is a discussion here about, as you

15     see in the second line, a new trach shot, an injectable drug

16     that goes into the trachea, into the horse's neck.  Have they

17     figured it out yet or not?  If you look at page 2, Fishman is

18     experimenting with this drug.  He's looking for guinea pigs.

19     That's under the street lamp.  That's in the light.

20     Mr. Sercarz doesn't want you to look at that.  Prefer for you

21     to stay in the dark.

22          Let's look at 102ET, please, line 6.

23          This is a call with Adrienne Hall.  It's not a call

24     that Mr. Sercarz talked about at all.  So Monday, Mary will

25     have stuff, and then if you want to try stuff on your horses,

1    you can try it.  He's referring here to blood-building drugs.

2    And just so everybody remembers, blood-building drugs are never

3    allowed in racing horses; doesn't matter if it's the race day

4    or not.  You heard that from Dr. Cole and other witnesses.

5    Blood building drugs are banned.

6              He's talking with a complete amateur about injectable

7    blood-building drugs on this call, Epogen, Epogen hematics.

8    He's specifically discussing the kind of drugs that will get

9    Hall kicked out of racing -- permanently potentially -- if she

10   got caught.  The doctor had a reputation.  You don't get caught

11   with Dr. Fishman.  This, beyond a misquote of the law, is a

12   misquote of the transcript.  Adrienne Hall doesn't talk about

13   Dr. Fishman having a good reputation as a vet.  That's not what

14   she said.  Ask for the transcript.  You can do it when you go

15   in the back.  If you want to look at the transcript for any of

16   the witnesses, you can ask.  Adrienne Hall knew Dr. Fishman to

17   have a reputation as somebody to help you win.

18             What's his advice to Adrienne Hall?  What's his advice

19   to this complete amateur?  Try some stuff on your horses.

20             Does that sound like a caring veterinarian

21   relationship to you?  No.

22             In Exhibit 105, 105C, which is the transcript that

23   Mr. Sercarz decided to put up on the screen, one of the few, he

24   pointed to this call like it shows that Seth Fishman cares for

25   Adrienne Hall's horses.  That's not what this shows.  He never

1   saw Adrienne Hall's horse.  He never saw Ross Cohen's horses.

2   He never saw anybody's horses.  He's not a veterinarian, he's a

3   drug dealer.

4           He pointed at this call as if this shows his good

5   faith, glossing over the fact that Dr. Fishman mentions that

6   his other clients burn through their horses in a couple of

7   months when they use his drugs.  Adrienne Hall, who doesn't

8   have much money and doesn't have many horses, as you heard,

9   can't afford to burn through her horse in a couple of months.

10  So he develops a longer-term program to build the horse's drugs

11  through illegal blood builders.  Again, it might take a couple

12  of weeks; doesn't mean that it's a race day injection, but it

13  also doesn't mean that it was legal.  It was in fact illegal,

14  but something that could slip underneath the radar.  That's the

15  purpose of Dr. Fishman's business.

16          If we could look at 139AT, please.

17          This is a conversation with Lisa Giannelli.  It's his

18  primary sales representative.  Nothing stops these guys from

19  hitting their horses in a gas station.  And her response has to

20  do with the risk of intramuscular drugs being administered by

21  amateurs sometimes at gas stations.  And her reaction is that

22  you're risking an infection.  Of course you're risking an

23  infection.  Your common sense will tell you that.  That's just

24  nasty.

25          Fishman's response:  It's more than just an infection.

1   It's also painful.  It's painful when you go and stick

2   something into someone's neck and ask them to run for money.

3          Does this sound like a valid veterinary relationship

4   to anybody?  No.  No.  He doesn't care about these horses'

5   health.  He cares that they run faster.

6          This is a call that happened on June 4, 2019.  Did he

7   stop selling intramuscular drugs on June 5, 2019?  No.

8          Did he stop selling intravenous drugs on June 5, 2019?

9   No.

10          You know, because you looked at the evidence, that he

11   kept doing exactly that all the way up until December of last

12   year, after he was arrested, after he was put on bail, still

13   manufacturing drugs in 2021.  Just nasty.

14          Take a look at Government Exhibit 113AT and go to page

15   5, if you don't mind, Ms. Jung.

16          This is a conversation with Jeff Gillis.  It's the end

17   of a conversation.  You might recall that it's specifically

18   about slipping misbranded drugs across the U.S./Canadian

19   border.  And it's another one of these choose your own

20   adventure calls, like a valid veterinarian would do, pick

21   whatever drug you want, we'll make it work.  He's perfectly

22   happy to send Jeff Gillis an Epogen or the BB3.  Whatever you

23   want to inject in your horses, Dr. Fishman is happy to sell it.

24          If you actually look at the evidence in the case, as

25   the government is inviting you to do, you will learn that he

1  was actually more inclined, that he was happier to sell drugs

2  without caring about the animals into which those drugs were

3  being pumped.  In fact, not practicing veterinary medicine is a

4  point of pride for this guy.

5          Let's look at Government Exhibit 106E, page 2, please.

6          It's a lot less work and it's a lot more lucrative to

7  be the shot guy, to be the guy who just sells shots.

8          Let's look at 912T, please.  We can go to the last

9  page.

10          I'm telling you I'm like the only guy in this gig that

11  doesn't have to touch horses.  You can put that on my résumé.

12          Walk into your vet's office, please, ask for the

13  résumé.  If it says Harvard Veterinary School post-graduate

14  work at Oxford and I don't touch animals, find another

15  veterinarian.

16          You sat through an hour of argument from the

17  defendant.  Not once did he play you any of these calls.  Not

18  once did he point you towards any of them.  This isn't a case

19  where he wants you to be looking for the evidence, where he

20  wants you to go search in the dark corners of Seth Fishman's

21  mind.  The point of the Seth Fishman's presentation today,

22  which he didn't have to give, Ms. Mortazavi reminded you, is to

23  distract you.

24          Not once did he mention that every witness in this

25  case, Courtney Adams, Ross Cohen, Adrienne Hall, Jamen

1    Davidovich, everyone that had this experience with him told you

2    that he didn't examine horses and that he was no one's vet.

3         Why?  Why not mention that?  Because he knows that if

4    you think about the evidence, if you look at the evidence, if

5    you recall what the witnesses told you, Seth Fishman is guilty

6    on both counts, and that it won't take long for you to make

7    that determination.

8         Let me touch on the notion of the nexus and the

9    purpose of these misbranding offenses.  Again it was suggested

10   to you that you need to find that the customers are the

11   victims.  Not true.  You will hear that in just a moment.

12        It was suggested to you that you need to find that the

13   fact that the drug is misbranded is the relevant thing that the

14   lie has to be about.  Not true.  Wait for it.  The judge is

15   going to instruct you on the law.

16        He just argued to you that all the drugs were

17   misbranded, they're adulterated, unsafe, unregistered,

18   unlabeled, and he didn't engage in these conspiracies with any

19   intent to defraud or mislead.  Ms. Mortazavi walked through six

20   different ways that you know that that's false.  She

21   anticipated and obliterated that argument before Mr. Sercarz

22   even started talking.  That's presumably why the decision was

23   made to misstate the law rather than engage with the evidence.

24        MR. SERCARZ:  Objection.

25        THE COURT:  Overruled.

1        MR. ADAMS:  So I won't spent much time on that.  But

2   the core fact, again, is that every time that Dr. Fishman

3   shipped one of his drugs it was part of a conspiracy to

4   distribute and misbrand adulterated drugs, distribute them, to

5   put them into commerce.  And why did he do that?  To provide

6   others with the tools that they needed to deceive racing

7   commissions, to make money on races where the horses weren't

8   allowed to be, with doped-up horses using illegal drugs, and to

9   do so without being caught, to do so without being stopped by

10  state regulators or by the FDA.  It was distribution of

11  misbranded drugs with the intent to defraud and mislead.

12        Courtney Adams testified about this directly on point.

13  She testified that the entire purpose of the company was to

14  create untestable performance-enhancing drugs.  You can call

15  for the transcript for Ms. Adams, who were among the people

16  that Fishman told you that he was concerned would be asked --

17  would ask questions about his business.

18        Page 113 of the transcript.

19        Why did he want Adams in this case to be cornered, to

20  be gagged under non-disclosure agreement?  Why did he want

21  that?

22        There are quite a few people, she said, that the FDA,

23  any regulatory person basically, basically any authority that

24  has to do with horses.  That went unmentioned in closing

25  statement from Dr. Fishman.

1     Government Exhibit 910T.  This is the I'm-a-bad-guy

2   recording about the non-disclosure agreement.  He's talking

3   again specifically about gagging his employees in the event

4   that regulatory authorities like the FDA come calling.  Again,

5   he's agreed with other people, including people on the call

6   that he recorded, to distribute illegal drugs and to do so with

7   the intent to defraud and mislead.

8     This, the notion here, continues in a different

9   conversation that was also recorded on Fishman's iPad at 912T.

10   This is the conversation about setting up the Panamanian

11   corporation again for the purpose of misleading the FDA

12   specifically.  I set it up, set up his sham corporation, as a

13   shield against FDA.  Why?  So that if the FDA started asking

14   questions about why he's sending drugs around the world, they

15   would think oh, we don't have jurisdiction here, he's a foreign

16   corporation.  He's not, he's sitting in a condo in Florida

17   selling drugs, but he wants the FDA to be misled.

18     The nexus that Fishman talks about and that you will

19   hear more about in the judge's instructions is actually even

20   tighter than all that because the labeling itself is also

21   misleading.  And Mr. Sercarz didn't even try to touch this.

22   Research and development, clinical trials, drugs to be

23   administered by a vet, all false.  All false.  The notion that

24   Jamen Davidovich is running research and development or

25   clinical trials is absurd, which is why it wasn't mentioned in

1   the closing statement of Dr. Fishman.

2        The purpose of the labeling here is to slip by

3   regulators.  That's why it's on there.  People who are buying

4   it, they know full well it's not for research and development.

5   It's his co-conspirators.  It's so if anyone walks into the

6   barn and finds the bottle, they won't bring charges.

7        Think about those labels from the perspective of

8   somebody who was actually acting in good faith.  Put yourself

9   in the mind of someone who was actually trying to build a

10  program to make drugs that would help the horse, that was not

11  designed to mislead, that was designed to aid the horse in

12  overcoming pain or fixing its red blood cell count, addressing

13  anemia, whatever it might be, good faith, an actual

14  veterinarian, think about that.  How would you label the drug

15  if you were that person?

16        You might say this drug contains the following

17  ingredients.  Dr. Fishman doesn't do that.  You might say these

18  ingredients are testable.  They can be used only for the

19  medical purpose by which they're prescribed.  Don't use them in

20  a horse that might be racing.  You might say that if you

21  actually had that concern.  Not testable is almost the exact

22  opposite of what you would say if you were a person acting in

23  good faith.  Dr. Fishman is not a person acting in good faith.

24  Not testable is what he says.

25        Quick note on the cooperators, this was a bit all over

1    the place.  The defense sort of wants to have it both ways with

2    the cooperators and the witnesses in the case.  On the one

3    hand, when, for example, Ross Cohen is talking about his bad

4    acts, that's totally truthful, he's telling the full truth.  Of

5    course, Ross Cohen's bad acts are Dr. Fishman's bad acts.

6    They're co-conspirators.

7         But then at the same time that you're told you should

8    believe these guys when they talk about their bad acts, you're

9    also told don't believe them, they're lying about something.

