

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 5, 2022

**VIA ECF & E-MAIL**
The Honorable Mary Kay Vyskocil
United States District Court
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, New York 10007

    Re:  <u>United States v. Seth Fishman</u>, S6 20 Cr. 160 (MKV)

Dear Judge Vyskocil:

   For almost two decades, including 2 years after his arrest in this matter, Seth Fishman cravenly pumped hundreds of thousands of illegal performance-enhancing drugs into the marketplace, and was dissuaded by no one—not state racing commissions, racetracks, the Food and Drug Administration ("FDA"), Customs and Border Protection ("CBP"), state drug regulators, the Federal Bureau of Investigation (the "FBI"), the U.S. Attorney's Office for the Southern District of New York ("SDNY"), nor this Court—to comply with the law. The defendant earned millions of dollars. He did so on the backs of racehorses that were doped by corrupt trainers. The defendant and his convicted co-conspirator, Lisa Giannelli, armed trainers motivated by greed with the means to corruptly win races by injecting and drenching racehorses with unsafe, medically unnecessary, prohibited performance-enhancing drugs ("PEDs"). Fishman was not naïve or ignorant of the law. He did not "exercise[] very poor judgment." Def. Sent. Subm.[1] Exhibit B. His crimes were not the product of a momentary lapse. Fishman was at the helm of a sophisticated, years-long, cross-border scheme to profit from the creation, marketing, sale, and distribution of illegal PEDs that he shipped across the country and around the world to unscrupulous trainers and others in the racehorse industry that sought to gain a competitive edge. And he did it with the shared aim of misleading drug and racing regulators tasked with rooting out such corruption.

   Among the myriad of drugs the defendant offered for sale were: blood builders designed to mimic Epogen; injectable drugs designed to be used on race day; and potent pain shots, all of which were created by the defendant to compel a racehorse to perform beyond its natural abilities. Fishman's crimes are all the more insidious because of his efforts to cast an aura of legitimacy over his illegal drug manufacturing business by dint of his status as a veterinarian. Over approximately twenty years, Fishman perpetuated the myth that he was operating as a legitimate veterinarian, conducting examinations, reaching diagnoses, and prescribing necessary medications

---

[1] The defense's sentencing submission, submitted to the Government and the Court via email on June 27, 2022, was filed under seal.

for the treatment and prevention of *bona fide* medical issues. Yet Fishman did no such thing. He instead concocted novel PEDs, mass-produced his creations, and marketed and sold them to trainers across the country and around the world, resulting in millions of dollars of sales. He ran an illegal wholesale drug distribution business. As a veterinarian, Fishman had a duty to use his skills to protect the health and welfare of all animals and to prevent and relieve animal suffering; Fishman instead abused the trust and deference typically shown to medical professionals in order to deflect scrutiny, cover up his crimes, and challenge anyone who questioned his criminal practices.

It is unsurprising that the defendant's sentencing submission contains no expression of remorse or contrition. He likewise expresses no desire to reform. Even on the verge of sentencing, the defendant is entirely unrepentant for his crimes, and, absent a significant term of imprisonment, is at a high risk of recidivism.

As argued herein, the defendant's Guidelines Range is 210 to 240 months' imprisonment, automatically adjusting the high end of the calculated Guidelines range to the statutory maximum sentence of twenty years' imprisonment.[2] In light of the longevity and sophistication of the defendant's crimes, the defendant's efforts to obstruct this prosecution, and his failure to accept responsibility for his conduct, balanced against the need to avoid unwanted sentencing disparities, the appropriate sentence in this case is a significant term of imprisonment greater then the ten-year term of imprisonment recommended by the Probation Office, but below the applicable Guidelines Range. *See* Presentence Investigation Report dated April 28, 2022 ("PSR") ¶¶ 103, 105, 163-164, Page 37 (recommending 120 months' imprisonment).

## I. <u>Offense Conduct</u>

For years, Seth Fishman—in 2 separate conspiracies, one in which co-defendant Lisa Giannelli was a participant—sold adulterated and misbranded animal drugs that Fishman manufactured, and that Giannelli promoted, sold, and delivered, with the intent to defraud or mislead. Fishman specifically targeted clients in the racehorse industry, peddling dozens of new drugs that purported to have performance-enhancing effects on racehorses. Fishman created and produced scores of new animal drugs that were adulterated and/or misbranded for a number of reasons, including because: (1) they were not manufactured in facilities registered with the U.S. Food and Drug Administration ("FDA"); (2) were labeled with deficient or misleading information, and omitted (among other things) manufacturer information, directions for use, ingredients, or other details required of all lawfully distributed drugs; (3) were not dispensed pursuant to valid veterinary prescriptions; and (4) lacked requisite FDA approval. Many of these drugs were described by Seth Fishman as having a performance-enhancing effect on racehorses, *and* were likewise promoted as untestable under typical drug screens. Fishman extolled the virtues of his drugs, specifically, by describing his method of creating customized products for individual

---

[2] As argued herein, the Government shares the defense's position that the statutory maximum sentence is twenty years' imprisonment, and likewise agrees that the two-point enhancement for inflicting a loss involving ten or more victims is inapplicable in the event the Court adopts the Government's and the Probation Department's loss calculation pursuant to U.S.S.G. § 2B1.1. *See infra* Part III.A.

customers in order to silo product lines to reduce the collateral consequences of a trainer getting caught using Fishman's drugs.

Fishman, though a licensed veterinarian, did not practice veterinary medicine in connection with his drug sales; he did not examine, treat, and diagnose racehorses, and he did not issue prescriptions for the drugs he distributed. In this respect, Fishman was not distributing medications to promote the health of racehorses: instead, he sold performance-enhancing drugs widely to laypeople for the express purpose of boosting a racehorse's performance without getting caught. There is no doubt that Fishman was well aware of both state and federal regulations restricting the manufacture and distribution of drugs; he nonetheless ignored those requirements, promoting his non-compliance as a feature of his business. Fishman's disregard for regulatory oversight enabled him to rapidly create and distribute hundreds of unapproved drugs. Fishman's drugs, by their marketing, design, and effect, were specifically targeted at those in the racehorse industry seeking to boost the performance of their racehorses so the horses could be compelled to race beyond their natural ability, with the promise that the buyer administering those drugs would not be caught by standard drug screens. At trial, the defense pressed the argument that the drugs Fishman marketed and sold, were "less toxic alternative[s] to what the likes of Mr. Poliseno [a competitor] had been" selling at the time. Trial Tr. 844:24-845:1. The suggestion that Fishman cared about animals because he may have been selling a "less toxic" slew of illegal PEDs than that of another convicted defendant, *see United States v. Grasso et al.* 20 Cr. 163 (S.D.N.Y.) (PKC) (sentencing scheduled for September 7, 2022), is hardly a credit to Fishman's character.[3]

Fishman was not concerned with the health of the horse so much as he was with making sales, and ensuring that he and, by extension, his buyers, would not get caught. To that end, Fishman and Giannelli discussed amongst each other whether they could trust new clients before offering for sale their most potent and sensitive drugs, including Fishman's custom-made blood builder, BB3. In distributing these drugs, Fishman intended to mislead or defraud—and in fact successfully misled and defrauded—multiple state and federal agencies and entities through various deceptive tactics. These included listing misleading information on the labels of Fishman's drugs to make them appear innocuous if they were to be found in a barn search; designing drugs so as to be untestable on standard drug screens; and creating siloed product lines for different clients so that, if a drug were found, it would not impact Fishman's separate product lines.

