

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 5, 2023

**Via ECF & Email**
The Honorable Mary Kay Vyskocil
United States District Court
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, New York 10007

Re: *United States v. Seth Fishman*, 20 Cr. 160 (MKV)

Dear Judge Vyskocil:

The Government respectfully submits this letter in advance of the forfeiture hearing in the above-captioned case to provide the Court with the declaration of Sarah Mortazavi ("Mortazavi Decl.") appending rebuttal exhibits prepared in response to the defendant's declaration and the defense exhibits.

On Thursday, March 2, 2023, the defense produced almost 300 exhibits consisting of over 5,000 pages of records drawn from the Avimark system, which were not previously produced to the Government, and not drawn from the Government's discovery. These records purportedly establish that Fishman's domestic sales of adulterated and misbranded drugs are *de minimis*, a contention the Government disputes. The Government has reviewed portions of this data; however, given the volume and timing of the production, the Government's analysis has not concluded.

Nonetheless, based upon the analysis the Government has conducted to date, the Government now writes to preview certain responses to the defendant's claims, which will be discussed in more detail during oral argument.

<u>Legal Standard</u>

As the Court is aware, and as previously stated in the Government's November 23, 2022 submission, in determining the forfeiture amount, the Court need only make a reasonable estimate, *United States v. Lizza Industries*, 775 F.2d 492, 498 (2d Cir. 1985), and may extrapolate from the evidence in the record, *see United States v. Roberts*, 660 F.3d 149, 166 (2d Cir. 2011).[1] Pursuant

---

[1] "Conspiracies are, by their nature, shrouded in secrecy and, thus, such evidence may not always be available. Consequently, the law does not demand mathematical exactitude in calculating the proceeds subject to forfeiture. Indeed, because the purpose of forfeiture is punitive rather than restitutive, district courts are not required to conduct an investigative audit to ensure

to Rule 32.2(b)(1)(B), "[t]he court's determination may be based on evidence already in the record . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant *and reliable*." Fed. R. Crim. P. 32.3(b)(1)(B) (emphasis added). "Generally, 'sentencing judges are not restricted to information that would be admissible at trial. Any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy.' " *United States v. Simmons*, 164 F.3d 76, 79 (2d Cir. 1998) (quoting *United States v. Brach,* 942 F.2d 141, 144 (2d Cir. 1991) (internal citation and quotation marks omitted)). As the factfinder, this Court may credit or discount any piece of evidence, including any portion of the parties' exhibits and declarations.

Government's Revised Forfeiture Calculation

Prior to the production of defense exhibits, the Government sought entry of a forfeiture money judgment in the amount of **$15,640,130.56**.[2] As reflected in Paragraph 20 of the Declaration of John Rubino, the Government does not contest a reduction in the Government's forfeiture calculation by 1% of the Government's initial proposed money judgment amount of $15,640,130.56, reflecting a conservative approximation of $156,401.31 in shipping costs billed to clients. As reflected in Paragraph 6 and Exhibit A of the Mortazavi Declaration, the Government has reviewed the defense exhibits and does not contest the deduction of approximately $965,785.41 from the Government's initial proposed forfeiture sum, reflecting charges for items other than adulterated and misbranded drugs, according to the exhibits submitted by the defense. Paragraph 37 of the defendant's declaration states generically that there is "substantial gross income" from the sale of additional items "that are not drugs of any kind." Fishman Decl. ¶ 37. Based on a review of the items the defendant lists in this paragraph and the Government's manual searches of SFX 1800, it appears that the only additional charges for non-drug items described by the defendant in his declaration totals $1,231.59.[3] The Government otherwise contests much of the defendant's claims.

In light of the foregoing, the Government respectfully requests that the Court order forfeiture in the amount of **$14,516,712.25**, reflecting a reasonable estimate of the value of adulterated and misbranded drugs the defendant distributed, for only a portion of the conspiracy's time period.

---

that a defendant 'is not deprived of a single farthing more than his criminal acts produced." *Roberts*, 660 F.3d at 166 (internal citation omitted).

[2] The total included in Government Exhibit 110F reflects a rounding error of 4 cents. In the Government's November 23, 2022 letter, and in the Declaration of John Rubino, the Government requested the correct forfeiture amount.

