N367FisH

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              20 Cr. 160 (MKV)

5    SETH FISHMAN,

6                   Defendant.
                                              Hearing
7    ------------------------------x

8                                             New York, N.Y.
                                              March 6, 2023
9                                             10:20 a.m.

10   Before:

11

12                    HON. MARY KAY VYSKOCIL,

13                                            District Judge

                             APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  SARAH MORTAZAVI
          Assistant United States Attorney
17
     LAW OFFICES OF STEVEN L. KESSLER
18        Attorneys for Defendant
     BY:  STEVEN L. KESSLER
19        ERIC M. WAGNER

20   Also Present:
     Seth Fishman(via telephone)
21   Robert Fishman
     Anthony Imperatore, U.S.A.O. Paralegal
22   Bruce Turpin, F.B.I. Special Agent

23

24

25

N367FisH

| | |
|---|---|
| 1 | (Case called) |
| 2 | MS. MORTAZAVI:  Good morning, your Honor. |
| 3 | Sarah Mortazavi for the government.  I'm joined at counsel |
| 4 | table by Anthony Imperatore, a paralegal with our office, and |
| 5 | Special Agent Bruce Turpin with the FBI. |
| 6 | THE COURT:  Good morning to all of you. |
| 7 | MR. KESSLER:  Good morning, your Honor. |
| 8 | Steven Kessler for Dr. Fishman.  Dr. Fishman is on the line. |
| 9 | And with me is my associate, Eric Wagner. |
| 10 | THE COURT:  All right.  Good morning, Mr. Kessler. |
| 11 | Good morning, Mr. Wagner.  I don't think we've met before. |
| 12 | MR. WAGNER:  Good morning. |
| 13 | THE COURT:  And Dr. Fishman, can you hear me clearly? |
| 14 | THE DEFENDANT:  Yes, your Honor.  Good morning. |
| 15 | THE COURT:  All right.  Good morning to you, sir.  And |
| 16 | you can hear everyone in the courtroom who has spoken so far? |
| 17 | THE DEFENDANT:  Thus far, yes, your Honor. |
| 18 | THE COURT:  And good morning to our court reporter. |
| 19 | Thank you for being here. |
| 20 | All right.  So we are here, at long last I'll say, for |
| 21 | a hearing on the proper amount of forfeiture in this case. |
| 22 | Now, before we turn to the substance of what we're here for |
| 23 | this morning, I want to just talk to everyone about a couple of |
| 24 | preliminary procedural matters to just have a clear record that |
| 25 | we're all on the same page. |

N367FisH

1          So the first item is, pursuant to Rule 43, a defendant

2     has -- in fact, a defendant must be present at sentencing.  I

3     don't know if this is fairly considered hearing with respect to

4     sentencing, but arguably, it might be.

5          So I would like, Mr. Kessler, to confirm with you

6     that -- well, I should have said too that, pursuant to

7     Rule 43(a), defendant has a right to be present -- in fact, he

8     must be present at sentencing, but he can waive that right.

9          Now, as you know, we agreed some time ago that we

10    would hold this hearing by video conference.  Dr. Fishman

11    elected not to be transported to New York because of his

12    medical issues and all the attendant concerns about transport

13    to New York.  We agreed to this do by video conference -- or

14    live with Dr. Fishman attending, being present, by video, which

15    is authorized.  But thereafter, you advised me that video

16    access is not available at the facility where Dr. Fishman is

17    being housed.  The parties conferred, and it's my understanding

18    that Dr. Fishman waives his right to be physically present in

19    the courtroom and consents to attendance remotely by

20    teleconference.

21          Is that correct?

22          MR. KESSLER:  That is what was agreed to, yes, your

23    Honor.

24          THE COURT:  All right.  Dr. Fishman, is that, in fact,

25    accurate?

N367FisH

1          THE DEFENDANT:  That is accurate, your Honor.

2          THE COURT:  You waive your right -- I'm sorry, sir.  I

3    spoke over you.

4          THE DEFENDANT:  That is correct, I waive my right to

5    be physically present.

6          THE COURT:  All right.  Thank you, sir.

7          All right.  Next, I'm not going to repeat on the

8    record what we've talked about numerous times, the record about

9    the conversations we had back at the time of sentencing with

10   respect to forfeiture.  They are all a matter of record.  And

11   the parties can refer to the sentencing transcript,

12   particularly pages 16-19, I believe, and then thereafter at

13   pages 72 and 73.  And specifically, what was agreed at

14   sentencing was that, really on a proposal from both sides, I

15   would enter the preliminary order of forfeiture and that the

16   parties would confer.  At the time, Mr. Sercarz, who was

17   representing Dr. Fishman, was hopeful.

18         Dr. Fishman, I think you need to mute your line.

19   We're getting some feedback.

20         Are you able to do that, sir?

21         THE DEFENDANT:  Let me ask the officer.

22         THE COURT:  So Mr. Sercarz was hopeful that the

23   parties would be able to agree to the amount of forfeiture, but

24   that, if not, within 30 days, any objections to the forfeiture

25   amount would be filed.  I'll talk in a moment about the timing

N367FisH

1    issue and where we're at now, but that order of forfeiture was

2    entered at the time of judgment, and it is at ECF 887.

3          Thereafter, Dr. Fishman hired new counsel, Mr. Kessler

4    and his colleagues, some of whom are with us today, others who

5    have been at other hearings.  Again, I'm not going to repeat

6    the record about the numerous delays that have visited upon

7    this forfeiture issue, but they are all documented in the

8    record of a hearing that I held with the parties back in

9    October.  I believe it was October 24 of 2022.

10         So I would like confirmation on the record from both

11   sides that you consent to my holding this evidentiary hearing

12   at this date with respect to forfeiture and that you do not

13   object to the timing of the hearing or to the Court's authority

14   to amend the preliminary order of forfeiture.

15         Ms. Mortazavi.

16         MS. MORTAZAVI:  No objection from the government.

17         THE COURT:  Mr. Kessler.

18         MR. KESSLER:  If you're asking me about the timing, of

19   course there's no objection.

20         THE COURT:  All right.  And do you object to my

21   authority to hold an evidentiary hearing today?

22         MR. KESSLER:  Is that a question mark?

23         THE COURT:  Yes.  And then there's another one.

24         MR. KESSLER:  Okay.  I do not object to the hearing

25   being held today.  One of the things I was led to understand

N367FisH

1    last time we appeared before you was that we would be

2    discussing legal issues in addition to evidentiary.

3               THE COURT:  Yes, that's correct.

4               MR. KESSLER:  Yes.  As far as a hearing, yes, of

5    course.

6               THE COURT:  Okay.  Finally, do you consent to the

7    Court's authority to change the preliminary order of forfeiture

8    at this stage of where we're at?

9               MR. KESSLER:  I expect the Court to amend the order,

10   yes, absolutely.

11              THE COURT:  Okay.  The next issue that I want to be

12   clear on the record about is, given the way things unfolded

13   with the inability of Dr. Fishman to be present by video

14   conference -- well, first, to be present in the courtroom, and

15   thereafter to be present by video conference, when we last

16   convened—I'm not sure whether we nailed this down at the

17   October hearing or in January; I think it was January 6 of this

18   year—I met again with all of you, and we agreed that either

19   side could proceed by affidavit if it wished to do so.  And I

20   would like the parties' consent that that is acceptable for us

21   to proceed that way.

22              Ms. Mortazavi.

23              MS. MORTAZAVI:  Yes, the government consents, your

24   Honor, in order to streamline these proceedings.

25              THE COURT:  Mr. Kessler.

N367FisH

1              MR. KESSLER:  Yes, your Honor.

2              THE COURT:  Ms. Mortazavi, let me ask you, is your

3     affiant in the courtroom, John Rubino?

4              MS. MORTAZAVI:  He is, your Honor.

5              THE COURT:  Okay.  Ms. Mortazavi, then let me ask you,

6     by consenting for Dr. Fishman to present his testimonial

7     evidence via affidavit, you are obviously waiving your right to

8     cross-examine him, correct?

9              MS. MORTAZAVI:  That's correct, your Honor.  I'm not

10    waiving my right to challenge the credibility or reliability of

11    his statements, but I do waive cross-examination.

12             THE COURT:  All right.

13             Mr. Kessler, let me ask you, have you made the

14    determination about whether you wish to cross-examine

15    Mr. Rubino?

16             MR. KESSLER:  Same that Ms. Mortazavi said, your

17    Honor.  We are accepting the declaration and we will comment on

18    it as well.

19             THE COURT:  All right.  So is each side offering into

20    evidence the affidavit?

21             Let me start with Mr. Kessler, since you're still

22    standing.  Are you offering into evidence the affidavit of

23    Dr. Fishman?

24             MR. KESSLER:  Yes, the declaration of Dr. Fishman,

25    together with the exhibits, yes, your Honor.

N367FisH

1          THE COURT:  Okay.  And, Ms. Mortazavi, are you

2     offering the Rubino affidavit?

3          MS. MORTAZAVI:  Yes, your Honor, I'm offering that

4     declaration into the record with all the appended exhibits.

5     I'm also offering my own declaration into the record with the

6     appended exhibits, which was submitted yesterday by e-mail.

7          THE COURT:  Right.  So that was my final point that I

8     wanted to make to both of you.

9          I don't know where people get the idea that filing the

10    volume of materials -- I should just say that those affidavits

11    that we just talked about that were submitted, appended to them

12    I have three large loose-leaf binders of exhibits, and that

13    doesn't include Dr. Fishman's exhibits, which were a series of

14    charts.

15         Yesterday, as late as 6 p.m., I received from the

16    parties additional submissions.  So at 10:30 yesterday morning

17    I received from the government another declaration, the

18    declaration of Ms. Mortazavi, to which she's just referred, 34

19    pages in all, including 7-page single-spaced letter.  I then

20    received at 6 o'clock last night from Mr. Kessler a 14-page

21    single-spaced letter.  Now, I will say I actually found those

22    materials helpful, it's just inexcusable that they weren't

23    submitted back in the fall when the date for objections to the

24    forfeiture amount were due.

25         Mr. Kessler, you in particular, what you submitted

N367FisH

last night was exactly what I was looking for back in the fall

when neither side briefed anything with respect to the proper

amount of forfeiture, and all you did was brief the issue of

whether forfeiture was appropriate at all.  You re-briefed that

last night, but now you have finally gotten around to talking

about the amount of forfeiture.  So I think that's what we're

here to talk about today.

Is everybody prepared to proceed?

MS. MORTAZAVI:  Yes, your Honor.

And if I may comment, the reason for the timing of the

government's declaration was in response to exhibits that they

only received on Thursday.

THE COURT:  I understand, Ms. Mortazavi.  But the

government does have the burden of proof here.  And Mr. Kessler

could have responded then to what you proffered, which is three

volumes worth of exhibits.  So the government does have the

burden of proof here.

So as I say, we're here for the evidentiary hearing on

which the government has the burden of proof.  So in the

Court's view, what we agreed to do today was both an

evidentiary hearing, where I am expecting that the government,

which has the burden of proof, is going to marshal evidence in

support of its proposed forfeiture figure and I'll hear legal

argument, and then I'll hear from Dr. Fishman.  It's up to you

all—and I don't know whether you've talked about this—whether

N367FisH

1    you wish to first deal with the evidentiary issues and then to

2    the legal argument with each side having a turn or if you want

3    one side to do everything.  I defer to you on how you wish to

4    present your case.

5            MS. MORTAZAVI:  Your Honor, let me confer with

6    Mr. Kessler.

7            THE COURT:  Sure.

8            (Counsel confers)

9            MS. MORTAZAVI:  I'm sorry, your Honor.  Whenever the

10   Court is ready.

11           THE COURT:  One moment, please.

12           Okay.  Whenever you're ready, Ms. Mortazavi.  Thank

13   you.

14           MS. MORTAZAVI:  Yes, your Honor.

15           The parties conferred and would like to proceed by

16   first briefing the legal issues and then proceeding to the

17   evidentiary portion of the hearing.

18           THE COURT:  Okay.

19           MS. MORTAZAVI:  And if the Court would like me to

20   begin, I'm happy to do it.  Since the defendant raised the

21   objection, I'm happy to let him begin.  However the Court would

22   like to proceed.

23           THE COURT:  I'll defer to you both, but frankly the

24   government has the burden of proof.

25           Mr. Kessler, do you have a view?

N367FisH

1          MR. KESSLER:  I'm happy to either way, but the

2     government does have the burden.

3          MS. MORTAZAVI:  I'll then begin, your Honor.

4          With respect to the Court's ability to enter a

5     forfeiture at all, it is clear from a plain reading of the

6     relevant statutes that there is in fact a lawful basis for

7     forfeiture.  It is perfectly normal.  There is no reason to

8     read Section 334 in any manner different than any other civil

9     forfeiture statute.  And the order of forfeiture that this

10    Court-entered is lawful.

11         THE COURT:  What about the fact that 334 talks

12    about -- doesn't it say "condemnation or seizure," not

13    forfeiture?

14         MS. MORTAZAVI:  Certainly, your Honor, it uses the

15    term "condemnation."  Obviously, the Food, Drug, and Cosmetic

16    Act was passed in a different era, in 1938, so the verbiage is

17    slightly different.  But if you look at the reading of the

18    entire section, it is clear that condemnation is essentially

19    forfeiture by another name.

20         THE COURT:  Is that true or -- doesn't it relate to

21    the drugs that you seized from both Ms. Giannelli and

22    Dr. Fishman?

23         MS. MORTAZAVI:  It is not restricted only to the drugs

24    we seized from Lisa Giannelli and Dr. Fishman.  And I believe

25    that's a separate issue as to whether the civil forfeiture

1    statute imports into a criminal case and not necessarily the

2    question of whether Section 334 is a civil forfeiture statute

3    at all.  We believe that it is.

4            Page 2 of the defendant's reply concedes that it is a

5    civil forfeiture statute.  And I'm happy to explain the

6    arguments in our opposition as to why condemnation is

7    essentially forfeiture based on a plain reading of that section

8    itself and based on subsequent case law and how that statute

9    has been interpreted.  However, if that's a concession that the

10   defense has already made, which I believe they have, there's

11   really no reason for this Court to broach the issue because

12   there's no disagreement among the parties.

13           THE COURT:  Oh, I think there's a disagreement.  I can

14   see from Mr. Kessler's reaction behind you.

15           MS. MORTAZAVI:  All right.  Very good.  Then I'm happy

16   to talk about it, your Honor.

17           So Section 334 talks about condemnation.  And in

18   discussing condemnation, it talks about the things that can be

19   done with the drugs.  Those things are either the government

20   destroys the drugs, or the government sells the confiscated

21   drugs or the condemned drugs and puts the deposits into the

22   U.S. Treasury to retain the deposits, or it can return them

23   to --

24           THE COURT:  Clearly, that's all about the stuff you

25   seized.

1          MS. MORTAZAVI:  Certainly.  Let me clarify, your

2     Honor.

3          Every civil forfeiture statute is only going to relate

4     to the items seized.  That is going to be the case for any

5     civil forfeiture statute because civil forfeiture statutes only

6     contemplate proceeding against items that are in hand, they are

7     *in rem* proceedings.  So the fact that it refers to the

8     existence of drugs does not preclude the government from

9     seizing the forfeiture of substitute assets as part of a

10     federal criminal case.

11          THE COURT:  Okay.  I don't understand Dr. Fishman to

12     be challenging your right to have seized the drugs.  I'll hear

13     from Mr. Kessler, but I don't understand him to be challenging

14     that.

15          MS. MORTAZAVI:  Well, if he does not challenge that,

16     your Honor, then he has to concede that all the -- that, first,

17     that means that the civil forfeiture statute is imported into

18     the criminal context by virtue of the bridging statute, which

19     is 28 U.S.C. 2461(c).  That statute means that any civil

20     forfeiture statute can automatically be attached to a criminal

21     case.  And in criminal cases, forfeiture is *in personam*; they

22     follow the person, they do not follow the items that are in

23     hand.

24          THE COURT:  What's your authority for that?

25          MS. MORTAZAVI:  That is how the statutes are

N367FisH

1    conceived, and that is the subject of many court decisions.

2              THE COURT:  Can you point me to one Second Circuit

3    case, for example?

4              MS. MORTAZAVI:  Your Honor, I certainly can if I have

5    a moment to refer to my records.

6              THE COURT:  Yes, that's okay.

7              MS. MORTAZAVI:  But --

8              THE COURT:  You have it in the materials you gave me?

9              MS. MORTAZAVI:  I do, your Honor.  I made this

10   assertion in the materials.

11             THE COURT:  Okay.  But do you have case law support,

12   I'm asking.

13             MS. MORTAZAVI:  I would have to go back and review it,

14   but this is sort of a bedrock principle of the difference

15   between civil forfeiture and criminal forfeiture.  Civil

16   forfeiture always follows the property itself because it's an

17   action against a property itself; criminal forfeiture always

18   follows the individual.  And that's in addition to the bridging

19   statute making any civil forfeiture statute applicable in the

20   criminal context.  It also imports the procedures of

21   Section 853(p), and those procedures apply for any criminal

22   forfeiture.  Whether it's based on an underlying civil statute

23   or a criminal statute, Section 853's procedures apply, and that

24   includes Section 853(p).  That subsection deals with substitute

25   assets where property has been dissipated.

N367FisH

```
 1              So to put it in a completely different context, if a
 2     defendant has used a property, a piece of real property, a home
 3     as part of a RICO crime, and that property is involved in the
 4     RICO crime and, thus, it is forfeitable, but the defendant
 5     then --
 6              THE COURT:  What does "involved in" mean?
 7              MS. MORTAZAVI:  That is the language of the underlying
 8     forfeiture statute.
 9              THE COURT:  I know.  I'm asking you how am I supposed
10     to construe it, how broadly?
11              MS. MORTAZAVI:  Well, that's not the language at issue
12     here.  I'm merely posing a hypothetical to illustrate a point.
13              THE COURT:  Okay.
14              MS. MORTAZAVI:  The point is, if any piece of real
15     property is involved in a criminal offense, and then that
16     property is dissipated——say the defendant burns the house
17     down——Section 853(p) is the means by which the government can
18     collect the value on the property that has now been dissipated.
19              And so 853(p) applies to all, as I mentioned, criminal
20     forfeiture actions.  If the defense is conceding that Section
21     2461(c) means that the government as part of this criminal case
22     does have forfeiture authority, then they are necessarily
23     conceding that the government may collect substitute assets,
24     because Section 853(p) is one of the available procedures for
25     any criminal forfeiture regardless of the underlying statute.
```

N367FisH

1          Thus, if this Court and the defendant are in agreement

2     that the government has the authority to seize the actual

3     physical drugs, then there's no basis to exclude the dissipated

4     property under Section 853(p).  It is one of the many

5     procedures that are incorporated in a criminal forfeiture, and

6     it is not a contingency that if the underlying statute is a

7     civil forfeiture statute that the government cannot employ

8     Section 853(p).  No Court has recognized such a carve-out and

9     the defendant is asking this Court to do it for the first time.

10          THE COURT:  Let me back you up just one minute.

11          You launched right into the question of whether

12     forfeiture is applicable in this case.  You didn't address what

13     I'll call a threshold question of where we left things at the

14     end of the sentencing hearing and whether this issue was even

15     preserved.

16          Now, Mr. Kessler argues in his -- I think it was in

17     the memorandum last night -- it certainly jumped out at me in

18     the letter brief last night that he argues that that goes to

19     subject matter jurisdiction.  If I don't have the authority,

20     then it can't be waived I think is, in effect, what he's

21     saying.  You haven't addressed that.

22          MS. MORTAZAVI:  And, your Honor, the government's

23     position on waiver is -- I can see from the record that the

24     defendant in some ways relinquished his right to make the

25     argument that forfeiture is unlawful.  The context in which the

1    government typically sees waiver raised and credited as a basis

2    for disqualifying an argument is when an argument is raised

3    before the Second Circuit for the first time.  This is

4    obviously a unique posture, and we continue to litigate this

5    case before the district court.  And so in the government's

6    view, the prudent course of action is to resolve this on the

7    merits and not to resolve it based on any apparent waiver.

8            THE COURT:  Is there a difference between waiver and

9    forfeiture of an argument?

10           MS. MORTAZAVI:  There is a difference, your Honor.

11   The waiver would be the affirmative consent that would

12   implicitly relinquish an argument.  But relinquishment of an

13   argument is just the failure to raise it, even absent consent.

14           Now, the defendant at sentencing through counsel

15   consented to the entry of a forfeiture of money judgment, and

16   that can be taken as an implicitly affirmative waiver because

17   he consented to the entry of the order; he only observed his

18   right to object to the amount.  However, again, regardless of

19   whether it is waiver or the relinquishment of an argument that

20   could have been raised, the government still believes that this

21   Court should resolve this on the merits.

22           THE COURT:  Okay.  Then we don't need to talk much

23   more about that issue.

24           MS. MORTAZAVI:  So, your Honor, to go back to -- if

25   the Court would like to hear argument on why Section 334 is in

N367FisH

1    fact a forfeiture statute, I'm happy to discuss the language of

2    that statute and why it does authorize forfeiture at all, a

3    fact that the defense at least in the initial paperwork and in

4    what was filed last night contests.

5             THE COURT:  Yes, I think he does contest it.

6             MS. MORTAZAVI:  Okay.

7             So with respect to the language of Section 334, as I

8    was mentioning earlier, the condemnation contemplated has

9    basically the same remedies made available to the government as

10   a forfeiture.  And if you look to beyond subsection (a), which

11   is the provision that we are looking at under Section 334, to

12   subsection (d), which refers back to subsection (a), there's a

13   reference to the condemnation in subsection (a)(2) as being a

14   forfeiture.  That clearly shows that when Congress drafted the

15   statute there was a view as to the interchangeability of

16   forfeiture and condemnation.  In fact, that is how Court's have

17   interpreted Section 334.

