UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_____7/7/2023_____

UNITED STATES OF AMERICA,

-against-

SETH FISHMAN,

Defendant.

20-cr-160-7 (MKV)

OPINION & ORDER
ON FORFEITURE

MARY KAY VYSKOCIL, United States District Judge:

The defendant, Seth Fishman, was a licensed veterinarian, but he did not practice veterinary medicine for many years before his arrest.  Instead, Dr. Fishman made and sold drugs designed to enhance the performance of racehorses and to evade regulatory scrutiny.  After a jury trial, he was convicted of two counts of conspiracy to commit drug adulteration and misbranding with the intent to defraud or mislead, in violation of 18 U.S.C. § 371 and 21 U.S.C. §§ 331 and 333.

At Dr. Fishman's sentencing, on the consent of both parties, the Court issued a Preliminary Order of Forfeiture/Money Judgment in the amount of $13,503,176.20 [ECF No. 887 ("POF")], representing the value of the adulterated and misbranded drugs that were sold or otherwise dissipated during the course of the two conspiracies.  The Indictment contained forfeiture allegations, and the defense never objected to the forfeiture proposed by the government and contemplated by the Presentence Investigation Report at any point in advance of Dr. Fishman's sentencing.  However, after the Court *sua sponte* raised questions about the amount of forfeiture, the defense requested an opportunity to revisit "the addition that leads . . . to the number of $13.5 million in total" [No. 901 ("Sentencing Tr.")] at 18:14–17].

As such, the Court, on the consent of both parties, gave the parties time to confer about the amount of the preliminary order of forfeiture and either "consent to the calculation of that amount," or request an amended money judgment or a hearing on the correct amount of the forfeiture in this

case.  Sentencing Tr. at 92:7–16; 97:22–98:4.  Thereafter, Dr. Fishman hired new counsel (for the second time), who instead filed a brief arguing that the statutes of conviction do not authorize forfeiture, without addressing the correct amount of any forfeiture.  Following significant delays to accommodate the defense, the Court held a forfeiture hearing.  The Court heard arguments on whether any forfeiture is permissible and, if so, the appropriate amount of the forfeiture in this case.  After the hearing, the government submitted additional evidence in response to voluminous data that the defense first shared with the government shortly before the hearing.

The Court has painstakingly reviewed the governing law, the trial record, and the evidence presented in connection with the forfeiture hearing, including line-by-line review of various drugs and non-drug items Dr. Fishman's company sold during the relevant period.  For the reasons set forth below, the Court rules that: (1) adulterated and misbranded drugs are "forfeitable pursuant to 21 U.S.C. § 334(a),"[1] and two other statutes, 28 U.S.C. § 2461(c) and 21 U.S.C. § 853, authorize the Court to impose a money judgment representing the approximate value of adulterated and misbranded drugs that Dr. Fishman caused to be sold or otherwise dissipated; and (2) in this case, the government has carried its burden to show that Dr. Fishman sold or dissipated approximately $10,312,627.40 worth of adulterated and misbranded drugs.

## I.    BACKGROUND

### A.  The Convictions

The defendant, Seth Fishman, was convicted at trial of two counts of conspiracy to commit drug adulteration and misbranding with the intent to defraud or mislead, in violation of Title 18, United States Code, Section 371 and Title 21, United States Code, Sections 331 and 333.  Dr. Fishman was also convicted of the continued commission of one of the conspiracies while he was

---

[1] *United States v. Eight Unlabeled Cases, more or less, of an Article of Cosmetics.*, 888 F.2d 945, 949 (2d Cir. 1989).

on pretrial release in violation of Title 18, United States Code, Section 3147.  The evidence at trial demonstrated that Dr. Fishman was a licensed veterinarian but he did not practice veterinary medicine during the relevant period.  Rather, Dr. Fishman led a conspiracy, with his co-defendant Lisa Giannelli and others, to use his company Equestology to make and sell custom drugs that he had designed to enhance the performance of racehorses and to evade detection by racing-industry tests for performance enhancing drugs ("PEDs").  Dr. Fishman and Ms. Giannelli also used Dr. Fishman's veterinary license to sell prescription animal drugs that trainers administered to horses that Dr. Fishman had never medically evaluated.

The evidence at trial further demonstrated that, in addition to leading his own conspiracy, Dr. Fishman participated in a conspiracy led by Jorge Navarro, a successful thoroughbred trainer who was notorious for "doping" the horses in his care with PEDs.  Dr. Fishman sold adulterated and misbranded PEDs to Mr. Navarro.  Indeed, when a horse Mr. Navarro trained won a $2 million purse, Mr. Navarro credited Dr. Fishman as "a big part of it" [GX 401].

### i.    Dr. Fishman's Custom PEDs

The evidence at trial demonstrated that Dr. Fishman sold and distributed drugs that were adulterated and misbranded in several ways.  *See, e.g.*, 21 U.S.C. §§ 321(g)(1)(B)-(C), 321(k), 321(m), 321(n), 331(a), 351(a)(5), 352(a)-(c), 352(f), 352(o), 353(b)(1), 353(b)(4)(A), 353(f), 360b.  First, testimony from expert witnesses demonstrated that Dr. Fishman's custom PEDs were "new animal drugs" that were neither approved by the Food and Drug Administration ("FDA"), nor "generally recognized as safe and effective" for any intended use.  Fishman Trial Tr. [ECF No. 749] at 393:11–19, 395:5–16, 396:6–12, 400:2–5, 437:3–439:22; *see* Fishman Trial Tr. [ECF No. 751] at 605–621; *see also* 21 U.S.C. §§ 351(a)(5), 360b.

In addition, the evidence at trial demonstrated that Dr. Fishman's custom PEDs were not labeled in accordance with FDA requirements. *See* 21 U.S.C. §§ 352(a)-(c), 352(f). For example, instead of disclosing the ingredients of the drug, the label for Dr. Fishman's "HP Bleeder" drug stated: "This product contains no known testable ingredients" and described the ingredients only vaguely as a "[p]roprietary blend of complex amino acid structures." Fishman Trial Tr. [ECF No. 749] at 438:11–14 [GX 1018]. Other products bore similar labels. Moreover, Dr. Fishman's custom PEDs were adulterated and misbranded because they were made in facilities that were not registered with the FDA. *See* 21 U.S.C. § 352(o).

### ii.     Prescription Animal Drugs

The evidence at trial further demonstrated that Dr. Fishman distributed adulterated and misbranded drugs when he dispensed prescription animal drugs, either personally or through Ms. Gianelli. *See* 21 U.S.C. § 353(f). As the Court instructed the jury, a prescription animal drug must be either administered by a veterinarian, or dispensed pursuant to a valid prescription, meaning it is prescribed "in the usual course of professional practice by a licensed veterinarian for a legitimate medical purpose [and] based upon a *bona fide* veterinarian-client/patient relationship." Fishman Trial Tr. [ECF No. 759] at 1306:16–1307:13. Furthermore, it was established at the trial that any drug that must be administered via injection or nasogastric tube requires a prescription. *See* Fishman Trial Tr. [ECF No. 749] at 419:8–420:22.

The evidence at trial clearly demonstrated that Dr. Fishman did not have any *bona fide* veterinarian-client/patient relationships during the relevant period. He was not in the practice of examining or treating animals at that point in his career. For example, the government introduced a recording of an intercepted phone call in which Dr. Fishman boasted that he "doesn't . . . touch horses" [GX 912-T]. Similarly, a witness at the trial, Adrienne Hall, testified that she sought to

have Dr. Fishman examine one of her horses but she was informed that "he doesn't do that type of work anymore."  Fishman Trial Tr. [ECF No. 753] at 793:10–19.

Another witness at Dr. Fishman's trial, a former standardbred racehorse trainer named Ross Cohen, testified that he purchased from Ms. Giannelli a variety of injectable prescription drugs—including injectable vitamins, phenylbutazone, flunixin, and banamine—in addition to some of Dr. Fishman's custom PEDs.  Fishman Trial Tr. [ECF No. 751] at 669:3–13 ("Those were all injectable."), 669–676.  Mr. Cohen also testified that Dr. Fishman came to his barn once but did not examine any horses.  Fishman Trial Tr. [ECF No. 751] at 673:9–15.  Mr. Cohen testified that he did not have prescriptions for the drugs Ms. Giannelli sold him and that the bottles listed Dr. Fishman as the prescribing doctor.  Fishman Trial Tr. [ECF No. 751] at 670:1–3, 676:25–677:1, 677:4–6.  Mr. Cohen testified that he administered the prescription drugs himself.  Fishman Trial Tr.  [ECF No. 751] at 672:2–3.

### iii.    Non-Drug Items

Notably, for purposes of calculating the forfeiture, Equestology also distributed products other than adulterated and misbranded drugs, including, for example, needles and syringes.  There was little, if any, evidence about such products at Dr. Fishman's trial.  However, at Ms. Giannelli's trial, her attorney adduced evidence about the full range of products she sold for Equestology.  Ms. Giannelli's attorney offered evidence that Ms. Giannelli used a database called the Avimark system to keep track of the orders she placed on behalf of Equestology clients (predominantly trainers of racehorses) from several pharmacies and from Dr. Fishman personally, along with the prices of the products she ordered.  *See* Giannelli Trial Tr. at 904:7–907:7.  Ms. Gianelli sold not only Dr. Fishman's custom PEDs, but also numerous prescription drugs that she ordered from pharmacies using Dr. Fishman's veterinary licenses, as well as non-drug items such as syringes.

*See* Giannelli Trial Tr. at 964:15–22; Giannelli Trial Tr. at 256:18 (Mr. Cohen testifying that he purchased "needles and syringes" from Ms. Giannelli, in addition to the various prescription drugs mentioned above that he purchased).