10   Never actually said what it was they're lying about in the

11   course of that summation, did they?  Except for one time, one

12   time it was suggested to you that Jamen Davidovich lied to you

13   about using or reselling these pain shots that he received,

14   that he had received blood builders, he used those.  Davidovich

15   told you he received some pain shots, that he didn't use those.

16   Mr. Sercarz asked you whether that sounded plausible to you.

17        What they didn't mention is that Davidovich brought

18   the pain shots into court.  These are the pain shots.  This is

19   Government Exhibit 14024.  They're right here.  This is in the

20   light.  Don't look at this.  An inconvenient fact for

21   Dr. Fishman.

22        They want you to believe that Courtney Adams would

23   risk her non-pros agreement lying to you about something that

24   they didn't define, that Ross Cohen would risk his cooperation

25   agreement, that he would be stuck with his guilty plea and no

1   support at sentencing just to lie about Seth Fishman, that

2   Adrienne Hall would lie and risk her non-prosecution agreement.

3   Adrienne Hall, who, by the way, is entirely corroborated by

4   Courtney Adams and Ross Cohen.  Ross Cohen who, by the way, is

5   entirely corroborated by Courtney Adams and Adrienne Hall, et

6   cetera, et cetera.

7           Does that make any sense to you?  Does it make any

8   sense that these people who do not know each other would come

9   in and tell you the same essential facts, that they would come

10  in here and tell you in their own stories and then have those

11  stories happen to match up with entirely independent evidence?

12  Do you think -- does Dr. Fishman expect you to think that those

13  witnesses somehow hacked into Seth Fishman's email account, or

14  that they forged a bunch of text messages, or that Ross Cohen

15  impersonated Seth Fishman during the course of the wiretap over

16  Seth Fishman's phone?  Is that what they want you to think?  Do

17  you they want you to think they invented this evidence years,

18  years before the charges were brought?  If it sounds absurd

19  it's because it is absurd.

20          And moreover, the defense knows it's absurd.  They

21  stipulated that in fact the emails are true, they're authentic,

22  that the text messages are authentic, that the wiretap and the

23  people listed on the wiretap are authentic and correctly

24  labeled.

25          But if you look at that evidence, they know that Seth

1    Fishman is guilty, and so they ignored it and continued to

2    ignore it throughout the time they were talking to you.

3              Mr. Sercarz talked about the standard proof that's at

4    issue in this case.  It's beyond a reasonable doubt.  That's

5    the standard that's the burden, that's the burden that he

6    carry.  It is a weighty standard.  It's the standard that has

7    applied in every criminal case in this courthouse.  It's the

8    standard that applies in every criminal case since the

9    beginning of this country.  And the government has met that

10   standard in this case.  It's a standard that reflects the

11   seriousness of this event.

12             And this is a serious case.  It is a serious case just

13   like every criminal trial in this court.  It's a serious case

14   because we are talking about serious crimes.  It is a serious

15   case but it is not a close case.  The evidence is overwhelming.

16   This defendant's criminal intent is obvious.  Your job is

17   serious, but the road ahead is clear.  Seth Fishman is guilty

18   as charged.  Thank you.

19             THE COURT:  All right.  Thank you, Mr. Adams.

20             All right.  Members of the jury, you have now heard

21   all of the evidence in this case as well as the arguments of

22   the parties.  We have reached the point where you're about to

23   undertake your final function as jurors.  You have all paid

24   very careful attention to the evidence, and I'm confident that

25   you will act together with fairness and impartiality to reach a

1    just verdict in this case.

2           At this point, the next and final stage before you

3    retire to deliberate is for me to instruct you on the law.  The

4    instructions are not short, so I suggest that we just take a

5    very brief break at this time, not retire to the jury room, but

6    just maybe stand and stretch in your places.  It will also give

7    Ms. Dempsey an opportunity to make an announcement to anybody

8    else in the courtroom.

9           So we'll just take a couple of minutes and then we'll

10   all regroup.

11          DEPUTY CLERK:  Ladies and gentlemen, the Court is

12   about to charge the jury.  Any spectator wishing to leave the

13   courtroom may do so now or remain seated until the completion

14   of the Court's charge.

15          THE COURT:  My duty at this time point is, as I said,

16   to instruct you as to the law.  It is your duty to accept these

17   instructions of law and apply them to the facts as you

18   determine them, just as it has been my duty to preside over the

19   trial and decide what testimony and evidence is proper under

20   the law for your consideration.

21          On these legal matters, you must take the law as I

22   give it to you.  If any attorney or witness has stated a legal

23   principle different from any that I state to you in these

24   instructions, it is my instructions that you must follow.

25          You should not single out any instruction as alone

stating the law, but you should consider my instructions as a

whole when you retire to deliberate in the jury room.

You should not, any of you, be concerned about the

wisdom of any rule that I state.  Regardless of any opinion

that you may have as to what the law may be or ought to be, it

would violate your sworn duty to base a verdict upon any other

view of the law than that which I give you.

Because my instructions cover many points, I have

given each of you, or my colleagues have given each of you a

copy of them so that you may follow along, if you wish.  In

addition, you may take your copy of the instructions with you

for reference during your deliberations.  You should not single

out any instruction as alone stating the law; instead, you

should consider my instructions as a whole when you retire to

deliberate in the jury room.

Your final role is to pass upon and decide the fact

issues that are in the case.  You, the members of the jury, are

the sole and exclusive judges of the facts.  You evaluate the

evidence.  You determine the credibility of the witnesses.  You

resolve any conflicts there may be in the testimony.  You draw

whatever reasonable inferences you decide to draw from the

facts as you have determined them.  And you determine the

weight of the evidence.

I'll discuss with you later how to pass upon the

credibility or the believability of witnesses.

1    In determining the facts, you must rely upon your own

2    recollection of the evidence.  What the lawyers have said in

3    their opening statements, in their closing arguments, in their

4    objections or in their questions is not evidence.  In this

5    connection, you should bear in mind that a question put to a

6    witness is never evidence.  It's the answer only that is

7    evidence.  But you may not consider any answer that I directed

8    you to disregard or that I directed struck from the record.  Do

9    not consider any such answers.  Nor is there anything I may

10   have said during the trial or may say during these instructions

11   with respect to a fact matter to be taken in substitution for

12   your own independent recollection.  What I say is not evidence.

13   The evidence before you consists of the answers given

14   by the witnesses, the testimony they gave, as you recall it,

15   and the exhibits that were received in evidence.  You may also

16   consider as evidence the stipulations of the parties and the

17   exhibits received pursuant to those stipulations, including

18   audio recordings, photographs and physical evidence.

19   Since you are the sole and exclusive judges of facts,

20   I do not mean to indicate any opinion as to the facts or what

21   your verdict should be.  The rulings I have made during the

22   trial are not any indication of my views of what your decision

23   should be as to whether or not the guilt of the defendant has

24   been proven beyond a reasonable doubt.

25   You should draw no inference or conclusion for or

1  against any party by reason of lawyers making objections or my

2  rulings on such objections.  Counsel have not only the right,

3  but also the duty to make legal objections when they think that

4  such objections are appropriate.

5      Further, do not concern yourselves with what was said

6  at sidebar conferences or my discussions with counsel.  As we

7  told you throughout the trial, those discussions relate to

8  rulings of law.

9      I also ask you to draw no inference from the fact that

10 upon occasion I interacted with certain witnesses.  Anything I

11 said was only intended for clarification or to expedite

12 matters, and certainly was not intended to suggest any opinions

13 on my part as to the verdict you should render or whether any

14 of the witnesses may have been more credible than any other

15 witnesses.  If I commented on the testimony or any other

16 evidence at any time, do not accept my statements in place of

17 your recollection or your interpretation.  You are expressly to

18 understand that the Court -- meaning me -- has no opinion as to

19 the verdict you should render in this case.

20     As to the facts, ladies and gentlemen, you are the

21 exclusive judges.  You are to perform the duty of finding the

22 facts without bias or prejudice as to any party.  You to

23 perform the duty of finding the facts without bias or

24 prejudice, as I say, to any party.  You are to perform your

25 final duty in an attitude of complete fairness and

1    impartiality.

2              The case is important to the government, for the

3    enforcement of criminal laws is a matter of prime concern to

4    the community.  Equally, it is important to the defendant, who

5    is charged with serious crimes.

6              The fact that the prosecution is brought in the name

7    of the United States of America entitles the government to no

8    greater consideration than that accorded to any other party to

9    a litigation.  By the same token, it is entitled to no less

10   consideration.  All parties, whether government or individuals,

11   stand as equals at the bar of justice.

12             The defendant has pleaded not guilty to the charges in

13   the indictment.  To convict the defendant, the burden is on the

14   prosecution to prove the defendant's guilt of each element of

15   the charge beyond a reasonable doubt.  This burden never shifts

16   to the defendant for the simple reason that the law presumes a

17   defendant to be innocent and never imposes upon a defendant in

18   a criminal case the burden or duty of calling any witnesses or

19   producing any evidence.

20             In other words, the defendant arrives and starts with

21   a clean slate and is presumed innocent of each charge until

22   such time, if ever, that you, as a jury, are satisfied that the

23   government has proven that the defendant is guilty of a given

24   charge beyond a reasonable doubt.

25             Since, in order to convict the defendant of a given

1   charge, the government is required to prove that charge beyond

2   a reasonable doubt, the question then is:  What is reasonable

3   doubt?  The words almost define themselves.  It is a doubt that

4   is based on reason.  It is a doubt that a reasonable person has

5   after carefully weighing all the evidence.  It is a doubt that

6   would cause a reasonable person to hesitate to act in a matter

7   of importance in his or her personal life.  Proof beyond a

8   reasonable doubt must, therefore, be proof of a convincing

9   character that a reasonable person would not hesitate to rely

10  upon in making an important decision.

11      A reasonable doubt is not caprice or whim.  It is not

12  speculation or suspicion.  It is not an excuse to avoid the

13  performance of an unpleasant duty.  The law does not require

14  that the government prove guilt beyond all possible doubt.

15  Proof beyond a reasonable doubt is sufficient to convict.

16      If, after fair and impartial consideration of the

17  evidence, you have a reasonable doubt as to the defendant's

18  guilt with respect to a particular charge, you must find that

19  defendant not guilty of that charge.  On the other hand, if,

20  after fair and impartial consideration of all the evidence,

21  you're satisfied beyond a reasonable doubt of the defendant's

22  guilt with respect to a particular charge, you should find the

23  defendant guilty of that charge.

24      The defendant, Seth Fishman, is formally charged by a

25  grand jury in an indictment.  As I instructed you at the outset

1    of this case, the indictment is a charge or an accusation.  It

2    is not evidence.  The defendant is not charged with committing

3    any crime other than the offenses in the indictment.

4         The indictment in this case contains multiple charges,

5    known as counts.  Each count charges a separate offense or

6    crime.  Although there are facts in common to different counts,

7    each count must be considered separately.  Each count must

8    therefore be considered separately by you, and you must return

9    a separate verdict on each count.

10        Count One of the indictment charges that from at least

11   in or about 2016 through at least in or about March 2020, Seth

12   Fishman, the defendant, conspired with others -- that is,

13   agreed with others -- to violate the federal criminal law

14   prohibiting what is known as drug adulteration or misbranding

15   with the intent to defraud or mislead.  Specifically, the

16   defendant is charged with agreeing with others to introduce

17   misbranded or adulterated drugs into interstate commerce, to

18   misbrand or adulterate drugs in interstate commerce, to receive

19   in interstate commerce misbranded or adulterated drugs, or to

20   take any act with respect to a drug while held for sale after

21   shipment in interstate commerce, with the intent to defraud or

22   mislead.