## A. Fishman Sold His Custom-Made Injectable Drugs Without Regard To the Dangers Posed to the Horse

The defendant's drug sales carried inherent dangers to the racehorse. As a trained veterinary professional, the defendant was undoubtedly aware of the risks associated with relying on lay people, who lacked the requisite medical training, to inject racehorses with a drug of unknown composition, unknown side effects, and unknown interactions with other drugs. Adrienne Hall testified at trial that she did not use all the drugs the defendant had provided her,

---

[3] The defendant does himself no favors by inviting this comparison, particularly since, unlike Fishman, Donato Poliseno is not a licensed veterinarian, and the Government has uncovered no evidence that a horse died after receiving a drug sold by Poliseno.

because she "wasn't very comfortable mixing and administering" the drugs according to the defendant's instructions, in case she "screw[ed] something up." Trial Tr. at 821:14-19; *see id.* at 821:21-22 ("It was a little sophisticated, the color coding and the withdrawal times and the mixing, and I just got nervous.").[4]

That risk was compounded by the clients the defendant catered to, specifically, racehorse trainers whose incentives were *not* to ensure the health of the receiving animal, but to increase the animal's speed and mask the animal's pain so the horse could continue racing despite natural, physical limitations. The defendant's distribution of drugs was not merely "unsafe" as a legal matter. His black market drugs were dangerous.

The defendant sold a number of injectable drugs intended to be administered to racehorses within hours of a race, in violation of applicable racing prohibitions against the use of "race-day drugs" common across numerous jurisdictions. *See* GX 711 at 1 (HP Bleeder Plus to be administered "4-6 hours prior to strenuous exercise"); *id.* at 2 (VO2 Max to be administered "4-5 fors [hours] prior to race"); *id.* at 2-3 (PSDS to be administered "4-6 hours prior to strenuous exercise"); *id.* at 3 (GNRH to be administered "4-6 hours prior to strenuous exercise"); *id.* at 3 (ITTP Plus to be administered "4-5 hours before event"); *id.* at 4-5 (ACTH to be administered within "4-6 hours prior to strenuous exercise"); *id.* at 4 (Oxygenator to be administered "4 hours prior to event"); *id.* at 7 (Serenity to be administered "4-6 hours before event"); GX 319J (Fishman emailing Giannelli that VO2 Max should be used "4-5 fors [hours] prior to race"); GX 320FN (Fishman texting Giannelli directions for HP bleeder plus: "10 mLs IV 4-6 hours prior to race"); GX 403M (Giannelli forwarding instructions from the defendant indicating that bleeder pills

---

[4] The defense's reliance on Adrienne Hall as a *de facto* character witness for the defendant is entirely misplaced. *See* Def. Sent. Subm. at 8-10. The defense has it entirely backward. Hall is not emblematic of the defendant's consideration of the health of racehorses, and she certainly was not characteristic of the average client Fishman catered to: Hall—who was racing at most three "pet" horses—was the one who instructed the defendant that she did not want her horses to "crash" from the doping regimen the defendant provided. *See* GX 105C-T. Fishman noted that Hall's horses were different because it was "kind of like treating a virgin horse," as compared to the racehorses Fishman was familiar with, "that are getting everything under the sun." GX 104A-T. In fact, in conversations with Hall, the defendant contrasted Hall with the defendant's other "clients that are going to race a horse for three months and that horse may never race again," indicating that those clients had no qualms about "overdo[ing]" racehorses with the drugs the defendant provided. *Id.* The defendant cared so little about the horses receiving his drugs that he did not bother to maintain records of which racehorses received which drug. *See, e.g.*, GX 20004 (Giannelli Trial Exhibit) (Equestology drug sale record for BB3 listing the "Patient" in many instances as "Barn Supplies," "Stable Use," or "Doc Fishman"). The defendant's reliance on his approximately six-month interaction with Hall in support of his claim that his conduct was benign is pure misdirection. It was Hall, a relative novice to the industry, who was seeking benign drugs with which to dope her horse. She received instead some of Fishman's most potent PEDs, including blood builders and race-day injectables. The defendant had hundreds of clients and knew virtually nothing about their horses' health. Many of the defendant's clients are convicted defendants in this and a related matter, due to their years-long doping of racehorses with blood builders and other adulterated and misbranded PEDs. *See United States v. Grasso et al.*, 20 Cr. 163 (S.D.N.Y.) (PKC).

should be used within "8 hrs" of race); GX 105D-T (Fishman call with Hall in which Hall stated she injected a horse with VO2 Max the day of a race); GX 401K (Fishman advising Navarro to give bleeder pills to horse "till the race"). Yet the defendant explicitly acknowledged in a call with Giannelli that injecting horses with race-day drugs is a crime, and that doing so would risk infection and caused the horse pain:

> I gotta be honest, nothing stops these guys if they have a four or four or a half hour lasiks from hitting their horse you know in a gas station right before they pull on to a track. I mean that's the way old school guys used to do it. I am sure the better guys are still hitting their horses and dumping the syringes before going on to the track, you know? You know some of these guys wanna be prima donnas and do it at the luxury of the farm. *The crime is not that you do it in the gas station, the crime is you doing it period.* You know? . . . . more than the infection. *It's just, it's—it's painful.* You've gotten shots, haven't you? . . . . They don't feel good. . . . So, if you want to go and stick something in someone's neck before they are going to go out and try and make you money, I mean that's what you're basically doing.

GX 139A-T (emphasis added). The defendant's discussions with Giannelli were *not* designed to contrast his own, purportedly "safe" performance-enhancing drugs from those offered by other corrupt drug suppliers. These statements, made in private to a co-conspirator, reflect the defendant's admission that his race-day drugs were not only criminal, they were also painful, all for the overriding purpose of corruptly wining races.

The defendant, in fact, recognized that giving trainers and their employees (including assistants, grooms, and others), access to injectable medications to administer at will could be lethal if administered incorrectly. As the Court is aware, in 2011, the defendant was investigated by the Delaware Division of Professional Responsibility after a groom for racehorse trainer Les Givens mis-administered Pentosan, an unapproved drug that Giannelli had sold to Givens, resulting in the horse's death. GX 3001. It is self-evident that the defendant's profligate sales of injectable medications to trainers—and, in particular, his sales of intravenous drugs—risked that such trainers would be sloppy or reckless in administering injectable drugs to horses under their care, which could harm a horse, cause it pain, or risk its life. Nonetheless, Fishman, motivated by greed, was callously indifferent to the medical risks he inflicted on the animals through his distribution of misbranded and adulterated drugs.