[3] The additional $1,231.59 deduction reflects the following charges for non-drug items: $21 for gauze; $121 for scrub pads; $417.75 for ultrasound gel; $300 for urine tests; $151.84 for Veggie dent chews; $195 for Breathe Rite; $25 for silver nitrate sticks.

## Defendant's Calculations of Domestic Sales Are Unreliable

The defendant asks this Court to rely on the Avimark data set maintained by Lisa Giannelli in determining Fishman's domestic sales. To that end, the defendant makes easily disprovable allegations regarding which of those domestic sales relate to adulterated and misbranded drugs, and omits key clarifications illustrating the limitations of the Avimark data and the defense's calculations. The defendant's declaration, and a substantial number of the defense exhibits, are unreliable.

*First*, the manner in which this data was stored, gathered, produced, and analyzed by the defense casts doubt on the completeness and accuracy of the defendant's competing forfeiture figure. On Thursday, March 2, 2023, the defendant produced to the Government SFX 1800, a PDF document containing over 5,000 pages of data purportedly from the Avimark system used by Lisa Giannelli to record her Equestology sales. This 5,000-page PDF document is alleged to contain every recorded transaction Giannelli input into the Avimark system, which includes the number of units sold and the total sales. The defense claims this represents the entirety of the data in the Avimark system, and makes the further (incorrect) representation that this reflects all of Fishman's domestic sales. While the PDF document is searchable, the data cannot be manipulated, and calculations must be made manually. The defense did not prepare or provide an Excel version of SFX 1800 for the Government's use. The defense further produced on March 2, 2023 over 200 sales reports for individual products that appear to have been generated between July 31, 2022 and November 26, 2022, which also purportedly derive from the same Avimark data set used to generate SFX 1800. According to the defense, these exhibits were not generated using SFX 1800 itself.

The Government has now requested the original Avimark data set from the defense, but has been informed that the defense does not possess it. Rather, according to the defense, Giannelli maintained a copy of the Avimark data offline and generated SFX 1800 prior her surrender date on or about January 9, 2023, which is approximately when she produced this data to the defense.[4] It appears from the individual product sales reports, which lists the date they were generated, that Giannelli was conducting searches in the original, offline Avimark data set over an approximately

---

[4] The defense has wrongly claimed that the Government did possess this data or, alternatively, that the Government had an obligation to collect and preserve this data. Neither contention is true. The Avimark data was not saved to any device seized by the Government. Prior to Giannelli's trial, the Government served a trial subpoena on Giannelli calling for productions of the Avimark data. Notably, Giannell, through counsel, represented that she did *not* possess an offline version of the Avimark data set. On that representation, Giannelli's defense team authorized law enforcement agents to access Giannelli's Avimark account through her seized computer for the limited purpose of responding to the trial subpoena; agents were instructed to review and retain a discrete set of reports relevant to Giannelli's upcoming trial only. Those reports were produced to Seth Fishman on or about April 20, 2022. The Government did not collect or possess the remainder of the voluminous data set.

five-month period. The Government was not alerted to the existence of this data until three days ago.[5]

Particularly given that Giannelli, who possessed this data and created the Avimark reports, is now incarcerated, the Government has no practical mechanism to test the reliability or authenticity of the defense exhibits by conducting searches of the data itself to validate the defense's underlying sales reports or the summary charts. *See* Fed. R. Crim. P. 32.2(b)(1)(B).

It further appears that the defendant omitted from his declaration, calculations, and summary charts the very drugs that Equestology manufactured (listed under the heading "DOC" in the Travel Inventory Sheet (GX 709)), and the drugs that Fishman distributed domestically without Giannelli's involvement (such as sales to Jorge Navarro, or BB3 bottles provided by Fishman to Adrienne Hall and Jamen Davidovich, which are not reflected in SFX 1800). These glaring omissions undermine the defendant's reliance on the Avimark data.

*Second*, the defense's calculations appear to contain simple mathematical errors. The Government has made efforts to validate the defense's calculations as reflected in the defense's various summary charts, but has not completed its review given the untimely disclosure. Nonetheless, to date, the Government has identified a number of discrepancies in the defendant's calculations with respect to certain non-drug items, as detailed in Paragraphs 5-6 of the Mortazavi Declaration. These discrepancies (among other things) call into question the defense's proposed forfeiture figure.