18            Now, we believe there's no ambiguity with respect to

19   the statute, so the Court need not probe case law, but the case

20   law is very clear that civil forfeiture actions have been

21   supported based on Section 334.  If forfeitures were unlawful,

22   then all of those cases would be unlawful as well.  In

23   addition, in our papers we pointed to a number of cases that

24   refer to both condemnation and forfeiture.  And we think that

25   the Court should evaluate those cases as well in determining

N367FisH

whether there has been, for over 80 years, a misreading and a

misunderstanding of Section 334 as a condemnation proceeding

rather than a forfeiture proceeding, or whether this Court

should take the natural reading of the statute and the natural

view of case law and view it as a forfeiture statute.

THE COURT:  So when you say you set this forth in your

materials, are you talking about in your submission yesterday

or something earlier?

MS. MORTAZAVI:  No, that was in our opposition to the

defendant's objections, your Honor.

THE COURT:  Okay.

MS. MORTAZAVI:  Pardon me, your Honor.  If I may just

review my notes.

THE COURT:  No problem.

MS. MORTAZAVI:  So we believe that based on the

natural reading of the plain language of Section 334 and the

way it has been interpreted by courts, it is undoubtedly a

civil forfeiture statute.

Now, in the defendant's reply, he seems to amend his

argument --

THE COURT:  I'm sorry.  You keep using these

expressions, like you say your opposition to defendant's

objection.  You're talking back in the fall?

MS. MORTAZAVI:  Correct, your Honor.

THE COURT:  And when you say "the reply," what are you

N367FisH

1  referring to?

2          MS. MORTAZAVI:  That was also a reply filed by the

3  defendant in the fall.

4          THE COURT:  In the fall.  Okay.

5          MS. MORTAZAVI:  It's ECF No. 945.

6          THE COURT:  Thank you.

7          MS. MORTAZAVI:  And for ease of reference, your Honor,

8  I believe the matter was fully briefed as of October 14.  But

9  for the purpose of the substance, those are the only materials

10  I'm referring to.

11          THE COURT:  Okay.  But I mean, as I said last night,

12  Mr. Kessler did refer back to the fall filings, but he also

13  addressed some of these arguments again.

14          MS. MORTAZAVI:  Understood, your Honor.

15          In the defendant's reply, he appears to raise for the

16  first time the novel interpretation.  And the reason I keep

17  asking whether the defendant has indeed conceded or contests

18  that Section 334 is a forfeiture statute is because in page 2

19  of his reply he states, in relation to Section 334, the statute

20  authorizes the government to take and forfeit the adulterated

21  and misbranded drugs.  So that's why there's some confusion,

22  your Honor, as to what the defendant has conceded and to what

23  he is contesting today.

24          It seems, based on the reply, that the defendant is

25  not saying that Section 334 is an ersatz civil forfeiture

N367FisH

1    statute.  Instead, he claims that Section 981 is the only

2    authoritative civil forfeiture statute that could apply in a

3    criminal case.  In so long as he's making that argument, he is

4    incorrect.  Section 981 is not the only civil forfeiture

5    statute that applies in criminal cases by virtue of 28, U.S.C.,

6    2461(c).  Looking at all the relevant statutes and the two that

7    I just mentioned, the plain language is clear, any civil or

8    criminal forfeiture statute that is authorized by an act of

9    Congress can be imported as part of a criminal case.  If

10   Congress had intended that provision to only apply to one civil

11   forfeiture statute, Section 981, they would have said so, they

12   would have said so in Section 981, or they would have said so

13   in Section 2461(c); and they did neither.

14            Again, the Court's inquiry can stop there.  Where the

15   plain language is clear and there's no ambiguity, there's no

16   reason for this Court to look to any case law or any limiting

17   principle.  It is apparent that any civil forfeiture statute

18   can be used as part of a criminal prosecution, and that

19   includes Section 334.  That also includes Section 924, which

20   was the statute that was discussed in the Ninth Circuit case

21   that both parties cited, *United States v. Valdez*, relating to

22   the forfeiture of firearms and ammunition.  So if this Court

23   were to look at case law and step outside of the four corners

24   of the relevant statutes, the Court still would find no basis

25   for reading into the law what the defense asks, which is that

N367FisH

1    981 is the only exclusive civil forfeiture statute and that no

2    others can be applied in a criminal case.

3    *United States v. Valdez*, the Ninth Circuit case that

4    we cite, premises a criminal forfeiture on Section 924, which

5    is the civil forfeiture statute, and they walk through the same

6    analysis that we asked the Court to engage in in entering the

7    preliminary order of forfeiture.  There is a civil forfeiture

8    statute that authorizes the forfeiture of firearm and

9    ammunitions and, again, that provision relates to the objects

10   themselves.  The Court found that those objects had been

11   dissipated and that they had been sold by the defendant, so

12   they no longer existed.  The Court found that, by virtue of

13   Section 2461(c), the forfeiture provision in Section 924

14   applied to the criminal prosecution of the person who had

15   illegally sold the firearms and also imported the procedures

16   under Section 853(p).  And because the property had been

17   dissipated, the government was entitled to collect the value of

18   the property, which is what is authorized under 21, U.S.C.,

19   853(p).

20       The defendant's retort to that is that the only reason

21   the Ninth Circuit's case is even lawful is because there was an

22   alternative theory of forfeiture under Section 981, but that is

23   entirely a limitation of the defendant's own making.  The Ninth

24   Circuit does not remark that that is the case.  The Ninth

25   Circuit does not refer to 981.  Simply because there may have

1   been an alternative theory of forfeiture that was not pursued

2   does not mean that those are the only cases in which civil

3   forfeiture statutes may be imported into the criminal context.

4           And indeed, given that forfeiture was specifically

5   challenged in that case, you would expect that the Ninth

6   Circuit wouldn't enter an order on an unlawful basis.  If

7   entering forfeiture in a criminal case based on Section 924, a

8   civil forfeiture statute, was indeed unlawful—which is what

9   the defendant is asking this Court to conclude—then the Ninth

10  Circuit would have affirmed an order that was illegally entered

11  by the district court.  And that's simply not the case.

12          It's worth noting, your Honor, that the Ninth Circuit

13  reaffirmed that same finding in a December 2022 case.  And I'm

14  happy to provide the reference to your Honor.  It's *United*

15  *States v. Mora*, 2022 WL 17984468.  Those cases employ the exact

16  same analysis that we are asking this Court to adopt here.  And

17  again, that analysis is only necessary -- or, I'm sorry.  It's

18  only necessary for this Court to look at those cases if this

19  Court finds that the plain language of the statutes are

20  ambiguous, which they are not.

21          We've also cited in our papers to cases applying

22  Section 334 in the criminal context.  The defendant's only

23  response is to waive his arms and say, well, it wasn't

24  challenged so you can't credit it.  But again, multiple

25  district courts have not found that it is unlawful for

N367FisH

1    Section 334 to be imported into the criminal context.

2         We additionally have some cases that we can bring to

3    the Court's attention.  I've provided copies of these materials

4    to the defense before today's hearing.  And in these cases,

5    Court's have opined that other civil forfeiture statutes do in

6    fact, by virtue of 28, U.S.C., 2461(c), the bridging statute,

7    apply in the criminal context, and thus 21, U.S.C., 853 also

8    applies to any action that is predicated on those civil

9    forfeiture statutes, but only in the criminal context.  Those

10   cases are *United States v. Rafael*, which is a district of

11   Massachusetts case from 2017.

12        I'm happy to hand the cases up to your Honor or list

13   the cites on the record; however you would prefer.

14        THE COURT:  You could just list the cites for now.

15        MS. MORTAZAVI:  That's 282, F. Supp. 3d 407, again,

16   the District of Massachusetts 2017.  In that case, the Court

17   was considering a civil forfeiture provision under the Lacey

18   Act, which prohibits trafficking in wildlife, fish, and plants,

19   the illegal importation of those items.  And it found that the

20   stand-alone civil forfeiture statute applicable, which was 16,

21   U.S.C., 3374, did apply in the criminal context by virtue of

22   the bridging statute that I just mentioned.

23        In another case, related to the government's request

24   for a restraining order, that request was made under Title 21,

25   United States Code, 853, and that only relates in the criminal

context.  With respect to an application for a restraining

order under those procedures, the Court found that the

procedures could be granted under 21, U.S.C., 853.  The

government had to make a showing that it was likely to prevail

on the forfeiture of -- on the basis of that statute and it

granted the restraining order.  The statute in question was 7,

United States Code, 2156(e), which relates to the forfeiture of

animals and animal fighting ventures.

          And in another case, *U.S. v. Wahchumwah*, that is a

case --

          THE COURT:  Want to just spell it for the court

reporter, please.

          MS. MORTAZAVI:  Certainly.  W-A-H-C-H-U-M-W-A-H.

That's 2011 WL285161.  It is a case from the Eastern District

of Washington, and that reflects an amended preliminary order

of forfeiture that was entered on the basis of, again, the same

civil forfeiture statute under the Lacey Act, 16, U.S.C.,

Section 3374, relating to the illegal importation of fish,

wildlife, and plants, and it employed the same analysis we're

asking this Court to do today.

          So either the statutes are not clear on their face

and, where the bridging statute, 2461(c), refers to any

criminal or civil forfeiture provision, it is ambiguous, and

all of these cases that have interpreted the statutes in this

manner are wrong and the defendant is right; or the Court looks

1    to the natural reading of these statutes, the Court looks to

2    the case law and how they've been interpreted to date, and the

3    Court finds that entry of an order of forfeiture is appropriate

4    here.

5              And again, the defense argues, and the Court seems to

6    imply, that the government was limited to seizing what was in

7    hand and could not seek substitute assets.

8              THE COURT:  I implied that, you're saying?

9              MS. MORTAZAVI:  Perhaps I misunderstood.  And I

10   apologize if --

11             THE COURT:  No.  I'm saying I think that much is

12   agreed.

13             MS. MORTAZAVI:  That much is agreed, certainly, your

14   Honor.  To the extent that is a concession that the government

15   can seize what has already been seized physically and is in

16   hand but that the government cannot take any substitute assets,

17   well, again, that premises only bears out if there is a

18   carve-out from the procedures of 21, U.S.C., 853, the

19   substitute asset provision.  No court has found that, there's

20   no basis to find that, and it is not correct.  It is not a

21   correct reading of the law.

22             So, your Honor, there are two other points that I'd

23   like to deal with, unless the Court has any questions on the

24   statutes and their interactions.

25             THE COURT:  No.  But I'm just going to drop a

N367FisH

1       footnote.  We'll talk about this, I guess, when we turn to the

2       evidentiary portion of the hearing.

3              So if I'm correct -- whether I'm correct or not,

4       frankly, you have seized certain drugs from Dr. Fishman, and I

5       think from Ms. Giannelli as well, and yet your evidentiary

6       support seems to say you haven't deducted all of that from your

7       proposed forfeiture amount.  So I'm going to expect to hear

8       from you on that.

9              MS. MORTAZAVI:  Certainly, your Honor.  We're prepared

10      to address it.

11             There are two other points that I'd like to respond to

12      with respect to what the defense has raised specifically in

13      their October reply.  And then if the Court has any questions,

14      I'm happy to respond to that.

15             There's a suggestion made in the reply by the defense

16      that the forfeiture money judgment that the government is

17      seeking is only lawful when it is predicated on a statute that

18      allows for the proceeds of an offense to be forfeited.  And the

19      defendant in --

20             THE COURT:  Those would be like substitute assets,

21      right?

22             MS. MORTAZAVI:  Not quite, your Honor.  And I think

23      that is a distinction that is important to make.

24             The defendant keeps on conflating what the government

25      is seeking with proceeds of the crime.  I want to make clear

N367FisH

1    that the government is not seeking and has not sought the

2    proceeds of the crime.

3            THE COURT:  You're seeking things that facilitated the

4    crime?

5            MS. MORTAZAVI:  We are not seeking that either, your

6    Honor.

7            THE COURT:  Okay.  Why don't you tell me what you are

8    seeking.

9            MS. MORTAZAVI:  Certainly.

10           It was clear from the order of forfeiture and it was

11   clear from the statements that I made at sentencing that we are

12   seeking the value of the adulterated and misbranded drugs.  It

13   may be a distinction without a difference --

14           THE COURT:  That's all you're seeking?

15           MS. MORTAZAVI:  That's correct, your Honor.  We're

16   seeking the value of the adulterated and misbranded drugs.

17   Again, that may end up being a distinction without a

18   difference.

19           THE COURT:  Well, I don't think that it is.  So I just

20   want to be 100 percent clear that you are not seeking

21   forfeiture or substitute money judgment for various things that

22   may have facilitated the commission of the crime.

23           MS. MORTAZAVI:  That's correct, your Honor.

24           THE COURT:  Okay.

25           MS. MORTAZAVI:  So the government is seeking

N367FisH

1    forfeiture of the value of the adulterated and misbranded

2    drugs.  And let me explain why it is that the forfeiture is

3    articulated in this way.

4           Section 334 authorizes the forfeiture of adulterated

5    and misbranded drugs.

6           THE COURT:  Right.

7           MS. MORTAZAVI:  And so Section 2461(c), as we've

8    discussed, imports the procedures of Section 21, United States

9    Code, 853(p).  So that substitute asset provision states that

10   where property has been dissipated, the government may seek

11   assets up to the value of what would have been directly

12   forfeitable property.  That is why the government is seeking

13   the value of the adulterated and misbranded drugs that have

14   been dissipated.

15          So we have conclusively shown over the course of the

16   trial and this case that the defendant sold or gave away

17   adulterated and misbranded drugs.  As a result, those drugs are

18   not available.  The government is thus seeking a finding by

19   this Court as to the value of those adulterated and misbranded

20   drugs.  That is the premise of the order of forfeiture, that is

21   how it was articulated, and that is what the government

22   articulated at sentencing.

23          THE COURT:  So what is the legal authority for you

24   having as your starting point any revenue that Equestology ever

25   received during the course of the conspiracy?

N367FisH

1          MS. MORTAZAVI:  At the time we proposed the original

2     $15,000,000 figure, we were mindful of a few principles.  The

3     first is that this Court can make a reasonable estimate of

4     forfeiture.

5          THE COURT:  Right.

6          MS. MORTAZAVI:  And the second is that this Court can

7     rely on the evidence in the record.

8          THE COURT:  Plus any other evidence that the parties

9     have now proffered, right?

10          MS. MORTAZAVI:  Certainly.

11          THE COURT:  Okay.

12          MS. MORTAZAVI:  At that time, before any evidence was

13     proffered, we were looking at any evidence in the record, we

14     were looking at any information that the government proffered

15     by that point, and we were mindful that the Court can make a

16     reasonable approximation.  And we've cited to language in the

17     letter that I submitted yesterday morning on the fact that

18     conspiracies are difficult.  Courts are not expected to --

19          THE COURT:  I don't think there's a dispute on that.

20     I could be wrong, but I don't think those two principles are

21     generally disputed.

22          MS. MORTAZAVI:  Very good.

23          THE COURT:  I'll confirm that with Mr. Kessler, but

24     that's my understanding of what each side has submitted that

25     you're in agreement with, the general principle that obviously

N367FisH

1    the Court can't, with exactitude, figure out the amount of

2    adulterated or misbranded drugs that have been dissipated.  So

3    a reasonable estimate is the best I can do.

4            I would add to your list that the government has the

5    burden of proof.

6            MS. MORTAZAVI:  Correct.

7            THE COURT:  And I don't think there's any dispute that

8    we can rely on evidence that's in the record or the additional

9    evidence that the parties have submitted.

10           MS. MORTAZAVI:  Certainly.  And the burden of proof on

11   the government is a preponderance of the evidence --

12           THE COURT:  Right.

13           MS. MORTAZAVI:  -- which is lower than the burden of

14   proof at trial.

15           THE COURT:  Right.

16           MS. MORTAZAVI:  So in conceiving of a conservative and

17   appropriate number to raise with the Court, the government

18   looked at the evidence in the record, which were bank account

19   statements that had been produced in discovery and admitted at

20   trial.

21           THE COURT:  But how is that conservative?  I mean,

22   clearly Mr. Kessler, on behalf of Dr. Fishman, has raised a

23   number of arguments about problems with using that as the

24   starting point.  And your own statement to me that you're only

25   seeking the value of adulterated and misbranded drugs that have

N367FisH

1    been dissipated suggests to me that an appropriate way to begin

2    is not to start at the top from all of the revenues that

3    Equestology ever had during the course of the conspiracy and

4    then finding appropriate deductions but, instead, to build up

5    from the ground.  Here's the value of what was adulterated and

6    misbranded that was dissipated during the course of the

7    conspiracy.

8           MS. MORTAZAVI:  So, your Honor, there is no exact

9    science to the methodology that is employed.

10           THE COURT:  Correct.  But it has to be reasonable.

11           MS. MORTAZAVI:  Certainly.  And the reason the

12    government believed it was reasonable to rely on the deposits

13    is because of the breadth of the defendant's criminal offense,

14    as well as the fact that the deposits were limited in time.  So

15    they only expand at that point from 2009 to 2019.  They did not

16    account for the seven years prior to 2009 where the defendant

17    was involved in the offense, nor did they account for the

18    additional period of time that the defendant continued to

19    commit his offense after he was arrested.  So however

20    over-inclusive that number was, the government believed that it

21    was corrected because we did not attempt to extrapolate that

22    figure over the course of time.

23           Now, certainly, there can be commentary as to that

24    methodology, but it was a methodology that was set forth.  No

25    one obtained to the methodology before trial.  And had there

N367FisH

1    been any discussions --

2            THE COURT:  No.  Until sentencing.  And even then, I

3    don't know if there was an objection.

4            MS. MORTAZAVI:  Right.  Apologies, your Honor.  I did

5    mean until the date of sentencing.

6            THE COURT:  By the way, you haven't commented on this:

7    The figure that you started with, the 15 million—and you have

8    modified it a little bit over time, but let's call it 15

9    million—was set forth in the PSR.

10            MS. MORTAZAVI:  With an amendment, your Honor.  The

11    figure was 13 million and some additional number --

12            THE COURT:  Right, that's true.

13            MS. MORTAZAVI:  -- set forth in the initial PSR, the

14    final PSR, and in the order of forfeiture that this Court

15    entered.  That was based on the deposits.  Once it became clear

16    that the defendant wanted to challenge the figure, the

17    government then went back, looked at the evidence that we had,

18    including the evidence that hadn't been admitted at trial,

19    calculated that, and determined the total number of deposits.

20            THE COURT:  And then you raised it?

21            MS. MORTAZAVI:  And then we raised it.

22            Now, your Honor, I want to make sure I put this on the

23    record.  I've had multiple conversations with defense counsel

24    about a principal basis of reducing that number.  The

25    government was always open to those conversations.  The

N367FisH

1    government was always open to discussing ways to modify it in a

2    way that could be satisfactory to the parties.  The only point

3    at which we received any sort of concrete evidence that the

4    government should make particular deductions was on Thursday,

5    four days ago.  And in response --

6              THE COURT:  Do you dispute them?

7              MS. MORTAZAVI:  Do I dispute the deductions?

8              THE COURT:  Yes.

9              MS. MORTAZAVI:  I do dispute a large number of

10   deductions.  As I pointed out in the submission that we

11   submitted yesterday, there are some that we do credit based on

12   our own fact-checking of the mathematical calculations.  So

13   we've proposed to your Honor a modified order of forfeiture

14   based on deductions that we found to be valid, again, in an

15   attempt to narrow the areas of disagreements between the

16   parties.

17             Your Honor, I'm attempting to find a copy of my letter

18   because I know that we set forth the number in that filing, but

19   I'm happy to keep discussing until that point.

20             THE COURT:  Why don't we just pause for one minute.

21   You try to find it and I'm pulling up it myself.

22             MS. MORTAZAVI:  Your Honor, I believe I've located it.

23             So looking at page 2 of the government's filing -- I'm

24   happy to pause if the Court would like to locate it.

25             THE COURT:  No.  I have it.  You're talking about

N367FisH

1    reducing it to basically $14,516,712.25.

2        MS. MORTAZAVI:  That's right.  And that's based on all

3    the items that the defendant, in his declaration, identified as

4    nondrug items and the government's own fact-checking of those

5    claims to determine what was in fact a nonadulterated and

6    misbranded drug.  We calculated those totals.  We then included

7    the deductions.  We also deducted shipping charges based on our

8    own, again, methodology of trying to approximate what the

9    shipping charges would have been based on the shipping invoices

10   that were available to us.

11       THE COURT:  Before you go to that -- if I'm drifting

12   into what you want to cover in the evidentiary portion you can

13   tell me that and I'll put the question aside, but let me just

14   back you up to say you've deducted nonadulterated,

15   non-misbranded drugs.  Have you deducted the cost of syringes,

16   for example?

17       MS. MORTAZAVI:  Yes, your Honor.

18       THE COURT:  Have you deducted the cost of bandages?

19       MS. MORTAZAVI:  Yes.

20       THE COURT:  Fluids?

21       MS. MORTAZAVI:  Fluids that do require prescription we

22   did not deduct.  If there were fluids that did not require a

23   prescription, we did deduct those.

24       THE COURT:  Okay.

25       MS. MORTAZAVI:  And our analysis is set forth in

N367FisH

1    Exhibit A to the declaration that I submitted.

2              THE COURT:  I know.  Let me just finish my list.

3              MS. MORTAZAVI:  Certainly.

4              THE COURT:  Tubes?

5              MS. MORTAZAVI:  I don't know if tubes were

6    specifically enumerated, your Honor.  We had a list in

7    footnote 3 of certain specified items.

8              THE COURT:  All right.  Are we getting into the

9    nature -- more of what your evidence is?

10             MS. MORTAZAVI:  I'm happy to shift to that, unless the

11   Court --

12             THE COURT:  No, no.  I want to be clear on the

13   categories because it did occur to me that there are large

14   categories of things that clearly were not adulterated or

15   misbranded, and yet I wondered, were you going to argue to me

16   that these were things that were used to facilitate the

17   administration of these drugs to horses outside of a

18   doctor-patient relationship and, therefore, they did fall

19   within the statute.  But you've just told me you're not seeking

20   the value of anything used to facilitate the criminal conduct.

21   So all of those things, it seems to me, are properly

22   excludable.