### iv.   Foreign Sales

Also relevant to the forfeiture dispute, the government introduced at trial evidence that Dr. Fishman sold his drugs overseas, primarily to the United Arab Emirates ("UAE").  *See* Fishman Trial Tr. [ECF No. 745] at 108:8–19 (witness testimony about shipping "Equestology . . . products" abroad, "[f]or the most part, to the UAE," as well as to "Singapore" and "Saudi Arabia"), 209:6–8 (witness testimony that Dr. Fishman "[m]ade numerous trips . . . to the United Arab Emirates").  For example, the government introduced emails in which a customer in the UAE requested "a thousand vials of equine growth hormone," and Dr. Fishman instructed an Equestology employee based in South Florida to ship the requested product to Dubai Equine Hospital.  Fishman Trial Tr. [ECF No. 745] at 150:17–22.

Prior to the trial, Dr. Fishman's counsel at the time, Messrs. Sercarz and Fernich, had filed motions *in limine* arguing that the government should not be permitted to introduce evidence of any foreign sales, citing the so-called "export exemption" to adulteration and misbranding laws set forth in 21 U.S.C. § 381(e) [ECF Nos. 571 at 5; ECF No. 599 at 10; ECF No. 625 at 2–3].  The statute provides that a drug "intended for export shall not be deemed adulterated or misbranded" if it (A) accords to the specifications of the foreign purchaser, (B) does not violate the laws of the country for which it is intended for export, (C) is labeled for export, and (D) is not offered for domestic sale.  *See* 21 U.S.C. § 381(e).  In its motions *in limine*, the defense argued Dr. Fishman's foreign sales met these criteria and, thus, were not evidence of guilt.

The government, in turn, argued that Dr. Fishman should not be permitted to mention the export exemption at the trial [ECF No. 572 at 35; ECF No. 598 at 4–8; ECF No. 626 at 5–6]. Specifically, the government argued that the export exemption is an affirmative defense and that there was no support for such a defense in this case. The defense did not concede that that export exemption is an affirmative defense. It argued the government should have to show Dr. Fishman failed to comply with the export exemption because "the question of intent to defraud is part of the government's . . . case in chief" [ECF No. 706 at 79:2–3]. The defense did concede, however: "We have a burden . . . to present some evidence implicating the defense, raising the defense. If we fail to present any evidence . . . then it's out of the case" [ECF No. 706 at 78:20].

In ruling on the motions *in limine*, the Court tentatively opined that "the export exemption is an affirmative defense" [ECF No. 706 at 72:8–9, 78:11–79:8]. However, the Court refused to preclude either evidence of foreign sales, or mention of the export exemption. Rather, the Court ruled that "if the government introduces evidence of foreign sales . . . then Dr. Fishman has the right to offer evidence that these sales conformed to the requirements" of the export exemption [ECF No. 706 at 77:22–78:2]. At trial, the government introduced evidence of foreign sales, but the defense never argued those sales were lawful based on the export exemption.

### v.      The Panamanian Entity

The final piece of trial evidence germane to the forfeiture dispute concerns Dr. Fishman's creation of a financial entity in Panama. The government offered evidence of a recording in which Dr. Fishman references "setting up a Panamanian corporation" as a "shield" because the FDA has "no jurisdiction there" [GX 912-T]. *See* Trial Tr. [ECF No. 759] at 1210:19–24, 1277:9–17. The government in its closing arguments characterized this phone call as evidence of Dr. Fishman's

intent to defraud or mislead, as required for a felony conviction under 21 U.S.C. §§ 331 and 333.
*See* Trial Tr. [ECF No. 759] at 1210:19–24, 1277:9–17.

**B. Dr. Fishman's Sentencing**

Upon Dr. Fishman's conviction, the Court ordered the Department of Probation to prepare
a Presentence Investigation Report ("PSR").  The initial draft of the PSR was sent to the parties in
April 2022 [ECF No. 824 ("Initial PSR")].  The Probation Department found that Dr. Fishman was
liable for forfeiture of $13,503,176.20 for the two conspiracies.  Initial PSR ¶ 179.  Dr. Fishman
did not object to the forfeiture in the Initial PSR.  Indeed, Dr. Fishman's counsel at the time of his
sentencing included with his sentencing submission to the Court a letter outlining his numerous
objections to the Initial PSR, and it did not mention forfeiture [ECF No. 888-11].

The final PSR, like the Initial PSR, found that Dr. Fishman was liable for forfeiture of
$13,503,176.20 for the two conspiracies [ECF No. 860 ("PSR") ¶ 181].  It noted, in the justification
for the Probation Department's sentencing recommendation, that forfeiture is "mandatory" in this
case.  PSR at 39; *see also* PSR at 37 (recommending that the Court sentence Dr. Fishman to
forfeiture in the amount of $13,503,176.20); PSR at 43 (same).  The final PSR reflects a number
of defense objections, but Dr. Fishman did not object to the amount of the forfeiture in the PSR,
much less argue that any forfeiture would be unlawful.

The Court adjourned Dr. Fishman's sentencing several times at the request of his then-
counsel Messrs. Sercarz and Fernich (his second set of lawyers) [ECF Nos. 816, 849, 853].  The
Court later denied a request to adjourn yet again, noting that defense counsel had represented that
he did have adequate time to prepare his sentencing submission [ECF No. 870].  The day of the
deadline, defense counsel submitted Dr. Fishman's sentencing submission to the Court via email.
Then, about six days later, defense counsel submitted a "corrected" memorandum of law, and the

Court accepted and relied on that untimely submission in connection with the sentencing [ECF No. 888; ECF No. 901 ("Sentencing Tr.") at 9:3–10:14].   Defense counsel raised a number of arguments and objections in Dr. Fishman's sentencing submission, but nothing defense counsel submitted ever mentioned the forfeiture [ECF No. 888].

At Dr. Fishman's sentencing, on July 12, 2022, the Court discussed with the parties in great detail the various corrections and objections to the PSR.  *See* Sentencing Tr. at 4:14–8:23.   After ruling on defense objections unrelated to the forfeiture, the Court adopted the PSR and the factual findings therein.   The Court then asked not only Mr. Sercarz, but also Dr. Fishman himself whether he "had the opportunity to review the presentence report," to discuss it, and to raise "any corrections or objections."   Sentencing Tr. at 15:3–6, 15:8–11.   Both Mr. Sercarz and Dr. Fishman separately answered, "Yes."   Sentencing Tr. at 15:7, 15:12.   Next, the Court specifically asked, "Are there any objections that have not been previously filed?"   Sentencing Tr. at 15:17–18.   Mr. Sercarz answered, "None by the defense, your Honor."   Sentencing Tr. at 15:20.

The Court then *sua sponte* raised several questions about the proposed preliminary order of forfeiture that the government had submitted to the Court, seeking a money judgment in the amount of $13,503,176.20 (the same amount specified in the PSR).   The Court asked the Assistant United States Attorney appearing on behalf of the government, Ms. Mortazavi, to provide more information about the basis for the proposed amount of the forfeiture.   Sentencing Tr. at 16:19.   The Court specifically asked Ms. Mortazavi, "don't you have a large volume of drugs that were seized from Dr. Fishman's various locations?  Are they encompassed by this order?"   Sentencing Tr. at 16:20–22.

Ms. Mortazavi represented that the proposed amount of the forfeiture was limited to Dr. Fishman's adulterated and misbranded "drugs that had been dissipated" prior to any seizure.

Sentencing Tr. at 17:12–14.  Ms. Mortazavi explained that the $13,503,176.20 reflected "the value of the [dissipated] dugs," based on federal agents' review of bank records and sales invoices. Sentencing Tr. at 17:18–25. Ms. Mortazavi further represented that she had shared the basis for the proposed forfeiture with defense counsel in advance of the sentencing and her understanding was that "they do not contest the government's figure."  Sentencing Tr. at 18:1–10; *see* Sentencing Tr. at 19:22–24 (stressing that "the government did provide the underlying records that formed its calculation to defense counsel").

The Court then prompted defense counsel to respond.  Sentencing Tr. at 18:11.  The defense never, during this colloquy, or at any other time during the sentencing, objected that the imposition of any forfeiture would be unlawful.  Rather, defense counsel stated: "I believe I understand the government's methodology, but I would request on behalf of my client an effort to indicate the addition that leads them to the number of $13.5 million in total."  Sentencing Tr. at 18:14–17. Specifically, Mr. Sercarz stated that he was concerned that the numbers "don't quite add up" because tax returns for the years 2016, 2017, 2018, and 2019 "declared gross revenues in the vicinity of $2 million per year" for Equestology, although Mr. Sercarz acknowledged that was only four years of an approximately eighteen-year conspiracy.  Sentencing Tr. at 18:18–20:20; *see* Sentencing Tr. at 23:21–24:1.

Mr. Sercarz admitted that he had not informed the government in advance of the sentencing that he intended to contest the forfeiture amount.  Sentencing Tr. at 19:10–21.  He then suggested ("My proposal") that the Court proceed with the sentencing but "set a date for a [later] hearing, should we regard one as necessary."  Sentencing Tr. at 19:4–6.  He stated that the defense was "just not prepared to accept this *number* today."  Sentencing Tr. at 19:8–9 (emphasis added). However, he expressed confidence that "after some further discussion with Ms. Mortazavi, we can

resolve this without the need for a hearing." Sentencing Tr. at 19:6–7. Ms. Mortazavi responded, "I have no issues . . . with trying to come to an agreement post sentencing on the forfeiture *figure*." Sentencing Tr. at 20:7–9 (emphasis added).