23        Count Two of the indictment charges that from at least

24   in or about 2002 through at least in or about March of 2020,

25   Seth Fishman, the defendant, conspired with others -- that is,

1  agreed with others -- to violate the federal criminal law

2  prohibiting what is known as drug adulteration or misbranding

3  with the intent it to defraud or mislead.  Specifically, the

4  defendant is charged with agreeing with others to introduce

5  misbranded or adulterated drugs into interstate commerce, to

6  misbrand or adulterate drugs in interstate commerce, or to

7  receive in interstate commerce misbranded or adulterated drugs,

8  with the intent to defraud or mislead.  Count Two also alleges

9  that the defendant continued to commit that offense after he

10  was arrested and released on bail in this case.

11        In a moment, I will instruct you on the law that you

12  must apply when considering each of Count One and Two.  Much of

13  the law that applies to Count One will also apply to Count Two,

14  and I will note where the law is applicable to each count.  In

15  the few instances where there is a difference between the laws

16  applicable to each count, I will note that for you and provide

17  specific instructions for those particular elements or

18  findings.

19        As I just indicated, for purposes of your

20  determination, the indictment contains two counts charging the

21  defendant.  Each of these counts constitutes a separate offense

22  or crime, and you must consider each count of the indictment

23  separately and return a separate verdict on each count in which

24  the defendant is charged.  Whether you find the defendant

25  guilty or not guilty as to one offense should not affect your

1    verdict as to any other offense charged.

2            As I stated, Seth Fishman, the defendant, is accused

3    in Count One of having been a member of a conspiracy to violate

4    the federal laws prohibiting what is known as drug misbranding

5    or drug adulteration between at least in or about 2016 through

6    at least in or about March 2020.

7            Count One reads in part as follows:

8            From at least in or about 2016 through at least in or

9    about March of 2020, in the Southern District of New York and

10   elsewhere, Seth Fishman, the defendant, together with others

11   known and unknown, willfully and knowingly did combine,

12   conspire, confederate, and agree together and with each other

13   to commit offenses against the United States, to wit,

14   violations of Title 21, United States Code, Section 331 and

15   333(a)(2).

16           It was a part and an object of the conspiracy that

17   Seth Fishman, the defendant, together with others known and

18   unknown, with the intent to defraud and mislead, would and did

19   introduce and deliver for introduction, and would and did cause

20   the introduction and delivery for introduction, into interstate

21   commerce, adulterated and misbranded drugs, as defined by 21,

22   United States Code, Sections 351(a)(5), 352(a), 352(b), 352(f),

23   352(o), 353(f), and 360b, in violation of 21, United States

24   Code, Sections 331(a) and 333(a)(2).

25           It was further a part and an object of the conspiracy

1    that Seth Fishman, the defendant, together with others known

2    and unknown, with the intent to defraud and mislead, in

3    interstate commerce, willfully and knowingly would and did

4    adulterate and misbrand drugs, and would and did cause the

5    adulteration and misbranding of drugs in interstate commerce,

6    as defined by 21, United States Code, Sections 351(a)(5),

7    352(a), 352(b), 352(f), 352(o), 353(f), and 360b, in violation

8    of 21, United States Code, Sections 331(b) and 333(a)(2).

9             It was further a part and an object of the conspiracy

10   that Seth Fishman, the defendant, together with others known

11   and unknown, with the intent to defraud and mislead, would and

12   did receive in interstate commerce adulterated and misbranded

13   drugs, as defined by 21, United States Code, Sections

14   351(a)(5), 352(a), 352(b), 352(f), 352(o), 353(f), and 360b,

15   and deliver and proffer delivery thereof for pay and otherwise,

16   and would and did cause the receipt in interstate commerce of

17   adulterated and misbranded drugs as defined by 21, United

18   States Code, Sections 351(a)(5), 352(a), 352(b), 352(f),

19   352(o), 353(f), and 360b, and cause the delivery and proffered

20   delivery thereof for pay and otherwise, in violation of 21,

21   United States Code, Section 331(c) and 333(a)(2).

22            It was further a part and an object of the conspiracy

23   that Seth Fishman, the defendant, together with others known

24   and unknown, with the intent to defraud and mislead, would and

25   did alter, mutilate, destroy, obliterate or remove the whole or

1  any part of the labeling of, and did any other act with respect

2  to a food, drug, device, tobacco product or cosmetic, while

3  such article was held for sale (whether or not the first sale)

4  after shipment in interstate commerce that results in such an

5  article being adulterated or misbranded as defined by 21,

6  United States Code, Section 351(a)(5), 352(a), 352(b), 352(f),

7  352(o), 353(f), and 360b, in violation of 21, United States

8  Code, Section 331(k) and 333(a)(2).

9          The defendant is also charged in Count Two with

10  conspiracy to violate the drug misbranding and drug

11  adulteration laws with intent to defraud or mislead.  As to

12  Count Two, the defendant is charged with agreeing with others

13  from at least in or about 2002 through at least in or about

14  March 2020 to introduce misbranded or adulterated drugs into

15  interstate commerce, to misbrand or adulterate drugs in

16  interstate commerce, or to receive in interstate commerce

17  misbranded or adulterated drugs, all with the intent to defraud

18  or mislead.

19          Count Two reads in part relevant part as follows:

20          From at least in or about 2002, through at least in or

21  about March of 2020, in the Southern District of New York and

22  elsewhere, Seth Fishman, the defendant, together with others

23  known and unknown, willfully and knowingly did combine,

24  conspire, confederate, and agree together and with each other

25  to commit offenses against the United States, to wit,

1   violations of Title 21, United States Code, Sections 331 and

2   333(a)(2), including while Fishman was released under

3   conditions of bail pursuant to Title 18, United States Code,

4   Chapter 207.

5           It was a part and an object of the conspiracy that

6   Seth Fishman, the defendant, together with others known and

7   unknown, with the intent to defraud and mislead, would and did

8   introduce and deliver for introduction and would and did cause

9   the introduction and delivery for introduction, into interstate

10  commerce, adulterated and misbranded drugs as defined by 21,

11  United States Code, Sections 351(a)(5), 352(a), 352(b), 352(f),

12  352(o), 353(f), and 360b, in violation of 21, United States

13  Code, Sections 331(a) and 333(a)(2).

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  It was further a part and an object of the

2  conspiracy that Seth Fishman, the defendant, together with

3  others known and unknown, with the intent to defraud and

4  mislead in interstate commerce, would and did adulterate and

5  misbrand drugs, and would and did cause the adulteration and

6  misbranding of drugs in interstate commerce as defined by 21,

7  United States Code, Sections 351(a)(5), 352(a), 352(b), 352(f),

8  352(o), 353(f) and 360b in violation of 21, United States Code,

9  Sections 331(b) and 333(a)(2).

10    It was further a part and an object of the conspiracy

11  that Seth Fishman, the defendant, together with others known

12  and unknown, with the intent to defraud and mislead, would and

13  did receive in interstate commerce adulterated and misbranded

14  drugs, as defined by 21, United States Code, Sections

15  351(a)(5), 352(a), 352(b), 352(f), 352(o), 353(f) and 360b, and

16  deliver and proffer delivery thereof for pay and otherwise, and

17  would and did cause the receipt in interstate commerce of

18  adulterated and misbranded drugs, as defined by 21, United

19  States Code, Sections 351(a)(5), 352(a), 352(b), 352(f),

20  352(o), 353(f) and 360b, and caused the delivery and proffered

21  delivery thereof for pay and otherwise, in violation of 21,

22  United States Code, Sections 331(c), and 333(a)(2).

23    A conspiracy, as charged in both Counts One and Two,

24  is a kind of criminal partnership -- a combination or agreement

25  of two or more persons to join together to accomplish an

1    unlawful purpose.  The crime of conspiracy to violate a federal

2    law is an independent offense.  It is separate and distinct

3    from the actual violation of any federal law which the law

4    refers to as a "substantive crime."  The crime of conspiracy is

5    complete once the unlawful agreement is made, the defendant

6    enters into it and an overt act occurs.

7         If a conspiracy exists, even if it should fail in its

8    purpose, it is still punishable as a crime.  Indeed, you may

9    find the defendant guilty of conspiracy to commit an offense

10   even though the substantive crime or crimes which were the

11   object of the conspiracy were not actually committed, were not

12   successful, or were impossible to achieve.

13        Congress has deemed it appropriate to make conspiracy,

14   standing alone, a separate crime, even if the conspiracy is not

15   successful or could not have been successful.  This is because

16   collective criminal activity is believed to pose a greater

17   threat to the public's safety and welfare than individual

18   conduct, and increases the likelihood of success of a

19   particular criminal venture.

20        To sustain its burden of proof with respect to each of

21   the charged conspiracies, the government must establish beyond

22   a reasonable doubt the following three elements:

23        First, the existence of a conspiracy charged in each

24   count, that is, an agreement or an understanding to violate one

25   or more laws of the United States;

1      Second, that the defendant knowingly and willfully

2   became a member of the conspiracy you are considering;

3      And, third, that any one of the conspirators, not

4   necessarily the defendant, but any one of the parties involved

5   in each conspiracy, knowingly committed at least one overt act

6   in furtherance of the conspiracy that you are considering

7   during the life of that conspiracy.

8      Now, let's separately consider the elements that

9   constitute the object of each of the conspiracies.

10     Starting with the first element, a conspiracy is a

11  combination or agreement or understanding of two or more people

12  to accomplish by concerted or collective action a criminal or

13  unlawful purpose.  The gist or the essence of the crime of

14  conspiracy is the unlawful combination or agreement to violate

15  the law.  As I mentioned earlier, the ultimate success of the

16  conspiracy, or the actual commission of the criminal act which

17  is the object of the conspiracy, is not relevant to the

18  question of whether the conspiracy existed.

19     The conspiracies alleged here in Counts One and Two,

20  therefore, are agreements to engage in certain kinds of acts

21  that the law refers to as "misbranding" or "adulteration,"

22  whether or not those acts actually occurred.  The conspiracy

23  alleged in Count One and that alleged in Count Two, therefore,

24  is the agreement to commit each of those charged crimes.

25     Each charged conspiracy is an entirely separate and

distinct offense from the underlying offenses, which as I told

you, the law calls "substantive crimes."  The crime of

conspiracy is complete once the unlawful agreement is made and

the defendant enters into it.

         To prove a conspiracy, the government is not required

to show that individuals sat around a table and entered into a

solemn pact orally or in writing, or any express or formal

agreement stating that they have formed a conspiracy to violate

the law.

         You need not need find that the alleged conspirators

stated, in words or writing, what the scheme was, its object or

purpose, or every precise detail of the scheme, or the means by

which this object or purpose was to be accomplished.  Indeed,

it would be extraordinary if there were such a formal document

or specific oral agreement.

         Your common sense tells you that when people, in fact,

undertake to enter into a criminal conspiracy, a great deal is

left to unexpressed understanding.  From its very nature, a

conspiracy is almost invariably secret in its origin and

execution.  Conspirators do not usually reduce their agreements

to writing or acknowledge them in front of a notary public, nor

do they normally publicly broadcast their plan.  Thus, you may

infer the existence of a conspiracy from the circumstances of

the case and the conduct of the parties involved.