Notably, even after the defendant learned of the death of trainer Les Givens' horse, he showed no contrition whatsoever for the role he had played, and continued to play, in supplying untrained trainers and grooms with potent injectable drugs. In an intercepted call almost ten years after the defendant was first investigated by Delaware, he complained to Giannelli about the investigation, lamenting the unfairness of holding Fishman responsible in any respect as a result of that horse's death:

> Now look we have one horse with Les Givens. His groom does the wrong thing and kills the horse. It doesn't matter what they got in it but look at the shit that went on with that. . . . when you have a guy that admittedly his groom killed a damn horse and somehow, it's our fault.

GX 119B-T, and in a text message to Adrienne Hall, the defendant repeated the complaint that he was "investigated for BS." GX 900D. The defendant's failure to accept any responsibility for his role in that horse's death is emblematic of the defendant's abdication of responsibility with respect to the horses at the receiving end of Fishman's litany of prohibited PEDs.

## B. The Defendant's Knowing and Deliberate Violations of Law

Throughout the litigation of this matter, the defendant has sought at virtually every turn to obstruct the investigation and prosecution of this case. There is no doubt that during the course of the conspiracy, the defendant was aware that his conduct violated federal law. *See, e.g.*, GX 140D-T; GX 140F-T. There is also no doubt that the defendant knew his conduct violated the racing rules. *See, e.g*, GX 139A-T. Yet even after the defendant was criminally charged in this matter by complaint on October 28, 2019, removing any doubt as to the criminality of his actions, he continued his drug distribution business. Specifically, the defendant continued to supply his convicted co-conspirator, Lisa Giannelli, with the same PEDs that he had been distributing and marketing prior to his arrest, and relied on Giannelli to continue making sales while he maintained a low profile. *See, e.g.*, GX 320FM, 403C, 314B.

On February 26, 2020, a federal grand jury sitting in the Southern District of New York returned the Indictment charging the defendant with engaging in two conspiracies: one in service of Navarro's scheme of obtaining PEDs in order to dope racehorses, and the second in service of Fishman's operation of Equestology and the manufacture, distribution, and sale of PEDs to racehorse trainers, including with the assistance of convicted co-defendant Lisa Giannelli, who operated as Equestology's primary salesperson. *United States v. Navarro et al.*, 20 Cr. 160 (MKV) (S.D.N.Y.). The Indictment was unsealed on March 9, 2020.

Post-indictment, the defendant nonetheless continued making and selling drugs, even as he was litigating—directly and through a proxy—a motion pursuant to Federal Rule of Criminal Procedure 41 for the return of thousands of adulterated and misbranded drugs the Government had seized during a search of premises associated with Fishman and Equestology. *See infra* Part IV.B.

The defendant's continuation of his offenses while on bail led the grand jury to return the operative superseding S6 Indictment on November 5, 2020, charging Fishman with the same two counts and—on the basis of the defendant's continued commission of crimes while on pretrial release— a sentencing enhancement pursuant to 18 U.S.C. § 3147. *See also* Trial Tr. at 987:7-994:17 (Concannon testimony). That sentencing enhancement, which the defense concedes applies in this case, subjects the defendant to an additional, consecutive term of imprisonment of up to ten years.

After the failure of the defendant's Rule 41 action, and even after the defendant's criminal exposure increased as a result of his post-arrest offenses, the defendant continued selling adulterated and misbranded drugs. On December 3, 2021, agents searched the defendant's office/warehouse space—merely two months before trial was scheduled to commence—and found that the defendant continued to produce and distribute numerous injectable misbranded and

adulterated PEDs, including those he manufactured and sold before he was first charged, namely, "HP Bleeder," and "PSDS: Pain Shot DS."

In January 2022, Fishman proceeded to trial and was ultimately convicted of Counts One and Two of the Indictment; the jury further made a special finding that, with respect to Count Two, the defendant committed part of the offense while released on bail following his arrest. PSR ¶ 164.

## II.  **The Presentence Report**

The PSR calculates the defendant's offense level as 39, and his criminal history category as I, PSR ¶¶ 120, 123, yielding a Guidelines calculation of 262 to 327 months' imprisonment, consistent with the Government's *Pimentel* letter. Upon reviewing the defense's sentencing submission, the Government agrees that, assuming the Court calculates the "loss" enhancement pursuant to U.S.S.G. § 2B1.1(b) on the basis of the defendant's "gain," the two-point enhancement for involving 10 or more victims pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i) is inapplicable. Consequently, the Government's current view is that the defendant's total offense level is 37, and the defendant's Criminal History Category is I, yielding a revised Guidelines calculation of 210 to 262 months' imprisonment, that must be adjusted in accordance with the defendant's statutory maximum sentence to determine the total applicable Guidelines sentence.

With respect to the maximum statutorily authorized sentence, the Government believes that the total allowable sentence is 240 months' imprisonment. There is no dispute that the statutory maximum term of imprisonment for Count One, predicated on the defendant's participation in Jorge Navarro's doping conspiracy in violation of 18 U.S.C. § 371, is five years' imprisonment. There is likewise no dispute that, as to Count Two, the Section 3147 sentencing enhancement applies. PSR ¶¶ 115, 166.

The statutory maximum term of imprisonment for Count Two, predicated on the conspiracy led by the defendant himself in violation of 18 U.S.C. § 371, would be five years' imprisonment; however, because of the Section 3147 sentencing enhancement, the defendant faces an additional term of imprisonment of up to ten years, to be imposed "consecutive to any other sentence of imprisonment." Consequently, because the statutory maximum sentence is less than the minimum of the applicable Guidelines Range, the defendant's Guidelines Sentence correspondingly adjusts to 210 to 240 months' imprisonment.

## III.  **Defendant's Sentencing Submission and Guidelines Calculation**

The defendant's sentencing submission disputes the Guidelines calculation in the PSR in several respects, and raises arguments pursuant to Section 3553(a) regarding the defendant's culpability. The Government addresses the points meriting a response in this section below. For the reasons enumerated herein, the Court should largely adopt the Guidelines calculation reflected in the PSR and impose a sentence within the Guidelines Range.