*Third*, a majority of the items the defendant claims are non-forfeitable for various reasons (including because they are supplements, over-the-counter drugs, or not drugs at all), are in fact adulterated and misbranded drugs that are appropriately included in the forfeiture calculation. The defendant's declaration identifies, generically or by product name, several charges reflected in the Avimark data that he purports are either not drugs (such as needles or "ointments") or that he asserts are drugs, but are "over-the-counter." *See* Fishman Decl. ¶¶ 33-36.[6] The defendant is wrong. Exhibit A to the Mortazavi declaration reflects the Government's inquiries into the products described by the defendant or, where those precise products could not be found, their

---

[5] In prior phone calls and emails, the Government made repeated, direct requests for reciprocal discovery—including for the "nature and source" of new documents the defense claimed to have received shortly before the parties filed their joint letter-submission in December 2022, but was not informed of the existence of this data. The Government has likewise offered to confer regarding the calculation of the forfeiture figure prior to this hearing. The defendant has had the vast majority of the Government's discovery for at least two years and was provided with the Government's proposed exhibits and the declarant's 3500 material over three months ago.

[6] The defendant has effectively conceded that the remainder of the products in his exhibits are prescription drugs, which require a lawful prescription for their legal distribution, pursuant to the Food Drug and Cosmetic Act ("FDCA") and enacting regulations. Prescription drugs are adulterated and misbranded absent a valid prescription based on a *bona fide* veterinarian-client-patient relationship. *See* 21 U.S.C. § 353(f)(1); 21 C.F.R. § 201.105(a)(1)(i)-(iii), (b)(1).

equivalent.[7] Most of the enumerated products are, in fact, prescription drugs and/or unapproved drugs. Such drugs require a valid prescription for their lawful distribution and are otherwise adulterated and misbranded. The defendant's misleading and imprecise descriptions of these drugs underscore the fundamental unreliability of the declaration itself.

*Fourth*, Fishman states in his declaration that he either had a valid veterinarian-client-patient relationship with the receiving animal, or that none was required, in an attempt to justify his sales of unprescribed prescription drugs. Fishman Decl. ¶¶ 23-25. The record in this case, the jury's findings, and this Court's findings at Fishman's sentencing contradict that narrative. *See, e.g.*, Fishman Sentencing Tr. at 74:11-15; *id.* at 76:6-10 ("You were not in fact practicing veterinary medicine. Rather, you used your training, your knowledge, your skill to create and design, manufacture and sell illicit drugs that were calculated and intended to push animals beyond their natural capacity."). The defendant did not, in fact, issue valid prescriptions for each drug that he and/or Giannelli distributed. *See* Giannelli Sentencing Tr. at 67:16-68:7 (Giannelli "used Dr. Fishman's veterinary license to bulk-order drugs; she had her own supply of illegal drugs in her garage; . . . She clearly knew that some of those drugs required prescriptions, because she used Dr. Fishman's veterinary license to purchase those drugs."). With no valid prescription, any prescription drugs or unapproved drugs distributed by Fishman and his employee were adulterated and misbranded, and their value is properly included in the amount of the forfeiture money judgment.

The Defendant's Requests for Further Deductions Are Misplaced

- **Pre-2009 Sales.** The defendant's declaration implies that his sales prior to 2009 are negligible. Fishman Decl. ¶¶ 7-8. The Court should not credit the defendant's memory on this score. Appended to the Mortazavi Declaration as Exhibits D and E are Federal Bureau of Investigation reports reflecting witness statements regarding Seth Fishman's drug sales during that time period, and illustrating that he, indeed, sold adulterated and misbranded drugs to trainers.[8] At trial, Angela Jett testified regarding Fishman's sales to David Brooks during approximately the same time period. *See* Trial Tr. 271:16-20, 272:14-17, 273:1-8.[9]

- **Foreign Sales.** The defendant claims that his foreign sales[10] complied with the Food, Drug, Cosmetic Act's ("FDCA's") so-called "export exemption" set forth in Section 801(e) of

---

[7] The Government considered comparable products offered by different manufacturers, and those offered for use on humans or animals other than horses, to provide the Court with a reference regarding the status of each drug.

[8] These reports were produced to the defendant in discovery on or about May 28, 2020 and were separately marked and reproduced to the defendant as trial exhibits These exhibits were not offered or admitted at Fishman's trial.