23             MS. MORTAZAVI:  And how we quantified that, your

24   Honor, was by going through the declaration to everything that

25   the defendant identified, going to the exhibits and the summary

N367FisH

1    charts that the defendants applied, finding those items --

2              THE COURT:  And you come up with roughly 1 percent,

3    right?

4              MS. MORTAZAVI:  No, that's not correct.  To clarify,

5    the one percent was shipping charges --

6              THE COURT:  Okay.

7              MS. MORTAZAVI:  -- that the government proposed based

8    on looking at invoices and calculating what appeared to be the

9    approximate value of the shipping charges.

10             THE COURT:  Isn't it a reasonable thing for me to do,

11   based on whatever evidence you've all given me, to try to come

12   up with some percentage of whatever Equestology sold that

13   represents nonadulterated, non-misbranded drugs?

14             MS. MORTAZAVI:  Because there is no magic to the

15   methodology, the Court can do that.  The government, however,

16   has itemized those items.

17             As I was about to say before clarifying the 1 percent

18   figure, the government went through everything the defendant

19   declared was not an adulterated and misbranded drug, researched

20   them for the ones that were drugs requiring a prescription or

21   drugs that were not approved, we did not include those in our

22   calculations.

23             THE COURT:  But you didn't go through invoices?

24             MS. MORTAZAVI:  We did not have invoices available for

25   each of these transactions.

N367FisH

1          THE COURT:  All right.  Well, I want you to talk to me

2     about that issue, too, because this question about Avimark

3     obviously bears on all of this, and I don't have a clear

4     understanding, frankly, about that.

5          Mr. Kessler can explain it to me more, but it's my

6     understanding that this was attained from Lisa Giannelli while

7     she's in prison and was never produced during the course of

8     discovery in this case.

9          Is that correct?

10          MS. MORTAZAVI:  My understanding, your Honor, the

11     Avimark data was never produced by the government in discovery

12     because the government never obtained the Avimark --

13          THE COURT:  No.  My question -- okay.

14          MS. MORTAZAVI:  And so it apparently seems that,

15     beginning in July 2022, shortly after Seth Fishman's

16     sentencing, Lisa Giannelli began running reports on the Avimark

17     system.  She had previously represented to the government that

18     she did not have access to the Avimark system.

19          THE COURT:  So what am I supposed to make of that, her

20     representation to you?

21          MS. MORTAZAVI:  I think that goes to the reliability

22     of the materials that are being submitted to the Court.  I

23     think that also goes to the reliability of other

24     representations that the defense has made in asking this Court

25     to make further deductions.  And we have a lot to say, your

N367FisH

1    Honor, about the credibility and reliability of the defendant's

2    declaration.

3         THE COURT:  That's a different issue that I'll talk

4    about in a minute.

5         I mean, I will just say for the record some of

6    Dr. Fishman's affidavit is more in the nature of argument.  For

7    example, the first paragraph about whether there has or hasn't

8    been a waiver, that's not a factual statement, that's on

9    conclusions of law on legal argument.  But in any event, I will

10   also say it is the Court's view that questions about the

11   applicability of the export exemption and about the existence

12   of a doctor- or veterinarian-patient-relationship were fully

13   presented at trial and rejected by the jury and are not proper

14   subjects for the affidavit, but that's not really what we were

15   talking about.

16        I mean, I really have a serious issue here with

17   respect to this Avimark documentation.  I will tell you,

18   Ms. Mortazavi, that I think starting with revenue is really not

19   a reasonable starting point.  I think, as I said before, an

20   appropriate -- and I'm talking out loud while I'm thinking.

21   This is not my final ruling.  It's going to take me some time,

22   in light of all the materials that you've all deposited with

23   the Court, for me to go back and try to sort through all of

24   this.  But it does seem to me that a far more reasonable way to

25   begin is to value -- since you have said all you're seeking is

N367FisH

1   the value of adulterated and misbranded drugs that were

2   dissipated, to figure out a value of them, not to start from

3   revenue and then make deductions, but that's where you started.

4   So let's finish talking about categories you've deducted and

5   then I want to is circle back to this Avimark system, because

6   it does seem to me that some of the information from Avimark is

7   among the more helpful evidence that's available.

8           MS. MORTAZAVI:  Your Honor, I don't disagree that the

9   Avimark data in some ways informs the inquiry.  The issue is

10  that the defense has been running or -- either directing Lisa

11  Giannelli or she, of her own accord, have been running these

12  reports since July.  They were never produced to the

13  government.

14          THE COURT:  Is there a burden a defendant to produce

15  to the government?

16          MS. MORTAZAVI:  Under Rule 16, there is a reciprocal

17  disclosure obligation.  And the government, when we were

18  preparing our joint submission to the Court in December,

19  specifically asked for the defense to provide any materials on

20  which they were basing deductions.

21          THE COURT:  You mean in connection with this

22  forfeiture matter?

23          MS. MORTAZAVI:  Correct.

24          THE COURT:  Okay.

25          MS. MORTAZAVI:  We only received these materials

N367FisH

1  Thursday, the entirety of the materials.  And so the government

2  has had four days to digest the data.  And the government is

3  also in a position where -- Giannelli apparently turned over

4  all these materials shortly before she was incarcerated.  The

5  government no longer has access to the initial source data, so

6  the government is prevented from subpoenaing Lisa Giannelli,

7  for example, to obtain further searches into the Avimark data

8  of its own accord.

9          THE COURT:  Okay.  Here's another question I have for

10  you.  Just give me one second.

11          Where is Ms. Giannelli serving her sentence; do you

12  know?

13          MS. MORTAZAVI:  I don't, your Honor.

14          THE COURT:  Do you know, Mr. Kessler?

15          MS. MORTAZAVI:  I do not, no, your Honor.

16          THE COURT:  Dr. Fishman, do you know?  Obviously,

17  someone has been in touch with her.

18          THE DEFENDANT:  I have not spoken to Ms. Giannelli

19  since I saw her with -- she was represented when we were not

20  even severed yet.  I did not speak to her ever again.

21          THE COURT:  Okay.  Somebody did.

22          Mr. Kessler.

23          MR. KESSLER:  Yes, your Honor.

24          THE COURT:  So how, did you communicate with her?

25          MR. KESSLER:  By a fluke, actually.  We were able to

N367FisH

 1    get Ms. Giannelli's attorney, after many calls, to agree if

 2    Ms. Giannelli wanted to talk to us then to call me.  I spoke

 3    with her.

 4              THE COURT:  You spoke with Ms. Giannelli herself, not

 5    her lawyer?

 6              MR. KESSLER:  Yes, that's correct.

 7              THE COURT:  Okay.

 8              MR. KESSLER:  We got the permission from her counsel

 9    to speak with her.

10              THE COURT:  Without him on the phone?

11              MR. KESSLER:  Without him on the phone.  I was a

12    little surprised myself.

13              Ms. Giannelli spoke with me.  And I requested -- I

14    told her the situation.  She seemed to be up to speed with the

15    forfeiture issues in her case, I guess, and understood that

16    there was something relating to Dr. Fishman as well.  I asked

17    if there was any documentation that she had that might be

18    helpful.  And this is what she told me, your Honor.  She told

19    me that when her home was raided by the agents they seized her

20    computer, and one of the agents said, What is this particular

21    system?  Ms. Giannelli informed him -- I shouldn't say him—I

22    don't know if it was a male or female agent—but informed the

23    agent.  And the agent indicated to Ms. Giannelli that if she

24    did not tell him how to use the system and teach him how the

25    use the system that they were going to charge her with

N367FisH

1    additional crimes and ask for additional time.

2            So Ms. Giannelli complied and told the agent or

3    agents—and I'm not clear on this—how to use the system.  The

4    agents took all of the computer equipment.  And then, according

5    to Ms. Giannelli—obviously this is all according to

6    Ms. Giannelli—she found, shortly thereafter -- I guess it had

7    fallen behind a desk, but it was a backup that she had made of

8    not all of the Avimark data but some of the Avimark data which

9    she had.  I said, Does that mean that there's some material

10   there that could be helpful that you could get?  She said, I

11   will look and I will see.  And before she was incarcerated,

12   which I believe was beginning of January, she sent me primarily

13   the material that your Honor has seen.

14           THE COURT:  So you've had it since January?

15           MR. KESSLER:  I have had a -- I mean, the material

16   that you have, your Honor -- and again, I apologies for the

17   volume, but the material that you have is only part.  We

18   have -- as Ms. Mortazavi seemed to be upset that we did not

19   include items that were clearly not going to fall within what

20   we were discussing, what we were arguing in our papers, we did

21   not include those items.  But we had to go through to see, and

22   to talk then with Dr. Fishman, to go down with Dr. Fishman --

23   we had to hire on attorney to go down and show Dr. Fishman the

24   documentation.  I am not complaining about that at the moment,

25   I am saying that before we were going to use any of this

N367FisH

1     information we had to understand what it was as well.  But at

2     no point and at no time have I ever accessed the Avimark

3     system.  I have no idea how to access the Avimark system or to

4     use it.

5             THE COURT:  But you have a lot of information that you

6     haven't turned over to Ms. Mortazavi?

7             MR. KESSLER:  I don't think that would be a fair

8     statement.

9             THE COURT:  You have information that you haven't

10    turned over to Ms. Mortazavi?

11            MR. KESSLER:  I did turn over, that your Honor did not

12    get, to Ms. Mortazavi the spreadsheets.

13            So I'm sure you read Mr. Rubino's declaration and how

14    he transformed a PDF document into an Excel spreadsheet.  Not

15    having worked at KPMG as an auditor, mine was probably a little

16    more simplistic, but we tried to do the same.  And there were

17    issues, of course——if your Honor is aware of how this system

18    works——that don't actually mesh, so you have to go through the

19    files, take out lines, and adjust columns, and things like

20    that.  So it's a lot of intensive work in transforming the PDFs

21    that I got from Ms. Giannelli into workable spreadsheets.  I

22    have supplied those spreadsheets to Ms. Mortazavi, the ones

23    that we have.

24            THE COURT:  But not the backup data?

25            MR. KESSLER:  The backup data for the spreadsheets

N367FisH

1    that I sent she has, all of it.

2              THE COURT:  But she doesn't have what you eliminated.

3              So I mean the reason I'm harping on this is it seems

4    to me if the government wants to somehow use revenue but there

5    are other deductions that I want to talk to you about, too,

6    Ms. Mortazavi, before we conclude, that the only way I could

7    come up with a reasonable estimate of the value of drugs that

8    were dissipated is to figure out some percentage of what

9    Dr. Fishman acquired or sold, and then figure out what

10   percentage of that was adulterated and what percentage of it

11   wasn't.  But that means I need all of the data.

12             Now, apparently, the data doesn't exist for the

13   entirety of the conspiracy, so there needs to be some agreement

14   on a time period or I need to pick a time period and say I'm

15   going to use that as representative and extrapolate from there,

16   but these are the kinds of things you all should have done.

17             MR. KESSLER:  So we did supply, your Honor, and you

18   have it——and I really thank you for not asking me to print it

19   out——the journal, transaction journal, which is SFX 1800.  It's

20   5,007 and pages.

21             THE COURT:  I know.  That's what I'm saying to you.

22   So you don't want to print it out, but I'm supposed to look on

23   a computer at 5,000 pages and extrapolate a percentage?

24             MR. KESSLER:  No.  What I'm --

25             THE COURT:  No.  I should just accept your word for

N367FisH

1    it?

2            MR. KESSLER:  No, your Honor.  That's not what I'm

3    saying.

4            What I'm saying is we have provided that to the

5    government.  So all of that information from 2009 to 2019 -- I

6    think it actually goes to 2020.  But whatever it is—I think

7    it's 2019—they have.  They have all of the information,

8    including material—and this is my guess—that I don't have in

9    PDF format, because the transaction journal covers every

10   transaction with a caveat, your Honor.  These were domestic.

11   These went through Ms. Giannelli, so they do not include the

12   foreign sales, the exports as well.

13           THE COURT:  So if I reject your argument on that, that

14   all needs to be added in?

15           MR. KESSLER:  So there's a limitation on it.  But

16   given that limitation, it is all of the domestic product that

17   was sold.  That is everything from a needle, to vitamin C, to

18   any of the other drugs that are involved.  So everything is

19   included in the transactions, your Honor.

20           THE COURT:  What is the exhibit number again?

21           MR. KESSLER:  SFX 1800.

22           THE COURT:  All right.  Let me finish my conversation

23   with Ms. Mortazavi if you would, please.

24           Ms. Mortazavi, another category, frankly, about which

25   I have grave concerns—and this relates to Ms. Giannelli as

1    well——is have you deducted out from Equestology totals whatever

2    was imposed as forfeiture on Ms. Giannelli.  And if not, is

3    Ms. Giannelli's forfeiture subject to some of these same

4    issues?

5            MS. MORTAZAVI:  So I'll address that question, your

6    Honor, and then I have some responses to what defense just

7    said.

8            THE COURT:  Yes.  And I have more questions for you.

9            MS. MORTAZAVI:  Okay.  With respect to Ms. Giannelli's

10    forfeiture figure of 900,000, the Court does not need to

11    revisit that because it was on consent by the parties.  And

12    because she was operating under the supervision of Seth

13    Fishman, that $900,000 portion will be joint and several

14    between Seth Fishman and Lisa Giannelli.

15            THE COURT:  I told you at Ms. Giannelli's sentencing

16    that I reject the idea that forfeiture should be joint and

17    several.

18            MS. MORTAZAVI:  I understood——I apologize, your

19    Honor——that you had said that because Lisa Giannelli was Seth

20    Fishman's employee, not because she had exclusive control over

21    the drugs that she sold.  She bought them under his supervision

22    using his vet license.  He paid her.  They were joint account

23    holders.  He was undoubtedly the owner and operator of

24    Equestology.  The parties have said that throughout this case.

25    So under *Honeycutt*, it is entirely consistent to have the

1   leader of a conspiracy responsible for what his underlings did

2   under his supervision.  And in that sense, the $900,000 is

3   appropriately attributed to Seth Fishman, but it will be joint

4   and several with Lisa Giannelli.

5        THE COURT:  All right.  So first of all, your

6   understanding is that that 900,000 is on consent and is not

7   part of the appeal that's been filed by Ms. Giannelli?

8        MS. MORTAZAVI:  The parties -- at sentencing, the

9   government had proposed the $13 million figure.

10        THE COURT:  Yes.

11        MS. MORTAZAVI:  And the defense conferred with the

12   government, said 900,000 is all she actually retained as her

13   salary.  And so the parties agreed that $900,000 was the

14   appropriate number.  I don't know what issues Ms. Giannelli is

15   going to raise on appeal, but that was certainly on consent.

16   So there's no reason for this Court to have to revisit that

17   number.  It was predicated on her salary and what she

18   personally obtained.

19        Seth Fishman, as her boss and the owner of

20   Equestology, had constructive control of all of the funds that

21   came in, all the revenue for those drugs.  They were deposited

22   into joint bank accounts.  His name was on those bank accounts.

23   Giannelli is responsible for whatever was siphoned off as her

24   salary, but it is undoubtedly the case that Seth Fishman

25   controlled the money when it hit his bank account.

N367FisH

1          Now, to respond to what the defense just said, with

2    respect to SFX 1800, it is an unusable document, your Honor.

3    It is a PDF that needs to be manually searched.  It lists

4    transaction by transaction, every sale for approximately a

5    decade.

6          THE COURT:  What are the years covered?

7          MS. MORTAZAVI:  2009 I believe to 2019.

8          MR. KESSLER:  I believe that's right, yes, your Honor.

9          THE COURT:  Okay.

10          MS. MORTAZAVI:  So that's the approximate end date.

11    So it's a decade worth of transactions, again, not grouped by

12    drug, not grouped by customer, but chronologically as these

13    sales happened.

14          Now, while Mr. Kessler had access to the initial

15    source data that Ms. Giannelli obtained——and thus she could

16    search it and she could run reports——that was not made

17    available to the government, even though it apparently exists

18    on a disc that could have been produced.  And so for

19    Mr. Kessler to say that the government has to sit there and

20    manually search every single time a drug was sold in order to

21    reach its calculation is simply unreasonable.

22          THE COURT:  All right.  But even if you're correct

23    about all that——and I want to talk later about what do we do

24    about all this——there are still other categories of things.

25          So, for example, why are you not deducting all the

N367FisH

1    costs that Dr. Fishman or Equestology paid for what it

2    acquired?  You're using their revenue.

3        MS. MORTAZAVI:  That's right, your Honor.  And the

4    reason for that is because it goes back to the forfeiture

5    statute and the basis for forfeiture.  We're authorized to seek

6    forfeiture for the value of the adulterated and misbranded

7    drug.  There's no offset for costs.  There's no net proceeds,

8    which is what the defense refers to in their filing last night.

9    There's no contemplated deduction.

10        Now, in a separate context where forfeiture is based

11   on proceeds, which is not what's happening here——the government

12   is not seeking proceeds, it's seeking the drugs themselves,

13   their value——where it is based on proceeds, where the entirety

14   of the business is illegal, then the government is entitled to

15   collect gross proceeds, not net proceeds.  And we have

16   established throughout this trial that Seth Fishman was not a

17   veterinarian who occasionally sold adulterated and misbranded

18   drugs.  He operated basically a pharmaceutical manufacturing

19   company and a drug destruction company for which he shielded

20   his activities by saying that he was a veterinarian.  The

21   government has established that Equestology, and Equisigns, and

22   SPC, and various other brands that the defendant operated under

23   were all illegal, and they were all devoted to the manufacture

24   and distribution of adulterated and misbranded drugs.  So even

25   if we were proceeding on a proceeds theory——which, again, we

N367FisH

1    are not——we would still be entitled to gross proceeds.

2              However, because the statute attaches to the value of

3    the adulterated and misbranded drugs, the government is

4    entitled to collect on the value of that drugs.  And the best

5    way to peg the value, and the reason the government has looked

6    to revenue, is because the sale of a drug is the best

7    reflection of its value.

8              Now, to go back again to another point that we were

9    raising early are, the Court questioned why the government is

10   starting with the top number and then making deductions, and

11   it's because previously the government didn't have access to

12   the Avimark data.  And now the defense has not provided reports

13   as to drug sales that were recorded in the Avimark data.  So

14   the government cannot start form --

15             THE COURT:  But wait.  I thought you told me the

16   Avimark data is transaction by transaction.  So wouldn't that

17   reflect sales?

18             MS. MORTAZAVI:  If the government searches it manually

19   through SFX 1800.

20             THE COURT:  I know.  I said we'll talk in a minute

21   about if we can get there where you can get it in electronic

22   format.

23             MS. MORTAZAVI:  Well, the reason we don't need to

24   delay and continue this hearing for that purpose, your Honor,

25   is because the government is prepared to proceed in a different

N367FisH

1    way.  If the Court does not want to start with the deposits,

2    which is a starting point for the government, what we could

3    start with is the Avimark revenue, that's the $11 million

4    figure.  I have the exact portion here, $11,489,667.50.  We

5    could start with that.  And then, as the Court noted, based on

6    the rulings that are made today, we would add in foreign sales

7    from the bank records.  We would add in foreign sales from the

8    invoices.  We would add in the Panamanian bank accounts.  We

9    would deduct all of the nondrug items based on what the

10    government has identified, which is detailed in Exhibit 8 to my

11    declaration, which amounts to $9,067.17—and that reflects

12    charges for blood work, for syringes, for materials related to

13    IV drips, the actual mechanical material themselves, and

14    various other categories all enumerated in Seth Fishman's

15    declaration.  We would then get a total of approximately $15.8

16    million.  We would have to add on to that the sales to Jorge

17    Navarro, based on the exhibits the government submitted to the

18    Court, which is roughly $85,565.

19            THE COURT:  Why isn't the Navarro stuff covered in the

20    Avimark?

21            MS. MORTAZAVI:  Because Giannelli did not sell to

22    Navarro.

23            THE COURT:  I see.  Okay.

24            MS. MORTAZAVI:  And the Avimark data in general is

25    going to be under-inclusive for that fact, your Honor.  We know

1   that Jamen Davidovich, for example, and Adrienne Hall both

2   received BBC from Seth Fishman.  They're certainly not the only

3   ones over the course of 10 years, 20 years who've received

4   drugs directly from him.  The Avimark data isn't going to

5   capture that.  But if the Court prefers to proceed in this

6   manner, we're happy to go with the total sales from the Avimark

7   system and then layer in the categories of transactions that we

8   know are not captured in that system, such as foreign sales,

9   foreign bank accounts, and the sales to Jorge Navarro.

10          THE COURT:  Where are you going to get that from?

11          MS. MORTAZAVI:  The sales of Jorge Navarro are

12   detained in the Rubino declaration.  We looked at bank deposits

13   from JN Racing Stables.

14          THE COURT:  Yes, I recall you have that in there.

15   Where are you going to get the foreign sales?  The Panamanian

16   bank account, I know that can be quantified.

17          MS. MORTAZAVI:  The foreign sales are quantified based

18   on two things, your Honor.  Invoices, which we provided as

19   exhibits, there are four of them, and they are not captured in

20   the bank deposits.  And then we have separately gone through

21   the bank deposits and looked for any deposits that appear to be

22   from a foreign international wire transfer and quantified it.

23   The parties and roughly have the same number.

24          THE COURT:  Which is what?

25          MS. MORTAZAVI:  Approximately $2.7 million.  That's

N367FisH

1    enumerated in the defendant's declaration, so there really is

2    no dispute.

3            THE COURT:  What's the value of the Panamanian bank

4    accounts?

5            MS. MORTAZAVI:  $2.2 million.

6            THE COURT:  So instead, you're telling me, start with

7    Avimark, which is about 11 and a half million, and add back in

8    2.74 foreign sales, and add back in 2.2 for the Panamanian bank

9    accounts.  So we're getting roughly back to the same 15 million

10   in revenue, which is where you started, which underscores to me

11   some of the unreliability with what you're doing.

12           MS. MORTAZAVI:  Well, in fact, your Honor, I think it

13   might be the opposite.  Because the government has approached

14   this by looking at bank deposits.  The Avimark system as a

15   starting point looks at sales.

16           THE COURT:  Right.  And sales you just said was the

17   best indicator of value.