After this colloquy, the Court explained with respect to the proposed preliminary order of forfeiture: "I cannot make a finding, as I must, by a preponderance of the evidence without the evidence if this issue is disputed." Sentencing Tr. at 24:2–4. Mindful that the Court must announce the forfeiture as part of the judgment at sentencing, the Court asked the parties how they wished to proceed. Sentencing Tr. at 24:5. Both sides agreed that the Court should enter the government's proposed preliminary order of forfeiture with the understanding that, if the defense did agree to "the government number," the parties would "alert the Court that the preliminary order [could] be converted to a final order." Sentencing Tr. at 24:6–17; *see* Sentencing Tr. at 72:6–20. Otherwise, the defense could request either "a revised proposed forfeiture *figure*," or a hearing, pursuant to Rule 32.2(b)(1)(B) of the Federal Rules of Criminal Procedure, on the amount of the forfeiture. Sentencing Tr. at 72:16 (emphasis added); *see* Sentencing Tr. at 24:6–17; 72:6–20.

On the consent of both parties, the Court issued the Preliminary Order of Forfeiture/Money Judgment [ECF No. 887 ("POF")]. It provides that the government is entitled to a money judgment of $13,503,176.20. The Court gave the parties 30 days to confer about the amount of the forfeiture and either "consent to the calculation of that amount," or request an amended money judgment or a hearing on the appropriate forfeiture amount. Sentencing Tr. at 92:7–16; 97:22–98:4.

### C. The Post-Sentencing Process

After the sentencing, Dr. Fishman hired his third set of lawyers, and delays ensued. After requesting and receiving more time to object to the forfeiture, new counsel, Mr. Kessler, submitted a brief that did not address the correct amount of any forfeiture but, instead, argued only that any

forfeiture is unlawful in this case [ECF Nos. 904, 905, 923, 932 ("Def. First Brief")].   The government responded that forfeiture is both lawful and mandatory in this case and argued that, since the defense failed to "meaningfully contest that the forfeiture amount of $13,503,176.20 properly reflects the value of the adulterated and misbranded drugs the defendant dissipated during the course of the conspiracy," the POF "should be left undisturbed" [ECF No. 936 ("Gov. First Brief") at 1 & n.1].   Mr. Kessler asked for more time to file a reply brief, which the Court granted [ECF Nos. 938, 939].   None of the original briefing, from either side, addressed in any detail the correct amount of forfeiture.

The Court then scheduled a hearing, which the Court repeatedly delayed to accommodate the defense [ECF Nos. 950, 951, 960, 971, 979, 980, 993, 1013, 1016, 1017, 1025].   After Mr. Kessler's first request to adjourn the hearing, the Court directed the parties to appear for a videoconference on October 24, 2022 [ECF No. 951].   During the conference on October 24, 2022, all parties agreed that the Court would hold a hearing on the forfeiture, at which the Court would hear both: (1) argument on whether the applicable statutes provide for forfeiture at all; and (2) evidence on the correct amount of any forfeiture [ECF No. 957 ("October 24, 2022 Status Conference Tr.")].   Mr. Kessler repeatedly assured the Court that the defense consented to this process, and that he was waiving any objection based on the delays in resolving this aspect of Dr. Fishman's sentence.

The Court rescheduled the forfeiture hearing for November 10, 2022, but, thereafter, the Court again adjourned the forfeiture hearing to accommodate the defense [ECF No. 960].   Then, after the Court set the hearing for December 1, 2022 [ECF No. 965], Mr. Kessler informed the Court that the hearing could not go forward because the Bureau of Prisons had not provided Dr.

Fishman with all relevant documents [ECF Nos. 971, 979, 980].  The Court again adjourned the forfeiture hearing until January 6, 2023 [ECF No. 993].

The defense again said it could not be ready [ECF No. 1013].  The government filed an opposition to adjourning the hearing [ECF No. 1016].  The Court, once again, granted the defense request to adjourn [ECF No. 1017].  But the Court held a status conference on January 6, 2023 to "discuss the process going forward" [ECF Nos. 1017, 1038].  At that conference, the Court made clear to the parties that it would not accept further delays.

The Court scheduled the forfeiture hearing to take place on March 6, 2023 [ECF No. 1025]. Both sides agreed that they would offer testimony only by affidavit or declaration, as well as exhibits and oral arguments.  On the eve of the March 2023 hearing, both sides submitted not only the testimony and exhibits they sought to offer, but also substantial new briefing on the parties' many disputes related to the forfeiture [ECF No. 1063, 1064].

### D.  The March 2023 Forfeiture Hearing

The government initially submitted, via email to Chambers, the declaration of John Rubino, a forensic accountant with the Federal Bureau of Investigation, together with several exhibits.  Mr. Rubino's declaration makes clear that his calculation of the forfeiture amount reflected the gross income of Equestology, based primarily on bank deposits, along with invoices issued by Equestology that were not already reflected in the bank deposits.  *See* Rubino Decl. ¶¶ 9–15, 17. In his declaration, Mr. Rubino represented that he generally did not "deduct from [his] calculations charges for non-drug items, such as syringes" and, with certain exceptions, his calculations were not based on "itemized charges."  Rubino Decl. ¶ 8.  In this initial pre-hearing submission, the government requested entry of a final order of forfeiture and money judgment in the amount of $15,640,130.56 (more than $2 million higher than the POF).

The defense then submitted, via email to Chambers, the Declaration of Dr. Fishman and numerous exhibits, including voluminous, detailed, newly-produced records of Equestology sales from the Avimark system that had been referenced at Ms. Giannelli's trial. The defense divided the sales data into different categories of products, including "Antibiotics," "Bleeding and Breathing" products, "Bloodwork" screenings and tubes, "Fluids," "Needles and Syringes," "Ointments and Creams," and "Vitamins and Blood Builders." The defense also prepared summary charts of the approximate value of the sales from each of these categories between 2009 and 2019. While the defense did not propose a forfeiture amount, its evidence purports to demonstrate that the vast majority of Equestology's income did not come from sales of adulterated and misbranded drugs.

Then, on March 5, 2023, the government filed a lengthy letter and exhibits in response to the defense evidence [ECF No. 1063]. The government protested that the defense had not shared the (5,000 pages of) Avimark data with the government until March 2, 2023—a mere four days (including a weekend) before the hearing, which had been adjourned so many times at the request of the defense. Nevertheless, in the time it had to review the defense evidence, the government concluded that the vast majority of the items in the Avimark data were adulterated and misbranded drugs. The government revised its forfeiture request slightly downward to $14,516,712.25.

Then, on the evening of March 5, 2023, the evening before the forfeiture hearing, the defense filed a lengthy letter—tantamount to a second brief—explaining, for the first time, its arguments about the appropriate amount of any forfeiture [ECF No. 1064 ("Def. Second Brief")]. Defense counsel argued that the government is not entitled "to forfeit the gross proceeds" of Equestology, but rather must meet its burden to "prove the amount of funds that Dr. Fishman received from the sale of misbranded or adulterated products." Def. Second Brief at 1, 4. The

defense explained that the Avimark data shows that Equestology billed for $11,489,667.50 in domestic sales from 2009 to 2019. *Id.* at 6. The defense argued that "resales of FDA-approved products" accounted for "more than $9.7 million" of total domestic sales and that such resales are not a basis for forfeiture. *Id.* at 5–6. The defense cited additional transactions that it described as involving non-drug items and "veterinary services, such as Blood Work." *Id.* at 6.

The defense also argued that the government is not entitled to forfeiture with respect to foreign sales. According to the defense, "[n]early $3 million of the amount sought to be forfeited is attributable to foreign sales." Def. Second Brief at 8. The government's evidence reflects at least $2.03 million in sales to the United Arab Emirates, and Dr. Fishman attests to $700,000 worth of additional sales to UAE customers. The defense contends that none of this income constitutes proceeds from sales of misbranded or adulterated products, citing the export exemption set forth in 21 U.S.C. § 381(e). The defense renewed its pre-trial argument that Dr. Fishman's foreign sales met these criteria.

The defense further argued that the government is not entitled to forfeit $2,283,036.83 held in a trust account in Panama. According to the defense, the account belonged to a business called Equine Performance; Dr. Fishman "held only a small percentage share" of the company; the products sold by Equine Performance were made in Australia and at least half of the products were sold abroad; and the government has not proven the Equine Performance products were adulterated or misbranded. Def. Second Brief at 9; *see* Fishman Decl. ¶ 52; SGX-2000. For all of these reasons, the defense contends that the government failed to meet its burden to forfeit the $2,283,036.83 in the Panamanian trust account.

The Court held the forfeiture hearing on March 6, 2023 [ECF No. 1075 ("Forfeiture Tr.")]. Both sides confirmed on the record at the hearing that they consented to the Court holding the

evidentiary hearing, "to the timing of the hearing," and "to the Court's authority to amend the preliminary order of forfeiture" after the hearing. Forfeiture Tr. at 5:10–6:10. The Court admitted the declarations and exhibits offered by both sides without objection. Neither side requested the opportunity to cross-examine the opposing side's declarants.

The government again protested that it had received the Avimark data for the first time only four days before the hearing, including a weekend. *See* Forfeiture Tr. at 38:11–12, 40:12–41:20. The government went on to argue that, based on its review of the Avimark data, whether the Court uses the gross income of Equestology, or the Avimark revenue, together with sales to Mr. Navarro, foreign sales, and the Panamanian trust account, the Court would find a similar total forfeiture amount. *See* Forfeiture Tr. at 50:3–55:1 ("we end up at roughly the same number").

Mr. Kessler principally argued that no forfeiture is permissible in this case. Forfeiture Tr. at 64:13–14 ("There is no statute here that permits forfeiture, period. There is no caveat to it."), 65–74. He also reiterated the arguments laid out in the brief he filed the evening before the hearing. For example, he argued that sales of vitamin C are not a basis for forfeiture because vitamin C is not a new animal drug. Forfeiture Tr. at 83:20–84:1.