         To show that a conspiracy existed, then, it is

1   sufficient that the evidence shows that two or more persons, in

2   some way or manner, through any contrivance, explicitly or

3   implicitly, came to an understanding to violate the law and to

4   establish an unlawful plan.  Express language or specific words

5   are not required to indicate offense or attachment to a

6   conspiracy.

7           You may find the existence of an agreement to commit

8   an unlawful act has been established by direct proof, but it is

9   rare that a conspiracy can be proven by direct evidence of an

10  explicit agreement.

11          In determining whether there has been an unlawful

12  agreement, you may consider the acts and the conduct of the

13  alleged co-conspirators that were done to carry out the

14  apparent criminal purpose.  The adage "actions speak louder

15  than words" is applicable here.

16          Often, the only evidence available with respect to the

17  existence of the conspiracy is that of disconnected acts on the

18  part of the alleged individual co-conspirators.  When taken

19  together and considered as a whole, however, those acts are

20  capable of showing a conspiracy or agreement as conclusively as

21  would more direct proof.

22          Of course, proof concerning the accomplishment of the

23  object of the conspiracy may be the most persuasive evidence of

24  the existence of the conspiracy itself, but it is not necessary

25  that the conspiracy actually succeed in its purpose in order

1    for you to conclude that the conspiracy existed.

2              In deciding whether each conspiracy alleged, in fact,

3    existed, you may consider all of the evidence of the acts,

4    conduct and declarations of the alleged conspirators and a

5    reasonable inferences to be drawn from such evidence.

6              It is sufficient to establish the existence of each

7    conspiracy if, after considering all of the relevant evidence,

8    you find beyond a reasonable doubt that the minds of at least

9    two alleged conspirators in each conspiracy met in an

10   understanding way and that they agreed, as I have explained, to

11   work together in furtherance of the unlawful scheme alleged in

12   the indictment.

13             In short, as far as the first element of each

14   conspiracy is concerned, the government must prove beyond a

15   reasonable doubt that at least two alleged conspirators came to

16   a mutual understanding, either spoken or unspoken, to violate

17   the law in the manner charged in the indictment.

18             The object or objects of a conspiracy is the alleged

19   goal or goals that the co-conspirators agree or hope to

20   achieve.  The indictment here charges that the conspiracy

21   alleged in Count One had four such objects -- objects one

22   through four as I will read them in a moment -- whereas, the

23   conspiracy charged in Count Two had three objects, objects one

24   through three only.

25             The objects are:  Object One, applicable to Counts One

1   and Two:  The introduction of misbranded and adulterated drugs

2   into interstate commerce;

3          Object Two, applicable to Counts One and Two:  The

4   misbranding or adulteration of drugs while they were held for

5   sale after they traveled in interstate commerce;

6          Object Three, applicable to Counts One and Two:  The

7   receipt of misbranded or adulterated drugs shipped in

8   interstate commerce;

9          And Object Four, which is applicable to Count One

10  only:  Taking any action to adulterate or misbrand the drugs.

11         As for both Counts One and Two, and for each object

12  alleged in each count, the indictment further alleges that the

13  objects were undertaken with the intent to defraud or mislead.

14  I will define the elements of these criminal objects in a

15  moment.

16         Although the indictment alleges as to Count One that

17  the conspiracy had at least four objects or goals, the

18  government does not need to prove that the conspiracy had all

19  four elements in order for you to find the conspiracy existed.

20  That is, if you find that the government has proven the

21  existence of the charged conspiracy, you do not need to find

22  that there was a conspiracy to do all four of these things.

23         Similarly, the government does not need to prove that

24  the conspiracy alleged in Count Two had all three charged

25  objects in order for you to find that the conspiracy existed.

1    To find that the government has proven the existence of the

2    conspiracy charged in Count Two, you do not need to find that

3    there was a conspiracy to do all three of the charged objects.

4         As to each of Count One and Count Two, it is

5    sufficient if you find that the conspiracy had just one of the

6    charged goals relevant to each count.  However, you must be

7    unanimous that one or more of those goals existed.  In other

8    words, you may find that the conspiracy charged in Count One

9    existed as to all four objects of the conspiracy, but you need

10   only find one such objective and you may find that the

11   conspiracy charged in Count Two existed as to all three

12   objectives of that conspiracy, but you need only find one such

13   objective.

14        For each count, however, you must be unanimous as to

15   the object of the conspiracy or unanimous as to multiple

16   objects of the conspiracy, and you must be unanimous that any

17   conspiracy you may find is the conspiracy charged in the count

18   you are considering.

19        If you conclude that the government has proven beyond

20   a reasonable doubt that the conspiracy in each charge you are

21   considering existed, then you must next determine the second

22   question, whether the defendant participated in that conspiracy

23   with knowledge of its unlawful purpose and in furtherance of

24   its unlawful objectives.

25        As I mentioned, the conspiracy charged in Count One is

1    alleged to have had four unlawful objects or goals.  Objects

2    One, Two and Three are also the objects alleged with respect to

3    Count Two.  I will now describe the law with respect to all

4    four objects.

5          Remember, you need not find that a conspiracy

6    successfully achieved all of the objectives alleged with

7    respect to that conspiracy.  You do need to find, as I said

8    earlier, whether or not the evidence establishes the existence

9    of each of the conspiracies charged in Counts One and Two of

10   the indictment, that is an agreement between at least two

11   people to seek to achieve at least one objective of each

12   respective conspiracy.  So that you may consider whether such

13   conspiracies existed, I will describe the law covering the

14   crimes that are alleged to have been the object of the

15   conspiracy.

16         Object One, which, as I said, is alleged with regard

17   to both Count One and Count Two.  The first object of each of

18   the conspiracies charged in Counts One and Two is the

19   introduction of misbranded drugs into interstate commerce, with

20   the intent to defraud or mislead.  That offense has three

21   elements:

22         One.  The defendant introduced or delivered for

23   introduction into interstate commerce or caused to be

24   introduced or delivered into interstate commerce a product;

25         Two.  At the time the defendant introduced or

1    delivered for introduction or caused the introduction or

2    delivery of that product into interstate commerce, the product

3    was a drug;

4            Three.  At the time the defendant introduced or

5    delivered for introduction or caused the introduction or

6    delivery of that product into interstate commerce, the drug was

7    misbranded or adulterated in at least one way;

8            And Four.  The defendant had the intent to defraud or

9    mislead.

10           "Interstate commerce" means commerce between any state

11   and anyplace outside that state.  To deliver something for

12   introduction into interstate commerce means to deliver it to a

13   place for service, such as the United States Postal Service, so

14   that the thing may then be put into interstate commerce with

15   the knowledge that that is what will occur.  It is not

16   necessary for the government to prove that the defendant

17   himself carried the drugs interstate or to prove who carried it

18   across or how it was transported.

19           The term "drug" means anything, other than food,

20   intended for use in the diagnosis, cure, mitigation, treatment

21   or prevention of disease in any animal, or intended to affect

22   the structure or any function of the body of an animal.  If an

23   article is a drug, then any and all substances or ingredients

24   that are intended to be used as a component of that article are

25   also considered drugs.

1    To determine whether a product is either "intended for

2 use in the diagnosis, cure, mitigation, treatment or prevention

3 of disease in animals," or "intended to affect the structure or

4 any function of the body" of an animal, you should consider the

5 product's intended use. A product's intended use is what a

6 reasonable person would conclude the manufacturer, seller or

7 dispenser of the product intended the product to be used for

8 based on all the relevant information.

9    You can determine the intended use of a product by

10 considering the labels and oral representations made about the

11 product, and information from any other source which discloses

12 its intended use. If there is no label, accompanying labeling,

13 promotional material, advertising or other representations made

14 about the product on a particular occasion, you may still find

15 that the product was intended for use as a drug by looking at

16 any other source. If other evidence establishes this intended

17 use, such as marketing, promotion or previous labeling of the

18 product by the manufacturer, seller or dispenser, you may

19 consider such evidence.

20    A drug is "misbranded" if prior to being

21 dispensed: one, its labeling fails to contain any required

22 information, which includes lists of active ingredients,

23 "adequate directions for use," and manufacturer information;

24 two, its labeling is false or misleading in any particular way;

25 three, the drug is a "prescription animal drug" and its

1   labeling lacks the statement "Caution:  Federal law restricts

2   this drug to use by or on the order of a licensed

3   veterinarian;" four, the drug is a "prescription animal drug"

4   and it is dispensed without a prescription or other order

5   authorized by law in the course of the veterinarian's

6   professional practice.

7        A drug is "adulterated" if it is an "unsafe, new

8   animal drug."  I'll now define for you the term "unsafe" and

9   "new animal drug."

10        A "new animal drug" is defined as a drug intended for

11  use in animals, the composition of which is such that the drug

12  is not generally recognized among experts qualified by

13  scientific training and experience to evaluate the safety and

14  effectiveness of animal drugs as safe and effective for use

15  under the conditions prescribed, recommended or suggested in

16  the labeling thereof.

17        A "new animal drug" is "unsafe" and, thus, adulterated

18  if the USFDA has not approved or conditionally approved the new

19  animal drug application for that drug.

20        The indictment here charges that the first object of

21  each conspiracy was to introduce into, or deliver for

22  introduction into, interstate commerce drugs that were

23  misbranded or adulterated in one or more of these ways.  You

24  need not find that either conspiracy was to introduce drugs

25  that were each misbranded or adulterated in all of the ways I

1   have just described.  It would be sufficient if you found

2   beyond a reasonable doubt that for each conspiracy, a

3   conspiracy existed to introduce drugs that were misbranded in

4   one or more of these ways.

5          To assist you in determining whether that was so, I

6   will provide the following additional definitions:

7          The term "adequate directions for use" means direction

8   under which a person administering or using the drug can do so

9   safely and for the purpose for which it was intended.

10         A product is a "prescription animal drug" if it is a

11  drug intended for use in animals other than man and, because of

12  this toxicity, or other potentiality for harmful effect, or the

13  method of its use, or the collateral measures necessary to its

14  use, it is not safe for animal use except under the

15  professional supervision of a licensed veterinarian.

16         A "prescription animal drug" is a drug that can either

17  be administered by a licensed veterinarian in the course of the

18  veterinarian's professional practice, or can be dispensed only

19  upon a lawful written or oral order of a licensed veterinarian

20  in the course of the veterinarian's professional practice.

21         A prescription, or other order authorized by law, is

22  one issued in the usual course of professional practice by a

23  licensed veterinarian for a legitimate medical purpose based

24  upon a bona fide veterinarian-client/patient relationship.

25         Prescription animal drugs are misbranded if they are

administered by a licensed veterinarian but not in the course

of his professional veterinary practice.  Prescription animal

drugs are also misbranded if they are administered by someone

other than a veterinarian but not pursuant to a prescription or

other order authorized by law, issued in the course of the

veterinarian's professional practice.

          To dispense a prescription drug without a

prescription, or other order authorized by law, as I just

defined, means to provide a person with a prescription drug to

administer to an animal with no oral or written prescription or

order at all; or pursuant to a prescription or order that was

not issued for a legitimate medical purpose based upon a bona

fide veterinarian-client/patient relationship.

          The terms "label" and "labeling" have specific

meaning.  "Label," means any written, printed or graphic matter

upon the immediate container of a product.  The term "labeling"

is broader than the term "label."  "Labeling," means all

labels, as well as any other written, printed or graphic matter

that appears on any product or on any of its containers or

wrappers or that accompanies the product.  "Labeling" may

include promotional material or literature, including package

inserts, pamphlets, mailing pieces, and all other literature

that supplements, explains or is textually related to the

product.