### A. Guidelines Calculation

*First*, the defense argues that the 20-point loss enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(J) and Application Note 3(B), predicated on the defendant's gain, is improperly applied because there has been no "loss," and there can thus be no resort to "gain" as a proxy for calculating this enhancement. Def. Sent. Subm. at 11-12.[5] The Application Notes to the Guidelines define "actual loss" as encompassing "reasonably foreseeable pecuniary harm that resulted from the offense," "intended loss" as encompassing "pecuniary harm that would have been impossible or unlikely to occur," and "reasonably foreseeable pecuniary harm" as "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *See* U.S.S.G. § 2B1.1 Application Note 3(a)(i), (ii), (iv). The defendant's cramped understanding of the loss to the victims in this case—which the defense concedes include "the betting public," "racetracks," and "competitors," *id.* at 12—is misguided. The defendant's fraud schemes were aimed at deceiving regulators in service of the broader aim of enabling racehorse trainers to win races corruptly. The purse winnings paid by the racetrack, that would otherwise have been paid to a competitor, and members of the betting public that lost out on winnings they would have otherwise received absent the defendant's schemes, suffered a pecuniary loss. The defense's claim that the Government "cannot begin to prove" that any of the aforementioned victims "suffered actual loss or pecuniary harm" as a result of the offense is simply wrong. Both Navarro and Hall, at various points, credited the defendant's drugs with having ensured victories for their horses. *See* GX 401-K (Navarro crediting Fishman for "XY Jet's" victory at the Golden Shaheen race); GX 105B-T (Hall describing a race in which the horse that had been injected with Fishman's drugs "dominated"). Had their doping been exposed before the race, both competitors would have been disqualified. The defendant's sales of performance-enhancing drugs were intended to corruptly gain a competitive edge and thus reap underserved prize money; that loss was "reasonably foreseeable" to anyone participating in each conspiracy. Simply because the defendant's contributions to the conspiracy focused on one aspect of the conspiracy, that is, making and distributing untestable PEDs, does not insulate the defendant from the overarching aims of each conspiracy, which were to held trainers win races by breaking the rules and not getting caught.

The defense's narrow recharacterization of the charges as a conspiracy to deceive "drug and racing regulators – not to fix horse races," Def. Sent. Subm. at 12, ignores entirely the language in the speaking Indictment, the briefings in this matter, the trial record, and common sense.

---

[5] The Government notes that if this Court does resort to measuring "loss" to the victims rather than the defendant's "gain," the offense level calculation may reasonably be measured by the loss calculation applied for Navarro, a loss amount between $25 million to $65 million, yielding a 22-point offense level enhancement, on the basis of purse winnings earned by Navarro's horses. The Government respectfully submits that there may be little practical difference in applying the more conservative calculation predicated on the defendant's "gain," or the "loss" calculation predicated on the loss to the racetracks where Navarro's horses competed, given that, under either calculation, the high end of the defendant's Guidelines Range in any event adjusts to the statutory maximum sentence of 20 years' imprisonment.

Consequently, the Government has demonstrated that there was a loss in this case, and the 20-point enhancement is warranted.[6]

*Second*, upon reviewing the case law cited by the defense in its submission, the Government agrees that—assuming the Court adopts the calculation of the offense-level enhancement based on the defendant's gain rather than the victims' loss—the two-point enhancement for involving ten or more victims in the scheme pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i) does not apply, for the reasons articulated by the Second Circuit in *United States v. Iovino*, 777 F.3d 578, 580 (2d Cir. 2015).

*Third*, the defendant, in passing, argues that the Court should order no restitution because the number cannot be based on the defendant's gain. *See* Def. Sent. Subm. at 13. The Government does not suggest that the Court rely on the revenue the defendant and his co-conspirators generated through PED sales, precisely because the Mandatory Victim Restitution Act ("MVRA") does not permit the same substitution of "gain" for "loss" contemplated by the Sentencing Guidelines. *Compare* U.S.S.G. § 2B1.1(b)(1) and Application Note 3(B), *with* 18 U.S.C. § 3663A. The " 'restitution order must be tied to the victim's actual, provable, loss,' and the amount of restitution ordered must reflect a 'reasonable approximation of losses supported by a sound methodology.'" *United States v. Tanner*, 942 F.3d 60, 67 (2d Cir. 2019) (quoting *United States v. Zangari*, 677 F.3d 86, 91 (2d Cir. 2012) and *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013)).[7]

With respect to restitution for Count One, the Court should impose a restitution order of $25,860,514, to be paid jointly and severally with Jorge Navarro and any other defendant convicted of violating Count One of the S6 Indictment.[8]

_____

[6] In the alternative, courts have concluded that in cases involving sales of adulterated and misbranded drugs, the loss amount is appropriately predicated on the sales of drugs that are essentially worthless due to their illegality. *See, e.g.*, *United States v. Ihenacho*, 716 F.3d 266, 279 (1st Cir. 2013) (affirming district court's finding that there was a loss for purposes of calculating the Guidelines for prescription drugs distributed by an Internet pharmacy without a valid prescription because even if the buyers "got exactly what they wanted" and "were complicit in the fraud, and, in that sense, the drugs were not worthless to them," nonetheless the loss calculation could be used because there was no "after-sale retail value" to the drugs, among other reasons). *Cf. United States v. Milstein*, 401 F.3d 53, 74 (2d Cir. 2005) (affirming district court's finding that there was a loss for purposes of calculating the Guidelines for crime in which the defendant purchased foreign drugs, repackaged them, and sold them with forged labels).

[7] It is also the case that the MVRA recognizes no restitution need be ordered by the Court where "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B).

[8] Although Fishman was one of several drug suppliers who provided Navarro with PEDs, that fact is immaterial given the aims of the Navarro Conspiracy, and the foreseeability that Navarro would be doping his stable with all manner of illicit drugs. As the Second Circuit has repeatedly held, restitution is not limited to " 'losses caused by the actions of that defendant' during the

Notably, the manner in which the defendant conducted the conspiracy charged in Count Two—that is, broadly supplying racehorse trainers with drugs without accurate records of which horse received which drug in advance of which race—meaningfully complicates the calculation of the "actual" and "provable" loss amount associated with that count. *See Tanner*, 942 F.3d at 67. Consequently, while the defendant undoubtedly caused loss as a result of the conspiracy charged in Count Two, proving the extent of that loss is necessarily limited by the evidence the Government has been able to gather in connection with this case. Thus, the Government has restricted its calculation of the restitution amount to specific horses that the Government can demonstrably identify were doped, or specific trainers that the Government can demonstrate were recurrent purchasers of Fishman's inarguably prohibited PEDs, as reflected in the proposed restitution order provided to the Court and defense counsel, amounting to a total of $11,268,177.

## B.  Section 3553(a) Factors Set Forth By The Defense

The Government largely enumerates the relevant factors pursuant to 18 U.S.C. § 3553(a) in the following section, but briefly addresses herein the argument raised in the defense's motion.

*First*, as discussed *supra*, the notion that the defendant was always concerned with the health and welfare of racehorses is a skewed and incomplete representation. *See* Def. Sent. Subm. at 1-4, 8-11. The defendant's professed concern for the well-being of racehorses is necessarily qualified by his crimes, which were singularly focused on administering unnecessary PEDs to racehorses, using potentially dangerous means of administration, such as drenching and IV injection.