[9] David H. Brooks was indicted in 2007. *See United States v. Schlegel et al.*, 06 Cr. 660 (E.D.N.Y.).

[10] The defendant estimates that bank deposits from foreign sales amount to $2,316,762.50, with an additional $382,111.29 in sales sold domestically to All Veterinary Supply Inc. for subsequent export, totaling $2,698,873.79. Fishman Decl. ¶¶ 47-48. The Government has calculated an

the FDCA. As this Court noted at sentencing, this argument was raised at the very beginning of this case, the defendant had the opportunity to establish the applicability of that exemption, and he did not do so. Sentencing Tr. at 83:22-84:10. This Court, thus, declined to give "that argument any weight" at sentencing. *Id.* The defendant's declaration does not merit a different result. To qualify for this exemption, the defendant's exported drugs must: "accord to the specification of the foreign purchaser," 21 U.S.C. § 381(e)(1)(A), comply with foreign law, § 381(e)(1)(B), contain appropriate labeling that it is intended for export, *id.* § 381(e)(1)(C), and "not [be] offered for sale in domestic commerce," *id.* § 381(e)(1)(D). The letters the defendant has provided in SFX 1901 are orders, not "specifications." A mere request for the shipment of products does not trigger the exemption. Nor has the defendant pointed to anything other than a handful of letter-requests to establish his unsupported claim that all exported drugs complied with foreign law.[11] Likewise, the letters themselves demonstrate that the products the defendant sold overseas are also those offered for domestic sale.[12] Finally, the defendant's provision of a label sheet fails to establish that Fishman actually used the label sheet during the course of the conspiracy, or otherwise complied with the labeling requirements under that exemption.[13] The defendant's bare, self-serving assertions that all his exports were compliant have no weight. *See* Fishman Decl. ¶ 40-42, 50.[14]

- **Panamanian Accounts.** The defendant impliedly disputes that he had control of the deposits in two Panamanian bank accounts, and further claims that those accounts derived from the sale of lawful drugs manufactured and distributed outside the United States. Those conclusory statements are self-serving and unavailing. Those accounts were listed among the defendant's assets in the Final Presentence Investigation Report, *see* PSR ¶ 158, with no objection from the defendant at sentencing, undermining his claim that he lacked control of those accounts. The defendant's instant attempts to disclaim involvement is further contradicted by the exhibits presented at trial, indicating the defendant's intention to evade

---

additional $261,700 not captured in deposits, which also reflect sales to a foreign buyer. *See* Rubino Decl. ¶ 17; GX 110F.

[11] Indeed, according to the intercepted call admitted at trial as Government Exhibit 121D, the defendant offered to fraudulently ship drugs to a private citizen in the United Arab Emirates under cover of a delivery to a member of the Government. A transcript of this call, admitted at trial as GX 121D-T, is appended to this letter.

[12] According to the intercepted call admitted at trial as Government Exhibit 108A, the defendant offered to let a domestic buyer "piggyback" on a "production for overseas." A transcript of this call, admitted at trial as GX 108A-T, is appended to this letter.

[13] Although the defendant admits to shipping drugs to a score of countries, he only provides the labels apparently designed for the United Arab Emirates. *See* Fishman Decl. ¶ 40 (listing Singapore, Qatar, Saudi Arabia, Thailand, Malaysia, Australia, Canada, Brazil, "and other South American countries"); SFX 1902.

[14] Likewise, the defendant's unsupported claim that he generated $1 million in sales from "drinks" is spurious. Fishman Decl. ¶ 43. Many of the "drinks" in the supporting exhibit are described as "samples," which would not total $1 million in sales. *See* SFX 1901 at 8, 12.

the Food and Drug Administration by setting up a Panamanian trust. GX 912-T. His retention of the account numbers associated with the Panamanian account further contradicts his declaration. GX 202F.

***

The Government is prepared to address these, and the remaining points raised in the defendant's declaration, at the upcoming proceeding.

                        Very truly yours,

                        DAMIAN WILLIAMS
                        United States Attorney

               by: ___/s/_____
                    Sarah Mortazavi
                    Assistant United States Attorney
                    (212) 637-2520

Cc:     Steven Kessler, Esq. (by ECF)

# GX 108A-T

**United States v. Seth Fishman and Lisa Giannelli, S6 20 Cr. 160 (MKV)**

DATE: 05/20/2019

TIME: 10:34:50 A.M.