18           MS. MORTAZAVI:  Correct.

19           And so the fact that we are starting with the Avimark

20   system and still getting to roughly the same number as we get

21   when we start with the bank deposits means that either

22   methodology is going to be reliable because we have

23   cross-referenced using different starting points --

24           THE COURT:  Maybe.

25           MS. MORTAZAVI:  -- and we end up at roughly the same

1    number.

2              THE COURT:  Maybe.

3              MS. MORTAZAVI:  Again, in both scenarios, whether we

4    start with the government's number or whether we start with the

5    Avimark total, which is the alternative proposal, we would

6    still have the deductions that the Court contemplates,

7    deductions for blood work, syringes, nondrug items, physical

8    items related to IV drips.  Again, your Honor, we have looked

9    at the declaration, researched every item that the defendant

10   identifies as a nondrug item and removed them from our total

11   based on what we could validate.

12             THE COURT:  Looking at Avimark or some other way?

13             MS. MORTAZAVI:  Looking at Avimark.  Looking at the

14   defendant's own summary charts.  We created our own summary

15   chart based on what the defense provided to us.

16             THE COURT:  And do you dispute where the defense came

17   out?

18             MS. MORTAZAVI:  We do in certain respects, because

19   their math is wrong.  We've corrected their math in the chart

20   that we appended as Exhibit A to my declaration.

21             THE COURT:  What kind of difference are we talking

22   about?

23             MS. MORTAZAVI:  I'll qualify this by saying we were

24   only able to check the number of days that we believe should be

25   deducted because of the volume and the timing of what was

1  produced to us.  Based on what we agree should be deductions,

2  we saw there was an overstatement of approximately $118,000.

3              THE COURT:  Okay.

4              MS. MORTAZAVI:  Nonetheless, the government started as

5  a starting point with the summary charts provided by the

6  defendant that were marked as Defendant's Exhibit 200, 300,

7  400, etc., compiled them, looked at the declaration, identified

8  every single item and category that the defendant said was

9  nondrug, researched each one.  Where we agreed that it was a

10  nondrug item, we created a running total of deductions that we

11  would consent to.  We think that is a reasonable approach to

12  removing from the Avimark sales records or from the bank

13  deposits any nondrug item.  And so ultimately what you are left

14  with are the value of the adulterated and misbranded drugs.

15  And whether you start with sales or whether you start with

16  deposits you end up in roughly the same place means that,

17  whether you begin with the defendant's starting point or the

18  government's starting point, you will end up with a reasonable

19  approximation of what the value of these drugs are.

20              THE COURT:  Okay.  Anything else you want to tell me?

21              MS. MORTAZAVI:  Not at this time, your Honor.  I'm

22  happy to respond to any questions.

23              THE COURT:  All right.  Let me hear from -- as you've

24  no doubt noticed, my style is I ask the questions as you're

25  going along.  It's just better for me to get your reaction on

N367FisH

 1    the spot.  So I don't have any additional questions, but I may

 2    after I hear from Mr. Kessler.

 3              MS. MORTAZAVI:  Thank you, your Honor.

 4              THE COURT:  All right.

 5              Mr. Kessler.

 6              MR. KESSLER:  Not sure where to start, your Honor, but

 7    there are a couple things.

 8              THE COURT:  That's why they pay you the big bucks.

 9              MR. KESSLER:  I'm not sure about that.  But let's

10    start with this.

11              I've practiced for a while and I've never actually

12    heard counsel bring negotiations in front of the Court.  But

13    Ms. Mortazavi did, so I'm going to have to respond to that.

14              The discussion that Ms. Mortazavi is referring to --

15              THE COURT:  Let me just -- I'm going to let you say

16    what you want to say, but I want to interrupt you to tell you

17    this.  I don't really care about the back-and-forth.  I mean,

18    frankly, at sentencing Mr. Sercarz said he wanted to try to

19    talk to see if you could resolve things.  I don't care that you

20    talked to each other.  Frankly, I wish you would have talked

21    more to each other and found a way to work this out.  I'll tell

22    you I think both sides' positions are unreasonable.  That's

23    where my head is at right now.  So you can say what you want,

24    but you should know that.

25              MR. KESSLER:  You know what, let's talk about the

1    case.  My point, your Honor, is that Ms. Mortazavi has never

2    gotten back to us since my phone call, and that was in

3    November.

4          Putting that aside, let's talk about the case.  This

5    is a forfeiture case.  We're here not on the criminal case, but

6    on the forfeiture piece of it.  And the forfeiture piece is

7    typically very simple and very straightforward.

8          THE COURT:  Nothing about this case has been simple or

9    straightforward.

10         MR. KESSLER:  There are two questions.  One is, what's

11   the statute under which forfeiture is permitted, because

12   forfeiture is only statutory.  That's why the first part of the

13   discussion with Ms. Mortazavi was talking about the statutes,

14   your Honor.  And then the question is, based on the violation

15   of the statute——it's math——how much?

16         THE COURT:  Correct.  So before we get to the statute,

17   in my mind there still is a preliminary question, which is:

18   How do you address the fact that the PSR set forth a forfeiture

19   amount?  In none of the objections to Probation was there a

20   word about that amount.  I spent over an hour at sentencing

21   going through every single objection and not a word was spoken

22   about the forfeiture amount.  We then turned to the preliminary

23   order of forfeiture.  Not a word was said objecting legally to

24   the availability of forfeiture.  The only comment was about the

25   amount.  So why shouldn't that be all that remains on the

N367FisH

 1    table?

 2                MR. KESSLER:  For --

 3                THE COURT:  And why aren't you precluded, frankly,

 4    given there were no objections to the PSR?

 5                MR. KESSLER:  Three reasons your Honor:

 6                First, as Dr. Fishman put in his declaration, I think

 7    it's paragraph 4, I never agreed to any forfeiture, I never

 8    agreed to waive --

 9                THE COURT:  He never objected to it.  It was in the

10    PSR and I asked repeatedly at the sentencing whether he had

11    reviewed the PSR with his counsel, whether there were any

12    objections.  I went through although objections.  And then I

13    asked, "Are there any last minute belated objections?"

14                MR. KESSLER:  And I believe --

15                THE COURT:  Never was it raised.  And then he sat

16    there while I spoke with Mr. Sercarz and Mr. Fernich and

17    they -- we almost were at the point of my signing the order and

18    finally somebody said, Well, I'm not sure I can agree today to

19    the amount, but I'm sure if I talk to Ms. Mortazavi we can work

20    this out.  And now here we are, six, seven, however many months

21    later dealing with a massive volume of materials.

22                MR. KESSLER:  I know Dr. Fishman has indicated to the

23    Court—and I will not go through this anymore—regarding the

24    length of time that he was able to discuss the forfeiture issue

25    with Mr. Sercarz.

N367FisH

1          THE COURT:  So maybe he has a claim against his

2    lawyer.  I don't know.

3          MR. KESSLER:  But putting that aside, your Honor,

4    there are two legal issues.

5          First, as we indicated, subject matter jurisdiction

6    cannot be waived.

7          THE COURT:  How does this go to subject matter

8    jurisdiction?

9          MR. KESSLER:  It goes to subject matter jurisdiction

10   because, among the objections, the proposed forfeiture here

11   expands upon the jurisdiction of the statute that the

12   government is using for purposes of forfeiture.

13         THE COURT:  But that doesn't go to subject matter

14   jurisdiction.  That goes to is it an available remedy, but it

15   doesn't go to my jurisdiction to hear this dispute which is

16   what a subject matter jurisdiction is about.

17         MR. KESSLER:  It goes to your power to make a decision

18   based on what a statute does and does not say.  My

19   understanding is that is subject matter jurisdiction.

20         THE COURT:  Okay.

21         MR. KESSLER:  But more importantly, your Honor,

22   there's the Constitution and there's the Fifth Amendment.  The

23   Due Process Clause indicates that there cannot be a thing as an

24   illegal sentence.  Forfeiture is still a part of the sentencing

25   process.  And under the Due Process Clause, it prohibits the

N367FisH

1    entry of an illegal sentence.

2                THE COURT:  Yes.  So if you're correct and I enter a

3    forfeiture order in the amount you're talking about, then you

4    have an appeal, but that doesn't mean I didn't have

5    jurisdiction in the first place.

6                MR. KESSLER:  No.  Those are two separate.

7                THE COURT:  Okay.

8                MR. KESSLER:  I'm sorry, your Honor.  I'm making two

9    separate points.

10               THE COURT:  Okay.

11               MR. KESSLER:  But my point is——and I guess that's

12   true——we are here and we are discussing it.  But if in fact it

13   is an illegal sentence, according to the Fifth Amendment, I

14   think we would all prefer that it not go up on appeal.

15               THE COURT:  Correct.

16               MR. KESSLER:  And then come back down.

17               THE COURT:  Correct.

18               MR. KESSLER:  So my point is that under any of these

19   theories I believe that there has been no waiver, but pick

20   whichever one.  And I believe that this issue is still ripe,

21   certainly, for now——we are talking about it——and, of course,

22   for appeal if it goes up on appeal.

23               THE COURT:  Okay.  I mean, look, the government has

24   said they think the more prudent course is to deal with the

25   amount, and I will say I don't disagree with that.  I will say

N367FisH

 1  I do think there was a waiver -- not a waiver, a forfeiture of

 2  the right to rehash this.  And I think this has been abusive.

 3  But as I said, that's between Dr. Fishman and his other

 4  lawyers, and maybe you.  I don't know.  I mean, that's not the

 5  Court's concern.  I do think, though, the more prudent course

 6  is to talk about the amount.

 7           MR. KESSLER:  I will, if I may, just refer your Honor

 8  to one thing you said at sentencing.  It's on page 92, lines

 9  11-16.

10           THE COURT:  Give me one moment.

11           MR. KESSLER:  Yes.

12           THE COURT:  92?

13           MR. KESSLER:  Yes, your Honor.

14           THE COURT:  I'm just going to remind you it's never a

15  smart thing to throw a judge's words back in her face.

16           Go ahead.

17           MR. KESSLER:  "As we've discussed, this will be a

18  preliminary order of forfeiture.  The defense will have 30 days

19  from entry of the judgment filing any application to modify the

20  order or to advise the Court that you aren't consenting to the

21  order.  If I don't hear from the defense by then, the order

22  will become a final order of forfeiture."

23           THE COURT:  Yes, you can't take that out of context

24  from everything that happened on pages 16, 17, and 18.

25           MR. KESSLER:  I am not.

N367FisH

1          THE COURT:  You most certainly are.

2          MR. KESSLER:  No.  All I'm saying, your Honor, is that

3    you gave us the opportunity, which we took --

4          THE COURT:  So object to the amount.

5          MR. KESSLER:  To object to the forfeiture.

6          THE COURT:  No.

7          MR. KESSLER:  And the fact that Mr. --

8          THE COURT:  I categorically reject that, Mr. Kessler.

9    You weren't there.

10          MR. KESSLER:  Correct.

11          THE COURT:  But somebody once told me when I was in

12    private practice, when you're ahead, don't look back.  I just

13    said I don't disagree that the more prudent course is to talk

14    about the amount.  So for you to distort the record of what

15    happened at the sentencing when you weren't even present is

16    really not productive.

17          MR. KESSLER:  So let me go to the statutes, your

18    Honor.

19          THE COURT:  Yes.

20          MR. KESSLER:  There are literally hundreds of

21    forfeiture statutes on the books.  They're on the federal

22    level.  They're on the state level.  We're blessed in New York

23    to have 17 last counts in New York State.

24          THE COURT:  Who cares?  What does that have to do with

25    anything here?

1          MR. KESSLER:  What it has to do with that -- never in

2     my years, either as a prosecutor or now, have I come across a

3     prosecutor who has said that they are wanting for a statute to

4     use for a particular forfeiture.

5          THE COURT:  I don't think that's what she said.

6          MR. KESSLER:  But here --

7          THE COURT:  Mr. Kessler, why don't you make your

8     argument instead of trying to recharacterize what happened at

9     sentencing or what Ms. Mortazavi said.  I heard what she said.

10    We're going to have a transcript.  Just make your argument,

11    please.

12         MR. KESSLER:  I am, your Honor.

13         There is no statute here that permits forfeiture,

14    period.  There's no caveat to it.  It's a statement that has no

15    qualification.  There happened to be, despite the hundreds of

16    forfeiture statutes on the books, a particular category that it

17    seems that Congress decided not to include forfeiture as a

18    punishment for the violation of the statutes.  I term them the

19    "protect-the-public statutes."

20         THE COURT:  So let me just ask you, do you disagree

21    were the proposition I put out there when I was talking to

22    Ms. Mortazavi that I don't understand you to be challenging the

23    condemnation or the seizure of the drugs from Dr. Fishman?

24         Is that accurate?

25         MR. KESSLER:  That is absolutely correct.

N367FisH

1          THE COURT:  Okay.  So if that's --

2          MR. KESSLER:  Section 334.

3          THE COURT:  Right.  Okay.

4          MR. KESSLER:  The authorization for the government is

5     to seize and condemn the property.  It's taking it off the

6     shelf, right?  This is an FDCA violation.  That's the

7     punishment.  That's the authority.  It does not say --

8          THE COURT:  It's really not the punishment, but go

9     ahead.

10          MR. KESSLER:  That's the -- that's what happens in --

11     if someone violates one of the earlier provisions, that is the

12     punishment.  And in fact, your Honor, as I think you even

13     indicated, the title of 334 is "seizure."  That is what is

14     authorized.  It is the seizure of the products.

15          THE COURT:  And you dispute that case law and even

16     elsewhere in some of the other statutes that I discussed with

17     Ms. Mortazavi the word "forfeiture" is used interchangeably

18     with the words "condemnation" and "seizure."

19          MR. KESSLER:  Well, certainly we dispute that.

20          THE COURT:  You dispute that the cases use those

21     interchangeably?

22          MR. KESSLER:  No, your Honor, I don't dispute if a

23     case uses them interchangeably, I dispute that it matters.  And

24     here's why I say that.  Because when the statute that -- we do

25     two things.  First, we look at this particular statute.

N367FisH

1           THE COURT:  334.

2           MR. KESSLER:  331, 333, 334, yes.

3           THE COURT:  Okay.

4           MR. KESSLER:  In the FDCA.  And we see if there is any

5   forfeiture that is permitted.  This is civil.  So what if there

6   is civil forfeiture that is permitted?  The answer is no.  Now

7   that's just a regular reading.

8           THE COURT:  Aren't you playing a semantics game,

9   though?

10          MR. KESSLER:  No.

11          THE COURT:  You just told me that you don't dispute

12  that those drugs could be seized or condemned, and now you're

13  saying that's that that's not a forfeiture?

14          MR. KESSLER:  That's correct, your Honor.  In fact,

15  I'm the one who's not playing semantics here.

16          No.  Forfeiture means something to Congress.  There

17  are forfeiture statutes.  And in fact, if your Honor takes a

18  look, as we have -- I've never done this before, Judge, but in

19  our reply papers that were filed in October that Ms. Mortazavi

20  mentioned we cut and pasted the various sections of the

21  statutes that relate to civil forfeiture.  So the problem the

22  government has is that the federal forfeiture statutes are very

23  specific about the statutory violations that may constitute the

24  basis for civil forfeiture.  The general civil forfeiture

25  statute, 18, U.S.C., 981, sets forth an exhaustive list of

1    hundreds of statutes whose violations permit civil forfeiture,

2    either within in the body of the statute itself or through

3    incorporation by referencing other statutes, such as 18,

4    U.S.C., 981(c) or 18, U.S.C., 1967(c)(7), which further

5    includes hundreds of other statutes that could be deemed civil

6    forfeiture.  We go through all of that in the reply.  And after

7    looking at each one of those statutes, each one, what we find

8    is that the FDCA is not included.

9         I'm not here to discuss whether it's my belief that

10   under Webster's Dictionary forfeiture and condemnation are the

11   same, I'm talking about what the statutes say.  That's all

12   that's important here.  There is no civil forfeiture statute

13   that authorizes misbranding.

14        I will say this to the Court:  A couple of years ago

15   before COVID, I had a case down in Texas.  My client was

16   charged with 11 counts, she was acquitted of 10, and convicted

17   of misbranding.  Same here.  And the judge looked at the

18   parties, at the attorneys, after the case and said, So I guess

19   we're done with forfeiture.  That's because for a violation of

20   misbranding there can be no civil forfeiture.

21        THE COURT:  Did you cite that case in your materials

22   to me?

23        MR. KESSLER:  I'm happy to.

24        THE COURT:  No.  I said did you.  Is it in your

25   materials?

N367FisH

1              MR. KESSLER:  I don't believe so.

2              THE COURT:  So you want to tell me it?

3              MR. KESSLER:  I don't like to cite my own cases, but

4      it was *U.S. v. Gas Pipe* in the Northern District of Texas.

5              THE COURT:  In what year?

6              MR. KESSLER:  So if I said --

7              THE COURT:  I mean, ballpark.  Are we talking --

8              MR. KESSLER:  2019, 2018, end of 2018.

9              THE COURT:  Okay.

10             MR. KESSLER:  Right before COVID.

11             THE COURT:  Oh, okay.  You did say that.

12             MR. KESSLER:  So somewhere it would have to authorize

13     that a violation of 21, U.S.C., 331 is a specified unlawful

14     activity.

15             THE COURT:  Didn't the Second Circuit say that in *U.S.

16     against Eight Unlabeled Cases*, where it upheld -- or it said,

17     "adulterated cosmetics were forfeitable"—and I'm

18     quoting—pursuant to 21, U.S.C., Section 334(a) because they

19     were adulterated under the FDCA?

20             MR. KESSLER:  So I don't -- based on what you're

21     reading to me, your Honor—and I don't have the case in front

22     of me—that would make sense.  And again, we're now using the

23     different word for the same meaning.  So the Second Circuit is

24     saying that you can forfeit the drugs.  I am saying you can

25     seize the drugs or condemn the drugs.  Yes, that's what 334

N367FisH

1    says.

2              THE COURT:  So you're only challenging forfeiture with

3    respect to what was dissipated or sold?

4              MR. KESSLER:  No.

5              THE COURT:  What was not seized?

6              MR. KESSLER:  May I put it in the affirmative?

7              THE COURT:  Yes, sure.

8              MR. KESSLER:  So the government, under 334, has the

9    authority to seize product.  In this case, I understand there

10   were more than 25,000 bottles that were seized by the

11   government.  They haven't been condemned yet.  As far as I

12   know, there's been no proceeding to condemn them, but that was

13   seized from Ms. Giannelli and Dr. Fishman.  That is permitted

14   under Section 334, yes.

15             THE COURT:  Okay.

16             MR. KESSLER:  So if the Second Circuit wishes to use

17   forfeiting them, that's fine with me, but it is not a

18   forfeiture statute.  So the government may not forfeit the

19   proceeds or the value of an FDCA violation, and that's point

20   one.  And that is separate from what I am now about to say,

21   your Honor, because the government takes it to a little

22   different twist.  The government is using 28, U.S.C., 2461(c).

23             THE COURT:  Right.  You said they didn't cite any

24   statutes, but obviously they did.

25             MR. KESSLER:  No.  No, Judge.  I'm sorry.  So let me

N367FisH

1    go back.  If that's your question, then I haven't been clear.

2         THE COURT:  You're saying the statutes they cite don't

3    stand for what they contend they stand for, but she did point

4    to statutes is my only point.

5         MR. KESSLER:  Oh, yes, she pointed to statutes.  They

6    certainly don't say what Ms. Mortazavi says they said.

7         THE COURT:  Okay.

8         MR. KESSLER:  But yes, she did point to statutes.

9         THE COURT:  All I'm pointing is at is that you make

10   very broad, generalized statements that aren't always accurate.

11   But go ahead.

12        MR. KESSLER:  I hope that's not true, your Honor.  But

13   I will tell you that 334 -- and this is a broad statement that

14   is accurate.  There is no civil forfeiture statute in the

15   federal books --

16        THE COURT:  You said that and I heard you.  I heard

17   that.  So you're all going to order a transcript and give it to

18   me.  So if I didn't hear it the first time, I will read it

19   multiple times, I assure you.

20        MR. KESSLER:  So now the government takes the next

21   step.  They're saying that because the FDCA is a civil

22   forfeiture statute, that's a requirement, your Honor.

23        THE COURT:  So if you're wrong and 334 is a civil

24   forfeiture statute --

25        MR. KESSLER:  That's correct, if I am wrong.

N367FisH

1          THE COURT:  -- do you then concede that the government

2     is right and it can seek forfeiture for the dissipated drugs?

3          MR. KESSLER:  No.

4          THE COURT:  Okay.  Why?

5          MR. KESSLER:  Because the statute that they point

6     to—and thank you, this is my transition—28, U.S.C., 2461 is a

7     statute that actually was modified when CAFRA was passed in

8     2000, the Civil Asset Forfeiture Reform Act of 2000, it was

9     part of the amendment.  And when Congress amended 2461, it did

10    so under the title, "Section 16, Encouraging Use Of Criminal

11    Forfeiture As An Alternative To Civil Forfeiture."  And as your

12    Honor can see from the title, it was to permit criminal

13    forfeiture as an alternative only if the statute we were

14    dealing with was a civil forfeiture statute.

15         THE COURT:  Are you quoting from legislative history

16    as opposed to the statute?

17         MR. KESSLER:  Absolutely, yes.

18         THE COURT:  And titles?

19         MR. KESSLER:  Absolutely.

20         So CAFRA -- and I'm happy to do this, your Honor.

21    CAFRA was passed by a vote of approximately 395 to 35.

22    Shocking these days.  And the reason was because of the abuse

23    that was demonstrated and documented that the government was

24    abusing the civil forfeiture statutes.  So Congress wished to

25    have criminal forfeiture used which, according to Congress,

N367FisH

1    would have been a little more easier to control given that it

2    is in a criminal context and it is *in personam*, which is

3    against the defendant individually.

4            THE COURT:  So you agree with the government on that

5    point?

6            MR. KESSLER:  Oh, if you need cases, your Honor --

7            THE COURT:  No.  I'm just asking if you agree with the

8    government.  It's always helpful for me to say the parties

9    agree on this point.  That's all I'm asking.