Mr. Kessler further argued that any forfeiture must be limited to Equestology's domestic sales. He argued that "all the foreign sales [by Equestology] are exempt." Forfeiture Tr. at 92:16–17. He also argued that the government failed to offer evidence "to distinguish anything about the funds" in the Panamanian trust account "in the name of Equine Performance," which "is an Australian company" that "made products in Australia," and sold most of its product "to countries other than the United States." Forfeiture Tr. at 97:16–24. Further, since the government offered "no documentation to demonstrate what was sold in the United States" by Equine Performance, there is no way to distinguish what "was an adulterated product," or "if there are any medical

16

devices or items that fall outside the categories of" forfeitable property.  Forfeiture Tr. at 98:1–4.

Moreover, Dr. Fishman attested in his declaration that his "interest in Equine Performance ended

in 2014."  Forfeiture Tr. at 97:12–13.

### E.  The Government Supplements the Record.

Several weeks after the hearing, the government submitted additional evidence to establish

that the domestic sales documented in the Avimark system overwhelmingly were, indeed, sales of

adulterated and misbranded drugs [ECF No. 1079].  In particular, the government's supplemental

evidence showed that what the defense had characterized as benign resales of FDA-approved

products were sales of prescription drugs.  Similarly, what the defense had characterized as mere

vitamins were, in fact, injectables that required prescriptions.  What the defense had characterized

as non-drug creams and ointments were likewise prescription medications.  Based on its thorough

review of the Avimark data, and taking true non-drug sales into account, the government contends

the appropriate forfeiture amount is $15,564,406.53.  The defense responded that the government's

post-hearing evidence should be rejected as untimely [ECF No. 1081].

## II.      LEGAL STANDARD

The purpose of forfeiture is to deprive criminals of the fruits of their illegal acts.  *United*

*States v. McIntosh*, 58 F.4th 606, 610 (2d Cir. 2023).  Once a criminal defendant is convicted of

an offense that is punishable by forfeiture, the district court "must determine what property is

subject to forfeiture under the applicable statute."  Fed. R. Crim. P. 32.2(b)(1)(A).  The "court's

determination may be based on evidence already in the record . . . and on any additional evidence

or information submitted by the parties and accepted by the court as relevant and reliable."  Fed.

R. Crim. P. 32.2(b)(1)(B).  "If the forfeiture is contested, on either party's request the court must conduct a hearing after the verdict or finding of guilty."  *Id.*

The government has the burden of proof.  That said, since criminal forfeiture is "part of the sentencing process, the government need prove facts supporting forfeiture only by a preponderance of the evidence."  *United States v. Gaskin*, 364 F.3d 438, 461 (2d Cir. 2004).  Moreover, courts "need not" determine "the loss with precision but rather need only make a reasonable estimate of the loss, given the available information."  *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011) (citing *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009)).

### III.   DISCUSSION

The government has authority to forfeit adulterated and misbranded drugs, and the Court has authority to impose a money judgment representing the approximate value of adulterated and misbranded drugs that Dr. Fishman caused to be sold or otherwise dissipated.  Contrary to the assertions of defense counsel, the legal basis for forfeiture in this case is not a close question.  As explained below, the Court finds that the government has carried its burden to with respect to forfeiture in the amount of $10,235,230.90.

Before explaining its findings with respect to the amount of the forfeiture, the Court must address a number of issues.  First, the Court explains that Dr. Fishman arguably waived or forfeited the opportunity to object that forfeiture is unlawful in this case.  Second, the Court explains that the defense is simply wrong, at every stage, in its arguments that forfeiture is unlawful.  Third, the Court explains, for the avoidance of doubt, that the Court has authority to correct the forfeiture order at this stage of the case.  Fourth, the Court explains that it accepts and considers the evidence the government submitted after the forfeiture hearing.

Turning to the correct amount of the forfeiture, the Court explains that a preponderance of the evidence from the trial and the forfeiture hearing shows that, during the period of the two conspiracies, Dr. Fishman caused approximately $10,312,627.40 worth of adulterated and misbranded drugs to be dissipated through his company Equestology and, separately, to Jorge Navarro.  In particular, the Court explains that its careful review of the Avimark data submitted by the defense and the government's supplemental evidence about the Avimark data confirms that the vast majority of Equestology's $11,489,667.50 in domestic sales from 2009 to 2019 were sales of adulterated and misbranded drugs.  The Court then factors in the sales to Mr. Navarro.  Finally, the Court explains that the government failed to carry its burdens respect to foreign sales and the deposits into a Panamanian account.

**A.  The Defense Waived or Forfeited the Objection that Forfeiture is Unlawful.**

The Second Circuit has explained that waiver of an objection is strategic or otherwise intentional, while forfeiture of an objection is an oversight.  *See United States v. Spruill*, 808 F.3d 585, 596 (2d Cir. 2015).  In general, a defendant must raise objections in advance of or at the time of his sentencing.  If a defendant has an opportunity to object to an aspect of sentencing but fails timely to do so, he generally has waived or forfeited the objection.  *See Greer v. United States*, —– U.S. ——, 141 S. Ct. 2090, 2096 (2021) (in the context of appellate review).  A district court has "discretion" to "deem a party to have forfeited any objection to the PSR by its failure to file a timely objection or to show good cause for a late filing."  *United States v. Young*, 140 F.3d 453, 457 (2d Cir. 1998).  Moreover, the Federal Rules of Criminal Procedure allow only "14 days after sentencing" to correct even "clear error."  Fed. R. Crim. P. 35(a).

Dr. Fishman had ample notice of the government's intention to seek forfeiture and ample opportunity in advance of his sentencing to object that forfeiture is unlawful in this case.  The

Indictment contained forfeiture allegations [ECF No. 283 ("S6")]. It alleges that, for the offenses charged in Count One and Count Two, Dr. Fishman "shall forfeit to the United States," pursuant to Title 21, United States Code, Section 334, Title 28, United States Code, Section 2461, and Title 21, United States Code, Section 853(p), "any and all drugs that were adulterated and misbranded" in interstate commerce or "a sum of money" representing the value of such adulterated and misbranded drugs. S6 ¶¶ 66, 68. In a motion to dismiss, Dr. Fishman attacked the Indictment on several grounds, but he did not suggest—as he now argues—that the statutes cited in the forfeiture allegations of the Indictment do not authorize forfeiture [ECF No. 327].

As the Court explained in detail above, the PSR repeatedly stated that Dr. Fishman should be sentenced to forfeiture in the amount of $13,503,176.20 for his two conspiracy convictions. *See* PSR ¶ 181; PSR at 37, 39 (forfeiture is "mandatory" in this case), 43. The government provided to the defense, in advance of the sentencing, its proposed preliminary order of forfeiture and "the underlying records that formed its calculation." Sentencing Tr. at 18:1–10; Sentencing Tr. at 19:22–24. But Dr. Fishman did not object to the forfeiture findings in the PSR [ECF No. 888], or inform the government or the Court at any point in advance of the sentencing that the defense had any reservations about forfeiture. *See* Sentencing Tr. at 19:10–21.

The failure of defense counsel to object to forfeiture in advance of the sentencing was not for lack of opportunity. The Court adjourned Dr. Fishman's sentencing several times at the request of the defense, and defense counsel expressly represented that he had adequate time to prepare his sentencing submission by the final deadline [ECF Nos. 816, 849, 853, 870]. The Court then relied on the "corrected" memorandum of law that defense counsel submitted approximately six days after the final deadline [ECF No. 888]. *See* Sentencing Tr. at 9:3–10:14. Dr. Fishman raised a

number of legal arguments in his sentencing submission but he did not argue, or even suggest, that forfeiture would be unlawful [ECF No. 888].

Even at Dr. Fishman's sentencing, the defense failed to object that forfeiture is unlawful in this case. The Court specifically asked defense counsel if they had any objections that were not raised in advance of the sentencing, and Mr. Sercarz said: "None by the defense, your Honor." Sentencing Tr. at 15:20. Only when the Court *sua sponte* questioned the government about the *amount* of the proposed forfeiture did the defense raise any objection, and, even then, the defense questioned only the *amount*, and not the fact, of forfeiture. The defense stated: "We're just not prepared to accept this *number* today." Sentencing Tr. at 19:8–9 (emphasis added). Mr. Sercarz described his concern only as a problem of "addition." Sentencing Tr. at 18:16; *accord* Sentencing Tr. at 18:21. Indeed, the parties anticipated coming to "an agreement post sentencing on the forfeiture figure." Sentencing Tr. at 20:7–9; Sentencing Tr. at 19:6–7.

As explained above, the Court accepted the parties' consensual proposal that the Court should enter the POF but should give the parties time after entry of the judgment to confer about the amount of the forfeiture and either "consent to the calculation of that amount," or request an amended money judgment, or request a hearing on the correct amount of the forfeiture. Sentencing Tr. at 92:7–16; 97:22–98:4. The parties' proposal clearly implies that, at the time of Dr. Fishman's sentencing, the defense accepted that there would be a sentence of forfeiture, although the defense might (or might not) object to the amount in the POF. Thus, the Court's acceptance of the parties' proposal was not an invitation for the defense to raise, for the first time after the sentencing, a new argument that forfeiture is entirely unlawful in this case.

Furthermore, the defense has not shown good cause for failing to object to the legality of forfeiture until after the sentencing. *See Young*, 140 F.3d at 457. The defense has been on notice

of the governing law since the Indictment.  The only thing that changed was defense counsel.  By failing to argue at or before Dr. Fishman's sentencing that any sentence of forfeiture would be unlawful, the defense waived or, at a minimum, forfeited this objection.  In any event, however, as set forth below, the Court will rule on the merits of the defense's untimely objection to the imposition of any forfeiture.  It is without merit.