          It is unnecessary for the written, printed or graphic

1    matter to have been physically attached to the product to

2    constitute labeling.  It's also unnecessary for the written,

3    printed or graphic material to have been shipped at the same

4    time as or with the product to constitute "labeling."  The

5    focus is whether the written, printed or graphic matter is part

6    of an integrated transaction to market the product.

7          Turning to Object Two, which is applicable to both

8    Counts One and Two.  The second object of each of the

9    conspiracies charged in Counts One and Two is misbranding or

10   adulteration of drugs while they were held for sale, with the

11   intent to defraud or mislead.  That offense has five elements:

12         One.  The defendant did or caused another to do some

13   act with respect to a product;

14         Two.  At the time the defendant did or caused another

15   to do the act, the product was a drug;

16         Three.  The act caused the product to be misbranded or

17   adulterated in at least one way;

18         Four.  Prior to the misbranding or adulteration of the

19   product, the product or a component of the product had moved or

20   been shipped in interstate commerce;

21         And Five.  The defendant had the intent to defraud or

22   mislead.

23         The definitions that I gave you earlier with respect

24   to the first object of the conspiracy applies equally here to

25   the second object.

1    Object Three, applicable to Counts One and Two.  The

2    third object of each of the conspiracies charged in Counts One

3    and Two is the receipt of misbranded or adulterated drugs after

4    they were shipped in interstate commerce, with the intent to

5    defraud or mislead.  That offense has five elements:

6    One.  The defendant received or caused another to

7    receive a product in interstate commerce;

8    Two.  At the time the defendant received or caused the

9    receipt of that product in interstate commerce, the product was

10   a drug;

11   Three.  At the time the defendant received or caused

12   the receipt of the drug in interstate commerce, the drug was

13   misbranded or adulterated in at least one way;

14   Four.  The defendant delivered or proffered for

15   delivery the drug received in interstate commerce for pay or

16   otherwise after it was received;

17   And Five.  The defendant had the intent to defraud or

18   mislead.

19   Again, the definitions I gave you earlier with respect

20   to the first object of the conspiracy apply equally here.

21   Object Four, and this applies only to Count One.  The

22   fourth object of the conspiracy charged in Count One, but not

23   in Count Two, is to do or cause the doing of an act to a drug

24   while the drug is held for sale and after shipment in

25   interstate commerce, which results in the drug being

1   adulterated or misbranded, with the intent to defraud or

2   mislead.  This offense has four elements:

3          One.  The defendant did or caused another to do some

4   act with respect to a product while it was held for sale;

5          Two.  At the time the defendant did or caused another

6   to do the act, the product was a drug;

7          Three.  The act caused the product to be misbranded in

8   at least one way;

9          Four.  Prior to the product being held for sale, the

10  product or a component of the product had moved or been shipped

11  in interstate commerce.

12         For each of the objects to be considered in connection

13  with the conspiracies charged in Counts One and Two, one of the

14  elements is that the defendant engaged in any of those objects

15  I described earlier with an intent to defraud or mislead.

16         To act "with intent to defraud" means to act with the

17  specific intent to deceive or to cheat, ordinarily for the

18  purpose of either causing some financial loss to another or

19  bringing about some financial gain to oneself.  The intent must

20  be connected -- related in time, causation or logic -- to the

21  commission of the misbranding or adulteration offense that is

22  the subject of each charged conspiracy.

23         It is not necessary, however, for the government to

24  prove that anyone was, in fact, defrauded, as long as it proves

25  beyond a reasonable doubt that the defendant acted with the

1   intent to defraud.

2          To act with "intent to mislead," means to act with a

3   specific intent to create a false impression by misstating,

4   omitting or concealing material facts.  It is not necessary,

5   however, to prove that anyone was, in fact, misled, as long as

6   it is established beyond a reasonable doubt that the defendant

7   acted with the intent to mislead.

8          Intent need not be proved directly.  You may infer the

9   defendant's intent from the surrounding circumstances.  You may

10  consider any statement made or omitted by the defendant, and

11  all other facts and circumstances in evidence which indicate

12  state of mind.

13         The element of "intent to defraud or mislead" is

14  written in the disjunctive, meaning with the word "or."  Thus,

15  you can find either that the defendant had the intent to

16  defraud or the intent to mislead.

17         Intent to defraud or mislead can be demonstrated by

18  evidence of intent to defraud or mislead consumers, state

19  racing and drug regulators, the Food and Drug Administration,

20  or other federal drug enforcement authorities, including U.S.

21  Customs and Border Protection, the FBI and the DEA.

22         The defendant has argued that he acted in good faith.

23  You could find that the defendant believed in good faith that

24  he was acting properly, even if he was mistaken in that belief

25  and, therefore, he did not act with an intent to defraud or

mislead.  The burden of establishing criminal intent rests on

the government.  The defendant is under no burden to prove his

good faith.  Rather, the government must prove beyond a

reasonable doubt an intent to defraud or mislead.

I just need to pause for a moment.

(Pause)

You all want to take a stretch break, or are you doing

okay?  You're okay?  All right.

The government must prove beyond a reasonable doubt

that the defendant unlawfully, willfully and knowingly entered

into the conspiracy, that is, that the defendant agreed to take

part in the conspiracy with knowledge of its unlawful purpose,

and that he agreed to take part in the conspiracy to promote

and cooperate in furtherance of one or more of its unlawful

objectives.

Now, as to this element, the terms "unlawfully,

willfully and knowingly" mean that you must be satisfied that

in joining the conspiracy, assuming you find that the defendant

did join the conspiracy or conspiracies in which he is charged,

that the defendant knew what he was doing.  That is, that he

took the actions in question deliberately and voluntarily.  The

key question is whether the defendant joined the relative

conspiracy with an awareness of at least some of the basic aims

and purposes of the unlawful agreement.

"Unlawfully," simply means contrary to law.  A

1   defendant need not have known that he was breaking any

2   particular law or any particular rule, but he must have been

3   aware of the generally unlawful nature of his acts.

4           An act is done "knowingly" and "willfully" if it is

5   done deliberately and purposefully.  That is, the defendant's

6   acts must have been the product of his conscious objective,

7   rather than the product of mistake, accident, mere negligence

8   or some other innocent reason.

9           Now, knowledge is a matter of inference from the

10  proven facts.  Science has not yet devised a manner of looking

11  into a person's mind and knowing what that person is thinking.

12  However, you do have before you the evidence of certain acts

13  and conversations alleged to have taken place involving the

14  defendant or in his presence.  You may consider this evidence

15  in determining whether the government has proven beyond a

16  reasonable doubt the defendant's knowledge of the unlawful

17  purposes of the charged conspiracies.

18          It is not necessary for the government to show that a

19  defendant was fully informed as to all the details of a

20  conspiracy in order for you to infer knowledge on his part.  To

21  have guilty knowledge, a defendant need not have known the full

22  extent of the conspiracy or all of the activities of all of its

23  participants.  It is not even necessary for a defendant to know

24  every other member of a conspiracy.  In fact, a defendant may

25  only know one other member of the conspiracy and still be a

1    co-conspirator.

2            Nor is it necessary that the defendant received any

3    monetary benefit from his participation in the conspiracy that

4    you are considering, or had a financial stake in the outcome.

5    However, although proof of a financial interest in the outcome

6    of the scheme is not essential or determinative, if you find

7    that the defendant had a financial or other interest, that is a

8    factor you may properly consider in determining whether the

9    defendant was a member of the conspiracy.

10           The duration and extent of the defendant's

11   participation has no bearing on the issue of his guilt.  He

12   need not have joined the conspiracy from the outset.  A

13   defendant may have joined it for any purpose at any time in its

14   progress, and he will be held responsible for all that was done

15   before he joined and all that was done during the conspiracy's

16   existence while he was a member.

17           Each member of a conspiracy may perform separate and

18   distinct acts and may perform them at different times.  Some

19   conspirators may play major roles, while others play minor

20   roles in the scheme.  An equal role or an important role is not

21   what the law requires.  In fact, even a single act can be

22   sufficient to make a defendant a participant in an illegal

23   conspiracy.

24           However, a person's mere association with a member of

25   a conspiracy does not make that person a member of that

1    conspiracy, even when that association is coupled with

2    knowledge that a conspiracy is taking place.  Mere presence at

3    the scene of a crime, even coupled with knowledge that a crime

4    is taking place, is not sufficient to support a conviction.  In

5    other words, knowledge, without agreement and participation, is

6    not sufficient.

7         What is necessary is that a defendant participated in

8    the conspiracy that you are considering with knowledge of its

9    unlawful purposes and with an intent to aid in the

10   accomplishment of its unlawful objective.  It is not required

11   that the government show that the co-conspirators also knew

12   that they were violating some particular federal statute.

13        The question of a co-conspirator's intent is a

14   question of fact that you are called upon to decide.  Just as

15   you determine any other facts at issue, the ultimate facts of

16   knowledge and criminal intent, though subjective, may be

17   established by circumstantial evidence based upon a person's

18   outward manifestation, his words, his conduct, his acts and all

19   the surrounding circumstances disclosed by the evidence and the

20   rational or logical inferences that may be drawn therefrom.

21   Circumstantial evidence, if believed, is of no less value than

22   direct evidence.

23        In sum, a defendant with an understanding of the

24   unlawful nature of the conspiracy may have intentionally

25   engaged, advised or assisted in the conspiracy for the purpose

1  of furthering an illegal undertaking.  A defendant thereby

2  becomes a knowing and willing participant in the unlawful

3  agreement, that is to say, he becomes a conspirator.

4           A conspiracy, once formed, is presumed to continue

5  until its objective is accomplished or until there is some

6  affirmative act of termination by its members.  So, too, once a

7  person is found to be a participant in the conspiracy, that

8  person is presumed to continue being a participant in the

9  venture until the venture is terminated, unless it is shown by

10 some affirmative proof that the person withdrew and

11 disassociated himself from it.

12          The third element of each conspiracy charge set forth

13 in each of Counts One and Two is the requirement of an overt

14 act.  To sustain its burden of proof, the government must show

15 beyond a reasonable doubt that at least one overt act was

16 committed in furtherance of the conspiracy that you are

17 considering by at least one of the co-conspirators, not

18 necessarily the defendant.

19          The purpose of the overt act requirement is that there

20 must have been something more than a mere agreement; some overt

21 step or action must have been taken by at least one of the

22 conspirators in furtherance of the conspiracy.

23          In order for the government to satisfy the overt act

24 requirement, it is not necessary for the government to prove

25 any of the overt acts alleged in the indictment.  Indeed, you

1  might find that overt acts were committed which were not

2  alleged at all in the indictment.  In short, it is sufficient

3  for the government to show that the defendant, or one of his

4  alleged co-conspirators, knowingly committed any overt act in

5  furtherance of the conspiracy during the life of the

6  conspiracy.

7          In that regard, you should bear in mind that you need

8  not reach a unanimous agreement on whether a particular overt

9  act was committed in furtherance of the conspiracy.  You just

10  need to all agree that at least one overt act was so committed.

11          In addition, you should bear in mind that the overt

12  act, standing alone, may be an innocent, lawful act.

13  Frequently, however, an innocent act sheds its harmless

14  character if it is step in carrying out, promoting or aiding or

15  assisting a conspiratorial scheme.  You are, therefore,

16  instructed that the overt act does not have to be an act which,

17  in and of itself, is criminal or an objective of the

18  conspiracy.