*Second*, any suggestion that the defendant attempted to avoid engaging in criminal conduct while released on bail is flatly incorrect. *See* Def. Sent. Subm. at 13-16. Immediately upon Fishman's arrest, he continued his criminal conduct, and did not desist until practically the eve of trial. The defense admits that Fishman fulfilled PED orders processed by Giannelli following his arrest, and further admits—as they must—that Fishman concealed his ongoing criminal activity from his attorney and the Government, all while Fishman was attempting to cooperate and purportedly seeking the Government's assent to export drugs. *Id.* at 14-15. What the submission fails to describe[9] is that the Government, upon learning that Fishman intended to export drugs, informed Fishman's counsel of the Government's view that such activities were illegal. The defendant thus deserves no credit for having informed the Government of his plans

---

conspiracy, but also embraces losses flowing from the reasonably foreseeable 'actions of that defendant's co-conspirators.' " *United States v. Goodrich*, 12 F.4th 219, 228 (2d Cir. 2021) (quoting *United States v. Boyd*, 222 F.3d 47, 50–51 (2d Cir. 2000)). "In this way, a restitution order that incorporates a co-conspirator's acts is rooted in the defendant's own 'criminal conduct' " because it is based upon the defendant's choice to join in a conspiracy, and all its foreseeable aims. *Id.* (citing 18 U.S.C. § 3663A(a)(2)).

[9] The Government notes that Fishman's current defense team replaced Fishman's former counsel approximately one year after Fishman was indicted, and after many of the events and conversations described in the months following Fishman's arrest had concluded.

to export drugs, given that he persisted in doing so without the Government's consent, and against the Government's express warnings. In the same vein, the defendant cannot rely upon the fact that he consulted counsel "on the requirements of the export exemption" to the FDCA. *Id.* at 14. The defendant's consultation with counsel is meaningless absent a proffer of what the defendant told counsel, and what advice the defendant received in return. Notably, the defense makes no representation that Fishman *followed* the advice of the attorney he retained. And as the Court is well aware, Fishman never sought to waive the attorney-client privilege and assert an advice of counsel defense at trial, thus the extent of his good-faith reliance on counsel's advice cannot be measured.[10]

*Third*, the defendant requests a variance or downward departure on the grounds that many of the offense level enhancements "overlap[]." Def. Sent. Subm. at 17-18. The defense's request is unsupported, and contrary to the Guidelines, which contemplate application of each sentencing enhancement, without restrictions on the combinations of enhancements, at least with respect to the enhancements applicable in this case.[11] The defense request for a departure or variance on this ground is baseless.

*Fourth*, the defendant argues that a downward variance is required to avoid unwanted sentencing disparities between the defendant and others. The defense first points to *United States v. Murray Rojas*, 15 Cr. 169 (M.D. Pa. 2015), in which Rojas received 24 months' imprisonment after trial. The cases the defense cites, and *Rojas* in particular, are of limited utility in providing a comparison for the Fishman because the defendant's crimes eclipse those cited by the defense based on the scope, longevity, and sophistication of his criminal scheme, all of which are exacerbated by Fishman's obstructive acts.

For example, the defendant in *Rojas*, a racehorse trainer, was indicted based on her participation in a 1-year scheme to administer prescription drugs to racehorses with no valid prescription, and contrary to Pennsylvania racing rules. *Id.* (ECF No. 1). Rojas's conduct pales in comparison to Fishman's, insofar as it involved only one trainer, acting in one state, violating the rules of a single racing commission, involving drugs that were adulterated and misbranded in only one way, and did not include the creation, manufacture, and marketing of novel drugs. In

---

[10] For clarity, the Government is not suggesting that the defendant should have then, or should now, waive the attorney-client privilege. The Government notes only the limitations of the defense's suggestion that he believed he was complying with the law, merely because he retained and consulted with an attorney familiar with the FDCA. It is equally possible that Fishman received, and disregarded, legal advice counseling against exporting drugs, rendering his point moot.

[11] Other sections of the Sentencing Guidelines do provide restrictions as to the application of certain enhancements, indicating that the absence of restrictions on combinations of enhancements is deliberate. *See, e.g.*, U.S.S.G. § 2B1.1(b)(2) instructing that the Court "apply the greatest" of a subset of enhancements related to the number of victims impacted.

short, these and the other cases cited by the defense are poor benchmarks against which to measure Fishman's culpability.[12]

The defense's reliance on Navarro's five-year sentence is similarly misguided. Def. Sent. Subm. at 19-20. Navarro, unlike the defendant, accepted responsibility for his crimes relatively early in this matter, having pleaded guilty before filing any suppression motions in this case. Navarro was convicted for his participation in a single conspiracy in service of his own doping scheme. That scheme lasted for approximately four years and was, as the Government argued at sentencing, complex, multi-faceted, and egregious. Fishman, one of Navarro's suppliers, participated in that conspiracy, and associated himself with Navarro. But Fishman also led his own enterprise, spanning approximately 20 years, to disseminate his illegal drugs to scores of corrupt trainers. Fishman manufactured hundreds of drugs. He, in turn, supplied those drugs to hundreds of trainers. Fishman abused his veterinary license to shield himself and others, all in service of his own greed. Fishman, unlike Navarro, has not only failed to accept responsibility for his crimes, he has tried actively to thwart the Government's investigation and prosecution, and to enlist others to do the same. *See infra* Part IV.B. Given Fishman's persistent efforts to continue this crime following his arrest, indictment, and the enlargement of his sentencing exposure, the defendant is at an incredibly high risk of recidivism. And Fishman shows no repentance or regret for having engaged in these crimes, and displayed no acceptance of responsibility. *Compare* Def. Sent. Subm. *with* Navarro Sent. Subm. at 1-2, 9-10 (Navarro expresses "contrit[ion]" and is "remorseful" and "acknowledges the error of his ways."). In short,

---

[12] Four cases cited by the defendant reflect veterinarians who had cooperated with the U.S. Attorney's Office for the Middle District of Pennsylvania and testified against Murray Rojas at trial in exchange for misdemeanor pleas offered by those prosecutors. Consequently, those charges and sentences have no persuasive authority. In *United States v. Herbert*, 17 Cr. 39 (W.D.La. 2018), a veterinarian was convicted at trial of conspiracy to commit misbranding violations for providing mislabeled syringes *of one particular drug* to employees, directing that they be administered to horses on race day, and falsifying invoices to conceal purchases of the drug. *Id.* (ECF No. 1). That defendant was convicted for his participation in an 8-year conspiracy and sentenced to 15 months' imprisonment. *Id.* (ECF No. 132). *United States v. Moran*, 18 Cr. 112 (E.D. Ky. 2019), involved an entirely different statute, and a 2-year course of conduct, in which the defendant permitted others to sign veterinary inspection reports for cattle under his signature, and ultimately was sentenced to a term of probation after entering into a plea. *Id.* (ECF Nos. 35, 51). In *United States v. Wang*, 17 Cr. 168 (S.D. Tex. 2017), the defendant was likewise charged for violating an entirely different statute than the one at issue here, and was convicted for trafficking in counterfeit labels and packaging; he was ultimately sentenced to a term of probation after entering into a plea. *Id.* (ECF Nos. 1, 43). Finally, in *United States v. Stratton*, 18 Cr. 114 (D.N.H. 2018), the defendant was convicted of participating in a 9-month conspiracy to dispense prescription drugs without a valid prescription, for which he also received probation. *Id.* (ECF Nos. 1, 14). In another case— not cited by the defense—*United States v. Landers*, 19 Cr. 183 (N.D. Tex. 2019), the defendant pleaded guilty in connection with distributing a single adulterated and misbranded drug, Super Fecta, in violation of 21 U.S.C. §§ 331, 333, and was subsequently sentenced to the statutory maximum sentence of three years' imprisonment. *Id.* (ECF Nos. 11, 26). As discussed above, these cases are all distinguishable from the offense conduct at issue here, for various reasons discussed herein, including the length and complexity of the conspiracy and Fishman's obstruction of justice.