INTERCEPTED LINE: ███████

OUTGOING TO: ███████

PARTICIPANTS: SETH FISHMAN [SF]
ADRIENNE HALL [AH]

ABBREVIATIONS:

[U/I]
Unintelligible

[ph]
Phonetic rendering

[O/V]
Overlapping voices

1



| LINE | NAME | TRANSCRIPTION |
|------|------|---------------|
| 1. | | [05:23 Recording Start] |
| 2. | AH: | Are you coming to New Jersey anytime or are you going straight to Florida? |
| 3. | SF: | Florida, I'll be up in New York at some point. But again, I'm about to, you know, do a half million dollars' worth of production for overseas. So, if he wants to piggy back on some of this stuff I am making for their endurance stables, great. If not, no big deal. You know? |
| 4. | AH: | Right. |
| 5. | SF: | It's an opportunity for him to get stuff that normally he wouldn't get. Because as many horses as he thinks he has, its [U/I]. You know what I'm saying? |
| 6. | AH: | Yeah. |
| 7. | SF: | I'm making it for four – five hundred horses right now. |
| 8. | AH: | Yeah. |
| 9. | SF: | So, adding another hundred horses on it makes it definitely cheaper for him than anyone else. So if he wants to take advantage of that production, great, if not, you know, it's okay. I understand. You got good horses, you gonna do well anyways, so let's be honest, you know, he can just play the numbers. |
| 10. | AH: | Right. |

| LINE | NAME | TRANSCRIPTION |
|------|------|---------------|
|      |      |               |
| 11.  | SF:  | But if you want to tell him that you know, I'm doing things right now. I'm making stuff that I normally wouldn't make because it's too expensive. But he can definitely take advantage of piggy back production. And if he does, you can get some of it too. |
| 12.  | AH:  | Alright, I'll let him know. |
| 13.  | SF:  | [U/I] other stuff. You know? |
| 14.  | AH:  | Yeah, I'll let him know. |
| 15.  |      | [07:04 Recording Ends] |

# GX 121D-T

**United States v. Seth Fishman and Lisa Giannelli, S6 20 Cr. 160 (MKV)**

|  |  |
|---|---|
| DATE: | 03/21/2019 |
| TIME: | 09:44:31 A.M. |
| INTERCEPTED LINE: | ▬▬▬▬▬ |
| INCOMING FROM: | +9715▬▬▬ |
| PARTICIPANTS: | SETH FISHMAN [SF]<br>UNIDENTIFIED MALE [UM] |

ABBREVIATIONS:

[U/I]
Unintelligible

[ph]
Phonetic rendering

[O/V]
Overlapping voices

1



| LINE | NAME | TRANSCRIPTION |
|---|---|---|
| 1. | | [08:22 Recording Start] |
| 2. | SF: | Are you training the horses or you own the horses, are you managing the horses? |
| 3. | UM: | uh, all of the above. |
| 4. | SF: | Alright, so you're the actual trainer, so then, and the owner, so then it makes it easy because it's not 5 people that have to make a decision. |
| 5. | UM: | Yeah. |
| 6. | SF: | So, again, I can present you with some options, now the biggest question to ask is, do you have the ability to get stuff into your country? |
| 7. | UM: | Very easily. |
| 8. | SF: | OK. Because if not, then you have to go through certain people, which you may not even want to go through because you know how things are there. |
| 9. | UM: | Yes, yes. |
| 10. | SF: | I have some local guys, but they add a lot of zeros sometimes to the price of things. |
| 11. | UM: | Yes. |
| 12. | SF: | And then of course, if you want the privilege. |

| 13. | UM: | Thats not a problem. |
|---|---|---|
| 14. | SF: | Ok because what I'm saying is, you know I send packages and then they always use uh you know I don't like to mention other people's names but they use very important people's names on top of the address so that it goes in without any problems. So, because you know, you can figure out what that means, so. |
| 15. | UM: | Yes, I know, I know. |
|  | SF: | If you've have things to do like that, and your packages can come in, no problem because again, you have to consider a few packages get seized, and stuff like that, you know, I can't get your stuff out of a FedEx office in Dubai, I have no authority, I have no ability to do that. |
| 16. | UM: | Don't worry about that, that's not an issue. |
| 17. |  | [09:55 Recording End] |