10           MR. KESSLER:  I agree there's a difference between

11   *in rem* and *in personam* forfeiture, absolutely.

12           THE COURT:  Okay.

13           MR. KESSLER:  The cases are collected in either of my

14   two treatises.  So feel free to get thousands of cases on the

15   two, but yes, absolutely.

16           But what 2461 does, and the only thing 2461 does, is

17   to permit the government to do in a criminal forfeiture case

18   what they are permitted to do in a civil forfeiture case.  So

19   assuming for a moment to a fact, as you know, I do not agree

20   with that 331 is a civil forfeiture statute and 334 is the --

21   I'll call it the punishment section, or the punitive piece of

22   the statute, then in a criminal forfeiture case the only thing

23   the government can do by way of 2461 is what is authorized

24   under 334, what they call the civil forfeiture statute.

25           THE COURT:  Which you're saying is seizure.

N367FisH

1          MR. KESSLER:  And that is not I saying it, your Honor,

2     but the statute says it.

3          What is interesting, and I'm learning for the first

4     time now, is that the government is not seeking proceeds.  But

5     the reason why I guess we all thought that the government was

6     seeking proceeds is because, in criminal forfeiture cases,

7     typically under 21, U.S.C., 853, which is the general criminal

8     forfeiture statute, the remedy for the government with a

9     conviction and a criminal forfeiture crime is to seek the

10     proceeds of the criminal activity, the instrumentalities.

11          THE COURT:  That's why I asked the questions I asked.

12          MR. KESSLER:  Exactly.

13          So now we hear this isn't a proceeds case.  You know,

14     the expression is -- my little one would say, If it walks like

15     a duck, I don't know what it would be.  Ms. Mortazavi talks

16     about seeking the value of the New Animal Drugs dissipated by

17     Dr. Fishman.  I don't know what that means, the value of the

18     New Animal Drugs dissipated.  I know what proceeds are from the

19     sale of something.  And, of course, it has to be property that

20     is subject to forfeiture.  But if you have the property -- and

21     this is something that I'm not quite understanding with the

22     government's theory.  If you have the property—which they've

23     seized pursuant to 334—there is no proceeds from the sale of

24     that property.  That's our double counting --

25          THE COURT:  Obviously, there are proceeds of from the

N367FisH

1    sales of things that were sold prior to the date of the arrest.

2            MR. KESSLER:  There can be.  But there has to be proof

3    that those things and only those things are what we are seeking

4    the value for forfeiture.  And it is the government's burden to

5    show not that they are seeking the forfeiture of everything

6    that ever was deposited into a bank account, as your Honor made

7    clear, but specifically the value of -- in my case, I thought

8    it was proceeds, but here it is the value of these products.

9            Now, there's one thing that struck me, your Honor,

10   when I first took over this case from Mr. Sercarz.  The reason

11   why what we're doing here doesn't happen——I'm very sorry about

12   that, Judge——is because in virtually every other case that I'm

13   aware of that had misbranding there's another crime that's a

14   forfeitable crime, such as money laundering, bank fraud.

15           THE COURT:  You don't want to go there, I think.

16           MR. KESSLER:  I guess I don't.  But what I'm saying is

17   it is unusual that the crime is limited to one of these

18   protect-the-public crimes.

19           THE COURT:  The charged crime is limited.

20           MR. KESSLER:  The convicted crime.

21           THE COURT:  Yes.

22           MR. KESSLER:  It's not the charged crime, right?

23           THE COURT:  Well, it's both.

24           MR. KESSLER:  Well, in this case, it is.

25           THE COURT:  Yes.

N367FisH

1          MR. KESSLER:  But the only one we care about today is

2     what he was convicted of.

3          THE COURT:  Right.

4          MR. KESSLER:  So the question is if the government

5     were to bring a civil forfeiture statute, looking through all

6     the civil forfeiture codes, looking through all of them, under

7     what section would the government file a civil forfeiture case?

8     What statute?  Because it's not Section 334.

9          THE COURT:  No.  But we've agreed that if I determine

10    you're wrong about 334 then this prong of your argument falls

11    away.

12         MR. KESSLER:  It does to the extent that 2461 is

13    inapplicable.

14         THE COURT:  Applicable or inapplicable?

15         MR. KESSLER:  I'm sorry.  It does not apply.  So

16    you're correct, then 2461 would apply.

17         THE COURT:  Oh, it would apply?

18         MR. KESSLER:  Yes.

19         THE COURT:  Yes.  Okay.

20         MR. KESSLER:  But it would limit the criminal

21    forfeiture to only what is permitted under the civil forfeiture

22    statute.  And I do not know where the comment that

23    Ms. Mortazavi made that the courts have been misreading this

24    for 80 years comes from.

25         THE COURT:  I don't think that's what she said.

1          It's just not productive to do that.  Just make your

2     argument to me.

3          MR. KESSLER:  You know what, you're right, Judge.  My

4     apologies.

5          So it is our view, and I think it is the law, that

6     there can be no forfeiture under the FDCA.  I will say to your

7     Honor——I'm sure it's something you already know and have

8     thought of, but I will say it anyway——first of all, it doesn't

9     mean that Dr. Fishman is not convicted and incarcerated.  It

10    also doesn't mean that the Court doesn't have at its disposal

11    financial penalties, which your Honor has already used.  I

12    understand there are fines involved and, indeed, there's a

13    restitution judgment --

14         THE COURT:  Each of which served different purposes;

15    you know that.

16         MR. KESSLER:  I understand that, I do.  I understand

17    that.  But I am saying that -- well, also, yes, restitution and

18    forfeiture do serve different purposes and, in fact, as your

19    Honor knows, they talk about different things.  Forfeiture is

20    the ill-gotten gains of the defendant where restitution is the

21    loss of the victim.  So they are two separate --

22         THE COURT:  Yes.

23         By the way, you keep talking about punishment.  I

24    don't know that I agree with you that a forfeiture statute is a

25    punishment.  It's divesting you of ill-gotten gains.  I guess

N367FisH

1    you could call that a punishment, but we don't need to debate

2    that.

3         MR. KESSLER:  I just refer you to *U.S. v. Bajakajian*,

4    from the Supreme Court, and *U.S. v. Austin*, from the Supreme

5    Court, and *Honeycutt*, and all the cases that have followed from

6    the Supreme Court that say that forfeiture, whether it is civil

7    or criminal, is punitive.

8         THE COURT:  That's probably right.  Clearly, in the

9    amounts we're talking about here, it would be punitive.

10        MR. KESSLER:  It is part of punishment.

11        And just for the fun of it, Judge, in *Leonard v.*

12   *Texas*, Justice Thomas even mentioned that civil forfeiture is

13   unconstitutional in his mind and should be done away with

14   completely, but that is not what we're discussing here today.

15        THE COURT:  No, we're not.

16        MR. KESSLER:  So on the legal issue, I frankly don't

17   believe that -- I believe that the statutes and the cases

18   support me that there is no forfeiture against Dr. Fishman

19   under the facts that we have here.  I think that the expansion

20   that is attempted here under the various statutes, as we've

21   said in our filings and here today, is not permitted.  I think

22   it would be an illegal sentence to have a forfeiture in this

23   case, and I think that the courts and the statutes bare me out

24   on that.

25        THE COURT:  You're not referring to the drugs that

N367FisH

1    were seized at the time of the arrest, though, right?

2              MR. KESSLER:  No, Judge.

3              THE COURT:  Okay.  All right.  I just want to be

4    crystal clear.  We established that right at the outset, so --

5              MR. KESSLER:  I just want to qualify that, if I might.

6              The only reason I hesitated is because they have been

7    taken.  They are in the possession of the government, as far as

8    I know, but they have not yet been condemned.  So if there is a

9    question, would we consent to the condemnation of those drugs

10   as the punishment under 331, then I can answer that, but I

11   don't --

12             THE COURT:  No, that's not really before me today.

13             MR. KESSLER:  Okay.  And I didn't think it was.  So,

14   yes.

15             THE COURT:  All right.  Do you want to turn to the

16   amount?

17             MR. KESSLER:  I'm happy to address whatever your Honor

18   wishes.

19             THE COURT:  Well --

20             MR. KESSLER:  So.

21             THE COURT:  I told you before I'm not going to tell

22   you how to make your argument, but there was a lot of

23   discussion with Ms. Mortazavi --

24             MR. KESSLER:  But you also said you had questions.

25             THE COURT:  No.  I've been asking you as we go along.

N367FisH

| | |
|---|---|
| 1 | There was a lot of discussion with Ms. Mortazavi with |
| 2 | respect to the amount, so I would like to better understand.  I |
| 3 | am troubled by this whole Avimark thing.  Frankly, I am |
| 4 | sympathetic to the idea that it might be a more appropriate |
| 5 | starting point, but I am very troubled by the fact that it's in |
| 6 | possession of one side and not the other. |
| 7 | What do we do about that? |
| 8 | MR. KESSLER:  This is my thought.  So that it's clear, |
| 9 | your Honor, what I am saying to you is based on my conversation |
| 10 | with Ms. Giannelli.  I told you how the Avimark system was |
| 11 | taken from her and what transpired. |
| 12 | THE COURT:  According to her. |
| 13 | MR. KESSLER:  Yes.  Again, my qualification is -- |
| 14 | THE COURT:  Yes. |
| 15 | SPEAKER4:  -- I wasn't there, and I don't think |
| 16 | anybody here was there. |
| 17 | THE COURT:  Well, I think some people might have been. |
| 18 | I don't know. |
| 19 | MR. KESSLER:  Okay.  To me, that says that the |
| 20 | government has or had access to the system.  If that's the |
| 21 | case, then the government can do -- I'm not here to talk about |
| 22 | Brady violations in a criminal case, we're talking about the |
| 23 | forfeiture amount.  So if the government had the Avimark |
| 24 | system, which everyone agrees they did, what they did with the |
| 25 | Avimark system is the government's business. |

1    THE COURT:  No.  They had the computer and they didn't

2    have whatever Ms. Giannelli told you fell behind the desk.

3    MR. KESSLER:  Oh, no, that's not true, your Honor.

4    Then I misspoke before.  This was a backup of what was on

5    the --

6    THE COURT:  Well, that's according to her, but it

7    wasn't -- that disc was not provided to the government, right?

8    She never told you she gave that to the government.  And I have

9    no reason to doubt Ms. Mortazavi's representation that it

10   wasn't.

11   So you have the disc now?

12   MR. KESSLER:  No.  I do not have -- if there was

13   something that fell behind the desk, I do not have that

14   something that fell behind the desk.

15   THE COURT:  What do you have?

16   MR. KESSLER:  I have, for the most part, what you have

17   and what Ms. Mortazavi has, PDFs that were sent to me by

18   Ms. Giannelli that reflected the various items that have been

19   bound as our exhibits for this proceeding.

20   THE COURT:  She didn't give you anything in electronic

21   format.

22   MR. KESSLER:  Yes, Judge.  She e-mailed -- well, maybe

23   I should first ask you what you mean by "electronic format."

24   THE COURT:  I guess that's a fair point.

25   I meant a disc, flash drive, those sorts of things.

N367FisH

1          MR. KESSLER:  She put on -- she e-mailed a couple of

2    things to me and then said would it be easier if I copied these

3    few things onto a flash drive, which she sent to me.  Yes, that

4    is what I have.  And those files were used for the production

5    of our exhibits.

6          THE COURT:  Do you have any objection to loaning that

7    flash drive to the government or making a copy of it?

8          MR. KESSLER:  I guess in theory, not, but they have

9    it, Judge.

10          THE COURT:  I don't know whether something is

11    searchable when it's on a flash drive and not when it's in a

12    PDF.  It seems to me it might be.

13          MR. KESSLER:  So all I can tell you, Judge, is that

14    what is on the flash drive are PDF files.  They are the exact

15    same PDF files that I copied onto my computer and the exact

16    same PDF files that were used -- that I sent to the printer to

17    print the documents.

18          THE COURT:  How did you give them to Ms. Mortazavi?

19    In what format?

20          MR. KESSLER:  I e-mailed them to her, and I put them

21    in Zip format, I believe.  And then I sent the spreadsheets

22    that are my work product, I sent those spreadsheets to her by

23    e-mail.  But there is nothing different on the flash drive than

24    anything else that I'm referring to.

25          THE COURT:  No.  The question I'm getting at is not

N367FisH

1    whether the contents is different, it's whether the ability to

2    manipulate it or to sort it might be different.  And I honestly

3    don't know the answer to that.

4              MR. KESSLER:  It shouldn't be --

5              THE DEFENDANT:  Your Honor, can I chime in, not on

6    law, but on Avimark and give you guys a little bit of a connect

7    here?

8              THE COURT:  No.

9              MR. KESSLER:  No.

10             THE COURT:  Your own lawyer is telling you no, but

11   also, Dr. Fishman, no.

12             MR. KESSLER:  So it is in the same format on the flash

13   drive as it is on the computer as it is in your Honor's system

14   when I uploaded it.

15             THE COURT:  Okay.

16             All right.  Do you want to talk to me about the amount

17   or are you resting on your papers?

18             MR. KESSLER:  I'm always happy to talk, Judge, but --

19             THE COURT:  You have the floor.  I'm not going to tell

20   you how to do your argument.

21             MR. KESSLER:  So yes, let's talk a little bit about

22   it.

23             First, there's the issue of burden of proof, which I

24   think has been stated the obvious, that the government has it.

25   But I do wish to highlight one thing as it comes to the burden

N367FisH

1    of proof.  The government's burden of proof is not to prove --

2    let's rephrase that.

3              The government has to prove what is subject to

4    forfeiture.  It can use its various methodology, but it is not

5    a matter of totaling up deposit slips and saying most of this

6    or some of this or all of this is subject to forfeiture.

7              THE COURT:  I think I said I --

8              MR. KESSLER:  I agree.

9              THE COURT:  -- don't necessarily agree with that.

10             MR. KESSLER:  So we look to the forfeiture statute

11   that is involved.  Of course we say that there is none, but

12   whatever the forfeiture statute is that is involved, that is

13   what will be subject to forfeiture.

14             THE COURT:  So let's just assume you're wrong or I

15   find you're wrong and what is subject to forfeiture is the

16   adulterated and misbranded drugs that were involved in the

17   conspiracy.  How do you suggest we proceed?

18             MR. KESSLER:  Well, my first question is what would

19   they be?  And I don't mean that facetiously.  Because in the

20   filing yesterday, Ms. Mortazavi indicated when they went

21   through the chart, our printout, that vitamin C is something

22   that is not deductible.  Why is vitamin C a New Animal drug?

23   Why is it something under any statute that should not be

24   deducted?  That is a rhetorical question for me.

25             THE COURT:  Well, no.  It's actually a valid point.

N367FisH

1          MR. KESSLER:  Yes.  I think it is deductible.

2          Your Honor was correct, of course, when it comes to

3    things like mechanical devices.  I guess those are the

4    syringes, the needles, and the bandages.  They're the testing

5    equipment that blood work was done.

6          THE COURT:  By the way -- okay.  Go ahead.

7          MR. KESSLER:  There are the saline fluids, and the

8    vitamins, and the IV lines for all these fluids.  These are

9    easy things.  And these are things that, according to

10   Mr. Rubino, were not deducted.  Now, we did, but that begs the

11   issue, your Honor.

12         THE COURT:  Because you used the same starting point.

13         MR. KESSLER:  But we shouldn't have --

14         THE COURT:  I understand that.

15         MR. KESSLER:  Yes.  So when the government is talking

16   about meeting its burden of proof, Mr. Rubino's declaration

17   tells us specifically that they didn't meet their burden of

18   proof.  There was no attempt to exclude the amount paid by

19   Equestology to purchase the products that we sold.  There's no

20   attempt to separate out the products that Dr. Fishman received

21   from the sale of any of these New Animal drugs.  There was no

22   attempt to subtract the costs of the FDA-approved products he

23   resold, many of which went directly from the pharmacy,

24   untouched to the customer.  That's not mislabeled, or

25   misbranded, or adulterated.

N367FisH

1          THE COURT:  Let me just interrupt you.

2          Suppose they are -- even if they're FDA approved but

3    they're drugs that require a prescription, those are

4    legitimately included, because I've told you I reject your

5    attempt to re-argue that Dr. Fishman operated outside the

6    veterinary-patient relationship.  Your predecessor counsel made

7    that argument to the jury and they categorically rejected it.

8    So I am not rehash hadding criminal liability here.

9          MR. KESSLER:  So my only response to that, your Honor,

10   is that is something that we have put into our submission.  We

11   believe it to be true.  We believe, as Dr. Fishman indicated in

12   his declaration, that he in fact either did examine the horses

13   in his care when required --

14         THE COURT:  Notwithstanding the fact that there are

15   numerous pieces of evidence received at trial where he bragged

16   about how he hasn't touched a horse in years.

17         MR. KESSLER:  And that may be true, Judge, but he did

18   have other veterinarians who were working on his behalf and

19   according to the --

20         THE COURT:  All right.  I'm sorry.  I am going to cut

21   you off on this because this was -- your opportunity to make

22   those arguments was at the trial.  So we're finished with that.

23         MR. KESSLER:  Okay.  I wasn't at the trial.

24         THE COURT:  So?

25         MR. KESSLER:  I'm just making the comment that --

N367FisH

1          THE COURT:  He was amply represented.

2          MR. KESSLER:  And that is not before me right now,

3     Judge.

4          But yes, so that is something that we do have in our

5     papers.  And if your Honor is saying that you reject it, then

6     you reject it.

7          THE COURT:  Okay.

8          MR. KESSLER:  But it doesn't change one other thing,

9     your Honor.  And this is as important.  So Ms. Mortazavi talked

10    about -- I'm not going to do person.

11         The government discusses that he had an illegal

12    operation, and this goes to the gross versus net proceeds

13    discussion that you had a bit earlier.  The Second Circuit is

14    pretty clear when it comes to this.  And the case is *U.S. v.*

15    *Percoco.*

16         THE COURT:  It's *Percoco.*

17         MR. KESSLER:  So you do know it.  Great.  Okay.

18    *Percoco.*

19         THE COURT:  Most people who live in New York know who

20    *Percoco* is.

21         MR. KESSLER:  Okay.  Well --

22         THE COURT:  Go ahead.

23         MR. KESSLER:  I guess I didn't -- I wasn't there for

24    it, because I do fall within at least the first category, your

25    Honor.

N367FisH

1          THE COURT:  Is this the case involving Cuomo's --

2          MS. MORTAZAVI:  Yes, your Honor.

3          MR. KESSLER:  Oh, is it?  Oh, okay.  Now I know the

4    case, Judge.

5          So in *Percoco*, the -- I quote from the Second Circuit,

6    "In cases involving lawful services that are sold or provided

7    in an illegal manner, the term 'proceeds' means the amount of

8    money acquired through the illegal transaction resulting in the

9    forfeiture, less the direct costs incurred in providing goods

10   or services."

11         THE COURT:  Yes.

12         MR. KESSLER:  So it is the distinction, of course,

13   between a lawful business doing something illegal and a drug

14   cartel or a Ponzi scheme.

15         THE COURT:  You may be overstating things.  Again, I

16   think you're drifting into the area of issues that were decided

17   by the jury, but I don't know that we need to debate that.

18         MR. KESSLER:  It is our argument——and I think even

19   looking at it from the point of view of what we were just

20   discussing, your Honor——there are products that we are in

21   agreement are not counted.

22         THE COURT:  "We," meaning you and the government?

23         MR. KESSLER:  We, meaning me.

24         THE COURT:  Or you and yourself?

25         MR. KESSLER:  Me, myself, and I, yes.

N367FisH

1          THE COURT:  That's the problem.

2          MR. KESSLER:  And I thought your Honor was in

3     agreement as well, given your questions, but I am not speaking

4     for the Court.

5          THE COURT:  Okay.

6          MR. KESSLER:  So there are certain items that should

7     not count if there is going to be any counting at all.

8          THE COURT:  Okay.

9          MR. KESSLER:  And those are the ones that we've

10    discussed a few minutes ago.

11         THE COURT:  Okay.

12         MR. KESSLER:  If that is the case --

13         THE COURT:  So you think you can identify anything

14    that was sold legally you fall within the *Percoco* case?

15         MR. KESSLER:  I think "anything" is the right term,

16    your Honor, because according to our calculations we're talking

17    about millions of dollars in products.

18         THE COURT:  So I have to do a weighing to determine

19    whether the business was more illegal or legal?

20         MR. KESSLER:  No.  I think that Dr. Fishman performed

21    veterinary services that even the government concedes.  And in

22    fact it's quite ironic --

23         THE COURT:  I think after a certain period of time

24    they may not concede that.

25         MR. KESSLER:  But what's interesting, Judge, is on the

N367FisH

1    travel sheet that's provided as one of the government's

2    exhibits, the travel sheet has been -- I don't know the legal

3    term, but mutilated.

4          THE COURT:  Has been what?  I'm sorry.

5          MR. KESSLER:  It has been.

6          MR. WAGNER:  Altered.

7          MR. KESSLER:  It has been altered.

8          THE COURT:  Okay.

9          MR. KESSLER:  So there are five pages.  And then page

10   6 doesn't have --

11         THE COURT:  I see.

12         MR. KESSLER:  -- a page number on it.  And then it

13   goes to page 11.

14         THE COURT:  Yes, I do want to hear from Ms. Mortazavi

15   about that.

16         MR. KESSLER:  There are several pages.  I don't know

17   what is there.  Again, I do not have anything other than what

18   the government provided me.  This was not something that

19   Ms. Giannelli gave me either.  So I don't know, when you're

20   talking about what came up at trial -- and again, I apologize,

21   but at trial, that was for the conviction.  But for the

22   purposes of the forfeiture itself, you can use credible and

23   relevant evidence form the trial, but we are not retrying the

24   case here.

25         THE COURT:  Well, you're trying in some respects, but

N367FisH

1    that's a different issue.  You are.

2              MR. KESSLER:  I don't mean to retry the case, Judge.

3    I am focusing only on the dollar figures and as they relate to

4    things that are involved.