### B.  There Is Clear Legal Authority for Forfeiture.

As stated above, at the time of Dr. Fishman's sentencing, the Court issued, on the consent of both parties, the Preliminary Order of Forfeiture/Money Judgment [ECF No. 887 ("POF")]. The POF provides that, pursuant to Title 21, United States Code, Section 334, and Title 28, United States Code, Section 2461(c), Dr. Fishman must forfeit sums of money representing the "Forfeitable Property"—defined as drugs that were adulterated and misbranded by Dr. Fishman and introduced into interstate commerce—from each of the conspiracies of which he was convicted.  The POF includes a finding that the Forfeitable property "cannot be located upon the exercise of due diligence . . . as a result of acts and/or omissions" of Dr. Fishman (*i.e.*, the drugs were sold or otherwise dissipated).  The POF provides that $13,438,313.20 represents the value of the Forfeitable Property from the Equestology conspiracy and $64,862 represents the value of the Forfeitable Property for the Navarro conspiracy, and, therefore, the government is entitled to a money judgment of $13,503,176.20.

In the initial brief the defense filed after the sentencing, the defense argues, for the very first time, that the relevant statutes do not authorize any such order of forfeiture and money judgment.  As discussed below, there are three relevant statutes, each of which is cited in the Indictment and the POF.  The first statute is 21 U.S.C. § 334.  In a section entitled "Seizures," the statute provides: "Any article of food, drug, or cosmetic that is adulterated or misbranded . . . in

interstate commerce. . . shall be liable to be proceeded against . . . and condemned."  21 U.S.C. §

334(a)(1).  As discussed below, this is a civil forfeiture provision.  The second relevant statute is

28 U.S.C. § 2461(c).  That statute provides for criminal forfeiture wherever civil forfeiture is

authorized and provides that the "procedures in" another statute, 21 U.S.C. § 853, shall govern the

"criminal forfeiture proceeding."  28 U.S.C. § 2461(c).  Thus, the third relevant statute is 21 U.S.C.

§ 853.  That statute provides, in a subsection entitled "Forfeiture of substitute property," that if

forfeitable property "cannot be located upon the exercise of due diligence . . . as a result of any act

or omission of the defendant," "the court shall order the forfeiture of any other property of the

defendant, up to the value of" the forfeitable property.  21 U.S.C. § 853(p).  In other words, it

authorizes a money judgment.

The defense first argues that 21 U.S.C. § 334 does not authorize forfeiture.  *See* Def. First

Brief at 5–6.  The defense then argues that, because 21 U.S.C. § 334 is not a forfeiture statute, 28

U.S.C. § 2461(c) and 21 U.S.C. § 853 do not apply.  *See* Def. First Brief at 10, 11–14.  The defense

is clearly wrong.

### 1.  21 U.S.C. § 334 Authorizes Forfeiture, According to the Second Circuit.

Dr. Fishman's counsel asserts: "Misbranding is not a forfeiture crime."  Def. First Brief at

5.  Specifically, he argues, without authority, that "21 U.S.C. § 334 is not a forfeiture statute."

Def. First Brief at 5.  It is true, as Dr. Fishman points out, that the statute does not use the word

forfeiture.  *See* Def. First Brief at 5; 21 U.S.C. § 334.  The statute instead uses the terms "seizure"

and "condemnation."  21 U.S.C. § 334(a)(1).  However, Dr. Fishman is wrong to insist, in the face

of contrary authority, that 21 U.S.C. § 334 does not authorize forfeiture.

The Second Circuit has made clear that 21 U.S.C. § 334 provides for forfeiture.  *See United*

*States v. Eight Unlabeled Cases, more or less, of an Article of Cosmetics.*, 888 F.2d 945, 949 (2d

Cir. 1989) (holding that adulterated cosmetics were "forfeitable pursuant to 21 U.S.C. § 334(a)"

because they were adulterated under the FDCA); *see also Lee v. Thornton*, 538 F.2d 27, 32 (2d

Cir. 1976) (using the terms "condemnation" and "forfeiture" interchangeably); *United States v. 52*

*Drums Maple Syrup*, 110 F.2d 914, 915 (2d Cir. 1940) (referring to "the government's right to

forfeit" adulterated syrup).  Other federal courts of appeals have likewise explained that 21 U.S.C.

§ 334 authorizes forfeiture.  *See, e.g.*, *United States v. Undetermined Quantities of All Articles of*

*Finished & In-Process Foods*, 936 F.3d 1341, 1351 (11th Cir. 2019) ("The governing statute [21

U.S.C. § 334(a)(1)] provides notice that unapproved food additives are subject to forfeiture."));

*United States v. Kanasco, Ltd.*, 123 F.3d 209, 210–11 (4th Cir. 1997) ("Adulterated drugs are

subject to forfeiture under 21 U.S.C.A. § 334(a)(1)."); *United States v. Two Units, More or Less,*

*of an Article or Device, Consisting of a Power Unit & a Chair*, 49 F.3d 479, 482 (9th Cir. 1995)

(ruling that "[m]isbranded medical devices are subject to forfeiture" and citing 21 U.S.C. § 334);

*United States v. Articles of Drug for Veterinary Use*, 50 F.3d 497, 499 n.2 (8th Cir. 1995) (noting

that "adulterated drugs are subject to forfeiture" and citing 21 U.S.C. § 334).

Indeed, Dr. Fishman quotes in his own brief from an Eleventh Circuit opinion discussing

"forfeiture" under 21 U.S.C. § 334(a)(1).  Def. First Brief at 5 (quoting *United States v.*

*Undetermined Quantities of All Articles of Finished & In-Process Foods*, 936 F.3d at 1344).

Nevertheless, Dr. Fishman tries to distinguish "seizure" and "condemnation" under 21 U.S.C. §

334 from forfeiture.  He argues that the purpose of "seizure" and "condemnation" is to protect the

public, in contrast with forfeiture whose purpose is to punish the defendant.  This speculation about

purpose is immaterial in the face of Second Circuit precedent holding that offending products are

"forfeitable pursuant to 21 U.S.C. § 334(a)."  *United States v. Eight Unlabeled Cases, more or*

*less, of an Article of Cosmetics.*, 888 F.2d at 949.  Moreover, even while insisting that forfeiture is

24

different from condemnation, the defense admits the government lawfully could seek "forfeiture" of the drugs that were adulterated or misbranded by the defendant, instead of the money the government seeks.  Def. First Brief at 4.

### 2.   There Is No Question that 21 U.S.C. § 853 Authorizes a Money Judgment.

Given that 21 U.S.C. § 334 authorizes forfeiture, the defense argument collapses.  Stripped of bluster about legislative purpose, the defense's only argument about 28 U.S.C. § 2461(c) is that the statute does not apply to this case because 21 U.S.C. § 334 does not authorize forfeiture.  Since, as the Second Circuit has recognized, 21 U.S.C. § 334 does authorize forfeiture, 28 U.S.C. § 2461(c) applies to this case.

Section 2461(c) authorizes a court to impose criminal forfeiture wherever civil forfeiture (such as forfeiture under 21 U.S.C. § 334) is authorized.  Thus, the Court clearly can impose criminal forfeiture for adulterated and misbranded drugs.  Moreover, Section 2461(c) instructs the Court to follow the procedures in 21 U.S.C. § 853.

The defense goes on at length arguing that Section 853 does not permit a money judgment in this case because a particular provision, Section 853(p), refers back to the definition of forfeitable property in Section 853(a), and, the defense stresses, adulterated or misbranded drugs do not meet the definition of forfeitable property in 853(a).  But 21 U.S.C. § 853 is part of the Controlled Substance Act.  Thus, it defines forfeitable property in terms of violations of the Controlled Substance Act.  That makes no difference, since 28 U.S.C. § 2461(c) instructs the Court to impose forfeiture using the "procedures" described in 21 U.S.C. § 853.  One of those procedures is the forfeiture of substitute property, including money, where the forfeitable property has been dissipated by the defendant.  There is no question that 21 U.S.C. § 853(p) allows the Court to impose a money judgment as forfeiture for adulterated and misbranded drugs that the government

cannot reasonably find and seize because Dr. Fishman sold or otherwise distributed them to clients far and wide.

### C. For the Avoidance of Doubt, the Court May Conduct a Post-Sentencing Evidentiary Hearing and, Thereafter, Amend the Order of Forfeiture.

As laid out in detail above, at Dr. Fishman's sentencing, both sides agreed—indeed, both sides proposed—that the Court should sentence Dr. Fishman, enter the government's proposed preliminary of forfeiture, and then hold a post-sentencing evidentiary hearing on forfeiture if necessary.  *See* Sentencing Tr. at 19:4–6 (Mr. Sercarz: "My proposal"), 24:6–17 (Ms. Mortazavi: "I would suggest"), 72:6–20 (both sides agreeing).  Since Dr. Fishman's sentencing, both sides have represented that they do not object to the timing of the post-sentencing evidentiary hearing on forfeiture, which was delayed repeatedly to accommodate the defense, and do not contest the Court's authority to amend the forfeiture order thereafter.  *See* October 24, 2022 Status Conference Tr. at 14:24–16:12 (no defense objection); *see also* October 24, 2022 Status Conference Tr. at 11:19–12:22 (government arguing that it can introduce evidence not in the trial record at a post-sentencing forfeiture hearing and citing Rule 32.2(e) authority to amend the forfeiture order).  At the forfeiture hearing, both sides again confirmed on the record that they consented to the Court holding the hearing and later ruling on the correct amount of any forfeiture.  Forfeiture Tr. at 5:10–6:10.