19          In some cases, the law that the defendant is charged

20  with breaking actually covers two separate crimes; one is more

21  serious than the second, and the second is generally called a

22  "lesser-included offense."  The indictment in this case charges

23  the defendant with participating in two separate conspiracies

24  to adulterate and misbrand drugs with the intent to defraud or

25  mislead, and I have explained to you the elements that the

1    government must prove beyond a reasonable doubt before you may

2    convict the defendant of those crimes.

3         You must first consider whether the government has

4    satisfied its burden of proof as to all elements of conspiracy

5    to commit drug adulteration and misbranding, other than intent

6    to defraud or mislead.  If you find that the government has

7    done so, you must render a verdict of guilty.

8         If you find the defendant guilty, you must then

9    proceed to determine whether the government has proven beyond a

10   reasonable doubt that the defendant committed that offense with

11   the intent to defraud or mislead.  If the government has

12   satisfied its burden as to all of the elements, including

13   intent to defraud or mislead, you must select "yes" on the

14   verdict form that I will give you, which we will discuss in a

15   few minutes.

16        With respect only to the conspiracy to violate the

17   drug misbranding and drug adulteration laws charged in Count

18   Two of the indictment, the indictment further charges that the

19   defendant continued to commit that offense after he was

20   released on bail, in violation of Section 3147 of Title 18 of

21   the United States Code.  The government and the defendants have

22   agreed, through a stipulation that is in evidence in this case,

23   that the defendant was released on bail in this case on

24   October 28th, 2019.

25        Therefore, if you find the defendant guilty of the

1  offense charged in Count Two, you must make one additional

2  finding, whether the government has proven beyond a reasonable

3  doubt that the defendant continued to commit that offense after

4  October 28th, 2019.  There's a place on the verdict form you

5  will receive where you can record your finding on this

6  question.

7          In your consideration of whether the defendant acted

8  knowingly with respect to any objective of the conspiracy

9  charged in Count One or Count Two, you may consider whether the

10  defendant deliberately closed his eyes to what otherwise would

11  have been obvious.  If you find beyond a reasonable doubt that

12  the defendant acted with a conscious purpose to avoid learning

13  the truth, then the requirement that he acted knowingly may be

14  satisfied.

15          However, guilty knowledge may not be established by

16  demonstrating that the defendant was merely negligent, foolish,

17  or mistaken.  One may not willfully and intentionally remain

18  ignorant of a fact material and important to his conduct to

19  escape the consequences of the criminal law.

20          If you find beyond a reasonable doubt that the

21  defendant intentionally participated in the conspiracy, but

22  that the defendant deliberately and consciously avoided

23  confirming certain facts about the specific objective of the

24  conspiracy, then such "conscious avoidance" may support a

25  finding that the government has proven the defendant's

1    knowledge of the objectives or goals of the conspiracy.

2         Keep in mind, you cannot rely on conscious avoidance

3    to support a finding that the defendant intentionally joined a

4    conspiracy.  Conscious avoidance may apply only to a

5    defendant's knowledge of the specific objectives of a

6    conspiracy, not to whether the defendant joined that conspiracy

7    in the first place.  It is logically impossible for the

8    defendant to intend and agree to join a conspiracy if he does

9    not actually know that it exists.

10        If you find that the defendant was aware of a high

11   probability that a fact regarding the objective of a conspiracy

12   was so, and that the defendant acted deliberately to avoid

13   confirming that fact, you may find that the defendant had

14   knowledge of the fact.  However, if you find that the defendant

15   actually believed the fact was not so, then he may not have

16   acted knowingly with respect to the fact.

17        When people enter into a conspiracy to accomplish an

18   unlawful end, they become agents or partners of one another in

19   carrying out that conspiracy.

20        In determining the factual issues before you, you may

21   consider against the defendant any acts or statements made by

22   any of the people who you find, under the standards I've

23   already described, to have been his co-conspirators, even

24   though such acts or statements were not made in his presence or

25   were made without his knowledge.

1    The indictment alleges that the conspiracy charged in

2    Count One existed from in or about 2016 through in or about

3    March of 2020, and that the conspiracy charged in Count Two

4    existed from in or about 2002 through in or about March of

5    2020.  It is not essential that the government prove that the

6    conspiracy started and ended at these specific times.

7    The government is not required to prove that the

8    conduct took place on the precise dates alleged in the

9    indictment.  The law only requires a substantial similarity

10   between the dates alleged in the indictment and the dates

11   established through evidence at trial.

12   In addition to all of the elements of each of the

13   charges that I've just described for you, you must decide

14   separately with respect to each of these counts whether any act

15   in furtherance of the crime you are considering occurred within

16   the Southern District of New York.  The Southern District of

17   New York includes the counties of Manhattan, The Bronx,

18   Westchester, Dutches, Putnam, Orange, Sullivan and Rockland

19   Counties.

20   Venue is proven if any act in furtherance of the

21   crimes you are considering occurred in the Southern District of

22   New York, regardless of whether it was the act of the defendant

23   or anyone else.

24   I should note on this issue, and this issue alone, the

25   government need not prove venue beyond a reasonable doubt but

1    only by a mere preponderance of the evidence.  A preponderance

2    of the evidence means that the government must prove that it is

3    more likely than not that any acts in furtherance of a given

4    crime occurred in the Southern District of New York.

5            In deciding whether or not the government has met its

6    burden of proof, you may consider both direct and

7    circumstantial evidence.

8            Direct evidence is evidence that proves a disputed

9    fact directly.  For example, when a witness testifies to what

10   he or she saw, heard or observed, that is called direct

11   evidence.

12           Circumstantial evidence is evidence that tends to

13   prove a disputed fact by proof of other facts.  To give a

14   simple example, suppose that when you came into the courthouse

15   today, the sun was shining and it was a nice day, but the

16   courtroom blinds were drawn and you could not look outside.

17   Then, later, as you were sitting here, someone walked in with a

18   dripping wet umbrella, and soon after that, someone else walked

19   in with a dripping wet raincoat.

20           Now, on our assumed facts, you cannot look outside the

21   courtroom and you cannot see whether or not it is raining; so

22   you have no direct evidence of that fact.  But, on the

23   combination of the facts about the umbrella and the raincoat,

24   it would be reasonable for you to infer that it had begun to

25   rain.

1          And that is all there is to circumstantial evidence.

2    Using your reason and experience, you infer from established

3    facts the existence or the nonexistence of some other facts.

4    Please note, however, that is it is not a matter of speculation

5    or guess.  It is a matter of logical inference.

6          The law makes no distinction between direct and

7    circumstantial evidence, and circumstantial evidence is of no

8    less value than direct evidence.  You may consider either or

9    both and may give them such weight as you conclude is

10   warranted.

11         During the trial, you have heard the attorneys use the

12   term "inference," and in their arguments they have asked you to

13   infer on the basis of your reason, experience and common sense,

14   from one or more established facts, the existence of some other

15   fact.

16         An inference is not a suspicion or a guess.  It is a

17   reasoned, logical decision to conclude that a disputed fact

18   exists on the basis of another fact that you know exists.

19         There are times when different inferences may be drawn

20   from facts, whether proven by direct or circumstantial

21   evidence.  The government asks you to draw one set of

22   inferences, while the defendant asks you to draw another.  It

23   is for you, and you alone, to decide what inferences you will

24   draw.

25         The process of drawing inferences from facts in

1    evidence is not a matter of guesswork or speculation.  An

2    inference is a deduction or a conclusion that you, the jury,

3    are permitted, but not required, to draw from the facts that

4    have been established by either direct or circumstantial

5    evidence.  In drawing inferences, you should exercise your

6    common sense.

7         So while you are considering the evidence presented to

8    you, you are permitted to draw, from the facts that you find to

9    be proven, such reasonable inferences as would be justified in

10   light of your experience.

11        Here again, let me remind you that whether based on

12   direct or circumstantial evidence, or on the logical,

13   reasonable inferences drawn from such evidence, you must be

14   satisfied of the guilt of the defendant beyond a reasonable

15   doubt before you may convict.

16        Now, during the trial, you have heard evidence in the

17   form of stipulations.  A stipulation of fact is an agreement

18   among the parties that a certain fact is true.  You should

19   regard such acts as true.  A stipulation of testimony is an

20   agreement among the parties that if called as a witness, the

21   person would have given certain testimony.  You must accept as

22   true the fact that the witness would have given that testimony.

23   It is for you, however, to determine the effect to be given to

24   that testimony.

25        It must be clear to you by now that the government and

1    the defendants are asking you to draw very different

2    conclusions about various factual issues in this case.

3    Deciding these issues will involve making judgments about the

4    testimony of the witnesses you have listened to and observed.

5    In making these judgments, you should carefully scrutinize all

6    of the testimony of each witness, the circumstances under which

7    each witness testified, and any other matter in evidence that

8    may help you decide the truth and the importance of each

9    witness' testimony.

10           Your decision whether or not to believe a witness may

11   depend on how that witness impressed you.  How did the witness

12   appear?  Was the witness candid, frank and forthright; or, did

13   the witness seem to be evasive or suspect in some way?  How did

14   the way the witness testified on direct examination compare

15   with how the witness testified on cross-examination?  Was the

16   witness consistent or contradictory?  Did the witness appear to

17   know what he or she was talking about?  Did the witness strike

18   you as someone who was trying to report his or her knowledge

19   accurately?  These are examples of the kind of common sense

20   questions you should ask yourself in deciding whether a witness

21   is or is not truthful.

22           How much you choose to believe a witness may also be

23   influenced by the witness' bias.  Does the witness have a

24   relationship with the government or the defendant that may

25   affect how he or she testified?  Does the witness have some

incentive, loyalty or motive that might cause him or her to
shade the truth?  Does the witness have some bias, prejudice or
hostility that may cause the witness to give you something
other than a completely accurate account of the facts he or she
testified to?

You should also consider whether a witness had the
opportunity to observe the facts he or she testified about.
Also, you should consider whether the witness' recollection of
the facts stands up in light of the other evidence in the case.

In other words, what you should try to do in deciding
credibility is to size up the person just as you would in any
important matter where you are trying to decide if a person is
being truthful, straightforward and accurate in his or her
recollection.

(Continued on next page)

1    THE COURT:  If a person is shown to have knowingly

2    testified falsely concerning any important or material matter,

3    you have a right to distrust the testimony of such an

4    individual concerning other matters.  You may reject all of the

5    testimony of that witness or give it such weight or credibility

6    as you think it deserves.

7    But the issue of credibility also need not be decided

8    in an all-or-nothing fashion.  Even if you find that a witness

9    testified falsely in one part, you still may accept his

10   testimony in other parts, or you may disregard all of it.  That

11   is a determination entirely for you, the jury.

12   You have heard testimony of law enforcement officials

13   and of employees of the government.  The fact that a witness

14   may be employed by the government as a law enforcement official

15   or as an employee of the government does not mean that his or

16   her testimony is necessarily deserving of more or less

17   consideration or greater or lesser weight than that of an

18   ordinary witness.  In this context, defense counsel is allowed

19   to try to attack the credibility of such a witness on the

20   grounds that his or her testimony may be colored by a personal

21   or professional interest in the outcome of the case.

22   It is your decision, after reviewing all of the

23   evidence, whether to accept the testimony of law enforcement or

24   government employee witnesses and to give that testimony

25   whatever weight, if any, you find it deserves.