Fishman is more culpable: his conduct spans a greater period of time; is exacerbated by Fishman's obstruction; and is mitigated in no respect, because Fishman has accepted no responsibility for his crimes.

*Fifth*, the defense points to other, inapplicable Guidelines sections to convince the Court that U.S.S.G. § 2B1.1 overstates the defense's culpability. This argument merits little response. Section 2B1.1 plainly applies; the application of other sections that apply to charges not brought in this case says little about the sentence that should be imposed here. The Sentencing Guidelines, intended to be the benchmark for sentencing, undoubtedly contemplate that economic crimes would be subject to the enhancements applied here, to which the defense objects.

## IV.  Sentencing Factors

### A.  Applicable Law

Although *United States v. Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  543 U.S. 220, 264 (2005).  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims."  18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)    to afford adequate deterrence to criminal conduct;
(C)    to protect the public from further crimes of the defendant; and
(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B.  Discussion

As the Court is aware, the Government has carefully considered its view of the relative culpability of the defendants who have pled guilty thus far, keeping in mind the culpability of those defendants who have yet to reach any disposition in this case, and has endeavored to reach dispositions with Guidelines calculations that accurately and appropriately reflect the defendants' individual offense conduct and personal characteristics, their culpability relative to one another, as well as the quality of their acceptance of responsibility relative to the timing of their decisions to plead guilty. The defendants who have pleaded guilty thus far in this matter and their stipulated Guidelines ranges are listed below. This summary is provided for the Court's reference, but it of course does not capture the totality of the relevant considerations for each defendant.

- Jordan Fishman (Guidelines Range of 12 to 18 months' imprisonment): Jordan Fishman, a drug manufacturer, assisted Seth Fishman in creating and manufacturing adulterated and misbranded performance-enhancing drugs in his Massachusetts-based laboratory, for further distribution by Seth Fishman and Seth Fishman's sales representative, Lisa Giannelli. Jordan Fishman personally produced the illegal drugs for later distribution, created new drugs entirely at Seth Fishman's direction, and was involved in the manufacture of a variety of drugs. Jordan Fishman was not involved in the labeling, marketing, or sale (to consumers) of the illicit drugs he created, nor did he solicit customers or otherwise engage with customers, and did not otherwise promote the drugs that he created and produced. Unlike Seth Fishman, Jordan Fishman's offense conduct spanned approximately three years. Jordan Fishman also was not a veterinarian, did not have any animals under his care and/or control, and was not involved in the marketing and sale of the drugs he was creating for Seth Fishman. On February 8, 2022, this Court sentenced Jordan Fishman to a term of fifteen months' imprisonment, and one year of supervised release.

- Michael Kegley Jr. (Guidelines Range of 30 to 37 months' imprisonment but, given the statutorily authorized maximum sentence, the Guidelines sentence correspondingly adjusted to 30 to 36 months' imprisonment): Kegley, the Director of Sales of Medivet, unlike Fishman, held no medical license, and did not have any duty of care to racehorses as part of his profession. Likewise, unlike Fishman, Kegley did not engage in efforts to directly mislead state racing commissions. Further, while Fishman was involved in the creation and distribution of hundreds of novel adulterated and misbranded drugs, Kegley's criminal activity was predominantly confined to the marketing and distribution of a discrete set of adulterated and misbranded drugs. Kegley's offense conduct spanned approximately four years. On January 6, 2022, this Court sentenced Kegley to a term of thirty months' imprisonment, and one year of supervised release.

- Marcos Zulueta (Guidelines Range of 30 to 37 months' imprisonment but, given the statutorily authorized maximum sentence, the Guidelines Range correspondingly adjusted to 30 to 36 months' imprisonment): Zulueta, a racehorse trainer, assisted Navarro in obtaining and administering performance-enhancing

drugs for the purpose of doping horses, and exchanged tips with Navarro regarding new illicit drugs to administer to horses, and different methods of administration. Zulueta not only procured illicit drugs, he personally administered them to the racehorses under his care and control, and stood to personally profit from the improved performance of the racehorses he doped. However, unlike Fishman, Zulueta was not involved in the creation or marketing of adulterated and misbranded drugs, and unlike Fishman, his offense conduct spanned approximately one year. On February 24, 2022, this Court sentenced Zulueta to a term of 33 months' imprisonment, and one year of supervised release.

- Christopher Oakes (Guidelines Range of 46 to 57 months' imprisonment but, given the statutorily authorized maximum sentence, the Guidelines sentence correspondingly adjusted to 36 months' imprisonment): Oakes, a racehorse trainer, procured adulterated and misbranded performance-enhancing drugs from Seth Fishman, re-distributed those drugs to Navarro, and produced his own drench that was purportedly untestable even when administered the day of a race, which Oakes administered to his own racehorses (those he owned and trained) and provided to Navarro. Oakes assisted Navarro in surreptitiously administering drugs to one of Navarro's racehorses, "XY Jet," the day that horse was scheduled to race, by sneaking past racetrack security officials and concealing from those same officials the true purpose of his entry into the racetrack and barn area where "XY Jet" was housed. Oakes was licensed—and was thus proficient in various racing rules prohibiting the use of PEDs—and personally administered drugs to the horses under his care and control. Oakes was convicted for offense conduct that spanned approximately one year. On March 3, 2022, this Court sentenced Oakes to a term of thirty-six months' imprisonment, and one year of supervised release.

- Kristian Rhein (Guidelines Range of 135 to 168 months' but, given the statutorily authorized maximum sentence, the Guidelines Sentence correspondingly adjusted to 36 months' imprisonment): Rhein was a veterinarian and Medivet-affiliate who conspired with Kegley and others to market, distribute, sell, and administer SGF-1000, and further illicitly distributed unprescribed clenbuterol. Rhein, like Fishman, was a licensed veterinarian, thus was well-acquainted with the various legal regimes governing the sale and distribution of adulterated and misbranded drugs. Rhein generated false invoices for customers, using misleading billing codes for SGF-1000 and the illicit clenbuterol he provided to racehorse trainers. Rhein's offense conduct was limited to a handful of adulterated and misbranded PEDs, and Rhein was involved in the marketing and administration of those drugs, but not the creation and manufacture of those drugs. Rhein participated in the offense conduct for approximately four years. On January 5, 2022, this Court sentenced Rhein to a term of three years' imprisonment, and one year of supervised release.