5              THE COURT:  Can I try to cut through to something?

6              MR. KESSLER:  Please, yes.

7              THE COURT:  So suppose I disagree with you and I find

8    that forfeiture is appropriate here, including for assets that

9    were dissipated, is there a bottom line dollar amount that you

10   think is a reasonable and appropriate -- and I appreciate you

11   don't have the burden, the government does.

12             MR. KESSLER:  If you're asking me, Judge, to do the

13   government's work --

14             THE COURT:  Well, that's why I said I appreciate you

15   don't have the burden.  So if you prefer not to answer it,

16   that's fine.  That is fine because you do not have the burden.

17   So that's fine.

18             MR. KESSLER:  The only thing -- I will not answer but,

19   what I will do is refer the Court to our calculations.

20             THE COURT:  Okay.  But your calculations basically

21   zero everything out.

22             MR. KESSLER:  No.  I think it was almost -- it was

23   low, but it was not zero.

24             THE COURT:  All right.  Look, that's fair.  I'm not

25   going to pressure you further on that.  That is fair.

N367FisH

1          MR. KESSLER:  What else should we talk about?  So

2    there are those calculations.

3          THE COURT:  Excuse me one second.

4          (Pause)

5          THE COURT:  Okay.

6          MR. KESSLER:  Foreign sales.

7          THE COURT:  Yes.

8          MR. KESSLER:  So there are the foreign sales that in

9    our paperwork, your Honor, we listed that totals approximately

10   $3 million.  Virtually, all of the clients identified by name

11   in Mr. Rubino's declaration were in fact foreign clients.

12         THE COURT:  I don't think anyone disputes that they

13   were foreign clients.  I think the issue is, according to the

14   government——and I don't really disagree with this——that the

15   issue of the export exemption was part of this case since

16   pretrial days.  There's been *limine* practice on it, I did not

17   resolve the issue on the *in limine* motions.  I said it was fair

18   grounds for you to bring it up during the course of the trial.

19   It was never brought up, other than to talk about the fact that

20   Dr. Fishman -- I think there was some evidence about him

21   dealing with camels and joking over there about how he may be

22   the luckiest guy because he's never touched a horse in years.

23   That's my recollection.  So you cannot on forfeiture now try to

24   re-argue the applicability of this exemption.

25         MR. KESSLER:  I thought your Honor said that it wasn't

N367FisH

1   decided.

2           THE COURT:  I said I didn't rule it out of the case.

3           MR. KESSLER:  Oh.

4           THE COURT:  And you presented no evidence to the jury

5   for them to reject that portion of Dr. Fishman's business.  In

6   other words, one of his defenses in front of the jury was this

7   is all about my camel work, but you presented no every day for

8   the jury to substantiate that, and they convicted him.

9           MR. KESSLER:  So that goes to the trial.  And I am

10  not -- again, I apologize if it seems that way, but I'm not

11  trying to relitigate the trial.

12          For the purposes of forfeiture, however, this is an

13  issue.  And it's an issue because what is forfeitable is

14  domestic sales.  So the reason --

15          THE COURT:  Are you saying that because you're saying

16  all the foreign sales are exempt?

17          MR. KESSLER:  Yes.

18          THE COURT:  Or you're saying if I'm correct or if the

19  government is correct and there is forfeiture and the statutes

20  kick in by their terms they only apply to domestic sales?

21          MR. KESSLER:  I am saying that if you rule that I am

22  wrong and there is a statute supporting forfeiture --

23          THE COURT:  Right.  For all this discussion, that's

24  what we're assuming, okay?

25          MR. KESSLER:  And if there is going to be a dollar

1    amount for forfeiture --

2              THE COURT:  Right.

3              MR. KESSLER:  -- we go back to what the statute would

4    authorize.  Assuming somewhere that there is a statute that

5    authorizes the value of New Animal Drugs that were dissipated,

6    then it is our position that that relates to domestic sales,

7    yes.

8              THE COURT:  And where does that come from?

9              MR. KESSLER:  That comes from the export exemption.

10             THE COURT:  Okay.  That's what I asked you, is this

11   all by reason of the exemption.

12             MR. KESSLER:  Yes.

13             THE COURT:  Okay.

14             MR. KESSLER:  It comes from the export exemption as

15   well as the statutes.  And again, I'm arguing against myself

16   here, but the statutes --

17             THE COURT:  No.  I get it that we're assuming.

18             MR. KESSLER:  The statutes that authorize the

19   forfeiture do so for the domestic sale of forfeiture -- the

20   domestic sale of product.  So the forfeiture is for domestic

21   product.

22             THE COURT:  Again, you're saying it authorizes for

23   domestic sales because of the export exemption, right?

24             MR. KESSLER:  Only --

25             THE COURT:  Because of the exemption?

N367FisH

1          MR. KESSLER:  No.  Because of the products themselves,
2     I guess.
3          THE COURT:  Explain that to me.
4          So let me ask it slightly differently.
5          MR. KESSLER:  Okay.
6          THE COURT:  If we were to agree that the exemption
7     didn't apply -- and I know that's not your position, but let's
8     just say if you were to agree that there were certain
9     categories of drugs to which the exemption was inapplicable but
10    they were sold overseas, are you saying the statute doesn't
11    reach those in the first instance?
12         MR. KESSLER:  My answer is that is what I'm saying
13    because I know of no statute that would reach it.  They're the
14    same exemptions, I guess, for domestic as well as -- the
15    government would have to prove that these were domestic sales.
16         THE COURT:  And I'm asking, what's the authority for
17    that?
18         MR. KESSLER:  I would have to get back to your Honor,
19    but I guess my answer is there is no statute that permits the
20    forfeiture of what we're talking about here.
21         THE COURT:  But is that because of the exemption or is
22    that just because they were sold overseas?  And if it's just
23    because they were sold overseas, why are you going through all
24    this song and dance about the applicability of the exemption?
25         MR. KESSLER:  Because you're asking me to, is the

N367FisH

1    short answer.

2              THE COURT:  No, I didn't ask you to.  You volunteered

3    it in your papers.

4              MR. KESSLER:  But that's only assuming there is a

5    statute that authorizes the forfeiture of what the government

6    is seeking in the first place.  I have no statute, I can't see

7    a statute, and I haven't been pointed to any statute by the

8    government that permits them to forfeit what they're seeking to

9    forfeit.

10             THE COURT:  Okay.  Let me just ask you this:

11             If there were a narcotic drug conspiracy case, and the

12   defendant was convicted, and there's some evidence that some of

13   the sales were overseas, are you saying by virtue of the fact

14   that they were overseas those sales can't be added into --

15   assuming there are statutes that apply?

16             MR. KESSLER:  But that's the key.  There are statutes

17   that deal with precisely what you are mentioning, your Honor.

18             THE COURT:  Foreign versus domestic?

19             MR. KESSLER:  No.  What is permitted to be forfeited

20   pursuant to a scenario that you just described.

21             So my answer would be, without giving a general

22   answer, whatever the statute says, yes.  If the statute permits

23   the proceeds of the criminal activity, then it doesn't seem to

24   distinguish --

25             THE COURT:  So it's not an extraterritoriality

N367FisH

1    question, it's a question of go back to the language of the

2    statute.

3            MR. KESSLER:  Absolutely correct.

4            THE COURT:  Okay.  I think I have your position.

5            MR. KESSLER:  And it is only after that, if we do get

6    past that point that I am now pointing to the export exemption

7    and to the documents that we've submitted under——I believe it

8    is SFX 1900, which includes the letters from the UAE --

9            THE COURT:  Yes.  All of that I'm telling you my view

10   is your opportunity to deal with that was at trial.  But in any

11   event, I have your papers, which I will obviously be going back

12   and studying all of this.

13           MR. KESSLER:  And we believe, of course——just to close

14   the loop, your Honor——that that should be deducted any final

15   total.

16           THE COURT:  And that amount is?

17           MR. KESSLER:  Approximately $3 million.

18           THE COURT:  You said that.  I'm sorry.  Thank you.

19           MR. KESSLER:  I believe that our figures and the

20   government's figures are about the same.

21           THE COURT:  Yes, I think on that, they were.

22           MR. KESSLER:  The other category that I guess I would

23   refer the Court to——we've talked about it and I believe your

24   Honor mentioned it as well to Ms. Mortazavi——is that dealing

25   with the seized products.  So that in my book is double

N367FisH

1    counting.  So pick your poison.

2                THE COURT:  I can't disagree with you about that.  You

3    don't have to belabor it.  I agree with you completely about

4    that.

5                MR. KESSLER:  And finally, I guess, is the Panama.

6                So the Panamanian account, I must tell you, Judge, I

7    don't think it's worthwhile going through it with you in very

8    much detail right now.  I will refer to our submissions on

9    this.  Just very briefly, the Panamanian account is a trust

10   account that was in the name of Equine Performance, which was a

11   partnership that Dr. Fishman was involved with.  He had no --

12   his interest in Equine Performance ended in 2014, as he

13   indicated in his declaration.  There were some issues relating

14   to the attorney who was supposed to do things in Panama that

15   never happened.  I believe there's approximately $300,000 in

16   that Panamanian account as we speak.  The government has not

17   sought to distinguish anything about the funds that went

18   through that account or that were deposited in the account.

19   The same as I indicated with Mr. Rubino's declaration applies

20   to these funds as well.

21               So our argument would be the same that, first of all,

22   this is an Australian company.  The products were made in

23   Australia.  More than 50 percent of the product was sold from

24   Australia to countries other than the United States.  So we are

25   starting at a less than 50 percent number.  And there has been

N367FisH

1    no documentation to demonstrate what was sold in the United

2    States, if any was an adulterated product, if there are any

3    medical devices or items that fall outside the categories you

4    and I have discussed earlier, your Honor.  So that figure is

5    way out of line.

6            THE COURT:  All right.  So the only question I have

7    with respect to this is where does the 2 million, or the

8    2,200,000, which you say is the amount at issue, and yet you

9    told me there's only 300,000?

10           MR. KESSLER:  That's the figure the government used,

11   your Honor.

12           THE COURT:  Okay.  I see.

13           MR. KESSLER:  And I believe -- you can have the

14   government answer this, but I believe that represents the

15   amount that was deposited into that account over the years.

16           THE COURT:  Over the years.  Okay.  Thank you.

17           MR. KESSLER:  Any other questions?

18           THE COURT:  Not at this time.

19           MR. KESSLER:  Thank you, your Honor.

20           THE COURT:  All right.  Ms. Mortazavi, briefly.

21           MS. MORTAZAVI:  Well, your Honor, I realize that I had

22   not sort of gone through our presentation of how to think about

23   calculating the total.  I'm going to do that briefly and then

24   respond to defense's points that have been raised.

25           THE COURT:  Okay.

1          MS. MORTAZAVI:  I hear the Court's concern in a number
2     of areas, but particularly with respect to the starting point.
3     So I'd ask the Court——and the government would consent to
4     this——to start with the total Avimark sales data.  That should
5     encompass not only the million $9.7 million that the defendant
6     says comes from domestic sales of products that he allegedly
7     resold, that should also include at least for what went through
8     Giannelli's hands BB3, TB7, and various other of the drugs that
9     Dr. Fishman was responsible for producing and that she sold.
10    The $11.4 million --
11         THE COURT:  I'm sorry.  Is that total 11.4 then?
12         MS. MORTAZAVI:  That's right.
13         THE COURT:  Okay.
14         MS. MORTAZAVI:  And so that will reflect sales.  It
15    will only reflect sales from 2009 on, so it is already
16    conservative.  It will not reflect domestic sales from Seth
17    Fishman, so it is conservative in two ways.
18         THE COURT:  Did Dr. Fishman ever do any sales?
19         MS. MORTAZAVI:  He certainly distributed.  And we know
20    that because two of our witnesses --
21         THE COURT:  Yes, but he gave those things for free.
22         MS. MORTAZAVI:  Exactly.  Because we are seeking the
23    value of the drugs, it doesn't matter if he was paid or not.
24    The fact is he had the drugs in his possession, they had a
25    value, and he gave them away.  We also believe that he did do

1    sales independently because he sold to Jorge Navarro of his own

2    accord.  Jorge Navarro is not captured in the Avimark data.

3              THE COURT:  No.  But Navarro is a separate figure that

4    you've put forth.

5              MS. MORTAZAVI:  Certainly.  But that tends to

6    indicate, your Honor, that Seth Fishman did have sales flowing

7    domestically through him.  So in both of those respects, it is

8    a conservative figure.

9              So starting with the 11.4 million, I'm just going to

10   again reiterate the categories we talked about earlier, foreign

11   sales from bank records of an approximate amount of $2.7

12   million.  Now, this Court is correct that the defendant had the

13   opportunity to assert the export exemption and he did not carry

14   his burden.

15             THE COURT:  Okay.  Let me interrupt you.

16             I understand Mr. Kessler to be saying he doesn't

17   really need the exemption.  His argument is that the statute

18   assuming—as he disputes—that the statute provides for

19   forfeiture in the first instance, it only relates to domestic

20   sales.

21             MS. MORTAZAVI:  I did not understand Mr. Kessler to be

22   saying that.  I understood him to be, again, challenging the

23   basis for forfeiture at all.

24             THE COURT:  Yes, he is.  But then I think he's

25   saying -- when I kept pressing him, saying let's just assume

N367FisH

```
1    forfeiture can happen, I thought I understood him to say——and
2    this was the point I kept pressing about, do you need the
3    exemption or not——ultimately, I don't need it because you first
4    need a statute that would authorize it, but if you reject my
5    argument in that regard then I have the exemption.
6              MS. MORTAZAVI:  And Mr. Kessler is simply wrong.
7    Section 334 nowhere bounds what the government can seize to
8    solely what was distributed domestically.
9              THE COURT:  Yes.  I mean, I do have to say 334 talks
10   with about introduction into interstate commerce, and
11   interstate commerce clearly does include overseas.
12             MS. MORTAZAVI:  Of course.  So because it uses the
13   term "interstate," there's an understanding that interstate
14   includes foreign.  And because there's no other limitation to
15   domestic distribution only, Mr. Kessler's argument based on the
16   being statute must be rejected.
17             THE COURT:  Okay.  Now, so let's just pause for a
18   minute.
19             On this issue of the fact that I didn't rule *in limine*
20   that this was inadmissible -- and I didn't rule it was
21   admissible, I left it for the parties to deal with if and when
22   it came up at trial, and it never did.  All right.  So
23   Dr. Fishman didn't rely——although he alluded to it——on the
24   export exemption in terms of whether he was criminally liable.
25   Why can they not, in dealing with the amount of forfeiture,
```

N367FisH

1    present additional evidence which you've conceded is proper on

2    a forfeiture hearing with respect to this issue?

3            MS. MORTAZAVI:  They can, but they still have not

4    carried their burden.

5            THE COURT:  Okay.  But you don't dispute that they can

6    raise the issue?

7            MS. MORTAZAVI:  I don't dispute that this Court can

8    evaluate it.  There have been statements made in the

9    declaration and a handful of exhibits that are attached to

10   support it, none of which supports the export exemption.

11           With respect to the exhibits, they are merely orders.

12   The export exemption requires that there be specifications for

13   what is created.  That is ingredients.  That is much more

14   specificity than what is contained in merely a letter saying

15   send me these five products.  So they haven't fulfilled that.

16           Secondly, they have to show that the products complied

17   with foreign law.  Seth Fishman generally states in the

18   declaration that they do.  He doesn't cite to any foreign law

19   and he only refers to one jurisdiction, although he admittedly

20   exported to a number of different countries, none of which he

21   addresses, apart from United Arab Emirates.

22           Third, he claims that his exports were appropriately

23   labeled, as is required under the exemption, and all he

24   attaches as support is a blank label sheet.  He contains no

25   authority from one of his employees stating that they always

N367FisH

1    labeled exports.  He provides no photographs.  He provides no

2    proof that at the time he was committing these offenses he

3    properly labeled shipments as "for export."  So he has not

4    carried his burden with respect to the export exemption.

5            THE COURT:  Does he have the burden on this?

6            MS. MORTAZAVI:  With respect to the exemption, yes,

7    because it's an affirmative defense.  The government has

8    already established that the foreign shipments were adulterated

9    and misbranded.  If defense wants to come forward and say, no,

10   no, an exemption applies, they do have a burden of proof.

11   They've attempted to carry it, and they've failed.  And they

12   additionally, under the export exemption, have to show that

13   those drugs were not also distributed within the United States.

14   And we know from the trial record that they were.

15           THE COURT:  You mean the type of drug or those exact

16   drugs?

17           MS. MORTAZAVI:  That type of drug.

18           But we also know that those exact drugs were offered

19   for distribution in the United States.  And in my papers, your

20   Honor, I believe I attached a transcript of a Title III wire

21   intercept that was already admitted at trial in which the

22   defendant offered to Adrienne Hall to have her contact purchase

23   something and piggy back——that was the term that he used——off

24   of foreign shipment.

25           THE COURT:  I remember that.

N367FisH

1          MS. MORTAZAVI:  So the way Seth Fishman operated, and

2     as this Court knows, he had a separate lab, 21st Century, in

3     Massachusetts that would manufacturer these drugs according to

4     his specifications.  They would then be shipped to him, and

5     then they would then be shipped to foreign and domestic

6     purchasers.  They concentrated in Florida, and then they were

7     distributed to Lisa Giannelli, to individual purchasers, like

8     Jorge Navarro and Christopher Oakes, and to foreign buyers.  So

9     he amalgamated all of his drugs, he resold the same drugs, and

10    so he does not satisfy that prong of the export exemption

11    either.

12         As well, your Honor——and this is somewhat of a

13    departure——there are many statements in the declaration that

14    this Court should just reject out of hand because there are

15    significant reliability and credibility issues with Seth

16    Fishman, and I'm going to outline them just for the record,

17    though we talked about them at sentencing.

18         This is a defendant who, back in 2011 where he faced a

19    Delaware Provision of Professional Responsibility

20    investigation, lied in a notarized letter that was submitted in

21    order to avoid the consequences of having distributed

22    adulterated and misbranded drugs.  This is someone who does not

23    have a reputation for honesty, particularly with respect to

24    proceedings in which he could face personal consequences.  This

25    Court found that it was obstructive that Seth Fishman had not

N367FisH

disclosed the Panamanian bank accounts in the preparation of
the PSR.  That was a statement that this Court made at
sentencing.

THE COURT:  I recall.

MS. MORTAZAVI:  And indeed, your Honor, this Court
also found obstructive Seth Fishman's efforts to shape the
testimony of a trial witness Jamen Davidovich.

THE COURT:  Davidovich.

MS. MORTAZAVI:  Davidovich.  Which is what he did
prior to that witness being called to testify in anticipation
that that was one of the government's witnesses.

In addition, just looking at the face of several of
the statements that he made, they are either easily
controverted and, thus, unreliable.  Whether or not he is
deliberately misleading, they are unreliable.  And they are
generalizations that are made with no specifics, no
particulars.  And Seth Fishman and the defense asks the Court
to just accept the conclusions without probing the basis for
the opinions that are offered.

THE COURT:  You waived your right to cross-examine
him.

MS. MORTAZAVI:  Certainly.

THE COURT:  That's why I asked the questions I asked
at the outset.

MS. MORTAZAVI:  When you asked those questions, your

N367FisH

1    Honor, that's why I said we did not waive our right to make

2    arguments as to the reliability or credibility of these

3    statements.

4              THE COURT:  You didn't, that's true.

5              MS. MORTAZAVI:  The declarations are just like a

6    stipulation of evidence.  The fact finder can choose to accept

7    it or reject it in whole or in part.  And under Rule 32.2, this

8    Court will only admit into these proceedings what is deemed

9    reliable.  So if this Court finds, as the government is asking,

10   that several of the statements in the declaration are

11   unreliable, including because the declarant has significant

12   motive to lie to this Court to reduce the forfeiture number on

13   the basis of spurious generalized assertions, then this Court

14   should reject those statements.  And we think that should

15   factor heavily into how this Court shapes its view various

16   issues brought up in the declaration.

17             So with respect to the --

18             THE COURT:  I just have to say from an evidentiary

19   point of view I asked at the beginning, are these declarations

20   offered into evidence and are they admitted, and you both

21   stipulated that they were you reserved your right to make

22   argument, which you're doing now.

23             MS. MORTAZAVI:  So, your Honor, it's a standard jury

24   instruction, as the Court is well aware, that the jury can

25   accept or reject whatever is in evidence.

N367FisH

 1              THE COURT:  Yes.

 2              MS. MORTAZAVI:  The reason——and I mentioned this at

 3      the beginning——we consented to the declaration was first to

 4      accommodate Seth Fishman's own preference to not move from the

 5      facility that he was in, which is an accommodation the

 6      government made out of consideration for Seth Fishman, but

 7      also, knowing that this Court could streamline things by just

 8      simply seeing what the testimony would be if there was to be

 9      live testimony.  But the Court certainly knows this case well

10      and knows how to probe at the assertions that are made.  Again,

11      this Court does not have to accept wholesale any piece of

12      evidence.

13              So if we are looking again at the calculation here, we

14      believe that all the foreign deposits, deposits made from

15      foreign parties, are correctly included in the forfeiture

16      total, and there's really no dispute as to those amounts.

17      We've also included and asked this Court to include foreign

18      sales from invoices in the amount of approximately $261,700.

19              THE COURT:  So in that regard——I'm just going to back

20      up a little bit——why shouldn't I send you back with the Avimark

21      information and give you time to propose to the Court a figure

22      based on you do the work and add up the sales of adulterated

23      and misbranded drugs?

24              MS. MORTAZAVI:  We're prepared to give you that figure

25      today, your Honor.

N367FisH

1           THE COURT:  Oh, okay.

2           MS. MORTAZAVI:  It may be helpful -- I've prepared

3      this chart for my own reference, but it may be helpful if the

4      Court sees it.

5           THE COURT:  Have you shared it with Mr. Kessler?

6           (Counsel confers)

7           MS. MORTAZAVI:  Your Honor, I'd like to offer it as a

8      demonstrative.  It is essentially what I've been walking

9      through.  Mr. Kessler appears to not want me to share the

10     demonstrative with the Court.  So I'll leave it to the Court to

11     determine if you want to see these records.