For the avoidance of any doubt, the Court notes that there is authority for a district court to hold a post-sentencing evidentiary hearing on forfeiture and, thereafter, to enter an amended, final order of forfeiture.  *See United States v. Papas*, 715 F. App'x 88, 90 (2d Cir. 2018) ("Rule 32.2 therefore permits a district court to withhold judgment on the amount of forfeiture owed by a defendant pending post-sentencing briefing and/or argument from the parties."); *United States v. Akhavan*, No. 20-cr-188 (JSR), 2021 WL 3862123, at *2 (S.D.N.Y. Aug. 30, 2021), *vacated and*

*remanded on other grounds sub nom. United States v. Patterson*, 2022 WL 17825627 (2d Cir. Dec. 21, 2022) (ruling that parties had waived, by failing timely to raise, any objection to the court's authority to hold a "post-sentencing evidentiary hearing on forfeiture" and to change the forfeiture amount more than the 14 days allowed for correcting clear error after sentencing); *United States v. Vilar*, No. 05-cr- 621 (RJS), 2010 WL 3447222, at *4 (S.D.N.Y. Aug. 26, 2010) (ruling that the court had authority to correct the forfeiture when it made clear at the time of the sentencing that it intended to impose forfeiture and "consult[ed] with the parties about its planned procedure" at the time of sentencing); *see also United States v. McIntosh*, 58 F.4th 606, 611 (2d Cir. 2023) (under Rule 32.2, even a total failure timely to enter a preliminary order of forfeiture does not deprive the district court of the authority to impose forfeiture).

### D.  The Court Admits the Government's Supplemental Evidence.

Several weeks after the Court held the March 2023 hearing on forfeiture, the government filed evidence to supplement the record with respect to the Avimark data that was produced mere days before the forfeiture hearing [ECF No. 1079].  The government offered declarations to establish that items the defense had argued were not a basis for forfeiture were, in fact, adulterated and misbranded drugs.  The defense filed a response arguing that the government's evidence should be rejected as untimely [ECF No. 1081].

The Court grants the government's request to supplement the record with evidence about the nature of the products itemized in the Avimark data.  In general, the parties in criminal cases have reciprocal disclosure obligations.  *See* Fed. R. Crim. P. 16.  Months before the March 2023 forfeiture hearing, in December of 2022, the government "specifically asked for the defense to provide any materials on which they were basing [requested] deductions" from the government's proposed forfeiture.  Forfeiture Tr. at 40:18–20.  However, the government received the Avimark data, which spanned 5,000 pages, for the first time on March 2, 2023, the Thursday before the

Monday, March 6, 2023 hearing.  Forfeiture Tr. at 40:25–41:2.  The government clearly needed more than four days, including a weekend, to evaluate and respond to the voluminous Avimark data.  While not figuring into the Court's decision to admit the government's supplemental evidence, the Court also notes that it has permitted numerous delays and relied on several untimely submissions by the defense in connection with Dr. Fishman's sentencing and forfeiture.

More importantly, the Court must base its forfeiture determination on "evidence [and] information submitted by the parties" that the Court accepts "as relevant and reliable."  Fed. R. Crim. P. 32.2(b)(1)(B).  The defense urges to the Court to rely on the Avimark data to conclude that any forfeiture in this case must be "low," though "not zero."  Forfeiture Tr. at 90:23.  The Court finds, however, the "information" the defense provided about the nature of the items reflected in the Avimark data—in the form of descriptive summary charts—is not reliable.

Rather, the trial record and the government's supplemental evidence establish that defense treatment of the Avimark data is highly misleading.  For example, what the defense describes as mere resales of FDA-approved products are, in fact, sales of prescription medications for which there were no valid prescriptions.  What the defense categorizes as non-drug ointments and creams [SFX 1300] are prescription medications [ECF No. 1079, Ex. A ¶¶ 2(dd), 2(ee)].  As such, these were sales of adulterated and misbranded drugs that support forfeiture.

As discussed below, the Court does rely on the Avimark data because the Court agrees with the defense that the government may not forfeit the gross income of Equestology.  But the Court must rely on relevant and reliable information about that data.  The supplemental evidence the government provided after the hearing is essential for the Court's appropriate reliance on the Avimark data submitted by the defense.  The government's failure to submit the evidence before

28

the forfeiture hearing is excusable given the late disclosure of the Avimark data to the government

and the misleading characterizations of the data submitted by the defense.

**E.  The Government Carried its Burden To Show that Dr. Fishman Dissipated Approximately $10,312,627.40 worth of Adulterated and Misbranded Drugs.**

Pursuant to Rule 32.2(b) of the Federal Rules of Criminal Procedure, where the government

seeks criminal forfeiture, the Court "must determine what property is subject to forfeiture under

the applicable statute." Fed. R. Crim. P. 32.2(b)(1)(A).  The Court does not need to determine the

amount of the forfeiture "with precision but rather need only make a reasonable estimate . . . given

the available information." *Treacy*, 639 F.3d at 48.  That said, the Court must hold the government

to its burden of proof, which is a preponderance of the evidence. *Gaskin*, 364 F.3d at 461.  Indeed,

Rule 32.2(b) specifically instructs the Court to "determine whether the government has established

the requisite nexus between the property [it seeks to forfeit] and the offense" of conviction.  Fed.

R. Crim. P. 32.2(b)(1)(A).

The "applicable statute" is 21 U.S.C. § 334(a)(1).  It provides for forfeiture of drugs that

are "adulterated or misbranded" and are in "interstate commerce."  21 U.S.C. § 334(a)(1).  To

obtain a money judgment for the value of the forfeitable drugs, the Court must be able to find by

a preponderance of the evidence that Dr. Fishman sold, or otherwise dissipated, adulterated and

misbranded drugs worth that amount of money.  *See* 21 U.S.C. § 853(p).  Thus, in the light of the

governing law, the Court rejects proposition that the government is entitled to forfeit the gross

income of Equestology.  The gross income of Equestology is not a "reasonable estimate" of the

adulterated and misbranded drugs that Dr. Fishman caused to be sold or otherwise dissipated when

there is clear evidence, and, indeed, the government concedes, that Equestology derived some of its income from sales of products other than adulterated and misbranded drugs.[2]

As such, to determine the appropriate amount of forfeiture, the Court has "conduct[ed] a hearing," scrupulously reviewed the "evidence already in the [trial] record," and carefully reviewed "additional evidence [and] information submitted by the parties and accepted by the court as relevant and reliable."  Fed. R. Crim. P. 32.2(b)(1)(B).  In particular, as indicated above, the Court has painstakingly reviewed the Avimark data submitted by the defense, as well as the supplemental evidence about the items in the Avimark data submitted by the government after the hearing.  The Court has also carefully reviewed the evidence of invoices to Mr. Navarro, foreign sales, and deposits into the Panamanian account discussed below.

The Avimark data and supplemental evidence establish that Equestology sold or otherwise dissipated approximately $10,235,230.90 worth of adulterated and misbranded drugs between 2009 and 2019.  Specifically, the parties agree that the Avimark data reflect $11,489,667.50 in total sales.[3]  *See* Def. Second Brief at 6; Forfeiture Tr. at 52:4.  The question for the Court is which

---

[2] As the Court has observed on the record at prior proceedings in this case, the law of forfeiture generally "requires the defendant to forfeit only 'his interest in' the enterprise."  *Honeycutt v. United States*, 581 U.S. 443, 450 (2017) (quoting 21 U.S.C. § 853(a)(3)).  In particular, at Ms. Giannelli's sentencing, the Court, citing *Honeycutt*, ruled that Ms. Giannelli could not be held jointly and severally liable for the entire amount of forfeiture imposed on Dr. Fishman.  The Court notes that Dr. Fishman is in a different position from Ms. Giannelli because Equestology was his enterprise, while Ms. Giannelli was a salesperson.  Put another way, unlike Ms. Giannelli and the defendant in *Honeycutt*, Dr. Fishman had a "controlling interest" in the business.  *Honeycutt*, 581 U.S. at 446.  Further, while Ms. Giannelli earned only a percentage of her own sales and "did not stand to benefit personally" from Dr. Fishman's sales, Dr. Fishman made money from Ms. Giannelli's sales.  *Id.*  As such, the Court concludes that it is appropriate for purposes of the forfeiture calculation to hold Dr. Fishman responsible for all of Equestology's sales of misbranded and adulterated drugs, including the sales that Ms. Giannelli facilitated and logged into the Avimark system, even though it was not appropriate to hold Ms. Giannelli responsible for sales Dr. Fishman arranged with the assistance of other Equestology staff.

[3] The defense suggests that the Court should start its analysis with a slightly lower figure, $11,398,582.70, because Equestology did not actually receive payments for all of its sales.  But, as the Court has explained, the question is the value of the adulterated and misbranded drugs that Dr. Fishman dissipated such that they cannot be located and seized.  It does not matter that he failed to collect payment for a fraction of such forfeitable property.

of those sales were sales of adulterated and misbranded drugs. The answer, as it turns out, is the overwhelming majority of them.

The defense argues that $9.7 million must be deducted from the $11,489,667.50 because, according to the defense, Equestology sold "at least $9.7 million" in non-forfeitable (1) resales of FDA-approved products, (2) non-drug products in the nature of vitamins, ointments, and creams, and (3) non-drug products in the nature of needles and syringes. Def. Second Brief at 6. Upon closer examination, the Court finds that virtually all of the items the defense places in the first two categories are, in fact, adulterated and misbranded drugs.