1    You have heard testimony from what we call expert

2  witnesses.  An expert is someone who by education or experience

3  has acquired learning or experience in a science or a

4  specialized area of knowledge.  Such a witness is permitted to

5  give his or her opinions as to relevant matters in which he or

6  she professes to be expert and give his or her reasons for

7  those opinions.  Expert testimony is presented to you on the

8  theory that someone who is experienced in the field can assist

9  you in understanding the evidence or in reaching an independent

10  decision on the facts.

11    Now your role in judging credibility applies to

12  experts as well as to other witnesses.  You should consider the

13  expert opinions that were received in evidence in this case and

14  give them as much or as little weight as you think they

15  deserve.  If you should decide that the opinion of an expert

16  was not based on sufficient education or experience or on

17  sufficient data, or if you should conclude that the

18  trustworthiness or credibility of an expert is questionable for

19  any reason, or if the opinion of the expert was outweighed, in

20  your judgment, by other evidence in the case, then you might

21  disregard the opinion of the expert entirely or in part.

22    On the other hand, if you find that the opinion of an

23  expert is based on sufficient data, education and experience,

24  and the other evidence does not give you reason to doubt the

25  expert's conclusions, you would be justified in placing great

1  reliance on his or her testimony.

2          You have heard evidence during the trial that

3  witnesses have discussed the facts of the case and their

4  testimony with lawyers before the witness appeared in court.

5          Although you may consider that fact when you are

6  evaluating a witness's credibility, I should tell you that

7  there is nothing either unusual or improper about a witness

8  meeting with lawyers before testifying so that the witness can

9  be aware of the subjects he or she will be questioned about,

10  focus on those subjects, and have the opportunity to review

11  relevant exhibits before being questioned about them.  Such

12  consultation helps conserve your time and the Court's time.  In

13  fact, it would be unusual for a lawyer to call a witness

14  without such consultation.

15          The weight you give to the fact or nature of the

16  witness's preparation for his or her testimony and what

17  inferences you draw from such preparation are matters

18  completely within your discretion.

19          Some of the people who may have been involved in the

20  events leading to this trial are not on trial.  This does not

21  matter.  There is no requirement that all members of a

22  conspiracy be charged and prosecuted or tried together in the

23  same proceeding.

24          You may not draw any inference, favorable or

25  unfavorable, towards the government or the defendant from the

1    fact that certain persons other than the defendant were not

2    named as defendants in this indictment.  Nor may you speculate

3    as to the reasons why other persons are not on trial.  Those

4    matters are wholly outside your concern and have no bearing on

5    your function as jurors.

6            Whether a person should be named as a co-conspirator

7    or indicted as a defendant in this case or another separate

8    case is a matter within the sole discretion of the United

9    States Attorney and the grand jury.  Therefore, you may not

10   consider it in any way in reaching your verdict as to the

11   defendant.

12           As you know, we began this trial with another

13   defendant charged in this case, Lisa Giannelli.  Last Tuesday,

14   I instructed you that she was no longer part of this trial, and

15   you were no longer being asked to render a verdict with respect

16   to Ms. Giannelli.  I instructed you at the time, and I instruct

17   you again now, please do not concern yourselves with why

18   Ms. Giannelli is no longer part of this trial.  Do not

19   speculate about the reasons why.  Neither her presence at the

20   beginning of the trial, nor her absence from the remainder of

21   the trial, may influence your verdict as to the defendant,

22   Dr. Fishman, in any way.  You may not draw any negative

23   inference about him on this basis.  You must base your verdict

24   solely on the evidence or lack of evidence against Dr. Fishman.

25           You have heard testimony from a witness who testified

that he was involved in criminal conduct, and who subsequently

pled guilty to his criminal conduct pursuant to what is called

a "cooperation agreement" with the government.  You have also

heard from two witnesses who testified that they were involved

in potentially criminal conduct, and who subsequently entered

into what is called a "non-prosecution agreement" with the

government.

The government frequently relies on testimony of

cooperating witnesses and other witnesses who have admitted to

participating in crimes.  The government must take its

witnesses as it finds them and frequently uses such testimony

in criminal prosecutions because otherwise it would be

difficult or impossible to detect and prosecute wrongdoers.

The testimony of such witnesses is properly considered

by the jury.  If these witnesses could not be used, there would

be many cases in which there was real guilt and conviction

should be had, but in which convictions would be unobtainable.

For these reasons, the law allows the use of such witness

testimony.  Indeed, it is the law in federal courts that the

testimony of a single cooperating witness may be enough in

itself for conviction, if the jury believes that the testimony

establishes guilt beyond a reasonable doubt.

Because of the possibility interest a cooperating

witness may have in testifying, the cooperating witness's

testimony should be scrutinized with care and caution.  The

1    fact that a witness is a cooperating witness can be considered

2    by you as bearing upon his or her credibility.  It does not

3    follow, however, that simply because a person has admitted to

4    participating in one or more crimes, that he or she is

5    incapable of giving truthful testimony.

6         Like the testimony of any other witness, cooperating

7    witness testimony should be given the weight that it deserves

8    in light of the facts and circumstances before you, taking into

9    account the witness's demeanor, candor, the strength and

10   accuracy of the witness's recollection, background, and the

11   extent to which his or her testimony is or is not corroborated

12   by other evidence in the case.

13        I must caution you that it is of no concern of yours

14   why the government made an agreement with a particular witness.

15   Your sole concern is whether a witness has given truthful

16   testimony here in this courtroom before you.

17        In evaluating the testimony of a cooperating witness,

18   you should ask yourselves whether this cooperating witness

19   would benefit more by lying or by telling the truth.  Was his

20   or her testimony made up in any way because he or she believed

21   or hoped that he or she would somehow receive favorable

22   treatment by testifying falsely?  Or did he or she believe that

23   his or her interests would be best served by testifying

24   truthfully?  If you believe that the witness was motivated by

25   hopes of personal gain, was the motivation one that would cause

1    him or her to lie, or was it one that would cause him or her to

2    tell the truth?  Did this motivation color the witness's

3    testimony?

4         If you find that the testimony was false, you may

5    reject it.  If, however, after a cautious and careful

6    examination of the cooperating witness's testimony and demeanor

7    upon the witness stand, you are satisfied that the witness told

8    the truth, you may accept it as credible and act upon it

9    accordingly.  As with all witnesses, you may accept some but

10   not all of a witness's testimony and give it whatever weight

11   you deem appropriate.

12        You have heard the testimony of a witness who has

13   testified under a grant of immunity from this Court.  What this

14   means is that the testimony of the witness may not be used

15   against him in any criminal case, except a prosecution for

16   perjury, giving a false statement, or otherwise failing to

17   comply with the immunity order of this Court.

18        You are instructed that the government is entitled to

19   call as a witness a person who has been granted immunity by

20   order of this Court, and that you may convict a defendant on

21   the basis such a witness's testimony alone if you find that the

22   testimony proves the defendant's guilt beyond a reasonable

23   doubt.

24        However, the testimony of a witness who has been

25   granted immunity should be examined by you with greater care

1    than the testimony of an ordinary witness.  You should

2    scrutinize it closely to determine whether or not it is colored

3    in such a way as to place guilt upon the defendant in order to

4    further the witness's own interests; for, such a witness,

5    confronted with the realization that he can win his own freedom

6    by helping to convict another, has a motive to falsify his

7    testimony.

8            Such testimony should be scrutinized by you with great

9    care, and you should act upon it with caution.  If you believe

10   it to be true, and determine to accept the testimony, you may

11   give it such weight, if any, as you believe it deserves.

12           You have heard testimony about certain evidence that

13   was seized in searches of places, vehicles, and electronic

14   devices, and through the use of wiretaps on the defendant's

15   cellular telephone.  Evidence obtained from those searches was

16   properly admitted in this case and may be considered by you.

17   Whether you approve or disapprove of how the evidence was

18   obtained should not enter into your deliberations, because I

19   now instruct you that the government's use of this evidence is

20   entirely lawful.

21           Similarly, there is evidence concerning an

22   individual's location based on the location of cellar phones.

23   Evidence obtained in this manner was properly admitted in this

24   case and may be considered by you.  Whether you approve or

25   disapprove of how the evidence was obtained should not enter

1    into your deliberations, because I now instruct you that the

2    government's use of this evidence is entirely lawful.

3            You must, therefore, regardless of your personal

4    opinions, give this evidence full consideration along with all

5    the other evidence in this case in determining whether the

6    government has proven the guilt of the defendant beyond a

7    reasonable doubt.

8            There has been evidence that the defendant made

9    statements to law enforcement authorities.  Evidence of these

10   statements was properly admitted in this case and may properly

11   be considered by you.  You are to give the evidence of such

12   statements such weight as you feel it deserves in light of all

13   of the evidence.

14           Whether you approve or disapprove of the use of these

15   statements may not enter into your deliberations.  I instruct

16   you that no one's rights were violated, and that the

17   government's use of this evidence is entirely lawful.

18           As you know, the defendant did not testify in this

19   case.  Under our Constitution, a defendant has no obligation to

20   testify or present any evidence, because it is the government's

21   burden to prove the defendant's guilt beyond a reasonable

22   doubt.  That burden remains with the government throughout the

23   trial and it never shifts to a defendant.  A defendant is never

24   required to prove that he is innocent.  You may not attach any

25   significance to the fact that the defendant did not testify.

1   You may not draw any inference against the defendant because he

2   did not take the witness stand.  You may not speculate as to

3   why he did not testify, and you may not consider this against

4   him in any way in your deliberations.

5        The government has introduced evidence in the form of

6   audio recordings and transcripts.  If you wish to hear any of

7   the recordings again, or see any of the transcripts of those

8   recordings, they will be made available to you during your

9   deliberations.

10       We have among the exhibits that were received in

11  evidence some documents that are redacted.  "Redacted" means

12  that part of the document or the tape was taken out.  You are

13  to concern yourself only with the parts of the item that have

14  been admitted into evidence.  You should not consider any

15  possible reason why the other parts of it have been deleted.

16       You have seen evidence in which the defendant made

17  statements in which he claimed that his conduct was consistent

18  with innocence and not with guilt.  The government claims that

19  these statements in which the defendant exculpated himself are

20  false.

21       If you find that the defendant gave a false statement

22  in order to divert suspicion, you may infer that the defendant

23  believed he was guilty.  You may not, however, infer on the

24  basis of this alone that the defendant is, in fact, guilty of

25  the crimes for which the defendant is charged.

1   Whether or not the evidence as to the defendant's

2   statements shows that the defendant believed he was guilty, and

3   the significance, if any, to be attached to any such evidence,

4   are matters for you, the jury, to decide.

5   Now different judges have different methods of

6   selecting the foreperson on the jury.  I'm instructing you now

7   that Juror No. 1, Ms. Barry, will be the foreperson of the

8   jury, unless for any reason she prefers not to act in that

9   capacity.  In that event, your first order of business will be

10  to elect a different juror as the foreperson.  Please, after

11  you retire to deliberate, send me a note, signed and dated,

12  identifying the foreperson.  The foreperson will send out any

13  notes, and when the jury has reached a verdict, he or she will

14  notify the marshal that the jury has reached a verdict, and

15  when you come into open court, the foreperson will be asked to

16  state what the verdict is.  Again, notes should be signed and

17  should include the date and the time when they are sent.  They

18  should also be as clear and precise as possible.  Any notes

19  from you, the jury, will become part of the record in this

20  case, so please be as clear and specific as you can be in any

21  notes that you send.