- Jorge Navarro (Guidelines Range of 168 to 210 months' imprisonment but, given the statutorily authorized maximum sentence, the Guidelines sentence is correspondingly adjusted to 60 months' imprisonment): Navarro, a thoroughbred racehorse trainer, was a prolific doper of racehorses, utilizing multiple sources of supply for the PEDs he used, drawing from foreign and domestic sources, and soliciting drugs from both non-veterinarians and veterinarians alike. Navarro is notable for his aggressive pursuit of novel drugs to administer to the racehorses under his care and control. As a trainer, Navarro personally profited from the improved performance of the racehorses he had surreptitiously and corruptly doped. Navarro's offense conduct spanned approximately four years. On December 17, 2021, this Court sentenced Navarro to a term of 60 months' imprisonment, and three years' supervised release.

Turning to Seth Fishman, the 18 U.S.C. § 3553(a) factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to protect the public, and to afford adequate general and specific deterrence. A sentence below the Guidelines Range, but nonetheless greater than ten years' imprisonment, is the appropriate sentence: one sufficient but not greater than necessary to serve the purposes of sentencing when balancing the nature and seriousness of the defendant's crimes; the longevity of the offense conduct; the defendant's numerous and varied efforts to obstruct the Government's investigation and prosecution of this matter and conceal his continued criminal activity; the defendant's risk of recidivism; the defendant's failure to accept responsibility; and the sentences imposed on co-defendants to date.

*First*, a Guidelines sentence is necessary to reflect the nature and seriousness of the offense. 18 U.S.C. § 3553(a)(1). The defendant engaged in the offense conduct for almost two decades, longer than any other charged defendant in this matter. Further, unlike the trainer-defendants charged and sentenced in this matter, Fishman's reach extended far beyond a single barn. He supplied *at least* hundreds of trainers with his unsafe and illegal drugs. The breadth of the drugs the defendant offered for sale is unmatched by any other charged defendant in this action. The defendant was thus responsible for amplifying the disastrous effects of doping on racehorses in the industry. The defendant, under the guise of providing medically necessary veterinary care, enabled scores of corrupt trainers by selling unnecessary PEDs to enrich himself. In fact, because the defendant disregarded applicable drug regulations and a formal approval process and, further, because he performed no veterinary work and, thereby, did not charge trainers for medical services (such as conducting physical examinations or administering injectable medications), the defendant and his co-conspirators undercut prices offered by legitimate manufacturers and practicing veterinarians in order to boost Equestology's sales. Fishman made millions of dollars in revenue and courted new buyers with artificially depressed prices by disregarding FDA regulations and distributing adulterated and misbranded drugs with impunity. Fishman's conduct is particularly pernicious because of the deference Fishman enjoyed as a veterinarian, which cloaked his business with a veneer of legitimacy, and permitted Fishman to successfully deflect scrutiny for years, even when he was investigated by specific individuals or regulators. There is no doubt that Fishman understood at all times that his actions were wrong, and further understood that they represented a betrayal of the trust placed in him as the result of his licensure. The defendant's unconscionable behavior warrants a substantial term of incarceration.

*Second*, a Guidelines sentence is necessary to provide just punishment, to afford specific deterrence, and to protect the welfare of the public given Fishman's attempts to evade detection and to frustrate efforts by regulators and law enforcement. 18 U.S.C. § 3553(a)(2)(B). For years, the defendant defiantly pursued his illegal drug business, thwarting investigations, ignoring warnings and—most significantly—continuing his criminal conduct even after he had been charged in this very matter (and, thus, had no illusions as to the illegality of his conduct). At numerous junctures over the course of the defendant's decades-long conspiracy, he was alerted to the criminality of his actions and had the opportunity to desist. The defendant never did so, until practically the eve of trial, and only when compelled to do so by yet another seizure of the defendant's illegal drugs. The defendant's numerous efforts to obscure his conduct are significant because they indicate that the defendant knew precisely that his conduct was illicit, and took extensive and varied measures to make his crime difficult to detect, yet did *not* take commensurate steps to ensure compliance with the law.

Notably, the defendant's response to the investigation by the Delaware Division of Responsibility illustrates the defendant's bad faith in continuing the offense conduct uninterrupted. As the defendant admitted in a text message to trainer Adrienne Hall, the defendant "spent $25,000 in legal fees and had a personal political favor called in to end the BS," referring to the investigation. GX 900D. The defendant reiterated in a phone call that "Presidential Affairs," one of the defendant's alleged foreign purchasers, "cleaned . . . up" the "Veterinary Board's" investigation into Fishman. GX 140A-T; *see also* GX 140B-T (discussing inquiries by law enforcement and describing how he planned to fall under the umbrella of Presidential Affairs "[s]o when the IRS or somebody accuses me of money laundering they speak to Presidential affairs.").

*Third*, a Guidelines sentence is further warranted given that the two-point enhancement pursuant to U.S.S.G. § 3C1.1 understates the severity and extent of the defendant's attempts to obstruct justice, given that application of his enhancement accounts for only a single obstructive act by the defendant, and is consequently underinclusive. *See United States v. Ventura*, 146 F.3d 91, 97 (2d Cir.1998) ("[I]t is well settled that a sentencing court may depart upwardly if a defendant engages in multiple acts of obstruction that fall outside the heartland conduct contemplated by § 3C1.1." (internal quotation marks omitted)).

As stated above, on October 28, 2019, the defendant was arrested and several premises associated with the defendant and his business were searched, leading to the seizure of thousands of vials of adulterated and misbranded drugs that the defendant maintained as inventory in order to more quickly fulfill orders placed by his buyers. GX 4000-4047. After the defendant's indictment in March 2020, the defendant prompted one of his buyers to file an action pursuant to Federal Rule of Criminal Procedure 41 seeking the return of the evidence the Government had seized, approximately five months after the seizure of Fishman's drugs. *See* Exhibit A at 2 ("I have a lawyer to argue for your product back. If you want to represent all the Dubai clients collectively then that is ok."). Several months later, that same client filed an action in the U.S. District Court for the Southern District of Florida moving to compel the Government to return the contraband drugs law enforcement had seized during the course of the searches conducted on the day of Fishman's arrest. Those filings included demonstrably false allegations regarding the nature of the work that the defendant purportedly conducted for that client, including the following false

representations: (1) that the drugs at issue were not offered for sale in the United States; (2) that the items seized were required to be returned for purposes of the camel breeding season; and (3) that the items seized had been custom-made by Fishman for breeding, vaccinating, and otherwise treating "common diseases" in camels, and *not* performance products for racehorses or racing camels. *See* Exhibit B at 3-4 (Petitioners' Rule 41 Motion)[13]; Exhibit C at 5, 9-10 (Petitioners' Reply ISO Rule 41 Motion).[14]

After the Petitioners' motion was denied, the defendant hurriedly filed a motion for reconsideration and motion to intervene in the action, in which Fishman and his counsel—no longer working through the proxy of the apparent foreign purchaser—*directly* repeated several of the false and misleading allegations in the prior submissions, including that VO2 Max was a camel product, Exhibit D at 13, and that Fishman "treats animals (Endurance horses and camels) for various ailments," *id.* at 15, among other misleading claims. The defendant's motion likewise omitted information regarding the defendant's creation, manufacture, marketing, and sale of drugs for racehorses, including work the defendant had done for racehorses associated with the Petitioners.