12          THE COURT:  The records?  Or that's a chart?

13          MS. MORTAZAVI:  It is a summary chart that I've

14     prepared to direct my remarks to the Court.  And if I can put

15     it on the ELMO, the Court can see what I see.

16          THE COURT:  Why can't she use it in aid of her

17     argument, Mr. Kessler?

18          MR. KESSLER:  Your Honor, I never said no.

19          THE COURT:  Okay.  Great.

20          MR. KESSLER:  I said I don't know what this is.

21          THE COURT:  Okay.  Don't get excited.  That's why I

22     gave you the chance to be heard.

23          MR. KESSLER:  Talk about me putting words in someone

24     else's mouth.

25          THE COURT:  Okay.  That's fair, sir.  That's fair.

N367FisH

```
1    But that is why I turned to you, to hear from you directly.

2              MR. KESSLER:  Thank you.

3              THE COURT:  So Ms. Mortazavi, I'm going to tell you

4    the fundamental problem I am still having with the government's

5    case and the government's burden here is I find it almost

6    incredible that starting with revenues and deducting things

7    versus building up the other way gets you the exact same

8    number.  I mean, if you were doing it properly, it should, but

9    that the number is so close to the revenue amount just seems

10   difficult to conceive of to me.

11             MS. MORTAZAVI:  So, your Honor, again, not having had

12   the Avimark system, the government used what it could.

13             THE COURT:  Okay.  But now you have it, so let's move

14   forward with that.

15             MS. MORTAZAVI:  Certainly.

16             I'm hearing the Court's discomfort and I want to be

17   responsive to it.  We have made our own calculations on the

18   basis of the Avimark data.

19             THE COURT:  Okay.

20             MS. MORTAZAVI:  So we are starting with the defense's

21   figure as the starting point, that is the Avimark sales.

22             THE COURT:  Hold on one second.

23             I'm sorry.  Go ahead.

24             MS. MORTAZAVI:  That's all right, your Honor.

25             So I've already set forth the $11.4 million that
```

N367FisH

1    should represent the domestic Avimark sales records.

2              MR. KESSLER:  Excuse me.

3              MS. MORTAZAVI:  Then there are --

4              THE COURT:  Hold on.

5              MR. KESSLER:  Excuse me, your Honor.

6              Would you mind if I just took a picture of this from

7    my phone so I can --

8              THE COURT:  I don't mind if you don't mind if the

9    Court has a copy then, because I can't have both sides having a

10   copy of a document, and you're arguing me and I don't have it.

11             MS. MORTAZAVI:  It's a summary chart.

12             THE COURT:  Why are we fighting?  Go ahead.  Go ahead

13   and take a picture, but, I mean, frankly, I can write the

14   numbers down, too.

15             MR. KESSLER:  I'm good.  Thank you.

16             THE COURT:  It's just silly.  Go ahead, take a

17   picture.  I don't have a problem.  Do you, Ms. Mortazavi?

18             MS. MORTAZAVI:  I believe that under the courthouse

19   rules pictures are not supposed to be taken, but I'm happy to

20   provide a copy of this to both Mr. Kessler and the Court.  I

21   had just planned to use it for my own remarks, so I did not

22   bring extras, but I'm happy to do that.

23             MR. KESSLER:  I won't be taking any photo, your Honor.

24   Thank you.

25             THE COURT:  Nothing is easy in this case.

N367FisH

1            Go ahead.

2            MS. MORTAZAVI:  All right.  So again, not to repeat

3     myself, but the Avimark data set for domestic sales to Lisa

4     Giannelli, 11.4 million.  We then believe that we've carried

5     our burden with respect to including foreign sales from the

6     bank records which amount to about $2.7 million.  The figure is

7     not at issue.  The only issue is whether the export exemption

8     applies and, apparently, whether Section 334 has extra

9     territorial reach.

10           Now, we've discussed why it does have extra

11    territorial reach or why it is not restricted to domestic

12    sales, and we've also talked about how the defendant simply has

13    not carried his burden with respect to the export exemption.

14    He could have, and he hasn't.  He has to make a much more

15    powerful and stronger showing, and it has to go to all of his

16    sales.  He's attached, instead, a handful of letters in which

17    people have made orders on an individual basis.  There's no

18    amount attributed to those letters and there are no other

19    records to show that those shipments complied with the sales

20    of --

21           THE COURT:  Okay.  You're starting to repeat yourself.

22           MS. MORTAZAVI:  All right.

23           THE COURT:  With regard to the Panamanian bank

24    accounts, why is your number 2.2 million and their number is

25    300,000?

N367FisH

1          MS. MORTAZAVI:  Because there's a difference in what

2     we are talking about.  The Panamanian number here, the 2.2

3     million, refers to all deposits into that account.  And as this

4     Court remembers, at trial, Seth Fishman stated that he had set

5     up a Panamanian trust as a shield against the FDA.  We

6     believe -- and, of course, the name of the account is Equine

7     Performance, Inc., which further tends to show that this has to

8     do with adulterated and misbranded drugs as opposed to drugs

9     that are legal and used for the health and welfare of a horse

10    pursuant to a valid PCPR.

11         THE COURT:  I know, but now you're reverting back to

12    revenue, right?

13         MS. MORTAZAVI:  That's correct, your Honor.

14         THE COURT:  Okay.

15         MS. MORTAZAVI:  And we would be open to a discount

16    over that number, but that is what we've calculated.

17         Now, the $200,000 figure is what the defense says Seth

18    Fishman received as a commission from Nature Vet, apparently.

19    The reason why that $200,000 -- well, firstly, that $200,000

20    commission does not account for all the deposits.

21         THE COURT:  I'm sorry.  You're on the line that says

22    "foreign sales from invoices"?

23         MS. MORTAZAVI:  No, your Honor.  You had asked me

24    about the Panamanian accounts?

25         THE COURT:  Yes.

N367FisH

1          MS. MORTAZAVI:  I was on Panama bank accounts.

2          THE COURT:  But you said something about the $200,000

3    figure.

4          MS. MORTAZAVI:  That was the defense's figure.

5          THE COURT:  He said 300, I thought, of what's left in

6    the account now.

7          MS. MORTAZAVI:  Correct.

8          If I may, your Honor, the 300,000 is approximately

9    what is left in the account, but that is not what was deposited

10   into the account over the lifetime of the account.

11         THE COURT:  Right.  I understand that.

12         MS. MORTAZAVI:  All right.  So that $2.2 million

13   figure is what was deposited into the Panamanian bank account.

14   Given Seth Fishman's statement that he set up a Panamanian

15   trust as a shield against the FDA, given the manner in which we

16   found those accounts was because he had saved the account

17   information in his storage unit——and that's what led the

18   government to those accounts——he is the account holder.  The

19   name of the account is Equine Performance, Inc.  All of that

20   tends to show that he was trying to evade the FDA by depositing

21   funds for adulterated and misbranded drugs into those

22   Panamanian bank accounts.

23         Defense counsel has come back and said, well, there

24   was this agreement with Nature Vet that entitled Seth Fishman

25   to some type of commission for sales of that drug, they were

N367FisH

1      manufactured outside the United States and not distributed in

2      the United States.  Now, there are multiple issues with that

3      statement beyond the ones that I've raised about the

4      credibility and reliability of Seth Fishman, and that includes

5      that the contract at issue itself does not state that the

6      entire value of the adulterated and misbranded drugs are

7      deposited into any account at all, it's only the commissions.

8      So to try to discount in its entirety the balance of the

9      Panamanian bank accounts is wrong.

10             THE COURT:  All right.  But weren't the Panamanian

11     accounts shared by multiple holders, but he had only had a

12     percentage interest; didn't he?

13             MS. MORTAZAVI:  He was the account holder of that

14     account.  He claims that he has a partner, but he is the

15     account holder.  Again, based on the reliability issues of Seth

16     Fishman, I don't believe that that should be credited.

17             THE COURT:  Also, have you even established what went

18     into the Panamanian accounts as part of the conspiracy for

19     which he was convicted?

20             MS. MORTAZAVI:  We believe that it was.

21             THE COURT:  I know you believe it.  Have you --

22             MS. MORTAZAVI:  Well, based on the indicia that I just

23     described to the Court, which is all part of the record, the

24     name of the account, Equine Performance Inc.——which, again,

25     indicates performance enhancing drugs which was part of this

N367FisH

1    case——the Government Exhibit that was exhibited at trial where

2    Seth Fishman man said he set up a Panamanian trust to evade the

3    FDA, which is a U.S. regulatory body, not an Australian

4    regulatory body or Panamanian --

5             THE COURT:  That's in the record you're telling me.

6             MS. MORTAZAVI:  Yes, your Honor.  That was admitted as

7    a transcript.  It was Government Exhibit 912.  It's a recording

8    that we are prepared to play for the Court today.

9             THE COURT:  That's okay.  I can go back and find it.

10            MS. MORTAZAVI:  But in that exhibit, he states that he

11   was setting it up as a shield against the FDA.

12            Pardon me, your Honor.  I may have to correct myself.

13   I believe it may have been 911-T but, I will supply the Court

14   with the correct record.

15            THE COURT:  Okay.

16            MS. MORTAZAVI:  Given all of that, his statements

17   about Panama and trying to evade the FDA, the name of the

18   account, the fact that he's an account holder, I believe that

19   we are correct in including the Panamanian bank account

20   deposits in our total.

21            The commission contract, which I believe is

22   Defendant's Exhibit 2000, but defense can correct me on that,

23   makes no mention of these bank accounts in Panama.  They make

24   no mention of Equine Performance, Inc.  And so while that

25   contract may exist, it does not necessarily specify that

1    deposits went into this account.  Again, the only link between

2    that contract and this account are Seth Fishman's own

3    statements, which are inherently unreliable.

4         So if we add up all of those, your Honor, starting

5    from domestic sales and then including foreign sales, we end up

6    with the subtotal of approximately $16.8 million.  The

7    government has then gone through, based on the declaration of

8    Seth Fishman, and deducted any nondrug items.

9         Now, this Court brought up the fact that any

10   prescription drug that was resold by Seth Fishman, we can

11   assume was resold without a valid prescription and so it was

12   adulterated and misbranded.  So to give one example, because

13   defense counsel brought up vitamin C specifically, we attached

14   in our filing yesterday a photo of vitamin C.

15        THE COURT:  Where do I get that this is vitamin C?

16        MS. MORTAZAVI:  I'm sorry, your Honor.  I was on the

17   wrong page.

18        Here, vitamin C injectable solution, at the bottom,

19   you can see, your Honor, federal law restricts this drug to use

20   by or on the order of a licensed veterinarian.

21        So while defense counsel may be colloquially looking

22   at some of these items in the Avimark system and believing them

23   to be over-the-counter, and while Seth Fishman who has an

24   interest in this case is claiming that several of these items

25   are over-the-counter, when we actually look at the items

N367FisH

1    themselves, we can see that they are RX products, they do

2    require a prescription, and his resale of them violated the

3    FDCA and makes them forfeitable.

4              THE COURT:  Did you go through item by item?

5              MS. MORTAZAVI:  We did, your Honor.

6              THE COURT:  Okay.  This is what you gave me yesterday,

7    right?

8              MS. MORTAZAVI:  Yes.  This is just one page of the

9    chart that we supplied to the Court.  We prepared it after we

10   got the defense materials on Thursday.  Again, we went through

11   Seth Fishman's declaration, identified everything and every

12   category that he stated was a nondrug item or an

13   over-the-counter drug, and we researched whether or not that

14   was true.

15             So here, for SFX 323, Lubrisyn, you can't see the

16   category, but the heading is "notation" for this column.  We've

17   put "NA."  We've reflected the value of total sales in two

18   deduction columns.  By contrast, for SFX 331 on the same page,

19   it's Pyridoxine 150-milligram HCL distributed by Boothwyn.

20   We've put the notation "RX," and we put that because we had

21   done research online to find that drug or its equivalent.  We

22   found a product page or material that indicated that that drug

23   needs a prescription, which is why we made the notation that we

24   did, and then we added "zero" next to the deduction, next --

25   under what would have otherwise been a deduction, because we

N367FisH

1    don't believe that's appropriately excluded.

2            THE COURT:  How am I supposed to make findings based

3    on internet searches?

4            MS. MORTAZAVI:  It's available on the public record,

5    your Honor.

6            THE COURT:  That's not public record.  Talk about

7    inherently unreliable.  The internet?  Really?

8            MS. MORTAZAVI:  Well, if your Honor would permit, we

9    did not have time in the past four days, but we could go to the

10   FDA, have them do the research and then submit a declaration.

11   In the time we were given, that was not possible, and so we did

12   would we could in preparation for this hearing in the interest

13   of not adjourning these proceedings.

14           THE COURT:  Did you seize any of these drugs where you

15   have zero corrections?  Why can't you look at the bottles just

16   the way you did with this vitamin C, which I suspect is

17   restricted because it's injectable.  I could be wrong about

18   that, but that's my guess.  But in any event, it says it.  So,

19   I mean, do you have samples of any of these drugs that you can

20   give me reliable evidence?

21           MS. MORTAZAVI:  We may, your Honor, but we would need

22   time to gather that.

23           THE COURT:  Yes.  I appreciate that.

24           MS. MORTAZAVI:  And we may not have all of them just

25   because this is a ten-year period of information for which data

N367FisH

1    is being provided.  I don't know what was seized the day of the

2    seizures.  We're certainly happy to do it but, again, we will

3    need additional time.

4            THE COURT:  All right.  Let me hear the rest of that

5    chart that you were going through with me.  You had an option

6    B, which I guess starts with the total deposits and comes down.

7            MS. MORTAZAVI:  Which I understand the Court is not

8    inclined to do, so we would propose option A.

9            So let's assume for the moment that the government had

10   produced reliable evidence that these are RX drugs.  That is

11   the total of the deduction that should be made.  The total for

12   Count One would then be $15.8 million.  That reflects domestic

13   and foreign sales, minus any nondrug items or drugs that are

14   not adulterated and misbranded.  We then add the Navarro sales.

15           THE COURT:  This is the part that I have to tell you I

16   find troubling.  Having sat through both trials, Dr. Fishman's

17   and Ms. Giannelli's, and seeing the photographs of all of the

18   bandages, and syringes, and tubes, and all these other things,

19   I find it hard to believe that they total $967,000.

20           MS. MORTAZAVI:  Your Honor, if the defense is putting

21   forth the Avimark data, which they are, as reliable --

22           THE COURT:  Yes, but they don't have to prove

23   anything.

24           MS. MORTAZAVI:  Certainly, they don't.  But now the

25   evidence is before the Court and the Court can decide how to

N367FisH

1    come at a figure.  And I understand that the Court is

2    frustrated with the government, but the Court can, based on the

3    evidence submitted by both parties, reach a conclusion as to

4    what the appropriate forfeiture amount is here.

5         THE COURT:  Without having evidence, any figure I come

6    up with could be completely arbitrary, no?

7         MS. MORTAZAVI:  I don't believe so, because it would

8    still be a reasonable estimation, which is all that's required.

9    And we do have evidence, your Honor.  We have the Avimark sales

10   data.  The defense is standing behind that data and saying that

11   those figures are reliable.  The government has worked with

12   those figures to come up with the deduction.  That $967,000 was

13   not plucked out of thin air, it comes from the defense's data.

14   And so there should be no argument from the defense about the

15   authenticity or the completeness of it.

16        THE COURT:  No, I agree there can't be an argument

17   about the authenticity of the data.  The defense has relied on

18   the data, there's no doubt about that.  But short of me sitting

19   here and going through and doing these kinds of calculations --

20        MS. MORTAZAVI:  That's why, your Honor, we put forth

21   the chart that we did because we've done those calculations and

22   we've shown our work in this chart.  Again, this is the

23   category "blood work."  We've credited all of that as an

24   appropriate deduction.  These are the amounts that we came up

25   with, and that was the amount that we used to total the

N367FisH

 1  $967,000.  The government has done the work.  We're happy to

 2  have done the work, and we're happy to reach a resolution as

 3  expeditious a way as possible.  We do not expect the Court to

 4  have to take on this burden.  We've done it.  We've tabulated

 5  the amounts.  Once again, there they are.

 6          THE COURT:  This is the same chart, right?

 7          MS. MORTAZAVI:  This is the same chart, your Honor.

 8          THE COURT:  Okay.  One moment.

 9          What's your position on antibiotics?  You haven't

10  deducted them, right?

11          MS. MORTAZAVI:  If those antibiotics require a

12  prescription then they are precisely the same as any other drug

13  requiring a prescription.

14          THE COURT:  Okay.  So Dr. Fishman attached to his

15  declaration 16 different charts, right, with all different

16  kinds of products?

17          MS. MORTAZAVI:  Summary charts with Avimark reports

18  supporting them, yes.

19          THE COURT:  Right.  Did you go through all 16 of his

20  categories?

21          MS. MORTAZAVI:  In this exhibit that is attached to my

22  declaration, yes.  This is drawn from the defense's summary

23  charts.  It includes every category this that they included and

24  every drug that they included.

25          THE COURT:  Okay.

N367FisH

1            MS. MORTAZAVI:  So we worked with the defense's data.

2            THE COURT:  Okay.

3            MS. MORTAZAVI:  That's why I think, your Honor, you

4    can find this reliable.

5            If the Court thinks that -- I'm going to call it back

6    of the envelope, but I think the Court understands what I

7    mean -- research into these RX drugs requires more

8    substantiation.  We're happy to do it.  We would need

9    additional time to do it, but we're happy to provide it to the

10   Court so that the Court can have a level of comfort that in

11   fact the RX drugs we claim are RX-required prescriptions.

12           THE COURT:  All right.  Anything further?

13           MS. MORTAZAVI:  I'm sorry, your Honor.  I had some

14   responses to what the defense said.  I know I've been talking

15   at some length, so I apologize.

16           So with respect to the figure, your Honor, I think

17   there is a path forward and a path that narrows the areas of

18   disagreement between the parties.  With respect to what the --

19           THE COURT:  I don't know, Ms. Mortazavi, how you can

20   say that when you're ending up with a figure of 15,851,000 and

21   you started with a figure of 15 million -- something slightly

22   higher than that.

23           MS. MORTAZAVI:  But, your Honor, there's -- if the

24   methodology is sound -- the government didn't pluck these

25   numbers out of thin air.  If the methodology is reliable and

N367FisH

1    reasonable, then this Court can rely on it.  I understand that

2    the fact that the numbers are roughly equivalent is the source

3    of some discomfort.

4             THE COURT:  It's the size of the number.  I just don't

5    find it credible after sitting through two trials that there's

6    less than a million dollars in nonadulterated, nonmisbranded

7    products, I just don't.

8             MS. MORTAZAVI:  The record evidence tends to suggest

9    that that is the case based on the very data that the defense

10   has set forward as what this Court should consider in arriving

11   at this number.

12            THE COURT:  Okay.  And you wanted to address certain

13   other issues?

14            MS. MORTAZAVI:  Yes, your Honor.  I'll try to do it

15   briefly.  I understand we've been going for quite some time.

16            With respect to the Avimark data, I want to make clear

17   we do not have the source data.  We did not have the source

18   data.

19            THE COURT:  What does that mean, "source data"?

20            MS. MORTAZAVI:  As we understood it, the Avimark data

21   is hosted on a cloud.  We were told Lisa Giannelli did not have

22   access to it.  It can be manipulated, as I understand it, in

23   its original form, such that searches can be done in the way

24   you would search in Excel.

25            THE COURT:  Right.

N367FisH

1          MS. MORTAZAVI:  SFX 1800, which is the 5000-page PDF,

2     cannot be manipulated.

3          THE COURT:  Right.  I get both of those.

4          MS. MORTAZAVI:  And the defense has provided some

5     Excels, but they've provided approximately 90, whereas they've

6     generated from what they've turned over approximately 300

7     Avimark reports, and I believe they have more in their

8     possession that they have not turned over.

9          THE COURT:  Hold on.

10          Is that true?  Do you have more of these reports that

11     you've not turned over, Mr. Kessler?

12          MR. KESSLER:  The spreadsheets?  No.

13          THE COURT:  Okay.

14          MR. KESSLER:  With one exception.  We started with a

15     product valued at $800 and higher.  So if there were items that

16     were lower, we did not use them.

17          THE COURT:  Where did you get that number?

18          MR. KESSLER:  From the travel sheet.  This is where we

19     got everything, Judge.

20          THE COURT:  No.  Why did you pick 800, I'm saying?

21          MR. KESSLER:  Based on what we were seeing, it seemed

22     like a reasonable number.

23          THE COURT:  Okay.

24          MR. KESSLER:  No particular reason.  Believe it or

25     not, to reduce the amount of paper.

N367FisH

1          THE COURT:  Okay.

2          MS. MORTAZAVI:  Pardon me, your Honor.  I'm going

3    through my remarks——and I don't want to repeat myself on

4    anything that I've already said——I believe we're in agreement

5    that anything that required a prescription is adulterated and

6    misbranded based on what's been proven to date.

7          The defense has cited *United States v. Percoco* for the

8    principle that costs should be reduced here.  Again, I want to

9    reiterate *United States v. Percoco* is not relevant here because

10   we are not proceeding on a proceeds theory.  That discussion

11   and that determination was relevant for gross proceeds versus

12   net proceeds.  But the statute here, Section 334, ties to the

13   value of the adulterated and misbranded drugs.  So the value of

14   that drugs is reasonably reflected to be the sales value.

15         THE COURT:  And isn't that proceeds, the sales value?

16         MS. MORTAZAVI:  Again, it may end up that it is the

17   equivalent, but in terms of the nomenclature, we hew to what

18   the statute authorizes, and the statute here, Section 853(p),

19   goes to the value of those drugs.

20         THE COURT:  Okay.

21         MS. MORTAZAVI:  To respond to this claim that the

22   travel sheet has been altered, that is simply not the case.

23   We've produced in discovery the version of the travel sheet

24   that we found.  Of course the government did not alter it.  If

25   there were additional drugs, it would have only helped our case

N367FisH

1    because we take the view that these RX drugs, even if

2    distributed, were adulterated and misbranded.