First, as the Court indicated above, virtually all of the items the defense describes as resales of FDA-approved products are sales of prescription medications for which there were no valid prescriptions. Mr. Kessler's position appears to be that only drugs subject to forfeiture in this case are Dr. Fishman's custom PEDs, which were adulterated and misbranded because they were new animal drugs. Forfeiture Tr. at 84:20–21. That position is untenable. The applicable statute, 21 U.S.C. § 334(a)(1), provides for forfeiture of drugs that are "adulterated or misbranded," and, as the Court instructed the jury at the trial and explained at the outset of this opinion, drugs may be adulterated or misbranded in a number of ways, *see supra* at 3–5.

Crucially, drugs are adulterated or misbranded if they are prescription animal drugs that are dispensed without a valid prescription, and a veterinarian cannot issue a valid prescription in the absence of a *bona fide* veterinarian-client/patient relationship. *See* Trial Tr. [ECF No. 759] at 1306:16–1307:13. Mr. Kessler argued at the hearing that Equestology's sales of FDA-approved products were not a basis for forfeiture because they were "not mislabeled, or misbranded, or adulterated." Forfeiture Tr. at 84:21–25. But this argument completely ignores the law with respect to prescription animal drugs. As such, the Court pressed Mr. Kessler at the hearing on how

it should treat drugs that were "FDA approved but . . . require a prescription." Forfeiture Tr. at 85:2–6. Mr. Kessler's only response was that, according to Dr. Fishman, he "did examine the horses in his care when required" and had other veterinarians "working on his behalf." Forfeiture Tr. at 85:12–19. However, as the Court told Mr. Kessler at the forfeiture hearing, the question whether Dr. Fishman was practicing veterinary medicine and had any *bona fide* veterinarian-client/patient relationships during the relevant period was already litigated and decided against Dr. Fishman at his trial. *See* Trial Tr. [ECF No. 753] at 793:10–19; Trial Tr. [ECF No. 751] at 673:9–15, 670:1–3, 676:25–677:1, 677:4–6. Accordingly, the Court finds that all of Equestology's sales of prescription animal drugs are a basis for forfeiture. *See* 21 U.S.C. § 353(f).

The second category of items in the Avimark system that the defense contends the Court should deduct are what the defense describes as non-drug products in the nature of vitamins, ointments, and creams. Virtually all of these items likewise require prescriptions. At the hearing, Mr. Kessler scoffed, "Why is vitamin C a New Animal drug? . . . That is a rhetorical question for me." Forfeiture Tr. at 83:22–24. However, the vitamin C and other vitamins that Equestology sold were for administration via injection [ECF No. 1063, Ex. C; ECf No. 1079, Ex. A ¶ n]. It was established at the trial that any drug that must be administered via injection or nasogastric tube requires a prescription. *See* Trial Tr. [ECF No. 749] at 419:8–420:22. Indeed, the government submitted a photograph of the vitamin C Equestology sold, and the label clearly states: "Injectable Solution" and "CAUTION: Federal law restricts this drug to use by or on the order of a licensed veterinarian" [ECF No. 1063, Ex. C]. The ointments and creams the defense cites [SFX 1300] are likewise prescription medications [ECF No. 1079, Ex. A ¶¶ 2(dd), 2(ee)]. As such, these injectable and other prescription products are a basis for forfeiture. *See* 21 U.S.C. § 353(f).

The Avimark data demonstrates, however, that Equestology did sell products that do not meet the definition of adulterated and misbranded drugs for purposes of the forfeiture, including needles and syringes [SFX-1200]. Taking the Avimark data the defense submitted together with the government's supplemental evidence, the Court agrees with the government that the proper deduction for such products is $1,254,436.59 [ECF No. 1079 at 3].

The Avimark data shows that Equestology sold or otherwise dissipated approximately $10,235,230.90 worth of adulterated and misbranded drugs during the relevant period.

### 1. The Navarro Invoices

Dr. Fishman was convicted of two drug adulteration and misbranding conspiracies, the Equestology conspiracy and the Navarro conspiracy. The evidence at trial established that Dr. Fishman sold custom PEDs to Jorge Navarro, a highly successful thoroughbred racehorse trainer. Dr. Fishman's sales to Mr. Navarro are not reflected in the Avimark data because Ms. Giannelli did not facilitate those sales. Rather, Dr. Fishman had a direct relationship with Mr. Navarro. The government has provided evidence, in the form of invoices to Jorge Navarro and bank deposits that originated from "[Jorge Navarro] Racing," that Dr. Fishman sold approximately $77,396.50 worth of adulterated or misbranded drugs to Mr. Navarro.[4]  Rubino Decl. ¶ 19.

The defense does not appear to contest the evidence of Dr. Fishman's sales of custom PEDs to Mr. Navarro. Dr. Fishman does not address the sales to Mr. Navarro in his declaration, and defense counsel does not argue those particular sales involved any drugs that were not adulterated and misbranded or non-drug items. Given the evidence in the record about the nature of Dr.

---

[4] At the forfeiture hearing and in the letter the government submitted with its supplemental evidence after the hearing, the government incorrectly represented that it found evidence of "roughly $85,565" worth of sales to Mr. Navarro. Forfeiture Tr. at 52:18 [ECF No. 1079 at 3 & n (citing Rubino Decl. ¶ 19)]. That is an obvious error, according to the government's own evidence. Mr. Rubino explains in his declaration that adding up all of the invoices and deposits "associated with Jorge Navarro amounted to $85,565, however approximately $8,168.50 of that amount reflects an invoiced charge that is a duplicate of a bank deposit." Rubino Decl. ¶ 19. Thus, Mr. Rubino expressly attested that he found only "$77,396.50" worth of sales to Mr. Navarro. Rubino Decl. ¶ 19.

Fishman's relationship with Mr. Navarro, the Court has no reason to doubt that the sales to Mr. Navarro reflect only sales of adulterated and misbranded drugs.  As such, the Court finds that the government carried its burden to forfeit the $77,396.50 attributable to sales of adulterated and misbranded drugs to Mr. Navarro.

### 2.  The Government Failed To Carry its Burden To Prove the Panamanian Trust Account Is Forfeitable Property.

The government seeks to forfeit $2,283,036.83 deposited into a Panamanian trust account held in the name of an Australian company, Equine Performance, Inc.  At the trial, the government offered evidence of an audio recording in which Dr. Fishman references "setting up a Panamanian corporation" as a "shield" because the FDA has "no jurisdiction there" [GX 912-T].  *See* Trial Tr. [ECF No. 759] at 1210:19–24, 1277:9–17.  The government in its closing arguments characterized this phone call as evidence of Dr. Fishman's intent to defraud or mislead, as required for a felony conviction under 21 U.S.C. §§ 331 and 333.  *See* Trial Tr. [ECF No. 759] at 1210:19–24, 1277:9–17.  At this stage, the government's theory is that $2,283,036.83 deposited, over time, into the Equine Performance account in Panama is forfeitable property because Dr. Fishman created that account to "shield" his income from adulterated or misbranded drugs.  *See* Rubino Decl. ¶ 16; Forfeiture Tr. at 113:12–22.

The defense maintains that the government has not carried its burden to prove that the $2,283,036.83 is forfeitable property.  In the declaration of Dr. Fishman that the Court admitted, without objection, at the forfeiture hearing, Dr. Fishman attests that he was one partner in an Australian company named Equine Performance.  Fishman Decl. ¶ 52.  He further attests: "Equine Performance's products were made in Australia and more than 50 percent of those products were sold outside of the United States.  Of the less than 50 percent sold in the United States, my share of the income was a small percentage . . . between $200,000 and $400,000."  Fishman Decl. ¶ 52.

34

Moreover, he attests that his "involvement with Equine Performance ended in 2014." Fishman Decl. ¶ 52.

The defense offers documentary evidence in an effort to corroborate Dr. Fishman's explanation of the Panamanian account. Specifically, it offers a "Commission Agreement" dated June 18, 2008. SFX-2000. The Agreement provides that an Australian company named Nature Vet would pay Dr. Fishman "ten percent (10%) of gross sales" of the "formulae" Dr. Fishman developed "into a bank account nominated by Dr. Fishman." SFX-2000.

The government argues that the Court should "reject out of hand" Dr. Fishman's testimony, finding that he is not credible or reliable. Forfeiture Tr. at 104:14–16. The government asserts that, contrary to defense counsel's argument, the Panamanian account belonged to Dr. Fishman alone. Forfeiture Tr. at 114:13–16 ("He was the account holder of that account. He claims he has a partner, but he is the account holder. Again, based on the reliability issues of Seth Fishman, I don't believe that that should be credited."). The government points out that the Commission Agreement does not establish that gross sales would be deposited into a shared account and that Dr. Fishman would own a small percentage of that account; rather, the Commission Agreement suggests the 10% commission would be paid into "a bank account nominated by Dr. Fishman." SFX-2000; *see* Forfeiture Tr. at 114:5–9.

The Court will not "reject out of hand" Dr. Fishman's testimony. The government chose to consent to Dr. Fishman testifying by affidavit or declaration and waived its right to cross-examine him about his statements regarding the correct amount of the forfeiture [ECF No. 1030]. Moreover, while the government is correct that Dr. Fishman has not conclusively proven his explanation of the Panamanian account, Dr. Fishman has no burden of proof. The government has the burden. *See Gaskin*, 364 F.3d at 461.

To be sure, Dr. Fishman's comment about setting up a Panamanian corporation as a shield fairly raises suspicion. But the government has not offered the Court sufficient, specific evidence to find by a preponderance of the evidence that $2,283,036.83 deposited, over time, into an account held in the name of an Australian company is wholly attributable to Dr. Fishman's sales of adulterated or misbranded drugs. Without contrary evidence from the government, the Court will not simply disregard the defense evidence that some of the deposits into the Equine Performance account reflect sales of products made in Australia and sent to countries other than the United States. To the extent that is true, Dr. Fishman was correct that there is "no jurisdiction" to punish him for such sales [GX 912-T].