22  You are about to go into the jury room and begin your

23  deliberations.  If during those deliberations you want to see

24  or hear any of the exhibits, upon request they will be sent to

25  you in the jury room or you will be brought back into the

1    courtroom to examine them.  If you want any of the testimony

2    read, that also can be done.  Please, though, remember it is

3    not always easy to locate what you might want, so be as

4    specific as you possibly can in requesting exhibits or portions

5    of testimony that you may want.

6         Your requests for exhibits or testimony, in fact, any

7    communications with the Court, should be made to me in writing,

8    signed by your foreperson, and given to one of the marshals.  I

9    will respond to any questions or requests you have as promptly

10   as possible, either in writing or by having you return to the

11   courtroom so I can speak with you in person.  In any event, do

12   not tell me or anyone else how the jury stands on the issue of

13   the defendant's guilt until after a unanimous verdict is

14   reached.

15        Now during this trial I permitted you to take notes.

16   Those notes are to be used solely to assist you and are not to

17   substitute for your recollection of the evidence in the case.

18   The fact that a particular juror has taken notes entitles that

19   juror's view to no greater weight than those of any other

20   juror, and your notes are not to be shown to any other juror

21   during deliberations.  If, during your deliberations, you have

22   any doubt as to any of the testimony, you will be permitted to

23   request that the official transcript from the trial which was

24   made of these proceedings be read to you.

25        Under your oath as jurors, you are not to be swayed by

1    sympathy.  You are to be guided solely by the evidence in this

2    case, and the crucial question that you must ask yourself as

3    you sift through the evidence is:  Has the government proven

4    the guilt of the defendant beyond a reasonable doubt with

5    respect to each of the elements of each of the offenses

6    charged?

7            It is for you alone to decide whether the government

8    has proven beyond a reasonable doubt that the defendant is

9    guilty of each crime for which he is charged solely on the

10   basis of the evidence or lack of evidence and subject to the

11   law as I have charged you.  It must be clear to you that once

12   you let fear, prejudice, bias, or sympathy interfere with your

13   thinking, there is a risk that you will not arrive at a true

14   and a just verdict.

15           If the government has failed to establish the

16   defendant's guilt beyond a reasonable doubt, you must acquit

17   him.  But, on the other hand, if you should find that the

18   government has met its burden of proving the defendant's guilt

19   beyond a reasonable doubt, you should not hesitate because of

20   sympathy or any other reason to render a verdict of guilty.

21           The question of possible punishment of the defendant

22   is of no concern to you, ladies and gentlemen of the jury, and

23   should not in any sense enter into or influence your

24   deliberations.  The duty of imposing sentence rests exclusively

25   upon the Court.

1    Your function is to weigh the evidence in the case and

2  to determine whether or not the government has proved that the

3  defendant is guilty beyond a reasonable doubt solely upon the

4  basis of such evidence.

5    Under your oath as jurors, you cannot allow

6  consideration of the punishment that must be imposed on the

7  defendant, if he is convicted, to influence your verdict or in

8  any sense enter into your deliberations.

9    Now I have prepared a verdict form for you to use in

10 recording your decision.  After you have reached a decision,

11 the foreperson should fill in the verdict sheet, sign it, and

12 note the date and time.  The foreperson should then give the

13 note to the marshal who will be outside your door, stating

14 simply that you have reached a verdict.  Do not specify what

15 the verdict is in your note and do not give the verdict sheet

16 to the marshal.  Instead, the foreperson should retain the

17 verdict sheet and hand it to us in open court when you are then

18 called in.

19    I will stress again that each of you must be in

20 agreement with the verdict that is announced in court.  Once

21 your verdict is announced by your foreperson in open court and

22 officially recorded, it cannot be revoked.

23    Your function now is to weigh the evidence in this

24 case and to determine whether the government has proven the

25 guilt of the defendant beyond a reasonable doubt with respect

1  to the charges of the indictment.

2        You must base your verdict solely on the evidence or

3  the lack of evidence, and these instructions as to the law, and

4  you are obliged under your oath as jurors to follow the law as

5  I have instructed you, whether you agree or disagree with the

6  particular law in question.

7        The verdict must represent the considered judgment of

8  each juror.  In order to return a verdict, it is necessary that

9  each juror agree to it.  Your verdict, whether guilty or not

10  guilty, must be unanimous.

11        It is your duty, as jurors, to consult with one

12  another and to deliberate with a view to reaching an agreement,

13  if you can possibly do so without violence to individual

14  judgment.  Each of you must decide the case for himself or

15  herself, but do so only after an impartial discussion and

16  consideration of all the evidence in the case with your fellow

17  jurors.

18        As you deliberate, please listen to the opinions of

19  your fellow jurors and ask for an opportunity to express your

20  own views if you wish to be heard.

21        In the course of your deliberations, do not hesitate

22  to reexamine your own views and change an opinion if you're

23  convinced it is erroneous.  But do not surrender your honest

24  convictions as to the weight or effect of evidence solely

25  because of the opinion of your fellow jurors.  Remember,

1 | please, at all times you are not partisans. You are judges,

2 | judges of the facts. Your sole interest is to seek the truth

3 | from the evidence in this case.

4 | If you are divided, do not report how the vote stands,

5 | and if you have reached a verdict, do not report what your

6 | verdict is until you are asked in open court.

7 | So in conclusion, ladies and gentlemen, I'm sure that

8 | if you listen to the views of your fellow jurors and if you

9 | apply your own common sense, you will reach a fair verdict

10 | here.

11 | Remember that your verdict must be rendered without

12 | fear, without favor, and without prejudice and without

13 | sympathy.

14 | Finally, I say this not because I think it is

15 | necessary but because it is the custom in this courthouse to

16 | say this: You should, please, during your deliberations, treat

17 | other with courtesy and respect.

18 | So at this point, members of the jury, I ask for your

19 | patience just for a few moments longer. It's necessary for me

20 | to spend a few moments with counsel and the reporter at

21 | sidebar. I will ask you to patiently remain in the jury box

22 | without speaking to each other and we'll return to you in just

23 | a moment to submit the case to you. And I thank you.

24 | (At sidebar)

25 | THE COURT: All right. As you know, the purpose for

1    our convening here is for you to note whatever you would like

2    for the record, if anything.

3         MS. MORTAZAVI:  Nothing from the government.

4         MR. FERNICH:  Just one of substance.  In the back and

5    forth between myself and Mr. Chow, the placement of this

6    connection language, what we called the nexus requirement

7    changed.  As it stands, inadvertently, intent to defraud and

8    intent to mislead are separated now such that the language only

9    applies, as written and read, to intent to defraud.  And

10   obviously I want to make it as benign as possible, so I suggest

11   that with respect to charge 11, the connection requirement I

12   described applies to both "intent to defraud" and "intent to

13   mislead."

14        THE COURT:  Ms. Mortazavi, that sounds very

15   reasonable.

16        MS. MORTAZAVI:  It does.  I would like to review the

17   instruction.

18        MR. FERNICH:  Take your time.  I just noticed it

19   myself.

20        MS. MORTAZAVI:  That's fine, your Honor.

21        THE COURT:  Thank you.

22        Anything else for the record?

23        MR. FERNICH:  No.  That was a marathon.

24        THE COURT:  Yeah.  Okay.

25        (In open court)

1     THE COURT:  All right.  Let me make one clarification,

2  if I may, if you turn back to charge 11, please.  It's

3  convenient that you all have a copy.

4     I simply point out to you that the connection

5  requirement that I described in charge 11 applies equally both

6  to the intent to defraud and the intent to mislead.

7     All right?

8     Now before you retire to the jury room, I must excuse

9  our alternate jurors with the thanks of the Court.

10     The alternate jurors are Jurors Nos. 13 through 16.

11  So I excuse you as I say, very much with the thanks of the

12  Court.  You have been very attentive, very patient, and I'm

13  sorry that you will miss the experience of deliberating with

14  the jury, but the law provides for a jury of twelve persons in

15  this case.

16     Before the rest of the jury retires into the jury

17  room, if you have any clothing or items in the jury room, we're

18  going to ask you, being accompanied by one of our colleagues in

19  a moment, to go down to that jury room and pick them up and to

20  withdraw from the jury room before any deliberations start.

21     For the next few days though, I will ask you, the

22  jurors, the four jurors who I'm excusing, to please refrain

23  from discussing the case with anyone or conducting any research

24  about anything that you have heard during this trial or about

25  the trial itself.  I'm asking you that because in the event

1    that one of our jurors is unable to complete the deliberation

2    process, you may be called back to join the jury for

3    deliberations.

4         So please, don't read about the case, don't discuss it

5    with anyone, not with your family, friends, anyone whatsoever,

6    and I promise that Ms. Dempsey, whom you've all met and been

7    spending some time with, will let you know when we have a

8    verdict in the case, and at that point you're free to discuss

9    the case with anyone whom you wish.

10        All right.  So our alternates are excused very much

11   with the thanks of the Court and all the parties.  You can

12   leave your notebooks on the chairs and the transcript binders,

13   if they are there.  Take home with you your personal

14   belongings, nothing related to the case.

15        Give us a moment.

16        (Alternate jurors excused from the courtroom)

17        THE COURT:  You may be seated.

18        So you are about to retire momentarily to deliberate,

19   and I just want to tell you a few logistical details before you

20   do.

21        The schedule for your deliberations is entirely up to

22   you.  We have been beginning each day at 9:30.  That seems to

23   be a reasonable starting time.  But if there is a reason that

24   you agree among yourselves to a different starting time on a

25   particular day for a particular reason, that's entirely up to

you.

We have been concluding each day about 4:30, 5:00, but you are free to deliberate until later in the day if you wish to do so.

One other reminder, whatever time you all agree that you're going to begin your deliberations each morning, please wait until every juror is present.  You cannot and should not talk about the case among yourselves unless all of the jurors are in attendance.

All right.  Anything else from anyone?

MS. MORTAZAVI:  Not from the government.

THE COURT:  All right.  Then at this point may I ask our court officer to please come forward so that Ms. Dempsey can administer the marshal oath.

(Marshal sworn)

THE COURT:  All right.  The court officer will accompany you down to the deliberation room.  I ask you to wait until Mr. Dempsey can confirm with Mr. Lee that the alternates have cleared the room.

From this point forward, you will be in the care of our marshal's service.  Ms. Dempsey will no longer be with you. As I said during the instructions, any notes that you have should be -- you should let the court security officer know that you have a note for me, the first of which should be to let us know who your foreperson is.

1    I just remind the jurors while we're waiting, when you

2    leave each day do not talk about the case with your family or

3    your friends and do not do any research on the case, and

4    deliberate solely on basis of the evidence that you heard here

5    in court.

6    I remind you, too, don't take your notes home in the

7    evening, leave them in the jury room.

8    All right, ladies and gentlemen, the room is cleared

9    downstairs so you can retire to the deliberation room.  Thank

10    you.

11    (Jury retired to deliberate, 4:40 p.m.)

12    (Jury not present)

13    THE COURT:  Ladies and gentlemen, I ask you to --

14    obviously you have been through this drill.  You need to stay

15    in the courthouse or close by so that if we get jury notes you

16    will all come back into the courtroom and we'll talk about the

17    note.  So I know not everybody has an office close by, but

18    you'll have to make the necessary arrangements.

19    Is there anything else for the record at this time?

20    MR. ADAMS:  Nothing here, your Honor.

21    THE COURT:  Thank you, Mr. Adams.

22    MR. SERCARZ:  Nothing by the defendant, your Honor.

23    THE COURT:  Thank you, Mr. Sercarz.

24    All right.  We are adjourned then for the time being.

25    (Recess taken and trial adjourned to February 2, 2022)