That was hardly the defendant's only attempt to obstruct the Government's prosecution. In preparation for trial, Fishman—after reviewing the Government's trial exhibits—contacted racehorse trainer Jamen Davidovich, an individual Fishman anticipated would be a government witness at trial, in order to improperly influence Davidovich's testimony. *See* GX 14000; Trial Tr. at 905:25-906:17. *See United States v. Gershman*, 31 F.4th 80, 104 (2d Cir. 2022) ("[W]e have explained that the 'obstruction-of-justice enhancement is warranted . . . when the defendant threatens, intimidates, or otherwise unlawfully influences a potential witness with the intent to obstruct justice.' *United States v. Archer*, 671 F.3d 149, 166 (2d Cir. 2011). . . . The obstruction enhancement therefore even 'applies where the targeted co-defendant or witness is still only a *potential* co-defendant or witness.' *United States v. Agudelo*, 414 F.3d 345, 351 (2d Cir. 2005) (emphasis added and quotations omitted)); *see also United States v. Gaskin*, 364 F.3d 438, 465 (2d Cir. 2004) ("A threat to a potential witness qualifies as an attempt to obstruct justice and

---

[13] The judge presiding over the Rule 41 matter, the Honorable Dave Lee Brannon, noted that the filings in the Rule 41 action had been sealed by the clerk's office because they were filed in connection with a "sealed search warrant case number," but that "the Court has not made any rulings that the other filings in this matter [apart from the warrant] should be sealed pursuant to" that district's local rule. *Presidential Affairs Dep't et al. v. United States*, 19-mj-8437 (S.D.Fla. June 19, 2020). (ECF No. 31). Consequently, and in light of Judge Brannon's clarification, the Government has filed on the public docket the papers related to the Rule 41 action cited herein.

[14] In the course of that litigation, the defendant's prior counsel, acting on Fishman's behalf, submitted a deeply misleading declaration to the court in support of the Petitioner's facially suspect, self-contradictory motion on the basis of a skewed summary of the Rule 16 discovery the Government had produced by that time. *See* Exhibit C-1 (Feldman Decl.). That declaration did not mention the reams of evidence indicating that the defendant created and supplied PEDs for horses (including for Petitioners); the declaration, instead, advanced the notion that Fishman had international clients, in the hopes that the Court would apply the FDCA's export exemption to find that the seized drugs were not contraband (which, of course, they were).

fully warrants a sentencing enhancement pursuant to § 3C1.1."), *cited in Gershman*, 31 F.4th at 104. There can be no excuse for the defendant's clear efforts to manipulate a witness's testimony in anticipation of trial.

Moreover, the defendant's obstructive acts extended even to the preparation of the PSR. In enumerating the defendant's assets, (which typically informs a defendant's ability to pay a fine), Fishman omitted from that list two Panamanian bank accounts, which were not included in the draft PSR.[15] The omission of these accounts was not the result of oversight or mistake. Evidence of the defendant's establishment of a Panamanian corporation in order to evade the FDA was introduced at trial. *See, e.g.*, GX 912A-T. The Government was alerted to the existence of these accounts by reviewing seized documents from Fishman's storage unit, in which Fishman wrote down his Panamanian bank account numbers and the account balances on a sheet of paper identifying foreign bank accounts. *See* Exhibit E. There is likewise no question that these accounts remain open and active; the Government contacted Panamanian officials to inquire into these accounts, and understands that they remain open, with a current total balance of $357,052.77. This latest display of Fishman's deception comes as no surprise given the defendant's actions to date, and further demonstrate why a significant sentence within the Guidelines Range is necessary in order to provide just punishment and to deter this defendant from his continued attempts to thwart law enforcement.

*Fourth*, the defendant's stubborn refusal to conform his actions to what the law requires highlights the importance of a serious sentence here. Even faced with overwhelming and incontrovertible proof of the criminality of his actions, the defendant is still unwilling to express the slightest hint of remorse, contrition, or desire to reform. *See* PSR ¶ 105. Following his conviction, while contemplating his sentence, the defendant continued to speak with others about his disdain for the law. *See, e.g.*, Exhibit F ("The idea that a high school student could recommend supplements at a part time afternoon job to people, but myself as a licensed doctor with 20 years of practice could not mix them and give them to a race horse without FDA approval is ridiculous. . . . [A] vet who has the right to compound can not dispense peptides that are sold on Groupon without being prosecuted for mislabeling & misbranding is one of 100 examples of how the law is a joke."). The defense's submission is notable in its absence of any self-reflective statement regarding the defendant's crimes.

*Finally*, a Guidelines sentence is necessary to afford adequate general deterrence. *See* 18 U.S.C. § 3553(a)(2)(B). Veterinarians occupy a rarified position; as medical professionals, veterinarians are afforded deference and the presumption of legitimacy regarding the manner in which they distribute drugs to animals. The defendant exploited that position of public trust, actively thwarting any investigation into his conduct by using his veterinary license as a shield. *See, e.g.*, GX 3000 (defendant's response to the Delaware Division of Professional Responsibility's 2011 investigation in which Fishman claimed to practice veterinary medicine and examine every animal that received Fishman's drugs). Corrupt and self-serving veterinarians, like the defendant, have enabled the hazardous and illegal administration of unnecessary medications to performance animals with the goal of enriching themselves, and under the assumption that no

---

[15] The Government informed the Probation Department of the existence of the Panamanian accounts, resulting in their inclusion in the Final PSR. PSR ¶ 159.

serious consequences will follow if they are ever caught. As the Government has argued in prior submissions, many actors in the racehorse industry like the defendant have grown indifferent to, and dismissive of, the notion of obtaining illegal drugs to dope racehorses for profit. Many, like the defendant, believe that—if caught—they will have the wherewithal and the means to bully, intimidate, or pay off whomever threatens their corrupt activities. Imposing a substantial sentence here would send a strong signal to others thinking of engaging in such criminality that there will be consequences for their crimes. It will likewise counter the view that selling and administering PEDs is inconsequential, and is not subject to serious punishment.

## **Conclusion**

The Government respectfully submits that a significant sentence of imprisonment below the Guidelines Range, but greater than ten years' imprisonment, is sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing set forth in Title 18, United States Code, Section 3553(a).

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by:

Sarah Mortazavi
Assistant United States Attorney
212-637-2520

cc:    Maurice Sercarz, Esq. (via ECF)
        Marc Fernich, Esq. (via ECF)