3         I've also provided defense counsel two other exhibits

4    that were admitted at trial, they were Government Exhibit 1915

5    and Government Exhibit 301, and they are alternative versions

6    of the travel sheet that defense counsel had in their

7    possession.  In fact, one of those was produced by Equestology

8    in response to a subpoena.  There is no 11-page travel sheet

9    that was ever produced to the government in response to the

10   subpoena served on Equestology, nor has the government obtained

11   an 11-page travel sheet.  There was no attempt here to

12   manipulate the data.

13        THE COURT:  All right.  But even if -- I don't

14   think -- I hope, counsel wasn't accusing you or anybody on your

15   team of manipulating or in any way acting inappropriately.  But

16   if a document on its face is incomplete, isn't it inherently

17   unreliable?

18        MS. MORTAZAVI:  Depends on the purposes for which it

19   is being offered.

20        We offered it generally to demonstrate the types of

21   drugs that were being sold.  And the reason that version was

22   relevant to us is because it was on Lisa Giannelli's computer,

23   so it showed proof of the conspiracy.  There were other

24   versions that were produced that were of roughly equivalent

25   lengths across --

N367FisH

1          THE COURT:  Was that admitted as a trial exhibit?

2          MS. MORTAZAVI:  Yes, your Honor.  Government Exhibit

3    709, 1915 --

4          THE COURT:  I'm sorry.  Slow down.

5          MS. MORTAZAVI:  Apologies.

6          709, 1915, and 301 were all various versions of the

7    travel sheet.

8          If I mistook what defense counsel said, then there's

9    no need to me to clarify, but there was no subterfuge here.  In

10   any event, we have the Avimark data.  We're dealing with the

11   data in its totality.

12         I believe I covered the export exemption to the

13   Court's satisfaction, so I will not address that.

14         With respect to the seized product and double

15   counting, we don't believe we are double counting here because

16   we know that both Lisa Giannelli and Seth Fishman held their

17   office stock.  They held inventory prior to selling it.  It

18   wasn't as if every order had a customer attached to it.  They

19   were stockpiling drugs that they planned to distribute.  They

20   wanted them on hand so that they could quickly fulfill orders.

21   So we don't believe that we have double counted anything.  And,

22   in any event, we are now agreeing to go from the Avimark sales

23   data.

24         THE COURT:  So if you go from revenue, maybe I see

25   your point about the seized drugs because they weren't sold and

1    therefore there wouldn't be revenue associated with them.  But

2    if you're going from the Avimark, Avimark is only transactions?

3    Does that include purchases or only sales?

4            MS. MORTAZAVI:  You mean purchases prior to

5    fulfillment?  I think defense counsel would have to speak to

6    that.  But there would only be a narrow window of time where

7    there were sales that were not fulfilled.

8            THE COURT:  But what about the drugs that Dr. Fishman

9    says he ordered some stuff and then received it in and then

10   just turned around and resold it?  Would that be included in

11   the Avimark?

12           MS. MORTAZAVI:  From Seth Fishman, no, because Avimark

13   was Lisa Giannelli's tracking system.

14           THE COURT:  Okay.  But Lisa Giannelli did the same

15   thing.  She testified at trial that there were things that she

16   ordered that she turned around and she resold.

17           MS. MORTAZAVI:  Anything that she ordered and that she

18   paid for, we don't believe, based on the declaration, would be

19   reflected in Avimark.

20           THE COURT:  That's what I'm asking.

21           MS. MORTAZAVI:  Because that would reflect sales to

22   customers purchasing from Giannelli, not her purchasers --

23           THE COURT:  That's what I asked.  Okay.  So it's only

24   stuff that she sold to someone else?

25           MS. MORTAZAVI:  Correct.  It is not her paying Rapid

N367FisH

1    Equine or paying Boothwyn for a product, it is solely Mr. Dane

2    has ordered something, and now I'm going to input it, and now

3    I'm going to fulfill it.  So I don't believe there's a double

4    counting issue in that regard.  Those were future orders that

5    they would have fulfilled.  We have now seized those drugs.  We

6    are not counting the value of those drugs towards the

7    forfeiture money judgment.

8                THE COURT:  Okay.

9                MS. MORTAZAVI:  Finally, your Honor, I just want to

10   make one point as this Court looks at the statute.  I would ask

11   the Court to start with 28, U.S.C., 2461(c) and that language

12   itself because I think that definitively establishes that any

13   civil forfeiture statute may be imported into a criminal

14   context.  And there's no qualification, again, to what counsel

15   is asking for.  That also incorporates the procedures under

16   Section 853.  Again, there is no qualification to those

17   procedures.  The notion that the government is restricted in

18   what it can do in a criminal case to only what it can do in a

19   civil case is entirely of the defense's own making.  The

20   statute clearly says, whether it's based on civil or criminal

21   forfeiture, the procedures of Section 853 will apply.

22               THE COURT:  I didn't talk with Mr. Kessler about 853,

23   actually, but I understand him principally to be saying 334

24   isn't a forfeiture statute so you can't invoke 2461.

25               MS. MORTAZAVI:  And if there is a concession that it

N367FisH

1    is a forfeiture statute, which --

2              THE COURT:  There's not a concession.  He disputes

3    that.

4              MS. MORTAZAVI:  All right.  But if there were

5    recognition from the Court, if there were a ruling that it is a

6    forfeiture statute, then Section 853 must apply, which means

7    Section 853(p) must apply.  And there's no reason to read into

8    those procedures that the government may only seize the

9    physical property in hand, what would be *in rem*, and not

10   pursue --

11             THE COURT:  No, I think you already went through all

12   of this.  I understand your argument on this point.

13             MS. MORTAZAVI:  Very good, your Honor.  Then I have

14   nothing further to add.

15             THE COURT:  All right.  Anything you want to say by

16   way of rebuttal, Mr. Kessler?

17             MR. KESSLER:  Very briefly, your Honor.

18             THE COURT:  Sure.

19             MR. KESSLER:  Part of the problem, I think, is the

20   changing theories of the government and why something is

21   included and sometimes something is not included.  But let me

22   do easy things first, your Honor.  The double counting --

23             THE COURT:  For the seized products?

24             MR. KESSLER:  Yes.

25             THE COURT:  Yes.

N367FisH

1          MR. KESSLER:  So as Dr. Fishman's declaration made

2     clear, and as we indicated in our papers as well, those were

3     paid for.  So these are products that are already included in

4     income as well as the products itself.

5          THE COURT:  So how are they included in income?

6          MR. KESSLER:  They were paid for.

7          THE COURT:  So that's not income.  That's an expense.

8          MR. KESSLER:  No.  I'm sorry, Judge.  Equestology

9     received the money and had not yet sent out the product.

10          THE COURT:  How do I know that for all of these?  I

11     mean, Lisa Giannelli did say she had -- I mean, we had pictures

12     of the cabinets containing lots of supplies and products.

13          MR. KESSLER:  Correct.  And you see in the declaration

14     by Dr. Fishman he did not say all of it, there was an amount

15     that was listed.  If there was -- and I'm making this --

16          THE COURT:  Where are we going to ballpark that

17     amount?

18          MR. KESSLER:  It was a reasonable amount if you're

19     asking me, but that's, I guess, for the Court to determine.

20          But more importantly, Judge──and I'm sorry to go back

21     to this, but I have to──the reason we're having trouble is

22     because the party with the burden hasn't carried it.

23          THE COURT:  I understand that fully.  You don't need

24     to belabor that.

25          MR. KESSLER:  Thank you.

1          Regarding burden of proof, the one thing that

2     Ms. Mortazavi said I've got, I'd like to read the statute.  And

3     this is the export exemption.  The reason we don't have the

4     burden of proof and it's on the government is nothing more than

5     the language of the statute.  And I'm reading it.

6          THE COURT:  Tell me the cite for the statute, please.

7          MR. KESSLER:  It is 21, U.S.C., 381(e), as in Edward.

8          THE COURT:  Thank you.

9          MR. KESSLER:  It's under the Section "exports" and

10    it's subdivision 1.  It reads as follows:

11         A food drug, device, tobacco product, or cosmetic

12    intended for export shall not be deemed to be adulterated or

13    misbranded under this chapter.  And a tobacco product -- okay.

14    If it (a) accords to the specifications of the foreign

15    purchaser (b) is not in conflict with the laws of the countries

16    to which it is intended for export (c) is labeled on the

17    outside of the shipping package that it is intended for export

18    and (d) it is not sold or offered for sale in domestic

19    commerce.

20         That's the export exemption we're referring to.  It is

21    not an innocent owner defense.  It is not for the person to

22    prove that something didn't happen.  This is part of the proof

23    that under the rest of the section—now we get to one of the

24    exceptions, and that is export—it shall not be deemed to be

25    adulterated.  This is not an affirmative defense.  Your Honor

N367FisH

         1    has seen enough affirmative defenses.  This is not how Congress

         2    crafted an affirmative defense.  The burden here is on the part

         3    of the government.  And if we're wondering why Dr. Fishman only

         4    had a handful of papers to prove what he said in his

         5    declaration, which he said as the chief scientific officer in

         6    the UAE, is because the documents had been seized.  So we have,

         7    we presented what we can, but that's what we have and that's

         8    what we were able to present.  But the burden should not be on

         9    us to make that presentation.  So I disagree that it is an

        10    affirmative defense.

        11          As far as the Panamanian accounts are concerned, the

        12    government says that Dr. Fishman didn't disclose them, maybe

        13    his declaration wasn't drafted carefully enough.

        14          THE COURT:  No.  I think she's saying you didn't

        15    disclose them to Probation, which he didn't.

        16          MR. KESSLER:  No, I understand.  The money wasn't his.

        17    He said he didn't have any interest --

        18          THE COURT:  Now you're just re-arguing a point that

        19    was made by me in connection with sentencing.

        20          MR. KESSLER:  I am only saying this, your Honor,

        21    because Ms. Mortazavi is focusing on credibility.

        22          THE COURT:  Okay.

        23          MR. KESSLER:  If I have an account that I gave over to

        24    you and someone asks me if I have a list of accounts, I am not

        25    going to be including that account if I believe I handed it to

N367FisH

1    you.

2                THE COURT:  Okay.

3                MR. KESSLER:  In addition, I find it almost humorous

4    that the government is backing away from proceeds.  There is no

5    statute that supports forfeiting the value of New Animal Drug,

6    none.  And don't let it be said that I am consenting that there

7    is --

8                THE COURT:  I understand.

9                MR. KESSLER:  -- any forfeiture.

10               THE COURT:  I understand you're not consenting.

11               MR. KESSLER:  Now, Ms. Mortazavi I believe asked about

12   the travel sheet, and why it is that we're using it, and

13   they're using it, and it should be used.  It's the key to the

14   case.  It's the only document we have——"we" being everyone here

15   that I know of——that has a value.

16               THE COURT:  Yes.  The only problem with -- you may be

17   right that somebody should have objected to that document on

18   the grounds that on its face it's inherently unreliable, but

19   nobody did at least as far as I recall.

20               MR. KESSLER:  And I'm not accusing anybody of

21   impropriety at this point.

22               THE COURT:  No.  I get that.

23               MR. KESSLER:  What I'm saying is, it is just as

24   likely——and I don't know this, so I'm just saying as

25   likely——that the reason why pages, whatever they are, 8, 9, 10,

N367FisH

1  11, are missing is because they don't relate to drugs.

2  Dr. Fishman also had, believe it or not, veterinary patients

3  and services that he provided, and there were codes that were

4  used for veterinary services, too.  Maybe the codes related to

5  them.

6         THE COURT:  Okay.  But I'm just not going to

7  speculate.

8         MR. KESSLER:  Thank you.  I don't want you to

9  speculate.

10         THE COURT:  And that document is in evidence.

11         MR. KESSLER:  Yes.

12         THE COURT:  It is.

13         MR. KESSLER:  I'm not asking for the Court to

14  speculate.

15         THE COURT:  Okay.

16         MR. KESSLER:  Two last points, though, Judge.

17         First, reasonable estimation.  I promised I wouldn't

18  do this, but I'm going to do anyway.

19         THE COURT:  Don't ask me why I don't credit some of

20  what you say when you make a statement like that.

21         Go ahead.

22         MR. KESSLER:  The case that's cited by the government,

23  they repeatedly talk about the reasonable estimate as their

24  standard.

25         THE COURT:  What case?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N367FisH

1          MR. KESSLER:  The case is *U.S. v. Roberts*, it is a

2    Second Circuit case, I believe, 2021.

3          THE COURT:  Okay.

4          MR. KESSLER:  It's fascinating they use *Roberts* as the

5    analysis because the default is not the government using a

6    reasonable estimate.  That's not the default in forfeiture

7    cases.  It comes into play in certain situations.  *Roberts* is a

8    perfect example.  *Roberts* dealt with a cocaine smuggler who was

9    involved in, I believe, 70,000 grams of cocaine that were

10   seized.  The question for the district court was how much is

11   that worth?  The government said, well, we don't have buys or

12   sales, whatever it is, of each one of them, but we can estimate

13   that the value of a gram of coke is -- I'm picking a number --

14   $40 per gram.  So the Court said, okay, we can do a reasonable

15   estimate, 70,000 times $40 is whatever it comes to.

16         THE COURT:  Of the value, not the proceeds, right?

17         MR. KESSLER:  No the proceeds.  It's under 21 U.S.C.

18         THE COURT:  It's the value of the drugs, isn't it?

19   You just told me the Court said we don't know, we don't have

20   sales, so we have to make a reasonable estimate of the value.

21         MR. KESSLER:  That was seized.  I'm sorry.  The 70,000

22   grams were seized.

23         So what's the value of this and how are we going to

24   forfeit from the proceeds?  And that's how they did a

25   reasonable estimate.  And that's the figure that the district

N367FisH

1    court came to, and the Second Circuit said that was a

2    reasonable way to calculate that figure.

3          That is nowhere close to the situation we have here.

4    The fact that the government keeps talking about reasonable

5    estimation, yes, there is a time and place for reasonable

6    estimation, not in this situation.

7          Finally, we didn't talk about 853(p).

8          THE COURT:  Right.

9          MR. KESSLER:  Would you like to?  I want to briefly

10   mention it.

11         THE COURT:  Go ahead.

12         MR. KESSLER:  853(p), your Honor, deals with

13   substitute assets, substitute property.  I commend the Court to

14   an incredible decision by Judge John Gleeson in the Eastern

15   District, it's *U.S. v. Surgent*.  It was a 2009 decision from

16   Judge Gleeson in which he goes through the differences in the

17   various types of property, especially substitute assets.

18   Substitute assets by definition substitute for something.

19   There has to be proof that the property that it's been

20   substituted for.  And 853 mentions the type of property.  They

21   mention real property, they mention personal property, rights,

22   things like that, all listed in the statute, I believe under

23   (b) of 853.  Those types of property, if they are secreted or

24   done away with by the defendant, then the government can

25   substitute for the tainted property untainted property.

N367FisH

1          THE COURT:  Like money.

2          MR. KESSLER:  Exactly like money.

3          So as a wild example, my house is subject to

4    forfeiture, I sell the house, and the government can't find

5    that money.  They can attach an account that says "grandma's

6    inheritance."

7          THE COURT:  So why aren't drugs personal property that

8    have been dissipated and you can substitute money for it?  How

9    is that any different than what you're telling me?

10         MR. KESSLER:  But we don't have that here, Judge.  The

11   preliminary order of forfeiture is for a money judgment.  It is

12   not for any specific property.  It is not for the forfeiture of

13   my house or my car.

14         THE COURT:  So you're saying in order to invoke 853(p)

15   you need to list the specific property for which you are

16   substituting and you can't do it generically?

17         MR. KESSLER:  You have to seek it.  Correct.

18         THE COURT:  No, you can't seize it.  In your example

19   where you talk about a house that had already been sold, you

20   couldn't seize it.

21         MR. KESSLER:  No.  I'm sorry, Judge.  You have to be

22   seeking.

23         THE COURT:  Oh, seeking.  I'm sorry.  I misheard you.

24         MR. KESSLER:  Quite all right.

25         You have to be seeking the forfeiture of specific

N367FisH

1    property.

2            THE COURT:  And can you refer to it generically or you

3    need line by line?

4            MR. KESSLER:  But it's not generic, it's specific.

5            THE COURT:  That's what I'm asking you.  So can they

6    say adulterated and misbranded drugs?  Or can they say

7    adulterated and misbranded drugs and break it down by

8    categories?  Or are you saying they have to say 963 bottles of

9    BB3?

10           MR. KESSLER:  If that is what they are seeking to

11   forfeit, if the statute permits them to forfeit --

12           THE COURT:  I get all that.

13           MR. KESSLER:  -- 963 bottles of PP, then yes.  It

14   doesn't have to say the 936 bottles.  It can say bottles of PP,

15   and DD, and FF, and whatever it is, the drugs that we are

16   looking for.  And this is standard language in every

17   indictment.  And if those are unavailable, we will be seeking a

18   money judgment.

19           THE COURT:  I think it's in the indictment.

20           MR. KESSLER:  I'm not saying it's not.

21           THE COURT:  So I don't understand your point then.

22           MR. KESSLER:  In the preliminary order of forfeiture

23   and in this proceeding, the government is specifically not

24   talking about proceeds not invoking anything that we're talking

25   about here.  They're asking for and, in fact, the preliminary

N367FisH

1    order of forfeiture talks about nothing but a money judgment.

2              THE COURT:  Well, in any event, we are revising --

3    that's the whole purpose of our being here today is to scrap

4    the preliminary order of forfeiture and talk about what the

5    final order were to look like, right?

6              MR. KESSLER:  That is correct, Judge.

7              THE COURT:  So --

8              MR. KESSLER:  But there is nothing to substitute for a

9    money judgment.  Money does not substitute for money.

10             THE COURT:  Money substitutes for the adulterated and

11   misbranded drugs that had been sold or otherwise distributed.

12             MR. KESSLER:  Yes.  But the government is seeking a

13   money judgment for the value of something.

14             THE COURT:  Right.

15             MR. KESSLER:  That is repetitive.  That is asking for

16   a money judgment.  There is no applicability of substitute

17   property in this discussion.  I don't know why it's even

18   mentioned here.

19             THE COURT:  Do you have the preliminary order of

20   forfeiture?

21             MR. KESSLER:  I do, yes.

22             THE COURT:  I mean, on the top of page 2, the first

23   "whereas" paragraph says, Whereas the Court finds that drugs

24   that were adulterated or misbranded by the defendant when

25   introduced into or while in interstate commerce or were held

N367FisH

| | |
|---|---|
| 1 | for sale -- I'm going to skip the parenthetical and the rest of |
| 2 | that line -- under the provisions of sections 331(11), 334, or |
| 3 | 355 of this title have been introduced into interstate |
| 4 | commerce, are subject to forfeiture to the United States (the |
| 5 | forfeitable property).  And now by the rest of this order they |
| 6 | are substituting a money judgment for that forfeitable |
| 7 | property. |
| 8 | Am I reading this right? |
| 9 | MR. KESSLER:  Yes, you are. |
| 10 | THE COURT:  So I'm just not understanding your point. |
| 11 | MR. KESSLER:  I am going to withdraw what I said, |
| 12 | Judge, and end on the final point. |
| 13 | THE COURT:  Okay. |
| 14 | MR. KESSLER:  I don't know -- withdrawn. |
| 15 | The final point is that -- |
| 16 | THE COURT:  I thought that was your final point. |
| 17 | MR. KESSLER:  Yes, I don't like ending on that though, |
| 18 | if you don't mind. |
| 19 | THE COURT:  Yes, it's not a great note to end on. |
| 20 | MR. KESSLER:  It would have been. |
| 21 | THE COURT:  But you were wrong. |
| 22 | MR. KESSLER:  I was, yes.  I don't know why in all my |
| 23 | reading of that I did not see that line, and I apologize for |
| 24 | that, Judge. |
| 25 | THE COURT:  Okay. |

N367FisH

1          MR. KESSLER:  My statements regarding substitute

2     assets still apply, but not here.

3          THE COURT:  Okay.  I have tremendous respect for

4     Judge Gleeson for whatever it's worth.

5          MR. KESSLER:  I do as well.  Wonderful human being as

6     well.

7          2461, the government says there are no qualifications

8     to it.  That was in the last piece that Ms. Mortazavi said.

9     There certainly are.  And I've said it before and I will end

10    with this, the primary qualification is that there has to be a

11    civil forfeiture statute --

12         THE COURT:  I get that.

13         MR. KESSLER:  -- which is going to be converted then,

14    to use a loose term --

15         THE COURT:  Right.

16         MR. KESSLER:  -- into a criminal forfeiture.

17         THE COURT:  Right.  And in all my conversations with

18    you, I asked you to assume because I'll never reach this

19    question if I rule in your favor.

20         MR. KESSLER:  And wouldn't it be so much easier,

21    Judge, then?

22         THE COURT:  Oh, come on.  You're not seriously arguing

23    rule in your favor because it's the easy way.

24         MR. KESSLER:  I'm being facetious, your Honor.

25         THE COURT:  Okay.  I've put in a tremendous amount of

N367FisH

1    time and effort in this case, not just this part.

2                MR. KESSLER:  I do not doubt that, and we have as

3    well.

4                THE COURT:  I appreciate that.  I said at the outset

5    it would have been helpful if I had that back in October and I

6    could have all that time to have the benefit of that authority,

7    but we are where we are.

8                MR. KESSLER:  Thank you very much, your Honor.

9                THE COURT:  All right.  With that, we'll stand

10   adjourned then.  I will obviously need time to sort through

11   what you have all given me.  I have a pretty full calendar for

12   the next couple of weeks, so I will get back to you as promptly

13   as I can, but I appreciate everybody's efforts.

14               All right.  We'll stand adjourned.

15               Dr. Fishman, I hope you are well, and I continue to

16   wish you well.

17               THE DEFENDANT:  Thank you.

18               THE COURT:  You're welcome.  And I thank our court

19   reporter very much.  I know we went very long, so I appreciate

20   your patience.  We're adjourned.

21               (Adjourned)

22

23

24

25