Crucially, as the defense has pointed out, the government has offered no evidence to enable the Court to distinguish deposits from sales of adulterated or misbranded drugs from possible sales of non-drug items. *See* Forfeiture Tr. at 98:1–4. Given that Dr. Fishman undoubtedly sold some non-drug items through Equestology, it is clearly possible that he sold some non-drug items through Equine Performance, if such a business truly existed. Indeed, Mr. Rubino attests that he deducted from his estimate of forfeitable property "approximately $426,622.08 in deposits" into the Panamanian account because those deposits "appeared to derive from sources unrelated to sales." Rubino Decl. ¶ 16. As such, the Court cannot uncritically accept the government's theory that the Equine Performance account existed solely to shield for income from sales of adulterated and misbranded drugs.

It may very well be that some, or even most, of the $2,283,036.83 the government seeks is forfeitable property. But the Court cannot guess. It must "make a reasonable estimate" based on reliable evidence. *Treacy*, 639 F.3d at 48. The government has failed to offer the Court sufficient information to approximate what subset of the deposits into the Panamanian account reflect Dr.

Fishman's sales of adulterated and misbranded drugs.  As such, the government has failed to meet its burden to forfeit any of the deposits into the Panamanian account.

### 3.   The Government Is Not Entitled To Forfeiture Based on the Foreign Sales.

The government seeks to forfeit nearly $3 million based on Dr. Fishman's sales overseas, principally to the UAE [ECF No. 1079 at 3].  Dr. Fishman maintains that these sales are exempt from the drug adulteration and misbranding law, citing 21 U.S.C. § 381(e).  The statute provides that a drug "shall not be deemed to be adulterated or misbranded" if it "(A) accords to the specifications of the foreign purchaser, (B) is not in conflict with the laws of the country to which it is intended for export, (C) is labeled on the outside of the shipping package that it is intended for export, and (D) is not sold or offered for sale in domestic commerce."  21 U.S.C. § 381(e).  Dr. Fishman attests that his foreign sales satisfied these criteria and offers supporting documentary evidence.  Fishman Decl. ¶¶ 39–50 [SFX 1901, SFX 1902].

As explained above, prior to trial, Dr. Fishman's then-counsel Messrs. Sercarz and Fernich filed motions *in limine* arguing that the government should not be permitted to introduce evidence of foreign sales because, the defense argued, those sales were lawful under the export exemption [ECF Nos. 571 at 5; ECF No. 599 at 10; ECF No. 625 at 2–3; *see* ECF No. 706 at 73:10–79:3]. The government, on the other hand, argued that Dr. Fishman should not be permitted to mention the export exemption at trial [ECF No. 572 at 35; ECF No. 598 at 4–8; ECF No. 626 at 5–6; ECF No. 706 at 76:23–24 ("we think that it is . . . prejudicial to bring up an affirmative defense that does not have any record support")].  The parties specifically debated whether the so-called export exemption is an affirmative defense.

In ruling on the motions *in limine*, the Court tentatively opined that "the export exemption is an affirmative defense" but did not issue a definitive ruling on that question [ECF No. 706 at

72:8–9, 78:11–79:8].  The Court ruled that if the government introduced evidence of foreign sales, Dr. Fishman could "offer evidence" that he complied with the export exemption [ECF No. 706 at 77:22–78:2].  At the trial, the government introduced evidence of Dr. Fishman's foreign sales, but the defense never raised the export exemption.

The defense now reprises its pre-trial argument about the export exemption in connection with the forfeiture.  Def. Second Brief at 8–9.  The parties continue to debate whether the export exemption is an affirmative defense, or the government must prove that Dr. Fishman's foreign sales did not comply with the criteria set forth in 21 U.S.C. § 381(e).  *See* Forfeiture Tr. at 103:6–7.  However, this time, the defense offers evidence of Dr. Fishman's compliance in support of its argument that foreign sales should not be included in any forfeiture.  *See* Fishman Decl. ¶¶ 39–50 [SFX 1901, SFX 1902].

In the Court's view, the export exemption is an affirmative defense.  The Second Circuit has not addressed this question.  However, at least one federal court of appeals has held that the export exemption is an affirmative defense.  *See United States v. Kanasco, Ltd.*, 123 F.3d 209, 211 (4th Cir. 1997) ("The burden of pleading and proving the applicability of § 381(e)(1) is on [the defendant]—the party that seeks the benefit of the exemption").  This holding is consistent with the overall statutory scheme and controlling precedent about the nature of affirmative defenses.  *See Patterson v. New York*, 432 U.S. 197, 201 (1977).

Dr. Fishman waived this defense for purposes of his conviction by failing at the trial to argue, let alone offer evidence, that Dr. Fishman complied with the export exemption.  Indeed, before the trial, Dr. Fishman's then-counsel conceded: "We have a burden . . . to present some evidence implicating the defense, raising the defense.  If we fail to present any evidence . . . then it's out of the case" [ECF No. 706 at 78:20].  At trial, the defense never argued to the jury that Dr.

Fishman had complied with the export exemption or offered any evidence, any point during at trial, to support a finding that his foreign sales met the criteria set forth in the statute.  Moreover, the defense never requested a jury instruction with respect to the export exemption, nor proposed a special verdict form requiring the jury to decide whether Dr. Fishman's foreign sales were exempt.  As such, any defense based on the export exemption was "out of the case" for purposes of deciding Dr. Fishman's guilt or innocence.

However, the defense waiver of the affirmative defense as to Dr. Fishman's guilt does not dispose of the export exemption as an issue for purposes of calculating the forfeiture in this case. In all events, the Court must make an evidence-based approximation of the property subject to forfeiture under the relevant statutes.  *See* Fed. R. Crim. P. 32.2(b)(1)(A).  And Section 381(e) is a relevant statute for the Court's determination of the amount of the forfeiture.

The government proved beyond a reasonable doubt that Dr. Fishman committed conspiracy to commit drug adulteration and misbranding with the intent to defraud or mislead through his company Equestology.  Nonetheless, the Court had an obligation to sort through the Avimark sales data to determine which sales violated relevant statutes.  The Court's obligation to sort through the relevant evidence to determine the forfeitable property likewise obtains with respect to the foreign sales, although the defense, rather than the government, bears the burden.

In general, a criminal defendant who asserts an affirmative defense must carry the burdens of production and persuasion.  *See Smith v. United States*, 568 U.S. 106, 112 (2013); *Patterson*, 432 U.S. at 201.  However, the defendant typically can meet his burden of proof with respect to the affirmative defense by a mere preponderance of evidence.  *See Smith*, 568 U.S. at 109; *Dixon v. United States*, 548 U.S. 1, 8 (2006); *Patterson*, 432 U.S. at 200.  Dr. Fishman has come forward with evidence that he satisfied the requirements of the export exemption.  *See* Fishman Decl. ¶¶

39–50 [SFX 1901, SFX 1902].  The government has not offered the Court adequate reasons to reject that evidence.  *See* Forfeiture Tr. at 102:7–104:17.

Specifically, Dr. Fishman attests that "[m]ost of the substances I exported accorded to the specifications of the foreign purchaser, were not in conflict with the laws of the country to which they were exported, were labeled on the outside of the shipping package that they were intended for export, and were not sold or offered for sale in domestic commerce."  Fishman Decl. ¶ 43.  In support of his declaration, Dr. Fishman offers what purports to be a September 2013 letter signed by the "Director of Presidential Camels Racing Research" for the United Arab Emirates that seeks customs clearance for a shipment of "medicines" from Equestology [SFX 1901].  The letter states that the items in the Equestology shipment will "be used solely for camels owned by his Highness Sheikh Khalifa bin Zayed al Nahyan," many items "have been customized" for his requirements, and "[t]here are no prohibited or dangerous substances in this shipment" [SFX 1901].  Dr. Fishman also submits what purport to be shipping labels he used that say "INTENDED FOR EXPORT" [SFX 1902].  Dr. Fishman attests that he earned "more than $1 million" solely from the customized "drinks" he exported for camel races, noting that "there is no camel racing here in the United States."  Fishman Decl. ¶¶ 43, 44.

The government responds, in substance, that Dr. Fishman's testimony is not credible and that, in any case, the evidence he submits does not conclusively prove that all of his foreign exports complied with all of the requirements of the export exemption.  *See* Forfeiture Tr. at 102:7–104:17. As discussed above, the government waived its opportunity to cross-examine Dr. Fishman on his assertions about the correct amount of the forfeiture.  Moreover, even if the export exemption is an affirmative defense, Dr. Fishman does not need to conclusively prove that all of his foreign exports complied with all of the requirements of the export exemption. *Cf. Smith*, 568 U.S. at 109.

40

Dr. Fishman has come forward with evidence that he complied.  The government has not come forward with any evidence in rebuttal.  As such, the Court is not satisfied that the government is entitled to forfeit $3 million based on foreign exports.

### IV.   CONCLUSION

For the reasons set forth above, the government has carried its burden to demonstrate that it is entitled to forfeiture and a money judgment in the amount of $10,312,627.40.  Thus, the Preliminary Order of Forfeiture/Money Judgment in the amount of $13,503,176.20 [ECF No. 887 ("POF")] is VACATED.  The Court will separately issue a final order of forfeiture and money judgment in the amount of $10,312,627.40.  The Clerk of Court is respectfully requested to terminate the motion at docket entry 1079.

**SO ORDERED.**

**Date:  July 7, 2023**
**New York, NY**

MARY KAY VYSKOCIL
United States District Judge